UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **KLEEN PRODUCTS LLC; R.P.R. ENTERPRISES, INC.; MIGHTY PAC, INC., FERRARO FOODS, INC.; FERRARO FOODS OF NORTH CAROLINA, LLC; DISTRIBUTORS PACKAGING GROUP, LLC; RHE HATCO, INC.; THULE, INC.; and CHANDLER PACKAGING, INC,** individually and on behalf of all those similarly situated, | Case No. 1:10-cv-05711<br><br>CLASS ACTION<br><br>**CONSOLIDATED AND AMENDED COMPLAINT FOR VIOLATION OF THE SHERMAN ACT**<br><br>**JURY TRIAL DEMAND** |
| **Plaintiff,** | |
| **v.** | |
| **PACKAGING CORPORATION OF AMERICA; INTERNATIONAL PAPER; CASCADES CANADA, INC; NORAMPAC HOLDINGS U.S. INC.; WEYERHAEUSER COMPANY; GEORGIA PACIFIC LLC; TEMPLE-INLAND INC.; TIN INC.; and SMURFIT-STONE CONTAINER CORPORATION** | |
| **Defendants.** | |

## Index

Nature of the Action.................................................................................................................3

Jurisdiction and Venue............................................................................................................5

Parties......................................................................................................................................6

Co-Conspirators.....................................................................................................................11

Class Action Allegations........................................................................................................11

Trade and Commerce..............................................................................................................13

      Containerboard Products..............................................................................................13

      The Structure of the Containerboard Industry .............................................................14

      Industry and Trade Association Membership ..............................................................19

      History of Anticompetitive Conduct and Acts of Concealment ...........................................20

Violations Alleged .................................................................................................................22

2005........................................................................................................................................26

2006........................................................................................................................................32

2007........................................................................................................................................38

2008........................................................................................................................................40

2009........................................................................................................................................45

2010........................................................................................................................................47

Active Concealment................................................................................................................57

Antitrust Impact and Damages...............................................................................................57

Claim for Relief .....................................................................................................................58

Prayer .....................................................................................................................................59

Jury Trial Demand .................................................................................................................61

CONSOLIDATED AMENDED COMPLAINT

Plaintiffs Kleen Products LLC; R.P.R. Enterprises, Inc.; Mighty Pac, Inc.; Ferraro Foods, Inc.; Ferraro Foods of North Carolina, LLC; Distributors Packaging Group, LLC; RHE Hatco, Inc.; Thule, Inc. and Chandler Packaging Group, Inc. individually and on behalf of a class of all those similarly situated, bring this action for treble damages under the antitrust laws of the United States against Defendants, and demand a trial by jury.

## NATURE OF THE ACTION

1.      This case is an antitrust class action brought to recover for the injuries sustained by Plaintiffs and the members of the Plaintiff Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and seeks treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and Rule 23 of the Federal Rules of Civil Procedure.  The Plaintiff Class, defined more fully below in Paragraph 28, consists of all persons and entities that purchased Containerboard Products directly from Defendants between August 2005 and the present (the "Class Period").

2.      Containerboard, which includes both linerboard and corrugating medium, is the principal raw material used to manufacture corrugated products such as boxes and other types of corrugated containers.  Linerboard is used as the facing to which corrugating medium is fluted and laminated to produce sheets.  The containerboard sheets are subsequently printed, cut, folded and glued to produce corrugated products.  As used herein, "Containerboard Products" includes linerboard, corrugated medium, corrugated sheets and corrugated products, including boxes and other containers.  Defendants are integrated producers of the Containerboard Products sold to the Plaintiff Class.

3.      Various Containerboard Products manufacturers, including multiple Defendants herein and their predecessors, have been subject to governmental investigations and civil lawsuits concerning their engagement in anticompetitive conduct over the past two decades.  The Containerboard Products industry is highly susceptible to collusive behavior and anticompetitive conduct due to a small number of manufacturers, inelastic product demand, the commodity-like

nature of the products, and an inability of any single manufacturer to unilaterally control supply and price.

4.     The consolidation of the containerboard industry has further concentrated the industry and exacerbate the conditions that led to the anticompetitive conduct at issue in this complaint.

5.     Defendants employ various acts and practices to facilitate the combination or conspiracy alleged herein.  Defendants' opportunities and ability to engage in anticompetitive practices are also fostered through the frequent meetings and events held by industry trade organizations led by officers and/or board members who simultaneously serve as the Defendants' employees.

6.     Beginning in 2005, the Containerboard Products industry was faced with decreasing profit margins, rising product demand, and a promising macroeconomic outlook. Nevertheless, Defendants began a coordinated across-the-board imposition of capacity restraints, leading to a subsequent restriction in the supply of Containerboard Products on the market.  The goal of the conspiracy was to fix, raise, maintain and stabilize the price at which Containerboard Products were sold during the Class Period.  Defendants' conspiracy included a scheme to impose capacity constraints which had the effect of creating an artificial shortage of Containerboard Products in the United States during a time of stable or increasing demand, thereby allowing Defendants to charge supra-competitive prices to the Plaintiff Class.  As detailed below, the conspiracy was effected, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in massive and unprecedented idling of production capacity, reduced production and near simultaneous across-the-board price increases.

7.     Defendants' anticompetitive conduct cannot be explained away as independent parallel behavior.  As multiple Defendants confirm in their own quarterly reports, market demand for Containerboard Products remained stable or was expected to increase during the period of coordinated production capacity restriction.  Similarly, no significant lasting changes in production costs account for the Defendants' repeated price increases.  In fact, during the Class

CONSOLIDATED AMENDED COMPLAINT

Period, price increases outpaced cost increases by over fifty percent (50%). Although basic economics holds that manufacturers in a competitive market faced with similar demand conditions as evidenced here would be expected to increase production to satisfy market demand and gain market share, each Defendant refrained. In sum, Defendants' conduct, individually and collectively, evidences a restriction of freedom and sense of obligation associated with an agreement.

8. The market impacts of Defendants' scheme on the Plaintiff Class have been, and continue to be, substantial. As a result of Defendants' market domination and their coordinated restriction of production and operations capacity, direct purchasers of Containerboard Products were forced to pay substantially higher prices during the conspiracy period than they would have paid in a competitive market.

9. Giving a voice to those impacted by Defendants' coordinated actions, on July 13, 2010, the Association of Independent Corrugated Converters ("AAIC") published an article entitled "*3rd Containerboard Increase puts the Integrity of Our Industry on the Line*." The article notes that in light of the manufacturing capacity cuts, as well as the absence of cost drivers, yet another price increase, the third for 2010, beyond already historic highs "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies" and noted the similarity of the present situation to "the years 1994-1995, [when] six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak" which resulted in allegations of collusion, government investigations, a consent decree and over $200 million paid in settlements.

## JURISDICTION AND VENUE

10. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Plaintiff Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations.

CONSOLIDATED AMENDED COMPLAINT

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

12.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

13.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## PARTIES

14.     During the Class Period, each of the Plaintiffs purchased Containerboard Products directly from one or more of the Defendants and thereby suffered injury to their business or property:

    a.  Plaintiff Kleen Products LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Minnetonka, Minnesota;

    b.  Plaintiff R.P.R. Enterprises, Inc. is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business in Kansas City, Missouri;

    c.  Plaintiff Mighty Pac, Inc. is a corporation organized and existing under the laws of the State of an Illinois, with its principal place of business in Palatine, Illinois;

    d.  Plaintiff Ferraro Foods, Inc. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Piscataway, New Jersey;

CONSOLIDATED AMENDED COMPLAINT

e.  Plaintiff Ferraro Foods of North Carolina, LLC is a limited liability company organized and existing under the laws of the State of North Carolina, with its principal place of business in High Point, North Carolina;

f.  Plaintiff Distributors Packaging Group LLC is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business in Carrollton, Texas;

g.  Plaintiff Thule, Inc. is a corporation organized and existing under the laws of the State of Connecticut with its principal pace of business in Seymour, Connecticut;

h.  Plaintiff RHE Hatco, Inc. is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Garland, Texas; and,

i.  Plaintiff Chandler Packaging, Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Diego, California.

15.     Defendant Packaging Corporation of America ("PCA") is a Delaware corporation with its principal place of business in Lake Forest, Illinois.  During the Class Period, PCA and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

16.     Defendant International Paper ("International Paper") is a New York corporation with its principal place of business in Memphis, Tennessee.  During the Class Period, International Paper and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

17.     Defendant Norampac U.S. Holdings Inc. ("Norampac") is a Canadian corporation with its principal place of business in Saint-Bruno, Quebec, Canada.  Norampac Inc. was formed

in 1997 as a joint venture by Cascades Inc. ("Cascades Inc.") and Domtar Corporation and became a wholly-owned and controlled subsidiary division of Cascades Inc. and/or Cascades Canada Inc. in December 2006. Norampac Holdings US Inc. is a Delaware corporation with residency in Delaware. Norampac Industries Inc. is a New York Corporation with a place of business in Niagara Falls, New York and which lists it Principal Executive Office as "c/o Cascades Inc." in Montreal, Quebec, Canada. These and other businesses engaged in the Containerboard Products business using the Norampac name, as detailed below, and are collectively referred to hereafter as "Norampac". During the Class Period, Norampac and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates, including by and through its corporate parent, Cascades Canada, Inc., sold Containerboard Products in interstate commerce directly to purchasers in the United States. Norampac's (and Cascades Canada, Inc.) subsidiaries and divisions in Canada serviced customers in the United States by selling Containerboard Products directly to them as alleged above. Norampac's subsidiaries and divisions located in the United States including Norampac Industries, Inc. Lancaster Division in Lancaster, New York (corrugated packaging containers) and Niagara Falls Division in Niagara Falls, New York (corrugated medium); Norampac New England, Inc., Thompson Division in Thompson, Connecticut (corrugated packaging containers) and Leominster Division in Leominster, Massachusetts (corrugated products) Norampac New York City Inc., Maspeth, New York (corrugated products) and Norampac Schenectady Inc. (corrugated packaging) also sold Containerboard Products in interstate commerce directly to purchasers in the United States.

18. Defendant Cascades Canada Inc. ("Cascades") is a Canadian corporation with its principal place of business in Kingsley Falls, Quebec, Canada. Cascades describes Norampac as both a subsidiary and a division of Cascades and represents that its Containerboard Group conducts business under the name Norampac. Plaintiffs are informed and believe that Cascades uses the Norampac name or brand in connection with certain of its Containerboard Products businesses that are not owned, directly or indirectly, by Norampac. During the Class Period, Cascades and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates,

8

CONSOLIDATED AMENDED COMPLAINT

including, but not limited to Defendant Norampac, sold Containerboard Products in interstate commerce directly to purchasers in the United States.

19.     Defendant Weyerhaeuser Company ("Weyerhaeuser") is a Washington corporation with its principal place of business in Federal Way, Washington.  During the Class Period, Weyerhaeuser and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

20.     Defendant Georgia-Pacific LLC ("Georgia-Pacific") is a Georgia corporation with its principal place of business in Atlanta, Georgia.  During the Class Period, Georgia-Pacific and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

21.     Defendant Temple-Inland, Inc. ("Temple-Inland") is a Delaware corporation with its principal place of business at Austin, Texas.  During the Class Period, Temple-Inland and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates, including Defendant TIN, Inc. sold Containerboard Products in interstate commerce directly to purchasers in the United States (Defendant Temple-Inland, Inc. and Defendant TIN, Inc. are collectively referred to hereafter as "Temple-Inland").

22.     Defendant Smurfit-Stone Container Corporation ("Smurfit-Stone") is a Delaware corporation with its principal place of business at Chicago, Illinois.  During the Class Period, Smurfit-Stone and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.  On or about January 26, 2009, Smurfit-Stone filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware; effective June 30, 2010, Smurfit-Stone was discharged under a plan of reorganization.  However, many of Smurfit-Stone's most senior executives, including those with responsibility for Containerboard Products, continued with the company substantially throughout the conspiracy alleged herein, including through the inception of bankruptcy proceedings and after the discharge became effective, such as Patrick J. Moore, Chief Executive Officer and John Knudsen, Senior Vice President.  After its discharge for

bankruptcy, Smurfit-Stone knowingly and intentionally joined the conspiracy. This complaint seeks to recover damages from Smurfit-Stone for post-discharge conduct only, and in no way seeks to violate any Orders of the above-referenced Bankruptcy Court. Specific post-discharge actions by Smurfit-Stone in furtherance of the conspiracy as alleged, *inter alia*, in paragraphs 168-172 and 174-178 are consistent with the actions taken by all of the Defendants throughout the Class Period and that it is part of the ongoing antitrust conspiracy to and including the date of the filing of this complaint. [Plaintiff Thule, Inc. alleges that Smurfit-Stone participated as co-conspirator with the other Defendants and has performed acts and made statements in furtherance of the conspiracy, however, does not join in the allegations naming Smurfit-Stone as a Defendant.]

23.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including Containerboard Products manufacturers merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold Containerboard Products in interstate commerce directly to purchasers in the United States during the Class Period.

