IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KLEEN PRODUCTS, LLC, et al.,    )
                                )
            Plaintiffs,         )
                                )
      v.                        )    No.  10 C 5711
                                )
PACKAGING CORPORATION OF        )
AMERICA, et al,.                )
                                )
            Defendants.         )

<u>MEMORANDUM OPINION AND ORDER</u>

This action is the outgrowth of a number of class actions that had been brought against Packaging Corporation of America ("Packaging"), International Paper Company ("International Paper"), Cascades Canada, Inc. ("Cascades"), Norampac Holdings U.S., Inc. ("Norampac"), Weyerhaeuser Company ("Weyerhaeuser"), Geogia-Pacific, LLC ("Georgia-Pacific"), Temple-Inland, Inc. ("Temple") and Smurfit-Stone Container Corporation ("Smurfit-Stone"),[1] charging violations of Sherman Act §1 ("Section 1," 15 U.S.C. §1).  As a result of the sequence of events described in the next paragraph, the present action is the only one pending, with the individual plaintiffs (also serving as the putative

---

[1] Despite this Court's general preference for avoiding the generic terms "plaintiffs" and "defendants" in favor of using the individual names of litigants before it, that generic usage (with initial capital letters) makes the most sense here because of the large number of combatants on each side of the "v." sign and because the analysis most often speaks in group rather than individual terms.  This opinion likewise cites to Defendants' original supporting memorandum as "D. Mem.," to Plaintiffs' responsive memorandum as "P. Mem." and to Defendants' reply memorandum as "D.R. Mem."

class representatives) comprising Kleen Products, LLC, R.P.R. Enterprises, Inc., Mighty Pac, Inc., Ferraro Food, Inc., Ferraro Foods of North Carolina, LLC, Distributors Packaging Group, LLC, RHE Hatco, Inc. and Chandler Packaging Group.[2]

This Court originally received, via random assignment, <u>Kleen Prods., LLC v. Packaging Corp. of Am.</u>, 10 C 5711, the first-filed among a number of prospective class actions brought in this District Court. Four of those later-filed cases[3] were then reassigned to this Court's calendar on grounds of relatedness under this District Court's LR 40.4.

This Court then required Plaintiffs to file a Consolidated and Amended Complaint ("Complaint") under the original case number (Dkt. 51) and dismissed all the other cases without prejudice (Dkt. 69). As it has in a number of other cases, this Court followed a sealed bid procedure to rule on the designation

---

[2] As n.3 reflects, Thule, Inc. ("Thule") had originally filed its own Complaint in Case No. 10 C 6797, advancing essentially identical class action claims against almost all of the Defendants. As later stated in the text, that action was dismissed without prejudice when the current Complaint was filed, with Thule being included as a coplaintiff in the present action. Now, while this memorandum opinion and order was in the final stages of preparation, this Court has received from Thule's counsel a notice of voluntary dismissal as to all of the Defendants whom it had targeted, so that it is no longer a party to the litigation.

[3] <u>R.P.R. Enters., Inc. v. Packaging Corp. of Am. et al</u>, 10 C 5849, <u>El Jay Poultry Corp. v. Packaging Corp. of Am. et al</u>, 10 C 5896, <u>Mighty Pac, Inc. v. Packaging Corp. of Am. et al</u>, 10 C 6125 and <u>Thule, Inc. v. Packaging Corp. of Am., et al</u>, 10 C 6797.

of class counsel (Dkt. 145).

During that rather lengthy procedural sequence, Defendants jointly filed a Fed. R. Civ. P. ("Rule") 12(b)(6) motion to dismiss the Complaint with prejudice. After settling the class counsel issue, this Court ordered a response by Plaintiffs and a reply by Defendants to complete the briefing process. For the reasons set out below, Defendants' motion is denied.

### Rule 12(b)(6) Standard

Under Rule 12(b)(6) a party may move for dismissal of a complaint on the grounds of "failure to state a claim upon which relief can be granted." Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) did away with the Rule 12(b)(6) formulation first announced in Conley v. Gibson, 355 U.S. 41, 45-46 (1957) "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." As Twombly, id. at 562-63 put it:

> Conley's "no set of facts" language has been
> questioned, criticized, and explained away long enough.
> To be fair to the Conley Court, the passage should be
> understood in light of the opinion's preceding summary
> of the complaint's concrete allegations, which the
> Court quite reasonably understood as amply stating a
> claim for relief. But the passage so often quoted
> fails to mention this understanding on the part of the
> Court, and after puzzling the profession for 50 years,
> this famous observation has earned its retirement.

