**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

KLEEN PRODUCTS LLC, et al.
individually and on behalf of all those
similarly situated,

       Plaintiff,

v.

PACKAGING CORPORATION OF
AMERICA, et al,

       Defendants.

Civil Case No. 1:10-cv-05711

Hon. Nan R. Nolan

**DEFENDANTS' BRIEF ON DISCOVERY ISSUES TO BE ADDRESSED AT**
**FEBRUARY 21, 2012 HEARING**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

THE DETAILS OF DEFENDANTS' ESI SEARCH METHODOLOGY......................................8

ARGUMENT ...............................................................................................................................10

I.      DEFENDANTS' ESI SEARCH PROTOCOL SATISFIES OR EXCEEDS
EXISTING STANDARDS FOR BEST PRACTICES .......................................................10

II.     RULE 34 DOES NOT REQUIRE DEFENDANTS TO INDEX OR CODE
DOCUMENTS AS PLAINTIFFS NOW PROPOSE ........................................................13

III.    WITNESSES TO TESTIFY AT THE HEARING ............................................................17

CONCLUSION............................................................................................................................19

## TABLE OF AUTHORITIES

**Page**

### Cases

*Breunlin v. Vill. of Oak Park*,
  2008 WL 2787473 (N.D. Ill. July 17, 2008)........................................................15

*City of Colton v. Am. Promotional Events, Inc.*,
  2011 WL 4906695 (C.D. Cal. Oct. 13, 2011)............................................7, 14, 16

*Pass & Seymour, Inc. v. Hubbell, Inc.*,
  255 F.R.D. 331 (N.D.N.Y. 2008).......................................................7, 14, 15, 16

*In re Seroquel Prods. Liab. Litig.*,
  244 F.R.D. 650 (M.D. Fla. 2007)........................................................................12

*Treppel v. Biovail Corp.*,
  233 F.R.D. 363 (S.D.N.Y. 2006) .........................................................................11

*United States v. O'Keefe*,
  537 F. Supp. 2d 14 (D.D.C. 2008) ......................................................................12

*Valeo Elec. Sys., Inc. v. Cleveland Die & Mfg. Co.*,
  2009 WL 1803216 (E.D. Mich. June 17, 2009)............................................. 14-15

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
  250 F.R.D. 251 (D. Md. 2008)............................................................................12

### Rules

Fed. R. Civ. P. 1 ..............................................................................................16, 17

Fed. R. Civ. P. 34 ........................................................................................... passim

Pursuant to the Court's Minute Entry (Dkt. No. 277) dated January 17, 2012, Defendants[1] respectfully submit this brief on the issues to be addressed at the evidentiary hearing scheduled for February 21, 2012.

## PRELIMINARY STATEMENT

The two core issues to be addressed at the upcoming evidentiary hearing are (1) whether the search term methodology that Defendants have employed to identify potentially responsive ESI satisfies the requirements of the Federal Rules of Civil Procedure; and (2) whether Plaintiffs can require Defendants to code every document being produced according to 29 overlapping issue codes, even though documents are being produced Bates-numbered by Defendant, in searchable format, with agreed-upon metadata (including, custodian, author, recipient and date, among other things), pursuant to an ESI protocol negotiated by the parties and entered by the Court.

With respect to the first issue, Plaintiffs have not meaningfully challenged the specific ESI search methodology that Defendants implemented here. Rather, Plaintiffs challenge the use of search terms *per se* in this litigation. Plaintiffs argue that Defendants, notwithstanding their very substantial investment of time and resources, must abandon what they have done and instead use the methodology Plaintiffs prefer. To the extent Defendants understand the "Content Based Advanced Analytics" (CBAA) process Plaintiffs advocate, however, it is a relatively new, largely untested methodology that has not been shown to achieve better results than the search term methodology that Defendants have employed, tested and validated here.

---

[1] "Defendants" means Cascades Canada, Inc. and Norampac Holdings U.S., Inc., (together, the "Norampac Defendants"); Georgia-Pacific LLC ("Georgia-Pacific"); International Paper Company ("International Paper"); Packaging Corporation of America ("PCA"); RockTenn CP, LLC ("RockTenn"); Temple-Inland Inc. ("Temple-Inland"); and Weyerhaeuser Company ("Weyerhaeuser").

Defendants have engaged some of the country's leading ESI consulting firms to manage an extensive search term development process (including input from Plaintiffs) that has incorporated robust testing and validation procedures, and that meets and exceeds current best practices recognized by courts across the country.

With respect to the second issue, the coding requirements that Plaintiffs seek to impose here are premised on a flawed interpretation of Fed. R. Civ. P. 34 and would be virtually unprecedented. Requiring Defendants to determine which of Plaintiffs' 29 codes apply to every document Defendants have already produced, or will produce in the future, would impose severe burdens violating all notions of proportionality.

