# Exhibit 31

# HEINS MILLS & OLSON, P.L.C.

### ATTORNEYS AT LAW

310 CLIFTON AVENUE
MINNEAPOLIS, MINNESOTA 55403
TEL (612) 338-4605 • FAX (612) 338-4692
WWW.HEINSMILLS.COM

JAMES W. ANDERSON
JANDERSON@HEINSMILLS.COM

January 30, 2012

**By E-Mail**
Mr. Leonid Feller
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654

Re:     *Kleen Products LLC, et al. v. Packaging Corporation of America, et al.*

Dear Mr. Feller:

As discussed during our January 26, 2012 call, plaintiffs submit this letter as a means by which to clarify the intended scope of questioning we will undertake as part of the 30(b)(6) deposition of Packaging Corporation of America ("PCA"). As was noted during the call, this letter is not intended to comprehensively set forth our individual lines of questioning; instead, it is meant to assist you in identifying potential 30(b)(6) designees and preparing those designees for the deposition. It remains our intention to proceed with this deposition during the week of February 13, 2012 and we look forward to solidifying this date with you in very short order.

1.     **Document retention, archiving and/or destruction policies and/or procedures used by Defendant during the Relevant Time Period for the Documents and Data relevant to any claim or defense or any facts in this Litigation, including policies and procedures applicable to the retention and/or destruction of Documents, Electronic Data or other ESI, including the Electronic Media by which such information is maintained, the Network(s) by which such information is maintained and the location of such Media, Networks or hard copy Documents.**

With respect to this deposition topic, plaintiffs expect to question PCA's designee(s) on matters relating to the company's records retention policies, both past and present. Questioning will focus not only on the policies themselves, but also on matters relating to the timing, application, implementation and enforcement of these polices both generally and specifically with regard to this litigation. Additionally, plaintiffs will question PCA's designee(s) on matters relating to the accessibility, format, extractability and searchability of records retained pursuant to these policies both generally and with specific regard to this litigation.

2.     **Defendant's policy and procedures for the suspension of any Document retention, archiving and/or destruction policies and/or procedures, including the details of any suspension of such policies and/or procedures relating to**

**any Documents or Data relevant to any claim or defense or any facts in this Litigation.**

With respect to this deposition topic, plaintiffs expect to question PCA's designee(s) on matters relating to the company's document retention, archiving and destruction policies, both past and present. Questioning will focus not only on the policies themselves, but also on matters relating to the timing, application, implementation and enforcement of these polices both generally and with specific regard to this litigation.

3.    **The identity of all past or present subsidiaries, affiliates, business divisions, departments, groups, units and employees of Defendant that have preserved and/or have collected Documents and/or Data concerning or related to any claim or defense or any facts of the Litigation.**

With respect to this deposition topic, plaintiffs expect to question PCA's designee(s) on non-privileged matters relating to the process, including timing, undertaken by the company of identifying the subsidiaries, affiliates, business divisions, departments, groups, units and employees from whom or which Documents and/or Data relevant to this litigation were preserved and/or collected.

4.    **The process, by which Defendant has identified, collected and/or preserved Documents and/or Data concerning or related to any claim or defense or any facts of the Litigation.**

With respect to this deposition topic, plaintiffs expect to question PCA's designee(s) on non-privileged matters relating to the process and timing by which the company identified, collected and preserved Documents and/or Data relevant to this litigation, including the specific methods employed with respect to each identified custodian. Additionally, plaintiffs will question PCA's designee(s) on matters relating to the accessibility, format, extractability and searchability of these Documents and/or Data.

5.    **The method employed to identify, collect, and/or preserve from each custodian's Documents and or Data.**

With respect to this deposition topic, plaintiffs expect to question PCA's designee(s) on non-privileged matters relating to the methods employed to identify, collect, and/or preserve Documents and/or Data from each custodian. Plaintiffs are also interested in the timing of these efforts. Additionally, plaintiffs will question PCA's designee(s) on matters relating to the accessibility, format, extractability and searchability of records identified, collected and/or preserved by way of these methods.

6.    **Organizational policies regarding Documents, Electronic Data and Database management, retention, deletion, sharing, production, and backup of electronic media responsive to the claims or defenses or any facts of the litigation.**

With respect to this deposition topic, plaintiffs expect to question PCA's designee(s) on matters, including timing, relating to the company's policies on the subjects enumerated above, particularly as they relate to the claims, defenses or facts of this litigation. Additionally, plaintiffs will question PCA's designee(s) on matters relating to the accessibility, format, extractability and searchability of Documents and/or Data that are responsive to the claims, defenses or facts of this litigation.

7.    **The identity and description of the following:**
      **(a) the type, location and usage of any Computer and/or Network systems currently or previously in use by Defendant;**
      **(b) the type, details, and usage of Network servers and mainframes currently or previously in use by Defendant, including details regarding Network users;**
      **(c) the type, details and usage of Computer workstation operating systems, Databases and Network operating systems currently or previously in use by Defendant;**
      **(d) the type, details, and usage of software applications, server applications, and Network applications currently or previously in use by Defendant, including:**
            **(i) email applications;**
            **(ii) personal and office planner applications;**
            **(iii) word-processing and database applications;**
            **(iv) instant messaging applications;**
            **(v) applications and programs relating to production, inventory management, and distribution**
            **(vi) any enterprise resource planning applications; and**
            **(vii) server applications.**

Plaintiffs believe the answers set forth in PCA's December 23, 2011 letter substantially addresses this topic and its subparts. As a result, plaintiffs anticipate asking PCA's designee(s) only confirmatory questions relating to this topic and its subparts.

8.    **The identity of all Computers, Databases, Networks that have been searched for Documents and/or Data responsive to any claim or defense or the facts of the Litigation.**

With respect to this deposition topic, plaintiffs expect to question PCA's designee(s) on non-privileged matters relating to the process, including timing, by which the company identified Computers, Databases and Networks that were searched for Documents and/or Data relevant to this litigation. Additionally, plaintiffs will question PCA's designee(s) on matters relating to the accessibility, format, extractability and searchability of all such Documents and/or Data.

9.    **The physical location where backup media are stored or catalogued, including offsite locations.**

Plaintiffs believe the answers set forth in PCA's December 23, 2011 letter substantially addresses this topic. As a result, plaintiffs anticipate asking PCA's designee(s) only confirmatory questions relating to this topic.

> **10.** **The identity of person(s) responsible for conducting, maintaining, storing and cataloguing any backup tapes made.**

Plaintiffs believe the answers set forth in PCA's December 23, 2011 letter substantially addresses this topic. As a result, plaintiffs anticipate asking PCA's designee(s) only confirmatory questions relating to this topic.

> **11.** **The identity of any backup media containing information responsive to any claim or defense or the facts of the Litigation, including where they are physically located, who maintains custodianship, dates of creation, content, and media type.**

With respect to this deposition topic, plaintiffs expect to question PCA's designee(s) on non-privileged matters relating to the identity of backup media containing information relevant to this litigation, including the process by which the company identified this backup media. Additionally, plaintiffs will question PCA's designee(s) on matters relating to the accessibility, format, extractability and searchability of this backup media.

> **12.** **The identity of any backup media containing information responsive to any claim or defense or any facts of the Litigation that has been erased, copied over, misplaced, destroyed, or otherwise altered during the Relevant Time Period.**

With respect to this deposition topic, plaintiffs expect to question PCA's designee(s) on non-privileged matters relating to the identity of backup media containing information relevant to this litigation that has or may have been erased, copied over, misplaced, destroyed, or otherwise altered. Plaintiffs will also question PCA's designee(s) as to the timing of any such events as well as the process by which the company identified any such backup media. Additionally, plaintiffs will question PCA's designee(s) on matters relating to the recoverability of any such backup media.

Sincerely,

HEINS MILLS & OLSON, P.L.C.

