# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

KLEEN PRODUCTS LLC, individually and
on behalf of all others similarly situated,

                              Plaintiffs,

        vs.

PACKAGING CORPORATION OF
AMERICA, et al.,

                              Defendants.

Case No. 1:10-cv-05711

Judge Milton I. Shadur

Magistrate Judge Nan R. Nolan

# PLAINTIFFS' MEMORANDUM OF LAW
# FOR EVIDENTIARY HEARING

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT .................................................................................................................. 4

    A. Defendants Fail To Establish Undue Burden By Specific Facts ............................ 4

    B. CBAA Search Methods Based on Department or Corporate Function Are Far Superior to Defendants' Boolean Keyword, Self-Selected Custodian-Based Search Methodology. ................................................................................ 5

    C. Defendants Must Search For and Produce Information Responsive to Plaintiffs' Discovery Requests Regardless of Where that Data is Stored. ........... 14

    D. Defendants Must Produce Responsive Conduct Information Beginning in 2002 and Transactional Data Beginning in 2000. .................................................. 15

    E. Rule 34(b)(2)(E) Requires Defendants to Organize and Label Their Document Production According to Plaintiffs' Subject Matter Categories.......... 17

III. CONCLUSION.............................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Callahan v. A.E.V. Inc.*,
 947 F. Supp. 175 (W.D. Pa. 1996)..................................................................................4

*Cardenas v. Dorel Juvenile Grp., Inc.*,
 230 F.R.D. 611 (D. Kan. 2005)....................................................................................18

*In re Auto. Refinishing Paint Antitrust Litig.*,
 MDL No. 1426, 2004 U.S. Dist. LEXIS 29160 (E.D. Pa. Oct. 29, 2004)............................1, 4

*In re Brand Name Prescription Drugs Antitrust Litig.*,
 MDL No. 997, 1995 U.S. Dist. LEXIS 8281 (N.D. Ill. Jun. 13, 1995) .....................................5

*In re High Fructose Corn Syrup Antitrust Litig.*,
 295 F.3d 651 (7th Cir. 2002) .......................................................................................17

*In re Seroquel Prods. Liab. Litig.*,
 244 F.R.D 650 (M.D. Fla. 2007)............................................................................11, 13

*In re Shopping Carts Antitrust Litig.*,
 95 F.R.D. 299 (S.D.N.Y. 1982) ...................................................................................17

*In re Sulfuric Acid Antitrust Litig.*,
 231 F.R.D. 351 (N.D. Ill. 2005)..........................................................................5, 17, 18

*In re Urethane Antitrust Litig.*,
 261 F.R.D. 570 (D. Kan. 2009)..................................................................................4, 5

*Johnson & Johnston v. R.E. Serv. Co.*,
 No. C 03-2549, 2004 U.S. Dist. LEXIS 26973 (N.D. Cal. Nov. 2, 2004).........................5, 17

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
 775 F. Supp. 2d 1071 (N.D. Ill. 2011) .......................................................................1, 16

*Mizner Grand Condominium Assoc., Inc. v. Travelers Property Cas. Co. of Am.*,
 270 F.R.D. 698 (S.D. Fla. 2010)...............................................................................17, 18

*New Park Entm't L.L.C. v. Elec. Factory Concerts, Inc.*,
 No. Civ. A. 98-775, 2000 WL 62315 (E.D. Pa. Jan. 13, 2000) ..................................4, 15, 16

*Oppenheimer Fund, Inc. v. Sanders*,
 437 U.S. 340 (1978).................................................................................................4, 14

*Peskoff v. Faber*,
240 F.R.D. 26 (D.D.C. 2007)........................................................................5, 13, 14

*Poller v. Columbia Broad. Sys., Inc.*,
368 U.S. 464 (1962)...............................................................................................1

*Smith v. Life Investors Ins. Co. of Am.*,
No. 2:07-CV-681, 2009 WL 2045197 (W.D. Pa. July 9, 2009) ............................13

*United States v. Dentsply Int'l., Inc.*,
No. 99-5, 2000 WL 654286 (D. Del. May 10, 2000) ............................................4

*United States v. IBM Corp.*,
66 F.R.D. 186 (S.D.N.Y. 1974) .............................................................................2

*United States v. O'Keefe*,
537 F. Supp. 2d 14 (D.D.C. 2008) .......................................................................18

## RULES

Fed. R. Civ. P. 26(b)(1)...........................................................................................4

Fed. R. Civ. P. 34 .......................................................................................... *passim*

Fed. R. Evid. 502(d)................................................................................................7

## OTHER AUTHORITIES

Grossman & Cormack, *Technology-Assisted Review in E-Discovery*, 17 Richmond J.
Law & Tech. 3, 43-44 (2011) ..........................................................................7, 10

Hon. A. Peck, *Search, Forward*, Law Tech. News, Oct. 1, 2011.........................8, 9, 13

