## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

KLEEN PRODUCTS LLC, individually and
on behalf of all others similarly situated,

                        Plaintiffs,

      vs.

PACKAGING CORPORATION OF
AMERICA, et al.,

                        Defendants.

Case No. 1:10-cv-05711

Judge Milton I. Shadur

Magistrate Judge Nan R. Nolan

## INDEX OF EXHIBITS TO PLAINTIFFS' REPLY
## MEMORANDUM OF LAW FOR EVIDENTIARY HEARING

A.      June 5, 2006 Press Release entitled "KPMG Forensic Purchases a Leading Investigations Software Solution," available at http://www.autonomy.com/content/News/Releases/2006/0605.en.html (last accessed Feb. 12, 2012).

B.      November 10, 2011 letter from Douglas A. Millen to Defendants.

C.      August 8, 2011 email from Douglas A. Millen to Sami Rashid, *et al*.

D.      November 8, 2011 letter from James T. McKeown to Daniel Mogin.

E.      "G-P challenges 5% return in boxes," Pulp & Paper (June 2007).

# Exhibit

# A

# KPMG Forensic Purchases a Leading Investigations Software Solution

**London - June 5, 2006 - KPMG Forensic in the UK has signed an agreement with Aungate**, specialists in Real-Time Enterprise Governance and a division of Autonomy Corporation plc (LSE: AU.) to purchase its leading-edge investigations software solution. KPMG is the first major UK Professional Services or Advisory firm to acquire this application of Aungate technology, which has the potential to play a significant role in investigations, particularly those involving suspected fraud.

The agreement covers the use of Aungate's Automated Electronic Document Discovery (EDD) and Production solution, one of Aungate's range of real-time and automated compliance monitoring, eDiscovery and enforcement applications. Aungate will form an integral component in the end to end Investigations proposition offered by KPMG's Forensic practice.

Autonomy's EDD and Production software enables the rapid collection, preparation, investigation, review and production of electronic evidence from virtually any file format and in virtually any language. It provides the facility for investigators to analyse other types of information such as recordings of telephone calls, voicemail or video recordings. It also enables investigators to track and trace communications over voice and email alike.

Aungate has global credentials and is applicable to a number of sectors including National Security, Criminal Intelligence, Commercial Fraud Investigation and support of eDisclosure in litigation.

Commenting on the development, Paul Walker, Head of Forensic Technology at KPMG, said: *"With technology becoming increasingly key to investigating and prosecuting fraud, KPMG is serious about building leading edge Forensic Technology differentiators for its services. This software will become an integral component of our secure Forensic Datalab? facility, offering clients the ability to use Autonomy and select a range of services without making an investment in building a capability themselves."*

Ian Black, Managing Director of Aungate said: *"We are proud to power KPMG Forensic, and welcome them to a growing number of organisations who are now taking advantage of the wide spectrum of solutions Aungate provides. Underpinned by Autonomy's IDOL platform the world's No1 clustering technology used by the US SEC, NASD and NYSE, only Aungate provides scalable solutions which automatically processes terabyte volumes of content including text and rich media such as voice and video. This agreement represents a significant opportunity for a range of sectors and new clients to gain access to our proven application through one of the world's leading advisory firms. Aungate is proud to support KPMG's lead in this area of the UK market."*

**About KPMG Forensic**

KPMG Forensic includes a European fraud investigation and dispute advisory team of over 500 people, including ex-police officers, forensic accountants, expert witnesses, data mining consultants and fraud risk management specialists. It investigates and advises on all suspicions of fraud and deception including, for example, procurement, treasury, payments and revenue fraud and accounts manipulation, as well as giving expert evidence in commercial disputes Our casebook ranges from matters of less than £50,000 to major international scams or disputes with sums at risk in excess of $1 billion. Our clients are truly international. Over the last few years we have worked all over the UK and Europe, and many other countries in the rest of the world.

**About KPMG**

KPMG is the global network of professional services firms who provide audit, tax and advisory services. KPMG LLP operates from 22 offices across the UK with over 9,000 partners and staff. KPMG recorded a UK turnover of £1.28 billion in the year ended September 2005. KPMG LLP, a UK limited liability partnership, is the UK member firm of KPMG International, a Swiss cooperative.

