```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   KLEEN PRODUCTS, LLC, et al.,       ) No. 10 C 5711
                                        )
 4                    Plaintiffs,       )
                                        )
 5            v.                        )
                                        )
 6   PACKAGING CORPORATION OF AMERICA,  ) February 21, 2012
     et al.,                            ) Chicago, Illinois
 7                                      ) 9:00 a.m.
                      Defendants.       ) Evidentiary Hearing
 8
                  TRANSCRIPT OF PROCEEDINGS
 9   BEFORE THE HONORABLE MAGISTRATE JUDGE NAN R. NOLAN

10   APPEARANCES:

11   For the Plaintiffs:          FREED KANNER LONDON & MILLEN LLC
                                  2201 Waukegan Road
12                                Suite 130
                                  Bannockburn, Illinois  60015
13                                BY:  MR. MICHAEL J. FREED
                                       MR. ROBERT J. WOZNIAK
14
                                  THE MOGIN LAW FIRM, P.C.
15                                707 Broadway
                                  Suite 1000
16                                San Diego, California  92101
                                  BY:  MR. DANIEL J. MOGIN
17
                                  SCOTT & SCOTT LLP
18                                707 Broadway
                                  San Diego, California  92101
19                                BY:  MR. WALTER W. NOSS

20

21

22          TRACEY DANA McCULLOUGH, CSR, RPR
                 Official Court Reporter
23               219 South Dearborn Street
                      Room 1426
24            Chicago, Illinois  60604
                    (312) 922-3716
25
```

```
 1    APPEARANCES CONTINUED:

 2    For Defendant Packaging          KIRKLAND & ELLIS LLP
      Corporation of America:          300 North LaSalle Street
 3                                     Chicago, Illinois  60654
                                       BY:  MR. BARACK S. ECHOLS
 4                                          MR. LEONID FELLER

 5    For Defendant                    FOLEY & LARDNER LLP
      International Paper:             777 East Wisconsin Avenue
 6                                     Milwaukee, Wisconsin  53202
                                       BY:  MR. JAMES T. McKEOWN
 7
                                       FOLEY & LARDNER LLP
 8                                     321 North Clark Street
                                       Suite 2800
 9                                     Chicago, Illinois  53202
                                       BY:  MS. JOANNE LEE
10
      For Defendant                    MAYER BROWN LLP
11    Temple-Inland:                   71 South Wacker Drive
                                       Chicago, Illinois  60606
12                                     BY:  MR. ANDREW S. MAROVITZ
                                            MS. BRITT M. MILLER
13
      For Defendants                   K & L GATES LLP
14    Cascades and Norampac:           70 West Madison Street
                                       Chicago, Illinois  60602
15                                     BY:  MR. SCOTT M. MENDEL

16    For Defendant                    QUINN EMANUEL URQUHART &
      Georgia Pacific:                 SULLIVAN LLP
17                                     51 Madison Avenue
                                       22nd Floor
18                                     New York, New York  10010
                                       BY:  MR. STEPHEN R. NEUWIRTH
19
                                       FIGLIULO & SILVERMAN
20                                     Ten South LaSalle Street
                                       Suite 3600
21                                     Chicago, Illinois 60603
                                       BY:  MR. JAMES R. FIGLIULO
22
      For Defendant                    WINSTON & STRAWN
23    RockTenn CP, LLC:                227 West Monroe Street
                                       Suite 4400
24                                     Chicago, Illinois  60606-5096
                                       BY:  MR. R. MARK McCAREINS
25                                          MR. JOSEPH L. SIDERS
```

PDF created with pdfFactory trial version www.pdffactory.com

1    APPEARANCES CONTINUED:

2    For Defendant                McDERMOTT WILL & EMERY LLP
    Weyerhaeuser Company:      227 West Monroe Street

3                                   Suite 4400
                                   Chicago, Illinois  60606-5096

4                                   BY:  MS. RACHAEL V. LEWIS

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Good morning, everyone.

2          MR. MAROVITZ:  Good morning, Your Honor.

3          MR. MOGIN:  Good morning, Your Honor.

4          THE COURT:  Okay.  So Lynette will call our case.

5          THE CLERK:  10 C 5711, Kleen Products versus

6   Packaging Corporation.

7          THE COURT:  Okay.  Good morning, ladies and

8   gentlemen.  We're here for an evidentiary hearing, and this

9   case has been referred by Judge Shadur.  So will the

10  plaintiffs' lawyers identify themselves, please.

11         MR. MOGIN:  Good morning, Your Honor.  Dan Mogin on

12  behalf of the plaintiffs.

13         THE COURT:  Hi, Mr. Mogin.  Welcome to Chicago.

14         MR. MOGIN:  Thank you very much.

15         MR. FREED:  Michael Freed, Your Honor.  Interim

16  co-lead counsel on behalf of the direct purchaser plaintiffs.

17         THE COURT:  Thanks, Mr. Freed.

18         MR. NOSS:  Walter Noss, Your Honor, on behalf of

19  plaintiffs.

20         THE COURT:  Hi, sir.

21         MR. WOZNIAK:  Robert Wozniak on behalf of the

22  plaintiffs.

23         THE COURT:  Good morning, Mr. Wozniak.  And for

24  defendants will you identify -- we have seven defendants.  So

25  will each of the defendants -- I'm going to see if I can keep

PDF created with pdfFactory trial version www.pdffactory.com

1 people straight here -- introduce yourself and what client you

2 represent, please.

3          MR. MAROVITZ:  Good morning, Your Honor.  Andy

4 Marovitz for Temple-Inland.  I'm here with Britt Miller as

5 well.

6          THE COURT:  Thank you.

7          MR. McKEOWN:  Good morning, Your Honor.  James

8 McKeown for International Paper, and my colleague Joanne Lee is

9 with me as well.

10          THE COURT:  And how do you spell Miss Bee's last

11 name?

12          MR. McKEOWN:  Lee, L-E-E.

13          THE COURT:  Miss Lee.  And you are for?  I'm sorry,

14 Mr. McKeown.

15          MR. McKEOWN:  International Paper.

16          THE COURT:  International Paper.  Okay.  Our third

17 defendant.  Good morning, sir.

18          MR. MENDEL:  Scott Mendel for Cascades and Norampac.

19          THE COURT:  Okay.  Thank you.

20          MR. NEUWIRTH:  Good morning, Your Honor.  Stephen

21 Neuwirth for defendant Georgia Pacific.  And I'm also joined

22 here today by Jim Figliulo.

23          THE COURT:  Okay.  Thank you.  And next.

24          MR. McCAREINS:  Good morning, Your Honor.  Mark

25 McCareins on behalf of Rock Tenn.  And I have to apologize.  At

PDF created with pdfFactory trial version www.pdffactory.com

1   11:30 I have to go to another matter before Judge Cole, and

2   I'll be turning over the baton on behalf of Rock Tenn to Joe

3   Siders.

4           THE COURT:  Okay.  You're leaving your case in good

5   hands then.

6           MR. McCAREINS:  Completely.

7           THE COURT:  Okay.  Mr. Siders.  Will you return to

8   us, or are you going to -- just going for a status?

9           MR. McCAREINS:  I hope to after probably you're done

10  with lunch.

11          THE COURT:  Okay.  Thank you.  Good morning, sir.

12          MR. ECHOLS:  Good morning, Your Honor.  Barack Echols

13  on behalf of Packaging Corporation of America.  And I have with

14  me my colleague Leonid Feller.

15          THE COURT:  Okay.  Mr. Feller, thank you.

16          MS. LEWIS:  Good morning, Your Honor.  Rachel Lewis

17  on behalf of Weyerhaeuser Company.

18          THE COURT:  Okay.  Do you need to be at the table?

19          MS. LEWIS:  No.

20          THE COURT:  Are you sure?

21          MS. LEWIS:  Oh, do I?  No, Your Honor.

22          THE COURT:  Okay.  Yes.  Who's next?  That's it.

23  Okay.  Good.  Okay.  And you all met our court reporter Tracey

24  McCullough.

25          Are there any pretrial matters or any prehearing

1    matters anyone wishes to bring up?

2            MR. FREED:  Your Honor, Michael Freed.  I believe

3    this Friday we filed a motion for partial reconsideration of

4    Your Honor excluding the testimony of Miss Tenny.  We're

5    perfectly prepared to wait for a ruling on that depending upon

6    what evidence defendants put into the record.  But if Your

7    Honor is prepared to rule on that, that is before you.

8            THE COURT:  Okay.  So I think the record wise -- just

9    one moment.

10       (Brief pause.)

11           THE COURT:  So since our last status at which we

12   decided or I ordered that today's hearing was going to proceed,

13   the defendants volunteered to go forward this morning.  We

14   divided the time 9 to 12:30 for the defendants, an hour break

15   for lunch, 1:30 to 5 o'clock for the plaintiffs.  We also, we

16   also -- and I guess I just want to stress again that I think we

17   have so much to do within the eight hours that all lawyer

18   arguments, I am going to be available for argument some other

19   day.  Not today.  And the scope of the referral from Judge

20   Shadur is for all discovery.

21           So we -- we're going to concentrate our efforts, I

22   think it is fair to say on the issue before the Court, is

23   search method.  There are three other issues.  And I suggested,

24   and it was really a strong suggestion that if your other issues

25   that were mentioned in the brief relate to the expert who's on

1    the stand, you may want to ask a couple questions.  But nothing
2    is going to be precluded, including Miss Tenny is her name,
3    right, the linguistics lady?
4                 MR. FREED:  Yes.
5                 THE COURT:  Okay.
6                 MR. FREED:  I apologize for interrupting, but I
7    neglected to advise you she is here and available to testify
8    today should it be determined that she can.
9                 THE COURT:  Well, here's what my thinking was:  At
10   the time we set today's schedule each of you had the five
11   people who are scheduled to testify today.  You had their
12   resumes.  You had -- I think you've even exchanged reports with
13   each other.  And what happened with Miss Tenny, who is a
14   linguist, I'm not saying she may not -- we may need her
15   testimony.  But I think in fairness there wasn't enough notice
16   for today.  And I'm not precluding, I'm not precluding
17   anything.  Okay.  I just think we have our plate full on the
18   eight hours today.  And my ruling was that she's not testifying
19   today.  That's all.  Okay.  So if she does want to leave.
20                Now, here's my next suggestion.  When I was on your
21   side of the podium and we had experts, the normal procedure is
22   that experts are not excluded from the courtroom.  Because if
23   at the end of the day I have questions, you have questions, I
24   think they should hear the other people's testimony.  Does
25   anybody have an objection to that?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MOGIN:  No objection by the plaintiffs, Your
2    Honor.
3          THE COURT:  How about for the defendants?
4          MR. McKEOWN:  No objection for the defendants, Your
5    Honor.
6          THE COURT:  Okay.  And are your experts intending to
7    stay all day?  That was kind of a scheduling question I had.
8          MR. MAROVITZ:  Ours are, Judge.
9          THE COURT:  How about yours?  Well, I guess they're
10   on this afternoon, so they better be, right.
11         MR. MOGIN:  Yes.
12         THE COURT:  Well, that's good.  Okay.  Because then
13   because the -- when we designate a time for the plaintiffs and
14   the defendants that's to do both direct and cross.  So it would
15   be good if everybody were here if we have any cleanup at the
16   end.  Okay.
17         So plaintiffs, you want to call your first witness,
18   please.
19         MR. MOGIN:  The defendants, Your Honor.
20         THE COURT:  I'm sorry.  The defendants, right.  Doing
21   things a little differently.  Hi, sir.
22         MR. NEUWIRTH:  Thank you, Your Honor.  Again this is
23   Stephen Neuwirth.
24         THE COURT:  Thank you for saying your name again too.
25         MR. NEUWIRTH:  Thank you, Your Honor.  And the first

PDF created with pdfFactory trial version www.pdffactory.com

1    witness called by the defendants is Mr. Kenneth Koch, K-O-C-H.

2            THE COURT:  Okay.

3            MR. MOGIN:  Your Honor, actually before Mr. Koch does

4    testify.

5            THE COURT:  Yes.

6            MR. MOGIN:  The Court may recall that last week,

7    perhaps Thursday, the plaintiffs filed a memorandum regarding

8    the testimony by experts invading the legal matters, testifying

9    about legal issues.

10           THE COURT:  Right.

11           MR. MOGIN:  And part of that was addressed to the

12   description, the very brief description that we received of

13   Mr. -- I think Mr. Koch.

14           MR. NEUWIRTH:  Yes.

15           MR. MOGIN:  Mr. Koch's testimony, where he

16   indicated -- where Mr. Neuwirth indicated that Mr. Koch would

17   be testifying about what we would consider to be legal matters.

18   I don't know if the Court has had an opportunity to take a look

19   at those pleadings.

20           MR. NEUWIRTH:  Your Honor, I would just say that I

21   don't believe anything Mr. Koch is going to be testifying to

22   today constitutes a legal matter by any stretch.  And certainly

23   if objections need to be made during the testimony, they can.

24   But I think in advance of the testimony it would be premature

25   for the plaintiffs to assert that Mr. Koch is going to be

1   testifying to legal matters.

2           THE COURT:  Don't you think this whole hearing is

3   about the interplay between law and science?  I mean in a way.

4           MR. NEUWIRTH:  Well, certainly there is an issue of

5   interplay between law and science, and we are looking forward

6   to Your Honor's ruling on how the law applies in this context.

7   But I believe all of the witnesses for the defendants are going

8   to be testifying about factual issues that will bear on your

9   legal ruling.

10          THE COURT:  So I think maybe what we should do, I

11  don't know how to do a pre -- this is kind of a -- this whole

12  area is a new area here in a way.  So why don't you -- you have

13  a right to make an objection.  So you've got your -- you've got

14  your record made.  And I think we should take it all, let them

15  testify.  And if we need to strike anything based upon that

16  type of objection, we can certainly do it afterwards.  Okay.

17          MR. MOGIN:  Very good, Your Honor.

18          THE COURT:  Thank you.

19          MR. MOGIN:  And in that regard since we're dealing

20  primarily with experts today --

21          THE COURT:  Right.

22          MR. MOGIN:  -- do we want to have a mild suspension

23  of the rule against leading questions so we can move this

24  along?

25          THE COURT:  Yes, I wanted to -- in fact, I wanted to

PDF created with pdfFactory trial version www.pdffactory.com

1  do that, and you are all preserving Daubert challenges for

2  trial or for any other period here.  Today is an evidentiary

3  hearing that is educational and investigatory and helpful to

4  ruling on -- I don't think I even have a motion in front of me,

5  though.  Or do I have a motion?  Is there actually a motion?

6  No.

7            MR. MOGIN:  You do not, Your Honor.

8            THE COURT:  So I am definitely in new territory here.

9  Okay.

10            MR. MOGIN:  Very good.

11            THE COURT:  You're not waiving anything.  Okay.

12            MR. MOGIN:  Thank you.  And in light of that we won't

13  request to voir dire a witness.  We'll just reserve that.

14            THE COURT:  Right.  Thank you.  Okay.  Okay, Mr.

15  Neuwirth.

16            MR. NEUWIRTH:  Thank you, Your Honor.  Does Your

17  Honor plan to have a procedure for swearing in the witness, or

18  can we just proceed?

19            THE COURT:  Oh.  No, we're not that casual.

20       (Laughter.)

21            THE COURT:  Yes.  The oath hasn't left us.

22       KENNETH KOCH, DEFENDANTS' WITNESS, DULY SWORN

23                      DIRECT EXAMINATION

24  BY MR. NEUWIRTH:

25  Q    Can you please state your full name for the record.

1    A    Kenneth Charles Koch.

2    Q    Mr. Koch, where are you currently employed?

3    A    At KPMG.

4    Q    And how long have you been at KPMG?

5    A    I've been at KPMG for nine years.

6    Q    And what is your current position there?

7    A    I lead our forensics technology services practice in the

8    southeast U.S.

9    Q    Now, you said you've been at KPMG for about nine years.

10   Can you generally describe your employment history at KPMG?

11   A    Sure.  We provide computer forensic and electronic

12   discovery services for our clients in matters such as

13   litigation, regulatory inquiries, and internal investigations.

14   Q    And has that been the focus of your work over those nine

15   years?

16   A    It has.

17   Q    Tell me what you did before you joined KPMG nine years

18   ago.

19   A    Prior to joining KPMG, I was in the United States Air

20   Force for 10 years.

21   Q    And what was your last position in the Air Force prior to

22   working for KPMG?

23   A    My last position was a special agent and computer crime

24   investigator with the Air Force Office of Special

25   Investigations.

Koch - direct by Neuwirth                                    14

1    Q     And how long were you at the Office of Special
2    Investigations?
3    A     For the last four years of my time in the Air Force.
4    Q     And what was the nature of the work that you did in the
5    Office of Special Investigations during that period?
6    A     I ran criminal and counterintelligence investigations.
7    Q     And did that involve computers and electronically stored
8    information?
9    A     It did.  I specialized in computer crime investigations,
10   and we did primarily work in computer forensics area.
11   Q     Okay.  And briefly what is your educational background?
12   A     I have an undergraduate degree in management information
13   systems from Colorado Christian University.
14   Q     And in connection with the work you do on E discovery at
15   KPMG, do you take any steps to stay current on developments in
16   the area of ESI discovery?
17   A     I do.  I try to keep up on my reading, and I attend Legal
18   Tech.  I attend the Georgetown Advanced E Discovery Institute
19   in November and various other conferences that may come up.
20   Q     Do you have any connection to the Sedona Conference?
21   A     I do.  I'm a member of the Sedona Conference.
22   Q     Now, at KPMG are there any steps that are typically taken
23   in matters involving discovery of ESI?
24   A     Yes.  Typically based on my experience we would go out and
25   identify where potentially relevant ESI might exist in the

PDF created with pdfFactory trial version www.pdffactory.com

1    client's enterprise.  And it's usually based on a list of

2    custodians that's provided to us by counsel or the client.  And

3    based on that list of custodians we might try to go out and

4    figure out, you know, where they store -- where they have the

5    capability to save documents and information.  And then, and

6    then gather the information that has been identified as needing

7    to be gathered.

8              Once it's gathered we would put it through a process

9    to take, you know, the vast amounts of ESI and try to cull it

10   down to something a little bit more meaningful that you would

11   then prepare to set up in a repository where counsel could come

12   in and review the documents and ultimately make their

13   productions.

14   Q    So is it correct that you just identified five basic

15   steps?  Identifying where the ESI is located, potentially

16   relevant ESI, collecting it, having a process to narrow it down

17   from the large set to a smaller set which can then be reviewed

18   by attorneys and then ultimately produced?

19   A    That's right.

20   Q    Okay.  And you mentioned at the start when you talked

21   about this first step of identification custodians.  Can you

22   just flesh out what that meant.

23   A    Sure.  Usually it's -- when we're handed a custodian list,

24   it's usually, you know, key employees at the company that

25   counsel and/or the client think would be most likely to have

1   information that's responsive to whatever document request is

2   out there.

3   Q    Okay.  And the second step you mentioned was this

4   collection step.  What happens in that step?

5   A    Well, for all the data that's been identified, you would

6   go out and gather that data and make copies of it and collect

7   it and ultimately start to prepare it to put into a repository.

8   So you might apply some processes to it.  You might apply some

9   filtering to it, including things like, you know, file type

10  filters to say if you want to see all the e-mail and office

11  type documents for this matter.

12        And if you have a certain date range that you can

13  work with, we might apply date filters to that information too.

14  And if you have certain keywords that you know that you want to

15  look for to try to cull down that set a little bit, we might

16  apply those keywords.  And so we take a very large amount of

17  ESI and then cut it down to something a little bit more

18  meaningful prior to having folks start the review.

19  Q    So it sounds like you talked about the second and third

20  step.  The second step is the collection, is that correct?

21        THE COURT:  We have an objection.

22        MR. MOGIN:  I'm sorry, Your Honor.  It's not an

23  objection.  I'm just having a little bit of trouble hearing the

24  witness.

25        THE WITNESS:  I'm sorry.

Koch - direct by Neuwirth                17

```
 1            MR. MOGIN:  If I could just ask that that last part
 2   of that be repeated, the last part of his answer.
 3            THE COURT:  So, Miss McCullough, what's your
 4   preference?  Miss McCullough, can you read that back.
 5        (Record read.)
 6   BY MR. NEUWIRTH:
 7   Q    So it sounds like you were talking about there the second
 8   and the third step.  And this second step, the collection, is
 9   it correct that you take the ESI from these custodians and
10   literally collect it and put it in a location where these
11   processes you described like filters and keywords can be
12   applied in the third step; is that correct?
13   A    That's correct.
14   Q    And when the ESI is collected, is it loaded into some sort
15   of platform for doing the processing you described?
16   A    It is.  That's generally how you would set it up for some
17   sort of content review.  You'd have to upload it into some sort
18   of tool, some sort of platform.
19   Q    And in this third processing stage you mentioned that you
20   might apply date filters.  You mentioned other steps you might
21   take to take this broad set of ESI and narrow it down to
22   something more meaningful, I think was your term.  And one of
23   the things you mentioned was keywords.
24            What were you referring to when you said keywords?
25   A    Search terms that have been developed to identify things
```

PDF created with pdfFactory trial version www.pdffactory.com

1    that are likely to be responsive to the issues that are under

2    request.

3    Q     Are you familiar with something called deNISTing?

4    A     Yes.

5    Q     And what is deNISTing?

6    A     DeNISTing is basically applying a filter to the data to

7    remove any system type files that might exist there, things

8    that are generally not responsive.

9    Q     And what is the reason for these various types of

10   processing steps you mentioned that you would do in this third

11   phase?

12   A     Well, usually when you have a broad base collection, you

13   end up with quite a bit of ESI that you would then want to cull

14   down into something a little bit more meaningful before you

15   then put it into a repository and have folks start to go

16   through and review the information, because you don't want them

17   reviewing things that are garbage and spending a lot of money

18   there.

19   Q     And when you say garbage, what are you referring to?

20   A     Things that aren't responsive, just -- yes.

21   Q     And you then mentioned a fourth stage, which is once

22   you've narrowed down the set of ESI, I think you said it's then

23   actually reviewed by attorneys; is that correct?

24   A     That's correct.

25   Q     And then the fifth stage you mentioned was from this

PDF created with pdfFactory trial version www.pdffactory.com

1   review there's a set of documents to be produced?

2   A    Yes.

3   Q    Okay.  So let's turn now to this case.  How did KPMG

4   become involved in this litigation?

5   A    We were contacted in May of 2011 by Counsel On Call with

6   an opportunity to put in a bid at Georgia Pacific to help them

7   with their processing.  They were looking for a processing and

8   hosting vendor and also someone to help them with the search

9   capabilities.  So we were able to put together a bid, and

10  ultimately we were engaged in that same month.

11  Q    Now, you mentioned that you were contacted by Counsel On

12  Call.  What is Counsel On Call?

13  A    Counsel On Call is a firm that provides attorneys, you

14  know, as needed to corporate clients, and they also have an E

15  discovery focus where they have a big E discovery review teams

16  and things like that.

17  Q    Is Counsel On Call a company that KPMG has worked with

18  prior to this matter?

19  A    Yes, we have worked with them for at least the last year,

20  and we've got several matters that we worked together with them

21  on across multiple clients.

22  Q    Okay.  Now, you mentioned that you put in a bid.  When was

23  that bid submitted in this case?

24  A    In May of 2011.

25  Q    Okay.  And just for clarification, I know you had

PDF created with pdfFactory trial version www.pdffactory.com

1  mentioned this briefly, but what was it that this bid that you

2  put in May 2011 covered?

3  A    Georgia Pacific was looking for a vendor to help them with

4  processing and hosting and search, searching the data.  So that

5  was the bid that we put in.

6  Q    And is it fair to say that that was a bid that related to

7  the first three steps you mentioned, the identification,

8  collection, and processing of electronically stored

9  information?

10  A    No.  The data had already been collected.  It was just to

11  process and search and host the repository for the information.

12  Q    Okay.  So this was a bid related to the process of taking

13  a broad amount of ESI and narrowing it down to a smaller set to

14  be reviewed?

15  A    That's correct.

16  Q    And you said KPMG was ultimately retained.  And when was

17  that retention?

18  A    In May of 2011.

19  Q    And at the time that KPMG was retained in May of 2011 did

20  KPMG offer its clients any particular platforms?  You had

21  mentioned earlier that platforms are used in this processing

22  phase to upload the data and work with it, the data and the ESI

23  generally.

24       Did KPMG in May 2011 offer its clients any particular

25  platforms for this purpose?

Case: 1:10-cv-05711 Document #: 304 Filed: 03/01/12 Page 21 of 313 PageID #:6262

Koch - direct by Neuwirth                                    21

1    A    We did.  We offered Discovery Radar, which is also known

2    as DR, which is our own platform.  And we also offered

3    Clearwell at that time, which is a commercial platform.

4    Q    And why was KPMG offering Clearwell to its clients?

5              THE COURT:  Wait.  I have a question.  Is a platform

6    a search method?

7              THE WITNESS:  It's the tool, ma'am, that we would

8    load the data into.  And it would be the tool to be able to

9    apply searches, but also ultimately to be able to review some

10   of the information as well.

11             THE COURT:  All right.  And the two that you were

12   using at that time was Clearwell and what else?

13             THE WITNESS:  Discovery Radar.

14   BY MR. NEUWIRTH:

15   Q    And I believe you said Discovery Radar was a KPMG

16   proprietary product?

17   A    Yes, it's our proprietary platform.  Also called DR.

18   Q    And so what was the reason that in May 2011 in addition to

19   your own product KPMG was also offering Clearwell?

20   A    Well, we definitely like our own product, of course.  But

21   we also want to have something that's commercially available

22   that other folks like in the industry, and so we'll always have

23   a commercial product available as well.  And we go out and do

24   the research to figure out what's sort of best in class and

25   then make our decisions as far as sort of what's best in class

PDF created with pdfFactory trial version www.pdffactory.com

1   and then what the majority of the industry likes.

2           And we decided that we would start hosting Clearwell

3   several years ago.  I can't remember when we actually started,

4   but we've been hosting it ever since.

5   Q    And as of May 2011 was it still KPMG's view that Clearwell

6   was best in class, as you have said?

7   A    Yes, we have run several engagements through Clearwell and

8   had very good success with it.

9   Q    Now, are you familiar with something called the Magic

10  Quadrant?

11  A    I am.

12  Q    And what is the Magic Quadrant?

13  A    Well, from an E discovery perspective the Magic Quadrant

14  was Gartner's assessment this past year of E discovery vendors

15  that are out there.

16          MR. NEUWIRTH:  Okay.  Your Honor, if I could mark for

17  identification as Defendants' Exhibit 1, we have the Gartner

18  report, the Magic Quadrant report that the witness just

19  referred to.  If I may hand a copy to the witness.

20          THE COURT:  Surely.

21          MR. NEUWIRTH:  And I also have copies for opposing

22  counsel and for Your Honor.

23          THE COURT:  Thank you.

24          MR. MOGIN:  May I just note for the record, Your

25  Honor, we have not seen this before.

 1            MR. NEUWIRTH:  May I approach, Your Honor.

 2            THE COURT:  Yes.  Thank you.

 3            MR. NEUWIRTH:  I'm giving the marked copy to the

 4    witness, and I also have copies for the court reporter and for

 5    Your Honor.

 6    BY MR. NEUWIRTH:

 7    Q    Now, if I could, can you just tell me what it is that I've

 8    just handed to you.

 9    A    It's the Magic Quadrant for E discovery software.

10    Q    And is there a date on this document?

11    A    May 13th, 2011.

12    Q    And is this the report by Gartner that you were referring

13    to in your prior answer?

14    A    Yes.

15            MR. NEUWIRTH:  If there's no objection, Your Honor,

16    we would move for the admission of this document as Defendants'

17    Exhibit 1.

18            MR. MOGIN:  May we reserve objection, Your Honor.

19            THE COURT:  Yes, until after cross.

20            MR. NEUWIRTH:  That's fine, Your Honor.

21    BY MR. NEUWIRTH:

22    Q    I'd like you, if you could, to turn to the second page of

23    this document.  And do you see that there is a chart on the

24    upper right side of that page?

25    A    Yes, I do.

1    Q    Can you tell me what that chart is.

2    A    Sure.  That's the results of the assessment and where they

3    placed the different vendors.

4    Q    And based on your review of this chart, where does

5    Clearwell fall in the assessment by Gartner of E discovery

6    software?

7    A    Clearwell is in the leader area.

8    Q    And how does the leader area compare to the other areas on

9    this chart?

10   A    The leader area is definitely the ones that are on top,

11   the ones that understand the market and are very well respected

12   out there.

13   Q    And is the Magic Quadrant report something that you in

14   your work at KPMG value?

15   A    Yes, it is.

16   Q    Now, are you familiar with the term analytics as it's used

17   with respect to E discovery platforms?

18   A    Yes, I am.

19   Q    And what is your understanding of the term analytics?

20   A    There's a lot of different types of analytical tools that

21   can be used to help do things like group like documents

22   together.  Some of the analytics that have been developed over

23   the past years have been able to group like documents together

24   based on their content.  There's also analytics that allow you

25   to analyze e-mail and pull out certain web domains.  There's

1   analytics that allow you to put e-mail threads together in

2   their context so you can get through, you know, the data a

3   little bit easier.

4   Q    Now, did the version of Clearwell that KPMG made available

5   in May of 2011 include any features that had analytics?

6   A    It did.  It had several of those features that I just

7   mentioned.  The topics feature is one that can group like

8   documents together based on their subject.  It has a threading

9   feature.  It has very robust domain analysis to pull out

10  different domains and things like that.

11  Q    Now, you just said that this topics feature can group

12  documents together by their subject.  And earlier you had

13  referred to analytics as grouping documents together based on

14  their contents.

15       Is the topics feature able to group documents based

16  on their content?

17  A    Yes, it analyzes the content and groups them together.

18  Q    And you had also mentioned e-mail threading.  What is

19  that?

20  A    It's where you can take a chain of e-mails with the

21  replies and the forwards and put the thread together and see it

22  sort of in its context.

23  Q    And is that something that the Clearwell program that was

24  available in May 2011 was able to do?

25  A    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q    Were there any other features of Clearwell that you would

2  put in the analytics category?

3  A    It can analyze again, you know, domain names, e-mail

4  addresses.  It's got several, several tools.  I can't remember

5  them all off the top of my head, but they're right there on the

6  web site.

7  Q    Now, I think you know that in this litigation the

8  plaintiffs are using the term content based advanced analytics

9  or CBAA.  Prior to this litigation had you in your professional

10 experience or otherwise ever heard the term content based

11 advanced analytics or CBAA?

12 A    I hadn't heard that specific term before this case.

13 Q    Now, do you have an understanding of what content

14 analytics refers to?

15 A    Well, I think generally it refers to what I described

16 before in being able to group like documents together, analyze

17 the content of the documents and then group like documents

18 together.  And I saw some of the letters from the plaintiffs

19 when they were describing content based advanced analytics.

20 And it seemed to go between the technology that allows you to

21 group those like documents together, and then also later on in

22 the letter it seemed to start talking about some of the newer

23 technology that's out there that's commonly referred to as

24 predictive coding.

25 Q    And what is predictive coding?

1    A     Predictive coding is a fairly new technology that will

2    allow a more senior trained attorney with a good grasp of the

3    issues to sit down and start to train the software as to what's

4    responsive and what's not responsive.  And the software watches

5    these actions, and after a while it gets to a point where it

6    understands and becomes stable so that you can apply those

7    across the entire population.

8    Q     How exactly is it that an attorney trains the software?

9    A     By literally sitting down and making judgment calls on a

10   sample set of documents to say this is responsive, this is not

11   responsive.

12   Q     So the attorney takes documents, decides which ones are

13   responsive and which aren't, and shares those decisions with

14   the software?

15   A     That's correct.

16   Q     And the software learns from those decisions?

17   A     Yes, that's right.

18   Q     And is it correct that those decisions that the attorney

19   is making about which documents are or are not responsive are

20   subjective decisions by the attorney?

21   A     Absolutely.

22   Q     And so those subjective decisions are then shared with the

23   software, which learns from those subjective choices, is that

24   correct?

25   A     Yes.

1   Q    Now, does KPMG offer predictive coding at the present

2   time?

3   A    We do.  In our latest version of Discovery Radar we have

4   implemented Equivio Relevance into the back end of it, so we've

5   got the capability to provide some of the -- what's commonly

6   referred to as predictive coding.  And we call it software

7   assisted first review.

8   Q    Now, you said that KPMG offers this at the present time.

9   When did KPMG first make this type of predictive coding feature

10  available to clients?

11  A    We first rolled it out in September of last year.

12  Q    And that's September 2011?

13  A    That's correct.

14  Q    And so that's four months after you had been retained in

15  this case by Georgia Pacific in May of 2011, is that correct?

16  A    Yes, that's right.

17  Q    Now, in May of 2011, just to be clear, did the KPMG

18  software that you were offering include any of this, any of

19  these predictive coding features?

20  A    No.  We didn't have that until September.

21  Q    And so at no time prior to September were they available?

22  A    Correct.

23  Q    Okay.  And does the DR 4 predictive coding feature work

24  the way you described predictive coding to work with an

25  attorney making choices and sharing that information with the

1    software?

2    A    It does.

3    Q    And what is the benefit in your view based on your

4    experience of using predictive coding?

5    A    Well, I personally don't have any matters that are using

6    the capability yet, but we do have some at KPMG, and we're --

7    it's still pretty new.  But what we're hoping is that it's

8    going to save a lot of money on the review end.  So instead of,

9    you know, first taking that broad set of ESI and once you kind

10   of cull it down to something meaningful, apply your date range,

11   your keywords, your file types, and you get that down to

12   something a little bit more manageable.  Instead of then just

13   having a team of attorneys do this first pass review, we can

14   apply some of this technology and hopefully save some of the

15   costs of the review.

16   Q    So just to be clear --

17        MR. MOGIN:  Your Honor, objection.  In light of the

18   witness' admission that he has no experience in using this

19   technology, I'd like to move to strike the prior testimony.

20        MR. NEUWIRTH:  I think we can clarify this, Your

21   Honor.  I don't think the witness said he has no experience

22   with this technology.  It's something that's offered by KPMG.

23   And I think we can establish that he's familiar with it and

24   involved in offering it to clients.  I think what he said was

25   that at the present time he wasn't working on any matters where

Koch - direct by Neuwirth                           30

1    a client had chosen to use it.

2           MR. MOGIN:  Well, I believe the record will reflect

3    that Mr. Koch testified that he has not worked on any

4    engagements that have used this technology.

5           THE COURT:  All right.  So in the spirit of what I

6    said before about we're going to let most things in and I'll

7    figure it out afterwards, why don't you ask these questions

8    again about his personal experience.

9           MR. NEUWIRTH:  Sure.

10          THE COURT:  Maybe his training, maybe his knowledge.

11   Maybe he read an article.

12          MR. NEUWIRTH:  Sure.

13          THE COURT:  I don't know what it's based on.  Okay.

14          MR. NEUWIRTH:  Okay.

15          THE COURT:  I think it's called foundation.

16          MR. NEUWIRTH:  Sure.

17   BY MR. NEUWIRTH:

18   Q    So, Mr. Koch, do you feel familiar with the features, the

19   predictive coding features that KPMG now offers in its

20   proprietary platform?

21   A    I do.  I've been involved in discussing it with my clients

22   and provided demos to clients with this software.  And we just

23   haven't had any takers yet.

24   Q    And as this product came to market did you familiarize

25   yourself with it?  Were you trained in how it operates, and do

PDF created with pdfFactory trial version www.pdffactory.com

1  you feel comfortable that you understand exactly how it works?

2  A    Yes, I do.  And my teams that run the day-to-day

3  operations have been through the training for it.  Again, we

4  demonstrate this software and we're actively talking to our

5  clients about using it.  It's just -- it's fairly new.

6  Q    Right.  And this new software, just to be clear although

7  you are familiar with it and you said you've demonstrated it to

8  clients, as of the present time have any clients of your

9  southeast region business chosen to use this new -- these new

10  predictive coding features?

11  A    Not yet.

12  Q    And are there any clients of KPMG throughout the United

13  States that have chosen to use it?

14  A    Yes.  There are a couple of matters that we have using the

15  predictive coding capabilities right now.

16  Q    Now, when you say a couple of matters, is it fair to say

17  that that's probably five or fewer?

18  A    It's fewer than five.

19  Q    And how many matters -- how many E discovery matters does

20  KPMG typically handle throughout the United States at any point

21  in time?

22  A    We have hundreds.

23  Q    And so at the present time there may be a few, less than

24  five of all those hundreds of matters where clients have chosen

25  to use those predictive coding tools, is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1   A    It is so far.  Again, we just rolled it out in September,

2   and we're very hopeful that, you know, many more people are

3   going to start using it in the future.

4   Q    Right.  Now, given that you're familiar with this and

5   given your obvious familiarity based on what you testified

6   earlier about matters involving search terms, can you tell us

7   what you see -- just now that we have gone over your background

8   with this, can you just tell us what you see as the potential

9   benefits of using these predictive coding features.

10  A    Yes.  So the same as I said last time.  We think that it's

11  going to be able to help clients save a lot of money on the

12  review end, to where instead of having a large team of sort of

13  first pass review folks going through the documents, that this

14  might be able to be applied to save some of that time and

15  money.

16  Q    Now, just to be clear, you're talking now about review,

17  which was that fourth stage of the five you described.  This is

18  where attorneys look at documents that have been identified as

19  potentially responsive and review them, is that correct?

20  A    That's correct.

21  Q    And what you're saying is that this predictive coding

22  software can be involved in doing that review rather than human

23  beings, is that correct?

24  A    That's correct.

25  Q    And that's why it would save money?

1  A    Yes.

2  Q    Now, in terms of the earlier stages where you take a broad

3  set of ESI and cull it down, is the KPMG predictive coding

4  software being used instead of search terms for the purpose of

5  culling down a broad set of ESI to something more narrow?

6  A    I'm not aware of any matters now where they're using the

7  predictive coding capability instead of search terms.  The

8  matters that I'm aware of they have culled down the larger set

9  of ESI with some terms prior to applying the predictive coding

10 to help on the review side.

11 Q    Now, putting aside the benefit of costs, have you found

12 based on your work at KPMG or otherwise that predictive coding

13 would be better at locating potentially responsive documents

14 than search terms?

15      MR. MOGIN:  Objection, Your Honor.  At this point

16 we're far afield of the witness' --

17      THE COURT:  Okay.  I mean, not only has he not done

18 it, the company hasn't done it.  Nobody -- I mean, I guess what

19 he said is -- I don't know what he's basing this on.  I mean, I

20 mean, this is a real foundation problem here.

21      MR. NEUWIRTH:  Yes, well, let me see --

22      THE COURT:  Even for -- okay.  I mean it's kind of

23 ironic that the plaintiffs are objecting when he's saying how

24 wonderful predictive coding is, but that's their -- you know,

25 that's kind of what happens at hearings.  Okay.

Koch - direct by Neuwirth                                    34

1          MR. NEUWIRTH:  Well, let me see if I can do this a

2    different way.

3          THE COURT:  But on this specific question -- all

4    right.  Try it again.

5          MR. NEUWIRTH:  I can ask it a different way.

6    BY MR. NEUWIRTH:

7    Q    You're involved in the marketing -- you've described that

8    you're involved in marketing predictive coding to clients,

9    correct?

10   A    Yes.

11   Q    In marketing predictive coding to clients have you told

12   clients that predictive coding is better than search terms for

13   taking a broad set of ESI and narrowing it to what you

14   described as a more meaningful set to be reviewed?

15         THE COURT:  I'm going to object to that.  I mean,

16   honestly, what he is saying in a marketing -- I mean, I --

17         MR. NEUWIRTH:  Well, I think what we're trying to do

18   is determine whether the advantages -- what he considers to be

19   the reason to use predictive coding, which I think is different

20   from what the plaintiffs are saying are the reasons to use

21   predictive coding.  And all we're trying to do is establish

22   what those are.

23         THE COURT:  I think one question you could ask that I

24   have a question of, Mr. Mogin, is is this new software -- in

25   the review portion, in step one or step two, are they doing

1   word search; or is it all analytical search?  And then is it

2   word search or department search?  Those are the issues in this

3   case here.  I mean, what he really is telling somebody in a

4   marketing setting is really different than here.

5           MR. NEUWIRTH:  Well, that's fine --

6           THE COURT:  Now, Mr. Mogin, is that question -- do

7   you have an objection to my question?

8           MR. MOGIN:  I don't, Your Honor.  But just to confuse

9   the matter as much as I possibly can.

10          THE COURT:  Okay.

11          MR. MOGIN:  We have no objection to Mr. Koch

12  discussing KPMG's marketing.  My objection was the hearsay that

13  was inherent in what Mr. Neuwirth was trying to bring out, and

14  that Mr. Koch had gone far afield of his admitted lack of

15  expertise.  But as to the marketing, if they want to discuss

16  that, we do not object, Your Honor.

17          MR. NEUWIRTH:  I don't think there's been any

18  admitted lack of expertise.  I think Mr. Koch described his

19  familiarity with the software.  The only issue is how much it's

20  been used so far, and I think he's established that it's a new

21  software that's just come to market.  And all I was trying to

22  do -- he explained that the main advantage I think was cost

23  savings at the review phase.  So I think I can ask your

24  question and get directly to the point and move on.

25          THE COURT:  Thank you.

PDF created with pdfFactory trial version www.pdffactory.com

1    BY MR. NEUWIRTH:

2    Q    And the question is, is this software something that KPMG

3    is using to do these earlier phases of identification and

4    culling down of the broad set of ESI to something more narrow,

5    or is it being used for the review phase?

6    A    It's being used for the review phase.  Not necessarily for

7    search and retrieval.

8    Q    And what is being used for search and retrieval?

9    A    Well, in my experience --

10            MR. MOGIN:  Objection, Your Honor.  I believe the

11   witness testified that he was not involved in the search and

12   retrieval in this case.  So again, we're well beyond his

13   personal knowledge.

14            MR. NEUWIRTH:  No.  No.  He's testified -- we can go

15   over what KPMG did in a minute, but he's made clear what we're

16   talking about now is this phase of taking the broad set and

17   narrowing it down, which he described as the third phase of the

18   processing, which he said he was involved with.

19            THE WITNESS:  That's correct.

20            MR. NEUWIRTH:  This is just a question about what

21   KPMG is doing, which I think the witness has said he's familiar

22   with.

23            THE COURT:  I want to hear the answer to this.

24            MR. NEUWIRTH:  Thank you, Your Honor.

25            THE COURT:  Thank you.

1          THE WITNESS:  I'm sorry.  Can you repeat it again.

2     BY MR. NEUWIRTH:

3     Q     I think Judge Nolan had such a good question, which I

4     repeated.  But let me do it one more time.

5     A     All right.

6     Q     Is KPMG -- I think you said that KPMG is using this for

7     the review phase.  Is KPMG using this -- you said it's not

8     using this software for the process of narrowing the broad set

9     of ESI to a smaller one for review.  And the question is what

10    is KPMG doing to narrow down the broad set to a more narrow one

11    in cases where this new software is being used for the review?

12    A     In my experience the way to narrow down a large set of ESI

13    has been to apply certain filters.  So date range, file type,

14    and keyword.

15    Q     And keyword you mean search terms?

16    A     Yes, search terms.

17    Q     Okay.  Now, what was the role that KPMG played in this

18    case in GP's, Georgia Pacific's process of taking a broad set

19    of ESI and narrowing it down to a more meaningful set?

20    A     We processed data and hosted it in Clearwell, and helped

21    to -- helped in the search and testing of the search terms by

22    applying those searches that were provided to us in Clearwell

23    and then providing -- we would provide the results, the hit

24    count results.  And then they would go back and make some

25    modifications and provide us with updated search terms as they

1    were sort of tuning them up.  And then we would apply those and

2    sort of back and forth.

3    Q    And what was your personal role in this process?

4    A    I'm the engagement partner responsible for the engagement.

5    Q    Now, when did this process begin?

6    A    In May of last year.

7    Q    Now, based on your personal experience, are there any

8    potential problems with using search terms to segregate out

9    potentially responsive ESI from a larger universe of ESI?

10   A    Absolutely.

11   Q    And what are those potential problems?

12   A    Well, you could miss things by not having a very good

13   keyword list or you could have a keyword list that is going to

14   bring back a lot of false positives and cost a lot more money

15   to get through and have a lot of junk in the data set.

16   Q    Okay.  And were any steps taken here in the Georgia

17   Pacific process to address these potential problems?

18   A    Yes, there were several iterations of key terms that we

19   applied and provided hit results back so that they could be

20   tweaked and tuned up to make sure that they were comfortable in

21   the end with the results that were coming out of the data from

22   the keyword -- from applying the keywords.

23   Q    And was the topics function of Clearwell, this analytics

24   function you talked about, used in this process?

25   A    It was.  They used it in both the data that was returned

1   from keywords and the data that wasn't returned from keywords

2   to test and look through to determine if there should be any

3   other keywords that they might want to apply.

4   Q    So you're saying that it was applied to the set of

5   documents that was hit by the key terms as well as the

6   documents that were not?

7   A    That's correct.

8   Q    But the topics function was used on both.  Were there any

9   other steps that were taken to address these potential problems

10  that could occur with search terms?

11  A    Yes.  There were tests run of the data that was not

12  returned by the keywords, and they called that the null set.

13  So they ran tests in -- by pulling random samples of that

14  information from the documents that weren't returned from the

15  keywords to test to see if they had any errors and see if they

16  needed to add any other keywords to their keywords.

17           THE COURT:  I have a question.  A null set, N-U-L-L,

18  Miss McCullough, what does that mean?

19  BY MR. NEUWIRTH:

20  Q    Can you describe what that means?

21  A    Sure.  The null set -- when you have the list of keywords

22  and you apply the keywords to the data, it brings back certain

23  files that hit on the keywords.  Everything else that's left

24  behind, that's what we have been calling the null set.  So the

25  things that did not hit on the key words.

PDF created with pdfFactory trial version www.pdffactory.com

1      THE COURT:  And then say again what -- so then when

2   you get a set of null set, then what did you do with the null

3   set?

4      THE WITNESS:  They went in and pulled random samples

5   of documents from that null set to test to see if there were

6   any other words that they should be adding to the keyword list

7   to bring back any documents that may have been responsive but

8   not captured by the keyword list that they already had.

9   BY MR. NEUWIRTH:

10  Q    And that was done including with the topics feature?

11  A    That's correct.

12  Q    That analytics tool in Clearwell?

13  A    Yes.

14  Q    And was there also testing done of the random sample to

15  see whether or not documents that were responsive were ending

16  up in the null set as a result of the search terms?

17  A    Yes, that was the -- what I just went through a second

18  ago.

19  Q    And --

20      THE COURT:  I have another question.  What's the

21  difference between a topics function and a keyword?

22      THE WITNESS:  The topics function is an analytics

23  function that can analyze the documents and group like

24  documents together based on their content.  And the keywords

25  is --

1          THE COURT:  I know what keyword is.  So topic is more
2    than one word?
3          THE WITNESS:  Yes, it's more of an analytical tool.
4          THE COURT:  Okay.  But it includes more than a
5    keyword.
6          THE WITNESS:  Yes, ma'am.
7          THE COURT:  Okay.
8    BY MR. NEUWIRTH:
9    Q    And, in fact, it would look at the entire subject matter
10   of the document and compare that to subject matter in other
11   documents, correct?
12   A    It would.
13   Q    And that was a function in Clearwell?
14   A    Yes.
15   Q    And do you understand if any other steps were taken in
16   this process to address the types of problems that can come up
17   with search terms?
18   A    Well, I do know that they got input from other defendants
19   on the keyword list and also from the plaintiff as well.
20   Q    And what was the nature of the feedback that was received
21   from the plaintiffs?
22   A    They sent a letter.  I remember seeing a letter where the
23   plaintiffs had a whole list of keywords that I think they
24   pointed out that GP had not considered.  And so we took a look
25   at that letter and then added, I think added some keywords from

1   that list that they provided.

2           MR. NEUWIRTH:  May I approach, Your Honor, with a --

3           THE COURT:  Yes.

4           MR. NEUWIRTH:  I am handing for identification

5   Defendants' Exhibit 2 to the witness.  If I may approach.

6   BY MR. NEUWIRTH:

7   Q    And what is it that I have given to you, Mr. Koch?

8   A    The plaintiffs' preliminary analysis of defendants' first

9   sets of proposed search terms.

10  Q    And is this what you were referring to when you said that

11  there had been feedback provided by the plaintiffs on the

12  search term list?

13  A    Yes.

14          MR. NEUWIRTH:  And, Your Honor, I understand you're

15  reserving on entry into evidence.  We will move for entry into

16  evidence, but we will understand that Your Honor reserves.

17  BY MR. NEUWIRTH:

18  Q    Now, what was your reaction to this document upon

19  receiving it?

20  A    Well, we looked at the document and it seemed to take

21  issue with, with the keywords in general and provided a list of

22  things that weren't considered by GP.

23  Q    And did you find that the suggestions that the plaintiffs

24  had provided were helpful?

25  A    Well, it probably would have been a little bit more

1    helpful to say here's -- you know, here's definitely what we

2    think you should add from a keyword perspective.  Some of the

3    things they list on here that weren't, you know, considered

4    include things that are pretty broad and you might find, you

5    know, in someone's signature file at the end of their e-mail,

6    which could potentially return like every e-mail.  So for cell

7    and mobile and fax and e-mail and things like that, you know, I

8    have that at the bottom of every e-mail on my signature block.

9    Q    But was any use made of these suggestions by the

10   plaintiffs?

11   A    Yes, we did end up using a couple of the words out of the

12   list to add to the overall keyword list.

13   Q    Okay.  And ultimately what was the number of hours that

14   KPMG personnel devoted to this process at Georgia Pacific of

15   taking a broad set of ESI and narrowing it down to a more

16   meaningful set for review?

17   A    We sent almost 500 hours.

18   Q    Now, I take it you are aware that the plaintiffs at this

19   point have been suggesting that the search term process here

20   should be replaced with a content based analytics approach?

21   A    I am.

22   Q    Based on learning that, has KPMG recommended to Georgia

23   Pacific that it abandon this search term process that has been

24   implemented and instead use a content based analytics approach?

25   A    No.  I think the most important thing about using any kind

1   of search capability is how you test it and how you QC it in

2   the end to be comfortable with the results.

3   Q      By QC what do you mean?

4   A      Quality control testing.  Testing the results.

5   Q      And based on your involvement and KPMG's involvement, do

6   you feel that the process that -- well, what is your view of

7   the process that Georgia Pacific has implemented here through

8   its search term methodology?

9   A      Sure.  I thought it was very thorough, very robust.  There

10  were several iterations of search term development, and they

11  tested and went back and tuned up the keywords several times.

12  And, you know, quite honestly that's more than I see in a lot

13  of the cases that I'm dealing with.  A lot of times they'll

14  just -- both sides will agree to some key terms that really

15  haven't been tested a lot and bring back a lot of garbage.  And

16  this was a fairly thorough process.

17  Q      And so given --

18          THE COURT:  Okay.  We have --

19          MR. MOGIN:  Well, I'm going to object, Your Honor --

20          THE COURT:  Yes.

21          MR. MOGIN:  -- in light of the fact that the witness

22  has already testified that he has no experience whatsoever with

23  the technology that he's now critiquing.

24          THE COURT:  Wait.  I thought he was critiquing what

25  he did.

1          MR. MOGIN:  No, he just said --

2          THE COURT:  I thought this was pretty self-serving

3   that he thought he did a pretty good job.  But you go right

4   ahead.  But that's what I thought he was critiquing right now.

5          MR. NEUWIRTH:  Thank you, Your Honor.

6          THE COURT:  Not analytics.

7          MR. NEUWIRTH:  Thank you, Your Honor.

8          THE COURT:  Wasn't that your question?

9          MR. NEUWIRTH:  My question was what was his view of

10  the process --

11         THE COURT:  Did he do a good job.

12         MR. NEUWIRTH:  -- that was done here.  Correct.

13         THE COURT:  Yes.

14  BY MR. NEUWIRTH:

15  Q    And so given that KPMG now has this new -- these new

16  features, these predictive coding features, why aren't you

17  recommending that Georgia Pacific use those instead of the

18  methodology that it's put into place?

19  A    Well, I would love Georgia Pacific to use our new tool.

20  That would be fantastic.  But the way we sort of go to market

21  with our tool is a cost savings measure around helping save

22  money in the review phase.  And GP's already done the review of

23  the majority of the data, so there would be no cost savings.

24  Q    Now, when you say a review of the majority of the data,

25  what are you referring to?

PDF created with pdfFactory trial version www.pdffactory.com

1    A     All the documents that they have in their repository.

2    Q     And so you talked earlier about the five steps.  That the

3    first three involved taking the broad set of ESI and narrowing

4    it down.  The fourth step that you mentioned is actually

5    reviewing that narrowed set of ESI that emerges from that

6    process.

7          Are you saying that those documents have already been

8    reviewed?

9    A     Yes.

10   Q     And they've been reviewed by human beings?

11   A     Yes, that's correct.

12   Q     And do you know roughly what percentage of those documents

13   have been reviewed to date by Georgia Pacific?

14   A     I think it's just about all of them.  99 percent or more.

15   Q     And so this review benefit you talked about from using the

16   predictive coding feature would not add any value here since

17   the documents have already been reviewed by human beings?

18   A     That's correct.

19         MR. NEUWIRTH:  We have no further questions, Your

20   Honor.

21         THE COURT:  Would you wish to cross-examine?

22         MR. MOGIN:  I do, Your Honor.  But in light of the

23   technical subject matter and the fact that we don't have

24   reports or depositions, I wonder if we could take a few minutes

25   before we begin the cross-examination.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Sure.  Sure.  We can take our morning

2    break right now.  So 10 minutes.  Can you do that?

3          MR. MOGIN:  Yes.

4          THE COURT:  Okay.  10 minutes.  Okay.  Thank you.

5      (Short break taken.)

6          THE COURT:  Okay.  We're back on the hearing.  Mr.

7    Mogin, are you ready?

8          MR. MOGIN:  I am, Your Honor, subject to the caveat

9    that as I said before we've had no depositions, we don't have a

10   report from Mr. Koch.  So this is a bit --

11         THE COURT:  So you're doing it the old fashioned way.

12         MR. MOGIN:  Yes, trial by ambush.  Here we go.

13         THE COURT:  That's true.  Okay.  Here you go.

14                   CROSS-EXAMINATION

15   BY MR. MOGIN:

16   Q    All right.  Mr. Koch, you're with KPMG, correct?

17   A    Yes.

18   Q    KPMG is a worldwide enterprise, correct?

19   A    Yes.

20   Q    KPMG provides forensics services throughout much of the

21   English speaking world, correct?

22   A    That's correct.

23   Q    They provide them in England, correct?

24   A    Yes.

25   Q    They provide them in Canada, correct?

1   A    Yes.

2   Q    They provide them in the United States, correct?

3   A    Yes.

4   Q    Now, do you interface with any of the people from Canada?

5   A    We do on occasion.  They're a member firm, so we talk to

6   the folks in Canada.

7   Q    And how about the UK?

8   A    Yes, we do.

9   Q    Now, is it your understanding that the idea of -- that

10  KPMG only recently got involved in predictive coding and

11  advanced analytics?

12  A    In our U.S. firm, yes.

13  Q    But that's not true for the rest of the firm, is it?

14  A    I'm not aware of what every member firm does.

15  Q    Isn't it true that in 2006 there was an acquisition of

16  Autonomy Software by KPMG?

17  A    Not KPMG in the U.S., no.

18  Q    But it was by KPMG the worldwide enterprise, correct?

19  A    Well, KPMG is a global network of member firms.  We're not

20  a -- we're not a global firm per se.  But we're a global

21  network of member firms that are each sort of their own legal

22  entities, but we're a cooperative.

23  Q    Do you share information?

24  A    Certainly.

25  Q    So are you aware of what's going on in the forensics

1    services in Europe?

2    A     Yes.

3    Q     In England?

4    A     Yes.

5    Q     In Canada?

6    A     Yes.

7    Q     So are you aware of the Autonomy acquisition?

8    A     I had heard about it, yes.

9    Q     When did you first hear about that?

10   A     I don't recall.  I mean, it's been a while.

11   Q     A couple years?

12   A     Sure.  At least a year.

13   Q     Maybe three years?

14   A     I don't remember, but it's --

15   Q     Maybe even 2006?

16   A     Maybe.  I don't remember.

17   Q     Would it refresh your recollection if I were to show you a

18   KPMG press release announcing the acquisition?

19   A     Sure.

20         MR. MOGIN:  Your Honor, if I may.  If I may approach,

21   Your Honor, and mark this just as an exhibit for demonstrative

22   purposes.

23         THE COURT:  Thank you.  To refresh recollection.

24         MR. MOGIN:  Refresh.  Thank you.  Thank you for

25   refreshing my recollection.

1          THE COURT:  Yes.

2    BY MR. MOGIN:

3    Q    Okay.  You'll see that this article is headlined "KPMG

4    Forensic Purchases of Leading Investigations Software

5    Solution," correct?

6    A    Yes.

7    Q    And the date line is June 2006, correct?

8    A    That's correct.

9    Q    All right.  Now, does this refresh your recollection as to

10   the date of the Autonomy acquisition by KPMG?

11   A    I hadn't seen this particular news release before, but now

12   seeing it here, yes, I can read it and I understand it.

13   Q    Okay.  Very good.  Now, you're aware that that -- are you

14   not, that that Autonomy product that was purchased by KPMG has

15   many of the features that the plaintiffs have described as

16   CBAA, correct?

17   A    I know it has analytic capabilities.

18   Q    Okay.  Are you aware of a technology called Latent

19   Semantic Indexing?

20   A    I am.

21   Q    And what do you understand that to be?

22   A    Latent semantic indexing is the technology behind the

23   analytic capabilities to group like documents together based on

24   their content.

25   Q    Very good.  And how long has latent semantic indexing

PDF created with pdfFactory trial version www.pdffactory.com

1   technology been available?

2   A    It's been available for years.

3   Q    1970s, is that correct?

4   A    I don't know about that.

5   Q    Would you say that predictive coding is a proven or

6   unproven methodology for use in eDiscovery?

7   A    You know, I don't know that I -- in my experience I

8   haven't used the predictive coding capabilities yet of our

9   implementation to prove it or disprove it, so I wouldn't be

10  able to say.

11  Q    Well, you've testified that you are involved in marketing,

12  correct?

13  A    Yes.

14  Q    And you're aware of KPMG's marketing in this area,

15  correct?

16  A    Yes.

17  Q    Now, do you know Mr. Chris Paskach, P-A-S-K-A-C-H?

18  A    Yes.

19  Q    And who is Mr. -- would you pronounce that for me?

20  A    Paskach.

21  Q    Who is Mr. Paskach?

22  A    He is our national practice leader.

23  Q    He's your boss?

24  A    Yes.

25  Q    And do you know Mr. Michael Carter?

1    A    Yes.

2    Q    And who's Mr. Carter?

3    A    I believe Mr. Carter is a manager or director at our

4    Cyprus data center.

5    Q    At your what?

6    A    Cyprus, California data center.

7    Q    Do you know Mr. Phil Strauss?

8    A    Yes.

9    Q    And who is Mr. Strauss?

10   A    He's a director in our San Francisco office.

11   Q    Now, all of these people are involved in KPMG's forensic

12   services just like you, correct?

13   A    Yes.

14   Q    Are they also project managers like you?

15   A    Well, Chris is the leader.  So he's not a project manager

16   per se.

17   Q    He's the leader.  Okay.  So would you concede that a

18   marketing -- strike that.

19          Would you concede that a brochure that bears the

20   names of Mr. Paskach, Mr. Carter, and Mr. Strauss was an

21   authoritative statement by KPMG about its forensics services?

22   A    Yes.

23   Q    Let me, if I may, please first I would like to ask you to

24   look at -- well, we'll mark this as exhibit next.

25          MR. MOGIN:  I guess this would be Plaintiffs' 2, Your

PDF created with pdfFactory trial version www.pdffactory.com

1   Honor.

2             THE COURT:  Right.

3             MR. MOGIN:  Plaintiffs' 2, please.  Entitled, "The

4   Case for Statistical Sampling in eDiscovery."

5             THE COURT:  Thank you.

6   BY MR. MOGIN:

7   Q    Did I read that correct?  This is called "The Case for

8   Statistical Sampling in eDiscovery?"

9   A    Yes.

10  Q    Have you seen this before?

11  A    Yes.

12  Q    This is an official KPMG brochure, correct?

13  A    Yes.

14  Q    It would be an authoritative statement by KPMG, correct?

15  A    That's correct.

16  Q    And if you look at the back page, it was prepared by the

17  people that we were talking about before; that is, Mr. Paskach,

18  Mr. Carter, and Mr. Strauss, is that correct?

19  A    Yes.

20  Q    Now, let me also show you --

21            MR. MOGIN:  If we could have Plaintiffs' 3 marked

22  please, Your Honor.

23  BY MR. MOGIN:

24  Q    Plaintiffs' Exhibit 3 is entitled "Making Document Review

25  Faster, Cheaper, and More Accurate," is that correct?

1    A    Yes.

2    Q    And the subtitle is "How Concept Searching can Change the

3    Way your Legal Teams Handle First Pass Review," correct?

4    A    Yes.

5    Q    And this was another official KPMG document, correct?

6    A    This document looks like it, just from the cover of it

7    looks like it came from our firm in Canada.

8    Q    But you've interfaced with the folks in Canada, right?

9    A    Yes.

10   Q    You've talked with them about forensic services, right?

11   A    Yes.

12   Q    But, by the way, Canada has a legal system that's very

13   similar to the United States, doesn't it?

14   A    I suppose.  Sure.

15   Q    Do you know?

16   A    I don't.

17   Q    You don't know?

18   A    No.

19   Q    Well, is a tool dependent upon the legal system that it's

20   used in?

21   A    I suppose it depends on how you're using the tool.

22   Q    You're an expert in these eDiscovery tools.

23   A    Sure.

24   Q    Is it language dependent?

25   A    Some are.  Some can handle multiple languages.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q     Is Clearwell language dependent?

2    A     It can handle multiple languages.

3    Q     It can.

4    A     Yes.

5    Q     Are there other tools that you're aware of that can handle

6    multiple languages?

7    A     Yes.

8    Q     In fact, speaking of Clearwell, how many times have you

9    read that Gartner report that has the Magic Quadrant thing in

10   it?

11   A     Once, and then I've skimmed it.  I've skimmed it a couple

12   times.

13   Q     Did you read it before you were engaged by KPMG -- I'm

14   sorry, by GP, Georgia Pacific?

15   A     Yes.

16   Q     When did you first see that?

17   A     Well, right when it came out it was distributed to us, so

18   it was all on the same -- probably in the same month that we

19   were engaged by Georgia Pacific.

20   Q     Isn't it true that Gartner has been sued several times for

21   not including respected eDiscovery vendors in that Magic

22   Quadrant?

23   A     I don't know.

24   Q     Are you aware of any criticisms of that report?

25   A     Not off the top of my head, no.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q     Did you look at any other sources that were similar to
2   Gartner?
3   A     Not that I can remember.
4   Q     Are all of the eDiscovery tools listed in the Magic
5   Quadrant, do they all perform the same function?
6   A     No.  There's specific functions that some do and others
7   don't.  But generally they perform a lot of the same functions,
8   sure.
9   Q     You're certain of that?
10  A     I'm -- well, I'm not certain about every tool in the Magic
11  Quadrant, no, not off the top of my head.
12  Q     Do you have any experience with any of those tools?
13  A     I have -- I don't recall what the -- you want me to flip
14  back to the Magic Quadrant and take a look?
15  Q     Sure.  Do you have any personal experience with the
16  Symantec tool?
17  A     No.
18  Q     Do you have any personal experience with the FTI
19  Technology tool?
20  A     Well, which FTI Technology  tool?
21  Q     The one that's listed here in the Magic Quadrant.
22  A     I'm not -- I don't know.
23  Q     Okay.  Do you have any experience with kCura?
24  A     We're just starting to offer Relativity, so I have had
25  some recent experience with kCura.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q    Relativity is the name of the --

2   A    The software --

3   Q    -- particular software offered by kCura, correct?

4   A    Yes.

5   Q    And you understand that Relativity has a predictive coding

6   or supervised learning capability, correct?

7   A    I thought I read that they're coming out with it and

8   implementing it, but that it's not quite there yet.  I could be

9   wrong.

10  Q    You could be wrong on that, right?

11  A    I could be wrong.

12  Q    How about Guidance?  What is it that Guidance or Guidance

13  does?

14  A    Guidance makes a variety of software tools to help with

15  eDiscovery and computer forensics.

16  Q    But it's not having to do with the search technology, is

17  it?

18  A    There's search capabilities in Guidance, sure.

19  Q    Search as in searching for documents or searching as in

20  reviewing documents?

21  A    Searching for documents.

22  Q    Okay.  So that's really the collection aspect, correct?

23  A    No, it's the searching aspect.

24  Q    All right.  It's not a review based software, is it?

25  A    You can review in Guidance.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q    Really?

2    A    There's some review capabilities, sure.

3    Q    Which part of the Guidance tool can you review?

4    A    The piece that presents results on the screen that allows

5    you to review it.

6    Q    Do you know the name of that piece?

7    A    Not off the top of my head.

8    Q    Now, is Autonomy in the Magic Quadrant?

9    A    It is.

10   Q    And what do you know about Iron Mountain's tool?

11   A    I don't have any experience with it.

12   Q    How about Kroll Ontrack, are you familiar with that?

13   A    I am.

14   Q    Have you worked with Kroll Ontrack or seen demonstrations

15   of it?

16   A    I've seen it and I've logged into a repository and looked

17   at it briefly at one point.

18   Q    Isn't it true that that's a well-respected tool in the

19   industry?

20   A    It is.  I mean, in my understanding and in my experience

21   it is a well-respected tooling company.

22   Q    So maybe that should be in the upper level of the Magic

23   Quadrant?

24   A    Well, I don't know.  I'm not with Gartner, so ...  They

25   did their own analysis.

1   Q    Well, if you were doing an analysis based on what you

2   know, wouldn't it be up there?

3   A    I don't have enough knowledge to rank them about their

4   particular services.  I haven't done the research.

5   Q    But you would concede that Kroll is well-respected?

6   A    Yes, from my experience they're well-respected.

7   Q    Now, let's go to Plaintiffs' Exhibit 2, please.  This is

8   the KPMG statistical sampling document.  I wonder if you could

9   go to page 1, please.  Do you agree with the statement that

10  "Effective use of statistical sampling can help overcome the

11  concern about use of predictive coding technology by

12  quantifying the reliability of the system's technology assisted

13  predictive coding," as is stated there?

14  A    Yes, I think that statistical sampling can be used to test

15  and measure the reliability of any sort of search method that

16  you might use.

17  Q    And did you prepare the statistics that have been

18  presented in this case regarding the review of Georgia

19  Pacific's documents?

20  A    No.

21  Q    Do you know who did?

22  A    Prepare the --

23  Q    Who prepared the statistical report that has been

24  presented to plaintiffs and the Court regarding the review

25  process of the Georgia Pacific documents?

PDF created with pdfFactory trial version www.pdffactory.com

Koch - cross by Mogin                                    60

1   A    I don't know.

2            MR. NEUWIRTH:  Your Honor --

3            THE COURT:  Yes.  Hold on.  We have --

4            MR. NEUWIRTH:  When you refer to a report, can tell

5   us what you are referring to?

6            THE COURT:  I had the same question.

7            MR. MOGIN:  Your Honor, we can mark as Plaintiffs' 4

8   the November 22nd letter which I believe is Defendants' Exhibit

9   15.

10           THE COURT:  So now wait.  Why don't we identify --

11  okay.  So it's the November 22nd letter.  It is from who to

12  whom?

13           MR. MOGIN:  This is a November 22nd letter addressed

14  to Mr. Freed, Mr. Kanner, and myself.

15           THE COURT:  From the?

16           MR. MOGIN:  From counsel for Georgia Pacific Mr.

17  Neuwirth.

18           THE COURT:  Okay.

19           MR. MOGIN:  And it was presented by the defendants as

20  Exhibit 15 in this matter in their opening brief.

21           THE COURT:  Okay.  Thank you.  And we're now marking

22  this as Plaintiffs' 4, right?

23           MR. MOGIN:  Yes.

24           THE COURT:  Okay.

25  BY MR. MOGIN:

1   Q     Have you seen this letter before?

2   A     I do recall seeing this letter.

3   Q     Okay.  Now, if you'll look at page 5.  Do you have page 5

4   before you?

5   A     I do.

6   Q     And you'll see there's a paragraph there that refers to a

7   validation process where Counsel on Call determined with

8   99 percent confidence that the final set of search terms had no

9   more than a 5 percent margin of error in identifying documents

10  as not responsive to plaintiffs' document requests.

11           Did I read that correctly?

12  A     Yes, you did.

13  Q     Have you seen this before?

14  A     I do recall seeing this document.

15  Q     Have you seen the underlying statistical report -- have

16  you seen any underlying data that relates to this declaration

17  of 99 percent confidence level?

18  A     I haven't seen any under -- any other report.  I've seen

19  this document.

20  Q     Are you familiar with statistical reporting?

21  A     Not extremely.  I'm not a statistical person.

22  Q     Do you understand what this statistic means?

23  A     Only very generally.

24  Q     A layman's understanding, correct?

25  A     Sure.

1   Q    Is that the type of statistical reporting that KPMG is

2   referring to in Plaintiffs' Exhibit 2?  That is, the document

3   entitled "The Case for Statistical Sampling in eDiscovery."

4   A    I have the document in front of me again.  What was the

5   question?

6   Q    Is the report that you just read from Plaintiffs' 5; that

7   is, the November 22nd letter, the type of statistical reporting

8   that KPMG is endorsing in this brochure "The Case for

9   Statistical Sampling in eDiscovery?"

10  A    Well, we put out the document that talks about the case

11  for statistical sampling.  So, yes, we are -- you know, as a

12  firm we are -- we put out a white paper about statistical

13  sampling and using it to test results of your searches.

14  Q    Okay.  Is this report compliant with what KPMG has --

15          MR. NEUWIRTH:  Could you repeat the question, please.

16  BY MR. MOGIN:

17  Q    Is the report in Plaintiffs' 5 compliant with the type of

18  statistical reporting urged by KPMG in this document?

19  A    I don't understand your question.  Tell me again which

20  document you're referring to.  Is the report --

21  Q    Is the statistical report that's made there in Plaintiffs'

22  5, the November 22nd letter, reporting on the results -- the

23  search results of the KPMG docu -- of the Georgia Pacific

24  documents in which KPMG participated, is that statistical

25  reporting compliant with the type of statistical reporting

PDF created with pdfFactory trial version www.pdffactory.com

1  urged by KPMG in the document discussing the use of

2  statistics -- a statistical sampling in eDiscovery?

3  A    I don't know.  I haven't analyzed and digested both

4  documents together to compare them.  I couldn't tell you off

5  the top of my head.

6  Q    But you've marketed statistical sampling to your clients,

7  haven't you?

8  A    Yes.

9  Q    So you have an understanding of statistical sampling,

10  don't you?

11  A    Generally.

12  Q    Okay.  So can you read that report and make any sense of

13  it?

14  A    I mean, I can read it just the same you did.  I didn't

15  write it.  So, you know, I can sit here and read it to you.  I

16  guess what's the question?  Does it make sense?

17  Q    That's fair enough.

18       All right.  Let's go to, if you would, page 5 of the

19  statistical sampling document.  Now, you mentioned in your

20  direct testimony something about a random sample.

21  A    Yes.

22  Q    Were you using that term in a statistical sense, or were

23  you using that term in a more generic sense?

24  A    In a generic sense based on how Clearwell implements that

25  technology and ability to pull a random sample.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q    But you understand that the term random sample is, in

2    fact, a term of art in statistics, correct?

3    A    I do.

4    Q    Now, and you will concede, will you not, that the random

5    sample that you discussed earlier was not a statistically

6    correct random sample?

7    A    I couldn't say.  I don't know.  I'm not a statistics

8    person.

9    Q    You did no statistical measurements to determine if the

10   statistical -- if the random sample complied with good

11   statistical practice?

12   A    We weren't involved with the statistical piece of it.  We

13   applied and pulled the random sample based on the information

14   we were given.  So they would say, please create a random

15   sample with this many documents.  And we would apply that in

16   Clearwell and then provide the results.

17   Q    So you created the random sample?

18   A    Technically we clicked the buttons in Clearwell to create

19   the random sample.

20   Q    Do you know what you did besides clicking buttons?

21   A    Yes.  We received either a number of documents to use to

22   pull a certain number of documents randomly or a percentage.

23   Q    In other words, a quantity of documents?

24   A    That's correct.

25   Q    Okay.  And were they -- were the documents somehow

PDF created with pdfFactory trial version www.pdffactory.com

1   identified?  Was there a numerical indicator on the documents?

2   How did you know which documents to pull?

3   A    Oh.  Based on whatever document set they asked us to go

4   to.  So if it was the null set, they may say, you know, go pull

5   a certain number of documents from the null set.  So that's

6   where we would go.  That's the collection of documents we would

7   go to create the random sample.

8   Q    A certain number of documents?

9   A    Sometimes it was a certain number, but also sometimes it

10  was a percentage as well.  There's two --

11  Q    So how --

12  A    Sorry.  I wasn't finished.

13  Q    Go ahead.

14  A    There's two options in Clearwell that you can do, either a

15  number of documents or a percentage.

16  Q    And beyond knowing that you followed the Clearwell

17  constructions, you're not aware of whether or not this was a

18  statistically valid random sample?

19  A    No, we're not -- we weren't involved in that piece of it.

20  Q    So if, in fact, that random sampling method was not

21  statistically valid, then your entire testimony about the

22  random sample would be invalid, wouldn't it?

23  A    I don't know.  I'm not, I'm not the statistics person.  I

24  don't know what you mean.

25  Q    So who gave you the instructions to pull a particular

1    number of documents?

2    A    GP or Counsel on Call.

3    Q    Do you recall which?

4    A    It was -- in some cases it would have been Counsel on

5    Call.  In some cases it would have been perhaps outside

6    counsel.  I mean, everybody was involved, you know, during the

7    whole project as a team.

8    Q    Do you recall who gave you the specific -- which person

9    gave you the specific instructions regarding the random sample?

10   A    No, not off the top of my head.  There were multiple

11   occasions where we were doing that.

12   Q    How many random samples did you pull?

13   A    I don't remember off the top of my head.

14   Q    Well, do you have any idea?

15   A    It was, it was several.

16   Q    Two or three?

17   A    I think it was more than that.

18   Q    Is there any relationship in your understanding between

19   the number of random samples and the confidence -- strike that.

20        Confidence level in statistics?

21   A    No.  I don't, I don't know.

22   Q    Let's go back, if we can, to statistical sampling.  And to

23   save time I wondered if you would please look at page 5.

24        THE COURT:  Of your -- of 2 or 3?

25        MR. MOGIN:  This is --

Koch - cross by Mogin                                      67

1          THE COURT:  Of Canada or the United States?

2          MR. MOGIN:  This is the United States, Your Honor.

3          THE COURT:  So that's -- so now we're on Plaintiffs'

4    2.  What page?

5          MR. MOGIN:  This is Plaintiffs' 2, page 5.

6          THE COURT:  Page 5.  Do you have it, sir?

7          THE WITNESS:  I do, yes.  I don't have stickers on

8    mine, so I had to pull the -- I've got it, though.

9    BY MR. MOGIN:

10   Q    All right.  Very good.  "Measuring and assuring process

11   quality," do you see that?

12   A    Yes.

13   Q    And did you have some responsibility for quality control?

14   A    Well, we were assisting in the search and the test and we

15   would apply, you know, the criteria that they gave us.  So,

16   yes.

17   Q    All right.  And so did you apply statistical measures?

18   A    We applied the numbers that they gave us to pull the

19   random samples.  So if they told us to pull, you know, 500

20   documents, a random sample from this collection, we would make

21   sure that we plugged in the right number to pull.

22   Q    Okay.  So let's start at where it says "Measuring and

23   assuring process quality."  KPMG in this document says, "The

24   ability to carefully select a sample and infer from it the

25   condition of a larger population with a high degree of

PDF created with pdfFactory trial version www.pdffactory.com

1    confidence in the reliability of the inference has tremendous

2    utility in electronic discovery," correct?

3    A    Yes.

4    Q    In KPMG's test projects the software consistently recalled

5    a greater number of relevant documents than the human reviews

6    did, is that correct?

7    A    Yes.

8    Q    And were you involved in any of those tests that are

9    referred to here?

10   A    No.

11   Q    Are you aware of the results of those tests?

12   A    Generally, yes.

13   Q    So KPMG has conducted tests on predictive coding software,

14   is that correct?

15   A    We have.

16   Q    And they did so for a number of years before they rolled

17   out their own proprietary product, correct?

18   A    Well, sir, we don't have a, we don't have a proprietary

19   product in Discovery Radar.  We implemented Equivio Relevance

20   into Discovery Radar.  And so we -- sure, we did tests before

21   we put it in.  You know, I don't think it was going several

22   years back, but definitely we sort of tested the system before

23   we implemented it into Discovery Radar, sure.

24   Q    I'm sorry.  I misunderstood.  I had thought that Radar was

25   a proprietary product of KPMG's.

Koch - cross by Mogin                                    69

1    A    Discovery Radar is a proprietary product of KPMG's, and we

2    licensed Equivio Relevance to put into Discovery Radar.  So

3    that piece of it is Equivio Relevance, but it's implemented

4    into -- sorry if I wasn't clear before.  It was implemented

5    into Discovery Radar.

6    Q    Similar to what they do in the UK with the Autonomy

7    product?

8    A    I suppose.  I'm not familiar with how they use Autonomy

9    over there.

10   Q    All right.  Now, let's go to the next part of this, which

11   says, "Demonstrating and assuring process capabilities to

12   defend a technology assisted review is a matter of, 1, sound

13   design; 2, transparency; and 3, quantifiable results."  Do you

14   agree with that?

15   A    Sure.

16   Q    Let's talk here about sound -- well, let's first talk

17   about transparency.  What do you understand transparency to

18   mean in this context?

19   A    Something that is, that is clear for those to see and

20   understand the process that's being applied.

21   Q    And does transparency have some relationship to

22   replicability?

23   A    To --

24           THE COURT:  To what?

25   BY MR. MOGIN:

Koch - cross by Mogin                                    70

1    Q    Replicability.  The ability of another person to replicate
2    the results.
3    A    Sure, I think it does.
4    Q    All right.  And can you tell me what has been done in this
5    particular case to assure transparency.
6    A    Well, I know that the keywords were shared with others to
7    take input, and so that was a transparent process.  And there
8    was input sought on how to build, you know, an appropriate
9    keyword list.
10   Q    This is referring to transparency in the statistical
11   results, isn't it?
12   A    Our document is, yes.
13   Q    Yes.  Okay.  So let me then rephrase the question.
14        What transparency of the statistical results to your
15   knowledge has occurred in this case?
16   A    Well, I mean, I guess this letter right here that you were
17   pointing to earlier.  I don't have a sticker on mine, so I
18   don't know what exhibit it is.  But I suppose that that lays
19   out, you know, what they did, which I would consider
20   transparent.
21   Q    Are you aware of any other transparency in statistical
22   reporting that's occurred in this case?
23   A    I'm not aware of all the communications back and forth
24   between GP and plaintiffs.
25   Q    But the question was transparency in statistical

1    reporting.

2    A    Well, I would assume that that's where it would come with

3    the communications back and forth.

4    Q    What statistical reports have you seen?

5    A    I've seen this document that you referred to earlier as a

6    statistical report, which is a letter.  And I haven't seen any

7    other underlying statistical reports that have been generated.

8    Q    Are you making some distinction between statistical

9    reports and some other document that has statistics in it?

10   A    No.  No.

11   Q    Okay.  So the November 22nd letter is the only statistical

12   report that you're aware of in this case?

13   A    Yes.

14   Q    From GP?

15   A    Yes.

16   Q    Now, you oversaw the project, correct?

17   A    I oversaw KPMG's engagement to GP, which helped with the

18   processing and hosting of documents and applying search terms

19   and pulling random samples and things like that, sure.

20   Q    Well, now, in fact, KPMG wasn't retained until May 4th, is

21   that right?

22   A    We were retained in May.

23   Q    You were retained in May.  In fact, May is when you put in

24   a bid, correct?

25   A    Yes.

1   Q    Can you tell me the parameters of that bid?

2   A    We put in a bid to provide processing and hosting and help

3   with the search, and I think that was, I think that was

4   essentially it.

5   Q    It was a financial bid.  You stated a price for these

6   services?

7   A    Yes.

8   Q    And was it your understanding that the lowest bidder was

9   going to win?

10  A    No.  In fact, I know we weren't the lowest bidder.  They

11  let us know that right away.

12  Q    Were there higher bidders?

13  A    Higher than us?

14  Q    Yes.

15  A    I'm not sure.

16  Q    Do you know who the other bidders were?

17  A    I don't.

18  Q    Do you know how many other bids there were?

19  A    I certainly don't, no.

20  Q    Were there more than two?

21  A    I just said I don't know.

22  Q    Well, when was this lawsuit filed?

23  A    I don't remember off the top of my head.

24  Q    Do you have any understanding?

25  A    I don't remember when it was filed.

PDF created with pdfFactory trial version www.pdffactory.com

Koch - cross by Mogin                                    73

1    Q    Was it before May?

2    A    I'm sure it was if they were engaging us in May and had

3    already, you know, had data for us to process.  Then I would

4    assume that it would be, yes.

5    Q    In fact, you know it was in 2010, don't you?

6    A    I don't know that for a fact.

7    Q    Have you reviewed the complaint in this case?

8    A    I'm sure I read it at some point, but I just don't recall

9    off the top of my head.

10   Q    Would the case number of the case inform you of the year

11   that the case was filed?

12            THE COURT:  Okay.  I think they'll stipulate to that.

13            MR. NEUWIRTH:  We'll stipulate.

14            THE COURT:  Okay.  All right.

15   BY MR. MOGIN:

16   Q    All right.  Having now heard that the case was filed in

17   2010, in fact, in September of 2010, in your professional

18   experience is that consistent with good preservation or

19   identification practice; that is, to wait approximately nine

20   months before engaging vendors?

21            MR. NEUWIRTH:  Objection.

22            THE COURT:  Okay.

23            MR. NEUWIRTH:  There is -- now, there's a complete

24   lack of foundation.  There hasn't been any testimony on the

25   steps that were taken to preserve documents or when.

 1              THE COURT:  All right.

 2              MR. NEUWIRTH:  And he testified he was not involved

 3    in that step.

 4              THE COURT:  All right.  A couple things.  You can

 5    answer that specific thing, but it is now a quarter to 11.  I'm

 6    a little concerned on our other two witnesses who are supposed

 7    to be on this morning.  I'm just reminding you.  It's your

 8    hearing, not mine.  But I am reminding you of the other two

 9    people.  And can you rephrase.  Take the keyword out.  I mean,

10    I don't think -- I think of everything that's on the issue here

11    today I don't think we're talking about preservation.  At least

12    nobody has said preservation until now.  If you're interjecting

13    a new issue here.

14    BY MR. MOGIN:

15    Q    Well, you testified, Mr. Koch, that it was important to

16    have proper --

17              THE COURT:  They can't hear you.  So if --

18              MR. MOGIN:  I'm sorry.

19              THE COURT:  The lawyers can't hear you.  Okay.

20    BY MR. MOGIN:

21    Q    Didn't you testify on direct about what was essentially

22    the five or six steps that were necessary in order to go

23    through a proper practice, a proper review that incorporated

24    best practices?

25    A    Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q    Okay.  And you understood and didn't you testify about the

2  importance of proper identification of the documents as one of

3  the steps that was to be taken?

4  A    Yes, of identification of ESI.

5  Q    Of ESI.

6  A    Yes.

7  Q    Okay.  And you talked in terms of custodians, correct?

8  A    I did.

9  Q    But you're aware that there can be other sources of ESI

10 within an enterprise, correct?

11 A    Yes.

12 Q    In fact, you in your practice I venture to say have found

13 relevant documents, responsive documents in places other than

14 custodial locations, isn't that true?

15 A    I'd say responsive information, sure.

16 Q    And what do you understand to be the nature of this

17 lawsuit?

18 A    I understand at a high level that it's about price fixing.

19 Q    Have you worked on any price fixing engagements before?

20 A    I'm certain I have, but I can't recall any off the top of

21 my head.  We work on just a ton of different matters, and a lot

22 of times we're not really deep into the substance of the

23 matters.

24 Q    Okay.  If I misspeak, Her Honor will correct me, but you

25 understand that the crux of this lawsuit has to do with

1    conspiracy; correct?

2    A    Yes.

3    Q    And does that have any implications with respect to the

4    identification of documents in your practice?

5    A    Whether or not conspiracy has any implication?

6    Q    That's right.

7    A    Sure.

8    Q    How so?

9    A    Well, I suppose if you were doing an investigation and you

10   may, you know -- and you had a conspiracy, you would want to

11   make sure that you identify, you know, the appropriate

12   documents to gather.

13   Q    All right.  Very good.

14        MR. MOGIN:  Your Honor, I will try to move as quickly

15   as I can in light of your admonition regarding the time.  May I

16   suggest the following:  In light of the time implications,

17   since we have Plaintiffs' 2 and 3 in, the two KPMG documents,

18   if I can move their admission in and if we can -- well, if

19   those are in evidence, then I can dispense of questioning the

20   witness with respect to these documents.

21        THE COURT:  Do you have any objection, Mr. Neuwirth?

22        MR. NEUWIRTH:  Well, I only have an objection to the

23   idea that the documents we introduced which are clearly ready

24   to be entered into evidence would be adjourned based on Mr.

25   Mogil's comments but his would come in.  We have no objection

Koch - cross by Mogin                           77

1    to everything coming in.

2              THE COURT:  Right.  Do you have any objection to

3    theirs?  This is a little horse trading we have going on here.

4        (Laughter.)

5              MR. MOGIN:  Good enough, Your Honor.

6              THE COURT:  Good enough.  Good enough.  In Chicago

7    this is how we do it.

8        (Laughter.)

9              THE COURT:  We let it all in.  We'll worry about it

10   later.  Okay.

11       (Whereupon, Plaintiffs' Exhibits 2 and 3 and Defendants'

12        Exhibits 1 and 2 were received in evidence.)

13             MR. MOGIN:  May I have just a moment please, Your

14   Honor.

15             THE COURT:  Sure.  No, take your time.  Take your

16   time.

17       (Brief pause.)

18   BY MR. MOGIN:

19   Q    So you had nothing to do with -- or KPMG had nothing to do

20   with the collection and preservation steps, is that correct?

21   A    I'm sorry?

22   Q    Is it correct that KPMG was not involved in the collection

23   and preservation steps in this case?

24   A    That's correct.

25   Q    So you don't know whether the documents that were received

Koch - cross by Mogin                                              78

1   were from the proper custodians, correct?

2   A    They had -- they provided us with a hard drive of data

3   that had already been collected.  That's where we, that's where

4   we got involved.

5   Q    And you don't know the locations from where that was

6   collected, correct?

7   A    Only based on what we saw from the hard drive with the

8   data on it that had already been collected.  I mean, there's

9   obviously mail files and things on there and things like that,

10  so we assumed that they got them from their mailbox.

11  Q    But you don't know if backup drives were searched?

12  A    We didn't go do the collection.

13  Q    You don't know if the share spaces were searched?

14  A    We didn't get involved in doing the collection.

15  Q    And you're not aware of the time period for which the

16  search was conducted, are you?

17  A    I'm sure I've seen it at some point, but I can't recall

18  what it is off the top of my head.

19  Q    KPMG didn't have any input into the planning of the search

20  and collection process, correct?

21  A    That's correct.

22         MR. MOGIN:  All right.  Your Honor --

23         THE COURT:  Hold on.  Hold on.

24      (Brief pause.)

25         THE COURT:  Okay.  Thank you.  I don't have any other

1    questions.

2            MR. MOGIN:  Thank you.

3            THE COURT:  Okay.  Mr. Neuwirth, do you have any

4    more?

5            MR. NEUWIRTH:  We have no questions, Your Honor.

6            THE COURT:  Okay.  Thanks, Mr. Koch, for coming and

7    we hope you can stay.  Okay.

8            THE WITNESS:  Thank you.

9        (Witness excused.)

10           THE COURT:  All right.  And you can call your next

11   witness, please.

12           MR. MAROVITZ:  Your Honor, Andy Marovitz for

13   Temple-Inland.  We'd like to call Dan Regard, please.

14           THE COURT:  Okay.  Oh, you're not calling Counsel on

15   Call next?

16           MR. MAROVITZ:  We were going to call Counsel on Call

17   after Mr. Regard.

18           THE COURT:  Okay.  Then we'll hear from Mr. Regard.

19   Come on up, Mr. Regard.

20       DAN REGARD, DEFENDANTS' WITNESS, DULY SWORN

21                    DIRECT EXAMINATION

22   BY MR. MAROVITZ:

23   Q    Mr. Regard, good morning.

24   A    Good morning, sir.

25   Q    Introduce yourself please to the Court.

Regard - direct by Marovich                                    80

1   A     My name is Dan Regard.

2   Q     Mr. Regard, where are you currently employed?

3   A     I work at Intelligent Discovery Solutions in Washington,

4   D.C.

5   Q     Is that also known as IDS?

6   A     It is.

7   Q     What's the business of IDS?

8   A     We provide consulting services and technology services in

9   a litigation context to companies and to parties involved in

10  litigation.

11  Q     What's your current position at IDS?

12  A     I'm currently the CEO and managing director.  I'm also one

13  of the two cofounders.

14  Q     Have you been retained to reach expert opinions in this

15  case?

16  A     I have been, yes.

17  Q     Have you, in fact, reached such opinions?

18  A     Yes, sir, I have.

19  Q     What are those opinions?

20  A     I've reached four opinions in this case.  No. 1, I've

21  reached the opinion that the search methodologies used by the

22  defendants in this case were consistent with my experience and

23  my understanding of best practices.  My second opinion is that

24  the custodial centric approach that the defendants used to

25  identify key players and documents within their organizations

Regard - direct by Marovich                          81

1    is also consistent with my prior experience and with best

2    practices.

3           My third opinion is that the manner in which ESI has

4    been produced by the defendants in this case is sufficiently

5    robust to provide the receiving parties significantly

6    equivalent access to those documents as the defendants had in

7    the usual course of business.  And my fourth opinion is the

8    manner in which the defendants have handled the process for

9    considering offline media is consistent with best practices.

10   Q    We'll talk about the specifics of those opinions in a

11   moment, but first let's find out about your experience and

12   expertise and your qualifications in order to offer those.

13          Tell us something about your college education.

14   A    I have an undergraduate degree in computer science, with a

15   math minor from the University of Southwestern Louisiana.  If

16   you look that up, the university has changed its name a few

17   times.  It's now the University of Louisiana in Lafayette.

18   After college I spent a few years consulting on computer

19   science and litigation issues.  And then I pursued and earned a

20   masters of business from Tulane University, as well as a law

21   degree from Tulane.  I have a third -- it's not a degree.  It's

22   a certificate of specialty in European legal practice.

23   Q    Other than your education, what work, if any, has helped

24   you gain the necessary experience and expertise to lead IDS?

25   A    Well, from a technology and litigation perspective, I've

PDF created with pdfFactory trial version www.pdffactory.com

1    been working with technology and computers in a litigation

2    context since the late 1980s, developing financial forecasting

3    and courtroom exhibits.  I've had a number of my own companies,

4    including during and after law school for scanning and coding

5    and preparation of document repositories.  In terms of

6    leadership, I've been responsible at Deloitte & Touche, FTI

7    Consulting, and LECG, three companies specializing in

8    consulting and expert services, developing and leading

9    regional, national, and international teams for electronic

10   discovery services.

11   Q     Mr. Regard, have you ever lectured to lawyers or to law

12   students on eDiscovery issues?

13   A     Yes, sir, I have.

14   Q     On what occasions?

15   A     I'm called upon on a fairly regular basis to lecture at

16   various law schools up and down the eastern seaboard.  Most of

17   the time that's George Washington, Georgetown, George Mason,

18   American, Temple, Penn Law.  I make presentations for CLE

19   credit or for -- just for presentation purposes to a variety of

20   law firms.  And I've been a present lecturer at the Georgetown

21   Advanced Institute for eDiscovery, at the Masters Conference,

22   and at special events put on by Sedona.

23   Q     Do you belong to any professional associations?

24   A     I do.  I belong to the Louisiana Bar Association, although

25   I'm not a practicing attorney.  I belong to the American Bar

Regard - direct by Marovich                          83

1   Association and the International Bar Association.  I belong to

2   the Sedona Working Group 1 on domestic issues for electronic

3   discovery.  I belong to Sedona Working Group 6 on international

4   issues for disclosure, discovery, and privacy.  I belong to the

5   High Tech Computer Crimes Investigation Organization.  I belong

6   to the International Computer Forensics Professionals

7   Organization.

8           I'm a director of the Georgetown Advanced Institute

9   for eDiscovery.  I am on the cabinet of the -- the educational

10  cabinet for the Masters Conference for Legal Professionals.

11  I'm a member of the American College of eNeutrals, a director

12  as well.  There may be a few others on my resume.

13  Q    Have you ever offered testimony to the Rules Committee?

14  A    I have.  I had an opportunity to speak to the Rule

15  Committee in Dallas in preparation for the amendments

16  ultimately that made it into the 2006 changes.

17  Q    Have you written any scholarly articles on eDiscovery

18  topics?

19  A    I've written a number of articles that have appeared in

20  trade magazines.  But most recently I was fortunate enough to

21  co-author a chapter on eDiscovery of databases in an eDiscovery

22  desk manual published under the ABA by Judge Grimm and Michael

23  Berman and Courtney Barton.

24          I've participated in Sedona since its inception,

25  Working Group 1.  So the original Sedona principles, I

PDF created with pdfFactory trial version www.pdffactory.com

1    participated in the drafting of those.  Most recently I've been

2    on the smaller drafting steering committee for the

3    international principles through Working Group 6.  It's a lot

4    of stuff.  And we also published at the end of last year the

5    database principles for database discovery.

6              MR. MAROVITZ:  Your Honor, may I approach.

7              THE COURT:  Yes, of course.

8    BY MR. MAROVITZ:

9    Q    Mr. Regard, I'm handing you what's been marked as

10   Defendant's Exhibit 3 for identification.  Identify for us, if

11   you will, Defendants' Exhibit 3.

12   A    This is a copy of my resume.

13   Q    Who prepared it?

14   A    I did.

15   Q    Is it current or very recent in time?

16   A    It's very recent.  For example, I noticed that some of the

17   publications listed as pending have now been published.

18   Q    To the best of your knowledge does it accurately summarize

19   your educational and professional eDiscovery experience through

20   the date on which it was drafted?

21   A    Yes, sir, it does.

22             MR. MAROVITZ:  Your Honor, we'd like to move to have

23   admitted Defense Exhibit 3 into evidence.

24             THE COURT:  Any objection?

25             MR. MOGIN:  No objection.

Regard - direct by Marovich                    85

1          (Whereupon, Defendants' Exhibit 3 was received in

2          evidence.)

3   BY MR. MAROVITZ:

4   Q    Mr. Regard, what sorts of real world eDiscovery services

5   does IDS provide to companies seeking eDiscovery advice?

6   A    Well, let me first clarify we work with individual

7   litigants, not just companies.  We provide advice in the early

8   onset of litigation in helping companies identify potential

9   locations for electronically stored information.  We help them

10  understand from a computer perspective their architecture.  We

11  help them collect information from a variety of sources,

12  whether it's individual computers, laptops, servers.  We work

13  with IT departments to export data off of larger systems.  We

14  work to define and extract data off of enterprise applications

15  or databases.  We also take possession of that data very often,

16  and we will transform it or process it.

17          We provide also hosting services either directly

18  through tools that we license or through partnership with other

19  companies that do the hosting for us or for our clients.  We

20  help clients segregate documents.  We help them execute

21  searches across large collections of documents.  We help them

22  prepare the documents for review.  And then we're often called

23  upon to prepare the documents for production, to Bate stamp

24  them, to package them up, to export them.

25  Q    Have you ever been qualified as an expert in court in

1    eDiscovery matters?

2    A    Yes, sir.

3    Q    And has any court ever rejected your qualifications as an

4    expert?

5    A    No, sir.

6    Q    Have you ever served as a court appointed neutral expert

7    in eDiscovery?

8    A    I have.

9    Q    On what occasions?

10   A    I had an occasion quite a few years ago to be a court

11   appointed forensics neutral in a dispute between two parties to

12   actually go in and execute forensics activities as a neutral.

13   But more recently I was appointed in Washington D.C. as a court

14   appointed special master on an ESI dispute involving an FTC

15   investigation.

16   Q    And who was the judge?

17   A    Judge John Fasciola.

18          MR. MAROVITZ:  Your Honor, may it please the Court.

19   We tender Mr. Dan Regard as an expert witness in the field of

20   ESI.

21          THE COURT:  Mr. Mogin, can you do any questions about

22   his qualifications on your cross?

23          MR. MOGIN:  Your Honor, I haven't been provided

24   sufficient information to do so, but I will attempt to do so

25   and I will not at this point stipulate.

Regard - direct by Marovich                    87

1          THE COURT:  Good.  Thank you.

2          MR. MOGIN:  And I would repeat the arguments that we

3    made earlier in our filing regarding legal opinions dressed up

4    as ESI opinions.

5          THE COURT:  Right.  And I took it very seriously.

6    And certainly in a decision will take that into consideration.

7    For today -- we just have so much on our plate here today.  I'm

8    not going to try to distinguish one from the other.  Okay.  All

9    right.  Do you agree with that?  Whether you agree with it or

10   not, that's the ruling.

11       (Laughter.)

12         MR. MOGIN:  I understand, Your Honor, but that

13   basically requires me then to say I will just have a running

14   objection and I won't be jumping up.

15         THE COURT:  I was just going to say you can certainly

16   make objections if, particularly if something's -- your record

17   is preserved that you -- in general it's preserved, okay.

18         MR. MOGIN:  So shall I jump up and make objections?

19         THE COURT:  Yes, start off jumping up.  Why not.

20   Okay.  Try not to have legal conclusions, though, because that

21   is frankly my job.

22         MR. MAROVITZ:  We agree, Your Honor.

23         THE COURT:  Okay.  Thank you.

24   BY MR. MAROVITZ:

25   Q    Mr. Regard, what role have you had in defendants'

1   discovery protocol here?

2   A    Well, I was first hired by the defendants sometime in the

3   spring or summer of last year.

4              THE COURT:  The defendants or a defendant?

5              THE WITNESS:  A single defendant, Your Honor.

6              THE COURT:  And who was that?

7              THE WITNESS:  That would have been Temple-Inland.

8              THE COURT:  Oh, Temple.  Okay.  Thank you.

9              THE WITNESS:  Temple hired me to advise them on some

10  of their self-collection techniques and the tools that they

11  were using, which I did.  And then more recently I was brought

12  back into this case in order to provide the opinions for

13  today's hearing.

14  BY MR. MAROVITZ:

15  Q    What information did you receive with respect to the ESI

16  process?

17  A    With respect to preparation for this hearing?

18  Q    And to render your opinions in this case.

19  A    I've been granted copies and access to correspondence, to

20  pleadings, to document requests.  I've been granted copies of

21  30 (b) 6 disclosures made by the defendants, and I've had an

22  opportunity to talk to the defendants' -- counsel for the

23  defendants and consultants for the defendants.

24  Q    And how did you go about obtaining that information that

25  you've just described?

PDF created with pdfFactory trial version www.pdffactory.com

Regard - direct by Marovich

1   A    Well, the documents were provided to me by counsel for

2   Temple-Inland.  The conversations, I was permitted access to

3   scheduled conference calls and speak to them directly.

4   Q    Did you receive sufficient information first with respect

5   to Temple-Inland and its consultants to allow you to evaluate

6   its ESI process?

7   A    Yes, sir.

8   Q    Would you have simply assumed as part of your work that

9   all the other defendants' ESI processes were the same as

10   Temple-Inland's?

11   A    Well, there's a certain amount of cooperation is my

12   understanding that the defendants engaged in to develop their

13   initial set of search terms, so there was some similarity on

14   the work product.  Downstream from that I found differences,

15   and I did not make the assumption.  I think the differences are

16   spelled out in the 30 (b) 6 disclosures.  And it's also what I

17   confirmed or learned in the course of my conversations with the

18   individual defendants.

19   Q    And by the 30 (b) 6 disclosures, do you mean the letters

20   that counsel sent to the plaintiffs to describe processes in

21   response to a 30 (b) 6 deposition notice received by the

22   defendants?

23   A    That's my understanding.  Both the letters and I believe

24   in the case of some of the defendants, at least one, subsequent

25   addendums or additional information sent.

1  Q    With respect to all of those other defendants, did you

2  receive sufficient information to allow you to evaluate their

3  ESI processes?

4  A    Yes, sir.

5  Q    Mr. Regard, are you being paid for your testimony today?

6  A    I am.

7  Q    At what rate?

8  A    525 per hour.

9  Q    Does that rate or the amount that you're paid depend in

10 any way on the outcome of this hearing or the outcome of this

11 case?

12 A    It does not.

13 Q    I want to talk about ESI best practices now with you.  Mr.

14 Regard, what are the industry best practices by which ESI

15 gathering and production are measured?

16 A    Well, I think it's the principles that we measure them by.

17 As to best practices, we execute to achieve those measurement

18 principles.  The principles, and there are many, but the ones I

19 find are relevant here are the first principle is that we

20 expect that parties will do a diligent job to find electronic

21 discovery, but there's not an expectation they will find every

22 single document.

23         MR. MOGIN:  Objection, Your Honor.  I think when

24 we're talking about -- he's divided this into principles and

25 best practices.  I think that principles are derived from law,

Regard - direct by Marovich                    91

1    and that's a legal matter.  Now, the best practices that are

2    used to implement the law or to comply with the law is a

3    different issue.  But I don't think that this witness can

4    testify as to the principles.

5              MR. MAROVITZ:  I disagree, Your Honor.  And why don't

6    you give us -- Your Honor with your indulgence, we could ask

7    where those principles are derived.

8              THE COURT:  Well, I wanted to know where they came

9    from.

10             MR. MAROVITZ:  Sure.  So Mr. --

11             THE COURT:  So let's figure out where they came from

12   first.

13             THE WITNESS:  Well, when I talk about principles, I

14   rely heavily on the work that I've participated in at the

15   Sedona Conference.  But not everything that we've done at the

16   Sedona Conference has been written up as a -- under the title

17   principle.  We have a number of papers that we've published

18   that have recommendations, best practices, or scholarly work on

19   the area of electronic discovery.  So that when I say a

20   principle, I'm talking generically what I derived from the work

21   that we'd done in the Sedona Conference and in other

22   conferences and think tanks I participate in.

23             The Sedona Conference is --

24             THE COURT:  Well, Mr. Mogin -- let me ask Mr. Mogin.

25   Well, when a person is both a consultant expert in an area, and

PDF created with pdfFactory trial version www.pdffactory.com

Regard - direct by Marovich                    92

1    that seems like Mr. Regard's primary work is in eDiscovery or E

2    consulting.  When he's using the word principle, I mean what --

3    tell me what your objection is here so just the record is

4    clear.  Tell me what your objection is.

5            MR. MOGIN:  I think that principles, Your Honor --

6    there's a distinction between principles and best practices.

7    And that when you unpeel the onion, that principles really are

8    matters of law.  That is what the Courts and Congress have said

9    are the requirements of law that apply to discovery whether

10   it's eDiscovery or other discovery.  Now, how that gets

11   implemented would be best practices.  So if I could use an

12   example.

13           Miranda in a criminal context would be a principle.

14   The giving of a Miranda warning as proper police procedure

15   would be a best practice.

16           MR. MAROVITZ:  Your Honor, if I may.

17           THE COURT:  Yes.

18           MR. MAROVITZ:  I think Mr. Mogin's testifying.  The

19   fact is that Mr. Regard is prepared today to explain where the

20   material that he replies upon comes from, the life's work he's

21   done in ESI, and the fact that he is not trying to take your

22   job in interpreting what the law is.  The Court is well able to

23   interpret his opinions today and apply it to the law.

24           THE COURT:  I think that it was his choice of words

25   that started this debate.  I mean, I think if he is -- I think

Regard - direct by Marovich          93

1  what Mr. Mogin said is if he is talking about best practices,

2  okay, he can talk about best practices.  Then on

3  cross-examination we're going to find out if -- you know, what

4  does he base his best practices on, I think.  Is that correct?

5  Is that what you were saying?

6           MR. MOGIN:  Depending, yes, Your Honor.

7           THE COURT:  And his experience.  I mean, I think

8  that's it.  I think it was the principle word that got us

9  tripped up.  Okay.

10          MR. MAROVITZ:  Let me reload.

11          THE COURT:  Yes.

12  BY MR. MAROVITZ:

13  Q    We were talking a minute ago about the industry best

14  practices by which ESI gathering and production are measured.

15  And to provide context, I think your answer in general was that

16  there were several.  One of which was that you can't expect to

17  get every single document wherever it's located in the company.

18  So was that right, and what were the other ones that you were

19  testifying to?

20  A    So that is correct.  As a best practice litigants and

21  producing parties should strive to produce as much electronic

22  discovery as possible, but must realize they cannot produce a

23  hundred percent of every document because of the complexity and

24  diversity of our systems.  That No. 2, as a best practice

25  litigants should strive, or parties should strive, not

PDF created with pdfFactory trial version www.pdffactory.com

1    necessarily litigants -- it could be third parties -- to use

2    technology to cope with the volumes of electronic discovery and

3    electronic documents that we have today.  And that also as a

4    best practice when that technology is used, there should be

5    some type of quality assurance testing to verify or to satisfy

6    concerns that the technology is applied correctly.

7    Q    And does that last step that you spoke of, does that

8    include in some cases testing the remaining corpus or what's

9    been called today the null set?

10   A    That has more recently emerged as a best practice.

11   Absolutely.

12   Q    Now, with those best practices in mind, let's discuss what

13   you did in this case to determine whether or not they were met.

14   Please provide the Court with a general overview of what you

15   learned with respect to defendants' processes here.

16   A    Well, a lot of what I'm going to talk about has already

17   been described in the disclosures and the correspondence, but

18   I'm happy to repeat it.  My understanding is that during the

19   course of the litigation the filing of the complaint, the

20   correspondence, the pleadings, and the requests for production,

21   that the defendants have assembled together a list of terms

22   that have been made known to them through the allegations and

23   requests.  And that I call this in my own vernacular the seed

24   set of search terms and queries have been put together through

25   a collaboration with the various defendants.  And actually the

1   task was taken by Georgia Pacific to test those.

2           And that testing, as earlier testimony indicated, was

3   an iterative process where search terms were applied against a

4   corpus of documents.  The results were examined.  The null set

5   was examined.  The search terms were revised and tested again.

6   At some point in that process the search terms, it's my

7   understanding, were shared with the plaintiffs.  Feedback was

8   received on the quality or perceived lack of quality of those

9   search terms, and they were modified as a result.  And then at

10  some point subsequent the search terms, again the seed set now

11  revised and modified, was distributed to different defendants.

12  And each of the defendant groups took those search terms,

13  adapted them to their individual organizations, and ran them

14  against information they had collected as potentially

15  responsive to this litigation.

16          And that when they finished applying these search

17  terms to that collection that they had, that each of the

18  defendants in their own way tested the residual documents,

19  again their individual null sets, if you will, as a verifica-

20  tion process to collaborate the success of the search terms.

21  Q    Mr. Regard, I'm handing you what's been marked as

22  Defendants' Exhibit 4 for identification.

23  A    And I just said collaborate.  I should have said

24  corroborate.

25          MR. MOGIN:  Again, Your Honor, for the record this is

PDF created with pdfFactory trial version www.pdffactory.com

Regard - direct by Marovich                          96

1   not a document we have seen before.

2   BY MR. MAROVITZ:

3   Q    Mr. Regard, do you recognize Exhibit 4?

4   A    Not in this size.  Yes, sir, I do recognize it.

5   Q    My eyesight is getting worse, and so we've got to make

6   things wider.

7   A    It is unfortunately.

8   Q    What do you recognize Defense Exhibit 4 to be?

9   A    This is an exhibit that I had pulled together.  I actually

10  set it up, and my team and I helped pull this document

11  together.  This reflects some of the information I gathered

12  from the pleadings, the disclosures, and my conversations with

13  individual defendants.

14  Q    Did you oversee the document's creation?

15  A    I did.

16  Q    Is Defense Exhibit 4 a fair and accurate summary of the

17  facts elicited during your interviews and that you culled from

18  the documents that you reviewed that relate to the issues that

19  are contained on Exhibit 4?

20  A    It is.

21  Q    And to the best of your knowledge are the facts and -- are

22  the facts that are contained on Exhibit 4 accurate?

23  A    To the best of my knowledge, yes.

24       MR. MAROVITZ:  Your Honor, we move for admission of

25  Defense Exhibit 4 into evidence.

Regard - direct by Marovich                    97

1          MR. MOGIN:  Your Honor, we object.  This is a bit of

2     an ambush to be frank about it.

3          THE COURT:  It's what?

4          MR. MOGIN:  An ambush.  We were supposed to have

5     received the demonstratives on last Thursday.  There was no

6     indication that we would receive a document anything like this.

7     We have no idea when this document was compiled, and we can't

8     at this point in the proceedings even check the accuracy of it.

9     I note that there's some statements about disclosures, about

10    the search terms by the defendants to the plaintiffs.  And in

11    my view it's grossly inaccurate.  And if we had the time and

12    the ability, we could go through and we can prove it.  But

13    having been ambushed, having just received this document, we

14    don't have any ability to do that.  We'd object to the

15    admission of this document.

16         MR. MAROVITZ:  Your Honor, if I may.

17         THE COURT:  Yes.

18         MR. MAROVITZ:  A few things.  First we mentioned --

19    when Your Honor set up this hearing, Your Honor mentioned that

20    exhibits could if they had already been prepared be turned over

21    in advance, but that there may be some that weren't fully

22    prepared.  This wasn't fully prepared at the time of Thursday.

23         Second, the information that's contained on the

24    exhibit for the most part has already been shared with the

25    plaintiffs in the 30 (b) 6 and other letters.  This is a

1    summary document, Your Honor.  And it's fine with us frankly if

2    plaintiffs wish to reserve on this.  I just want to make sure

3    that I make the motion to get it admitted into evidence.  We

4    don't have a jury here, Judge.  It's simply a matter of using

5    it with this witness to allow the witness to identify and

6    describe what he did.

7            MR. MOGIN:  Your Honor, there's an awful lot of

8    detailed information in this that the plaintiffs would simply

9    need to look at to verify before.

10           THE COURT:  Well, I assume this is like an outline of

11   what Mr. Regard's testimony is going to be about what he did.

12   This is kind of his help to -- this is like his exhibit book.

13   So the first is I think he's able to say on the stand what he

14   did.  Okay.  I do think he can say what he did.  So I'm going

15   to reserve ruling on the admissibility of this.

16           Now, I don't -- I wouldn't use the word ambush.  But

17   just as I said clearly on Friday that -- to the plaintiffs that

18   I thought they didn't have enough notice on Miss Tenny.  Okay.

19   I do think we could have at least been told that he is going to

20   bring a spread sheet that involves six defendants.  And I have

21   a question.  Why isn't GP on this?  I mean, GP is not on this.

22   So it's not in -- did he only review the six people who are the

23   six companies that are on here?

24           MR. MAROVITZ:  Right.  His -- the answer to that

25   question, Your Honor, his testimony primarily will be for the

PDF created with pdfFactory trial version www.pdffactory.com

1    other six because the first witness --

2              THE COURT:  GP had their own.

3              MR. MAROVITZ:  Right.  Has already testified

4    generally as to the GP process.  Secondly, I just -- I bristle

5    a little bit at the charge that this is an ambush.  We wrote in

6    our letter --

7              THE COURT:  I didn't, I didn't use --

8              MR. MAROVITZ:  No.  No.  I'm not --

9              THE COURT:  -- Mr. Mogin's word.

10             MR. MAROVITZ:  I'm well aware of that.

11             THE COURT:  Okay.  But I am saying that, I am saying

12   that they at the last minute wanted to add something for today,

13   and I didn't allow them to do it.  So I think his point is well

14   taken.  But we'll just --

15             MR. MOGIN:  Your Honor, I don't care to wrangle about

16   this on the record in light of the time limitations that we

17   have.

18             THE COURT:  Right.

19             MR. MOGIN:  But you have reserved ruling.

20             THE COURT:  I have reserved ruling.

21             MR. MOGIN:  And I would urge you before ruling to go

22   back and please take a look at the letter that Mr. Marovitz

23   submitted where he describes the testimony that Mr. Regard is

24   going to give.

25             MR. MAROVITZ:  That's fine.

Regard - direct by Marovich                    100

1        THE COURT:  I think the content of what he's going to

2   say, I mean, I'm going to let -- there is a difference between

3   an exhibit and the content.  I don't think the content is a

4   surprise.  I think the exhibit and pulling it all together is

5   quote, unquote were.  But let's start with the content because

6   it's now 11:20.

7        MR. MAROVITZ:  Very good, Your Honor.

8   BY MR. MAROVITZ:

9   Q    Mr. Regard, let's jump directly to the content.

10  A    Yes, sir.

11  Q    Tell us exactly what you did in terms of evaluating the

12  defendants' ESI protocol.

13  A    Well, No. 1 I wanted to understand the process that I

14  recently described prior to this dialogue.  Basically the

15  process they went through in originating search terms that were

16  ultimately used, the process used to modify those, to

17  reconsider them, to test them at the first level.  And then as

18  they were distributed to individual defendants to understand

19  how the defendants tested those against the null set.  And

20  really that was the most important thing to me.

21        Because as I learned in this process and that I have

22  seen in other cases, individual parties can follow a variety of

23  paths from the beginning of the collection of ESI to the

24  ultimate production.  But it's the testing of the application

25  of technology that's of particular importance today.  And so it

1    was the testing of the null set that I thought was the most

2    important part of corroborating, corroborating the ability of

3    defendants to rely upon their processes.  And so this chart

4    reflects my focus on gathering from the defendants the specific

5    information as to the null set testing that they conducted.

6    Q    Mr. Regard, plaintiffs claim that defendants' reliance on

7    keywords at the outset of this process compromised the results.

8    Do you agree with that?

9    A    I do not.

10   Q    Why not?

11   A    Two reasons.  At least two initially.  No. 1, in my

12   experience it's been very common, in fact, in every case that I

13   reflect upon keywords have been used in one fashion or another.

14   And I find that keywords are very common in dealing with the

15   volumes of ESI that we deal with today.  There was some earlier

16   testimony about filtering of documents.  The filtering of

17   documents by date ranges is a type of a keyword.  The selection

18   of custodians is a type of a keyword or key players.

19          Again, the use of keywords to help separate documents

20   from that which is a viable corpus of documents to that which

21   is obviously or sometimes not so obviously not relevant is a

22   very useful technique.  We use keywords both to include

23   documents as well as to exclude documents in shaping up the

24   document corpus.

25          The second reason is because the keywords the way

PDF created with pdfFactory trial version www.pdffactory.com

1   they have been used in this particular case I find have

2   followed best practices.  Best practices in that there was

3   significant human input at the beginning.  Counsel

4   collaborated.  There was significant review of documents from

5   both keyword hits as well as nonhits.  And again, I'm repeating

6   some of the testimony from this morning from Georgia Pacific

7   which drove through KPMG and Counsel on Call the testing of the

8   initial set.  That iterative processing, again is a best

9   practice to try the keywords, to look at the results, to use

10  the results to modify the keywords and try them again and

11  again.

12          And then finally when the keywords were distributed

13  to defendants, they were modified again and tested.  So I find

14  the application of keywords both appropriate in my experience

15  and the way that they were applied consistent with best

16  practices.

17  Q    Have you undertaken any independent studies of -- well, of

18  anything that relates to keywords in your area of expertise?

19  A    Well, I mentioned earlier that my background is in

20  computer science, my undergraduate degree.  One of the things

21  that we pride ourselves on at IDS is that we have a computer

22  science focus.  In fact, sometimes we're called upon to testify

23  on issues of not ESI but computer science and how computers

24  work at both the forensics level, various enterprise

25  applications, et cetera.

PDF created with pdfFactory trial version www.pdffactory.com

1              As a computer science student, I've gone and studied

2      academic papers on various forms of machine learning and

3      information retrieval, the TREC papers.  But more importantly

4      papers going back to space vector machines back in the 1960s

5      through the '70s, the '80s.  Latent semantic indexing,

6      probabilistic latent semantic indexing, latent Dirichlet

7      allocations, and more recently work by Google and Yahoo on

8      search engine optimization.

9      Q    So that goes to the first point about keywords, your

10     background and experience in using them.  The second point that

11     you made was that essentially they comported with best

12     practices here.  I want to ask you a question about that.

13             How is it in this case that you understand the

14     defendants used keywords?

15     A    In my understanding in this case the keywords have been

16     used to create a, I'll call it a perimeter of documents from

17     which to review for production of ultimately documents

18     responsive to the document requests.  And I use the word

19     perimeter because that's really what it has been.  The

20     documents that were collected -- and that's just an artifact of

21     the collection process.  Because of the way we collect

22     documents, tend to overcollect documents always.  When you

23     collect an entire PST or an entire my docs folder, you're

24     overcollecting.

25             And so we use filtering processes of it was mentioned

Regard - direct by Marovich                    104

1    earlier file extensions, date ranges, and custodians.  It's

2    also very useful, and again, in my experience very common for

3    parties to create a perimeter of documents by using keywords

4    and then taking that corpus and reducing it further through

5    document review.

6    Q    Were the -- oh, I'm sorry.  Mr. Regard, go ahead.  I

7    didn't mean to cut you off.

8    A    Well, I was going to add to that, one of the indicators of

9    the perimeter is responsiveness or the precision of documents

10   that are inside the perimeter.  I know through my talks, my

11   discussions with the various defendants, that once this

12   perimeter is drawn, the tighter you draw the perimeter the more

13   that you can exclude noise documents but also the greater the

14   likelihood is you might exclude relevant documents.

15          And so when I look at things like precision, I look

16   at how broad is the perimeter.  And in this case from my

17   discussion with the defendants, the perimeter has been fairly

18   broad which has resulted in what we call the precision being

19   relatively low.  And so again that confirms to me this was a

20   conservative perimeter that was drawn to identify documents for

21   subsequent document review.

22   Q    Based upon all of this, Mr. Regard, do you have an opinion

23   on whether defendants' search protocol, which included but was

24   not limited to keywords, met or exceeded best practices?

25          THE COURT:  Now I'm in a dilemma.  So far Mr. Regard

1   has been talking about in general word search.  You get down to

2   the specifics here, and you keep saying the defendants.  I mean

3   we did not know, and I did read every piece of paper in this, I

4   did not know how many custodians each -- I didn't know any of

5   this factual information.

6          MR. MAROVITZ:  That's a fair point, Your Honor.

7          THE COURT:  I mean, I really don't know whether --

8   you know, what Mr. Regard has been saying so far has been

9   pretty general.  I don't know whether we shouldn't bring Mr.

10  Regard back or do Mr. Regard a separate time so that the

11  plaintiffs can have a chance to absorb some of this

12  individual -- this is he's now testifying about six separate

13  systems here.  This doesn't seem fair when they got this chart.

14         MR. MAROVITZ:  If I may, Your Honor, a couple things.

15  First I'd be happy to walk through with Mr. Regard the

16  information so that it's clear on the record.

17         THE COURT:  Well, did you know the underlying -- let

18  me say maybe it's just me.  And I mean be straight.  Did you

19  know these specifics?

20         MR. MOGIN:  No, Your Honor.

21         MR. MAROVITZ:  Your Honor, we've identified our

22  custodians months and months and months ago.

23         THE COURT:  Well, we know.  But if -- I mean, what

24  the last witness said is there has to be some kind of

25  statistical, if you will, if we're going to find out if this

PDF created with pdfFactory trial version www.pdffactory.com

Regard - direct by Marovich                    106

1    method is valid, accurate as much as human beings can make it.

2    I mean I can't even read this and listen to Mr. Regard at the

3    same time.

4           MR. MAROVITZ:  Well, I'd be happy, Judge, if you

5    will, to have him walk through what these things mean so that

6    it's clear on the record for the Court.  There really -- we

7    tried to make this a summary.  It may be the case that there

8    are stray things here and there that were not provided

9    previously, but this is a summary of the give and take that the

10   plaintiffs and defendants have had over a series of months.

11   And we prepared it really to orient, as Your Honor pointed out,

12   Mr. Regard's testimony here.  So I think it's a great

13   observation that in order to enlighten this, to allow him to go

14   through and identify what each of these things means.  We'd be

15   happy to do that.  We want the record to be clear about this.

16          MR. MOGIN:  Your Honor, if I might.  Both in the

17   descriptive letter from Mr. Marovitz of February 16th, as well

18   as in their defendants' motions they tell us that Mr. Regard is

19   going to testify concerning the testing and validation of

20   search terms.  We don't have that testing.  We don't have that

21   validation.  And the first time that we've seen the statistics

22   is in this document that counsel is trying to introduce.  We're

23   simply not prepared to deal with this witness without that sort

24   of underlying information.

25          MR. MAROVITZ:  Judge, just to be clear, Miss Miller

1    just handed me, tab 2 is a good example.

2              THE COURT:  Of what?  Tab 2 of what?

3              MR. MAROVITZ:  Tab 2 of our initial -- exactly.  The

4    brief contains 44 tabs essentially of all of the background of

5    the back and forth between the parties.  There are letters from

6    all defendants, from plaintiffs.  Tab 2 is an example of some

7    of that back and forth, including the custodians.

8              THE COURT:  The August 11th letter, is that what --

9              MR. MAROVITZ:  Pardon?

10             THE COURT:  You're talking about an August 11th

11   letter?

12             MR. MAROVITZ:  That's exactly right.

13             THE COURT:  Okay.

14             MR. MAROVITZ:  So if, Your Honor, if you -- for

15   instance, if you go towards the back, you could see all of the

16   different custodians who were there first from Georgia Pacific

17   and from Norampac.  Then from PCA.  Then from Rock Tenn.  And

18   then from our client Temple-Inland.  These were provided to the

19   plaintiffs back in August of 2011.  There's a series of

20   additional letters that were provided back and forth between

21   the parties.  As I say, it provided them a lot of this

22   information.

23             And I really, I guess I would ask the Court simply

24   to -- since Mr. Regard is here, to hear him out.  Plaintiffs

25   can cross him.  If plaintiffs can make a showing later that

1    there's some real material information here that they haven't

2    had access to or couldn't have had access to, then the Court

3    certainly will act on that.  But --

4            MR. MOGIN:  Your Honor, the entire statistical

5    presentation at the bottom of this chart is brand new

6    information.

7            THE COURT:  All right.  So here's what I think we

8    should do.  They've got another hour how they want to use their

9    time.  If you want, you could do more of the direct of

10   Mr. Regard, but definitely Mr. Regard must have other cases in

11   Chicago.  We'll do the cross another time when they have some

12   time to hear it, or you can put on CAC and we'll do, we'll do

13   the whole thing another day.  I mean, I don't know what else to

14   do because I'm surprised, and I don't have to get up and do the

15   cross.

16           MR. MAROVITZ:  Right.  Well, Your Honor, apologies to

17   both you and to plaintiffs' counsel for the surprise.  We had

18   written in our letter just to be clear that any additional

19   exhibits which had not yet been prepared will be provided

20   Tuesday morning.

21           THE COURT:  It's not a technical -- it's not

22   technical.

23           MR. MAROVITZ:  Okay.

24           THE COURT:  I mean, some exhibits are nothing.  Okay.

25   So then that's kind of what -- I mean, this is -- this could be

PDF created with pdfFactory trial version www.pdffactory.com

Regard - direct by Marovich                    109

1    a whole day testimony here.

2              MR. MAROVITZ:  Well, if you'll permit me --

3              THE COURT:  You want to talk to about the process --

4              MR. MAROVITZ:  If you'll permit me --

5              THE COURT:  You want to talk about Mr. Regard's

6    process a little bit, kind of give a little bit overview of the

7    process or you want to call CAC?  Whatever you want to do.

8              MR. MAROVITZ:  If you'll permit me 30 seconds.

9              THE COURT:  Yes.  Sure.

10        (Brief pause.)

11             THE COURT:  Yes, sir.

12             MR. MAROVITZ:  Judge, thank you for your indulgence.

13   I think with your permission what we'd like to do, we think it

14   would be important to get Mr. Regard's testimony in at one

15   time.  We're a little concerned about breaking it up.  And

16   frankly the way we have this set is we were going to have Mr.

17   Regard go and then have Sandy go after that.  So it probably

18   makes sense if Mr. Regard has to come back anyway for us to

19   essentially stop the defendants' presentation here, allow the

20   plaintiffs to put their experts on, and then set another date

21   for our two witnesses to be completed.

22             THE COURT:  Well, I think -- here's the other thing

23   is I know the least about these other six parties.  Because,

24   you know, there was a choice made before I got into the case

25   that GP was kind of taking the lead or something.  So I

Regard - direct by Marovich                    110

1    factually am interested to know kind of what went on with the

2    six.  I'm sorry, Mr. Regard.

3            THE WITNESS:  Not at all, Your Honor.

4            THE COURT:  But you get another great trip to

5    Chicago, okay.

6            THE WITNESS:  Yes, ma'am.

7            THE COURT:  So anyway -- can you stay, though?  Are

8    you staying today --

9            THE WITNESS:  Yes, ma'am.

10           THE COURT:  -- at least part of the day anyway.  I

11   think you ought to call CAC, okay.  With the understanding that

12   we're going to recall Mr. -- we're not going to take back

13   everything he said here today.

14           MR. MOGIN:  Of course.

15           THE COURT:  But we'll give you a do over.

16           MR. MAROVITZ:  We appreciate it, Your Honor.

17           THE COURT:  Okay.

18           MR. MAROVITZ:  And I don't know if Your Honor -- our

19   preference would be to call Counsel on Call after Mr. Regard.

20   So we wonder whether it would make more sense simply to move to

21   the plaintiffs' presentation now.  Currently our Counsel on

22   Call examination is relatively brief.  So the ordering that we

23   have would be Mr. Regard and then Counsel on Call, and we'd be

24   happy to turn the floor over to the plaintiffs now for their

25   experts so we can do both of them on another day afterwards.

1    And Counsel on Call could be here on another day.

2              THE COURT:  No.  No.  Why aren't we going to do

3    Counsel on Call right now?

4              MR. MAROVITZ:  It's just -- it's the way that we had

5    it set up, but we'll -- if Your Honor would prefer it that way.

6              THE COURT:  You were going to do Counsel on Call

7    after their presentation?

8              MR. NEUWIRTH:  No.

9              MR. MAROVITZ:  No, ma'am.  What we had intended to do

10   was to have Mr. Regard go first.

11             THE COURT:  Right.

12             MR. MAROVITZ:  And then have Counsel on Call go.

13             THE COURT:  Well, that's what I'm saying.  So why

14   don't do -- just do -- we've got 45 minutes on Counsel on Call.

15             MR. NEUWIRTH:  Your Honor, we're certainly happy to

16   proceed in whatever way Your Honor determines makes sense.  I

17   think that what Mr. Marovitz was trying to suggest to the

18   Court, but we'll proceed as you say, is that we think that the

19   length of Mr. Brown's testimony from Counsel on Call could be

20   reduced, and it would make sense logically to have Mr. Regard's

21   testimony prior to Mr. Brown's testimony.  And so I think what

22   the suggestion was that if Mr. Regard is going to come back on

23   another day, to have Mr. Brown come back on --

24             THE COURT:  Didn't Counsel on Call just do GP?

25             MR. NEUWIRTH:  Yes.

Regard - direct by Marovich                112

1          THE COURT:  Did they do everybody?

2          MR. NEUWIRTH:  They did GP.

3          THE COURT:  Well, then --

4          MR. MOGIN:  Well, Your Honor, if I can refer you to

5    the chart --

6          MR. NEUWIRTH:  We can proceed.

7          MR. MOGIN:  -- we've been discussing --

8          MR. NEUWIRTH:  We can proceed.

9          MR. MOGIN:  -- it appears that Counsel on Call was

10   also involved with another one of the defendants.

11         MR. NEUWIRTH:  But not Mr. Brown.

12         THE COURT:  Not Mr. Brown.

13         MR. NEUWIRTH:  So we'll proceed however Your Honor

14   wants.  And if you would like to hear Mr. Brown now, we can.

15         THE COURT:  Let me -- you know, I do what I do all

16   the time incorrectly.  Mr. Mogin, is this the way you want to

17   proceed?  This is actually your hearing.  Do you want Mr.

18   Regard just to continue on today, do your cross, and we'll be

19   finished?  Is that what you want?

20         MR. MOGIN:  Quite frankly, Your Honor, I'd like to

21   hear Mr. Brown's testimony.  We don't have -- we have very

22   little information from Mr. Brown, but we're ready to proceed.

23         THE COURT:  Well, I see no reason not to do Mr. -- I

24   mean Mr. Brown seems like a follow-up from the first witness.

25         MR. NEUWIRTH:  We're happy to go, Your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  So I think that the problem is all the

2   information that came with Mr. Regard just was a little fount

3   of information here that --

4          MR. NEUWIRTH:  We're ready to go, Your Honor.

5          THE COURT:  Okay.  So I say, Mr. Regard, you step

6   down and let's call Mr. Brown.

7          MR. FREED:  Your Honor, if I may.  Michael Freed.

8          THE COURT:  Yes.

9          MR. FREED:  It may be implicit in what you have said,

10  but before Mr. Regard gets his next opportunity to visit

11  Chicago this winter, we would like to get the kind of

12  information that we will need in order to cross-examine him at

13  that time.  So we're going to want to have an opportunity to

14  learn more about what he's done.  Now, that -- and that's the

15  dilemma.  He doesn't have to do it now if they can give us the

16  information before he returns.  So if they wanted to go through

17  what he has done up until now, because otherwise we're not

18  going to be able to deal with what's on this chart anyway.

19          So I'm saying maybe we -- and I apologize to Mr.

20  Marovitz.  It's his witness.  But maybe we should learn what he

21  did and then recall him after that so at least we'll be working

22  off some information.

23          THE COURT:  You know, one of the reasons expert

24  discovery is different than other discovery, and there

25  really -- and we were -- we're definitely in a hybrid situation

Regard - direct by Marovich                    114

1  here, because this was not following all of the rules, but it's

2  exactly the reason that experts unlike many laypeople are going

3  to be testifying to more complicated subject matter.  So if you

4  wanted to ask some preliminary questions of Mr. Regard about

5  his process, that would help us for the next time.  Because I

6  certainly don't want this to happen the next time.

7            I think what he said so far is he got hired.  He

8  worked with -- he worked with the defendants early in the case

9  and then he came back in order to opine on their search

10 methodology.  Right.

11           MR. MAROVITZ:  I think that's right.  Judge, I just

12 want to -- you're exactly right.  This is an unusual situation.

13 We didn't have --

14           THE COURT:  But I'm not even being critical.  What

15 I'm saying is let's use a couple minutes here since Mr. Regard

16 is here.  He can tell us kind of what he did.  No cross of it.

17 And then when we have him back again at least they'll know what

18 the process was.  Thank you.

19           MR. MAROVITZ:  That's fine.  Thank you, Your Honor.

20 I appreciate it.  We're all finding our way in this new regime.

21           THE COURT:  Right.

22 BY MR. MAROVITZ:

23 Q    Mr. Regard, you get all that?

24 A    Luckily I have a trailblazer in the form of a competent

25 counsel, so I'll follow the questions and we'll do the best we

PDF created with pdfFactory trial version www.pdffactory.com

1   can, Your Honor.

2   Q    Very good.  Let's -- just to give an idea of the way this

3   worked, and I know counsel and the Court will guide me if I go

4   astray.  Let's take a look at the Temple-Inland line --

5   A    Yes, sir.

6   Q    -- on the chart.  Maybe you can walk through the

7   Temple-Inland line there and give the Court an idea of what you

8   did and how you did it.

9   A    And maybe I can clarify.  This information as to the

10  defendant Temple-Inland, counsel, the consultants that worked

11  on the Temple-Inland matter in terms of processing and

12  participating in the application of search terms, the

13  technology that Temple-Inland used, the number of custodians

14  that Temple-Inland has collectively collected, and then the

15  smaller number -- a set of custodians that I would call the

16  first level key players that were used for the testing of

17  search terms.

18        A footnote about the totality of the custodians, that

19  it includes assistants.  In this case my understanding is

20  assistants who worked as assistants to various officers or

21  people with responsibilities within the organization.  Whether

22  or not search terms were used in the collection of documents

23  from the native systems.  When modifications or search terms

24  were disclosed to the opposing party, the requesting party.

25  Various footnotes of information that I learned from the

PDF created with pdfFactory trial version www.pdffactory.com

1    pleadings, the correspondence or through discussions.  And then

2    a summary at the bottom.

3          Again, like each of the defendants I spoke to,

4    Temple-Inland received the search terms from the collective

5    effort of the defendants driven by Georgia Pacific to test and

6    then modified those for Temple-Inland.  Temple then used

7    information that had been collected from custodians but culled

8    down through de-duplication, through deNISTing, which was

9    described with the earlier testimony, to a corpus of documents

10   that they then applied the search terms against and that

11   created a null set.  So they took a corpus of documents.  They

12   applied the search terms, they created a hit set, and the

13   documents that were not hits we called the null set.  And then

14   from the null set they applied a random selection of documents.

15   They reviewed those documents.  So that would be the 500, Your

16   Honor, if we're on the same place in that first column.

17         And then they reviewed those 500 randomly chosen

18   documents, of which they found 7 of them in their opinion to be

19   responsive to their document requests.  And then I calculated a

20   percentage, which I also believe has been calculated and

21   produced in various correspondence by Temple-Inland.  I didn't

22   create the result.  I merely reperformed the mathematical

23   calculation of the percentage of potentially relevant documents

24   they found in the random sample chosen from the null set.

25         My goal in creating this column of information was

1   more to make sure that I had at my reference the information

2   that I found in these pleadings and discussions than to create

3   a novel calculation.  My other goal in this was to document to

4   some small degree for myself again as a reminder of the process

5   they went through, the iterative process both in stage 1 and in

6   stage 2 of developing these search terms and then applying them

7   to a corpus of documents that ultimately was used for document

8   review.

9   Q    And maybe, Mr. Regard, we'll await another day on the

10  specifics of all the other columns that are here.  But

11  generally as you've just put it, is that the general process

12  that you used with respect to the defendants in this case,

13  obviously other than Georgia Pacific?

14  A    Well, again there are nuance differences as to how many

15  documents they started with and the way that they modified the

16  search terms for their individual organization or the software

17  that they were using, but that is what I have learned is

18  generally the way that each of the defendants handled their

19  approach to this stage of document review and production.

20          MR. MAROVITZ:  Your Honor, I have -- maybe I can

21  propose that we proceed in this fashion.  I have a number of

22  questions that I would ask to Mr. Regard that are not really

23  related to this issue.  And if you'd like me to reserve those,

24  I can.  Or if you'd like me to fire away, I can do that.

25          THE COURT:  Why don't you start off.  I mean, they

1    don't have to do with this issue, but --

2                MR. MAROVITZ:  It really doesn't.

3                THE COURT:  Okay.

4                MR. MAROVITZ:  If we can reserve the rest of that

5    issue for another time.

6                THE COURT:  Right.  Okay.

7    BY MR. MAROVITZ:

8    Q    Mr. Regard, without getting into the specifics of what you

9    did that we'll talk about on another day, how does defendants'

10   search methodology compare to the content based advanced

11   analytics that the plaintiffs have offered in this case?  Let

12   me ask you a --

13   A    There's a lot in that question.

14   Q    Yes.  Let me ask you a more detailed question.  Are you

15   familiar with the phrase concept based searching or other

16   methods of computer based advanced analytics?

17   A    I am familiar with the idea of content based analysis and

18   analytics.  The exact phrase content based advanced analytics

19   is new to me in this case.  It doesn't surprise me.  I've seen

20   a lot in the marketplace of various companies and software

21   providers promoting content based analytics.  It's a common

22   term in marketing.  It has a variety of different definitions.

23              But if one takes the testimony this morning to say

24   it's based on somehow analyzing the words in a document and

25   using that to make decisions about that document or to

Regard - direct by Marovich                119

1   understand the decisions on that document combined with the

2   analysis to make a projection of what another document might

3   be, then yes, I'm very familiar with that.

4   Q    Plaintiffs say in their reply brief that when compared

5   head to head plaintiffs' content based search methodology is

6   far superior in this case to defendants' Boolean search

7   methodology.  Do you remember seeing that?

8   A    I recall seeing that, yes.

9   Q    Do you have an opinion on whether plaintiffs' content

10  based search methodology is far superior in this case to

11  defendants' Boolean search methodology?

12       MR. MOGIN:  Objection, Your Honor.  I think this is a

13  question for you ultimately, but also I don't believe that

14  there's any foundation based upon the prior answer to the

15  question that Mr. Regard has the expertise to compare the two

16  systems in the manner that the question seeks.

17       THE COURT:  Well, hold on.  Hold on.  I mean, the

18  reason I'm allowing these, folks, is to help us because I'm not

19  an expert, okay, in the two systems.  Okay.  But now I'm

20  really -- I'm so sorry I'm interrupting you.  But, you know,

21  you asked him if he's aware of it.  Do you think that's --

22       MR. MAROVITZ:  Maybe I can help, Your Honor.

23       THE COURT:  Yes.

24       MR. MAROVITZ:  The plaintiffs have made submissions

25  in this case.

1          THE COURT:  Right.

2          MR. MAROVITZ:  And Mr. Regard will testify that he's

3   had a chance to review those submissions, and that's really

4   what I'm asking him about.  I'm certainly not asking him

5   whether -- I'm not asking him more than that.

6          THE COURT:  And what's your objection again?

7          MR. MOGIN:  Well, I think the question has just been

8   changed.  What the question was he was asked to compare CBAA as

9   the plaintiffs have used it with Boolean search as the

10  defendants have proposed it.

11         MR. MAROVITZ:  Oh, no, that's not my question.  My

12  question is as plaintiffs have proposed it.  I'm not aware that

13  the plaintiffs have actually used it.  So my question needs to

14  be clear.  And if my misspoke before, I apologize.  But my

15  question is as proposed, is it the case that when compared head

16  to head plaintiffs' content based search methodology is

17  superior to defendants' Boolean search methodology.

18         MR. MOGIN:  And my point, and putting aside the legal

19  issue, my point is is that based upon the witness' prior answer

20  there's no foundation for him to comment on plaintiffs'

21  proposed methodology because he hasn't testified -- there's not

22  a proper foundation at this point as to any knowledge or

23  expertise that this witness has with the advanced analytics.

24  He said he's aware of it.  As I heard that, it sounded like

25  he's done some reading in the area.  Well, I've done some

1   reading too, and nobody wants to hear my expertise.

2               MR. MAROVITZ:  The problem, Judge, the problem,

3   Judge, is that plaintiffs have presented advanced analytics as

4   though it is a discrete methodology that everybody knows.  I

5   think Mr. Regard can debunk that, and that's why I'm asking him

6   the question the way I've asked it.

7               THE COURT:  All right.  I'm going to -- I think that

8   the whole first 15 minutes of Mr. Regard's resume was to

9   qualify him as an expert, if you will, in the field of -- in

10  this field.  In this field.  And I think based upon that, he is

11  going to give an opinion here -- you know, I so much look at

12  this as a real work in progress.  Okay.  This is not a Daubert

13  hearing.  This is not -- we have got a very practical issue

14  here we've got to address.  So I really wanted to keep this as

15  specific as possible.  Okay.  Not a, as I said before, a

16  treatise on what might be applicable in other cases.  I'm just

17  talking about right here.  So if you want to ask him -- I'm

18  going to overrule your objection is what I'm doing, and you may

19  ask the question.  Okay.

20  BY MR. MAROVITZ:

21  Q    Do you have an opinion, Mr. Regard, on whether as applied

22  here in this case for this Court, whether the plaintiffs'

23  content based search methodology that's been offered that

24  you've read about is superior in this case to the defendants'

25  search methodology that the defendants used in this case?

PDF created with pdfFactory trial version www.pdffactory.com

Regard - direct by Marovich                        122

1   A     I do.

2   Q     What's that opinion?

3   A     My opinion is that it is not demonstratively superior.

4   That, in fact, the process used by the defendants uses many, if

5   not all of the aspects the plaintiffs have even asked for.  And

6   that when one thinks of content based analytics, that the

7   application of keywords is content based analytics.  The use of

8   the topics functionality on Clearwell is content based

9   analytics.  It's the process we need to look at, not the

10  individual technologies.

11  Q     And what do you mean by that?  Why are keywords content

12  based analytics?

13  A     A lot of the pleadings and the discussion as I look at it

14  revolves around the issue of predictive coding.  Predictive

15  coding is the ability to look at a few documents to make

16  decisions, and to come up with a methodology, a technology that

17  will take those decisions and apply them to a different body of

18  documents.  And that's what keywords do.  When you look at

19  documents and you say these keywords are choosing documents

20  that I believe help me segregate my documents and find ones

21  that are likely to be relevant and I apply those keywords which

22  look at the full text of the documents I'm applying them

23  against and segregate those documents, it's making a decision.

24  That is a form of predictive coding.

25          And then we go and we confirm the way that technology

Regard - direct by Marovich                123

1    is working by looking at the null set.  I would also suggest,

2    not suggest.  I would also acknowledge, observe that the

3    defendants used other types of content analytics in developing

4    and testing their search terms.  They used the topic feature in

5    Clearwell.  This is a feature that uses software technology to

6    analyze the words in individual documents and create

7    relationships between those words and the way those words

8    appear on a frequency basis between multiple documents and in

9    proximity to each other -- not proximity, but in co-appearance,

10   if you will, in one document versus another.  And again uses

11   that to group documents, define similar documents, and make

12   better decisions about how to segregate one set of documents

13   from another.

14            So from that aspect what the defendants have used is

15   content based analytics, and they've used it in a predictive

16   coding manner.  So I don't find the methodology suggested by

17   the plaintiffs to be superior.  I find in many ways it

18   overlaps.  I find that they didn't recommend any particular

19   tool or technology.  And that the tools and technologies the

20   defendants have used have already incorporated those concepts.

21   Q    So in many respects is the dichotomy on the one hand

22   between Boolean searching and on the other -- well, why don't

23   you comment on the way this has been set up on the dichotomy on

24   the one hand between Boolean searching and the other on

25   predictive coding as it applies to this case.

1   A      Again, I have worked with clients on cases to use Boolean

2   tech -- Boolean search strings in a predictive coding manner,

3   where we have used iterative searching and evaluational

4   searches to create a set of search terms that we feel will

5   successfully and reasonably segregate a corpus of documents

6   into those that we're going to review and those that we're not

7   going to review.  That is a prediction on that corpus based on

8   these search terms.

9            And I also want to say that, you know, we talk about

10  search terms as if we're talking about one or two searches in

11  Google.  That's not what we're doing here.  We're talking about

12  very complex search terms that the defendants put together

13  here.  I mean, I've looked at some of these.  These have dozens

14  of terms.  And when you look at the Boolean structure of those,

15  those translate into many more searches.  It's not a case of

16  running five or six searches and saying that was it and,

17  therefore, it's so simple it's not reliable.  It was actually

18  extraordinarily complex and varied.

19           MR. MAROVITZ:  Your Honor, if I may.  I want to

20  reserve time for Counsel on Call because I know Mr. Regard is

21  coming back anyway at some point.  So might I suggest that we

22  essentially allow Mr. Regard to come back on another day.  I

23  would finish off his direct examination with the remaining

24  points that we just -- we haven't gotten into because we're all

25  going through this new area of procedure and law, and we allow

PDF created with pdfFactory trial version www.pdffactory.com

Brown - direct by Neuwirth                    125

1   Counsel on Call to give its testimony at this point.

2          THE COURT:  All right.  Let's do Counsel on Call, and

3   I'll think about what we're doing -- I'm going to think about

4   how we're handling the rest of this at lunch.  Okay.

5          MR. MAROVITZ:  That's, that's --

6          THE COURT:  But let's call Counsel on Call right now.

7   Okay.

8          MR. MAROVITZ:  Right.  Thank you, Your Honor.

9          THE COURT:  Thanks, Mr. Regard.  Don't leave please.

10         THE WITNESS:  Thank you, Your Honor.

11      (Witness excused.)

12         MR. NEUWIRTH:  If it pleases the Court, Your Honor,

13  we would call Samuel Brown from Counsel on Call.

14     SAMUEL W. BROWN, DEFENDANTS' WITNESS, DULY SWORN

15         THE COURT:  Have a seat and please state your name

16  for the record.  Okay.

17         THE WITNESS:  My name is Samuel William Brown.

18         MR. NEUWIRTH:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20  BY MR. NEUWIRTH:

21  Q    Mr. Brown, for whom do you work?

22  A    Counsel on Call.

23  Q    And briefly what does Counsel on Call do?

24  A    Counsel on Call is a company that provides attorneys on a

25  contract basis to its clients, which are typically large law

PDF created with pdfFactory trial version www.pdffactory.com

1    firms and corporations.  The company has a division in which it

2    provides attorneys that work on substantive matters to

3    corporate clients, and then they have an eDiscovery division.

4    Q     And how long have you been at Counsel on Call?

5    A     Since April of 2006.

6    Q     And what's your current position there?

7    A     Senior attorney and project manager.

8    Q     And can you tell me the types of clients that you've

9    worked for at Counsel on Call.

10   A     Well, currently obviously Georgia Pacific, currently

11   AT & T, AT & T Mobility, Cox Communications, Wal-Mart, and in

12   the past Coca-Cola.

13   Q     And these are all clients that you've worked on with

14   eDiscovery projects related --

15   A     That's correct.

16   Q     -- related to ESI?  And very briefly what is your

17   educational background?

18   A     I have a bachelors degree and a JD from the University of

19   Tennessee.

20   Q     And you say you have a JD.  Have you practiced law?

21   A     Yes.

22   Q     And are you admitted in any states?

23   A     Licensed to practice in Tennessee and Georgia.

24   Q     And have you ever practiced at a law firm?

25   A     Yes.

Brown - direct by Neuwirth                    127

1   Q    Which firm?

2   A    My own firm.  First of all, I was an associate and then a

3   partner in a firm in Knoxville, Tennessee for I think 11 or 12

4   years.

5   Q    Now, what was the timing of Counsel on Call's retention in

6   this case?

7   A    I believe we were retained in May of 2011.

8   Q    Okay.  Now, in the interest of time I'm just going to move

9   very quickly.  Can you tell me were you personally involved in

10  the work that Counsel on Call did here related to the

11  development and testing of search terms?

12  A    Yes.

13  Q    And is that a process that began in May 2011?

14  A    Yes.

15  Q    Now, when this process began are you familiar with the

16  concept of a sample set for developing and testing search

17  terms?

18  A    Yes.

19  Q    And was a sample set created here?

20  A    It was.

21  Q    And what was in that sample set?

22  A    Initially there were four high, what were considered to be

23  high priority custodians.

24  Q    And who were those four custodians?

25  A    Christian Fisher.

Brown - direct by Neuwirth                    128

1   Q    And who is Mr. Fisher?

2   A    Mr. Fisher is an executive vice president and in charge of

3   the Container Board Division.

4   Q    Who was the second one?

5   A    Molly Hilliard.

6   Q    And who is that?

7   A    She is involved in the trades area.

8   Q    And the third?

9   A    Scott Denton.  He is a pricing analyst.

10  Q    And the fourth?

11  A    Travis Ballard.  And he is involved in inventory and

12  modeling down time.

13  Q    And is there anyone else whose ESI was included in the

14  sample set that was used for development and testing of search

15  terms?

16  A    We also included a fifth individual, Robert Bellinger.

17  Q    And why was this fifth individual included?

18  A    Mr. Bellinger was or is a plant manager.  It was felt that

19  his ESI should be less -- well, it was felt that with respect

20  to the first four custodians they would be a very target rich

21  environment.

22  Q    And, in fact, those four custodians were from among the

23  custodians that Georgia Pacific had identified to plaintiffs as

24  custodians whose ESI would be searched, correct?

25  A    That's correct.

1    Q    Mr. Bellinger was not on that list, correct?

2    A    That's correct.

3    Q    So you had this sample set of the five custodians.  And

4    can you describe for the Court how the process of developing

5    the certain terms began.

6    A    Well, the first thing we did was we received a set of

7    search terms and strings from I believe it was International

8    Paper's counsel.

9    Q    And what did you do with that list?

10   A    Well, we had our test corpus, which at that time consisted

11   of about 94,200 documents or so.  We then --

12   Q    And those were the documents that came from the files of

13   these five custodians, the ESI of these five custodians.  And

14   is it correct that those have already been through some of the

15   steps talked about today, like de-duplication and deNISTing?

16   A    Yes.  Those were provided --

17   Q    And 94,000 was what was left over, correct?

18   A    Those were provided to KPMG.  They were deNISTed,

19   de-duped, and made available to us.

20   Q    And you ran the, you ran those --

21   A    We ran the set of -- the initial set of search terms and

22   strings and looked at the hit counts and then began a linear

23   review of the result set from those searches.

24   Q    And what then did you do?  Just generally describe the

25   process.

1   A    As a result of looking at those, we discovered that they

2   were, in fact, highly responsive.  They pulled back responsive

3   documents, but they did not pull back a very large number of

4   responsive documents.  So we then began a process of

5   identifying additional terms that we could then add to those

6   terms and strings.

7   Q    And did you do this just once or did you do this multiple

8   times?

9   A    We did it repeatedly.  It was over a two-week period in

10  which we worked with internal counsel at Georgia Pacific.  We

11  worked with Quinn Emanuel.  We worked with KPMG.  And it was

12  through a series of iterative steps that we eventually arrived

13  at a very elaborate, very robust sort of strings.

14  Q    Now, in this initial process what was the time period that

15  this took place?  You said it started in May and ran till

16  roughly when?

17  A    I believe that we got the initial set of terms from IP in

18  about the second or -- toward the third week of May.  And it

19  would have been -- we would have been finished with that

20  process around the 16th till say the 20th of June.

21  Q    And in this initial process was the topics function from

22  Clearwell used as part of the work you did to develop the

23  search terms?

24  A    Yes.

25  Q    And was it applied to the null set?

1   A     It was applied -- at that time it was applied both to look

2   at the documents that were positive hits, and then it was

3   applied generally to the reviewed corpus.  We didn't have a

4   null set of that topic.

5   Q     So it was applied to both the hit set and the corpus as a

6   whole?

7   A     That's correct.

8   Q     Now, you said that the results by mid-June were robust.

9   Did you do any testing to determine that?

10  A     Okay.  At that point we felt that the results were robust,

11  and so we began the validation phrase in which we created what

12  I referred to as the combined composite set and then the null

13  set.  The combined composite set was the set of search strings

14  that would hopefully pull back, you know, positive hits from

15  the test corpus.  The null set was defined as the test corpus

16  less the combined composite set.

17  Q     And did you create a sample to test?

18  A     At that point we created sample sets.

19  Q     And how big was that sample set?

20  A     For the null set it was 660 documents.

21  Q     And you ran -- and what testing did you do with that set

22  of -- that sample set?

23  A     We reviewed them linearly.

24  Q     Meaning one by one?

25  A     One by one.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q    And did you -- and was the purpose of that -- what was the

2  purpose of that review?  What were you trying to determine?

3  A    The purpose of that was to look for false negatives.

4  Basically --

5  Q    You were trying to see if any documents that had been in

6  the null set were --

7  A    That were responsive had slipped through and into the null

8  set.

9  Q    And based on that testing, what was the percentage of

10 documents in the null set that you determined could have been

11 considered as documents that should have been hit?

12 A    It was 4.1 percent.

13 Q    So out of all the documents just 4.1 percent --

14 A    Yes.

15 Q    -- were ones that you would consider that could have been

16 treated as hits?

17 A    Might have been treated as marginally responsive.

18 Q    Okay.  Now, after this testing, what was done next?

19 A    Well, then we also did the same, essentially the same

20 exercise on the combined composite set.  There we looked at 400

21 documents, and we determined that out of the 400, 218 of them

22 were responsive.  And so we had a 58 percent responsiveness

23 rate.

24 Q    All right.  So that's in the set that was hit by the

25 search terms, 58 percent of the documents were actually

1   responsive as opposed to just potentially responsive?

2   A    That's correct.

3   Q    Okay.  Now, after this round of testing in mid-June, what

4   was the next part of the process?

5   A    It was the -- the results of the search strings themselves

6   were given to the defendants.

7   Q    And did the defendants give you feedback?

8   A    They did.

9   Q    And did you use that feedback to further develop the

10  search terms?

11  A    Yes, we did.

12  Q    And did you come up with revised sets of search terms

13  based on that?

14  A    We did.

15  Q    And in this process did you again use the topics function?

16  A    Always.

17  Q    Did you use it both on the hit set and the null set?

18  A    We used it on the hit set, and we used it especially on

19  the null set.

20  Q    And then did that lead to a further revised set of search

21  terms?

22  A    It did.

23  Q    Did you test them again and validate them?

24  A    We did.

25  Q    And this time in the validation what was the percentage

1    result you got?

2    A    At that time we actually ran the validation twice.  We had

3    4.7 percent on one set and 4.1 on the other.

4    Q    And that was testing of the null set?

5    A    That was testing of the null set.

6    Q    And then what was the next step in the process after this

7    testing that was done?

8    A    Well, and again we did the combined composite set.

9    Q    And what was next?

10   A    That would have been around I think the 5th of August.

11   And those search strings were turned over to the plaintiffs.

12   Q    And then did you receive feedback back from the

13   plaintiffs?

14   A    On about the -- I believe it was about the 15th of

15   September we received a letter.

16   Q    Could you hold up -- you should have there in front of you

17   Defendants' Exhibit 2, which is the plaintiffs' preliminary

18   analysis of defendants' first set of proposed search terms.

19   A    Yes.

20   Q    And is this what you received back?  Is this what you were

21   referring to?

22   A    It is.

23   Q    And did you use this in any way to try to add anything to

24   the search terms?

25   A    Yes.

1   Q     And what did you do?

2   A     Well, we reviewed the letter, and we determined -- there

3   were several examples where, in fact, for example, we missed

4   the name of a trade association.  So we added that to one of

5   the search strings.  We then began a process, an iterative

6   process discussing with the other defendants how we could

7   accommodate some of the, the concerns that the plaintiffs

8   raised in the letter principally by modifying some of the

9   strings and by modifying the proximity of connectors so that we

10  would capture a larger set of documents.

11  Q     As a general matter did you find this plaintiffs' input

12  helpful to the process?

13  A     As a general matter I did not.

14  Q     But you did try to extract this information?

15  A     Absolutely.

16  Q     And did this lead again t go another development of a

17  further revised set of search terms?

18  A     It did.

19  Q     And did you validate those search terms again?

20  A     Yes.

21  Q     What were the results of that validation process?

22  A     At the end of the vali -- at the end of that validation

23  process the null set validated to 4.2 percent.

24  Q     So you now have had four tests all in the range of

25  somewhere between 4 and 5 percent when you tested the null set?

PDF created with pdfFactory trial version www.pdffactory.com

1   A    That's correct.

2   Q    And did that lead to a final set of search terms?

3   A    Yes.

4   Q    Okay.  Now, was that final set of search terms then

5   applied against GP's full review corpus?

6   A    It was.

7   Q    And is it correct that that corpus included ESI from 17

8   custodians?

9   A    I believe that's correct.

10  Q    And did it also include ESI from other sources that were

11  not specific custodians?

12  A    There were specific -- I think there were reports that

13  were pulled from other custodians --

14  Q    Well, was it from other --

15  A    Other sources.

16  Q    From other sources, right.  So there were both custodian

17  ESI --

18  A    And source ESI.

19  Q    -- and ESI from other sources within GP, correct?

20  A    That's correct.

21  Q    And so you now -- the search terms were applied to that

22  and you got a set of documents to review, is that correct?

23  A    That's correct.

24  Q    And do you recall how large that set of documents was,

25  that ESI set that was going to be now reviewed by attorneys?

Brown - direct by Neuwirth                    137

1   A    The total set including everything that you mentioned, all

2   17 custodians plus the additional ESI sources was about 140,000

3   records.

4   Q    And --

5            MR. MOGIN:  Your Honor.

6            THE COURT:  Yes, sir.

7            MR. MOGIN:  I don't want to interrupt the proceedings

8   in light of the time, but this also regarding the application

9   of the 17 custodians is new information.

10           MR. NEUWIRTH:  I just have one more question.  The

11  17 -- those custodians have all been disclosed.  We're not

12  trying to make any big point.  I just have one follow-up

13  question on this.

14           THE COURT:  Well, you could --

15           MR. MOGIN:  The 17 -- first off, the 16 custodians

16  have been disclosed to us.  However, the fact that the

17  custodian has been disclosed is not an issue.  The fact that

18  this test was run with respect to those custodians is the new

19  information.

20           MR. NEUWIRTH:  He didn't say the test was run.  He

21  said the search terms were run against the custodians to get a

22  body of documents to be reviewed.  And all I want to do is have

23  Mr. Brown tell the Court where GP is in the review process.

24  That's it.

25           THE COURT:  Okay.  To me what you're saying is also

1    subject to cross-examination.  This is one person talking about

2    something he did himself.  Okay.  So there's a little bit

3    easier to control the cross on that.  And you may certainly

4    follow up whatever you want to follow up.

5              MR. NEUWIRTH:  I just would have one follow-up

6    question.

7    BY MR. NEUWIRTH:

8    Q    Of those approximately 140,000 documents of ESI that you

9    mentioned that were the result of applying the search terms to

10   the full body, those were reviewed by Counsel on Call as a

11   first level of review, correct?

12   A    That's correct.

13   Q    And what percentage of those documents have now been

14   reviewed as of today?

15   A    Over 99 percent.

16   Q    Okay.  How many hours did Counsel on Call spend on the

17   process of developing and testing and validating the search

18   terms you referred to earlier?

19   A    I believe in excess of 900 hours.

20   Q    900?

21   A    900.

22   Q    Thank you.  Just one final question.  You mentioned

23   earlier that when the set, the sample set was set up, it had

24   these five custodians, four from the list of custodians that GP

25   had identified as being likely to have responsive ESI that was

1   shared with the plaintiffs and one who was not on that list?

2   A    That's correct.

3   Q    And you mentioned today that you did four rounds, at least

4   four rounds of this validation process?

5   A    Right.

6   Q    Were all of those rounds -- did all of those rounds of

7   testing involve all five of those custodians in the sample set?

8   A    The final validation phase after we received the

9   plaintiffs' input did not include Mr. Bellinger.

10  Q    So the final round of testing was just on the four

11  custodians that you identified earlier, the four senior

12  executives that GP, Georgia Pacific had identified as being --

13  A    That's correct.

14  Q    -- likely to have responsive documents and this so-called

15  controlled custodian Mr. Bellinger's files were not included in

16  that validation test?

17  A    They were completely removed and suppressed.  We did

18  not --

19  Q    And that was the test that had the result of 4.2 percent?

20  A    Yes.

21       MR. NEUWIRTH:  We have no further questions, Your

22  Honor.

23       THE COURT:  You can cross.

24       MR. MOGIN:  Can we possibly delay the cross, the

25  beginning of cross till after the lunch hour in light of the

1    fact that we're bringing Mr. Regard back?

2         THE COURT:  Cross when -- you're saying after lunch?

3         MR. MOGIN:  Yes.

4         THE COURT:  Oh.  And then that's going to cut into

5    your time?

6         MR. MOGIN:  Well, I understand that, but Mr. Regard's

7    going to come back so there will be some second sessions.

8         THE COURT:  No, I -- I actually, I'm going to talk to

9    Chris about what we're doing.  I'm also -- I'm just so confused

10   on this.  Do you want to take a break for lunch now, is that

11   what you're saying?  Because if you want to take a break for

12   lunch, that's fine with me.  We were going to go -- and then

13   we'll -- you've got the two witnesses this afternoon.

14        MR. MOGIN:  Yes, Your Honor.

15        THE COURT:  Okay.  So let's take a break.  We're

16   taking one hour, so we're back here at 1:20.  Okay.

17        MR. MOGIN:  Thank you, Your Honor.

18        THE COURT:  And we will do cross-examination then.

19   Okay.  Thank you.

20        (Whereupon, said trial was recessed at 12:20 p.m., until

21         1:20 p.m.)

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   KLEEN PRODUCTS, LLC, et al.,        ) No. 10 C 5711
                                         )
 4                   Plaintiffs,         )
                                         )
 5            v.                         )
                                         )
 6   PACKAGING CORPORATION OF AMERICA,   ) February 21, 2012
     et al.,                             ) Chicago, Illinois
 7                                       ) 1:20 p.m.
                   Defendants.           ) Evidentiary Hearing
 8
                  TRANSCRIPT OF PROCEEDINGS
 9   BEFORE THE HONORABLE MAGISTRATE JUDGE NAN R. NOLAN

10   APPEARANCES:

11   For the Plaintiffs:        FREED KANNER LONDON & MILLEN LLC
                                2201 Waukegan Road
12                              Suite 130
                                Bannockburn, Illinois  60015
13                              BY:  MR. MICHAEL J. FREED
                                     MR. ROBERT J. WOZNIAK
14
                                THE MOGIN LAW FIRM, P.C.
15                              707 Broadway
                                Suite 1000
16                              San Diego, California  92101
                                BY:  MR. DANIEL J. MOGIN
17
                                SCOTT & SCOTT LLP
18                              707 Broadway
                                San Diego, California  92101
19                              BY:  MR. WALTER W. NOSS

20

21

22           TRACEY DANA McCULLOUGH, CSR, RPR
                    Official Court Reporter
23                219 South Dearborn Street
                         Room 1426
24                Chicago, Illinois  60604
                      (312) 922-3716
25
```

```
 1   APPEARANCES CONTINUED:

 2   For Defendant Packaging        KIRKLAND & ELLIS LLP
     Corporation of America:        300 North LaSalle Street
 3                                  Chicago, Illinois  60654
                                    BY:  MR. BARACK S. ECHOLS
 4                                       MR. LEONID FELLER

 5   For Defendant                  FOLEY & LARDNER LLP
     International Paper:            777 East Wisconsin Avenue
 6                                  Milwaukee, Wisconsin  53202
                                    BY:  MR. JAMES T. McKEOWN
 7
                                    FOLEY & LARDNER LLP
 8                                  321 North Clark Street
                                    Suite 2800
 9                                  Chicago, Illinois  53202
                                    BY:  MS. JOANNE LEE
10
     For Defendant                  MAYER BROWN LLP
11   Temple-Inland:                 71 South Wacker Drive
                                    Chicago, Illinois  60606
12                                  BY:  MR. ANDREW S. MAROVITZ
                                         MS. BRITT M. MILLER
13
     For Defendants                 K & L GATES LLP
14   Cascades and Norampac:         70 West Madison Street
                                    Chicago, Illinois  60602
15                                  BY:  MR. SCOTT M. MENDEL

16   For Defendant                  QUINN EMANUEL URQUHART &
     Georgia Pacific:               SULLIVAN LLP
17                                  51 Madison Avenue
                                    22nd Floor
18                                  New York, New York  10010
                                    BY:  MR. STEPHEN R. NEUWIRTH
19
                                    FIGLIULO & SILVERMAN
20                                  Ten South LaSalle Street
                                    Suite 3600
21                                  Chicago, Illinois 60603
                                    BY:  MR. JAMES R. FIGLIULO
22
     For Defendant                  WINSTON & STRAWN
23   RockTenn CP, LLC:              227 West Monroe Street
                                    Suite 4400
24                                  Chicago, Illinois  60606-5096
                                    BY:  MR. R. MARK McCAREINS
25                                       MR. JOSEPH L. SIDERS
```

PDF created with pdfFactory trial version www.pdffactory.com

1    APPEARANCES CONTINUED:

2    For Defendant                    McDERMOTT WILL & EMERY LLP
     Weyerhaeuser Company:            227 West Monroe Street
3                                     Suite 4400
                                      Chicago, Illinois  60606-5096
4                                     BY:  MS. RACHAEL V. LEWIS

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1  SAMUEL W. BROWN, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

2          THE COURT:  Okay.  Mr. Mogin.

3          MR. MOGIN:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5  BY MR. MOGIN:

6  Q    Mr. Brown, let's be clear, you are a lawyer representing

7  or assisting in the representation of a defendant in this case,

8  is that true?

9  A    I'm an attorney licensed in Tennessee and Georgia, and I

10  am a contract attorney that works as an independent contractor

11  through Counsel On Call that is engaged by Georgia Pacific.  I

12  am not an attorney of record in this matter.

13  Q    Do you have a duty of loyalty to Georgia Pacific?

14  A    I would think so, yes.

15  Q    Did you act on that duty in connection with this

16  engagement?

17  A    Yes.

18  Q    So I want to make sure that I understand the chronology

19  that you've outlined.  Someone presented you in May of 2011

20  with a set of search terms, is that correct?

21  A    That's correct.

22  Q    And who presented those to you?

23  A    It came from Quinn Emanuel.

24  Q    And was it developed by Quinn Emanuel?

25  A    No.  My understanding was that it was developed by counsel

1   for International Paper.

2   Q    That would be the -- at that time the Gibson Dunn firm?

3   A    I'm sorry?

4   Q    At that time the Gibson Dunn firm?

5   A    All I know is that it came from International Paper.

6   Q    Well, did you talk to anybody who had created the search

7   string?

8   A    No.

9   Q    How many terms were on that search string?

10  A    It was a set of around I want to say between 12 and 16

11  strings that had, you know, a number of terms, 3 or 4 terms for

12  each string.

13  Q    Did you retain a copy of that in your file?

14  A    Yes.

15  Q    Do you have it with you today?

16  A    No.

17  Q    Were you instructed not to bring it with you today?

18  A    No.

19  Q    And then the next thing that happened was you reviewed

20  those search terms, correct?

21  A    Correct.

22  Q    And you made some suggested changes?

23  A    The first thing that we did was we tested those terms

24  against our test corpus.  We ran -- we set the terms up in the

25  syntax appropriate for Clearwell, and then we ran those terms

1   against the 94,000 document test corpus that we had set up in

2   Clearwell.  We then reviewed --

3   Q    No, sir.  My question was -- had to do with the search

4   string.

5   A    Yes.

6   Q    Who made the next set of modifications to the search

7   string?

8   A    We all did.

9   Q    Who's we all?

10  A    We were working collaboratively with Quinn Emanuel, with

11  KPMG, and with Georgia Pacific.

12  Q    Anyone else?

13  A    Only the people on my team and Counsel On Call.

14  Q    And how many people were on your team at Counsel On Call?

15  A    At times another person or two people.  Myself and two

16  others.

17  Q    Was that true of when you engaged in the review process as

18  well?

19  A    No, there -- you mean the document review?

20  Q    Yes.

21  A    No.  There are I think 14 attorneys on that project.

22  Q    14.  Okay.

23  A    Yes.

24  Q    Now, going back to this chronology, if you will.  So when

25  is the second iteration filed?

PDF created with pdfFactory trial version www.pdffactory.com

1   A    Okay.  After we -- the next step in the process --

2   Q    If you could just tell me when the next iteration of

3   search strings came out, please.

4   A    Well, I'm not sure I understand your question.

5   Q    Okay.  First you got the set from IP, and then you did

6   something.  And then you came up with a new set of search

7   strings or an amendment to the first set, correct?

8   A    Correct.

9   Q    Okay.  And when was that?

10  A    That would have been about a week after we received the

11  first set of strings.

12  Q    Okay.  And so the collaborators in that process were

13  Counsel On Call --

14  A    Georgia Pacific --

15  Q    -- Quinn Emanuel, and KPMG?

16  A    And internal counsel at Georgia Pacific.

17  Q    I'm sorry?

18  A    And internal counsel at Georgia Pacific.

19  Q    Internal counsel from Georgia Pacific.  Was anybody from

20  the IT department involved?

21  A    Not in the development of the search terms, no.

22  Q    And then that's when you ran your first tests, correct?

23  A    After we developed what we consider to be a robust set of

24  search terms, we then ran our first validation exercise, and

25  that would have been around the latter -- the middle part of

PDF created with pdfFactory trial version www.pdffactory.com

1   June I believe.

2   Q    Okay.  And do you have the results of those tests?  You

3   maintain those in your files?

4   A    Yes.

5   Q    Do you have them with you today?

6   A    I do not.

7   Q    Okay.  And then what happens next in the process of

8   developing the search strings?  You're up to June now.

9   A    At that point we handed the set of search terms and

10  strings off to the defendants.

11  Q    To which defendants?

12  A    The defendants would have been -- well, I don't know

13  exactly which defendants.  I know it would have been at least

14  International Paper.  That was through Quinn Emanuel.

15  Q    So you gave them back to Quinn Emanuel?

16  A    Correct.

17  Q    And Quinn Emanuel made some circulation, the details of

18  which you're not aware of?

19  A    That's correct.

20  Q    All right.  And then what happened?

21  A    Then we received feedback through Quinn Emanuel from the

22  other defendants.

23  Q    How do you know it was from the other defendants?

24  A    That's what I was told.

25  Q    Was there any indication that, for example, Rock Tenn

1   suggests the following terms or PCA suggests the following

2   terms, anything like that?

3   A    I do recall one instance when International Paper

4   suggested that we add the term, I think it was rationalize.

5   But generally speaking, the conversations were cordial and were

6   not as specific as to this defendant says we should do X, that

7   defendant says we should do Y, the next defendant says we

8   should do Z.  Rather, my understanding was that there was a

9   discussion that was then presented to us.

10  Q    All right.  We're up to June now.  So then what happened?

11  A    Okay.  Then at that point we revised the terms based on

12  the input from defendants.  We ran a rationalization process of

13  our own in which we sought to condense the search terms.  At

14  this point -- prior to that time there were -- it was a certain

15  level of redundancy because each term was developed either for

16  a specific concept or a specific RFP.  But we decided to reduce

17  the duplication.  And then we ran another -- after the

18  completion of the rationalization process we ran another

19  validation exercise.

20  Q    Do you mean to suggest that sometime after the

21  June 15th-ish event that there was some sort of a list that

22  existed that linked specific requests for production of

23  documents to specific search strings?

24  A    We documented all of our work.

25  Q    Do you have any of your documentation with you today?

Brown - cross by Mogin

1   A    No.

2   Q    Did you ever create any document that linked specific RFPs

3   to specific requests for production of documents to specific

4   keyword strings?

5   A    Yes.

6   Q    Do you still have that document?

7   A    I do.

8   Q    Do you have that document with you?

9   A    No.

10  Q    Does counsel have that document?

11  A    I would -- I honestly don't know if they have them today

12  or not.

13  Q    How many requests for production of documents do the

14  search strings attempt to capture?

15  A    I believe it was around 15 or 18.

16  Q    15 or 18 requests for production of documents?

17  A    That's correct.

18  Q    Now, you're aware, are you not, that at some point the

19  defendants requested -- strike that.

20       Were you aware that in January of 2011 at the

21  defendants' request the plaintiffs provided a list of

22  categories?

23  A    I don't believe I was aware of that.

24  Q    Were you aware that plaintiffs provided a revised list of

25  categories in March of 2011?

1    A    I do not believe I was aware of that.

2    Q    So you never saw either of those category lists?

3    A    If I did, I have no recollection of them.

4    Q    Well, okay.  Were you aware that at the defendants'

5    request the plaintiffs provided a list of document requests

6    that they labeled as the conduct requests as opposed to

7    transactional requests?

8    A    Not specifically, no.  I'm aware that, I'm aware that

9    there were document production requests.  I believe that there

10   were around 90 or 95, 96 requests that were -- that we did

11   receive a copy of those.

12   Q    Well --

13   A    But in terms of how those were subsequently discussed

14   between the parties and divided, I have no knowledge of that.

15   Q    Okay.  So I believe that -- well, I guess plaintiffs'

16   requests for production of documents have not been placed in

17   evidence yet.  Let me see if I can get a copy of those and put

18   them before you, please.

19   A    I'm sorry, but if you could speak up.  I'm only getting

20   about half of what you're asking me.

21   Q    I'll speak up.

22   A    Thank you.

23   Q    But I'm not yelling at you.

24   A    Very good.

25         MR. MOGIN:  We would ask, Your Honor, that this be

1    marked.  This is plaintiffs' first request for production of

2    documents directed to all defendants.  And this I believe would

3    be Plaintiffs' 5.  And for clarity of the record, Your Honor,

4    during the break I realized that I had been referring to

5    Plaintiffs' 4 previously as Plaintiffs' 5.  And that was the

6    letter of November --

7              THE COURT:  23rd.

8              MR. MOGIN:  Yes.

9              THE COURT:  That's what I have as 4.

10             MR. MOGIN:  Thank you.  So this will be No. 5, and

11   this is plaintiffs' first request for production of documents.

12   BY MR. MOGIN:

13   Q    So, Mr. Brown, can you tell me which of plaintiffs'

14   document requests the 15 search strings that you've testified

15   about relate to.

16             MR. NEUWIRTH:  Can I ask for clarification.  Are you

17   talking about the 15 that came from International Paper or

18   something else?

19             MR. MOGIN:  Well, we're up to June, correct?

20             THE WITNESS:  Correct.

21             MR. NEUWIRTH:  The testimony -- the only reason I'm

22   asking this question for the interest of everybody getting this

23   right is that I believe the testimony about 15 search strings

24   related to what was received from International Paper at the

25   very beginning of the process.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MOGIN:  All right.  Let me clarify that.

2          THE COURT:  Thank you.

3    BY MR. MOGIN:

4    Q    So by the end of June do you recall how many search

5    strings there were?

6    A    Somewhere between 15 and 25.

7    Q    Was it -- let me represent to you, if I may, that the

8    final search string that we received from Georgia Pacific,

9    which is in evidence as Exhibit 5, has 21 strings.  It's

10   actually 17 strings, 4 of them have subparts.  Does that ring a

11   bell?

12   A    Yes.

13   Q    So it's 21 slash 17, correct?

14   A    Yes.

15   Q    All right.  Now, please refer, if you would, to Exhibit 5

16   and tell me which requests for production of documents the

17   search strings, those search strings relate to.  And if you

18   like, Mr. Brown, on the very last page there should be a list

19   of categories with subheadings, and that might assist you.

20          MR. NEUWIRTH:  Your Honor, the witness has been

21   requested to answer a question about what I believe is now the

22   final set of search terms and which requests they relate to.

23   As Mr. Mogin notes, the final set of search terms is something

24   that was an exhibit to one of our filings.  And so I don't --

25   it may be helpful to the witness to have that with him when he

1   answers this question.  But I defer to everyone.  I just wanted

2   to make that option available.

3           THE COURT:  Do you know where that document is?

4           MR. NEUWIRTH:  Yes.  It is, it's Exhibit 5 to our --

5   to docket No. 288.

6           THE COURT:  You want to show that to -- Mr. Mogin,

7   you want to show that to Mr. Brown?

8           MR. MOGIN:  Well, I want to be clear about something

9   first, please, Your Honor.  I believe Exhibit 5 is the October

10  list.  I think the June list that the witness is referring to

11  is Exhibit 4.

12          MR. NEUWIRTH:  Well, you -- Mr. Mogin, in fairness

13  when the witness answered this question, you then referred to

14  the final list.  When the witness said he recalled somewhere

15  between 18 and 25 in June, you then said that the final list

16  had X number.  And so it wasn't clear.  It seemed to me you are

17  now asking about the final list.

18          MR. MOGIN:  Well, let's then -- I will be happy to

19  clarify it.  If I can get --

20          MR. NEUWIRTH:  We have -- there are two lists.

21  Exhibit 3 to our filing docket No. 288 is the list from

22  August 5th, 2011, which I believe there was testimony was sent

23  to the plaintiffs.  Exhibit 5 is the final list, which I don't

24  have -- it doesn't have an exact date on it, but it is the

25  final list.  So both of those are available.

1   BY MR. MOGIN:

2   Q    All right.  We'll skip ahead.  We'll move forward from

3   June.  We'll move forward to sometime in August.

4   A    And let me just add additionally that when we initially

5   started the search term process, perhaps this will clear up

6   some of the discussion, we for organizational purposes and

7   because the search strings that we were provided were organized

8   by RFP, that is how we started the process.  But eventually we

9   felt that it would be a better approach to organize the search

10  strings around broad concepts that encompassed the RFPs but

11  went beyond -- that were more of a concept approach, especially

12  after the rationalization occurred.

13          So by the end of the process, by the final set that I

14  believe you were given, it would not be correct to say that

15  they were an RFP specific set of search strings.  But rather

16  they were responsive to concepts that were embodied in the

17  RFPs.

18          MR. MOGIN:  I'm going to move to strike that answer

19  as being nonresponsive, if I may, Your Honor.

20          MR. NEUWIRTH:  Your Honor, that's --

21          THE COURT:  All right.  I'm going to leave -- okay.

22  We're going to leave it in.  I'm overruling the objection, and

23  we're leaving it in.  Can we go back to -- can we get a little

24  context here.  Okay.  Because I think -- I mean, I'm confused

25  so the witness may also be confused here.  So which one of the

PDF created with pdfFactory trial version www.pdffactory.com

Brown - cross by Mogin                          156

1    lists of search terms do you want him to refer to?  And let's

2    give him a copy if we have that.  If it is June, August -- so

3    far I have June, August, or October.  And then that I guess is

4    tied to an RFP is what your question is.

5            MR. MOGIN:  What I had hoped to do, Your Honor, was

6    to use the August 5th list of search terms, which I think

7    relates to his June process that he's talked about.  I'm trying

8    to establish the chronology myself.

9            THE COURT:  Okay.

10           MR. MOGIN:  And then -- but we don't apparently have

11   that with us here in the courtroom.  So in order to move the

12   proceedings I'll modify my questioning, and I'm going to skip

13   ahead a little bit, but I might have to come back in order to

14   get the chronology correct.

15           THE COURT:  Okay.

16           MR. MOGIN:  So I will now place before the witness

17   what I'll ask to be marked as Plaintiffs' 6 which -- and even

18   though, Your Honor, there is a fly -- there's a fly sheet here,

19   Your Honor, that says Exhibit 5, but that relates to the

20   Exhibit 5 to the motion that was submitted to you.

21           THE COURT:  So if you'll give it to Miss McCullough

22   and give one to the witness.  Thank you.

23       (Document tendered.)

24           MR. NEUWIRTH:  I'm sorry.  Exhibit 5 is the final

25   list, not the August list.  Exhibit 3 is the August list.

Brown - cross by Mogin                      157

1           MR. MOGIN:  I think I tried to specify that, Your
2    Honor.  We don't have a copy of the August list here in the
3    courtroom or sufficient copies, so we're skipping ahead.
4           THE COURT:  Okay.  So this is the -- just tell me
5    what month this is.
6           MR. MOGIN:  The plaintiffs received this in October.
7           THE COURT:  Okay.  Got it.
8    BY MR. MOGIN:
9    Q    So I'll tell you what, before I start asking questions
10   about these two documents, let's do a little back and fill on
11   the chronology, shall we.
12   A    Sure.
13   Q    So in June you completed an iteration and then did some
14   testing.  And then do you understand that that document was
15   provided to the plaintiffs in early August, August the 5th?
16   A    I believe around the 5th of August, yes.
17   Q    Were any changes made between the testing and validation
18   process that you described taking place in June and August the
19   5th?
20   A    No.
21   Q    Okay.  Did anything happen with respect to development of
22   the search strings during the month of August?
23   A    No.
24   Q    So the next event in this chronology would be the receipt
25   of plaintiffs' critique of the first set of the search terms,

1    is that correct?

2    A    That would be correct.

3    Q    And as I understood your testimony, you looked over that

4    critique, correct?

5    A    That is correct.

6    Q    And, in fact, that critique is before you as Plaintiffs'

7    Ex -- I'm sorry, as defendants' search term -- it's Defendants'

8    Exhibit 2.

9    A    Correct.

10   Q    So you looked that over and you adopted -- can you tell us

11   precisely which of the suggestions of plaintiffs were adopted

12   from the next iteration?

13   A    Well, I think we -- the first thing that we did was

14   conceptually try to understand what the -- you know, the core

15   objection was to what the plaintiffs were saying with respect

16   to our search terms.  So as I read the first page of the first

17   paragraph, it's reading from the document:  "In addition to the

18   above nonexhaustive list of core terms, the following items and

19   derivatives that appear in the RFP definitions do not appear in

20   the defendants' list."  And there is a list of terms, which I

21   took to be search terms.  They appeared to have been taken from

22   the plaintiffs' RFPs.  So the first thing that I did was to

23   actually build a search string that encompassed this entire

24   list.  And --

25   Q    One search string?

1  A     One search string.  Because it is -- this appears to be a

2  search string, is the way it is structured.  And I ran that

3  against our test corpus.

4  Q     May I ask what led you to believe that that was intended

5  to be one search string?  Do you see any logical connectors

6  there?

7  A     Well --

8  Q     Do you see any parentheses there?

9  A     No, but it is -- well, I see a number of parentheses -- I

10  see a number of -- not parentheses, no.

11  Q     Do you see any *ands* in that string?

12  A     It was a set of terms that we were missing.

13  Q     Do you see any *ands* in that string?

14  A     No.

15  Q     Do you see any *ors* in that string?

16  A     No.

17  Q     Do you have any proximity indicators within that string?

18  A     Nope.

19  Q     Do you see any groupings of documents within that string?

20  A     Actually there is one *and*.

21  Q     There's one *and*, and where is that *and*?

22  A     At the very end.

23  Q     At the very end.  So that indicates to you, does it not,

24  that this was not indicated to be a single search string?

25  A     No, it was indicated to be a single search string.  But it

1    was indicated that our search strings were deficient by lacking

2    all of these terms.

3    Q    But you then created one search string and ran that, is

4    that right?

5    A    Yes.

6    Q    Using all of these terms?

7    A    That's correct.

8    Q    And what did you conclude on that basis?

9    A    Well, it pulled back approximately 67,700 hits from our

10   94,000 document test corpus.

11   Q    The one search string did?

12   A    With all these terms.

13   Q    Got two/thirds of your documents?

14   A    Yes.

15   Q    And so did that make it a valid search string in your

16   opinion?

17   A    It did not.

18   Q    Now, let's talk about your opinion of search strings.  Do

19   you have any training in linguistics?

20   A    No.

21   Q    Do you have any training in statistics?

22   A    Not for many years.

23   Q    Do you have any training in the science of information

24   retrieval?

25   A    Not beyond -- as in terms of like a degree or something,

Brown - cross by Mogin                                     161

1    no, I do not.

2    Q     How about national language processing?

3    A     I know what the term means, but I -- no.

4    Q     So you applied your lawyerly training and expertise to

5    development of the search strings, is that right?

6    A     Correct.

7    Q     So are you an expert in search strings, is that your

8    contention?

9    A     I am -- I have created and ran hundreds, if not thousands

10   of searches on a variety of different subjects in a variety of

11   different litigations.

12   Q     Are you an expert on the creation of Boolean search

13   strings?

14   A     I consider myself to be knowledgeable and experienced.  I

15   do not consider myself to be an expert.

16   Q     Do you know what the term Boolean search string refers to?

17   A     Yes.

18   Q     What does it refer to?

19   A     It's from Boolean algebra in which keyword terms are

20   connected to one another by various connectors that either

21   cause the computer that's running the search string to pull in

22   combinations of documents based on the instructions provided by

23   the connectors.

24   Q     Are you familiar with the term polysemy, P-O-L-Y-S-E-M-Y?

25   A     No.

Brown - cross by Mogin                                   162

1   Q    Pardon me?

2   A    No.

3   Q    Are you familiar with the term synonymy, S-Y-N-O-N-Y-M-Y?

4   A    Well, synonym in the sense of like a word that has the

5   same meaning as another word.

6   Q    Do you know?

7   A    If that's the word that you're using, that's how I would

8   define it, yes.

9   Q    Have you heard the word before?

10  A    Yes.

11  Q    Have you engaged in exercises in connection with

12  developing Boolean keyword strings that involve polysemy or

13  synonymy?

14  A    I may very well have, but not using that nomenclature.

15  Q    What are the effects in developing Boolean keyword strings

16  of either of those phenomena?

17  A    I'm sorry?

18  Q    What are the effects when you develop a Boolean query of

19  either of those phenomena?

20  A    Well, like I said, I don't know what the terms mean.

21  Q    All right.  Well, if you can refer please to Plaintiffs'

22  Exhibit 2, page -- I believe it's page 4.  You'll see on the

23  left-hand side there's a box.

24  A    I'm sorry.  I don't know which one Plaintiffs' Exhibit 2

25  is.

1    Q    It's entitled "Making Document Review Faster Cheaper and

2    More Accurate."

3            THE COURT:  What page did you say?  What page did you

4    say, Mr. Mogin?

5            MR. MOGIN:  Page 4, please, Your Honor.

6            THE WITNESS:  I'm sorry.  Which page?

7    BY MR. MOGIN:

8    Q    Page 4.  In the middle of the page you'll see that there's

9    a subheading, "So What Exactly is Concept Searching?"

10   A    Yes.

11   Q    Do you see the box on the left-hand side?

12   A    I do.

13   Q    All right.  And do you see the definition of polysemy that

14   appears there?

15   A    Let me read the entire paragraph.  All right.

16   Q    All right.  Now, having read that paragraph, do you have

17   an understanding of the impacts of either polysemy or synonymy

18   in connection with the development of Boolean search queries?

19   A    They can introduce false positives and false negatives

20   into the --

21   Q    Did you know that before you read this document?

22   A    I knew that the concept that the English language isn't --

23   well, I know that the English language isn't perfect.  And I

24   know that care must be taken in the construction of Boolean

25   strings to -- and testing of the results of running the strings

PDF created with pdfFactory trial version www.pdffactory.com

1    needs to be taken in order to ensure the results that you wish.

2    I have not specifically read KPMG's promotional literature, and

3    I have not heard those two terms.

4    Q    All right.  Now, when you constructed what eventually

5    became Plaintiffs' Exhibit No. 6; that is, the search strings,

6    did you review Plaintiffs' Exhibit No. 5, the RFPs?

7    A    I reviewed the RFPs, yes.

8    Q    Did you look in the defined terms?

9    A    Yes.

10   Q    And did you attempt to incorporate into your Boolean

11   strings each of the defined terms?

12   A    No.

13   Q    Now, let's go back then to exhibit -- to the final search

14   string list Exhibit 6.  And take a look, if you would, and

15   compare that to Plaintiffs' 5, the RFPs.  And please tell us

16   which of the 15 or so RFPs that you have identified are

17   reflected in the search strings -- in each of the search

18   strings in Exhibit 5.

19   A    Well, by this time --

20        MR. NEUWIRTH:  Your Honor, I have to object to this

21   question.  This question is mixing up things that were said

22   earlier.  There's been no testimony that this related to just

23   15 of the RFPs.  That was a question that was asked about a

24   different point in the process.

25        THE WITNESS:  Right.  By this time by the end of --

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Mr. Brown, just one minute, because I

2   want the record to be clear here.  So let's -- why don't you --

3   I think now we're to the right month and to the right document.

4   So why don't you ask your question.  I have Plaintiffs' Exhibit

5   5 is the RFP that was directed to all defendants.  I don't have

6   a -- let me see.  So this was May 3rd you sent it out.

7          MR. MOGIN:  Correct.

8          THE COURT:  And I think Plaintiffs' Exhibit 6 is a

9   document that, I don't know whether the record is clear, but I

10  think this is a record of search strings that you sent to the

11  defendants.

12         MR. MOGIN:  No, Your Honor.

13         THE COURT:  Oh.

14         MR. MOGIN:  This is the end products of defendants'

15  search strings.  This is what was sent to the plaintiffs by

16  Georgia Pacific in October of 2011 after we went through the

17  iterations that were described in the chronology of the

18  witness' testimony.

19         THE COURT:  So now you are at -- so now ask your

20  question.  Now that I'm straight on that, why don't ask your

21  question about the two documents.

22         MR. MOGIN:  All right.

23         THE COURT:  Okay.  So Mr. Brown has a chance now to

24  see what goes with what.  Okay.

25  BY MR. MOGIN:

1   Q    So, Mr. Brown, how many of the plaintiffs' RFPs from

2   Exhibit 5 are represented in your opinion in search strings in

3   Plaintiffs' Exhibit 6?

4   A    I don't think I can answer that question because the

5   method that we used by the time this final set of search

6   strings was prepared had become significantly divorced from the

7   RFPs themselves.  Basically, by way of background defense

8   counsel made -- responded to these RFPs as I understand it.

9   They objected to certain RFPs as being objectionable for some

10  reason.  Other RFPs were identified that would be answered by a

11  sufficient to show methodology or where a specific custodian

12  could be identified or specific source of data at Georgia

13  Pacific could be identified that would satisfy the RFP.

14          Some RFPs were duplicative or it was unclear.  And so

15  the end result of the process, though, was that there was a

16  collection of RFPs that would be used that we would have to

17  develop search terms for to search the ESI.  And that process

18  resulted in this set of search strings.

19  Q    Is the bottom line of that testimony that you're unable to

20  link specific search strings in Plaintiffs' 6 with specific

21  document requests in Plaintiffs' 5?

22  A    And again, I'm sorry.  I did not hear what you said.

23  Q    I said is the result of the process that you've just

24  described that you are unable to tell us which of the search

25  strings in Plaintiffs' Exhibit 6 correspond to the RFPs or to

1   particular RFPs in Plaintiffs' Exhibit 5?

2   A    No, I could go through the RFPs one by one and potentially

3   locate search strings that may have had a bearing on that, on

4   the specific RFP.

5   Q    But in the process of creating the RFPs, in other words,

6   you would have to do that as of now; is that correct?

7   A    That's correct.

8   Q    There's not a document that you could refer back to that

9   would link these final RFPs; that is, Exhibit 6 to specific

10  document requests in Exhibit 5?

11  A    Not at the end of the iterative process, no.

12  Q    Now, did you do anything to assure yourself that all of

13  the defined terms in Exhibit 5 were incorporated into Exhibit

14  6?

15  A    Did I do anything to determine that all of the terms in

16  the RFPs were included in the search term string?

17  Q    I just asked about the defined terms.  If you'll refer to

18  Exhibit -- well, do you understand the concept of defined

19  terms --

20  A    I do.

21  Q    -- as it relates to RFPs?

22  A    Right.

23  Q    Okay.

24  A    You have defined the meaning as specified by the

25  paragraph.

1   Q    So you see the section that says definitions beginning on

2   page 1?

3   A    Yes.

4   Q    And it continues, does it not, on to -- through page 10?

5   A    Correct.

6   Q    And did you review those definitions?

7   A    I did.

8   Q    And did you do anything to assure that those defined terms

9   were incorporated within the final search string that is

10  Exhibit 6?

11  A    We read at the beginning of the process the entire set of

12  RFPs.  We read the definitions of the definitional section.

13  And all of that information was included in our deliberations

14  throughout the entire process.  I did not go back at the end of

15  the process and check off the boxes, if that's what you're

16  asking.

17  Q    So the answer is that you don't know whether all of the

18  defined terms are reflected in the search strings?

19  A    No.  My answer is that I read the RFPs cover to cover.  I

20  read the defined terms, and I used that information to build

21  the search strings.

22  Q    Are all --

23  A    And, in fact, to then, you know, test the search strings.

24  Q    Are each of the defined terms included in the search

25  strings?

PDF created with pdfFactory trial version www.pdffactory.com

1    A    I'm sure they are not.

2    Q    Do you have any documentation that would show us which

3    ones were included and which were eliminated?

4    A    On the defined terms, no.

5    Q    What did you do in terms of search terms when plaintiffs

6    asked for all documents relating to a particular concept?  How

7    did you pick up using your Boolean logic the term relating?

8    A    What we did was we started with a process.  We had a

9    process.  We started at the beginning of that process with the

10   International Paper search terms.  We then went through a

11   number of rounds of iterations, of discussions, of revisions,

12   of testing of the individual terms.  The upshot of which was at

13   various stages in the process we would have a collection of

14   search strings with terms that we felt covered the ESI that we

15   were charged with locating.  At that time we then tested the

16   result of that.

17           MR. MOGIN:  Your Honor, may I have an answer to my

18   question, please.

19           THE WITNESS:  I'm answering your question.

20           THE COURT:  Hold on.  I think Mr. Brown is answering

21   your question.  Okay.  You can continue, Mr. Brown.

22           THE WITNESS:  Thank you.  At each stage of the

23   process after the cumulative discussions were completed we

24   engaged in a set of testing of validation with our test corpus

25   that I had already described.  We had what we considered --

1    what we called the combined composite set and the null set.

2    The combined composite set being the collection of hits that

3    resulted from all of the search strings.  The null set being

4    the quantity of the -- the ECA corpus that were left over after

5    those hits were removed.  We then picked statistically

6    significant samples of each one of those bodies and did a

7    linear review of them based on our experience as review

8    attorneys.  Again having read the RFPs, having read the

9    definitional section, having read the complaint.

10          And we went through and we actually coded those

11   documents in Clearwell so that, you know, on the -- for

12   example, on the -- in the first round of iterations we -- or in

13   first round of development we looked at 400 documents from the

14   combined composite set and determined that 218 of those had

15   been pulled in by the search terms and were responsive.  We

16   then looked at the null set and we looked through 660 of those,

17   and from that initial 660 set, if memory serves, there were two

18   documents that were technical problem documents that couldn't

19   be identified.  There were 27 documents that were marginally

20   responsive, and the remaining set of documents were

21   nonresponsive.

22          So to answer your -- so to bring all this back

23   together and to specifically answer your question, our goal in

24   creating a set of search terms was in effect to create

25   something like a net or a mesh that we could run through the

1    ECA corpus and pull out every document that was responsive to

2    those hits, and then most importantly go back and validate the

3    process by testing the null set.

4    BY MR. MOGIN:

5    Q    Okay.  You had a process.  Who designed the process?

6    A    The process was developed by me and was developed in

7    coordination with my superiors at Counsel On Call.

8    Q    What input did the plaintiffs have in the process?

9    A    In the process that we used we solicited -- the input that

10   we received, for example, in the September 15th correspondence

11   we utilized that in defining our terms.  But in terms of the

12   process itself, it was a process that the defense group

13   developed.

14   Q    Okay.  And did you ever become aware that plaintiffs sent

15   a second letter in November regarding what's been marked as

16   Exhibit 6?

17   A    Would that be this document?

18   Q    November 10th, 2011.

19   A    22nd.

20   Q    Let's mark it.  Perhaps it hasn't been marked yet.  This

21   will be Plaintiffs' 7.  Let me direct your attention to the

22   bullet points beginning on page 3.

23   A    Yes.

24           THE COURT:  So this is Exhibit 7?

25           MR. MOGIN:  This is Plaintiffs' 7, Your Honor.

1          THE COURT:  Plaintiffs' 7.

2          THE WITNESS:  Yes.

3   BY MR. MOGIN:

4   Q    Yes, you have seen this letter before?

5   A    I believe I have, yes.

6   Q    Okay.  And after receipt of this letter were the search

7   terms subsequently modified in any way that reflects the

8   concerns expressed in the letter?

9   A    No.  I don't believe so because this letter was sent on

10  the 10th of November, and I do not believe that we changed any

11  of the search terms subsequent to that time.

12  Q    Now, you said that the search strings in part reflected

13  defendants' objections to plaintiffs' requests for production

14  of documents, is that right?

15  A    Again, I do apologize.  I'm sort of hard of hearing in one

16  ear.

17  Q    I said is it correct that defendants' objections to

18  plaintiffs' requests for production of documents are reflected

19  in your search term list?

20  A    In the sense that once an objection was made to the

21  request, that request was not considered in the construction of

22  the strings.  That doesn't mean to say, however, that these

23  search strings would not necessarily pull up documents that

24  might be responsive to one of those.

25  Q    So who identified the ESI corpus that you were given?

PDF created with pdfFactory trial version www.pdffactory.com

1    A    I'm sorry.  You're going back to the beginning of the

2   process?

3    Q    At the beginning of the process who identified the corpus?

4    A    The four custodians were identified by Georgia Pacific.

5    Q    Did you have anything to do with the collection of

6   documents from Georgia Pacific?

7    A    No.

8    Q    Did Counsel On Call participate in that process?

9    A    We do not do that.

10   Q    So if a mistake was made in the collection of the process,

11  in your opinion would that have impacted the search results?

12   A    It would depend on the nature of the mistake.

13   Q    Documents that should have been included were eliminated.

14   A    If documents that were -- that should have been included

15  were eliminated, then those would not have been in the test

16  corpus.  And it is possible that a search term that would have

17  been developed otherwise might not have been developed.

18   Q    And a responsive document or a document that might

19  otherwise have been responsive couldn't have been found no

20  matter how good your Boolean strings were, correct?

21   A    Not necessarily, no.  The -- your argument is premised --

22  the question as I understand it is premised on the idea that a

23  unique search term would be required for a unique document.

24  And it's very possible that that document that was not

25  collected -- I mean, if it's not in the corpus, it's not going

1  to be produced.

2  Q     Exactly.  Thank you.  Now --

3  A     If that's what you're saying me.

4  Q     That's precisely what I was asking you.  If it's not in

5  the corpus --

6  A     Okay.  I'm sorry.  I wasn't trying to make it more

7  difficult.  I just didn't understand what --

8  Q     If it's not in the corpus --

9  A     If it's not in the corpus, it's not going to be produced.

10 Q     That's right.  No matter how good your search strings

11 are --

12 A     Right.

13 Q     -- correct?  Okay.  Now, in your experience in managing

14 all of these document reviews, have you ever found documents

15 from sources other than custodians that were responsive?

16 A     Absolutely.

17 Q     Thank you.  So if you failed to search in those areas, it

18 wouldn't be reflected in the corpus, would it?

19 A     It wouldn't be reflected -- in the test corpus those

20 documents would not be present.

21 Q     Thank you.  Now, did you use the same sets of reviewers

22 for all of the tasks that you've described?

23 A     Are you speaking about the document review or about the

24 ESCA portion?

25 Q     In the review.

PDF created with pdfFactory trial version www.pdffactory.com

1    A    I'm sorry?

2    Q    In the review.  That is, when you looked at the four

3    custodians, did one group look at the null set and a different

4    group look at what you have called the combined set?

5    A    Okay.  I refer to that as the ECA portion.  Yes, I and two

6    other attorneys were responsible for that portion of the

7    exercise.

8    Q    For both the combined set and the null sets?

9    A    That's correct.  The way we did that typically was we were

10   very concerned about the issue of bias.  So null sets, for

11   example, were divided into -- whatever number that we needed to

12   test were divided into assignments, and those assignments were

13   split between the attorneys.

14   Q    And so were the attorneys that -- were the attorneys aware

15   of which set contained -- which set was the null set and which

16   set was the combined set?

17   A    Yes.

18   Q    Were you involved in the determination of which filters to

19   apply?

20   A    By filters do you mean like the date range?

21   Q    Date range, domain names, anything like that.

22   A    Not really, no.

23   Q    Do you know who was?

24   A    I would assume Georgia Pacific.

25   Q    Are you familiar with Expedia.com?

PDF created with pdfFactory trial version www.pdffactory.com

1   A    Yes.  It's a website that deals with travel matters,

2   travel reservations, travel packages, things like that.

3   Q    Okay.  And do you know whether Expedia.com was a domain --

4   strike that.

5        Do you know whether ESI that related to the domain

6   Expedia.com was excluded from the review set that you were

7   given?

8   A    It was not.

9   Q    It was not excluded?

10  A    It was not excluded.

11  Q    So you found documents from Expedia.com?

12  A    I know that their domain name was not excluded.  I don't

13  know if there were documents that had Expedia in them.

14  Q    Would you agree with me that if there were RFPs that were

15  seeking information about the travel arrangements or actual

16  travel engaged in by certain executives, that Expedia.com

17  should be included within the corpus?

18  A    I honestly don't know how Georgia Pacific organizes their

19  travel information, so I don't know if they use Expedia or not.

20  The way the Expedia came up was when the documents were first

21  moved into Clearwell, there were certain processes that were

22  performed.  And standard in every eDiscovery matter that I've

23  ever worked in, specifically de-duplication and deNISTing,

24  which I believe those terms were discussed this morning, it is

25  not uncommon to apply a domain -- a set of domain name filters

1    that are historically regarded in the industry as being, for

2    lack of a better term, junk e-mails or junk domain names.  Such

3    as, you know, ESPN.com, WSJ, The Wall Street Journal.com, maybe

4    Expedia, Orbitz, that kind of thing.

5              But in this particular case that was not done.  We

6    looked at that possibility, and we just didn't find that many,

7    many domain names of that nature that it warranted the exercise

8    of suppressing them.

9    Q    So did you look through the corpus to determine the number

10   of domain names referring to travel sites were there before you

11   determined whether or not to exclude that?

12   A    We have a list of domain names.

13   Q    Okay.  Are you the person who is responsible for doing the

14   statistical testing and reporting?

15   A    Yes.

16   Q    So if you would refer please to Plaintiffs' 5 -- I'm

17   sorry.  The November 22nd letter.

18   A    Thank you.  I would appreciate it if you'd refer to the

19   letters by their dates.  Yes.

20   Q    On page 5 there I believe you'll see a reference to a

21   confidence level?

22   A    Yes.

23   Q    And did you help author that sentence?

24   A    I did not author this letter, no.

25   Q    Just the sentence.

PDF created with pdfFactory trial version www.pdffactory.com

1   A     I provided information that was undoubtedly used in the
2   construction of the sentence, yes.
3   Q     Does the letter accurately represent the information that
4   you provided?
5   A     No.
6   Q     Do you have the results of the statistical testing with
7   you here today?
8   A     I can tell you what it was.
9   Q     Do you have the results here with you today?
10  A     I do not.
11  Q     Do they remain in your files?
12  A     Yes.
13  Q     Did Georgia Pacific's counsel have access to them before
14  November 22nd, 2011?
15  A     I don't know.  Georgia Pacific's internal counsel would
16  have.  I honestly don't know.
17  Q     You don't know whether Quinn Emanuel did or not?
18  A     I would have -- I don't know the answer to that question.
19  What this sentence -- there's another -- well, let me go back
20  by way of explaining this sentence --
21            MR. MOGIN:  Your Honor --
22            THE WITNESS:  -- if I may.  The work that we did was
23  to -- in most of our projects we strive for an error rate that
24  is perhaps 10 percent.  Meaning that in the null set we don't
25  wish to have more than 10 percent false negatives.

1    BY MR. MOGIN:

2    Q    If I understand what you've testified here today, then the

3    statistics that are generated based upon review of a null set

4    are incredibly important to your process, is that true?

5    A    That is absolutely correct.

6    Q    Now, you testified that there were, what, three reviewers,

7    yourself and two other reviewers that were involved in the

8    subsequent review?

9    A    Yes.

10   Q    And you were involved in the search string development as

11   well.  Were the others?

12   A    Yes.

13   Q    So all three of you helped develop the search strings and

14   then you reviewed both the null set and the combined set?

15   A    On the last validation exercise I personally did not do

16   either in fact.  The other two attorneys did.  In the other

17   validations I would have done at least one of them, one of the

18   samplings.

19           MR. MOGIN:  If I could have just a moment, Your

20   Honor.  I think I'm --

21           THE COURT:  Sure.

22      (Brief pause.)

23   BY MR. MOGIN:

24   Q    Yes, one -- a couple of things.  You did mention that you

25   conducted a random sample, is that right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A    Yes.

2    Q    And was that a statistically valid random sample?

3    A    I asked KPMG to prepare a statistically valid random

4    sample using -- first using a software tool called Raosoft,

5    which would estimate the sample size that I would need for a

6    certain confidence interval and a certain margin of error.

7    After I -- and that program gives me the sample size.  I then

8    gave that information to KPMG and asked them using whatever

9    tool Clearwell possesses or whatever process Clearwell

10   possesses to generate a true random sample of the size that I

11   requested.

12   Q    Do you know how it was done?

13   A    Do I know how Clearwell randomizes documents?

14   Q    Do you know how --

15   A    I have no idea.  I have no idea how Clearwell randomizes

16   documents.

17   Q    Do you understand that the term random sample is a term of

18   art in statistics?

19   A    Yes.

20   Q    And do you believe that your process complied?

21   A    I do.

22   Q    Now, when you ran the null set, you found, what is it, 15

23   documents that were marginally responsive?

24   A    Which null set?

25   Q    Well, if you look at the letter of November 22nd.

1    A    I'm sorry.  Which letter?

2    Q    The letter of November 22nd.

3    A    Okay.

4    Q    You see on page 3?

5    A    Okay.

6    Q    The last bullet point.  "Georgia Pacific in consultation

7    with COC --

8    A    Yes.

9    Q    -- sought to validate the null sets."

10   A    Yes.  There's 27 marginally responsive documents.

11   Q    27 marginally responsive documents in a null set of 660

12   documents?

13   A    That's correct.

14   Q    So what percentage is that?

15   A    That would be about 4.1 percent.

16   Q    So the confidence interval would be what?

17   A    It would be -- well, it's 99 percent level of confidence.

18   The margin of error is 5 percent.  So it would be 4.1 percent

19   plus or minus 5 percent.

20   Q    Okay.  Now --

21   A    So between 91 and a hundred or 9 -- yes.

22   Q    So 9 percent of the documents that are, as you've termed

23   them, marginally responsive --

24   A    The --

25   Q    -- within the null set, correct?

1    A    4.2 percent of the null set as we tested it were

2    marginally responsive, the 4.1 percent.

3    Q    And you used the term marginally responsive.

4    A    Yes.

5    Q    Okay.  Now, responsiveness if you're going to use the

6    terminology of information retrieval is a binary decision, is

7    it not?  It's either responsive or it isn't.  It's either a

8    true positive or a false positive, correct?

9    A    In information science I think that would be correct.

10   Q    So marginally responsive is your lawyer characteriza-

11   tion --

12   A    Absolutely.

13   Q    -- of the relative responsiveness of a document?

14   A    That is correct.

15            MR. MOGIN:  Thank you.  I'm done, Your Honor.

16            MR. NEUWIRTH:  We have no questions, Your Honor.

17            THE COURT:  Okay.  Well, thanks, Mr. Brown.

18            THE WITNESS:  Thank you.

19            THE COURT:  Thanks for coming.  Can you wait a little

20   longer?

21            THE WITNESS:  Oh, yes.

22            THE COURT:  All right.  Good.  Have a seat.

23        (Witness excused.)

24            THE COURT:  Okay.  You want to call your first

25   witness.

1    MR. WOZNIAK:  We'll call Tim Hanners.

2  TIMOTHY HANNERS, PLAINTIFFS' WITNESS, DULY SWORN

3    THE COURT:  Yes, sir.

4    MR. ECHOLS:  I'm sorry, Judge.  Just one point of

5 order.

6    THE COURT:  Sure.

7    MR. ECHOLS:  This morning you made clear to us that

8 with the experts here that any of the four topics were good to

9 be allowed to have testimony received on them, but you also

10 made clear that there was one topic on preservation which was

11 not at issue, not anticipated for this now.  When we filed our

12 motion in limine earlier, we didn't have Mr. Hanners' report,

13 which we got Thursday night.  And he spends a bit of time on

14 the topic of preservation.  It's not at issue for this

15 proceeding.  It's not before the Court.  It raises individual

16 defendant specific issues that would require each of us to

17 cross-examine him.

18    And I just wanted to be clear that that's a line that

19 we believe isn't one of those areas that ought to be allowed

20 for these purposes.

21    THE COURT:  Were you intending to go into

22 preservation?

23    MR. WOZNIAK:  Absolutely.  The scope of the search

24 and the efforts of defendants to identify and preserve

25 documents have, in fact, been at issue.

```
 1              THE COURT:  Can you do your -- can you without -- I'm
 2   sort of stepping on everybody's toes here.  Can you do your
 3   examination of Mr. Hanners and leave that towards the end.  I
 4   need to review -- I have to review what you're talking about.
 5   I have Mr. Hanners here.  I'll look at it now.
 6              MR. WOZNIAK:  I can say that with some level of
 7   confidence that I don't believe we are going to get into any
 8   defendant specific issues that we have identified at least by
 9   name.  We will be talking about some opinions that Mr. Hanners
10   has reached based on written responses that defendants have
11   provided to us.
12              THE COURT:  Okay.  I'm just asking you in the next 10
13   minutes can you talk about something else?
14              MR. WOZNIAK:  Sure.
15              THE COURT:  So I get --
16              MR. WOZNIAK:  Other than preservation.  Certainly we
17   can --
18              THE COURT:  Right.  Right.
19              MR. WOZNIAK:  Sure.
20              THE COURT:  I just need to go back -- I just must
21   have missed that.  Okay.
22              MR. WOZNIAK:  Okay.  I'll do my best, Your Honor.
23              THE COURT:  Right.
24              MR. WOZNIAK:  I think this may be a little tricky,
25   but I think we can certainly go through Mr. Hanners'
```

1   qualifications and other matters.

2              THE WITNESS:  Is that going to preclude the other

3   topic of discussion as well in my report?

4              MR. WOZNIAK:  Well, let's first --

5              THE COURT:  Well, you'll jump up.  You'll jump up if

6   we're getting there.

7              THE WITNESS:  Okay.

8              MR. ECHOLS:  Okay.

9              THE COURT:  And I made a broader statement.  It's not

10  if it's one question as part.

11             MR. ECHOLS:  Absolutely, Judge.  I understand that.

12             THE COURT:  If it's not question.  If it's one

13  question, it's not worth it.  We ought to move on, okay.

14             MR. WOZNIAK:  Your Honor, for the record Robert

15  Wozniak for the plaintiff.

16             THE COURT:  Thanks, Mr. Wozniak.

17                  DIRECT EXAMINATION

18  BY MR. WOZNIAK:

19  Q   Mr. Hanners, can you please state your full name for the

20  record.

21  A   Timothy Drew Hanners.

22  Q   And, Mr. Hanners, what --

23             MR. NEUWIRTH:  Your Honor, could we ask for the

24  witness to be sworn in.

25             MR. WOZNIAK:  I think he --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  I did.
 2              THE WITNESS:  I already did.
 3              THE COURT:  I did.  Didn't I swear you in?
 4              THE WITNESS:  Yes, ma'am, you did.
 5              MR. NEUWIRTH:  I didn't hear it.
 6              THE COURT:  No, actually the court reporter just
 7  asked me too.  Either I have such a calm little voice you
 8  didn't hear you.
 9              MR. NEUWIRTH:  Thank you.
10  BY MR. WOZNIAK:
11  Q    All right.  So you've stated your name.  Mr. Hanners, can
12  you please state your current occupation.
13  A    I am the owner of a computer forensics investigations
14  company called 1st Forensic Consulting located in Lucas, Texas.
15  Q    What do you mean by computer forensics?
16  A    I provide computer forensic services.  And the term
17  computer forensics is generally associated with the
18  preservation -- identification, preservation of computer based
19  evidence for a matter before the court.
20  Q    And what was the last part?
21  A    In a matter that's coming before the court, legal matter
22  or hearing.
23  Q    And so do you have any specialized training in the area of
24  computer forensics?
25  A    Well, my experience in computers started back in 1982
```

PDF created with pdfFactory trial version   www.pdffactory.com

1    where I was working with the Stealth fighter program.  I worked

2    on aircraft related computer systems.  And then in 1989 I

3    joined the Air Force Office of Special Investiations, United

4    States Air Force Office of Special Investigations, where I

5    became a general investigator with them.  I later specialized

6    in doing computer crime investigations, commonly termed as CCI

7    as a special agent with them.

8            I conducted a large number of investigations

9    involving federal, state criminal matters, foreign intelligence

10   services, any number of crimes that involved a computer at the

11   time.  Since that time -- while with them I attended

12   specialized training in the field of computer forensics.  I

13   also attended the Federal Law Enforcement Training Center and

14   other specialized computer forensics training courses.

15           Upon my retirement from the United States Air Force I

16   worked with Bank of America, where I attended additional

17   computer forensics courses.  I worked as a special -- or vice

18   president of information security located in Dallas, Texas.

19   Part of my duties there involved the collection and

20   preservation of information within the bank.  After that period

21   of time I worked as a contractor for Computer Sciences

22   Corporation out of D.C., working with the United States Postal

23   Inspection Service lab in Pittsburgh running their cases.  They

24   basically went in and cleared up a three-year backlog.

25           As part of that, we received additional training

1   there.  I have attended other courses and classes.  After

2   working with the Postal Inspection Service, I worked for a

3   company called Vogon International, who taught computer

4   forensics.  I went through their computer forensics training,

5   as well as instructed in their computer forensics training, to

6   include U.S. Secret Service, U.S. Treasury Service, federal and

7   state law enforcement agencies both in the States and overseas.

8   After they were bought out by Kroll Ontrack, I worked with

9   another company called Xact Data Discovery, which is the EDD

10  Company based out of the Dallas area for the last four and a

11  half years till last August, when I started up my own company.

12  Q    I'm going to hand the court reporter what I believe will

13  be marked as Plaintiffs' Exhibit 8.

14          Mr. Hanners, I've just handed to you your resume,

15  which was previously provided to the Court as an exhibit to

16  plaintiffs' opening brief in this matter.  We've already

17  covered quite a bit of your experience and your background.

18  I'd like to turn your attention to the third page.  You list

19  some court experience there, and it indicates that you have

20  testified as an expert in several cases?

21  A    Yes, it does.

22  Q    Without going into the detail of each case, can you just

23  briefly tell me what those cases involved and what the nature

24  of your testimony was.

25  A    The nature of my testimony was similar in all.  It all

1    revolved around computer based evidence and my review of that

2    evidence in all but one, which was a capital murder case where

3    I testified both on the computer evidence as well as

4    evidentiary searches for physical evidence.

5    Q    Any of these cases involve large scale ESI collections?

6    A    The last one there, John Doe versus Peters School District

7    involved over 30,000 users.  Their information was reviewed in

8    that matter.  In addition to the ones that are documented here,

9    a large number of my cases were settled prior to going to full

10   trial.  And those cases involved extremely large sets of data

11   and include 420 terabytes of data in past cases with

12   information coming off tape in those cases to up and to more

13   recent last year 24 terabytes of data at alive on servers that

14   was being reviewed for ESI.

15   Q    Have your credentials as a testifying expert in the field

16   of computer forensics ever been challenged?

17   A    No.

18   Q    And you've never been excluded or prevented from

19   testifying as an expert?

20   A    No, I have not.

21        MR. WOZNIAK:  Your Honor, I'd like to move that

22   Plaintiffs' 8 be offered into evidence, and we would also

23   tender Mr. Hanners as an expert in the field of computer

24   forensics.

25        THE COURT:  Okay.  What's your position?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. MENDEL:  Your Honor, we'd like to have you
 2   reserve ruling until after cross-examination.
 3              THE COURT:  Sure.  That's fine.  Thank you.
 4   BY MR. WOZNIAK:
 5   Q    Mr. Hanners, why were you retained by plaintiffs in this
 6   matter?
 7   A    I was retained to review the defendants' replies as they
 8   relate to doing a targeted collection of custodians for ESI
 9   versus that of a different technology that might be used or a
10   bigger scope or volume of information.
11   Q    Did you review any materials in connection with the work
12   that you have done in this matter?
13   A    Yes, I did.
14   Q    Did you review the complaint?
15   A    Yes, I did.
16   Q    Did you review plaintiffs' document requests that were
17   served on defendants?
18   A    Yes, I did.
19   Q    Did you review the ESI or production format stipulation?
20   A    Yes, I did.
21   Q    Did you review the 30 (b) 6 deposition notice that was
22   served on defendants?
23   A    Yes, I did.
24   Q    And did you review written responses that were provided by
25   defendants to plaintiffs in connection with that 30 (b) 6
```

1    notice?

2    A    Yes, I did.

3    Q    And you reached some conclusions and observations in

4    connection with your review of all of those materials?

5    A    Yes, I was able to.

6    Q    And those conclusions and observations are written in your

7    preliminary report of findings that was submitted to the Court

8    last week, isn't that right?

9    A    Yes, they are.

10   Q    Is there anything that you've reviewed -- well -- yes, let

11   me ask you.  Is there anything that you have reviewed

12   subsequent to submission of your report in connection with the

13   30 (b) 6 deposition process?

14   A    There was a deposition of one of International Paper's

15   employees that I reviewed.  I believe it was Mary -- I'm trying

16   to recall her last name.  It started with S.  I'm sorry.  I

17   don't recall her last name.

18   Q    Do you know whether that was a rough or final transcript

19   of that deposition?

20   A    It was a rough transcript of the deposition.  It was made

21   available to me within the last couple of days.

22   Q    And did your review of that transcript change any of your

23   conclusions or findings that are included in your report?

24   A    No, it did not.

25        MR. WOZNIAK:  Your Honor, we would move to include --

PDF created with pdfFactory trial version www.pdffactory.com

1  well, actually let me -- I'm sorry.  I'm getting ahead of

2  myself.  Let me hand up and we'll have marked as Plaintiffs'

3  Exhibit 9 I believe we are on, Mr. Hanners' preliminary report

4  of findings.  And that was submitted to the Court last

5  Thursday.

6          MR. MENDEL:  Your Honor --

7          MR. WOZNIAK:  I'm not moving it into evidence quite

8  yet, but --

9          THE COURT:  Did you want to say something?

10          MR. MENDEL:  Yes, we do object to any use of this

11  document at this stage of the proceedings.  It is all about

12  preservation.  That's all this document addresses.

13          MR. WOZNIAK:  Well, I would say it's about

14  identification and preservation.  And it also goes directly to

15  the heart of a key dispute up to this point, which is whether a

16  custodian based approach to identifying and collecting

17  documents is sufficient as compared to a subject matter

18  approach, which is one plaintiffs had been urging from the

19  outset.

20          THE COURT:  And how does that -- we're going to have

21  to take it one step at a time on preservation.  Here's what

22  this gentleman says:  "None of the defendants provided

23  sufficient detail about their identification and preservation

24  process to permit any reasonable assessment of their processes

25  as adequate."  Okay.  We've heard six hours of identification.

PDF created with pdfFactory trial version www.pdffactory.com

1    Okay.  I think anybody sitting here could tell you something

2    about what you folks did on identification.  There hasn't been

3    anything about preservation, which is the reason I said what I

4    did.  He says he didn't have enough to say anything, so I don't

5    know what he's going to talk about.

6           MR. MENDEL:  That's exactly our point, Your Honor.

7    Then he goes on and writes a whole report about something he

8    says he doesn't have any basis for.

9           THE COURT:  Well, that goes to something else, okay.

10   I mean, I -- I guess we have to take it on a

11   question-by-question basis.  Okay.

12          MR. MENDEL:  May I have a standing objection, Your

13   Honor, to this report.

14          THE COURT:  And you can keep objecting when we get to

15   preservation.  On identification I think we've had information

16   on your identification process.  Okay.

17          MR. MENDEL:  I think the identification process that

18   was described was how we take a corpus of documents and

19   identify the relevant documents.  What I believe Mr. Hanners is

20   going to be talking about is identifying that corpus initially

21   and the preservation of those documents.  That is a different

22   issue.  And it's much earlier in the process, and it is not

23   what this testimony today has been about.

24          THE COURT:  All right.

25          MR. MENDEL:  It's not about search terms.  It's not

PDF created with pdfFactory trial version www.pdffactory.com

Hanners - direct by Wozniak                    194

1    about predictive coding.

2              THE COURT:  Can we have him ask the first question so

3    then I can figure out where we are.  Okay.  So we're not

4    moving -- the report is certainly not -- you can talk to him

5    about the report.

6              MR. WOZNIAK:  Before I even attempt to move it in as

7    evidence I was going to lay a foundation and ask him some

8    questions about the report and other work that he's done to

9    this point.

10             THE COURT:  Right.

11   BY MR. WOZNIAK:

12   Q    So, Mr. Hanners, if I could turn your attention to the

13   last, very end of your report.  There's an attachment there, a

14   chart, a diagram, if you will.

15   A    I'm there.

16   Q    Okay.  And you recognize this diagram?

17   A    Yes, it's an electronic discovery reference model.

18   Q    And what is that?

19   A    It's a concept that was put forth by the Evergreen Group.

20   It's called the EDRM model.  It was a group that was

21   self-established back in the early 2002 time frame I believe to

22   bring forth the best practices for doing ESI collections

23   together and formulate plans and -- or godets for doing general

24   type of ESI collections.

25             And you'll notice in the first steps of it, the first

1    step actually applies to a company as it would maintain its

2    information on a regular course of business to ensure it was

3    properly handling information.  The second step labeled

4    identification is the very first step in the ESI process

5    according to the EDRM model.

6    Q     And this is an area -- in your experience in computer

7    forensics your work is primarily focused on which of these

8    boxes?

9    A     Well, generally speaking, for large eDiscovery cases such

10   as this my chief focus is in the identification and preserva-

11   tion steps, the steps that are taken prior to any work being

12   done with the information to subdivide it.  It's basically an

13   evidentiary identification and preservation process to identify

14   evidence to make sure it doesn't change.

15   Q     And why is that important?

16   A     Well, with the volatile nature of computers, for instance,

17   say, a desktop as an example, information can change as a user

18   changes -- opens Word documents, saves Word documents.  He

19   could accidentally delete a document not out of intent, but out

20   of mistake.  E-mail could be changed.  E-mail can be saved on

21   the local system by the user.  What we're basically trying to

22   do is go in there at the very beginning of the ESI process and

23   grab a snapshot of that information so it can be set aside and

24   preserved for additional work.

25          MR. MENDEL:  Your Honor, if I may.  Again, this is

1    all about preservation.  It's not about any of the issues we've

2    talked about this morning.

3           MR. WOZNIAK:  If I may, Your Honor.  Using this

4    diagram as an example, I mean this is designed to show a

5    process by which an ESI collection comes about.  And without

6    identifying and preserving data, one can't go on to the next

7    step of collecting and processing that data.  So these are

8    inextricably tied together.  We've made clear throughout in

9    both our position statement submitted to Judge Shadur going

10   back to mid-December and continuing forward to the present,

11   we've been very consistent that the scope of the search in this

12   case is directly at issue.

13          And defendants have consistently taken the position,

14   for instance, that they are only obligated to search, for

15   example, live active servers in terms of searching for --

16   identifying as a first step potentially responsive ESI.  So

17   that's one example of how I think Mr. Hanners' testimony is

18   directly on point here.

19          MR. MENDEL:  Your Honor, the scope of the search and

20   whether that search is to involve search terms or predictive

21   coding is an issue before Your Honor.  Document preservation,

22   which is what Mr. Hanners has been talking about, what his

23   report is all about, is not in issue here.  There's no motion

24   before this Court about whether or not the defendants have

25   properly preserved their documents.

PDF created with pdfFactory trial version www.pdffactory.com

 1          THE COURT:  Well, that's what I'm starting to -- you

 2     have to tell me what you mean.  I mean -- what I mean by

 3     preservation is document preservation.  Okay.  Are you folks

 4     using preservation in a different way?

 5          MR. WOZNIAK:  We are using preservation as it's

 6     connected to identification.  I mean, you can't preserve what

 7     you haven't identified, and you can't search what you haven't

 8     preserved.  So it's all tied together.  And as Mr. --

 9          THE COURT:  I mean, but you've just now interjected

10     backup tapes.  I mean, I just -- before I go down this road and

11     get in -- I thought you meant document preservation in the

12     sense that there was an accusation that documents weren't

13     preserved here.  And I don't think any of the motions I have

14     have to do with whether or not documents have been preserved.

15          MR. WOZNIAK:  We -- if you're talking about a

16     spoliation motion or something of that nature, no, we don't

17     have any motion on the table.

18          THE COURT:  Right.

19          MR. WOZNIAK:  What we do have is our very clear

20     position that was set out in the December 15th position paper

21     that was submitted to Judge Shadur where we talk about the

22     scope of the search and the nature of the search that should be

23     conducted if one is going to adequately search for potentially

24     responsive ESI.  And we have -- for example, Mr. Brown just

25     testified that if something is not in the corpus, it can't be

```
1   found.  So I think that just serves to reinforce our view that

2   these issues are all tied together.

3          MR. MENDEL:  That has nothing to do with

4   preservation.

5          THE COURT:  All right.  All right.  That's why I

6   would say that's inadequacy of the search method myself as

7   opposed to the term preservation, but -- and I think that the

8   term preservation sets off all kinds of bells on people, legal

9   bells and whistles that -- I thought you were talking about --

10  I thought this fellow had reviewed what each of them had done,

11  and he was going to opine that he didn't think they did such a

12  good job, and one of the reasons they didn't do such a good job

13  are they didn't include everything that maybe could have been

14  included.

15         Now, you're calling that preservation.  I'm not

16  calling that preservation.  I'm talking about the accuracy of

17  the search that was done.

18         MR. WOZNIAK:  Fair enough, Your Honor.  And I

19  would --

20         THE COURT:  And I think it's the preservation -- I

21  mean, you were expecting him to say you didn't do such a good

22  job.

23         MR. MENDEL:  Your Honor, we had read his expert's

24  report.

25         THE COURT:  Right.
```

1          MR. MENDEL:  Which you have before you, Your Honor.

2          THE COURT:  Right.

3          MR. MENDEL:  It has nothing to do with the adequacy

4    of the search.  It is all about preservation.

5          THE COURT:  Well --

6          MR. ECHOLS:  And, Judge, this is -- part of the

7    reason this affects all of us and all of us differently is that

8    we understood when Mr. Hanners was identified that there was a

9    dispute about whether backup tapes, for instance, could or

10   should be searched or not.  Now, that was one of those topics

11   for a later day.  We understood as Your Honor said in ruling on

12   our motion in limine that there is an issue -- there's a

13   potential issue concerning if the identification of those

14   custodians used for developing a search methodology were

15   sufficient.

16         That's totally separate from whether any of us

17   defendants used appropriate preservation methods in identifying

18   the sources, locations of ESI to be preserved.  You're

19   absolutely right, that's never been raised either before Judge

20   Shadur or before Your Honor.  The source of collection of

21   documents, yes, that may be disputed.  But the preservation is

22   an individual issue.  We've had requests from plaintiffs for

23   information from us.  We've responded to those requests.  It's

24   ongoing.  Some depositions have taken place.  Letters are being

25   written, but it's entirely individualized, and nothing is ripe

PDF created with pdfFactory trial version www.pdffactory.com

1    and certainly nothing before this Court on the preservation

2    issue the way you define preservation, Judge.

3                    MR. FREED:  Your Honor, may I be heard on this.

4                    THE COURT:  Yes.  Maybe you can help us out here.

5                    MR. FREED:  I hope so, Your Honor.  Because I think

6    what's happening here is the ultimate question is whether the

7    defendants will be producing the documents which are responsive

8    to the document requests.  And that starts the five step

9    process, which their own expert started talking about, and we

10   can't jump up and say that wasn't appropriate for discussion.

11   If they have the best search methodology in the world but

12   they've excluded 95 percent of the relevant documents, there's

13   a deficiency in their production.

14                   And what this witness is going to go to is the whole

15   collection effort, the location effort, the identification

16   effort.  The discussion of ESI is only a portion of the big

17   picture, which is are they giving us everything that they

18   should be giving us?  Have they employed all of the techniques

19   that they should have employed?  Did they do the right thing

20   when they started the process?  Did they do the right thing

21   when they searched the documents?  He's giving a background on

22   that.  And he -- and that is something which is relevant to the

23   ultimate determination which I believe Your Honor is going to

24   have to make, is have they responded correctly and properly to

25   the requests for production?

PDF created with pdfFactory trial version www.pdffactory.com

1      He's prepared to explain why in very material

2   respects he has seen evidence which indicates they haven't.

3   Now, you can't just compartmentalize and say, no, I just want

4   to talk about search.  That's all I want to talk about, because

5   we have maintained from the beginning that the whole body, the

6   corpus -- they keep talking about this corpus -- is this all

7   encompassing?  The corpus is not all encompassing.  The corpus

8   is a fraction perhaps of what they should have been doing.  And

9   you can't understand the application of the search terms and

10  how they could apply to the rest of the corpus, which should be

11  analyzed as well unless you know what the whole corpus ought to

12  be.

13      So I don't think you can just make that artificial --

14  you know, it's like saying -- well, I'll leave it at that.

15      MR. MOGIN:  Your Honor, I would add very briefly that

16  if you go back and you look at the plaintiffs' statement of

17  position as well as the joint statement of position and the

18  defendants' statement of position, all of which were submitted

19  to Judge Shadur in connection with the December 15th hearing,

20  you will find that the first issue is defined in two parts.

21  Part one, to summarize, is Boolean versus content based, and

22  part two is custodians versus subject matter.

23      THE COURT:  Right.

24      MR. MOGIN:  And, in fact, subject -- and Mr. Hanners

25  is here to talk about custodians versus subject matter.

PDF created with pdfFactory trial version www.pdffactory.com

1              MR. ECHOLS:  And, Judge, we have no objection --

2              THE COURT:  And there's no problem.

3              MR. ECHOLS:  We have no objection to that.

4              THE COURT:  No problem.

5              MR. ECHOLS:  Custodians and subject matter.

6              THE COURT:  It's no problem with that at all.  Okay.

7     I mean, I want him -- I want to hear, I want to hear on that

8     topic, okay.  I think it's when --

9              MR. MENDEL:  And, Your Honor, his entire -- none of

10    his report addresses --

11             THE COURT:  Well, let's not get there yet.  Now, come

12    on.  We don't even know what he's going to say here today.  I

13    mean, I -- I mean, I want to hear what he's got to say.  I

14    was -- my back went up on the problem is they didn't preserve,

15    okay.  And you don't know if they -- because I don't -- I think

16    what this gentleman says in his report is he doesn't know what

17    they preserved because it's not there.  Okay.  No, he doesn't

18    know.

19             And the backup tapes or archive or not reasonably

20    accessible.  The reason I was cutting you off is we have enough

21    to do today on what has been done already and you guys are

22    jumping to something we haven't done.  That was the reason I

23    was cutting you off on that.  I'm not saying on another day.

24    We obviously on a long term discovery have to talk about that.

25    We're not ready for it right now.  I've been interrupting

PDF created with pdfFactory trial version www.pdffactory.com

Hanners - direct by Wozniak                           203

1   lawyers all day, and I hated it when judges did it to me.

2   Okay.  I don't want to be micromanaging this gentleman's direct

3   examination.  I know what you mean by preservation.  I wish you

4   could find -- where's that linguist?

5       (Laughter.)

6           THE COURT:  Let's get her in here, okay, to give me

7   another term other than the P word, and you can talk about it.

8           MR. MOGIN:  Does that mean you're granting our motion

9   for partial reconsideration?

10          THE COURT:  Sure.  At 12:00 o'clock tonight.

11      (Laughter.)

12          THE COURT:  Now, let's just see what you can do --

13  let's start to hear what he did, what his study heard.  I'm

14  hearing you on this.  If nothing else let's find out what it is

15  this gentleman's going to say.  Okay.  Sit down, and you're

16  more than welcome if you want to make it for the record jump

17  up.  And I'm sorry to interrupt you.  Okay.

18          MR. WOZNIAK:  That's understood, Your Honor.  No

19  problem.  I will do my best to proceed --

20          THE COURT:  Right.

21          MR. WOZNIAK:  -- and elicit testimony --

22          THE COURT:  Right.

23          MR. WOZNIAK:  -- that will not cause defendants to

24  keep jumping on their feet.

25          THE COURT:  Right.

1          MR. WOZNIAK:  We'll see how that goes.

2    BY MR. WOZNIAK:

3    Q    Mr. Hanners, I'm going to refer back to your report only

4    for the limited purpose of talking about the first section

5    where you identify what you call general principles for the

6    reliable identification of preservation processes.  And the

7    only question that I have is whether those general principles

8    as you list them are based on anything more than your own

9    opinion?

10   A    Yes, they are.  The EDRM Group was a collaboration of --

11   it basically read like a who's who of who's on eDiscovery.  If

12   you looked down, you saw all the significant players, the

13   KPMGs, all the other major significant vendors, as well as

14   attorneys and practitioners of computer forensics were

15   attending and making inputs.  And they basically came up with

16   some standards and some guides.  One being an identification

17   guide to help you through the ESI discovery process.

18   Q    Let's talk about identification.  And specifically you

19   understand that the defendants in this case, and we've heard

20   testimony to this effect already today, the defendants have

21   taken a custodian based approach to identifying potentially

22   responsive ESI?

23   A    Yes.

24   Q    Do you agree with a custodian -- that a custodian focused

25   approach is the best way to locate all potentially responsive

PDF created with pdfFactory trial version www.pdffactory.com

1   ESI?

2           MR. MENDEL:  Objection, lack of foundation, Your

3   Honor.

4   BY MR. WOZNIAK:

5   Q    Let me ask you this way:  Are you familiar with an

6   approach other than a custodian based approach that one might

7   take in attempting to identify all potentially relevant ESI in

8   a given lawsuit?

9   A    Well, if I can equate this to just as a general

10  investigator.  If I look at a matter that's before me, whether

11  that be electronic evidence or any other form of evidence, if I

12  don't go in and consider all the available evidence that's

13  presented to me, then I'm liable to rule out information before

14  I've ever considered it.

15          A case may be that where I go into a home to search

16  for computer information.  If I never go into a room, I don't

17  know if there's computer media in there.  I don't know if

18  there's a floppy disk sitting in there that I haven't searched.

19  So if I take a targeted search and equate say the living room

20  to being a custodian and I only search there, I'm not searching

21  for anything else.  If I do a more topical or subject matter

22  search or consider potential evidence being in the whole house

23  or the whole business, then I go in with that in mind.  My

24  focus is wide open, my eyes are wide open.  I'm looking.  I'm

25  asking the relevant questions.

 1              And my part in the initial identification process is
 2    to help ensure that the right questions are asked.  Working
 3    with inside counsel, working with outside counsel, working with
 4    maybe HR, IT, and others within the business that are key
 5    players that have a corporate knowledge that I don't possess.
 6    My goal is to go in and ensure that they're addressing all
 7    their available media areas, to include how the business works,
 8    how do they communicate, how do they store information?  And
 9    then from that we would assign tasks for individuals to go out
10    and do.
11              Part of that might be a mapping to go out and collect
12    where is this information sent.  A lot of businesses have
13    diagrams of computers, but they may be months or years old.  So
14    we ask them to update that to bring back to the table so an
15    informed decision can be made of all the possible storage
16    locations.  An example would be during an identification phase
17    I would remind the legal counsel that when they're talking to
18    people, you need to ask them do they store information on USB
19    devices, on external hard drives, on CDs, do they work from
20    home?  Is that information being preserved?
21              And we generally would say there's some volatile
22    information out there.  PCs are volatile.  Stuff that's in
23    rotation is volatile.  Archives that can be overwritten would
24    be considered a volatile area that you need to look at
25    preserving that information.  Take the necessary steps to stop

PDF created with pdfFactory trial version www.pdffactory.com

1    activity from happening that's going to change information.

2    Q    Okay.  You've said a lot there, and let me --

3    A    I'm sorry.

4    Q    -- try to bring this back to the defendants taking a

5    custodian based approach in this case.  And what I've heard you

6    say is that you would recommend taking a broader approach?

7              THE COURT:  Okay.  You have a gentleman standing up.

8    What would you like to say, sir?

9              MR. MENDEL:  Your Honor, I object to the question

10   being unclear as whether now he's asking about a custodian

11   based approach to preservation or a --

12             MR. WOZNIAK:  Purely the best approach --

13             THE COURT:  No, he said --

14             MR. WOZNIAK:  Purely for purposes of identification.

15             THE COURT:  For identification.  I think that's what

16   he set up.  There's a custodian based approach to

17   identification and there's a subject matter approach.  And I

18   think what this gentleman was referring to was subject matter

19   approach or mapping he called it.

20   BY MR. WOZNIAK:

21   Q    I'll rephrase.  What I think I heard you say is that a

22   subject matter approach would result in a greater volume of

23   potentially relevant ESI being collected or identified.  Let me

24   use identified.

25   A    During the identification phase you want to consider all

1   available sources of information based on activity and based on

2   the matter, not based upon preselecting a target group of

3   people to go out and look for because you've identified a much

4   smaller group of -- than the possibly available evidentiary

5   material.

6   Q    If you were to start from scratch, I'm just going to ask

7   you to run me through the steps of how you would sort of soup

8   to nuts go about identifying -- and you've done some of this

9   already.  But if I -- say you're brought in as a computer

10  forensics expert and it's a large scale ESI project.  You are

11  asked to identify -- and we'll put it in the context of this

12  case.  It's a price fixing conspiracy case.  You're asked to go

13  about identifying all potentially responsive ESI.  What's the

14  first step you take?

15  A    The first step I would take would be as previously

16  mentioned, getting together a team within the company or

17  working with a team in the company.  That being I'm generally

18  called in by counsel or management at some point and introduced

19  to the rest of the team.  I would ensure that that team

20  includes a good corporate knowledge from IT.  They know where

21  most information resides.

22         I would make sure that someone from HR was inclusive.

23  They know the current people working at the company and the

24  ones that are former employees.  You can identify that based on

25  relevant time period.  I would ensure that the -- any number of

 1    people from management that might have knowledge of the matter

 2    and that have the sufficient clout to ensure that the processes

 3    that we identify can be followed and that there's not going to

 4    be any interruptions in those processes.  That a senior manager

 5    can say that they're going to do it and it's going to do it

 6    appropriately.

 7              I would try to identify the immediate -- my immediate

 8    concern would be let's identify the type of media that's out

 9    there that can be changed while we're sitting here talking and

10    let's take the immediate steps to stop that from changing.  I

11    would then -- for things that would be missing from that

12    group's information base such as the active known computers

13    within the company, I would send them out to gain that

14    additional process through doing an active network mapping to

15    identify systems that are connected and turned on to their

16    system, to actively seeking out the sources of available ESI.

17    Q    Let me stop you there.  You've talked -- if I could

18    rephrase a part of what you just said.  You said -- I think it

19    sounds like you said you would assemble basically a cross

20    functional team as a first step.

21    A    That's correct.

22    Q    And what if management of the company in question was

23    potentially involved or was alleged to have been involved in

24    some wrongdoing, would that impact in any way the scope of your

25    identification effort?

PDF created with pdfFactory trial version www.pdffactory.com

1   A    Well, generally speaking, from an investigative

2   background, my background, I would go in and tell -- talk with

3   someone that's not involved from legal.  Whether that's inside

4   counsel or outside counsel and advise them that anyone

5   connected to the matter should not be a decision point during

6   the initial identification part of the process.  That someone

7   else should be appointed for that period of time to be able to

8   make those decisions that -- if it's the CEO, somebody lesser

9   in the company should make the decision.  And if it's somebody

10  else in the company as far as IT is involved, they should be

11  locked out of the process.

12  Q    And if I might follow up, why?  Why would you want someone

13  other than those that were potentially involved to be a part of

14  the identification process?

15  A    Well, potentially you're asking for a person that may be

16  named later as part of the allegation to identify documents and

17  collect documents that may potentially prove they did

18  something.  It's not generally -- the investigator tells me

19  that's not the smartest thing in the world to do.  I would

20  equate that to having a physical crime scene, somebody --

21  somewhere where somebody may have gotten stabbed and asking

22  the person that did the stabbing to go in and collect the knife

23  for me.

24        MR. WOZNIAK:  Your Honor, I might have -- I wanted to

25  ask a question about a portion of Mr. Hanners' brief where he

Hanners - direct by Wozniak                    211

1    says -- and I don't intend to get into this in great detail,

2    but he has a section in here that talks about preservation

3    being only as good as the identification project which preceded

4    it.  And I wanted to simply ask him what he means by that.

5              THE COURT:  Don't you want to know what he means by

6    that?

7              MR. WOZNIAK:  Well, I'm just -- I guess I'm --

8              THE COURT:  No, the gentleman behind you who's

9    standing up.

10       (Laughter.)

11             MR. MENDEL:  Your Honor, I think it's pretty clear

12   he's going to be talking about preservation.

13             THE COURT:  He doesn't know what you did.  How can he

14   say anything?  I mean, duh.  I mean, by what we know about

15   preservation or what --

16             MR. WOZNIAK:  I simply want to ask him that question

17   and --

18             THE COURT:  Does he know what each of the eight

19   defendants -- has he ever seen a litigation hold?  Has he ever

20   done anything about the preservation that actually happened in

21   this case?

22             MR. WOZNIAK:  Well, he -- I mean, he has reviewed the

23   written responses that the defendants provided to us in

24   response to our 30 (b) 6 notice, and those written responses

25   were supposed to provide information about their identification

PDF created with pdfFactory trial version www.pdffactory.com

 1  and preservation efforts in this case, including the

 2  information relating to litigation holds.

 3          THE COURT:  I really want to hear what he says from a

 4  forensic standpoint, okay, about the identification and the

 5  search that was done.  I think that's why we dragged him here.

 6  Not whether or not they had -- but it's your case.  It's your

 7  case.  I just got your last point about self-selecting, about

 8  potential people doing self-selecting of word search.  Okay.  I

 9  did get that.  Okay.  I did get that.  That was in your brief.

10  Now, I don't know -- I still don't understand where the

11  preservation is coming from, which is why this gentleman keeps

12  jumping up.

13          MR. WOZNIAK:  Well, I think in a general sense if I

14  can just say -- make the point that if something -- you've

15  identified something as potentially responsive.

16          THE COURT:  Right.

17          MR. WOZNIAK:  Okay.  If you don't preserve that or

18  you choose not to preserve that because you -- well, let's say

19  you haven't identified it.  Okay.  You've taken a custodian

20  based approach and so you've ignored certain chunks of

21  potentially responsive ESI because you've made the

22  determination that only certain custodians are going to have

23  responsive documents in this case.

24          THE COURT:  Right.

25          MR. WOZNIAK:  Okay.  So there's this --

PDF created with pdfFactory trial version www.pdffactory.com

1              THE COURT:  Void.

2              MR. WOZNIAK:  -- group of documents that are not part

3     of the corpus.

4              THE COURT:  Right.

5              MR. WOZNIAK:  And I simply want to ask Mr. Hanners

6     some questions that go to exactly what he's written in his

7     report, that preservation can only be as good as the

8     identification project that precedes it.  And I think that's a

9     general question that's fair game, and it doesn't get to --

10             THE COURT:  Go ahead and ask it.  Just go ahead and

11    ask it because we have to move on to the next topic.

12             MR. WOZNIAK:  Fair enough.

13             THE COURT:  Okay.

14    BY MR. WOZNIAK:

15    Q    What do you mean, Mr. Hanners, when you say preservation

16    is only as good as the identification project which preceded

17    it?

18    A    Well, if your identification fails to document all

19    available sources of information, sources like you could be

20    talking about backup tapes, you could be talking USBs, or how

21    the company works, how the individuals work, if you fail to

22    address that and bring that back to the table and identify it

23    within your working documents that you're going to carry

24    forward to the preservation process, then you're going to be

25    missing information.  You're not going to collect on that.  And

1    as a result, relevant ESI could be left behind at the onset

2    before any searches or other processes are done with the

3    information.

4           And part of that you basically take the list that you

5    generated in the I.D. section once you define what is going to

6    be preserved to the preservation process.  And generically --

7    and once I start preserving information I'm going to document

8    all that information.  Everything is preserved, who did it,

9    when, how.  So it's building my chain of custody up.  This is

10   how I identified it.  This is what I did to keep it from

11   changing condition, called a preservation step or whatever

12   terms you choose to apply.  And that information typically sits

13   aside and is retained so it's never changed or modified,

14   following the best evidence rules.

15          You go seek the best evidence, you gather it, you

16   store it in a method that it can't be changed or modified.  And

17   typically with electronic media we're going to work off a copy

18   of that information so you're never going to touch that

19   original evidence.  It's done for the simple point of fact that

20   we want to be able to go back to the beginning.  We have the

21   documentation that says how we identified, what we identified,

22   who we identified, or the process we used.  And it's defensible

23   from that viewpoint.  Excuse me if I ran on, Your Honor.

24   Q    A quick follow-up.  You said about potentially altering

25   documents I believe you said or images.

1   A    Right.  Well --

2   Q    And I actually have a follow-up question on that.

3   A    Okay.

4   Q    I want to know if what you meant by that has to do with

5   metadata that's associated with a given electronic file, for

6   instance?

7   A    Well, metadata is information about documents, about other

8   electronic information, and it's contained within the scope of

9   ESI.  It contains information like last saved by, other

10  information.  If you're not properly identifying it and not

11  properly, quote, the term preserve generically, I'd consider it

12  collecting it and setting it aside, if you're asking someone to

13  look and see if that document's relevant, just the mere fact of

14  opening it could change the last access date.

15          If I moved it to another computer for whatever reason

16  as part of the ESI process, then I've changed the date created

17  for that file.  So that information is lost to the reviewer at

18  some future date.  They would assume that the date created is

19  true and accurate or they would have to question and backtrack

20  and see if the information is still there.  Certain types of

21  ESI are volatile, and that comes out in the identification

22  process up front.  We know that PST files are volatile that sit

23  on people's systems.  We know that other information are

24  volatile based on just how a computer works.  We know that we

25  can't really as a whole trust that information is going to be

PDF created with pdfFactory trial version www.pdffactory.com

Hanners - direct by Wozniak                    216

1    there tomorrow.

2              What happens if the individual's hard drive crashes?

3    What happens if the computer is taken away by somebody and is

4    no longer available?  A laptop that disappeared, stolen.  So we

5    want to go ahead and preserve that information -- collect that

6    information at the initial or identify it for collections.

7    Q    We'll call it collect and set aside.

8    A    Collect and set aside.  I'm sorry.

9    Q    Let me ask you specifically, with respect to metadata if a

10   document is, for instance, accessed in the process of trying to

11   determine whether it's responsive and the date last accessed is

12   changed, the date last modified just as an example.  That

13   document is then produced to a party in litigation.  Does the

14   party receiving that document have any way of knowing -- I mean

15   can you tell then whether that document was produced as it was

16   kept in the ordinary course of business by the producing party?

17   A    Well, if the path statement is changed as part of your

18   identified process that you're going to use later, then it's no

19   longer available to the end user.  At some point it's pulled

20   into these ESI collection tools, and it's based upon what's

21   represented to the ESI tool as to where it originated at.

22             Say I moved a file from my laptop to a server and I

23   didn't include the full pathing information, the full date

24   range and all the stuff we do with computer forensic imaging

25   process as we collect, then that information's changed and

1  modified.  If it's taken from that location and later

2  represented in an ESI tool, it's going to show that as the

3  location where it came from with the dates associated and any

4  other changes that occurred.

5  Q    You mentioned earlier including archived media sources, I

6  believe you called them as part of the identification process,

7  is that correct?

8  A    That's correct.

9  Q    What are some examples -- well, let me just cut to the

10  chase.  Are backup tapes an example of an archived source of

11  ESI?

12  A    Yes, it is.

13  Q    And what is typically contained on a backup tape?  Let's

14  say you have a backup tape of an exchange server.  What would

15  be contained on that tape?

16  A    Well, a backup is a snapshot in time of information,

17  whatever was targeted.  Whether that be -- say, an example

18  would be exchange server.  If I targeted the EDB file to back

19  it up so I have everybody's e-mail that's contained within that

20  EDB file, that's a snapshot from whenever it's made.  So if the

21  tape was made yesterday, it's reflective of information that's

22  fairly current.  If it's a three-year old tape of e-mail, then

23  it probably has no comparison or very low comparison to what's

24  actually in the person's current e-mail.  The older you go, the

25  further -- more differences you would expect to see.

Hanners - direct by Wozniak                    218

1  Q    So it fair to say that if one was seeking to go back eight

2  or nine years, one would likely find nonduplicative e-mail on a

3  backup tape as opposed to what's contained on an active server?

4           MR. MENDEL:  Objection, Your Honor.  Lack of

5  foundation.

6           THE COURT:  What's the objection?

7           MR. MENDEL:  Lack of foundation, Your Honor.  And

8  also relevance to this matter.

9           THE COURT:  I will overrule it.  He can answer it.  I

10 don't know that this has to do with choosing between word

11 search and a concept analysis, but --

12          MR. WOZNIAK:  Well, it goes more to the scope of the

13 search, which is again something that we've placed at issue I

14 believe pretty consistently.  But I only have a few more

15 follow-up questions.

16          THE COURT:  Go ahead.

17          THE WITNESS:  I'm sorry.  Can you repeat the

18 question?

19 BY MR. WOZNIAK:

20 Q    The question was, the likelihood that an eight-year-old

21 tape, let's say, would contain duplicative or nonduplicative

22 information as opposed to what's contained on a live active

23 server.

24 A    Well, if you look back eight years, you're going to see

25 many generations of changes that take place in an eight-year

PDF created with pdfFactory trial version www.pdffactory.com

1   time frame.  The whole e-mail system could have swapped out
2   multiple times if you're referring to e-mail.  People that come
3   and go from a company may no longer be there, so their
4   information on an eight-old-year tape would be certainly
5   nonduplicative of information present say on a file server or
6   found within the e-mail server.
7   Q    Based on your review of the written responses, the 30 (b)
8   6 letters from defendants, do you know whether defendants have
9   revealed the existence of backup tapes in their possession?
10  A    Yes, they have.
11  Q    And did they provide information about the content of
12  those tapes?
13  A    Some did.
14  Q    Okay.  For those that did not provide any information, is
15  there a way of going about determining the content?
16  A    Yes.  Generically it's called cataloging of tapes.  There
17  are -- and whether they have the equipment or not, there's
18  companies that produce catalogs of tapes that are out there.
19  And a catalog is nothing more than what you would typically see
20  in Windows as a directory structure.  It would show you the
21  full path down to file name but do so in a text basis.  It
22  would show you the file name, the size of the file, and maybe a
23  MD5 hash of the file.  And that's doable for the entire
24  contents of the tape.
25  Q    And would that then allow you to see whether the

1   likelihood that there were -- there was duplicative or
2   nonduplicative ESI on that tape?
3   A     With the use of an MD5 hash, yes, you could de-dupe the
4   files based upon that.
5   Q     And do you have personal experience cataloging backup
6   tapes?
7   A     Currently I use a company called RenewData out of Austin,
8   Texas.  They do the cataloging work for me.  And past companies
9   I've worked with we did it in-house.
10  Q     What are the typical costs in your experience associated
11  with cataloging a backup tape?
12  A     Well, for a generic tape I've received quotes this year of
13  approximately $50 per tape.  Typically the company I work with
14  if you submit a hundred tapes or more, that cost comes down.
15  Q     How common is it in your experience to access backup tapes
16  in the context of litigation?
17  A     Well, when I was working with a larger company, we did it
18  on a fairly routine basis.
19  Q     Which means?  Can you elaborate?
20  A     Well, companies that are involved in litigation -- I've
21  had banks come to me with a couple of thousand tapes.  I've had
22  a company here in Chicago I did work for in the past that
23  bought me 3700 tapes to have the information as part of an SEC
24  finding saying their information wasn't available.  They needed
25  to de-dupe, actually de-dupe and retain one copy, but they

1    wanted to retain a historical record of where all -- that copy
2    may have existed among all the possible custodians.  That
3    process is certainly out there and available.
4    Q    In your experience is a broad approach to identifying and
5    collecting potentially relevant ESI significantly more
6    expensive than taking a more narrow approach, for example,
7    looking only at certain selected document custodians as opposed
8    to basing your identification on subject matter or an entire
9    department?
10   A    Well, lacking -- or just stating a fact, last year in St.
11   Louis I went in to collect say, I think the figure was 50
12   custodians.  While I was on-site -- and I had projected three
13   days to do so.  While I was on-site during that collection
14   during the three days they added, I think the total came out to
15   be 107 custodians.  The cost to the client was nil because I
16   was able to work it in in the same time frame that the normal
17   custodians I was there to collect.  Their machines were
18   available at the same time.  So there was no appreciable cost
19   for that.
20   Q    And would it make a difference if you take a -- let's say
21   you take a subject matter approach to searching or for
22   identifying potentially relevant ESI.  How does that compare to
23   the costs of -- again if you had to sort of estimate, how much
24   more costly, if at all, it would be to take a more narrow
25   custodian based approach?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. MENDEL:  Objection, Your Honor.  Lack of
2    foundation.
3          THE COURT:  All right.  Lack of foundation as to the
4    type of subject matter.  I mean --
5          MR. WOZNIAK:  I'm willing to scratch the -- or pull
6    the question.
7          THE COURT:  Okay.
8          MR. WOZNIAK:  I don't think it's important.
9          THE COURT:  Thank you.
10   BY MR. WOZNIAK:
11   Q    Strike it.  And really what I want to get at is just to
12   sum up, based on your experience you typically take a subject
13   matter or a broad approach to identifying potentially
14   responsive ESI?
15   A    I always take a much broader approach than a targeted
16   approach.  I would go with a subject matter approach or global
17   approach to collecting ESI within a division, group, or
18   department.
19   Q    And again, if you could just quickly tell me, summarize
20   why that is.  Why you believe it's important to do so.
21   A    Well, early on and in a litigation matter you may know or
22   may not know the full scope of the information that may be
23   requested.  So we try to collect as much information as we can,
24   and we don't know at a later on date that additional
25   individuals could be named.  And if you don't collect it up

PDF created with pdfFactory trial version www.pdffactory.com

1  front, you don't have an opportunity to build a defensible

2  process saying we preserved everything that was available to

3  us.

4          If you have to go back at later date it's more

5  costly.  I generally point that out.  And my recommendation is

6  always collect broadly.  And you're not processing it.  You're

7  setting it aside until a determination can be made.

8  Q    And you said more costly.  If, for instance, you wanted to

9  add a particular custodian, if one had taken a custodian

10  focused approach and one later learned that there was another

11  person that should have been included but you didn't learn this

12  until a year later, you might not even be able to do that

13  realistically, isn't that right?

14  A    Well, if they've upgraded the person's computer since

15  then, the prior information could have been lost.  Certainly if

16  you were looking for latent data, that would be gone with the

17  previous computer.  E-mail systems.  A person could have left,

18  a person could have died.  Any number of factors could come

19  into play there that really make it no longer a viable

20  solution.

21          MR. WOZNIAK:  I don't think I have any further

22  questions, Your Honor.

23          THE COURT:  Okay.  Do you have any cross?

24          MR. MENDEL:  Yes, Your Honor.  Can we take a break,

25  Your Honor.

1         THE COURT:  Yes.  Why don't we take 10 minutes.
2    Okay.
3       (Short break taken.)
4         MR. MENDEL:  In light of the fact, Your Honor, that
5    there are ongoing 30 (b) 6 discussions between the parties that
6    are about a lot of what Mr. Hanners just testified about --
7         THE COURT:  You have no questions?
8         MR. MENDEL:  No questions.
9         THE COURT:  Okay.  Thanks, Mr. Brown.  You're
10   excused.
11        THE WITNESS:  I guess I'm done.
12        THE COURT:  You're excused.
13        THE WITNESS:  Pleasure meeting you, Your Honor.
14        THE COURT:  Thank you.
15        MR. MOGIN:  This is Mr. Hanners.
16        THE COURT:  Mr. Hanners.  I'm sorry.
17        THE WITNESS:  That's okay.  I'm from a large family.
18      (Witness excused.)
19        MR. MOGIN:  Your Honor, we'd like to call Dr. David
20   Lewis, please.
21      DAVID LEWIS, PLAINTIFFS' WITNESS, DULY SWORN
22        MR. MOGIN:  Your Honor, with respect to the time, if
23   I could have a little latitude with respect to the form of the
24   questions, I think we can get this information in before our
25   deadline.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Sure.  Absolutely.

2                   DIRECT EXAMINATION

3     BY MR. MOGIN:

4     Q    Dr. Lewis, would you please tell us your educational

5     background.

6     A    I have a bachelors degree in mathematics and a bachelors

7     degree in computer science from Michigan State and a masters

8     degree and Ph.D in computer science from the University of

9     Massachusetts at Amherst.

10    Q    Are you also a fellow of the American Association for the

11    Advancement of Science?

12    A    Yes, I am.

13    Q    Could you tell us a little bit about that.

14    A    I was elected in 2006 for contributions to the algorithms

15    and evaluation of the use of supervised learning and

16    information retrieval.

17    Q    And just a one sentence definition of supervised learning

18    and information retrieval, please.

19    A    Supervised learning is learning from examples.  People say

20    this document, say, belongs to one category, this document

21    belongs to another.  And computer algorithms learn to tell the

22    difference between the two.

23    Q    Okay.  And how are you currently employed?

24    A    I'm an independent consultant.

25    Q    And can you tell me the nature of your consulting

PDF created with pdfFactory trial version www.pdffactory.com

1    practice, please.

2    A    I consult on information retrieval, machine learning,

3    natural language processing, and the statistical evaluation of

4    systems in these areas.

5    Q    Okay.  And natural language processing, would you give us

6    the one sentence definition of that, please.

7    A    Computer analysis of language.

8    Q    Do you currently work with any eDiscovery vendors?

9    A    Yes, I do.

10   Q    And what type of eDiscovery vendors do you work with?

11   A    I work with a company called Kroll Ontrack.  I'm a

12   consultant for them, and they provide eDiscovery services.  I

13   recently started consulting for a small Chicago company called

14   Nextpoint, which provides Cloud based eDiscovery services.

15   Q    What do you do, or what did you do for Kroll?

16   A    I have designed algorithms for supervised learning and

17   statistical ranked retrieval, and I have also designed

18   algorithms for statistical evaluation of those technologies.

19   Q    And you mentioned a small company that you're working with

20   now.  What have you done for them?

21   A    I've done some preliminary work for them on how they might

22   use supervised learning, but that has not been implemented yet.

23   Q    Have you done any teaching in the field of information

24   retrieval?

25   A    I've taught a number of tutorials at conferences in

1   information retrieval, computational linguistics, and

2   statistics.

3   Q    Have you published any papers that have been peer reviewed

4   in scientific journals?

5   A    Yes, I've published a number of peer reviewed journal

6   articles.

7   Q    And are the articles that you have so published attached

8   to your resume that was submitted to the Court?

9   A    Yes, they are.

10  Q    And is that resume true and correct and accurate?

11  A    Yes.  I haven't updated it for a few months.  I noticed

12  that there's an article in the *Journal of Artificial*

13  *Intelligence and Law* which is listed to -- as to appear, but

14  that actually has appeared both in print and online now.

15  Q    And what was that article?

16  A    That's an article on the evaluation of information

17  retrieval systems in electronic discovery.

18  Q    Do you have any patents in the field?

19  A    Yes, I believe eight of them have issued so far.

20  Q    And can you tell us in general terms what those patents

21  are for?

22  A    They're patents on information retrieval and machine

23  learning.

24  Q    Very good.  Now, very briefly, Dr. Lewis, could you give

25  us the definition of the science of information retrieval.

1   A     Information retrieval is the science of developing methods

2   for better access to data such as textual data, where the

3   meaning of the data is somewhat subjective and the information

4   needs are complex subjective information needs.

5   Q     Are there other disciplines that are involved in

6   information retrieval besides computer science?

7   A     Yes.  Issues of computational linguistics come to bear,

8   issues of statistics come to bear.  Database technologies

9   sometimes come to bear.

10  Q     And could you give us a one sentence definition please of

11  computational linguistics.

12  A     Well, I used the term natural language processing earlier.

13  The two are essentially the same.  They're the study of how to

14  develop computer systems that perform meaningful tasks on

15  linguistic data.

16  Q     And what is the relationship of the field of statistics to

17  the science of information retrieval?

18  A     So statistics is used in two ways in information retrieval

19  systems.  First it's used for -- in various techniques for

20  improving the performance of the systems.  And second, it's

21  used in various ways to evaluate the performance of the system.

22  And those are two different bodies of statistics.

23  Q     Please tell us how it's used to evaluate the performance

24  of a system.

25  A     Well, you would typically draw a random sample from some

PDF created with pdfFactory trial version www.pdffactory.com

1   universe of documents that one needs information access to.

2   Review elements of the -- review the elements in the random

3   sample to determine which categories each element should belong

4   to.  You then need to run the information system on the

5   universe of documents and see what the outputs of the system

6   are on that universe of documents.  And then finally, you need

7   to compute some statistical estimate of the effectiveness of

8   the system by comparing the system's decisions to the manual

9   judgments.

10  Q    And how would you express that last statistic?

11  A    Excuse me.  I didn't quite hear the question.

12  Q    How would you express that last statistic that you

13  described?

14  A    Oh, well, it's common to use a confidence interval for

15  expressing these forms of estimates.

16  Q    In layman's terms what's a confidence interval?

17  A    So a confidence interval consists of three quantities.  So

18  first it's worth mentioning a confidence interval is an

19  estimate of a particular statistic; that is, a particular value

20  on the universe of documents.  The confidence interval has

21  three parts.  It has a central value, the sort of expected --

22  the point estimate expected value.  It has a margin of error,

23  which is sort of a degree of uncertainty on that estimate.  And

24  then it has a confidence level, which is an expression of how

25  confident you are that the size of the sample drawn was

1    representative of the universe of documents.

2    Q    So confidence level refers to the random sampling process,

3    correct?

4    A    Yes.

5    Q    Now, could you please tell us what is from a statistical

6    perspective as it's used in information retrieval, what is a

7    random sample?

8    A    A random sample of a given size or a simple random sample

9    of a given size, because there's several random sampling

10   techniques.  So a simple random sample is a sample that's drawn

11   in a fashion that every set of that size from the universe has

12   an equal probability of ending up being the sample.

13   Q    All right.  And what is the margin of error in layman's

14   terms, please?

15   A    The margin of error is simply how certain you are about

16   the estimate.

17   Q    And what is -- again, what is the estimate as you have

18   just used that term?

19   A    So the estimate would be typically a confidence interval

20   is expressed as a particular central value plus or minus a

21   margin of error, so that that point estimate is that central

22   value.  It's -- typically it's the value that would be most

23   probable to be the actual value.  But that somewhat depends on

24   the details of the sampling.

25   Q    And what is the central value that's important to

1  information retrieval in the context of this case?

2  A    The most important statistic here is recall.  My

3  understanding of the discovery process is that it's very

4  important to find most of the responsive documents.  Recall

5  is -- recall is the proportion of all the responsive material

6  in the universe to be searched which the system has managed to

7  find.

8  Q    And you've heard other witnesses today use the term

9  precision, correct?

10 A    Yes, I have.

11 Q    And precision is a term of art in information retrieval,

12 correct?

13 A    Yes, it is.

14 Q    It has a different meaning than it does in everyday

15 conversation, correct?

16 A    That's correct.

17 Q    And what is -- precisely what does precision mean?

18 A    Precision is of all the material that an information

19 retrieval system found and identified as being interesting,

20 what proportion of it was actually responsive.  So it's a

21 measure of how much junk was in the stuff that the system

22 found.

23 Q    So why is recall, understanding recall more important than

24 understanding precision in this context?

25 A    Well, recall goes to the extent to which the need to find

1   responsive documents has been satisfied.  Precision is largely

2   an issue of what it's going to cost to go through the stuff

3   that the system found.  So you can always compensate for

4   failures in precision by doing more manual review, running

5   through the material with other tools, but there's no way to

6   compensate for a failure in recall.  If you're never given the

7   material, there's nothing you can do about it.

8   Q    Now, in this particular case have you had the opportunity

9   to review the  defendants', first Georgia Pacific's proposed

10  search methodology?

11  A    Yes, I have.

12  Q    And can you tell us in general terms what you have

13  reviewed.

14  A    I reviewed the November 22nd letter and there were

15  subsequent briefs and documents which provided a couple other

16  versions of the same Georgia Pacific process that was described

17  there.  I've also looked at the complaint in the case and the

18  requests for documents.  I've looked for the -- looked at the

19  Boolean search strings from the various defendants.  I've

20  looked at Dr. Tenny's and Mr. Hanners' reports.  And I listened

21  to the testimony here in court today.

22  Q    All right.  Now, with respect to defendants' search

23  strings, do you understand those to be Boolean queries?

24  A    Yes, they appear to be Boolean queries.

25  Q    And can you give us a little bit of your background from

PDF created with pdfFactory trial version www.pdffactory.com

 1    information retrieval about what Boolean queries are, what they

 2    do, and what are their limitations.

 3    A    So a Boolean query is a logical expression on search

 4    terms.  It combines search terms which are intended to be

 5    exactly matched against the corpus.  And a search term might

 6    have things like a wild card, so that would be an exact match

 7    against words that end in several ways.  Combined with logical

 8    operators *and* and *or* and *not* often there are proximity

 9    operators which allow expressing that certain words are near

10    each other.  So that's what a Boolean query is.  It's a

11    technology that's been used in information retrieval for a very

12    long time.

13            Some of the limitations of it are it requires an

14    exact match against the document so that the user using a

15    Boolean query has to specify exact matching conditions.

16    Q    What are the ramifications in a document review situation

17    of the requirement of an exact match?

18    A    Well, it would depend on the request for proposals -- I'm

19    sorry, request for documents.

20    Q    Could you elaborate, please.

21    A    Sure.  So, for instance, some of the requests for

22    documents in this case refer to ideas that can be expressed in

23    a very wide range of fashions linguistically.  Notions like

24    raising prices, changing capacities of factories.  There's a

25    very -- these are very broad topics, a very wide range to talk

PDF created with pdfFactory trial version www.pdffactory.com

1    about them.  So it is difficult to express these sorts of

2    notions in an exact match framework.

3              There's also requests for documents related to

4    alleged illegal activities.  One can expect that given that my

5    understanding is that some of this -- in this industry there

6    has been previous litigation, that people would be cautious, if

7    they were undertaking illegal activities, they would be

8    cautious in the way that they referred to them.  They would be

9    unlikely to use easily anticipatable terminology when

10   discussing such activities.

11   Q    Are you saying then that one of the limitations of Boolean

12   queries are that it requires the user to anticipate in advance

13   of reviewing the corpus the exact words that might be found in

14   documents?

15   A    That's correct.

16   Q    Now, Dr. Lewis, are you involved in something called TREC?

17   A    Yes, I am.

18   Q    And TREC is a project sponsored by the National Institute

19   of Standards, is that right?

20   A    That's correct.

21   Q    And can you tell us about your involvement in TREC.

22   A    Yes.  I was one of the founding members of the TREC

23   program committee in 1992, and I've served on the TREC program

24   committee most, but not all of the years since then.  I was

25   also one of the cofounders of the TREC Legal Track.  TREC Legal

PDF created with pdfFactory trial version www.pdffactory.com

1    Track was a subtask within TREC that was focused on studying

2    the behavior of information retrieval systems on simulated

3    electronic discovery tasks.

4    Q    And TREC stands for Text REtrieval ...

5    A    Conference.

6    Q    Conference.  All right.  So in the TREC studies have there

7    been any findings regarding -- strike that.

8            TREC has conducted certain studies where they've

9    compared Boolean queries, the effectiveness of Boolean queries

10   to content based queries, is that correct?

11   A    Yes.

12   Q    And what have been the results of those studies?

13   A    Well, there's two series of studies that are relevant

14   there.  There was one series of studies that had to do with

15   comparing Boolean querying with statistical ranked retrieval.

16   Statistical ranked retrieval was found to be more effective in

17   the last of those studies where the methodology had been

18   refined.

19   Q    Let me stop you right there.  Give us the one sentence

20   definition of statistical ranked retrieval, and then we'll go

21   back to what TREC did.

22   A    Okay.  Statistical ranked retrieval refers to technologies

23   that accept a query, usually simply a list of words, and

24   produce a ranking of documents taking into account the

25   statistical properties of words and phrases in the entire

PDF created with pdfFactory trial version www.pdffactory.com

1    collection of documents.

2    Q    All right.  Now, you were telling us about TREC and its

3    comparison of Boolean to other methodologies.

4    A    Right.  So there was a -- there was comparison of

5    statistical ranked retrieval with Boolean queries.  There was

6    also a series of three studies that compared supervised machine

7    learning methods with Boolean queries.  And again in the last

8    of those three when the -- and which was the one that had the

9    most refined methodology, the best supervised learning system

10   had an effectiveness level of 250 percent of the Boolean system

11   that was compared.

12   Q    So now you've referred so far in your testimony to three

13   different search systems, is that correct?

14   A    That's correct.

15   Q    Boolean, statistically ranked retrieval, and what you've

16   called supervised learning; correct?

17   A    That's correct.

18   Q    And what's the relationship from your perspective of

19   supervised learning to what other people have described as

20   predictive coding?

21   A    Predictive coding is a term that is used in the eDiscovery

22   industry.  My understanding is it refers to the use of

23   supervised learning in eDiscovery.  There is -- I should

24   mention I prefer not to use the term predictive coding because

25   there's some legal controversy.  A company called Recommind has

1    claimed certain trademark rights to that phrase, so I prefer to

2    use the term supervised learned.

3    Q    Very good.  Now, are you familiar with or have you become

4    familiar with a term called content based advanced analytics?

5    A    Yes, I have.

6    Q    And have you developed an understanding of that term?

7    A    Yes.  My understanding of content based advanced analytics

8    is that it's one of several terms that's used in information

9    technology to refer to technologies that include statistical

10   ranked retrieval, supervised machine learning, and a variety of

11   unsupervised learning methods such as clustering and latent

12   semantic analysis.

13   Q    Now, very good.  Now, based -- is there anything else that

14   you can inform the Court with respect to the relative

15   capabilities of these three methods before we begin to discuss

16   Georgia Pacific's specific methodology; that is, Boolean versus

17   statistically ranked retrieval versus supervised learning?

18   A    The major thing that I think is important to understand

19   about the three technologies is the relative burden that they

20   put on the need of a user to anticipate what the language is in

21   the universe of documents to be searched.  A Boolean query

22   system requires specifying an exact match on search terms

23   use -- expressing that in logical operators.

24        A statistical ranked retrieval system relaxes the

25   demands on the user by allowing them to simply provide a list

PDF created with pdfFactory trial version www.pdffactory.com

1   of words and phrases.  And a supervised learning system relaxes

2   that demand even more by allowing the user to express their

3   information need in the form of examples.  This is responsive,

4   this is not responsive.  With the computer algorithm doing the

5   work of figuring out which words distinguish responsive from

6   nonresponsive documents and how much weight to pay attention to

7   those words.

8          So if we compare supervised learning back to Boolean

9   querying, the identification of which words are important can

10  be done by the algorithm.  The identification of how much

11  attention to pay to those words is done by the algorithm.  And,

12  in fact, in a Boolean framework you can't even express this

13  sort of relative importance of words.

14         A final thing I would mention is that a supervised

15  learning algorithm is essentially unbounded in the amount of

16  information that it can make use of.  You can provide it more

17  and more and more labeled examples, and it will get more and

18  more and more value out of them.

19  Q    Now, in your --

20         THE COURT:  I have a question, though.

21         MR. MOGIN:  Certainly.

22         THE COURT:  Is the SRR word based or concept based,

23  though?

24         THE WITNESS:  Statistical ranked retrieval -- so I do

25  not like to use the word concept based when talking about

PDF created with pdfFactory trial version www.pdffactory.com

1    information retrieval systems because it's so ambiguous.  It

2    has been used to refer to a wide range of technologies.  A

3    statistical ranked retrieval system can take advantage of

4    words.  It can take advantage of phrases.  It can take

5    advantage of the metadata if the system is configured in that

6    fashion.  But I would prefer to avoid using the word concepts,

7    Your Honor.

8              THE COURT:  But it does involve words?

9              THE WITNESS:  It does -- yes, it can use words.  It

10   can use phrases.  It can use metadata.

11             THE COURT:  Okay.  All right.

12   BY MR. MOGIN:

13   Q    When you say it can use words, do you mean Boolean type

14   words or other configurations of words?

15   A    Well, I mean words -- the words are words.  The question

16   is what the information retrieval system does with them.  A

17   statistical ranked retrieval system uses the statistical

18   properties of language and can pay differing attention to

19   different words.  So again, the statistical ranked retrieval

20   system is different from Boolean in that sense.  Boolean,

21   either the word is used or not in certain logical combinations.

22   A statistical ranked retrieval system computes a numeric weight

23   for each word and determines how much attention to pay to the

24   word.

25   Q    Can you think of an example when we compare Boolean to

PDF created with pdfFactory trial version www.pdffactory.com

1   statistical ranked retrieval that would apply to this case

2   perhaps based upon the RFPs that are in issue?

3   A    Well, sure.  So if you were -- excuse me.  If you were

4   looking for one of these concepts that's difficult to express

5   like a price increase, there's many many different ways to talk

6   about price increases.  You could -- so you would either have

7   to anticipate that in a Boolean query, or you could use, you

8   could use a query to a statistical ranked retrieval system and

9   be able to match documents at least based on all of the words

10  you listed, which could be a big long list of words.  You don't

11  have to combine them with logical operators.  And there would

12  be differential weighting of those.

13          And then if in addition there's a supervised learning

14  capability, or for that matter if there was certain forms of

15  unsupervised learning, such as latent semantic indexing, you

16  also would be able to match on words that were not anticipated

17  in the original query.

18  Q    What do you mean mash on?

19  A    Match on.

20  Q    Match on.

21  A    Match on.  Sorry.  Yes.

22  Q    Okay.  Now, you used the term anticipate.  What does

23  anticipation involve in this context?

24  A    Well, the point being that if you're using an exact match

25  system, you have to anticipate exactly the combinations of

1    words that will appear in the documents that you're looking

2    for.  In a statistical ranked retrieval system you still have

3    to anticipate something there.  You have to anticipate at least

4    some of the words that are going to occur in the documents

5    unless you're applying -- again, there's some of these other

6    technologies like latent semantic indexing where you could get

7    a match even with no identical matches on the query.

8              And then finally, in supervising learning there's no

9    anticipation at all.  You simply look at examples and you say

10   this is responsive, this is not responsive, and the system does

11   the rest.

12   Q    Now, you're aware that in this case one of the examples

13   that the plaintiffs have put forward is the phrase *they are*

14   *with us*, correct?

15   A    I am.  I understand that.

16   Q    Could you please tell us how each of these systems would

17   handle -- could you please tell us the likelihood of each of

18   those three systems being able to find such a document

19   containing that phrase *they are with us*.

20   A    Well, I would say that it's important to recognize that

21   the individual words they, are, with, and us are very all high

22   frequency terms.  And that's going to pose a difficulty for any

23   system that's using only the words in the query.  So it's going

24   to be extremely difficult to handle in a Boolean query system.

25   You know, if the Boolean query had access to metadata, you

1   know, maybe you could, you know, gin up something with the

2   metadata to try to get at those relevant documents.

3          The statistical ranked retrieval system, you know,

4   you would have a somewhat better chance if you are using the

5   metadata in a statistical fashion.  But, you know, frankly

6   getting something like that is -- you're only even going to

7   have much of a decent shot with a supervised learning system,

8   and for that matter with a supervised learning system that has

9   access to the metadata so that it could latch onto things

10  besides the words.  You know, time of day, custodians, file

11  path names, you know, was something stored in an unusual place,

12  things like that.

13         And these are the kinds of systems -- these are the

14  kinds of things that are very difficult for a person to

15  anticipate, but where a supervised learning system has some

16  hope of finding patterns in the data and finding them.

17  Q    Now, you heard Mr. Hanners' testimony about the

18  possibility of metadata being altered or not properly

19  maintained, correct?

20  A    Yes, I have.

21  Q    And could you tell us if that situation were to occur,

22  what would happen with the use of these systems of metadata as

23  you've described it.

24  A    Well, you know, any time the metadata is distorted, the

25  system is losing evidence that it could otherwise use to find

PDF created with pdfFactory trial version www.pdffactory.com

1   responsive documents.

2   Q    Now, would supervised learned be able to find a document,

3   label it as responsive bearing the phrase *they are with us*?

4   A    Yes, if it has access to the metadata.  I think it's

5   unlikely it would find it if it had only the text to work with.

6   You know, maybe if there was routine use of these -- of that

7   particular phrase in the context of responsive documents, it

8   might get it.  But it's going to be pretty hard.  Those are

9   high frequency words.

10  Q    The same with *they're with us*?

11  A    Yes, I mean, it's the same problem.  The words have very

12  high frequency and they occur in a lot of different documents.

13  Q    *They're okay with that*?

14  A    It's the same issues.

15  Q    Okay.  Now, have you reached a conclusion -- some

16  conclusions about Georgia Pacific's proposed search

17  methodology?

18  A    Yes, I have.

19  Q    Can you tell us what your conclusions are.

20  A    My conclusions are first that it cannot be relied upon to

21  find a substantial proportion of responsive documents.  And

22  second, that it cannot be relied upon to produce a

23  statistically valid estimate of its own effectiveness.

24  Q    Let's start with the first.  It cannot be relied upon to

25  produce -- I'm sorry.  What did you say?

1   A    To find a substantial proportion of the responsive

2   documents.

3   Q    It cannot be relied upon to find a substantial portion of

4   the documents.  Please explain your reasons.

5   A    Well, there's -- there's several reasons.  The first is

6   that the process of developing their queries was done on --

7   without having collected all of the sources of responsive

8   material.

9   Q    Can you explain that further.

10  A    Yes.  My understanding from the report and the testimony

11  of Mr. Hanners is that there are substantial sources of

12  potentially responsive material that are not associated with

13  particular custodians.  And thus were not material that was

14  present at the time Georgia Pacific did their -- applied their

15  protocol.

16  Q    Okay.  And you said you had a number of reasons.  What's

17  your next reason?

18  A    Yes.  The second reason is that Georgia Pacific did the

19  development of their queries on a set of five arbitrarily

20  selected custodians.

21  Q    And can you explain what's wrong with that?

22  A    Well, yes.  The purpose of developing a search query is to

23  distinguish responsive documents from nonresponsive documents.

24  The ability of the query to do that depends on the distribution

25  of words in the responsive and nonresponsive documents.  By

1   using an arbitrary subset of the five custodians they've

2   created an artificial distribution of words which is not

3   representative of the entire body of material to be searched.

4   Q    So it wasn't diverse enough?  Is that what you're saying?

5   A    Yes, it's not diverse but it's also not representative.

6   Q    Why isn't it representative?

7   A    Well, because it's each person's vocabulary is somewhat

8   different.  They use language differently based on their life

9   experiences, their job functions, and so on.  So if you choose

10  any fixed set of the custodians as a -- it's not going to be

11  representative of the universe of documents that you need to

12  search.

13  Q    Okay.  And the impact of that would be?

14  A    The impact is that again it would degrade the

15  effectiveness of the Boolean queries that they developed by

16  their iterative procedure.

17  Q    Okay.  Is there any other reason that you believe that the

18  methodology cannot be relied upon?

19  A    The third was the question about the spam filtering, the

20  junk filtering that was brought up earlier.  That filtering on

21  the string Expedia.com may have removed responsive documents.

22  Now, I was a bit unclear from Mr. Brown's testimony at what

23  point that was no longer being done.  In the November 22

24  document it was still described as part of the process.

25          But to the extent to which those responsive documents

1   were removed during the iterative process of query development,

2   that would again degrade the effectiveness of the queries that

3   were produced.

4   Q    So what kind of spam or junk are you referring to?  Is

5   there any spam or junk that it would be legitimate to remove?

6   A    Well, one can think of some obvious examples we all get in

7   our e-mail boxes.  You know, if you had a very, very highly

8   accurate junk mail filter and it was applied in a fashion where

9   there was some validation of its effectiveness, you know, I

10  could imagine a responsible use of something like that.

11  Q    All right.  And are there any other reasons?

12  A    Okay.  Well, the fourth reason was, is -- okay.  Scratch

13  that one because that's an evaluation one.  The next reason is

14  the use of the -- there was a process that they undertook

15  iteratively to develop the search queries.  And it involved

16  taking samples and reviewing those samples for whether

17  documents were responsive or not.  That process as was

18  described by Mr. Brown was done with the knowledge by the

19  people doing the reviewing of whether the system had retrieved

20  the document or not.

21      That is, was the document in what they called the

22  combined composite set or was it in the null net?  So the

23  reviewers potentially are biased by the fact that they know

24  what the right answer they're supposed to find is.

25  Q    And what are the impacts of that?

PDF created with pdfFactory trial version www.pdffactory.com

1    A    Well, review for responsiveness is a very complicated

2    subjective decision.  And it's easily affected by contextual

3    factors.  And obviously an important contextual factor is

4    knowing what answer is going to make the system look good.

5    Q    Now, with respect to the five custodian process that

6    you've heard described and then later iterations of that, is

7    that a random sample as you understand it?

8    A    No.

9    Q    Could you explain why.

10   A    There was no statement that the custodians were chosen

11   randomly or even chosen in any fashion that their documents

12   were meant to be representative.

13   Q    So from an information retrieval statistical perspective,

14   what's a random sample?  How should it have been done in this

15   case?

16   A    Well, the first thing would be to identify the entire

17   universe of documents to which the queries are going to be

18   applied.  And then you would draw, for instance, a simple

19   random sample from that universe of documents.  And as I

20   mentioned earlier, a simple random sample is a sample such that

21   all samples of that size have an equal probability of ending up

22   being the sample.

23   Q    Now, were there any other issues with respect to the

24   first, that is, the methodology and its ability to find

25   responsive documents?  Was there any issue of overfitting?

1   A    Well, that's really one of --

2            THE COURT:  Of what?  I'm sorry.  Of what?

3            MR. NEUWIRTH:  Can you repeat that question.

4   BY MR. MOGIN:

5   Q    Was there any issue of overfitting?

6   A    That's an evaluation issue.

7   Q    All right.

8   A    That's not a, that's not an effective -- that's not an

9   issue with the effectiveness of the queries.  That's an issue

10  with the evaluation.

11  Q    We'll come back to that then.  Did they make effective use

12  of the analytical tools that were available to them?

13  A    No.

14  Q    With re -- go ahead and explain that.

15  A    Well, so there was a description in the process and also

16  we heard testimony that Clearwell's topics page tool was used

17  in the process.  I examined the Clearwell manual, and the

18  topics page tool is a tool that does document clustering and

19  then also attempts to sort of pull out which words are

20  representative of each cluster.

21  Q    And go ahead and explain as much detail as you need

22  document clustering and how it compares to the other

23  technologies you've described.

24  A    Well, document clustering falls in what is scientifically

25  referred to as an unsupervised learning process.  That is, it

1   is a machine learning technique which finds relationships among

2   documents without any human guidance.  So it attempts to group

3   together documents that have similar topic, but without sort of

4   any human guidance as to what those topics are.

5   Q    And what's the impact of the lack of human guidance?

6   A    Well, the lack of the human guidance is that document

7   clustering methods will find some sort of relationships between

8   documents, but those relationships don't necessarily have

9   anything to do with the particular information need of

10  interest.  I've done experiments where I've run, oh, at least

11  10 different document clustering algorithms on the same corpus,

12  and they produced 10 different clusterings of the documents.

13  Each one has its own statistical bias as to what an interesting

14  pattern is, but these don't necessarily line up with the

15  distinctions that people want to make among the documents.

16  Q    And so because of those limitations on the concept

17  clustering, are you saying that Georgia Pacific used the tool

18  improperly?

19  A    That's limitations on document clustering.  No, actually

20  there were two other reasons I felt they used it

21  inappropriately or ineffectively would be a better way to put

22  it.  First, and again this was something that I again have some

23  unclarity after Mr. Brown's testimony.  In the November 26th

24  letter it was said that the topics page tool was applied

25  separately to the combined composite set and to the null set.

1   The difficulty with that is that it means that documents that

2   were missed by the query cannot be clustered together with

3   documents that were hit by the query.  And, of course, the

4   documents hit by the query are the ones that are, you know,

5   presumed to be the most, the most rich in responsive documents.

6   Q    You know, let's get to the whole idea of the null set.  As

7   you heard Mr. Brown testify, their whole thing from their

8   perspective, their process hinges on the null set.  Do you have

9   any opinion with regard to that?

10  A    My understanding of Mr. Brown's testimony and of the

11  description in the November 22nd letter to the extent that I

12  could make out what they were saying in that letter, is that

13  their validation process is focused on determining how many

14  responsive documents are in the null set.  And that can be a

15  reasonable way to evaluate an information retrieval system.

16  There's some caveats that are important there, however.

17  Q    What are the caveats?

18  A    Well, the caveats are that it's extremely important if you

19  do you that, that the review of the documents in the null set

20  be consistent with the review of documents that's done for

21  production.

22  Q    And did Georgia Pacific follow that process?

23  A    Well, I'm not aware of who did the review for

24  production -- well, no, there's a whole -- that's right,

25  because Mr. Brown testified about that.  Mr. Brown and two of

1    his colleagues reviewed the null sets, or the samples, excuse

2    me, samples from the null seats.  And there was a team of I

3    think 15 lawyers or something that were doing the review for

4    production.  So what would be critical is to, you know, have

5    some statistical guarantee that the two sets of reviewers are

6    actually making comparable decisions.

7             The serious problem that could arise is that if you

8    use a stringent criterion for evaluating responsiveness in the

9    null set and then a more liberal criterion during review, if

10   you then actually compared the quantities, you could think,

11   well, you found some, you know, incredibly large proportion of

12   the documents that were out there, but that ratio would not be

13   correct because they were not being reviewed comparably.

14   Q    Now, you've heard Mr. Brown's testimony with respect to

15   the number of, as he put it, marginally responsive documents

16   within the null set?

17   A    Yes.

18   Q    And how does that fit into the paradigm that you just

19   expressed as between stringent and liberal?

20   A    Well, that would be -- it's sort of saying that certain

21   documents -- it's really sort of saying certain documents fall

22   into a different class of responsiveness.  It would seem to be

23   trying to define certain responsive documents as, well, not

24   really being responsive.  And I guess I don't know if

25   marginally responsive has got a legal meaning or something.

1  But I think the thing that most struck me about that was that

2  there was no notion of marginally responsive when they were

3  reviewing the documents the system found.  There was only a

4  notion of marginally responsive when they were reviewing the

5  documents that the system had missed.

6  Q    Very good.  Now, let's go to your other area of criticism,

7  if you will, which was that the methodology cannot be relied

8  upon to produce a statistically valid estimate of

9  effectiveness.

10 A    That's correct.

11 Q    Can we begin with the reporting of the statistical events.

12 A    Okay.  So could I see the November 22nd letter?

13 Q    It should be there on the witness stand.

14 A    I have only stuff from Mr. Hanners here.  Oh, is it up

15 here?  Yes, I have it.

16        THE COURT:  So just for the record you're talking

17 about Plaintiffs' 4, right?

18        MR. MOGIN:  Plaintiffs' 4, correct, Your Honor.

19        THE WITNESS:  Okay.  I have the letter.

20 BY MR. MOGIN:

21 Q    You've reviewed this letter previously?

22 A    Yes, I have reviewed it several times.

23 Q    Okay.  Now, I believe that the statistical reporting is on

24 page 5, is that correct?

25 A    Yes, it is.

1   Q     Now, go ahead and read in for the record what you

2   understand to be the statistical reporting in that letter?

3   A     The report takes this form.  It is the sentence which

4   says, "Based on this validation process, COC determined with

5   99 percent confidence that the final set of search terms had no

6   more than a 5 percent margin of error in identifying documents

7   as not responsive to plaintiffs' document requests."

8   Q     What is your response upon reading that?

9   A     That's not a statistical statement.

10  Q     Well, what kind of statement is it?

11  A     It's a statement which uses statistical terminology, but

12  does not actually express a statistical result.

13  Q     Why not?

14  A     Because a confidence interval, as I mentioned earlier,

15  requires three things.  It requires a confidence level.  It

16  requires a margin of error.  But most critically, it requires

17  the actual value at the center of the confidence interval.

18  When I took at this statement -- well, it's like this:  Suppose

19  you wanted to decide what proportion of the vehicles on the

20  road were pickup trucks, and you did a random sample, and you

21  went and you told somebody, well, there are plus or minus

22  5 percent pickup trucks on the road.  And that's analogous to

23  what this sentence says.

24        We don't know if there's 95 percent plus or minus

25  5 percent pickup trucks or 5 percent plus or minus 5 percent

PDF created with pdfFactory trial version www.pdffactory.com

1    pickup trucks or 13 percent.  This statement to the extent it

2    communicates anything is completely consistent with every

3    document in the null set being responsive.

4    Q    Say that again.  I'm sorry.

5    A    This statement is consistent with every document in the

6    null set being responsive.

7    Q    Is there any -- if you look at the November 22nd letter,

8    you'll see that there is a reference to 27 marginally

9    responsive documents within the null set.

10   A    Yes, I have that on page 3.

11   Q    And how did you -- what's your reaction to that report?

12   A    Well, as I mentioned earlier, the notion of marginally

13   responsive seems to have appeared only in the null set.  You

14   know, other than that, it's a -- if we took away the word

15   marginally, then it's a measure of the number of responsive

16   documents they found in a sample from the null set.

17   Q    All right.  Now, putting aside the reporting issues --

18   well, are there other reporting issues that you have?

19   A    Well, they omitted the technique that they used to compute

20   the confidence interval.  They also omitted the raw data that

21   the confidence interval was computed from, so there's no way to

22   check their calculations.

23   Q    So that implies a lack of transparency, is that correct?

24   A    That would be a fair description.

25   Q    And in your understanding of information retrieval as it's

PDF created with pdfFactory trial version www.pdffactory.com

1    applied in eDiscovery, there is some element of transparency

2    that is required to comply with best practice, is that correct?

3    A     That would be my understanding, yes.

4    Q     Are there other issues with respect to the fact that it

5    cannot produce a statistically valid sample of effectiveness?

6    A     Well, yes.  Yes.  I mean, all of the upstream problems

7    that I mentioned earlier, the fact that the collection had not

8    been identified, the fact that there was an arbitrary selection

9    of five custodians or maybe four at other points, the fact that

10   the spam filtering may have removed responsive documents, the

11   fact that the review of the documents was potentially biased by

12   the fact that reviewers knew what the right answer was.  Then

13   there's an additional factor which is particular to the

14   statistical validity of the evaluation.

15   Q     And that is?

16   A     That's the factor of overfitting.  And overfitting in the

17   statistical sense means fitting a statistical model to the same

18   data that you're going to evaluate it on.

19   Q     Could you explain that further, please.

20   A     Yes.  So in this case the Georgia Pacific process involves

21   tuning a search query.  And Mr. Brown described in some detail,

22   and it's also described here, the fact that a number of

23   iterations were done to improve the performance of the search

24   query on this set of five custodians.  The same -- a sample

25   from the same set of five custodians was then used to evaluate

1    that query.  So the queries were customized to the data that

2    was going to be used to evaluate them.

3              It's sort of like if you had a class where the

4    students studied the final exam for the entire semester, and

5    then they were tested on the final exam, and then you felt that

6    if they did well that certified that they understood the field

7    and would be able to understand questions about that in the

8    future.  The implication is that even if everything else had

9    been done correctly in this process, you would not be able to

10   extrapolate the effectiveness level produced by this procedure

11   to any other data.

12   Q    So with respect to a project of the nature described by

13   Mr. Brown and Mr. Koch earlier, what would you have expected

14   the statistical reporting to look like?

15   A    Simply the reporting part I would have expected to -- I

16   would have expected to see a description of how the random

17   sample was drawn and presumably a description that described an

18   appropriate process.  I would have seen an explanation of how

19   the random sample was reviewed, and I would have expected to

20   see an unbiased review having been done.

21             And then I would have expected to see explicit counts

22   of the four possibilities, the number of true positives, false

23   positives, false negatives and true negatives, because one

24   could then verify any effectiveness measures that were

25   reported.  And then finally the reporting of the estimates of

1    effectiveness should have taken the proper form.  The procedure

2    described by which a confidence interval would be produced and

3    the central value, the margin of error, and the confidence

4    level.

5         I would have also expected to see frankly in a

6    computing setting an exact count of the size of the population.

7    There's several expressions here like something was more than a

8    certain amount or less than a certain amount.  And if it's all

9    in a computer, you can count it exactly.

10   Q    So if the other defendants were to report, as they did in

11   their opening brief, which I think has been marked, that the

12   search term effectiveness confirmed by this testing which

13   yielded margin of errors in the range of 1.4 to 3.9 percent is

14   comparable to the compelling results of the GP testing, your

15   reaction would be?

16   A    If they had used the same process?

17   Q    Yes, sir.

18   A    I would not find those results to convey any useful

19   information about their information retrieval system.

20   Q    Now, is there anything else that you can say regarding the

21   defects in the proposal -- the defendants' proposed methodology

22   and statistical reporting?  Have we covered the main things?

23   A    I think we've covered everything.

24   Q    All right.  Now, have you had an opportunity to examine

25   the plaintiffs' proposal?

PDF created with pdfFactory trial version www.pdffactory.com

1  A    Yes, I have.

2  Q    And have you reached any conclusions with respect to the

3  plaintiffs' proposal?

4  A    Yes, I have.

5  Q    And what are those conclusions, please?

6  A    I conclude first that plaintiffs' proposal is likely to

7  find a greater proportion of responsive documents with less

8  human effort.  And second, I conclude that plaintiffs' proposal

9  will provide a statistically valid estimate of the recall of

10 the information retrieval process.

11 Q    And what's the basis for those conclusions, please?

12 A    Well, I have examined the proposal and have examined it in

13 the context of my knowledge of the literature on research and

14 development in information retrieval and machine learning.  I

15 have consulted textbook references on statistical sampling to

16 verify the techniques that are used for computing estimates.

17         MR. MOGIN:  I'd like to mark please, Your Honor, as

18 Plaintiffs' 10 what has previously been tendered in connection

19 with Dr. Lewis' report, which is the proposed CBAA search

20 process for each defendant.

21 BY MR. MOGIN:

22 Q    Dr. Lewis, is this the proposed process that you have put

23 together?

24 A    Yes, I aided the plaintiffs in the development of this,

25 and in particular I'm responsible for the technical aspects of

1   this proposal.

2   Q    So after reviewing plaintiffs' proposal you made certain

3   modifications in the explanations, is that correct?

4   A    Yes, I did.

5   Q    And the result is Plaintiffs' Exhibit 10, correct?

6   A    This document, yes.

7   Q    All right.  Could you explain your proposal, please.  Step

8   1, collection.

9   A    Really all that's assumed here is that all the reasonable

10  sources of responsive documents are collected and made

11  available to the system.

12  Q    And I guess we'll defer for another day what those

13  reasonable sources may be.  Step 2, test set creation, could

14  you explain that, please.

15  A    Yes.  There are two proposals here for how to create the

16  test set; that is, the set of data that will be used to

17  evaluate the system.  And those proposals are called the

18  indirect method and the direct method.

19  Q    Could you first explain what the test set is and how it

20  operates.

21  A    Yes.  The test set is a simple random sample of the data,

22  and it's used to produce statistically valid estimates of

23  recall of the information retrieval system.

24  Q    So that would be a random -- simple random sample drawn

25  according to recognized statistical technique?

1   A    That's correct.

2   Q    Okay.  And now that we have established what the test set

3   is, how would we go about creating it?

4   A    Well, there's two methods proposed here.  The first is the

5   indirect method, and the indirect method is somewhat similar to

6   the ideas -- basically it's based on the idea of doing a sample

7   to find out what the number of responsive documents -- well,

8   the proportion and thus the number of responsive documents is

9   in the entire universe.

10          You then can compare the number, the estimated number

11  of responsive documents in the universe with the number of

12  responsive documents that have been found in production.  Now,

13  as I mentioned earlier in commenting on Mr. Robbins' testimony,

14  it's very important in that case that the review of the test

15  set be done in a fashion that's consistent with the review for

16  production.

17  Q    Now, having heard the testimony of both Mr. Koch and Mr.

18  Brown, does the Georgia Pacific methodology do that?  Do you

19  recall it was Mr. Brown and two people who did the --

20  A    Yes.  Well, I mean it assumed -- the Georgia Pacific

21  methodology is implicitly assuming that there's consistent

22  review of their samples and review during production.

23  Obviously there's many other characteristics that are different

24  in the Georgia Pacific process than in this process.

25  Q    Okay.  Now, is consistency in any way a function of the

1  number of reviewers?

2  A    That's a difficult question.  It's obviously -- it is more

3  difficult to achieve consistency the greater number of

4  reviewers, but there's also issues of the training and skills

5  of the people.  So it's hard to make a definitive statement

6  about that.

7  Q    But you can say that the greater the number of reviewers,

8  the greater the likelihood of variability?

9  A    That's fair to say.

10 Q    So, for example, if there were three reviewers

11 consistently used well trained as compared to 13 contract

12 attorneys, we'd be more likely to get better results using the

13 direct method, is that right?

14 A    I wouldn't want to make any statement about the skills of

15 contract attorneys.  But just the larger number of people makes

16 it more difficult.

17 Q    Fair enough.  Okay.  Is there anything else that you need

18 to tell us about the indirect or the countdown method?

19 A    Only, only to reiterate the danger that's involved if the

20 reviews are not consistent.  Because what can happen in that

21 setting is that you could think that you had much more higher

22 recall than you actually did.

23 Q    And in the TREC studies what have you found about

24 people's -- attorneys' intuition about their own effectiveness?

25 A    Well, that hasn't really been looked at in the TREC

1    studies, but there's a classic paper that actually was

2    mentioned earlier today by Blair and Moran, which was looking

3    at the searches that were done in the context of a discovery

4    setting.  And the result was that --

5              MR. McKEOWN:  Your Honor, I'm going to object.  I

6    think this goes beyond his personal knowledge if he's going to

7    testify to this report, as to the results of this particular

8    study with respect to comparison.

9              THE COURT:  Well, do you adopt -- I mean, let's find

10   out if that's his opinion or if he agrees with this study, and

11   then you can question him about it.

12   BY MR. MOGIN:

13   Q    Do you agree with the Blair and Moran study?

14   A    I will simply report what the Blair and Moran study found.

15   It's one of the most famous studies in information retrieval.

16   It found that the attorneys in the case believed that they had

17   found on the order of 75 percent of responsive documents.  And

18   a proper statistical evaluation found that they had found less

19   than 25 percent.

20   Q    Let's move on then to the direct method.

21   A    Okay.

22   Q    Would you describe that, please.

23   A    Sure.  The direct method is involved -- basically works by

24   taking random samples from the -- again, from the entire

25   universe of documents and reviewing them until a particular

1    number of responsive documents has been found.  Based on the

2    desired confidence level and margin of error in this proposal

3    that number of responsive documents is 385.

4            So those samples as they're found are reviewed, and

5    the intention being that they be reviewed in a careful fashion

6    such that there's good agreement between the assessors.  And

7    then that set of 385 responsive documents is what's used to

8    evaluate the recall of the information retrieval process.

9    Q    And how did you calculate that 385 documents would be

10   necessary?

11   A    So this was based on using a margin of error of 5 percent

12   on recall and a confidence level of 95 percent.  And then

13   choosing a sample size, given that we don't actually know -- we

14   don't know how many responsive documents there are in the

15   collection, I used a conservative calculation based on a

16   binomial proportion.

17   Q    Can you explain that a little further in layman's terms.

18   A    Sure.  So the question is the size of the sample you need

19   is based on sort of how wide you want this confidence interval

20   to be and how confident you want to be that your sample is

21   representative.  The exact sample size is based -- in theory it

22   would depend on -- let's see.  In a funny sense if you knew

23   what the proportion of responsive documents was and you knew

24   that it was fairly extreme, you might be able to draw a smaller

25   sample.

PDF created with pdfFactory trial version www.pdffactory.com

1            Since we don't know what the proportion of responsive
2    documents is, we make the conservative assumption that half of
3    the documents are responsive.  That gives you then a sample
4    size which will give this margin of error and confidence level
5    regardless of the actual proportion of responsive documents.
6    Q    Now, this is according to standard statistical technique
7    as applied in information retrieval, correct?
8    A    Oh, yes.  And it's applied in many other fields of
9    science, engineering, finance, and other areas.
10   Q    All right.  So now once we have this total of 385, what
11   happens next?
12   A    Okay.  So, so again the -- and the proposal is a little
13   bit unclear here.  If the indirect method is used, we have step
14   2-A and then step 3.  In the direct method -- so basically you
15   draw a sample once and you review it.  In the direct you're
16   drawing several samples, reviewing each of them.  So step 3
17   actually happens several times.
18            The important thing to mention about the review is
19   that the review needs to be unbiased.  That is the personnel
20   who are reviewing the test set should not know what the
21   information retrieval process has been finding.  And indeed
22   these three processes, the review of the test set and the
23   beginning of actually looking for responsive documents could be
24   done in parallel.
25   Q    Did you hear Mr. Brown's testimony in that regard?

1    A    Yes, I did.

2    Q    And what was your conclusion?

3    A    That the reviews that were done by Georgia Pacific were

4    potentially biased because the reviewers knew what the right

5    answer was supposed to be.

6    Q    Another example of teaching to the test?

7    A    Well, this is -- it's a little different.  It's sort of

8    more, you know, just human review is affected by many factors,

9    including, you know, potentially self-interest.

10   Q    All right.  And then what happens in your protocol here?

11   A    Okay.  So in step 4 then we're now on to actually

12   searching for responsive documents.  And the protocol is based

13   centrally around the use of supervised learning.  To begin to

14   use the supervised learning set one wants an initial training

15   set.  What's sometimes referred to as a seed set, though I

16   heard that term used in a different fashion earlier.

17        The important thing about the initial training set --

18   and I should acknowledge that many different vendors provide

19   supervised learning.  Each of them will have their own best

20   practices for how to initialize machine learning.  This is a

21   description of a procedure that, you know, is fairly generally

22   applicable, should produce good results, but might be modified

23   according to vendors' understanding of their particular

24   systems.

25        This particular procedure draws on four sources of

1    documents to produce the initial training set.  The first is a

2    sample of responsive documents already found by the defendants.

3    The second is a sample of responsive documents available to

4    plaintiffs either that they've somehow obtained or that they

5    have created as simulated responsive documents to -- as a

6    representative of documents that might potentially exist.  The

7    third is --

8    Q    Just let me stop you there.  So, for example, the

9    plaintiffs could create a document that said they are with us?

10   A    Indeed.  And they could also create, you know, based on

11   their best understanding what metadata might look like if such

12   a document was responsive.  The third source is leveraging the

13   work that the plaintiffs -- excuse me, the defendants have done

14   in producing their Boolean queries.  While we don't know how

15   effective those Boolean queries are, they were produced with

16   some intent to try to find some responsive documents, and so

17   they can be used to retrieve sets of documents from the entire

18   universe of documents, and some sample of those could be

19   reviewed and included in the training set as another source.

20   Q    So if this were applied then, Georgia Pacific or any other

21   defendant would not have to go back to square one and begin

22   writing on a blank slate, is that correct?

23   A    Oh, no.  They would have gotten some considerable value

24   out of the Boolean queries that they have.  And then finally

25   the fourth source is to simply take the words from defendants'

1   Boolean exercise and use them as queries to a statistical

2   ranked retrieval system and review a sample of the top ranked

3   documents.  And this would take advantage of the statistical

4   ranked retrieval system's ability to not require exact match.

5   Again, one would take advantage of the work that's been done in

6   developing the search terms, but use them in the more powerful

7   context of a statistical ranked retrieval system.

8   Q    All right.  That Chicago accent got me again.

9   A    Oh, I'm sorry.

10  Q    You said match?

11  A    So you would not need to do an exact -- the statistical

12  ranked retrieval system does not require an exact match.  It

13  can use the words that were in the Boolean query but rank the

14  entire document collection by sort of degree of strength with

15  respect to those words.

16  Q    All right.  Is there anything else that you would do in

17  order to utilize statistical ranked retrieval in this protocol?

18  A    Well, I think that would be the main way to use it.  But,

19  of course, I should be clear that supervised learning systems

20  themselves produce a ranking of the collection.  They -- almost

21  all supervised learning systems, certainly the ones I'm aware

22  of in eDiscovery, produce models.  They learn terms and learn

23  term weights, and then can use those term weights to rank

24  documents just like you would rank from a natural language

25  query in a statistical ranked retrieval.

1   Q    So in supervised learning you get a little bit of both?

2   A    You do.

3   Q    All right.  Now, step -- we'll do the next step.

4   A    Okay.  So the next step is actually training the system,

5   and this simply means executing the supervised learning

6   capability of the software.  The point to be stressed here is

7   that the maximal amount of information should be available to

8   the supervised learning.  In particular the supervised learning

9   should have access to both the content and the metadata of the

10  documents.

11  Q    And that would be the original metadata of the documents?

12  A    Well, whatever the most informative metadata is.

13  Q    Okay.  And then what happens after we've trained the

14  system?

15  A    So then after you train the system, it can then be used to

16  find additional documents.  And those documents can be

17  reviewed.  Responsive documents, you know, become part of the

18  production -- obviously responsive and nonprivileged documents

19  become part of the production set.  Some of the new responsive

20  and nonresponsive documents that are found can also be added to

21  the training set.

22  Q    All right.  And then once you've done that what happens?

23  A    Well, so now we've got some documents in the production

24  set, and we can estimate the recall.  We can compute a 95

25  percent confidence interval on the recall of the production

1   set.

2   Q    And this is estimation in a statistical sense, correct?

3   A    Yes.  And again, one thing that's important to stress is

4   just as the people reviewing the sample should not know what

5   the decisions of the system are on those documents, it's

6   important that the people running the system not know what the

7   behavior of the system on the sample is.  And indeed it's

8   preferable if they're not even aware of the current estimate of

9   recall on the test set.

10         They may well want to have other samples of data that

11  they use to tune their system.  But if they tune their system

12  to the test data, then they'll invalidate the statistical

13  validity of the results, and this is the overfitting process I

14  mentioned.

15  Q    Now, with respect to the 95 percent confidence interval,

16  if the system is able to achieve a 95 percent confidence

17  interval within the specified margin of error, does that mean

18  that the system has discovered 95 percent of all responsive

19  documents within the corpus within that margin of error?

20  A    No.  No.  The 95 percent confidence is a measure of the

21  representativeness of the sample that's drawn.  The process

22  produces a confidence interval on recall.  So, for instance,

23  the result of step 7 might be there's a 95 percent confidence

24  that the recall of the system is 13 percent plus or minus

25  5 percent.

PDF created with pdfFactory trial version www.pdffactory.com

1          Or you might have a 95 percent confidence that the

2    recall of the system is 78 percent plus or minus 5 percent.  So

3    it's the estimate of recall which is what's telling you how

4    much of the responsive documents you've found.

5    Q    So can you put that as close to in lay terms or give us a

6    very simple example of how a confidence interval is properly

7    used in this context.

8    A    Well, you would -- so I mean we could go on to step 8, and

9    what would happen in step 8 is you would, you would look at

10   this confidence interval.  The confidence interval would say

11   something like, you know, the system has found -- we think

12   the -- you know, the estimate is the system has found, or the

13   whole production process has found 13 percent of the responsive

14   documents, and we have some uncertainty.  It's plus or minus 5

15   percent.  So we're between 8 percent and 18 percent of the

16   responsive documents at this point.

17         And then there would be a cost benefit analysis.  Is

18   13 percent enough?  How much it would cost to find some more.

19   And, you know, this can be done many times in an iterative

20   process.  The process as described here says that if review is

21   not terminated, you return to step 6.  Actually it would be, it

22   would be more clear to say you could go back to any of steps 4,

23   5, or 6.  If things were going really badly, it might be the

24   case that the whole initialization of the seed set would need

25   to be done again.  Otherwise you might go back to step 5 maybe

PDF created with pdfFactory trial version www.pdffactory.com

1    to retrain the system some more, or maybe you just go back to

2    step 6.  You think the system is already working pretty well

3    and you just sort of use it in its current state to find more

4    of the responsive documents.

5    Q    Now, Dr. Lewis, the defendants have contended that this

6    process that the plaintiffs have proposed is unprecedented.

7    It's new, it's untested.  What's your reaction to that?

8    A    Well, people have been using supervised learning in

9    information retrieval since the early 1960s, so it's not

10   unprecedented in the field of information retrieval.  We have

11   been studying supervised learning on eDiscovery, simulated

12   eDiscovery tasks in TREC since 2007 I think.  There are a

13   number of vendors who provide supervised learning capabilities

14   in their software or review services.  I don't -- maybe there's

15   a legal definition of unprecedented I'm not familiar with.

16   Q    Well, do you know how long these current vendors have been

17   offering supervised learning as an eDiscovery tool?

18   A    I haven't kept close track of that.  I know that Orcatech

19   has been offering it since 2010.  I know that the Kroll system,

20   which I helped design some of the algorithms for, has been

21   offered since 2010.  I haven't really kept track of the others

22   in the industry.

23   Q    Can supervised -- strike that.

24        Can supervised learning be used on different review

25   platforms?

1   A     Yes, there's several different review platforms that use
2   it.
3   Q     Is supervised learning used outside of the eDiscovery
4   area?
5   A     Oh, yes.  I mean, it's becoming ubiquitous in almost any
6   application that involves text data.  To give an example, you
7   know, when you see advertisements on web pages, many of those
8   advertisements are placed by supervised learning systems.  And
9   the reason is that benefits in accuracy of predicting whether
10  you'll click on an advertisement lead to millions of dollars in
11  improvements in revenue for large companies like Google and
12  Yahoo and whatnot, and they inevitably use supervised learning
13  systems.  Some of them on a quite immense scale.  Some of these
14  systems are trained literally on billions of training examples.
15  Q     Are you familiar with Amazon.com?
16  A     Yes.  So Amazon would be another one.  The recommenda-
17  tions, you know, when you go there and it recommends you might
18  be interested in buying these books, it has used supervised
19  learning to learn from large numbers of purchase decisions what
20  you might be apt to buy.
21  Q     And do you believe that your proposal or the plaintiffs'
22  proposal is superior to defendants'?
23  A     Yes, it is superior in that first it is likely to produce
24  a higher level of responsive documents with less manual review.
25  And second, it provides a statistically valid estimate of its

PDF created with pdfFactory trial version www.pdffactory.com

1    recall, where defendants' process does not provide a

2    statistically valid estimate.

3            MR. MOGIN:  One moment please, Your Honor.

4            THE COURT:  Sure.

5        (Brief pause.)

6            MR. MOGIN:  Your Honor, there is only the issue of

7    Dr. Lewis' report.  For the life of me I don't know what we're

8    doing with reports.  I would move also to qualify Dr. Lewis as

9    an expert in the field of information retrieval as it's applied

10   in eDiscovery.

11           THE COURT:  Okay.  And, Mr. McKeown.

12           MR. McKEOWN:  Your Honor, with respect to the area of

13   information retrieval, I think that's one area.  I think the

14   application of information retrieval in eDiscovery, we would

15   ask you to reserve ruling on because this is a fairly novel

16   area.  I'm not sure there is an expert in that area.

17           THE COURT:  How about his resume coming in?

18           MR. MOGIN:  Very good.  And his report, Your Honor?

19           THE COURT:  What about his report?  Do you have a --

20           MR. McKEOWN:  Reports typically don't come in.

21   That's usually the testimony of the experts.

22           THE COURT:  Right.

23           MR. McKEOWN:  And his exhibits.

24           THE COURT:  Well, his resume's coming in.  You're not

25   objecting to his qualification on search retrieval, correct?

Lewis - cross by McKeown                    274

1          MR. McKEOWN:  On information retrieval, Your Honor.

2          THE COURT:  Information retrieval.

3          MR. McKEOWN:  Information retrieval.

4          THE COURT:  Okay.  Is that good enough for you?

5          MR. MOGIN:  Yes, it is.  Thank you, Your Honor.

6          THE COURT:  Thank you.  Are you going to cross, Mr.

7   McKeown?

8          MR. McKEOWN:  Yes, Your Honor, I am.  In addition,

9   with respect to the portions that are specific to Georgia

10  Pacific, Mr. Neuwirth will handle that portion of the

11  cross-examination.

12         THE COURT:  Okay.  That's fine.

13                    CROSS-EXAMINATION

14  BY MR. McKEOWN:

15  Q    Good afternoon, Dr. Lewis.

16  A    Good afternoon.

17  Q    My name is Jim McKeown.  I represent one of the

18  defendants, and I have some questions for you about your

19  testimony.

20         Do you have in front of you Exhibit 10, the protocol

21  you were just discussing?

22  A    Yes, I do.

23  Q    Did I understand your testimony to be you modified part of

24  this, but you did not write it originally, is that correct?

25  A    I did all of the technical design of this protocol based

1    on the descriptions -- my conversations with plaintiffs'

2    attorneys on their intended use of CBAA technology.

3    Q    And when were you first retained in this matter?

4    A    I believe it was January 18th.

5    Q    January 18th of 2012?

6    A    That's correct.

7    Q    And have you spoken to any of the plaintiffs as opposed to

8    the plaintiffs' lawyers?

9    A    No, I have not.

10   Q    And when did you prepare the protocol we see marked as

11   Plaintiffs' Exhibit 10, or your edits to it?

12   A    The, I believe the final version of this went in last

13   Thursday.

14   Q    And when did you first see it?

15   A    Well, I first started working on it -- well, it was, oh,

16   within a few days of having been retained I started working on

17   it.  You know, basically I looked at the descriptions of what

18   the plaintiffs have been asking for.  Discussed with them what

19   they meant by CBAA and, you know, started work on ideas for

20   this.

21   Q    And if we go back to February 6th, you may recall that was

22   the date that the parties made their submissions to court on

23   their respective positions.  Prior to February 6th, how much

24   work, how many hours had you spent on this matter?

25   A    Prior to February 6th.  I would have to go back and look

1   on my time records, but, you know, it would have been -- you

2   know, it would have been something -- it would have been at

3   least 10 hours.  I'd really have to go back and look at my

4   records to know, you know, what happened before or after

5   February 6th.

6   Q    Prior to January 18th when you were retained in this

7   matter, had you ever heard the term content based advanced

8   analytics?

9   A    I'm not sure.  I've heard many terms like content based

10  analytics.  I'm not sure if I've heard it with the advanced in

11  it.  You sometimes hear text analytics.  You sometimes hear

12  content analytics.  So there's a number of terms like this in

13  the industry.  I'm not sure if I've heard that exact term

14  before.

15  Q    And have you done anything to assist the plaintiffs in

16  their response to document requests with respect to the

17  protocol they're going to use?

18  A    Could you repeat the question.

19  Q    Sure.  You have here Exhibit 10, which is plaintiffs'

20  proposal for search process for each defendant.  You also

21  understand, don't you, that the defendants served document

22  requests on the plaintiffs?

23  A    Oh, yes.  I see what you mean.

24  Q    Did you prepare a protocol for the plaintiffs to comply

25  with their document responses?

1    A    No, I have not.

2    Q    Have you done anything to assist the plaintiffs with their

3    document responses?

4    A    No, I have not.

5    Q    And you said that the Kroll system, that you helped write

6    one of the algorithms for, a couple of the algorithms for was

7    launched in 2010?

8    A    That's correct.

9    Q    Are you aware of that system having ever been approved by

10   a court for use in terms of finding responsive documents?

11         MR. MOGIN:  Objection.  I'm not sure the courts

12   approve this.

13         THE COURT:  Well, if he knows -- I mean, if he knows.

14   I mean, if he knows.  I don't know.  I mean, I don't know

15   whether you know.  Do you know, Mr. McKeown?  Do you know the

16   answer to that question?

17         MR. McKEOWN:  I do not believe it has ever been

18   approved, Your Honor.

19         THE COURT:  Okay.  Well, ask him if he knows.  Okay.

20         MR. MOGIN:  Shouldn't counsel have a good faith basis

21   for the question?

22         THE COURT:  Sure.

23         MR. MOGIN:  Has a court ever approved any particular

24   platform?

25         MR. McKEOWN:  I'm talking about the --

PDF created with pdfFactory trial version www.pdffactory.com

1            THE COURT:  The Kroll system --

2            MR. McKEOWN:  The new system that has his algorithms.

3            THE COURT:  -- that actually Dr. Lewis has worked on,

4    yes.

5            THE WITNESS:  I've been informed by Kroll that the

6    system has been used in a number of eDiscovery matters.  I'm

7    not aware of any of the, the legal issues around that, if there

8    was a court approval.  I'm simply not aware of those issues.

9    BY MR. McKEOWN:

10   Q    This concept of -- and I know you don't want to use the

11   word predictive coding because of the trademark.  And you

12   prefer learning, right?

13   A    Supervised learning.

14   Q    Supervised learning.  This concept of supervised learning

15   is a fairly new development, correct?

16   A    No.

17   Q    In the legal context, would you agree with that?

18   A    If by new you mean within the past 10 years, sure.

19   Q    Do you think the use of supervised learning as a means of

20   identifying documents for purposes of producing them in

21   response to document requests is a fairly new development?

22   A    It is a relatively new development in the industry to my

23   understanding.

24   Q    And you talked about TREC, correct?

25   A    Yes, I did.

1   Q    And that was Text REtrieval Conference, T-R-E-C, is that

2   right?

3   A    That's correct.

4   Q    And I think you said you were a founding member?

5   A    I was one of the initial PC members and I was one of the

6   cofounders of the TREC Legal Track.

7   Q    And the -- I believe you said that the TREC Legal Track

8   was started in 2007, is that right?

9   A    I believe we had the initial discussions in 2005, and I

10  believe the first year that there were results for was 2006.

11  Q    And one of the things that you do at TREC is you have this

12  interactive task, is that correct?

13  A    Yes, there is an interactive task at TREC.

14  Q    And as part of this interactive task, various teams look

15  at this collection of documents you have for purposes of

16  testing various approaches to finding documents, correct?

17  A    Yes.

18  Q    And 2008 was the first year that there was this

19  interactive task exercise, correct?

20  A    I'd have to go back and look to check that.  That sounds

21  reasonable.

22  Q    Well, do you recall that there were only four teams that

23  first year?

24  A    Again, I would have to go back and check the document.  If

25  you have the document, I'd be happy to look at it.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q    I do.  Let me just show you what we're going to mark for

2   identification purposes as Exhibit No. -- Defendants' Exhibit

3   No. 5.  And I just would like to ask you to turn to page 26 for

4   purposes of refreshing your recollection.

5   A    Okay.  So this document is a *Law Journal* article by Maura

6   Grossman and Gordon Cormack called "Technology Assisted Review

7   in eDiscovery Can Be More Effective and More Efficient Than

8   Exhaustive Manual Review."

9   Q    Right.  And my question was if you could look to page 26

10  to see if that refreshes your recollection that 2008 was the

11  first year of the interactive task.

12  A    Yes, it is.

13  Q    And, in fact, in that first year of the four groups that

14  went, only one had a recall over 20 percent, is that correct?

15  A    Are you referring to a particular mention of that in this

16  document?

17  Q    That's actually what's going to be marked as Defendants'

18  Exhibit 6.  Defendants' Exhibit 6 is an article that you helped

19  write, correct?

20  A    That's correct.

21  Q    And if we turn to page 24.

22  A    Okay.  I'm on page 24.

23  Q    You report the results of the 2008 study, correct?

24  A    Uh-huh.  Yes, this is the reports of the 2008 interactive

25  task.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q    And if you look at the very top of the page on 24, the

2    last sentence there says, "One team, notably the one that made

3    the most use of TA time, obtained a relatively high recall,

4    .62.  While the other three all making significantly less use

5    of TA time obtained recall values below 0.20," is that correct?

6    A    I see that, yes.

7    Q    And when we talk about recall, you said that recall had to

8    do with respect to how many of the total population of

9    responsive documents were found through this system, correct?

10   A    That's correct.

11   Q    So that when you ran the interactive task in 2008 and four

12   teams ran it, the best team did over 60 and the other three did

13   less than 20 percent of recall, is that correct?

14   A    Well, you said when you ran.  I was --

15   Q    I'm sorry.

16   A    I was not involved in running the Legal Track that year.

17   Q    My apologies.  When TREC had its interactive task for 2008

18   and four teams entered, three of the four terms had recall of

19   less than 20 percent, is that correct?

20   A    That's correct.

21   Q    Now, in 2009 were you involved in that interactive task?

22   A    No, I was not.

23   Q    Do you recall that in 2009 that the database that was used

24   was a collection of Enron e-mails?

25   A    Yes.

1   Q    And presumably this Enron e-mail production was an e-mail
2   production to FER (phonetic), correct?
3   A    That's my understanding.
4   Q    And presumably that had been collected somehow.  Do you
5   know if search terms were used to collect that grouping of
6   e-mails that were used for the Enron -- or excuse me, the TREC
7   interactive task in 2009?
8   A    I'm not familiar with the collection processes for the
9   Enron data.
10  Q    And again, there were a number of teams, and they would
11  look at what recall they could achieve with respect to pulling
12  documents for particular requests that were crafted for
13  purposes of that exercise, correct?
14  A    My understanding is that the teams were attempting to
15  optimize I believe it was the F measure.  TREC, in no case are
16  the teams focusing solely on recall.
17  Q    And if you look again at what we have marked as Exhibit 6,
18  your article.
19  A    Yes.
20  Q    And you turn to page 4.
21            THE COURT:  Which article?
22            MR. McKEOWN:  I'm sorry, Your Honor.  I need to
23  give --
24            THE COURT:  Defendants' 6?
25            MR. McKEOWN:  Yes.

1          THE COURT:  Okay.

2          MR. McKEOWN:  I need to give him a different exhibit,

3   though.

4          THE COURT:  Oh, okay.

5   BY MR. McKEOWN:

6   Q    You have Exhibit 7 in front of you?

7   A    Yes.  It's a document entitled "Overview of the TREC 2009

8   Legal Track."

9   Q    And is this a document you have seen before?

10  A    Yes, I have seen this before.

11  Q    By the way, I meant to ask you before, is H5 supervised

12  learning or predictive coding?

13  A    It's actually unclear what technologies H5 uses

14  internally.

15  Q    If you look at Exhibit 7.

16  A    That's the TREC 2009 Legal Track.

17  Q    The TREC 2009 Legal Track.

18  A    Yes.

19  Q    And we turn to page 4.  Although I see they don't have

20  page numbers on this version.

21  A    Yes, this does not seem to have page numbers.

22  Q    If you look at Section 2.21.

23  A    Okay.

24  Q    Which is on the fourth page.  And you look down at the

25  second to last paragraph.  It says, "The steps we took to

1    process the collection are as follows."  Do you see that?

2    A    I do see that.

3    Q    It appears that Clearwell was the process that was used,

4    is that correct, for the TREC?

5    A    That's what's stated there, yes.

6    Q    And so the interactive task group used Clearwell for

7    purposes of their exercise in 2009, correct?

8    A    That does appear to be correct.

9    Q    And the images that were used were TIFF images, is that

10   correct?

11   A    I'm not seeing that here.  Could you show me where you're

12   referring to.

13   Q    That was just a question.  It's not on the page.  Are you

14   familiar with the fact that the images were TIFF images?

15   A    I'm not aware whether TIFF images were used during 2009 or

16   not.

17   Q    Do you recall that there were 24 runs undertaken in 2009?

18   A    In which task are you specifying that?

19   Q    If we could turn to page 20 -- page -- you don't recall

20   which tasks were undertaken or how many in 2009?

21   A    There were several tasks undertaken.  I don't remember the

22   exact number of participants.  I'd be happy to look at the

23   section that you're referring to.

24   Q    Do you recall that one of the tasks was related to fantasy

25   football?

1   A    I believe there was a -- one of the topics used in one of

2   the tasks.  I don't actually remember which of the tasks that

3   topic was used in.

4   Q    And sitting here today you don't know that there were 24

5   tasks run at that time?

6   A    I'm certain there were not 24 tasks run.  The tasks are

7   the high level groupings, such as interactive, batch, or

8   supervised learning, and whatnot.  There would never be more

9   than three of those in a year.  I'm not sure what you're

10  referring to then.

11  Q    Perhaps I'm using the wrong term.  Does the term run mean

12  something to you?

13  A    It's certainly possible there were 24 runs.  If you could

14  point me to the particular task that you want to ask about, I'd

15  be happy to look at that.

16  Q    If you turn to -- and again, unfortunately there are no

17  page numbers in this study.  But if you turn in Exhibit 7 to

18  section --

19          MR. McKEOWN:  I apologize, Your Honor.  Could I just

20  have a moment.

21          THE COURT:  Sure.  Sure.

22      (Brief pause.)

23  BY MR. McKEOWN:

24  Q    If you could look right above Section 2.3.4 -- excuse me.

25  Right before Section 2.3.5.

1    A    Okay.  I see Section 2.3.5.

2    Q    Okay.  And if you look at the paragraph above that.

3    A    Where it says, "We return to these data below?"

4    Q    I'm sorry.  The first full paragraph there.  That there

5    were 24 runs.

6    A    Okay.  The first full paragraph.  Yes, there were -- it's

7    discussing that there were 24 runs.  I have to look back and

8    see which task this is for.

9    Q    And you could find the runs assigned by topics in Section

10   2.2.3.

11   A    Okay.  So this is under the interactive tasks.  And sorry,

12   what was the section you just mentioned?

13   Q    2.2.3.

14   A    All right.  All right.  So 2.2.3 is a list of the research

15   groups that took part.

16   Q    And there's a list of the runs as well, correct?

17   A    Oh, yes.  There's the -- the table on the next page then

18   shows which topics each team submitted results for.

19   Q    And you see there were topics 2001 through -- or 201

20   through 2000 -- or 207, correct?

21   A    Yes.

22   Q    And if we turn back to Section 2.2.2, it gives the topics

23   and topic authorities, is that correct?

24        MR. MOGIN:  I'm sorry.  Could I have that question

25   repeated, please.

```
 1                MR. McKEOWN:  Sure.
 2   BY MR. McKEOWN:
 3   Q    If we turn back to Section 2.2.2.  I apologize.  There are
 4   no page numbers on this document.
 5   A    Yes, I'm at Section 2.2.2.
 6   Q    There is the list of topics, correct?
 7   A    Yes.
 8   Q    And if you look at the topics, these are topics that were
 9   created by the interactive task team as potential document
10   requests for purposes of this study, correct?
11   A    Yes, that's my understanding.
12   Q    And there are just seven topics in this exercise, correct?
13   A    That's correct.
14   Q    And they're applied to this Enron group of e-mails that
15   were collected for this task, is that correct?
16   A    Yes.
17   Q    And isn't it true that out of the 24 runs that were done
18   only 5 of the runs had a recall over 70 percent?
19   A    Are you referring to a particular table or a description
20   here?
21   Q    I was referring to your article, which I think is Exhibit
22   6.
23   A    At which page?
24   Q    At page 24.
25   A    All right.  And where on this page are you referring?
```

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. McKEOWN:  I apologize, Your Honor.  Let me move

2     on.  I'll come back to that.

3          THE COURT:  Okay.

4     BY MR. McKEOWN:

5     Q    Isn't it true that the total number of documents amassed

6     in all four years of the TREC legal study are less than the

7     number routinely assessed in even a real world eDiscovery

8     problem?

9     A    Well, my understanding is that real world eDiscovery

10    problems vary to a considerable degree.  However, large scale

11    problems routinely involve review of very large numbers of

12    documents.  And I do believe that there are large scale

13    eDiscovery problems that would have reviewed more documents

14    than were reviewed in the TREC evaluations.

15    Q    If you look at page -- again, on Exhibit 6, page 28.  And

16    Exhibit 6 is your article, correct?

17    A    Absolutely.

18    Q    And I direct your attention to Section 5.5 on page 28.

19    The second paragraph.  And again we're talking here about the

20    2009 project, correct?

21    A    No.  This is talking about the history of the TREC Legal

22    Track from the beginning.

23    Q    Okay.

24    A    Up to, I believe up to 2009.

25    Q    And you wrote, "The Legal Track was humbling also for the

1    insight it has provided the IR research operational eDiscovery

2    settings.  While the scope of the TREC relevance assessment

3    process was large by TREC standards in geography, technology,

4    personnel, and data set preparation, the total number of

5    documents assessed across all four years of Legal Track has

6    been far smaller than the number routinely assessed in even a

7    single real world discovery project."

8             Isn't that what you wrote?

9    A    Yes, it is.

10   Q    And if you'd turn back to page 24 at the very bottom of

11   the page.  It says, "The post-adjudication results for the 2009

12   topics showed some encouraging signs.  Of the 24 submitted runs

13   aggregating across all 7 topics, 6 obtained an F1 score of 0.7

14   or greater," is that correct?

15   A    That's correct.

16   Q    So that only 6 of the 24 were 0.7 or greater, correct?

17   A    That's on the F score, yes.

18   Q    And is there a recall score there as well?

19   A    The next sentence says, "In terms of recall of the 24

20   submitted runs, 5 distributed across 4 topics attained a recall

21   score of 0.7 or greater."  And then, "Of these five runs, four

22   distributed across three topics simultaneously obtained a

23   precision store of 0.7 or greater."

24            So for the systems that were attempting to do a

25   single Boolean classification optimizing the F1 score, that's

1   the results that were achieved.

2   Q    And for recall there are only five above .7 or greater,

3   correct?

4   A    That's correct.  Of course, the systems were not trying to

5   optimize recall.

6   Q    Okay.  And of the five, two of the five were topic 207, is

7   that correct?

8   A    I would have to go back and look.  Do you have the

9   point --

10  Q    Well, let me point you first to what 207 is, which I think

11  you'll find on page 24.

12  A    Yes, I'm already open to that page.

13  Q    And topic 207 called for all documents or communications

14  that describe, discuss, refer to, report on, or relate to

15  fantasy football, gambling on football, and related activities,

16  including but not limited to football teams, football players,

17  football games, football statistics, and football performance;

18  is that correct?

19  A    That's correct.

20  Q    And that was the document request that was run against the

21  Enron e-mails.  And two of the five that hit over 70 percent

22  recall were the fantasy football as opposed to the other

23  requests, correct?

24  A    Are you citing a particular one of the documents for that

25  statement?

1  Q    We'll pull that up out of there later.  Let me move along.

2  A    Well, I will look forward to being pointed to that when

3  you find it.

4  Q    Are you familiar with the concept of stemming?

5  A    Yes, I am.

6  Q    What is stemming?

7  A    Stemming refers to a variety of techniques for allowing

8  matches between words that ignore to some extent the endings of

9  the words.

10  Q    And you talked earlier about your concern with Boolean

11  searches was in part that you had to have precise word matches,

12  is that correct?

13  A    Yes.  And as I believe I mentioned in my testimony,

14  Boolean queries often allow a wild card operator that allows

15  matching on words to some extent ignoring their word endings.

16  Q    And they allow for more than just word endings, don't

17  they?

18  A    Stemming typically is focused on reduction to a stem form

19  that removes what would be called suffixes.  So it's

20  essentially stemming is focused on word endings.

21  Q    Have you seen the stemming reports in this case?

22  A    The stemming reports.  I've seen the Boolean query

23  descriptions.  I don't recall if I've read the stemming

24  reports.

25  Q    Are you familiar with the fact that each of the defendants

1   in addition to having these search terms had a whole number of

2   stems that were also searched as part of the Boolean search?

3   A    Well, yes.  The Boolean queries include wild card

4   operators.  Often indicated by a star, but sometimes by other

5   endings, which allow ignoring word endings during the matching.

6           MR. McKEOWN:  Your Honor, my colleagues have asked me

7   to inquire about the Court's plan for this evening.  We didn't

8   have any questions that we were asking from 1:20 until probably

9   about 20 minutes ago.

10          THE COURT:  I'm not going anywhere.

11          MR. McKEOWN:  Okay.

12          THE COURT:  Let we find out my court reporter,

13  though.

14      (Off the record discussion.)

15          THE COURT:  I think our court reporter could stay

16  till 6.  If we had to go later than 6, we could go down to my

17  courtroom and turn the tape on.

18          MR. McKEOWN:  Okay.

19          THE COURT:  Mr. Neuwirth.

20          MR. NEUWIRTH:  Yes, I think there is a possibility

21  that we might need to go past 6.  As you heard, there were --

22  in addition to the general issues, there were a number of

23  issues about Georgia Pacific's --

24          THE COURT:  Well, Mr. Lewis fortunately is in

25  Chicago, so -- and we're going to have to come back for

1    Mr. Regard.

2              MR. McKEOWN:  I'm happy to go for a while longer as

3    well, Your Honor.

4              MR. NEUWIRTH:  We're happy to --

5              THE COURT:  I'm not going anywhere.

6              MR. NEUWIRTH:  We're happy to stay, but we just would

7    want to make sure that this is a process that in addition to

8    Mr. McKeown's cross-examination --

9              THE COURT:  That you have enough opportunity.

10             MR. NEUWIRTH:  -- that there's an opportunity to go

11   over Georgia Pacific's specific cross-examination.

12             THE COURT:  No, right.  Well, should we have Mr.

13   McKeown finish up and then we'll do Georgia Pacific the next

14   time?  Would that make sense?

15             MR. NEUWIRTH:  That's fine with us if it would please

16   the Court.

17             THE COURT:  Okay.  Why don't you continue on, Mr.

18   McKeown.  Because you're -- I mean, you're on a roll right now,

19   and I'm remembering things, so ...

20   BY MR. McKEOWN:

21   Q    Dr. Lewis, you have been handed what's been marked Exhibit

22   8.  I'd like to direct your attention to the attachment to the

23   cover letter.

24   A    Okay.

25   Q    And if you look at the attachment to the cover letter, do

PDF created with pdfFactory trial version www.pdffactory.com

Lewis - cross by McKeown                                    294

1   you see there are three pages that have the International Paper

2   search terms attached?

3   A    That's these first three with the string Nos. 01 to 21?

4            THE COURT:  Mr. McKeown, just one moment.  You know,

5   this is kind of -- I asked the other experts to stay till the

6   end of the hearing.  And obviously we're not going to be

7   recalling or asking questions.  Mr. Regard, we need to know on

8   date.  Does anybody else need any of the experts for any other

9   reason?

10           MR. McKEOWN:  Present now, Your Honor?

11           THE COURT:  Pardon me?

12           MR. McKEOWN:  You mean to keep them present now?

13           THE COURT:  Right, because otherwise if they're

14   catching planes and stuff other than Mr. Regard who we've got

15   to figure out date wise, I don't know if anybody else is here.

16   We had our linguistics lady, Mr. Brown, and Mr. Hanners.  So

17   can we relieve them?  Going, going --

18           MR. NEUWIRTH:  Yes.

19           MR. FREED:  Your Honor, also I apologize, but I have

20   a plane I have to catch, so I may have to leave before they

21   complete the examination.  But I have plenty of adequate

22   counsel here.

23           THE COURT:  Well, maybe it will take us a half hour

24   to figure out a date.  I mean, maybe that's what we really need

25   the half hour for.  What time's your plane, Mr. Freed?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. FREED:  7:10.  So it's getting a little ...

2          THE COURT:  Yes.  Oh, darn it.  How much more do you

3    have would you say?

4          MR. McKEOWN:  I would probably go till at least a

5    quarter to 6.

6          THE COURT:  Okay.

7          MR. FREED:  I'm not suggesting that he shouldn't

8    proceed.  I'm just apologizing for having to leave early.

9          THE COURT:  Well, I think the whole question is,

10   though, on picking this next date.  It was hard enough to get

11   us all together at one time, and I want you to be here, so ...

12   All right.  10 minutes more and then we're stopping.  Okay.

13   Wherever you are in 10 minutes.

14         MR. McKEOWN:  Understood, Your Honor.

15         THE COURT:  Thank you.

16         MR. MOGIN:  Your Honor, if I may interrupt for just a

17   moment.

18         THE COURT:  Sure.

19         MR. MOGIN:  I am concerned about this exhibit that's

20   been marked as Defendant 8.  There seems to be lengthy

21   attachments to it.  There's no indication that I've been able

22   to see in the few minutes that I've been able to examine the

23   letter.  The attachments were in the original.  It doesn't

24   indicate any such thing after the signature line, and I can't

25   see anything in the content of the letter that indicates so.

1    Perhaps I'm missing something.  But if the attachment wasn't

2    part of the original and we don't have any indication of

3    that --

4              MR. McKEOWN:  Well, why don't we just take --

5              MR. MOGIN:  -- I don't think this is a proper

6    exhibit.

7              MR. McKEOWN:  We could take the cover letter off.  My

8    questions are all about the exhibit in any event.

9              MR. MOGIN:  Well, as I said, I don't know that we've

10   seen this exhibit, Your Honor.  Certainly not in its totality.

11             MR. McKEOWN:  Well, if you look at the second page of

12   the letter, the second paragraph from the bottom, the middle of

13   the paragraph, it says the search terms, search terms and

14   associated stemming report are attached hereto as Exhibit 1.

15             MR. MOGIN:  May I inquire of counsel if these are the

16   same search terms that were attached to the defendants' opening

17   brief.

18             MR. McKEOWN:  The search terms, yes.

19             MR. MOGIN:  But not the stemming report?

20             MR. McKEOWN:  The stemming was not in there.

21             MR. MOGIN:  Very good.

22             THE COURT:  Do you still have an objection now that

23   you know where they're from?

24             MR. MOGIN:  No, I don't, Your Honor.

25             THE COURT:  Okay.  Fine.  Then continue on, Mr.

1   McKeown.

2   BY MR. McKEOWN:

3   Q    Dr. Lewis, looking at the page that goes landscape mode

4   with the search terms starting with 01, 01.1, et cetera.

5   A    Yes.

6   Q    Have you seen this list of search terms before?

7   A    Well, I don't remember if I've seen exactly this list.

8   These are very complicated Boolean queries.  I'd have to go

9   back and compare them to the documents I've looked at before.

10  Q    And if you turn past those first three pages to the --

11  what is behind it.  Do you recognize that as a form of a

12  stemming report?

13  A    I have not seen this particular output format before.  It

14  looks like something that could be a stemming report.

15  Q    So that if we look, for example, just under search 01.1

16  where we have Weyerhaeuser stemmed as the first line, do you

17  see that there?

18  A    Yes, I do.

19  Q    And again I'm on the stemming report.

20  A    Yes.

21  Q    It lists numerous spellings of Weyerhaeuser, including

22  Weyerhaeuserization.  And what's your understanding of what

23  would happen in a Boolean search if some other form of spelling

24  were included in a stemming report?

25  A    I really don't know how to interpret this report.  This is

1    the -- yeah, you know, I would have to know what the software

2    that produced this report was configured to do.

3    Q    Okay.  Well, let me ask you a different question.  Your

4    understanding when you talked about the precision that was

5    needed for purposes of searching with Boolean search terms,

6    it's not the case that if the word is -- someone wants to know

7    about the price -- if prices were raised, right, that if the

8    term raise, R-A-I-S-E, is included and there's a stemming that

9    has a whole variety of different variations of the word raise,

10   those variations would all be picked up by the Boolean search;

11   isn't that correct?

12   A    It would depend on the exact details of the stemming

13   algorithm.  But certainly the intent of stemming algorithms

14   that are included in Boolean search systems is to allow some

15   degree of matching on morphological variations of a word.  And

16   I'm sorry.  I shouldn't use that word.  But just different,

17   different words that are derived from the same root.

18   Q    And so when you were suggesting before in your direct that

19   Boolean searches you have to have a precise match, it's not

20   just whatever the one word is that's in that search string,

21   it's whatever other stems may also exist with respect to the

22   words in that search string; isn't that correct?

23   A    It would depend on how the stemming operations of the

24   Boolean search are implemented.  In some cases a Boolean search

25   system will require an explicit operator at this end of the

PDF created with pdfFactory trial version www.pdffactory.com

 1    stem, which then specifies the set of extensions of the stem

 2    that can be matched.  In other Boolean search systems there may

 3    be a configuration of the software that would turn on stemming

 4    for all of the words in the Boolean query.

 5    Q    But you haven't seen the stemming reports for any of the

 6    defendants, is that correct?

 7    A    Not to my recollection.

 8    Q    Okay.  So you don't know what words were included or not

 9    included as variations of the words in the search term string,

10    correct?

11    A    Under the assumption that the Boolean search algorithms

12    used stemming, I don't know what variations of the stems or the

13    words in the Boolean queries were being matched on.  It would

14    depend on the configuration of the stemming operations of the

15    system.

16          When I discuss Boolean query systems as being exact

17    match systems, I am referring to the fact that the -- each

18    word -- the combinations of words that are expressed in the

19    Boolean query need to be matched exactly.  There often in

20    information retrieval systems is some degree of stemming that

21    allows a small amount of matching on other words with the same

22    root or with the same beginning depending on how

23    morphologically accurate the stemming is.

24    Q    Let's talk a little bit about supervised learning that you

25    are proposing.  And your hope in the broader scheme beyond this

1  case would be to reduce the costs of discovery, is that

2  correct?

3  A    My hope is to see statistical technology information

4  retrieval used to solve people's needs for information.  Many

5  different factors go into people's needs for information.

6  Completeness of the information found, costs, amount of human

7  effort, degree of desirability of types of human effort.

8  There's a huge variety of factors that one optimizes in

9  information retrieval systems.  Obviously costs is one of the

10 factors that's of considerable interest.

11 Q    And one of the things that you'd like to do is reduce the

12 costs of eDiscovery through supervised learning?

13 A    I believe that supervised learning has considerable

14 potential for reducing costs of eDiscovery through the

15 possibility of leveraging the manual effort in review to

16 produce -- you know, in order to produce strong predictive

17 models that bring more responsive documents to the fore,

18 enabling the responsive documents to be reviewed with less

19 manual effort.  So it's certainly one of the desiderata.

20 Q    You've heard of a linear review, is that correct?

21 A    Yes, I have.

22 Q    And a linear review is when someone looks at each document

23 one after the other, correct?

24 A    Right.  My understanding of linear review and I -- my

25 understanding is also that there's some variation in what

PDF created with pdfFactory trial version www.pdffactory.com

1  people mean by linear review.  But it is usual -- my

2  understanding is this usually referred to a process where some

3  set of documents is identified and each of those documents is

4  looked at by some person.

5  Q    And if the defendants had some groups of documents that

6  were reviewed by linear review, you're not objecting to that,

7  are you?

8  A    Well, I'm not here to object to anything.  I'm here to

9  provide my analysis of defendants' process and my analysis of

10 plaintiffs' proposed process.

11 Q    And you're not criticizing a linear review that may have

12 been done with respect to segments of documents, isn't that

13 correct?

14 A    I'm not here to criticize any linear review.  I have not

15 been asked to analyze such a thing.

16 Q    So that if there were some group of documents that were

17 collected and put before the contract attorney to have every

18 document reviewed individually, your testimony about supervised

19 learning would be not directed at that, is that correct?

20 A    I'm not sure that I understand your question.  Could you

21 repeat it.

22 Q    Sure.  Let's assume that there is a server, and the server

23 has some folders that are dedicated to a topic that through the

24 process counsel has determined may have potentially relevant

25 documents.  You're not suggesting that instead of saying that a

PDF created with pdfFactory trial version www.pdffactory.com

1   contract attorney ought to review every document in that

2   particular folder, that they can't do that, that instead they

3   ought to use supervised learning for those documents?

4   A    Well, again, I'm not saying that anybody can or can't do

5   anything.

6   Q    When you talk about recall and precision, I just want to

7   make sure I have the terms correct.  When you talk about

8   recall, you are assuming that if there is some universe of

9   documents that are responsive, recall defines what percentage

10  of those are captured by the search process that was

11  undertaken, is that correct?

12  A    Yes.  Recall describes the extent to which a system has

13  found all of the responsive documents that are available in

14  whatever the appropriate universe to be considered and the

15  particular problem is.

16  Q    So that, for example, if there were out in a collection of

17  a million documents 100,000 documents that were actually

18  responsive and your system collected 90,000 of that hundred

19  thousand responsive documents, you would say the recall is

20  90 percent, correct?

21  A    Yes, that's correct.

22  Q    And I think you testified earlier this afternoon that

23  recall is the most important factor, correct?

24  A    My understanding in the discovery context is that there is

25  a great premium on the finding of responsive documents.  And so

Case: 1:10-cv-05711 Document #: 304 Filed: 03/01/12 Page 303 of 313 PageID #:6544

Lewis - cross by McKeown                          303

1   my impression would be then that recall is the most important

2   effectiveness measure in a discovery setting.  Obviously

3   precision affects what the costs of subsequent review are going

4   to be.  But in some sense recall seems fundamental given the

5   need to find the majority of responsive documents.

6   Q    And in the TREC studies, the interactive tasks, again, of

7   the 24 runs in 2009 completed just a couple years ago, only 5

8   of the 24 got over 70 percent recall, is that correct?

9   A    I believe that's the case.  Of course, the systems were

10  not being told to optimize recall.

11  Q    And in the field of information technology there is no

12  defined minimum level of recall, isn't that correct?

13  A    That's correct.  That was something -- that would be

14  something that's a task specific.  What would be a sufficient

15  level of recall or any other effectiveness measure depends on

16  the details of the task.

17  Q    Now, let's go back to my example before where we had the

18  million documents and we had found through our search

19  methodology the 80,000 of the 100,000 that are responsive.  But

20  our search methodology has actually pulled in 200,000 documents

21  so that the search methodology has 200,000 documents, of which

22  80,000 are responsive.  Are you with me so far?

23  A    I believe you said 90,000 were found before.  Are you now

24  saying 80,000?

25  Q    Let's use 90,000.  I was trying to make the math easier

Lewis - cross by McKeown

1   for myself, but that's okay.  We can go with 90.  Let's assume

2   that there are 90,000 responsive out of the 200,000 that are

3   pulled in by your search methodology.

4   A    Okay.

5   Q    Your precision measure in that case would be 45 percent,

6   is that correct?

7   A    Oh, well, I'd have to sit down and do the math.  But let's

8   see.  You're saying that there's -- well, let's go back to your

9   80,000 then if we're going to do that computation.

10      (Laughter.)

11          THE WITNESS:  So you would be saying that of the

12  200,000 the system found 80,000 were responsive, 120,000 were

13  nonresponsive.  So we'd have 12 over 20, which would be -- it

14  would be 6 over 10.  So that would be a 60 percent precision.

15  BY MR. McKEOWN:

16  Q    60 -- oh, so the precision measures the number that are

17  nonresponsive or the number that are responsive?

18  A    Oh, no, I'm sorry.  I got it backwards.  It's the -- yes,

19  80 -- I'm sorry.  80,000 over the 280,000.  So it -- yes, it's

20  40.  It's 40 percent.

21  Q    And if I took those 200,000 and then gave them to contract

22  attorneys and had them review them for responsiveness so that

23  ultimately 120,000 documents were produced -- well, if I had

24  them --

25  A    You mean the other way around, right?

Lewis - cross by McKeown                                    305

1    Q    I'm sorry.  I'm going to change the numbers to make it

2    easier.

3    A    Okay.

4    Q    All right.  My search methodology has collected 200,000.

5    A    Okay.

6    Q    Out there in the mystical world where we know exactly what

7    is responsive, there are 80,000 responsive documents.  We're

8    changing the math to go to 80, right?

9    A    Okay.  So we have a new example here.  Could you give me

10   all the parameters of the new example.

11   Q    Certainly.  My search methodology has drawn in 200,000

12   documents, correct?

13   A    So could you first tell me what the size of the collection

14   is.

15   Q    1 million.

16   A    Okay.

17          MR. McKEOWN:  It's not going to be that hard of a

18   question at the end, and I know I'm very close to my 10-minute

19   limit, Your Honor.  And I will wrap this up quickly.

20          THE COURT:  I know you will.

21   BY MR. McKEOWN:

22   Q    So I have a universe collected of a million documents.  My

23   search methodology has brought back 200,000 documents.

24   A    Okay.  200,000 hits.

25   Q    200,000 hits.  There are only 80,000 that are truly

1  responsive.

2  A    Out in the whole 1 million.

3  Q    Out of the whole -- well, out of the 200,000.

4  A    There's 80,000 in the 200,000 hits.

5  Q    That are responsive?

6  A    Okay.

7  Q    All right.  If I use contract lawyers to review those

8  documents and mark them responsive and nonresponsive, and the

9  contract attorneys mark the 80,000 documents that are

10  responsive as responsive and the other 120,000 as

11  nonresponsive, the set that I have produced to the other side

12  has a 100 percent precision rate, correct?

13  A    If they do that with complete accuracy, that would be the

14  case.

15        MR. McKEOWN:  Your Honor, this would be a good time

16  to break.

17        THE COURT:  Okay.  Thank you.  So you may step down,

18  Dr. Lewis, but don't go too far because you're involved in the

19  next hearing too.  Okay.  Now, if we solve this, we could

20  settle the case.  Monday, March 5th, next Monday, I'm assuming

21  that's probably not a go.  But a week from Friday, March 9th,

22  could people switch things around?  Mr. Regard, can't do it.

23  Okay.

24        MR. MAROVITZ:  Your Honor, it's Andy Marovitz for

25  Temple-Inland.  I have Mr. Regards' availability.  During the

1    break I had a chance to grab it.  We'll work around yours

2    obviously to the extent we can.  Mr. Regard has some child

3    caring issues that he's trying to work around.

4              THE COURT:  How is Wednesday, March 28th?

5              MR. MAROVITZ:  That's fine, Your Honor.

6              THE COURT:  Can you guys do March 28th?

7              MR. MAROVITZ:  It's fine with Mr. Regard.

8              THE COURT:  Right.

9              MR. MAROVITZ:  I shouldn't speak for the other

10   defendants.

11             THE COURT:  Dr. Lewis, it's a Wednesday March 28th.

12             DR. LEWIS:  I believe that will be fine, Your Honor.

13             THE COURT:  Okay.  And we just have to find out from

14   our plaintiffs.

15             MR. MOGIN:  Your Honor, I hate to be a fly in the

16   ointment.  I have a -- would we be concluding on the 28th?

17             THE COURT:  Yes, I can also do the 29th if the 29th

18   is better.

19             MR. MOGIN:  Well, what I'm trying to schedule around,

20   Your Honor, is that the Southern District of California's

21   District Conference is the 29th.

22             THE COURT:  Oh, so you want to get back.  Well, I'd

23   like to start very early in the morning actually on the 28th.

24   And I think we -- I would like to suggest three things for the

25   agenda.  We have to finish -- we're going to do Mr. Regard's

1  cross-examination.  We are going to do Mr. -- well, actually

2  direct.  I mean direct and whatever.  And then we're going to

3  finish up Dr. Lewis', and I would like to have a meeting.  I'd

4  like to have a Rule 16 conference with the lawyers.  If we're

5  all going to be together, it can be 15 minutes or it can be

6  longer, but I would like to sit down with you.  And I didn't

7  get an opportunity at the beginning of the case.

8          MR. NEUWIRTH:  Just one point of inquiry, Your honor.

9  I don't know if that agenda was meant to be the order in which

10 we would do things.  But since we are in the middle of the

11 cross of Dr. Lewis, it would seem to make sense to start with

12 finishing that.

13         THE COURT:  Dr. Lewis, can you get down here at

14 8:00 o'clock in the morning?

15         DR. LEWIS:  Sure.

16         THE COURT:  Okay.  He's close.

17         MR. NEUWIRTH:  Thank you.

18         THE COURT:  He's my neighbor.  I'll give him a ride.

19         MR. FREED:  Can I add Dr. Tenny to the mix?  Because

20 at this point her report has been in the defendants' hands for

21 quite a long time.  And we did have a motion for

22 reconsideration.  They knew everything that they needed to know

23 on the 16th.  If there was some surprise relative to this

24 hearing today, that's one thing.  But to a hearing that is out

25 another month, Your Honor --

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  What new is she going to add to what Dr.
2     Lewis said?
3          MR. FREED:  Well, she has certain issues which have
4     been raised with respect to search strings, which is precisely
5     an area of expertise which she has analyzed.  And I would at
6     least like to keep the option open.  And believe me if we feel
7     it's redundant, we're not going to impose on Your Honor or the
8     defendants.  But --
9          MR. ECHOLS:  The only question, Judge, Barack Echols
10    on behalf of Packaging Corporation of America, would be with
11    respect to any Daubert issues.  At least based on what we saw
12    when we got the report on Thursday it's not clear that there's
13    any appropriate qualification or fit for this witness'
14    testimony in this particular circumstance.  I don't know how
15    you would want those to be raised and addressed.
16         MR. FREED:  We'd be very, you know, happy to do that
17    in advance so that there wouldn't be an issue about again
18    having her attend and then not be qualified.
19         MR. ECHOLS:  Exactly.  That was part of what you had
20    said the last time, Judge, not to waste anybody's time.
21         THE COURT:  Why don't you talk to each other and see.
22    I don't want to be preclu -- I'm trying not to preclude
23    anybody, but I don't think after nine hours today that we need
24    any redundancy here.
25         MR. FREED:  We don't, Your Honor.  And we will

1    seriously consider it.  I just want to keep the option open.

2              THE COURT:  This gentleman needs to get to

3    California, and I have a 4 o'clock with Judge Holderman that

4    day, so I need to get there.  So that's why we're starting at 8

5    o'clock in the morning.  And I do want to have enough time for

6    this Rule 16.  Yes.

7              MR. MAROVITZ:  Judge, may I raise just two issues

8    just of housekeeping.

9              THE COURT:  Absolutely.

10             MR. MAROVITZ:  First, 8 o'clock in morning is just

11   fine.  We intend at least a week before March 28th to give the

12   plaintiffs, and we'd like to submit to Your Honor as well,

13   additional information about the chart that was tendered.  We

14   don't want there to be any claim of surprise or lateness or

15   anything else.  So of the same kind of information that was

16   submitted beforehand whether it's called a report or something

17   else, we just --

18             THE COURT:  And that goes to Mr. Regard's testimony

19   anyway.

20             MR. MAROVITZ:  Correct.  Correct.

21             THE COURT:  Okay.  That's fine.

22             MR. MAROVITZ:  Second, in that connection also I

23   don't know if it applies generally here, but we would like a

24   suspension of the witness rule.  We do need to talk to Mr.

25   Regard about that.  And technically we'd like to be able to do

PDF created with pdfFactory trial version www.pdffactory.com

1   that.

2            THE COURT:  And that's fine.  And if they need to

3   talk to Dr. Lewis, that's fine too.  Is that okay with

4   everybody?  Yes?

5            MR. MOGIN:  Yes.

6            THE COURT:  Okay.  Yes.

7            MR. McCAREINS:  Mark McCareins on behalf of Rock

8   Tenn.  I just talked to counsel for plaintiffs.  I think we've

9   agreed that he would kind of fish or cut bait within the next

10  couple weeks --

11           MR. FREED:  Absolutely.

12           MR. McCAREINS:  -- as to whether he would even need

13  that additional expert.

14           THE COURT:  Just think about it.  Okay.

15           MR. FREED:  We are, Your Honor.  And we don't want to

16  impose on the Court or other counsel.  We will give it very

17  serious consideration.

18           MR. MAROVITZ:  And, Your Honor, finally.  On

19  Mr. Regard there is obviously some more direct to go, but not

20  very much.  There is obviously the point of the chart that we

21  didn't have a chance to go through today.  And then Mr. Regard

22  offered opinions at the very outset about a couple other issues

23  that we just didn't get to.  It's a --

24           THE COURT:  Well, that's not a problem.  I mean, I

25  cut, I cut that off.  Okay.  And we didn't finish with Dr.

PDF created with pdfFactory trial version www.pdffactory.com

1　Lewis.  So that makes a lot of sense.

2　　　　MR. MAROVITZ:  Thank you, Your Honor.

3　　　　THE COURT:  So we'll get all that done.  Then we'll

4　be all finished.  Do you go back to Judge Shadur also?  I meant

5　to ask that.  Do you have a date with Judge Shadur?

6　　　　MR. NEUWIRTH:  March the 15th, Your Honor.

7　　　　MR. MAROVITZ:  Yes, March 15th at 8:45.

8　　　　THE COURT:  Do you physically come on March 15th?

9　　　　MR. NEUWIRTH:  Yes, Your Honor.

10　　　MR. MAROVITZ:  We do.

11　　　MR. McKEOWN:  Well, I think the -- if there's this

12　convention that has occurred that if Judge Shadur is satisfied

13　with the status report, we don't need to appear on the 15th.

14　And perhaps if the Court could suggest to Judge Shadur that we

15　don't need to appear because we're coming here on the 28th.

16　　　THE COURT:  That we have more to do as far as the

17　purpose of the referral.

18　　　MR. McKEOWN:  Yes.

19　　　THE COURT:  Okay.  I'll certainly do that.

20　　　MR. McKEOWN:  Thank you, Your Honor.

21　　　MR. MAROVITZ:  Thank you, Your Honor.

22　　　MS. MILLER:  Thank you, Your Honor.

23　　　THE COURT:  Okay.  Well, we'll see everybody then.

24　We're saying Wednesday, March 28th, right.  Okay.  8 o'clock in

25　to morning.

1          MR. MAROVITZ:  Thank you, Your Honor.

2          MR. MOGIN:  Your Honor, I had completely forgotten

3     completely about the Judge Shadur matter.  But perhaps if we're

4     going to be here the 15th, we're all scheduled up anyway.  If

5     the Court's got the availability.

6          MR. MAROVITZ:  Not the experts, Your Honor.

7          THE COURT:  I'm on criminal duty that week, which

8     means I have to be available all day, or I'm going to put you

9     all in jail.  Okay.

10          MS. MILLER:  The 28th it is, Your Honor.

11          THE COURT:  All right.  I have to be available the

12     entire day.  Okay.  Everybody, thank you.

13          MR. MOGIN:  Thank you, Your Honor.

14          MS. MILLER:  Thank you, Your Honor.

15          MR. MAROVITZ:  Thank you.

16        (Whereupon, said trial was recessed at 5:45 p.m., to

17          reconvene on 3/28/12, at 8:00 a.m.)

18                          CERTIFICATE

19          I HEREBY CERTIFY that the foregoing is a true,

20     correct and complete transcript of the proceedings had at the

21     hearing of the aforementioned cause on the day and date hereof.

22

23     /s/TRACEY D. McCULLOUGH                February 27, 2012

24     Official Court Reporter                     Date
       United States District Court
25     Northern District of Illinois
       Eastern Division