Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
     KLEEN PRODUCTS, LLC, et al.,      )  Docket No. 10 C 5711
 4                                     )
                       Plaintiffs,     )
 5                                     )
               vs.                     )
 6                                     )
     PACKAGING CORPORATION OF AMERICA, )  Chicago, Illinois
 7   et al.,                           )  March 28, 2012
                                       )  8:00 o'clock a.m.
 8                     Defendants.     )

 9
            TRANSCRIPT OF PROCEEDINGS - EVIDENTIARY HEARING
10       BEFORE THE HONORABLE MAGISTRATE JUDGE NAN R. NOLAN
                          VOLUME 2-A
11
     APPEARANCES:
12

13   For the Plaintiffs:        THE MOGIN LAW FIRM
                                 BY:  MR. DANIEL J. MOGIN
14                               707 Broadway, Suite 1000
                                 San Diego, CA  92101
15                               (619) 687-6611

16                               FREED KANNER LONDON & MILLEN LLC
                                 BY:  MR. MICHAEL J. FREED
17                               MR. ROBERT J. WOZNIAK
                                 2201 Waukegan Road, Suite 130
18                               Bannockburn, IL  60015
                                 (224) 632-4500
19
                                 SCOTT & SCOTT
20                               BY:  MR. WALTER W. NOSS
                                 707 Broadway, Suite 1000
21                               San Diego, CA  92101
                                 (619) 233-4565
22

23
     Court Reporter:            MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                              Official Court Reporter
                                219 S. Dearborn Street, Suite 1854-B
25                              Chicago, Illinois  60604
                                (312) 435-5639
```

```
 1   APPEARANCES CONTINUED:

 2   For the Plaintiffs:        LOCKRIDGE GRINDAL NAUEN PLLP
                                BY:  MR. BRIAN D. CLARK
 3                              100 Washington Avenue S.
                                Minneapolis, MN  55401
 4                              (612) 239-6900

 5
     For Defendant Packaging    KIRKLAND & ELLIS LLP
 6   Corporation of America:    BY:  MR. BARACK S. ECHOLS
                                     MR. LEONID FELLER
 7                              300 North LaSalle Street
                                Chicago, IL  60654
 8                              (312) 862-3144

 9
     For Defendant             FOLEY & LARDNER LLP
10   International Paper:       BY:   MR. JAMES T. McKEOWN
                                      MR. NATHAN EIMER
11                              777 East Wisconsin Avenue
                                Milwaukee, WI  53202
12                              (414) 297-5530

13
                               FOLEY & LARDNER LLP
14                              BY:  MS. JOANNE LEE
                                321 North Clark Street, Suite 2800
15                              Chicago, IL  53202

16   For Defendant             MAYER BROWN LLP
     Temple-Inland:            BY:  MR. ANDREW S. MAROVITZ
17                                   MS. BRITT M. MILLER
                                71 South Wacker Drive
18                              Chicago, IL  60606
                                (312) 782-0600
19
     For Defendant             K & L GATES LLP
20   Cascades and Norampac:    BY:  MR. SCOTT M. MENDEL
                                70 West Madison Street, Suite 3100
21                              Chicago, IL  60602
                                (312) 372-1121
22

23   For Defendant             QUINN EMANUEL URQUHART &
     Georgia-Pacific:          SULLIVAN LLP
24                              BY:  MR. STEPHEN R. NEUWIRTH
                                51 Madison Avenue, 22nd Floor
25                              New York, NY  10010
                                212-849-7000
```

1  APPEARANCES CONTINUED:

2  For Defendant                    WINSTON & STRAWN LLP
   RockTenn CP, LLC:                BY:  MR. R. MARK McCARIENS
3                                        MR. JOSEPH L. SIDERS
                                    35 West Wacker Drive
4                                   Chicago, IL  60601
                                    (312) 558-5902
5

6  For Defendant                    McDERMOTT WILL & EMERY LLP
   Wayerhaeuser Company:            BY:  MS. RACHAEL V. LEWIS
7                                   600 13th Street NW
                                    Washington, DC  2005
8                                   (202) 756-8479

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 05:06:50 | 1 | are the best sport for coming two days. We will be back to |
| 05:07:00 | 2 | you shortly on what our next step will be here. |
| 05:07:04 | 3 | You can step down, Mr. Regard. |
| 05:07:06 | 4 | THE WITNESS: Thank you, your Honor. |
| 05:07:06 | 5 | (Witness leaves the stand.) |
| 05:07:06 | 6 | THE COURT: We are going to be finished if you are |
| 05:07:08 | 7 | running for a plane. We are going to be finished in a few |
| 05:07:10 | 8 | minutes, I promise you. |
| 05:08:18 | 9 | Okay. So this is what I am calling, if everybody can |
| 05:08:20 | 10 | hear me, when I received this referral in December, it was |
| 05:08:30 | 11 | from my darling Judge Shadur, who never sends anything to me. |
| 05:08:34 | 12 | I am putting this in context. Okay? And it said, Conduct an |
| 05:08:38 | 13 | evidentiary hearing. So I thought -- being the obedient |
| 05:08:44 | 14 | little magistrate judge that I am, I thought, Oh, I better set |
| 05:08:48 | 15 | this thing real fast. So we did. And this is quite a large |
| 05:08:54 | 16 | group here. |
| 05:08:56 | 17 | If I had one thing to do over, and that's what I am |
| 05:09:00 | 18 | doing right now, if we could go back to that day, and I had |
| 05:09:06 | 19 | reviewed as many documents as I now have reviewed, I want to |
| 05:09:12 | 20 | say a couple things because I don't think it's too late to go |
| 05:09:16 | 21 | back to that original place. |
| 05:09:18 | 22 | I am a believer of principle 6 of Sedona, and I'm not |
| 05:09:28 | 23 | just because it's Sedona, but I think the people who are |
| 05:09:30 | 24 | producing the records, producing the documents, are in a |
| 05:09:36 | 25 | better position to know, since they have to do the work, spend |

| | |
|---|---|
| 05:09:42 | 1 |
| 05:09:46 | 2 |
| 05:09:50 | 3 |

the money, spend the time, they know their people, they know
their material, so as a basic premise, I think that's a pretty
fair premise here.

| | |
|---|---|
| 05:09:52 | 4 |
| 05:10:00 | 5 |
| 05:10:06 | 6 |
| 05:10:10 | 7 |
| 05:10:14 | 8 |
| 05:10:18 | 9 |
| 05:10:24 | 10 |

I also think I don't quite understand why they went
so fast without getting you involved.  Okay?  But as soon as
they found out, I'm sort of assuming, they were trying to
figure out, all seven of them, of what the heck was going on,
I'd say by August, and Judge Shadur did not decide his motion
to dismiss until April.  So by August, I think the dialog
starts.

| | |
|---|---|
| 05:10:26 | 11 |
| 05:10:30 | 12 |
| 05:10:38 | 13 |
| 05:10:42 | 14 |
| 05:10:48 | 15 |

And the reason I'm even going to suggest what I am
going to suggest is I think -- I would give you a B plus for
cooperation, communication with each other.  I actually think
you really did -- once it got started, I think you did a
really good job.

| | |
|---|---|
| 05:10:50 | 16 |
| 05:10:54 | 17 |
| 05:11:02 | 18 |
| 05:11:08 | 19 |

I don't know whether the indexing issue started to
send this off on this kind of I'd almost call it a detour
we're on with quote, unquote, predictive quoting, what all the
blogs are talking about us.

| | |
|---|---|
| 05:11:10 | 20 |
| 05:11:16 | 21 |
| 05:11:24 | 22 |
| 05:11:32 | 23 |
| 05:11:38 | 24 |

I assume you and Dr. Lewis, what you really are
interested in is a search, regardless if it's Boolean or
computer-assisted, that is fair and statistically -- and that
can be validated statistically because that would be a good
word search.

| | |
|---|---|
| 05:11:40 | 25 |

My question to all of you right now -- really, it's

05:11:44   1   to you, and you don't have to answer me today; I even have a
05:11:50   2   time we are going to call up again -- is there a way, rather
05:11:56   3   than starting all over with all of the good work that is here,
05:12:04   4   if Dr. Lewis and Mr. Regard were able to help and we were able
05:12:12   5   to within a same framework take their search and be able to
05:12:20   6   tweak it and make it something that you could be comfortable
05:12:24   7   with?
05:12:24   8           MR. MOGIN:  You're right.  I won't answer you today.
05:12:26   9           THE COURT:  You don't have to answer me today.  And I
05:12:30  10   understand that I am sort of -- and I have no idea.  Now, I
05:12:36  11   have no idea if they want to go to the mat as the Godfather
05:12:40  12   would say, with their search as it is.  Maybe they don't want
05:12:44  13   to tweak anything.
05:12:46  14           MR. MOGIN:  I will --
05:12:46  15           THE COURT:  I don't know.  I don't know.
05:12:50  16           What I have gotten out of this -- and I think there
05:12:58  17   is a bigger hole in the case book of what is statistically
05:13:04  18   correct.  I have been walking around saying to Chris for the
05:13:10  19   last week, because we spend so much time fighting with parties
05:13:16  20   about agree, agree, agree, all of the case law, all of my
05:13:22  21   time, all of my opinions in this area, as Joe knows, is
05:13:26  22   beating people over the head to agree what the search terms
05:13:30  23   are.  We never get to -- I really, you know, you can all jump
05:13:34  24   in here.  You start telling me cases you know, other than Paul
05:13:40  25   Grimm kind of waxing on that it should be statistically valid,

| | | |
|---|---|---|
| 05:13:48 | 1 | and what Judge Facciola said, there hasn't -- judges just |
| 05:13:54 | 2 | haven't -- parties haven't been thinking like that, judges |
| 05:13:58 | 3 | haven't been thinking like that, and I actually think that's |
| 05:14:02 | 4 | probably the more helpful part of the case is what I am trying |
| 05:14:08 | 5 | to say.  And I happen to think it should be, it should be |
| 05:14:14 | 6 | valid.  It shouldn't be, Oh, my God, oh, my God, let's just |
| 05:14:18 | 7 | move on, let's just get rid of this. |
| 05:14:22 | 8 | So your homework assignment is I want you to talk to |
| 05:14:28 | 9 | each other, see if Dan would come up with -- if Dan would |
| 05:14:34 | 10 | agree that he would go -- he would go along with the Boolean |
| 05:14:38 | 11 | search and he tell you what kind of changes, what kind of |
| 05:14:44 | 12 | tweaking, what kind of running, whatever he needs, whatever |
| 05:14:50 | 13 | kind of validation they need, if you would be willing to do |
| 05:14:52 | 14 | that. |
| 05:14:56 | 15 | In exchange for that, here is my quid pro quo.  We |
| 05:15:00 | 16 | could take -- it is five months tomorrow that I leave here.  I |
| 05:15:06 | 17 | will work with you for the next five months on trying to |
| 05:15:08 | 18 | figure out privilege, indexing, 30(b)(6)s.  We could take the |
| 05:15:18 | 19 | five months and try to get you in some kind of shape where |
| 05:15:24 | 20 | maybe you could get your arms around the rest of the discovery |
| 05:15:28 | 21 | issues here. |
| 05:15:30 | 22 | I actually think -- I mean, when you say, you know, |
| 05:15:34 | 23 | you're not exaggerating that you could be coming in on motions |
| 05:15:38 | 24 | to compel on this for the next two years to whoever the new |
| 05:15:42 | 25 | magistrate judge is. |

301

05:15:46   1   So I don't know.  I think it's kind of a matter of

05:15:48   2   where you want to put your resources.  I know you all have

05:15:54   3   clients, and you've got all those other plaintiffs' lawyers,

05:15:58   4   and I mean it as somebody who used to get kicked around every

05:16:04   5   courtroom in this building as a criminal defense lawyer, you

05:16:06   6   can imagine, I am not going to take this personal, but I did

05:16:10   7   not want to walk out of here today and not say to you, Hey,

05:16:16   8   why don't we all take a nice, big, deep breath, step back, and

05:16:22   9   see if there's not something we could do to save this right

05:16:26  10  now.  And not only save it, make it better.

05:16:28  11         MR. MOGIN:  I appreciate what you're saying.  I will

05:16:30  12  give it good-faith consideration.

05:16:32  13         THE COURT:  Good.

05:16:32  14         MR. MOGIN:  However, just so defense counsel hears it

05:16:36  15  loud and clear, so that they can't accuse us of any holding

05:16:40  16  back, since December 2010 when Mr. Neuwirth and I had a heated

05:16:48  17  exchange in the hallway, we have said we will not tolerate a

05:16:52  18  search that is restricted to these custodians.  It won't -- we

05:16:58  19  will not make that agreement.

05:17:00  20         THE COURT:  So that would be one of the things you

05:17:06  21  would come back, is you would want to propose custodians?

05:17:10  22         MR. MOGIN:  No.  It's going to have to be some other

05:17:12  23  way besides custodians.

05:17:16  24         THE COURT:  Oh, you won't do a custodian-based

05:17:18  25  search.

05:17:18    1        MR. MOGIN:  I certainly won't do these top custodians
05:17:20    2   that they have picked out.
05:17:22    3        THE COURT:  I see.
05:17:24    4        MR. ECHOLS:  Your Honor, Barack Echols.  Ms. Miller
05:17:28    5   and I, during the course of the summer and after, have had
05:17:30    6   some of those conversations.  I think you saw some of that
05:17:32    7   correspondence that we sent to you.  And our position has
05:17:36    8   always been that this is our position as to the ones that make
05:17:40    9   the most sense.  We think this may be all.  We understand you
05:17:44   10   disagree, we understand there may have to be a conversation
05:17:48   11   about additional custodians at some point, but we never have
05:17:50   12   been able to get into that, even at which seems to be a
05:17:54   13   reasonable place to be because, as you said, we took a little
05:17:58   14   bit of a detour.
05:18:00   15        THE COURT:  Can you do -- experts, could you do I
05:18:06   16   would call what Mr. Mogin is saying as some kind of concept or
05:18:12   17   a broader-based search, what would you call it, other than the
05:18:16   18   non-custodial?  Can you do that with Boolean?
05:18:24   19        DR. LEWIS:  You are asking me?
05:18:24   20        THE COURT:  Yes.
05:18:26   21        DR. LEWIS:  That is can you do a Boolean search on
05:18:28   22   material that wasn't gathered by custodians but were gathered
05:18:30   23   some other way?
05:18:32   24        THE COURT:  Yes.
05:18:32   25        DR. LEWIS:  Yes.

| | | |
|---|---|---|
| 05:18:32 | 1 | THE COURT: Clusters or concepts or any -- |
| 05:18:34 | 2 | DR. LEWIS: Well, no, I'm saying -- you are talking |
| 05:18:36 | 3 | about the collection procedure, whether it's collection -- |
| 05:18:38 | 4 | THE COURT: You're right. But you could use Boolean |
| 05:18:40 | 5 | for a non-custodial search? |
| 05:18:44 | 6 | DR. LEWIS: Yes. |
| 05:18:44 | 7 | THE COURT: All right. |
| 05:18:50 | 8 | MR. McKEOWN: The scope of what is going to be in the |
| 05:18:52 | 9 | universe is a very big question. We have other custodial |
| 05:18:56 | 10 | documents that we have collected and are reviewing, and we |
| 05:18:58 | 11 | have shared servers that we have collected and are reviewing. |
| 05:19:02 | 12 | But if it's -- we have to take every document in the company, |
| 05:19:04 | 13 | and that's a major problem. |
| 05:19:06 | 14 | THE COURT: When I would like to talk to you is |
| 05:19:08 | 15 | Tuesday at 4:00 o'clock, if I can, Chicago time. And one of |
| 05:19:14 | 16 | you must have a bridge line with all your technology -- |
| 05:19:22 | 17 | MS. MILLER: We will provide it, your Honor. We will |
| 05:19:24 | 18 | take care of it. |
| 05:19:26 | 19 | THE COURT: And at least maybe you will give one |
| 05:19:28 | 20 | call, somebody, whoever has the most charm, some Irish person, |
| 05:19:34 | 21 | some other Irish person, and try to have a conversation here |
| 05:19:40 | 22 | before Tuesday, and if the answer is no, the answer is no. |
| 05:19:44 | 23 | And then we know what to do. We will go back to -- we will |
| 05:19:50 | 24 | figure out who else has to be heard on the hearing. I have |
| 05:19:54 | 25 | Friday, April 29th, a full day. |

| | | |
|---|---|---|
| 05:20:04 | 1 | MS. MILLER:  April 29th is a Sunday. |
| 05:20:06 | 2 | THE COURT:  Thank you.  April 27th.  I do have |
| 05:20:10 | 3 | Friday, April 27th, open.  We could do another round if you |
| 05:20:16 | 4 | wanted to have another day.  That gives you enough time.  This |
| 05:20:22 | 5 | group is just so darn hard -- now, here is the other thing. |
| 05:20:26 | 6 | That's my suggestion in here.  I would love to hear anybody |
| 05:20:32 | 7 | else's suggestion, what we could do, short of starting over |
| 05:20:38 | 8 | from scratch, and that would free Chris and I up. |
| 05:20:48 | 9 | If we spend all of our time, regardless of how we |
| 05:20:52 | 10 | turn out, I am not available to you to do anything else.  And |
| 05:20:58 | 11 | I am really good at some form of mediation in this.  So it's |
| 05:21:02 | 12 | kind of -- so if you have any other suggestion of what we |
| 05:21:10 | 13 | could do for the next five months, I also want to hear that. |
| 05:21:18 | 14 | MR. MAROVITZ:  Judge, can I -- |
| 05:21:20 | 15 | THE COURT:  Sure. |
| 05:21:20 | 16 | MR. MAROVITZ:  Far be it from me to throw a kink in |
| 05:21:24 | 17 | the works here, and I hope that we wouldn't need the 27th.  I |
| 05:21:28 | 18 | have a multiparty -- I can move many things, I have a |
| 05:21:30 | 19 | multiparty mediation scheduled for that day.  I cannot move |
| 05:21:34 | 20 | that. |
| 05:21:34 | 21 | THE COURT:  So Tuesday then.  When we talk Tuesday, I |
| 05:21:38 | 22 | will have to have -- you know, we might have to do it on a |
| 05:21:42 | 23 | Saturday. |
| 05:21:42 | 24 | MR. MAROVITZ:  I apologize. |
| 05:21:44 | 25 | THE COURT:  Maybe we will just do it on a Saturday or |

| | | |
|---|---|---|
| 05:21:46 | 1 | something in New York. |
| 05:21:50 | 2 | MR. MOGIN:  San Diego. |
| 05:21:52 | 3 | THE COURT:  Or San Diego.  Absolutely. |
| 05:21:54 | 4 | Anybody want to say anything?  You don't even have to |
| 05:21:58 | 5 | be on the record. |
| 05:22:02 | 6 | MR. McKEOWN:  We will communicate prior to Tuesday. |
| 05:22:04 | 7 | THE COURT:  Good.  And you talk to each other before |
| 05:22:06 | 8 | Tuesday and see if, you know, I am just being the old dreamer |
| 05:22:12 | 9 | that I am. |
| 05:22:14 | 10 | Thank you, everybody. |
| 05:22:16 | 11 | MR. McKEOWN:  Thank you. |
| 05:22:16 | 12 | MS. MILLER:  Thank you, your Honor. |
| 05:22:18 | 13 | MR. MAROVITZ:  Judge, one other final note just in |
| 05:22:20 | 14 | terms of my pet project, the witness rule.  Again, I am |
| 05:22:24 | 15 | hopeful that we won't need to come back, but if we do, can I |
| 05:22:28 | 16 | talk to Mr. Regard? |
| 05:22:28 | 17 | THE COURT:  You may talk to Mr. Regard, you may talk |
| 05:22:30 | 18 | to Dr. Lewis, you may talk to Ms. Tenny.  You may talk to -- |
| 05:22:38 | 19 | Dr. Tenny, yes, excuse me. |
| 05:22:40 | 20 | MR. MAROVITZ:  Thank you, Judge. |
| 05:22:40 | 21 | THE COURT:  And you can talk to anybody else you |
| 05:22:42 | 22 | want, Mr. Marovitz. |
| 05:22:44 | 23 | Bye, everybody. |
| 05:22:46 | 24 | MS. MILLER:  Thank you, your Honor. |
| 05:22:46 | 25 | MR. McKEOWN:  Thank you, your Honor. |

| | | |
|---|---|---|
| 05:22:48 | 1 | MR. NEUWIRTH:  Thank you, your Honor. |
| 05:22:56 | 2 | THE COURT:  Hold on. |
| 05:23:00 | 3 | MR. CAMPBELL:  I just think the question needs to be |
| 05:23:04 | 4 | about how do we satisfy our comfort level if the response -- a |
| 05:23:12 | 5 | vacuum is produced.  And I would hope that things don't have |
| 05:23:14 | 6 | to be taken off the table as long as you get to that comfort |
| 05:23:18 | 7 | level because that what we are talking about, producing |
| 05:23:20 | 8 | responsive documents. |
| 05:23:22 | 9 | THE COURT:  That's the way we are seeing it.  In the |
| 05:23:26 | 10 | end, that's what your responsibility to your clients are. |
| 05:23:32 | 11 | Okay?  Thanks, everybody. |
| 05:23:34 | 12 | MR. McKEOWN:  Thank you, your Honor. |
| 05:23:34 | 13 | MS. MILLER:  Thank you. |
| | 14 | (Which were all the proceedings had in the above-entitled |
| | 15 | cause on the day and date aforesaid.) |
| | 16 | I certify that the foregoing is a correct transcript from |
| | 17 | the record of proceedings in the above-entitled matter. |
| | 18 | _____        _____ |
| | | Carolyn R. Cox                              Date |
| | 19 | Official Court Reporter |
| | | Northern District of Illinois |
| | 20 | /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Exhibit B

1             IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3    KLEEN PRODUCTS LLC, et al.,   )
                           ) Docket No. 10 C 5711
4              Plaintiffs,   )
                           ) Chicago, Illinois
5          v               ) April 2, 2012
                           ) 4:03 p.m.
6    PACKAGING CORPORATION OF     )
   AMERICA, et al.,          )
7                           )
          Defendants    )
8

9               TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE NAN NOLAN
10

11   PRESENT:

12   For the Plaintiff:  FREED KANNER LONDON & MILLEN LLC
                   2201 Waukegan Road
13                    Suite 130
                 Bannockburn, Illinois 60015
14                    BY: MR. MICHAEL J. FREED
                    MR. ROBERT J. WOZNIAK
15

16                    THE MOGIN LAW FIRM, P.C.
                 707 Broadway
17                    Suite 1000
                 San Diego, California 92101
18                    BY: MR. DANIEL J. MOGIN  (By Telephone)

19                    SCOTT & SCOTT LLP
                 707 Broadway
20                    San Diego, California 92101
                 BY: MR. WALTER W. NOSS
21

22

23

24

25

