```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   KLEEN PRODUCTS, LLC., et al.,      )   No. 2010 C 5711
                     Plaintiffs,        )   April 19, 2012
 4          v.                          )   2:15 P.M.
     PACKAGING CORPORATION OF AMERICA,  )
 5   et al.,                            )
                     Defendants.        )
 6
                 TRANSCRIPT OF PROCEEDINGS - STATUS
 7               BEFORE THE HON. NAN NOLAN

 8   APPEARANCES:

 9   On behalf of Plaintiffs:    MR. CHARLES P. GOODWIN
                                 BERGER & MONTAGUE, P.C.
10                               1622 Locust Street
                                 Philadelphia, Pennsylvania 19103
11                               (215) 875-3000

12                               MR. WALTER NOSS
                                 SCOTTSCOTT, LLP
13                               707 Broadway, 10th floor
                                 San Diego, California 92101
14                               (619) 233-4565

15                               MR. DANIEL J. MOGIN
                                 THE MOGIN LAW FIRM
16                               707 Broadway, Suite 1000
                                 San Diego, California 92101
17                               (619) 687-6611

18                               MR. ROBERT J WOZNIAK
                                 FREED KANNER LONDON & MILLEN, LLC
19                               2201 Waukegan ROad, Suite 130
                                 Bannockburn, Illinois 60015
20                               (224) 632-4507

21                               MR. BRIAN D. CLARK
                                 LOCKRIDGE GRINDAL NAUEN PLLP
22                               100 Washington Avenue S, Suite 2200
                                 Minneapolis, Minnesota 55401
23                               (612) 339-6900

24                   MICHAEL P. SNYDER, FCRR
                        Official Court Reporter
25                  United States District Court
                         (312) 435-5563
```

1

Appearances (continued):

2

On behalf of Defendants:        MR. LEONID FELLER
3                               MR. DANIEL F. LAYTIN
                                KIRKLAND & ELLIS, LLP
4                               300 North LaSalle Street
                                Chicago, Illinois 60654
5                               (312) 862-2719

6                               MR. JAMES T. McKEOWN
                                FOLEY & LARDNER, LLP
7                               777 East Wisconsin Avenue
                                Milwaukee, Wisconsin 53202
8                               (414) 297-5530

9                               MR. SCOTT M. MENDEL
                                K&L GATES, LLP
10                              70 West Madison Street, Suite 3100
                                Chicago, Illinois 60602
11                              (312) 372-1121

12                              MS. JENNIFER A. SMULIN DIVER
                                MS. RACHAEL V. LEWIS
13                              McDERMOTT WILL & EMERY, LLP
                                227 West Monroe Street, Suite 4400
14                              Chicago, Illinois 60606
                                (312) 984-7528

15
                                MR. STEPHEN R. NEUWIRTH
16                              QUINN EMANUEL URQUHART & SULLIVAN
                                51 Madison Avenue, 22nd floor
17                              New York, New York 10010
                                (212) 849-7---
18
                                MR. ANDREW S. MAROVITZ
19                              MS. BRITT M. MILLER
                                MAYER BROWN, LLP
20                              71 South Wacker Drive
                                Chicago, Illinois 60606
21                              (312) 782-0600

22                              MR. R. MARK McCAREINS
                                MR. MICHAEL P. MAYER
23                              WINSTON & STRAWN, LLP
                                35 West Wacker Drive
24                              Chicago, Illinois 60601-9703
                                (312) 558-5600

25

1       THE CLERK:  10 C 5711, Kleen Products versus

2   Packaging.

3       THE COURT:  Okay.  So we are back.  Well, Mr. Snyder

4   is here too.  I hope you have met everyone, Mr. Snyder.

02:18:15   5       So for our plaintiffs, please, will you identify

6   yourself and your team, please.

7       MR. MOGIN:  Dan Mogin for the plaintiffs, Your Honor.

8   Also with me are Walter Haas, ScottScott; Charles Goodwin from

9   Berger & Montague; Brian Clark from the Lockridge firm; and Mr.

02:18:31   10  Wozniak from Freed Kanner.

11      THE COURT:  Good.  Thank you.  Hi, everybody.

12  Welcome.

13      And for Mr. Neuwirth, we'll begin with you.  You have

14  the named party.

02:18:41   15      MR. NEUWIRTH:  Thank you.  Stephen Neuwirth for

16  defendant Georgia Pacific.

17      THE COURT:  Okay.  And?

18      MR. McKEOWN:  James McKeown for International Paper.

19      THE COURT:  Hi, Mr. McKeown.  Thank you.

02:18:52   20      MR. MAROVITZ:  Good afternoon.  Andy Marovitz and

21  Britt Miller for Temple-Inland.

22      THE COURT:  Okay, Mr. Marovitz and Miss Miller for

23  Temple.

24      MR. McCAREINS:  Mark McCareins and Mike Mayer for

02:19:04   25  RockTenn.

1          THE COURT:  Thank you.

2          MR. MENDEL:  Scott Mendel for Cascades and Norampac.

3          THE COURT:  Thank you, Mr. Mendel.

4          MS. DIVER:  Jennifer Diver and Rachel Lewis for

02:19:14   5   Weyerhaeuser Company.

6          THE COURT:  Thank you.

7          MR. FELLER:  And, Your Honor, Leonid Feller and Daniel

8   Laytin on behalf of Packaging Corporation of America.

9          THE COURT:  Good.  All right.

02:19:22   10          So when we last met, we decided that, it was agreed

11   between the parties that between that date and today the

12   plaintiffs would meet with the defendants individually in meet

13   and confers in order to be able to see if there was a way to

14   resolve not only the search issues but we could also start

02:19:56   15   talking about other issues too cooperatively or if we were

16   going to have to resume the hearing again.

17          So let's begin with Mr. Mogin, okay?  So, Mr. Mogin,

18   how many of these meet and confers did you have?

19          MR. MOGIN:  We have had seven, Your Honor.

02:20:15   20          THE COURT:  Seven?

21          MR. MOGIN:  Yes.  Beginning Tuesday afternoon with

22   Cascades Norampac and concluding just now with PCA.

23          THE COURT:  Okay.

24          MR. MOGIN:  On Wednesday we met in order with

02:20:33   25   Weyerhaeuser, International Paper and RockTenn.

1    THE COURT:  Okay.

2    MR. MOGIN:  And this morning we met with Temple-Inland

3 and Georgia Pacific.

4    THE COURT:  Well, that's very productive.

02:20:46    5    MR. MOGIN:  It was informative.

6    THE COURT:  Yes.

7    MR. MOGIN:  And I guess what I would report to Your

8 Honor is that I can't report progress.  I can report that there

9 has been an exchange of information and an exchange of views

02:21:06    10 that was helpful.  I now better understand both the defendants'

11 position, the feasibility from their point of view of their

12 ability to comply with our various requests, and I also have a

13 better understanding of the process that they went through as

14 well as a better understanding of their actual responses to the

02:21:30    15 document requests.

16        There is a lot of uniformity that emerged in these

17 meetings.  I would say that there were more uniformity than

18 there were differences among the defendants.

19        Ultimately, though, Your Honor, you will recall at the

02:21:50    20 last hearing after you -- Mr. Regard, we were about halfway

21 through Mr. Regard's testimony, and you had a meeting I think

22 with the chief judge that you had to get off to, and you asked

23 us to do something very specific.  You asked us to get together

24 with our experts and see if we could devise a protocol that fit

02:22:12    25 within the boolean system that the defendants had devised, that

1    the testimony had been about, and we did that.  We got together

2    with Mr. Lewis, Dr. Lewis, and our other consultants and spent,

3    moved as quickly as we could but spent a considerable amount of

4    time on it.  And we tried to come up with a way to accomplish

5    this, that is, preserve the boolean search methodology, give us

6    better measures of validation, the type of measures that we

7    were seeking which were recall oriented, and to mix some of the

8    principles that Dr. Lewis talked about in terms of supervised

9    learning and random sampling in the sense that, yes, there

10   would be two random samples, small random samples by each

11   defendant, which, as some people characterize, that the

12   plaintiffs would look over their shoulder.  So there would be

13   first cut of documents, and this is described in the protocol

14   which I believe Your Honor has that we gave the defendants on

15   the 3rd of April, a first cut of documents where we looked at

16   the totality of the corpus that defendants had collected,

17   putting aside the disagreements that we've been having to this

18   point about what should be in that corpus, taking a measurement

19   so that we got some sense of the number of responsive documents

20   or hits, if you will, using the boolean strings as to the

21   corpus; then taking a look at the hit set itself, and again

22   doing another measurement.

