```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   KLEEN PRODUCTS LLC, et al.,      )  Docket No. 10 C 5711
                                      )
 4              Plaintiffs,           )  Chicago, Illinois
                                      )  June 19, 2012
 5        v.                          )  1:40 p.m.
                                      )
 6   PACKAGING CORPORATION OF         )
     AMERICA, et al.,                 )
 7                                    )
              Defendants.             )
 8

 9             TRANSCRIPT OF PROCEEDINGS - Status
             BEFORE THE HONORABLE NAN R. NOLAN
10

11   APPEARANCES:

12
     For the Plaintiffs:      THE MOGIN LAW FIRM PC by
13                            MR. DANIEL J. MOGIN
                              707 Broadway
14                            Suite 1000
                              San Diego, California 92101
15

16                            FREED KANNER LONDON & MILLEN LLC by
                              MR. MICHAEL J. FREED
17                            MR. ROBERT J. WOZNIAK
                              2201 Waukegan Road
18                            Suite 130
                              Bannockburn, Illinois 60015-1543
19

20                            SCOTT+SCOTT LLP by
                              MR. WALTER W. NOSS
21                            707 Broadway
                              Suite 1000
22                            San Diego, California 92101

23
                              BERGER & MONTAGUE PC by
24                            MR. CHARLES P. GOODWIN
                              1622 Locust Street
25                            Philadelphia, Pennsylvania 19103
```

```
 1    APPEARANCES (Cont'd.):

 2
      For the Plaintiffs              HAGENS BERMAN SOBOL SHAPIRO LLP by
 3    (Cont'd.):                      MR. ANTHONY D. SHAPIRO
                                      1918 Eighth Avenue
 4                                    Suite 3300
                                      Seattle, Washington 98101
 5
 6                                    GRANT & EISENHOFER PA by
                                      MR. ROBERT G. EISLER
 7                                    123 Justison Street
                                      Wilmington, Delaware 19801
 8
 9                                    MILLER LAW LLC by
                                      MR. MATTHEW E. VAN TINE
10                                    115 South LaSalle Street
                                      Suite 2910
11                                    Chicago, Illinois 60603

12
13    For Defendant PCA:             KIRKLAND & ELLIS LLP by
                                      MR. LEONID FELLER
14                                    300 North LaSalle Street
                                      Chicago, Illinois 60654
15
16
      For Defendant                  FOLEY & LARDNER LLP by
17    International Paper:            MR. JAMES T. McKEOWN
                                      777 East Wisconsin Avenue
18                                    Milwaukee, Wisconsin 53202
19
                                      FOLEY & LARDNER LLP by
20                                    MS. JOANNE LEE
                                      321 North Clark Street
21                                    Suite 2800
                                      Chicago, Illinois 60654-5313
22
23                                    EIMER STAHL LLP by
                                      MR. NATHAN P. EIMER
24                                    224 South Michigan Avenue
                                      Suite 1100
25                                    Chicago, Illinois 60604
```

```
 1    APPEARANCES (Cont'd.):

 2

 3    For Defendants           K&L GATES LLP by
      Norampac and             MR. SCOTT M. MENDEL
      Cascades:                70 West Madison Street
 4                             Suite 3100
                               Chicago, Illinois 60602-4207
 5

 6
      For Defendant           McDERMOTT WILL & EMERY LLP by
 7    Weyerhaeuser:           MS. JENNIFER A. SMULIN DIVER
                              227 West Monroe Street
 8                            Suite 4400
                              Chicago, Illinois 60606-5096
 9

10
      For Defendant           QUINN EMANUEL URQUHART &
11    Georgia-Pacific:        SULLIVAN LLP by
                              MR. STEPHEN R. NEUWIRTH
12                            51 Madison Avenue
                              22nd Floor
13                            New York, New York 10010

14

15    For Defendant           MAYER BROWN LLP by
      Temple-Inland:          MR. ANDREW S. MAROVITZ
16                            MS. BRITT M. MILLER
                              71 South Wacker Drive
17                            Chicago, Illinois 60606

18

19    For Defendant           WINSTON & STRAWN LLP by
      RockTenn:               MR. R. MARK McCAREINS
20                            MR. MICHAEL P. MAYER
                              35 West Wacker Drive
21                            Chicago, Illinois 60601-9703

22

23    Court Reporter:         LAURA R. RENKE, CSR, RDR, CRR, CLR
                              Contract Court Reporter
24                            219 S. Dearborn Street, Room 2144A
                              Chicago, Illinois 60604
25                            708.447.0905  laurarenke@hotmail.com
```

1        (In open court.)

2            THE COURT:  Hi, everybody.  Have a seat, please.

3    Okay.  Thank you.

4            THE CLERK:  10 C 5711, Kleen Products v. Packaging

5    Corporation.

6            THE COURT:  Okay.  Good afternoon.  We'll have the --

7    we're here for a status, a working status.

8            We have a new court reporter.  What's your name?

9            THE REPORTER:  Laura Renke.

10           THE COURT:  Laura.  Hi, Laura.  Thank you for helping

11   us today.

12           So let's start with the plaintiffs.  Mr. Mogin, will

13   you introduce your team, and if people are associated with the

14   case, will you tell us, please?

15           MR. MOGIN:  Certainly.  Good afternoon, your Honor.

16   Dan Mogin on behalf of the plaintiffs.  Also with me are my

17   co-lead counsel: Mr. Freed, Mr. Wozniak, from the Freed firm;

18   Mr. Van Tine, who is helping with the Temple-Inland issues.

19           THE COURT:  Okay.

20           MR. MOGIN:  Mr. Goodwin, who is helping with the

21   Georgia-Pacific issues; Mr. Shapiro, Anthony Shapiro, who is

22   working with the IP issues.

23           THE COURT:  Oh, good.

24           MR. MOGIN:  He's here in lieu of Mr. Sprung.

25           THE COURT:  Okay.  Thank you.

1          Welcome, Mr. Shapiro.  Glad to have you.

2          MR. SHAPIRO:  Thank you, your Honor.

3          MR. MOGIN:  Seated next to him is Robert Eisler,

4    E-I-S-L-E-R.

5          THE COURT:  Okay.

6          MR. MOGIN:  And he's helping us with the PCA-related

7    issues.

8          THE COURT:  Okay.

9          MR. MOGIN:  Also Walter Noss, from the ScottScott

10   firm.  And --

11         THE COURT:  Is that N-O-S-S or K?

12         MR. NOSS:  N-O-S-S.

13         THE COURT:  N-O-S-S.  Okay.

14         MR. MOGIN:  And behind him, as you know, is our expert

15   witness, David Lewis, L-E-W-I-S.

16         THE COURT:  Oh, hi, Mr. -- hi, Doctor.

17         Okay.  Good.  And let's start with Georgia-Pacific.

18   Okay?  Hi, Mr. Neuwirth.

19         MR. NEUWIRTH:  Good afternoon, your Honor.

20         THE COURT:  You want to say -- just for the record,

21   just say your name?  Okay.

22         MR. NEUWIRTH:  Thank you.  Stephen Neuwirth for

23   Georgia-Pacific.  Thank you.

24         THE COURT:  Thanks, Mr. Neuwirth.  Okay.

25         MR. McKEOWN:  Good afternoon, your Honor.  James

1  McKeown.  With me is Nate Eimer from Eimer Stahl, Joanne Lee

2  from Foley & Lardner.  We represent International Paper.

3          THE COURT:  Okay.  Thanks, Mr. McKeown and Mr. Eimer

4  and Ms. Lee.  Okay.

5          MR. MENDEL:  Scott Mendel for Cascades and Norampac.

6          THE COURT:  Thank you.

7          MR. McCAREINS:  Mark McCareins for RockTenn, and with

8  me is my first lieutenant, Mike Mayer.

9          THE COURT:  Oh, good.  Hi, Mr. Mayer.

10         MR. MAYER:  Hello, your Honor.

11         THE COURT:  You keep us all smiling.  So I'm very glad

12 you're here, Mr. McCareins.  Thank you.  Okay?  That's your job

13 in this case -- okay? -- is a few jokes, a little levity.

14         MR. McCAREINS:  Can you enter an order that I can show

15 to my wife?

16         THE COURT:  Sure, absolutely.

17         MR. FREED:  She won't believe it.

18         THE COURT:  Hi, Mr. Marovitz.

19         MR. MAROVITZ:  Good afternoon, Judge.  Andy Marovitz

20 and Britt Miller for Temple-Inland.

21         THE COURT:  Thank you.

22         MS. DIVER:  Good afternoon, your Honor.  Jennifer

23 Diver for Weyerhaeuser Company.

24         THE COURT:  Thanks, Ms. Diver.

25         MR. FELLER:  And good afternoon, your Honor.  Leonid

1   Feller for Packaging Corporation.

2   THE COURT:  Okay.  Thank you, Mr. Feller.

3   Okay.  And that's everybody?  Okay.  Well, great.

4   So the last time that we met all together was about a

5   month ago.  And at that time, we offered if based upon the

6   results of how folks were progressing whether some individual

7   sessions would maybe be helpful.

8   So we had three individual sessions.  The plaintiffs

9   and their specific lawyer who was working with each group,

10  we -- the first day, we met with Temple-Inland.  The second

11  day, in the morning, we met with Mr. McKeown and -- for IP; and

12  then in the afternoon, we met with Georgia-Pacific.

13  So I'm sure that your co-counsel have told you, but

14  since you weren't at the session for the other codefendants,

15  and if any of the plaintiffs weren't there, I just wanted to

16  tell you my take on it.

17  I thought -- actually, I guess I'm grading myself.  I

18  didn't do very well the first day.  I improved on the second

19  day somewhat.  This is a work in progress, as much for you as

20  the lawyers who are trying to do something very radical here.

21  It's also a work in progress for me, who does

22  mediation all the time.  But for the trial judge to also be the

23  mediator, sometimes I get a little confused on what my role is.

24  And I felt that I wasn't quite as focused on the Temple-Inland,

25  but I still think we accomplished some things in the

1    Temple-Inland.

2            And some of the issues that we brought up in

3    Temple-Inland then helped to crystallize things for the next

4    day.

5            And I also think your follow-up letter, which I read,

6    seemed to move the ball along.

7            What happened on Thursday, though, I was very pleased

8    with.  I never get to see clients.  And the general counsel or

9    someone from the general counsel's office for both

10   Georgia-Pacific and IP attended the conference.

11           Mr. McKeown, what did your -- you know, no

12   attorney-client privilege, but what was your -- do you think

13   that was a positive thing that you brought her to the

14   conference?

15           MR. McKEOWN:  I'm sorry, your Honor.  You must be

16   mistaken.  There wasn't anybody from International Paper there.

17           THE COURT:  I thought they were.

18           MR. McKEOWN:  No.

19           MR. MAROVITZ:  The meeting was here.

20           MR. McKEOWN:  At the -- oh, I'm sorry.  At the

21   mediation.  I was thinking of the program at the 7th Circuit

22   committee --

23           THE COURT:  Oh, no, no, no.  Forget that.  That was --

24   that just seems like -- no, at the session.  I thought it was

25   very good that you brought your client with you.  This is

1  how -- this is how confused I can be.  I thought, oh, my God.

2  What am I talking about here?  Okay.

3          MR. McKEOWN:  No, that was my mistake.

4          THE COURT:  But you did bring her.  Did she think it

5  was a positive thing for the future?

6          MR. McKEOWN:  I think she has a good sense of the

7  process that we're going through.

8          THE COURT:  Good.

9          MR. McKEOWN:  I think she's still a little frustrated.

10          THE COURT:  Right.  It's costing her tons of money.

11  They were very quick to tell me that.  See, if you bring the

12  clients to the meeting, then the judge gets to hear how much

13  money it's costing.

14          So how about you, Mr. Neuwirth?  I thought your client

15  was very engaged.  She certainly knew what we were about.

16          MR. NEUWIRTH:  She's so engaged, your Honor, that

17  she's right here.

18          THE COURT:  Oh, hello.

19          MR. NEUWIRTH:  I feel like it's the end of the book

20  *Are You My Mother*?

21          THE COURT:  Oh, good.  I didn't see you.  See, I

22  didn't see you back there.

23          MS. McLEMORE:  I'm hiding, your Honor.

24          THE COURT:  Oh, hi.

25          MR. NEUWIRTH:  I wonder if that'll be included in the

1    order that Mr. McCareins wants for his wife.

2         THE COURT:  Well, it's good that I said all these

3    positive things about you, right?

4         But I do.  I think this is the missing part of civil

5    cases is that we do not get to see the clients here in court.

6    I think it would change -- in the criminal cases, it changes

7    the whole dynamic.  Anyway, so I'm very glad that you both

8    brought your clients.

9         Okay.  And I thought that we did better, and you can

10   see from the follow-up that we made some progress.  Okay?  And

11   this is -- so for today, I think, much to my chagrin, we have

12   to talk about the requests to produce.  I mean, there's just --

13   we can't avoid it any longer.  Even though we've been talking

14   around it, I think we have to -- and what I mean by talking

15   about it is I think we have to make a decision by -- are we

16   working to 4:30?  What's our time?

17        MR. NEUWIRTH:  4:00.

18        THE COURT:  4:00.  Okay.  We're working until 4:00.

19        We have to decide if we're going to be able to

20   continue in a cooperation mode with the requests to produce or

21   if on this we're going to have to do our default briefing --

22   okay? -- because this is going to be a mammoth exercise.

23        Second issue I would like to talk about that -- I

24   think was something that came out of the three individual

25   conferences.  Mr. Mogin certainly is not shy, and he can speak

1    for himself.  But I think an overriding issue are custodians

2    and how do we increase -- it's not just a matter of increasing

3    the number of custodians, but what can we do to get the

4    plaintiffs more comfortable with who the custodians were.

5           And one of the things that happened the second day --

6    and this was a real free-flow thing -- was we started talking

7    about, hey, what if you gave the names of litigation holds?  It

8    wasn't just, oh, this is one more thing we'll put on the table;

9    it was to address a real concern the plaintiffs have been

10   saying since day one.  They're not just saying increase the

11   number; they're really saying it's both quantity and quality of

12   who the custodians are.

13          So one logical might be on the litigation holds,

14   people that the producing party would give a litigation hold to

15   might have important information for the case.  So that might

16   be another way to get to it.

17          Then the defendants, equally, were absolutely correct

18   because I think each of you have said, hey, plaintiffs.  Once

19   you review the material and you start seeing e-mail to Nan

20   Nolan, who isn't a custodian, and you start seeing 25 e-mails

21   to Nan, you might want to add Nan as a custodian.  And each of

22   you have said already, we'll listen to you.

23          But there is a gap time here, which, you know, isn't

24   written in any of the books.  We have to give the plaintiffs

25   sufficient time to be able to get their material -- first of

1   all, we have to give you sufficient time to get it to them and

2   them sufficient time to be able to do that.

3           So I want to talk a little bit more about anybody

4   else's interesting ideas and what we can do about custodians

5   fairly.  And we'll talk about the litigation hold order.  We'll

6   talk about that too.

7           Then I have my calendar, and I hope you have your

8   calendars, and I can go all the way to September 29th since I

9   know where I'll be on September 30th.  We'll go all the way to

10  September 29th.  We can mark dates off.  We may not need them,

11  but I think it might not be a bad idea to mark them off anyway

12  for either joint sessions or individual sessions.

13          And then I would like to hear -- because I know that

14  you -- every time you're not here in court, you're talking to

15  one or the other of you every single minute of the day -- if

16  you've come up with any topics that you would like to talk

17  about.  It is your case, not mine.

18          So anybody want to add anything right now?

19          You're all so polite.  Okay.  Let's talk about

20  requests to produce.  Okay?  I'm going to give you three

21  minutes on my take on it.

22          I think that I helped you that day back in February

23  when I said if I'm going to ask transparency from you, I'm

24  going to give you transparency back -- I hope I said that -- on

25  what kind of the difference between Boolean and predictive

1  coding.

2      All right.  So Chris and I have *ad nauseam* looked at

3  these requests to produce.  So I want to put this in context.

4  To me, the most interesting issue in this case about the old

5  way of doing discovery and the new way of doing discovery comes

6  together on this request to produce.  And I don't have an

7  answer for this, but this is the background, I think, of what

8  happened here.

9      So on April 6th, Judge Shadur issued his denial of the

10  motion to dismiss.  So that technically would be the date you

11  would gear up under the old system.