24.     To the extent that subsidiaries and divisions within Defendants' corporate families sold or distributed Containerboard Products to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this complaint because Defendants wished to ensure that the prices paid for such Containerboard Products would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing and collecting monies from Plaintiffs and the members of the Plaintiff Class for Containerboard Products was known to and approved by their respective corporate parent named as a Defendant in this complaint.

## CO-CONSPIRATORS

25.    Various other persons, firms and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.   The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this complaint.

26.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

27.    Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

28.    Each Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

> All persons who purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as August 2005 until the Present.

> Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

29.    Class Identity: The Plaintiff Class is readily identifiable and is one for which records should exist.

30.    Numerosity:  Due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of Class members as above described, the exact number and their identities being known to Defendants and their co-conspirators.

CONSOLIDATED AMENDED COMPLAINT

31.     Typicality:  Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class because each Plaintiff purchased Containerboard Products directly from one or more of the Defendants or their co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

32.     Common Questions Predominate:  There are questions of law and fact common to the Class, including, but not limited to:

a.  Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Containerboard Products sold in interstate commerce in the United States;

b.  The identity of the participants of the alleged conspiracy;

c.  The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

d.  Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

e.  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Plaintiff Class;

f.  The effect of Defendants' alleged conspiracy on the prices of Containerboard Products sold in the United States during the Class Period; and,

g.  The appropriate class-wide measure of damages.

33.     These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

34.     Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

35.     Superiority:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical.  Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

## TRADE AND COMMERCE

### Containerboard Products

36.     Containerboard is the principal raw material used to manufacture corrugated products.  Containerboard includes both corrugating medium and linerboard.  Linerboard is a flat wood-fiber paperboard.  Corrugated medium is a type of fluted paperboard made from the same material as linerboard.  Linerboard is used as the inner and outer facings, or liners, of corrugated products. Corrugating medium is fluted and laminated to linerboard in corrugator plants to produce corrugated sheets. The sheets are subsequently printed, cut, folded and glued to produce corrugated products, mostly boxes and other containers.  As used herein, "Containerboard Products" includes linerboard, corrugated medium, corrugated sheets and corrugated products including corrugated boxes and other corrugated containers.

37.     Defendants and their co-conspirators manufacture and sell linerboard, corrugated medium, containerboard and corrugated boxes and other corrugated containers.

38.     Containerboard Products is a multi-billion dollar industry.  During the relevant time period, annual sales of Containerboard Products were in the tens of billions of dollars.

39.     The containerboard industry is heavily concentrated.  As of 2010, Defendants had a combined share of approximately 83% of the containerboard market, controlling nearly thirty

CONSOLIDATED AMENDED COMPLAINT

million tons of annual production. Collectively, Defendants and their co-conspirators control an even greater proportion of the supply of Containerboard Products in the market.

40.     The price of corrugated medium is tied to the price of linerboard. As a result, the price of containerboard is directly tied to the price of corrugated medium and linerboard. Likewise, because containerboard is used in the manufacture of corrugated containers, a rise in the price of containerboard results in a similar rise in the price of corrugated containers. Collectively, Defendants and their co-conspirators utilize most of the linerboard and medium they manufacture to produce containerboard and corrugated containers that they sell to the Plaintiff Class. In some instances, Defendants sell the manufactured linerboard and corrugated medium to other Defendants or independent converters who in turn produce containerboard sheets and corrugated products. Corrugated products are generally viewed as interchangeable commodities because most manufacturers are able to supply the product needs of most customers.

## The Structure of the Containerboard Products Industry

41.     Economists Haizheng Li and Jifeng Luo (hereinafter "Li and Luo") of the Georgia Institute of Technology have thoroughly examined the containerboard industry and concluded that the characteristics of the containerboard industry make it highly susceptible to horizontal price-fixing and output restrictions:

> The linerboard industry is very capital intensive and thus entry is restricted because of the large amount of capital and the long-term nature of investment…Firms may have similar cost curves if the equipment used is similar. Additionally, the demand for containerboard is relatively inelastic because of no major substitutes. Therefore, the US linerboard industry may have a certain degree of oligopolistic structure such that leading producers can exercise some pricing power, for example, through either barometric price leadership or collusive price leadership.[1]

42.     Antitrust law and economics have identified several factors which make markets susceptible to price-fixing. Those factors include: relatively few firms with a large share of the market; high barriers to entry into the market; lack of close substitutes/commodity nature of the

---

[1] Li, Haizheng and Jifeng Luo. *Industry consolidation and price in the US linerboard industry.* Journal of Forest Economics 14 (2008) at 98.

CONSOLIDATED AMENDED COMPLAINT

good; inelastic demand; and inability of any single firm to control supply and price unilaterally. The Containerboard Products industry demonstrates all of these factors.

43.  <u>Relatively Few Firms</u>:  Historically, Containerboard Products has been considered a concentrated industry.  In the last decade, however, a series of mergers and acquisitions have led to a significant increase in market concentration.  In 1995, the top five firms controlled approximately 42% of the containerboard market and the top 10 firms had a combined 66% market share. During the relevant time period of this complaint, the containerboard industry endured considerable consolidation resulting in the top five firms controlling approximately 72.5%, of the containerboard market while the Defendants' combined share reached approximately 83%.

44.  The consolidation of the Containerboard Products industry involving Defendants and their co-conspirators both during the Class Period and immediately preceding it has been substantial.  The following are examples of transactions that lead to such concentration:

 a.  In 1999, PCA acquired the containerboard and corrugated packaging products business of Pactiv Corporation, formerly known as Tenneco Packaging;

 b.  In 2001, Temple-Inland acquired the corrugated packaging operations of Chesapeake Corporation and Elgin Corrugated Box Company and ComPro Packaging LLC;

 c.  In 2002, Weyerhaeuser acquired Williamette Industries, including its Containerboard Products businesses

 d.  In 2002 Temple-Inland acquired Gaylord Container Corporation;

 e.  In September 2002, Smurfit-Stone purchased the Stevenson Mill containerboard mill and the related corrugated container assets;

 f.  In March 2003, Smurfit-Stone acquired complete control of Smurfit-MBI which operated 15 corrugated container plants in Canada;

 g.  In February 2004, PCA purchased Acorn Corrugated Box Co.;

 h.  In March 2004, Georgia-Pacific bought the assets of Temple-Inland's corrugated box plants;

15

i.  In July 2004, International Paper acquired Box USA ;

j.  In April 2005, PCA acquired Midland Container Corp.;

k.  In September 2005, the Jefferson Smurfit Group merged with Kappa Packaging;

l.  In October 2005, Norampac acquired three Standard Paper box plants;

m.  In December 2005, privately-held Koch Industries, Inc., purchased Georgia-Pacific for $21 billion;

n.  In April 2006, Georgia-Pacific acquired Smurfit-Stone's Brewton, Alabama linerboard mill;

o.  In March 2008, International Paper announced its acquisition of Weyerhaeuser's Packaging Business for $6 billion;

p.  In April 2008, Smurfit-Stone acquired Calpine Corrugated LLC; and,

q.  In 2008 Temple-Inland acquired a 50% interest in PBL, a joint venture that manufactures containerboard.

45.  In 2009, Temple-Inland presented the following graphic illustration of the changes brought about by the consolidation of the Containerboard Products industry:



46.  <u>Barriers to Entry</u>:  There are two significant barriers to entry to the Containerboard Products industry: 1) capital-intensive start-up costs; and 2) high transportation costs.  The equipment used to manufacture Containerboard Products is both highly specialized and very expensive.  Li and Luo conclude that the "linerboard industry is very capital intensive…entry is restricted because of the large amount of capital and the long-term nature of investment."  Another industry report affirmed that "the industry is capital-intensive."[2] Consequently, large capital investments prohibit new entrants.  At a 2005 industry trade conference attended by Defendants' officers, employees or representatives, presenter Deloitte Development LLC instructed the audience not to overestimate "the threat of new entrants into the market," indicating that entry into the containerboard market was highly unlikely.[3]

47.  <u>Manufacturers Have Similar Costs</u>:  Defendants and their co-conspirators share relatively similar costs.  The technology and process of containerboard manufacturing are well known and Defendants and their co-conspirators employ the same types of equipment and processes in the production process.

48.  Moreover, the fewer the number of firms in an industry, the more similar costs become for the remaining firms. Accordingly, the recent consolidation of the Containerboard Products industry has in turn driven Defendants' costs to be even more similar.  Further, paper manufacturing has relatively few economies of scale.  Industry reports state that "Large and small producers operate the same kinds of plants –large producers just have more of them."[4]  The combination of these industry facts – consolidation, similar plants, and technology – indicates that the Defendants have very similar cost structures.

49.  Because Containerboard Products are bulky and cumbersome to transport, long-distance shipping is expensive.  Consequently, there are geographic entry barriers to the Containerboard Products industry as well.  One industry report stated that "[t]he effective sales

---

[2] Hoover's Industry Profile: Paper Products Manufacture.
[3] Sinoway, Mike, "Pricing Opportunities in the Forest Products Industry," June 28, 2005, Deloitte Development LLC.
[4] See PCA Form 10-K, filed February 20, 2008 at p.11.

area for corrugated boxes, for example, is only about 150 miles from the production plant."[5] High start-up costs and shipping costs make entry into the containerboard market very difficult.

50.    No Close Substitutes/Commodity Nature of the Products:    Containerboard Products do not have close substitutes in the market.  The closest substitutes for corrugated containers are plastic containers, which comprise a very small portion of the container or packaging market.  Likewise, containerboard and corrugated packaging are commodities because containerboard and corrugated containers made by any one of the Defendants are interchangeable with that of any of the other Defendants.  In its 2007 10-K filing, PCA acknowledged this fact, noting "[c]ontainerboard is generally considered a commodity-type product and can be purchased from numerous suppliers."[6]

51.    Inelastic Demand:    The demand for Containerboard Products is very inelastic.  Li and Luo estimated the price elasticity of demand for linerboard to be 0.18.  This means that a one percent increase in linerboard price would result in just a 0.18% decrease in the quantity demanded.  When elasticity is this low, concerted price increases are likely to be profitable and sustainable since purchasers will continue to buy nearly the same quantity of containerboard despite price increases.[7]

52.    No Firm With Sufficient Unilateral Market Power:  While the Defendants and their co-conspirators collectively comprise approximately 83% of the containerboard market, no single firm has sufficient market power to unilaterally control supply and price.  For example, PCA's 10-K for the year ending December 31, 2006, states that "PKG [stock symbol for PCA] operates in an industry that is highly competitive, with no single containerboard or corrugated packaging producer having a dominant position."  Similarly, Temple-Inland's 10-K for the year ending December 31, 2006, states "[g]iven the commodity nature of our manufactured products, we have little control over market pricing or market demand.  No single company is dominant in any of our industries."[8]  As a result, when single manufacturers have attempted to raise prices

---

[5] Hoover's Industry Profile: Paper Products Manufacture; see also, PCA Form 10-K, filed February 20, 2008, at p. 11, noting, "[c]orrugated producers generally sell within a 150-mile radius of their plants."
[6] See PCA Form 10-K, filed February 20, 2008, at p. 11.
[7] See N. Gregory Mankiw, PRINCIPLES OF ECONOMICS (5th ed. 2009), at p. 94.
[8] See Temple-Inland Form 10-K, filed February 23, 2007, at p. 10.

without the agreement of other firms, customers are able to resist the unilateral price increase by turning to other manufacturers.

### Industry and Trade Association Membership

53.     The Fibre Box Association ("FBA") is a Containerboard Products trade organization.  Its members include Defendants PCA, International Paper, Norampac, Georgia-Pacific, Temple-Inland and Smurfit-Stone.  According to its 2007 tax records, Thomas A. Hassfurther, PCA's current Executive Vice President, served as FBA's 1st Vice Chairman, and its board of directors includes representatives from Temple-Inland, Georgia-Pacific, International Paper, Weyerhaeuser, and Smurfit-Stone.  The FBA holds at least three meetings each year where executives and other representatives of the Defendants and their co-conspirators have an opportunity to meet and talk with one another, including communicating about supply and prices.  Further, the FBA holds dozens of networking events each year which give the Defendants and their co-conspirators additional opportunities to communicate with one another.  Further, the FBA publishes a set of antitrust guidelines that it distributes to its members.  Notably absent from these guidelines are prohibitions on communicating or agreeing with other containerboard product manufacturers concerning output, supply or capacity decisions.

54.     The American Forest & Paper Association ("AF&PA") is a trade organization representing forest and building product industries as well as pulp, paper and paperboard manufacturers.  Its members include PCA, International Paper, Georgia-Pacific, Weyerhaeuser, Temple-Inland and Smurfit-Stone.  During the Class Period, its officers have included James Hannan, President and CEO of Georgia-Pacific and John Faraci, Chairman and CEO of International Paper and its board of directors has included Daniel S. Fulton, President & CEO of Weyerhaeuser, Patrick J. Moore, Chairman & CEO of Smurfit-Stone, Doyle R. Simons, Chairman & CEO of Temple-Inland, and Paul T. Stecko, Chairman & CEO of PCA.  The AF&PA holds several meetings a year where executives and other representatives of the Defendants have an opportunity to meet and talk with one another, including communicating about supply and prices.  As described below, AF&PA forums have included instructions on steps to conceal anticompetitive communications between firms.