Twombly, id. at 570 held that to survive a Rule 12(b)(6) motion a complaint must provide "only enough facts to state a claim to

3

relief that is plausible on its face." Or put otherwise, "[f]actual allegations must be enough to raise a right to relief above the speculative level" (id. at 555).

But almost immediately thereafter the Supreme Court issued another opinion that seemed to cabin the Twombly opinion somewhat. Airborne Beepers & Video, Inc. v. AT&T Mobility LLC, 499 F.3d 663, 667 (7th Cir. 2007) has described the two opinions this way:

> In Bell Atlantic Corp. v. Twombly, [550 U.S. 544,] 127 S.Ct. 1955 (2007), the Supreme Court wrote that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ...a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]' to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." Id. at 1964-65 (citations omitted). Two weeks later the Court clarified that Twombly did not signal a switch to fact-pleading in the federal courts. See Erickson v. Pardus, [551 U.S. 89,] 127 S.Ct. 2197 (2007). To the contrary, Erickson reaffirmed that under Rule 8 "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the...claim is and the grounds upon which it rests.'" 127 S.Ct. at 2200, quoting Twombly, [551 U.S. at 93,] 127 S.Ct. at 1964. Taking Erickson and Twombly together, we understand the Court to be saying only that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8.

Since then Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009) has shed further light on the principles articulated in Twombly, so that the ensuing caselaw tendency has been to treat the pair of cases like a two-horse entry (1 and 1A) in the jurisprudential

4

sweepstakes.  But because this case like <u>Twombly</u> involves the antitrust canon, this opinion will look more to <u>Twombly</u> for application of the concept of "plausibility" in the present context.

### Section 1 Standard

<u>Twombly</u>, 550 U.S. at 553-54 (ellipses and brackets in original, but internal quotation marks and citations omitted) also set out the applicable substantive requirements of a Section 1 claim:

> Because §1 of the Sherman Act does not prohibit [all] unreasonable restraints of trade...but only restraints effected by a contract, combination, or conspiracy, [t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express.  While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establish[ing] agreement or...itself constitut[ing] a Sherman Act offense.  Even conscious parallelism, a common reaction of firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful.

<u>Twombly</u>, <u>id</u>. at 557 made it clear that Plaintiffs must place such an allegation of conscious parallelism "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."

In constructing its plausibility standard, <u>Twombly</u>, <u>id</u>. at 556 (internal footnote and quotation marks omitted) did not require any determination of probability:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.

And <u>In re Text Messaging Antitrust Litig.</u>, 630 F.3d 622, 629 (7th Cir. 2010) has further clarified the distinction between probability and plausibility in the Section 1 context:

> Probability runs the gamut from a zero likelihood to a certainty. What is impossible has a zero likelihood of occurring and what is plausible has a moderately high likelihood of occurring. The fact that the allegations undergirding a claim could be true is no longer enough to save a complaint from being dismissed; the complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as "preponderance of the evidence" connote.

Put another way, what Plaintiffs must do is to "nudge[ ] their claims across the line from conceivable to plausible" (<u>Twombly</u>, 550 U.S. at 570).

### Factual Background

Countless industrial and consumer products are manufactured from containerboard, the principal raw material used to manufacture corrugated products such as linerboard and corrugated boxes (¶36[4]). That being so, the prices of those corrugated products are of course tied directly to the price of

---

[4] Citations to the Complaint will simply take the form "¶--."

containerboard (¶40).

During the class period the containerboard industry was heavily consolidated (¶39). Significant barriers to entry in the form of capital-intensive startup costs and high transportation costs make that industry susceptible to an oligopolistic structure (¶41). Containerboard industry firms share a cost structure because of those barriers to entry and the degree of consolidation in the industry (¶¶47-48). Because there are no close substitutes for containerboard, the demand for the product is inelastic (¶¶50-51). While the containerboard industry is consolidated, no single firm has sufficient market power to control the supply and price of the product (¶52).