Plaintiffs also seek to raise two issues at the upcoming hearing that Defendants respectfully submit are not ripe for the Court's consideration: (i) the relevant time period for document and data production[2], and (ii) the scope of searches (*e.g.*, whether Defendants must search inactive ESI systems, such as backup tapes). Resolution of the ESI search methodology and indexing issues already will require the entire day that has been set aside for the upcoming hearing, and in any event, resolution of the two additional issues would be premature. These additional issues are the subject of ongoing meet-and-confer discussions between each Defendant and the Plaintiffs and pertain to the details of each individual Defendant's computer systems, back-up protocols, identified custodians and other relevant circumstances.[3] Moreover, resolution of the ESI and indexing issues would inform those ongoing discussions and at the very

---

[2] The Consolidated Amended Complaint alleges expressly that the conspiracy at issue began in mid-2005. Defendants have already agreed to produce electronic and hard copy documents for the period commencing January 1, 2004, and transactional data for the period commencing January 1, 2003. Plaintiffs seek to move those dates earlier by several years.

[3] *See* Exs. 16-22 (each Defendant's written response to Plaintiffs' Rule 30(b)(6) notice on company systems and other information); Exs. 23-43 (subsequent meet-and-confer correspondence concerning each Defendant's written response).

least create an opportunity for the parties to resolve, or significantly narrow, the remaining two issues – which depend in significant part on the particular burdens to each Defendant. For these reasons, Defendants believe it will be most efficient to address the ESI search methodology and indexing issues at the February 21 hearing, and then allow the parties, as part of the meet-and-confer process, a brief opportunity to resolve the other issues following a ruling by the Court.

**The ESI Search Methodology Issue**

In May 2011, Plaintiffs served 94 broad-ranging document requests, almost all of which purport to apply to a lengthy time period.[4] Since then, Defendants have devoted substantial time and resources to develop and implement methodologies for identifying responsive ESI that fully satisfy Defendants' obligations under the Federal Rules of Civil Procedure. *See* Defendants' Statement of Position with Respect to Disputed Items (Dkt. No. 267) at 2-10. As Defendants will demonstrate at the evidentiary hearing:

- Each Defendant identified the custodians most likely to have responsive ESI in their files.[5]

- For purposes of identifying the potentially responsive ESI, Defendants worked with recognized expert consultants to develop electronic search terms. Although Georgia-Pacific took the lead in this effort, input was obtained from the other Defendants at critical points in the process, so that the final list of search terms is applicable to all Defendants, subject to Defendant-specific adjustments for particular identifying nomenclatures, such as the names of mills.

---

[4]  *See* Ex. 1 (Plaintiffs' First Document Requests).

[5]  *See* Ex. 2 (Letter from Britt M. Miller to Plaintiffs' Lead Counsel (Aug. 11, 2011)). Defendants also identified other specific sources of responsive documents and data – both electronic and hard copy – that they agreed to produce.

- Clearwell, widely recognized as a highly effective tool for early case assessment and search term development, was used in an iterative process during which Defendants and their consultants revised and refined the search terms over the course of several months. Sampling procedures were used throughout the process to evaluate the effectiveness and reliability of the search terms to identify potentially responsive ESI.

- Defendants solicited Plaintiffs' input on the proposed search terms, extracted what they could from the input Plaintiffs provided (which was of limited utility[6]), and then revised the search terms accordingly.

- Once a draft of final search terms had been developed, further testing and validation, including random sampling of a statistically significant subset of the non-hit ESI population, confirmed that the search terms are highly robust, and meet or surpass any reasonableness standards for identifying and distinguishing potentially responsive ESI from non-responsive ESI. That list of search terms, which had been validated in the foregoing process, was transmitted to Plaintiffs.[7]

- Since that time, all Defendants have tested and validated the search terms on their own respective ESI, with each Defendant testing a random and statistically significant sample. The search term effectiveness they achieved is comparable to, or exceeds, the compelling results of the Georgia-Pacific testing.

---

[6]  For example, Plaintiffs proposed that Defendants add search terms – such as *business\**, *address\**, *report\**, *memo*, *gov\**, *finance\**, *input\** and *comply* – that were so broad as to ensure that the set of documents "hit" by the search terms would be so large and over-inclusive as to defeat the very purpose of search terms in the first place. *See* Ex. 4 (Plaintiffs' search term "Analysis" (Sept. 14, 2011)).

[7]  *See* Ex. 5 (revised search terms (Oct. 20, 2011)).

- Each Defendant has run the search terms on the files of its identified custodians, and the results – even after application of industry-standard de-duplication technology – have been substantial:  the search terms yielded over 128,000 potentially responsive documents, constituting more than 1 million pages, from Defendant Georgia-Pacific's files alone, and other Defendants obtained similar, and in some instances even larger, review populations.

- Defendant Georgia-Pacific's work to develop, validate and test the search terms alone involved over 1300 hours of work by outside consultants – as well as substantial time commitments of company employees and outside counsel.  The testing and validation of the search terms by other Defendants have also involved substantial commitments of time by outside consultants, company employees and outside counsel.

- Defendants have also agreed to produce other categories of ESI and hard copy documents without regard to custodians, as well as transactional data for the time period beginning on January 1, 2003.  To date, Defendants collectively have produced the equivalent of more than 1 million pages of responsive, non-privileged documents, and expect to make similarly large rolling productions of documents in the coming months.