JAMES W. ANDERSON

JWA:lkg

96215

**Exhibit 32**



**LOCKRIDGE GRINDAL NAUEN**
P.L.L.P.
Attorneys at Law

www.locklaw.com

MINNEAPOLIS
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401-2179
T 612.339.6900
F 612-339-0981

WASHINGTON, D.C.
Suite 210
415 Second Street, N.E.
Washington, D.C. 20002-4900
T 202.544.9840
F 202-544-9850

Brian D. Clark
bdclark@locklaw.com
Phone: 612-339-6900

January 23, 2012

**VIA E-MAIL**

R. Mark McCareins
Winston & Strawn LLP
35 West Wacker Drive
Chicago, Illinois 60601
RMcCareins@winston.com

Re:     Plaintiffs' Notice of Rule 30(b)(6) Depositions

Dear Mr. McCareins:

Thank you for your January 9, 2012, letter to Plaintiffs' Co-Lead Counsel on behalf of RockTenn CP, LLC ("RockTenn") responding to the issues raised in Plaintiffs' Notice of Rule 30(b)(6) Depositions. We have carefully examined RockTenn's response and recognize the effort devoted to drafting the letter. Due to Plaintiffs' need for substantial additional information concerning RockTenn's document creation, collection, and retention practices, however, Plaintiffs must proceed with taking RockTenn's previously noticed 30(b)(6) deposition.

We intend to take RockTenn's deposition February 7, 8, 9, or 10. We are willing to take RockTenn's 30(b)(6) deposition in Chicago, Minneapolis, or St. Louis. We will contact you tomorrow, Tuesday, January 24, in order to discuss which date and location you and RockTenn's designee(s) prefer.

Very truly yours,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

Brian D. Clark

BDC

453141.1

cc:   Daniel J. Mogin
       Steven A. Kanner
       Michael Freed
       Benjamin D. Bianco
       Alexander M. Schack
       W. Joseph Bruckner

**Exhibit 33**

| BEIJING | 35 WEST WACKER DRIVE | MOSCOW |
| CHARLOTTE | CHICAGO, IL 60601 | NEW YORK |
| CHICAGO | | NEWARK |
| GENEVA | +1 (312) 558-5600 | PARIS |
| HONG KONG | | SAN FRANCISCO |
| HOUSTON | FACSIMILE +1 (312) 558-5700 | SHANGHAI |
| LONDON | | WASHINGTON, DC |
| LOS ANGELES | www.winston.com | |

**R. MARK MCCAREINS**
RMcCareins@winston.com
(312) 558-5902

January 23, 2012

**VIA E-MAIL**

Brian D. Clark
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401-2179

**In Re:**     **Containerboard Antitrust Litigation**

Dear Mr. Clark:

I received your letter today and I am surprised that plaintiffs believe that a 30(b)(6) deposition relating to RockTenn CP, LLC's document practices is needed in light of RockTenn's January 9, 2012 submission and the parties' discussions on November 2, 2011 at Eimer Stahl's offices. Although your letter states that plaintiffs need "substantial additional information," your letter fails to identify any issue that you feel has not been addressed. Additionally, your proposed deposition timetable (in approximately two weeks) will not work due to the number of people and logistics involved in such a purported deposition. We request that plaintiffs provide a more detailed explanation as to why you now believe that the letter is unacceptable given the admittedly large amount of work that went into compiling such a detailed response.

Very truly yours,

R. Mark McCareins

**Exhibit 34**



**LOCKRIDGE GRINDAL NAUEN**
P . L . L . P .
Attorneys at Law

www.locklaw.com

**MINNEAPOLIS**
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401-2179
T  612.339.6900
F  612-339-0981

**WASHINGTON, D.C.**
Suite 210
415 Second Street, N.E.
Washington, D.C. 20002-4900
T  202.544.9840
F  202-544-9850

Brian D. Clark
bdclark@locklaw.com
Phone: 612-339-6900

January 23, 2012

**VIA E-MAIL**

R. Mark McCareins
Winston & Strawn LLP
35 West Wacker Drive
Chicago, Illinois  60601
RMcCareins@winston.com

Re:     Plaintiffs' Notice of Rule 30(b)(6) Depositions

Dear Mr. McCareins:

Thank you for your timely response to the letter we sent earlier this afternoon. Your letter states that RockTenn needs additional time to prepare for a Rule 30(b)(6) deposition and asks Plaintiffs to explain why RockTenn's 30(b)(6) letter is "inadequate."

With respect to the issue of timing, we strongly prefer to take RockTenn's deposition February 7, 8, 9, or 10. However, in the interest of cooperation, we are willing to agree to take the deposition on February 14 or 15, which gives you three weeks to prepare. Any further delay is unacceptable because Plaintiffs need adequate time to analyze RockTenn's testimony prior to the February 21 evidentiary hearing. We also question the need for any further delay of discovery of the topics in the Rule 30(b)(6) notices given that the notices were served in October 2011 and Defendants agreed in June 2011 to provide much of the basic document creation, collection, and retention information described in the notices. Since the RockTenn letter was received as recently as January 9, it would seem that the information should be fresh and the persons that provided the information should already be prepared to give a deposition

As we indicated in our letter earlier today, RockTenn's January 9 letter provides helpful information. Indeed, we believe this information will help streamline and limit the length of RockTenn's deposition. However, RockTenn's January 9 letter is simply insufficient to stand in the place of a deposition.

Please let us know as soon as possible the date and location you and RockTenn's designee(s) prefer so that we may proceed with making arrangements for the deposition.

453187.1

Very truly yours,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

/s/ Brian D. Clark

Brian D. Clark

BDC

cc:   Daniel J. Mogin
Steven A. Kanner
Michael Freed
Benjamin D. Bianco
Alexander M. Schack
W. Joseph Bruckner

Exhibit 35 FILED UNDER SEAL

Exhibit 36 FILED UNDER SEAL

**Exhibit 37**

# MURRAY FRANK LLP
ATTORNEYS AT LAW

275 MADISON AVENUE
SUITE 801
NEW YORK, N.Y. 10016
212 682 1818
212 682 1892 FAX

info@murrayfrank.com
www.murrayfrank.com

February 2, 2012

**VIA E-MAIL**

Michael P. Mayer, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, Illinois 60601
MMayer@winston.com

**Re:   Scheduling of RockTenn's 30(b)(6) Deposition**

Dear Mike:

As discussed during our February 1, 2012 teleconference, Plaintiffs are providing this letter as a means by which to clarify the intended scope of questioning we expect to undertake as part of the 30(b)(6) deposition(s) of your client, RockTenn.  The areas of inquiry set forth herein are not intended to comprehensively or exhaustively identify Plaintiffs' specific lines of questioning.[1] Instead, this Letter is meant to assist you in selecting a 30(b)(6) designee (or designees) for the deposition(s).  In addition, and as noted during our several recent conversations, we intend to ask confirmatory questions regarding the topics covered in RockTenn's January 9, 2012 30(b)(6) Letter.  Finally, it remains our intention to proceed with RockTenn's deposition during the week of February 13, 2012, and we look forward to solidifying a date with you in short order.

**Document Retention, Preservation, and Collection-related Topics (Nos. 1-7)**

Plaintiffs expect to question RockTenn's designee(s) with respect to the following matters:

- Records Retention Policies:  Matters relating to the company's records retention policies, both past and present.  Questioning will focus not only on the policies themselves, but also on matters relating to the timing, application, implementation, and enforcement of these polices both generally and specifically with regard to this litigation.  With respect to e-mail communications, questioning will focus on (i) any exceptions or deviations from RockTenn's 400-day e-mail auto-delete policy, (ii) the existence of relevant e-mails retained in connection with other litigation, (iii) monitoring or knowledge of e-mail archiving practices by employees either on the H-drive or their local hard-drives, (iv) an

---

[1] Plaintiffs specifically reserve their rights to expand upon the information identified and sought herein.  Indeed, as you repeatedly mentioned during our recent conversations, RockTenn believes that in-depth questioning on certain topics set forth in the operative Subpoena (particularly the individual document retention practices of the identified custodians) is premature.  As such, we have, in good faith, attempted to avoid those areas on contention.