Howard Turtle, "Natural Language vs. Boolean Query Evaluation," *Proceedings of the
17th Annual Int'l ACM SIGIR Conf. on Res. & Dev. in Info. Retrieval*, at 212-20
(1994) ...................................................................................................................7

*Moore v. Publicis Groupe*, No. 11-CV-1279, Transcript of Jan. 4, 2012, Hearing
(S.D.N.Y.) (Peck, J.) .........................................................................................7, 8

*The Sedona Conference Best Practices Commentary on the Use of Search & Information
Retrieval Methods in E-Discovery*, 8 Sedona Conf. J. 189 (2007) .......................7, 8

# I.    INTRODUCTION[1]

The Consolidated Amended Complaint ("CAC") (ECF No. 65) alleges a complex antitrust conspiracy involving an industry that "[f]rom the 1930s onward . . . has been subject to extensive antitrust litigation and other charges of unfair competition." *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1076 (N.D. Ill. 2011) (Shadur, J.); *see also* CAC ¶¶ 57-63 (reciting Defendants' history of anticompetitive conduct and certain acts of concealment).

It has long been recognized that "in complex antitrust litigation . . . motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962). "Broad discovery is permitted because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence, such as business documents and other records." *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29160, at *8 (E.D. Pa. Oct. 29, 2004).  Notwithstanding the requirements of the Federal Rules of Civil Procedure that parties search for and produce any relevant, non-privileged information, Defendants here have repeatedly sought to evade or minimize their discovery obligations by:

(1)    refusing to rely on anything but an antiquated Boolean keyword, custodian-based search methodology that is likely to find less than 24 percent (best case) of responsive documents rather than Plaintiffs' proposed Content-Based Advanced Analytics ("CBAA") search that can find more than 70 percent (worst case) at no greater

---

[1] Plaintiffs incorporate by reference their December 13, 2011 Position Statement (ECF No. 266).

burden (and which certain of Defendants' counsel and consultants advertise is a superior, cost-effective search methodology);

(2)     refusing to search for documents stored in locations routinely searched, such as backup tapes and local hard drives;

(3)     refusing to search the relevant time period by unilaterally narrowing it to avoid producing documents relevant to the formation of the conspiracy and Plaintiffs' damages; and

(4)     refusing to organize their document productions in any meaningful way, which is contrary to Fed. R. Civ. P. 34(b)(2)(E)'s  the express requirements.

Defendants claim "undue" burden, but ignore longstanding case law holding that burden in an antitrust case "is less weighty a consideration than in other cases."  *See United States v. IBM Corp.*, 66 F.R.D. 186, 189 (S.D.N.Y. 1974) (internal citations omitted).  They also fail to specify their actual burden, despite Plaintiffs' long-running and on-going efforts to discover the capabilities of Defendants information technology ("IT") systems and the accessibility of their ESI archives.  Whether a discovery burden is "undue" is determined relative to the stakes in the litigation.  This is a major case, the stakes are exceedingly large (overcharges to the class may be in the billions of dollars), and cartelization of an important industry has significant public policy and law enforcement implications – all of which mandate that Defendants search for and produce all relevant information using the best available methods, especially given Defendants' substantial resources.  Nevertheless, Defendants have requested this hearing for the purpose of obtaining the Court's approval of their plainly inadequate proposed search methodology.

Defendants' refusal to cooperate in discovery is manifest.  They have refused to heed Plaintiffs' repeated requests that they conduct content-based searches by department or corporate

function rather keyword custodian searches.  Plaintiffs' requests began in December 2010 – one month after the CAC was filed and 5 months before Plaintiffs' First Requests for Production of Documents ("P1-RPD")[2] were served.  Further, while the importance of information about Defendants' IT systems and archiving is obvious, for over a year, Defendants have not provided oft-requested and much-promised information requiring Plaintiffs to issue a 30(b)(6) deposition notice to all Defendants on November 2, 2011.[3]  Defendants subsequently requested that Plaintiffs review letters from counsel ("30(b)(6) letters") and thereafter determine if the depositions were necessary.  After their letters proved inadequate, some Defendants have abjectly refused to produce any witnesses and no Defendant has provided a firm deposition date. In other words, Defendants have requested this evidentiary hearing while withholding potentially important evidence.

In short, Defendants propose to use inadequate search methods from self-selected custodians and locations from an improperly narrowed time period to produce  millions of pages of unorganized documents while claiming undue burden, but failing to specify their burden and refusing to reveal either the capabilities of their IT systems or the content and accessibility of their archives.  Defendants' approach would drastically diminish Plaintiffs' ability to discover the relevant information they seek and to which they are entitled.

Plaintiffs will demonstrate, including through expert testimony,[4] that Defendants have not justified their refusal to properly search and have not shown "undue" burden.  Accordingly,

---

[2] *See* Ex. A to accompanying Declaration of Michael J. Freed ("Freed Decl.").

[3] *See* Ex. B to Freed Decl.