**About Autonomy and Aungate**

Founded in 1996 and built on ground-breaking research carried out at Cambridge University, Autonomy (LSE: AU. or AU.L) has experienced a meteoric rise to become the undisputed leader in the field of meaning based computing, that is the handling and processing unstructured information such as emails, documents, phone calls and video. It encompasses areas such as enterprise search, taxonomies, compliance, CRM and CEM amongst others.

Autonomy's best of breed technology has benefited more than 16,000 global companies in both the public and private sectors. Global customers include BAE Systems, Ford, Ericsson, Shell, Nestle, BBC, Reuters, Hutchison 3G, Royal Sun Alliance, Sun Microsystems, Philips, Boeing, Schneider Electric, Coca Cola, GlaxoSmithKline, Butterworths, Citigroup, ABN AMRO, Deutsche Bank, Nomura, the New York Stock Exchange, Daimler Chrysler, Kraft Foods, Lloyds TSB and public sector agencies including the

U.S. Department of Defense, the U.S. Securities and Exchange Commission, NASA and the U.K. Houses of Parliament. Autonomy plays a key role for government organizations across the globe and has been adopted as the organization standard at the U.S. Department of Homeland Security.

The Autonomy Group includes: Aungate, a leader in technology for Real-Time Enterprise Governance; Virage, a leading supplier and visionary in Rich Media Management technology; etalk, a leading provider of enterprise-class contact center products, Cardiff, a leader in content capture and business process management solutions, and Ultraseek, a leading provider of business search engine.

Autonomy's Aungate suite of products enables enterprises to achieve Real-Time Enterprise Governance by automatically understanding the content and interrelationships of all enterprise communications including email, voice and Instant Messaging. Aungate's unique technology powers real-time monitoring, alerting, policy management, electronic discovery and enforcement operations while proactively engaging behavioral change processes required to achieve best practice.

Aungate has quickly built a prestigious customer list, including the world's leading regulators and stock exchanges such as the U.S. SEC and NYSE as well as premier banks, litigation management companies and compliance publishers. Aungate's ability to identify both known and unknown relationships in all enterprise communications is premised on Autonomy's distinguished history in the intelligence community which Autonomy has been serving since the company's foundation, culminating in the award of "single supplier" status to the US government. Autonomy's history in the compliance market extends to the company's founding in 1996, and includes serving financial institutions globally.

Autonomy and the Autonomy logo are registered trademarks or trademarks of Autonomy Corporation plc. All other trademarks are the property of their respective owners.

| For more information, please contact: | |
|---|---|
| Mark Hamilton<br>KPMG Corporate Communications<br>+44 (0)20 7694 2687<br>mark.hamilton@kpmg.co.uk | Ali Merifield<br>Bite Communications ltd<br>+44 (0)20 8834 3441<br>+44 (0)20 8741 1123<br>ali.merifield@bitepr.com |
| Edward Bridges<br>Financial Dynamics<br>+44 207 831 3113<br>edward.bridges@fd.com | |

# Exhibit

# B

FREED KANNER LONDON & MILLEN LLC

direct dial: 224.632.4505
dmillen@fklmlaw.com

November 10, 2011

**Via Electronic Mail**

Barack S. Echols, Esq.
Kirkland & Ellis LLP
300 North LaSalle St.
Chicago, IL 60654

Stephen Neuwirth, Esq.
Sami Rashid, Esq.
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison, 22nd FL
New York, NY 10010

Scott M. Mendel, Esq.
K&L Gates LLP
70 West Madison, Ste. 3100
Chicago, IL 60602

Nathan P. Eimer, Esq.
Eimer Stahl Klevorn & Solberg LLP
224 South Michigan Ave., Ste. 1100
Chicago, IL 60604

Andrew S. Marovitz, Esq.
Mayer Brown LLP
71 South Wacker Dr.
Chicago, IL 60606

Michael P. Mayer, Esq.
Winston & Strawn LLP
35 West Wacker Dr.
Chicago, IL 60601

Jennifer S. Diver, Esq
McDermott Will & Emery LLP
227 West Monroe St
Chicago, IL 60606

Re: *Kleen Products, et al. v. Packaging Corporation of America, et al.*

Dear Counsel,

I am writing in response to Mr. Rashid's October 20, 2011 email, in which Mr. Rashid attached Defendants' revised and amended search-term list and Georgia Pacific's ("GP") stemming guide[1]. Plaintiffs are glad that our initial input led to a more comprehensive, search-term list. Plaintiffs, however, do not share Defendants' conclusion that they are "confident further adjustments to the search terms will not be necessary."