```
1    PRESENT:  (Cont'd)

2
     For Defendant Packaging: KIRKLAND & ELLIS LLP
3    Corporation of America:  300 North LaSalle Street
                              Chicago, Illinois 60654
4                             BY: MR. BARACK S. ECHOLS

5
     For Defendant            FOLEY & LARDNER LLP
6    International Paper:      777 East Wisconsin Avenue
                              Milwaukee, Wisconsin 53202
7                             BY: MR. JAMES T. McKEOWN

8
     For Defendant            MAYER BROWN LLP
9      Temple-Inland:         71 South Wacker Drive
                              Chicago, Illinois 60606
10                            BY: MR. ANDREW S. MAROVITZ
                                  MS. BRITT M. MILLER
11
     For Defendants           K&L GATES LLP
12     Cascades and Norampac: 70 West Madison Street
                              Chicago, Illinois 60602
13                            BY: MR. SCOTT M. MENDEL

14   For Defendant            QUINN EMANUEL URQUHART &
       Georgia Pacific:           SULLIVAN LLP
15                            51 Madison Avenue
                              22nd Floor
16                            New York, New York 10010
                              BY: MR. STEPHEN R. NEUWIRTH
17
     For Defendant            WINSTON & STRAWN
18    RockTenn CP, LLC:       227 West Monroe Street
                              Suite 4400
19                            Chicago, Illinois 60606-5096
                              BY: MR. R. MARK McCAREINS
20

21   For Defendant            McDERMOTT WILL & EMERY LLP
     Weyerhaeuser Company:    227 West Monroe Street
22                            Suite 4400
                              Chicago, Illinois 60606-5096
23                            BY: MS. RACHAEL V. LEWIS