23        At each level the plaintiffs would see nonprivileged

24   but some amount of nonresponsive documents as well.  Recall,

25   Your Honor, that with respect to that, there is a pretty strong

1    protective order in place so there would be no misuse of

2    documents, as well as if the defendants have competitive

3    concerns about the nonresponsive documents that would be

4    produced in this set, they could designate them under the terms

02:24:35    5    of that confidentiality order so that only outside counsel

6    would be able to see them.

7          So that is a degree of cooperation consistent with the

8    Sedona concept of cooperation that we've asked for, and I will

9    say that not a single defendant has accepted that.  Some are in

02:25:01    10    consideration of some aspects of that request.  Most have

11    unilaterally rejected, or I shouldn't say unilaterally, I

12    should say categorically rejected it.  So I don't know how much

13    further down the pike we are with respect to testing and trying

14    to work within that boolean construct that the defendants

02:25:28    15    devised.

16          Now, that's not the only thing that we discussed.  We

17    discussed custodians, we discussed methods for discovering

18    other potential custodians other than merely looking through

19    what at this point amounts to some volume of documents, and

02:25:48    20    I'll come back to that in just a second, and we haven't made a

21    great deal of progress on that, but there has been a fair

22    amount of discussion with respect to that.

23          Now, one of the things that we have asked for, which

24    has not been categorically rejected across the board, is using

02:26:09    25    the boolean process is a dictionary.  As I understand it, each

1   of the tools as it processes the documents categorizes or lists

2   each of the words that are used.  So for each defendant there

3   would be a set of words that was unique to that particular

4   defendant.

02:26:32  5       For example, the best --

6       THE COURT:  That's not a keyword?

7       MR. MOGIN:  It would be a keyword.  In other words, it

8   would be a word that was within the corpus of the defendants'

9   documents, a word that would be used by the company itself.  So

02:26:48  10   similar, Your Honor, if you recall the deposition transcripts,

11   particularly the mini transcripts that we get these days, you

12   look in the back and you see there's a list of words.  And it

13   tells you you can find the word "magistrate" on page 5, page

14   15, page 13.  So you get a sense with each word that's used by

02:27:09  15   the company of how --

16       THE COURT:  And the computer automatically can do

17   that?

18       MR. MOGIN:  Yes.  Each of the --

19       THE COURT:  The court reporter's computer can do that

02:27:20  20   too?  When you say from the -- I know, I just mean from the

21   transcript.  When you say it was at the back of the transcript,

22   it's like an index, it's like an automatic index?

23       MR. MOGIN:  Yes, Your Honor.

24       THE COURT:  Well, what do you know?

02:27:33  25       MR. MOGIN:  So each of the defendants could do that.

1   We could then take that list, review that list, work with our
2   linguists and Dr. Lewis to see if we couldn't come up with
3   different strings that would be usable for us.

4           Most of the defendants will tell you that they don't
02:27:53  5   want to do that.  What they prefer us to do is to review the
6   documents that are being produced and then come back to them
7   sort of in the traditional iterative way, and we'll consider
8   this string, we'll consider that custodian, that type of thing
9   as has traditionally been done, which from our viewpoint, quite
02:28:17  10  frankly, Your Honor, is not satisfactory.  It would delay the
11  process for many months.

12          Now, with respect to the actual productions that have
13  occurred so far, as I stand here today I have received
14  approximately, I have received a hard drive yesterday from
02:28:38  15  International Paper that I'm told has approximately 200,000
16  pages of hard copy documents, not ESI.

17          THE COURT:  Not?

18          MR. MOGIN:  Not.

19          THE COURT:  200,000, okay.

02:28:52  20          MR. MOGIN:  PCA approximately a week ago produced what
21  they have represented is about half of the totality of their
22  production, which includes other, which includes a substantial
23  amount of ESI.

24          THE COURT:  Okay.  Is that email or is that --

02:29:17  25          MR. MOGIN:  Yes.

1    THE COURT:  That's email?  Okay.

2    MR. MOGIN:  Yes.  We have received schedules, sort of

3 loose but good faith schedules from the rest of the defendants

4 with respect to their intended production.  It's a bit unique

02:29:36    5 as to each defendant.  Some are producing in kind of defined

6 batches, others are producing in less defined batches, some

7 aren't really batching at all.  So we have a better

8 understanding of that.  We have some rudimentary understanding,

9 and I do mean rudimentary, of what's in the batches.  And

02:30:02   10 that's about where we stand from the plaintiffs' perspective.

11    So to put a bottom line to it, we have a better

12 understanding of what's been done, but not agreement about

13 what's to be done other than the defendants more or less say

14 that they will proceed the way they have been proceeding and

02:30:32   15 will at the end of the process or as plaintiffs review the

16 documents accept additional suggestions in terms of custodians

17 or in terms of search requirements.

18    We will not see -- first off, all of the productions

19 as a totality from what I understand this morning won't be

02:30:54   20 completed for at least six months.  And all of the defendants

21 propose that privilege logs, which in these types of cases are

22 particularly important, won't be produced until the end of each

23 of their respective productions.  So that's another 60 days

24 plus for each defendant as they end.

02:31:24   25    So that takes us approximately, by my reckoning, sort

1  of a best case scenario is we are back here in a year.  I'm

2  sorry.  We are back here toward the end of the year.  And as I

3  understand it, a new magistrate has to drink from the fire hose

4  and try to understand this case.

02:31:53  5  THE COURT:  Or Judge Shadur, because Judge Shadur

6  usually doesn't refer cases, so it may be Judge Shadur.  This

7  was a special, this was a special referral.

8  MR. MOGIN:  So I can't tell you that I know precisely

9  where we go from here.  The idea that the defendants have

02:32:15  10  raised, which is review all of our documents and then get back

11  to us, is problematic from the plaintiffs' standpoint.  It's as

12  if the past year hasn't happened, from our perspective; it's as

13  if the hearings and all the briefing hasn't taken place.

14  So I'm sure you'll want to hear from the defendants,

02:32:44  15  and I'm sure they'll tell you that I'm all wrong, but I don't

16  know at this point.  And when I say I don't know, I truly don't

17  know what it's productive to do in terms of continuing the

18  hearing or going down another path.  And some of these

19  discussions I will tell you are far from complete, and we've

02:33:08  20  made pledges in good faith to continue in very short time to

21  follow up and with more discussions.

22  THE COURT:  Well, you are, I want to say, I mean, this

23  entire case has been a work in progress, okay, for me.  You are

24  accurate that at the end of the second day of the evidentiary

02:33:38  25  hearing, when I was talking off the seat of my pants or a

1    little bit of thought, I mean more than the seat of my pants,

2    but I was saying that I wanted you to think about if we were

3    to -- that what I learned from the hearing, what seemed to be

4    the most important is that whatever your method would be,

02:34:08   5    whether it would be boolean or predictive coding or whatever

6    they are going to call it next year, is that the parties and to

7    a certain extent the Court, but I think it's more the parties,

8    want to feel and be able to say that this is a verifiable,

9    somewhat verifiable and accurate method that they have chosen.

02:34:37  10    That's what I was trying to say.  I don't think that I said --

11    and I suggest it because I actually think Mr. Regard and Dr.

12    Lewis were, you know, and maybe Dr. Tenny too, maybe could help

13    in trying to do that.

14         Now, the only cases Chris and I have found that have

02:35:04  15    even discussed that are Victor Stanley and Judge Facciola.  But

16    they kind of just talk about it in general.  I was only talking

17    about it in general when I threw it back to you.