12      So the defendants -- the plaintiff -- I'm sorry.

13      So the plaintiff very -- as you would kind of do this

14  old-school, I guess, sort of way.  On May 3rd, almost less than

15  30 days from when Judge Shadur, they issued to each of you, as

16  you know, 92 requests to admit.  They're somewhat divided

17  between conduct requests and data requests.

18      And within 32 days, because you guys are such -- you

19  guys and ladies are such dutiful people, in 32 days -- I don't

20  know how the heck you did it, but you answered this mammoth

21  amount of requests to produce.

22      I believe -- and this is what I do want to clear up.

23  I think that you then picked your search terms and your

24  custodians from the way you answered your requests to produce.

25      It seems to me by answering, because so much of it

1    revolves around your executive function answer, it seems that

2    you then picked your search terms and picked the custodians

3    based upon that. And that's a neutral statement. That's all

4    I'm saying.

5        Then we fast-forward nine months. And the defendants

6    obviously received it. Mr. Mogin received each of your

7    answers. He had them. They're the same answers that we have

8    today.

9        The defendants answered and did not go in on a motion

10    for protective order. Mr. Mogin never filed a motion to

11    compel. And I do not mean that -- I'm saying that as a

12    narrative. I'm not saying that in any kind of critical way

13    because I don't even know how the heck you were able to answer

14    within 30 days.

15        I don't know how anybody would be able to answer

16    before you knew so much more in this mammoth case that you've

17    got with very large corporations.

18        So the very first thing I want to say, you provided

19    each other and the Court through letters, not anything on the

20    record, but through our meet-and-confer conferences, a number

21    of cases. It appears that the defendants will probably argue

22    to me -- and you still can argue to me, but I'm going to tell

23    you what I'm going to do with it. Okay? Don't spend too much

24    time arguing -- that Mr. Mogin waived it, or Mr. Mogin might

25    want to say, hey, you waived it because somebody didn't file.

1      The way Chris and I read every one of those cases --

2  and I've said this to you at the private session -- is that I

3  think when you have a problem with a request -- I don't think

4  there was one way that a person has to be a moving party.  I

5  think either party can bring it to the Court.  Mr. Mogin now

6  calls this parsing.  Okay.

7      I don't think there even is definitive law on how you

8  have to answer them.

9      But, frankly, I don't particularly give a darn because

10 every one of the cases that you cited to me were cases where

11 discovery was closing.  And the Court had no -- the Court had

12 absolutely -- couldn't do anything.  Judge Waxse's cases where

13 he is going on and on and on and on and on, he had a discovery

14 closure, and he had to do it.  We have no discovery closure

15 here.

16     So to me, what we are going to do is we're going to

17 try to get something saying -- that both sides can work with;

18 both sides can get information.  I think his requests in a lot

19 of ways -- I don't know if I'm calling them overbroad,

20 Mr. Mogin.  I think a lot of yours are vague, unhelpful.  And I

21 think that you guys tried to narrow things too much.

22     Now, I'm going to Mr. McKeown yesterday sent me his

23 newest version of trying to answer, because if I understand you

24 correctly, what you're saying is, hey, don't get hung up on

25 this executive power or this executive because our actual

1    disclosure is much broader than that category.

2           Then Mr. Mogin to that, I think, correctly came back

3    and said, well, how am I going to find these documents?  Even

4    if I've got the documents, how am I going to find the

5    documents?

6           Mr. McKeown, I don't know whether you all read what he

7    wrote back to Mr. Mogin yesterday, but he did -- I don't know

8    if it will get us out of this mess, but he actually tried to

9    take the categories and then show where his documents would

10   fall in.

11          Did that help you?  Who's got IP?  Who's got IP here?

12   Did that help?

13          MR. SHAPIRO:  Somewhat, but not particularly, your

14   Honor.  One of the --

15          THE COURT:  And that would be good.  This is a new

16   court reporter too, so say your name too.  Okay?

17          MR. SHAPIRO:  Anthony Shapiro.

18          THE COURT:  From Seattle, right?

19          MR. SHAPIRO:  From Seattle.

20          THE COURT:  From Seattle.  Okay.

21          MR. SHAPIRO:  We just got Mr. McKeown's letter

22   yesterday.  We're still studying it.

23          MR. NEUWIRTH:  Could you talk into the microphone?

24          THE COURT:  That would help.  Thank you.

25          MR. SHAPIRO:  Does that help?

1           THE COURT:  Yeah.

2           MR. SHAPIRO:  Is that better?

3           THE COURT:  Is there a light on there or not?

4           MR. SHAPIRO:  There is not --

5           THE COURT:  I think just on the table the light goes

6    on.  You're fine.  Okay.

7           MR. SHAPIRO:  So we are still studying his letter.

8    However, with respect to the identification of custodians --

9           THE COURT:  Right.

10          MR. SHAPIRO:  -- we had asked -- and I know you were

11   at a meet-and-confer with my partner Mr. Sprung last month --

12          THE COURT:  Uh-huh.

13          MR. SHAPIRO:  -- where we had asked for certain

14   additional positions to be added.

15          THE COURT:  Right.

16          MR. SHAPIRO:  We haven't gotten a response on that.

17          We also have asked -- and I think it is an overarching

18   problem -- for comprehensive organization charts because we

19   can't -- even though we've gotten the litigation hold names, we

20   can't see how people are connected --

21          THE COURT:  Right.

22          MR. SHAPIRO:  -- and what organization they are or who

23   they are reporting to or who reports to them.

24          So they're of a piece.  The litigation hold letters

25   were helpful.  They do give names; they do give titles.

1    But now we need the organization charts, which were

2  very spotty.  And, in fact, with respect to the sales force, we

3  basically have no organization charts.

4    THE COURT:  Right.

5    MR. SHAPIRO:  So the efficacy of the litigation hold

6  names and titles are reinforced if we know where they fit in

7  the organization.

8    THE COURT:  Well, if they gave you titles, like say

9  they gave you titles, because some of the companies don't have

10  organizational charts.  I mean, I -- or at least

11  Georgia-Pacific doesn't.  So if as a substitute for the

12  organizational chart they gave you -- they didn't want to give

13  you sales.  I mean, sales and marketing was up for grabs.

14  Okay?

15    MR. SHAPIRO:  And we still don't have it.

16    THE COURT:  Right.  Okay.  But if we get to sales and

17  marketing on a certain level, not all of sales and marketing,

18  but we got to some sales and marketing, and they gave you a

19  description of current or former or whatever, and they told you

20  what department were they in, would -- I know it's not perfect,

21  but would that answer your question?

22    MR. SHAPIRO:  I don't know without seeing some of

23  these organizational charts whether that would answer my

24  question.

25    THE COURT:  Well, now, I thought Mr. McKeown, again,

1  really came up.  And this is what kind of comes when just a

2  small group of people can sit down.  He said, well, how about

3  if I do a sample?  So he was the one that was going to do the

4  sample of the marketing before we went all the way down the

5  road.  I thought that was a pretty good idea.  What happened

6  with that?

7  MR. SHAPIRO:  Well, what happened with that is we

8  responded to Mr. McKeown's offer of two mills and I think two

9  box plants.  And we responded to that saying, all right.

10  We'll -- we understand you have 100 box plants.  Instead of

11  two, we think ten, a sampling of ten, so one-tenth, is

12  appropriate.

13  With respect to the mills, we understand there are

14  18 mills.  We had asked for -- for eight mills, the

15  organization of eight of the 18.

16  And in his letter that we received yesterday, we were

17  told that he was very disappointed with our response.

18  THE COURT:  Mm-hmm.

19  MR. SHAPIRO:  So that's where it sits.

20  THE COURT:  But he didn't say no.

21  MR. SHAPIRO:  He didn't say yes either.

22  So that's where we are on that.

23  THE COURT:  Fortunately, he's here, so he can speak

24  for himself.

25  But I thought that was -- you know, it still kept the

1    dialogue going -- okay? -- I mean, is the way I would look at

2    it.  And I think what we're trying to figure out today is are

3    there certain areas where we can keep the dialogue going, and

4    is that how you want to -- is that how you want to do this

5    case, or would you prefer to just brief it and leave it to

6    Chris and I? -- okay -- which --

7              MR. SHAPIRO:  I won't speak for anyone else.  But with

8    respect to the prosecution of the case, IP, I'm certainly

9    interested -- I think we're all interested -- in keeping the

10   dialogue going to see if we can reach an accommodation.

11             But saying they're disappointed in our response

12   doesn't really keep the dialogue going.

13             THE COURT:  Well, I've seen some really horrible

14   e-mails attached that were much worse than "I'm disappointed."

15   I mean, you should read some of the stuff that's written at

16   3:00 in the morning that's attached to these motions.

17             I'm just trying a little levity.  I know what you

18   mean.  I hear you, what you said.

19             Mr. Mogin, you want to --

20             MR. MOGIN:  Yes, your Honor.  Before you go too much

21   further down the road of dealing with the specifics of IP or

22   any of the other defendants, I did want to comment on one thing

23   that you said.

24             First and foremost, though, is we do -- the plaintiffs

25   as a group do think that it is important to keep the process

1  going.  We think that progress is being made.

2          And to that end, we would suggest not only that we

3  have some continued supervised meet-and-confers with the people

4  that we had them with, but also that we have shorter ones with

5  some of the other defendants as well, who weren't included in

6  that process.

7          THE COURT:  Okay.

8          MR. MOGIN:  But with respect to Mr. McKeown's letter,

9  I think that that letter is a very interesting document in a

10 lot of ways.  And I think --

11         THE COURT:  You don't mean that sarcastically.

12         MR. MOGIN:  I do not.

13         THE COURT:  No.  I did too.

14         MR. MOGIN:  I mean it in the sense of you were talking

15 about the old way and the new way and trying to bridge the gap.

16         THE COURT:  Right.

17         MR. MOGIN:  And you also spoke in terms of

18 transparency.

19         And I think that while I certainly disagree violently

20 with the content of what was in that letter, I certainly cannot

21 fault Mr. McKeown for giving us that letter.  And, in fact, I

22 applaud it.

23         It's the type of information, I think, that we have

24 been seeking from all of the defendants throughout the process.

25 It gives us great transparency into what actually occurred with

1    respect to the documents that were selected and how they relate
2    to the documents that were requested.
3         We can now see the gaps much better than we could
4    before, but I don't want to go overboard in discussing the
5    negatives of the letter.
6         THE COURT:  I don't want you to.
7         MR. MOGIN:  Because there are so many positives to it.
8         THE COURT:  Yes.
9         MR. MOGIN:  And I think that as far as keeping the
10   process going that if we were to get similar letters from the
11   other defendants that that would not only expedite the process
12   and the meet-and-confer process, but also, if, in fact, we do
13   have to get to the point where motions are necessary in order
14   to resolve this --
15        THE COURT:  It would narrow it .
16        MR. MOGIN:  -- it would narrow it.  It would be a
17   great bit of information to the Court.  That would certainly
18   make the Court's job easier.
19        So with respect to the letter, I just wanted to bring
20   those thoughts to your attention.
21        THE COURT:  Okay.  Well, good.
22        So author of the letter, do you want to stand up and
23   take a bow or something?
24        MR. McKEOWN:  The only thing I would say is that
25   although I'm glad that Mr. Mogin appreciates the transparency,

1    on the sampling front, we have --

2              THE COURT:  Yeah.  What --

3              MR. McKEOWN:  -- we have a serious problem, and we

4    will not accept their offer.  It's that simple.

5              THE COURT:  Okay.  Well, tell me what the problem is.

6              MR. McKEOWN:  Here's my problem.  As you may recall,

7    we were at an impasse before we took a break when we had the

8    individual meet-and-confer.

9              THE COURT:  Right.

10             MR. McKEOWN:  We did not want to provide any mill

11   managers, any plant managers.

12             And there was a suggestion by the Court before we took

13   the break about maybe sampling might work.  And the arguments,

14   as I recall, that were being made were that there's the

15   possibility that somebody in the plant could have an e-mail or

16   could have some reaction to something, and that's what they're

17   interested in.

18             Our offer was the plaintiffs can pick any two of the

19   mills in our system, any two of the box plants in our system,

20   and for those four locations, we would run a search of the mill

21   manager or plant manager, as the case may be, e-mails.  And we

22   would find the salesperson responsible for those four locations

23   and that -- again, on the e-mails.

24             The response that we received back as a

25   counterproposal wants eight mills, with two individuals from

1  each mill and all predecessors going back; ten box plants, two

2  individual or titles at each box plant, and all predecessors

3  going back.  Salespeople they want, but they don't know who

4  yet, so that's a whole another category.

5           But even with just the mills and the plants, that's

6  36 new custodian positions going all the way back, which is way

7  beyond sampling, in our view.  And the plaintiffs ask not just

8  for e-mails, which we had offered --

9           THE COURT:  No.

10           MR. McKEOWN:  -- but all sources of information and

11  documents.

12           THE COURT:  Right.

13           MR. McKEOWN:  So we thought we were attempting to move

14  it forward, and the response we got seems to have moved us

15  farther away.

16           So I just didn't want to leave the Court with the

17  impression that we are getting anywhere near to close on

18  agreeing on a sampling.

19           THE COURT:  Now I'm forgetting what I've said to the

20  group as a whole and to the folks that were not at the

21  individual sessions.

22           So most of you in this room are probably the country's

23  experts in antitrust cases.  And I found that other

24  containerboard case from -- I mean, there was another container

25  box case not too long ago somebody cited that Temple was in,

1    actually.  I think Temple was in this case about five years

2    ago.

3                    MR. MAROVITZ:  The *Linerboard* cases, your Honor.

4                    THE COURT:  Yes, yes.

5                    So here's where I need help.  If you could drop your

6    advocate help, your advocate role, and help me out on even -- I

7    don't know if in container -- you know, in cases like this much

8    action is going out in the mill, in the plant.

9                    I can make my own independent assessment on sales and

10   marketing.  I have enough.  That's close enough to a RICO case.

11   That's close enough to a conspiracy case.

12                   I have no idea if these folks are just sitting here

13   making this up about these mills and that -- I mean, I -- if

14   somebody could show me another cardboard box case, or

15   containerboard case, that the information on the mills -- or

16   not just -- not just on the mills, but on some of these areas

17   that are very unique to cardboard boxes.

18                   So that this kind of a request is, you know -- that's

19   the reason I thought Mr. McKeown's suggestion on the sampling,

20   like let's see what the heck happens here.  You did give one

21   example.  So they gave one example on downtime -- didn't

22   downtime have something to do with this request too?  Maybe?

23                   MR. MOGIN:  Yes, your Honor.  I believe that in

24   discussing the need for it, we talked about the fact that there

25   might be some dissidence between headquarters and what was

1  actually going on at the mill level.

2          THE COURT:  So, I mean -- and that's how you have to

3  educate -- if you're going to do this kind of process too, I

4  mean, a little bit to educate the judge too.

5          So let me hear from my friend here with all the jokes.

6          MR. McCAREINS:  I hope I'm more than that.

7          THE COURT:  Right, right.  You are.

8          MR. McCAREINS:  Mark McCareins for RockTenn.

9          I was, I think, one of the few lawyers in the room who

10  was actually involved from start to finish in *Linerboard I* --

11          THE COURT:  Okay.

12          MR. McCAREINS:  -- on behalf of Smurfit-Stone

13  Container --

14          THE COURT:  Okay.

15          MR. McCAREINS:  -- which has since been acquired by

16  RockTenn.

17          THE COURT:  Okay.

18          MR. McCAREINS:  And to the best of my knowledge, we

19  were never asked and we never did any searches for documents or

20  information at the box plant and mill level.

21          THE COURT:  Okay.  And they had them?

22          MR. McCAREINS:  They had some of the same box plants

23  and mills -- the same general structure that exists today with

24  box plants and mills.

25          And to take it one step further, when I was getting

1    reports, not in real time, but of what was happening here with

2    Mr. McKeown's issue on sampling, not even anticipating what

3    Mr. Mogin and his group would say in response to Mr. McKeown's

4    offer, I wasn't a big fan of that either for several reasons.

5         I mean, I know firsthand the burdens associated with

6    doing this even at the sampling level.  I know firsthand that

7    this is the proverbial needle in a haystack.  It's not even a

8    needle.  And this box plant structure for all of these

9    companies, there's let's say a thousand box plants around the

10   country, plus all these mills.

11        It is -- would be a Herculean job to search those at

12   any level of statistical significance or integrity.  And when

13   Mr. McKeown said we'll sample two, I reacted to that.  Not as

14   violently as Mr. Mogin reacted to the other suggestion, but I

15   understand the burdens associated with this.