55.     RISI (founded as Resource Information Systems Inc.) is an information provider to the global forest products industry and provides market news and information. RISI hosts conferences regarding containerboard every two years, bringing together companies in the containerboard industry. Executives of all Defendants attended both the 2006 and 2008 conferences.

56.     The International Corrugated Case Association ("ICCA") is an international trade association that serves to "promote and protect the general welfare of the worldwide corrugated container industry" by, among other things, collecting and disseminating information about corrugated products, issues, services and resources around the world. Every year, ICCA members participate in a global summit. Defendants Georgia-Pacific, Smurfit-Stone, International Paper and Temple-Inland are all members of the ICCA.

## History of Anticompetitive Conduct and Acts of Concealment

57.     The Defendants and their co-conspirators have a prior history of anticompetitive horizontal agreements with one another.  For decades, the paper and pulp industry has consistently demonstrated cartelization and anticompetitive behavior.  In particular, the linerboard, corrugated, containerboard and corrugated products segments of the industry have a history of antitrust violations.  A consent decree was entered on April 23, 1940, in the action entitled *United States of America, Plaintiff, against National Container Association, et al., Defendants* (SDNY Civil Action No. 8-318) and in *United States v. Container Corporation of America, et al*., 393 US 333 (1969) the defendants (including certain predecessors of Defendants herein) were found to have violated Section 1 of the Sherman Act after being charged with conspiring to restrain price competition in sale of corrugated containers in the Southeastern United States from January 1, 1955, to October 14, 1963.[9]

58.     International Paper, Weyerhaeuser, PCA and Georgia-Pacific were also defendants in an alleged nationwide price-fixing conspiracy among manufacturers of folding cartons from 1960 to 1974.  *See In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727 (N.D. Ill.

---

[9] See *U.S. v. Container Corp. of America*, 273 F.Supp. 18, (M.D.N.C. Aug 31, 1967) and *U.S. v. Container Corp. of America*, 1970 WL 513, 1970 Trade Cases P 73,217 (M.D.N.C. May 19, 1970) (on remand).

1977), 557 F. Supp. 1091, 1093 (N.D. Ill. 1983) and 687 F. Supp. 1223 (N.D. Ill. 1988). On September 19, 1979, prior to trial, the class action parts of the case were settled for approximately $200 million.

59.     In 1978, a federal grand jury in the Southern District of Texas indicted 14 companies and 26 individuals, including International Paper, Weyerhaeuser and Stone Container Corporation (predecessor to Smurfit-Stone) for participating in a conspiracy east of the Rocky Mountains to fix prices of corrugated containers and sheets. *See United States v. International Paper Co.*, No. H-78-11 and *United States v. Boise Cascade Corp.*, No. H-78-12. International Paper, Weyerhaeuser and Stone Container Corporation and almost all of the other defendants pleaded *nolo contendere*; those that did not were acquitted at trial.

60.     In a related case, PCA, International Paper, Stone Container and Georgia-Pacific were also involved in a price fixing cartel over corrugated containers and corrugated cardboard sheets from 1964-1975.  Those firms that did not settle went to trial and most settled before a verdict was rendered; the sole defendant remaining at the time of the verdict was found liable for participating in a price fixing conspiracy over corrugated containers and corrugated sheets from 1964-1975. *See In re Corrugated Container Antitrust Litigation*, 556 F.Supp. 1117, 1125 (.S.D.Tex.1982).

61.     In 1998, Stone Container Corp. (now known as Smurfit-Stone) entered into a consent agreement with the Federal Trade Commission ("FTC") in which it pledged to refrain from "entering into, attempting to enter into, adhering to, or maintaining any combination, conspiracy, agreement understanding, plan or program with any manufacturer or seller of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties." *See In the Matter of Stone Container Corp.*, Docket No. C-8306, Decision and Order, May 18, 1998.

62.     Smurfit-Stone, International Paper, Georgia-Pacific, Weyerhaeuser, Temple-Inland, and PCA participated in a price-fixing cartel over containerboard from 1993-1995.  See *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir. 2002).  As part of the conspiracy, these firms increased the "downtime" of linerboard machines, reducing production and

inventory. At the same time, they purchased substantial amounts of containerboard from one another, protecting market shares, causing an artificial shortage and an increase in the price of linerboard. At the peak of the cartel's efficacy in 1995, the price of linerboard peaked at $530/ton. The class action claims were settled in 2003 when the defendants agreed to pay their customers over $200 million, however, lawsuits brought by plaintiffs opting out of the class proceeded.

63. As a result of their exposure to prior antitrust lawsuits, Defendants have taken steps to conceal their anticompetitive communications with one another. For example, at the American Forest & Paper Association's 128th Annual Paper Week held in New York City in April 2005, Defendants attended a seminar entitled "Are You Vulnerable to Lawsuits?" aimed at reducing vulnerability to antitrust litigation.[10] Because the Defendants have received training on how to avoid getting caught communicating with one another regarding price and output decisions, the amount of conspiratorial evidence that can be obtained from public sources and without access to internal records and testimony is highly limited. Nevertheless, the existence of an agreement is unambiguously evidenced by Defendants' coordinated conduct during the Class Period.

## VIOLATIONS ALLEGED

64. The unprecedented industry consolidation detailed in paragraphs 43-45 created an environment conducive to collusion. Further, at or about the onset of the Class Period, the Containerboard Products industry was experiencing decreased profit margins, rising product demand, and a promising economic outlook. Additionally, shortly before the Class Period, the Containerboard Products industry endured two failed price increases. Specifically, on May 31, 2003, Official Board Markets reported that a $35/ton price increase in both linerboard and corrugated medium failed, noting "[n]ot only is this attempt a failure, but discounting prevails." While prices steadily increased in 2004, by early 2005 they again began to erode, bottoming out in spring 2005. On May 31, 2005, Official Board Markets reported that Defendant International Paper announced a $50/ton price increase; but due to other Defendants not backing the price

---

[10] *Are You Vulnerable to Lawsuits?* Official Board Markets, April 23, 2005.

increase with a "firm stance," the end result was a failed increase. In June 2005, "it became apparent that industry-wide price hikes weren't sticking. Instead of rising about 10%, prices on the thick paper used to make corrugated containers slipped as inventories of boxes inched higher."[11] These factors acted together as the catalyst for Defendants to coordinate their capacity restraints in order to reduce available supplies and thereby fix, raise, stabilize and maintain the prices of Containerboard Products.

65. In October 2003, Smurfit-Stone announced a massive restructuring plan intended "to reduce [containerboard] capacity."[12] According to its Chief Executive Officer Pat Moore, the designed goal was "to cut supply enough at Smurfit [-Stone] to force price increases throughout the industry."[13] After the failed May 2005 price increase, Smurfit-Stone recognized that their independent action to reduce containerboard capacity could not force industry prices upward unless Defendants supported both the capacity reduction and subsequent price increases.

66. The period of 2005-2010 witnessed an exceptional number of containerboard plant closings, capacity reductions, and price increases that can only be explained by concerted effort by the Defendants and their co-conspirators. Defendants increased Containerboard Products prices eight times between August 2005 and August 2010. Over that period, Containerboard Product prices have increased over fifty percent (50%) despite the economic downturn during the latter half of the Class Period. Each of these price increases was implemented by the Defendants nearly simultaneously and was facilitated by reductions in supply and production capacity. In the face of increasing demand, these reductions make no economic sense absent conspiracy and collusion. Norampac's 2005 20-F filing illustrates these phenomena:

> In 2005, industry box shipments decreased by 0.4% in North America while North American containerboard operating rates were approximately 95%. Containerboard producers in the United States reduced their inventories and drove a US$30/ton increase on linerboard in October following a US$55/ton decrease in the first three quarters of the year…

---

[11] *Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05,* Crain's Chicago Bus., June 27, 2005, at p. 4.

[12] *Clayton, Mo., Packaging Firm Smurfit-Stone Container Thinks Outside the Box,* St. Louis Dispatch, Aug. 22, 2004, at p. 1.

[13] *Ibid.*

The market share of the top five containerboard producers increased from 48% in 1995 to 64% in 2005. This consolidation has helped accelerate the rationalization of inefficient containerboard mill capacity. In 2005, a total of over 1.5 million tons of North American containerboard capacity was permanently closed. Furthermore, the industry has generally adopted a model of balancing supply with current demand as opposed to maximizing capacity utilization. As a result, operating rates in the industry in recent years more closely reflect the current economic environment. Overall, market consolidation and rationalization have helped to create a less volatile and more stable industry pricing environment.

67.     Demand for Containerboard Products is tied to overall consumer demand and spending.  In mid-2005 and continuing thereafter through 2007, consumer demand, including demand for Containerboard Products in the U.S., was relatively stable and industry expectations were that demand would increase, yet Defendants cut capacity and raised prices.  These actions were contrary to Defendants' unilateral economic interests because, given market conditions and expectations that demand was increasing, in a competitive market capacity would, at minimum, be maintained if not expanded, in order to enhance volumes, revenues, profits and market share. During the second half of 2008, consumer demand in the United States plummeted, yet Defendants continued to raise prices.  In August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%; and notwithstanding fears of deflation in the general economy, increased prices an unprecedented three times in 2010 to all-time highs, without any underlying cost justifications. This led one market commentator to note that the series of historic price increases "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies." The same commentator noted the similarity of the present conduct of Defendants to the conduct in the prior *Linerboard* cases.

68.     Defendants and their co-conspirators were also able to facilitate the conspiracy in part by causing artificially inflated, supra-competitive prices to be published in trade publications which served to indicate and index prices or to function as list prices for Containerboard Product purchasers.  Certain supply and purchase contracts between Defendants and purchasers were tied to the prices listed in those trade publications.

69.     Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply.  As a result of Defendants' conduct as

CONSOLIDATED AMENDED COMPLAINT

alleged herein, their production capacity of Containerboard Products was significantly reduced while their prices increased by approximately 50% between 2005 and 2010:





CONSOLIDATED AMENDED COMPLAINT

70.     Defendants profited substantially from these price increases.  In a December 2005 presentation by International Paper's Executive Vice President and Chief Financial Officer, Marianne Parrs, one slide titled *Strong Leverage to Improving Prices: Price Sensitivity of U.S. Businesses* showed that there would be a $0.15 earnings per share increase for every $50 change in the price of containerboard.

## 2005

71.     In the 1st Quarter of 2005, having previously indicated its intent to force price increases through the industry by cutting its capacity, Defendant Smurfit-Stone closed its 203,000 tons-per-year Fernandina Beach, Florida containerboard plant.  Notwithstanding the closure of this plant, on May 5, 2005, Smurfit-Stone reported in its SEC Form 10-Q filing that "[w]e expect our profitability to improve in the 2nd Quarter of 2005 as a result of stronger demand and high sales prices for containerboard and corrugated containers."

72.     During the 1st Quarter of 2005, Defendant PCA idled 65,000 tons per year of production capacity by taking off-line one of its three paper machines at its containerboard plant in Tomahawk, Wisconsin.

73.     Defendant Weyerhaeuser likewise reported strong demand for Containerboard Products during the 1st Quarter of 2005 in its 3rd Quarter 2005 Form 10-Q, stating that:

> Containerboard sales increased $36 million. Unit shipments increased 45,000 tons, or approximately 18 percent, and price realizations, which include freight and are net of normal sales deductions, increased $71 per ton, or approximately 22 percent in the first quarter of 2005, compared to the same period of 2004. These increases were mainly due to an improvement in demand for corrugated packaging in U.S. markets.

74.     Similarly, Defendant International Paper reported in its May 6, 2005 Form 10-Q that "2nd Quarter earnings normally benefit from seasonably higher containerboard and box demand."

75.     Nevertheless, in the 2nd Quarter of 2005, International Paper took approximately 530,000 tons of containerboard downtime compared with approximately 215,000 of downtime in the 2nd Quarter of 2004.  In its 10-Q filed on August 5, 2005, Defendant explained that this was "market related downtime" which was "taken to balance internal supply with demand to help

manage inventory levels." However, when a manufacturing plant is idled during "downtime", the firm must continue to pay fixed costs, which are very high in the Containerboard Products industry. Smurfit-Stone acknowledged this fact in its SEC Form 10-K for the 2006 fiscal year, stating "the industry is capital intensive, which leads to high fixed costs and has historically resulted in continued production as long as prices are sufficient to cover marginal costs." Accordingly, "market related downtime" is very costly and is economically irrational from a single-firm's point of view during periods of strong demand, such as the 2nd Quarter of 2005.