There are a number of important industry groups and trade associations in the containerboard industry (¶¶53-56). Most Defendants belong to one or both of two prominent organizations: the Fibre Box Association ("FBA") and the American Forest and Paper Association (¶¶53-54).

From the 1930s onward the containerboard industry has been subject to extensive antitrust litigation and other charges of unfair competition (¶¶57-62). In this instance Plaintiffs allege the existence of such behavior beginning in August 2005 and continuing through the present (¶1). In August 2005 the containerboard industry faced complex environmental factors, including declining profit margins, rising demand and a promising

economic environment (¶64). Between 2003 and 2005 individual producers had tried and failed to institute price increases at least twice (id.).

In 2005 many of the Defendants, including Smurfit-Stone, Packaging, International Paper, Temple, Georgia-Pacific and Norampac, significantly reduced their production capacity through plant closures, capacity idling or scheduled production downtime (¶¶71-72, 75, 78-81, 84-87). Those capacity reductions coincided in time with the existence of a high demand for containerboard (¶¶73-75).

In June 2005 industry leaders, including many representatives of Defendants, attended an industry conference where pricing strategies were discussed (¶¶76-77). Just over three months after the conference, each of Smurfit-Stone, Packaging and Georgia-Pacific announced a $30 per ton price increase effective October 1, 2005 (¶¶83-84). After an FBA conference on September 27 the remaining Defendants followed suit by announcing a $30 per ton price increase effective October 1 (¶89). Only a few months later, on November 28, the FBA Board of Directors met (¶91). At that meeting both Weyerhaeuser and Packaging announced $40 per ton price increases effective January 1, 2006 (id.). All other Defendants matched the $40 per ton price hike on January 1 (¶98). Then on March 14, 2006 the FBA Executive Committee met again (¶104), and Defendants raised

their prices by $50 per ton only a few weeks later (id.).

Even though prices were increasing throughout 2005 and into 2006, many of the Defendants reduced capacity during that period (¶¶115, 117-18). Such capacity decreases continued through 2007 (¶¶123, 125, 132). Shortly after a large industry conference in June 2007, both Packaging and Smurfit-Stone announced $40 per ton price increases effective August 1 (¶¶126-27). On or about August 1 all other Defendants followed suit (¶129).

In late March of 2008, as the economy was beginning to decline, the industry conducted a series of conferences (¶¶138-39). Less than two months later, in early May, both Georgia-Pacific and Smurfit-Stone announced $55 per ton price increases to take effect July 1 (¶141). Most of the remaining Defendants instituted identical price increase in the same time period (id.). About a month later International Paper announced its intention to raise prices by an additional $60 per ton on October 1 (¶145). International Paper's price increase was followed by the majority of the industry soon thereafter (id.). Over the course of the remainder of the year the industry saw a continued decrease in production (¶¶150, 152).

Despite a drastic economic slowdown in 2009, containerboard prices were sticky and for the most part remained at the levels achieved by earlier price increases (¶¶154-58). In the face of economic weakness and normal seasonal weakness, Defendants raised

prices by $50 per ton on January 1, 2010.  Defendants continued
to raise prices through the summer of 2010, raising prices by $60
per ton on April 1 and August 1 (¶¶163, 167).

### Conscious Parallelism

Plaintiffs assert that Defendants engaged in the type of
parallel business behavior that meets the threshold requirement
of conscious parallelism.  In particular Plaintiffs allege that
Defendants' uniformly contemporaneous[5] supply restrictions and
price increases establish such parallelism (P. Mem. 3-4).[6]  There
are numerous allegations of circumstances where, in the context
of alleged parallel capacity reductions, Defendants raised prices
simultaneously or most Defendants raised prices closely following
announced price increases by a small number of Defendants.  Thus
at first blush Plaintiffs' allegations certainly seem to allege
the required conscious parallelism.

Defendants attempt to counter those allegations in a number
of ways.  First they argue that their capacity reductions were

---

[5]  "Contemporaneous" is employed here in the broader sense,
connoting essentially the same time rather than lockstep
conformity.  As the just-completed extended account reflects,
many of the increases by different Defendants followed the
actions of others after a short time interval.  But that of
course is common in conscious parallelism scenarios.