Against this background, Plaintiffs now ask this Court to require that Defendants abandon all that they have done, and start from scratch with what Plaintiffs describe as CBAA technology.  Plaintiffs argue that search terms are simply an insufficient method for identifying potentially responsive ESI.   Putting aside the obvious practical problems with Plaintiffs' proposal, their position is legally baseless.  Plaintiffs have failed to identify any court decision or other authority holding that the type of search term process applied by Defendants here has suddenly become unacceptable.  Indeed, the very few cases that Plaintiffs have cited criticized producing parties not for using search terms *per se*, but for failing to engage in precisely the type

of careful search term development, testing and validation that Defendants here employed. The ESI policies of the Seventh Circuit and other federal courts (including, for example, new ESI policies adopted by the District of Delaware this past December, and the Model E-Discovery Order for Patent Cases recently adopted by the Federal Circuit) expressly recognize search term methodologies as an appropriate means of identifying potentially responsive ESI. *See, e.g.,* Seventh Circuit Electronic Discovery Committee, Principles Relating to the Discovery of Electronically Stored Information ("Seventh Circuit Principles") at Principle 2.05, revised Aug. 1, 2010.[8] Plaintiffs also have cited no authority for the proposition that the Federal Rules now require that producing parties must use some CBAA method. Certainly, new analytical tools may provide future opportunities in the field of ESI. But that does not mean – and no court has ever suggested – that a well-developed, tested and implemented search term protocol is now deficient legally or otherwise.

**<u>The Coding Issue</u>**

Plaintiffs also ask this Court to order that Defendants code every single document produced in this litigation according to a set of 29 overlapping "coding fields" that Plaintiffs devised and appended to their document requests. The starting premise for Plaintiffs' position – that Defendants are "dumping" millions of pages of unorganized documents – is simply baseless. Each Defendant has been, and will continue, separately producing and Bates-numbering its own documents. Moreover, pursuant to a stipulation between the parties that was then ordered by the Court on October 25, 2011 (*see* Dkt. No. 245 ("Production Format Order")),[9] all ESI is being produced in text-searchable format and with dozens of agreed-to metadata fields – including fields that identify the custodian from whose files the document was obtained, as well as (among

---

[8] *See* http://www.discoverypilot.com/sites/default/files/Principles8_10.pdf.

[9] *See* Ex. 12 (Production Format Order).

other things) the author, recipient, filepath and date of the document.  As courts have recognized, providing such searchable metadata fields satisfies Rule 34's provision that documents may be produced as they are maintained in the "usual course of business."  *See, e.g.*, *City of Colton v. Am. Promotional Events, Inc.,* 2011 WL 4906695, at *7-*8 (C.D. Cal. Oct. 13, 2011).

At the same time, the coding Plaintiffs seek to require here would be largely unprecedented and effectively burden Defendants with performing a subject matter document review for Plaintiffs.  In large cases involving tens of documents requests (let alone more than 90 as Plaintiffs served here), courts have rejected demands that a producing party identify which documents being produced are responsive to which specific document requests.  *See Pass & Seymour, Inc. v. Hubbell, Inc.*, 255 F.R.D. 331, 338 (N.D.N.Y. 2008).  Perhaps recognizing this, Plaintiffs here offered as an alternative their 29 broad, overlapping subject area codes.[10]  But reviewing documents to determine which are responsive to which of these overlapping codes would itself represent a huge burden – all the more so because the type of lengthy business planning documents that are relevant to the claims here will often be responsive both to multiple codes and multiple document requests.  In addition, the more than 1 million pages of documents Defendants have already produced, and the hundreds of thousands of additional documents (expected to total millions of pages) that have already undergone review, presumably would need to be re-reviewed at exorbitant cost to accommodate Plaintiffs' codes.

---

[10]   Defendants dispute Plaintiffs' assertion that their 29 proposed codes were offered only after Defendants asked Plaintiffs to come up with a proposal for organizing the documents to be produced.  To the contrary, Defendants understood that any organization of documents would be achieved through the metadata to be provided pursuant to the Production Format Order. Defendants will be prepared at the hearing to address the background facts on this issue if necessary.

## THE DETAILS OF DEFENDANTS' ESI SEARCH METHODOLOGY

Defendant Georgia-Pacific retained consultants from KPMG and Counsel on Call and

undertook the following steps in coordination with the other Defendants:

- **Preliminary Set of Search Terms:** As a preliminary step in the process, the consultants from Counsel on Call ("COC"), in close coordination with Georgia-Pacific's in-house legal department and outside counsel from Quinn Emanuel ("QE"), devoted substantial time and effort to developing an initial search term list based on, among other things: (i) the subject matter of Plaintiffs' consolidated complaint; (ii) the subject matter of Plaintiffs' document requests and Defendants' objections thereto; (iii) consideration of industry- and company-specific language, terminology and abbreviations; and (iv) the expertise of the consultants. KPMG reviewed and revised the syntax of the search terms to prepare them for application on the Clearwell platform as described below.