# MURRAY FRANK LLP

employee's ability to manually delete e-mails (or other electronically stored information) from RockTenn's servers, and (v) the real-world practice of RockTenn's supervisory review and retention of former employee's electronically stored information.

- <u>Employees with Responsibility for Decisions related to Conspiratorial Allegations</u>: In our several recent conversations, you mentioned that some, but not all, employees' hard-drives and other off-server electronically stored information had been preserved. As such, we intend to seek information on the identities of those current and former RockTenn employees that participated in authorizing, determining, or setting containerboard pricing, containerboard output, and containerboard mill and plant closures or operational suspensions. For each identified employee, Plaintiffs expect to question RockTenn's designee(s) concerning the identification, preservation, and collection of (i) documents stored locally on the employee's hard-drive, (ii) voicemails and telephone records (landline, VOIP, or other phone systems), (iii) cellular phones and PDAs (such as iPhones, BlackBerrys, or Androids, including the technical settings related to the integration of such devices with RockTenn's Microsoft Exchange server), and (iv) tablet or laptop computers and any related USB or other removable storage media associated therewith. For any former employees with responsibilities enumerated above, (i) the dates of departure from the company, (ii) whether secretaries or other proxies may have copies of certain e-mails stored separately from custodians, (iii) whether supervisors in fact reviewed (as per corporate policy) the former employee's e-mail and other documents within 30 days of their departure from the company, and (iv) where that preserved information is stored or otherwise located.

- <u>Corporate Policy and Practice regarding use of software applications</u>: Matters generally relating to the issues described in Topic 7(d), including (i) the availability and accessibility of the applications listed therein, (ii) estimates of monthly volume of instant messaging use (*e.g.*, Microsoft Communicator), (iii) whether instant messaging access is limited to internal-RockTenn use only (including with Microsoft Communicator or other computer or PDA-based instant messaging programs), and (iv) the ability of users to use instant messaging to share or collaborate on the creation of documents.

## Confirmation regarding identity of commonly used databases and networks (Topic No. 8)

With respect to this deposition topic, Plaintiffs believe the answers set forth in RockTenn's January 9, 2012 Letter substantially addresses the information requested. As a result, Plaintiffs anticipate asking RockTenn's designee(s) only confirmatory questions relating to this topic, including confirmatory questions regarding RockTenn's transactional-related data stored on its "SCORE" system (including the time period of available information).

# MURRAY FRANK LLP

**Backup Tape-Related Topics (Nos. 9-12)**

With respect to these related deposition topics, Plaintiffs believe the answers set forth in RockTenn's January 9, 2012 Letter substantially addresses the information requested. As a result, subject to the exceptions below, Plaintiffs anticipate asking RockTenn's designee(s) only confirmatory questions relating to this topic. Plaintiffs, however, do expect to question RockTenn's designee(s) on non-privileged matters relating to (i) the physical location of backup media "located in decentralized locations," and (ii) what general categories of information are (or are not) stored on RockTenn's "main, active servers."

Although we have a teleconference already set for Monday afternoon (February 6, 2012), I am available today or tomorrow to discuss any or all of the issues herein should the need arise. I look forward to hearing from you.

Sincerely,

Benjamin D. Bianco

cc:     Brian D. Clark, Esq.
        R. Mark McCareins, Esq.
        Joseph Siders, Esq.
        Daniel J. Mogin, Esq.

Exhibit 38 FILED UNDER SEAL

Exhibit 39 FILED UNDER SEAL

**Exhibit 40**



Boston  Brussels  Chicago  Düsseldorf  Houston  London  Los Angeles  Miami  Milan
Munich  New York  Orange County  Paris  Rome  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Rachael V. Lewis
Associate
rlewis@mwe.com
+1 202 756-8709

January 25, 2012

VIA E-MAIL

Jeffrey T. Sprung
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3303
Seattle, WA 98101

Re:     *Kleen Products LLC, et al. v. Packaging Corporation of America, et al.,*
         Case No. 1:10-cv-05711

Dear Jeff:

I write in response to your January 23, 2012 letter in connection with the above-referenced
matter in continuation of the meet and confer process.

We are surprised at the timing and the substance of your January 23 letter. Pursuant to an
agreement we reached with plaintiffs on November 10, 2011, Weyerhaeuser provided written
responses to Plaintiffs' 30(b)(6) topics covering various electronic discovery and preservation
issues on November 30, 2011. In our November 30 responses, we stated that we were available
to meet and confer to discuss or provide clarification on the information being provided to
plaintiffs. It has been nearly eight weeks since we transmitted the November 30 letter to
plaintiffs and we are just now receiving a response. We are also troubled by the fact that
plaintiffs are seeking to pursue the 30(b)(6) deposition in the next two weeks without affording
Weyerhaeuser an opportunity to try to address any of the questions plaintiffs raised based upon
our November 30 letter. In our view, plaintiffs' demand, on short notice, for a 30(b)(6)
deposition that our communications were intended to obviate, is unreasonable and inconsistent
with the agreement that the parties reached on November 10.

We intend to promptly address plaintiffs' questions in the January 23 letter as well as provide
additional information regarding FileNet, COLD, and the accessibility of data and documents.
We will not agree to schedule the 30(b)(6) deposition until after plaintiffs have received our
response letter.

Please let me know if you have any questions or would like to discuss further.

U.S. practice conducted through McDermott Will & Emery LLP.

600 Thirteenth Street, N.W. Washington D.C. 20005-3096  Telephone: +1 202 756 8000  Facsimile: +1 202 756 8087  www.mwe.com

Sincerely,

Rachael V. Lewis

cc:     Daniel J. Mogin
        Tony Shapiro
        Cadio Zirpoli
        Michael J. Freed
        Steven A. Kanner

**Exhibit 41**

**Lewis, Rachael**

| | |
|---|---|
| **From:** | Jeff Sprung [JeffS@hbsslaw.com] |
| **Sent:** | Thursday, January 26, 2012 4:16 PM |
| **To:** | Lewis, Rachael |
| **Cc:** | Tony Shapiro; Cadio Zirpoli (Cadio@saveri.com) |
| **Subject:** | Containerboard - January 25, 2012 letter |
| **Attachments:** | image001.jpg; image002.png; image003.png |

Rachel:  We received your letter dated yesterday and most of it is wrong.  We're negotiating with you on the majority of issues addressed in your November 30, 2011 letter.  We never agreed that a letter would substitute for a deposition as you suggest.  In any event, at this point we *do* we want to confer further in an effort to avoid a deposition except in two areas.

In those two areas, your November 30 letter was so general as to be totally unhelpful.  We hold out no hope that further letters will be more efficient to elicit accurate information than a deposition.  On backup systems for catastrophic failure recovery, the import of your letter (at 5) is that Weyerhaeuser only maintained data and information for a maximum recovery window of 35 days.  This seems patently incredible, and we're not interested in further explanations from lawyers rather than witnesses to get to the bottom of this issue.

On COLD and FileNet, we don't know from your letter what collections of data were kept on these two systems, what was given to IP from these two systems at the time of sale, and what Weyerhaeuser retained on the systems.  Again, we're not interested in a lengthy and stuttering back-and-forth with lawyers during which a full understanding of these important data collection systems eventually drips out.  A deposition will be more efficient.

You can provide us any additional information on these two issues you want.  But your agreement contemplated a deposition if we concluded, as we now have in good faith, that a letter from lawyers was not an efficient way for us to get answers to questions we originally planned to put to company witnesses.