[4] Plaintiffs experts are Dr. David Lewis, an expert in information retrieval science, and Timothy Hanners, a computer forensics expert. (*See* resumes attached as Exs. C and D to Freed Decl.) Per the parties' agreement, expert witness reports will not be submitted in connection with the evidentiary hearing.  Instead, each party will summarize the anticipated testimony of their experts in their respective briefs.

Plaintiffs request that the Court order Defendants to: (1) cooperate with Plaintiffs on the use of CBAA methods; (2) collect documents by corporate function, department, or work unit; (3) collect and produce responsive information wherever it may be stored; (4) collect and produce responsive conduct information beginning in 2003 and responsive transactional data beginning in 2000; and (5) index their document productions consistent with Fed. R. Civ. P. 34(b) (2)(E)(i);

## II.    ARGUMENT

### A.    Defendants Fail To Establish Undue Burden By Specific Facts.

Rule 26(b)(1) permits discovery on "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  Discovery is not limited only to those specific issues raised in the pleadings, nor must litigants "prove a prima facie case to justify a request which appears reasonably calculated to lead to the discovery of admissible evidence." *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009).  Particularly broad discovery is allowed in antitrust cases because courts recognize that direct evidence is rare and that conspiracies are often established by circumstantial evidence. *See, e.g.*, *In re Auto. Refinishing Paint*, 2004 U.S. Dist. LEXIS 29160, at *8; *United States v. Dentsply Int'l., Inc.*, No. 99-5, 2000 WL 654286, *5 (D. Del. May 10, 2000) (noting "broad discovery may be needed to uncover evidence of invidious design, pattern, or intent") (internal quotations and citation omitted); *Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996) ("Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct.  Such conduct is generally covert and must be gleaned from records, conduct, and business relationships.") (citations omitted); *see also New Park Entm't L.L.C. v. Elec. Factory Concerts, Inc.*, No. Civ. A. 98-775, 2000 WL 62315, *3 (E.D. Pa. Jan. 13, 2000).

As the party resisting discovery, Defendants have the burden of establishing undue burden by specific facts. *See In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 361-62 (N.D. Ill. 2005) (party must provide affirmative proof in the form of affidavits or record evidence to demonstrate undue burden); *Johnson & Johnston v. R.E. Serv. Co.*, No. C 03-2549, 2004 U.S. Dist. LEXIS 26973, *5 (N.D. Cal. Nov. 2, 2004) (party "must state specific facts in support of [their burden] objection."); *see also Urethane*, 261 F.R.D. at 573; *Peskoff v. Faber*, 240 F.R.D. 26, 31 (D.D.C. 2007). The party claiming undue burden must also demonstrate that the burden is disproportionate to the claims at stake in the litigation. *In re Brand Name Prescription Drugs Antitrust Litig.*, MDL No. 997, 1995 U.S. Dist. LEXIS 8281, *6-*7 (N.D. Ill. Jun. 13, 1995).

## B. CBAA Search Methods Based on Department or Corporate Function Are Far Superior to Defendants' Boolean Keyword, Self-Selected Custodian-Based Search Methodology.

Unlike Boolean searches, content-based or subject matter searches do not focus on word matching but rather on deriving larger concepts out of the words in a document using various algorithms. CBAA methods and tools recognize language patterns, concepts, and patterns of conduct, and unlike Boolean keywords, are not limited to finding exact matches for specific terms, dates and phrases. They provide a richer, substantially more accurate return than can ever be achieved with a terms searching process. CBAA can identify patterns of behavior, such as behavior intended to obfuscate or conceal, which is particularly important in this case. Looked at separately, disparate pieces of surreptitious correspondence might not appear responsive. CBAA can see patterns across the data set and include such item as responsive where Boolean keywords would miss them. Human reviewers also can miss the connections between such items when they are not made into a group – when they are reviewed as the naturally occurred in a data set.

A CBAA search of documents collected by corporate or department function is the best and most practical method for locating responsive ESI in this case. Plaintiffs' expert, Dr. Lewis, will testify to the superiority of Plaintiffs' proposed CBAA search over Defendants' Boolean keyword search. Dr. Lewis will testify that Plaintiffs' proposed CBAA search is capable of locating not less than 70 percent (worst case) of responsive documents rather than no more than 24 percent (best case) for Defendants' Boolean, keyword search. Dr. Lewis will explain that numerous studies that have shown the superiority of CBAA search over Boolean keyword search – even when weighting the study in favor of Boolean keyword search. Dr. Lewis will further testify that CBAA search does not impose a substantially greater burden upon Defendants and may, in fact, save costs due to the reduction in manual review time. Dr. Lewis will testify that collecting ESI by corporate or department function provides even greater effectiveness and accuracy for CBAA search. Mr. Hanners will also testify to the superiority of collecting ESI by corporate function, department, or work unit over defense-selected custodians and explain how it produces more initial materials and minimizes the likelihood of missing responsive materials and this takes on heightened importance where there are allegations of conspiracy and concealment and Plaintiffs do not have access to internal documents that reveal the identifies of involved individuals.