---

[1] Plaintiffs appreciate GP's willingness to provide its stemming guide. Plaintiffs, however, are concerned that other Defendants will not be following GP's guide and, therefore, plan to subject their documents to more limited searches. Accordingly, until all Defendants clarify their positions regarding the scope of their stemming, Plaintiffs are reserving their rights to comment.

November 10, 2011
Page 2

*First*, Defendants' rejection of Plaintiffs' sampling protocol undermines the likelihood that Defendants' search terms will produce a robust, certifiable production. Without sampling Defendants are essentially putting themselves in the same black box that Plaintiffs have been in since our discussions began.

*Second*, Defendants have not provided Plaintiffs with any assurances that Defendants have – or will – test their search terms. Plaintiffs continue to request that Defendants share the efforts they undertook to create their search terms and to test and sample their planned productions, including an explanation how each Defendant's process will yield reasonable precision and recall.

*Third,* Defendants' revised and amended search-term list remains deficient. Plaintiffs have studied Defendants' revised and amended list and highlight below some of its deficiencies and limitations.

As we have stated during our discussions, Defendants overarching obligation is to follow the Federal Rules and make certifiable productions. As we have also stated during our discussions, the parties should work cooperatively to develop search and review processes and undertake quality steps to ensure that responsive documents are captured.

Plaintiffs, therefore, and once again, request information necessary to allow us to evaluate and collaborate with Defendants to devise a defensible and robust search-term list. Plaintiffs feel that such cooperation gives the parties the best chance to reduce motion practice in this area down the road.

Plaintiffs' position is well-supported. As Magistrate Judge Peck said in *William A. Gross Constr. Assoc., Inc. v. American Manufacturers Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009), "[e]lectronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI. Moreover, where counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords, with input from the ESI's custodians as to the words and abbreviations they use, and the proposed methodology must be quality control tested to assure accuracy in retrieval and elimination of 'false positives.' It is time that the Bar — even those lawyers who did not come of age in the computer era — understand this." Judge Peck, along with a number of other leading ESI jurists, have rejected the "Go Fish" model of keyword searching Defendants seek to impose here, where the requesting party guesses which keywords might produce evidence to support its case without having much, if any knowledge, of the responding parties' "cards"/documents.

Moreover, Plaintiffs' position is consistent with the approach outlined in the Sedona Conference's Commentary on Achieving Quality in the E-Discovery Process, which, in Principle 4, states: "Principle 4. Practicing cooperation and striving for greater transparency within the adversary paradigm are key ingredients to obtaining a better



November 10, 2011
Page 3

quality outcome in e-discovery. Parties should confer early in discovery, including, where appropriate, exchanging information on any quality measures which may be used. Transparency and mutual cooperation between and among parties in the discovery process will contribute significantly to ensuring quality, maintaining best practices, and reducing claims of spoliation in complex e-discovery. The discovery phase should no longer be a place for extended argument and advocacy. Rather, discovery should be viewed as an opportunity for cooperation and transparency, in the spirit of Federal Rule of Civil Procedure 1.11. The appropriate time for advocacy and argument arrives once discovery is completed — not before. . . . The meet-and-confer 'conference' is best viewed as a process. It should start as early as practicable and should extend through the entire discovery lifecycle — identification, preservation, collection, search, review, and production — including discussions, where appropriate, on which search and review processes or technologies will be used, and what quality steps will be taken to ensure that these tools have accurately captured responsive documents. The thrust of the recent amendments to the Federal Rules of Civil Procedure has been open and forthright sharing of information by all parties and 'removing contentiousness as much as practicable.'"

Plaintiffs' efforts to date have been to serve the same goal endorsed by the courts and the Sedona Conference: cooperatively developing search and review processes and quality steps to ensure that responsive documents are captured. That is why Plaintiffs proposed the sampling protocol. That is also why Plaintiffs have again analyzed Defendants' search-term list and identified the following examples of potentially critical search-term deficiencies (based on the limited information we have):

 While you have not provided us with the identity of the Request(s) for Production to which each search string relates, we have done what we could to point out key responsive documents that are not likely to be recalled by your search terms.