24   (TRANSCRIBED FROM DIGITAL RECORDING.
      PLEASE SUPPLY CORRECT SPEAKER IDENTIFICATION)
25
```

```
1        THE CLERK:   10 C 5711, Kleen Products v Packaging
2   Corporation.
3        THE COURT:   Good afternoon, everyone.  I have quite a
4   few people here, even out-of-town people.  Nice to see you
5   all.  So will the plaintiffs identify themselves first,
6   please.
7        MR. FREED:   Michael Freed and Robert Wozniak.
8        THE COURT:   Mr. Freed, Mr. Wozniak.  Is Mr. Mogin on the
9   phone?
10       MR. MOGIN:   I am, your Honor.
11       THE COURT:   Hi, Mr. Mogin.
12       MR. MOGIN:   Also Mr. Noss and Mr. Clark are also on the
13  phone.
14       THE COURT:   Is that N-o-d?
15       MR. MOGIN:   N-o-s-s.
16       THE COURT:   Oh, N-o-s-s, okay.  And who is the other
17  gentleman?
18       MR. MOGIN:   Brian Clark.
19       THE COURT:   Mr. Clark, okay.
20       And for our defendants, we will start with you, Mr.
21  Neuwirth.
22       MR. NEUWIRTH:   Stephen Neuwirth for Georgia Pacific.
23       THE COURT:   Okay, good.  Next on the roll call.
24       MR. MC KEOWN:   James McKeown of International Paper.
25       THE COURT:   Thanks, Mr. McKeown.
```

1      MR. MAROVITZ:   Good afternoon, Judge, Andy Marovitz and

2  Britt Miller is here with me for Temple-Inland.

3      THE COURT:   Okay, thank you.

4      MR. ECHOLS:   Good afternoon, your Honor, Barack Echols

5  on behalf of Packaging Corporation of America.

6      THE COURT:   Thanks, Mr. Echols.

7      MR. MC CAREINS:   Mark McCareins for RockTenn.

8      THE COURT:   Mr. McCareins.

9      MR. MENDEL:   Scott Mendel for Cascades and Norampac.

10     THE COURT:   Okay, thank you, Mr. Mendel.  Hi, Ms.

11 Miller.  Okay.  And is there anybody else on the telephone,

12 any other defendant?  I think we're all here.

13     MS. LEWIS:   Rachael Lewis for Weyerhaeuser Company.

14     THE COURT:   Okay, thanks, Ms. Lewis.  Okay.  Well, at

15 the end of our evidentiary hearing, after I so rudely closed

16 the courtroom, I was pretty weary, but as they would say in

17 the NFL, this was my last final Hail Mary here, and I didn't

18 know if I got any takers that maybe we could get some -- maybe

19 there would be another way to resolve this portion of the case

20 without having more hearings on search.

21     So I asked you all to meet and confer, and I don't know

22 who will be your spokesperson about what the result of that

23 is.

24     MR. NEUWIRTH:   Well, maybe I can start, your Honor, for

25 defendants.

1      THE COURT:   Good.

2      MR. NEUWIRTH:   Your Honor, defendants are takers, and we

3  agree with what we heard your Honor say, that finding an

4  alternative to continuing with this hearing and freeing you up

5  to help with other matters in the case would be a very good

6  idea, and the defendants are very prepared to go that way.

7      And I should add that the defendants heard what you

8  said -- defendants' counsel who were there and we all spoke to

9  our clients, and I can represent to the court that the

10  defendants are really prepared to try to find a way forward to

11  get this resolved.  And we thought it would be helpful if I

12  could report to you what the defendants are prepared to do

13  immediately --

14      THE COURT:   Good, that will help.

15      MR. NEUWIRTH:   -- to try to advance that goal.  And

16  there are really three main points.

17      First, the defendants are prepared, and I'm going to use

18  the word "immediately" in the broad sense to mean starting by

19  next week and hopefully to be largely done within 30 days, to

20  make a very substantial production of materials that were

21  collected through the process that was described in court.

22      And in the case of Georgia Pacific, my client, this will

23  be virtually the entire production that would come from that

24  process that you heard about over the two days of hearings,

25  and there are several other defendants that will be able not

1    to make necessarily as complete a production as Georgia

2    Pacific, but very substantial production.  It's not all the

3    defendants, but many of them are in a position to do that and

4    we believe that that means that within several weeks there

5    would be a production of over a million pages of ESI, and the

6    reason that we think this is so important is because we have

7    been spending a lot of time talking in the abstract about

8    different things.  We think that what might really be a first

9    step to move this forward would be to make this major

10   production, which would be coupled with some materials we

11   previously produced and let the plaintiffs look at it, and we

12   would be very open once they have looked at it, if at that

13   point they feel that there are categories of materials that

14   need to be added or if they learn about custodians that were

15   not mentioned in Ms. Miller's letter last year that they think

16   need to be added based on looking at actual documents, the

17   defendants are prepared to have very serious good faith

18   discussions that would be informed by looking at the

19   documents.

20         The second thing that the defendants are prepared to do

21   is immediately, not waiting for that process to be done, but

22   immediately as soon as the plaintiffs are ready, to engage in

23   serious good faith discussions about some of the other issues

24   that the plaintiffs have said were important to them that were

25   not yet addressed at the hearing, including the full time

1   period for production, and including the issue of what sources

2   need to be searched in terms of active versus inactive, and I

3   think all of the defendants' counsel and now the defendants

4   have heard what you said about the need to have constructive

5   conversations and to cooperate and we are prepared to do that.

6   And then the third thing that the defendants are prepared to

7   do also immediately, is to have a discussion with the

8   plaintiffs about what transactional data fields the plaintiffs

9   are interested in having the defendants produce and to as

10  quickly as possible make a production of transactional data

11  which is another source of information that certainly will be

12  important to the defendants' requests -- or to the plaintiff's

13  requests certification and also a way to advance this.  And

14  just on these last 2 points, the one thing we want to make

15  clear is both for transaction data and for time periods and

16  for active versus inactive, you know, there are some issues

17  that are defendant specific because each defendant has

18  different systems.  We're prepared to engage, to the extent we

19  can, in discussions on behalf of all the defendants that would

20  be case wide with the idea that those might have to be

21  supplemented as quickly as the plaintiffs want to with

22  defendant by defendant discussions.  But there is no goal to

23  delay here.  And in fact, the defendants are prepared to put a

24  time limit on this to say that the parties have to try to get

25  this done within 45 days and report back to you at that time

1  whether we have been able to work it out or whether there is

2  some issue that the parties would like your help in resolving.

3  But the defendants are very serious in this attitude and our

4  overall goal is to move the case forward.  We genuinely want,

5  to do that and we hope that this type of proposal,

6  particularly making all these documents available, would allow

7  the plaintiffs to really look at what our process produced and

8  then we can have an informed discussion about what more might

9  be appropriate.

10      THE COURT:   Okay.  Well, that sounds terrific.  It's

11  certainly in the spirit.  Whether or not it's going to work,

12  it's certainly in the spirit of what I was talking about.  So

13  I want to thank you for your work.

14      MR. NEUWIRTH:   Thank you.

15      THE COURT:   Mr. Mogin.

16      MR. FREED:   If I may, your Honor.

17      THE COURT:   Mr. Freed.  Yes.  I have a live person here

18  in the courtroom, right.

19      MR. FREED:   I thought it might be easier with a live

20  person.  I'll do sort of the broad outline.  Mr. Mogin --

21      THE COURT:   So you knew what they were going to say.

22      MR. FREED:   Yes.

23      THE COURT:   Good, good.

24      MR. FREED:   I should add that we had a conversation

25  yesterday where the defendants proposed this as a way to move

1    forward.  We told them we had some ideas, protocol we were

2    working on, and the first thing I can say, which I think is

3    constructive, is we have only a very minor quarrel with what

4    they have said.  They are prepared to produce documents, we

5    are prepared to take documents.  We hope that when it gets

6    down to what Mr. Neuwirth has called individual discussions,

7    there may be some commonality, for example, in time frames.

8         We appreciate that certain defendants may have different

9    availability of material for certain time frames, but the

10   broad structure of what the appropriate time frame should be

11   we think should be something which could be discussed on a

12   common basis.

13        The major issue which remains from our perspective is

14   that defendants have done what defendants have described to

15   the court in the two previous hearings the way they want to

16   proceed with their Boolean search or search term search.  And

17   I wasn't in court, but I have read the transcript, I have

18   spoken with our colleagues as well as our experts, and our

19   group thought that what your Honor was proposing was to see if

20   we could narrow the gap between the plaintiffs and the

21   defendants between predictive coding and Boolean search, and

22   we felt that your Honor seemed to be leaning towards some sort

23   of a compromise which might expand on Boolean search.  You

24   certainly didn't specifically say, you told us to go out and

25   try to work out some arrangement.

1    So we still have the objections to what we see as certain

2    limitations on the way that the defendants proceeded.  And

3    with that in mind we went to our experts and spent a fair

4    amount of time and have come up with a protocol, which we only

5    admittedly gave them very recently, which we think would be a

6    way to test the way they have proceeded on their Boolean

7    search.  It's very detailed and comprehensive, and I would be

8    happy to submit it to your Honor or not, as you prefer,

9    because we have not had an opportunity to discuss it with them

10   yet.

11        THE COURT:   No, I think you should do that first.  I

12   mean, I think that makes more sense.

13        MR. FREED:   Yes, that's fine.

14        THE COURT:   Right.

15        MR. FREED:   And that is what we would like to do because

16   we don't feel -- basically, with all due respect to what the

17   defendants have said, while it is forthcoming to produce

18   documents and talk about meeting, about time frames, remote

19   servers, et cetera, that's always been their position.  It

20   isn't really a compromise of any sort as we see it, and that's

21   not to discredit what they have proposed, it is basically

22   their position in saying "Now we have moved forward further

23   with our position and we would like to have you look at our

24   documents and then see what you think and that," but we feel

25   that while we will be happy to look at their documents, start

1    the process, and we think it's constructive, that there are

2    limitations, and it is not harmful at all on a parallel track

3    to test some of the underpinnings of the way they have

4    proceeded with a more refined search on a relatively limited

5    number of documents.

6         The only thing I'll say about our proposal is that it's

7    about 2,400 documents per defendant.  So we're not talking

8    about applying our proposal to a huge universe of documents.

9    In terms of --

10        THE COURT:   Maybe I should take a look at it.  Why don't

11   you give it to me.

12        MR. FREED:   Yes.  And I was going to say in terms of --

13   and it's very detailed.

14        THE COURT:   Do you have one for Chris and do you have

15   them for all the defendants?

16        MR. FREED:   They have them.  Now, I have pretty much

17   exhausted what I can say about our proposal because most of

18   the work has been done on the West Coast with our experts, Mr.

19   Mogin supervising, so if there are any specific questions

20   about that, but the point I want to make is we certainly don't

21   object to what the defendants have said.  We think it will

22   move us forward in certain respects, but it won't resolve the

23   issue which we have had two hearings about and that's the

24   problem we have.  We would like to at the same time have some

25   opportunity to test some of what we think are deficiencies in

1    the way they went about it.  And we don't see that that's

2    inconsistent -- if we wait and look at their documents, we

3    still will always be concerned about the deficiencies as we

4    see it and we will want to come forward with this as well.

5        This is not abandoning our position on predictive coding

6    or CBAA, this is an attempt to resolve the issue.  If we can't

7    resolve the issue, we may revert back to that and feel that

8    that's where we're going to need to go.

9        THE COURT:    So let's just put it in real -- so we would

10   be agreeing that we would be doing a custodian based Boolean

11   search?

12       MR. MOGIN:    Not entirely, your Honor.

13       THE COURT:    Not entirely, okay.

14       MR. MOGIN:    You asked us to confer with our experts --

15       THE COURT:    Right.

16       MR. MOGIN:    -- and to see if there was some way we could

17   go about coming up with a Boolean search that might be

18   feasible and that's what we did.

19       THE COURT:    I did say that to you, that's correct, and I

20   said that in the context of that the defendants had done a lot

21   of work, the defendant under Sedona 6 has the right to pick

22   the method.  Now, we all know, every court in the country has

23   used Boolean search, I mean, this is not like some freak thing

24   that they picked out, but what I was learning from the two

25   days, and this is something no other court in the country has

1   really done too, is how important it is to have quality

2   search.  I mean, if we want to use the term "quality" or

3   "accurate," but we all want this.  I mean, I don't think this

4   is even anything, but ironically, there aren't really any

5   cases on how do you do the accurate either.

6       I mean, I think we're actually in more interesting

7   territory than what kind of a word search or what kind of a

8   search method is in how you -- how do you verify the work that

9   you have done already, is the way I put it.

10       So that's, Mr. Mogin, what -- I mean, I was saying in a

11   very weary way at the end of the day, you know, and I thought

12   that would work in a cooperative mode much more than me

13   writing an opinion ordering it because a judge writing an

14   opinion ordering people working together doesn't have the same

15   input as if the people can actually just take a big deep

16   breath and say "Okay, I don't like this pill, but I'm doing

17   it."

18       MR. FREED:  And that's what our proposal is and I think

19   that's what Mr. Mogin was going to amplify on.

20       THE COURT:  Okay.  Now I'm going to hope my friend, Mr.

21   McKeown, have you read this?

22       MR. MC KEOWN:  I have, your Honor.  We got it about a

23   half hour before I headed over here, but we talked about it

24   generally yesterday.  I mean, there are some serious problems

25   with this proposal from the defendants' perspective.

1        THE COURT:    Okay.

2        MR. MC KEOWN:    One of which is it assumes not just that

3    we take all the documents we have collected so far, but that

4    at least as we understand this proposal, we have to go gather

5    all the backup tapes and everything else and collect them all

6    and load them all into a server or in the collection and then

7    sample that collection and then create a word index of every

8    word that is in any document, any metadata piece that is in

9    any document and then basically start over with the Boolean

10   approach.

11        Our view is we have already spent millions of dollars on

12   this.  We already have collections.  We can argue and meet and

13   confer about whether those collections may be broadened in

14   certain respects as we go forward.  We already have a lot of

15   documents that are going to be produced within the next month

16   that you know, the production of those documents would allow

17   the plaintiffs then to look if they think there is a weakness

18   in our Boolean searches, to work off of that as opposed to

19   going back to A, a ground zero, and B, a much broader and even

20   more expensive than what we have already undertaken.

21        THE COURT:    Is that a fair telling, Mr. Mogin, do you

22   think, of what your proposal is?

23        MR. MOGIN:    I don't think so, your Honor.

24        THE COURT:    How would you describe it?  Tell me how you

25   would describe it.  I mean, I'm literally reading this as we

1    are talking here, but it looks like -- okay, you tell me,

2    please.

3         MR. MOGIN:    Well, your Honor, first off, we have been

4    consistent throughout the proceedings that there were serious

5    issues with respect to sources.

6         THE COURT:    To sources.

7         MR. MOGIN:    Sources of the collections.

8         THE COURT:    Yes.

9         MR. MOGIN:    You have heard our expert testify that one

10   cannot test parts of the collection, that the collection as a

11   whole has to be tested.  So what the defendants are proposing

12   to do, your Honor, is nothing different than what they have

13   been doing all along as if the hearing -- as if they have

14   prevailed at the hearing.

15        And what we have tried to do very hard with a great deal

16   of effort and expert input is to come up with a compromise

17   position, something that was consistent with your request.

18   And so does it require that the defendants do different work

19   than they were planning on doing?  Yes, it certainly does.

20   Does it mean that they have to go back to step one?  Well,

21   they can characterize it that way, but that simply isn't so.

22   We will not accept a situation where defendants refuse to

23   search in the places that we think they need to search.  It

24   can't happen from our perspective.  So that's the first thing

25   that we have to get over.

1    The second thing is we asked for a random sample, 2,401

2  documents --

3    THE COURT:   So is that in Step 1?

4    MR. MOGIN:   Step 1 is let's get the collection right.

5  Step 2 is take your collection and load it into whatever tool

6  they wish to use, whether it's Clearwell or something else.

7  The next step is pull 2,401 documents from a proper

8  collection.  Let's see what the responsiveness is on that and

9  then we will begin to move forward and then we have Steps 3, 4

10  and 5, which are, you know, quite specific, consistent with

11  what we have outlined in the testimony.  That is, you know,

12  let's see what comes back from the random sampling.  Let's get

13  unique word counts.  Let's see the metadata.

14    By the way, there is nothing new in this metadata.

15  They're required to give us the metadata under the terms of

16  the ESI protocol.  Now, we are not asking for anything more

17  than what we are entitled to under that (sound fades).  Then

18  we will go through an iterative, cooperative process with

19  respect to Boolean query based upon statistical validations.

20  And that's the best we can do in terms of coming up with a

21  Boolean methodology.  But what the defendants have proposed to

22  do, your Honor, is nothing.  It's nothing.

23    THE COURT:   No, no.

24    MR. MOGIN:   They say they will give us a million

25  documents based upon exactly what they have been doing.

1     THE COURT:  Well, I'm sorry, Mr. Mogin, they must do

2  things very different in California than they do in Chicago.

3  I have had too many ESI cases to let that statement stand,

4  okay?  They have done -- they have done a wonderful job.  Is

5  it a perfect job?  Is it -- could it use some help?  But I

6  don't want this record to be that I'm sitting here silent on

7  this because that's not true.

8     MR. FREED:  May I just say this, your Honor.  I think

9  the word "more" wasn't said, they have done nothing more and

10  that was the point Mr. Mogin was making, because the

11  hearing --

12     THE COURT:  I mean, my office is filled to the ceiling

13  with what you have all done.  And look, you know, this isn't

14  just the defendants.  I mean, the reason I had the nerve, Mr.

15  Freed, to even bring this up to you after everything that was

16  done for the two days is frankly, you two did a lot of work

17  together.  There was a real basis for this.  I have got, you

18  know, you have practically talked to each other -- you have

19  talked to each other more than you talk to your significant

20  others for nine months straight.  Okay?  So I have

21  verification of all of that.

22     Now, I want to --

23     (Pause)

24     THE COURT:  I want to make sure I even understand the

25  words I'm reading.  I'm still on Step 1, okay?  Each defendant

1  will collect all sources, that is, sources that include

2  corporate function as defined in the requests to produce

3  documents, the 97 -- the way that you sent your requests to

4  produce documents, the 97 of them.  Chris and I were looking

5  at those earlier today.

6        MR. ECHOLS:   Right, Judge.  This is Barack Echols on

7  behalf of PCA, and consistent with what you have heard

8  already, going back to my client as well, I was instructed to

9  be coming here to say we are prepared to do more, to have

10  those conversations, but Step 1 really here is start over,

11  start from scratch.  And that wasn't what I took from your

12  comments and directions to us at the hearing, it was rather

13  that because the defendants are in a position to know who the

14  right people are and what the general locations are to start

15  off with, that we should make sure to be cooperative in

16  discussing that, providing the information, as you said,

17  Judge, from the conversations we had over the summer,

18  explaining these things so that we are not operating in an

19  entire vacuum here, but we are speaking concretely.

20        If there are people or specific sources that based on

21  looking at what the facts of the case are, the allegations and

22  what we are providing or prepared to provide, that if Mr.

23  Freed or Mr. Mogin comes and says you know, "PCA, why don't

24  you have these sources," then that's a conversation that I

25  have always been willing to have.  But it doesn't make sense

1   to say start over from scratch because this, frankly, I could

2   not explain Step 1 to my client as far as what this means.  I

3   don't know what it means to get all appropriate sources.  I

4   think I got all appropriate sources in the first instance.

5   This is saying something other than that.  And so we're

6   operating here against something --

7        THE COURT:   Well, that's why we got Mr. Mogin on the

8   phone, okay?  What do you mean by "all sources"?

9        MR. MOGIN:   Precisely what we have been saying all

10  along, your Honor.  What the defendants have said that they're

11  going to search is current media, and it's current media

12  that's impacted by their document retention policy for ESI so

13  that the likelihood, for example, of an e-mail from 2005 ever

14  being seen is very slim unless they go to their backup tapes.

15  They will be unable to come up with e-mail that covers the

16  relevant time period.  That's just one example.

17       Employees work on lap tops as well.  To the extent that

18  that material has been collected, it's quite likely in a case

19  of this nature to be relevant.  This is precisely the type of

20  point --

21       THE COURT:   Did you hear Mr. Neuwirth say, though,

22  because that was one of the things that I wrote down, Mr.

23  Neuwirth said, you know, and I know too we have to get to the

24  issue -- I wouldn't have called that sources.  I would have,

25  you know -- I don't like the online, offline active, I don't

1   like all those terms, but I am not clear after two days of

2   what sources did not get searched, okay, or haven't been

3   searched yet, okay?  The defendants just said to you that is

4   something they would do in the next 45 days.  They're aware of

5   that too.

6          MR. ECHOLS:   And, Judge, we tried to talk about this in

7   a concrete fashion.  Again, I'm speaking just for PCA in this

8   particular instance, but for instance, there are issues

9   related to pricing and production.  There are documents in our

10  financial department that have all of our standardized reports

11  with detailed information relating to pricing and production.

12  That is not impacted whatsoever by whether I am only going to

13  the Accurate system because I have it.  I have it going all

14  the way back to this time period.  And I'm going to produce

15  that.  And that was the intention all along.

16         And then to say immediately up front, "Well, I want you

17  to go to backup tapes or to some other place for that

18  information" doesn't make any sense because I'm providing it

19  in the first instance.

20         Now, there are going to be situations where that

21  conversation has to be had in a concrete fashion, but to do it

22  in the abstract at the beginning and say just start all over

23  and ignore everything that you have done and everything that

24  you have thoughtfully gone through on a topic by topic basis

25  to collect doesn't make any sense, Judge.  That's not the way

1    that any of us have ever done this.  In this room you have

2    probably got 25 or 30 years of the most, the largest antitrust

3    cases everybody has had here if you take our firms in the last

4    50 years, and this is a different way of approaching this than

5    any of us ever experienced.

6           THE COURT:   Let me go back again.  Just indulge me for a

7    minute because I'm trying to figure this out.  Mr. Mogin, each

8    defendant will collect all sources.  Now, by that I know you

9    mean sources as locations of where media might be, okay, not

10   PDAs, not that kind of sources, or do you mean that kind of

11   sources?

12          MR. MOGIN:   PDAs?

13          THE COURT:   Like hand-held -- you mean active, inactive?

14   Some of them merged with other companies it seemed like.  I

15   mean, so the first is we'll collect all sources and how are

16   they going to collect it?  Do you mean they're going to put it

17   on one server?  What do you mean by "collect all sources"?

18   They're going to give you a list of all sources, is that it,

19   or are they actually going to do something?

20          MR. MOGIN:   The list is part of it.

21          THE COURT:   Okay.

22          MR. MOGIN:   Certainly -- let me just go back if I might.

23          THE COURT:   Sure.

24          MR. MOGIN:   So Mr. Echols was describing for you that

25   they were going to go to the central location for financial.

1     THE COURT:   Right.

2     MR. MOGIN:   Well, that's very interesting, but if we

3   focus, your Honor, on the e-mails we get a very different

4   story.  And the e-mails have very aggressive deletion

5   policies.  So the only place that most e-mails are likely to

6   tie that cover the relevant time period of the case are not on

7   active servers.  That's just simply a fact.  And that there

8   may be a random e-mail that was somehow preserved in the

9   active file from 2004 doesn't really cover the fact that the

10   bulk of the 2004 e-mails are on backup tapes.

11     THE COURT:   Okay.

12     MR. MOGIN:   So to me the e-mails are particularly

13   important and they are much more relevant to the discussion

14   than to talk about the financial documents.

15     THE COURT:   Okay.