18         We fast forward to two weeks ago.  I think you're

19    putting the horse before the cart here as a method goes because

02:35:39  20    to me I feel like I have learned a lot more about what the

21    nature of the search is than I knew two weeks ago.

22         One day -- I owe you an apology.  I was very rude to

23    you.  You wanted to say something about preservation, and I

24    jumped down your throat because I thought, oh, my God, you're

02:36:02  25    going to start some sanctions thing is what I thought, okay?

02:36:27

1       Instead, if I had to do it over again, I would have
2  said, are you talking about sources of information, are they
3  accessible, are they not reasonably accessible, you know, and
4  not even think about sanctions or anything like that.  What I'm
5  seeing now between what, I think Miss Miller keeps giving me
6  these scripts for everything, which I really appreciate.  I
7  have more of the 30(b)(6).  We've read some of the 30(b)(6), so
8  we are starting to get it just like you are starting to get a
9  better understanding of these systems, the letters or the, your

02:36:55

10  new checklist here that you provided following or for the meet
11  and confers.
12       MR. MOGIN:  Right, the agenda that the defendants had
13  requested.
14       THE COURT:  Right.  I'm not, I don't have, because I'm

02:37:16

15  going to be out of here September 30th, I don't have the luxury
16  to put you off or, you know, to try to just push this off.  But
17  I don't think you could do or Dr. Lewis and Dr. Regard are in a
18  position to test the corpus yet, because unless you know a lot
19  more than I know, until we figure out some of the answers to

02:37:44

20  the questions on what's active, was not active or what's
21  accessible, what's not accessible, what has been searched, what
22  hasn't been searched, I don't know why you'd want to do these,
23  the statistical check until you get that information.
24       MR. MOGIN:  Frankly, Your Honor, respectfully I was

02:38:03

25  following your lead in the sense that --

1      THE COURT:  Well, I know, and I'm telling you what
2  happened.  I mean, I now get that if we are going to do it, you
3  don't -- I mean, I don't know what the it is, okay?  I don't
4  know what because I don't know -- and until you look at this is
5  where I think too until you're able to look at some of the
6  materials that are turned over and you can in fact go back to
7  them and say, hey, I need da da da da da, that's what I am
8  seeing.

9      And this isn't, this is just a really iterative
10  process here is what I'm trying to say.  I don't know if the
11  defendants, and today we are going to try to give everybody an
12  individual opportunity here too, I don't want to be clumping
13  them as the defendants; but I don't know if they are saying no,
14  we don't want any kind of testing or -- I don't even know what
15  testing means, but, you know, a check, some kind of a
16  reasonable check.  I would think they would want to know
17  they've done a good search.  They may need these documents.

18      I mean, this is the irony of this.  In every white
19  collar case, not that you're a white collar case, but in every
20  white collar case I was in in this building for 25 years, I
21  needed the documents as much as the government needed the
22  documents.

23      So I don't -- I mean, I don't think even if we, even
24  if all seven of them said "We want to do the search, we want to
25  be tested," I don't know what you would, you would only be

02:38:27

02:38:57

02:39:22

02:39:45

02:40:11

1    testing now without having a bigger portion of each one of

2    their work, right?

3              MR. MOGIN:   Correct, Your Honor, but as I said in

4    light of the Court's comments, and in order to avoid what could

02:40:31    5    have been World War III with respect to what should be in the

6    corpus, for purposes of these discussions, to see if we could

7    get something to come back over the table to us, we were

8    willing to table the discussion of collection to see if we

9    could get a cooperative movement going.  And I'm disappointed

02:40:58   10    to be able to tell you that no defendant will commit, none will

11    commit to a version of the protocol, even taking step one which

12    has to do with the collection, off of the table.  No defendant

13    will commit at this point.  Some have said they are checking on

14    it, but none have committed to even giving us the simple data

02:41:25   15    dictionary that I just described for you, which is the product

16    of, that's essentially the same thing as taking a look at the

17    documents that they are producing.  It's just an abbreviation.

18    It gets us a lot of relevant information quickly, painlessly

19    and inexpensively from the defendants' perspective so that it

02:41:48   20    accelerates our ability to look at their documents and to have

21    an understanding of their documents as well as to get some

22    sense of the real world deficiencies in their search strings.

23    Admittedly to this point we have been talking without having an

24    actual knowledge of what's in the corpus.

02:42:11   25              THE COURT:   Do you feel that after these seven

1   meetings, you now understand or have a better understanding of

2   accessible, nonaccessible data?  I mean, do you have an idea of

3   what's in their collection?

4           MR. MOGIN:  I certainly have a better understanding.

02:42:31   5           THE COURT:  Okay.  So let's take example that the one

6   that's just turned over the 250,000, who just turned over the

7   one with some emails in it?  Was that you, Jim?

8           MR. NEUWIRTH:  No, that was --

9           MR. FELLER:  Yes, Your Honor?

02:42:49   10           THE COURT:  So on that, sir, if you can, will you tell

11   me that -- I'm so trying to stay away from backup -- I'm trying

12   to stay away from buzz words that everybody uses different buzz

13   words.  So of your production, does it include both active data

14   and backup tapes?  Does it, you know, of your email, what did

02:43:19   15   you search?

16           MR. FELLER:  Sure, Your Honor.  And it's Leonid Feller

17   for PCA.

18           Our collection which we just produced is about 47,000

19   documents or document equivalent total.  A portion of that is

02:43:32   20   hard copy, a portion of that is ESI.  The ESI consists of

21   emails, it consists of Microsoft Word documents, Excel

22   documents, PowerPoints, all those sorts of things.

23           In the lingo that we've been using in court, those

24   would all be active server type documents.  We, with a very

02:43:56   25   narrow exception, did not go to any backup tapes to produce

1    that, that ESI.

2         THE COURT:  In your explanation to Mr. Mogin, did you

3    explain to him what periods of time you have active data, where

4    the backup tape -- I mean, what kind of a guide did you give

02:44:24    5    him in addition to giving him the documents?

6         ATTORNEY NO. 2:  So I think we covered some of that

7    today when we met earlier.  A lot of that information was

8    provided in our 30(b)(6) written submission.  I imagine we'll

9    cover more of it when we have the actual 30(b)(6) deposition.

02:44:41    10   But I would hope that Mr. Mogin and his team have a fairly good

11   understanding of all of those issues.

12        THE COURT:  Okay.  And has he -- you've given him a

13   list of your custodians that you searched under, and did he ask

14   you to increase any of your custodians or did he offer to you

02:45:09    15   any words that he wanted you to search?

16        MR. FELLER:  Your Honor, we have provided a list of

17   custodians, and what we have said is we are perfectly willing

18   to take under consideration any additional custodians

19   plaintiffs would like to suggest.  They have not done that yet,

02:45:25    20   but I understand that's going to be an ongoing process and they

21   may do that in the future.  And similarly with search terms,

22   they haven't at this point suggested any additional search

23   terms, but we understand they may do that in the future.

24        MR. MOGIN:  May I address the custodian issue?

02:45:40    25        THE COURT:  Yes.

1    MR. MOGIN:  With respect to the defendants, Your

2   Honor, if you look at the backup, as you know, from the

3   inception the plaintiffs have been clear that they were

4   uncomfortable with the custodial approach.

02:45:53    5    THE COURT:  Right.

6    MR. MOGIN:  The defendants' position was essentially

7   that it was the only feasible way for them to conduct the

8   search.

9    If you go back and you look at the requests for

02:46:03    10   production of documents, I believe it's definition or

11   instruction No. 9 lists corporate functions that we are

12   interested in, identifies those corporate functions.  It's not

13   quite a job description, but it's who performs the following

14   functions.  And then there are various requests for production

02:46:25    15   that ask for materials from particular corporate functions.

16    Corporate functions aren't quite the same thing as the

17   custodians.  What the defendants will tell you is that by and

18   large the custodians that they have tendered are the top people

19   that fulfill those functions.

02:46:51    20    Some defendants, and as I'm standing here I can't tell

21   you which one, have given me job descriptions, and the joke

22   during our meet and confers was those are great but they are in

23   HR-speak; I speak antitrust and English, I don't know HR, and I

24   don't want to hire another linguist.  So some of the defendants

02:47:14    25   are considering whether to give us more or different

1  descriptions.