16        And to your Honor's question about what's the

17   connection?  What's the nexus?  What's the basis for doing

18   this?  Even embarking on this slippery slope with this

19   sampling, which has now expanded to 10 percent of the box

20   plants, other than a suspicion that there might be such a

21   document there, there's no tangible proof that there is.

22        And as a direct answer to your first question, no,

23   this wasn't done the first time around.

24        And I for one on behalf of RockTenn object to it.

25   And, you know, if we end up having a motion on this and your

1     Honor makes a ruling, your Honor's going to make a ruling.  But

2     I'm not -- on behalf of my client --

3           THE COURT:  Okay.

4           MR. McCAREINS:  -- we've given on many, many issues.

5     And this is not --

6           THE COURT:  Well, see, that's good.  So we're kind of

7     clarifying issues.  I mean, we're somewhat clarifying issues

8     that -- for whatever reason, because I don't have any context

9     to put this in.  Okay.

10           Yes, sir?

11           MR. EISLER:  Your Honor, Robert Eisler, Grant &

12     Eisenhofer.

13           I might be the third lawyer who was involved in the

14     old *Linerboard* case start to finish and took at least one

15     deposition of at least one mill manager in that case.

16           And Mr. London, one of Mr. Freed's partners, took

17     similar depositions in that case as well.  Now, off the top of

18     my head today, I can't tell you how many were taken from which

19     defendants.  But I don't know if anyone here would have

20     difficulty or an objection to us putting together a list for

21     your Honor of who was deposed in that case and what their

22     positions were.

23           THE COURT:  Well --

24           MR. EISLER:  But there was certainly discovery of

25     plant and mill managers in those cases -- in that -- in the

1    earlier case.

2           THE COURT:  Well, I'm not throwing this out as a

3    suggestion.  But, I mean, this to me, because we have so many

4    issues, part of it -- and since you have no cutoff of

5    discovery, I've already offered the idea of phase Discovery I,

6    II, something like that.

7           This did not seem to be to me even -- this did not

8    seem to be in the same category of importance as sales and

9    marketing as far as getting going now with these custodians.

10   But it did come up.  It did come up as an issue.

11          I also wondered on some of this if a 30(b)(6) of

12   somebody would be quicker than trying to run all these searches

13   and things, if that would even help you, if you did a 30(b)(6)

14   of a plant manager.  But I -- remember, I didn't do civil law.

15   So --

16          MR. MOGIN:  Well, your Honor, you're right on track.

17   After our meeting this morning, we had a discussion amongst

18   ourselves.  And not to give anything away, we are considering

19   going down the 30(b)(6) road, not just with respect to this

20   issue, but with respect to some of the other issues that we

21   haven't been able to get to closure on.

22          THE COURT:  I know you've got preparation for it, and

23   then maybe one of them, to see if there's anything fruitful,

24   and mainly because I don't hear them -- you know, you can all

25   jump up and speak for yourself.

1    But I want to go back to the requests to produce for a

2    minute.  I have -- Chris and I call it there's functionality --

3    I'm calling it these folks have to know the functionality of

4    how your companies work, whether it is organizational charts,

5    whether it is people.  How the heck are they going to read

6    these e-mails when they've got them up on the platform if they

7    don't know who fits into what?  Okay?

8        I do not see what -- I understand why you don't want

9    to.  When you get to some of the underlying people, I think

10   you're afraid or you're worried, you know, not only does he

11   want to know sales and marketing; then he wants Rolodexes and

12   da-da-da-da-da-da-da.  I mean, and then it just keeps going and

13   going and going and going.

14       But I -- it seems like there is a breakdown on some of

15   the organizational informational -- information I think they

16   need to have that I actually think would make them narrow their

17   requests rather than broaden their requests.

18       Then we've got what they're doing with these requests

19   to produce is then the category seems to get broader -- I

20   agree -- and then all of the stuff before you even take a look

21   at it to see who these people are, if you really needed all

22   these backup documents to go with it.

23       And this is a problem in our system.

24       Bless you.

25       MR. NEUWIRTH:  Thank you.

```
 1              THE COURT:  I mean, this is really a problem in our
 2    system.  How do we go back and forth, give you a chance to look
 3    at it?  I believe you when you say you want to look at less,
 4    not more.
 5              So -- yes.
 6              MR. MOGIN:  Your Honor --
 7              THE COURT:  Here.
 8              MR. McCAREINS:  He jumped up first.
 9              THE COURT:  All right.
10              MR. MOGIN:  Why, thank you.
11              Your Honor, you'd asked in a nonadversarial way if we
12    could talk a little bit about sampling and if we could also
13    talk about context.
14              First let me talk about sampling, and if you have any
15    questions, although, you know, Dr. Lewis is just here as an
16    observer today, and sampling of people is not really his thing.
17              THE COURT:  Right.
18              MR. MOGIN:  But he does know sampling.
19              The number 36, when you're trying to figure out
20    whether we're dealing with something that's representative, is
21    a non sequitur in the following sense.  We don't know what the
22    universe is, so we don't know what the sample size -- proper
23    sample size is.  All we know is the number of box plants and
24    the number of mills.
25              Obviously, we need continuity for people in those
```

1    positions throughout the time period.  And if that has a

2    multiplying effect, there's not much that we can do about that.

3         But is it 36 out 1,000?  Because that's 3.6 percent,

4    and that doesn't seem like much of a burden.  Is it 36 out of

5    100?  Well, that's 36 percent, and then, you know, maybe the

6    answers are different.  So we don't know the answer, number

7    one.

8         Number two, you asked about context, and you asked a

9    little bit about cases.  And if you recall -- I believe it was

10   either during one of -- the last session or during one of the

11   meet-and-confers -- we gave you a list of cases and quotes from

12   the cases, other antitrust cases, not necessarily involving

13   linerboard or containerboard.

14        THE COURT:  Right.

15        MR. MOGIN:  But I think perhaps doing so where

16   appellate courts or other courts writing decisions had

17   actually -- and they were mostly decisions denying summary

18   judgment -- had actually relied upon evidence from these

19   lower-level employees, particularly sales personnel and people

20   in plants and mills.

21        Thirdly, for context, this is a case about corruption

22   of a marketplace.  And we have to prove an injury to a

23   marketplace.  And the marketplace isn't necessarily limited to

24   the corporate suite.  It's also where the nitty-gritty, where

25   the rubber hits the road, and the rubber hits the road when the

1    salespeople talk to the customers and when the mill managers

2    are given production orders, whether they're orders to produce

3    more, produce less, shut down machines, get rid of inventories,

4    et cetera.  That's the context of the request.

5           And we have a legal requirement to prove, if you will,

6    that there has been a competitive impact, that the marketplace

7    has been injured.  And we can't do that without getting as

8    close as we possibly can to the marketplace.

9           THE COURT:  Okay.  You're on.

10           MR. McCAREINS:  I'm going to take the high road.

11           THE COURT:  Good.

12           MR. McCAREINS:  Trying to take the high road.

13           THE COURT:  Take your time.

14           MR. McCAREINS:  His --

15           THE COURT:  Mr. Mogin's.

16           MR. McCAREINS:  -- statements --

17           THE COURT:  Mr. Mogin's statements.

18           MR. McCAREINS:  Mr. Mogin's statements are nice

19    rhetoric, are not pled.  They have over 5 million pages of

20    documents that have been produced to date.  And I understand

21    quantity is not quality.  But that's a lot of paper that's been

22    produced, and there's a lot more in the pipeline --

23           THE COURT:  Mm-hmm.

24           MR. McCAREINS:  -- which I am directly responsible for

25    supervising on a day-to-day basis.

1          And the number that we put in our status report of

2    7 million or whatever is a realistic number that's going to be

3    achieved here in the next 60 days or so.

4          Now, I don't care if it's a RICO case, a securities

5    case, an antitrust case, a multiple-defendant case.  That is a

6    serious commitment by these defendants, in a relatively timely

7    fashion, to produce what they believe to be responsive

8    information.

9          Has he reviewed all that?

10   THE COURT:  No, because he -- how could he?

11   MR. McCAREINS:  So that's correct, which relates to

12   your initial question, which is I was with you about giving him

13   functionality.

14   THE COURT:  Right, right.

15   MR. McCAREINS:  So how do we give him functionality to

16   review this information?  I thought that was the issue, not

17   corruption in the marketplace and all this other stuff.

18   THE COURT:  Well, I know.  I know.  And those are like

19   buzzwords.  You've got to --

20   MR. McCAREINS:  So if -- your Honor --

21   THE COURT:  Yes?

22   MR. McCAREINS:  -- if each defendant -- again, I'm not

23   overly ecstatic about doing this either because we've done a

24   lot with the data dictionary and all this other stuff.  We have

25   to identify our litigation hold recipients.  There's over 200

1    in my client's case.  We identify their titles, and we give an

2    approximate date as to when they got the hold.

3            I've never been in a case where that's been ordered,

4    let alone agreed to.

5            THE COURT:  Mm-hmm.

6            MR. McCAREINS:  I'm with some reluctance prepared to

7    do that.  I can't speak for the other defendants.

8            THE COURT:  Right.

9            MR. McCAREINS:  But to suggest that's not unbelievably

10   helpful would be absurd.  I mean, that's just a hugely helpful

11   process and in and of itself an expensive process to do right.

12           So we have the list of litigation hold recipients.  We

13   have the organizational charts.  And I can only speak for my

14   client.

15           And, you know, companies view organizational charts,

16   like, differently.  I mean, I don't care if we have an

17   organizational chart or not.  If we have it, we'll produce it.

18   What, am I going to fight about that or have a motion to compel

19   on an organizational chart?

20           THE COURT:  Hope not.

21           MR. McCAREINS:  I mean, absolutely not.  If we have

22   any organizational charts at whatever level, we'll produce

23   them; we have produced them.  Are they always sufficient?  Are

24   they always complete?  Are they always timely?  All the gaps

25   filled?  We've got mergers.  We went through bankruptcy for two

1    years, my client.  You know, are we supposed to re-create

2    organizational charts to fit some map that he wants?  We're not

3    supposed to do that.

4           So what else can we do other than litigation hold?

5           Now, I thought you were talking too about giving some

6    descriptors to tying the --

7           THE COURT:  As another.

8           MR. McCAREINS:  -- requests to the people -- on our

9    custodians, and now we've added -- RockTenn has added six

10   custodians.  I don't know.  We're up to 20 or some amount like

11   that.

12          And if there's an issue about who these people are and

13   what they do -- I mean, their titles are fairly self-evident.

14   But, I mean, some guy who is the director of -- vice president

15   of sales and marketing obviously has responsibility for sales

16   and has people working under him, and then we'll have

17   correspondence and e-mail from those lower-level salespeople.

18          If he wants me to tie in the RFPs to the 20 or so

19   custodians, again, I'm not happy about doing that, but I'll do

20   it just to end this.

21          My point is, listen.  I feel like a circus juggler.

22          THE COURT:  Well --

23          MR. McCAREINS:  You know, and the circus juggler is

24   juggling some balls, and everything is going fine.  And then

25   all of a sudden, it says, here.  Why don't you juggle this

1  canned ham.  How do you do on that?  Oh, you can handle that.

2  Now throw in this --

3          THE COURT:  Well --

4          MR. McCAREINS:  -- electric saw.  How do you do on

5  that?

6          I'm -- we've been making a lot of accommodations for

7  the plaintiffs, and including these things that I've just

8  represented.  I'm not trying to be, you know, peevish about it,

9  but at some point in time, enough's enough.

10          THE COURT:  Well, I'm trying to tell both of you.  I

11  was trying to give you each a hint -- okay? -- on -- not a

12  hint.  I was trying to be -- kind of tell you what Chris' and

13  my reaction to this was.

14          And, I mean, I could give you -- I'd rather give you a

15  concrete example here because this will help Mr. Mogin too.

16          Okay.  RPD 3 seeks documents sufficient to identify

17  current or former directors and officers, management, planning

18  staff, sales personnel.  I don't know what ESI personnel and

19  paper document archive personnel have to do with the other

20  three, but that's in there too.

21          For each of those, in addition to names, titles, jobs

22  description, seek business affiliations -- which I guess, if

23  you -- you know, and included administrative assistants,

24  secretaries.

25          Okay.  So I think that universally, you fellows came

1    back and you said, we'll give it to you for the executives with

2    primary decision making and didn't include -- particularly what

3    keeps coming up is sales and marketing.  I would say of the two

4    areas under the executive, sales and marketing.

5           We haven't defined that.  Okay?

6           I'm leaning towards I would think in this kind of case

7    sales and marketing, to some extent, would be important.  I

8    think that your definition of "executive" is too narrow.

9           However, we then get to Response to Produce No. 4.

10   And for every one of those 20 categories they have, they want

11   all diaries, calendars, appointment books, to-do lists,

12   Daytimers, day planners.  I mean, this is -- this could be -- I

13   have no idea -- for somebody who is a sales assistant.

14          So I agree with you to a certain extent, but I don't

15   want you to take my comments as I'm agreeing with you a hundred

16   percent -- because I'm not -- because I think this executive

17   function definition has kind of -- it's sort of -- it's sort of

18   been the road map of what's happened the last year from the

19   search to the custodians to now.

20          Am I saying it could have been done differently?  I

21   don't know.  I think it's remarkable what you've all

22   accomplished in nine months.  I'm not being critical of this

23   because with this, with seven defendants, this is huge amount

24   to be able to work with.  So --

25          MR. McCAREINS:  Can I make a suggestion?

1          THE COURT:  Mm-hmm.  I'd love it.

2          MR. McCAREINS:  There are some issues that are

3    probably teed up for adjudication.

4          THE COURT:  Mm-hmm.

5          MR. McCAREINS:  Some that are idiosyncratic to certain

6    defendants --

7          THE COURT:  Mm-hmm.  Mm-hmm.

8          MR. McCAREINS:  -- which don't require any more

9    paperwork submitted to this Court or the chambers.  I think you

10   probably have enough paper back there.

11         And I would respectfully suggest that if the plaintiff

12   wants to identify those isolated issues that are already kind

13   of beaten to death and we can't come to closure, then in three

14   weeks, they file a very short position statement.  They get

15   three to five pages to set their position; we have three to

16   five pages.  You can include reference to stuff that's already

17   been submitted, and we get it done.

18         On the other bulk of the information, if we give

19   them -- and we should resolve this today -- what additional

20   context or functionality they need.  We'll do it promptly.

21   Then review the documents.  Like, I've done this for 30 years.

22   I've never had this situation.  That's why I'm frustrated.

23         I make the production.  I make a production of

24   800,000 pages, and the other lawyers and some of these same

25   plaintiffs come back and say, wait.  I didn't get many

1  documents from Sally Smith, or it doesn't appear that I got any

2  documents from your production people, or there were some

3  documents produced that had Joe Jones's name on a cc.  Who is

4  he?  So then we figure that out in Phase II or whatever you

5  want to call it.

6  THE COURT:  Right.

7  MR. McCAREINS:  But let's finish up Phase I, tee up

8  these issues that are ready to tee off, and give them time with

9  the context to review and just get off the dime on some of

10  these other issues.

11  THE COURT:  Well, I mean, one thing I'm kicking around

12  here today is to ask the plaintiffs after today if they could

13  identify what sort of like their hottest issues are.

14  I went to an ESI thing on criminal we had last -- a

15  week ago Friday.  And in criminal, they call it hot documents.

16  Maybe they do that in civil too, but I've never heard it.  But

17  they actually have it.  It's from the *Enron* case, the Supreme

18  Court.  They called it hot documents there.

19  And I think some of these topics are hotter, or, you

20  know, more significant or should be moved up to the front

21  burner.  And that's another thing I don't know.  I know I'm out

22  here babbling for one hour, so thank you for indulging me.  And

23  maybe we --

24  So your suggestion is maybe we try to identify what

25  needs to be briefed.  And if we -- but I'm not just saying give

 1    organizational charts.  I think your definition -- Mr. Mogin
 2    can certainly speak for himself -- but this executive -- you
 3    know, how do you say it?  You'd think I'd have it memorized --
 4    categories of persons -- executives with primary
 5    decision-making authority.
 6            I mean, am I -- that's what -- that's what your
 7    primary -- not that they didn't get other documents.  I know
 8    they got other documents.  But that was the focus of the
 9    search, correct?
10            MR. MAROVITZ:  Not entirely, your Honor.
11            THE COURT:  Not entirely.  Tell me how I'm -- tell me
12    what I'm missing.
13            MR. MAROVITZ:  Andy Marovitz for Temple-Inland.
14            A few things, Judge.  First, just to start where you
15    started, which was Request No. 3.
16            THE COURT:  Uh-huh.
17            MR. MAROVITZ:  If you look at -- I don't have all of
18    the parties' responses to Request No. 3.  But Temple-Inland's
19    request, the response that Temple-Inland made to Request No. 3,
20    identifies the Temple-Inland executives as the primary
21    decision-making authority for the manufacture or sale of
22    containerboard and those who directly report to those
23    individuals.
24            So it's not simply --
25            THE COURT:  The executives.