76. As previously alleged, at the onset of the Class Period, Defendants were experiencing decreased profit margins and historically high demand. In that context, in June 2005, high level executives and other representatives from each of the Defendants and their co-conspirators, including Pete Correll, Chairman and CEO of Georgia-Pacific, David A. Spraley, Vice President of Georgia-Pacific, C. Richard Larrick, General Manager of Georgia-Pacific, Russell Bishop, Chief Information Officer of Weyerhaeuser, Dick Thomas, Vice President of Weyerhaeuser, Ronnie Cosper, Papermill Superintendent for Smurfit-Stone, and others were reported as attending the PIMA 2005 Leadership Conference in Nashville, Tennessee.[14] The theme of this conference was "Success through Collaborative Teamwork." Topics discussed included "Effective Collaboration through Teamwork" and "Price Execution in the Forest Products Industry."

77. During this conference, Deloitte Consulting LLP gave a presentation called "Pricing Opportunities in the Forest Products Industry." Deloitte began its presentation by stating that the industry was "rich in competitive intelligence, which facilitates strategic pricing analysis." The presentation also included a discussion regarding the several factors which made coordinated price increases possible, such as "underestimating competitor's desire to raise prices" and "overestimating the threat of new entrants into the market."[15]

---

[14] The Paper Industry Management Association, or "PIMA," describes itself as "the premier association for management professionals in the paper and pulp industry" with the goal of contributing "to the strength of the international pulp and paper community by providing the means for our members to address relevant industry issues and to develop their management and leadership skills."

[15] Sinoway, Mike, "Pricing Opportunities in the Forest Products Industry," June 28, 2005, Deloitte Development LLC.

78.     Immediately before this conference, on June 27, 2005, Smurfit-Stone reported that it "has no immediate plans to close down plants."[16]  But only days later, on July 1, 2005, Deutsche Bank, which monitors the containerboard industry and issues regular reports on developments within the industry, reported that "[t]here has been a lot of 'chatter' suggesting that one or more of the big integrated producers will soon shutter capacity."[17]

79.     On July 19, 2005, Deutsche Bank reported "IP [International Paper] capacity withdrawals will help uncoated and CB [containerboard] producers.  Among the names: DTC [Domtar], PKG [Packaging Corporation of America], TIN [Temple-Inland]."[18]

80.     Beginning in early 2005 and continuing throughout the remainder of the year, Defendant Temple-Inland closed containerboard converting facilities in Antioch, California, Newark, Delaware, Atlanta, Georgia, and Louisville, Kentucky.  This reduced the supply of corrugated containers and aided in the overall scheme to increase the price of Containerboard Products.  Temple-Inland closed these facilities despite acknowledging in its May 10, 2005 10-Q that "market demand strengthened, resulting in higher prices for most of our product offerings." The closures were against Temple-Inland's unilateral economic self-interest because they were made during a period of increasing demand and prices.

81.     In the 3rd Quarter of 2005, Smurfit-Stone permanently closed two more of its containerboard mills as part of what the company called "its ongoing assessment and restructuring efforts."  Smurfit-Stone closed mills in New Richmond, Quebec and Bathurst, New Brunswick.  It closed these mills despite acknowledging in its 10-Q, filed with the SEC on August 8, 2005, that "in the third quarter of 2005, we expect seasonably strong demand for containerboard and corrugated containers."   All together, these mills accounted for approximately 274,000 tons per year of containerboard.  According to its 2007 Annual Report, in 2005  Smurfit-Stone shut down 8.5% of its total capacity.  The closures were against Smurfit-

---

[16] *Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05*, Crain's Chicago Bus., June 27, 2005, at p. 4.

[17] *050701 Containerboard & Boxes -- Boxed in*, Deutsche Bank – Equity Research

[18] *050719 IP Thoughts on Restructuring,* Deutsche Bank – Equity Research

Stone's unilateral economic self-interest because they were made during a period of increasing demand and prices.

82.     Despite Smurfit-Stone's disclaimer regarding plant closures only a few weeks before, on August 4, 2005 Deutsche Bank reported:

> Smurfit-Stone today announced a number of permanent capacity closures…a bit more capacity than we expected, a bit earlier than we expected.  They amount to 480K tons…or about 1.3% NA capacity…With Smurfit having done a good deal of "heavy lifting", we'll be watching the behavior of other major competitors like International Paper and Weyerhaeuser…the outlook of demand has also improved remarkably in recent weeks.[19]

83.     The following day, the St. Louis Post-Dispatch reported that Smurfit-Stone stated that "the closures are part of its restructuring efforts and will reduce its container-board manufacturing capacity by about 700,000 tons."[20]   Approximately one month later, on September 7, 2005, Smurfit-Stone announced a price increase of $30/ton to take effect on October 1, 2005.  On September 17, 2005, Defendant PCA followed with the announcement of a $30 per ton price increase also effective October 1, 2005.

84.     During the 2nd quarter of 2005, Georgia-Pacific reduced the number of its containerboard shipments "due to slowback and maintenance downtime."[21]   A slowback is another form of output restriction in lieu of completely shutting a machine or mill down. Georgia-Pacific did both in 2005, scheduling all major maintenance downtime across its mills in the fourth quarter of 2005 while announcing price increases of $30 per ton on linerboard medium, and 8% on boxes to be effective during that quarter.[22]

85.     In the 3rd Quarter of 2005, International Paper also announced the closing of its 100,000 ton-per-year mill in Fort Madison, Iowa.

---

[19] *050804 Bigger - Sooner - Enough -- Smurfit Announces Mill Shuts,* Deutsche Bank – Equity Research
[20] *Smurfit-Stone plans to close plants, lay off 565,* ST. LOUIS POST-DISPATCH, August 5, 2005, p. C3.
[21] *Georgia-Pacific Reports Second quarter Results,* Canada NewsWire, July 28, 2005, at p. 4.
[22] *Q3 2005 Georgia-Pacific Earnings Conference Call – Final,* FD (Fair Disclosure) Wire, Oct. 27, 2005, at p. 6.

86.    On September 20, 2005, Deutsche Bank reported that containerboard prices were moving up but that "[w]hether prices can rise further without more supply reductions remains an open question."[23]

87.    That same month, September 2005, Defendant Norampac permanently closed one of its two 150,000 tons-per-year paper machines at its Red Rock, Ontario containerboard mill. Additionally, in 2005, Norampac took "market related downtime" equal to 6.7% of its North American capacity despite increasing prices and demand.

88.    In October 2005, Norampac CEO Marc-Andre Depin commented on the September 2005 machine shut down by noting, "[i]f everyone would remove the same amount of capacity percentage-wise as we have, I think our business would look a lot better.  You have to be ready to let go of business if you want to keep the price up."[24]  In its 2005 Form 20-F, Norampac also noted, "continued industry consolidation, rationalization of inefficient containerboard mill capacity and market-related downtime have helped to better balance supply with demand and create a less volatile pricing environment."[25]

89.    On September 27, 2005, members of the FBA again met in Atlanta, Georgia at Georgia-Pacific's offices for the Corrugated Packaging Alliance Meeting.[26]  Just days later, on October 1, 2005, Defendants and their co-conspirators raised prices on linerboard by 7% ($30/ton) from $450/ton to $480/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 7% ($30/ton) from $420/ton to $450/ton.  Notably, the effective date of the price increase, as well as the amount of price increase, was implemented uniformly throughout the industry and mirrored the increase announced by Smurfit-Stone and PCA just weeks prior.  On October 3, 2005, Deutsche Bank reported that all major containerboard producers were now supporting the price increase.[27]

---

[23] *051017 Deutsche Bank - September Containerboard Monitor,* Deutsche Bank – Equity Research.

[24] Arzoumanian, M. *Board Increase Flies Through*, Official Board Markets, Volume 81, Issue 44, Oct. 29, 2005.

[25] See Norampac Form 20-F for year ending December 31, 2005, at p. 16.

[26] The Corrugated Packaging Alliance, or "CPA," states its mission is in part "to provide a coordinated industry forum that effectively acts on competing materials matters that could not be accomplished by individual members."

[27] *051003 Dr Paper's Pulse on Pricing,* Deutsche Bank – Equity Research

CONSOLIDATED AMENDED COMPLAINT

90.     Just one month later, on October 27, 2005, Deutsche Bank reported on another expected price increase: "Chemical producers do it, metal producers do it…maybe CB producers can do it too.  Two CB price hikes in 60 days is quite unusual.  A December price hike is unprecedented."[28]  Defendants were able to accomplish the across-the-board price increases by sharing supply and capacity curtailment information with one another in order to coordinate supply restrictions substantial enough to force and sustain a Containerboard Products price increase.

91.     On November 16, 2005, there was a meeting of the FBA's Board of Directors. That same day, Deutsche Bank reported that containerboard "[i]nventory numbers dropped steeply in October, much more than typical…inventories down to 2.18 million tons, lowest level since 1994."[29]  Notably, the last time that containerboard inventories were reported to be this low was during a horizontal output restriction conspiracy that ran from 1993-1995.  *See In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir.2002).

92.     Less than two weeks after the meeting of the FBA's Board of Directors, on or about November 28, 2005, Weyerhaeuser and PCA announced a 40$/ton price hike, effective January 1, 2006.

93.     Regarding these announced price hikes, on November 28, 2005 Deutsche Bank reported that they "are likely to be joined by others before long."[31]  Deutsche Bank also reported that:

> Industry sources report that 2 of North America's 6 largest containerboard producers (Weyerhaeuser, PCA) are talking with customers about a price hike on January 1.  It would appear that the increases are in the $40/ton range…Because January and early February tends to be one of the slowest periods of the year, a January price hike is unusual…Box plant inventories fell 208K in October and have fallen 356K in 2 months. Measured in terms of days of supply, box plant inventories are at only 2.8 weeks - the lowest level we can find in our 20+yrs of data…Further supply reductions could heat the market even further over the next month or two.[32]

---

[28] *051027 Deutsche Bank - Smurfit-Stone Container*, Deutsche Bank – Equity Research
[29] *051116 Deutsche Bank - October Containerboard Monitor and Numbers*, Deutsche Bank – Equity Research
[31] *051128 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[32] *051128 Deutsche Bank - Paper and Packaging*, Deutsche Bank – Equity Research

94.     The following day, Weyerhaeuser announced its intent to indefinitely idle its 350,000 tons-per-year linerboard machine in Plymouth, North Carolina. On November 29, 2005, Deutsche Bank reported that "[t]he shutdown removes nearly 1% of US containerboard capacity at a point when the market has begun to tighten rapidly. Containerboard was already a tight market." [33]

95.     On December 3, 2005, Official Board Markets reported that Weyerhaeuser was informing its customers about the $40 price increase and that "Packaging Corp. of America, Smurfit-Stone Container Corp. and Temple-Inland are telling their customers the same thing."

96.     In total, Defendants and their co-conspirators shut down nearly 1 million tons of containerboard capacity in 2005, or over 3% of total market capacity. Their conduct cannot be reconciled with the strong demand the industry anticipated throughout 2005 and thereafter. Defendants and their co-conspirators did not have economic justification to unilaterally cull capacity or reduce production of corrugated containers. As demand and prices were increasing, independent firms acting in their unilateral self-interest had an incentive to refrain from reducing capacity in order to produce sufficient containerboard to meet the strong demand for corrugated containers, not to restrain output as they did.

**2006**

97.     The Defendants and their co-conspirators also anticipated strong demand for Containerboard Products in 2006. For example, in its 10-K for the year ending December 31, 2005, International Paper reported that "[w]e see favorable signs of positive momentum for the remainder of 2006. We anticipate that demand in North America for both uncoated paper and industrial packaging products will be stronger."

98.     Effective on or about January 1, 2006, Defendants and their co-conspirators again raised prices on linerboard by 8% ($40/ton) from $480/ton to $520/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 9% ($40/ton) from $450/ton to $490/ton. These price increases, deemed "unusual" by Deutsche Bank just weeks before (see ¶¶ 91 and 93, *supra*), occurred across-the-board and were imposed by all

---

[33] *051129 Deutsche Bank – Weyerhaeuser*, Deutsche Bank – Equity Research

CONSOLIDATED AMENDED COMPLAINT

Defendants and their co-conspirators at or about the same time. In 2007, PCA Chairman and CEO, Paul Stecko, commented on the January 2006 price hike, noting "since consolidation began, inventories have trended down and we did get a price increase last January. So that would historically not be a normal time."[34]

99.     That same month, in January 2006, the Corrugated Packaging Alliance Action Team met at Georgia-Pacific's headquarters in Atlanta, Georgia. Despite the record low containerboard and corrugated container inventories and rising containerboard product prices, over the course of the following year Defendants and co-conspirators continued to reduce capacity of Containerboard Products. In its Form 20-F for fiscal year ending December 31, 2005, Norampac noted, "[i]n the first quarter of 2006, the situation was positive. In particular, several North American producers announced capacity reductions or closures and some of them have also reduced their box making capacity."

100.     In the 1st Quarter of 2006, Weyerhaeuser closed its 350,000 tons-per-year Plymouth, North Carolina containerboard plant. This plant shutdown was not in Weyerhaeuser's economic self-interest as it came at a time of rising prices and record low inventories, as evidenced by its 2006 1st Quarter 10-Q wherein Weyerhaeuser reported that:

> The company anticipates improvement in earnings for the Containerboard, Packaging and Recycling segment in the second quarter primarily due to implementation of previously announced price increases for both containerboard and corrugated packaging and a seasonal increase in demand for corrugated packaging.