[6]  Plaintiffs can prove relevant parallel activity by
showing either direct price-fixing or by showing output-
restriction alone (Gen. Leaseways, Inc. v. Nat'l Truck Leasing
Assoc., 744 F.2d 588, 594-95 (7th Cir. 1984)).  Here Plaintiffs
proceed by adducing substantial evidence of both activities.

not truly parallel. More specifically, they suggest that they made only modest capacity reductions, that the reductions were made in varying amounts and not all at the same time and that they did not follow each others' reductions. Those contentions are unconvincing for a number of reasons.

For one thing, Defendants give unwarrantedly short shrift to the amount of detail provided by Plaintiffs. As partially detailed above, Plaintiffs have provided specific allegations of just the type of reductions that Defendants characterize as required (P. Mem. 3-4). More significantly, Defendants' characterizations of Plaintiffs' allegations as assertedly insufficient reflect only their partisan view. To the contrary, Plaintiffs have alleged more than mere modest capacity reductions.[7] Similarly, while there may be some variation in the amount[8] and timing[9] of reductions, that variation is not

---

[7] In its separate memorandum, Temple argues that allegations of capacity reductions are not the same as allegations of reduced supply (T. Mem. 4-7). While that may be technically correct, such an assertion does not address the alleged price parallelism (the ultimate concern) or the simple fact that capacity restrictions demonstrate a long-term decline in possible supply and create the kind of restriction needed to enforce cartel behavior.

[8] Variations in the size of capacity reductions do not disprove the existence of a conspiracy, just as "[e]ven a single act may be sufficient to draw a defendant within the ambit of a conspiracy" (United States v. Consol. Packaging Corp., 575 F.2d 117, 126 (7th Cir. 1978)).

[9] Capacity reductions need not be simultaneous to demonstrate conscious parallelism (In re Plasma-Derivative

substantial enough to overcome the otherwise strong suggestion of conscious parallelism.[10]  More generally, Defendants' exclusive concentration on small details[11] without refuting the bigger picture allegations forgets a basic tenet confirmed nearly a half century ago in <u>Cont'l Ore Co. v. Union Carbide & Carbon Corp.</u>, 370 U.S. 690, 699 (1962)(quoting an earlier Sixth Circuit opinion):

> [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.

---

<u>Protein Therapies Antitrust Litig.</u>, No. 09 C 7666, 2011 WL 462648, at *7 (N.D. Ill. Feb. 9)).

[10]  Defendants point to specific periods of time during the class period when industry capacity actually increased (D. Mem. 12-15).  That focus is unconvincing.  As <u>In re High Fructose Antitrust Litig.</u>, 295 F.3d 651, 657 (7th Cir. 2002) has indicated, additions to capacity during the class period "do[ ] not disprove the existence of the conspiracy."  Further, to the extent that capacity increases took place after Defendants were able to effectuate their intended price increases, "no further action by the conspirators is required to effect the objectives of the conspiracy" because "each sale at the fixed price continues to benefit the conspirators" (<u>Morton's Market, Inc. v. Gustafson's Dairy, Inc.</u>, 198 F.3d 823, 838 (11th Cir. 1999)).

[11]  Defendants contend that Plaintiffs' allegations of mill closures actually rebut a suggestion of a conspiracy on the premise that closures impose permanent restrictions on capacity, while only temporary underutilization is required for the mutual deterrence needed to maintain a stable cartel (D. Mem. 11).  Plaintiffs successfully refute that argument in a number of ways, including their pointing out that in this specific context mill closures were combined with more temporary reductions in capacity (P. Mem. 32 n.29).  Further information about the specific capacities of each Defendant will reveal whether the mill closures actually furthered a conspiracy or may perhaps tend to make its existence less likely.

Most important, though, are the Complaint's allegations of parallel price increases. While Defendants do attempt to cast doubt on the parallel nature of the capacity reductions, they do not refute the allegations of directly parallel pricing activity. Even without any parallel capacity reductions, consistent parallel price increases are enough to make a threshold showing of conscious parallelism.

Instead of denying the parallel nature of the price increases, Defendants argue that such parallel pricing does not suggest an agreement because it is an expected result of lawful interdependent conduct in a consolidated industry (D. R. Mem. 11-13). Those arguments do not refute the obvious plausibility of Plaintiffs' threshold showing of conscious parallelism for Rule 12(b)(6) purposes.[12] Rather, as discussed below, they address whether one of the possible additional contextual factors are present.