- **Creation of Sample Set of ESI:** For purposes of both developing and testing search terms, Georgia-Pacific and its consultants created a sample set of ESI. To develop that set, Georgia-Pacific first collected all of the existing ESI, including email, C (local) and H (network) drives, and network share drives from the files of four Georgia-Pacific employees (including the senior executive in charge of the business) who had key decision-making roles on matters that are the subject of Plaintiffs' documents requests. In addition, the sample set of ESI included the email, C and H drives, and network share drives of a "control custodian" – an employee from the business who had no decision-making role related to the subject matter of the litigation. Clearwell was used to process the data for these five custodians, and a date filter was used to exclude documents outside the period January 1, 2004 through November 8, 2010. After application of the date filter and full processing with de-duplication, the Clearwell testing database contained over 94,000 documents (many of which had multiple pages).

- **Run of Preliminary Search Terms:** COC and KPMG, in consultation with QE and in-house counsel at Georgia Pacific, then began a collaborative, iterative process of search term development, testing, refinement, and validation. The development and validation of the initial set of key search terms involved the following steps:

  o The data set was reduced by culling clearly non-responsive junk materials, *e.g.*, by domain names such as wsj.com, espn.com, expedia.com, etc.

  o Post-culled documents were filtered with search terms and divided into two sets: (1) those containing positive search hits and (2) those negative for search hits. COC conducted a quasi-linear review of both the positive and null sets to test utility of search terms and to suggest refinements and alternative terms.

  o The results were analyzed and discussed, resulting in the creation of a set of Phase I Validated Search Terms, which was shared with counsel for the other Defendants for input based on their knowledge of each Defendant's respective ESI. The input from the other Defendants was utilized in Phase 2.

8

- o During Phase 2, COC used Clearwell content analytics, as discussed below, together with attorney judgment, to supplement, refine, and re-test the Phase 1 search terms and additional search terms.

- o In addition, the consultants created (1) a *Combined Composite Set* of all positive hits and (2) a *Null Set*, *i.e.*, the data corpus less the Combined Composite Set. The purpose of the Null Set was to allow searching for false negatives, *i.e.*, documents that were responsive but were not captured by the search terms.

- **Initial Rationalization:** Next, QE and COC began a process of rationalizing, or condensing, the search terms. This process included consultation with the other Defendants about the search terms and search term strings. This rationalization process, together with refinements agreed to among the Defendants, resulted in a new validated set of search terms.

- **Use of Content Analytic Tools to Improve and Expand the Set of Search Terms:** As part of the search term validation process, and for purposes of improving the search terms generally, a number of features of the Clearwell e-discovery platform were utilized. Among other features, COC used Clearwell's "topics classification" and "stemming" capabilities to enable the search term testing and refinement processes. Using proprietary linguistic algorithms, the Topics feature clusters documents based on linguistic similarity and then groups the documents according to topics. "Stemming" is used to capture all variations of words in which the stem is found, such as plurals or alternative verb forms. These technologies were used here to assist in evaluating the effectiveness of the search terms in locating responsive documents.

  COC, in coordination with KPMG, Georgia-Pacific in-house counsel and QE, applied the Topics Page content clustering tool to the "null sets" that resulted from application of the original search terms, and identified certain topics responsive to Plaintiffs' document requests that the original search terms had failed adequately to capture. COC also applied the Clearwell analytic tools to the set of documents that were "hit" by the original search terms. COC used the Topics Page tool to identify topics, and in particular industry-specific language and terminology, to add as search terms. They also applied the stemming feature to identify instances where stems in the original search terms were not ideally suited to identifying responsive information. Based on the results generated by the Clearwell analytic tools, COC, in ongoing coordination with KPMG, Georgia-Pacific in-house counsel and QE, revised and refined the set of search terms. COC used the Clearwell analytic tools throughout the process to revise and refine the search terms.

- **Consultation with Other Defendants:** During July and early August 2011, Georgia-Pacific shared the search terms that resulted from the foregoing analytic processes with the other Defendants. Defendants then worked together to further improve the list of search terms, based on their knowledge of Defendants' documents and terminology.

- **Search Terms Shared With the Plaintiffs:** After discussions with Plaintiffs on June 30, July 21, and July 25, Defendants shared their proposed set of search term strings with Plaintiffs on August 5, 2011. On September 15, 2011, Plaintiffs provided feedback in the

9

form of a letter. While Plaintiffs' letter did not offer an alternative set of search terms, Georgia-Pacific and its consultants worked in good faith over the course of the next month to extract from Plaintiffs' letter any potential search terms that had not been included in Defendants' proposed list. The words and categories that were selected, along with the search terms that were initially proposed to Plaintiffs, then underwent further development, refinement and testing. During this process, COC – in coordination with KPMG, Georgia-Pacific in-house counsel and QE – also considered and tested additional search terms proposed by other Defendants. The result of this month-long process was a further refined set of search term strings.