We expect you to abide by your agreement.  We expect that you will check on the availability of Weyerhaeuser witnesses to address these two areas during the week of Feb. 6.

A quick glance at the January 23, 2012 letter we sent you reveals more than 10 issues on which we *did* agree to confer further with you.  On these issues, we look forward to further clarification from you in writing, and hopefully that will avoid the need for additional deposition time.

**Jeff Sprung** | Partner
**Hagens Berman Sobol Shapiro LLP**
1918 Eighth Ave Suite 3300 - Seattle, WA 98101
Direct: (206) 268-9329
JeffS@hbsslaw.com | www.hbsslaw.com | HBSS Blog



Named to 2011 Plaintiff's Hot List by *The National Law Journal*



**Exhibit 42**

January 31, 2012

**_VIA ELECTRONIC MAIL_**

Rachael V. Lewis
McDermott Will & Emory
600 Thirteenth St., NW
Washington, DC 2005-3096

      Re:    _Kleen Prods. LLC, et al. v. Packaging Corporation of America, et al., No. 1:10-cv-05711_

Dear Rachael:

I write to follow up on Jeff Sprung's letter of January 23, 2012 requesting a date for the 30(b)(6) Deposition of Weyerhaeuser Company. As explained in the January 23 letter, there are certain deposition topics we feel are more efficiently pursued via a live witness.

While we appreciate your offer to promptly supplement the information previously provided for certain topics, we do not agree that the appropriate course is to delay setting a date certain for a 30(b)(6) deposition.

Accordingly, we again request that you provide us with some dates that work for you and your witness(s) during the week of February 13, 2012.

Sincerely,

Cadio Zirpoli

cc:    Daniel J. Mogin
       Tony Shapiro
       Jeffrey T. Sprung
       Steven A. Kanner

Exhibit 43 FILED UNDER SEAL

**Exhibit 44**

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3    KLEEN PRODUCTS LLC, et al.,      )  No. 10 C 5711
                                      )
4                      Plaintiffs,    )  Chicago, Illinois
                                      )  December 15, 2011
5                                     )  9:45 o'clock a.m.
     -vs-                             )
6                                     )
                                      )
7    PACKAGING CORPORATION OF         )
     AMERICA, et al.,                 )
8                                     )
                       Defendants.    )
9

10               TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MILTON I. SHADUR
11
     APPEARANCES:
12
     For the Plaintiffs:      FREED KANNER LONDON & MILLEN LLC
13                            2201 Waukegan Road
                              Suite 130
14                            Bannockburn Illinois 60015
                              BY:  MR. MICHAEL J. FREED
15                                 MR. STEVEN A. KANNER
                                      and
16                            THE MOGIN LAW FIRM, P.C.
                              707 Broadway
17                            Suite 1000
                              San Diego, California 92101
18                            BY:  MR. DANIEL J. MOGIN

19
     For the Defendant        KIRKLAND & ELLIS LLP
20   Packaging Corporation    300 North LaSalle Street
     of America:              Chicago Illinois 60654
21                            BY:  MR. LEONID FELLER