Under Rule 34(b)(1)(A), the contents of the request by a propounding party must describe each "category" of documents sought; in other words it must describe a reasonably particular concept or subject. Submitting a list of Boolean keywords to Defendants would not comply with its requirement. Clearly, the concept of a document taken in context is what is important – not necessarily its specific words or even the particular letters forming those words. For example, an email written to conceal its true meaning to those uninitiated in the cartel is a conspiratorial

6

communications, even if it lacks specific keywords. No Boolean keyword search, however, would lead to discovery of an email that simply said "they are with us" even though in certain contexts its conspiratorial meaning is evident. Each word in that phrase is so commonly used, however, that formulating a Boolean query that would locate such an important document is impossible. *See The Sedona Conference Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery*, 8 Sedona Conf. J. 189, 193 (2007) ("Human language is inherently elastic . . . [and] allows for private codes and vocabularies to exist in different subcultures in any enterprise, thus making the identification of the 'words' to be searched much more challenging."). A CBAA search is designed discover such documents.

Dr. Lewis will testify that a CBAA search also provides a ranking of the predicted relevance or responsiveness of results, which allows parties to sample the results and determine the point at which further production of documents is no longer necessary – offering a substantial cost-savings versus the binary "yes/no" results of a keyword search.[5]

Dr. Lewis will testify that side-by-side studies show CBAA search clearly outperform and provide better results than Boolean search. As an example, Dr. Lewis will testify about the results of a study in which expert searchers designed Boolean queries through an iterative process of trial and error. *See* Howard Turtle, "Natural Language vs. Boolean Query Evaluation," *Proceedings of the 17th Annual Int'l ACM SIGIR Conf. on Res. & Dev. in Info. Retrieval*, at 212-20 (1994) (attached as Ex. F to Freed Decl.). In contrast, a CBAA system was prepared without iterative testing. *Id.* Despite the initial advantages given the Boolean search,

---

[5] *See also* Grossman & Cormack, *Technology-Assisted Review in E-Discovery*, 17 Richmond J. Law & Tech. 3, 43-44 (2011) (noting fifty-fold savings from decreased human-review required with CBAA); *Moore v. Publicis Groupe*, No. 11-CV-1279, Transcript of Jan. 4, 2012, Hearing at 1, 44-53 (S.D.N.Y.) (Peck, J.) (excerpt attached as Ex. E to Freed Decl.) (noting that predictive coding does not require review of every document and Fed. R. Evid. 502(d) permits a party to use search processes to conduct a privilege review without risk of privilege waiver).

the CBAA provided 41 percent greater precision on the first dataset and 977 percent better precision on a second dataset. *Id.* Dr. Lewis will also testify about a series of studies conduct by TREC[6] to compare the effectiveness of CBAA search with Boolean search, which show CBAA searches to be substantially more effective than Boolean searches, including results showing that the best CBAA systems outperformed the Boolean systems by an average of 250 percent and found not less that 70 percent of responsive documents versus less than 24 percent for Boolean.

Defendants' reliance upon keyword searching also ignores the evolution of e-discovery search tools.[7] *See* Hon. A. Peck, *Search, Forward*, Law Tech. News, Oct. 1, 2011, at 1-2 (attached as Ex. G to Freed Decl.). Despite Defendants' characterization of its search process as "state-of-the-art" (Defs.' 12/13/11 Br. at 2), keyword searching is in fact only a crude short-cut used to avoid reviewing all potentially responsive documents in a party's possession. *See* Peck, *Search, Forward*, at 1-2. Dr. Lewis will testify that content searching has existed for decades and has been used in e-discovery for years, even though Defendants cast it as a new, untested technology.[8]

Moreover, certain of Defendants' counsel and consultants admit that keyword searching is not "state of the art." For example, Recommind (IP's e-discovery consultant) developed a proposal for another client last month that closely resembles the collaborative and iterative content search Plaintiffs propose here. *See Moore v. Publicis Groupe* Tr. (Ex. E to Freed Decl.),

---

[6] The Text Retrieval Conference ("TREC"), co-sponsored by the National Institute of Standards and the U.S. Department of Defense was started in 1992 to support research with within the information retrieval community. *See* http://trec.nist.gov/overview.html. The TREC Legal Track is a multi-year effort to develop methods for evaluating information retrieval approaches on simulated civil discovery tasks.

[7] *See Sedona Conference Best Practices re. Search and Retrieval Methods* at 212 (Practice Point 8: "Parties and the courts should be alert to new and evolving search and information retrieval methods.").

[8] *See* KPMG, *Making document review faster, cheaper and more accurate*, at 4 (2011), *available at* www.kpmg.com (noting use of content-based searching since 1970s).

at 1, 44-47. IP's attorneys also serve as endorsers for Recommind, describing its predictive coding search is a "tremendous opportunity to upgrade our eDiscovery practice by standardizing on the Axcelerate eDiscovery Platform." Pls.' 12/13/11 Br. at 6-7. Temple-Inland's counsel, Mayer Brown, has described the deficiencies and risks associated with using "traditional keyword searches" and concluded that CBAA "move[s] beyond this paradigm in a variety of ways."[9] It is disingenuous for Defendants to represent to this Court the merits of their keyword search at the same time that their attorneys and eDiscovery consultants are at the same time publicly acknowledging the superior benefits and cost savings of content-searching.