- String 1 does not address the common occurrence where responsive communications were sent to and/or received from non-corporate email accounts. Further, is this a complete set of the corporate email domains utilized by Defendants during the discovery period?
- String 1.1 unduly limits the search for competitor contacts solely to company names, rather than including, at a minimum, the individuals Defendants have identified as likely to have knowledge of relevant subject matter.
- String 1.2 suffers from the same deficiency as String 1.1. Relevant individuals are not included. The string also omits many obvious colloquialisms, *e.g.*, "get in touch with"; "reach out"; "ping"; "your source"; "counterpart"; and "competitor" related to meetings, conversations or communications that are at the core of this case. These are critical defects.
- String 3 omits key words related to "substitutes," such as the basic and essential term "commodity." This string also omits common terms used to describe the products at issue, *e.g.,* "CB"; "CTB"; "CTBD"; "liner"; "LB"; "med"; "box"; and "sheet." This major defect repeats itself throughout Defendants' Strings.



November 10, 2011
Page 4

- String 5 omits keywords relating to production, *e.g.,* "curtail," "cut," "balance," "monitor," and "discipline."
- String 6.1 lacks obvious keywords that would capture documents related to production shutdowns, *e.g.,* "maintenance" and "scheduled."
- String 7 does not include numerous keywords related to analysis of pricing and the market, *e.g.,* "review," "rumor," "estimate," and "forecast."
- String 8's chosen keywords do not account for phrases that businesses routinely use to describe pricing movements, *e.g.,* "up," "push," "strengthen" and "boost."
- String No. 8.2 does not include seemingly obvious cost-related keywords such as "input" and "material."
- String 9 should be more broadly defined to encompass the various combinations of words describing elasticity or sensitivity in the context of demand, price, or supply that are typically used in documents relating marketplace economics.
- String 9.1 appears that it is designed to capture only documents relating to demand. The string should include terms such as "supply," "market," "output," "production" and "capacity."
- String 10 omits many commonly occurring terms used in the context of discussions of "discipline" and being a "leader." For example, this string would not return documents discussing "industry discipline," "market discipline," "led the increase," "their turn to lead" and "follow the increase."
- String 11 restricts "market" and "share" by combining the terms into "market share." Additionally, the string contains an incomplete list of terms describing decreases to production, capacity, and output. The string should include terms such as "rationaliz*," "close," and "shut*."
- String 12 is too narrow. For example, the string should include "releas*" instead of "press release."
- String No. 14 does not include terms – other than "complain*" – that are commonly used in email communications to describe customer complaints. The string also fails to account for terms such as "agreement," "contract," or "deal," to which customers are likely to refer.
- String 15 does not include words such as "plan," "planning," "report" and "reports."
- String No. 16 does not include common terms that are used in communications and other documents concerning the success or failure of price increases, *e.g.,* "success," "successful," "unsuccessful," "held," "sliding," "slipping," "holding," "falling," "maintaining," "stabilized," "stabilizing," "stick," "stuck" and "accept."
- String No. 17 does not include common terms that are used in communications and other documents concerning the economic or market changes, *e.g.,* "market," "supply," "slowing," "falling," "decreasing" and "failing."



November 10, 2011
Page 5

Additionally, we are concerned that most, if not all, of your proximity limiters are too restrictive. Sampling would have provided us with the data we need to evaluate them and provide guidance. Without this data, we can only express concern over their extremely narrow nature.

Finally, the following categories of documents do not appear to be addressed by the search-term list:

    (a) Responsive documents relating to the deletion or destruction of potentially responsive documents. How are you going to search for any such documents?

    (b) Responsive documents utilizing coded or covert language. How are you going to search for any such documents?

    (c) Foreign Language documents. How do Defendants with potentially responsive foreign-language documents plan to identify and produce documents from that pool?

Separately, Defendants asked us to let them know if we intend to use search terms to locate and produce documents responsive to Defendants' document requests. Because the same concept can be described using innumerable different combinations of words, abbreviations, acronyms, symbols, codes, misspellings etc., keyword searches simply do not locate all documents concerning the subject matter of an RFD . Plaintiffs are interviewing vendors who can apply Concept Based Advanced Analytics to our class representatives' ESI. Once we decide on a review tool and protocol, we will discuss it with you in accord with our ESI stipulation. In the unlikely event that we decide to use keywords alone, we will likely utilize the sample protocol we have proposed. In other words, Plaintiffs will follow the same best practices that we have asked Defendants to employ. We hope that, given our identification of some obvious deficiencies in your search terms above, that Defendants will reconsider their position and follow these modern, best practices as well.