16     MR. MOGIN:   What I'm looking for is I want to see what

17   the defendants were saying to themselves, to each other, and

18   to other people in the community, and by and large, the medium

19   by which that's accomplished is e-mails.  And sometimes

20   e-mails get sent to desktops and sometimes e-mails get sent to

21   lap tops, and these days BlackBerrys, and sometimes there is a

22   way to capture it and sometimes there isn't.  That's the

23   reality that we have to live with.

24     THE COURT:   So we're still using -- so let me just say

25   who is general -- give me a name, who is your main person

1    here?  Okay.  So you want Nan Nolan -- I'll use myself -- you

2    want Nan Nolan's e-mail.

3         MR. MOGIN:    Of course.

4         THE COURT:    Of course.  And you have gotten some of Nan

5    Nolan's e-mail, but you think, Mr. Mogin, that you have only

6    got Nan Nolan's e-mail on active servers.

7         MR. MOGIN:    Correct.

8         THE COURT:    Okay.  So just for one minute, what you said

9    sounded like you were going to go back, you disagree on the

10   time frame, Mr. Mogin wants 2000, it looks like you go to

11   2002.  There is like a discrepancy on the time.  But you're

12   willing to talk about going back on the specifics and getting

13   him e-mails if it's possible, if it doesn't cost 27 gazillion

14   dollars, yada, yada, yada, you're willing to talk about that.

15        MR. NEUWIRTH:    Right.  To be clear, the premise I think

16   may be a little bit inaccurate because in the case of Georgia

17   Pacific and I believe the other defendants, we collected

18   everything from the custodians, which would be any existing

19   e-mail that is on any active server, and what we told you

20   today is we are prepared to have serious discussions in good

21   faith to talk about whether there is a practical way to go to

22   inactive servers to collect any additional information, and

23   what we told you was we're prepared to try to do as much of

24   that as possible for all defendants, but given that each

25   defendant has a different system, we need to have defendant by

1    defendant discussions.

2         We also believe that those discussions would be well

3    informed if the plaintiffs can look at what we're producing

4    because then we can have a shared understanding of what it is

5    we are giving and work with them to figure out how to get this

6    resolved.  The defendants really want to work this out.  We're

7    not here --

8         THE COURT:   Right.  So let's take that.  I agree with

9    you -- and Mr. McKeown is just dying to talk, so I think you

10   should talk.  Okay, you drove all the way here from Milwaukee.

11        MR. MC KEOWN:   Actually, I took the train, your Honor.

12        THE COURT:   All right.  Well, we should let you talk

13   since you came from Milwaukee.

14        MR. MC KEOWN:   Well, I think we have two buckets of

15   issues.

16        THE COURT:   Okay.

17        MR. MC KEOWN:   The one is the scope of the information,

18   the other is the Boolean searches and what ought to be in the

19   Boolean searches.  And our disconnect right now, as I see it,

20   is that Mr. Mogin wants us to take everything that's a

21   possible source and then run our Boolean search just through

22   that.

23        Our position is we have already run the Boolean search

24   terms through what we have collected and what we believe is

25   correct, that on the other types of sources, to the extent

1   there are discussions, those are really defendant individual

2   and those ought to be meet and confer with the individual

3   defendants in terms of whether there is some defendant that

4   has a backup tape that may have additional e-mails or

5   additional documents and what the cost would be of restoring

6   that if that becomes a question.  But one of the problems with

7   their proposal is that it presumes from the beginning that

8   everything, all sources has to go in and we don't think that

9   that's appropriate.  We think that our documents that we're

10  producing greatly inform the Boolean search terms.

11      THE COURT:   All right, I'm still asking, does "source"

12  mean more than active, inactive, online, offline, does it mean

13  devices --

14      MR. MC KEOWN:   Sources means -- we have gone into this

15  at some length in our 30(b)(6) discussions and at those

16  depositions, but we have collections from shared drives, we

17  have collections from imaged lap tops of custodians, we have

18  things that have been taken from the exchange server.

19      Documents have been taken from a whole list of sources,

20  which is again why we think any discussion about broadening,

21  what are the sources to be included in the universe is a

22  defendant by defendant discussion as opposed to something

23  where one rule applies across all defendants.

24      MR. MOGIN:   Your Honor, if I may?

25      THE COURT:   Of course.

1    MR. MOGIN:   I appreciate what Mr. McKeown is saying.

2   However, we have had defendant by defendant discussions.  They

3   didn't work.  We served 30(b)(6) deposition notices.  They

4   offered us information in terms of letters.  We didn't find

5   them to be sufficient.  We were forced to proceed with

6   depositions, and there now will be more discussions coming out

7   of those depositions.  So while I appreciate the fact that

8   they want to discuss these issues, it's not as if these issues

9   haven't been discussed at some point.

10    MR. MC KEOWN:   A little bit different, Judge, as I

11   mentioned to you at the hearing because we have had this

12   detour into the methodology dispute and that has held

13   everything up frankly.  We have been preparing to have things

14   produced and to have substantive discussions, but we have been

15   detoured by this process and we are trying to break that

16   logjam and move ahead now.  And that's why we said that we are

17   amenable to putting a tight timetable on it.

18    We don't want to be having ESI discussions for two years

19   and we don't want to be discussing the hypothetical 6-foot

20   tall motions to compel.  None of that should be necessary.

21   That's not the way any of us operates.  We want to have the

22   documents that are supposed to be produced produced, disputes

23   identified and resolved so we can get on to the merits.

24    And frankly, and I have not had individual defendant by

25   defendant discussions because of the detour we have had into

1    this issue on the methodology, I have a sense that there are a

2    lot of these issues that would be trimmed away if we could get

3    past this and it will be a much narrower focus and scope of

4    any discussions we need to ask your Honor to help us out with

5    if we could get there.

6              THE COURT:    Mr. Mogin.

7              MR. MOGIN:    Yes, Judge.

8              THE COURT:    Now, I have just heard about both proposals

9    five minutes ago.  So would you be willing to start with the

10   defendants' proposal and have -- and I can offer my courtroom

11   as a space to do this.  I think it's a great idea if you can

12   do this yourself without me.  But I also would be willing to

13   sit down if that, you know, helps or certainly if it doesn't

14   help, I don't want to do it.

15             Could we begin with one of these examples of what the

16   defendants are saying about why don't we sit down and try one

17   of these meet and confers, talk about -- I mean, I hear you on

18   the sources, okay?  You know, we need to know where the

19   potential sources of each of the named custodians are.  I

20   couldn't agree with you more.  You have down here defined in

21   the RPDs so I guess that's from the requests to produce

22   documents, the 97, proper -- is there something I'm missing in

23   the RPD?  I mean, is there something about that that defines

24   it that I don't know about?  What is it?

25             MR. MOGIN:    I'm sorry, I didn't understand that.

1    THE COURT:   I know.  It was a horrible question.  But I

2  mean is there -- Chris and I just started looking at them

3  today and they look to be a very logical progression.  The way

4  you set it up, Mr. Mogin, it was kind of logical progression

5  of the way the documents or the information may be kept.  I

6  mean, is there -- it's not a custodian based RFP, it's kind of

7  like asking -- it's like a subject matter -- I mean, I

8  guess -- but it's going towards what would be in ESI, is the

9  way I would say it.  Do you agree with me?

10    MR. MOGIN:   I think so.

11    MR. MC KEOWN:   I think the dispute or the disconnect,

12  Judge, may be on this corporate function definition.

13    THE COURT:   All right.  So that includes corporate

14  function.  Now, can you tell us more what you mean by this

15  corporate function?  I am assuming these decision makers,

16  let's just say hypothetically an antitrust case.  I am sure

17  it's not the the messenger who was setting the prices, so I

18  mean, I think it must be corporate function.

19    What do you mean by "corporate function"?  I have been

20  going along for the last two months thinking this is probably

21  the main honchos here that they're talking about.  Do you

22  agree, Mr. Mogin?

23    MR. MOGIN:   Yes and no, your Honor.

24    THE COURT:   Tell me what the "no" is.

25    MR. MOGIN:   Okay.  First off, the corporate function

1   that we're talking about are each defined terms within the RPD

2   because our task after looking at the organizational chart is

3   to try to define "corporate function," and while yes, your

4   Honor, it is quite likely that the people who you have

5   described as the honchos --

6        (Pause)

7        THE COURT:    Sorry.  I'm on the record, okay?  Okay?  No,

8   stay on the record.  Stay on the record.  Thanks, Lynette, for

9   trying to protect me, okay?  The executives, okay?

10       MR. MOGIN:    The senior people.

11       THE COURT:    The senior people, thank you.

12       MR. MOGIN:    So while the senior people may have been the

13  decision makers --

14       THE COURT:    Right.

15       MR. MOGIN:    -- history teaches that they may not be the

16  record keepers.  For example, I keep coming back to the very

17  famous case that took place right there in your courthouse,

18  the A.D. Young case, which dealt with bastards, that would be

19  the senior people, and what they called sherpas, the junior

20  people.  And it was the junior people who maintained the

21  records and basically were the ledger keepers, if you will,

22  for the conspiracy.  I'm very concerned, particularly in light

23  of the history of this industry, that we have a situation like

24  that.  And that's why we have been resistant to the (UI) idea

25  where the custodians were primarily the senior people because

1  we felt with this that there would be a trove of important

2  documents held at (UI) Mountain.

3         So certainly, I won't dispute that any decisions that got

4  made were probably made by senior people, but again, I do

5  think that there is a substantial likelihood based on history

6  that it was other people who were the record keepers, and

7  that's why we have been resistant to the custodial approach.

8         THE COURT:   But that's still a custodian-based search.

9  It's just getting the right people.

10        MR. MOGIN:   You could put it that way, but getting the

11 right people is matching functions as well.

12        THE COURT:   Okay, all right.  Well, I --

13        MR. MOGIN:   May I make a suggestion to you?

14        THE COURT:   Yes.

15        MR. MOGIN:   This is very difficult for me over the

16 telephone.  Would it be possible if I could travel next week

17 that we could have meet and confers amongst ourselves, say, on

18 Monday and Tuesday of next week and we could report to you on

19 Wednesday?

20        MR. NEUWIRTH:  Your Honor, I'm afraid unfortunately that

21 does not work for me.  As some of the counsel here know, I'm

22 taking my wife to Jamaica for our 30th anniversary.

23        THE COURT:   Oh, you're not old enough.

24        MR. NEUWIRTH:  My wife tells me I was supposed to have

25 done this for our 25th anniversary.  So I'm five years late

1   already.

2       THE COURT:   Wow.

3       MR. NEUWIRTH:   The following week is fine.

4       THE COURT:   And Chris is away next week, and if you

5   think you're in trouble with me without Chris -- and so -- but

6   I like the idea, Mr. Mogin, I agree, I think this is very hard

7   to do over the telephone.  I think it would be very good if

8   you could have some -- I mean, what I'm just trying to do is

9   like I hear you what you're saying and there might be other

10  people in given companies -- let me ask a background question.

11  How many 30(b)(6)s have you done already, depositions?  How

12  many have they taken already?  Ms. Miller is saying four.

13      MR. MOGIN:   Yes, I was going to say I believe it's four

14  companies.  It may be five.

15      MR. NEUWIRTH:   If I could just say, your Honor, I think

16  that what we proposed earlier would fit with the type of

17  discussion that Mr. Mogin is now suggesting that we have.

18      THE COURT:   Right.

19      MR. NEUWIRTH:   And we believe it can only be helpful to

20  the process for defendants to make the production we talked

21  about, to hopefully have that inform the discussions we have

22  going forward because I think we all know, for example, that

23  when you look at e-mails you will sometimes find names that

24  you think are important or you might not and you might see how

25  things happen.  We can do that, we can have this meet and

1   confer and hopefully use it as a way to start the discussion

2   on things like time periods and what servers, et cetera, need

3   to be included and I think we can do it on a fast timetable,

4   and that would not scheme to impede anything, and we're not

5   foreclosing anything.

6       THE COURT:   Right.

7       MR. NEUWIRTH:   But our idea has always been let's do

8   this and have an informed discussion where we are all looking

9   at something concrete because the abstract discussions are

10  somewhat like discussions on the telephone.

11      THE COURT:   Right.

12      MR. NEUWIRTH:   We're sort of shooting in the dark.

13      THE COURT:   Mr. Mogin, when I heard the other day that

14  you had a million documents already, I was like rather

15  stunned, and I thought -- I came down, the first thing I said

16  to Chris is well, who is the CC on all these e-mails.  I mean,

17  like you must know, you must know a lot -- yes, you want to

18  say something?

19      MR. FREED:   Only this, your Honor, those are hard

20  copies.

21      MR.             That's not true.

22      THE COURT:   No.  But I mean, see, I think -- Mr. Mogin,

23  you know, here is a whole group in Chicago and you out there

24  in sunny San Diego.

25      MR. MOGIN:   Actually, your Honor, I'm sitting in a phone

1    booth.

2       THE COURT:   In a phone booth.  This is pathetic.

3       (Laughter)

4       THE COURT:   How about the week after next coming to

5    Chicago?

6       MR. MOGIN:   That would be the week of the 16th?

7       MR. FREED:   Could I propose Thursday the 19th as a date

8    for doing that?

9       MR. MOGIN:   What I would propose, your Honor, would be

10   two days of meet and confers followed by a report to you on

11   Thursday.

12      THE COURT:   So what would be ideal for me, I can bump a

13   settlement and I can work with you if you want or at least

14   part of the day.  We also have extra rooms here too so you

15   could -- Thursday, April 19th would be perfect with me.

16      MR. MOGIN:   That would be fine.  So what I would

17   propose, your Honor, is that we will meet with the defendants

18   on the 17th and 18th and report to you sometime on the 19th.

19      THE COURT:   It probably wouldn't be bad, though, if Mr.

20   Mogin got here and maybe talked to some -- I mean, tried to do

21   some private the day before because to do all eight in one day

22   is going to be pretty hard.

23      MR. MAROVITZ:   Judge, Andy Marovitz for Temple-Inland.

24   Just a practical matter.  I'm in a deposition the 16th through

25   18th.  So the 19th is fine.  That's the day you were

1  recommending for Temple-Inland.  If we can have the 19th,

2  that's okay with us.

3      THE COURT:   But can you talk to Mr. Mogin before the

4  19th.  I mean, I definitely either think somebody ought to

5  start this ball rolling and you send him some real things to

6  take a look at.  I mean, you don't want to just walk in and

7  start from scratch, your Honor.

8      MR. MAROVITZ:   My only point, your Honor, was not that

9  everybody has to be on the same schedule, I didn't want Dan to

10 misunderstand that he can see everyone here.  For me at least

11 and for Britt, who if she could do it I wouldn't be standing

12 up, but she will be out that same day, the first day that we

13 can actually be present with him would be the 19th.  Maybe

14 other folks could start earlier.

15     THE COURT:   Now, I have -- where is Winston's person?  I

16 have a settlement conference with your folks on the 20th so

17 I'm not going to be available, on a case that has gone on for

18 five years.  So I have to -- so I mean, my availability is

19 only going to be -- but some of you are not available

20 Wednesday.  Like Mr. Neuwirth, are you going to be here

21 Wednesday?  Could you come Wednesday?

22     MR. NEUWIRTH:   I can't, I have a commitment in another

23 matter on the 17th and another one on the 18th.  However, to

24 make this work, I certainly could talk to Mr. Mogin by phone

25 or work out some other arrangement to speak with him so that

1    when we get here on the 19th, we're not trying from scratch

2    and assuming your Honor doesn't disagree, we will be prepared

3    by next week to make this major production.

4         THE COURT:   How does that sound, Mr. Mogin?

5         MR. MOGIN:   As long as the understanding is clear that

6    any production that's made is wholly without prejudice and all

7    reservation of rights, and --

8         THE COURT:   It is, it is.

9         MR. MOGIN:   We will do our best, but I would like as

10   much as possible, your Honor, to have face-to-face meetings in

11   Chicago before we come see you.

12        THE COURT:   Well, can anybody meet with him on

13   Wednesday?  You can.  Oh, good.  So good, that's good, okay.

14   So you have got two meetings on Wednesday.

15        MR. MOGIN:   I couldn't see the hands, your Honor.

16        THE COURT:   I'm sorry.

17        MR. MENDEL:   It's Mr. Mendel from Norampac available on

18   Wednesday.

19        THE COURT:   Okay, thanks, Mr. Mendel.

20        MR. MC CAREINS: I'll join the group.  Mark McCareins for

21   RockTenn with the following observation.

22        THE COURT:   Okay.

23        MR. MC CAREINS:   It would be very helpful and productive

24   since Mr. Clark, who is on the phone, did a wonderful job of

25   deposing our 30(b)(6) witness for about six hours in Atlanta

1    about a month ago on backup tapes, archives, and those kind of

2    things.  We haven't heard word boo about that deposition.

3         THE COURT:   Okay.

4         MR. MC CAREINS: It would be good to have some very

5    precise issues that the plaintiffs would like to discuss with

6    us at the meet and confer that are defendant specific in

7    advance of the meet and confer so we would have an opportunity

8    to work on that information, talk to our clients if possible

9    and make that meeting productive.  So a meeting on April 18th

10   with RockTenn, fine, as long as there is some precision.

11        THE COURT:   Does that make sense to you, Mr. Mogin?

12        MR. MOGIN:   Somewhat, your Honor.

13        THE COURT:   Well, I mean part of this is -- I mean we

14   need to individualize here because I was getting kind of

15   nervous of everybody getting -- I was in too many criminal

16   defendant cases where it was like all of the defendants were

17   being called the defendants okay.  We need to be able to

18   individualize to each of these folks here.  So I like this

19   idea.  I'm glad you suggested this, Mr. Mogin.  And so you

20   have got three takers for Wednesday.  You have got a little

21   dry run here.  Maybe you will just do so perfect -- does

22   everybody have an office in Chicago because you're more than

23   welcome to use our -- I can get you space here in the

24   courthouse if you needed it, but you have got all kinds of

25   offers with much better food than I have to offer, Mr. Mogin,

1  so take them up on it.

2      MR. ECHOLS:   Judge, this is Barack Echols.  I just

3  wanted to advise that I myself personally won't be able to be

4  here during that week.  I'm in a two-week arbitration

5  beginning on April 16th.  I as well will be glad to speak with

6  Mr. Mogin by telephone in advance with my colleagues, and if I

7  know precisely, as Mr. McCareins said, what my give is to help

8  resolve this --

9      THE COURT:   Good.  Okay.  Mr. Mogin, you are not waiving

10  anything, okay?  I want to try this, okay?  I want to try this

11  because we are all going to know a lot more and we don't need

12  any more experts.  We are pretty much experts sort of, sort

13  of.  We are knowledgeable people here.  Let's see what we can

14  figure out here, okay, even if we're using the wrong terms.

15      Anybody else want to say -- yes, Mr. Neuwirth.

16      MR. NEUWIRTH:   One question, your Honor.  On the 19th

17  when at least Temple-Inland and Georgia Pacific will be having

18  our meetings with the plaintiffs, does it make sense to

19  schedule a time that day when we will come to see you so that

20  we can actually do the reporting?

21      THE COURT:   What I was actually going to do is clear it.

22  So I have court.  I have a 9:00, a 9:30.  I am free from 10:00

23  on.  And I'm at your -- I'm telling you we have two jury rooms

24  on either side.  We have nice -- I mean, if you wanted to do

25  that, we could kind of do a little shuttle if we wanted to.

1  If you want to do -- whatever is going to work for you, but we

2  can certainly set a time in the afternoon because Mr. Mogin,

3  it would be nice to see you.

4      MR. MOGIN:   I think it would be useful.

5      THE COURT:   No, it would, and then we can kind of sit

6  around the table and talk about it.  I'm clearing the whole

7  day.

8      MR. NEUWIRTH:   Okay, that's fine, and I think maybe it

9  might facilitate the process if we set a time definite where

10  we will definitely be coming to see you to report, so maybe,

11  you know, at 3:00 that day.

12     THE COURT:   Or 1:30, 2:00.  Let's do 2:00.  And if you

13  need more time, then I'll just go back inside my room and you

14  will have more time, okay?

15     MR.           We would have, just so I'm clear, the

16  Georgia Pacific and the Temple-Inland meet first that morning

17  and it sounds like if we needed to, we could also call you to

18  help us with that process

19     THE COURT:   I also have the evening.  What I was going

20  to do on the hearing date because of all the out-of-town

21  folks, is whatever our next date is I was picking a date where

22  we are free in the evening too.  Okay?

23     Thanks guys.  And Ms. Miller, you're a guy.

24     MS. MILLER:  Thank you, your Honor.

25     (Laughter)

1    THE COURT:   Good Passover, good Easter.  Bye, Mr. Mogin.

2    MR. MOGIN:   Good-bye, your Honor.

3    THE COURT:   You can leave the telephone booth, Superman.

4 Okay.

5    MR. MOGIN:   Bye.

6         *                    *                    *

7

8    I certify that the above was transcribed was

9    digital recording to the best of my ability.

10   /s/ Lois A. LaCorte

11   _____        _____

12        Lois A. LaCorte                Date

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit C

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   KLEEN PRODUCTS, LLC., et al.,      )    No. 2010 C 5711
                      Plaintiffs,       )    April 19, 2012
 4            v.                        )    2:15 P.M.
     PACKAGING CORPORATION OF AMERICA,  )
 5   et al.,                            )
                      Defendants.       )
 6
                TRANSCRIPT OF PROCEEDINGS - STATUS
 7                 BEFORE THE HON. NAN NOLAN

 8   APPEARANCES:

 9   On behalf of Plaintiffs:   MR. CHARLES P. GOODWIN
                                BERGER & MONTAGUE, P.C.
10                              1622 Locust Street
                                Philadelphia, Pennsylvania 19103
11                              (215) 875-3000

12                              MR. WALTER NOSS
                                SCOTTSCOTT, LLP
13                              707 Broadway, 10th floor
                                San Diego, California 92101
14                              (619) 233-4565

15                              MR. DANIEL J. MOGIN
                                THE MOGIN LAW FIRM
16                              707 Broadway, Suite 1000
                                San Diego, California 92101
17                              (619) 687-6611

18                              MR. ROBERT J WOZNIAK
                                FREED KANNER LONDON & MILLEN, LLC
19                              2201 Waukegan ROad, Suite 130
                                Bannockburn, Illinois 60015
20                              (224) 632-4507

21                              MR. BRIAN D. CLARK
                                LOCKRIDGE GRINDAL NAUEN PLLP
22                              100 Washington Avenue S, Suite 2200
                                Minneapolis, Minnesota 55401
23                              (612) 339-6900

24                   MICHAEL P. SNYDER, FCRR
                       Official Court Reporter
25                  United States District Court
                          (312) 435-5563
```

```
 1
       Appearances (continued):
 2
       On behalf of Defendants:      MR. LEONID FELLER
 3                                    MR. DANIEL F. LAYTIN
                                      KIRKLAND & ELLIS, LLP
 4                                    300 North LaSalle Street
                                      Chicago, Illinois 60654
 5                                    (312) 862-2719

 6                                    MR. JAMES T. McKEOWN
                                      FOLEY & LARDNER, LLP
 7                                    777 East Wisconsin Avenue
                                      Milwaukee, Wisconsin 53202
 8                                    (414) 297-5530

 9                                    MR. SCOTT M. MENDEL
                                      K&L GATES, LLP
10                                    70 West Madison Street, Suite 3100
                                      Chicago, Illinois 60602
11                                    (312) 372-1121

12                                    MS. JENNIFER A. SMULIN DIVER
                                      MS. RACHAEL V. LEWIS
13                                    McDERMOTT WILL & EMERY, LLP
                                      227 West Monroe Street, Suite 4400
14                                    Chicago, Illinois 60606
                                      (312) 984-7528
15
                                      MR. STEPHEN R. NEUWIRTH
16                                    QUINN EMANUEL URQUHART & SULLIVAN
                                      51 Madison Avenue, 22nd floor
17                                    New York, New York 10010
                                      (212) 849-7---
18
                                      MR. ANDREW S. MAROVITZ
19                                    MS. BRITT M. MILLER
                                      MAYER BROWN, LLP
20                                    71 South Wacker Drive
                                      Chicago, Illinois 60606
21                                    (312) 782-0600

22                                    MR. R. MARK McCAREINS
                                      MR. MICHAEL P. MAYER
23                                    WINSTON & STRAWN, LLP
                                      35 West Wacker Drive
24                                    Chicago, Illinois 60601-9703
                                      (312) 558-5600
25
```