2  But the issue is to what extent can the custodians

3  match the functions.

4  THE COURT:  It's No. 9.

02:47:27  5  MR. MOGIN:  It is No. 9.  And defendants go,

6  defendants by and large, their custodians are, as they describe

7  them, top people, decisionmakers if you will, which is all well

8  and good.  From our perspective, those may be the people who

9  actually effectuated the conspiracy.  But that does not mean

02:47:54  10  those are the people who made records that would reveal the

11  conspiracy.

12  Recall, please, Your Honor, that as this is pleaded in

13  the complaint, and this is something that Judge Shadur made

14  specific reference to in his opinion denying the motions to

02:48:12  15  dismiss, we are not writing on a blank slate here.  This is an

16  industry with a history.  In fact, we even alleged that there

17  was a seminar that took place at a trade association meeting,

18  the American Forest Products Association, in 2005, just as the

19  conspiracy was taking off, and the seminar was entitled "Are

02:48:37  20  you vulnerable to antitrust lawsuits?"  From the information

21  that we have, it was as much about how to conceal an antitrust

22  conspiracy as it was about anything else.

23  The defendants, of course, the trade association will

24  dispute that characterization.  However, I would note, you

02:48:57  25  know, we all live in a world where the headlines are out there.

1    You probably heard of the eBooks case that the justice

2    department just filed against Apple and other publishers, and

3    there is a specific reference to that type of thing in the

4    justice department's allegations that says that the defendants

02:49:19    5    went to great pains, the chief executives met, that they went

6    to great pains to avoid leaving paper trails, things like be

7    sure, they would tell each other, to double delete.

8    So given this industry's history, that is precisely

9    the type of situation that I think it's reasonable for us to

02:49:47    10   use as our investigative assumption, and because of that we

11   have to go deeper on these organizational charts with respect

12   to custodians than most of the defendants have gone to this

13   point.  And in order to do that, I need some sort of matching,

14   and you'll see that on the agenda, Your Honor, I asked for this

02:50:09    15   in the meet and confer, what can we do to bridge the gap

16   between your custodian list and my corporate function list, and

17   so that I can get an understanding of who might be a possible

18   record keeper of the conspiracy as opposed to decisionmaker.

19   THE COURT:  You know, I saw that.  What do you mean by

02:50:28    20   that?  I saw that in one of your -- how would someone be the

21   record keeper of the conspiracy?  What do you mean?

22   MR. MOGIN:  It's fairly simple.  I'm the chief

23   executive officer, and I met with my fellow chief executive

24   officers, and we all agreed we would raise prices by $50 a ton,

02:50:46    25   and we would reduce our capacity at about the same time.

1        Well, I'm not going to, as the CEO, write a memo that
2   says that I just broke the antitrust laws and I've exposed
3   myself to criminal liability and my corporation to treble
4   damages.  But I may say something to somebody on my staff who
02:51:07   5   will write something down to justify other conduct.  This is
6   what my 32 years has taught me, that that is the type of
7   evidence that we see in these cases.

8        MR. FELLER:  And, Your Honor, what Mr. Mogin just said
9   is -- I'll speak for PCA -- is exactly why we think you're
02:51:30   10   exactly right, that plaintiffs have to get through some of
11   these documents and actually look at what we've produced.
12   We've picked 14 custodians for PCA.  Mr. Mogin is exactly
13   right.  It's our CEO, it's our CFO, it's our highest level
14   officials having to do with any issues in the complaint.  We
02:51:48   15   think they are the right people.  We think they are -- we think
16   they are the appropriate people.

17        If Mr. Mogin looks at the documents and says well,
18   what about this person, or our organization chart and that
19   person, we are entirely prepared to have that discussion.  We
02:52:05   20   haven't been -- the plaintiffs haven't, for whatever reason,
21   proposed any additional names to us yet.

22        What we can't do, what we just as Mr. Echols said at
23   the last hearing, what we don't know how to do is collect by
24   corporate function.  That is, it has no meaning to us as a
02:52:22   25   practical thing that we can actually go out and do.

1      So what we are waiting on and the conversation we are

2  perfectly happy to have is for suggestions of additional

3  custodians and to have a meaningful discussion as to whether

4  those are appropriate or not.

02:52:35    5      MR. NEUWIRTH:  May I address this, Your Honor?

6      THE COURT:  Sure.

7      MR. NEUWIRTH:  May I have the podium again?

8      Your Honor, the --

9      If you can give me some space?

02:52:52   10      Your Honor, we appreciate that you want to hear

11  perhaps from multiple defendants today, but there are a few

12  things that I believe I can say on behalf of all the defendants

13  on the issues that have been discussed, and Mr. McKeown has

14  some additional points if it would please the Court.

02:53:08   15      But as a general matter, we told you at the last

16  conference before Your Honor that the defendants are seriously

17  interested, as you said, in trying to get a complete and valid

18  production done that will enable us as well as the plaintiffs

19  to make our case to the Judge on the merits.  We want the

02:53:32   20  evidence in the record.

21      As we told Mr. Mogin when we met with him today on

22  behalf of Georgia Pacific, and I know other defendants have

23  said, the corporate functions that are listed in No. 9 are very

24  broad corporate functions that in the case of Georgia Pacific

02:53:50   25  could, if taken literally, cover almost the entire business.

1    And we explained in our meet and confer with Mr. Mogin that the

2    problem here, and your word "ironic" is correct, is that we

3    really believe both sides are trying to do the same thing which

4    is to figure out who are the people and where are the places in

02:54:14    5    the company where responsive, relevant information exists and

6    how can we get it produced?

7            The difference is that because the plaintiffs are

8    obviously coming to this without having worked at these

9    companies, they need to describe things in a certain level of

02:54:34    10    generality, and the companies very familiar with how their

11    businesses work have attempted to identify the actual people

12    who are doing the things that are the subject matter of the

13    plaintiffs' complaint.

14           Now, in the abstract we understand that it is always

02:54:51    15    possible for people to say well, isn't there possibly someone

16    else out there?  And that's why we have so strongly suggested

17    to Your Honor last week and have continued to suggest today

18    that through the productions that are being made, the

19    plaintiffs will have an opportunity to see in concrete form

02:55:12    20    what it is that we are producing from these custodians' files

21    so that, to the extent the plaintiffs still feel it is

22    necessary to do so, we can have a well-informed and concrete

23    discussion about what else it may make sense to do.

24           And just to put this in perspective, as Mr. Mogin

02:55:34    25    mentioned, there's already been a production by PCA and by

1    Weyerhaeuser.  As we told you last week, Georgia Pacific is on

2    the verge, and we've committed to doing it by the Tuesday, to

3    producing over 700,000 pages of documents which with limited

4    exception is going to be the full production of ESI based on

02:55:53    5    the search term process that was described to Your Honor.

6    That's going to be on Tuesday, which will mean that if you take

7    what's been produced plus what I understand is the more than

8    90,000 pages that Weyerhaeuser is going to be producing today,

9    by Tuesday there will be over a million pages of new documents

02:56:12    10    that have been produced since the last time we were with Your

11    Honor.

12         And nobody is saying to the plaintiffs that you have

13    to look at every single thing that's been produced before we'll

14    talk to you further.  We've already started talking, and we

02:56:24    15    think in some respects the conversations have been

16    constructive.  And I know Georgia Pacific like many other of

17    the defendants agreed today to take certain topics that the

18    plaintiffs raised and get back to them, and we can give you the

19    examples if it would be helpful.  But in general all that we

02:56:40    20    are trying to do here is have a discussion which is concrete.

21    Nobody is looking to put this off by six months or a year.  We

22    think that over the next coming weeks when the plaintiffs are

23    producing what will end up being several million pages of

24    documents, there will be something concrete in the ESI for the

02:56:58    25    plaintiffs to look at.  We'll continue to meet with them.  We

1   are interested in continuing to talk about the time periods for
2   the production.