1          MR. MAROVITZ:  -- the people with primary authority,

2     but it's the people that report to them.  That's really --

3          THE COURT:  So does that include -- okay?  Here's --

4     if you and I were having a meet-and-confer, does that include

5     salespeople and marketing people are the people who report?

6          MR. MAROVITZ:  Yes.  We've, Judge --

7          THE COURT:  How would Dan Mogin know that, though?

8          MR. MAROVITZ:  Because they're on our -- a couple

9     reasons.

10          THE COURT:  Okay.

11          MR. MAROVITZ:  And let me start there.  First, they

12     are on our organization charts.

13          THE COURT:  Okay.

14          MR. MAROVITZ:  And your Honor knows because we were

15     involved with your Honor that we had a misunderstanding with

16     the plaintiffs --

17          THE COURT:  Correct.

18          MR. MAROVITZ:  -- at the time of our meet-and-confer.

19     The plaintiffs were operating under the assumption that they

20     had either one page or only 20 pages of our organizational

21     charts.  And we sent them a letter later that week showing that

22     they had over 400 pages.

23          THE COURT:  Right.

24          MR. MAROVITZ:  So, again, there's a lot of paper that

25     the defendants have produced.  There's a lot of paper that the

1    plaintiffs have to review.

2         THE COURT:  Right.

3         MR. MAROVITZ:  My point is for all of these things, it

4    is imperative that instead of operating in the abstract, we

5    find out what has been produced and what the plaintiffs really

6    need and then react.

7         And I read the transcripts of the Georgia-Pacific

8    meet-and-confer before your Honor, as well as the International

9    Paper meet-and-confer, and found that the most useful parts

10   were when there was an actual discussion of what had been

11   produced and what had not been produced.

12        THE COURT:  I agree.

13        MR. MAROVITZ:  I just -- I am -- and I am prepared to

14   talk -- I don't want to do it now because I think it would take

15   us in the wrong direction.  But I know that plaintiffs' counsel

16   sent a letter yesterday in response to one that I sent some

17   time ago about our response to Request 56.

18        And that letter goes to whether or not we would have

19   produced certain kinds of documents, and that letter speculates

20   about what we did and didn't produce.  And we produced

21   documents that we found in about 15 minutes this morning after

22   getting the letter yesterday.

23        I think the critical part of what we're doing here is

24   to identify not all of the things that could be -- not whether

25   in some unrelated case it was the conclusion by some judge

1    somewhere that in some chemicals industry, there was a person

2    who was in Alaska who did something, and that turned the case,

3    because if that's the standard, Judge, then in every case,

4    every antitrust case across the country, every person has to

5    produce documents.  That's not the standard.

6           The standard ought to be what people reasonably

7    believe is likely, the people who are likely to have responsive

8    documents.

9           And given all of the millions of pages of documents

10   that the defendants have produced, our position continues to be

11   if after reviewing those documents the plaintiffs can make a

12   showing that there is something out there that really is

13   relevant, then -- and we haven't done it, we'll certainly

14   consider that.

15          And if the plaintiffs and the defendants disagree

16   about whether it's relevant, the plaintiffs will bring a

17   motion, and we'll respond, and the Court will decide.

18          But the idea somehow that because in some other case

19   it's possible that somebody who was a line guy at a plant

20   overheard something, and, therefore, we should have to produce

21   everything from our mills and our box plants in a way that's

22   never been done before --

23          THE COURT:  But, see, now you're going -- now, and

24   you're not this kind of person who does this.  But, see, now

25   you're going to every mill.  And I don't think -- and the

1   sam -- my sampling of other antitrust cases only was my stating

2   my own ignorance -- okay? -- and my own lack of experience in

3   antitrust cases.

4           I have a lot of securities fraud cases, so I'm very

5   familiar with the kinds of issues that are repetitive.  And I

6   wasn't trying to get a consensus here.  But, I mean, to me, I

7   don't know what somebody out doing a plant in Ohio has to do

8   with fixing the prices.

9           MR. MAROVITZ:  Of course.  Or sampling.

10          THE COURT:  But I'd like to be educated.  I mean,

11  maybe it does.

12          MR. MAROVITZ:  If I could say one final thing just as

13  a reminder because --

14          THE COURT:  You can say anything you want.

15          MR. MAROVITZ:  Thank you, Judge.

16          And I know I've said this before, but it's --

17  everybody in this room who practices in Chicago or who has had

18  the privilege of practicing before Judge Zagel knows that Judge

19  Zagel is extremely sophisticated about these matters.

20          And, you know, Mr. Freed and Mr. Eimer --

21          THE COURT:  Are you in that case too?

22          MR. MAROVITZ:  -- Mr. Eimer and I all are in the *Steel*

23  case.  And Judge Zagel took an approach that I thought was

24  extremely practical.  He understood -- he hasn't made any

25  conclusions.  The facts are not out in the case.

1        But at a preliminary stage of the case, he decided

2   that -- he told us that he thought that if there was the kind

3   of conspiracy that was actually pled that the folks at the top

4   of the food chain would have had to have known about it.

5        And I think that is -- I think it is difficult to

6   square that kind of I think educated understanding with what it

7   is that the plaintiffs are requesting here, which we just think

8   is far too broad.

9        And I know Mr. Neuwirth wanted to say something, so

10  I'll give him the mike.

11       THE COURT:  Mm-hmm.

12       MR. NEUWIRTH:  If I could just say one thing very

13  briefly.

14       THE COURT:  Mm-hmm.

15       MR. NEUWIRTH:  First, I want to reiterate on behalf of

16  Georgia-Pacific and I think all the defendants that we

17  appreciate the efforts that are being made to try to find

18  solutions to these problems.  And I hope you feel from our

19  conference before you that we are trying to be responsive to

20  that.

21       THE COURT:  Mm-hmm.

22       MR. NEUWIRTH:  There was one thing you said today --

23  and I apologize if I misunderstood it -- but that I felt needed

24  to be addressed, because you said a couple of times, your

25  Honor -- or at least I understood you to be saying -- that the

1  search terms were somehow determined here by the custodians

2  that were selected.

3          And I actually don't think that that is the case.

4          THE COURT:  Okay.

5          MR. NEUWIRTH:  The search terms were meant to address

6  the substance of the requests.  And those search terms are all

7  meant to capture concepts that were reflected in the requests

8  for production.  And you had a lot of testimony about that.  We

9  don't need to repeat it.

10          The selection of custodians was a separate effort to

11  do what Mr. Marovitz just said, which was to identify the

12  people that in good faith the defendants felt were --

13          THE COURT:  Right.

14          MR. NEUWIRTH:  -- reasonably likely to have the

15  documents.

16          And I think that we saw at the Georgia-Pacific

17  meet-and-confer two things:  One, that we really did capture

18  with the search terms and through these custodians the types of

19  documents that the plaintiffs said they were looking for; and,

20  second, that we saw one example that the plaintiffs brought to

21  your attention of a document that identified some names that

22  were not custodians in the context of pricing, but they got the

23  document through these custodians, as I think you noted.

24          And so, again, without foreclosing anything, we would

25  just reiterate our request that for Georgia-Pacific is an

1    important one, because Georgia-Pacific has already largely made

2    its production, that we really do think, as Mr. Marovitz said,

3    that it would be very constructive if we can do the types of

4    steps that you're talking about to help the plaintiffs identify

5    who is who but then really have them go through the documents,

6    and we will talk to them as they do that.

7          But we remain concerned that part of what's happening

8    here is that prior to doing that, we're all talking

9    hypothetically a little bit about -- about what's -- what may

10   or may not be out there when the answer may be right in front

11   of all of our noses.

12         So, again, we want to be constructive; we want to work

13   with you to find a solution particularly while you're still on

14   the bench.  And as you know, we have our order to work out, but

15   we agreed at our conference with you to give the names of the

16   400 people that got the litigation hold, plus all of their

17   titles, which should give a lot of information to the

18   plaintiffs about who is who.

19         And we also agreed to add the most senior CEO of the

20   company as a custodian --

21         THE COURT:  Right.

22         MR. NEUWIRTH:  -- again, with the order needing to be

23   worked out.  But we're trying to be constructive, and we hope

24   that we can all work together on that path.

25         THE COURT:  Thank you.

1          MR. FREED:  Your Honor, may I make a few isolated

2    remarks?

3          THE COURT:  Sure, Mr. Freed.

4          MR. FREED:  Counsel is talking about mills, and I was

5    prepared, and I was about to step up and talk about mills.  And

6    then the entire conversation sort of segued into the broader

7    issues which have been before you.

8          I want to make what I think are some fundamental

9    points.  This is a price-fixing case, but one of the principal

10   ways it's alleged the defendants fixed prices is coordinating

11   capacity reduction.  The intersection between production and

12   product demand is very important to this litigation.

13         There's been, I think, an attempt to portray the

14   requests to find out what's going on at the mill level as some

15   rogue effort to harass the defendants or look for a needle in a

16   haystack.  That's not what this is about.

17         And we can cite many cases where the 7th Circuit --

18   and one which I was intimately involved, the *Fructose* case,

19   where the 7th Circuit found interesting a defendant reducing

20   capacity in the face of very, very strong demand.  That was an

21   individual defendant.

22         When you have defendants collectively making actions

23   which may be against their economic interest, it's relevant.

24         Wouldn't a mill manager be a person who might well

25   say, why is this being done in the face of our demand?  That is

1  not an illogical thing to do.  It's not inconsistent with the

2  principal allegations of the complaint.

3         And I make the point not to try to prevail on the

4  argument about how many plants should be searched by IP, but

5  just to sort of redirect the discussion away from what I think

6  was getting to be that somehow the plaintiffs are just out

7  there throwing these terms out willy-nilly with no purpose or

8  intent.  That's not the case.

9         With respect to Mr. McKeown's proposal, I think that

10  this is an important issue, but it's not the most important

11  issue.  I think parsing -- and I know Mr. Mogin really wants to

12  get into that in the context of an IP letter, which he found

13  very transparent but also very concerning to us.  If that's

14  what he wants to do, I would ask him to compromise with us, and

15  we'll put up a little more from 2 and 2 to maybe 4 and 4.

16         And then let's see what happens there, and let's put

17  this, if not into Phase II discovery, Phase I½ discovery.

18         THE COURT:  Right.

19         MR. FREED:  I don't think we need to go to the mat on

20  this.  If it's all that stressful to them, I would like to try

21  to increase the number and see where it takes us.

22         We will probably want to pursue a Rule 30(b)(6)

23  because maybe it will be more revealing.  But we'd like to at

24  least start with some of the documents to give us a context for

25  that.

1      So I'm trying to come down to just a limited

2  resolution of this issue, with a deferral -- this would be

3  without prejudice to their position, without prejudice to our

4  position -- as to a limited, you know, resolution of that issue

5  so we can move on because we have a lot of other issues.

6      THE COURT:  Well, see, the other night in the middle

7  of the night, I actually had one thought, but I keep saying

8  phase and sequence and later on and, you know, everything else.

9      I had a thought that we could take what you folks

10  filed as requests to produce, Request to Produce No. 1.  Let

11  them be other than what you have to have now before the initial

12  discovery -- okay? -- not rule on any of them, and then come

13  back, because I do agree with the defendants that -- and I'm

14  willing to give you -- when have you ever heard any judge in

15  this building say if you need a year to review this, I'm going

16  to give you a year to review it?

17      I'm not pushing you.  Judge Shadur is not pushing you.

18  We want you to review because we think after the review, I

19  think you are going to need some stuff.  Okay?  You may have

20  more custodians; you might need more -- you might need a second

21  request to produce.

22      So I almost looked at the current request to produce

23  instead of getting into me, you know, kind of shooting my mouth

24  off in some general way too, which I don't think is helpful to

25  anybody.

1     MR. FREED:  But no -- oh, I'm sorry.

2     THE COURT:  That you come back -- you tell us the five

3  things you need.  I think Judge Shadur -- or Judge Zagel told

4  you.  He sort of did it numerical.  You tell me five things,

5  plaintiffs, you need.  I'll go to them, try to get you the

6  five.  If they say no, then I write an opinion on the five and

7  you start this review.

8     Next thing that's on the schedule is I want to talk

9  about where the production is too.

10     MR. FREED:  Well, Mr. Marovitz has mentioned Judge

11  Zagel several times.  And it is true.  Both he and Mr. Eimer

12  and I are in the case.

13     But that ship sailed a long time ago.  That was a

14  different kind of an approach.  It was an approach where the

15  judge said we'll take two of the six or seven or eight

16  defendants -- I forget which.  We'll use them as paradigms.

17  We'll do very intensive discovery.

18     THE COURT:  That's interesting.  That's an interesting

19  approach.

20     MR. FREED:  We'll do intense discovery with them.  We

21  will do what somewhat --

22     THE COURT:  Did they volunteer?

23     MR. FREED:  Did who volunteer?

24     MR. MAROVITZ:  Oh, no, no, no.  They were literally

25  picked out of --

1          THE COURT:  A hat?

2          MR. MAROVITZ:  Picked out of a hat, with random

3     numbers.

4          THE COURT:  See, this got Mr. Eimer up too.

5          MR. EIMER:  They lost the lottery.

6          MR. FREED:  It was sort of like that old joke about

7     the Army, and everybody who wants to volunteer, take a step

8     forward, and everybody else step back.

9          MR. EIMER:  Yeah.

10         MR. FREED:  And Mr. Eimer was left standing there.

11         MR. EIMER:  There were two of us that were left

12    standing, United States Steel and Gerdau.  And what Judge Zagel

13    said is exactly what Mr. Marovitz said.  It's if there's

14    evidence of conspiracy, it has to be in the top people.  He

15    chose ten or twelve, Judge Zagel did, and said find the top ten

16    or twelve people in your company.  Agree with the plaintiffs on

17    who they are.

18         We sat down, had a meet-and-confer on the top ten or

19    twelve.  We reached agreement within a day.  We had -- the

20    custodian issue was off the table within hours in our

21    meet-and-confer with the plaintiffs' counsel.

22         We then produced our documents.  We reported about how

23    long it took and how much effort it took.  It took millions of

24    dollars to produce ours.  We went in and told that to Judge

25    Zagel.  He said, well, this is an antitrust case.  I'm sorry,

1    but that's what it costs.  Then he ordered the other four or

2    five defendants to do the same.  They did that.

3           There had been no motions to compel.  There had been

4    questions of fact where we supplemented the production.

5           THE COURT:  And he gave you tons of time to do this.

6           MR. EIMER:  He gave us a year.

7           THE COURT:  Yeah.

8           MR. EIMER:  We had a year to do this.

9           THE COURT:  Yeah.

10           MR. EIMER:  In fact, the plaintiffs, I think, took

11    18 months to review the documents and then submitted a motion

12    to certify the class.  They had sufficient documents to write

13    an extensive brief and affidavits on a motion to certify the

14    class.

15           And this has -- we haven't spent ten minutes of this

16    time that we've spent here for the last several months worrying

17    about our production.  It all happened, and very fast and very

18    efficiently.

19           So I'm very concerned.  I'm not quite where our

20    fellows are here, but I really think that Mr. McCareins is

21    correct.  You know, we've always produced documents in the

22    antitrust cases.  The plaintiffs review them and then come back

23    and tell us what's wrong with the production.  That's what

24    Judge Zagel did.

25           We had some questions from the plaintiffs.  You know,

1    as we've tried here, we've answered those questions diligently.

2    There was no motion to compel.  There wasn't a magistrate

3    involvement.

4              THE COURT:  Well, we haven't had one either.  I mean,

5    we haven't.

6              MR. EIMER:  But they haven't reviewed the documents

7    yet.