101.     On February 13, 2006, Deutsche Bank reported that containerboard "[p]rices are rising - even faster than expected. Transaction prices on U.S. kraft linerboard and corrugating medium rose $40/ton in January - fully reflecting the price hike. Spot prices have reportedly risen further."[35]

102.     On February 21, 2006, Deutsche Bank reported that containerboard inventories "remain at historically lean levels" and characterized containerboard prices as "rapidly rising."[36]

---

[34] Transcript of Q1 2007 PCA Earnings Conference Call, April 18, 2007, at p. 6.
[35] *060213 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[36] *060221 Deutsche Bank - January Containerboard*, Deutsche Bank – Equity Research

CONSOLIDATED AMENDED COMPLAINT

Deutsche Bank also noted that: "A $50/ton price hike has been announced for late March/early April. A $40/ton January increase on linerboard & corrugated medium appears to have taken hold with relative ease. A $30/ton October hike also went in with ease."[37]  On March 4, 2006, Official Board Markets noted:

> "Other integrateds that have announced recently (all up $50 per ton) include Weyerhaeuser (April 1), Norampac (March 20), and Packaging Corp. of America (March 21)…¶…Last month, Georgia-Pacific announced a $50 per ton increase is scheduled to take effect April 1…¶…If this latest increase is fully implemented it will mean that containerboard prices have risen 33 percent since mid-October.

103.    On March 6, 2006, International Paper filed its Form 10-K for year ending December 31, 2005.  In its Executive Summary discussing the outlook for 2006, it was noted that "…operating rates should improve in 2006 reflecting announced industry capacity reductions in uncoated papers and containerboard."[38]

104.    On March 14, 2006, the FBA's Executive Committee met.  Approximately three weeks later, in early April 2006, Defendants and their co-conspirators raised prices on linerboard again, this time by nearly 10% ($50/ton) from $520/ton to $570/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 10% ($50/ton) from $490/ton to $540/ton.  These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time.

105.    In sum, between October 2005 and April 2006, the Defendants and their co-conspirators raised prices in concert three times, October 2005, January 2006, and April 2006. By April 2006, the price of linerboard had reached prices of $560-570/ton – its highest level since 1995.  A trade journal reported, "[s]ince October 2005, board prices have risen 33%.  The quickness of the jump is unprecedented."[39]

106.    The price increases in containerboard and its components caused corrugated container prices to rise as well.  As reported by Deutsche Bank: "It appears that most of the first two containerboard price hikes have made their way into box prices.  Producers are now trying to

---

[37] *Ibid.*
[38] International Paper Form 10-K for year ending December 31, 2005, filed March 6, 2006, at p. 11.
[39] Paperboard and Packaging, April 2006, at p. 16.

CONSOLIDATED AMENDED COMPLAINT

push this spring's $50/ton hike downstream to boxes.  There are encouraging early signs in the corrugated sheet & local box markets."[40]

107.    Defendants' costs, however, did not increase during this period.  In discussing the increasing profit margins enjoyed by the industry in the first quarter of 2006, Deutsche Bank noted "[h]igher prices and a moderation of cost pressures were the key drivers."[41]  Thus, increased costs cannot explain Defendants' price increases.   Notably, in April 2006, containerboard prices reached their highest peak since 1995 – which was also during a period of known collusion.  *See In re Linerboard Antitrust Litigation.*

108.    In its May 9, 2006 10-Q, International Paper reiterated its bullish outlook for demand, noting that "[e]ntering the 2nd quarter, we expect operating profits to be somewhat higher than in the 1st quarter.  Product demand and projects sales volumes are solid across all of our key platform businesses."

109.    Strong demand throughout 2006, combined with the capacity cuts and output restrictions imposed by the Defendants and their co-conspirators, resulted in significantly higher prices for Containerboard Products.  As stated in Weyerhaeuser's 2006 2nd Quarter 10-Q: "The increasing price realizations for containerboard and corrugated packaging resulted from an increase in industry demand for corrugated packaging, coupled with high containerboard mill operating rates and low inventory levels."  Despite an increase in demand which began at least in 2005, in early 2006, Weyerhaeuser closed its 350,000 ton-per-year containerboard machine at its Plymouth, N.C., mill.

110.    On June 8, 2006, Deutsche Bank reported on the effect of recent tightening of supply by Defendants:

> Most containerboard companies reported q/q [quarter over quarter] margin gains in Q1 2006.  Higher prices and a moderation of cost pressures were the key drivers…Published estimates for linerboard price have risen $120/ton since September, reaching $515/ton - - - the highest level since October 1995…Supply discipline has been an essential part of

---

[40] *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research
[41] *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research

the equation. Since early 2005, 1.67MM tons of capacity have been closed.[42]

111.    On June 15, 2006, Deutsche Bank confirmed the price increases resulted in higher corrugated container prices to the Plaintiff Class: "The strong box volume and lower inventories in May enhance the odds that producers will get full pass through of the CB hike into boxes… [t]he May figures show very solid demand and an inventory level reviving from upward climb."[43]

112.    On July 18, 2006, Deutsche Bank reported that "[PCA] says that April hike is now essentially fully into boxes."[44]

113.    On July 25, 2006, Deutsche Bank reported that Weyerhaeuser's "box prices were up 5.3%."[45]

114.    On August 7, 2006, Deutsche Bank reported that "[c]ompany earnings announcements to date show the 3rd price hike is being passed in the form of higher box prices."[46]

115.    Despite the substantially increased prices already brought about by a constriction of capacity and supply, in the 3rd Quarter of 2006, Norampac closed its 300,000 tons-per-year Ontario, Canada plant. On August 31, 2006, the *Toronto Sun* reported the closure, noting that Norampac cited "unfavourable economic factors" as the reason for the closure.[47] The Ontario plant was 20% of Norampac's total containerboard capacity and nearly 1% of total North American containerboard capacity. Norampac blamed the closure on high energy and input costs. However, as recently as June 2006, the trade press had indicated that Containerboard Products producers' margins were increasing due in part to a moderation of costs. In response to the plant closing, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement. Linerboard prices are up $120/ton over the last year, and the YTD operating rate

---

[42] *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research
[43] *060615 Deutsche Bank Report - May Containerboard & Box Numbers Big Volumes*, Deutsche Bank – Equity Research
[44] *060718 Deutsche Bank Report - COMPANY ALERT - Packaging Corp. of America*, Deutsche Bank – Equity Research
[45] *060725 Deutsche Bank Report - COMPANY ALERT – Weyerhaeuser*, Deutsche Bank – Equity Research
[46] *060807 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[47] *N. Ontario Mill To Shut Down,* THE TORONTO SUN, August 31, 2006, at p. 54.

for linerboard in the US is 98.9%."[48]  This plant shutdown was not in Norampac's unilateral economic self-interest as it came at a time of rising containerboard prices, tight supply and high plant operating rates; however, as alleged above, Norampac had previously urged the industry to "remove the same amount of capacity percentage-wise" as Norampac so that the "business would look a lot better," because, as its CEO committed to the industry, "You have to be ready to let go of business if you want to keep the price up.".

116.    On October 9, 2006, Deutsche Bank reported that containerboard "[d]emand remains solid."[49]

117.    On October 18, 2006, Deutsche Bank reported that PCA had record earnings per share in the 3rd Quarter of 2006, which reflected the hikes in containerboard prices.  Deutsche Bank also reported that PCA was "trimming output @ pt when mkt appears to be easing. [sic] They're not 'free riding' & not delaying – encouraging signs…4Q impact of mill outages will remove 12K tons from system…production cut-backs by a player often viewed as industry 'free rider' are constructive."[50]  PCA was contributing to the cartel by taking downtime and reducing containerboard output while demand remained strong.  Under competitive market conditions, PCA's downtime would not have been in its unilateral interest; rather, it would have continued as a free rider on the output reductions of the other Defendants.  PCA's downtime under then-current market conditions and expectations made economic sense only pursuant to an agreement or understanding with its competitors that they would also restrict supply.

118.    This was confirmed by PCA's 10-K for the year ending December 31, 2006:

> Industry supply and demand trends were favorable throughout 2006. Industry shipments of corrugated products increased 1.3% during 2006 compared to 2005, on a per workday basis.  During this same period, industry containerboard inventory levels remained at historically low levels, with inventory at the end of December 2006 at its second lowest level in the past 25 years, on a weeks of supply basis.  Since September 2005, linerboard prices have increased $120 per ton, or approximately 30%, as reported by industry publications.

---

[48] *060830 Deutsche Bank Report - Norampac closing Red Rock*, Deutsche Bank – Equity Research
[49] *061009 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank - Equity Research
[50] *061018 Deutsche Bank Report - PKG in 100 Words No more 100% operating rates?* Deutsche Bank - Equity Research

119.    Just one week after reporting that PCA was taking downtime to further reduce any slack in the supply constraint, on October 25, 2006, Deutsche Bank reported: "Best news may be SSCC's [Smurfit-Stone] Q4 'maintenance' downtime.    With markets appearing to slow, throttling back on supply could help pricing environment."[51]

120.    In October 2006, Weyerhaeuser and International Paper announced a price increase effective on January 1, 2007.

121.    The unprecedented across-the-board increases in containerboard prices were due to a concerted effort by the Defendants and their co-conspirators to restrict output and capacity. Industry trade journals reported that the "linerboard market began to tighten in the fourth quarter of 2005 and containerboard dropped to an unusually low level of 2.2 million tons."[52]    Another trade journal noted that "capacity reductions…may be the most important overall factor behind the strong price gains" and that "[w]ith supplies short, mills were in the drivers' seat and began to aggressively push up prices."[53]

122.    All together, between 1st Quarter 2005 and 3rd Quarter 2006, Defendants and their co-conspirators shut down nearly 1.7 million tons worth of containerboard capacity.    In comparison, the conspiracy among a similar set of defendants in 1993-1995 was executed by shutting down only 300,000-350,000 tons of capacity.    *See In re Linerboard Antitrust Litigation*, 305 F.3d at p. 154.    These massive shutdowns were part of the Defendants and their co-conspirators' concerted effort to stabilize and raise the price of Containerboard Products.

**2007**

123.    In 2007, Defendants and their co-conspirators continued to shut down capacity in furtherance of their conspiracy.    In late January 2007, International Paper took 74,000 tons of containerboard capacity offline.    In April, PCA reported that it took unspecific downtime in the 1st and 2nd Quarters of 2007.

124.    On April 18, 2007, PCA Chairman and CEO, Paul Stecko, stated the following with respect to industry-wide inventories during PCA's 1st Quarter earnings conference call:

---

[51] *061025 Deutsche Bank Report - SSCC Q3 in 100 Words*, Deutsche Bank - Equity Research
[52] Pulp & Paper (Jan. 2007) at p. 15.
[53] Paper Age (September/October 2006) at p. 15.

CONSOLIDATED AMENDED COMPLAINT

> Our containerboard inventories at the end of the first quarter were down about 2000 tons compared the year-end 2006 levels. I should also note that yesterday the Fibre Box Association released industry statistics for the month of March and in our opinion these statistics are very encouraging. Corrugated products demand was up 3.4% per workday and containerboard inventories fell by 75,000 tons to 2.472 million tons or 4.1 weeks of supply. This is 200,000 tons lower than the average March containerboard inventory for the past ten years and on a weeks of supply basis, this is the lowest March ending inventory on record. So pretty healthy statistics.

125.    In June 2007, Smurfit-Stone closed down two plants, a 148,000 tons-per-year plant in Vernon, California and a 52,000 tons-per-year plant in Carthage, Indiana.

126.    On June 18-20, 2007, there was a Joint AF&PA, AICC and FBA Washington Fly-In meeting in Washington, DC. Shortly thereafter, Weyerhaeuser announced a $40/ton price hike, effective August 1, 2007.

127.    In early July 2007, PCA and Smurfit-Stone also announced a $40/ton containerboard price hike, also effective August 1, 2007.

128.    Regarding whether these announced price hikes would work, Deutsche Bank commented that "the global containerboard backdrop remains just about as favorable as any we have seen in over 20 yrs."[54]  On July 6, 2007, Deutsche Bank reported that "[v]irtually all major containerboard producers have slated $40-50/ton hikes for August."[55]

129.    On or about August 1, 2007, Defendants and their co-conspirators raised prices on containerboard again, this time by over 7% ($40/ton) from $570/ton to $610/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 7% ($40/ton) from $540/ton to $580/ton. These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

130.    On September 4, 2007, Deutsche Bank reported that the "full $40/ton price hike initiative for August was reflected in the trade papers and most of our trade reports suggest uncharacteristic discipline from the big integrateds."[56]

---

[54] *070703 Deutsche Bank Report - August Containerboard Price Hike*, Deutsche Bank - Equity Research
[55] *070706 Deutsche Bank Report - Dr. Paper's Weekly Wrap Up (7/6/07)*, Deutsche Bank - Equity Research
[56] *070904 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank - Equity Research

131.    On September 6, 2007, Norampac announced that it had entered into a joint venture with two other Containerboard Products manufacturers, including Smurfit-Stone, to establish a new company called Niagara Sheet LLC.  Commenting on the transaction, Marc-André Dépin, President and CEO of Norampac, noted "[t]he participation of Norampac in this joint venture follows the trend of our investment strategy which aims to consolidate our expansion in the United States and enable us to ensure the quality of our products and the satisfaction of our customers."