## Additional Factors

Conscious parallelism alone is not enough for antitrust liability. As <u>Text Messaging</u>, 630 F.3d at 627 has recently put it:

---

[12] Cases cited by Defendants themselves confirm that parallel pricing decisions may be sufficient to meet the threshold requirement of conscious parallelism (see, e.g., <u>White v. R.M. Packer Corp.</u>, No. 10-1130, 2011 WL 565655, at *1-2 (1st Cir. Feb. 18)).

> [A] complaint that merely alleges parallel behavior
> alleges facts that are equally consistent with an
> inference that the defendants are conspiring and an
> inference that the conditions of their market have
> enabled them to avoid competing without having to agree
> not to compete.

For that reason Plaintiffs must provide additional contextual
factors that support a plausible inference of an agreement even
if they do not "exclude every plausible interpretation of the
facts that does not support their theory of liability" (In re
Potash Antitrust Litig., 667 F.Supp.2d 907, 936-37 (N.D. Ill.
2009) (quotation marks omitted)). To that end Plaintiffs allege
a number of such additional factors (P. Mem. 19-20).[13]

Plaintiffs first argue that a number of the specific
capacity and pricing decisions made by Defendants were against
their self-interest and thus suggest the presence of an
agreement. Plaintiffs point out that Defendants initially cut
capacity despite favorable economic conditions and that they
later increased prices notwithstanding declining demand (P. Mem.
24). Defendants respond that a decision to maintain or increase
prices in a period of declining demand is rational when demand is
inelastic because decreased prices will not appreciably increase
demand (D. Mem. 23)--a contention that seems to have some force
where, as here, Plaintiffs have alleged that demand is inelastic.

---

[13] This opinion discusses the suggested additional factors
in the same sequence as discussed by Plaintiffs, even though from
this Court's perspective Plaintiffs have not ordered such factors
according to their persuasiveness.

That, however, would not explain why Defendants would cut capacity despite a favorable economic environment. After all, in an inelastic market such reductions in capacity could be used as leverage to increase prices on the static group of consumers by creating product scarcity. Defendants seek to undercut that possibility by suggesting that the relevant reductions, as alleged, actually took place during a period of declining market demand (D. Mem. 15).

But Plaintiffs allege otherwise--they assert that such capacity reductions, at least in large part, took place when the industry foresaw rising demand (P. Mem. 24). On that score it must be remembered that the present context requires only plausibility of Plaintiffs' version and that this is not the time to evaluate evidentiary disputes as to whether Defendants reduced capacity in anticipation of increasing demand or because they began to see declining demand on the horizon.[14]

Plaintiffs also urge that Defendants would be acting against their own interests if they independently cut production, including permanent measures such as plant closings. Plaintiffs suggest that such capacity reductions are against Defendants'

---

[14] Plaintiffs also argue that Defendants' price increases were unusual and unprecedented. While Plaintiffs do allege some dramatic price increases, Defendants are correct in pointing out that Plaintiffs provide no comparative evidence as to whether the price increased were out of line with industry price increases before or after the class period (D. Mem. 16).

interest because they cannot be easily reversed and because "absent an agreement, the first firm to move takes a significant risk that competitors won't follow" (<u>Plasma</u>, 2011 WL 462648, at *9).

Defendants respond that this model of pricing behavior is incomplete. They claim that in a consolidated industry it is rational for an individual firm to exercise price leadership by announcing a future price increase early and waiting to see what happens (D. Mem. 19-20). If other firms follow suit the leader will effectuate the price increases, while if other firms do not follow suit the leader can abandon the increase. Defendants contend that non-leader firms will often rationally follow the leader's price increase because raising the price even higher would risk the loss of business, whereas maintaining a lower price would forgo profits. Defendants also add that not all Defendants permanently closed mills or otherwise permanently reduced capacity (D. R. Mem. 4-6).

To be sure, those contentions may be plausible--but that does not negate the plausibility of Plaintiffs' competing version. In that regard, it is certainly plausible that firms may see an agreement as a useful way to avoid the inherent uncertainty in such speculative price leadership, especially where as here there are a sizable number of individual firms, so that firms must anticipate and respond to the behavior

16

of many actors.  It is likewise plausible that the conduct of some Defendants in permanently reducing capacity while others did not may stem in whole or in part from the latter group's having previously reduced capacity or not having enough existing capacity to threaten the conspiracy.  In sum, the timing of capacity cuts and price increases may not call for a ruling in Plaintiffs' favor as a matter of law, but it also does not undermine the plausibility of an alleged conspiracy.