- **Final Testing and Validation:** COC then ran the full, revised set of search terms against the search term testing database. This generated a new set of "hits" and a new "null" set. The null set included approximately 72,000 documents. Counsel on Call reviewed a statistically significant, random sample of 660 documents to validate the effectiveness of the search terms in correctly identifying documents that are and are not responsive to Plaintiffs' document requests (subject to Defendants' objections). The 660 documents then were divided into four sets of 165 documents each, and those four sets were reviewed by two attorneys at COC, each reviewing two sets. The attorney reviews assessed whether each individual document was properly identified as non-responsive to Plaintiffs' document requests. From the sample of 660 documents, a set of 131 was also given to QE to review, again to assess whether each of those 131 documents had properly been characterized as non-responsive.

- **Results of Testing and Validation:** Based on this validation process, COC determined with 99 percent confidence that the final set of search terms had no more than a 5 percent margin of error in identifying documents as not responsive to Plaintiffs' document requests.

- **Additional Testing and Validation by the Other Defendants:** The Defendants other than Georgia-Pacific made appropriate modifications of the search terms to conform to their respective businesses.[11] The other Defendants have since tested and validated the search terms on their own respective ESI, with each Defendant testing a random sample from its individual null set. The search term effectiveness confirmed by this testing – which yielded margins of error in the range of 1.4 percent to 3.9 percent – is comparable to the compelling results of the Georgia-Pacific testing.

## ARGUMENT

## I. DEFENDANTS' ESI SEARCH PROTOCOL SATISFIES OR EXCEEDS EXISTING STANDARDS FOR BEST PRACTICES

The carefully planned, tested and validated ESI search methodology that Defendants have

implemented fully satisfies, and indeed exceeds, the requirement of a "diligent search" based on

---

[11]   As noted above, each Defendant has provided its modifications, if any, to the Plaintiffs. *See* Ex. 6 (Norampac Defendants' search terms); Ex. 7 (International Paper's search terms); Ex. 8 (PCA's search terms); Ex. 9 (RockTenn's search terms); Ex. 10 (Temple-Inland's search terms); Ex. 11 (Weyerhaeuser's search terms).

a "reasonably comprehensive search strategy." *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006).

Notwithstanding the robust search term protocols implemented by Defendants, Plaintiffs argue that any search term protocol cannot satisfy Rule 34. Yet, the Seventh Circuit's current e-discovery principles expressly contemplate the use of "keyword searching." *See* Seventh Circuit Principles at Principle 2.05.

Other federal courts similarly recognize search terms as a valid means of identifying potentially responsive ESI. As recently as December 2011, the District of Delaware approved the use of search terms in its newly adopted "Default Standard For Discovery, Including Discovery Of Electronically Stored Information ("ESI")" ("Default Standard"). *See* Ad Hoc Committee for Electronic Discovery, Default Standard, revised Dec. 8, 2011.[12] That new Default Standard expressly endorses search terms, *see id.* 5.b, and does not even mention the type of CBAA technology advocated by Plaintiffs here. Under the Default Standard, a producing party complies with its obligations by disclosing the search terms it intends to apply and allowing the receiving party to propose additional terms. *See id.* The Default Standard does not expressly require any testing, let alone the type of rigorous testing and validation Defendants performed here.[13]

Plaintiffs' Statement of Position (Dkt. No. 266) failed to identify any authority holding that search term methodologies are categorically inadequate. To the contrary, the only

---

[12]  *See* http://www.ded.uscourts.gov/SLR/Misc/Electronic-Standard-for-Discovery.pdf.

[13]  Similarly, the new Model E-Discovery Order for Patent Cases adopted by the Federal Circuit endorses the use of search terms and requires that the search terms be targeted. *See* Model Order on E-Discovery in Patent Cases ("Model E-Discovery Order"), available at http://memberconnections.com/olc/filelib/LVFC/cpages/9008/Library/Ediscovery%20Model%20Order.pdf. For example, the Model E-Discovery Order limits "email production requests to a total of five search terms per custodian per party," absent agreement or Court order, and calls for search terms "be narrowly tailored to particular issues." *Id.* at ¶ 11.

authorities Plaintiffs cite criticize producing parties for failing to use the type of careful search

term development, testing and validation process that Defendants undertook here. *In re*

*Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 660 n.6, 662 (M.D. Fla. 2007) ("while key word

searching is a recognized method to winnow relevant documents from large repositories . . .

[c]ommon sense dictates that sampling and other quality assurance techniques must be employed

to meet the requirements of completeness.").[14] Defendants here employed the best practices –

including "sampling and other quality assurance techniques" – recognized in the cases Plaintiffs

cite and by other courts. *See, e.g.*, *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251,

261-62 (D. Md. 2008) ("The implementation of the methodology selected should be tested for

quality assurance; and the party selecting the methodology must be prepared to explain the

rationale for the method chosen to the court, demonstrate that it is appropriate for the task, and

show that it was properly implemented.").

Defendants also sought Plaintiffs' input during the search term development process.[15]

Defendants provided Plaintiffs with an initial set of search terms, and used their feedback as a

---

[14]    In this regard, Plaintiffs' citation to *United States v. O'Keefe*, 537 F. Supp. 2d 14, 24 (D.D.C. 2008) (Facciola, J.) is misleading.  Far from suggesting that search terms are inadequate, the court in *O'Keefe* criticized the assertions by the defendants there about the inadequacy of the search terms without a sufficient evidentiary showing.  It was in that context that the Court observed that "for lawyers and judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread." *Id.*  The court further stated that "if defendants are going to contend that the search terms used by the government were insufficient, they will have to specifically so contend in a motion to compel and their contention must be based on evidence that meets the requirements of Rule 702 of the Federal Rules of Evidence." *Id.*  Similarly, here, Plaintiffs, without any real evidence of insufficiency, nonetheless have criticized the search terms developed, implemented, tested and validated by Defendants.