22


23   Court Reporter:          ROSEMARY SCARPELLI
                              219 South Dearborn Street,
24                            Room 2304A
                              Chicago, Illinois  60604
25                            (312) 435-5815
```

1    APPEARANCES:   (Continued)

2    For Defendant                EIMER STAHL KLEVORN & SOLBERG LLP
     International Paper:          224 South Michigan Avenue
3                                 Suite 1100
                                  Chicago Illinois 60604
4                                 BY:  MR. NATHAN P. EIMER
                                            and
5                                 FOLEY & LARDNER LLP
                                  777 East Wisconsin Avenue
6                                 Milwaukee, Wisconsin 53202
                                  BY:  MR. JAMES T. McKEOWN
7

8    For Defendant                MAYER BROWN LLP
     Temple-Inland:               71 South Wacker Drive
9                                 Chicago, Illinois 60606
                                  BY:  MR. ANDREW S. MAROVITZ
10

11   For Defendants               K&L GATES LLP
     Cascades & Norampac:         70 West Madison Street
12                                Suite 3100
                                  Chicago Illinois 60602
13                                BY:  MR. SCOTT M. MENDEL

14
     For Defendant                FIGLIULO & SILVERMAN
15   Georgia Pacific:             Ten South LaSalle Street
                                  Suite 3600
16                                Chicago Illinois 60603
                                  BY:  MR. JAMES R. FIGLIULO
17                                          and
                                  QUINN EMANUEL URQUHART
18                                & SULLIVAN LLP
                                  51 Madison Avenue
19                                22nd Floor
                                  New York, New York 10010
20                                BY:  MR. STEPHEN R. NEUWIRTH

21
     For Defendant                WINSTON & STRAWN
22   Rock Tenn:                   35 West Wacker Drive
                                  Chicago, Illinois 60601
23                                BY:  MR. R. MARK McCAREINS

24

25

1          THE CLERK:  10 C 5711, Kleen Products versus

2     Packaging Corporation.

3          THE COURT:  Yes.  Do you want to reflect your

4     appearances.  And I think for Rosemary's purposes you ought

5     to go along maybe from my left to my right, your right to

6     your left sequentially.  Okay.

7          MR. KANNER:  Good morning, your Honor, Steve

8     Kanner, co-lead counsel on behalf of plaintiffs.

9          MR. FREED:  Michael Freed, your Honor, on behalf of

10    the plaintiffs.

11         MR. MOGIN:  Good morning, your Honor, Daniel Mogin

12    behalf of the plaintiffs.

13         MR. NEUWIRTH:  Good morning, Stephen Neuwirth on

14    behalf of Georgia Pacific.

15         MR. EIMER:  Good morning, your Honor, Nate Eimer on

16    behalf of defendant International Paper.

17         MR. FIGLIULO:  Good morning, your Honor, Jim

18    Figliulo on behalf of defendant Georgia Pacific.

19         MR. FELLER:  Good morning, your Honor, Leonid

20    Feller on behalf of defendant Packaging Corp. of America.

21         MR. McKEOWN:  Good morning, your Honor, James

22    McKeown on behalf of International Paper.

23         MR. McCAREINS:  Good morning, your Honor, Mark

24    McCareins on behalf of Rock Tenn.  I will slide by here.

25         MR. MENDEL:  Scott Mendel for defendant Cascades

1  and Norampac.

2  MR. MAROVITZ:  Good morning, your Honor, Andy

3  Marovitz for Temple-Inland.

4  THE COURT:  Good morning.  Why don't you sit down.

5  I will get the papers here.

6  First of all, I wanted to thank you particularly

7  for the obvious degree of professionalism and cooperation

8  that I think are reflected here, despite the fact that you

9  are apart on some issues, and also on how constructive it is,

10  at least from my perspective, to get something like this

11  joint status conference report No. 2.  I hope that that means

12  that my protocol -- that is really too fancy a term for it --

13  that the procedure that I follow seems to be working.

14  I -- you heard me say in a much smaller case

15  earlier this morning that I think that the idea of setting

16  schedules at an early point is about the most pointless thing

17  imaginable.  And so I hope this unless somebody finds what

18  has been done up to now and the procedure that we are

19  following to be troublesome, that you would all agree that we

20  will continue on the same vein.

21  Now, that doesn't mean, of course, that as and when

22  issues may arise in the interim, that anybody should be

23  bashful about bringing them on.  And that is -- I am

24  available for that purpose.  But other than, that I really

25  again find the notion of periodic reports and statuses to be

1   the best way.

2           I do get the sense, though, I will tell you, that

3   -- you know, I saw a reference in here to 45-day intervals.

4   I think that may be too short for -- you know, as long as you

5   are getting along and working at the thing, I don't know any

6   reason that everybody has to show up and that we are dealing

7   with -- I hesitate to multiply, but whatever thousands of

8   dollars an hour are involved doesn't seem to me to be

9   especially constructive.  So I would think that something

10  more in the range of 60 to 75 days intervals would be

11  sensible.  And we will talk about that afterwards, but I

12  throw that out to you.

13          Now, having said that, I want to turn to the two

14  statements of position about the maybe four disputed issues

15  that you have covered.  This is I guess kind of an editorial

16  comment, but you will pardon it because I am sitting here,

17  but, you know, modern discovery seems to me to be a combined

18  blessing and a curse.  You know, it takes us I know from the

19  -- quite a distance from the historical fox hunt or sporting

20  theory of litigation when people went ahead blindly into

21  trial, armed only with the information that they had gotten

22  from their own clients.  Although the system I guess worked.

23  I don't know how.  But the --

24          On the other hand -- and this is particularly true,

25  at least I find -- with the explosion of electronic data, it

1    enables a responding party, for example, to overwhelm a

2    requesting party with responsive materials so that whatever

3    critical information might be contained someplace in the

4    massive pile of material is buried and it is retrievable only

5    by chance or maybe by excessive efforts at examining

6    thousands of documents.

7         While I was thinking about this, it struck me that

8    -- that that term "smoking gun" was particularly inapt a term

9    because, you know, critical documents don't emit little puffs

10   of smoke so that you can pull them out of the huge mass, even

11   if there is fire there.  So I don't think that the problem of

12   extricating the important things from the mass of otherwise

13   not particularly helpful documents is sensible.

14        It is understandable then to me why the provision

15   that plaintiffs' counsel relies on in Rule 34 -- 34(b)(2) --

16   (b)(1) which talks about production says, "Unless otherwise

17   stipulated or ordered by the Court, these procedures apply to

18   producing documents or electronically-stored information."

19   And one -- the first thing that is said is, "A party must

20   produce documents as they are kept in the usual course of

21   business or must organize and label them to correspond to the

22   categories in the request."

23        In a way that requirement strikes me as being in

24   harmony with the provision that we have all become familiar

25   with because it preceded the predominance of electronic

1  requirement that has to do with the one about interrogatories

2  in Rule 33.  33(d), as you know, gives the option.  Instead

3  of responding to an interrogatory, it can be determined by

4  specifying the records in enough detail to enable the

5  interrogating party to locate and identify them.  And that is

6  true if the burden of deriving or substantiating the answer

7  will be the same for either party.

8          Defendants argue on that one, which is the question

9  of how does the thing get organized, by saying, you know, we

10 spent a lot of time and it would really be terribly

11 burdensome for us to categorize them in a way that is

12 responsive to the way in which plaintiffs have chosen to

13 categorize their request.  It is hard to tell from the

14 outside, you know, where I haven't really seen the thing,

15 whether that is -- that is really legitimate or -- I won't --

16 "legitimate" is the wrong term.  Whether that is really a

17 persuasive response because it is quite obvious that in a

18 lawsuit like this everything is expensive.  I mean, you know,

19 you are dealing with enormous documentation.  But it seems to

20 me that the alternative of requiring the plaintiff, the

21 requesting party, to try to figure out, when they have been

22 delivered a warehouse full of papers, to bring those within

23 the -- their own organizational categories seems to me to be

24 a substantially greater burden than is imposed on the parties

25 who know what the documents are when they are producing them

1  and I would think could more readily categorize them.

2  So I will tell you my inclination generally is to

3  say I think on that one aspect the plaintiffs have I think

4  the better of the argument.

5  As for the others -- well, let's talk about the

6  methods for ESI search. On that score I cheerfully

7  acknowledge my lack of background to choose between the

8  opposing positions that I have gotten. From earlier movies I

9  think Mr. Freed is well aware, maybe Mr. Eimer as well, that

10  I still inhabit a universe where the quill pen and the

11  inkwell play a significant part in the whole process -- or

12  maybe a major role. To the extent that I am educable, I find

13  that the defendants' proposal for a hearing, with the

14  proverbial battle of experts, is the right way to approach

15  it.

16  One alternative, though, would be I -- you know, I

17  took a look at who the Magistrate Judge was who is assigned

18  to the case. It is Nan Nolan. Nan may be, among I think our

19  very extraordinarily able group of magistrate judges, the one

20  who is most familiar with electronic discovery. And I think

21  that it might make very good sense to have such a hearing

22  assigned to her. I don't know what the parties -- I

23  recognize, by the way, I do less referral to magistrate