Keyword searching often has been used as a search method *by agreement of the parties*, without full recognition of the percentage of responsive documents *not* collected as a result of inherent flaws with keyword searching, including its inability to obtain documents using coded language, misspelled words, or other unknown words or abbreviations. *See* Pls.' 12/13/11 Br. at 4-5 (citing cases and discussing challenges of using a keyword search methodology); *see* Peck, *Search, Forward* (Ex. G to Freed Decl.), at 1-2. As recognition has grown regarding the clear limitations and deficiencies inherent in keyword searching, many parties and courts have realized that while it may be a suitable option for retrieving some formal corporate memoranda and correspondence containing proper spellings and standard terminology, it is not well suited to obtain informal communications, such as email, especially where the most important communications are likely to use coded or idiosyncratic language about an illegal antitrust conspiracy.[10] Dr. Lewis will testify that given these shortcomings and other deficiencies

---

[9] Mayer Brown, *How to Manage the Risks Associated with Searching ESI*, at 1 (May 2010), *available at* http://www.mayerbrown.com/publications/article.asp?id=9051 (last accessed Feb. 6, 2012).

[10] A. Jones & B. Kerschberg, *What Technology-Assisted Electronic Discovery Teaches Us About The Role Of Humans In Technology*, Forbes (Jan. 9, 2012), *available at* www.forbes.com (noting

inherent in keyword searching, the use of such a methodology in this case would be both inadequate and unreasonable.

Defendants' argument that their search methodology is reasonable and adequate because it will produce a large volume of documents is specious. Defendants erroneously equate a *large volume* of keyword search results (apparently millions of pages) with the *recall and precision* of keyword searching. *See* Defs.' 12/13/11 Br. at 8. "[R]ecall is a measure of completeness, while precision is a measure of accuracy, or correctness. . . . A review resulting in higher recall and higher precision than another review is more nearly complete and correct, and therefore superior . . . ." Grossman & Cormack, *Technology-Assisted Review*, 17 Richmond J. Law & Tech. at 8-9. Recall and precision are far more important than raw page volume in assessing the appropriate search methodology. Dr. Lewis will testify that Plaintiffs' CBAA search methodology results in higher recall and precision than Defendants' Boolean, keyword methodology.

Dr. Lewis will testify that it is inappropriate for Defendants to rely as a group upon the testing and validation process conducted by Georgia Pacific ("GP") and its consultants as a proxy for the validity of their own search methodology.[11] He will testify that GP has carried out and propose a process for Boolean searching that is riddled with errors and poor practices, including invalid sampling, bias in the assessment of documents, ineffective use of analytical tools, confused and inappropriate reporting of purportedly statistical results. He will also testify that the larger problem is that GP's search process itself does not stand up to scrutiny because: (a) it relies upon a flawed null-set approach to verification; (b) Defendants have failed to disclose

---

importance of using linguistics experts in conjunction with CBAA to ensure a search obtains "rare event" documents that use "idiosyncratic or elliptical language") (last accessed Feb. 6, 2012).

[11] Defendants refer to unspecified and unexplained testing and validation done by each of their e-discovery consultants, but provide few details on what work was actually done. Defs.' 12/13/11 Br. at 8.

any of the responsiveness metrics used to verify GP's search; and (c) GP has unilaterally eliminated some undisclosed number of P1-RPD in its search. *See* Pls.' 12/13/11 Br. at 9-10. In particular, Dr. Lewis will testify that GP's use of certain CBAA tools to develop its Boolean keyword search method does not eliminate its inherent deficiencies because the search strings in the end are Boolean and yield only binary "yes/no" results. Further, Dr. Lewis will explain that use of the CBAA tools, including stemming and topics features, were only intended to eliminate non-responsive documents from GP's search string, rather than include responsive documents among those being produced. *See* Pls.' 12/13/11 Br. at 4, 9-11.