Very truly yours,

*/s/ Douglas A. Millen*

Douglas A. Millen



# Exhibit

# C

| | |
|---|---|
| **From:** | Douglas A. Millen |
| **Sent:** | Monday, August 08, 2011 12:08 PM |
| **To:** | Sami Rashid |
| **Cc:** | Steven A. Kanner; Dan Mogin; MLackey@mayerbrown.com; Carrington, Casey N. ; Rogers, Brent; Kyle Taylor |
| **Subject:** | RE: Kleen Products LLC et al. v. Packaging Corporation of America et al. |
| **Importance:** | High |

Sami,

I wanted to quickly respond to an inaccurate description of comments attributed to me in your letter sent last Friday afternoon. While I have encouraged defendants to use advanced analytics –ie something beyond outdated Boolean search strings- in responding to discovery, I never contemplated any use of "culling" analytics used to further reduce a universe of documents found with search strings. Rather, my hope was that defendants would use advanced analytics, instead of Boolean search strings, as more sophisticated tools used properly promise to increase both "recall" (the percentage of responsive docs in the overall located) and "precision" (the percentage of responsive docs in the set identified by the analytics). Boolean search terms are notorious for producing poor recall and precision rates to the disadvantage of all parties involved, so I was hopeful that we could avoid the time consuming wrangling over search terms that you have apparently initiated with your letter and proposed set of minimal terms.

To summarize, we are concerned about the use of search terms instead of the better analytical tools available and I had never contemplated that defendants would use enhanced analytics after the application of keywords, much less expressed an interest in it. To be clear, I think that would be a very troubling approach for a defendant to adopt and one we would take very seriously. We will get back to you more fully on the search terms.

Doug


**Douglas A. Millen**
**Freed Kanner London & Millen LLC**
**EMAIL: dmillen@fklmlaw.com**
**DIRECT DIAL: 224.632.4505**
**PRIVILEGED ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT**

**From:** Kyle Taylor [mailto:kyletaylor@quinnemanuel.com]
**Sent:** Friday, August 05, 2011 2:00 PM
**To:** Douglas A. Millen
**Cc:** Steven A. Kanner; Dan Mogin; MLackey@mayerbrown.com; Carrington, Casey N. ; Rogers, Brent; Sami Rashid
**Subject:** Kleen Products LLC et al. v. Packaging Corporation of America et al.

Counsel:

Please see the attached letter from Sami Rashid and Defendants' proposed search terms.

Regards,

Kyle R. Taylor
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

212 849 7208 - Tel
212 849 7100 - Fax
kyletaylor@quinnemanuel.com

The information contained in this email is intended only for the personal and confidential use of the recipients named above.  This message may be an attorney-client communication or work product, and is therefore privileged and confidential.  If you are not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is prohibited.  If you have received this communication in error, please notify me immediately by email and delete the original message along with any attachments.

# Exhibit
# D



**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202-5306
414.271.2400 TEL
414.297.4900 FAX
foley.com

WRITER'S DIRECT LINE
414.297.5530
jmckeown@foley.com EMAIL

CLIENT/MATTER NUMBER
075825-0127

November 8, 2011

<u>Via E-Mail</u>

Mr. Daniel Mogin
The Mogin Law Firm, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101

      Re:     Containerboard Antitrust Litigation

Dear Mr. Mogin:

      As I indicated during our conference call last Tuesday, we will be appearing to represent International Paper in this matter. This is in partial response to your letter of October 25 and to follow up on our discussions on Tuesday with respect to the issues of time, search terms and custodians. I am responding on behalf of International Paper and do not have the authority to speak for any of the other defendants.

      With respect to plaintiffs' request that IP respond to the document requests you describe as "conduct" requests back through January 1, 2002 and for transactional data back through January 1, 2000, we believe both those requests raise, at a minimum, a question of the burden associated with that expanded review and production. We are investigating that burden with respect to both non-transactional and transactional level data and, if plaintiffs will agree to accept IP's list of custodians and search terms and to exclude back-up tapes and other difficult or expensive to restore data, IP may be willing to expand the time to an earlier start date for the non-transactional documents for some of the requests. As you would expect, the burden of additional documents is considerably greater if plaintiffs are going to insist on additional broad search terms (or a non-search term methodology) or want to add a number of custodians or insist upon access to back-up tapes or non-current systems. Thus we believe the timing issue is intertwined with the other issues and we should discuss them together.