1        THE CLERK:  10 C 5711, Kleen Products versus

2   Packaging.

3        THE COURT:  Okay.  So we are back.  Well, Mr. Snyder

4   is here too.  I hope you have met everyone, Mr. Snyder.

02:18:15    5        So for our plaintiffs, please, will you identify

6   yourself and your team, please.

7        MR. MOGIN:  Dan Mogin for the plaintiffs, Your Honor.

8   Also with me are Walter Haas, ScottScott; Charles Goodwin from

9   Berger & Montague; Brian Clark from the Lockridge firm; and Mr.

02:18:31   10   Wozniak from Freed Kanner.

11        THE COURT:  Good.  Thank you.  Hi, everybody.

12   Welcome.

13        And for Mr. Neuwirth, we'll begin with you.  You have

14   the named party.

02:18:41   15        MR. NEUWIRTH:  Thank you.  Stephen Neuwirth for

16   defendant Georgia Pacific.

17        THE COURT:  Okay.  And?

18        MR. McKEOWN:  James McKeown for International Paper.

19        THE COURT:  Hi, Mr. McKeown.  Thank you.

02:18:52   20        MR. MAROVITZ:  Good afternoon.  Andy Marovitz and

21   Britt Miller for Temple-Inland.

22        THE COURT:  Okay, Mr. Marovitz and Miss Miller for

23   Temple.

24        MR. McCAREINS:  Mark McCareins and Mike Mayer for

02:19:04   25   RockTenn.

1    THE COURT:  Thank you.

2    MR. MENDEL:  Scott Mendel for Cascades and Norampac.

3    THE COURT:  Thank you, Mr. Mendel.

4    MS. DIVER:  Jennifer Diver and Rachel Lewis for

02:19:14  5  Weyerhaeuser Company.

6    THE COURT:  Thank you.

7    MR. FELLER:  And, Your Honor, Leonid Feller and Daniel

8  Laytin on behalf of Packaging Corporation of America.

9    THE COURT:  Good.  All right.

02:19:22  10   So when we last met, we decided that, it was agreed

11  between the parties that between that date and today the

12  plaintiffs would meet with the defendants individually in meet

13  and confers in order to be able to see if there was a way to

14  resolve not only the search issues but we could also start

02:19:56  15  talking about other issues too cooperatively or if we were

16  going to have to resume the hearing again.

17   So let's begin with Mr. Mogin, okay?  So, Mr. Mogin,

18  how many of these meet and confers did you have?

19    MR. MOGIN:  We have had seven, Your Honor.

02:20:15  20    THE COURT:  Seven?

21    MR. MOGIN:  Yes.  Beginning Tuesday afternoon with

22  Cascades Norampac and concluding just now with PCA.

23    THE COURT:  Okay.

24    MR. MOGIN:  On Wednesday we met in order with

02:20:33  25  Weyerhaeuser, International Paper and RockTenn.

1       THE COURT:  Okay.

2       MR. MOGIN:  And this morning we met with Temple-Inland

3    and Georgia Pacific.

4       THE COURT:  Well, that's very productive.

02:20:46    5       MR. MOGIN:  It was informative.

6       THE COURT:  Yes.

7       MR. MOGIN:  And I guess what I would report to Your

8    Honor is that I can't report progress.  I can report that there

9    has been an exchange of information and an exchange of views

02:21:06   10    that was helpful.  I now better understand both the defendants'

11    position, the feasibility from their point of view of their

12    ability to comply with our various requests, and I also have a

13    better understanding of the process that they went through as

14    well as a better understanding of their actual responses to the

02:21:30   15    document requests.

16         There is a lot of uniformity that emerged in these

17    meetings.  I would say that there were more uniformity than

18    there were differences among the defendants.

19         Ultimately, though, Your Honor, you will recall at the

02:21:50   20    last hearing after you -- Mr. Regard, we were about halfway

21    through Mr. Regard's testimony, and you had a meeting I think

22    with the chief judge that you had to get off to, and you asked

23    us to do something very specific.  You asked us to get together

24    with our experts and see if we could devise a protocol that fit

02:22:12   25    within the boolean system that the defendants had devised, that

1  the testimony had been about, and we did that.  We got together

2  with Mr. Lewis, Dr. Lewis, and our other consultants and spent,

3  moved as quickly as we could but spent a considerable amount of

4  time on it.  And we tried to come up with a way to accomplish

02:22:38  5  this, that is, preserve the boolean search methodology, give us

6  better measures of validation, the type of measures that we

7  were seeking which were recall oriented, and to mix some of the

8  principles that Dr. Lewis talked about in terms of supervised

9  learning and random sampling in the sense that, yes, there

02:23:05  10  would be two random samples, small random samples by each

11  defendant, which, as some people characterize, that the

12  plaintiffs would look over their shoulder.  So there would be

13  first cut of documents, and this is described in the protocol

14  which I believe Your Honor has that we gave the defendants on

02:23:23  15  the 3rd of April, a first cut of documents where we looked at

16  the totality of the corpus that defendants had collected,

17  putting aside the disagreements that we've been having to this

18  point about what should be in that corpus, taking a measurement

19  so that we got some sense of the number of responsive documents

02:23:46  20  or hits, if you will, using the boolean strings as to the

21  corpus; then taking a look at the hit set itself, and again

22  doing another measurement.

23      At each level the plaintiffs would see nonprivileged

24  but some amount of nonresponsive documents as well.  Recall,

02:24:14  25  Your Honor, that with respect to that, there is a pretty strong

1   protective order in place so there would be no misuse of

2   documents, as well as if the defendants have competitive

3   concerns about the nonresponsive documents that would be

4   produced in this set, they could designate them under the terms

02:24:35    5   of that confidentiality order so that only outside counsel

6   would be able to see them.

7           So that is a degree of cooperation consistent with the

8   Sedona concept of cooperation that we've asked for, and I will

9   say that not a single defendant has accepted that.  Some are in

02:25:01    10  consideration of some aspects of that request.  Most have

11  unilaterally rejected, or I shouldn't say unilaterally, I

12  should say categorically rejected it.  So I don't know how much

13  further down the pike we are with respect to testing and trying

14  to work within that boolean construct that the defendants

02:25:28    15  devised.

16          Now, that's not the only thing that we discussed.  We

17  discussed custodians, we discussed methods for discovering

18  other potential custodians other than merely looking through

19  what at this point amounts to some volume of documents, and

02:25:48    20  I'll come back to that in just a second, and we haven't made a

21  great deal of progress on that, but there has been a fair

22  amount of discussion with respect to that.

23          Now, one of the things that we have asked for, which

24  has not been categorically rejected across the board, is using

02:26:09    25  the boolean process is a dictionary.  As I understand it, each

1  of the tools as it processes the documents categorizes or lists

2  each of the words that are used.  So for each defendant there

3  would be a set of words that was unique to that particular

4  defendant.

02:26:32   5       For example, the best --

6       THE COURT:  That's not a keyword?

7       MR. MOGIN:  It would be a keyword.  In other words, it

8  would be a word that was within the corpus of the defendants'

9  documents, a word that would be used by the company itself.  So

02:26:48  10  similar, Your Honor, if you recall the deposition transcripts,

11  particularly the mini transcripts that we get these days, you

12  look in the back and you see there's a list of words.  And it

13  tells you you can find the word "magistrate" on page 5, page

14  15, page 13.  So you get a sense with each word that's used by

02:27:09  15  the company of how --

16       THE COURT:  And the computer automatically can do

17  that?

18       MR. MOGIN:  Yes.  Each of the --

19       THE COURT:  The court reporter's computer can do that

02:27:20  20  too?  When you say from the -- I know, I just mean from the

21  transcript.  When you say it was at the back of the transcript,

22  it's like an index, it's like an automatic index?

23       MR. MOGIN:  Yes, Your Honor.

24       THE COURT:  Well, what do you know?

02:27:33  25       MR. MOGIN:  So each of the defendants could do that.

1    We could then take that list, review that list, work with our

2    linguists and Dr. Lewis to see if we couldn't come up with

3    different strings that would be usable for us.

4              Most of the defendants will tell you that they don't

02:27:53    5    want to do that.  What they prefer us to do is to review the

6    documents that are being produced and then come back to them

7    sort of in the traditional iterative way, and we'll consider

8    this string, we'll consider that custodian, that type of thing

9    as has traditionally been done, which from our viewpoint, quite

02:28:17   10    frankly, Your Honor, is not satisfactory.  It would delay the

11    process for many months.

12             Now, with respect to the actual productions that have

13    occurred so far, as I stand here today I have received

14    approximately, I have received a hard drive yesterday from

02:28:38   15    International Paper that I'm told has approximately 200,000

16    pages of hard copy documents, not ESI.

17             THE COURT:  Not?

18             MR. MOGIN:  Not.

19             THE COURT:  200,000, okay.

02:28:52   20             MR. MOGIN:  PCA approximately a week ago produced what

21    they have represented is about half of the totality of their

22    production, which includes other, which includes a substantial

23    amount of ESI.

24             THE COURT:  Okay.  Is that email or is that --

02:29:17   25             MR. MOGIN:  Yes.

1          THE COURT:  That's email?  Okay.

2          MR. MOGIN:  Yes.  We have received schedules, sort of

3     loose but good faith schedules from the rest of the defendants

4     with respect to their intended production.  It's a bit unique

02:29:36    5     as to each defendant.  Some are producing in kind of defined

6     batches, others are producing in less defined batches, some

7     aren't really batching at all.  So we have a better

8     understanding of that.  We have some rudimentary understanding,

9     and I do mean rudimentary, of what's in the batches.  And

02:30:02    10    that's about where we stand from the plaintiffs' perspective.

11         So to put a bottom line to it, we have a better

12    understanding of what's been done, but not agreement about

13    what's to be done other than the defendants more or less say

14    that they will proceed the way they have been proceeding and

02:30:32    15    will at the end of the process or as plaintiffs review the

16    documents accept additional suggestions in terms of custodians

17    or in terms of search requirements.

18         We will not see -- first off, all of the productions

19    as a totality from what I understand this morning won't be

02:30:54    20    completed for at least six months.  And all of the defendants

21    propose that privilege logs, which in these types of cases are

22    particularly important, won't be produced until the end of each

23    of their respective productions.  So that's another 60 days

24    plus for each defendant as they end.