3           And I would just add in terms of, just very quickly in
4   terms of this issue of active versus inactive.  Certainly one
02:57:15   5   of the things we are all trying to do is make sure that we are
6   getting documents from the entire time period, not just from
7   the recent period.  And I can tell you that in the case of
8   Georgia Pacific, we are producing tens of thousands of
9   documents of ESI from the years 2004, 2005, 2006 that have been
02:57:37   10  collected from the custodian files and the shared files and the
11  other sources that we went to to collect the documents.

12          The goal here is to have an informed discussion that
13  will be concrete and not abstract, that will allow us to work
14  with the plaintiffs to figure things out.  And I can assure you
02:57:57   15  that in the case of Georgia Pacific and I think all the
16  defendants, we are prepared to talk about other custodians, we
17  are prepared to talk about other search terms, but we think to
18  talk in broad generalities about going from where we are to a
19  completely different broad process that's reflected in the type
02:58:18   20  of protocol that's been presented is not the most constructive
21  way to move forward.  We think the most constructive way is to
22  produce what we are producing and continue to talk to the
23  plaintiffs based on the content that's being produced about
24  what it makes sense to do more.

02:58:33   25          And as Mr. McKeown will explain, in the one example

1  that Mr. Mogin gave of whether or not we are willing to produce

2  these word indexes, I believe all the defendants are prepared

3  to do that and several of them already told that to Mr. Mogin

4  today.  So I'm a little surprised by that.

02:58:51  5  But I think our goal is to move this forward, as we

6  said last time, with serious discussions, but to try to do it

7  in a way that will allow us to make real progress by giving

8  these documents to the plaintiffs, having them talk to us about

9  what's in them, finding, you know, if they believe that the

02:59:09  10  custodians we have identified as reflected in the documents are

11  not sufficient, we can then have a meaningful discussion and

12  involve you in it if necessary about how to move forward.

13  And if it please the Court, Mr. McKeown I think can

14  talk about some of the specific things that came up in some of

02:59:27  15  the meet and confers that we are prepared to do.

16  THE COURT:  Sure.

17  MR. McKEOWN:  Actually, I'm not going to have too much

18  at this point, Your Honor, other than Mr. Mogin is correct that

19  yesterday he had asked us about would we be willing to create

02:59:46  20  and prepare a list of all the words that are in our documents

21  according to the, I think Clearwell is what we used.  And we

22  checked this morning, and at least International Paper is

23  prepared to prepare that list.  We need to talk a little more

24  about some of the logistics, but I wanted to use that as an

03:00:04  25  example.

1      I think these discussions over the past three days

2   have been very productive.  Ours went for over two hours.  Mr.

3   Sprung is not with us today, but he was also involved in ours.

4   He came with a list of custodians, and we talked about people

03:00:19    5   and their jobs, and that will continue.  We have indicated if

6   there is a particular custodian to talk about, let's talk about

7   it.

8      On search terms, we've also indicated that to the

9   extent that you look in our documents and you think we are

03:00:30   10   missing something and you want us to test some additional

11   search terms, we are prepared to test additional search terms.

12      THE COURT:  What do you mean by test?

13      MR. McKEOWN:  Well, let's say, for example, that they

14   look at our documents and they say "We have found" -- they look

03:00:41   15   at this data list and they say "We have found that you have not

16   used this term, and we want you to test it."

17      We could run that search term against the documents

18   that we have in our collection that have not yet been hit by

19   any of the search terms, and we can find out if it hits 400

03:00:57   20   documents or 400,000 documents.  If it hits 400 documents, if

21   there's a reasonable list of additional search terms, you know,

22   I'm not going to fight in here over 400 documents.  If it hits

23   400,000 documents, that's a whole different kettle of fish.

24      So that's why we think we are going to be making the

03:01:18   25   production of the ESI for our 26 named custodians in about

1    three weeks.  With that plus this list of all the terms that

2    are in the documents, that would help the discussion we think.

3            THE COURT:  What did Clearwell tell you how, either

4    how -- so Clearwell can make a dictionary, I mean, they can

03:01:43    5    create this dictionary?

6            MR. McKEOWN:  I am told, and I didn't get it straight

7    from Clearwell, I got it from one of the ESI folks that is

8    helping us.  I am told that, at least the way we have our

9    database collected, we can create a list of all the words that

03:01:58   10    are found somewhere in our documents.

11           THE COURT:  And then does it tell them where it is?

12           MR. McKEOWN:  No.

13           THE COURT:  It just says --

14           MR. McKEOWN:  It says "These are all the terms."

03:02:08   15           But if you're worried that someone is misspelling some

16    word and you want to see the various misspellings, it was

17    something that came up yesterday in our meet and confer

18    yesterday afternoon.

19           THE COURT:  Right.

03:02:19   20           MR. McKEOWN:  They asked about it, and we can do that,

21    and we are prepared to do that, but I think those are the types

22    of discussions that probably need to continue.  Each side took

23    their homework home, at least in our case, for what goes next.

24           MR. MOGIN:  May I just say one thing about that,

03:02:34   25    please, Your Honor?

1       THE COURT:  Sure.

2       MR. MOGIN:  I very much appreciate Mr. McKeown's

3   commitment, that is, we've checked our notes.  That's the first

4   commitment that we've heard, and it's very significant that

03:02:43  5   it's coming from Mr. McKeown because at this point, given the

6   Temple-Inland acquisition by his client International Paper and

7   the prior acquisition of Weyerhaeuser by International Paper,

8   it could be that Mr. McKeown's commitment works for three of

9   the seven defendants, and if the other defendants are prepared

03:03:05  10   at this point to commit on the record, that would be very

11   helpful.  I don't know whether he's speaking for IP in his

12   commitment.

13       THE COURT:  Now, wait.

14       MR. MOGIN:  The totality of the IP defendants.

03:03:15  15       THE COURT:  But would that, you know, you're being a

16   good plaintiffs' lawyer, and good trial lawyers sometimes have

17   to ask for more than what they really have to have, and part of

18   my job is to sort of get things down here.  I think you have

19   done a very thorough job here, Mr. Mogin, and I'm, I am trying

03:03:44  20   to get you so you can get comfortable with this because they

21   are willing to give up the hearing.  That's really what the

22   crux of today is.  I mean, it is, is can we -- because time

23   wise we can't do both.  I mean, truthfully, we can't, okay?

24       So what I'm trying to do, the defendants have all said

03:04:06  25   on behalf of their clients that, you know, I kind of put it how

1   do you want to spend the next five months, but it is kind of in

2   reality.  So we need to get you a comfort level here too, I

3   mean, is what I'm trying to do here.

4           So if -- I literally don't know what this -- I mean,

03:04:37   5   you just directed us to No. 9 corporate functions.  You

6   mentioned the dictionary.  And I don't think you're just upping

7   the ante here.  I think you're looking for some way that you

8   can be comfortable on behalf of the class that you're getting

9   the, you're getting -- it's sure as heck never perfection, but

03:05:08   10   you're getting enough information so you can try your case.

11          Now, would this dictionary, if I could get this

12   dictionary, if I could get the other defendants to commit to at

13   least calling, I don't know what system they used, but if I

14   could get them to commit to calling, figuring out the

03:05:28   15   dictionary, would that help in your, would that help you in

16   saying that you think we could work this out?

17          MR. MOGIN:  That would certainly be a help, Your

18   Honor.  It's not --

19          THE COURT:  The end-all?

03:05:41   20          MR. MOGIN:  It's not the silver bullet.  It's one

21   piece of many pieces.

22          THE COURT:  Okay.  You're a very good peacemaker, Mr.

23   McKeown.

24          MR. NEUWIRTH:  And I think I can say unless --

03:05:54   25          THE COURT:  Again, this to me --

1          MR. NEUWIRTH:  We can all try.

2          THE COURT:  -- is something that would help you.

3          MR. NEUWIRTH:  We can all try.  I think we use

4     Clearwell also, so I think we can do it.

03:06:04  5          THE COURT:  And Mr. McKeown might have the other three

6     that are kind of connected.