8              MR. FREED:  Well, but --

9              THE COURT:  Because, I mean, it's seven productions.

10   I mean, let's be --

11             MR. EIMER:  Well, we had seven productions there too.

12   There were no more plaintiffs or defendants there than there

13   are here.  It was the same scale.  We started with two, and

14   then Judge Zagel ordered the other four or five --

15             THE COURT:  To do the same thing, yeah.

16             MR. EIMER:  And then they were all reviewed.

17             The problem here is that without reviewing the

18   documents, the plaintiffs want to pick apart what it is they

19   think we might be doing without knowing what's there.  And

20   that's the problem we keep seeing.  That's the answer we need

21   to come up with --

22             THE COURT:  Right.

23             MR. EIMER:  -- is they should -- we did a lot of work

24   to comply with their document requests.  And the compliance

25   with the requests goes beyond the objections we made.  I think

1    Mr. McKeown made a very clear presentation to counsel for the

2    plaintiffs that you can't literally read the objections and

3    piece it against the production.

4              THE COURT:  Right.  So I have an idea.  You just gave

5    me an idea.

6              MR. EIMER:  Okay.

7              THE COURT:  So Georgia-Pacific has completed their

8    production.

9              MR. NEUWIRTH:  Almost.

10             THE COURT:  Almost.

11             Okay.  Georgia-Pacific has completed its production.

12   So if you were to, say, take the next 30 days and concentrate

13   on Georgia-Pacific, would that -- I'm just throwing it out as a

14   possibility for you then to be able to see if you had holes or

15   non-holes.

16             Or, you know, look.  I have a bunch of buckets going

17   on here.  We can go back to -- I'm not taking away from the

18   plaintiffs if they wanted to do motions.

19             But here's another interesting idea.  Since

20   Georgia-Pacific is ready, would that be worth 30 days to really

21   concentrate on what you've got?

22             MR. FREED:  I've never quoted Donald Rumsfeld in a

23   court in my entire life.  But what comes to mind is his famous

24   comment:  I know what I know and I know what I don't know, but

25   I worry about what I don't know that I don't know.

1    And that is what worries us with the defendants in

2   Georgia-Pacific.  If it was just that this is the corpus, and

3   for once and for all it's established this is the corpus of

4   documents and you're going to have to review them and see

5   what's missing.  We don't know if it's the right corpus.

6         THE COURT:  Well, I know.  But that -- I think that's

7   true of --

8         MR. FREED:  And so all I'm saying, your Honor, is if

9   we did that and we came back to you and we said, well, based on

10  this review of these documents, we have these isolated issues,

11  there still may be entire groups of documents or custodians or

12  subject matters of documents.

13        THE COURT:  But you do know that for a given custodian

14  what the backup -- I mean, you could take, even if you want --

15  you know, even if you wanted more actors named, you could look

16  at the actors that are named, what they gave you, how they keep

17  their documents, how complete they were, how redacted they

18  were, how -- I mean, you would just know much more than you

19  know right now.

20        MR. FREED:  Mr. Goodwin and Mr. Mogin knew more about

21  Georgia-Pacific.  But I do know this because I spent a lot of

22  time trying to get Mr. Hannan to be named as custodian

23  unsuccessfully until the last time we were before your Honor.

24  I don't believe that production has been made at all.

25        THE COURT:  To Mr. Hannan, because they're waiting for

1  us.

2          MR. NEUWIRTH:  Waiting for the order.

3          THE COURT:  They're waiting for us on the order.

4          MR. FREED:  Oh, all right.

5          THE COURT:  And then I think they're ready to go.

6          MR. FREED:  And I wasn't saying that as any fault.

7          THE COURT:  Right.

8          MR. FREED:  But in terms of we don't even have a

9  complete corpus of what Georgia-Pacific -- when he says we're

10 through or almost through, we don't know what we're going to

11 get there.

12         MR. NEUWIRTH:  I think -- look.  I'm good friends with

13 Mr. Freed.  We've worked together a lot.  Nothing personal

14 here.  But I think what Mr. Freed has just said --

15         MR. FREED:  When you say it's nothing personal, it's

16 always personal.

17         MR. NEUWIRTH:  Then I'm sitting down.

18         MR. FREED:  Now I'm sorry.  Go ahead.  Go ahead.

19         THE COURT:  But he just said what your point is.

20         MR. NEUWIRTH:  Yes.

21         THE COURT:  Yeah, okay.

22         Let's take -- can we take six minutes?  Okay?  Come

23 back at 3:00.

24         Who is leaving at 4:00?  Who is walking -- you're

25 walking out the door at 4:00.  Okay.  All right.  Six minutes.

1    MR. NEUWIRTH:  Well, only if you give me permission.

2    THE COURT:  Yes.  Yes, I'm giving you permission.

3    MR. NEUWIRTH:  But I do need to --

4    THE COURT:  Right.  But we need to also talk about the

5    rest here on where we're going.  Okay.

6    (Recess at 2:56 p.m., until 3:06 p.m.)

7    THE COURT:  All right.  So Chris has a -- Chris gave

8    me a really good point.  I think in -- I guess we could call

9    this an asymmetrical case in the sense that the producing

10   parties are called upon for so much information.  You know, as

11   the case goes on, it's going to change, that I think there is a

12   sincere part on the defendants' part where they're very proud

13   of what they've done in their production.

14       And I actually think it would be -- it would help the

15   confidence level here if you would agree -- and I know that

16   you're starting to, but if you could -- maybe Georgia-Pacific

17   isn't the best one to take because there might be somebody with

18   a smaller amount of materials that would be easier to be kind

19   of our test case.

20       But it's to be the test case, but it's also, I think,

21   an act on your part that you are hearing them that -- and

22   you're able to acknowledge to them in a real way of what's

23   working and what's not working.

24       Mr. Freed?

25   MR. FREED:  Yes, your Honor.  Here's the issue, as I

1  see it, with respect to that proposal.  As a proposal in the

2  abstract, I think it makes a certain amount of sense.

3        But we were talking about two categories of let's call

4  them custodians or employees where defendants have given us no

5  production or, if there's been any production, it's really been

6  isolated, and that that's the mill and plant box people, on the

7  one hand, and the sales force on the other hand.

8        THE COURT:  Right.

9        MR. FREED:  So if we don't have any of that -- and

10  what we've been trying to do is reach some sort of compromise

11  to get some of that material, to get a sense of what's there.

12        THE COURT:  All right.

13        MR. FREED:  But if we don't have any of that, with the

14  best of faith, we'll review everything they have, and we will

15  come back, and we will start at ground zero again with the mill

16  and the salespeople because they're not giving us anything on

17  that.

18        MR. NEUWIRTH:  You know --

19        THE COURT:  Well, except Mr. Marovitz -- I mean, I

20  thought he said a really helpful thing when he said -- I don't

21  know which one were you -- about the one where you said

22  marketing and sales came back.  I think that's what he just

23  said.

24        MR. MAROVITZ:  We listed in our -- just, sorry, very

25  briefly because I didn't mean to hijack this.

1    In our August 11th, 2011, letter, which is Tab 6 of

2    what we provided the Court on May 25th, we included a number of

3    custodians who were the Temple-Inland custodians.

4    And if you look at page 13, you can see at the top

5    sales executive Karen Hoaglund is listed as custodian, and

6    Larry Huey is listed as a custodian.  And, of course, those are

7    just the custodians.

8         THE COURT:  Now, where --

9         MR. FREED:  Those are the executives.

10         THE COURT:  Okay.  Are they executives?

11         MR. MAROVITZ:  Well, they're sales executives, but --

12         THE COURT:  Sales executives.

13         MR. MAROVITZ:  -- but the people -- the people who

14    are -- as I said, the people who are making -- as we went

15    through before, Judge, the people who have made the decisions

16    and the people that have decision-making authority and the

17    people that report to them are the folks who we've been

18    producing.  And they include, in many respects, the folks who

19    have national account responsibility, who are salespeople.

20         MR. NEUWIRTH:  And I --

21         THE COURT:  All right.  Now, wait.  Now, just wait,

22    guys.

23         MR. NEUWIRTH:  Sure.

24         THE COURT:  Just one minute.  Okay?

25         I thought you meant executives like president, vice

1    president.  And the way that you defined the RFP on the

2    executive thing, I did not know that that included sales

3    executives.  Okay?  I didn't.  Okay?  I didn't know that.

4            Now, they have been talking to you much more than I

5    have, but -- or marketing executives.

6            When you look at the custodian, does it say that lady

7    is a sales executive?

8            MR. MAROVITZ:  Yes, Judge.  On the areas of relevant

9    knowledge, we identify --

10           THE COURT:  Them as --

11           MR. MAROVITZ:  -- on the custodians that the -- for

12   instance, if you look at page 15 of what was -- what

13   Mr. Campbell just showed you.

14           THE COURT:  This is Tab 6?

15           MR. MAROVITZ:  It's Tab 6, the last page.

16           Under Areas of Relevant Knowledge, Ron Zimbelman --

17   he's a vice president of sales and marketing for

18   containerboard.  But he has knowledge concerning, among other

19   things, the sales and marketing of Temple-Inland's

20   containerboard products, including the purchase, sale, and

21   trade of products from other containerboard manufacturers.

22   Also has knowledge of the pricing of containerboard products

23   for internal purposes, sales to other manufacturers, and sales

24   to end users.  That's just one example.

25           THE COURT:  Okay.

1    MR. FREED:  In my experience, your Honor, which is

2    probably longer than most everybody here because I'm older,

3    I've probably taken hundreds of depositions of national sales

4    manager, regional sales managers.

5         In our view, the top down is very important.  I would

6    never disagree with Judge Zagel.  In our view, the bottom up is

7    very important.  I don't mean the very bottom of the chain, but

8    the regional and national salespeople and the plant managers

9    and the box managers.

10        If I'm mistaken, I'll be happy to learn.  But I don't

11   think any of the people that have been proffered, or very few

12   of the people that have been proffered, fit in that category.

13        MR. NEUWIRTH:  And I would respectfully say, your

14   Honor, the problem that we're encountering now is the exact

15   same one that we tried to address at our Rule 16 conference

16   with you.  The plaintiffs having not reviewed our documents --

17        THE COURT:  Okay.

18        MR. NEUWIRTH:  -- are standing here and telling you

19   what's not there.

20        Georgia-Pacific also has included sales and marketing

21   executives within the group of custodians, and we believe that

22   the documents in their files will include any interactions that

23   would have been relevant to the case.

24        Now, obviously, once the documents are looked at, the

25   plaintiffs can come and talk to us.

1        THE COURT:  Right.

2        MR. NEUWIRTH:  But for Mr. Freed to stand here and say

3   something's not there, we showed you the last time they said

4   that it wasn't true.

5        THE COURT:  Okay.  All right.  All right.  All right.

6   All right.

7        Ms. Miller.

8        MS. MILLER:  Thank you, your Honor.

9        Just following up on what Mr. Marovitz said, to be

10  clear, in Tab 6, which Mr. Marovitz referenced before, if you

11  turn to the chart -- I'll show it to you -- it looks like this

12  (indicating) -- so you know what you're looking for.

13       THE COURT:  Yes.

14       MS. MILLER:  It's towards the end.  It's the

15  attachment.  It just has the Temple-Inland custodians.

16       So it goes through, and for each of our custodians --

17       THE COURT:  I see.  Now, this is a good chart.

18       MS. MILLER:  Okay.  So for each of our custodians, we

19  not only give their title, but we also give an area of relevant

20  knowledge of the types of information that they would be

21  expected to be able to have documents about and have general

22  knowledge about.  We have included three sales executives:

23  Karen Hoaglund, Wayne Vandiver, and Larry Huey.

24       We've included their boss and their boss above them.

25  As Mr. Marovitz has already said, we included Mr. Zimbelman,

1    who is the head of sales for that side of the business. We've

2    also included our marketing manager, who is Adam Fugate, who is

3    also on this list.

4         So we have included -- we did not -- yes, the CEO is

5    on there, and, yes, the president is on there. But that is not

6    the only people that are on there. There are quite a few

7    people that are -- to reference your earlier statement about

8    Request No. 3, there are a number of people that report to

9    those executives that would have information that I believe

10   plaintiffs are seeking that we have identified in our -- some

11   of our named custodians, which from our perspective makes it

12   even more important that plaintiffs look at our documents so

13   they can see all the materials we've produced on behalf of

14   these folks.

15        THE COURT: How far are you in your production?

16        MS. MILLER: We've produced the equivalent of about

17   1.3 million pages. We expect to be making another production

18   in the next several weeks of hard-copy documents. So we have

19   produced all of our e-mail and our loose e-files for our named

20   custodians.

21        Our next -- I think as we talked about in our May 30th

22   discussion, our next tranche is hard-copy documents, and then

23   we have some "sufficient to show" categories and some

24   additional ESI for several drives we are looking at. So we are

25   by far not the farthest along.

1      MR. MOGIN:  Your Honor, if I recall from the

2  meet-and-confer with Temple-Inland, they anticipated that they

3  would not be finished until after October, perhaps close to the

4  end of the year.  But I --

5      MS. MILLER:  Go ahead.

6      I can update that.  We are moving faster than we

7  thought, which is why we're going to be making our next

8  production, I believe, in several weeks.  I don't think it will

9  be October.  I don't have a final end date.  A lot of that will

10 depend on the "sufficient to show" request, but I don't think

11 we're looking at October anymore.

12     THE COURT:  Okay.

13     MR. MOGIN:  I think that this has been particularly

14 helpful for a couple of reasons.  Now you know, your Honor.  It

15 all comes back to the same August list of custodians.  You've

16 heard our complaints about that list of custodians.  It was

17 self-selected.  We didn't have information.  We still don't

18 have the information that we started off.

19     You were talking about this morning or when we first

20 came out here.  You said the plaintiffs had to know things

21 about functionality.  We had to know more about functionality.

22     Let me start -- let me start, please, your Honor.

23     THE COURT:  I will.

24     MR. MOGIN:  We began the process.  We began this

25 process in December of 2009, telling the defendants we don't

1    want to go this custodian route.  There are other ways to do

2    this.

3           But they proceeded unilaterally with custodians and

4    without giving us the information that we sought about

5    functionality.

6           Now, you've heard about sales executives.  These are

7    senior executive people.

8           And you heard Mr. Marovitz talk about Alaska, some

9    sales executive in Alaska.

10          And you heard Mr. Freed talk about his experience with

11   *Fructose*.  And you've seen us talk about the 7th Circuit cases

12   that talks about that type of evidence.

13          I want to make -- and then you heard the comment about

14   making it personal.  I want to make it personal.  The first

15   time I ever worked with Mr. Freed was in the 1980s.  It was in

16   a case in Houston, Texas, involving the worldwide oil drill

17   bit.  That's the actual bit that they put into the ground to do

18   the drilling.  And it was a case about a price fix, plain and

19   simple, big international companies doing business all over the

20   world.

21          The key document in that case that unlocked the

22   conspiracy came from an assistant sales manager in an Oklahoma

23   City regional office who reported to his underlings:  Please

24   tell us about any instances that you see in the field of

25   discounting by our competitors so we can report it to

1   headquarters because the competitors have agreed they won't

2   discount if we won't discount.

3          Okay?  So you have a conspiracy on price not to grant

4   discounts coming from an assistant district manager remote from

5   headquarters.

6          That gentleman was forced to take the Fifth Amendment.

7   We were able to take advantage of the inference that came from

8   that.  And that was the key that opened up the door to the

9   case.

10          So I speak from personal experience when I talk about

11   the need to start with a proper corpus.  And that proper corpus

12   includes sales and marketing.

13          It also requires -- and you hit on this earlier this

14   morning, your Honor.  It requires the defendants to respond to

15   what's been asked.  That's part of the proper corpus.

16          It's not that the defendants get to go through a

17   reinterpretation process several different times and then give

18   us what is essentially the residual of that process.

19          They may be very proud of what they've done.  And

20   maybe that pride is justified, and maybe it isn't.

21          But as I stand here today -- and you've heard them

22   say, well, notwithstanding what's in our document response --

23   document request response, we actually produced this, and we

24   actually produced that.

25          So how many different times and how many different

1  ways have we asked for some map, some accountability, so that

2  we know and we can match up what we asked for to what was

3  produced?

4         And all the defendants say is go through all the

5  documents, and when you don't know -- when you figure out what

6  you don't know, come and talk to us about it.

7         THE COURT:  I don't think --

8         MR. MOGIN:  Well, that's to paraphrase Mr. Freed.

9         We don't know.  We don't know what's been produced.

10  They won't tell us what's been produced.  But they say go look

11  at what's been produced and figure out the case from there.

12         If, in fact, if we want to go old school, if, in fact,

13  they haven't -- if they produced something different than what

14  they said they were going to produce in their response, then

15  they have an obligation to amend the responses.