132.    October 2007, International Paper closed down its 200,000 tons-per-year containerboard plaint in Terra Haute, Indiana.

133.    PCA's 2007 10-K reported that the company's gross profits as a percentage of net sales increased from 20.3% to 22.7% "primarily due to the increased sales prices" of its corrugated products and that from 2006 to 2007, "industry containerboard inventory levels remained at historically low levels, with inventory at the end of December 2007 at its second-lowest level in the past 25 years, on a weeks-of-supply basis."

134.    Temple-Inland reported in its 2007 10-K that "[i]n 2007, corrugated packaging prices and linerboard prices moved higher as a result of price increases implemented in 2006 and 2007.   In 2006, corrugated packaging and linerboard prices moved higher reflecting price increases implemented in late 2005 and in 2006."   Notably, Temple-Inland also reported that prices for other paper products – specifically, gypsum wallboard – had decreased in the same period.

135.    Defendants and their co-conspirators did not have independent economic justification to cut capacity or reduce production of corrugated containers in the face increasing demand and prices. To the contrary, independent firms acting competitively and in their unilateral self-interest had an incentive to refrain from such acts.

**2008**

136.    On February 1, 2008, Deutsche Bank reported that "plant inventories fell from 3.1 to 3.0 weeks, one of the lowest levels in history."[57]

---

[57] *080201 Deutsche Bank Report - January Containerboard Monitor,* Deutsche Bank - Equity Research

137.    On or about March 17, 2008, International Paper announced that it was purchasing Weyerhaeuser.  This merger made International Paper the single largest containerboard producer with 11.5 million tons per year of global containerboard capacity.  As indicated above, prior to the merger announcement, International Paper had been idling and reducing its capacity.

138.    On March 24-26, 2008, the FBA's Annual Meeting 2008, was held at the J.W. Marriott Desert Springs in Palm Desert, California.  At this Annual Meeting, the FBA's Board of Directors meeting was also held.

139.    On March 30-April 2, 2008, the American Forest & Paper Association held its Annual Paper Week convention in New York, New York.

140.    On or about May 5, 2008, International Paper's purchase of Weyerhaeuser was approved.  As a result of the merger, the top seven containerboard producers made up a combined market share of approximately 80%.

141.    On or about May 10, 2008, Georgia-Pacific announced an increase on containerboard prices by $55/ton, effective July 1, 2008, and new reports stated that "within hours after this announcement, Smurfit-Stone…told its customers the same price increase details."[58]  Shortly thereafter, International Paper, Weyerhaeuser, PCA and Norampac also instituted identical price increases.[59]

142.    On May 16, 2008, Deutsche Bank reported that containerboard inventory was the "second-lowest April level in 20 years."[60]

143.    On May 28, 2008, Deutsche Bank reported that both Smurfit-Stone and Georgia-Pacific recently announced a $50/ton price hike, effective July 1, 2008.[61]

144.    On June 16, 2008, in a report primarily focusing on International Paper and Smurfit-Stone, Deutsche Bank reported: "IP's Packaging head, Carol Roberts, acknowledged that IP's number one priority was increasing prices.  Roberts argued that independent boxmakers

---

[58] Board producers again try for price increase; $55 per ton," Official Board Markets, May 31, 2008 (citing an earlier May 10, 2008 article).
[59] "More Integrateds Want Increase." Official Board Markets, June 7, 2008.
[60] *080516 Deutsche Bank Report - April Containerboard Monitor*, Deutsche Bank - Equity Research
[61] *080528 Deutsche Bank Report - July Price Hike*, Deutsche Bank - Equity Research

would welcome a disciplined push on containerboard and box prices as it would provide them with an opportunity to restore margins. They are showing some leadership. IP has recently announced an 11% box price increase effective July 1. Smurfit's Chuck Hinrich's [sic] noted that "we understand urgency around current price increase." Deutsche Bank further noted that in terms of "more capacity rationalization in containerboard and boxes . . . both IP and [Smurfit-Stone] acknowledged the need to maintain a balanced supply/demand situation."[62]

145.    On or about July 1, 2008, despite the effects of an economic recession felt throughout the United States, Defendants and their co-conspirators raised prices on linerboard yet again, this time by over 9% ($55/ton) from $610/ton to $665/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($40/ton) from $580/ton to $635/ton. The Defendants quickly followed the price increases in containerboard and corrugated medium by announcing an 11% increase in the price of finished boxes.[63] These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

146.    On July 16, 2008, Buckingham Research Group stated that "we are bullish on containerboard given low inventories, high operating rates, recent outages and closures . . .we believe that the July containerboard $55/ton price increase has gained traction and will be reflected in the trade journals this weekend."[64]

147.    In late August, International Paper, whose "number one priority was increasing prices" by means of a "disciplined push" as detailed above, in fact showed its "leadership" and announced a price increase of $60 per ton, effective October 1, 2008.[65] Shortly thereafter, Smurfit-Stone, Temple-Inland and Georgia-Pacific also announced identical price increases and on September 8, 2008 it was reported that Citigroup had confirmed that Temple-Inland, Smurfit-Stone and Georgia-Pacific "have followed International Paper's move to raise containerboard

---

[62]  June 16, 2008 Deutsche Bank Paper & Packaging report, at 3.
[63]  P. Scott Vallely. *Update on Containerboard Grades: Notes from Deutsche Bank Research Paper.* (June 17, 2008)
[64]  July 16, 2008 Buckingham Research Group analyst report, International Paper, at 3.
[65]  *IP Wants yet More for Board: Will Others Follow?*, Official Board Markets, September 6, 2008.

CONSOLIDATED AMENDED COMPLAINT

prices by $60/ton. They point out that this means that at least 70% of the US capacity have announced an October increase."[66]

148.    On August 20, 2008, Deutsche Bank reported that "[d]espite sluggish demand, the [July] containerboard [price] hike succeeded, supported by rising input costs, high operating rates, lean inventories (aided by outages at large mills owned by IP & [Weyerhaeuser]), and strong export markets. The next stop is the related box price hike, which will play out over the next few months. Producers are looking to get more than a simple pass-through of higher containerboard costs." Regarding input prices Deutsche Bank reported "while prices are rising, some important input costs appear to be rolling over. OCC costs have been declining steadily since the March high, and energy costs are falling sharply. Longer-term, we view the increased consolidation created by IP's acquisition of WY's packaging business as positive for the industry."[67]

149.    The AICC objected to the October price increases because "[the] announcements by International Paper and other integrated producers, coming as they do within 90 days of the $55 per ton increase in July, are unjustified based on current economic indicators and inputs. We believe they even border on collusion. Containerboard products, using their increasing market share in what one analyst called 'the hammer,' have in this announcement exhibited an unbridled arrogance toward their independent customers and a blatant disregard for the users of corrugated boxes." In fact, price increases in the face of soft demand are inconsistent with unilateral economic interests and are counter-intuitive without collective and coordinated decreases in production capacity.[68]

150.    In October 2008, Smurfit-Stone shut down its 135,000 tons-per-year corrugated medium plant in Snowflake, Arizona. That same month, International Paper began idling its 250,000 tons-per-year containerboard plant in Albany, Oregon. Less than a month later, in

---

[66] "SSCC, TIN, IP: Recommendations," Theflyonthewall.com, Sept. 8, 2008.
[67] August 20, 2008 Deutsche Bank Paper & Packaging industry analyst report, at 64, 68
[68] *AICC Strongly Opposes $60 per ton Board Price Increase: Borders on Collusion*, Official Board Markets, September 20, 2008.

CONSOLIDATED AMENDED COMPLAINT

November 20008, International Paper shut down its 430,000 tons-per-year linerboard plant in Valiant, Oklahoma.

151.    In November 2008, Smurfit-Stone announced temporary closures of several containerboard mills: (i) Smurfit-Stone temporarily shut down its 550 ton-per-year Missoula, Montana linerboard machine (from November 10, 2008 through the end of 2008); (ii) Smurfit-Stone also temporarily shut down its linerboard machine at its containerboard mill in Hodge, Louisiana (from November 24, 2008 to December 11, 2008);[69] (iii) Smurfit-Stone temporarily closed its 800 tons-per-day containerboard mill in Ontonagon, Michigan (from November 24, 2010 through at least the end of the year);[70] and (iv) Smurfit-Stone temporarily shut down its Panama City, Florida containerboard mill (from November 22, 2008 through the end of 2008).[71] Between fourth quarter of 2008 and first quarter of 2009, over 800,000 tons per year of capacity was idled by Defendants.

152.    In the 4th quarter of 2008:

   a.   Smurfit-Stone idled plants in Matane, Quebec (174,000 tpy), Missoula, Montana (171,000 tpy), and Jacksonville, Florida (170,000 tpy).

   b.   Georgia-Pacific idled plants in Cedar Springs, Georgia (265,000 tpy); Palatka, Florida (40,000 tpy) and announced the temporary closure of its corrugating medium mill in Toledo, Oregon from December 23, 2008 to December 30, 2008.[72]

   c.   PCA engaged in significant mill downtime or slowbacks in the fourth quarter of 2008.[73]

   d.   Temple-Inland took "108,000 tons market related" and "22,000 tons maintenance related" downtime 2008, despite rising prices and inventories were the "lowest year entering level in 3 years."

---

[69] *SSCC Shuts Down two Board Machines: In Louisiana and Montana*, Official Board Markets, November 15, 2008.
[70] *SSCC to Close Michigan Mill: May Reopen in January*, Official Board Markets, November 22, 2008.
[71] *CC Will Shut Down Florida Mill: More Layoffs Coming*, Official Board Markets, November 22, 2008.
[72] *GP Will Close Oregon Mill: For one Week*, Official Board Markets, December 6, 2008.
[73] *PCA Slows Board Production: Lower Earnings*, Official Board Markets, December 13, 2008.

CONSOLIDATED AMENDED COMPLAINT

e. International Paper announced plans to close its containerboard mills in Pineville, Louisiana and Albany, Oregon and that it would permanently shut down its previously idled machine in its Valliant, Oklahoma containerboard mill. These permanent shutdowns reduced International Paper's North American paper and board capacity by 2.1 million tons.

153. Outlining the history of containerboard price increases imposed during much of the Class Period, Temple-Inland reported in its 2008 10-K that "[i]n 2008, corrugated packaging prices were up as a result of price increases implemented in 2007 and mid-2008… In 2007, corrugated packaging prices and paperboard prices moved higher as a result of price increases implemented in 2006 and 2007. In 2006, corrugated packaging and paperboard prices moved higher reflecting price increases implemented in late 2005 and in 2006."[74] In a related presentation Temple-Inland revealed that it had taken "108,000 tons market related" and "22,000 tons maintenance related" downtime during 2008, which according to the same presentation saw TIC's average box prices increase by $29 per ton. The presentation also noted that inventories were at the "lowest year entering level in 3 years."

## 2009

154. On February 27, 2009, Deutsche Bank reported that "in recent months, containerboard demand has been off sharply, but published containerboard prices have remained remarkably 'sticky,'" commenting that, "[w]ith extremely weak demand, lower input costs and a stronger US$, the modest erosion in domestic pricing appears a victory for producers. Production discipline has kept inventories in check and limited domestic pricing erosion . . . the industry has done an impressive job to date in keeping prices relatively stable," and "[t]he industry is taking an unprecedented amount of market downtime to keep the market in balance. IP alone took 700K tons in 4Q." [75]

155. In the same report, Deutsche Bank commented on Temple-Inland's containerboard and box business: "This business should show reasonable resiliency in an

---

[74] Temple-Inland 2008 10-K, filed Feb. 23, 2009, at 25; TIC Nov. 4, 2008 10-Q, at 19.
[75] February 27, 2009 Deutsche Bank Paper & Packaging industry analyst report, at 39, 61, and 68.

economic downturn, because of (1) recent industry consolidation, (2) recent industry capacity rationalization, (3) end markets weighted toward non-discretionary items such as food and beverages, and (4) an easing trend in some important input costs such as energy, recycled fiber, and transportation."

156. In 2009, John Geenan, a Senior Vice-President of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), explained that the containerboard industry aggressively managed capacity in order to maintain or increase pricing and that whenever prices threaten to decrease the industry rapidly removed capacity.