Plaintiffs also assert that drastic changes in the industry's structure and pricing further support the existence of a conspiracy (P. Mem. 9-10).  Allegations of significant market consolidation in combination with the move from a model of maximizing capacity utilization to balancing supply with current demand at least hint at the types of "marked change in [D]efendants' behavior in the market...that have been held sufficient to make an antitrust conspiracy plausible" (Standard Iron Works v. Arcelormittal, 639 F.Supp.2d 877, 900 (N.D. Ill. 2009)(internal quotation marks omitted)).

In that regard Defendants rightly point out that Plaintiffs do not allege drastic changes at the beginning of the class period, but allege instead that the industry consolidated and changed its model throughout the decade preceding the class period (D. R. Mem. 16-17).  That however does not contribute significantly to the plausibility or implausibility mix--it may

place some weight on Defendants' side of the balance scales, but the factors already discussed here weigh more heavily in Plaintiffs' favor.

Even more significantly, Plaintiffs also stress as an additional factor the temporal proximity of price increases and capacity reductions to trade association and industry events--really the most persuasive evidentiary support that they proffer. It is striking that all Defendants repeatedly--twice in each of 2005 and 2006 and once in each of 2007 and 2008--raised their prices soon after an industry event.[15] As <u>Text Messaging</u>, 630 F.3d at 628 has said, belonging to a trade association or attending industry events and exchanging price information is "not illegal in itself" but "facilitates price fixing." Whereas here price increases are consistently and closely timed soon after industry gatherings, significant weight is lent to allegations of a conspiracy.

Defendants attempt to respond to those timing links by asserting that there are dozens of such industry events each year, so it is assertedly inevitable that price increases would fall in proximity to such events (D. Mem. 25). Once again that possible explanation cannot carry the day where the issue is

---

[15] Defendants point to a few situations where they did not follow each other's announced price increases (D. Mem. 18), but such arguments "fail[ ] to distinguish between the existence of a conspiracy and its efficacy" (<u>High Fructose</u>, 295 F.3d at 656).

plausibility of Plaintiffs' inculpatory implication.[16]  Although it might be conceivable that such parallel pricing conduct was not in any way linked to such events, Defendants have made no attempt to offer up specific alternate explanations.

As for Plaintiffs' references to numerous public statements by Defendants as a claimed additional factor, they have not tied such statements temporally to price increases or capacity reductions (P. Mem. 39-42).  Nor do any of those statements contain any kind of smoking gun admission.  Hence this Court gives those public statements no weight in the plausibility analysis.

That is not true, though, of the significance to be accorded the structure of the containerboard industry itself (P. Mem. 25-26).  Text Messaging, 630 F.3d at 627-28 has made that point well:

> Parallel behavior of a sort anomalous in a competitive
> market is thus a symptom of price fixing, though
> standing alone it is not proof of it; and an industry
> structure that facilitates collusion constitutes
> supporting evidence of collusion. An accusation that
> the thousands of children who set up makeshift lemonade
> stands all over the country on hot summer days were
> fixing prices would be laughed out of court because the
> retail sale of lemonade from lemonade stands
> constitutes so dispersed and heterogeneous and
> uncommercial a market as to make a nationwide

---

[16]  Defendants also assert that "[p]articipation in trade associations is presumed legitimate" and correspondingly that opportunities to conspire at a trade meeting do not suggest an agreement (D. R. Mem. 13-14).  That however ignores the crucial timing element discussed here.

conspiracy of the sellers utterly implausible. But the complaint in this case alleges that the four defendants sell 90 percent of U.S. text messaging services, and it would not be difficult for such a small group to agree on prices and to be able to detect "cheating" (underselling the agreed price by a member of the group) without having to create elaborate mechanisms, such as an exclusive sales agency, that could not escape discovery by the antitrust authorities.