[15]    While Plaintiffs suggest that they have consistently rejected the use of search terms in this litigation, *see* Dkt. No. 266 (Pls. Statement) at 4-5, that is not the case. *See, e.g.*, Ex. 13 (May 31, 2011 email from Plaintiffs' counsel requesting information to "properly evaluate defendants' search terms"); Ex. 14 (Aug. 1, 2011 email from Plaintiffs' counsel inquiring when Plaintiffs would receive Defendants' "list of search terms").

basis for revising the search term list.[16]  Defendants also cooperated by fully disclosing their

search term development process to Plaintiffs in face-to-face meetings, written correspondence

and, most recently, in the December 2011 status report.  *See* Ex. 15 (Letter from counsel for

Defendants to counsel for Plaintiffs (Nov. 22, 2011)).

For all of the foregoing reasons, Defendants respectfully submit that the Court should

deny Plaintiffs' request that Defendants abandon search terms that were developed through

adherence to e-discovery best practices and are demonstrably effective at identifying potentially

responsive ESI.

## II.     RULE 34 DOES NOT REQUIRE DEFENDANTS TO INDEX OR CODE DOCUMENTS AS PLAINTIFFS NOW PROPOSE

Plaintiffs' First Request for Production of Documents contains 94 separate requests,

many of which contain subparts.[17]  Even though Defendants use company-specific Bates-

numbers, identify the custodian or other source for each electronic document, and provide the

metadata agreed upon  in the Production Format Order, Plaintiffs have demanded that each

Defendant provide an index classifying each document produced with one, two, three or more of

the 29 topical categories created by Plaintiffs.[18]  Plaintiffs' demand is inconsistent with Rules 1

and 34, would impose great (and unnecessary) burden and expense upon Defendants, and should

be denied.

---

[16]    *See* Ex. 3 (initial search terms (Aug. 5, 2011)); Ex. 4 (Plaintiffs' search term "Analysis" (Sept. 14, 2011)); Ex. 5 (revised search terms (Oct. 20, 2011)).  Each Defendant has provided Plaintiffs with Defendant-specific versions of the October 20, 2011 search terms, largely in order to account for the differences in which Defendants' e-discovery platforms handle syntax, stemming and wildcards, and also to account for any Defendant-specific terms.

[17]    *See* Ex. 1 (Plaintiffs' First Document Requests).

[18]    *Id.*, Instruction No. 4 & Ex. A.

Plaintiffs' index argument misreads the plain language of Fed. R. Civ. P. 34(b)(2)(E)(i). Rule 34 provides in relevant part:

> (E) *Producing the Documents or Electronically Stored Information.* Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or electronically stored information:
>
> (i) A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request . . .

Fed. R. Civ. P. 34(b)(2)(E). Thus, the clear language of the rule recognizes that a producing party has two options: EITHER the party can "produce documents as they are kept in the usual course of business" OR the party "must organize and label them to correspond to the categories in the request." Plaintiffs focus solely on the second option, ignoring the first.[19] Plaintiffs also ignore that both limitations can be altered either by stipulation or by order of the Court.

Courts recognize that ESI satisfies the "as they are kept in the usual course of business" means of production when the producing party provides data sufficient to indicate the identity of the custodian or person from whom the documents were obtained, whether the documents were retained in hard copy or digital format, and a general description of the filing system from which they were recovered. *See Pass & Seymour, Inc.*, 255 F.R.D. at 338. Emails are produced as kept in the "usual course of business" if the emails include the custodian name and the ability to place the emails in chronological order. For non-email ESI, the standard is met by providing custodian identification as well as identification of the files' location on the hard drive directory or sub-directory and file name. *See City of Colton*, 2011 WL 4906695 at *7 (quoting *Valeo Elec.*

---

[19]  At the December 15 hearing before Judge Shadur, Plaintiffs' Counsel suggested that Defendants could "produce the documents as they are kept in the standard course of business," but then asserted that the documents were not being produced in that manner. See Ex. 44 (Transcript of Dec. 15, 2011 Hearing), at 21. As discussed below, the ESI protocols being followed satisfy the "usual course of business" method of production.

*Sys., Inc. v. Cleveland Die & Mfg. Co.*, 2009 WL 1803216 at *2 (E.D. Mich. June 17, 2009)); *see also Pass & Seymour, Inc.*, 255 F.R.D. at 337.