24  judges than I think most of my colleagues or maybe any of

25  them. And for a reason. But -- and of course one of the

1  main reasons is that, you know, to do it when that is just a
2  weigh station to ultimate delivery to the Court is often very
3  wasteful.

4      It struck me though that in this instance that
5  might not be so.  And so I don't know whether the parties --
6  you haven't heard this before, but I would think the parties
7  might want to think about that because it is quite right -- I
8  don't know whether -- how familiar any of you are with
9  Magistrate Judge Nolan's know-how in this area.

10      What is --

11      THE CLERK:  She is on sabbatical until the end of
12  the month.

13      THE COURT:  Oh, well, but that is --

14      THE CLERK:  Well, I mean just --

15      THE COURT:  That is until December 31?

16      THE CLERK:  Right.  But I just wanted to let you
17  know.

18      THE COURT:  And she is going to come back very
19  refreshed.

20      THE CLERK:  Well, there you go.

21      THE COURT:  So I want to throw that out as a
22  suggestion that I think the parties might want to talk about
23  because I think it would probably be constructive in this
24  case.  And that applies to the other related issues as well,
25  the other two which are essentially -- they are not a

1  variance on the second one but basically they are closely

2  interrelated I think.

3  Anyway, that is really all that I wanted to say at

4  the outset. And I am perfectly willing now to listen to

5  counsel in terms of the first point that I made -- I know

6  that defendants were opposed to that -- and also to the

7  suggestion that I have just thrown out with respect to the

8  other three contested issues.

9  So who is up? Who wants to come up first? Yes?

10  MR. NEUWIRTH: Your Honor, Stephen Neuwirth again

11  for defendant Georgia Pacific --

12  THE COURT: Yeah.

13  MR. NEUWIRTH: -- speaking on behalf of all

14  defendants.

15  THE COURT: Yeah.

16  MR. NEUWIRTH: I think, as your Honor appears to

17  recognize in your comments, the defendants have really

18  invested a tremendous amount of time, effort and through the

19  use of consultants to develop a methodology for

20  identification of ESI that we believe is state of the art.

21  THE COURT: Yeah, I think -- look, I think -- I

22  don't mean to minimize -- in my comments I don't mean to

23  minimize at all the point that you have -- you know, that you

24  invested a lot of time, a lot of money. You have developed

25  something.

1    I should say, by the way, on that score, you know,
2    although, as I say, I confess that the area you are talking
3    about is not -- is not one that I am comfortable saying I am
4    certainly not -- I wouldn't qualify under Daubert under any
5    circumstances. But I do want to say one other thing about
6    that, and that is what I do know and what I have dealt with
7    extensively, as you might guess, is the corollary to that in
8    terms of legal research. And I think anybody who is -- who
9    is familiar with -- and that has got to be all lawyers now --
10   with Westlaw and Lexis knows that that is a very valuable
11   search engine, but it has a lot of limitations, a lot of
12   limitations because what you are doing is you are guessing
13   what word or what combination of words would have been used
14   in terms of the classification that you are looking for.

15   You know, the days when we used to work with the
16   West key number system are long gone. But the difficulty
17   that was really created for the researcher at that point was
18   that you had to figure out what the nomes that worked for
19   West had done in terms of putting it under a particular key
20   number. And so your search had to be quite widespread
21   because you had to figure out all conceivable key numbers
22   that maybe they would do, whereas the middleman is eliminated
23   by Lexis and Westlaw because now your burden is only to
24   figure out what kind of words the Court would use.

25   Well, it is somewhat the same I think -- not

1   exactly but somewhat the same in this area, so that the kind
2   of search that you have talked about I am sure was expensive.
3   I not sure that it would uncover all of the things -- and,
4   you know, they made the statement that it is no more than
5   25 percent.  I am not buying that necessarily.  But I think
6   there is something to be said on both sides of that issue.

7            MR. NEUWIRTH:  Yes, your Honor.  And I think you
8   have hit the nail on the head in terms of what seems to be
9   the underlying points, not just the amount of money that is
10  spent, but it is the quality of what you do --

11           THE COURT:  Right.

12           MR. NEUWIRTH:  -- when you spend the money.  And on
13  that score I think that as the defendants detailed in their
14  papers --

15           THE COURT:  I know you consulted with professionals
16  and you came -- which is exactly what should have been done.
17  I am not criticizing that at all.

18           MR. NEUWIRTH:  And we consulted with the plaintiffs
19  in the process as well.

20           THE COURT:  Yeah.

21           MR. NEUWIRTH:  And I do think that this really
22  bears on the indexing issue as well.  You know, I think that
23  the type of testing and validation we did of our methodology,
24  which can be the subject of the upcoming hearing, shows that
25  the level of accuracy that we have been able to achieve with

1  the methods that we are using really is beyond the state of

2  the art, at least in terms of what courts have required. And

3  the type of methods that the plaintiffs are suggesting that

4  we use here are ones that in fact were -- only came to market

5  after the defendants were well along the way in implementing

6  the system that they have set up.

7  THE COURT: Yeah, I read that as well. Again I

8  find a lot of force in that. And, you know, the idea of

9  saying, well, start over again because somebody has come

10 along with a better mousetrap is -- really has something to

11 be said against it, even if the mousetrap is better.

12 MR. NEUWIRTH: Right.

13 THE COURT: And I don't mean to minimize that. All

14 I am saying is I don't -- I am certainly not in a position to

15 resolve that one now because I haven't heard from the

16 consultants, the experts that you have dealt with. And I

17 assume that the kind of hearing that we are talking about is

18 going to get conducted, a judicial officer is going to get

19 that and also input from the other side, and we will resolve

20 it.

21 MR. NEUWIRTH: Yes, your Honor. In terms of that

22 hearing I think I can say that all of the defendants would be

23 very pleased to proceed before your Honor, if that would

24 facilitate doing this expeditiously. I think that if your

25 Honor's determination is that it makes more sense to send

1  this to Judge Nolan, the defendants will obviously be pleased

2  to proceed before her as well.  But certainly we would be

3  very comfortable proceeding before your Honor, in part

4  because you are educated about the case generally and we

5  think that the information that the experts would be able to

6  provide would be quite straightforward in terms of the

7  different positions of the parties and we think it is

8  something that even people like us, who tend to do a lot with

9  pens and paper perhaps more than computers, would be able to

10  understand very clearly and it may facilitate a more prompt

11  resolution.

12       The defendants have already produced about a

13  million pages of documents and are very interested in moving

14  this process forward, in part so that we can get to the

15  merits of the case.  And so getting this resolved quickly is

16  something that the defendants would be grateful for --

17       THE COURT:  Yeah.

18       MR. NEUWIRTH:  -- if your Honor has the opportunity

19  on your calendar to hear this at the start of the new year.

20       The reason I said that this was in some ways

21  related to indexing is because I think that the blessing and

22  curse point you made before really applies to both of these

23  issues because we really do feel that what the defendants

24  have done -- we have blessed this case with an opportunity to

25  get things produced quickly and effectively and efficiently

1    in response to the plaintiffs' requests, and we are facing a

2    curse we think of being asked to do things that no court to

3    our knowledge has ever ordered.

4              And indexing is a good example of that because, as

5    I believe your Honor may recall, you have already entered an

6    ESI protocol in this case --

7              THE COURT:  Yes.

8              MR. NEUWIRTH:  -- it was stipulated by the

9    parties -- that requires defendants, when they produce ESI,

10   to include significant amounts of metadata that, among other

11   things, identify the custodian of the document, from whose

12   files the document came, et cetera.  And --

13             THE COURT:  Well, that of course doesn't really

14   answer, I think, the point that they are making.  I mean it

15   is not a question of being able to locate.  It is a question

16   of being -- of categorizing, and that is a different issue.

17   I mean, you know, the fact that something may be -- that

18   documents may be spread out over a very wide area and that

19   some available from this person, some available from that

20   person, doesn't really respond fully at all to the point that

21   the plaintiffs are making about organizing the materials as

22   -- and that is the reason, by the way, that I made the point

23   that I did about the -- what is sort of a rough equivalent in

24   Rule 33, and that is it is very difficult for a recipient to

25   be doing that, and considerably more difficult than it is for

1    the producing party because the producing party knows what

2    those documents are, whereas they -- you know, they get --

3    they get documents unvarnished.

4           And to my knowledge it continues to be true that

5    the only way to find out what is in a document is to read it.

6    And --

7           MR. NEUWIRTH:  Well --

8           THE COURT:  -- I know that that is unpopular these

9    days.

10          MR. NEUWIRTH:  Well, your Honor, without in any way

11    disagreeing with any of the points you made, which are --

12    which are all valid, I think there are some additional

13    considerations that may bear on this.  First, you know, this

14    is not a situation where the plaintiffs are saying to us, can

15    you please tell us which of our document requests, which of

16    our over 90 document requests, our over 90 overlapping