Finally, Defendants cannot claim that their unnecessary investment in developing a unilateral search process warrants its use over a cooperative content search methodology based on corporate or department function. Plaintiffs first requested that Defendants use content-searches based on corporate or department function in December 2010 – over seven months before GP began its keyword search development process. Plaintiffs repeated this demand during meet-and-confer discussions with each defendant in February and March 2011, as well as after P1-RPD were served in May 2011. At Defendants' request, Plaintiffs also provided subject matter lists in January and March 2011. Plaintiffs have consistently made their position clear on this issue and there is simply no justification for making any investment in a keyword search process that Plaintiffs objected to as inadequate both before and during its development.[12]  *See* . *See In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 662 (M.D. Fla. 2007) (rejecting party's secretive search validation process). Defendants evidently hope to steamroll Plaintiffs by unilaterally imposing a contested search method without an agreement or court order and then

---

[12] Defendants noted in their August 11, 2011, letter to Plaintiffs that "[i]n the past several months, the parties have been unable to agree [regarding the appropriate search methodology] as Plaintiffs have insisted that they are not willing to agree to a 'custodian-based approach' and instead believe the parties should pursue a 'subject matter approach.'"

claiming that they are too far along in the process to change.[13]  Indeed, this is precisely why the Sedona Conference and other authorities emphasize cooperation, and failing cooperation, court intervention, to settle e-discovery disputes at the outset.  Defendants' claim that using content searching will significantly increase or even double their review costs is simply not supported because content searching offers substantial cost savings by not requiring full manual review of all document results.  *See* Pls.' 12/13/11 Br. at 14.  Further, Defendants ignore Plaintiffs' substantial investment in CBAA: not only have Plaintiffs developed a CBAA process for reviewing Defendants ESI, but also on their own ESI.  Defendants were invited to participate in the latter on a cooperative basis but refused to do so.  Plaintiffs have a team of ESI consultants, a linguist, an information retrieval expert and a computer forensic specialist working on this matter.  Plaintiffs have also spent considerable resources demonstrating to Defendants the inadequacies of their 21 term keyword string—which have also gone unheeded.

Plaintiffs' expert Tim Hanners will testify to the superiority of collecting information by corporate function or department.  The alternative – relying upon Defendants to self-identify specific individuals who may or may not have knowledge of the conspiracy – puts Plaintiffs in the position of entirely missing important document custodians or subsequently requesting that Defendants add new custodians omitted from the original list as Plaintiffs review the Defendants' document productions, no doubt requiring a prolonged debate followed by

---

[13] To the extent Defendants have already coded particular documents responsive or non-responsive, these documents need not be re-reviewed and can be used to de-duplicate against the results of a content-based search.  Further, Defendants are welcome to supplement the documents they review and produce with keyword-only, custodian-based searches so long as the entire ESI corpus is first searched with content-based searching and all responsive documents are produced in accordance with the process Plaintiffs have laid out.

integrative motions to compel at each stage. [14]  *See* Peck, *Search, Forward* (Ex. G. to Freed

Decl.), at 1-2 (describing how a custodian-based approach puts the requesting party in the

position of playing "go fish"). Mr. Hanners will also testify, based on Defendants' "30(b)(6)

letters," that Defendants' backup media, which has not been searched, likely contains a

substantial amount of relevant ESI. Mr. Hanners will testify about the method for retrieving,

cataloguing, and reviewing backup media as well as the associated costs. Mr. Hanners'

testimony will demonstrate that Defendants' undue burden argument is unfounded. In addition,

Dr. Lewis will also testify that using a corporate or department function-based approach to

collecting ESI assures that all information relevant to a specific function at each Defendant is

collected and allows for a better CBAA search.

In conclusion, Dr. Lewis and Mr. Hanners will testify that Plaintiffs' CBAA

methodology, used on documents collected by corporate department or function, is far superior

at locating responsive information in a cost-effective manner than Defendants' Boolean keyword

search methodology. The large disparity between the effectiveness of CBAA search

methodology and Boolean keyword search methodology demonstrates that Defendants' cannot

establish that their proposed search methodology is reasonable and adequate as they are required.

*See Peskoff*, 240 F.R.D. at 31; *Smith v. Life Investors Ins. Co. of Am.*, No. 2:07-CV-681, 2009

WL 2045197, *7 (W.D. Pa. July 9, 2009) ("Defendant has a burden to demonstrate that its search

for documents was reasonable."); *In re Seroquel*, 244 F.R.D. at 662 ("The key word search was

plainly inadequate. . . . Relevant emails were omitted."). Accordingly, the Court should order

Defendants to apply CBAA as proposed by Plaintiffs and in cooperation with them.

---

[14]  For example, Defendants have not offered any information regarding their search for
custodian-ESI in the possession of proxies, such as a custodian's secretary. *See In re Seroquel
Prods. Liab. Litig.*, 244 F.R.D. 650, 661 (M.D. Fla. 2007) (noting failure of party to search the
email of proxies for custodians).

**C.** **Defendants Must Search For and Produce Information Responsive to Plaintiffs' Discovery Requests Regardless of Where that Data is Stored.**

Defendants' are required to search all depositories of ESI. *See Peskoff*, 240 F.R.D. at 31 (holding that defendant must "conduct a search of all depositories of electronic information in which one may reasonably expect to find all emails" related to key individual, not just his personal email account); *Oppenheimer*, 437 U.S. at 351 (stating that a party's obligation is to search for and produce information regarding "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case").