      For the transaction level data, as I indicated in our phone call on Tuesday, IP's current mill and plant system covers facilities acquired through various transactions, the system does not include as many plants and mills as it did earlier in the period of interest and IP has various financial and accounting systems. The requests that you described in your letter as data requests cover a broad range of information, some that we expect would be much more difficult than others to pull. We are continuing our investigation on this front and hope to be in a position to discuss what we can pull, and for what time period we are prepared to pull it, in the relatively near future. To the extent that you have a modified list of the transaction level data that you believe is most important, we would appreciate receiving that list for use in our further discussions on the transactional data topics.

BOSTON
BRUSSELS
CHICAGO
DETROIT

JACKSONVILLE
LOS ANGELES
MADISON
MIAMI

MILWAUKEE
NEW YORK
ORLANDO
SACRAMENTO

SAN DIEGO
SAN DIEGO/DEL MAR
SAN FRANCISCO
SHANGHAI

SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO
WASHINGTON, D.C.

MILW_11911603.1



**FOLEY & LARDNER LLP**

Mr. Daniel Mogin
November 8, 2011
Page 2

     We are prepared to discuss both custodian and search term issues with you but our initial investigation suggests that IP is reviewing and will be producing documents from 26 custodians and the search terms (as expanded per the recent letter of Britt Miller) are already comprehensive. In our conversation last Tuesday, you and Steve Kanner spoke about your preference for some form of analytics rather than the use of search terms. We believe that the use of search terms in this case is justified, reflects common practice in the Seventh Circuit and is particularly appropriate here given the correspondence in this case and the extent to which IP has already progressed in the document review and production based on search terms. We are prepared to discuss this analytics issue with you further, but we believe that any discussion of the CBAA that you advocate (and the burden that it will impose on International Paper) requires that we understand what you are requesting. Therefore, we ask that you provide the following information for our assessment of your request:

1.     We understand that there are different programs and methodologies for applying analytics. Is there a specific software program or list of CBAA programs that plaintiffs would insist be used for the analytics effort? For example, is the Relativity Assisted Review program the type of analytics tool that you are envisioning and would agree to its use?

2.     Is the concept that you envision that defendants would enter the 20-30 subject matter topics, review and code a sample of the documents as responsive or non-responsive, and then run the revised algorithm on the documents to determine responsiveness? Thus the computer would determine responsiveness, is that correct? Is there some measure or standard that plaintiffs propose to use as a benchmark for whether the analytics algorithm is sufficient?

3.     Your October 25th letter references "cooperative quality testing." What do you mean by cooperative quality testing and precisely how would that work. What steps would plaintiffs want to be undertaken, what would you want defendants to provide to plaintiffs and what would be the standard for a sufficient algorithm? If you are envisioning a particular program or programs, is there a benchmark within those programs that you are proposing?

4.     The letter also states that "CBAA searching can be combined with keyword searches to assure robust results." That sounds as if you want defendants to engage in both key word searching and some form of analytics, which could double our burden. Is that your proposal? If not, what is meant by the concept of keyword searches in your proposal?

5.     Are the plaintiffs envisioning that the analytics would be run as to all the documents with a single algorithm as to all the various document requests or is your suggestion that analytics be run separately for different discovery requests? If the latter, how many are you proposing?



FOLEY & LARDNER LLP

Mr. Daniel Mogin
November 8, 2011
Page 3

6.     Are the plaintiffs prepared to accept the results of the analytics software program even if it results in a relatively small number of responsive documents?

7.     Are you proposing that defendants that have already hired ESI vendors that do not have the capability to run the advanced analytics you envision would have to switch vendors at this stage of the process?

Given what we have seen to date, we believe that the search term approach that IP already has underway is the appropriate approach to identifying potentially responsive documents. We are, however, prepared to discuss your proposal further – at least as to documents not already through the contract attorney review – but we do not believe that a meaningful conversation is possible until we understand the specifics of your proposal and protocol that you propose, rather than merely the concept of using analytics rather than search terms.

Finally, with respect to the Rule 30(b)(6) deposition notice that plaintiffs recently served, this will confirm our interest in attempting to agree on a format for written responses we could provide instead of going the deposition route. I suggest we put that on the agenda for our next call.