02:31:24    25         So that takes us approximately, by my reckoning, sort

1  of a best case scenario is we are back here in a year.  I'm

2  sorry.  We are back here toward the end of the year.  And as I

3  understand it, a new magistrate has to drink from the fire hose

4  and try to understand this case.

02:31:53   5       THE COURT:  Or Judge Shadur, because Judge Shadur

6  usually doesn't refer cases, so it may be Judge Shadur.  This

7  was a special, this was a special referral.

8       MR. MOGIN:  So I can't tell you that I know precisely

9  where we go from here.  The idea that the defendants have

02:32:15  10  raised, which is review all of our documents and then get back

11  to us, is problematic from the plaintiffs' standpoint.  It's as

12  if the past year hasn't happened, from our perspective; it's as

13  if the hearings and all the briefing hasn't taken place.

14       So I'm sure you'll want to hear from the defendants,

02:32:44  15  and I'm sure they'll tell you that I'm all wrong, but I don't

16  know at this point.  And when I say I don't know, I truly don't

17  know what it's productive to do in terms of continuing the

18  hearing or going down another path.  And some of these

19  discussions I will tell you are far from complete, and we've

02:33:08  20  made pledges in good faith to continue in very short time to

21  follow up and with more discussions.

22       THE COURT:  Well, you are, I want to say, I mean, this

23  entire case has been a work in progress, okay, for me.  You are

24  accurate that at the end of the second day of the evidentiary

02:33:38  25  hearing, when I was talking off the seat of my pants or a

1    little bit of thought, I mean more than the seat of my pants,

2    but I was saying that I wanted you to think about if we were

3    to -- that what I learned from the hearing, what seemed to be

4    the most important is that whatever your method would be,

02:34:08    5    whether it would be boolean or predictive coding or whatever

6    they are going to call it next year, is that the parties and to

7    a certain extent the Court, but I think it's more the parties,

8    want to feel and be able to say that this is a verifiable,

9    somewhat verifiable and accurate method that they have chosen.

02:34:37    10    That's what I was trying to say.  I don't think that I said --

11    and I suggest it because I actually think Mr. Regard and Dr.

12    Lewis were, you know, and maybe Dr. Tenny too, maybe could help

13    in trying to do that.

14            Now, the only cases Chris and I have found that have

02:35:04    15    even discussed that are Victor Stanley and Judge Facciola.  But

16    they kind of just talk about it in general.  I was only talking

17    about it in general when I threw it back to you.

18            We fast forward to two weeks ago.  I think you're

19    putting the horse before the cart here as a method goes because

02:35:39    20    to me I feel like I have learned a lot more about what the

21    nature of the search is than I knew two weeks ago.

22            One day -- I owe you an apology.  I was very rude to

23    you.  You wanted to say something about preservation, and I

24    jumped down your throat because I thought, oh, my God, you're

02:36:02    25    going to start some sanctions thing is what I thought, okay?

13

02:36:27

1    Instead, if I had to do it over again, I would have
2    said, are you talking about sources of information, are they
3    accessible, are they not reasonably accessible, you know, and
4    not even think about sanctions or anything like that.  What I'm
5    seeing now between what, I think Miss Miller keeps giving me
6    these scripts for everything, which I really appreciate.  I
7    have more of the 30(b)(6).  We've read some of the 30(b)(6), so
8    we are starting to get it just like you are starting to get a
9    better understanding of these systems, the letters or the, your

02:36:55

10   new checklist here that you provided following or for the meet
11   and confers.
12        MR. MOGIN:  Right, the agenda that the defendants had
13   requested.
14        THE COURT:  Right.  I'm not, I don't have, because I'm

02:37:16

15   going to be out of here September 30th, I don't have the luxury
16   to put you off or, you know, to try to just push this off.  But
17   I don't think you could do or Dr. Lewis and Dr. Regard are in a
18   position to test the corpus yet, because unless you know a lot
19   more than I know, until we figure out some of the answers to

02:37:44

20   the questions on what's active, was not active or what's
21   accessible, what's not accessible, what has been searched, what
22   hasn't been searched, I don't know why you'd want to do these,
23   the statistical check until you get that information.
24        MR. MOGIN:  Frankly, Your Honor, respectfully I was

02:38:03

25   following your lead in the sense that --

1    THE COURT: Well, I know, and I'm telling you what
2    happened. I mean, I now get that if we are going to do it, you
3    don't -- I mean, I don't know what the it is, okay? I don't
4    know what because I don't know -- and until you look at this is
02:38:27    5    where I think too until you're able to look at some of the
6    materials that are turned over and you can in fact go back to
7    them and say, hey, I need da da da da da, that's what I am
8    seeing.

9    And this isn't, this is just a really iterative
02:38:57    10    process here is what I'm trying to say. I don't know if the
11    defendants, and today we are going to try to give everybody an
12    individual opportunity here too, I don't want to be clumping
13    them as the defendants; but I don't know if they are saying no,
14    we don't want any kind of testing or -- I don't even know what
02:39:22    15    testing means, but, you know, a check, some kind of a
16    reasonable check. I would think they would want to know
17    they've done a good search. They may need these documents.

18    I mean, this is the irony of this. In every white
19    collar case, not that you're a white collar case, but in every
02:39:45    20    white collar case I was in in this building for 25 years, I
21    needed the documents as much as the government needed the
22    documents.

23    So I don't -- I mean, I don't think even if we, even
24    if all seven of them said "We want to do the search, we want to
02:40:11    25    be tested," I don't know what you would, you would only be

1  testing now without having a bigger portion of each one of

2  their work, right?

3        MR. MOGIN:  Correct, Your Honor, but as I said in

4  light of the Court's comments, and in order to avoid what could

02:40:31  5  have been World War III with respect to what should be in the

6  corpus, for purposes of these discussions, to see if we could

7  get something to come back over the table to us, we were

8  willing to table the discussion of collection to see if we

9  could get a cooperative movement going.  And I'm disappointed

02:40:58  10  to be able to tell you that no defendant will commit, none will

11  commit to a version of the protocol, even taking step one which

12  has to do with the collection, off of the table.  No defendant

13  will commit at this point.  Some have said they are checking on

14  it, but none have committed to even giving us the simple data

02:41:25  15  dictionary that I just described for you, which is the product

16  of, that's essentially the same thing as taking a look at the

17  documents that they are producing.  It's just an abbreviation.

18  It gets us a lot of relevant information quickly, painlessly

19  and inexpensively from the defendants' perspective so that it

02:41:48  20  accelerates our ability to look at their documents and to have

21  an understanding of their documents as well as to get some

22  sense of the real world deficiencies in their search strings.

23  Admittedly to this point we have been talking without having an

24  actual knowledge of what's in the corpus.

02:42:11  25        THE COURT:  Do you feel that after these seven

1  meetings, you now understand or have a better understanding of

2  accessible, nonaccessible data?  I mean, do you have an idea of

3  what's in their collection?

4          MR. MOGIN:  I certainly have a better understanding.

02:42:31  5          THE COURT:  Okay.  So let's take example that the one

6  that's just turned over the 250,000, who just turned over the

7  one with some emails in it?  Was that you, Jim?

8          MR. NEUWIRTH:  No, that was --

9          MR. FELLER:  Yes, Your Honor?

02:42:49  10          THE COURT:  So on that, sir, if you can, will you tell

11  me that -- I'm so trying to stay away from backup -- I'm trying

12  to stay away from buzz words that everybody uses different buzz

13  words.  So of your production, does it include both active data

14  and backup tapes?  Does it, you know, of your email, what did

02:43:19  15  you search?

16          MR. FELLER:  Sure, Your Honor.  And it's Leonid Feller

17  for PCA.

18        Our collection which we just produced is about 47,000

19  documents or document equivalent total.  A portion of that is

02:43:32  20  hard copy, a portion of that is ESI.  The ESI consists of

21  emails, it consists of Microsoft Word documents, Excel

22  documents, PowerPoints, all those sorts of things.

23        In the lingo that we've been using in court, those

24  would all be active server type documents.  We, with a very

02:43:56  25  narrow exception, did not go to any backup tapes to produce

1  that, that ESI.

2        THE COURT:  In your explanation to Mr. Mogin, did you

3  explain to him what periods of time you have active data, where

4  the backup tape -- I mean, what kind of a guide did you give

02:44:24   5  him in addition to giving him the documents?

6        ATTORNEY NO. 2:  So I think we covered some of that

7  today when we met earlier.  A lot of that information was

8  provided in our 30(b)(6) written submission.  I imagine we'll

9  cover more of it when we have the actual 30(b)(6) deposition.

02:44:41  10  But I would hope that Mr. Mogin and his team have a fairly good

11  understanding of all of those issues.

12        THE COURT:  Okay.  And has he -- you've given him a

13  list of your custodians that you searched under, and did he ask

14  you to increase any of your custodians or did he offer to you

02:45:09  15  any words that he wanted you to search?

16        MR. FELLER:  Your Honor, we have provided a list of

17  custodians, and what we have said is we are perfectly willing

18  to take under consideration any additional custodians

19  plaintiffs would like to suggest.  They have not done that yet,

02:45:25  20  but I understand that's going to be an ongoing process and they

21  may do that in the future.  And similarly with search terms,

22  they haven't at this point suggested any additional search

23  terms, but we understand they may do that in the future.

24        MR. MOGIN:  May I address the custodian issue?

02:45:40  25        THE COURT:  Yes.

18

1       MR. MOGIN:  With respect to the defendants, Your

2   Honor, if you look at the backup, as you know, from the

3   inception the plaintiffs have been clear that they were

4   uncomfortable with the custodial approach.

02:45:53     5       THE COURT:  Right.

6       MR. MOGIN:  The defendants' position was essentially

7   that it was the only feasible way for them to conduct the

8   search.

9       If you go back and you look at the requests for

02:46:03   10   production of documents, I believe it's definition or

11   instruction No. 9 lists corporate functions that we are

12   interested in, identifies those corporate functions.  It's not

13   quite a job description, but it's who performs the following

14   functions.  And then there are various requests for production

02:46:25   15   that ask for materials from particular corporate functions.

16       Corporate functions aren't quite the same thing as the

17   custodians.  What the defendants will tell you is that by and

18   large the custodians that they have tendered are the top people

19   that fulfill those functions.

02:46:51   20       Some defendants, and as I'm standing here I can't tell

21   you which one, have given me job descriptions, and the joke

22   during our meet and confers was those are great but they are in

23   HR-speak; I speak antitrust and English, I don't know HR, and I

24   don't want to hire another linguist.  So some of the defendants

02:47:14   25   are considering whether to give us more or different

19

1  descriptions.

2          But the issue is to what extent can the custodians

3  match the functions.

4          THE COURT:  It's No. 9.

02:47:27    5          MR. MOGIN:  It is No. 9.  And defendants go,

6  defendants by and large, their custodians are, as they describe

7  them, top people, decisionmakers if you will, which is all well

8  and good.  From our perspective, those may be the people who

9  actually effectuated the conspiracy.  But that does not mean

02:47:54   10  those are the people who made records that would reveal the

11  conspiracy.

12          Recall, please, Your Honor, that as this is pleaded in

13  the complaint, and this is something that Judge Shadur made

14  specific reference to in his opinion denying the motions to

02:48:12   15  dismiss, we are not writing on a blank slate here.  This is an

16  industry with a history.  In fact, we even alleged that there

17  was a seminar that took place at a trade association meeting,

18  the American Forest Products Association, in 2005, just as the

19  conspiracy was taking off, and the seminar was entitled "Are

02:48:37   20  you vulnerable to antitrust lawsuits?"  From the information

21  that we have, it was as much about how to conceal an antitrust

22  conspiracy as it was about anything else.

23          The defendants, of course, the trade association will

24  dispute that characterization.  However, I would note, you

02:48:57   25  know, we all live in a world where the headlines are out there.

1    You probably heard of the eBooks case that the justice

2    department just filed against Apple and other publishers, and

3    there is a specific reference to that type of thing in the

4    justice department's allegations that says that the defendants

02:49:19    5    went to great pains, the chief executives met, that they went

6    to great pains to avoid leaving paper trails, things like be

7    sure, they would tell each other, to double delete.

8          So given this industry's history, that is precisely

9    the type of situation that I think it's reasonable for us to

02:49:47    10    use as our investigative assumption, and because of that we

11    have to go deeper on these organizational charts with respect

12    to custodians than most of the defendants have gone to this

13    point.  And in order to do that, I need some sort of matching,

14    and you'll see that on the agenda, Your Honor, I asked for this

02:50:09    15    in the meet and confer, what can we do to bridge the gap

16    between your custodian list and my corporate function list, and

17    so that I can get an understanding of who might be a possible

18    record keeper of the conspiracy as opposed to decisionmaker.

19          THE COURT:  You know, I saw that.  What do you mean by

02:50:28    20    that?  I saw that in one of your -- how would someone be the

21    record keeper of the conspiracy?  What do you mean?

22          MR. MOGIN:  It's fairly simple.  I'm the chief

23    executive officer, and I met with my fellow chief executive

24    officers, and we all agreed we would raise prices by $50 a ton,

02:50:46    25    and we would reduce our capacity at about the same time.

1          Well, I'm not going to, as the CEO, write a memo that
2   says that I just broke the antitrust laws and I've exposed
3   myself to criminal liability and my corporation to treble
4   damages.  But I may say something to somebody on my staff who
02:51:07   5   will write something down to justify other conduct.  This is
6   what my 32 years has taught me, that that is the type of
7   evidence that we see in these cases.

8          MR. FELLER:  And, Your Honor, what Mr. Mogin just said
9   is -- I'll speak for PCA -- is exactly why we think you're
02:51:30  10   exactly right, that plaintiffs have to get through some of
11   these documents and actually look at what we've produced.
12   We've picked 14 custodians for PCA.  Mr. Mogin is exactly
13   right.  It's our CEO, it's our CFO, it's our highest level
14   officials having to do with any issues in the complaint.  We
02:51:48  15   think they are the right people.  We think they are -- we think
16   they are the appropriate people.

17          If Mr. Mogin looks at the documents and says well,
18   what about this person, or our organization chart and that
19   person, we are entirely prepared to have that discussion.  We
02:52:05  20   haven't been -- the plaintiffs haven't, for whatever reason,
21   proposed any additional names to us yet.

22          What we can't do, what we just as Mr. Echols said at
23   the last hearing, what we don't know how to do is collect by
24   corporate function.  That is, it has no meaning to us as a
02:52:22  25   practical thing that we can actually go out and do.

1    So what we are waiting on and the conversation we are

2  perfectly happy to have is for suggestions of additional

3  custodians and to have a meaningful discussion as to whether

4  those are appropriate or not.

02:52:35    5    MR. NEUWIRTH:  May I address this, Your Honor?

6    THE COURT:  Sure.

7    MR. NEUWIRTH:  May I have the podium again?

8    Your Honor, the --

9    If you can give me some space?

02:52:52    10    Your Honor, we appreciate that you want to hear

11  perhaps from multiple defendants today, but there are a few

12  things that I believe I can say on behalf of all the defendants

13  on the issues that have been discussed, and Mr. McKeown has

14  some additional points if it would please the Court.

02:53:08    15    But as a general matter, we told you at the last

16  conference before Your Honor that the defendants are seriously

17  interested, as you said, in trying to get a complete and valid

18  production done that will enable us as well as the plaintiffs

19  to make our case to the Judge on the merits.  We want the

02:53:32    20  evidence in the record.

21    As we told Mr. Mogin when we met with him today on

22  behalf of Georgia Pacific, and I know other defendants have

23  said, the corporate functions that are listed in No. 9 are very

24  broad corporate functions that in the case of Georgia Pacific

02:53:50    25  could, if taken literally, cover almost the entire business.

1   And we explained in our meet and confer with Mr. Mogin that the

2   problem here, and your word "ironic" is correct, is that we

3   really believe both sides are trying to do the same thing which

4   is to figure out who are the people and where are the places in

02:54:14   5   the company where responsive, relevant information exists and

6   how can we get it produced?

7          The difference is that because the plaintiffs are

8   obviously coming to this without having worked at these

9   companies, they need to describe things in a certain level of

02:54:34   10   generality, and the companies very familiar with how their

11   businesses work have attempted to identify the actual people

12   who are doing the things that are the subject matter of the

13   plaintiffs' complaint.

14          Now, in the abstract we understand that it is always

02:54:51   15   possible for people to say well, isn't there possibly someone

16   else out there?  And that's why we have so strongly suggested

17   to Your Honor last week and have continued to suggest today

18   that through the productions that are being made, the

19   plaintiffs will have an opportunity to see in concrete form

02:55:12   20   what it is that we are producing from these custodians' files

21   so that, to the extent the plaintiffs still feel it is

22   necessary to do so, we can have a well-informed and concrete

23   discussion about what else it may make sense to do.