7          MR. MAROVITZ:  Judge, if I may?  If I were a client, I

8     would be very happy to have Mr. McKeown represent me.

9          I'm Andy Marovitz.  I represent Temple-Inland.  And I

03:06:24  10    don't remember, I don't want the record to be unclear, I do

11    represent Temple-Inland, and in connection with this case, Mr.

12    McKeown does not speak for Temple-Inland or for me.

13         THE COURT:  I'm sorry.

14         MR. MAROVITZ:  No, no worry.  Just, given what Mr.

03:06:35  15    Mogin said, I want the record to be very clear about that.

16         That said, for purposes of the data dictionary this

17    morning, Mr. Mogin asked us about it.  We said we would go back

18    and check into that, and we, to the extent that our system

19    allows us to do that, we'll be happy to provide it, to provide

03:06:54  20    the -- I think it's a data dictionary.  I think it's a word

21    dictionary.

22         MR. FELLER:  And, Your Honor, again, Leonid Feller for

23    PCA.

24         We heard about the data dictionary for the first time

03:07:03  25    today at 1:30.  We did not use Clearwell, and so, again, I

1   don't even know if we have the capability.  If we do have the

2   capability, I don't think we have an objection conceptually to

3   producing it.  We have some concerns down the road about what

4   it could and should be used for and how it actually advances

03:07:22   5   the process.  So subject to whether or not it actually exists

6   and whether our technology is capable of producing it, we don't

7   have an objection to it.

8         THE COURT:  Hi.

9         MR. McCAREINS:  Mark McCareins for RockTenn.

03:07:37   10         I don't think this dictionary thing came up in our

11   two-hour meet and confer.

12         THE COURT:  Okay.

13         MR. McCAREINS:  But they asked us in three different

14   letters like a hundred questions, so we spent a lot of time

03:07:49   15   answering those.

16         THE COURT:  They did.  They are very thorough.

17         MR. McCAREINS:  And they are tough graders too.

18         THE COURT:  Yes, they are.

19         MR. McCAREINS:  So my guru on this subject is Mr.

03:07:59   20   Mayer.

21         THE COURT:  Yes.

22         MR. McCAREINS:  Britt Miller sitting back there.  And

23   I don't know if we have this dictionary, so we are checking on

24   it.

03:08:08   25         THE COURT:  Sounds good.  That's what I want to hear.

1     MR. McCAREINS:  Yes.

2     THE COURT:  That's what I need to hear.  I never heard

3  of it either.

4     MR. McCAREINS:  It's news to me.

03:08:16     5     THE COURT:  Right.  Okay.

6     MR. MENDEL:  Your Honor, Scott Mendel.

7     We had the first meet and confer for Mr. Mogin, and

8  that did not come up in our meeting, so I'm hearing about it.

9     THE COURT:  See, he got better as the meet and confers

03:08:33    10  went on, and that is good.  And you volunteered, you were the

11  nice person who started this all off last time.

12     MR. MENDEL:  And we do use a different platform for

13  our documents, but I will check and see if the dictionary is

14  possible and, if so, what we can do to provide it.

03:08:48    15     THE COURT:  Mr. Mogin -- I want to ask a question.

16  Mr. Mogin, is this dictionary referred to as anything else

17  other than a dictionary?  I mean, is there like another term of

18  art on this?  Mr. McKeown too.

19     MR. McKEOWN:  Your Honor, we had the discussion --

03:09:08    20     MS. BARRY:  You can call it an index or a word list.

21  Any system that does boolean search indexes every single word

22  in the data set so that it can find them.

23     MR. MOGIN:  For the record, that was our consultant

24  Diane Barry, and that was our understanding as well after our

03:09:23    25  conversation yesterday with Mr. Mogin and his team, that what

1  they are looking for is a list of all the words in the

2  documents and that we can produce this list of all the words.

3      I also understand it will be fairly lengthy, so it,

4  therefore, may be transmitted electronically rather than on

03:09:39  5  paper.

6      THE COURT:  Okay.  Well, gee, it was worth a trip to

7  Chicago today.  We all learned something knew.

8      I didn't mean to cut you off.

9      MS. DIVER:  That's okay, Your Honor.  Jennifer Diver

03:09:49  10  on behalf of Weyerhaeuser Company.

11      We are using the Clearwell search system, and although

12  this issue did not come up in our meet and confer with Mr.

13  Mogin, it's my understanding that we are able and prepared to

14  provide this word index as well.

03:10:02  15      THE COURT:  Okay.

16      MR. MOGIN:  I don't know how I could have missed all

17  of these, Your Honor, with the script that I was using.

18      THE COURT:  Well, you had a lot to do.  Okay.

19      MR. MOGIN:  So we got a little sidetracked.  We have

03:10:24  20  worked through one of the issues.  The custodian issue remains

21  open.

22      THE COURT:  Well, except what they are saying, what

23  every single person who stood up here today said is they are

24  open to, after you look at some of the documents, and it's not

03:10:43  25  a quid pro quo, but it just makes more sense because they are

1 also acknowledging, unlike an employment case, you don't have

2 an insider -- I mean I'm assuming you don't have an insider at

3 seven companies -- so you're not going to know who might be

4 more appropriate people or more -- I don't even mean

03:11:06    5 appropriate, but more targeted people.  So as soon as you can

6 get to some of the key and you find out that Mann is sending to

7 Chris and you didn't know about Chris, maybe you want Chris,

8 maybe you want to add Chris as a custodian.

9              MR. MOGIN:  All I was searching for, Your Honor --

03:11:29   10              THE COURT:  They are saying, I affirmatively heard

11 them say on the record they are willing to do it.  Now, if you

12 come back with 500, they may be in here saying to me "I didn't

13 agree to 500."  But, I mean, as it is, as the record is right

14 now, all seven, correct, fellows, ladies, all seven said they

03:11:54   15 will entertain.

16              Now, I am not saying that takes away everything you've

17 said here, but as the judge here I have to decide whether we

18 are going back to the hearing or whether we are going to

19 continue.  And I'm inclined to, I'm certainly inclined today

03:12:34   20 for you to get at least a look-see at these documents.  I think

21 you're going to know much more than you know right now.

22              I think after you also take a look-see, another round

23 of meet and confers, and I didn't offer the last time, but I'm

24 happy to sit in if you want it.  I mean, I think you're doing

03:13:10   25 just fine without me, but I would be willing to do that.

1     MR. MOGIN:  If you were there, Your Honor, we would

2  not get the full benefit of Mr. McCareins' sense of humor.

3     THE COURT:  No, I actually know Jim.  Jim is on our

4  committee.  I actually know Jim.  He does have a good sense of

03:13:28   5  humor, don't you think?

6     MR. MOGIN:  Your Honor, may I suggest this then?  I

7  realize that you would prefer not to have to go back to the

8  hearing.

9     THE COURT:  I'd prefer not to what?

03:13:41  10     MR. MOGIN:  Yes, not to have to go back to the

11  hearing.

12     THE COURT:  Well --

13     MR. MOGIN:  To try to resolve this a different way.

14     THE COURT:  Well, that's for sure.  That's for sure,

03:13:50  15  because I am trying to get, I think it's a more direct way for

16  you to get this information than kind of where we were going.

17  I would like to get us as good of a search method as possible.

18  I think, I think we all want the same thing here, actually.

19     MR. MOGIN:  Well, I was going to say that one of the

03:14:30  20  things that seems to get lost in the discussion when the

21  defendants talk about their efforts and their burden and their

22  expense, it works two ways.  It's not as if I want an unlimited

23  universe of documents for people to have to plow through.  That

24  just costs me time and money, and as a good plaintiff's lawyer,

03:14:51  25  I would just as soon get this case over sooner rather than

1　later.

2　　　　THE COURT:  Right.

3　　　　MR. MOGIN:  Your Honor, may I make the following

4　suggestion?

03:15:00　5　　　　THE COURT:  Sure.