16         Somewhere, somehow, in the record -- I've never been

17  in a case in 30-some years where the defendants aren't required

18  to provide some kind of a road map to their production.  It has

19  to be.  Otherwise, there's no accountability.

20         And the game that we will get into is, where are the

21  documents in Request No. 21A?

22         Oh, we produced those to you.

23         Okay.  What are the Bates numbers?

24         Well, you go find them.  We're not going to tell you

25  what the Bates numbers are.  Okay?

1    So then we'll find them and we'll say, are these them?

2    Well, maybe.

3    And we're going to get back to that very situation

4    that I described to you when we were having the hearings, and I

5    held my hand up here (indicating) because that's as far as I

6    can get it, to indicate to you how high the motions to compel

7    were going to be.  And if you go down the route that the

8    defendants are suggesting, that's precisely where we're going

9    to get.

10    Now, I talked a little bit before about the IP letter.

11    And I just -- you know, I haven't had a great deal of time to

12    work with this.  But I want to show you -- I just want to give

13    you an example, if I may, please, your Honor.

14    If you look at Document Request No. 30.  Do you have

15    the letter handy?

16    THE COURT:  I do.

17    MR. MOGIN:  Okay.  So if you look at page 3 of the

18    document request.

19    THE COURT:  Wait just one minute.  I do have it here,

20    so just a minute.

21    Oh, here we go.  Okay.  No. 3.

22    MR. MOGIN:  Page 3.

23    THE COURT:  Does everybody have this?  This is Jim's

24    letter dated June 18th.  Okay.  Page 3.

25    MR. MOGIN:  Page 3, item E2.

1          THE COURT:  B2.

2          MR. MOGIN:  E, like Edward.

3          THE COURT:  Then maybe -- oh, page 3 of the letter.  3

4    on the bottom, not --

5          MR. MOGIN:  Yeah, it's page 3 on the --

6          THE COURT:  On the -- okay.

7          MR. MOGIN:  It's actually on the attachment.

8          THE COURT:  Okay.

9          MR. MOGIN:  So we're at page 3.

10         THE COURT:  All right.  E.

11         MR. MOGIN:  E as in Edward, 2.

12         THE COURT:  Right.

13         MR. MOGIN:  And that's a description, essentially, of

14   what has been produced in response to RPDs No. 30 and 31.

15         Now, RPD No. 30 is all documents relating to

16   communicating price changes of containerboard products produced

17   or sold in the U.S. (including price announcements,

18   explanations of the reason for price changes).

19         That's the end of the parenthetical.  At least that's

20   what I'm working off here.

21         IP's formal response there was:  Subject to and

22   without waiving of the objections -- and you can go back and

23   look at the TIN letter, or our letter that we sent yesterday

24   where we looked at Temple-Inland's objections and why the

25   "subject to" doesn't work, because there's not a lot of linkage

1    to the actual objections and then what they say they're doing

2    subject to.

3         But here in this case, you go to the "subject to."

4    And they say defendant will produce the notifications it sent

5    to its customers regarding price changes for containerboard or

6    corrugated products -- don't know why we have to redefine

7    containerboard products -- sold in the United States during the

8    period January 1, 2004, through November 8, 2010, to the extent

9    such exist, blah, blah, blah, reasonable control.

10        All right.  Now, that's what they said there.

11        Now, look at what they've said in E2 on page 3.

12        THE COURT:  What Mr. McKeown said.

13        MR. MOGIN:  That's right.

14        THE COURT:  Okay.

15        MR. MOGIN:  Well, I just read to you IP's response.

16        THE COURT:  Right.

17        MR. MOGIN:  Any notice sent to a U.S. customer

18   regarding a price change for containerboard prices.

19        That isn't what we asked for.  We asked for the

20   notices, and we asked for documents relating to them, including

21   explanations for the reasons.

22        The closest they get would be E3, which is a summary

23   analysis -- in which you have to now go to the footnote to

24   understand the meaning of that new term, "summary analysis" --

25   of prices, price changes, or the effects thereof for

1  containerboard products.  But "summary analysis" basically

2  means an analysis or evaluation that includes some examination

3  of the facts, figures, or opinions.

4       I don't know what that means and will spend some time

5  trying to figure out what that means.  It's a new term that

6  they introduced with a new definition for the first time today.

7       But where are the documents that we asked for?  We

8  asked for all documents analyzing the prices that they produced

9  or sold in the U.S.  "Analyzed" everybody seems to understand.

10  We didn't ask for summaries; we asked for all documents.

11       For example, what if that sales representative in

12  Alaska writes a memo to his boss at the mill and says, "You

13  know, I don't understand why headquarters just raised these

14  prices unless it's because everybody else is raising prices in

15  the same market.  We could really do a lot better if we kept

16  our prices the same because we could take customers away from

17  them, increase our volume, and I'd get more money in my

18  commissions."

19       The issue is not that the defendants get to pick and

20  choose like that.

21       So the corpus -- as I said from the very beginning,

22  the corpus is infected by the objections and by the limitations

23  that the defendants have unilaterally imposed.

24       So not only do they go through that process -- and it

25  wasn't until today that we got this insight, or yesterday that

1   we got this insight as to what was done -- remember that in

2   order to search for the documents -- and I'm not sure which

3   came first, the chicken or the egg, whether -- and the chicken

4   being this particular letter (indicating) -- or, rather, the

5   protocol that the letter explains, or the egg, being the search

6   terms themselves.  I don't know which.  But they're

7   interrelated documents.

8          So first they impose their objections.  The

9   objections, there's no linkage between the objections and the

10  exclusions, arbitrariness, unilateralness.

11         Then they redefined.  Then they --

12         THE COURT:  They narrowed.  They narrowed some of the

13  requests.  Okay?

14         MR. MOGIN:  And --

15         THE COURT:  Because they thought they were overbroad.

16         MR. MOGIN:  And then they chopped them up into the

17  search terms.  They cannot correlate the search terms to the

18  requests.  They can't correlate the documents that had been

19  produced to the requests.  They can't give us category lists.

20  They come up and they tell you, well, notwithstanding what we

21  said in our formal response, we actually produced the

22  documents, and the plaintiffs should go and they should find

23  it.

24         When is that going to happen?  How is that advancing

25  the process if we don't have the proper corpus to begin with?

1          And that's why while the defendants can call it a

2    theoretical examination all they want, it's not theoretical at

3    all.  We have been trying to do what is proper and what is

4    efficient from the very beginning, which is to get our arms

5    around and to advise the defendants of our views with respect

6    to a proper corpus.

7          That's the whole thing.  And a proper corpus obviously

8    includes sales and marketing.  You can't have an antitrust case

9    without it.

10         THE COURT:  But you're -- but they just showed you

11   that there is -- I mean, I have this chart here.  I mean, you

12   know, they just showed you -- Temple just showed you that they

13   have included some sales and marketing.  Does it include the

14   fellow in Alaska?  Probably not.  Okay.  That's probably not

15   included.

16         If you from No. 6, if from this chart when you do --

17   when you -- when you get to controller of mills -- are these

18   the mills that we're talking about, Ms. Miller?

19         MS. MILLER:  I'm sorry, your Honor?

20         THE COURT:  When you're putting the mills here, these

21   people who are on the mills, sales executive of mills, is that

22   the mills that are out in the field?

23         MS. MILLER:  No, ma'am.  They're the people that are

24   ultimately responsible.  The three salespeople, the three sales

25   executives, are salespeople that sell containerboard, as

1    opposed to boxes.  So those three people are salespeople.

2         THE COURT:  But is that connected to these mills that

3    they were talking about?

4         MS. MILLER:  They are off-site.  They are not in

5    Austin.  They are not located at the mills themself.

6         THE COURT:  I see.  Okay.

7         MS. MILLER:  They are not in Austin, but they are not

8    at the mills.  The reason that designation of mills is next to

9    those sales executives is to indicate that they sell board and

10   not boxes.

11        THE COURT:  I see.  I see.  Okay.

12        MR. MOGIN:  Maybe, your Honor, the proper question to

13   be asking is, ask Ms. Miller to describe how their sales

14   organization is structured, because I'm fairly confident that

15   what you will see is that you have these so-called sales

16   executives are literally the top of the pyramid.  That they

17   have two isn't a representative sample of the number of

18   salespeople at Temple-Inland.

19        THE COURT:  Well, you now have 400 pages of their

20   charts.  So you could specifically say from the 400 now we have

21   ascertained that.  Okay?

22        I actually am overwhelmed here by all of this because

23   I think -- you know, you're making some good points, Mr. Mogin,

24   but these requests are -- you know, I mean, I think it would

25   take them five years if -- even if some judge someplace was

1    going to grant every one of your requests.

2           I want you to think for a minute now what happens.

3    Just I want you to think because I know -- I know you could be

4    frustrated with this process of going back and forth.  But

5    think about if we have to key it up, and Chris and I have what

6    I'm calling on your part -- I don't know whether they're overly

7    broad or they're vague or they're something, a number of your

8    requests, and on their part that they somewhat narrowed.  Okay?

9           What does the opinion look like?  Do I say overbroad;

10   go back and do it over again?  Do I say to you -- you know, do

11   I say to you -- I don't know what I say to you because if I'm

12   not going to tell him that his request is okay, then I don't

13   know what I say to you on yours, like yours is too narrow.

14          I just want you to think for a moment and think in the

15   next couple days -- I don't know how -- I don't know what we do

16   at this moment.  You don't want to give up, obviously, your

17   objections to this.  But you have got some real momentum going

18   with these folks on getting stuff.

19          And you've got a judge that says I will put in writing

20   that you can have more requests to produce.

21          MR. MOGIN:  That's why we have -- the reason we have

22   the momentum, your Honor, is because you took the time to sit

23   down and have three individual meet-and-confers with the

24   defendants.  And we started out telling you that we thought

25   that that process should continue and that it should be

1    expanded to the other defendants.

2            So I'm not suggesting --

3            THE COURT:  You do notice, though, that I punted on

4    the requests to produce because I hate this.  I want to talk

5    about everything else except the requests to produce.

6            MR. MOGIN:  I don't think there's anybody in here that

7    wants to talk about the requests to produce.

8            THE COURT:  Right.

9            MR. MOGIN:  But point in fact, that's where the rubber

10   hits the road.

11           THE COURT:  Just like I like Mr. McKeown's letter, I

12   think this chart is very helpful to you.

13           MR. MOGIN:  That chart came in on August 11th of last

14   year.  And we have been telling the defendants why the chart

15   wasn't helpful to us from the git-go.  We don't have -- listen,

16   your Honor.  In these cases in particular, as in all cases,

17   context is king.  Context rules everything.  Information

18   without context --

19           THE COURT:  So what would give you context?

20           MR. MOGIN:  Proper set of organizational charts.

21           THE COURT:  All right.

22           MR. MOGIN:  Now we have the --

23           THE COURT:  Okay.

24           MR. MOGIN:  We don't have that from all of the

25   defendants.

1          THE COURT:  Okay.  You don't.  Okay.  You don't.

2     Okay.

3          MR. MOGIN:  Proper job descriptions so that we can

4     understand, in the English language, what it is that these

5     people really did, and not in HR speak.

6          THE COURT:  And not title.  Not title.

7          MR. MOGIN:  Not just the title, no.

8          THE COURT:  Okay.

9          MR. MOGIN:  We have the litigation holds.

10         THE COURT:  Right.

11         MR. MOGIN:  And now the information that we requested

12    with respect to RPD No. 3, which is the same thing,

13    functionality.  Give us the functionality information --

14         THE COURT:  What do you mean --

15         MR. MOGIN:  -- so that we have a context.

16         THE COURT:  All right.  What do you mean by

17    functionality?  Let's take Larry Huey.

18         MR. MOGIN:  The questions that we have to answer are

19    who, what, where, when, why, and how.  The first question that

20    we have to answer is who.  Why was Larry Huey doing it?  Who

21    else is involved with Larry Huey?  What does Larry Huey do?

22    Why did he do the things that he did?  Those are some of the

23    simple questions that we have to get to.

24         We have to have some understanding.  We can't go out

25    and start taking depositions in the blind without documents

1   knowing what these people did because then we're going to get

2   involved with some other things, which will be --

3           THE COURT:  Right.

4           MR. MOGIN:  -- depositions will be -- they'll look

5   like this (indicating).  Remember this, your Honor, from your

6   criminal days?

7           THE COURT:  Yeah, I do.  I do.

8           MR. MOGIN:  Crossing the arms.  Some other dude did

9   it, the SODDI defense.

10          THE COURT:  That's right.

11          MR. MOGIN:  That's what we'll hear in the depositions.

12          MS. MILLER:  Your Honor, from our perspective, the

13   chart does not just provide the title.  A lot of this

14   information was also included in our Rule 26(a) disclosures,

15   which were served very early on in the case.

16          But as Mr. Mogin notes, this letter is from August 11,

17   2011.  That's almost a year ago.  And so we provided not only

18   the title, but also the areas of relevant knowledge.  And if

19   you put this next to the organizational charts that we

20   produced, you can see where they fit in the organization, who

21   they report to, if there's anyone else at that level.  You can

22   answer the questions.

23          THE COURT:  And these people are custodians.

24          MS. MILLER:  Yes, ma'am.

25          THE COURT:  So you've got -- so they've got all of

1 their e-mails and their working documents, their transactional

2 documents.

3       MS. MILLER:  Their loose -- right now they have all of

4 their loose e-files and all of their e-mails.

5       MR. McKEOWN:  Your Honor, I know you don't want to

6 talk about requests for production, but if I could just respond

7 briefly to Mr. Mogin's point about the IP response.

8       THE COURT:  Which he liked.

9       MR. McKEOWN:  And, again, this goes to the letter that

10 we sent yesterday.

11       And our issue of how this has been viewed as parsing

12 is that things are being looked at too narrowly in silos.  And

13 so what we tried to do in this chart that was attached to my

14 letter was to put things under the categories, most of which

15 came from the plaintiffs' request, to show that you can't just

16 look at a single one; you have to look at the collection.  And

17 you can go across categories.

18       So, for example, Mr. Mogin read Request No. 30 and our

19 response to that.

20       If you look at Requests 31 and 32, you would see that

21 in our responses, we said we were going to give summary

22 analysis.  So it's not a surprise that we narrowed this to

23 summary analyses.  That was what was done, and that was used.

24       And then when you go back to the chart, though,

25 attached to the letter, this is to say, look.  If you want to

1    know what all you're getting on the context of pricing, here

2    you go.  If you want to go to competitive conditions, that's

3    page 4.  And there's a long list there of items.

4          And they're putting them together, as opposed to just

5    looking at each one individually and trying to parse, which I

6    guess has become a new verb in this court.

7          So I don't want to take a whole lot of time on that

8    this afternoon, but I wanted to make a point that was what we

9    were trying to accomplish is to show them collectively.

10          MR. MOGIN:  I think that's precisely what was

11    accomplished, your Honor, and it highlights what we've been

12    saying from the very beginning:  It isn't what was requested.

13    We're not saying --

14          THE COURT:  No, we know that.  We know that.  Okay?

15          And I'm trying to say to you this is kind of -- even

16    if a judge were interjecting herself in this -- okay? -- then

17    if -- you know, because we then are back to categorical

18    analysis -- okay? -- do we look at yours and we say it's okay

19    as it is?  They said yours is overbroad; it's vague.  They

20    didn't use the word "burden," but I suppose if they had to

21    brief it out, it probably would come to something like

22    "burden."

23          And then the judge has these two competing things.

24    And so what -- what does -- what do most decision-makers do?

25    Kind of what they did.  They offered -- without really giving

1    you any input, they offered a compromise.

2              MR. MOGIN:  Well, that's the point.

3              THE COURT:  I -- I get it.  I get it.  But I'm -- you

4    know --

5              MR. MOGIN:  There's never --

6              THE COURT:  I said to you a little while ago that if

7    you could leave -- I don't mean leave now, but when you leave,

8    if you within seven days could tell me what are your five

9    favorite issues, five things that you feel like you need in

10   order to start this review, maybe we could look at it that way.

11   Okay?  That's in one bucket.

12             Another bucket is we could just go to regular old

13   briefing.

14             Another bucket is what I said a little while ago, kind

15   of threw out there just as an idea.  Take these.  We'll

16   redefine these as Request to Produce No. 1.  Take what you got

17   from them, start your review, not even your intensive review,

18   with an order that says when you're ready, you're going to do

19   Request to Produce No. 2.  That's a third way we could go right

20   now.  I mean, if you just say give me everything, then I don't

21   know what we do, I guess.

22             MR. MOGIN:  I've never asked for everything.  I'm

23   willing to negotiate with people that are willing to negotiate.