157. During an investor presentation in February, 2009, Temple-Inland stated that it had "centralized pricing decision making" and a "structured and disciplined approach to the market." The same presentation included a slide titled "*North American Corrugated Packaging Industry Fundamentals*," noting the "Consolidating industry… Significant capacity rationalization and downtime . . . [and] Improved pricing." Temple-Inland continued that "[i]mproved industry fundamentals has led to higher average prices and reduced volatility" in linerboard pricing, and referred to remarkable "industry discipline".[76]

158. Deutsche Bank commented on June 2, 2009, "we're impressed that prices have not fallen further. Besides very weak domestic demand, the industry is also coping with sharply lower export volumes . . . the supply discipline to date has been impressive."

159. On December 7, 2009, Deutsche Bank described a "notable effort" by containerboard producers to increase prices, stating that "[i]n recent weeks, most major producers have announced $50-70/ton hikes for January 1. We are surprised by the timing, because this is a seasonally weak period." The same report emphasized that a January 1 price increase was "somewhat unusual timing because the market is entering a seasonally weak period, but we expect the larger producers to support the hike," and also noted that despite declining prices in the prior year, "the wonder is how the industry kept prices from falling further, given extremely weak demand and low input costs."

---

[76] TIC Feb. 2009 Investor Presentation, at 22 and 25 – 26.

160.     On December 14, 2009, Smurfit-Stone announced the permanent closure of its Containerboard Products mills in Missoula, Montana (620,000 tons of linerboard annually) and Ontonagon, Michigan (280,000 tons of medium annually) effective December 31, 2009.   In response to the Missoula mill closure, Montana state senator Cliff Larson sent a letter to Judge Brendan L. Shannon, presiding Judge in Smurfit-Stone's Chapter 11 Bankruptcy proceedings, stating:

> "We are told that Smurfit-Stone does not want the plant to run because they want to control 'the market.'  Well, what about competition?  What about gathering in cash for investors and creditors?   With electric generating capacity of about seventeen megawatts setting idle, trained plant workers willing to work and generate that biomass energy source we have a ready source of green energy sadly not generated. Another income source - not actualized."

According to Smurfit-Stone's Disclosure Statement, the Ontonagon Mill and Missoula Mill closures were "ordinary course transactions" which did not require Bankruptcy Court approval.

## 2010

161.     As the U.S. economy began to emerge from the recession, Defendants and their co-conspirators again raised prices on linerboard by over 8% ($50/ton) from $585/ton to $635/ton, effective on or about January 1, 2010.   At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 8% ($50/ton) from $555/ton to $605/ton.  This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time.  Deutsche Bank commented on the January price increase, "It is hard to recall another hike being so readily passed through during a seasonally-weak period."[77]

162.     Less than a month later, several Defendants, including International Paper, began to discuss an additional price increase for March or April in various forums.[78]  Deutsche Bank reported "[w]e give this second containerboard hike a good chance of success," in part because

---

[77] February 8, 2010 Deutsche Bank Paper & Packaging industry analyst report, at 1.
[78] *More Board Makers want Price Increase*, Official Board Markets, March 6, 2010.

CONSOLIDATED AMENDED COMPLAINT

"[International Paper] is the clear industry leader, with about 30 percent of the domestic market."[79]

163.    Effective on or about April 1, 2010, Defendants and their co-conspirators again raised prices on linerboard by over 9% ($60/ton) from $635/ton to $695/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($60/ton) from $605/ton to $665/ton. This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time.

164.    As a result of the January and April price increase, total containerboard prices increased by $110 per ton. In presenting its earnings for the first quarter of 2010, Temple-Inland looked forward and anticipated higher prices in the third quarter.

165.    On May 5, 2010, PCA stated in its 10-Q for the second quarter that "[r]eported industry containerboard inventories at the end of March 2010 were at their lowest level in nearly 30 years…"[80]

166.    On May 17, 2010, Deutsche Bank presciently wrote of more price hikes to come based upon "a host of recent conversations across the trade," stating, "we are increasingly convinced of the third price hike attempt in 2010 [for containerboard]. Hikes in Jan & Apr added $110/ton to domestic list prices. We expect the next attempt to be in the $40-50/ton range with implementation slated between July 15th and Sep 1st. Industry fundamentals remain strong….a spring corrugated box hike appears to be going in with relative ease, and a host of recent conversations across the trade point to a growing sense of 'when,' not 'if' the next initiative will appear."[81]

167.    As predicted by Deutsche Bank, "based upon conversations across the trade" on June 30, 2010, Defendants International Paper and Georgia-Pacific informed its customers of another $60/ton price hike effective August 1, 2010. In fact, announcements from other Defendants soon followed, including Defendants PCA, Smurfit-Stone and Norampac .

---

[79] *IP Leads off Second Board Price Increase Attempt*, Official Board Markets, February 27, 2010.
[79] *IP Leads off Second Board Price Increase Attempt*, Official Board Markets, February 27, 2010.
[80] PCA May 5, 2010 10-Q, at 16.
[81] May 17, 2010 Deutsche Bank Paper & Packaging industry analyst report, at 1.

168.    After its discharge from bankruptcy, Smurfit-Stone joined the conspiracy, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in further idling of production capacity, reduced production and another near simultaneous across-the-board price increase.

169.    In a July 1, 2010, investor presentation, Smurfit-Stone's CEO Pat Moore and President & COO Steve Klinger reported that between 2005 and 2010, the company had closed 54 container plants.[82]  Smurfit-Stone described the industry's "permanent capacity adjustments" of a total of 2,365,000 tons of containerboard capacity since the end of 2008, and also described the steadily declining industry inventory rates over the prior decade.[83]

170.    On July 13, 2010, the Association of Independent Corrugated Converters ("AAIC") published an article entitled "3rd Containerboard Increase puts the Integrity of Our Industry on the Line."  In light of the significant manufacturing capacity cuts, as well as the absence of cost drivers, the article recognizes that a third price increase in 2010 in that environment "calls into question the integrity of our industry."  The article goes on to forewarn of serious repercussions:

> This third increase is rightfully calling into question the pricing activities of the major companies.  During the years 1994-1995, six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak of $525-535/ton.  These actions rightfully caused corrugated users to seek alternative packaging and reduce their corrugated purchases – witness the growth of returnable plastic container use in the mid-1990s. A far more serious result was an inventory collusion allegation and subsequent class action lawsuit brought by the corrugated industry's customer base that cost containerboard makers over $210 million in settlements.

171.    On or about August 3, 2010, Defendant Smurfit-Stone conducted an 'earnings call" to discuss their financial results for second quarter of 2010.  In response to a question about scheduled downtime, Steven J. Klinger, President and COO, stated that the company had completed "42% of [its] related downtime and expect in the back half of the year a very similar level to what we took in all of second quarter.  So just over the back half of the year, about the

---

[82] Smurfit-Stone "Targeted Accelerated Performance Improvement" presentation, July 1, 2010, at 18.
[83] *Id.* at pp 27-28.

same amount that we took in the second quarter" and "the second half of the year should see maintenance downtime from a [tons] standpoint at levels about consistent with what we incurred in the second quarter alone".[84] In fact, however, Smurfit-Stone forecast this downtime despite "historic low" inventory and rising prices.[85]

172. During the August 3, 2010 "earnings call" Smurfit-Stone revealed that it had "maintained market share during not only a challenging environment from an industry standpoint, but clearly in our extremely challenging environment for us internally" and "our customers, particularly in our container business and in our mill business, were quite loyal during this [while in Chapter 11] and we improved some of our business with them." In fact, Smurfit-Stone's August 3, 2010 earnings press release reported "higher average prices," "higher selling prices" and "improved selling prices" at the same time that it announced plans to close three more converting plants.

173. During an August 11, 2010 analyst conference call, Norampac President and CEO Marc-Andre Depin stated that the "dynamic of [the containerboard sector] are really, really positive for price increase implementation. So we are going one after the other. So we will see about the next one. But I think the dynamics are all there for a price increase and having good backlogs of finished product, which is regular boxes and folding cartons and containerboard and CRB grades…. as I mentioned, Q3, Q4, for sure we have prices increase… the market has been really, really tight."[86]

174. On or about September 13, 2010, the Gerson Lehman Group stated matters bluntly, "for the 3rd price increase within a year by major paper mills to work, it must be supported by major paper converters...these include: TIN, Temple-Inland, IP International Paper; SSCC Smurfit-Stone Corrugated Container; PKG Packaging Company of America; GP Georgia-Pacific; … & others."[87]

---

[84] Final Transcript 8/3/10 Earnings Conf. Call, pp 7-8.
[85] Final Transcript 8/3/10 Earnings Conf. Call, p. 10
[86] August 11, 2010 Cascades, Inc. Q2 2010 Earnings Conference Call, at 11.
[87] http://www.glgroup.com/News/The-third-price-increase-in-less-than-a-year%E2%80%A6when-will-they-ever-learn--50520.html

175.     On or about September 15, 2010, Smurfit-Stone participated in the UBS Global Paper & Forest Products conference call.  When asked about its "pricing power" if inventory levels were to rise CEO Patrick Moore responded that "as long as we continue to see a demand environment that we're operating in today - again, very stable, reasonably steady growth, unless we have a major dislocation in the demand side of things or unless pricing levels really begin to attract a lot of supply....inventory levels [will] continue to be very low."  Smurfit-Stone further reported that it had "fully implemented" its January and April 2010 price increases and that it was "[a]ggressively pursuing all three 2010 price increases".

176.     It is hardly consistent with competition that a company such as Smurfit-Stone in a Chapter 11 proceeding or just emerging from Chapter 11 could simultaneously maintain its pricing power, maintain or increase its market share and raise prices.  As Gerson Lehman indicated, such pricing power could only be accomplished if "supported" by its competitors.  Nor is it consistent with competition that a company in such circumstances would engage in substantial downtime in the face of low inventories and rising prices.

177.     The Defendants and their co-conspirators raised the price of containerboard in order to cause an increase in the price of corrugated containers.  Because Defendants convert 81% of the containerboard they manufacture into corrugated containers, Defendants reduced containerboard capacity and jointly increased containerboard prices in order to artificially drive up the price of corrugated containers and increase their profits.

178.     To accomplish the unprecedented price increases during the Class Period, the Defendants and their co-conspirators needed to reduce capacity in a concerted fashion.  No single Defendant could reduce capacity enough to cause an industry-wide price increase. Accordingly, the Defendants reduced capacity in concert to prevent any one Defendant from bearing the brunt of the capacity shutdown.  Defendants' coordinated efforts to restrict containerboard supply substantially reduced the inventory available for sale to Plaintiff Class[88]:

---

[88] M. Wilde, Deutche Bank, *Containerboard Market Overview*, Apr. 15, 2010, at p. 5.





179. Further, the price of both linerboard and corrugated medium rose at exactly the same time by exactly the same per-ton amounts. This identical and simultaneous across-the-board price increase on multiple products can only be explained by concerted and coordinated behavior by the Defendants.

52



**There Are No Innocent Explanations for the Coordinated Price Increases**

180.     Despite the unprecedented price increases implemented in the Containerboard Products industry during the Class Period, there were no sustained significant changes in production costs which could account for those price increases or Defendants' coordinated reduction in manufacturing capacity and product supply.   During the Class Period, prices increased at over double the rate of corresponding manufacturing costs.

181.     There are four main costs which are responsible for the bulk of the total cost to manufacture and produce Containerboard Products.   They are: 1) raw material costs; 2) labor costs; 3) energy costs; and 4) environmental compliance costs.   As explained below, there were no significant or sustained changes in any of these types of costs during the Class Period.

CONSOLIDATED AMENDED COMPLAINT

182.    Raw Material Costs:  Pulpwood (woodchips used to produce various paper products) is the main input for linerboard.  Consequently, it is by far the most significant portion of linerboard cost, representing approximately 40-50%.  Alternately, other factors including energy and labor cumulatively represent only about 25%.  Because pulpwood prices represent such a large portion of linerboard cost, significant changes in the former may be detected in changes in the latter.  The price of pulpwood has increased at a constant rate since the middle of 2001 (an average of roughly 6% per year).  As a result, there are no major fluctuations in pulpwood price that correspond to the fluctuations in Containerboard Products.

183.    Labor costs:  According to PCA's executives: "[l]abor costs in a well run containerboard mill run $30-$40/ton cash cost, which is a relatively small part of the overall manufacturing cost…"[89]  Average weekly earnings for production workers at paperboard mills has remained flat during the Class Period.  Additionally, the 2005 annual report for Smurfit-Stone stated that both post-retirement healthcare and life insurance benefits were reduced in 2005.  Therefore, labor costs can largely be dismissed as an explanation for Containerboard Products price increases.

184.    Energy Costs:  Studies by economists have found no significant effect of energy costs on containerboard prices.[90]   Additionally, International Paper, the largest producer of containerboard, stated in its 2005 10-K that, "[w]hile energy, wood and raw material price movements are mixed, their impact for the quarter is expected to be flat."  In reference to the first few months of 2006, it was further added, "[w]e are starting to see some reductions in natural gas and southern wood costs that, if the trend continues, should benefit operations as the year progresses."[91]  Despite some volatility in the natural gas mark since that time, natural gas prices in 2010 are at or below the natural gas prices existing at the beginning of the Class Period.