Plaintiffs contend that the consolidated nature of the industry, inability of one firm to control the market, barriers to entry, cost structures, inelasticity of demand and commodity-like products make the containerboard industry susceptible to collusion (P. Mem. 26). Defendants counter only by arguing that to focus on the structure of an industry alone as a basis for establishing plausibility would invite an endless tide of lawsuits against all consolidated industries (D. R. Mem. 17). But that ignores the comparative analysis exemplified by <u>Text Messaging</u>, as well as the threshold determination of conscious parallelism that must be made to reach this stage. Thus the structure of the containerboard industry provides some additional contextual support for the plausibility of a conspiracy.

Lastly, Plaintiffs state that the history of the industry also suggests the plausibility of their allegations (P. Mem. 39). As Defendants correctly point out in response, it would be unfair to make too much of earlier accusations of unfair competition or of certain settlements that may have been, at least partially, the result of rational economic calculations about the costs of

litigation (D. Mem. 30-31).  Although Defendants fare somewhat better in this final exchange, what has gone before in this opinion more than satisfies the need for plausibility in the Complaint's threshold portrayal of a claimed conspiracy in the containerboard industry during the class period.

## Individual Defendants

All Defendants save Weyerhaeuser have filed separate memoranda that largely apply to the filing party the arguments made in Defendants' collective submission.  To the extent that individual defendants argue that they did not engage in the requisite supply reductions, price increases or other activity discussed above, the earlier analysis explains how Plaintiffs have plausibly alleged an industry-wide conspiracy.  In particular, each defendant has on multiple occasions increased its prices soon after an industry-wide meeting.  To demonstrate that it could not have plausibly participated in such a conspiracy, an individual defendant would have to argue that it engaged in none of the relevant activity.  No individual defendant has done so.

Smurfit-Stone's situation requires a bit of added discussion.  That corporation, an industry participant throughout the class period, instituted bankruptcy proceedings on January 26, 2009 and emerged from bankruptcy on June 30, 2010 (S-S. Mem. 3).  As this Court has made plain, and as neither side

21

now disputes, Smurfit-Stone can be held liable only for its actions taken post-discharge--but actions taken pre-discharge do not vanish and can be considered with respect to specific issues such as intent (Dkt. 24). So Smurfit-Stone's pre-discharge actions can establish plausibility as to its claimed intent and agreement to engage in a conspiracy for the same reasons that apply to other defendants.

That does not of course answer the question whether Smurfit-Stone participated in the conspiracy post-discharge. On that score Plaintiffs allege that in two conference calls and a separate investor presentation Smurfit-Stone signaled its positive impression of ongoing industry consolidation, intent to reduce capacity and desire to raise prices in line with others in the industry (P. Mem. 45-48). Because those allegations plausibly suggest that Smurfit-Stone was acting consistently with a conspiracy in which it may have participated pre-filing, Smurfit-Stone will not be spared the burden of defending the case shared by its fellow defendants.

### Corrugated Boxes

As for one separate facet of their Rule 12(b)(6) motions, Defendants argue that Plaintiffs have not alleged a conspiracy as to the sale of corrugated boxes, an end-use product of containerboard (D. R. Mem. 17-18). Not so. Throughout the Complaint Plaintiffs discuss the effect of the prices of

containerboard on the prices of corrugated boxes, alleging specifically that the price increases for containerboard were in part intended to increase the prices of corrugated boxes and other corrugated products (¶¶106, 111).

Further, Plaintiffs allege that Defendants are integrated producers of those products and so benefit from increases in prices of both raw materials and end-use products (¶2). Most importantly, Defendants identify nothing in the Complaint that even hints that the relevant price increases, supply reductions and other contextual factors were limited to containerboard and not to corrugated products. Hence all of the preceding discussion and its plausibility analysis apply with equal force to corrugated boxes.

## Conclusion

In sum, Plaintiffs have successfully pleaded an antitrust claim. All of Defendants' motions to dismiss (Dkt. Nos. 115, 119, 121, 124, 127, 134 and 137) are denied, and Defendants are ordered to answer the Complaint on or before May 2, 2011. If and to the extent that the parties have not previously engaged in the advance disclosures called for by Rule 26(a), they are ordered to do so by that same May 2 date. Finally, a status hearing is set for 8:45 a.m. May 9, 2011 to discuss the future course of this

litigation.

_____

Milton I. Shadur
Senior United States District Judge

Date:  April 8, 2011