In this case, Defendants have produced and will be producing electronic documents in a format that provides all the information needed to satisfy the "usual course of business" aspect of Rule 34(b)(2)(E)(i). The parties' stipulated Production Format Order provides that the producing party will produce attachments with the corresponding email and will provide the metadata showing (among other things) custodian, date, file folder, beginning bates number, ending bates number, and other relevant metadata fields.[20] Moreover, the hard copy documents being produced by Defendants not only provide custodian information but were scanned with optical character reader ("OCR") technology so that Plaintiffs can sort them by custodian or using search terms. As this Court has stated, "Rule 34 is designed to preclude litigants from 'deliberately mixing critical documents with masses of other document to hide their existence or obscure their significance.'" *Breunlin v. Vill. of Oak Park*, 2008 WL 2787473, at *4 (N.D. Ill. July 17, 2008) (Nolan, J.). Nothing in this case suggests that the Defendants have attempted to hide responsive documents or tamper with documents. Rather, Defendants have responded to the Plaintiffs' document requests and are providing all the metadata agreed upon between the parties. That necessarily satisfies the obligation under Rule 34 to produce documents "as they are kept in the usual course of business."

Plaintiffs appear to complain that they will receive too many documents, but they have only themselves to blame for that result. Although the Complaint alleged a conspiracy of purported coordination of containerboard capacity, Plaintiffs did not issue targeted document requests (the approach promoted by the Seventh Circuit E-Discovery Pilot Program principles)

---

[20] *See* Ex. 12 (Production Format Order).

and instead served extraordinarily broad requests.[21]  Defendants are incurring the cost and

expense of collecting, reviewing and producing millions of pages of documents in response to

Plaintiffs' already overbroad document requests, and Plaintiffs want to add to that the cost and

burden of sorting the documents for the convenience of Plaintiffs' review.  Rule 34 does not

impose the additional obligation to code and index all these documents for Plaintiffs'

convenience.  As stated by the Court in *Pass & Seymour,*

> The Court appreciates the burden associated with attempting to
> organize and collate 405,367 pages of documents, and further
> recognizes with the advent and increased use of digitized
> information and litigation support software, large quantities of
> documents can be rendered both manageable and text searchable.
> Accordingly, it can be argued that less by way of organizational
> information should be required than historically may have been the
> case in order to permit informed use of documents produced by an
> opponent.  After weighing these considerations, I conclude that it
> would be both unfair and unduly onerous to require P & S to
> organize the documents produced to correspond to the seventy-two
> document requests made by Hubbell, as Defendant now requests.

255 F.R.D. at 338.

"Rule 34(b)(2)(E) as a whole addresses both the organization and format of ESI

productions in furtherance of the larger goal of the Federal Rules to secure 'the just, speedy and

inexpensive determination of every action.'"  *City of Colton*, 2011 WL 4906695 at *7 (quoting

Fed. R. Civ. P. 1); *see also* Seventh Circuit Principles at Principle 1.  With the millions of pages

---

[21]  *See, e.g.*, Ex. 1 (Plaintiffs' First Document Requests), at Request No. 34 ("All non-
transaction specific documents, including communications, relating to the price of
Containerboard Products offered by you, by any other Defendant, or by any other manufacturer,
distributor, re-seller or broker of Containerboard Products…"); Request No. 36 ("All documents
relating to the elasticity of demand or price sensitivity of Containerboard Products."); Request
No. 71 ("All documents relating to complaints received from any Containerboard Products
customer regarding prices, pricing, or terms or conditions of sale or the refusal or failure to
supply Containerboard Products and any responses thereto, and all documents reflecting any
policy of your company concerning the handling of such complaints.").

of documents involved here, Plaintiffs' request finds no support in Rule 1 or in Rule 34. The Court should deny the unprecedented coding requests sought by Plaintiffs.

## III.    WITNESSES TO TESTIFY AT THE HEARING

Defendants plan to present the testimony of three witnesses: (1) Kenneth Koch, a partner at KPMG; (2) Samuel W. ("Sandy") Brown, senior attorney and project manager at Counsel on Call; and (3) Daniel L. Regard, a managing director at iDiscovery Solutions, Inc.

Mr. Koch will testify about KPMG's role in the search term development, testing and validation process employed by Georgia-Pacific and described above, and will address as well the following topics:

- A description of so-called "early case assessment" and its objectives.

- In KPMG's experience, search terms have been the most common method for identifying potentially responsive ESI among the vast volumes of electronic files that are routinely generated by large companies.

- In KPMG's experience, the process used by Georgia-Pacific to develop search terms addressed – through sampling and other quality assurance techniques – the potential flaws with the use of search terms that can result when less diligent processes are employed.

- While KPMG and other companies have developed new analytical tools as alternatives to the use of search terms, KPMG still regularly assists its clients in developing search terms for identifying potentially responsive ESI.

- KPMG's new analytical tool was not brought to market until September 2011, four months after Georgia-Pacific had started the search term development process here using the Clearwell software.

- It would not make sense for Georgia-Pacific now to create and implement an entirely new process using KPMG's new analytical tool (or any other tool), when the search term process Georgia-Pacific implemented reflects best practices and has been validated as effective at identifying potentially responsive ESI.

- KPMG employees have spent more than 400 hours on Georgia-Pacific's search term development process.

- The search term development process undertaken by Georgia-Pacific in this litigation is among the most extensive KPMG has seen a client conduct to date.