17    documents requests, this refers to, but they are saying, we

18    have come up with 29 categories that will help us analyze the

19    case and we would like you to go through the documents you

20    produced and code them for us, substantively code them based

21    on which of those categories you think they are responsive

22    to.

23          Now, the categories are overlapping.  We don't know

24    exactly what the plaintiffs consider them to be.  But there

25    really is no case we are aware of that has ever held that

1  anything like this needs to be done.  And the one case

2  plaintiffs cite in their submission is the Pass & Seymour

3  case from the Northern District of New York.  While it talks

4  about indexing --

5  THE COURT:  Yeah, I saw it.

6  MR. NEUWIRTH:  -- the ultimate ruling is to deny

7  the very type of thing that is being asked for here.

8  THE COURT:  I read that.

9  MR. NEUWIRTH:  And in fact that was a case where

10  there were 70 document requests, not the more than 90 we have

11  here.  And the court said, "Come on, that is too much."

12  Second, I think that while it is true that

13  defendants look at the documents they produce in the process

14  of producing them, the reality is that the defendants, just

15  like the plaintiffs, are dealing with a huge amount of ESI

16  that they need to review.  And many of the documents, as I am

17  sure your Honor knows, in corporations like the defendants

18  are business planning documents that may be 40 pages long

19  that cover multiple topics.  And on Page 3 you might find

20  something that is responsive to one code, on Page 5 you might

21  find something responsive to another.

22  We think that what the plaintiffs are really asking

23  for here is not what the discovery rules are talking about,

24  they are asking the defendants to do their document review

25  for them.  And we think that no precedent stands for having

1  substantive document review be undertaken by the producing

2  side or the receiving side.  This is not a request to

3  associate documents we produced with the document requests.

4  And that would be impossible given there are more than 90.

5         So instead they have come up with 29 codes that

6  presumably they think will help them through the documents.

7  And we are -- as we said, there is no case that would require

8  this.  So we would really be breaking new ground here to

9  require something like that.

10        And, you know, to the extent the plaintiffs want to

11  use their interrogatories to ask us for information about

12  documents we have produced, that is one option available to

13  them.  But there is a huge burden for the defendants just to

14  get through these documents for our purposes, let alone for

15  the plaintiffs' purposes.

16        So on that issue we would hope that your Honor

17  would consider those other factors and the fact that the

18  specific thing that the plaintiffs are asking us to do really

19  goes beyond, we would respectfully submit, the types of

20  things you are describing --

21        THE COURT:  Yeah.

22        MR. NEUWIRTH:  -- which defendants don't disagree

23  with, but we think plaintiffs are asking for something very

24  different and really understating in their papers the extent

25  of the type of burden that they would seek to put upon us.

1    So the only other thing we would add, your Honor,

2 is that part of the reason we think the hearing is so

3 important in this is because we think on all of these issues

4 if the Court, you or Judge Nolan, were to hear from the

5 experts about the nature of what defendants are doing and how

6 it relates to what both the experts understand about the

7 marketplace and what the case law says, we believe that the

8 Court will conclude that what defendants have done is

9 actually more than satisfactory.

10    And just finally, you know, while it is true that

11 the plaintiffs are talking about some new technology, the

12 plaintiffs have not yet undertaken any of this themselves.

13 And we are at the stage where they have literally sent us

14 brochures, including from our own consultant, describing type

15 of things that may be available.

16    THE COURT:  Yeah, I saw that.

17    MR. NEUWIRTH:  And they certainly haven't

18 implemented anything themselves.  They have asked us to help

19 them come up with so-called exemplars to help them figure

20 this out.

21    So all the defendants are working hard here.  We

22 want to get this resolved quickly.  And if it would please

23 the Court to have a hearing before your Honor in early

24 January, defendants would be very pleased to appear for that.

25    Thank you.

1          THE COURT:  Thank you.

2          Mr. Freed.

3          MR. FREED:  Thank you, your Honor.

4          THE COURT:  I do want to pose another question to

5   you in light of what counsel has said and it struck me based

6   on his comment, and that is this:  The one thing that I think

7   would be inappropriate would be if defendants were required

8   to comply with the kind of categorization that you have just

9   made and were then to be met later on in the litigation with

10  a charge that somehow there has not been adequate disclosure

11  because of miscategorization, I think particularly where -- I

12  haven't seen the categories -- don't misunderstand -- but I

13  suspect that it is true these do not occupy water tight

14  compartments.

15          And as a result I think that the notion of any

16  prospect that defendants could be met at a point with some

17  argument down the road that would be adverse to them in terms

18  of the failure to have -- or the asserted failure to have put

19  something in the right place, that would be, to me at least,

20  enormously troublesome.  You know, I -- I have no suggestion,

21  no indication anywhere by either side, by the way, that there

22  is an absence of good faith in terms of how people are

23  working at the thing.  And so I wouldn't want to see -- I

24  wouldn't want to create any prospect of that.

25          Anyway, I wanted to pose that because that I think

1  is an additional consideration.

2  Anyway, but go ahead.

3  MR. FREED:  Right.  Let me address that first, your

4  Honor.  We started with the Federal Rules, Rule 34, and going

5  way, way back.  These discussions have been ongoing for a

6  very long time.  They are complicated and so they have taken

7  a long time to crystallize to a point where we seem to be --

8  I would say at an impasse.  Maybe defendants wouldn't.  If we

9  started with just following Rule 34, which your Honor read,

10  which is either produce the documents as they are kept in the

11  standard course of business, which they are not clearly, or

12  comply with the other alternative, which is to identify --

13  THE COURT:  It does use the term "must."  I guess

14  Brian Garner got at them this time.  It doesn't say "shall."

15  MR. FREED:  Okay.  So defendants said that is very

16  onerous.  So we came up -- and they said, can you give us a

17  way -- another alternative for categorizing them.  So this is

18  sort of like no good deed goes unpunished.  We took an

19  inordinate length of time.  We came up with a content-based

20  group of 29 categories, and we said, if that works better for

21  you, then -- than responding to each of our document requests

22  and subparts, that is fine with us too.  We don't insist on

23  that.  If they want to go back to the language of Rule 34,

24  that is okay.  But even taking the rule -- the 29 categories,

25  that is not our intent.

1          Clearly we will be substantially ahead if the

2     defendants do a categorization.  And it may inadvertently on

3     their part -- and I don't question their good faith either --

4     if they inadvertently do not precisely categorize those

5     documents as we would, we will be way ahead than if they

6     don't categorize them at all.  And that is our concern.  As

7     your Honor knows, the whole case -- the key to the start of

8     discovery is the documents.  And the use of the documents

9     really was framed on our part by the way we framed our

10    request for production.

11         So to have a dump -- and I don't know any other

12    word to use -- of millions of pages of documents and say, oh,

13    we have done some analytical analysis for search, it doesn't

14    address the index problem from our perspective at all.  We

15    would never use it against them if they try sincerely to

16    comply with our 29 categories.  If they would rather go back

17    to the Federal Rules of Civil Procedure Rule 34, that is okay

18    too.

19         So we are not trying to take advantage.  It is not

20    a gotcha situation.  We are just trying to get some

21    reasonable definition of what documents relate to what

22    request.

23         THE COURT:  Well, I must say on that score, you

24    know, I haven't had occasion to research the question of how

25    that provision has been interpreted or applied, but it is

1  certainly true that not only that the provision is

2  unambiguous -- as I say, the style authors who are just about

3  to wreck havoc with the Federal Rules of Evidence, unless

4  they are stopped, which would be a tragedy -- they did it for

5  the civil rules, the criminal rules, the appellate rules --

6  and one of the things that they have done is to take "shall"

7  out of the vocabulary and use the term "must" when they mean

8  you have to.  And it says "must."

9  And I was just looking as you -- as you were

10  speaking at the Committee Report on the 2006 amendment, and

11  it says at the -- it makes it clear that that is a mandatory

12  requirement and that it applies to electronically-stored

13  information as well.

14  MR. FREED:  Right.

15  THE COURT:  So it is -- you know, when I am told,

16  well, no court has done it, I am not sure that -- it says --

17  the way the rule reads, it says, "Unless otherwise stipulated

18  or ordered by the Court, these procedures apply."  So I

19  suppose that there is a discretionary aspect of it that

20  enables a court to do some balancing on that score, but

21  certainly presumptively the rule requires what you are asking

22  to be done.  And as difficult as it may be -- now, of course,

23  again I am -- I am talking sort of in a vacuum because I

24  haven't seen the categories, I haven't seen whether they are

25  suspect in terms of making it especially difficult to do

1  that, but I guess on balance the thing really does appear to

2  be in the way that I started out by talking about it because

3  I was again looking at the rule, not having had an occasion