Defendants propose limiting their search to what they describe as "reasonably available" information stored on "main, active servers." *See* Pls.' 12/13/11 Br. at 16. With the exception of a limited category of "transactional data," Defendants claim they have no obligation to search data stored on ancillary or retired servers, back-up tapes, or any other media or systems. Some Defendants even refuse to search for email and other data stored locally on a custodian's hard drive. Defendants do not claim that information stored in locations other than Defendants' "main, active servers" contain only irrelevant or privileged information. Defendants do not even fully explain what constitutes "main, active servers" and offer no specific reason why searching for and producing responsive information from locations other than their "main, active servers" would be unduly burdensome.

Mr. Hanners will testify, *inter alia*, that Defendants have failed as a whole to sufficiently document their respective universes of potentially responsive ESI, including where such ESI is stored and Defendants' methods for identification and collection. For example, Mr. Hanners will testify about a Defendant (to be identified at the hearing) that has 60,000 employees, over 38,000 computers, and 3,000 servers, but has made a partial search of only 26 custodians. Mr. Hanners will also testify that Defendants have entirely failed to explore backup media for ESI, which has

14

a high likelihood of containing non-duplicative responsive information. Mr. Hanners will testify that backup media is routinely searched in litigation because of the high likelihood of containing non-duplicative responsive information. Mr. Hanners will also testify that using modern technology, archived data (such as backup tapes), can generally be accessed and catalogued at a relatively low cost.

Rule 3 4 does not permit Defendants to arbitrarily refuse to search for and produce information not stored on "main, active servers." *See New Park Entm't*, 2000 WL 62315, at *3. Accordingly, the Court should order Defendants to search for relevant information wherever located.

### D. Defendants Must Produce Responsive Conduct Information Beginning in 2002 and Transactional Data Beginning in 2000.

At Defendants' request, Plaintiffs provided the following time periods for P1-RPD:

- Conduct Requests: *January 1, 2002-December 31, 2010*

  (P1-RPD Nos. 3-11, 15-16, 29-32, 34, 36-46, 48-49, 51-60, 63 & 68-81);

- Transactional Data Requests: *January 1, 2000-December 31, 2010*

  (P1-RPD Nos. 1-2, 12-14, 17-28, 33, 35, 47, 49, 50, 61-62 & 81-99);

- Inquiries, Investigations and Prior Litigation Requests: *January 1, 1996-December 31, 2010* (P1-RPD Nos. 64-66); and

- Prior antitrust litigation identified in CAC ¶¶ 57-62: *No Time Limitation*

  (P1-RPD No. 67).

In contrast, to the extent that they are specific, Defendants propose to produce documents responsive to the Conduct Requests from January 1, 2004 through December 31, 2010 and responsive to the Transactional Data Requests from January 1, 2003 through December 31, 2010.

Defendants rely on conflating the class period with the conspiracy period    Plaintiffs allege a conspiracy that began at a time unknown and is continuing to the present.  *See* CAC ¶ 197.  Plaintiffs further allege that after a period of industry consolidation,[15] "[b]etween 2003 and 2005 individual producers had tried and failed to institute price increases at least twice." *Kleen Prods.*, 775 F. Supp. 2d at 1076.  In contrast, the alleged class period, beginning at least as early as August 2005, reflects the time period whereby Defendants' conduct manifested injury to the class.

The CAC details conduct and industry conditions occurring well before 2005 that are relevant to Defendants' motives and means to conspire, including industry consolidation.  A conduct-based time period beginning in 2002 is therefore appropriate and is designed to lead to the discovery of admissible evidence.  Further, because the alleged class or damage period is approximately 5 years, it is not unreasonable to request that Defendants provide data for a like-time preceding the class period so the Plaintiffs' expert can construct an equivalent but-for model, comparing a "before" period to the class period.  Accordingly, Plaintiffs have requested transactional data beginning in 2000.

Defendants would exclude production of substantial amounts of information relating to conduct and transactional data that occurred prior to the class period but within the relevant time period for discovery.  However, courts in antitrust cases routinely allow discovery related to conduct prior to the alleged beginning of the class period in order for Plaintiffs to develop evidence regarding the formation of the conspiracy.  *See New Park Entm't*, 2000 WL 62315, at *3 (permitting discovery seven years prior to class period alleged in complaint regarding question of how defendant obtained its monopoly power).  Likewise, courts routinely allow

---

[15] *See* CAC, ¶¶ 44-45.

discovery of transactional data beyond the class period so that plaintiffs can develop an appropriate benchmark for estimating damages. *See, e.g.*, *In re Shopping Carts Antitrust Litig.*, 95 F.R.D. 299, 309 (S.D.N.Y. 1982) (permitting discovery of transactional data up to four years after date the conspiracy was alleged to have ended in government indictment in order to permit civil plaintiffs to establish a before-and-after model to prove their antitrust damages). Defendants' lengthy history of past collusion also provides strong reason to believe pre-January 2004 conduct information is relevant. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002) (previous anticompetitive conduct in the same or related products or markets support the plausibility of a conspiracy, along with other facts, and are relevant to show absence of mistake or accident).