Thank you for your attention to this matter. I am on the road through Thursday but would be available Friday or Monday. We look forward to discussing these issues with you further in an attempt to resolve these issues without the need to involve the Court.

Very truly yours,

James T. McKeown

cc:    Steven Kanner
       Nathan Eimer

# Exhibit

# E



371 of 957 DOCUMENTS

Copyright 2007 ProQuest Information and Learning Company
All Rights Reserved
ABI/INFORM
Copyright 2007 Paperloop, Inc.

Pulp & Paper

June 2007

**SECTION:** Pg. 10 Vol. 81 No. 6 ISSN: 0033-4081; CODEN: PUPAA8

**ACC-NO:** 1295657461

**LENGTH:** 737 words

**HEADLINE:** G-P challenges 5% return in boxes

**BODY:**

The North American containerboard and corrugated box industry in now earning around a 5% rate of return in a decent year but this must change, Georgia-Pacific (G-P) president and COO James Hannon told the annual meeting of the Fibre Box Association in Orlando, FL. Hannon said Koch Industries has a goal of achieving a 15% return from its global portfolio, which includes consumer products, packaging, refining and chemicals, commodity and financial trading, fibers and polymers, chemical technology and ranching. G-P is the fourth largest North American containerboard producer (with close to 3.9 million tons of capacity) and the fifth largest US box producer. Hannon said G-P could attain the Koch goal of a 15% return in its corrugated division over the next four to eight years.

**FULL TEXT:**

CONTAINERBOARD

The North American containerboard and corrugated box industry is now earning around a 5% rate of return in a "decent year" but this must change, GeorgiaPacific (G-P) president and COO James Hannon told the annual meeting of the Fibre Box Assn in Orlando, FL.

"What does Koch Industries see in the corrugated box industry?" was the tide of Hannon's presentation that addressed how the company, the fifth largest US box maker by shipments, feels about this industry segment acquired as part of its $21 billion purchase ofG-P at the end of 2005.

"I don't know the answer yet, but that is a challenge we face everyday," said the veteran executive of Koch Industries, one of the largest privately owned companies in the world with revenue of $80 billion and 80,000 employees.

Hannon said Koch Industries has a goal of achieving a 15% return from its global portfolio, which includes consumer products, packaging, refining and chemicals, commodity and financial trading, fibers and polymers, chemical technology and ranching.

He wants a 15% return as well eventually from G-P's corrugated unit.

"The corrugated industry faces a lot of tough trends which are not going to change unless there is innovation," Hannon said.

He said there are a "lot of opportunities" to create value and improve returns.

G-P challenges 5% return in boxes Pulp & Paper June 2007

But he noted that the industry "must share in the value we create and not make agreements where customers receive all of the benefits and the suppliers are not paid for any of it. Producers must learn to say 'no' on deals when they are not profitable."

He said that corrugated suppliers must work on long-term "win/win" relationships with customers, which are mutually beneficial.

"A sure way to marginalize a business is to keep all the downside and give away all the upside," Hannon said.

Within organizations, management incentives must be based on creating value and not just selling volume, he added.

Hannon did provide a few additional clues regarding Koch's future strategy for its corrugated packaging business. He said Koch tends to be "more of a buyer than seller over time" and typically invests more than 90% of its earnings in businesses that offer the right growth rates and return. G-P increased its capital spending from $200 million in its last year as a public company to around $1 billion in its first year under Koch.

Under founder Charles Koch's "Market Based Management" philosophy, the company is focused more on analyzing and improving its own performance through techniques such as benchmarking rather than on beating the competition, Hannon said.

The company tries to use its vision and management techniques to bring new capabilities to the assets it acquires.

But Koch moves quickly to exit unprofitable or under performing businesses and "does not waste two years fixing a business which could not be fixed" - or a continual process of "creative destruction."

G-P is the fourth largest North American containerboard producer (with close to 3.9 million tons of capacity) and the fifth largest US box producer (with estimated annual box shipments of around 45 billion ft^sup 2^ from nearly 50 plants).

The company's corrugated packaging business had net operating margins in its final years as a public company (2002-2004) ranging from 10-12%, the highest among major integrated producers. Last year, margins for the half dozen largest US industry players (excluding G-P) ranged from 5.4% to 10.3% despite near record high US containerboard prices.

In response to a question, Hannon said that he thought G-P could attain the Koch goal of a 15% return in its corrugated division "over the next four to eight years."

**LOAD-DATE:** June 28, 2007