24          And just to put this in perspective, as Mr. Mogin

02:55:34   25   mentioned, there's already been a production by PCA and by

1    Weyerhaeuser.  As we told you last week, Georgia Pacific is on

2    the verge, and we've committed to doing it by the Tuesday, to

3    producing over 700,000 pages of documents which with limited

4    exception is going to be the full production of ESI based on

02:55:53    5    the search term process that was described to Your Honor.

6    That's going to be on Tuesday, which will mean that if you take

7    what's been produced plus what I understand is the more than

8    90,000 pages that Weyerhaeuser is going to be producing today,

9    by Tuesday there will be over a million pages of new documents

02:56:12    10    that have been produced since the last time we were with Your

11    Honor.

12              And nobody is saying to the plaintiffs that you have

13    to look at every single thing that's been produced before we'll

14    talk to you further.  We've already started talking, and we

02:56:24    15    think in some respects the conversations have been

16    constructive.  And I know Georgia Pacific like many other of

17    the defendants agreed today to take certain topics that the

18    plaintiffs raised and get back to them, and we can give you the

19    examples if it would be helpful.  But in general all that we

02:56:40    20    are trying to do here is have a discussion which is concrete.

21    Nobody is looking to put this off by six months or a year.  We

22    think that over the next coming weeks when the plaintiffs are

23    producing what will end up being several million pages of

24    documents, there will be something concrete in the ESI for the

02:56:58    25    plaintiffs to look at.  We'll continue to meet with them.  We

1    are interested in continuing to talk about the time periods for

2    the production.

3            And I would just add in terms of, just very quickly in

4    terms of this issue of active versus inactive.  Certainly one

02:57:15    5    of the things we are all trying to do is make sure that we are

6    getting documents from the entire time period, not just from

7    the recent period.  And I can tell you that in the case of

8    Georgia Pacific, we are producing tens of thousands of

9    documents of ESI from the years 2004, 2005, 2006 that have been

02:57:37    10   collected from the custodian files and the shared files and the

11   other sources that we went to to collect the documents.

12           The goal here is to have an informed discussion that

13   will be concrete and not abstract, that will allow us to work

14   with the plaintiffs to figure things out.  And I can assure you

02:57:57    15   that in the case of Georgia Pacific and I think all the

16   defendants, we are prepared to talk about other custodians, we

17   are prepared to talk about other search terms, but we think to

18   talk in broad generalities about going from where we are to a

19   completely different broad process that's reflected in the type

02:58:18    20   of protocol that's been presented is not the most constructive

21   way to move forward.  We think the most constructive way is to

22   produce what we are producing and continue to talk to the

23   plaintiffs based on the content that's being produced about

24   what it makes sense to do more.

02:58:33    25           And as Mr. McKeown will explain, in the one example

1   that Mr. Mogin gave of whether or not we are willing to produce

2   these word indexes, I believe all the defendants are prepared

3   to do that and several of them already told that to Mr. Mogin

4   today.  So I'm a little surprised by that.

02:58:51    5   But I think our goal is to move this forward, as we

6   said last time, with serious discussions, but to try to do it

7   in a way that will allow us to make real progress by giving

8   these documents to the plaintiffs, having them talk to us about

9   what's in them, finding, you know, if they believe that the

02:59:09    10   custodians we have identified as reflected in the documents are

11   not sufficient, we can then have a meaningful discussion and

12   involve you in it if necessary about how to move forward.

13   And if it please the Court, Mr. McKeown I think can

14   talk about some of the specific things that came up in some of

02:59:27    15   the meet and confers that we are prepared to do.

16   THE COURT:  Sure.

17   MR. McKEOWN:  Actually, I'm not going to have too much

18   at this point, Your Honor, other than Mr. Mogin is correct that

19   yesterday he had asked us about would we be willing to create

02:59:46    20   and prepare a list of all the words that are in our documents

21   according to the, I think Clearwell is what we used.  And we

22   checked this morning, and at least International Paper is

23   prepared to prepare that list.  We need to talk a little more

24   about some of the logistics, but I wanted to use that as an

03:00:04    25   example.

1       I think these discussions over the past three days

2   have been very productive.  Ours went for over two hours.  Mr.

3   Sprung is not with us today, but he was also involved in ours.

4   He came with a list of custodians, and we talked about people

03:00:19   5   and their jobs, and that will continue.  We have indicated if

6   there is a particular custodian to talk about, let's talk about

7   it.

8       On search terms, we've also indicated that to the

9   extent that you look in our documents and you think we are

03:00:30   10   missing something and you want us to test some additional

11   search terms, we are prepared to test additional search terms.

12       THE COURT:  What do you mean by test?

13       MR. McKEOWN:  Well, let's say, for example, that they

14   look at our documents and they say "We have found" -- they look

03:00:41   15   at this data list and they say "We have found that you have not

16   used this term, and we want you to test it."

17       We could run that search term against the documents

18   that we have in our collection that have not yet been hit by

19   any of the search terms, and we can find out if it hits 400

03:00:57   20   documents or 400,000 documents.  If it hits 400 documents, if

21   there's a reasonable list of additional search terms, you know,

22   I'm not going to fight in here over 400 documents.  If it hits

23   400,000 documents, that's a whole different kettle of fish.

24       So that's why we think we are going to be making the

03:01:18   25   production of the ESI for our 26 named custodians in about

1    three weeks.  With that plus this list of all the terms that

2    are in the documents, that would help the discussion we think.

3              THE COURT:  What did Clearwell tell you how, either

4    how -- so Clearwell can make a dictionary, I mean, they can

03:01:43    5    create this dictionary?

6              MR. McKEOWN:  I am told, and I didn't get it straight

7    from Clearwell, I got it from one of the ESI folks that is

8    helping us.  I am told that, at least the way we have our

9    database collected, we can create a list of all the words that

03:01:58    10    are found somewhere in our documents.

11              THE COURT:  And then does it tell them where it is?

12              MR. McKEOWN:  No.

13              THE COURT:  It just says --

14              MR. McKEOWN:  It says "These are all the terms."

03:02:08    15              But if you're worried that someone is misspelling some

16    word and you want to see the various misspellings, it was

17    something that came up yesterday in our meet and confer

18    yesterday afternoon.

19              THE COURT:  Right.

03:02:19    20              MR. McKEOWN:  They asked about it, and we can do that,

21    and we are prepared to do that, but I think those are the types

22    of discussions that probably need to continue.  Each side took

23    their homework home, at least in our case, for what goes next.

24              MR. MOGIN:  May I just say one thing about that,

03:02:34    25    please, Your Honor?

1      THE COURT:  Sure.

2      MR. MOGIN:  I very much appreciate Mr. McKeown's

3  commitment, that is, we've checked our notes.  That's the first

4  commitment that we've heard, and it's very significant that

03:02:43   5  it's coming from Mr. McKeown because at this point, given the

6  Temple-Inland acquisition by his client International Paper and

7  the prior acquisition of Weyerhaeuser by International Paper,

8  it could be that Mr. McKeown's commitment works for three of

9  the seven defendants, and if the other defendants are prepared

03:03:05   10  at this point to commit on the record, that would be very

11  helpful.  I don't know whether he's speaking for IP in his

12  commitment.

13      THE COURT:  Now, wait.

14      MR. MOGIN:  The totality of the IP defendants.

03:03:15   15      THE COURT:  But would that, you know, you're being a

16  good plaintiffs' lawyer, and good trial lawyers sometimes have

17  to ask for more than what they really have to have, and part of

18  my job is to sort of get things down here.  I think you have

19  done a very thorough job here, Mr. Mogin, and I'm, I am trying

03:03:44   20  to get you so you can get comfortable with this because they

21  are willing to give up the hearing.  That's really what the

22  crux of today is.  I mean, it is, is can we -- because time

23  wise we can't do both.  I mean, truthfully, we can't, okay?

24      So what I'm trying to do, the defendants have all said

03:04:06   25  on behalf of their clients that, you know, I kind of put it how

1   do you want to spend the next five months, but it is kind of in

2   reality.  So we need to get you a comfort level here too, I

3   mean, is what I'm trying to do here.

4        So if -- I literally don't know what this -- I mean,

03:04:37   5   you just directed us to No. 9 corporate functions.  You

6   mentioned the dictionary.  And I don't think you're just upping

7   the ante here.  I think you're looking for some way that you

8   can be comfortable on behalf of the class that you're getting

9   the, you're getting -- it's sure as heck never perfection, but

03:05:08   10   you're getting enough information so you can try your case.

11        Now, would this dictionary, if I could get this

12   dictionary, if I could get the other defendants to commit to at

13   least calling, I don't know what system they used, but if I

14   could get them to commit to calling, figuring out the

03:05:28   15   dictionary, would that help in your, would that help you in

16   saying that you think we could work this out?

17        MR. MOGIN:  That would certainly be a help, Your

18   Honor.  It's not --

19        THE COURT:  The end-all?

03:05:41   20        MR. MOGIN:  It's not the silver bullet.  It's one

21   piece of many pieces.

22        THE COURT:  Okay.  You're a very good peacemaker, Mr.

23   McKeown.

24        MR. NEUWIRTH:  And I think I can say unless --

03:05:54   25        THE COURT:  Again, this to me --

1    MR. NEUWIRTH:  We can all try.

2    THE COURT:  -- is something that would help you.

3    MR. NEUWIRTH:  We can all try.  I think we use

4 Clearwell also, so I think we can do it.

03:06:04    5    THE COURT:  And Mr. McKeown might have the other three

6 that are kind of connected.

7    MR. MAROVITZ:  Judge, if I may?  If I were a client, I

8 would be very happy to have Mr. McKeown represent me.

9    I'm Andy Marovitz.  I represent Temple-Inland.  And I

03:06:24   10 don't remember, I don't want the record to be unclear, I do

11 represent Temple-Inland, and in connection with this case, Mr.

12 McKeown does not speak for Temple-Inland or for me.

13    THE COURT:  I'm sorry.

14    MR. MAROVITZ:  No, no worry.  Just, given what Mr.

03:06:35   15 Mogin said, I want the record to be very clear about that.

16    That said, for purposes of the data dictionary this

17 morning, Mr. Mogin asked us about it.  We said we would go back

18 and check into that, and we, to the extent that our system

19 allows us to do that, we'll be happy to provide it, to provide

03:06:54   20 the -- I think it's a data dictionary.  I think it's a word

21 dictionary.

22    MR. FELLER:  And, Your Honor, again, Leonid Feller for

23 PCA.

24    We heard about the data dictionary for the first time

03:07:03   25 today at 1:30.  We did not use Clearwell, and so, again, I

1   don't even know if we have the capability.  If we do have the

2   capability, I don't think we have an objection conceptually to

3   producing it.  We have some concerns down the road about what

4   it could and should be used for and how it actually advances

03:07:22   5   the process.  So subject to whether or not it actually exists

6   and whether our technology is capable of producing it, we don't

7   have an objection to it.

8           THE COURT:  Hi.

9           MR. McCAREINS:  Mark McCareins for RockTenn.

03:07:37   10           I don't think this dictionary thing came up in our

11   two-hour meet and confer.

12           THE COURT:  Okay.

13           MR. McCAREINS:  But they asked us in three different

14   letters like a hundred questions, so we spent a lot of time

03:07:49   15   answering those.

16           THE COURT:  They did.  They are very thorough.

17           MR. McCAREINS:  And they are tough graders too.

18           THE COURT:  Yes, they are.

19           MR. McCAREINS:  So my guru on this subject is Mr.

03:07:59   20   Mayer.

21           THE COURT:  Yes.

22           MR. McCAREINS:  Britt Miller sitting back there.  And

23   I don't know if we have this dictionary, so we are checking on

24   it.

03:08:08   25           THE COURT:  Sounds good.  That's what I want to hear.

1    MR. McCAREINS:  Yes.

2    THE COURT:  That's what I need to hear.  I never heard

3  of it either.

4    MR. McCAREINS:  It's news to me.

03:08:16    5    THE COURT:  Right.  Okay.

6    MR. MENDEL:  Your Honor, Scott Mendel.

7    We had the first meet and confer for Mr. Mogin, and

8  that did not come up in our meeting, so I'm hearing about it.

9    THE COURT:  See, he got better as the meet and confers

03:08:33   10  went on, and that is good.  And you volunteered, you were the

11  nice person who started this all off last time.

12    MR. MENDEL:  And we do use a different platform for

13  our documents, but I will check and see if the dictionary is

14  possible and, if so, what we can do to provide it.

03:08:48   15    THE COURT:  Mr. Mogin -- I want to ask a question.

16  Mr. Mogin, is this dictionary referred to as anything else

17  other than a dictionary?  I mean, is there like another term of

18  art on this?  Mr. McKeown too.

19    MR. McKEOWN:  Your Honor, we had the discussion --

03:09:08   20    MS. BARRY:  You can call it an index or a word list.

21  Any system that does boolean search indexes every single word

22  in the data set so that it can find them.

23    MR. MOGIN:  For the record, that was our consultant

24  Diane Barry, and that was our understanding as well after our

03:09:23   25  conversation yesterday with Mr. Mogin and his team, that what

1   they are looking for is a list of all the words in the

2   documents and that we can produce this list of all the words.

3          I also understand it will be fairly lengthy, so it,

4   therefore, may be transmitted electronically rather than on

03:09:39   5   paper.

6          THE COURT:  Okay.  Well, gee, it was worth a trip to

7   Chicago today.  We all learned something knew.

8          I didn't mean to cut you off.

9          MS. DIVER:  That's okay, Your Honor.  Jennifer Diver

03:09:49   10   on behalf of Weyerhaeuser Company.

11          We are using the Clearwell search system, and although

12   this issue did not come up in our meet and confer with Mr.

13   Mogin, it's my understanding that we are able and prepared to

14   provide this word index as well.

03:10:02   15          THE COURT:  Okay.

16          MR. MOGIN:  I don't know how I could have missed all

17   of these, Your Honor, with the script that I was using.

18          THE COURT:  Well, you had a lot to do.  Okay.

19          MR. MOGIN:  So we got a little sidetracked.  We have

03:10:24   20   worked through one of the issues.  The custodian issue remains

21   open.

22          THE COURT:  Well, except what they are saying, what

23   every single person who stood up here today said is they are

24   open to, after you look at some of the documents, and it's not

03:10:43   25   a quid pro quo, but it just makes more sense because they are

1  also acknowledging, unlike an employment case, you don't have

2  an insider -- I mean I'm assuming you don't have an insider at

3  seven companies -- so you're not going to know who might be

4  more appropriate people or more -- I don't even mean

03:11:06  5  appropriate, but more targeted people.  So as soon as you can

6  get to some of the key and you find out that Mann is sending to

7  Chris and you didn't know about Chris, maybe you want Chris,

8  maybe you want to add Chris as a custodian.

9  MR. MOGIN:  All I was searching for, Your Honor --

03:11:29  10  THE COURT:  They are saying, I affirmatively heard

11  them say on the record they are willing to do it.  Now, if you

12  come back with 500, they may be in here saying to me "I didn't

13  agree to 500."  But, I mean, as it is, as the record is right

14  now, all seven, correct, fellows, ladies, all seven said they

03:11:54  15  will entertain.

16  Now, I am not saying that takes away everything you've

17  said here, but as the judge here I have to decide whether we

18  are going back to the hearing or whether we are going to

19  continue.  And I'm inclined to, I'm certainly inclined today

03:12:34  20  for you to get at least a look-see at these documents.  I think

21  you're going to know much more than you know right now.

22  I think after you also take a look-see, another round

23  of meet and confers, and I didn't offer the last time, but I'm

24  happy to sit in if you want it.  I mean, I think you're doing

03:13:10  25  just fine without me, but I would be willing to do that.

1      MR. MOGIN:  If you were there, Your Honor, we would

2  not get the full benefit of Mr. McCareins' sense of humor.

3      THE COURT:  No, I actually know Jim.  Jim is on our

4  committee.  I actually know Jim.  He does have a good sense of

03:13:28   5  humor, don't you think?

6      MR. MOGIN:  Your Honor, may I suggest this then?  I

7  realize that you would prefer not to have to go back to the

8  hearing.

9      THE COURT:  I'd prefer not to what?

03:13:41  10      MR. MOGIN:  Yes, not to have to go back to the

11  hearing.

12      THE COURT:  Well --

13      MR. MOGIN:  To try to resolve this a different way.

14      THE COURT:  Well, that's for sure.  That's for sure,

03:13:50  15  because I am trying to get, I think it's a more direct way for

16  you to get this information than kind of where we were going.