6　　　　MR. MOGIN:  There are still a number of issues that

7　are outstanding, a number of things that were discussed during

8　the meet and confers that the defendants still have to get back

9　to us on, similar to what we just went through with the

03:15:14　10　dictionary issue.  Might I suggest that we schedule another

11　status conference.  We'll continue with the meet and confer

12　process.  Perhaps we'll come back here in about three weeks or

13　so, depending upon your schedule, and we'll report our

14　iterative progress to you at that point, at which time I will

03:15:35　15　have had some chance, not a great one, but some chance to have

16　a look-see.  I should hopefully have these dictionaries in

17　hand.

18　　　　THE COURT:  Do you think, Mr. McKeown, did they say

19　how long it would take to get the dictionary?

03:15:52　20　　　　MR. McKEOWN:  Not entirely clear, Your Honor, and with

21　IT people, when they give me an estimate, I usually have to

22　quadruple it.  But we'll try to get it within the next week or

23　so.

24　　　　THE COURT:  Well, since you started it, it would also

03:16:05　25　help if maybe you could get Mr. Mogin one of them.  When does

1   he get your documents?

2         MR. McKEOWN:  He has our hard copy documents, our ESI

3   documents with the 26 named custodians will be in about three

4   weeks.

03:16:24   5         MR. NEUWIRTH:  We were going to suggest, Your Honor,

6   that maybe in light of those facts, that it might make sense to

7   try to do this in the third or fourth week of May so that

8   there's enough time for us to give what we are giving, have

9   some opportunity to look at it, and perhaps have some further

03:16:43   10   meet and confer.

11         MR. McKEOWN:  I don't have a problem giving the list

12   of words sooner rather than later.

13         THE COURT:  Well, I'm just thinking.  PCA, our PCA

14   fellow, you've given the documents already?

03:16:55   15         MR. FELLER:  Yes, Your Honor.

16         THE COURT:  So if you were to go back --

17         MR. FELLER:  Yes.

18         THE COURT:  And you were -- and who is your, you don't

19   have Clearwell, do you?

03:17:06   20         MR. FELLER:  We don't have Clearwell.  Our vendor is

21   Epiq, and I can certainly call them as soon as we are back.  I

22   take Miss Barry on her word, but candidly I don't know that it

23   exists or not.  But assuming it does --

24         THE COURT:  If you could get them yours the quickest,

03:17:22   25   there might be a way to see how effective, I mean, since Mr.

1 Mogin -- I mean, that would just help if he had the dictionary
2 and one set of the documents.  And then when you come back, we
3 could talk about something concrete.  What do you think about
4 that?

03:17:41  5          MR. FELLER:  Your Honor, again I'm happy to try.
6          THE COURT:  Good.
7          MR. FELLER:  I don't know that it exists yet much less
8 how long it will take, but I'm certainly happy to try.

9          MR. McKEOWN:  And I don't have a problem, assuming we
03:17:52  10 can create this word list off the computer, giving the word
11 list to Mr. Mogin before.

12          THE COURT:  Then at least he could see that too.  That
13 would help too.  Okay.

14          Well, I think we should do another round, clearly do
03:18:11  15 another round.  You're learning, as you just said, you were
16 very candid, you've also learned a lot more in talking about
17 things too.  I'm not into taking -- sure.

18          MR. McKEOWN:  Yes.  Your Honor, I just wanted to
19 clarify one thing with respect to the dictionaries before we
03:18:42  20 all broke and started talking about other subjects.

21          Many of the programs have the ability to put in sort
22 of a hit count next to the word.  So if it's the word "Nolan,"
23 it will say, you'll get a sense that Nolan was hit on 38 times,
24 40 times, whatever.

03:19:02  25          THE COURT:  Okay.  Well, if they can do that, that's

1   even better.  It helps everybody then.  Okay?

2         MR. McKEOWN:  I don't know whether or not we can do

3   that, Your Honor.  We will check to see if it can be done and

4   how hard it would be to do.

03:19:14   5         THE COURT:  Right.

6         MR. McKEOWN:  Because what I also don't want to do is

7   shut down my electronic discovery process to occupy computer

8   time if this is going to take three weeks to run it with a hit

9   count.  I just don't know how hard it is.

03:19:28   10         THE COURT:  Well, you find out, and let Mr. Mogin

11   know.

12         MR. McKEOWN:  We will.

13         THE COURT:  Okay.  Now.

14         MR. MAROVITZ:  Judge, Andy Marovitz for Temple-Inland.

03:19:40   15         We think Mr. Mogin's idea of coming back at some point

16   is a good one.  We do think that it would make sense for all

17   the defendants to have an opportunity to be able to produce

18   something in addition, and we mentioned to Mr. Mogin this

19   morning that we are shooting to make a production during the

03:19:59   20   week of April 30th that would go sometime until the 4th.

21         We would look for a day maybe in the middle of May to

22   give Mr. Mogin and his team a chance to look at whatever

23   documents they wanted to from the other defendants as well, so

24   we were hopeful for some time during the week of May 14th if

03:20:21   25   that's suitable with the Court.

1      THE COURT:  Well, I was going to, I mean, that's fine.

2    We'll find a date here.  I had even wanted to give Mr. Mogin,

3    if this would give him any kind of a comfort level so it

4    doesn't just get out there, is I don't do settlement

03:21:00   5    conferences on Fridays.  So if we can get the ball rolling

6    here, we could do telephone statuses so all of you don't have

7    to travel all the time, but we could do some series of

8    conferences, telephone conferences for people to make sure

9    things were happening, productions were happening.

03:21:22   10      I think the next one ought to be in person again,

11   though, because I think you're going to need feedback.  But

12   this isn't to -- I mean, I want to do everything we can to keep

13   this momentum going is what I'm saying.  I mean I'm saying it

14   to the defendants too, because I think that would give you,

03:21:43   15   Fridays can be kind of a clean, you know, like the old ravioli

16   day, whatever that ad was.

17      MR. MAROVITZ:  Wednesday is Prince Spaghetti day.

18      THE COURT:  Right, it can be Prince Spaghetti, this

19   can be clean day or something if you wanted to, because I don't

03:22:00   20   do mediations on Friday.  So let's do directly, if we were

21   going to try to do, what's that week?  You know, let me go get

22   my sheets.

23      MR. MOGIN:  The week that the defendants were

24   mentioning was a little tough for us.  Would the following week

03:22:21   25   be possible?  That would be the week of the 21st of May.

1       THE COURT:  Okay.

2    (Pause.)

3       MR. MAROVITZ:  Judge, we just took an informal caucus

4 and got no dissent for May 22nd.  But your schedule is the most

03:23:12   5 important, so if May 22nd is a good date for you, that works

6 for all the lawyers.

7       THE COURT:  Well, I think we are going to make it

8 work.

9       MR. MAROVITZ:  Your Honor, what time would be

03:23:31   10 convenient?

11       THE COURT:  Well, do you think you'd try to have

12 meetings again?  Would you kind of -- this seems to be very

13 productive.  They are going to know a lot more.  Can you do the

14 Monday-Tuesday again, and then come if you wanted to come

03:23:57   15 Tuesday at 1:30?

16       MR. MOGIN:  I'll try, Your Honor.  There's seven

17 defendants, and it's very difficult to meet individually with

18 the defendants, seven of them in one day basically.

19       THE COURT:  But I meant if you started on Monday, the

03:24:11   20 21st, would that work?

21       MR. MOGIN:  Three to four a day is about what it

22 takes.

23       THE COURT:  Well, we can do 3 o'clock.  I work at

24 night.  I mean we can start at, we can easily start at 3

03:24:23   25 o'clock.  Would 3:30 be better?

1      MR. MOGIN:  How about we'll split the baby.  How about
2   2:30?

3      THE COURT:  That's fine with me.  I'm here.

4      MR. MOGIN:  And I'll see what I can do by telephone
03:24:34   5   and what I can do in person.

6      THE COURT:  Yes.  Does that, can some of you commit to
7   the first day if Mr. Mogin comes from California?

8      MR. MAROVITZ:  Sure.

9      THE COURT:  Okay.

03:24:45  10      MR. McKEOWN:  We'll make it work, Your Honor.

11      THE COURT:  Sounds good.

12      What are we telling Judge Shadur?  Here's what I want
13   to know, because you've got the April 30th status.  I think
14   when I called him the last time, I think he reset it till April
03:25:02  15   30th.