24   But I cannot negotiate with unilateralism.  It cannot be done.

25             THE COURT:  Okay.  All right.  Hold on.  Hold on.

1    Hold on.

2          The PCA -- there was one person that you didn't need a

3    parsing letter for.  Which -- is that because you worked it out

4    so well with them?  I meant to say that.  Who was that?

5          MR. NEUWIRTH:  Mr. McCareins.

6          THE COURT:  Oh, you.  So you gave him everything he

7    wanted?

8          MR. McCAREINS:  I don't know.  I didn't get a letter,

9    and I didn't ask.

10          THE COURT:  I see.  Okay.

11          All right.  We have to talk time because two people

12    are going to run out the door, if nothing else.

13          So here is -- I'm not giving up on this process.

14    Okay?  I'm not giving up on this process because I think some

15    of the issues lend themself better to the process than other

16    issues do.

17          And I think for some people, individual groups,

18    because of personalities and because of style, work better in a

19    smaller group; some work better in a larger group.  And you

20    know the personalities and the styles.

21          I'm going to give you every date I'm free.

22          Chris, you're gone a week from Friday, right?

23          MR. McCAREINS:  Your Honor?

24          THE COURT:  Yes.

25          MR. McCAREINS:  These are dates for what?  Maybe I

1    missed something.

2            THE COURT:  No, you didn't.  You didn't.

3            MR. McCAREINS:  Just to come back and chat?

4            THE COURT:  All right.  So what are you going to put

5    on your time sheet?  What are you going to put on your time

6    sheet of what you did?

7            These are days that I have available for either joint

8    statuses, individual conferences -- okay? -- between now and

9    September 29th.  You're going to see it's not that many

10   until -- I mean, we're kind of limited in July and August.

11   So --

12           MR. McCAREINS:  Does this include, though, or reflect

13   some attempt to set a date, whether it's three weeks out or

14   not, to kind of fish or cut bait on some of these issues?

15           THE COURT:  Mm-hmm.  We can.  I know you want to do

16   that.  And this is also delicate here.  I don't know whether

17   it's ready to do it right now because -- let me just give you

18   the dates first because people are going to walk out the door.

19           Would you like to be heard first?

20           MR. FELLER:  I would.  And I think it feeds into this

21   as well.

22           THE COURT:  Okay.

23           MR. MOGIN:  Your Honor, just time management.  I don't

24   mean to cut counsel off.  But one of the things we need to

25   resolve before Mr. Neuwirth leaves is the GP order so

1    Mr. Goodwin is available to discuss that before 4:00.

2              THE COURT:  Okay.  All right.

3              MR. FELLER:  And, your Honor, I will be very, very

4    brief.

5              Leonid Feller for Packaging Corp. of America.

6              Your Honor, we had a meet-and-confer with Mr. Mogin

7    this morning and discussed also in court today whether it is

8    fruitful to have further meet-and-confers either with the Court

9    or directly.

10             There's two fundamental problems from our standpoint

11   before we have further meet-and-confers, I think.  And I don't

12   want to speak for anyone else, but I think to some extent this

13   is a universal sentiment.

14             One is, as you've said over and over again, plaintiffs

15   have got to get through the documents because we have these

16   meet-and-confers, and it's ships passing in the night.  I think

17   you saw it with the three you were at where you've got

18   plaintiffs saying we want X and defendants saying we gave you

19   X.

20             And we had the same thing this morning.  Mr. Eisler

21   says we want standard reports a level down from your top

22   management, and we say we've given them to you.

23             And so -- and the idea that we've dumped documents on

24   them, that they're not organized -- they may not be organized

25   exactly the way they want, but they're organized by custodian.

1  They're organized by reports.  They're organized by third-party

2  publications.  They're very well organized.  They have the

3  exact same search capability.

4       And so I think it's critical that we just -- that

5  rather than keep going every two or three weeks that we give

6  plaintiffs some time and just get through the documents.

7       And candidly, your Honor, I think, with respect,

8  there's a little bit too much slack in terms of, well, how can

9  they get through all this?  It's not as if we gave them the

10  documents, you know, millions of pages two weeks ago or --

11  we've been producing since last fall.  And they've had all

12  sorts of opportunity to get through them.

13       So that's number one, your Honor.

14       Number two is -- so there's got to be in this schedule

15  just, I think, some time for them to do what they need to do.

16       THE COURT:  Okay.  Okay.

17       MR. FELLER:  Number two is when Judge Shadur -- it was

18  months ago now, but first referred this case, remember we had

19  four issues.  Right?  We had predictive coding, custodians,

20  time period, and then this indexing issue.

21       If you look at the agenda that was sent out for this,

22  not a single one of those is on there.  Right?  Every issue is

23  new, a new issue raised by plaintiffs, and that we are now

24  dealing with and, essentially, from defendants' standpoint,

25  negotiating against ourselves on new issues that come up for

1    each status conference.

2         And that's a problem, your Honor.

3         And the issue is fundamentally, again, we're ships --

4    we're talking about all -- a lot of them go to this custodian

5    issue.  Right?  But we're not talking about -- when we say

6    custodians and they say custodians and you listen to Mr. Mogin,

7    we're talking about two totally different things.

8         From defendants' standpoint, what we say is, look.  We

9    think we've picked our right custodians.  And by the way, we've

10   picked the people in charge of the sales and marketing

11   organization and in some respects a level down.  We've picked

12   the people who are in charge of the containerboard mills.

13   We've picked the people in charge of the box plants.  You've

14   got all that.

15        Now, go through our documents, and if you see that,

16   hey, there's somebody else who we didn't pick related to those

17   people they're communicating with, more documents, there's

18   reason to believe they have stuff, let's have that conversation

19   and expand the custodian list that way.

20        What Mr. Mogin and Mr. Freed are talking about is

21   something completely different.  What they're talking about is

22   the deputy assistant sales manager in Tulsa -- at the Tulsa,

23   Oklahoma, box plant.  And, again, speaking for PCA, we're never

24   going to agree to have that person as a custodian.  That's just

25   not going to happen.

1          And there are all sorts of other, again, issues --

2  maybe the time period issue, maybe the backup tape issue --

3  that aren't dependent on documents, that aren't dependent on

4  anything else that we can -- that we are perfectly willing to

5  negotiate on, that we would like to resolve.

6          We had a meet-and-confer this morning.  I said to

7  Mr. Mogin we would love a global resolution of all these

8  issues.

9          And Mr. Mogin is right.  You need a negotiating

10  partner to do that.

11          THE COURT:  Right.

12          MR. FELLER:  And I said, Mr. Mogin, what issues have

13  you given on?  What single issue having to do with discovery

14  have you given on?  And the answer was, well, for conduct

15  requests, we went from 2002 to 2003.

16          THE COURT:  Okay.

17          MR. FELLER:  And so, your Honor, again, I speak for

18  PCA.  I think I speak for defendants.  There are a host of

19  issues, and there's any number of ways we can do it.  I think

20  Mr. McCareins is right.  We don't need a full briefing

21  schedule.

22          But we've got to get to a point of if -- again, this

23  is Mr. Mogin's prerogative.  If he won't be leveraged, if he

24  won't negotiate issues, then we just need to set a date, and

25  let's get them resolved.  Let's call balls and strikes.  Let's

1    figure out what defendants --

2           THE COURT:  I think he's saying he works better in

3    smaller groups.  I don't think he's saying he -- I think he

4    worked better with -- I think he, they, worked better with the

5    Court.

6           I mean, at least let's keep it --

7           MR. FELLER:  That may be.  But I think -- well, I can

8    tell you in our smaller group this morning, and what I've heard

9    Mr. Mogin say in court, is that he is not willing to trade off

10   issues --

11          THE COURT:  Sometimes the judicial presence helps a

12   little bit.

13          MR. FELLER:  Maybe.

14          THE COURT:  It does.

15          MR. FELLER:  Maybe.

16          THE COURT:  It does.  It could.

17          MR. FELLER:  So but anyway, your Honor, I think

18   certainly for PCA, we are certainly willing to continue the

19   dialogue.  We always are.

20          THE COURT:  But you're strongly urging -- if you were

21   in the voting column, you want them to do some review first

22   before we order anything more drastic.

23          MR. FELLER:  Because it's not productive.

24          THE COURT:  I hear you.

25          MR. FELLER:  Thank you, your Honor.

1          THE COURT:  I hear you.

2          Okay.  So can I tell you -- I have to -- they're going

3     to walk out the door.  Okay?

4          Here are Friday, July 13th; Friday, July 27th.

5          The week of August 6th, I'm very open except on

6     Friday.

7          The next week, I'm open Wednesday, Thursday, Friday.

8          Next week, which is August 20th, I have Monday,

9     Tuesday, Friday.

10         And then we're up to Labor Day.

11         Now, I could tell -- I mean, I guess I'm just trying

12    to say, you know, I know -- I think things -- I think people

13    are saying we're a little weary.  Maybe we should move on.  I

14    think it wouldn't be bad if we all thought about today, see if

15    we could identify some issues that we still could get some

16    progress on.

17         Mr. McKeown, do you think there are some issues that

18    maybe we could get some progress on?

19         MR. McKEOWN:  We can certainly attempt to do so, your

20    Honor.

21         THE COURT:  Right.  I mean, I would like -- because on

22    our list, we had -- we still had -- well, we had the litigation

23    holds, which we haven't gotten from everybody.  You heard the

24    plaintiffs say the names on the litigation hold would be very

25    helpful to increase the custodian.

1    We've got language here that we're going to talk about

2    that just by giving the litigation name doesn't turn that

3    person automatically into full-fledged discovery.  We're going

4    to talk about that in a minute.  Okay?

5    But it would give the defendants, give the plaintiffs,

6    much more information about these different departments in this

7    seven.  This is -- I mean, if you guys think about it for a

8    minute from the other side, you have seven of the largest

9    corps -- or some of the corporations in the country.  This is

10   pretty overwhelming trying to figure out how this fits.

11   Something as -- what I meant at the beginning of today

12   is I really saw firsthand at these three individual meetings --

13   I'm sorry, Mr. Mogin -- that there was this glitch.  Here

14   Temple had given you 400 pages and but they need basic

15   information on how their companies work.

16   So if any of you are willing to provide that

17   information just directly to them, you could call up the person

18   who is in charge -- or the person on the plaintiffs' team who's

19   got your client.  That would be very helpful, I think.

20   We had -- we were talking in general about some kind

21   of -- at the end of the search terms some kind of verification.

22   I was calling it some kind of verification in the end.  And we

23   were talking on the requests to produce -- this came up -- this

24   came out of a -- if there were a way to do search strings --

25   search string tied in to the requests to produce, if that would

1  not be terribly cumbersome to do if that could be done.

2          So those were some of the discussions that we had.

3          We still have the temporal scope.  We have a dispute

4  in that.  I understand that.

5          We've never talked about 30(b)(6) and interrogatories.

6  We just haven't talked about that.  I thought that wouldn't be

7  a bad thing to have a discussion of.

8          And then if we were going to put into Phase II,

9  although people kind of made faces.  People really didn't like

10 this phasing idea too much.  But in Phase II, if we were going

11 to put backup tapes in Phase II, and if we were putting

12 privilege logs or whatever is going to happen so that you and

13 Judge Shadur and the new magistrate judge would know that those

14 are issues that are not being dealt with right now, and

15 anything else you wanted to put in Phase II.

16         So I think I'm going to have to ask you to send me

17 some proposals.  And if the proposal is, you know, enough of

18 this already -- some of you seem to be kind of saying that --

19 you know, I'm going to be disappointed, but I'm a tough Irish

20 woman, as I always say.

21         So I'm available, and I would like to keep going with

22 whoever would like to keep going with this.  I mean, that's the

23 other way we can do it is we -- because if it cuts down a

24 couple motions, that would help.

25         We like our order that we wrote.  I want to hear from

1   you on what was the matter -- does everybody know what I'm

2   talking about?

3           So at the individual session, Temple-Inland worked

4   very hard.  It was a real --

5           MR. MAROVITZ:  Georgia-Pacific.

6           THE COURT:  I'm sorry.  Georgia-Pacific.

7           There was -- yeah.  But there was a real dispute there

8   because they felt very strongly about their CEO.  Mr. Neuwirth

9   really felt that he wasn't -- that unlike other people, he --

10  because of the size of the company, he wasn't going to be the

11  worker bee that somebody else might be.  But he heard what the

12  plaintiffs had to say, and at a break, he and his general

13  counsel came back and said they were willing to --

14          Well, why don't you say it, Mr. Neuwirth, better than

15  me.

16          MR. NEUWIRTH:  Sure.  And let me just say if this is

17  going to take -- one option would be to do this by phone within

18  the next couple of days.  There's been -- I can tell you

19  Georgia-Pacific has already prepared the custodian list with

20  the titles and the dates.  Mr. Hannan's documents are largely

21  collected.

22          THE COURT:  Good.

23          MR. NEUWIRTH:  Not completely.  So we're not going to

24  have a delay.  I just note the time is almost 4:00, and I --

25          THE COURT:  Yes.

1      MR. NEUWIRTH:  We -- there may be some back and forth

2  here.  But I -- if you want to do it now, we can, if we can do

3  it in --

4      THE COURT:  We could do it on the phone.  That's true.

5  And, in fact, we could do individual conferences so people

6  don't have to do that too.  I mean, we could do issues on the

7  phone too.

8      MR. NEUWIRTH:  Right.  So if there's a time within the

9  next day or two when it would be convenient for the Court and

10  Mr. Goodwin and whoever else on the plaintiffs' side will

11  participate to talk this through, I think that might be better

12  than trying --

13      THE COURT:  Okay.

14      MR. NEUWIRTH:  -- to rush it right now and just --

15      THE COURT:  Who else has to leave at 4:00?

16      MR. EIMER:  I do, your Honor.

17      THE COURT:  Mr. Eimer.

18      Okay.  Can you talk Friday?  I can talk Friday.

19      MR. NEUWIRTH:  I will make myself available at your

20  convenience, your Honor.

21      THE COURT:  Okay.  Can you guys talk Friday?

22      MR. GOODWIN:  Yes, your Honor.

23      THE COURT:  Somebody?

24      MR. MOGIN:  Yes.

25      THE COURT:  Just on this language.  It shouldn't take

1    that long.  Okay?  We thought we wrote a fine order.  Normally

2    I'm not asking parties on how to write orders, but I was trying

3    to be polite here.

4              MR. MOGIN:  I'll give you the plaintiffs' argument on

5    the order right now.  We think it's fine as it's written.

6              THE COURT:  So we don't even need them.  I'll have a

7    conversation -- thank you.  I have your authority.  I will

8    just -- I will call you up.  And so what time Friday would be

9    good for you?  In the afternoon.

10             MR. NEUWIRTH:  We'll make ourselves available.

11             THE COURT:  1:30?  1:30.

12             MR. GOODWIN:  Eastern or Central, your Honor?

13             THE COURT:  Central.  Is that okay?

14             MR. GOODWIN:  Central.  That's fine.

15             THE COURT:  1:30 Central.  We'll get Charles and

16   Mr. Neuwirth on the phone.  Okay.  Good.

17             MR. NEUWIRTH:  Can I have one second, your Honor?

18             THE COURT:  Sure, absolutely.

19             MR. NEUWIRTH:  Okay.  That's fine, your Honor.

20             THE COURT:  Is that okay?

21             MR. NEUWIRTH:  Yes.

22             THE COURT:  So we have your number -- or you'll call

23   us.  Why don't you call us.

24             MR. NEUWIRTH:  That's fine.

25             THE COURT:  Call chambers.  Okay.  Charles can --

1    yeah, and you and Charles get together and call us.  Okay.

2              MR. NEUWIRTH:  Okay.  Thank you, your Honor.

3              THE COURT:  Thank you.  Thank you for traveling here

4    today, and I'm so glad your client came.  Okay?

5              MR. NEUWIRTH:  Thank you, your Honor.

6              THE COURT:  All right.  So does anybody else want

7    to -- any thoughts on kind of where we go?  So let me just see

8    my notes here.

9              Well, I would like the plaintiffs -- here's some

10   homework.  For the plaintiffs, I would like the plaintiffs to

11   consider this idea.  This whole thing we've been doing is an

12   experiment.  I don't have any rules for doing it this way.

13             The defendants are saying to you loud and clear, as a

14   matter of good faith or as a matter of goodwill, for God's

15   sake, will you just look at our documents?