185.    Despite the absence of any lasting cost increases, Defendants have nevertheless attempted to blame increasing costs as the reason for their capacity restrictions and increases in

---

[89] Paul Stecko, *Creating Shareholder Value in Containerboard Markets*. PULP & PAPER 63 (March 1, 2005).
[90] *See e.g.* Li, H. and Luo, J.  Industry Consolidation and Price in the US Linerboard Industry. Journal of Forest Economics 14 (2008), pp. 93-115.
[91] International Paper Form 10-K for year ending December 31, 2005, filed March 6, 2006, at p.11.

CONSOLIDATED AMENDED COMPLAINT

Containerboard Products prices. Specifically, in the third quarter of 2006, the President and CEO of Norampac attempted to explain the closure of Norampac's 300,000 tons-per-year Ontario mill as follows: "[t]his decision was taken to mitigate the negative impacts of several economic factors such as growing fiber supply costs, rising energy costs and the strengthening of the Canadian dollar."[92] However, as this explanation does not comport with the relevant market data, it serves as little more than a pretense for collusive activity. *See In re Linerboard Antitrust Litigation*, 504 F.Supp.2d 38, 53 (E.D.Pa. 2007) ("[t]he Third Circuit has long recognized that evidence of pretextual explanations for price increases or output restrictions, 'if believed by a jury, would disprove the likelihood of independent action' by an alleged conspirator. [Citations].")

186. In response to Norampac's announcement, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement. Linerboard prices are up $120/ton over the last year, and the YTD operating rate for linerboard in the US is 98.9%."[93]

187. There is no consistent observable relationship between the price of natural gas (the predominant source of energy for the Containerboard Products industry) and the price of Containerboard Product. For example, although there was a brief uptick in the price of natural gas in the 4th Quarter 2005, the increased prices during the same period outpaced any corresponding manufacturing cost increase. Moreover, the price of natural gas fell nearly 40% from December 2005 to April 2006 without any corresponding price decrease in Containerboard Products. In fact, in April 2006, well after the 40% drop in natural gas prices, Defendants and their co-conspirators again raised prices by over 10%. If energy costs were responsible for price changes (as explained by Defendants to their customers) a 40% decrease in energy costs should result in a lower containerboard price, not a 10% increase. Similarly, from April 2006 through June 2007, the price of natural gas declined by approximately 7%. However, in August 2007, the Defendants and their co-conspirators raised containerboard prices by 7%. These increases in the prices for Containerboard Products cannot be explained by changes in energy costs.

---

[92] http://timview.blogspot.com/2006/09/red-rock-mill-shut.html
[93] *060830 Deutsche Bank Report - Norampac closing Red Rock*, Deutsche Bank – Equity Research

188.    Deutsche Bank reported that PCA reduced its natural gas usage "to barely over 3% of purchased fuels (was 9% year ago)."[94]   On April 18, 2006, Deutsche Bank doubted the ability of the Defendants and their co-conspirators to push further price increases through noting that "raw material costs for natural gas & wastepaper have fallen."[95] This is further indication that neither natural gas costs nor raw material costs had a significant impact on costs associated with producing Containerboard Products.

189.    <u>Environmental Costs</u>: The Defendants' public filings report that "Compliance with environmental standards should not adversely effect our competitive position or operating results."[96]   Accordingly, compliance with environmental regulations cannot explain the extraordinary increase in price of containerboard during the Class Period.

190.    The elimination of cost explanations supports an inference of conspiracy.  Both the capacity reductions and the price increases of the period beginning summer 2005 were record breaking in magnitude.  In early 2006, one trade journal reported, "Since October 2005, board prices have risen 33%.  The quickness of the jump is unprecedented."[97]   In regards to capacity reductions during this period, another trade journal called them "unprecedented."  By the end of 2006, the Defendants had successfully driven inventory to their lowest levels in twenty five years.  In addition, demand for Containerboard Products is tied to overall consumer demand and spending.  In about the second half of 2008, general consumer demand in the United States plummeted.   Yet, in August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%.  Even though the U.S. economy has continued to be weak with fears of deflation being expressed by economists and policymakers in 2009-2010, during 2010 Defendants and their co-conspirators raised Containerboard Product prices an unprecedented three times in one year to all time highs.   Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply.

---

[94] *060124 Deutsche Bank - Packaging Corp's 4Q in 100 words*, Deutsche Bank – Equity Research
[95] *060418 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[96] See e.g. Smurfit-Stone Form 10-K, filed March 06, 2006 at p. 7.
[97] Paperboard and Packaging. (April 2006) at 16.

CONSOLIDATED AMENDED COMPLAINT

191.    The unprecedented reduction in North American containerboard supply was not the result of the closure of one producer's machines but rather concerted effort by the Defendants and their co-conspirators to reduce capacity in an effort to raise and stabilize prices of Containerboard Products to supra-competitive levels.

## ACTIVE CONCEALMENT

192.    Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively, actively and fraudulently concealed their unlawful conduct from Plaintiffs and the Plaintiff Class.  Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases, including that energy and raw material cost increases were responsible for the price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection.  In addition to the various pretexts and false justifications detailed above, Defendants also maintain, and in some instances, disseminated directly to their customers or posted on their websites "codes of ethics" which among other things, expressed their strict adherence to the antitrust laws.  In the latter part of the Class Period, Defendants also falsely attempted to blame the demise of the "black liquor" tax credit for the increase in prices at a time when prices for other paper products which would have been similarly impacted, decreased.

193.    Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this litigation was commenced.

194.    As a result of the concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## ANTITRUST IMPACT AND DAMAGES

195.    Defendants' unlawful conspiracy has had at least the following effects:

a.  Prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Containerboard Products were artificially fixed, raised, stabilized and maintained at artificially inflated and supra-competitive levels in the United States;

b.  Plaintiffs and the other members of the Class paid more for Containerboard Products than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

c.  Competition in the sale of Containerboard Products was restrained, suppressed and eliminated in the United States; and,

d.  As a direct and proximate result of Defendants' illegal combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured in their respective businesses and property, in amounts according to proof at trial.

## CLAIM FOR RELIEF

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

196.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

197.    Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Containerboard Products in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

198.    The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, and/or stabilized prices for Containerboard Products in the United States.   Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

199.    The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce.  The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators.  These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

200.    The contract, combination or conspiracy has had the following effects, among others:

    a.    Prices charged to Plaintiffs and Class members for Containerboard Products were fixed or stabilized at higher, artificially derived, supra-competitive levels;

    b.    Plaintiffs and Class members have been deprived of the benefits of free, open and unrestricted competition in the market for Containerboard Products; and

    c.    Competition in establishing the prices paid, customers of, and territories for Containerboard Products has been unlawfully restrained, suppressed and eliminated.

201.    As a proximate result of the Defendants' unlawful conduct, Plaintiffs and Class members have suffered injury in that they have paid supra-competitive prices for Containerboard Products.  Plaintiffs and Class members will continue to be injured in their business and property by paying more for Containerboard Products purchased directly from the Defendants and their co-conspirators than they would pay in the absence of the contract, combination or conspiracy.

## PRAYER

WHEREFORE, Plaintiffs pray as follows:

A.    That the Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and that Plaintiffs be named representatives of the Class.

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudged to have been violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

C.      That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

D.      That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

F.      That Defendants and their co-conspirators be enjoined from further violations of the antitrust laws; and,

G.      That Plaintiffs and members of the Class have such other, further or different relief, as the case may require and the Court may deem just and proper under the circumstances.

CONSOLIDATED AMENDED COMPLAINT

## JURY TRIAL DEMAND

Pursuant to Federal Rules of Civil Procedure, Rule 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated:    November 8, 2010

/s/ Daniel J. Mogin
Daniel J. Mogin
Matthew T. Sinnott
Kristy F. Greenberg (Of Counsel)
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
T: 619-687-6611
F: 619-687-6610
dmogin@moginlaw.com
msinnott@moginlaw.com
kgreenberg@moginlaw.com

Michael J. Freed
Steven A. Kanner
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015 USA
T: 224-632-4500
F: 224-632-4521
mfreed@fklmlaw.com
skanner@fklmlaw.com
mmoskovitz@fklmlaw.com

Daniel E. Gustafson
Daniel C. Hedlund
Jason S. Kilene
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
T: 612-333-8844
F: 612-339-6622
DGustafson@gustafsongluek.com
DHedlund@gustafsongluek.com
JKilene@gustafsongluek.com

H. Laddie Montague, Jr.
Martin Twersky
Matthew P. McCahill
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
T: 800-424-6690
F: 215-875-4604
hlmontague@bm.net
mtwersky@bm.net
mmccahill@bm.net

Joseph Goldberg
FREEDMAN BOYD HOLLANDER
GOLDBERG IVES & DUNCAN, P.A.
20 First Plaza
Albuquerque, NM 87012
T: 505-842-9960
F: 505-842-0761
jg@fbdlaw.com

Dianne M. Nast
Erin C. Burns
RODANAST, P.C.
801 Estelle Drive
Lancaster, PA 17601
T: 717-892-3000
F: 717-892-1200
dnast@rodanast.com
eburns@rodanast.com

Howard Langer
LANGER GROGAN & DIVER, P.C.
1717 Arch Street
Philadelphia, PA 19103
T: 215-320-5661
F: 215-320-5703
hlanger@langergrogan.com

Simon B. Paris
Patrick Howard
Charles J. Kocher
SALTZ MONGELUZZI BARRETT &
BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
T: 215.575.3986
F: 215.575.3894
sparis@smbb.com
phoward@smbb.com
ckocher@smbb.com

Chris Burke
SCOTT + SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
T: 619-233-4565
F: 619-233-0508
cburke@scott-scott.com

Leland Shurin
Richard F. Lombardo
Kathy Woods
SHAFFER LOMBARDO SHURIN, P.C.
911 Main Street, Suite 2000
Kansas City, MO 64105
T: (816) 931-0500
F: (816) 931-5774
lshurin@sls-law.com
rlombardo@sls-law.com
kwoods@sls-law.com

Alexander M. Schack
Geoff Spreter LAW OFFICES OF
ALEXANDER M.
SCHACK
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
T: (858) 485-6535
F: (858) 485-0608
alexschack@amslawoffice.com
geoffspreter@amslawoffice.com

W. Joseph Bruckner
Heidi M. Silton
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0981
wjbruckner@locklaw.com
hmsilton@locklaw.com

CONSOLIDATED AMENDED COMPLAINT

Anthony D. Shapiro
Jeffrey T. Sprung
Ronnie Seidel Spiegel
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
T: 206-623-7292
F: 206-623-0594
tony@hbsslaw.com
jeffs@hbsslaw.com
ronnie@hbsslaw.com

Bonny E. Sweeney
Alexandra S. Bernay
Paula M. Roach
ROBBINS GELLER RUDMAN & DOWD    LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
T: 619-231-1058
F: 619-231-7423
bsweeney@rgrdlaw.com
xbernay@rgrdlaw.com
proach@rgrdlaw.com

Jonathan P. Whitcomb
DISERIO MARTIN O'CONNOR & CASTIGLIONI LLP
One Atlantic Street
Stamford, CT  06901
T: 203-358-0800
F: 203-348-2321
jwhitcomb@dmoc.com

Jay W. Eisenhofer
Robert G. Eisler
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
T:  646-722-8500
F:  646-722-8501
reisler@gelaw.com

Marvin A. Miller
Matthew E. VanTine
Lori A. Fanning
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
T: 312-332-3400
F: 312-676-2676
mmiller@millerlawllc.com
mvantine@millerlawllc.com
lfanning@millerlawllc.com

Samuel H. Rudman
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
T: 631-367-7100
F: 631-367-1173
srudman@rgrdlaw.com

Bruce K. Cohen
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA 19102
T: 215 564 5182
F: 215-569-0958
bcohen@mcgslaw.com

Vincent J. Esades
Scott W. Carlson
Heins Mills & Olson, P.L.C.
310 Clifron Avenue
Minneapolis, MN  55403
T:  612-338-4605
F:  612-338-4692
vesades@heinsmills.com
scarlson@heinsmills.com

CONSOLIDATED AMENDED COMPLAINT

Brian P. Murray
Lee Albert
MURRAY, Frank & SAILER LLP
275 Madison Avenue, Suite 801
New York, New York 10016
T: (212) 682-1818
F: (212) 682-1892
bmurray@murrayfrank.com
lalbert@murrayfrank.com

Robert J. LaRocca
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
T: 215-238-1700
F: 215-238-1968
rlarocca@kohnswift.com

Garrett Blanchfield
Reinhardt Wendorf & Blanchfield
E-1250 First Nat'l Bank Building
332 Minnesota Street
St. Paul, MN 55101
T: 651-287-2100
F: 651-287-2103
g.blanchfield@rwblawfirm.com

Manuel J. Dominguez
William Lewis
BERMAN DEVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
jdominguez@bermandevalerio.com
wlewis@bermandevalerio.com

Guido Saveri
R. Alexander Saveri
Cadio Zirpoli
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813
guido@saveri.com
rick@saveri.com
cadio@saveri.com

CONSOLIDATED AMENDED COMPLAINT