Mr. Brown will testify concerning Counsel on Call's role in the search term development, testing and validation process employed by Georgia-Pacific, including the rationale for the process that was used and the details of the steps taken to develop, test, revise, and validate the search terms that Georgia-Pacific is using.  In addition, Mr. Brown will testify that:

- In his professional experience, search terms are routinely used to identify potentially responsive ESI.

- Based on his experience, the process used by Georgia-Pacific to develop search terms reflects best e-discovery practices and is eminently reasonable.

- The testing and validation results Georgia-Pacific achieved surpass the results that are normally considered acceptable in his professional experience, and he is not aware of other available document review methods that would achieve greater success in identifying potentially responsive ESI.

- Based on his professional experience, it would be inappropriate for Georgia-Pacific now to create and implement an entirely new process using new analytic tools.

- Counsel on Call spent over 900 hours on search term development for Georgia-Pacific, and the process used by Georgia-Pacific here is among the most extensive he has seen any of Counsel on Call's clients implement.

Mr. Brown would also be prepared to testify on the burden associated with coding Georgia-Pacific's documents according to the 29 issue codes requested by Plaintiffs, if the Court believes such testimony would help resolve that issue.

Mr. Regard will testify concerning the testing and validation of the search terms by the Defendants other than Georgia-Pacific.  Mr. Regard will testify that the testing and validation results achieved by all Defendants here meet or surpass the results that are normally considered acceptable in Mr. Regard's experience.  Mr. Regard also will be able to address the metadata fields available with email and other ESI that Defendants are providing here pursuant to the ESI protocol agreed by the parties and approved by the Court.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully submit that the ESI methodology they have implemented should be approved for this litigation, and the Plaintiffs' proposal for indexing and coding should be rejected.

Dated: February 6, 2012                    Respectfully submitted,


By:    /s/ Stephen R. Neuwirth                                      By:    /s/ Nathan P. Eimer

Stephen R. Neuwirth
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
stephenneuwirth@quinnemanuel.com
marcgreenwald@quinnemanuel.com
samirashid@quinnemanuel.com

James R. Figliulo
Stephanie D. Jones
FIGLIULO & SILVERMAN, P.C.
10 South LaSalle Street, Suite 3600
Chicago, IL 60603
(312) 251-4600
jfigliulo@fslegal.com
sjones@fslegal.com

COUNSEL FOR DEFENDANT GEORGIA-
PACIFIC LLC

Nathan P. Eimer
Susan Razzano
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604-2516
(312) 660-7600
neimer@eimerstahl.com
srazzano@eimerstahl.com

James T. McKeown
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
(414) 297-5530
jmckeown@foley.com

COUNSEL FOR DEFENDANT
INTERNATIONAL PAPER COMPANY


By:    /s/ Douglas J. Kurtenbach                           By:    /s/ R. Mark McCareins

Douglas J. Kurtenbach, P.C.
Daniel E. Laytin
Barack S. Echols
Leonid Feller
KIRKLAND & ELLIS LLP

R. Mark McCareins
Michael P. Mayer
James F. Herbison
WINSTON & STRAWN LLP
35 West Wacker Drive

300 North LaSalle
Chicago, IL 60654
(312) 862-2000
douglas.kurtenbach@kirkland.com
daniel.laytin@kirkland.com
barack.echols@kirkland.com
leonid.feller@kirkland.com

COUNSEL FOR DEFENDANT
PACKAGING CORPORATION OF
AMERICA

Chicago, IL 60601
(312) 558-5600
rmccareins@winston.com
mmayer@winston.com
jherbison@winston.com

COUNSEL FOR DEFENDANT ROCKTENN
CP, LLC

By:    /s/ Andrew S. Marovitz

Andrew S. Marovitz
Britt M. Miller
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
amarovitz@mayerbrown.com
bmiller@mayerbrown.com

COUNSEL FOR DEFENDANT TEMPLE-
INLAND INC.

By:    /s/ Scott M. Mendel

Scott M. Mendel
John E. Susoreny
Lauren N. Norris
K&L GATES LLP
70 W. MADISON ST.
SUITE 3100
CHICAGO, IL 60602
(312) 372-1121
scott.mendel@klgates.com
john.susoreny@klgates.com
lauren.norris@klgates.com

COUNSEL FOR DEFENDANTS
CASCADES, INC. AND NORAMPAC
HOLDING U.S. INC.

By:    /s/ David Marx Jr.

David Marx Jr.
Jennifer S. Diver
Rachel Lewis
McDERMOTT WILL & EMERY LLP
227 W. Monroe Street
Chicago, IL 60606
(312) 372-2000
dmarx@mwe.com
jdiver@mwe.com
rlewis@mwe.com

COUNSEL FOR DEFENDANT
WEYERHAEUSER COMPANY

20

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on February 6, 2012, a true and correct copy of the

foregoing **Defendants' Brief on Discovery Issues To Be Address at February 21, 2012**

**Hearing** was electronically filed with the Clerk of the Court for the Northern District of Illinois

using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of

record.

/s/ *Nathan P. Eimer*_____
Nathan P. Eimer
An Attorney for Defendant International Paper Company

21