4  to search what courts may or may not have done with

5  compliance.

6       What about the -- what about the others in terms of

7  the suggestion that I had made -- I appreciate the vote of

8  confidence that defense counsel had suggested, but I am not

9  sure that it is justified.  And I am totally candid about

10 that.  It seems to me that I would profit myself from input

11 by a respected judicial officer based upon a hearing rather

12 than my doing it in the first instance myself.  Although I --

13 you know, I don't mean to disclaim the ability to analyze.  I

14 am much too immodest for that.  But I -- I do think that it

15 might be more constructive, and that is the reason I made the

16 suggestion, not because I am ducking work, but really in

17 terms of what is in everybody's interest in the long haul.

18      MR. FREED:  I have been before Judge Nolan.  I

19 agree Magistrate Judge Nolan -- I believe she is highly

20 respected and would be very, very competent to do the

21 analysis which might be a help to your Honor.  We would also

22 be perfectly willing to do it in front of your Honor.  But if

23 you think that her initial input would be helpful, we will

24 certainly agree with that.

25      THE COURT:  Well, she is coming off of what we

1   improperly refer to as sabbatical.  That is a term that my

2   colleague Bill Hart invented for us as district judges, and

3   we have passed it on to magistrate judges.  I don't know when

4   a sabbatical turned out to be a three-month interval, but

5   anyhow that is the vocabulary.  So, you know, she may be

6   raring to go.  On the other hand, she may be totally

7   overloaded with what is coming back to her right after her

8   arrival.  So I am not going to inflict on her something in

9   that nature.

10          I think that maybe the sensible thing to do is to

11  find out, when Nan gets back, what her situation is.  My

12  inclination would still be -- and I am appreciative of the

13  nice things that you said about my ability to do it, but I

14  got to tell you I think that it might be in everybody's

15  interest to have her dealing with it in the first instance.

16          MR. FREED:  That be would fine, your Honor.  And,

17  your Honor, if she is available but there is a range of

18  dates, then perhaps --

19          THE COURT:  Yeah.

20          MR. FREED:  -- we could speak with the defendants

21  about organizing it so that everybody could do it at a time

22  which is best.

23          THE COURT:  Well, I will make it my business to

24  check with her as soon as she gets back, which is -- her

25  "sabbatical" ends on December 31.  It is a three-month period

1  during which they are off the wheel essentially and free to
2  do whatever they want, just as happens with us and has for a
3  number of years.

4      Okay.  Well --

5      MR. NEUWIRTH:  Your Honor, may I be heard on one
6  point very briefly?

7      THE COURT:  Sure.

8      MR. NEUWIRTH:  Just on this issue of Rule 34, we
9  would respectfully submit that to the extent there is going
10  to be a hearing, that the issue of indexing be included
11  within the scope of the hearing because as your Honor --

12      THE COURT:  Oh, I am not opposed to that.  It seems
13  to me we ought to look at in totality.  But I have tried to
14  indicate to you the considerations that I think ought to be
15  meaningful for consideration.  So I am not taking that off
16  the table.

17      MR. NEUWIRTH:  Right.  Because as your Honor noted,
18  the beginning of Rule 34 says one of the options that the
19  defendants have is to produce documents in the way they are
20  stored.  And the metadata permits that.

21      THE COURT:  That is the way it reads.

22      MR. NEUWIRTH:  Right.

23      THE COURT:  And then it says they are maintained in
24  the ordinary course of business.  And as I understand what
25  the plaintiff said what happened -- and I am not being

1  critical about this -- is there are a lot of places where

2  they are, and this -- that really is not what is I think

3  contemplated by the Rule's reference to the ordinary course

4  of business.  The Rule's reference ordinarily would be

5  thought about as a single plaintiff and a single defendant,

6  if you think about that, and that therefore -- and a single

7  defendant then maintains its records in the ordinary course

8  of business in a particular way.

9          What we are dealing with here is a very different

10  animal.  There are a large number of defendants and,

11  therefore, ordinary course of business -- one defendant has

12  papers over here, one has over here, one has over here, and

13  it is very difficult to think -- to regard that as what was

14  contemplated by the drafters of the Rule.

15          MR. NEUWIRTH:  We think --

16          THE COURT:  I think --

17          MR. NEUWIRTH:  Right.  We understand, your Honor,

18  but we believe one of the things that would be shown at the

19  hearing is that each defendant is producing documents

20  separately, each defendant is identifying file locations of

21  documents, et cetera.

22          THE COURT:  I --

23          MR. NEUWIRTH:  And so we think that we would at

24  least be able to show that the first component of Rule 34(b)

25  is being addressed.

1          And then -- just the last thing, your Honor.  I

2    believe that if you look at the quote from Wright and Miller

3    on Page 11 and 12 of our statement --

4          THE COURT:  Wright and Miller is perhaps -- I hate

5    to say this, and I shouldn't be regarded as biased because I

6    got the assignment of writing one of the chapters in -- when

7    Moore's got a total overhaul and being the super editor on

8    four other chapters.  Wright and Miller is really for me a

9    pale shadow of what it was because you look at Wright and

10   Miller and your typical page is going to have one line of

11   text and the rest of the page is filled up with footnotes

12   that simply cite cases without telling what they say.  And it

13   is the least useful research treatise that I know of.

14         So I most recently told the librarian that -- I

15   guess I am one of the few that is blessed with both sets.

16   Not here.  I don't have any books here, but up in 23.  And

17   that is because the -- the Moore's people provide me with a

18   new set every year in some kind of gratitude for -- I guess

19   for my having done the overhaul.  And the other one that we

20   pay for and pay dearly, and I am thinking very seriously

21   about simply discontinuing it.  I really don't find Wright

22   and Miller useful, in candor.  No disrespect to Wright and

23   Miller at all.

24         MR. NEUWIRTH:  We will not cite it again.  But I

25   think that the general point --

1         MR. McKEOWN:  Your Honor, if I may, just as a

2   former research assistant for Arthur Miller, I do have to

3   take exception.

4         MR. NEUWIRTH:  But the point, your Honor, whether

5   it is Wright and Miller or just the case law --

6         THE COURT:  Yeah.

7         MR. NEUWIRTH:  -- we think that your Honor

8   correctly noted that there would be a benefit to looking at

9   what the courts have actually said in the context to be

10  assessed under this Rule 34 requirement --

11        THE COURT:  Of course.

12        MR. NEUWIRTH:  --  because we do believe that what

13  we are suggesting is the way to proceed would be consistent

14  with how it is interpreted.  And perhaps then if there is a

15  hearing, there may --

16        THE COURT:  Let's leave it this way:  First I am

17  going to give you a next status date.  And it seems to me

18  from everything that we have talked about that probably to

19  set it sooner than 90 days out doesn't make a lot of sense,

20  unless somebody thinks that that would be inappropriate.

21  Okay?  So Sandy has arrived just in time.

22        THE CLERK:  Yep.

23        THE COURT:  Suppose that we set the corresponding

24  date in March.  Well, I could give you people three months.

25  I could give you the Ides of March and you can decide for

1  whom it is fatal. But it is -- that is certainly an open

2  date, Thursday, March 15. I don't know whether anybody is --

3  finds it inconvenient or not. But actually any day in the

4  week of the 12th through the 16th is open.

5       MR. NEUWIRTH: March 15th is good for the

6  defendants, your Honor.

7       THE COURT: All right.

8       MR. FREED: That is fine, your Honor.

9       THE COURT: All right. Let's make it March 15th at

10  8:45. And that way I would hope you wouldn't have to sit

11  through what is in the category of noneducation in listening

12  to other motions that get dealt with on my motion call. So

13  8:45 on March 15th, 2012.

14       Then what I will do is I will check with Magistrate

15  Judge Nolan about her availability. And what I would suggest

16  is that defendants ought to delegate the responsibility for

17  this information being passed along to one of you rather than

18  corralling everybody in sight. And I would have my staff

19  people get back to you in terms of what might be available

20  there.

21       If it turns out that she is really weighted down

22  and would not be in a position to deal with the thing for an

23  extended period of time, then I will simply take it. So --

24  let's see here. So you people will talk and just let Sandy

25  know.

1          MR. FREED:  We can let you know now, your Honor.

2          THE COURT:  Single representatives from each side.

3    I will make sure that we get back to you as soon as Judge

4    Nolan becomes available.

5          MR. FREED:  In my case it will be myself, your

6    Honor, Michael Freed.

7          THE COURT:  Okay.

8          MR. NEUWIRTH:  And we can let you know, your Honor,

9    that Mr. Eimer for the defendants would be the person to

10   contact.

11         THE COURT:  So it is Mr. Eimer and Mr. Freed.

12         Anything else?

13         MR. FREED:  No.

14         MR. NEUWIRTH:  No, your Honor.

15         THE COURT:  Well, I want to thank you all again

16   just as I started out.  And I guess you ought to know by now

17   that I don't -- I don't say things just to be complimentary.

18   No, I am very serious.  I really -- I really have found this

19   very useful and I truly appreciate all the effort that you

20   have put in on the thing.

21         Thank you all.

22         MR. FREED:  Thank you, your Honor.

23         MR. NEUWIRTH: Thank you.

24     (Which were all the proceedings heard.)

25

1         CERTIFICATE

2         I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5    s/Rosemary Scarpelli/        Date:   December 16, 2011

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25