Defendants have not articulated specific facts supporting their claims that producing pre-January 2004 conduct information and pre-January 2003 transactional data would be an undue burden. *See Johnson & Johnston*, 2004 U.S. Dist. LEXIS 26973, at \*5. Instead, they simply advance an unfounded blanket claim that "the majority" of Defendants "may" be burdened. Such claims are insufficient to support a claim of undue burden. *See, e.g. In re Sulfuric Acid*, 231 F.R.D. at 361-62 (ruling party must provide affirmative proof in the form of affidavits or record evidence to demonstrate undue burden).

### E. Rule 34(b)(2)(E) Requires Defendants to Organize and Label Their Document Production According to Plaintiffs' Subject Matter Categories.

Rule 34(b)(2)(E) requires Defendants to either produce documents as kept in the usual course of business or organize and label them to correspond to the categories of plaintiffs' request. *See Mizner Grand Condominium Assoc., Inc. v. Travelers Property Cas. Co. of Am.*, 270 F.R.D. 698, 700-01 (S.D. Fla. 2010) (ordering party to organize and label document production). Here, Defendants have done neither.

17

The documents produced by Defendants to date do not reflect any organizational system and have not been accompanied by an index or labeled to correspond to P1-RPD. Defendants' unorganized production is precisely the type of "data dump" that Rule 34(b)(2)(E) is designed to prevent. *See United States v. O'Keefe*, 537 F. Supp. 2d 14, 19 (D.D.C. 2008).

Defendants' production of metadata, pursuant to the Production Format Order, relates to the form of production described in Rule 34(b)(2)(E)(ii), not the organization requirement of Rule 34(b)(2)(E)(i). This is readily apparent when one considers that Defendants do not ordinarily keep their files in TIFF format, maintain only the metadata fields they have provided Plaintiffs, or store only documents responsive to a set of keyword-based search terms. Instead, Defendants maintain their files in native format on numerous storage media at locations around the country. Courts interpreting Rule 34(b)(2)(E)(i) have routinely required labeling and organization of hard copy documents where documents were not produced as kept in the usual course of business. *Cardenas v. Dorel Juvenile Grp., Inc.*, 230 F.R.D. 611, 618-19 (D. Kan. 2005) (finding defendant had failed to meet burden of demonstrating documents were produced as kept in the usual course of business and ordering production of index linking each document to a specific RPD); *Mizne*r, 270 F.R.D. at 701 (same); *In re Sulfuric Acid*, 231 F.R.D. at 363-64 (concluding that mixing of hard copy documents from various storage locations and custodians, even if not intended to confuse adversary, results in the "proverbial 'needle in a haystack,' the very situation . . . Rule 34 was intended to prevent.") (internal citations omitted). Nothing in Rule 34(b)(2)(E) suggests ESI should be treated differently than hard copy documents. See Rule 34, 2006 Advisory Committee Notes ("electronically stored information stands on equal footing with discovery of paper documents").

Plaintiffs produced a list grouping its 94 RPDs into twenty-nine categories to accommodate a request from Defendants, including common sense categories regarding trade associations, competitor contacts, etc. Plaintiffs also offered to accept an index of Defendants' documents in a separate spreadsheet, which Defendants IP and Temple Inland, if not all Defendants, are already required to provide to the Department of Justice pursuant to that agency's investigation. *See* Pls.' 12/13/11 Br. at 3-4. Plaintiffs have also made clear they will accept the product of Defendants' good-faith attempt to properly categorize their document production. Transcript of 12/15/11 Status Conference at 21:15-22:18 (ECF No. 281). Defendants' failure to accept even these compromises demonstrates that Defendants believe that no form of organization is better than any form of organization.

### III. CONCLUSION

Defendants are obligated to comply with the broad scope of discovery authorized by the Federal Rules of Civil Procedure, particularly in the context of complex antitrust conspiracy cases. Without a method of discovery that is appropriate for the high stakes in this case, including use of the best available e-discovery tools, Plaintiffs may well be foreclosed from obtaining critically important responsive information. Accordingly, Plaintiffs respectfully request that the Court order Defendants to: (1) cooperate with Plaintiffs on the use CBAA methods; (2) collect by corporate function, department, or work unit; (3) collect and produce responsive information wherever it may be stored; (4) collect and produce responsive conduct information beginning in 2003 and responsive transactional data beginning in 2000; and (5) index their document productions consistent with Fed. R. Civ. P. 34(b)(2)(E)(i).

Dated: February 6, 2012                              Respectfully submitted,

*/s/ Michael J. Freed*
Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
FREED KANNER LONDON
& MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel:    (224) 632-4500
Fax:    (224) 632-4521

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
Tel:    (619) 687-6611
Fax:    (619)687-6610

*Interim Co-Lead Class Counsel*

W. Joseph Bruckner
Brian D. Clark
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel:    (612) 339-6900
Fax:    (612) 339-0981

Walter W. Noss
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Tel.    (619) 233-4565
Fax:    (619) 233-0508

*Class Counsel*

20