17  I would like to get us as good of a search method as possible.

18  I think, I think we all want the same thing here, actually.

19      MR. MOGIN:  Well, I was going to say that one of the

03:14:30  20  things that seems to get lost in the discussion when the

21  defendants talk about their efforts and their burden and their

22  expense, it works two ways.  It's not as if I want an unlimited

23  universe of documents for people to have to plow through.  That

24  just costs me time and money, and as a good plaintiff's lawyer,

03:14:51  25  I would just as soon get this case over sooner rather than

37

1  later.

2         THE COURT:  Right.

3         MR. MOGIN:  Your Honor, may I make the following

4  suggestion?

03:15:00  5         THE COURT:  Sure.

6         MR. MOGIN:  There are still a number of issues that

7  are outstanding, a number of things that were discussed during

8  the meet and confers that the defendants still have to get back

9  to us on, similar to what we just went through with the

03:15:14  10  dictionary issue.  Might I suggest that we schedule another

11  status conference.  We'll continue with the meet and confer

12  process.  Perhaps we'll come back here in about three weeks or

13  so, depending upon your schedule, and we'll report our

14  iterative progress to you at that point, at which time I will

03:15:35  15  have had some chance, not a great one, but some chance to have

16  a look-see.  I should hopefully have these dictionaries in

17  hand.

18         THE COURT:  Do you think, Mr. McKeown, did they say

19  how long it would take to get the dictionary?

03:15:52  20         MR. McKEOWN:  Not entirely clear, Your Honor, and with

21  IT people, when they give me an estimate, I usually have to

22  quadruple it.  But we'll try to get it within the next week or

23  so.

24         THE COURT:  Well, since you started it, it would also

03:16:05  25  help if maybe you could get Mr. Mogin one of them.  When does

38

1    he get your documents?

2         MR. McKEOWN:  He has our hard copy documents, our ESI

3    documents with the 26 named custodians will be in about three

4    weeks.

03:16:24   5         MR. NEUWIRTH:  We were going to suggest, Your Honor,

6    that maybe in light of those facts, that it might make sense to

7    try to do this in the third or fourth week of May so that

8    there's enough time for us to give what we are giving, have

9    some opportunity to look at it, and perhaps have some further

03:16:43   10   meet and confer.

11        MR. McKEOWN:  I don't have a problem giving the list

12   of words sooner rather than later.

13        THE COURT:  Well, I'm just thinking.  PCA, our PCA

14   fellow, you've given the documents already?

03:16:55   15        MR. FELLER:  Yes, Your Honor.

16        THE COURT:  So if you were to go back --

17        MR. FELLER:  Yes.

18        THE COURT:  And you were -- and who is your, you don't

19   have Clearwell, do you?

03:17:06   20        MR. FELLER:  We don't have Clearwell.  Our vendor is

21   Epiq, and I can certainly call them as soon as we are back.  I

22   take Miss Barry on her word, but candidly I don't know that it

23   exists or not.  But assuming it does --

24        THE COURT:  If you could get them yours the quickest,

03:17:22   25   there might be a way to see how effective, I mean, since Mr.

1    Mogin -- I mean, that would just help if he had the dictionary
2    and one set of the documents.  And then when you come back, we
3    could talk about something concrete.  What do you think about
4    that?

03:17:41   5    MR. FELLER:  Your Honor, again I'm happy to try.
6    THE COURT:  Good.
7    MR. FELLER:  I don't know that it exists yet much less
8    how long it will take, but I'm certainly happy to try.

9    MR. McKEOWN:  And I don't have a problem, assuming we
03:17:52   10   can create this word list off the computer, giving the word
11   list to Mr. Mogin before.

12   THE COURT:  Then at least he could see that too.  That
13   would help too.  Okay.

14   Well, I think we should do another round, clearly do
03:18:11   15   another round.  You're learning, as you just said, you were
16   very candid, you've also learned a lot more in talking about
17   things too.  I'm not into taking -- sure.

18   MR. McKEOWN:  Yes.  Your Honor, I just wanted to
19   clarify one thing with respect to the dictionaries before we
03:18:42   20   all broke and started talking about other subjects.

21   Many of the programs have the ability to put in sort
22   of a hit count next to the word.  So if it's the word "Nolan,"
23   it will say, you'll get a sense that Nolan was hit on 38 times,
24   40 times, whatever.

03:19:02   25   THE COURT:  Okay.  Well, if they can do that, that's

1     even better.  It helps everybody then.  Okay?

2          MR. McKEOWN:  I don't know whether or not we can do

3     that, Your Honor.  We will check to see if it can be done and

4     how hard it would be to do.

03:19:14    5          THE COURT:  Right.

6          MR. McKEOWN:  Because what I also don't want to do is

7     shut down my electronic discovery process to occupy computer

8     time if this is going to take three weeks to run it with a hit

9     count.  I just don't know how hard it is.

03:19:28   10          THE COURT:  Well, you find out, and let Mr. Mogin

11    know.

12          MR. McKEOWN:  We will.

13          THE COURT:  Okay.  Now.

14          MR. MAROVITZ:  Judge, Andy Marovitz for Temple-Inland.

03:19:40   15          We think Mr. Mogin's idea of coming back at some point

16    is a good one.  We do think that it would make sense for all

17    the defendants to have an opportunity to be able to produce

18    something in addition, and we mentioned to Mr. Mogin this

19    morning that we are shooting to make a production during the

03:19:59   20    week of April 30th that would go sometime until the 4th.

21          We would look for a day maybe in the middle of May to

22    give Mr. Mogin and his team a chance to look at whatever

23    documents they wanted to from the other defendants as well, so

24    we were hopeful for some time during the week of May 14th if

03:20:21   25    that's suitable with the Court.

1    THE COURT:  Well, I was going to, I mean, that's fine.

2  We'll find a date here.  I had even wanted to give Mr. Mogin,

3  if this would give him any kind of a comfort level so it

4  doesn't just get out there, is I don't do settlement

03:21:00  5  conferences on Fridays.  So if we can get the ball rolling

6  here, we could do telephone statuses so all of you don't have

7  to travel all the time, but we could do some series of

8  conferences, telephone conferences for people to make sure

9  things were happening, productions were happening.

03:21:22  10    I think the next one ought to be in person again,

11  though, because I think you're going to need feedback.  But

12  this isn't to -- I mean, I want to do everything we can to keep

13  this momentum going is what I'm saying.  I mean I'm saying it

14  to the defendants too, because I think that would give you,

03:21:43  15  Fridays can be kind of a clean, you know, like the old ravioli

16  day, whatever that ad was.

17    MR. MAROVITZ:  Wednesday is Prince Spaghetti day.

18    THE COURT:  Right, it can be Prince Spaghetti, this

19  can be clean day or something if you wanted to, because I don't

03:22:00  20  do mediations on Friday.  So let's do directly, if we were

21  going to try to do, what's that week?  You know, let me go get

22  my sheets.

23    MR. MOGIN:  The week that the defendants were

24  mentioning was a little tough for us.  Would the following week

03:22:21  25  be possible?  That would be the week of the 21st of May.

42

1     THE COURT:  Okay.

2       (Pause.)

3       MR. MAROVITZ:  Judge, we just took an informal caucus

4   and got no dissent for May 22nd.  But your schedule is the most

03:23:12    5   important, so if May 22nd is a good date for you, that works

6   for all the lawyers.

7       THE COURT:  Well, I think we are going to make it

8   work.

9       MR. MAROVITZ:  Your Honor, what time would be

03:23:31   10   convenient?

11     THE COURT:  Well, do you think you'd try to have

12   meetings again?  Would you kind of -- this seems to be very

13   productive.  They are going to know a lot more.  Can you do the

14   Monday-Tuesday again, and then come if you wanted to come

03:23:57   15   Tuesday at 1:30?

16     MR. MOGIN:  I'll try, Your Honor.  There's seven

17   defendants, and it's very difficult to meet individually with

18   the defendants, seven of them in one day basically.

19     THE COURT:  But I meant if you started on Monday, the

03:24:11   20   21st, would that work?

21     MR. MOGIN:  Three to four a day is about what it

22   takes.

23     THE COURT:  Well, we can do 3 o'clock.  I work at

24   night.  I mean we can start at, we can easily start at 3

03:24:23   25   o'clock.  Would 3:30 be better?

1    MR. MOGIN:  How about we'll split the baby.  How about

2    2:30?

3        THE COURT:  That's fine with me.  I'm here.

4        MR. MOGIN:  And I'll see what I can do by telephone

03:24:34    5    and what I can do in person.

6        THE COURT:  Yes.  Does that, can some of you commit to

7    the first day if Mr. Mogin comes from California?

8        MR. MAROVITZ:  Sure.

9        THE COURT:  Okay.

03:24:45    10    MR. McKEOWN:  We'll make it work, Your Honor.

11        THE COURT:  Sounds good.

12        What are we telling Judge Shadur?  Here's what I want

13    to know, because you've got the April 30th status.  I think

14    when I called him the last time, I think he reset it till April

03:25:02    15    30th.

16        MR. MAROVITZ:  Yes.  Our thought for the defendants

17    would be it would make sense to reset that again till at least

18    sometime after we've had a chance to meet with you.

19        THE COURT:  Well, one thing I could do if you're all

03:25:17    20    going to be here the 22nd of May, I mean, maybe would you like

21    to meet with him?  Do you want to tell him yourself what's

22    going on or, I mean --

23        MR. MOGIN:  I think that would be productive, Your

24    Honor.

03:25:30    25    THE COURT:  I have no idea if he sits on Tuesday.  I

1   have no idea on anything.

2        MR. MOGIN:  Judge Shadur?  I can't believe he doesn't

3   sit on Sundays.

4        THE COURT:  Right, that's true.

03:25:40   5        MR. MAROVITZ:  Judge, obviously if Judge Shadur is

6   interested in hearing the status, we would present it to him.

7   We don't, I don't know that there's a need to take up his time

8   until we have some resolution one way or the other.  I think we

9   are working toward --

03:25:54   10        THE COURT:  Well, that is true because we don't know

11  yet.

12        MR. MAROVITZ:  We are working right now towards

13  resolution, and, frankly, it might be better for everybody if

14  we got either to a place where we had a more concrete

03:26:06   15  resolution of the issues or a live dispute for Your Honor or

16  Judge Shadur to resolve.

17        MR. MOGIN:  It's a good point, Your Honor.

18        THE COURT:  Yes.

19        MR. MOGIN:  Maybe the best thing to do is Judge Shadur

03:26:16   20  would probably rather hear from you than us.

21        THE COURT:  That's true because he likes Nan so much.

22        MR. MOGIN:  So perhaps if you conferred with him, and

23  we'll do whatever you guys decide, obviously.

24        THE COURT:  Right.  And if he wanted to, I can offer

03:26:29   25  to him that you're here.  If he needs to, I think he'll be

1   happy to do it this way.

2           And so we are going to continue to try, and that will

3   still give us plenty of time that if we are not able to do it

4   and you want to either continue with argument, the hearing,

03:26:52   5   whatever you want, you're going to have the ability to do that.

6           MR. MOGIN:  There's one other subject that I would

7   like to raise, Your Honor.

8           THE COURT:  Sure.

9           MR. MOGIN:  And not to anticipate in advance or to

03:27:06   10   somehow ruin the possibility of agreement, but we had been

11   looking at the Court's procedures on motions to compel, and

12   they, we gamed out how much time it might take for a typical

13   motion and it was about a six- to seven-week process.

14           THE COURT:  All right.  Now, let me just tell you,

03:27:25   15   though, on that procedure, we just instituted about a year ago,

16   I looked at Shira Scheindlin's web site.  She also told me at

17   some conference I was at, her web site says no discovery

18   motions, or discovery motions are prohibited, and I guess I

19   thought oh, maybe I should start increasing the ante for

03:27:57   20   discovery motions.

21           In this case, you have to have a meet and confer.

22   Obviously you have to have a real meet and confer.  You do not

23   have to -- I'm not holding you to that entire process.  If your

24   meet and confer cannot work, you can even agree upon a

03:28:15   25   discovery schedule.

1         MR. MOGIN:  Thank you, Your Honor.  Appreciate it.

2         THE COURT:  That will take that away because I do in

3 fact want to do as much of the discovery in this case as

4 possible.

03:28:26  5         MR. MOGIN:  Thank you, Your Honor.  That's very

6 helpful.

7         THE COURT:  And the same thing for the defendants too

8 if you're having a problem too.

9         MR. McKEOWN:  Thank you.

03:28:34  10         THE COURT:  You have a protective order already.

11         MR. MOGIN:  Yes, ma'am.

12         THE COURT:  Now, I do have another question.  How far

13 are you on the 30(b)(6)s?

14         MR. MOGIN:  We still have PCA which is scheduled I

03:28:47  15 believe for May the 6th?

16         MR. FELLER:  10th.

17         MR. MOGIN:  May the 10th.  And we still have -- let

18 the record note that Ms. Miller just threw Mr. Mandell under

19 the bus, pointed him out.  So we still have his client to go,

03:29:05  20 and Georgia Pacific.

21         THE COURT:  All right.  Something I utilized with Miss

22 Miller in our last antitrust case that if I could impose, this

23 would help because we were trying to do working statuses, is

24 that I would ask that the day before, it doesn't even have to

03:29:34  25 be before that, if I could have a short status letter or a

1    report, whatever you want, if you want it for the record or you

2    can -- and these would be, it would kind of get you thinking

3    issues for the agenda too.  And it doesn't have to be long,

4    complicated, grammatically correct.  It doesn't have to be

03:29:56    5    anything.  It's just kind of here we go, Judge, here's what we

6    need to talk about, okay?

7                MR. MOGIN:  Could I beg a favor on that, Your Honor?

8                THE COURT:  Sure.

9                MR. MOGIN:  Make it a very short page limitation.

03:30:09    10    THE COURT:  I don't even do that.  I mean, it's just

11    very, it's just very simple here are the things.  You know,

12    we've got agreements on this, we don't need to talk about this,

13    but here are the issues.

14                I'm really curious to see, will you let me know on

03:30:25    15    this dictionary?  This would be helpful.

16                MR. McKEOWN:  Your Honor, we could probably get you a

17    copy if you would like one.

18                THE COURT:  No, no.

19                MR. McKEOWN:  I think I have my answer.

03:30:36    20                THE COURT:  Okay, thank you.

21                Do any of the defendants, does anyone wish to say

22    anything?  I am really conscious that each of you are getting

23    individual consideration.  I think a lot of clients now read

24    transcripts, and I want to make sure that everyone, if anyone

03:30:57    25    needs, would like to say anything about their client, they have

1   an opportunity to do so.

2          Okay.  Well, new plaintiffs' counsel, who is new here

3   who wasn't here before?  Anybody new.

4          MR. MOGIN:  This is our co-counsel, Mr. Goodwin from

03:31:12   5   Philadelphia.

6          THE COURT:  Hi, Mr. Goodwin.  I'm glad you're here.  I

7   saw your name.

8          MR. MOGIN:  What I didn't tell Your Honor is that the

9   plaintiffs have for each defendant and for certain third

03:31:25   10   parties our co-counsel we have assigned so they specialize in

11   particular defendants.  So Mr. Goodwin is the specialist in

12   Georgia Pacific.

13          THE COURT:  Well, good.

14          MR. MOGIN:  Mr. Eisler was here before.  He was for

03:31:37   15   PCA.

16          THE COURT:  That's good.

17          MR. MOGIN:  So each of those came in for these meet

18   and confers.

19          THE COURT:  I noticed that on the 30(b)(6)s there were

03:31:44   20   people other than you sending letters, and I couldn't figure

21   out how that was happening.

22          MR. MOGIN:  So each of them came into Chicago and

23   participated in the meet and confers.

24          THE COURT:  Good.  Does that work for you, sir?

03:31:57   25          MR. GOODWIN:  Yes, that's working just fine.  Thank

1    you, Your Honor.

2              THE COURT:  Okay, thank you.

3              Well, we'll see everybody.  If you have any

4    emergencies, anything like that, we take phone calls here,

03:32:08   5    okay.  You can always email Chris.

6              Peace.  Bye.

7              MR. MOGIN:  Thank you, Your Honor.

8              MR. McKEOWN:  Thank you, Your Honor.

9              THE COURT:  See you in a couple weeks.

10         (Proceedings concluded.)

11                   C E R T I F I C A T E

12         I, Michael P. Snyder, do hereby certify that the

13    foregoing is a complete, true, and accurate transcript of the

14    proceedings had in the above-entitled case before the Honorable

15    NAN NOLAN, one of the judges of said Court, at Chicago,

16    Illinois, on April 19, 2012.

17

18                        /s/ Michael P. Snyder

19                        Official Court Reporter

20                        United States District Court

21                        Northern District of Illinois

22                        Eastern Division

23

24

25