16      MR. MAROVITZ:  Yes.  Our thought for the defendants
17   would be it would make sense to reset that again till at least
18   sometime after we've had a chance to meet with you.

19      THE COURT:  Well, one thing I could do if you're all
03:25:17  20   going to be here the 22nd of May, I mean, maybe would you like
21   to meet with him?  Do you want to tell him yourself what's
22   going on or, I mean --

23      MR. MOGIN:  I think that would be productive, Your
24   Honor.

03:25:30  25      THE COURT:  I have no idea if he sits on Tuesday.  I

1   have no idea on anything.

2         MR. MOGIN:  Judge Shadur?  I can't believe he doesn't

3   sit on Sundays.

4         THE COURT:  Right, that's true.

03:25:40  5         MR. MAROVITZ:  Judge, obviously if Judge Shadur is

6   interested in hearing the status, we would present it to him.

7   We don't, I don't know that there's a need to take up his time

8   until we have some resolution one way or the other.  I think we

9   are working toward --

03:25:54  10         THE COURT:  Well, that is true because we don't know

11   yet.

12         MR. MAROVITZ:  We are working right now towards

13   resolution, and, frankly, it might be better for everybody if

14   we got either to a place where we had a more concrete

03:26:06  15   resolution of the issues or a live dispute for Your Honor or

16   Judge Shadur to resolve.

17         MR. MOGIN:  It's a good point, Your Honor.

18         THE COURT:  Yes.

19         MR. MOGIN:  Maybe the best thing to do is Judge Shadur

03:26:16  20   would probably rather hear from you than us.

21         THE COURT:  That's true because he likes Nan so much.

22         MR. MOGIN:  So perhaps if you conferred with him, and

23   we'll do whatever you guys decide, obviously.

24         THE COURT:  Right.  And if he wanted to, I can offer

03:26:29  25   to him that you're here.  If he needs to, I think he'll be

1  happy to do it this way.

2      And so we are going to continue to try, and that will

3  still give us plenty of time that if we are not able to do it

4  and you want to either continue with argument, the hearing,

03:26:52  5  whatever you want, you're going to have the ability to do that.

6      MR. MOGIN:  There's one other subject that I would

7  like to raise, Your Honor.

8      THE COURT:  Sure.

9      MR. MOGIN:  And not to anticipate in advance or to

03:27:06  10  somehow ruin the possibility of agreement, but we had been

11  looking at the Court's procedures on motions to compel, and

12  they, we gamed out how much time it might take for a typical

13  motion and it was about a six- to seven-week process.

14      THE COURT:  All right.  Now, let me just tell you,

03:27:25  15  though, on that procedure, we just instituted about a year ago,

16  I looked at Shira Scheindlin's web site.  She also told me at

17  some conference I was at, her web site says no discovery

18  motions, or discovery motions are prohibited, and I guess I

19  thought oh, maybe I should start increasing the ante for

03:27:57  20  discovery motions.

21      In this case, you have to have a meet and confer.

22  Obviously you have to have a real meet and confer.  You do not

23  have to -- I'm not holding you to that entire process.  If your

24  meet and confer cannot work, you can even agree upon a

03:28:15  25  discovery schedule.

1    MR. MOGIN:  Thank you, Your Honor.  Appreciate it.

2    THE COURT:  That will take that away because I do in

3  fact want to do as much of the discovery in this case as

4  possible.

03:28:26   5    MR. MOGIN:  Thank you, Your Honor.  That's very

6  helpful.

7    THE COURT:  And the same thing for the defendants too

8  if you're having a problem too.

9    MR. McKEOWN:  Thank you.

03:28:34   10   THE COURT:  You have a protective order already.

11   MR. MOGIN:  Yes, ma'am.

12   THE COURT:  Now, I do have another question.  How far

13  are you on the 30(b)(6)s?

14   MR. MOGIN:  We still have PCA which is scheduled I

03:28:47   15  believe for May the 6th?

16   MR. FELLER:  10th.

17   MR. MOGIN:  May the 10th.  And we still have -- let

18  the record note that Ms. Miller just threw Mr. Mandell under

19  the bus, pointed him out.  So we still have his client to go,

03:29:05   20  and Georgia Pacific.

21   THE COURT:  All right.  Something I utilized with Miss

22  Miller in our last antitrust case that if I could impose, this

23  would help because we were trying to do working statuses, is

24  that I would ask that the day before, it doesn't even have to

03:29:34   25  be before that, if I could have a short status letter or a

1    report, whatever you want, if you want it for the record or you

2    can -- and these would be, it would kind of get you thinking

3    issues for the agenda too.  And it doesn't have to be long,

4    complicated, grammatically correct.  It doesn't have to be

03:29:56    5    anything.  It's just kind of here we go, Judge, here's what we

6    need to talk about, okay?

7        MR. MOGIN:  Could I beg a favor on that, Your Honor?

8        THE COURT:  Sure.

9        MR. MOGIN:  Make it a very short page limitation.

03:30:09    10        THE COURT:  I don't even do that.  I mean, it's just

11    very, it's just very simple here are the things.  You know,

12    we've got agreements on this, we don't need to talk about this,

13    but here are the issues.

14        I'm really curious to see, will you let me know on

03:30:25    15    this dictionary?  This would be helpful.

16        MR. McKEOWN:  Your Honor, we could probably get you a

17    copy if you would like one.

18        THE COURT:  No, no.

19        MR. McKEOWN:  I think I have my answer.

03:30:36    20        THE COURT:  Okay, thank you.

21        Do any of the defendants, does anyone wish to say

22    anything?  I am really conscious that each of you are getting

23    individual consideration.  I think a lot of clients now read

24    transcripts, and I want to make sure that everyone, if anyone

03:30:57    25    needs, would like to say anything about their client, they have

1    an opportunity to do so.

2         Okay.  Well, new plaintiffs' counsel, who is new here

3    who wasn't here before?  Anybody new.

4         MR. MOGIN:  This is our co-counsel, Mr. Goodwin from

03:31:12    5    Philadelphia.

6         THE COURT:  Hi, Mr. Goodwin.  I'm glad you're here.  I

7    saw your name.

8         MR. MOGIN:  What I didn't tell Your Honor is that the

9    plaintiffs have for each defendant and for certain third

03:31:25    10    parties our co-counsel we have assigned so they specialize in

11    particular defendants.  So Mr. Goodwin is the specialist in

12    Georgia Pacific.

13         THE COURT:  Well, good.

14         MR. MOGIN:  Mr. Eisler was here before.  He was for

03:31:37    15    PCA.

16         THE COURT:  That's good.

17         MR. MOGIN:  So each of those came in for these meet

18    and confers.

19         THE COURT:  I noticed that on the 30(b)(6)s there were

03:31:44    20    people other than you sending letters, and I couldn't figure

21    out how that was happening.

22         MR. MOGIN:  So each of them came into Chicago and

23    participated in the meet and confers.

24         THE COURT:  Good.  Does that work for you, sir?

03:31:57    25         MR. GOODWIN:  Yes, that's working just fine.  Thank

1    you, Your Honor.

2        THE COURT:  Okay, thank you.

3        Well, we'll see everybody.  If you have any

4    emergencies, anything like that, we take phone calls here,

03:32:08    5    okay.  You can always email Chris.

6        Peace.  Bye.

7        MR. MOGIN:  Thank you, Your Honor.

8        MR. McKEOWN:  Thank you, Your Honor.

9        THE COURT:  See you in a couple weeks.

10        (Proceedings concluded.)

11                 C E R T I F I C A T E

12        I, Michael P. Snyder, do hereby certify that the

13    foregoing is a complete, true, and accurate transcript of the

14    proceedings had in the above-entitled case before the Honorable

15    NAN NOLAN, one of the judges of said Court, at Chicago,

16    Illinois, on April 19, 2012.

17

18                    /s/ Michael P. Snyder

19                    Official Court Reporter

20                    United States District Court

21                    Northern District of Illinois

22                    Eastern Division

23

24

25