16             So would you pick one defendant who has produced a lot

17   and agree for 30 days that maybe you could focus on their

18   turnover, knowing that you don't have everything you need?  But

19   at the end of the 30 days, or the end of 21 days or whatever it

20   is, you could come back, and we could sit down and concretely

21   talk about areas that might be missing.

22             I understand you don't know what you don't have.  But

23   you're sophisticated enough that if you start seeing holes;

24   e-mail to e-mail, you start seeing a pattern; you start seeing

25   a trend; you start seeing a word; you start -- you start seeing

1    something, you could come back and tell us rather than push it

2    off for seven months and then come back at the end of seven

3    months.

4           If you came back at the end of 21 days, do you think

5    this would be an interesting experiment?

6           MR. MOGIN:  I understand what you're saying, your

7    Honor.  There's some practical things to be considered before I

8    can give you an answer --

9           THE COURT:  Okay.  Tell us what they are.

10          MR. MOGIN:  -- before I can give you the answer, not

11   the least of which has to do with person power.  In other

12   words, I have many lawyers that are working on reviewing the

13   documents.  And I did want to mention that.  The implication

14   that we haven't reviewed the documents or that we've been

15   sitting around and not looking at documents is simply untrue.

16   These are my batch reports (indicating).

17          THE COURT:  Okay.  What is a batch -- I don't know

18   what a batch report is.

19          MR. MOGIN:  Every time a reviewer -- a reviewer is

20   given a certain batch of documents.

21          THE COURT:  Okay.

22          MR. MOGIN:  Mr. Wozniak and some other people working

23   with him make up the criteria as to what's going to be a

24   particular batch.  And a reviewer is assigned to that batch,

25   and they have to give me a report about the contents of the

1    batch.

2              THE COURT:  Okay.

3              MR. MOGIN:  Things like in this batch, there were 217

4    documents.  27 were relevant, 97 were irrelevant, two were

5    good, et cetera.  Okay?

6              THE COURT:  Okay.

7              MR. MOGIN:  So we have been through, your Honor, a

8    tremendous number of batches.  So each batch varies in terms of

9    its size.  But if I had to give you an estimate, I would say

10   that a batch is 10 to 20,000 documents.  Okay?

11             So that implication is just simply erroneous.

12             Number two, the case, as I said, I would have to take

13   everybody off reviewing all the other defendants' documents --

14             THE COURT:  And put them on it.

15             MR. MOGIN:  -- and retrain them to the sensitivities

16   of the particular company, as to who are the right custodians

17   in this company, what do they do, what's their functionality --

18   the word we've been using today -- what's the unique language

19   of this particular company.

20             THE COURT:  Right.

21             MR. MOGIN:  Back to the word lists, which were on the

22   agenda that we didn't get a chance to talk about today, and

23   have to retrain them in order to do that.

24             But even if that were doable, please remember that

25   it's not necessarily a good thing for us to review a single

1    defendant at a time because that silos -- the word somebody

2    else used -- the information.

3         This is a conspiracy case, and the important thing is

4    to look across the companies at a single point in time.  That's

5    the important thing.  And, your Honor, one of the processes, as

6    you know, that we're using -- defendants didn't use, but we're

7    using -- on what the defendants have produced is the advanced

8    analytics.

9         And it would be highly inefficient, I think -- I'll

10   check with the technologists -- to silo one company at a

11   time --

12        THE COURT:  I see.

13        MR. MOGIN:  -- when you're using the advanced

14   analytics.  But I will check with them in that respect before I

15   give you an answer.

16        MR. EIMER:  Your Honor, excuse me.  I wonder if I

17   might be excused.

18        THE COURT:  Yes, you may.  Nice to see you Mr. Eimer.

19        Okay.  So you pick a date and come back with some

20   problem.  I'm like Charlie Brown here, right?

21        MR. EIMER:  We each pick our own problem.

22        THE COURT:  Pick your own problem, right.

23        MR. EIMER:  Thank you, your Honor.

24        THE COURT:  Okay.  Bye, Mr. Eimer.

25      (Mr. Eimer exits the proceedings.)

1        THE COURT:  Are you ready, Mr. Neuwirth?

2        MR. NEUWIRTH:  Yes, but I hate to walk out.

3        THE COURT:  Don't walk out.

4        No, I wanted to know if anybody had any follow-up.

5        No, you're excused.  Okay?  You're excused.  You've

6   got to get a plane, for God's sake.  Go.

7        MR. NEUWIRTH:  I do.  Thank you, your Honor.

8        THE COURT:  Okay.  Good to see you again.

9        MR. NEUWIRTH:  Thank you.

10       (Mr. Neuwirth exits the proceedings.)

11       THE COURT:  All right.  So I would like

12  homeworkwise -- okay?  Homeworkwise, I would like the

13  plaintiffs to let us know if there is -- give them some time to

14  think about if there is any practical way that they could --

15  and you can pick whoever you want.  It doesn't -- I had just

16  thrown Georgia-Pacific out because it seemed like they were

17  almost finished.

18       Tell me what the projected -- I did want to know what

19  the projected production is for the other defendants.  When do

20  you think you might -- and this isn't like a cutoff date.  But

21  when do you think you might be finished with some of them?

22       Temple?

23       MR. MAROVITZ:  Your Honor, Andy Marovitz for

24  Temple-Inland.

25       We had previously anticipated by October.  Ms. Miller

1    earlier today said we're trying to accelerate that a little

2    bit.

3            THE COURT:  Oh, good.  Okay.  Thank you.

4            Mr. McCareins?

5            MR. McCAREINS:  For RockTenn, we're hoping for

6    August 1st.

7            THE COURT:  Okay.  Thank you.

8            Okay.

9            MR. McKEOWN:  Your Honor, for International Paper,

10   we're hoping for early August.

11           THE COURT:  Early August.  Okay.  Great.

12           MS. DIVER:  Hi, your Honor.  Jennifer Diver for

13   Weyerhaeuser.

14           We're hoping to complete our production in the next

15   month.

16           THE COURT:  Okay.  Great.  That's sometime in August

17   too.  Okay.

18           MR. MENDEL:  Scott Mendel for Cascades and Norampac.

19           I would expect sometime about Labor Day.

20           THE COURT:  Labor Day.  Okay.

21           MR. FELLER:  And, your Honor, for PCA, we have a small

22   number of documents we'll produce -- comparatively small -- in

23   the next couple of weeks where we had technical issues or

24   privilege or confidentiality issues, but we've been

25   substantially complete for about a month or so.

1      THE COURT:  Okay.

2      MR. FELLER:  Based on the documents collected to date.

3      THE COURT:  Is everyone including privileged documents

4  in this -- in this first batch here?  I mean, are you -- I

5  thought you were doing privilege later on.

6      MR. FELLER:  When I say privileged documents or

7  confidential, there is a secondary review process that we go

8  through --

9      THE COURT:  Okay.

10      MR. FELLER:  -- where a contract attorney might say

11  something is potentially privileged or there's a

12  confidentiality issue or there's a, you know, technical issue

13  where the documents -- so there's a secondary review process.

14  That's what I mean, not -- not anything beyond that.

15      THE COURT:  But the logs.

16      MR. FELLER:  No.

17      THE COURT:  If you were preparing logs.

18      MR. FELLER:  No.

19      THE COURT:  They wouldn't be -- right.  They wouldn't

20  be in August.

21      MR. FELLER:  No, no.

22      THE COURT:  That's when -- when I was going on about

23  Phase II, that's what I was thinking.  Okay.

24      Well, that seems like you're going to be getting a lot

25  of stuff in the month of August.

 1           Now, plaintiffs' documents to the defendants.  What do

 2    we -- what are you folks anticipating?

 3           Mr. Wozniak?

 4           MR. WOZNIAK:  Your Honor, we made a small production

 5    yesterday for -- it was actually all of the responsive ESI from

 6    one of our plaintiffs, along with some other residual hard-copy

 7    documents that were responsive to two of plaintiffs' -- or

 8    defendants', rather, document requests.

 9           We are continuing to work our way through the

10    remaining ESI.  I expect that by the end of this week or early

11    next week, we'll be prepared to make a substantial production.

12    I'm hoping it will be all remaining documents for most of our

13    plaintiffs.

14           There's one particular plaintiff, Mighty Pac, which

15    may take a little bit longer for us to get through because they

16    have quite a few sort of confidentiality concerns and

17    downstream data concerns.  So we may have to go through a

18    secondary process of redacting many of the otherwise responsive

19    documents before they're produced to defendants.

20           THE COURT:  Okay.

21           MR. WOZNIAK:  So that's where we are.

22           THE COURT:  And are you going to have any withheld for

23    privilege?

24           MR. WOZNIAK:  I don't know that yet.  We certainly --

25    our reviewers have --

1    THE COURT:  How many plaintiffs are -- how many named?

2    MR. WOZNIAK:  Seven named plaintiffs.

3    THE COURT:  Seven.  Oh, that's nice.  Seven and seven.

4    Seven and seven.  Okay.

5    MR. WOZNIAK:  In effect, there's eight named

6    plaintiffs, but the Ferraro entities I consider as one

7    plaintiff.

8    THE COURT:  Okay.  All right.

9    Do we have any other, other than the Temple-Inland

10   sale?  Are there any other individual issues that I should be

11   thinking about or that you might want to bring to me?  Are

12   there any other individual sort of side issues but that could

13   have an impact on the case?

14   Are you coming up to talk to us?

15   MR. FELLER:  No, your Honor.

16   THE COURT:  Oh, okay.

17   You brought that up in yours.  You think the end of

18   June?  Is that what you said?

19   MR. McKEOWN:  That was mine, your Honor.

20   THE COURT:  Yeah.

21   MR. McKEOWN:  With respect to the divestiture sale,

22   we've communicated with Mr. Mogin and got a response from him.

23   We have one open issue that we'll probably talk about after

24   today's hearing.

25   THE COURT:  Okay.

1          MR. McKEOWN:  But we're hoping to get this resolved

2     quickly.

3          THE COURT:  Oh, good.  Yes.

4          So, plaintiffs, do you have anything else you'd like

5     to bring up while we're here?

6          MR. MOGIN:  I don't think so, your Honor, just to

7     thank you for your time and patience.

8          THE COURT:  Well, I would like to hear -- I mean, I

9     guess it's kind of weird when a judge says, okay.  Tell me

10    where we should go from here.  But I'm sort of saying I want to

11    hear from the plaintiffs in seven days if they will consider

12    this proposal to do an expedited review of one defendant

13    because I -- I do -- I am thinking, Mr. Mogin, that we could be

14    much more precise on what should be ordered further if we could

15    see where the holes are.  Okay?

16         MR. MOGIN:  Understand, your Honor.  But we do have

17    the issues that I spoke of.

18         THE COURT:  You do.  And -- oh.  I did have a

19    question.  This CBAA or this analytics that you're using, do

20    they have to buy the equipment in order to run your material?

21    I mean, do they --

22         MR. MOGIN:  No.  So what we've done is we're going to

23    take the defendants' documents that they've produced --

24         THE COURT:  Right.

25         MR. MOGIN:  -- and put it through our own analytical

1    process.  So that's our own machine.  It's part of the way that

2    we review the documents.  Doesn't have -- they don't get the

3    output from that.

4              THE COURT:  I see.  Okay.  So they don't need anything

5    in order -- okay.  So that's good.  I just didn't understand

6    that.

7              And then for the defendants, since Mr. Mogin said

8    today the organizational charts, as much help as you could give

9    him -- give them, not him, give the plaintiffs in the way of

10   organizational structure, I think they would really appreciate

11   that.

12             Whether or not it falls under a particular request to

13   produce, this has been a recurring problem.

14             And if some of you would also consider giving them the

15   names of the people who are on your litigation hold, this

16   isn't -- I've already ruled or said we are not turning over the

17   wording of the litigation hold.  Several cases have found that

18   to be privileged, but we don't think there's any privilege in

19   the names of the people.

20             And I have language that Mr. Neuwirth and I -- I guess

21   it's just Mr. Neuwirth and I are going to fight out on Friday

22   to find out what we're going to say, that by giving the names

23   does not automatically equate with becoming a custodian.  And

24   it certainly doesn't automatically equate -- it doesn't mean

25   that that person is then going to be subject to a deposition.

1    They may -- okay? -- but by giving the names alone on the

2    litigation hold, you are not increasing -- automatically

3    increasing any future responsibility.

4            MR. MOGIN:  Your Honor, there is one thing I should

5    mention, just to be precise.

6            THE COURT:  Uh-huh.

7            MR. MOGIN:  We've talked in terms of functionality and

8    organizational charts in terms of human beings, in terms of

9    individuals.  But one of the components of this is what are the

10   entities that are involved?  What are the affiliates of each of

11   the defendants?  In other words, what are their subsidiaries?

12   What partnerships are they in?  Et cetera, et cetera.

13           THE COURT:  And you mean just names?

14           MR. MOGIN:  Sure.  We'll start with names.

15           THE COURT:  Well, I mean, I'm not -- but, I mean,

16   that -- this isn't their Rolexes -- or their Rolodexes or

17   whatever it is.  But you really do want, if they have

18   subsidiaries -- is that what you need?

19           MR. MOGIN:  Yes, subsidiaries, any other divisions.

20           I'm also mostly concerned with entities that they have

21   interests in, that they may not control, that they don't have

22   to report for SEC purposes.

23           So there's an ownership threshold there.  But because

24   we've reviewed the documents, I thought it was important that

25   we point that out.  That's something that we've --

1          THE COURT:  That's something that's come up already.

2  Okay.  Well, that's good.  See, there's a --

3          MR. MOGIN:  And that is in RPD No. 1.

4          THE COURT:  Okay.  All right.

5          Well, you'll hear from us.  Chris is going to do a

6  little bit longer -- we realize the fact that we've been saying

7  "see transcript."  I don't want to leave our new judge -- the

8  voting is also a week from today, right at this very moment,

9  one week from today.

10         So you won't know exactly which of the two, but you

11 will know who the two new magistrate judges are because they

12 actually pick the same day.

13         And then we are anticipating the new person will take

14 over October 1st.

15         I think we should have a status, I mean, one way or

16 the other.  I think, if nothing else, we ought to pick that

17 first -- do I hear anybody absolutely could not come Friday,

18 July 13th?

19         MR. MENDEL:  Your Honor, I'm going to be out of town

20 that day.

21         THE COURT:  Do you have an associate who could come?

22         MR. MENDEL:  Yes.

23         THE COURT:  Okay.  Then why don't we do that.  Okay?

24 Why don't we do Friday, July 13th.  And I think Chris will -- I

25 think we'll be putting together some things we need to think

 1    about today.  And I would like to really get your input.  I

 2    mean, I would really appreciate your input on areas that you

 3    think we could work together on.

 4          So, Mr. McKeown, did you sit through the other day?

 5    Did they figure out what the Kleen case was so that you could

 6    tell them?

 7          MR. McKEOWN:  Your Honor, based on the CLE program, it

 8    appears that someone's been reading the transcript.

 9          THE COURT:  They've all been reading the transcript.

10    This is our search program the other day.  And what did you

11    say?

12          MR. McKEOWN:  I believe there was one individual who

13    was using a number of the same phrases that Mr. Mogin, if he

14    had copyrighted, would get a royalty.

15          THE COURT:  Oh.  They did have -- first they had a

16    meet -- first they had Jason Baron gave a talk.  He gave a

17    great -- I was there for that part.  And then I was so busy I

18    had to leave.

19          They then did a meet-and-confer on the facts of Kleen,

20    basically, and then they had a panel.

21          And I think they figured out what we were supposed to

22    do, but they should have come here today and told us.

23          Yes, Ms. Miller?

24          MS. MILLER:  What time would you like to see us on the

25    13th, your Honor?

1    THE COURT:  11:00.  Okay.  Thank you for reminding me.

2        And, ladies and gentlemen, I'm telling you we're

3    available if you and -- you talk to the plaintiffs.  You want

4    to have -- we could do it on the telephone.  We can do it

5    before that time.  We can try to figure it in, any availability

6    that you want.

7        So thank you very much.  And we'll at least see you in

8    July.

9        ALL COUNSEL:  Thank you, your Honor.

10                   C E R T I F I C A T E

11    I certify that the foregoing is a correct transcript of the

12    record of proceedings in the above-entitled matter.

13

14
     */s/ LAURA R. RENKE*                        *June 28, 2012*
15   LAURA R. RENKE, CSR, RDR, CRR, CLR
     Contract Court Reporter
16   Illinois Certified Shorthand Reporter
     License No. 084-003184
17

18

19

20

21

22

23

24

25