<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3
    KLEEN PRODUCTS, LLC, et al.,        )   Docket No. 10 C 5711
 4                                      )
                         Plaintiffs,    )
 5                                      )
              vs.                       )
 6                                      )
    PACKAGING CORPORATION OF AMERICA,   )   Chicago, Illinois
 7  et al.,                             )   March 28, 2012
                                        )   8:00 o'clock a.m.
 8                       Defendants.    )

 9
            TRANSCRIPT OF PROCEEDINGS - EVIDENTIARY HEARING
10      BEFORE THE HONORABLE MAGISTRATE JUDGE NAN R. NOLAN
                          VOLUME 2-A
11
    APPEARANCES:
12

13  For the Plaintiffs:        THE MOGIN LAW FIRM
                                BY:  MR. DANIEL J. MOGIN
14                              707 Broadway, Suite 1000
                                San Diego, CA  92101
15                              (619) 687-6611

16                              FREED KANNER LONDON & MILLEN LLC
                                BY:  MR. MICHAEL J. FREED
17                              MR. ROBERT J. WOZNIAK
                                2201 Waukegan Road, Suite 130
18                              Bannockburn, IL  60015
                                (224) 632-4500
19
                                SCOTT & SCOTT
20                              BY:  MR. WALTER W. NOSS
                                707 Broadway, Suite 1000
21                              San Diego, CA  92101
                                (619) 233-4565
22

23
    Court Reporter:            MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                             Official Court Reporter
                               219 S. Dearborn Street, Suite 1854-B
25                             Chicago, Illinois  60604
                               (312) 435-5639
</pre>

```
 1   APPEARANCES CONTINUED:

 2   For the Plaintiffs:        LOCKRIDGE GRINDAL NAUEN PLLP
                                BY:  MR. BRIAN D. CLARK
 3                              100 Washington Avenue S.
                                Minneapolis, MN  55401
 4                              (612) 239-6900

 5
     For Defendant Packaging    KIRKLAND & ELLIS LLP
 6   Corporation of America:    BY:  MR. BARACK S. ECHOLS
                                     MR. LEONID FELLER
 7                              300 North LaSalle Street
                                Chicago, IL  60654
 8                              (312) 862-3144

 9
     For Defendant             FOLEY & LARDNER LLP
10   International Paper:      BY:   MR. JAMES T. McKEOWN
                                     MR. NATHAN EIMER
11                             777 East Wisconsin Avenue
                               Milwaukee, WI  53202
12                             (414) 297-5530

13
                              FOLEY & LARDNER LLP
14                            BY:  MS. JOANNE LEE
                              321 North Clark Street, Suite 2800
15                            Chicago, IL  53202

16   For Defendant            MAYER BROWN LLP
     Temple-Inland:           BY:   MR. ANDREW S. MAROVITZ
17                                  MS. BRITT M. MILLER
                              71 South Wacker Drive
18                            Chicago, IL  60606
                              (312) 782-0600
19
     For Defendant            K & L GATES LLP
20   Cascades and Norampac:   BY:   MR. SCOTT M. MENDEL
                              70 West Madison Street, Suite 3100
21                            Chicago, IL  60602
                              (312) 372-1121
22

23   For Defendant            QUINN EMANUEL URQUHART &
     Georgia-Pacific:         SULLIVAN LLP
24                            BY:  MR. STEPHEN R. NEUWIRTH
                              51 Madison Avenue, 22nd Floor
25                            New York, NY  10010
                              212-849-7000
```

```
 1   APPEARANCES CONTINUED:

 2   For Defendant                WINSTON & STRAWN LLP
     RockTenn CP, LLC:            BY:   MR. R. MARK McCARIENS
 3                                      MR. JOSEPH L. SIDERS
                                  35 West Wacker Drive
 4                                Chicago, IL  60601
                                  (312) 558-5902
 5

 6   For Defendant                McDERMOTT WILL & EMERY LLP
     Wayerhaeuser Company:        BY:   MS. RACHAEL V. LEWIS
 7                                600 13th Street NW
                                  Washington, DC   2005
 8                                (202) 756-8479

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1 <u>I N D E X</u>

2

3

4 <u>DESCRIPTION</u>                                                          <u>PAGE</u>

5

6 DANIEL D. LEWIS, CROSS-EXAMINATION CONTINUED                15
   BY MR. McKEOWN:
7

8 DANIEL D. LEWIS, CROSS-EXAMINATION                         81
   BY MR. NEUWIRTH:
9

10 DANIEL D. LEWIS, REDIRECT EXAMINATION                     142
   BY MR. MOGIN:
11

12 DANIEL D. LEWIS, RECROSS-EXAMINATION                      163
   BY MR. NEUWIRTH:
13

14 DAN REGARD, DIRECT EXAMINATION CONTINUED                  170
   BY MR. MAROVITZ:
15

16 DAN REGARD, CROSS-EXAMINATION                             237
   BY MR. MOGIN:
17

18

19

20

21

22

23

24

25

09:03:16   1    (The following proceedings were had in open court:)

09:03:16   2          THE CLERK:  10 C 5711, Kleen Products, et al., v.

09:03:20   3    Packaging Corporation of America, et al.

09:03:22   4          THE COURT:  Okay.  Good morning.  I am Nan Nolan.  I

09:03:28   5    am a magistrate judge.  Judge Feinerman was kind enough to

09:03:32   6    lend us his courtroom here.  And this case was referred from

09:03:40   7    Judge Shadur for all discovery matters, and we are in our

09:03:42   8    second day of an evidentiary hearing regarding word search in

09:03:48   9    this case.

09:03:48   10        So for the plaintiffs, will the plaintiffs' lead

09:03:54   11    lawyer introduce himself and your team, please.

09:03:58   12        MR. MOGIN:  Good morning, your Honor; Dan Mogin on

09:04:02   13    behalf of plaintiffs.  With me today, going around the table,

09:04:08   14    Walter Noss from the firm of Scott & Scott; Robert Wozniak

09:04:10   15    from the Freed Kanner firm; and Brian Clark from the Lockridge

09:04:14   16    firm.

09:04:14   17        THE COURT:  Okay.  Now, do these gentlemen --

09:04:20   18    gentlemen, I will ask you directly, do you represent other

09:04:22   19    named plaintiffs in the case?  I know Mr. Mogin was appointed

09:04:30   20    as lead counsel for the putative class.  What I am confused

09:04:38   21    from from the docket when I was studying the docket in between

09:04:44   22    are there appear there are a number of other lawyers who

09:04:46   23    represent other plaintiffs.  Are you fellows representing the

09:04:52   24    other plaintiffs, or are you working with Mr. Mogin on this?

09:04:56   25        MR. MOGIN:  They are all working with me, your Honor.

| | | |
|---|---|---|
| 09:04:58 | 1 | It's just that what you viewed in the docket I think is just a |
| 09:05:00 | 2 | matter of the way the docket gets entered.  All the |
| 09:05:04 | 3 | plaintiffs' lawyers appear on the consolidated amended |
| 09:05:08 | 4 | complaint. |
| 09:05:08 | 5 | THE COURT:  All right.  So you have -- for purposes |
| 09:05:10 | 6 | of this hearing, though, I want to clarify, you have authority |
| 09:05:14 | 7 | from -- I know this is funny with lead plaintiff, but you have |
| 09:05:18 | 8 | authority from each of the other plaintiffs' lawyers that |
| 09:05:26 | 9 | you're speaking on their behalf too? |
| 09:05:28 | 10 | MR. MOGIN:  Yes, your Honor. |
| 09:05:28 | 11 | THE COURT:  Okay.  Good.  Thank you. |
| 09:05:30 | 12 | So for our defendants, will you state your name, your |
| 09:05:36 | 13 | partners -- I mean whoever is here with you, and what |
| 09:05:42 | 14 | defendant you represent, please. |
| 09:05:44 | 15 | MR. NEUWIRTH:  Good morning, your Honor; Steven |
| 09:05:46 | 16 | Neuwirth, representing defendant Georgia-Pacific, and I am |
| 09:05:50 | 17 | joined here today by my colleague, Sammy Rasheed (phonetic). |
| 09:05:54 | 18 | THE COURT:  Thank you, Mr. Neuwirth. |
| 09:05:56 | 19 | MR. ECHOLS:  Good morning, your Honor; Barack Echols, |
| 09:06:00 | 20 | representing defendant Packaging Corporation of America, and I |
| 09:06:02 | 21 | am joined by my colleague, Leonid Feller. |
| 09:06:04 | 22 | THE COURT:  Thank you. |
| 09:06:08 | 23 | MR. McCAREINS:  Good morning, your Honor; Mark |
| 09:06:10 | 24 | McCareins from Winston Strawn on behalf of RockTenn, and I am |
| 09:06:14 | 25 | here with my colleague, Joe Siders. |

| | | |
|---|---|---|
| 09:06:16 | 1 | THE COURT:  Good.  Thank you. |
| 09:06:18 | 2 | MR. EIMER:  Good morning, your Honor; Nate Eimer on |
| 09:06:20 | 3 | behalf of International Paper. |
| 09:06:20 | 4 | THE COURT:  Hi, Mr. Eimer. |
| 09:06:24 | 5 | MR. McKEOWN:  Good morning, your Honor; James |
| 09:06:24 | 6 | McKeown.  I am here with my colleague, Joanne Lee, for |
| 09:06:28 | 7 | International Paper. |
| 09:06:30 | 8 | THE COURT:  Thank you. |
| 09:06:30 | 9 | MR. MAROVITZ:  Good morning, your Honor; Andy |
| 09:06:30 | 10 | Marovitz for Temple-Inland, and I am here with my partner, |
| 09:06:36 | 11 | Britt Miller. |
| 09:06:36 | 12 | THE COURT:  Thank you.  And, Ms. Miller, good |
| 09:06:38 | 13 | morning. |
| 09:05:58 | 14 | MR. MENDEL:  Good morning, your Honor; Scott Mendel |
| 09:06:42 | 15 | for Cascades and Norampac. |
| 09:06:42 | 16 | THE COURT:  Sir, can you spell your last name. |
| 09:06:48 | 17 | MR. MENDEL:  M-e-n-d-e-l. |
| 09:06:50 | 18 | THE COURT:  Thank you, Mr. Mendel.  And your client |
| 09:06:50 | 19 | is? |
| 09:06:52 | 20 | MR. MENDEL:  Cascades and Norampac. |
| 09:06:54 | 21 | THE COURT:  Thank you. |
| 09:06:54 | 22 | MS. LEWIS:  Good morning, your Honor; Rachel Lewis on |
| 09:06:58 | 23 | behalf of Weyerhaeuser Company. |
| 09:07:00 | 24 | THE COURT:  Okay.  And that's everyone we have. |
| 09:07:06 | 25 | Okay.  Good. |

| | | |
|---|---|---|
| 09:07:08 | 1 | Well, I have a few preliminary matters I'd like to |
| 09:07:14 | 2 | discuss, and you don't have to be shy. If you want to add |
| 09:07:22 | 3 | anything or if you have any questions, please do. |
| 09:07:26 | 4 | So the first thing is Mr. Mogin told us the last |
| 09:07:36 | 5 | time -- I want to talk about how we are going to work today. |
| 09:07:40 | 6 | When we were here the last time, Mr. Mogin told us that either |
| 09:07:44 | 7 | it was a Ninth Circuit or California or district court meeting |
| 09:07:48 | 8 | which he needed to be at. Based upon that, I went and |
| 09:07:50 | 9 | scheduled things and I have a 4:00 o'clock that's unmovable, |
| 09:07:56 | 10 | and so we are going to work -- what I would like to do today |
| 09:08:02 | 11 | is work here in the courtroom until about 10 to 3:00, we will |
| 09:08:08 | 12 | take a little walk around-the-table break at 10 to 3:00, and |
| 09:08:14 | 13 | then I'd like to invite you down to my courtroom with the |
| 09:08:18 | 14 | court reporter, and I'd like to have a conference, a |
| 09:08:22 | 15 | scheduling conference, with the lawyers at 3:00 until |
| 09:08:28 | 16 | approximately 10 to 4:00. Okay? |
| 09:08:32 | 17 | So we will do as much as we can witness-wise given |
| 09:08:38 | 18 | that confine. |
| 09:08:38 | 19 | My thinking on this, this morning we should begin |
| 09:08:46 | 20 | with Mr. Regard because it was -- we cut him off or I cut him |
| 09:08:52 | 21 | off or he was cut off in the -- at the beginning of his direct |
| 09:09:00 | 22 | examination, and if we began with Mr. Regard, then he could be |
| 09:09:04 | 23 | crossed. Dr. Lewis has been listening to what his comments, |
| 09:09:10 | 24 | at least the last time, he can then hear what Mr. Regard says, |
| 09:09:14 | 25 | and then he can opine about that. Mr. Regard will be here. |

09:09:18　1　If there's any follow-up that Mr. Regard needs to do, we

09:09:22　2　certainly will give Mr. Regard an opportunity to do that.

09:09:26　3　　　　　Okay.  I know Dr. Tenny is here too, and as I said to

09:09:32　4　you, I did not know whether we'd have sufficient time today,

09:09:36　5　nobody is going to be precluded if we need more evidence.  I

09:09:42　6　am sure she is just finding this so stimulating that it will

09:09:50　7　be fine.

09:09:50　8　　　　　MR. McKEOWN:  Your Honor, if I might, would it be

09:09:52　9　more efficient to do Dr. Lewis first?  We are in the middle of

09:09:56　10　his cross.  We didn't finish him last time.

09:09:56　11　　　　　THE COURT:  Well, then we are going to have -- then I

09:09:58　12　think -- I mean, we stopped both of them.

09:10:02　13　　　　　MR. McKEOWN:  Correct.  We had Dr. Lewis' direct was

09:10:04　14　done.  We were in the middle of his cross.  And we at least

09:10:08　15　had anticipated that what would happen is we would finish

09:10:10　16　Dr. Lewis' cross and go back to Mr. Regard.

09:10:14　17　　　　　THE COURT:  You don't want anything Mr. Regard says

09:10:18　18　first?

09:10:20　19　　　　　MR. McKEOWN:  I don't think it's needed at this

09:10:20　20　point, from our perspective.

09:10:24　21　　　　　MR. MOGIN:  Your Honor, I think you're correct.  It

09:10:26　22　would be more efficient to have Mr. Regard go first.  But we

09:10:30　23　are willing to be flexible on that.

09:10:34　24　　　　　THE COURT:  How many people are crossing Dr. Lewis?

09:10:38　25　　　　　MR. McKEOWN:  I have to finish my cross, and then

| | |
|---|---|
| 09:10:40 | 1 |
| 09:10:44 | 2 |
| 09:10:46 | 3 |
| 09:10:50 | 4 |
| 09:10:52 | 5 |
| 09:10:56 | 6 |
| 09:11:00 | 7 |
| 09:11:06 | 8 |
| 09:11:08 | 9 |
| 09:11:10 | 10 |
| 09:11:10 | 11 |
| 09:11:12 | 12 |
| 09:11:16 | 13 |
| 09:11:18 | 14 |
| 09:11:20 | 15 |
| 09:11:24 | 16 |
| 09:11:24 | 17 |
| 09:11:24 | 18 |
| 09:11:28 | 19 |
| 09:11:32 | 20 |
| 09:11:34 | 21 |
| 09:11:34 | 22 |
| 09:11:36 | 23 |
| 09:11:36 | 24 |
| 09:11:40 | 25 |

1  it's just Mr. Neuwirth with the Georgia-Pacific's aspect.

2       THE COURT:  Well, then maybe we should do it that

3  way.  Maybe we have a better sense of timing then.  Let's do

4  that.  Okay?

5       And if -- so if we do Dr. Lewis, then we're going to

6  do Mr. Regard, then if Dr. Lewis wants to come back on and

7  comment on anything Mr. Regard says, if he wants to add that

8  to his opinion, we will allow him to do that.  Okay?

9       MR. MOGIN:  Very good.  Thank you, your Honor.

10       THE COURT:  That will be fine.

11       MR. MOGIN:  Your Honor, before we do proceed with

12  Mr. Regard, there are several issues with respect to the

13  contours of his testimony we should take up.

14       THE COURT:  With regard to?  I'm sorry.

15       MR. MOGIN:  Well, for example, we had made a motion

16  in limine.

17       THE COURT:  Right.

18       MR. MOGIN:  There are some aspects -- I am a little

19  confused at this point because Mr. Regard has put in some

20  direct testimony --

21       THE COURT:  Right.

22       MR. MOGIN:  -- that subsequently there was a report

23  which --

24       THE COURT:  Right, which you object to.

25       MR. MOGIN:  I object to -- I certainly object to the

09:11:42  1   chart.

09:11:42  2            THE COURT:  Right.

09:11:42  3            MR. MOGIN:  And I object to other aspects of the

09:11:44  4   report.

09:11:46  5            THE COURT:  Right.

09:11:46  6            MR. MOGIN:  So I just need -- it seems to me it's a

09:11:50  7   bit of a squishy target and I just want to know what the

09:11:52  8   ground rules are.

09:11:54  9            THE COURT:  I am going to -- I was waiting on that

09:11:56  10  one.  I was waiting to be -- I have a couple more housekeeping

09:12:00  11  things, and then I will get to that.  Okay?

09:12:04  12           So I wanted to put on the record, just like I put on

09:12:14  13  the record before, that I have known Mr. Regard for a while.

09:12:20  14  Last week I was lucky enough to go to a Sedona Conference, and

09:12:26  15  Dr. Lewis was one of the participants, not a speaker, but one

09:12:32  16  of the participants at the conference, so I had a nice

09:12:36  17  opportunity to have a few chatty words with Dr. Lewis.

09:12:42  18  Obviously, we did not talk about the case, but I did want to

09:12:44  19  tell you that.  Okay?

09:12:54  20           The exhibits, I had to actually find out when I was

09:12:56  21  on your side of the podium, the court reporters used to take

09:13:00  22  the exhibits.  And I know from the trials that I just want to

09:13:04  23  make absolutely sure you are responsible for your own

09:13:06  24  exhibits.  Okay?

09:13:10  25           So the nice books that the two of you prepared, as

09:13:16  1   long as they are joint books, they will be fine for the last

09:13:20  2   hearing.  Thank you, Ms. Miller, for arranging all that for

09:13:26  3   us.  As you probably know, the clerk's office can't take bound

09:13:30  4   copies, so what I would do is -- what I think we will do is we

09:13:36  5   will have those -- if this issue ever goes to either Judge

09:13:42  6   Shadur or another court, you've got last time's, today we will

09:13:48  7   keep the original all together, one of you will be the

09:13:52  8   custodian of the original exhibits and maybe you will be kind

09:14:02  9   enough, if we need it, somebody will make us a copy too.

09:14:06  10            Thank you, Ms. Miller.  She is volunteering again.

09:14:08  11            Okay.  Let's see.  So last time, I know that I am

09:14:18  12   treating this much looser than I would treat a trial on ruling

09:14:24  13   on objections immediately.  I am kind of really -- it's very

09:14:32  14   important to me with all these folks from out of town that we

09:14:36  15   use every single minute that we have here doing the hearing,

09:14:40  16   so I was -- I know there were a number of objections, some of

09:14:46  17   the exhibits I did not rule on, some of that was wait until

09:14:52  18   the cross is over, so I will make any very best effort.  Chris

09:14:58  19   went through the transcript yesterday because it's searchable,

09:15:02  20   and we will try to clear it up.  And if I forget anything,

09:15:08  21   please feel free to let me know.

09:15:10  22            Okay.  So, Mr. Mogin, I received your motion in

09:15:18  23   limine regarding Mr. Regard.  I received the defendant's

09:15:24  24   response yesterday.  I assume that you did too.  So I am

09:15:28  25   denying your motion without prejudice.  Mr. Regard is -- so I

09:15:38　1　am going to allow him to testify today.

09:15:42　2　　　　　And on the chart, I am not ruling that I am admitting

09:15:48　3　the chart.  But the defendants even said -- I thought that was

09:15:54　4　a good reply -- I thought that was a good reply.  I mean, they

09:15:58　5　almost argued that it could be a demonstrative exhibit, and

09:16:04　6　demonstrative exhibits, I don't know how we are going sort all

09:16:08　7　this out.  I understand what you're saying.  I am sure you are

09:16:14　8　going to cross-examine him about many of the issues that you

09:16:16　9　raised in your motion.  I don't know if they go to weight, I

09:16:22　10　don't know whether it goes to admissibility, I haven't had

09:16:26　11　enough time to really sort that out, and we will, if we need

09:16:32　12　any follow-up after we hear what he's got to say today,

09:16:36　13　because I think almost any judge in this building would say,

09:16:40　14　How can I -- I am not going to preclude Mr. Regard up front,

09:16:46　15　and the exhibit, now that we have it and we know what goes

09:16:52　16　with it, I think I will be in a better position after

09:16:58　17　cross-examination to know what to do with it.

09:17:00　18　　　　　MR. MOGIN:  I understand your position, your Honor,

09:17:02　19　and, obviously, it will be not efficient for me to argue the

09:17:08　20　motion at this point in time.  However, I will say that the

09:17:10　21　issue is not the information that we do have.

09:17:12　22　　　　　THE COURT:  Right.

09:17:14　23　　　　　MR. MOGIN:  It's the information that we don't have,

09:17:16　24　which has some bearing on my ability to cross-examine

09:17:22　25　Mr. Regard.

09:17:22    1        So if Mr. Regard is going to testify about the bottom

09:17:24    2   part of the chart, I still do not have any documentation in

09:17:28    3   support of that. I have merely the hearsay. That's all we

09:17:32    4   have.

09:17:34    5        MR. MAROVITZ: Your Honor, Andy Marovitz for

09:17:38    6   Temple-Inland. Mr. Mogin has all of the documents that

09:17:42    7   Mr. Regard has seen in this connection. There's not been

09:17:46    8   anything that was provided to Mr. Regard in connection with

09:17:48    9   the preparation of the chart that Mr. Mogin does not have.

09:17:54   10        MR. MOGIN: Well, in point in fact, your Honor,

09:17:56   11   Mr. Regard testified before that he received documents, he

09:18:02   12   compiled his charts from documents, information that he

09:18:04   13   received from vendors that has not been produced.

09:18:08   14        THE COURT: Well, I think that's what you are going

09:18:10   15   to flush out. He provided -- one of the things I found to be

09:18:14   16   very helpful is he actually listed every single thing he read

09:18:22   17   in preparation. Now, did he have conversations -- I don't

09:18:26   18   know. That's what we are going to find out. Okay? And then

09:18:30   19   if he did not -- he has a page and a half single space of

09:18:36   20   every single thing that he read. But I am hearing you. You

09:18:44   21   know, there's a wonderful ability of a judge to strike things.

09:18:50   22   Okay? And we don't have a jury, and this is actually -- I am

09:18:56   23   so glad we have this hearing. That's what I am going to say

09:18:58   24   to you later on. I feel like I know the case so much better,

09:19:00   25   and it's been a real education for me. And you don't know me

09:19:06   1   because this is your first case with me, but I am a pretty

09:19:10   2   fair person.  I just think we should get our witnesses on

09:19:16   3   today and get going and we will figure out what to do about it

09:19:20   4   in fairness afterwards.  Okay?

09:19:24   5               MR. MOGIN:  Thank you.

09:19:24   6               THE COURT:  Anybody else have anything you'd like to

09:19:28   7   say?

09:19:30   8               And any issues -- this is the same thing, Mr. Mogin.

09:19:38   9   If I reserved any issues the last time too, we will deal with

09:19:42   10   those at the end of the day too, unless there's something that

09:19:46   11   anybody is remembering right off the top of their head.  Okay?

09:19:52   12               All right.  So who did we say is going first?  Oh,

09:19:56   13   Dr. Lewis is coming back.  Okay.

09:19:58   14               Good morning, Doctor.  Come on up.  Lynette is not

09:20:02   15   here.

09:20:34   16     (Witness sworn.)

09:20:34   17                           - - -

09:20:34   18           DANIEL D. LEWIS, CROSS-EXAMINATION CONTINUED

09:20:34   19   BY MR. McKEOWN:

09:20:50   20   Q.  Good morning, Dr. Lewis.

09:20:50   21   A.  Good morning, Counsel.

09:20:52   22   Q.  We are going to spend some time this morning on

09:20:54   23   Plaintiffs' Exhibit 10, which was the plaintiffs' proposed

09:20:58   24   CBAA search process.  Do you have a copy up there?

09:21:04   25   A.  I do not.

| | | |
|---|---|---|
| 09:21:06 | 1 | MR. McKEOWN: Your Honor, may I give the witness a |
| 09:21:08 | 2 | copy of the exhibit? |
| 09:21:08 | 3 | THE COURT: Sure. Of course. |
| 09:21:10 | 4 | THE WITNESS: Thank you. |
| 09:21:10 | 5 | MR. McKEOWN: Your Honor, did you need a copy of this |
| 09:21:20 | 6 | as well? |
| 09:21:20 | 7 | THE COURT: Yes. Thank you. |
| 09:21:30 | 8 | BY MR. McKEOWN: |
| 09:21:30 | 9 | Q. Dr. Lewis, before we go through this process in a little |
| 09:21:32 | 10 | more detail, I would like to spend a little bit of time just |
| 09:21:34 | 11 | making sure that we are understanding the terminology in the |
| 09:21:36 | 12 | same way. As you may recall, when we were last here in |
| 09:21:38 | 13 | February, we finished the day, we were talking about recall, |
| 09:21:42 | 14 | correct? |
| 09:21:42 | 15 | A. Yes. |
| 09:21:44 | 16 | Q. Okay. And recall was of the group of documents that would |
| 09:21:50 | 17 | be responsive, what percentage are actually captured by the |
| 09:21:54 | 18 | information retrieval technology; is that fair? |
| 09:21:56 | 19 | A. Yes, if one is talking about the recall and the |
| 09:22:02 | 20 | technology, it would be the set of documents that are in the |
| 09:22:04 | 21 | retrieve set or the retrieve set for that technology. |
| 09:22:06 | 22 | Q. And we also talked about precision, and precision was the |
| 09:22:10 | 23 | concept of -- of the documents that are identified by our |
| 09:22:14 | 24 | search methodology, what percentage are actually responsive of |
| 09:22:18 | 25 | that set, correct? |

09:22:20   1   A.  Right.  So within the set, again, we are looking at the

09:22:24   2   responsive documents within the retrieve set, and in this

09:22:26   3   case, we are comparing it to the size of that set rather than

09:22:30   4   in the case of recall, we compare it to all of the responsive

09:22:34   5   documents in the collection.

09:22:34   6   Q.  Now, you also used a term in your direct testimony called

09:22:40   7   a "confidence interval."  Do I understand correctly that a

09:22:44   8   confidence interval is the expected range within which you

09:22:48   9   expect the actual value to fall?

09:22:50   10  A.  It's a range in which, with high probability over a large

09:23:00   11  collection of random samples, you would expect the true value

09:23:04   12  to fall.

09:23:04   13  Q.  So, for example, if one were to take a political poll and

09:23:14   14  find that there was a sample that a particular candidate was

09:23:16   15  supported by 39 percent of the population, plus or minus 3

09:23:20   16  percent, let's just take that as our hypothetical.  Okay?  If

09:23:24   17  it's plus or minus 3 percent and the number is 39, the -- that

09:23:34   18  point estimate would be -- the central value would be 39,

09:23:40   19  correct?

09:23:40   20  A.  Yes, in your example, the central value is 39 percent.

09:23:44   21  Q.  And the confidence interval would give me the plus or

09:23:48   22  minus, correct, so it would go up to 42 or down to 36?

09:23:52   23  A.  That's correct.

09:23:52   24  Q.  And so that if I wanted to know the entire confidence

09:23:56   25  interval, I would say it's from 36 to 42?

| | | |
|---|---|---|
| 09:23:58 | 1 | A. That's correct. |
| 09:24:00 | 2 | Q. Now, there's also something that I saw that you referred |
| 09:24:06 | 3 | to as the margin of error. Is that 3 percent in my example, |
| 09:24:10 | 4 | would that be called the margin of error? |
| 09:24:12 | 5 | A. Yes. That's -- essentially, the margin of error is -- the |
| 09:24:18 | 6 | usual interpretation of that is half the width of the |
| 09:24:22 | 7 | confidence interval. |
| 09:24:22 | 8 | Q. Now, there's also a term you used called the confidence |
| 09:24:28 | 9 | level; is that correct? Is that a statistical term? |
| 09:24:32 | 10 | A. Yes, it is. |
| 09:24:32 | 11 | Q. And I believe that in Plaintiffs' Exhibit 10, the proposed |
| 09:24:38 | 12 | protocol, you had proposed a confidence level of 95 percent; |
| 09:24:38 | 13 | is that right? |
| 09:24:44 | 14 | A. I believe that there are two different confidence levels |
| 09:24:50 | 15 | in the protocol, so could you point me to the place where you |
| 09:24:52 | 16 | are talking about? |
| 09:24:54 | 17 | Q. Sure. I was looking at the page 2, step 7. |
| 09:25:06 | 18 | A. Yes. |
| 09:25:06 | 19 | Q. Where it says, A 95 percent confidence level? |
| 09:25:10 | 20 | A. Yes. |
| 09:25:10 | 21 | Q. For purposes of when we talk about a 95 percent confidence |
| 09:25:14 | 22 | interval, or a confidence level of 95 percent, am I correct |
| 09:25:18 | 23 | that what that means is that as a matter of statistics, you |
| 09:25:24 | 24 | have used a large enough sample so that you can be 95 percent |
| 09:25:28 | 25 | confident that the actual value falls within that confidence |

| | | |
|---|---|---|
| 09:25:32 | 1 | interval? |
| 09:25:32 | 2 | A.  No. |
| 09:25:34 | 3 | Q.  Okay.  What's wrong with that description? |
| 09:25:38 | 4 | A.  You're describing it, the 95 percent, as if it's the |
| 09:25:44 | 5 | probability that the true value falls within the confidence |
| 09:25:48 | 6 | interval.  The 95 percent confidence level refers to over a |
| 09:25:54 | 7 | large collection of random samples, 95 percent of the random |
| 09:26:00 | 8 | samples would produce a confidence interval that contains the |
| 09:26:04 | 9 | true value. |
| 09:26:04 | 10 | Q.  Would the confidence level also indicate to you whether |
| 09:26:10 | 11 | the size of the sample or the sample was representative of the |
| 09:26:12 | 12 | total universe you have talked from? |
| 09:26:14 | 13 | A.  The appropriately drawn random sample of a certain size |
| 09:26:24 | 14 | will give you a confidence level.  Obviously, the process by |
| 09:26:28 | 15 | which the sample is selected has to be correct, the population |
| 09:26:32 | 16 | that it's selected from has to be appropriate. |
| 09:26:34 | 17 | Q.  Okay.  So that the 95 percent confidence level, as I |
| 09:26:38 | 18 | understand your testimony, is that if you kept drawing random |
| 09:26:42 | 19 | samples from this universe, I kept going out and polling the |
| 09:26:46 | 20 | population as to how many people support this particular |
| 09:26:48 | 21 | candidate, 95 percent of the time, the average I get from that |
| 09:26:54 | 22 | or the results I get from that sample are going to fall in my |
| 09:26:56 | 23 | hypothetical between 36 and 42 percent; is that right? |
| 09:27:02 | 24 | A.  No. |
| 09:27:02 | 25 | Q.  Okay.  I thought you said that the confidence level told |

09:27:08  1  you -- let me back up.

09:27:10  2       I want to make sure we all understand.  What does it

09:27:14  3  mean when you say you have a confidence level of 95 percent?

09:27:16  4  A.  The confidence level is describing what the result of

09:27:22  5  repeated random samplings would be, and each random sample

09:27:26  6  would give you a different confidence interval.  And when you

09:27:30  7  say you have a 95 percent confidence interval, that means

09:27:36  8  you've used a procedure that 95 percent of the time would

09:27:40  9  produce a confidence interval that contains the correct value.

09:27:46  10  The --

09:27:46  11  Q.  When you say -- let me interrupt you.

09:27:48  12  A.  Yes.

09:27:48  13  Q.  When you say "correct value," are you talking about the

09:27:50  14  correct value from the total population?

09:27:52  15  A.  Yes, that it would contain -- 95 percent of the time, you

09:27:58  16  would have a confidence interval that would contain the

09:28:00  17  population value of the statistic.

09:28:04  18  Q.  I'm sorry.  I thought that's where I started.  Maybe I

09:28:06  19  didn't explain it very artfully.

09:28:08  20       So that if I do this right and I draw my random

09:28:12  21  sample and I calculate my confidence interval, 95 percent of

09:28:16  22  the time, I am going to have a confidence interval that will

09:28:18  23  include the actual value if I were to go out and talk to the

09:28:22  24  total population about which candidate they --

09:28:26  25  A.  Yes, that's correct.

09:28:26 1   Q.  I'm sorry.

09:28:30 2       If I had a 99 percent confidence level, that would

09:28:34 3   mean that 99 percent of the time, if I went out and polled the

09:28:38 4   entire population, not just a random sample, that my sample

09:28:42 5   would give me that value within 95 percent of the time, right?

09:28:46 6   A.  Yes.  And, indeed, the confidence level sometimes is a

09:28:54 7   little informal in that it could be more than 99 percent of

09:28:58 8   the time.  99 percent is kind of the guarantee you have.

09:29:00 9   Q.  Okay.  Now, in order to determine whether you are going to

09:29:06 10  be 95 percent confident or 99 percent confident or some other

09:29:10 11  percentage confident, you need to have the appropriate size

09:29:14 12  random sample, correct?

09:29:16 13  A.  That is correct.  You need to have an appropriately sized

09:29:20 14  random sample that's been correctly selected.

09:29:22 15  Q.  So you use a software, and I think you used a program

09:29:24 16  called Raosoft or you referenced a program named Raosoft in

09:29:28 17  your materials?

09:29:28 18  A.  I referenced a program from a website called Raosoft that

09:29:34 19  I used to double-check my calculations.  That's not a program

09:29:38 20  which selects random samples; that's a web-based program which

09:29:44 21  computes confidence intervals.

09:29:46 22  Q.  But it tells you how large a random sample you would want?

09:29:48 23  A.  You could use -- I believe there is an option to use that

09:29:54 24  for choosing how large the random sample is also.

09:29:56 25  Q.  But that's not the only program you could use to determine

| | | |
|---|---|---|
| 09:30:00 | 1 | how big a sample you need in order to determine if you have a |
| 09:30:02 | 2 | random sample? |
| 09:30:04 | 3 | A.  No, there are many such programs, or one could do the |
| 09:30:10 | 4 | calculation by hand. |
| 09:30:12 | 5 | Q.  Now, Plaintiffs' Exhibit 10, the proposed protocol -- by |
| 09:30:16 | 6 | the way, have you done any work on this matter since we were |
| 09:30:20 | 7 | last here in February? |
| 09:30:20 | 8 | A.  Could you be more specific? |
| 09:30:24 | 9 | Q.  Sure.  Have you done any further research or work on this |
| 09:30:28 | 10 | project for this litigation since we were last here and you |
| 09:30:30 | 11 | testified last time? |
| 09:30:32 | 12 | MR. MOGIN:  Your Honor, I don't know precisely where |
| 09:30:34 | 13 | Mr. McKeown is going with this, but there is an expert witness |
| 09:30:38 | 14 | stipulation in this case that basically precludes the |
| 09:30:42 | 15 | discovery of expert work product. |
| 09:30:48 | 16 | MR. McKEOWN:  I am not asking for anything that would |
| 09:30:50 | 17 | be work product. |
| 09:30:56 | 18 | BY MR. McKEOWN: |
| 09:30:56 | 19 | Q.  Let me ask this.  Have you read your testimony from last |
| 09:30:58 | 20 | time? |
| 09:30:58 | 21 | A.  I did review the transcript, yes. |
| 09:31:00 | 22 | Q.  Have you done any other work on which you are going to |
| 09:31:04 | 23 | rely your opinions here today? |
| 09:31:06 | 24 | A.  That's somewhat difficult to answer.  I read literature |
| 09:31:18 | 25 | about information retrieval all the time, I read statistical |

09:31:18  1  literature.  I don't recall anything that has, you know, been

09:31:22  2  particularly informative, but, you know, I am always learning

09:31:26  3  about statistics and information retrieval, so it's a little

09:31:28  4  hard to answer that question.

09:31:30  5  Q.  Okay.

09:31:32  6       THE COURT:  Mr. Mogin, you're correct.  We do have

09:31:34  7  that stipulation.  And I think Dr. Lewis has answered this.

09:31:42  8  I'm assuming he's read Mr. Regard's report, but maybe I am

09:31:48  9  wrong.  I mean, that would be something new.  He sat through

09:31:52  10  two days at Sedona and listened to tons of people yammering on

09:31:58  11  about predictive coding.  You know, I don't know.  I mean, I

09:32:04  12  don't know what you -- that's a pretty broad question,

09:32:06  13  Mr. McKeown, what you're asking what he would have done

09:32:10  14  between now and then.

09:32:12  15       MR. McKEOWN:  I just want to know if he had done any

09:32:14  16  other work specific to this case that he was going to rely on

09:32:18  17  for opinions.

09:32:18  18       THE COURT:  Oh, that he is relying on for opinions?

09:32:22  19  Oh, that's different.  Okay.

09:32:24  20       THE WITNESS:  So if you could ask me about particular

09:32:26  21  documents, I'd be happy to answer.

09:32:28  22  BY MR. McKEOWN:

09:32:28  23  Q.  Well, have you read Mr. Regard's report?

09:32:32  24  A.  Yes, I have.

09:32:32  25  Q.  Okay.  Other than that, are there any other documents that

09:32:36  1  you're relying on in your opinions today, anything new?

09:32:42  2  A.  Well, again, there's a lot of documents in the case.  I

09:32:44  3  looked some more at some of these spreadsheets studying stuff.

09:32:50  4  There was a March 21st letter from Georgia-Pacific that I read

09:32:54  5  a couple of times.  You know, I don't know that I remember the

09:32:58  6  exact list of all the things I read.

09:33:00  7  Q.  Let's turn to Plaintiffs' Exhibit 10.  And the first two

09:33:06  8  pages are laid out in terms of steps; is that correct?

09:33:10  9  There's a number of steps to this proposed process?

09:33:12  10  A.  Yes, there are.

09:33:12  11  Q.  Okay.  And the first step is labeled Collection.  And I

09:33:18  12  want to come back to collection in just a minute.  But if we

09:33:20  13  look at step 2, test set creation, do you see that on the

09:33:26  14  exhibit?

09:33:26  15  A.  Yes, I do.

09:33:28  16  Q.  Now, you have in step 2 two methods for test set creation.

09:33:36  17  One is 2-A, the indirect method, and 2-B is the direct method;

09:33:40  18  is that correct?

09:33:40  19  A.  Yes.

09:33:40  20  Q.  I'd like to spend just a minute on the indirect method,

09:33:44  21  item 2-A.

09:33:44  22  A.  Okay.

09:33:44  23  Q.  Now, as I understand step 2-A, you're going to create a

09:33:52  24  test set by drawing a random sample, and you're going to draw

09:33:56  25  that from the collection of documents that have been

| | | |
|---|---|---|
| 09:33:58 | 1 | assembled; is that correct? |
| 09:34:00 | 2 | A. That's what that step describes. |
| 09:34:02 | 3 | Q. And it says, A random sample of 2,401 documents. |
| 09:34:08 | 4 | Is that number drawn to obtain a 95 percent |
| 09:34:12 | 5 | confidence level with a plus or minus 2 percent? |
| 09:34:16 | 6 | A. Let's look at the note C-1. |
| 09:34:26 | 7 | Right. |
| 09:34:26 | 8 | Q. Just for the record, C-1, although there are no page |
| 09:34:30 | 9 | numbers on this document, is on the fourth page, notes on |
| 09:34:36 | 10 | indirect method; is that right? |
| 09:34:40 | 11 | A. Yes. Yes. |
| 09:34:40 | 12 | So the size 2401 was determined by saying we want a |
| 09:34:48 | 13 | 95 percent confidence interval on the proportion of responsive |
| 09:34:54 | 14 | documents in the collection, and we want a margin of error |
| 09:34:58 | 15 | of .02 on that confidence interval on the proportion of |
| 09:35:02 | 16 | responsive documents in the collection. |
| 09:35:04 | 17 | Q. And so in my example before with the political survey, we |
| 09:35:08 | 18 | had a plus or minus 3 percent. This would call for a plus or |
| 09:35:12 | 19 | minus 2 percent? |
| 09:35:14 | 20 | A. That's correct. |
| 09:35:14 | 21 | Q. And it would have the 95 percent confidence level we |
| 09:35:18 | 22 | talked about that you described for me before; is that |
| 09:35:18 | 23 | correct? |
| 09:35:20 | 24 | A. That's correct. |
| 09:35:20 | 25 | Q. Now, the purpose of this taking of this sample is in order |

09:35:24    1    to give an estimate of what the total number of responsive

09:35:28    2    documents are in the entire collection; is that right?

09:35:32    3    A.   Yes, one can do it either as estimating total number

09:35:36    4    responsive or the proportion of responsive, but the two are

09:35:40    5    equivalent.

09:35:40    6    Q.   And so that what you're attempting here is you're going to

09:35:44    7    take this random sample, you're going to find out some number,

09:35:48    8    maybe it's 20 percent, maybe it's 15 percent, maybe it's 30

09:35:52    9    percent, and this sample is going to tell you that if you

09:35:54    10   reviewed all the documents in the entire universe of this

09:35:58    11   collection, that the true value would be 95 percent confident

09:36:02    12   falls somewhere, plus or minus 2 percent, of what you got from

09:36:06    13   that sample; is that correct?

09:36:08    14   A.   Yes.   So 95 percent of the time the random sample would

09:36:12    15   give you a confidence interval that contained the true value

09:36:14    16   of that.

09:36:14    17   Q.   And that's because you want to know how many -- what's the

09:36:18    18   total universe of documents, responsive documents, try and

09:36:22    19   make an estimate of that, right?

09:36:24    20   A.   Try to estimate in the universe of all the documents what

09:36:26    21   is the proportion of them which are responsive.

09:36:28    22   Q.   Now, you could do the same thing with a null set, couldn't

09:36:34    23   you?

09:36:34    24   A.   So first in my understanding is in this case, the term

09:36:50    25   "null set" is not being used in the set -- theoretic set of

09:36:54  1  the set that contains nothing.  It is being used to describe

09:36:58  2  the set-upon retrieved documents.

09:37:00  3  Q.  Fair.

09:37:00  4  A.  So the -- one potentially could sample only from the null

09:37:06  5  set.  However, there is an even stronger necessity in that

09:37:14  6  case of the consistency of the review of the sample and the

09:37:18  7  review for production, and those two reviews have to be

09:37:26  8  consistent or the estimate would be invalid.

09:37:28  9  Q.  Okay.  And let me -- let's try to take this a step at a

09:37:32  10  time.

09:37:32  11       So -- and I agree with your refinement of the null

09:37:36  12  set.  We are not talking about a set that has nothing.

09:37:38  13  A.  Right.

09:37:38  14  Q.  So let's say we take the documents, we have this

09:37:40  15  collection of documents, a number of them are hit by search

09:37:44  16  terms, those are sent off to the review process.

09:37:46  17       What we have left, this corpus, we are going to call

09:37:50  18  our null set, correct?  And just as you propose in the

09:37:56  19  indirect method in Plaintiffs' Exhibit 10 to draw a random

09:37:58  20  sample in order to estimate how many documents are in the

09:38:02  21  entire collection there, one could draw a random sample from

09:38:06  22  the null set, and assuming they were properly reviewed, you

09:38:10  23  would have a statistical estimate of how many responsive

09:38:16  24  documents remained in that null set, correct?

09:38:18  25  A.  Right.  So you would get a confidence interval on the

09:38:22　　1　proportion and, thus, the number of the documents in the null

09:38:26　　2　set -- the proportion of the number of responsive documents in

09:38:30　　3　the null set.  And then if the review of that is consistent --

09:38:36　　4　that sample is consistent with a review of the population,

09:38:40　　5　and, that is, you're assuming you have a perfect review of the

09:38:44　　6　production set, then you would have -- you could use that then

09:38:46　　7　to have an estimate on the total number of responsive

09:38:50　　8　documents in the collection.

09:38:52　　9　Q.  Okay.  I'm not asking you to go to the next step,

09:38:56　10　Dr. Lewis.

09:38:56　11　A.  All right.

09:38:56　12　Q.  I'm not asking you to tell me what the total response is

09:39:00　13　in the whole universe.

09:39:00　14　A.  Just the null set.

09:39:02　15　Q.  I'm just looking at the null set.  As I look at the null

09:39:04　16　set, I draw a random sample, and I can find by that random

09:39:08　17　sample to a 95 percent confidence level in the example we have

09:39:10　18　just used where that 95 percent of the time, the confidence

09:39:16　19　level from my sample would include the true value in the null

09:39:18　20　set in the number of responsive documents that are left?

09:39:22　21　A.  Right.  So assuming a proper review, that's correct.

09:39:28　22　Q.  And the number you used for the indirect method in

09:39:32　23　Plaintiffs' Exhibit 10, the 2401 items in the random sample,

09:39:38　24　that was driven by the fact that you wanted a confidence level

09:39:40　25　of 95 percent and a margin of error, a plus or minus 2

09:39:46  1  percent, correct?

09:39:46  2  A.  That's correct.

09:39:48  3  Q.  I mean, there is a third factor; that would be what's the

09:39:50  4  size of the population you're sampling?

09:39:52  5  A.  Right.  The size of the population, given the sizes of

09:39:58  6  populations which are typically seen in e-discovery, would

09:40:02  7  only have a very small effect.  If you have a really small

09:40:04  8  population, sometimes you can shrink that sample down a

09:40:08  9  little.

09:40:08  10  Q.  So if, for example, instead of wanting to go 95 percent

09:40:12  11  confidence level with a plus or minus 2, you wanted to go to a

09:40:14  12  95 percent confidence level, plus or minus 5 percent, you

09:40:20  13  would need a sample size of only somewhere in the 370 to 385

09:40:24  14  range, correct?

09:40:24  15  A.  I would have to sit down and do the calculation to be

09:40:28  16  sure.  The exact size would be smaller.

09:40:30  17  Q.  If you wanted to do a 99 percent confidence level, plus or

09:40:36  18  minus 5 percent, would that require a sample size of

09:40:44  19  approximately 660 to 665?

09:40:46  20  A.  I would have to double-check that, but that sounds about

09:40:50  21  right.

09:40:50  22  Q.  And you know that in this case, the defendants drew random

09:41:00  23  samples from their null sets, correct?

09:41:02  24  A.  Yes, that's my understanding.

09:41:04  25  Q.  And you understood that the random samples were devised to

09:41:08 1 | be of a size to give either 99 or 95 percent confidence level
09:41:12 2 | with a plus or minus 5 margin of error, correct?
09:41:16 3 |       MR. MOGIN: Objection, your Honor. Counsel has used
09:41:20 4 | the plural, and I am not sure if the plural refers to the
09:41:22 5 | number of random samples per defendant or if it refers to the
09:41:28 6 | fact that there are multiple defendants who each did a random
09:41:30 7 | sample.
09:41:32 8 |       THE COURT: All right. So will you rephrase your
09:41:34 9 | question?
09:41:36 10 |       MR. McKEOWN: I will, your Honor.
09:41:36 11 |       THE COURT: The objection is sustained. Rephrase the
09:41:38 12 | question.
09:41:38 13 |       MR. McKEOWN: Yes, your Honor.
09:41:40 14 | BY MR. McKEOWN:
09:41:42 15 | Q. You understand that at least some defendants used a sample
09:41:46 16 | size that would give a 99 percent confidence level with a plus
09:41:50 17 | or minus 5 percent margin of error on the null set, correct?
09:41:54 18 | A. I would like to see the document where you are describing
09:41:58 19 | that. There's been a number of documents that describe
09:42:00 20 | different samples and confidence intervals and whatnot, so it
09:42:04 21 | would probably be good to be sure that we were talking about
09:42:08 22 | the same thing.
09:42:08 23 | Q. But -- and I want to move this along. Theoretically --
09:42:12 24 |       THE COURT: Now, wait, Mr. McKeown, because I am
09:42:14 25 | following this. We know Georgia-Pacific did that. I mean, to

09:42:20  1   me, what we heard is Georgia-Pacific -- I thought that was

09:42:26  2   Georgia-Pacific's testimony.  I don't think we have anything

09:42:30  3   in from anybody else.

09:42:34  4          MR. McKEOWN:  Well, there have been a number of

09:42:36  5   letters that have been submitted by the defendants that

09:42:36  6   described their process, and this is the bottom of Mr.

09:42:40  7   Regard's chart.

09:42:40  8          THE COURT:  Okay.  So then --

09:42:46  9          MR. McKEOWN:  I can move on to the hypothetical, your

09:42:50  10  Honor.

09:42:50  11         THE COURT:  Well, I don't -- why don't we talk about

09:42:58  12  Georgia-Pacific?  I guess Mr. Neuwirth is going to talk about

09:42:58  13  Georgia-Pacific when he does it.

09:43:00  14         Now, do you want to show him each of the letters?  I

09:43:02  15  am not -- I mean, I don't think that's fair to a witness to

09:43:06  16  say, you know, Did X report a 95 percent -- I mean, I guess it

09:43:14  17  could be did X report a 95 percent confidence level or how

09:43:20  18  they did a random sample of their null set.

09:43:26  19         Did you want to say something?  I keep jumping.

09:43:28  20         MR. MOGIN:  No, your Honor.  I think you have hit

09:43:30  21  precisely on the problem.  Now we are into --

09:43:32  22         THE COURT:  Well, I don't know whether it's a problem

09:43:34  23  or whether it's just a matter here of being able to phrase it.

09:43:38  24  Okay?  This is where I think it could go to weight as opposed

09:43:44  25  to admissibility.  I mean, experts all the time -- Dr. Lewis

| | |
|---|---|
| 09:43:48 | 1 |
| 09:43:52 | 2 |
| 09:43:54 | 3 |
| 09:44:00 | 4 |
| 09:44:06 | 5 |
| 09:44:06 | 6 |
| 09:44:12 | 7 |
| 09:44:14 | 8 |
| 09:44:18 | 9 |
| 09:44:18 | 10 |
| 09:44:18 | 11 |
| 09:44:20 | 12 |
| 09:44:20 | 13 |
| 09:44:24 | 14 |
| 09:44:28 | 15 |
| 09:44:30 | 16 |
| 09:44:34 | 17 |
| 09:44:38 | 18 |
| 09:44:40 | 19 |
| 09:44:46 | 20 |
| 09:44:54 | 21 |
| 09:45:02 | 22 |
| 09:45:04 | 23 |
| 09:45:06 | 24 |
| 09:45:08 | 25 |

1  read a whole bunch of things here.  Okay?

2       So -- but I don't think it's fair unless you

3  specifically point him to a spot on the other defendants and

4  ask him if he's aware of that.  Maybe he did read your letter.

5       MR. McKEOWN:  Let me ask that question, your Honor.

6       THE COURT:  Okay.  You can sit down.  Thank you.

7  Because you are making me nervous standing up.

8       MR. MOGIN:  I don't want to make you nervous, your

9  Honor.

10  BY MR. McKEOWN:

11  Q.  Dr. Lewis, let me ask a couple questions.

12  A.  Sure.

13  Q.  Did you read the letters that the various defendants sent

14  in response to Ms. Vulgan's (phonetic) letters that were sent

15  last week by the various plaintiffs?

16  A.  I did at least skim over all of those letters.  I did not

17  read all of them in detail.

18       THE COURT:  So you're referring to -- okay.  That

19  helps me because I've got that somewhere.  So that question

20  regarding each of the defendant's random sample of null set is

21  in -- the answers came from Mr. Mogin's post hearing letter to

22  them.

23       MR. McKEOWN:  Part of the answer was there, yes, your

24  Honor.

25       THE COURT:  Okay.  I do have that someplace.

09:45:22  1   BY MR. McKEOWN:

09:45:22  2   Q.  Dr. Lewis, have you read Mr. Regard's report?

09:45:24  3   A.  Yes, I have.

09:45:26  4   Q.  And have you read Mr. Regard's exhibits?

09:45:28  5   A.  Which exhibits are Mr. Regard's exhibits?

09:45:34  6   Q.  The documents that were attached to his report.

09:45:38  7   A.  The documents I recall being attached, there was like a

09:45:44  8   resume kind of thing and background information.  If you want,

09:45:50  9   I'd be happy to look and tell you whether I have looked at a

09:45:54  10  particular document.

09:45:54  11  Q.  Well, did you look at his chart, the large chart that

09:45:56  12  listed by every defendant how many documents were in the null

09:46:00  13  set, how many were sampled, what the results were of the null

09:46:04  14  set testing?

09:46:06  15  A.  Right.  So this was the chart that was introduced on

09:46:08  16  February -- the chart that was handed around the courtroom on

09:46:12  17  February 21st?

09:46:12  18  Q.  Correct.

09:46:14  19  A.  I did look at that piece of paper, yes.

09:46:16  20  Q.  In looking at that piece of paper, did you understand that

09:46:18  21  piece of paper, that chart, to show the sample size from the

09:46:24  22  null sets that each of the various defendants had drawn for

09:46:26  23  purposes of null set testimony?

09:46:30  24       MR. MOGIN:  Your Honor, at this point, I just want to

09:46:32  25  point out that Dr. Lewis is being asked to testify about

09:46:36 1    hearsay inside of hearsay inside of hearsay, and the

09:46:40 2    defendants are trying to get this in for the truth of the

09:46:44 3    matter in it; that is, that these were, in fact, the hit

09:46:50 4    counts, that these were, in fact, the tests that were

09:46:54 5    performed.  The letters themselves are hearsay within hearsay

09:46:58 6    and inadmissible.

09:47:16 7          MR. McKEOWN:  Your Honor, I don't think I was headed

09:47:18 8    where Mr. Mogin thinks I was headed.  I was about to wrap up

09:47:20 9    this line.  I just wanted to see if he had actually seen these

09:47:22 10   documents.

09:47:22 11         THE COURT:  Look, we can cut through -- I mean, we

09:47:26 12   can cut through some of this.  This is going to happen when

09:47:30 13   you have a summary witness.  Okay?

09:47:32 14         The alternative, if we decide after today that you

09:47:40 15   want each of the defendants to put a specific person on, this

09:47:44 16   is not that it's not curable here.  Okay?  I mean, I think

09:47:48 17   they could each put on a person as Georgia-Pacific did.

09:48:00 18         This entire issue has come in a different form than

09:48:06 19   most evidentiary issues.  I mean, this was not exactly the

09:48:14 20   normal procedural question that a court has to decide.  I

09:48:20 21   mean, as you know, it didn't even really come on a motion.  It

09:48:24 22   was a request from the defendants to see if the -- to test out

09:48:32 23   if their method was correct because in this case you were

09:48:36 24   suggesting a different method.

09:48:40 25         So I agree with you, Mr. Mogin, but I am still trying

09:48:44  1  to learn what has happened here.  Okay?

09:48:50  2       One alternative here could be to call all seven --

09:48:56  3  each of the seven defendants, put a person on who has personal

09:49:00  4  knowledge of what they did.  I don't know today if that's the

09:49:04  5  best use of our time.  So I am letting things come in

09:49:12  6  partially as an education for me of what the situation is here

09:49:16  7  because I wasn't in the case for the first nine months.  Now,

09:49:20  8  maybe someone might not think that's the appropriate role

09:49:28  9  here, but I think as we're going forward, that's very helpful

09:49:32  10  to the person who is, you know, charged with trying to manage

09:49:36  11  discovery here.

09:49:38  12       MR. MOGIN:  I understand, your Honor, and I

09:49:42  13  understand the value of the educational role.  But here in

09:49:46  14  this circumstance, recall what happened, it was the plaintiffs

09:49:52  15  who said, We are going to file a motion.  And the defendants

09:49:56  16  raced in and said, Oh, don't file a motion.  We want an

09:49:58  17  evidentiary hearing.  If they asked for the evidentiary

09:50:02  18  hearing, you can't have an evidentiary hearing without some

09:50:04  19  rules of evidence.

09:50:06  20       Now, I admit that the rules can be a little bit lax

09:50:10  21  under the circumstances.  But this is fundamental.  They are

09:50:14  22  trying to sneak in through the back door facts about the

09:50:18  23  testing, and then they are going to ask you to make a decision

09:50:22  24  based upon those facts.  We have no ability to cross-examine.

09:50:26  25  We don't have the documents, we don't have the percipient

09:50:30  1  witnesses.

09:50:30  2       THE COURT:  I just said to you that if it got to

09:50:36  3  that, if when I have to rule, the worst-case scenario here is

09:50:42  4  -- well, I suppose I could say, A, you didn't meet your

09:50:46  5  burden, or I could say, I'm opening up this hearing again and

09:50:48  6  they're calling all seven people if I need to do that.

09:50:52  7       Right now, this is helping me because I am struggling

09:50:58  8  with this very issue of random sample of null sets.  Okay?

09:51:04  9  Myself.

09:51:04  10       MR. MOGIN:  We too are struggling, your Honor.

09:51:06  11       THE COURT:  Fine.  Then we are on the same page.

09:51:10  12       So your objection right now is overruled for the

09:51:12  13  moment.  Okay.  Continue on.

09:51:14  14  BY MR. McKEOWN:

09:51:16  15  Q.  Dr. Lewis, we have spent more time on this than I had

09:51:18  16  intended, but my question was -- where I was headed was this.

09:51:24  17  If someone took a random sample of 660 or 665 documents out of

09:51:32  18  a null set of something greater than a hundred thousand

09:51:36  19  documents, they could produce a statistical result that would

09:51:44  20  give them a confidence interval, plus or minus 5 percent, with

09:51:48  21  a 99 percent confidence level; isn't that correct?

09:51:52  22  A.  You know, again, I would have to sit down and double-check

09:51:54  23  the calculation, but that sounds about the right size of the

09:51:58  24  sample you would need to get a confidence interval on the

09:52:02  25  proportion of responsive documents in the null set only.  It

09:52:06   1    obviously doesn't say anything about the hit set or about

09:52:08   2    recall.

09:52:08   3    Q.  Correct.  And I am not asking about the hit set or recall.

09:52:12   4    I am only asking about the null set.

09:52:14   5         So with that, you would have to do the calculation --

09:52:18   6    A.  I would have to do the calculation --

09:52:20   7    Q.  -- to see if it's 660 or 665?

09:52:22   8    A.  600 is on the order of the right number.

09:52:26   9    Q.  If we could turn back to Plaintiffs' Exhibit 10, the

09:52:28  10    protocol.  In step 1, the collection, it says, Determine

09:52:38  11    collection of documents to be searched for this defendant.

09:52:42  12         Now, I think you testified on direct that what you

09:52:46  13    assumed is that all reasonable sources of responsive documents

09:52:50  14    have been collected; is that right?

09:52:52  15    A.  I believe that's correct.

09:52:52  16    Q.  You haven't made any conclusions as to which documents are

09:52:58  17    to be collected; is that correct?

09:53:00  18    A.  That's correct.

09:53:02  19    Q.  You're offering no opinions as to which custodians should

09:53:04  20    be included or not included, correct?

09:53:06  21    A.  I believe the only thing that I have said about custodians

09:53:12  22    is that all of the custodians that are a reasonable source of

09:53:18  23    information should be sampled from it, the entire collection

09:53:22  24    should be sampled from if one was going to draw valid

09:53:26  25    conclusions.  I have not expressed opinions about any

09:53:28   1   particular custodians.

09:53:28   2   Q. Or whether this particular custodian is a reasonable

09:53:34   3   custodian or is not a reasonable --

09:53:36   4   A. No, I haven't been asked to look at that.

09:53:38   5   Q. And you have not given any opinion as to what that number

09:53:42   6   is either, correct, in terms of how many custodians that

09:53:44   7   should be?

09:53:44   8   A. That's correct.

09:53:46   9   Q. And sitting here today, you don't have any opinion in

09:53:50   10   terms of what would be the total number of gigabytes or

09:53:54   11   terabytes that would be in the collection for each defendant

09:53:58   12   that's referenced in Plaintiffs' Exhibit 10 under step 1?

09:54:00   13   A. That's correct.

09:54:00   14   Q. You also offered no opinion, as I understood your direct

09:54:10   15   testimony, on what the cost to the defendants would be of

09:54:12   16   complying with what's been proposed in Plaintiffs' Exhibit 10;

09:54:16   17   is that correct?

09:54:16   18   A. That's correct.

09:54:18   19   Q. Now, in terms of collection, is it your understanding that

09:54:40   20   whatever the documents are, whatever the reasonable group of

09:54:44   21   custodians is, that those documents would then be taken and

09:54:46   22   put onto some vendor's system for purposes of this protocol?

09:54:52   23   A. Well, there's a number of ways that you could do that. I

09:54:56   24   mean, you could bring the software to the data in some sense,

09:55:02   25   or you could bring the data to the software, you could use an

09:55:04　1　outsourcing company or you could lease software.  In terms of

09:55:08　2　where the data physically resides, that can be done a lot of

09:55:12　3　different ways.

09:55:12　4　Q.  Okay.  But the data is going to need to be copied or

09:55:14　5　collected somehow to start this process, correct?

09:55:16　6　A.  What would be necessary is that the data be indexed and

09:55:22　7　made available to the tools that supports statistical rank

09:55:30　8　retrieval and supervised learning.

09:55:30　9　Q.  And that collection has to stay constant as well, correct?

09:55:34　10　A.  Well, from the standpoint of operating supervised learning

09:55:44　11　software or statistical rank retrieval software, most software

09:55:50　12　of that sort has the ability to bring new documents into the

09:55:54　13　collection.

09:55:56　14　　　　　From the standpoint of the statistical sampling, if

09:56:02　15　substantial numbers of the documents were brought in, the

09:56:04　16　sample would have to be either redone or augmented, and there

09:56:10　17　are statistical techniques that could be used so that you

09:56:12　18　might not have to redo the sampling from scratch.  But you do

09:56:16　19　need to make sure that you end up with a statistically

09:56:22　20　appropriate representative sample of the entire collection of

09:56:26　21　new documents that come in.

09:56:28　22　Q.  And maybe my question just wasn't very clear.

09:56:30　23　A.  Sorry.

09:56:30　24　Q.  Under Plaintiffs' Exhibit 10, this protocol, in the real

09:56:34　25　world, if one were to try to apply this, you have to have

09:56:38  1  whatever the collection of documents is that you are going to

09:56:40  2  apply it to, correct?

09:56:42  3  A.  Right.

09:56:42  4  Q.  And that collection of documents is going to be copied and

09:56:48  5  it's not going to be changing during this protocol, correct?

09:56:52  6  A.  The collection of documents can change during the

09:56:56  7  protocol.  There's no difficulty with the operation of

09:57:00  8  statistical rank retrieval or supervised learning if the

09:57:04  9  document collection is changing.  There would be some

09:57:06  10  adjustments that would need to be made to the random sampling

09:57:10  11  in order to have a statistically valid estimate of the recall.

09:57:18  12  Q.  Is it your understanding that the documents would need to

09:57:24  13  be moved to some system, whether it's in-house or with a

09:57:28  14  vendor so that these processes could be applied?

09:57:32  15  A.  Not necessarily.  There are information retrieval systems

09:57:42  16  that are able to essentially sort of go out to where you point

09:57:46  17  them to on the network and index the documents in place.

09:57:50  18  Typically, the index itself would be built in a centralized

09:57:58  19  location, although there are some software that has

09:58:00  20  distributed indexing, but there's no necessity that the

09:58:04  21  documents physically would have to be moved.

09:58:08  22  Q.  Are you aware of that being done in the discovery context?

09:58:10  23  A.  To be -- I'm not sure if that's done.  I know that there

09:58:18  24  are enterprise knowledge management systems that allow search

09:58:22  25  over documents in place.  I am not sure if that's a capability

09:58:26  1  that's in any of the current e-discovery software.

09:58:28  2  Q.  Were you here during Mr. Hanners' testimony?

09:58:30  3  A.  Yes, I was.

09:58:32  4  Q.  And Mr. Hanners had some concern about collecting and

09:58:34  5  setting aside documents so that the metadata didn't change?

09:58:38  6  A.  Right.  I understand that there's a concern about opening

09:58:44  7  -- for instance, opening a document in some software

09:58:46  8  application that might change the metadata and wants to avoid

09:58:50  9  that.

09:58:50  10  Q.  So whatever the universe is that you are going to apply

09:58:54  11  this protocol to, unless you somehow capture it and collect it

09:58:56  12  in a fixed snapshot, so to speak, you run that risk that

09:59:02  13  Mr. Hanners is concerned about, correct?

09:59:04  14  A.  Well, again, that would depend on the details of the

09:59:06  15  operating system of the computer.  There are ways to lock

09:59:10  16  files and make them read only so you would make them read only

09:59:14  17  so that they can't be changed.

09:59:16  18      So I am not -- I don't have an opinion about what

09:59:18  19  would be the most practical way to ensure that the metadata is

09:59:24  20  not changed.  I am aware that there's several different ways

09:59:26  21  that that could be done, including copying the files.

09:59:30  22  Q.  With any document collection in a normal litigation

09:59:34  23  context, there is usually cost of collection, correct?

09:59:42  24  A.  I would assume that any activity costs something.

09:59:44  25  Q.  When laptops are imaged, that costs money, correct?

| | | |
|---|---|---|
| 09:59:46 | 1 | A.  Yes, I have certainly had that done, so I know that costs |
| 09:59:50 | 2 | money. |
| 09:59:50 | 3 | Q.  When servers are copied so that the documents can be sent |
| 09:59:52 | 4 | to a vendor for processing, that costs money? |
| 09:59:56 | 5 | A.  Very few things are free.  I agree to that. |
| 10:00:00 | 6 | Q.  And when documents go to an ESI vendor, they usually also |
| 10:00:04 | 7 | charge something for hosting your data; isn't that correct? |
| 10:00:08 | 8 | A.  That's my understanding. |
| 10:00:08 | 9 | Q.  Okay.  And that it can cost thousands or even more than |
| 10:00:12 | 10 | $10,000 a month just to host the data in a large case, |
| 10:00:16 | 11 | correct? |
| 10:00:16 | 12 | A.  I haven't looked into the particular figures.  I assume |
| 10:00:20 | 13 | they charge something. |
| 10:00:20 | 14 | Q.  And isn't it also the case that the various vendors who |
| 10:00:26 | 15 | offer this supervised learning charge an extra charge for |
| 10:00:30 | 16 | processing that data for the application of that software? |
| 10:00:32 | 17 | A.  I am not aware of the details of the charging for the |
| 10:00:38 | 18 | different options of the software services. |
| 10:00:40 | 19 | Q.  Now, you're a consultant for Kroll; is that correct? |
| 10:00:44 | 20 | A.  That's correct. |
| 10:00:44 | 21 | Q.  And are you familiar with Kroll's per gigabyte charge for |
| 10:00:50 | 22 | applying your software? |
| 10:00:52 | 23 | A.  I am not. |
| 10:00:54 | 24 | Q.  Are you aware of the charge by Recommind for applying |
| 10:00:58 | 25 | their software? |

10:00:58    1    A.  No, I'm not.

10:01:00    2    Q.  Are you aware of the charge that OrcaTec charges for

10:01:04    3    applying a supervised learning software?

10:01:04    4    A.  No, I'm not.

10:01:06    5    Q.  Are you aware of the charge that any company has on per

10:01:10    6    gigabyte or some other basis for what it costs to apply this

10:01:14    7    supervised learning software to some collection of ESI?

10:01:18    8    A.  No, I'm not.

10:01:18    9    Q.  And sitting here today, you can't tell me if that's $400,

10:01:32   10    $600, or $900 a gigabyte to apply the supervised learning

10:01:40   11    software; is that correct?

10:01:42   12    A.  That's correct.  My understanding is that different

10:01:44   13    vendors indeed have different pricing schemes.  I don't know

10:01:46   14    the details of them, but some charge by volume, some charge by

10:01:50   15    disk space, some charge by numbers of documents, some charge

10:01:54   16    by a variety of other complicated formulas.

10:01:56   17    Q.  Whatever the charge is per gigabyte, you would agree that

10:02:08   18    the more gigabytes or more terabytes, the more expensive it's

10:02:12   19    going to be to apply, correct, the supervised learning

10:02:14   20    software?

10:02:16   21    A.  One would have to be careful about that in the sense that

10:02:20   22    different types of files take up vastly different amounts of

10:02:26   23    space.  So, for instance, if one had an archive of digital

10:02:30   24    video, that could be an extraordinarily large amount of space

10:02:34   25    but a rather small number of documents.

| | | |
|---|---|---|
| 10:02:36 | 1 | So, again, given the complexities of the pricing |
| 10:02:38 | 2 | schemes by vendors, I really couldn't give an opinion on that. |
| 10:02:42 | 3 | Q.  Right.  But you would expect if I had two terabytes of |
| 10:02:44 | 4 | ESI, it would cost more to process that for supervised |
| 10:02:48 | 5 | learning than if I had one terabyte of ESI? |
| 10:02:50 | 6 | A.  Well, as I said, if the two terabytes were a couple of |
| 10:02:54 | 7 | long visual video files and the one terabyte was millions of |
| 10:02:58 | 8 | email messages, then it wouldn't necessarily work out that |
| 10:03:02 | 9 | way.  One simply can't do a comparison on that level. |
| 10:03:06 | 10 | Q.  By the way, your role with Kroll as a consultant, do you |
| 10:03:10 | 11 | have any ownership interest in Kroll? |
| 10:03:12 | 12 | A.  No, I do not. |
| 10:03:14 | 13 | Q.  It wasn't clear to me last time from your testimony.  Have |
| 10:03:16 | 14 | you written one algorithm for Kroll or a number of algorithms |
| 10:03:22 | 15 | for them? |
| 10:03:22 | 16 | A.  I have written several algorithms for them. |
| 10:03:26 | 17 | Q.  And do you receive any type of royalty if your algorithms |
| 10:03:28 | 18 | are used in terms of when Kroll applies its software? |
| 10:03:32 | 19 | A.  No, there's no royalties and I have no royalty or |
| 10:03:36 | 20 | ownership interest in any patents.  Those are all Kroll's |
| 10:03:38 | 21 | ownership. |
| 10:03:38 | 22 | Q.  Let's go back to Plaintiffs' Exhibit 10.  I'd like to go |
| 10:03:42 | 23 | to step 3, which is review the test set. |
| 10:03:46 | 24 | A.  Okay. |
| 10:03:48 | 25 | Q.  And what's happening in step 3, and please correct me if |

10:03:56    1   I'm wrong, but as I understand step 3, what's going to happen
10:04:00    2   is you have taken this sample from the universe in step 2 to
10:04:06    3   do this test set creation, and then you're going to have
10:04:08    4   someone review it and mark the documents as responsive or
10:04:12    5   nonresponsive; is that correct?
10:04:12    6   A.  That's correct.
10:04:14    7   Q.  And for the indirect method that you described above with
10:04:18    8   these 2,401 documents, you want some senior attorney to do
10:04:24    9   that review, correct?
10:04:24   10   A.  That's what the protocol specifies.
10:04:28   11   Q.  Well, is that your view that it should be a senior
10:04:30   12   attorney that does that review?
10:04:32   13   A.  I do not express an opinion on the type of personnel who
10:04:36   14   would do the review.  I express an opinion that they should be
10:04:42   15   people who can carry out the review with a very high degree of
10:04:44   16   accuracy.
10:04:46   17   Q.  Now, when we look to step 4, called Initialized Training
10:04:56   18   Set on Plaintiffs' Exhibit 10, we now have a training set, and
10:05:00   19   that is different from the test set, correct?
10:05:04   20   A.  That's correct.
10:05:04   21   Q.  All right.  And the training set is this group of
10:05:08   22   documents that is going to be fed into the computer to help
10:05:10   23   train the computer as to what is viewed as responsive or
10:05:14   24   nonresponsive; is that correct?
10:05:16   25   A.  Right.  So in step 4, this is initializing the first

10:05:18  1  version of that training set that the algorithm uses to try to

10:05:24  2  determine how to distinguish responsive and nonresponsive

10:05:28  3  documents.

10:05:28  4  Q.  And then when we turn over to step 5 on the next page of

10:05:32  5  Exhibit 10, where it says, Training review software, do you

10:05:40  6  see that step 5?

10:05:40  7  A.  I see that, yes.

10:05:42  8  Q.  All right.  Now, when we say training review software,

10:05:50  9  basically, you are having the software look at this training

10:05:52  10  set, correct?

10:05:52  11  A.  Correct.

10:05:54  12  Q.  Based on the algorithms that are in whatever system you

10:05:56  13  are using?

10:05:56  14  A.  Right, the algorithms of the training set.

10:06:00  15  Q.  And as a result then is what's going to happen is that the

10:06:04  16  computer is going to make a prediction for the rest of the

10:06:08  17  collection as to what is responsive and nonresponsive?

10:06:12  18  A.  So typically the algorithm will produce a model, a

10:06:18  19  statistical model, and that statistical model then can be run

10:06:22  20  back over the entire collection and will typically produce

10:06:26  21  some numeric score which is intended to be higher if the

10:06:30  22  document is more likely to be responsive and lower if it's

10:06:34  23  less likely to be responsive.

10:06:36  24  Q.  I should have asked you in step 4, the training set, how

10:06:40  25  large is the training set?

10:06:42   1    A.   That's something which can vary.   Different vendors will
10:06:46   2    have different best practices for what they consider to be an
10:06:52   3    appropriately sized training set.   So that's something that I
10:06:56   4    left unspecified here because that's really something that
10:07:00   5    should be discussed with the vendor.
10:07:02   6    Q.   All right.   So we have taken this training set, we put the
10:07:08   7    documents in, the algorithm runs, the computer then says,
10:07:16   8    according to what the computer has seen from this training
10:07:18   9    set, the computer is going to rank things in terms of whether
10:07:22  10    it thinks things are responsive or nonresponsive, correct?
10:07:24  11    A.   Yes.   So, typically, when it makes the prediction, it
10:07:28  12    assigns a score to each document, the software would have an
10:07:32  13    option to rank so it can see the highest scoring documents
10:07:36  14    first.
10:07:36  15    Q.   Now, once it has done that, there is a step 6 here on
10:07:40  16    Plaintiffs' Exhibit 10, which says, Find and review additional
10:07:42  17    documents.   And it says, Use the training system as specified
10:07:48  18    by vendors' best practices to find additional unreviewed
10:07:52  19    documents.
10:07:52  20         And by "unreviewed," I assume that means documents
10:07:56  21    that have not yet been reviewed by an attorney, correct?
10:07:58  22    A.   It would be documents that still -- that have not been
10:08:08  23    reviewed for production.   I don't want to say whether it's an
10:08:12  24    attorney or a paralegal or whoever is doing the review for
10:08:14  25    production.

10:08:14  1  Q.  Hadn't been reviewed by human eyes.  It's only been looked
10:08:18  2  at by the computer so far?
10:08:18  3  A.  Well, the sample, remember that there is a sample that's
10:08:22  4  been drawn, and the sample is being reviewed separately.  And
10:08:28  5  so it is possible that the system will bring up documents that
10:08:32  6  are included in the sample.  And indeed, that's part of the
10:08:36  7  point.  Part of what one is using the sample for is to
10:08:40  8  estimate the effectiveness of the system at finding responsive
10:08:44  9  documents.  To do that, you indeed need to have the system
10:08:48  10  finding some of the sample documents, and those sample
10:08:52  11  documents will have been separately reviewed.
10:08:54  12  Q.  Okay.  Let me step back, because I am trying to understand
10:09:00  13  this process.
10:09:00  14       We have our training set.  We put it into the
10:09:04  15  computer to train the computer.  The computer then codes
10:09:08  16  everything.  Then we are going to find and review additional
10:09:12  17  documents?
10:09:14  18  A.  Right.
10:09:14  19  Q.  And when I look at the third line of step 6 where it says,
10:09:20  20  Review those documents, do you see that line, Dr. Lewis?
10:09:24  21  A.  Yes.
10:09:24  22  Q.  What I want to understand is what are these documents that
10:09:28  23  are being reviewed after I've gone through this initial
10:09:34  24  training set, put it into the computer, had the computer code
10:09:38  25  them, and then I am supposed to find and review additional

10:09:40  1  documents?  What documents am I reviewing?

10:09:44  2  A.  Well, that would depend a bit on vendor's best practices.

10:09:46  3  A common strategy would be to review documents which are at

10:09:52  4  the top of the ranking, to review the documents which are most

10:09:56  5  -- the system currently believes are most likely to be

10:10:00  6  responsive.

10:10:00  7  However, that's not the only possible strategy.  So,

10:10:06  8  for instance, there are systems which use something called

10:10:08  9  active learning, which attempts to show -- as well as

10:10:12  10  top-ranked documents, attempts to show borderline documents

10:10:16  11  that the algorithm believes will be most informative for

10:10:20  12  improving the algorithm.  So there are several possibilities

10:10:22  13  there for which one could get reviewed.

10:10:26  14  Q.  Can you tell me how many documents I am going to have to

10:10:30  15  review in step 6?

10:10:32  16  A.  That's largely a choice of the -- an administrative choice

10:10:38  17  in terms of how many reviewers you have, how long the training

10:10:42  18  function of the system takes.  Again, this is something that

10:10:48  19  one could take into account vendor best practices of.

10:10:52  20  The protocol here doesn't depend on any particular

10:10:54  21  number of documents to be reviewed in step 6 because the

10:10:58  22  protocol terminates when a sufficient level of recall has been

10:11:04  23  achieved.  That might be achieved by doing a small number of

10:11:08  24  very large batches or a large number of very small batches.

10:11:12  25  Again, the intent here is to leave flexibility in the

10:11:16  1  protocol to be able to follow the best practices of any

10:11:20  2  particular vendor of these technologies.

10:11:22  3  Q.  Before we go to step 7, which is estimate the recall, is

10:11:32  4  there any way to know how many documents I am going to have to

10:11:34  5  look at in step 6?

10:11:36  6  A.  You get to choose.

10:11:38  7  Q.  So I could choose, for example, a sample of 665 documents?

10:11:44  8  A.  Well, one -- I don't know if you're confusing the notion

10:11:50  9  of the random sample with the documents that have been found

10:11:54  10  for review.  If, for some reason, you wanted to choose 660

10:11:58  11  documents in step 6, you could.

10:12:02  12  Q.  Well, I'm sorry, Dr. Lewis, if I'm being obtuse, but what

10:12:06  13  I'm trying to understand, let's go past step 6.  Step 7 is I

10:12:12  14  estimate the recall, and then step 8 is I evaluate the status

10:12:14  15  of the search, and depending on what I evaluate based on my

10:12:18  16  estimate of recall, I determine whether I go back to step 6

10:12:22  17  and do more of this training; is that correct?

10:12:26  18  A.  Yes.  You're going to look at recall and obviously

10:12:30  19  estimated recall and any other relevant factors here.

10:12:34  20      I should say that while we describe -- discussed

10:12:40  21  returning to step 6, one, depending on, again, best practices,

10:12:44  22  could actually go -- if you had to, you could go all the way

10:12:48  23  back to step 4 and do a seed set, you could go back to step 5

10:12:52  24  and retrain, or you could go back to step 6 if it's already

10:12:54  25  doing a good job of finding responsive documents and just kind

| | | |
|---|---|---|
| 10:12:58 | 1 | of review more.  So that probably should have been made clear |
| 10:13:00 | 2 | that there's that additional flexibility here. |
| 10:13:02 | 3 | Q.  For some vendors, is it the case that you take a sample, |
| 10:13:06 | 4 | you review the sample, retrain the system, the computer |
| 10:13:10 | 5 | recodes the documents, and then you pull another sample and |
| 10:13:12 | 6 | continue again? |
| 10:13:12 | 7 | A.  Yes.  There are some vendors who use that strategy where |
| 10:13:18 | 8 | essentially what they do is they choose a random sample, they |
| 10:13:22 | 9 | use it for evaluation.  If the estimated effectiveness is not |
| 10:13:26 | 10 | high enough, they throw that random sample into the training |
| 10:13:30 | 11 | set, retrain, and then draw a new random sample.  So they are |
| 10:13:36 | 12 | always using -- having used up all their old random samples as |
| 10:13:42 | 13 | training data and using only the last random sample for |
| 10:13:44 | 14 | evaluation.  So that, indeed, is a strategy that I am aware at |
| 10:13:48 | 15 | least one vendor follows. |
| 10:13:50 | 16 | Q.  Which vendor is that? |
| 10:13:50 | 17 | A.  That's kCura, I believe.  I'd have to go back and look at |
| 10:13:56 | 18 | the details, but at the high level that I have seen |
| 10:13:58 | 19 | presentations from them, I believe that that's the strategy |
| 10:14:00 | 20 | that they follow.  Now, again, they are always releasing new |
| 10:14:04 | 21 | technological updates, that may have changed, but I have seen |
| 10:14:08 | 22 | some discussion of that. |
| 10:14:08 | 23 | Q.  Does Kroll follow that strategy? |
| 10:14:12 | 24 | A.  I believe that that is not the strategy that they were |
| 10:14:14 | 25 | using.  I believe that that is not the strategy that Kroll is |

10:14:30  1  using.

10:14:30  2  Q.  So that if someone used Kroll rather than kCura, what

10:14:34  3  would they have to do?

10:14:36  4  A.  Again, I don't -- I designed algorithms for Kroll.  I am

10:14:40  5  not aware of all of the details of the operational protocols

10:14:46  6  that they use with their clients, so I would not want to be

10:14:52  7  opining on exactly what they are recommending to their clients

10:14:56  8  right now.

10:14:58  9  Q.  I saw in your materials that you had a reference to the --

10:15:10  10  I think it's the Moore Da La Silva case?

10:15:14  11  A.  Could you point that out?

10:15:14  12  Q.  Sure.  I'm sorry, I gave the case name wrong.  Da Silva

10:15:24  13  Moore.  It's on the fourth page of Plaintiffs' Exhibit 10

10:15:28  14  under note C-1.

10:15:30  15  A.  Yes.

10:15:30  16  Q.  All right.  The Da Silva Moore case, have you looked at

10:15:34  17  the protocol in that case?

10:15:36  18  A.  I have looked at some of the discussion in that case.  I

10:15:42  19  have not looked at it in detail.  The only part that I noted

10:15:46  20  was that they were -- they had a similar problem of drawing a

10:15:52  21  random sample to estimating a proportion in a population, so I

10:15:58  22  thought that would be an informative example for the legal

10:16:00  23  people.

10:16:00  24  Q.  But as you understand how the protocol worked there, it

10:16:04  25  would draw a random sample, train the system, they train the

10:16:08    1    system, the computer would classify all the documents, they

10:16:12    2    would draw a random sample from that, look at the random

10:16:18    3    sample to see how much the computer got right, how much the

10:16:20    4    computer got wrong?

10:16:22    5    A.   I have not looked at the protocol in that case in

10:16:24    6    sufficient detail to give a comment on it.   It's kind of

10:16:26    7    spread out over -- there's a lot of testimony, and I couldn't

10:16:32    8    give you any opinion on that.

10:16:32    9    Q.   Did you speak on the topic of the Da Silva Moore case two

10:16:40    10    weeks ago at the Standard Club?

10:16:40    11    A.   No, I did not.

10:16:42    12    Q.   You did not.

10:16:42    13          Were you on a program at the Standard Club two weeks

10:16:46    14    ago?

10:16:46    15    A.   Yes, I was.

10:16:46    16    Q.   What was the topic of your discussion?

10:16:48    17    A.   Predictive coding.

10:16:50    18    Q.   Now, at the end of -- when you estimate recall at step 7,

10:17:02    19    and I'm not sure how you get out of step 6, but when you

10:17:04    20    estimate recall at step 7, you're going to try to figure out

10:17:08    21    what percentage you have for recall at that point; is that

10:17:10    22    correct?   That's a statistical calculation?

10:17:12    23    A.   Right.   So you are attempting -- you are estimating a

10:17:16    24    confidence interval on recall.

10:17:18    25    Q.   And it could be that the estimate of recall you obtain

| | | |
|---|---|---|
| 10:17:24 | 1 | after you run through this whole process the first time is you |
| 10:17:28 | 2 | can find out that your recall estimate is 13 percent, plus or |
| 10:17:32 | 3 | minus 5 percent, correct? |
| 10:17:34 | 4 | A.  That could be an outcome, yes. |
| 10:17:38 | 5 | Q.  And if it were 13 percent after that first round of going |
| 10:17:42 | 6 | through, would you expect to go back through the round again? |
| 10:17:44 | 7 | A.  The recall target is something that would have to be |
| 10:17:50 | 8 | determined on a legal basis.  There is no right answer from |
| 10:17:56 | 9 | informational retrieval about what a sufficient level of |
| 10:18:00 | 10 | recall is. |
| 10:18:00 | 11 | Q.  So 13 percent might be okay? |
| 10:18:02 | 12 | A.  I just don't have an opinion on that. |
| 10:18:04 | 13 | Q.  Now, in the portion of the Da Silva case that you looked |
| 10:18:14 | 14 | at, did you see that there was a suggestion that the parties |
| 10:18:16 | 15 | had to go through the training and the rounds of this |
| 10:18:26 | 16 | predictive coding they were calling it there processed seven |
| 10:18:28 | 17 | times and then come back to the judges to see if they needed |
| 10:18:30 | 18 | to go through more rounds? |
| 10:18:32 | 19 | A.  I didn't look at that part of the protocol.  I really just |
| 10:18:34 | 20 | saw this bit about sampling, and that was a good example |
| 10:18:38 | 21 | there. |
| 10:18:38 | 22 | Q.  But sitting here today, we could go through this entire |
| 10:18:46 | 23 | protocol and you can't tell me what would be the recall that |
| 10:18:50 | 24 | we would result with after running this process; isn't that |
| 10:18:50 | 25 | correct? |

10:18:56   1   A.  If you set a recall target and you run the process, you
10:19:02   2   iterate enough times, eventually, you will reach that recall
10:19:08   3   simply because you will have looked at enough documents that
10:19:12   4   it would be inevitable you reach that recall.
10:19:14   5   Q.  But you can't tell me how long that iterative process is
10:19:18   6   going to take; is that correct?
10:19:20   7   A.  That's correct.
10:19:20   8   Q.  And you can't tell me how many times I'm going to have to
10:19:22   9   run through this process; isn't that correct?
10:19:24  10   A.  That's correct.
10:19:24  11   Q.  I mean, eventually, I would have, God forbid, the senior
10:19:28  12   attorney have to review every document in the entire
10:19:30  13   production or entire universe, correct?
10:19:32  14   A.  I don't believe -- I have not expressed an opinion about
10:19:40  15   what sort of personnel would be reviewing these documents.
10:19:42  16   Q.  I'm sorry.  That was in the protocol.
10:19:44  17        But, I mean, eventually, you say you are going to
10:19:46  18   look at enough documents.  You don't know if we are going to
10:19:48  19   be looking at any particular percentage of the documents or
10:19:52  20   how high a percentage of the documents, correct?
10:19:52  21   A.  No, my opinion is that using supervised learning and
10:19:58  22   statistical rank retrieval, you will have to look at fewer
10:20:00  23   documents than if you used Boolean queries.
10:20:04  24   Q.  And you can't tell me what it's going to cost?
10:20:06  25   A.  No, I can't.

10:20:06   1   Q.  All right.  I want to try to move a little bit to sort of
10:20:14   2   inside how this system works, and you talked about this some
10:20:18   3   on direct.  But this computer algorithm that we have talked
10:20:22   4   about, it's still relying, in part, on words, correct?
10:20:26   5   A.  Supervised learning and statistical rank retrieval
10:20:32   6   algorithms can make use of words in text, phrases in text,
10:20:36   7   metadata in the text.  All of those things can go into the
10:20:40   8   algorithm.
10:20:40   9   Q.  And the algorithm is going to distinguish responsive
10:20:44   10  documents from nonresponsive documents by giving various
10:20:48   11  weights to different terms, metadata, phrases, correct?
10:20:52   12  A.  Yes.  Typically, all the algorithms that I am aware of
10:20:56   13  that are being used for e-discovery produce some sort of
10:21:02   14  weighting of the different pieces of evidence.
10:21:06   15  Q.  And as part of this process, is there some type of word
10:21:08   16  index that the computer creates up front so it knows what
10:21:14   17  terms it's going to be looking at or considering?
10:21:16   18  A.  That would be a common way to implement such systems is to
10:21:22   19  produce an index of both the text and the metadata.  For
10:21:26   20  instance, you know, which documents contain which words and
10:21:30   21  metadata, how many times they occur, sometimes positional
10:21:36   22  information.
10:21:36   23  Q.  By the way, how long does this computer program take to
10:21:38   24  run?
10:21:38   25  A.  That would depend on the particular implementation.

10:21:40　1　Q.　If you had, say, a million documents in the program, how

10:21:44　2　long would it take for the algorithm to work through them all

10:21:48　3　the first time?

10:21:48　4　A.　How long -- you are asking how long the indexing would

10:21:52　5　take?

10:21:52　6　Q.　Well, let's start with the indexing, yes.

10:21:54　7　A.　I mean, again, it's something which is going to depend on

10:21:58　8　the particular vendor software.　Indexing a million documents

10:22:06　9　is something which is not a very large task.　I certainly, you

10:22:12　10　know, am aware of other -- of search software that can do that

10:22:18　11　in less than a minute.

10:22:20　12　Q.　Less than a minute?

10:22:22　13　A.　Yeah.

10:22:22　14　　　　　THE COURT:　A million?　A million documents in one

10:22:24　15　minute?

10:22:24　16　　　　　THE WITNESS:　I mean, you know, there's distributive

10:22:26　17　search software that runs across multiple computers.　The

10:22:30　18　indexing is not a substantial difficult culling.

10:22:36　19　BY MR. McKEOWN:

10:22:36　20　Q.　But at the end of this indexing, what the computer has

10:22:38　21　generated are all these different things it's going to look at

10:22:44　22　in a way; is that correct?

10:22:44　23　A.　Yeah.

10:22:46　24　Q.　There will be a bunch of words on this list, right?

10:22:48　25　A.　It goes through the documents, and it extracts information

10:22:50 1 on the piece of evidence that's going to be used. It could be

10:22:54 2 words, phrases, metadata, and so on.

10:22:56 3 Q. And isn't it also true that the more common or frequent

10:23:08 4 the term, the more difficult it's going to be for the computer

10:23:10 5 or the algorithm to sort between responsive and nonresponsive?

10:23:14 6 A. I would phrase that slightly differently. Very frequent

10:23:20 7 terms, you think of, say, common English words, the, a, and

10:23:26 8 whatnot, tend not to be very discriminative between

10:23:30 9 responsiveness and nonresponsiveness, so they don't tend to

10:23:34 10 get very much weight when the computer is discriminating

10:23:38 11 between the two.

10:23:40 12 Q. Okay. Let me see if I understand that.

10:23:42 13 When you say "discriminating between the two," you

10:23:46 14 mean when the computer is classifying it as responsive or

10:23:48 15 nonresponsive?

10:23:50 16 A. Right. So these very common terms don't tend to be as

10:23:54 17 helpful in classifying something as responsive versus

10:23:58 18 nonresponsive as a more moderate frequency piece of evidence.

10:24:06 19 Q. Now, we had talked at the last session about the TREC 2009

10:24:22 20 conference, and I just want to go back to that briefly.

10:24:26 21 Did you, by any chance, go back and check the TREC

10:24:30 22 2009 conference report since we last were here?

10:24:32 23 A. I don't think I've actually looked at TREC 2009 since

10:24:36 24 then.

10:24:36 25 Q. I want to show you what was previously marked as

10:24:54  1    Defendants' Exhibit 7.

10:24:56  2              THE COURT:  Did we admit that?

10:25:02  3              Thank you.  Did you want to move to admit it?

10:25:12  4              MR. McKEOWN:  Not at this stage, your Honor.  I want

10:25:14  5    to talk about it just a little first.

10:25:18  6              THE COURT:  Okay.

10:25:18  7    BY MR. McKEOWN:

10:25:20  8    Q.  And you recall this document, Dr. Lewis?

10:25:22  9    A.  Yes, I do.

10:25:24  10   Q.  And we talked about this in the context of the TREC 2009

10:25:30  11   legal track had used the Enron emails for their source data,

10:25:34  12   correct?

10:25:34  13   A.  I know that they used Enron for some of it.  However, I

10:25:42  14   believe they also used the INT feedback fee portion of the

10:25:48  15   tobacco documents for another part of it.

10:25:50  16   Q.  Let me just direct your attention -- by the way, if I ever

10:25:54  17   make a contribution to information retrieval, I'd ask that

10:26:00  18   they put page numbers on their publications.  But it's the

10:26:02  19   fourth page --

10:26:02  20   A.  Please talk to Ness (phonetic) about that.

10:26:04  21   Q.  It's under Section 2.2.1.

10:26:08  22   A.  Okay.

10:26:14  23   Q.  If you go down to the fifth line, it says, We turned in

10:26:22  24   2009 to a collection of emails that had been produced by Enron

10:26:26  25   in response to requests from the Federal Energy Regulatory

10:26:28  1  Commission, correct?

10:26:30  2  A.  I see that, yes.

10:26:30  3  Q.  Okay.  So it appears that, at least for this particular

10:26:34  4  year --

10:26:34  5  A.  Right.

10:26:34  6  Q.  -- they were using the Enron emails.

10:26:36  7  A.  Right.  They used Enron for one of the tasks, and they

10:26:38  8  used tobacco for another one of the tasks.

10:26:42  9  Q.  And we talked the last time about one of the topics that

10:26:46  10  they looked at here when they ran their request was a request

10:26:48  11  for an effort to find things about fantasy football and

10:26:54  12  gambling on football.  Do you recall that?

10:26:56  13  A.  I remember you asking about that.

10:26:58  14  Q.  Well, if you turn to what is the sixth page, at the top of

10:27:08  15  the page is a list for topic 204.

10:27:12  16  A.  Okay.

10:27:14  17  Q.  Have you found that?

10:27:14  18  A.  Yes, I see topic 204.

10:27:16  19  Q.  Okay.  And then it's right above Section 2.2.3, there's

10:27:22  20  topic 207.

10:27:24  21  A.  Yes, I see it.

10:27:24  22  Q.  And that says what they are looking for is the document

10:27:28  23  request are, All documents or communications that describe,

10:27:30  24  discuss, refer to, report on, or relate to fantasy football,

10:27:34  25  gambling on football, and related activities, including but

| | | |
|---|---|---|
| 10:27:38 | 1 | not limited to football teams, football players, football |
| 10:27:42 | 2 | games, football statistics, and football performance, correct? |
| 10:27:46 | 3 | A.  Yes. |
| 10:27:48 | 4 | Q.  For this particular request, that's what the teams were |
| 10:27:50 | 5 | supposed to look at, correct? |
| 10:27:50 | 6 | A.  Yes. |
| 10:27:52 | 7 | Q.  And we talked the last time about only five of the -- let |
| 10:28:00 | 8 | me get the term -- was it runs, 24 runs? |
| 10:28:04 | 9 | A.  Could you point me to the area -- |
| 10:28:08 | 10 | Q.  Sure.  If we go to -- I had the benefit last night of |
| 10:28:12 | 11 | writing numbers in the corners of my pages, but it is the 16th |
| 10:28:14 | 12 | page.  It's right above Section 2.3.6. |
| 10:28:24 | 13 | A.  Okay.  I see the page that has Section 2.3.6. |
| 10:28:28 | 14 | Q.  And if you look at the paragraph that's about 5 inches |
| 10:28:36 | 15 | from the bottom of that page that starts, As can be seen from |
| 10:28:40 | 16 | the table? |
| 10:28:40 | 17 | A.  Um-hmm. |
| 10:28:44 | 18 | Q.  Do you see that paragraph, Dr. Lewis? |
| 10:28:46 | 19 | A.  I see that, As can be seen from the table. |
| 10:28:48 | 20 | Q.  All right.  And drop down to the fourth line in about an |
| 10:28:50 | 21 | inch, it says, In terms of recall, of the 24 submitted runs, |
| 10:28:56 | 22 | five distributed across four topics attained a recall score of |
| 10:29:00 | 23 | 0.7 or greater. |
| 10:29:02 | 24 | Do you see that line? |
| 10:29:04 | 25 | A.  Yes. |

10:29:04  1  Q.  And in that four topics, two of those topics were topic
10:29:10  2  207; isn't that right?
10:29:12  3  A.  Yes, 207 UW and 207 CB are the runs.
10:29:16  4  Q.  And so of the five that reach recall of 0.7 or greater,
10:29:22  5  two of them were our football requests?
10:29:24  6  A.  That's correct.
10:29:24  7  Q.  Correct?
10:29:24  8  A.  Yes.
10:29:24  9  Q.  And, in fact, if we turn to the very next page, we'd have
10:29:30  10  table 6, which fills up the first top half of the page there.
10:29:36  11  Do you see that?
10:29:36  12  A.  Yes.
10:29:36  13  Q.  And looking at the columns, the first column says, Topic,
10:29:42  14  the second column is Run, the third column is actually three
10:29:46  15  columns together under the Recall header.
10:29:48  16      Do you see that?
10:29:48  17  A.  I do.
10:29:48  18  Q.  And where it says, EST, period, that's the estimate of
10:29:52  19  recall; is that right?
10:29:54  20  A.  That's my understanding.
10:29:54  21  Q.  And if we go down to topic 207, we see UW and CB were the
10:30:00  22  two teams that had recall over 0.7, correct?
10:30:04  23  A.  Yes, on topic 207, there were those two teams.
10:30:08  24  Q.  And if you look at topic 206, which is just above it on
10:30:12  25  that table?

10:30:14    1    A.   Yes.

10:30:14    2    Q.   Now, do I understand this correct that the first team, CB

10:30:18    3    high, had 0.076 recall?

10:30:22    4    A.   That's my understanding.

10:30:24    5    Q.   So that would be 7.6 percent recall, correct?

10:30:28    6    A.   That's correct.

10:30:28    7    Q.   So that CB high on topic 206, when they ran their process,

10:30:34    8    they only got 7.6 percent of the responsive documents,

10:30:38    9    correct?

10:30:40   10    A.   That's my understanding.

10:30:40   11    Q.   And then there's something, a team LO, and they've got 4.2

10:30:46   12    percent; is that correct?

10:30:48   13    A.   That's correct.

10:30:48   14    Q.   And CB mid had 1.1 percent recall; is that correct?

10:30:54   15    A.   Yeah.  My understanding is that CB is a single team and

10:30:56   16    that high, mid, and LO would have been three runs that they

10:31:00   17    submitted.

10:31:00   18    Q.   Okay.  So CB LO is 0.9 percent?

10:31:04   19    A.   Right.

10:31:04   20    Q.   So their low run, was that low-by-low score or low-by-low

10:31:10   21    effort?

10:31:12   22    A.   I don't know how they're coding their runs.

10:31:18   23    Q.   But, clearly, the recall return on top 206 is not so

10:31:22   24    great.  Would you agree with that?

10:31:24   25    A.   I would agree that it's substantially lower than the

| | | |
|---|---|---|
| 10:31:28 | 1 | recall on topic 207. |
| 10:31:28 | 2 | Q. And if we go back to the sixth page where we were just a |
| 10:31:32 | 3 | few minutes ago which has the list of topics? |
| 10:31:38 | 4 | A. Okay. |
| 10:31:38 | 5 | Q. This is right above Section 2.2.3. When we look at topic |
| 10:31:46 | 6 | 206 -- and, again, we are looking at the Enron emails, right? |
| 10:31:52 | 7 | A. That's right. |
| 10:31:52 | 8 | Q. So topic 206 was all documents or communications that |
| 10:31:56 | 9 | describe, discuss, refer to, report on, or relate to any |
| 10:32:02 | 10 | discussions, communications, or contacts with financial |
| 10:32:04 | 11 | analysts or with firms that employ them regarding the |
| 10:32:06 | 12 | company's financial condition, analyst's coverage of the |
| 10:32:10 | 13 | company and/or its financial condition, analyst's rating of |
| 10:32:14 | 14 | the company's stock, or the impact of an analyst's coverage on |
| 10:32:16 | 15 | the company -- on the business relationship between the |
| 10:32:20 | 16 | company and the firm that employs the analyst. |
| 10:32:22 | 17 | Do you see that? |
| 10:32:22 | 18 | A. I do. |
| 10:32:22 | 19 | Q. So on football, they did great. On requests about |
| 10:32:28 | 20 | financial analysts, the performance was pretty poor. Would |
| 10:32:32 | 21 | you agree? |
| 10:32:32 | 22 | A. I would agree that the performance in terms of recall was |
| 10:32:34 | 23 | substantially lower on topic 206. |
| 10:32:36 | 24 | Q. It was about 10 percent of what they got on football, |
| 10:32:40 | 25 | correct? |

10:32:40  1  A.  Yes, 10 percent of the recall on the item.

10:32:48  2  Q.  Now, when TREC 2009 ran their legal track, these teams ran

10:32:52  3  on -- you know, they would run a search for a single request;

10:32:56  4  is that correct?

10:32:56  5  A.  Could you describe a little more precisely what you mean?

10:33:00  6  Q.  Each team could take one, two, or three requests, but they

10:33:06  7  were running a process aimed for that one focused request,

10:33:16  8  correct?

10:33:18  9  A.  When you say "request," you mean the topics?

10:33:18  10  Q.  The topic.  I'm sorry.  I'm using a legal term in requests

10:33:22  11  for production.

10:33:24  12        But they were running -- when they ran the topic,

10:33:26  13  they were searching just for football?

10:33:28  14  A.  I don't know the details of what the particular teams did.

10:33:32  15  Q.  Would you agree that if you had to search for a number of

10:33:34  16  topics across a universe of documents, it would be more

10:33:38  17  difficult for the supervised learning process to cover all

10:33:42  18  those topics?

10:33:42  19  A.  That would depend on the details of the topics.

10:33:46  20  Q.  If the topics were diverse, it would take longer and more

10:33:52  21  effort to locate the documents with each topic; is that true?

10:33:54  22  A.  That's something one would really have to get into the

10:33:58  23  details.  It would depend on the details of the requests, it

10:34:06  24  would depend on what one was seeking in terms of the

10:34:10  25  effectiveness, whether one was seeking a high level of

10:34:16   1    effectiveness, for instance, on the union of the responsive

10:34:20   2    documents from the set of them or if there were individual

10:34:22   3    effectiveness targets for each of the requests.

10:34:26   4            So one would really have to understand the details of

10:34:30   5    the need in that operational situation.

10:34:32   6    Q.  Would you agree that you would have a richer training set

10:34:38   7    if you drew a sample for your training set that was entirely

10:34:42   8    devoted to football than if you drew a training set of the

10:34:46   9    same number of documents but it covered 29 different

10:34:50  10    categories of which football was only one?

10:34:52  11    A.  Could you repeat the question?

10:34:54  12    Q.  Sure.  Let's say we have a training set of 500 documents.

10:35:00  13    If I am only searching for one topic, football, all 500

10:35:04  14    documents are going to talk about football, right?

10:35:06  15    A.  Well, typically in training sets, you want examples of

10:35:10  16    both responsive and nonresponsive documents.

10:35:12  17    Q.  Fair point.

10:35:14  18            But the distinction in all those documents is going

10:35:18  19    to be football or no football if I am only looking for

10:35:20  20    football requests, correct?

10:35:22  21    A.  Again, I'm not sure what you are saying there.  A training

10:35:28  22    set -- what's important about a training set is you are trying

10:35:32  23    to detect documents about football is that you have some

10:35:36  24    documents about football and some that aren't about football

10:35:38  25    and that documents have been reviewed to label them in an

10:35:42  1  unbiased fashion with those labels.

10:35:44  2  Q.  But those 500 documents, that's the only thing they'd be

10:35:48  3  labeled for, correct?

10:35:48  4  A.  If that's the only goal that you have is to detect topics

10:35:52  5  about football.

10:35:54  6  Q.  If you had 30 different topics that I was looking at, I

10:35:56  7  would have to label those documents for all those topics,

10:35:58  8  correct?

10:35:58  9  A.  Again, that would depend on what the goal of the system

10:36:06  10  was.  If you needed separate predictions for each of those 30

10:36:12  11  topics, you would need training data labeled for each of those

10:36:16  12  topics.

10:36:18  13       If you only needed a prediction for whether a

10:36:20  14  document was in the union of those 30 topics, then you might

10:36:26  15  have labeling for the individual topics or you might just have

10:36:30  16  a label for is it in the union or not.

10:36:32  17  Q.  And if I only wanted to do responsiveness, then I'd

10:36:36  18  probably have fewer documents about football in my training

10:36:40  19  set if I had a lot of other topics as well, correct?

10:36:42  20  A.  This would depend what topic responsiveness was with

10:36:46  21  respect to.

10:36:48  22  Q.  You were also asked about, with respect to the training

10:36:52  23  set, whether you could create a document for this training set

10:36:58  24  or seed set with the words "they are with us."  Do you

10:37:02  25  remember that testimony, "They are with us"?

10:37:08 1 A.  I believe there was a question about that.

10:37:10 2 Q.  And I think you said that each of those four words was a

10:37:14 3 high frequency word, correct?

10:37:14 4 A.  That's correct.

10:37:16 5 Q.  And, therefore, when we talked about indexing before,

10:37:20 6 those are the types of words that the system is not likely to

10:37:24 7 put much weight to; is that correct?

10:37:26 8 A.  Right.  Those are words that are difficult to -- they tend

10:37:30 9 to have relatively little value individually in distinguishing

10:37:34 10 documents as responsive or not responsive.

10:37:36 11 Q.  And, therefore, it could pick up all sorts of things.  If

10:37:42 12 you tried to run them to try to find other documents and said,

10:37:44 13 They are with us, the computer is going to have difficulty

10:37:46 14 sorting those out; isn't that right?

10:37:50 15 A.  Yeah.  I mean, there are cases where, you know, if you

10:37:54 16 knew that systematically that exact string was used, one could

10:37:58 17 turn that exact string into a phrase.  But, in general, to get

10:38:02 18 -- if responsive documents had only high frequency words, it's

10:38:06 19 going to be difficult to distinguish them from nonresponsive

10:38:10 20 documents using only word-based evidence alone.

10:38:12 21 Q.  In fact, if you knew you were looking for that exact

10:38:16 22 phrase, you could use a Boolean search term, couldn't you?

10:38:22 23 A.  If you were using that exact phrase, yes, you could use

10:38:24 24 like proximity operators.

10:38:26 25 Q.  Because just putting in documents, even a made-up document

| | | |
|---|---|---|
| 10:38:30 | 1 | that says, They are with us, it could be things like, They |
| 10:38:34 | 2 | will be meeting us for dinner, or, They will be at breakfast |
| 10:38:40 | 3 | tomorrow, or it could be any sorts of things that might be |
| 10:38:42 | 4 | picked up, correct? |
| 10:38:42 | 5 | A.  But what you do when you are creating a made-up document |
| 10:38:46 | 6 | of that sort is you attempt to also take the metadata that |
| 10:38:50 | 7 | would be characteristic of the document as well because the |
| 10:38:52 | 8 | individual words, as you pointed out, finding the documents |
| 10:38:54 | 9 | purely based on a word search where you don't know what, say, |
| 10:39:00 | 10 | a coded phrase like that would be, you don't want to find just |
| 10:39:04 | 11 | the ones with the un-uncoded phrase because you don't know the |
| 10:39:10 | 12 | un-uncoded phrase.  What you hope to do is create artificial |
| 10:39:14 | 13 | documents that had characteristic metadata as well. |
| 10:39:16 | 14 | Q.  And so you're going to make up a document with both |
| 10:39:20 | 15 | phrases and metadata? |
| 10:39:20 | 16 | A.  Well, the idea one -- this is a possible way -- possible |
| 10:39:26 | 17 | technique could be used in this protocol is to create |
| 10:39:30 | 18 | simulated documents with both text and metadata. |
| 10:39:32 | 19 | Q.  But it's still going to have high frequency words, |
| 10:39:38 | 20 | correct? |
| 10:39:38 | 21 | A.  The words will be high frequency.  Obviously, the metadata |
| 10:39:40 | 22 | will have other characteristics. |
| 10:39:42 | 23 | Q.  And the metadata is going to be a complete guess? |
| 10:39:44 | 24 | A.  Well, it would obviously depend on the insight of the |
| 10:39:48 | 25 | person creating the artificial training document into the -- |

10:39:52  1  you know, what metadata would be likely to occur in a
10:39:56  2  responsive document.
10:39:56  3  Q.  Let's talk a little bit again about the algorithm.  Now,
10:40:02  4  you wrote some algorithms for Kroll.
10:40:04  5       Do different algorithms act differently when
10:40:08  6  documents are fed in as a training set?
10:40:12  7  A.  Yes, there are a number of different kinds of supervised
10:40:14  8  learning algorithms which will have somewhat different
10:40:18  9  responses in its training data.
10:40:22  10  Q.  When you say somewhat different responses, you mean that
10:40:24  11  different algorithms, if you feed the same documents into
10:40:28  12  them, could code documents differently, correct?
10:40:32  13  A.  Right.  So different algorithms would produce different
10:40:36  14  predictive models, and, you know, a model being what you apply
10:40:40  15  to the document to get a predictive score of relevance.  And
10:40:44  16  different of those models would score documents differently,
10:40:48  17  and so there could be some difference in the predictions of
10:40:50  18  which are responsive and which are nonresponsive.
10:40:54  19  Q.  And you didn't write the algorithm for any of the other
10:40:56  20  companies, correct?
10:40:58  21  A.  No, I have only done algorithms on Kroll.
10:41:00  22  Q.  So that if we took the exact universe of documents,
10:41:06  23  whatever it is we want to put through, and the exact same
10:41:08  24  training set and fed it into the Kroll system with your
10:41:12  25  algorithm and fed it into a different system with a different

10:41:16  1  algorithm, there is going to be different predictions by those

10:41:20  2  two algorithms; isn't that correct?

10:41:22  3  A.  Yes, one would expect that some of the predictions would

10:41:24  4  be there.

10:41:24  5  Q.  And that's because the algorithms are different?

10:41:28  6  A.  Yes.

10:41:28  7  Q.  You testified at our last session about a study called

10:41:38  8  Blair and Maron.  Do you recall that?

10:41:42  9  A.  Yes.

10:41:42  10  Q.  And, in fact, I think you listed that study as a reference

10:41:46  11  in the report you prepared in this case, correct?

10:41:48  12  A.  Yes.

10:41:48  13  Q.  And I think you said that, in your view, that study had to

10:41:56  14  do with the attorneys thinking they had found 75 percent of

10:42:00  15  the responsive documents and they had actually found a lot

10:42:04  16  lower percentage, correct?

10:42:04  17  A.  Yes.

10:42:06  18  Q.  Now, in that study, wasn't it the case that what happened

10:42:08  19  was there were two lawyers and two paralegals, and the lawyers

10:42:14  20  were asked to tell the paralegal what type of request to

10:42:20  21  create, and the paralegals then queried the system to try to

10:42:24  22  draw back documents?

10:42:24  23  A.  I'd have to look at the original study to verify that.

10:42:58  24          MR. McKEOWN:  Your Honor, may I approach the witness?

10:43:00  25          THE COURT:  Yes.

10:43:02  1     Did you show Dr. Lewis this the last time --

10:43:06  2          MR. McKEOWN:  No, I did not, your Honor.  This is a

10:43:08  3   new exhibit.  This would be Defendants' Exhibit 9.

10:43:10  4          THE COURT:  All right.

10:43:12  5          THE WITNESS:  Thank you.

10:43:16  6          MR. MOGIN:  I'm sorry.  This is 9?

10:43:18  7          MR. McKEOWN:  I believe so.

10:43:28  8   BY MR. McKEOWN:

10:43:32  9   Q.  Dr. Lewis, you have a copy of Defendants' Exhibit 9?

10:43:34  10  A.  Yes, I do.

10:43:36  11  Q.  Is this the Blair and Maron study that you were

10:43:40  12  referencing before?

10:43:42  13  A.  Yes, it is.

10:43:44  14  Q.  If you turn to page 291 of Defendants' Exhibit 9, at the

10:44:02  15  top of the page where it says, The conduct of the test, do you

10:44:06  16  see that?

10:44:06  17  A.  Yes, I do.

10:44:06  18  Q.  And in the third line, it says, Two lawyers, the principal

10:44:10  19  defense attorneys in the suit, participated in the experiment?

10:44:14  20  A.  Yes, I see that.

10:44:14  21  Q.  Does that refresh your recollection as to how that was

10:44:16  22  done?

10:44:16  23  A.  I see that that says that the two lawyers participated in

10:44:24  24  an experiment.

10:44:26  25  Q.  And then you will see, if you look down, that they

10:44:30    1    generated a total of 51 different information requests which

10:44:34    2    were translated into formal queries by either of the two

10:44:38    3    paralegals, both of whom were familiar with the case?

10:44:40    4    A.  I see that.

10:44:40    5    Q.  So it appears that the -- you had two lawyers, they

10:44:46    6    created requests, and then the paralegals created queries to

10:44:50    7    search the database, correct?

10:44:52    8    A.  Yes.

10:44:52    9    Q.  And what happened then was that the lawyers were told to

10:44:58   10    continue this process until they thought they had 75 percent

10:45:02   11    of the documents; is that correct?

10:45:04   12    A.  Until they thought that they had 75 percent of the

10:45:08   13    responsive documents.

10:45:08   14    Q.  I'm sorry, yes, until they thought they had 75 percent of

10:45:12   15    the responsive documents.

10:45:14   16         By the way, if you look at the middle of that same

10:45:16   17    column -- let me do it by lines.

10:45:26   18         About 13 lines down from the top on the right-hand

10:45:30   19    column starting at the end of the line, it says, The lawyer

10:45:34   20    then evaluated the documents ranking them according to whether

10:45:38   21    they were vital, satisfactory, marginally relevant, or

10:45:40   22    irrelevant to the original request; is that right?

10:45:42   23    A.  Yes, I see that.

10:45:44   24    Q.  So at least in this famous study, they listed things and

10:45:54   25    at least categorized some of them as marginally relevant?

10:45:58　1　A.  They did.

10:45:58　2　Q.  So in this case, the end of the study came when the

10:46:00　3　lawyers --

10:46:00　4　　　　　　MR. MOGIN:  Your Honor, may the witness be asked to

10:46:04　5　read from the rest of the document where the use of

10:46:06　6　"marginally relevant" is explained three sentences down?

10:46:12　7　　　　　　THE COURT:  I'm sorry.  I was actually looking down,

10:46:14　8　so I missed that.  Is that part of the sentence?

10:46:16　9　　　　　　MR. MOGIN:  He read from part of the paragraph.  I

10:46:18　10　was wondering if the witness could be asked to read the rest

10:46:22　11　of the paragraph.

10:46:22　12　　　　　　THE COURT:  Do you mind, Mr. McKeown, rather than

10:46:24　13　doing it on redirect, can you just have him do it now, please?

10:46:30　14　　　　　　MR. McKEOWN:  That's fine.

10:46:30　15　　　　　　THE COURT:  Thank you.

10:46:34　16　　　　　　MR. McKEOWN:  Is there a particular line?

10:46:36　17　　　　　　THE COURT:  What page?  Tell me what page,

10:46:40　18　Mr. McKeown.  I'm sorry.

10:46:42　19　　　　　　MR. McKEOWN:  We are on page 291 of the document,

10:46:44　20　your Honor.

10:46:44　21　　　　　　THE COURT:  And you were on -- halfway under conduct

10:46:48　22　of the test.

10:46:48　23　　　　　　MR. McKEOWN:  We were 13 lines down.

10:46:50　24　　　　　　THE COURT:  Okay.  Fine.  So ask Dr. Lewis again the

10:46:54　25　question incorporating Mr. Mogin's comments, if you will.

BY MR. McKEOWN:

Q.  If you look down, we were just on that 13 lines down where
it said, The lawyer then evaluated the documents ranking them
according to whether they were vital, satisfactory, marginally
relevant, or irrelevant to the original request, correct?

A.  Yes.

Q.  And then if you skip two sentences, so we are down about
six lines, the sentence, the line starts with the word
recorded at the end of the last sentence.

A.  Okay.

Q.  I want to point to the next one:  The information
requested in query formulation procedures were considered
complete only when the lawyers stated in writing that he or
she was satisfied with the search results for that particular
query, i.e., in his or her judgment, more than 75 percent of
the vital satisfactory and marginally relevant documents had
been retrieved; is that right?

A.  I do see that.

Q.  So what they did was they ran these queries and the
lawyers made that judgment.  However, they did no testing of
their null set; isn't that correct?

A.  Well, at this point when they are -- yeah, I mean, they
are looking at a series of documents, and they are not --
there is no description here of any testing of the null set
that went on at that point.  I don't know what the paralegals

10:48:24  1  were doing.

10:48:26  2  Q.  They had two lawyers, principal defense lawyers.  Lawyers

10:48:32  3  were asked when you think you have gotten 75 percent of the

10:48:36  4  responsive documents, they formed a judgment, their judgment

10:48:40  5  may have been wrong, but they didn't have anything -- there is

10:48:42  6  nothing in this report that suggests that they ran a null set

10:48:44  7  test, right?

10:48:46  8  A.  There is no description of a null set test, of a test of

10:48:48  9  the end review documents at this point in the process.

10:48:52  10  Obviously later in the paper, they talk about doing the

10:48:54  11  sampling.

10:48:56  12  Q.  To show that the lawyers were wrong about their guess?

10:49:00  13  A.  Yes, yes.

10:49:00  14  Q.  Which would be why you would test the null set to see if

10:49:08  15  you were wrong, correct?

10:49:08  16  A.  Yes.

10:49:08  17  Q.  You also testified, apart from the Blair and Maron study,

10:49:12  18  that you thought that the reviewers that would be looking at a

10:49:16  19  null set sample should not know that it's a null set sample;

10:49:16  20  is that right?

10:49:20  21  A.  That's correct.

10:49:22  22  Q.  And you think that bias would influence their judgment of

10:49:24  23  a document as responsive or nonresponsive?

10:49:28  24  A.  That's certainly possible.

10:49:30  25  Q.  Now, you're not an attorney, correct?

10:49:32   1  A.  That's correct.

10:49:32   2  Q.  Now, is it your belief that the fact that an attorney owes

10:49:34   3  some duty of loyalty to a client means that they are going to

10:49:38   4  grade things differently if they know that it's from the null

10:49:40   5  set and not a null set?

10:49:42   6  A.  I am not expressing an opinion on that.

10:49:44   7  Q.  Okay.  Let's say, for example, that Temple-Inland had

10:49:50   8  Ms. Miller review all the documents in the null set but she

10:49:54   9  knew they were from the null set.  It's your view that because

10:49:58  10  she knew they were from the null set that her judgment on

10:50:00  11  those documents is not to be trusted; is that correct?

10:50:04  12  A.  I'm not making any statement about Ms. Miller right now.

10:50:08  13  I'm simply making a statement about the difficulty of human

10:50:10  14  beings making subjective judgments about the responsiveness of

10:50:16  15  the document making an objective -- making an unbiased

10:50:22  16  judgment of that when they know what a computer system did or

10:50:26  17  didn't do to that document.

10:50:26  18  Q.  And in your view, that's not to be trusted?

10:50:30  19  A.  That's correct.

10:50:32  20        THE COURT:  I have a question then.  Okay.  Well,

10:50:42  21  then who would be -- how would the person doing the review, if

10:50:46  22  it's not somebody knowledgeable in the case or knowledgeable

10:50:52  23  of what was either supposed to be in the null set or not in

10:50:56  24  the null set, I mean, wouldn't the person have to know

10:51:02  25  something about the case in order to make that determination?

| | | |
|---|---|---|
| 10:51:04 | 1 | THE WITNESS: Of course they need to know about the |
| 10:51:06 | 2 | case to make the responsiveness judgments, but they don't need |
| 10:51:10 | 3 | to be told whether a computer system has already predicted |
| 10:51:12 | 4 | this document to be responsive or not responsive. That's |
| 10:51:16 | 5 | something which is easy to hide from them and keep them from |
| 10:51:20 | 6 | being biased by. |
| 10:51:24 | 7 | THE COURT: Well, I'm confused. This is -- you |
| 10:51:42 | 8 | don't, but some of the people want experienced people to tell |
| 10:51:46 | 9 | the computer what to do. Then the computer does it, and then |
| 10:51:52 | 10 | when it comes down to what the computer has done, you don't |
| 10:51:58 | 11 | think it has to be somebody who is knowledgeable? I don't |
| 10:52:02 | 12 | know how they would know whether it was responsive or not. |
| 10:52:04 | 13 | THE WITNESS: No, no, you need people who are |
| 10:52:08 | 14 | knowledgeable about the case to produce both the training set |
| 10:52:12 | 15 | and the test set, but when they are reviewing the test set, |
| 10:52:16 | 16 | they should not know what the computer has predicted for the |
| 10:52:20 | 17 | documents in the test set. It's sort of like if you were told |
| 10:52:26 | 18 | that, you know, the IBM computer that won on Jeopardy has |
| 10:52:32 | 19 | already said this document is responsive, it would be a danger |
| 10:52:34 | 20 | that you would be influenced by that. |
| 10:52:44 | 21 | THE COURT: I am -- |
| 10:52:44 | 22 | THE WITNESS: I am not speaking about you, Judge, but |
| 10:52:46 | 23 | a person. |
| 10:52:48 | 24 | THE COURT: A person, right. |
| 10:52:52 | 25 | If I can't visualize something, I don't get it, and I |

10:52:56    1    am having a hard time visualizing.

10:53:02    2        So you're saying they can know about the case, but

10:53:08    3    they just can't know that the computer has already said this

10:53:12    4    isn't an important document or it is an important document,

10:53:16    5    either way?

10:53:16    6        THE WITNESS:  That's correct.  So the idea would be

10:53:18    7    you would be reviewing a document on a standard review

10:53:22    8    platform, and you're simply reviewing documents, and you

10:53:24    9    simply are not told was this a document that the computer said

10:53:30   10    was a miss or was this a document that the computer said was a

10:53:34   11    hit.  You're just reviewing documents, you're bringing all

10:53:34   12    the --

10:53:34   13        THE COURT:  And this is in the test set or the null

10:53:38   14    set, in the test set?

10:53:38   15        THE WITNESS:  In the test set, regardless of whether

10:53:40   16    the test set was drawn from the hits or from the misses or

10:53:42   17    from ideally the whole population, you shouldn't know that

10:53:46   18    that's where it came from.

10:53:54   19        THE COURT:  Okay.  At least I understand that.

10:53:58   20    BY MR. McKEOWN:

10:54:00   21    Q.  And, Dr. Lewis, if one uses search terms, you still have

10:54:08   22    the possibility of -- let me back up.  Every time somebody

10:54:12   23    looks at a document in a document review, they have to mark it

10:54:16   24    responsive or nonresponsive, correct?

10:54:18   25    A.  Assuming that that's the assessment they are being asked

10:54:22   1   to make.  Sometimes people are asked to make assessments on

10:54:24   2   other kinds of topics, you know, product name, things like

10:54:28   3   that, but one of the things they might be reviewing in this

10:54:30   4   case is responsive versus nonresponsive.

10:54:34   5   Q.  And in your view -- let me ask you this.  In your view, is

10:54:36   6   it biased every time an attorney looks at a document to decide

10:54:42   7   whether or not it's responsive or not responsive?

10:54:48   8   A.  I'm not saying anything about every time attorneys look at

10:54:50   9   documents.  I'm talking about construction of a sample that

10:54:52  10   would be used to evaluate a piece of software or to evaluate

10:54:56  11   the thoroughness of a discovery process.

10:55:00  12   Q.  And your view is that regardless of who the attorney is

10:55:02  13   that is reviewing those documents, that person is not to be

10:55:06  14   trusted to make an honest decision about responsive or

10:55:10  15   nonresponsive on that null set; is that your testimony?

10:55:12  16   A.  I am not impugning anybody's honesty.  I am simply saying

10:55:18  17   it is difficult for human beings to make subjective decisions

10:55:20  18   in an unbiased fashion that are going to be used to evaluate a

10:55:24  19   piece of software when you've been told what the software

10:55:28  20   thinks the right answer is.

10:55:34  21        MR. McKEOWN:  Your Honor, at this point, I am going

10:55:36  22   to turn over the cross to Mr. Neuwirth.

10:55:38  23        THE COURT:  Do you want to take a few minutes?

10:55:42  24        MR. NEUWIRTH:  Whatever is good for the court and the

10:55:44  25   witness.

10:55:44  1    THE COURT:  How long are you going to be, do you
10:55:46  2  think?  Just approximately.
10:55:48  3    MR. NEUWIRTH:  I hope to be about half an hour.
10:55:50  4    THE COURT:  Oh, well, then why don't we take -- it's
10:55:54  5  10:00 o'clock.  We have been here since 8:00.  So between 10
10:55:58  6  and 12 minutes.  Okay?  Set your clocks.  Okay.
11:01:32  7    (Short break.)
11:10:26  8    THE COURT:  We are back on the record.
11:10:32  9    Mr. Neuwirth?
11:10:32  10    MR. NEUWIRTH:  Thank you, your Honor.  Good morning;
11:10:34  11  Steven Neuwirth, representing defendant Georgia-Pacific.
11:10:40  12                        - - -
11:10:40  13            DANIEL D. LEWIS, CROSS-EXAMINATION
11:10:40  14  BY MR. NEUWIRTH:
11:10:42  15  Q.  Good morning, Dr. Lewis.
11:10:44  16  A.  Good morning.
11:10:44  17  Q.  Now, Dr. Lewis, as we all know, you were present on the
11:10:46  18  first day of this hearing and you were present, correct, for,
11:10:50  19  among other things, the testimony of Mr. Koch from KPMG and
11:10:56  20  the testimony of Mr. Brown from Counsel on Call about the
11:11:00  21  processes that Georgia-Pacific used in this case, correct?
11:11:02  22  A.  Yes.
11:11:04  23  Q.  Now, do you recall that on the first day of this hearing,
11:11:10  24  you testified about the conclusions that you reached regarding
11:11:18  25  GP's, Georgia-Pacific's, ESI search methodology?

| | | |
|---|---|---|
| 11:11:22 | 1 | A.  Yes. |
| 11:11:22 | 2 | Q.  And do you recall that your first conclusion was that |
| 11:11:26 | 3 | Georgia-Pacific's methodology can't be relied on to find a |
| 11:11:32 | 4 | substantial portion of responsive documents? |
| 11:11:32 | 5 | A.  I'd have to see the transcript to know exactly the wording |
| 11:11:36 | 6 | I used. |
| 11:11:36 | 7 | Q.  Let's do that. |
| 11:11:38 | 8 | MR. NEUWIRTH:  If I may approach, your Honor? |
| 11:11:40 | 9 | THE COURT:  Yes. |
| 11:11:40 | 10 | MR. NEUWIRTH:  I'd like to give the witness a copy of |
| 11:11:42 | 11 | the transcript.  Would it be convenient to your Honor to give |
| 11:11:48 | 12 | you one as well? |
| 11:11:50 | 13 | THE COURT:  I think I have it, actually.  What page |
| 11:11:52 | 14 | are you on? |
| 11:11:56 | 15 | MR. NEUWIRTH:  Let's start, your Honor -- |
| 11:11:58 | 16 | THE COURT:  This is on direct?  Was this -- |
| 11:12:00 | 17 | MR. NEUWIRTH:  Yes. |
| 11:12:00 | 18 | BY MR. NEUWIRTH: |
| 11:12:00 | 19 | Q.  Let's turn to page 243 of the transcript. |
| 11:12:04 | 20 | THE COURT:  Okay.  I got it.  Thank you. |
| 11:12:04 | 21 | BY MR. NEUWIRTH: |
| 11:12:06 | 22 | Q.  And let's turn to line 20 and 21. |
| 11:12:08 | 23 | Now, I asked you, Dr. Lewis, whether your first |
| 11:12:12 | 24 | conclusion was that Georgia-Pacific's methodology can't be |
| 11:12:16 | 25 | relied upon to find a substantial portion of the responsive |

| | |
|---|---|
| 11:12:20 | 1 |
| 11:12:26 | 2 |
| 11:12:30 | 3 |
| 11:12:32 | 4 |
| 11:12:34 | 5 |
| 11:12:36 | 6 |
| 11:12:36 | 7 |
| 11:12:38 | 8 |
| 11:12:42 | 9 |
| 11:12:42 | 10 |
| 11:12:46 | 11 |
| 11:12:50 | 12 |
| 11:12:56 | 13 |
| 11:12:58 | 14 |
| 11:13:00 | 15 |
| 11:13:04 | 16 |
| 11:13:08 | 17 |
| 11:13:12 | 18 |
| 11:13:12 | 19 |
| 11:13:16 | 20 |
| 11:13:16 | 21 |
| 11:13:16 | 22 |
| 11:13:22 | 23 |
| 11:13:26 | 24 |
| 11:13:30 | 25 |

documents.  So why don't you look at line 20 and 21 of page
243, which says, "My conclusions are first that it cannot be
relied upon to find a substantial portion of responsive
documents."

Does that remind you that that was your first
conclusion?

A.  Yes, that was my wording.

Q.  And you gave several reasons for this conclusion, right?

A.  Yes, I did.

Q.  And the first reason you gave was that the process of
developing queries by Georgia-Pacific was done without having
collected all the sources of responsive material, right?  That
was the first reason you gave, wasn't it?

A.  Well, let's look at the wording there.

Q.  Turn to page 244, lines 5 to 8, where you said, The first
is that the process of developing their queries was done
without having collected all of the sources of responsive
material.

So I have exactly quoted what your first reason was,
correct?

A.  That's correct.

Q.  Now, in giving that first reason, you asserted that there
are substantial sources of potentially responsive material
that are not associated with particular key custodians, right?

A.  That was my understanding from the testimony of Mr.

11:13:34   1   Hanners, who said there are often materials in an enterprise

11:13:38   2   which are not associated with particular custodians.

11:13:40   3   Q.  So that is what you said at the hearing, right?

11:13:42   4   A.  That's correct.

11:13:42   5   Q.  You said that one of the reasons for your criticism of

11:13:46   6   Georgia-Pacific's method was that there are substantial

11:13:52   7   sources of potentially responsive material that are not

11:13:54   8   associated with particular key custodians.  You said that,

11:13:54   9   right?

11:14:00   10   A.  That is my understanding from Mr. Hanners is that is a

11:14:04   11   possibility.

11:14:04   12   Q.  Right.

11:14:04   13         And you don't know that yourself, do you?  You are

11:14:06   14   completely relying on Mr. Hanners for that point, aren't you?

11:14:08   15   A.  Yes, I am.

11:14:08   16   Q.  And as you sit here today, you don't have the ability, do

11:14:12   17   you, to name a single data source that Georgia-Pacific didn't

11:14:16   18   collect that you feel it should have collected, right?

11:14:18   19   A.  That's correct.

11:14:20   20   Q.  You just don't know, do you?

11:14:20   21   A.  I do not know.

11:14:22   22   Q.  And in terms of Dr. Hanners, he didn't identify a specific

11:14:32   23   data source that Georgia-Pacific didn't collect that it should

11:14:34   24   have, did he?

11:14:34   25   A.  Mr. Hanners?

11:14:36   1   Q.  Mr. Hanners.

11:14:38   2   A.  I would have to go back and look at his testimony if he

11:14:40   3   described any particular computer systems.

11:14:44   4   Q.  Well, you are relying on Mr. Hanners for this point,

11:14:46   5   right?  You came here to court and said that Georgia-Pacific

11:14:52   6   hadn't done enough collection of documents.

11:14:54   7        Do you or do you not know what Mr. Hanners said about

11:14:58   8   that topic with respect to Georgia-Pacific?

11:15:00   9        MR. MOGIN:  Objection.  We are mischaracterizing the

11:15:02  10   prior testimony.

11:15:04  11        THE COURT:  Well, wait.

11:15:06  12        MR. NEUWIRTH:  I can clear this up.  I can clear this

11:15:08  13   up.

11:15:10  14        THE COURT:  I don't understand what Mr. Mogin's

11:15:14  15   objection is, though.  What's your objection?

11:15:16  16        MR. MOGIN:  Well, Dr. Lewis has testified that he

11:15:18  17   doesn't have an opinion on collection.  In fact, when

11:15:24  18   Mr. Hanners was testifying about collection, what did we have

11:15:28  19   over from this side of the aisle?  We had nothing but pop-ups

11:15:32  20   and objections.

11:15:32  21        Are we going to talk about collection in this

11:15:34  22   hearing?  Is that going to be part of it?

11:15:36  23        THE COURT:  No, I --

11:15:36  24        MR. MOGIN:  Is my witness, who said he wasn't here to

11:15:40  25   talk about collection, now going to be cross-examined about

11:15:42  1  collection?

11:15:42  2       THE COURT:  I don't think that's what Mr. Neuwirth is

11:15:46  3  doing.

11:15:46  4       MR. NEUWIRTH:  Absolutely not.

11:15:48  5       THE COURT:  He is basing from the last hearing --

11:15:50  6  Mr. Neuwirth didn't get a chance to cross-examine Dr. Lewis at

11:15:54  7  the last hearing.  And Dr. Lewis very specifically, I have

11:15:58  8  asterisked all over the place in mine, he has two opinions on

11:16:04  9  why you can't be trusted.  He is asking him about opinion

11:16:08 10  number one where he got that opinion and what he knows about

11:16:10 11  it.  Does he know anything else independently about it, I

11:16:14 12  assume.

11:16:16 13       MR. NEUWIRTH:  Correct.

11:16:16 14       MR. MOGIN:  If he wants to spend his time on this,

11:16:18 15  okay, your Honor.

11:16:18 16       THE COURT:  Well, sure.

11:16:20 17  BY MR. NEUWIRTH:

11:16:20 18  Q.  It's true, isn't it, that the first reason you gave for

11:16:22 19  criticizing Georgia-Pacific's method was to say that the

11:16:28 20  process of developing queries was done without having

11:16:30 21  collected all the sources of responsive material, right?

11:16:34 22  A.  Right.

11:16:34 23  Q.  And your sole basis for that was your reliance on

11:16:38 24  Mr. Hanners, wasn't it?

11:16:40 25  A.  Well, of course, I have personal experience in large

11:16:46   1   enterprises and know that it's possible for materials not to

11:16:50   2   be associated with particular custodians.  But my -- I am

11:16:56   3   marginally relying on Mr. Hanners that this is possible in

11:16:58   4   this case.

11:16:58   5   Q.  Largely or completely?  Are you changing your testimony

11:17:02   6   from what you said on the first day of this hearing?

11:17:04   7   A.  I am saying in the context of this case that there is the

11:17:06   8   possibility there are materials which are not associated with

11:17:10   9   a custodian, I am relying on Mr. Hanners completely.

11:17:14   10   Q.  Correct.  And what did Mr. Hanners say Georgia-Pacific had

11:17:16   11   failed to do?

11:17:16   12   A.  Well, we would have to look at Mr. Hanners' testimony.

11:17:18   13   Q.  So you came to court and expressed that opinion, but you

11:17:22   14   don't remember what Mr. Hanners said, right?

11:17:24   15            MR. MOGIN:  Objection.

11:17:24   16            THE COURT:  He can ask if he remembers what he said.

11:17:28   17   Your objection is overruled.  Okay?

11:17:30   18            THE WITNESS:  At this point, I do not remember what

11:17:34   19   Mr. Hanners' words were.

11:17:34   20   BY MR. NEUWIRTH:

11:17:34   21   Q.  So let me refresh your recollection.  I have Mr. Hanners'

11:17:38   22   report in front of me, and I will just give you examples of

11:17:40   23   what Mr. Hanners said.

11:17:42   24            One of the things he said is that there is a failure

11:17:48   25   of Georgia-Pacific to have included any former employees in

| | | |
|---|---|---|
| 11:18:00 | 1 | its group of custodians.  He said, it's very unusual to find a |
| 11:18:02 | 2 | group of custodians that consists solely of current employees |
| 11:18:04 | 3 | and does not contain a single former employee. |
| 11:18:06 | 4 | Do you remember that he said that? |
| 11:18:06 | 5 | A.  I would need to look at the testimony to be sure of the |
| 11:18:10 | 6 | exact wording. |
| 11:18:12 | 7 | MR. NEUWIRTH:  May I show it to him, your Honor? |
| 11:18:12 | 8 | THE COURT:  Okay.  But I think the record should be |
| 11:18:16 | 9 | clear here.  When you're saying "his testimony," isn't that |
| 11:18:20 | 10 | his report?  I mean, just so we're clear -- |
| 11:18:26 | 11 | MR. NEUWIRTH:  Mr. Hanners' report. |
| 11:18:28 | 12 | THE COURT:  Just so we clarify, when you say |
| 11:18:30 | 13 | "testimony," most people use that that's what he testified in |
| 11:18:34 | 14 | court, and I don't remember what the heck he said. |
| 11:18:36 | 15 | MR. NEUWIRTH:  You are absolutely correct.  I am now |
| 11:18:38 | 16 | holding Mr. Hanners' report that was submitted -- |
| 11:18:42 | 17 | THE COURT:  So this is from the report, Dr. Lewis. |
| 11:18:44 | 18 | MR. NEUWIRTH:  Thank you. |
| 11:18:44 | 19 | THE WITNESS:  All right. |
| 11:18:46 | 20 | MR. NEUWIRTH:  If I may approach the witness, your |
| 11:18:48 | 21 | Honor? |
| 11:18:48 | 22 | THE COURT:  Sure.  You may. |
| 11:18:48 | 23 | BY MR. NEUWIRTH: |
| 11:18:50 | 24 | Q.  It says right here, start with, Therefore. |
| 11:18:52 | 25 | A.  Okay.  So which exhibit is this? |

| | |
|---|---|
| 11:18:58 | 1 |
| 11:18:58 | 2 |
| 11:19:04 | 3 |
| 11:19:08 | 4 |
| 11:19:10 | 5 |
| 11:19:14 | 6 |
| 11:19:16 | 7 |
| 11:19:20 | 8 |
| 11:19:22 | 9 |
| 11:19:24 | 10 |
| 11:19:24 | 11 |
| 11:19:30 | 12 |
| 11:19:36 | 13 |
| 11:19:40 | 14 |
| 11:19:44 | 15 |
| 11:19:48 | 16 |
| 11:19:52 | 17 |
| 11:19:52 | 18 |
| 11:19:56 | 19 |
| 11:19:56 | 20 |
| 11:20:02 | 21 |
| 11:20:06 | 22 |
| 11:20:12 | 23 |
| 11:20:16 | 24 |
| 11:20:20 | 25 |

Q.  That is Mr. Hanners' report.

A.  Okay.  All right.  So I have this starting at page 6 --
oh, I see.  You have kind of -- right.  So this is the cover
page.

     So, therefore, it is very unusual that the final
group of custodians consists solely of current employees and
does not contain a single former employee.

     Is this the thing you wanted me to read?

Q.  Right.  That's what it says, doesn't it?

A.  Yes, it does.

Q.  Now, in your preparation for giving your opinion that
Georgia-Pacific had failed to -- in your words, failed to have
collected all the sources of responsive material, did you
undertake in any way to look at the custodians, the list of
custodians that Georgia-Pacific had provided to plaintiffs
that Georgia-Pacific said it was going to be collecting
documents from?

A.  I believe I did see a list of the names.  I didn't look in
detail at it.

Q.  And do you recall looking at a letter that Britt Miller,
who is here in the courtroom today, sent to Mr. Mogin and
Mr. Freed on August 11th, 2011, that was included as Exhibit 2
to the February 6th submission to this court the defendants
made?  That was in the record before this hearing.  Did you
look at that letter?

| | | |
|---|---|---|
| 11:20:22 | 1 | A.  I would have to look at a copy of that again to refresh my |
| 11:20:24 | 2 | memory. |
| 11:20:24 | 3 | Q.  And did you, in preparing for the hearing, recognize that |
| 11:20:30 | 4 | of the custodians that were listed, four of them were |
| 11:20:34 | 5 | expressly identified as former employees of Georgia-Pacific? |
| 11:20:38 | 6 | A.  I don't recall that fact. |
| 11:20:40 | 7 | Q.  Now, you also assert that -- well, in making your |
| 11:20:54 | 8 | assertion, did you consider that Georgia-Pacific, in fact, |
| 11:20:56 | 9 | collected ESI that was not associated with particular |
| 11:21:00 | 10 | custodians? |
| 11:21:00 | 11 | A.  Is there a question there? |
| 11:21:06 | 12 | Q.  Yes.  Did you consider that in your rendering your opinion |
| 11:21:10 | 13 | that your first concern with Georgia-Pacific's process was |
| 11:21:12 | 14 | that it didn't collect the proper set of responsive documents, |
| 11:21:16 | 15 | potentially responsive documents? |
| 11:21:18 | 16 | A.  My opinion was based on Mr. Hanners' testimony that not |
| 11:21:24 | 17 | all sources of potentially responsive material had been |
| 11:21:26 | 18 | collected. |
| 11:21:28 | 19 | Q.  Okay.  So you have nothing to say beyond Mr. Hanners, |
| 11:21:30 | 20 | right, on that topic? |
| 11:21:34 | 21 | A.  Only based on my experience that there are sources that |
| 11:21:36 | 22 | are not associated with custodians. |
| 11:21:38 | 23 | Q.  In fact, you have made no effort yourself in rendering |
| 11:21:42 | 24 | this first point to really understand or evaluate exactly what |
| 11:21:46 | 25 | it was that Georgia-Pacific identified as the set of materials |

| | | |
|---|---|---|
| 11:21:50 | 1 | from which it was going to do its searches? |
| 11:21:54 | 2 | A.  Could you repeat the question? |
| 11:21:56 | 3 | Q.  You haven't -- as you sit here today, you don't know the |
| 11:22:02 | 4 | full set of materials that Georgia-Pacific has collected for |
| 11:22:06 | 5 | purposes of finding responsive materials in this case, right? |
| 11:22:08 | 6 | A.  That's correct. |
| 11:22:10 | 7 | Q.  Now, the second reason you gave for saying that |
| 11:22:14 | 8 | Georgia-Pacific's methodology can't be relied on to find a |
| 11:22:18 | 9 | substantial portion of the responsive documents was that |
| 11:22:22 | 10 | Georgia-Pacific developed the search term queries on a sample |
| 11:22:26 | 11 | set of five arbitrarily selected custodians, right? |
| 11:22:30 | 12 | A.  On a set of five arbitrarily collected custodians. |
| 11:22:36 | 13 | Q.  Correct.  You said your criticism was that |
| 11:22:40 | 14 | Georgia-Pacific's sample set included five arbitrarily |
| 11:22:44 | 15 | selected custodians, right? |
| 11:22:46 | 16 | A.  No, I don't believe I used the word -- |
| 11:22:46 | 17 | Q.  244, line 19 to 20:  "The second reason is that |
| 11:22:52 | 18 | Georgia-Pacific did the development of their queries on a set |
| 11:22:56 | 19 | of five arbitrarily selected custodians." |
| 11:23:00 | 20 | Does that refresh your recollection of what you said |
| 11:23:02 | 21 | at the last hearing? |
| 11:23:02 | 22 | A.  Oh, absolutely.  What I was saying is I did not use the |
| 11:23:06 | 23 | word "sample" in that sentence. |
| 11:23:06 | 24 | Q.  Okay.  Now, you know, right, that this case concerns an |
| 11:23:16 | 25 | alleged conspiracy to restrict output and fix prices for |

| | |
|---|---|
| 11:23:20 | 1 |
| 11:23:22 | 2 |
| 11:23:22 | 3 |
| 11:23:24 | 4 |
| 11:23:28 | 5 |

11:23:20  1  container work, correct?

11:23:22  2  A.  Yes.

11:23:22  3  Q.  And you also know that the plaintiffs are alleging that by

11:23:24  4  raising prices for container board, the defendants were able

11:23:28  5  to raise prices for boxes as well, right?

11:23:32  6  A.  That's my understanding.

11:23:34  7  Q.  So I take it in concluding that the Georgia-Pacific

11:23:38  8  custodians were arbitrarily selected, you have considered

11:23:42  9  carefully who those custodians were, right?

11:23:44  10  A.  No.

11:23:46  11  Q.  So you don't know who they were?

11:23:52  12  A.  It doesn't matter.

11:23:52  13  Q.  Oh, so your view is whoever Georgia-Pacific picked as a

11:23:58  14  custodian for the sample set, it would be arbitrary?

11:24:02  15  A.  There were, I believe, somewhere between 14 and 16

11:24:06  16  custodians who have been identified at that point.  There was

11:24:08  17  a selection of four of them plus one person who was not a

11:24:12  18  custodian who was believed to have responsive information, and

11:24:16  19  I believe that any choice of four of that set of custodians

11:24:20  20  and a choice of one person who is not believed to have

11:24:24  21  responsive information would be inappropriate.

11:24:26  22  Q.  Right.  So, now, you've said you don't know, but I can

11:24:30  23  represent to you, that one of the four custodians that was

11:24:32  24  picked for this set for testing was the senior executive who

11:24:38  25  heads GP's container board and box businesses.  Was that an

| 11:24:42 | 1 | arbitrary choice? |
| 11:24:44 | 2 | A.  Any selection of four of the custodians that are known |
| 11:24:50 | 3 | from the larger set is arbitrary from the standpoint of |
| 11:24:54 | 4 | producing a useful sample for statistical purposes. |
| 11:24:58 | 5 | Q.  Right.  So in your view, picking the executive who heads |
| 11:25:00 | 6 | the container board and box business, picking the former |
| 11:25:04 | 7 | director of trades and purchasing, picking the director of |
| 11:25:08 | 8 | planning and operations for the container board business, and |
| 11:25:12 | 9 | picking the director of planning analysis with supervisory |
| 11:25:16 | 10 | responsibility for any decisions about when to reduce or |
| 11:25:18 | 11 | increase output, your view is that all of that are just |
| 11:25:24 | 12 | arbitrary choices, right?  Those are your words, aren't they? |
| 11:25:26 | 13 | A.  From a statistical standpoint, yes, those are arbitrary |
| 11:25:30 | 14 | choices. |
| 11:25:30 | 15 | Q.  In fact, you can't name a single person at Georgia-Pacific |
| 11:25:36 | 16 | who would have been a better choice for the sample set, can |
| 11:25:40 | 17 | you? |
| 11:25:40 | 18 | A.  It's not an issue of choosing particular people who are |
| 11:25:44 | 19 | better.  It's an issue of having samples that are |
| 11:25:46 | 20 | representative of the population of documents to be searched. |
| 11:25:50 | 21 | Q.  So your real point, your real point, isn't it, that |
| 11:25:54 | 22 | custodians shouldn't have been used at all; that instead, a |
| 11:25:58 | 23 | random sample should have been selected from the entire corpus |
| 11:26:04 | 24 | of the ESI from the relevant business, right? |
| 11:26:08 | 25 | A.  I am not saying that you select a sample from all the |

11:26:12  1  documents in the enterprise information systems.  I am saying
11:26:14  2  you select a sample from all of the documents that have been
11:26:20  3  identified as being appropriate to search for responsive
11:26:24  4  documents.
11:26:24  5  Q.  And so you're saying that rather than use custodians for
11:26:28  6  your sample set, from whatever is the broad set of ESIs that
11:26:32  7  you have collected for the case, what you call the corpus,
11:26:36  8  from there, you should take a random sample from across that
11:26:40  9  set.  That's your point, right?
11:26:42  10  A.  Right.  The point is that you need a sample which is
11:26:44  11  representative of the body -- the entire body of material
11:26:46  12  that's going to be searched for responsive information.
11:26:48  13  Q.  And, therefore, you are saying, aren't you, that you
11:26:52  14  shouldn't use custodians to create your sample set, but that
11:26:56  15  rather, what you should do is from the body of ESI that you
11:27:00  16  have collected, select a random sample from across the entire
11:27:06  17  body of ESI?  That is what you are saying, correct?
11:27:08  18  A.  I am saying you should take a random sample from the
11:27:12  19  entire body of ESI.  There are sampling methods, such as
11:27:18  20  stratified sampling, which could make use of the fact that you
11:27:20  21  have additional information about custodians, but, again, that
11:27:24  22  would need to be done in a fashion that the sample was
11:27:26  23  representative of the entire collection to be searched.
11:27:28  24  Q.  Again, you are not changing your testimony from the first
11:27:32  25  hearing, are you, on page 247 at lines 16 to 19, where you

11:27:36    1    said, "Well, the first thing would be to identify the entire

11:27:40    2    universe of documents to which the queries are going to be

11:27:44    3    applied and then you would draw, for instance, a simple random

11:27:48    4    sample from that universe of documents"?

11:27:50    5        That is what you are saying, right, that that should

11:27:52    6    be done instead of creating a sample set and using custodians,

11:27:56    7    right?

11:27:56    8    A.  I'm not clear what you're saying about using the

11:28:00    9    custodians in the sample set.

11:28:02    10   Q.  Well, you have said that creating a sample set, as

11:28:06    11   Georgia-Pacific did, based on custodian files, you call that

11:28:12    12   arbitrary?

11:28:12    13   A.  Oh, certainly, choosing --

11:28:14    14   Q.  You testified instead, you should, "Identify the entire

11:28:18    15   universe of documents to which the queries are going to be

11:28:20    16   applied, and then you would draw, for instance, a simple

11:28:24    17   random sample from that universe of documents."

11:28:26    18       That's what you said should be done instead of what

11:28:30    19   Georgia-Pacific did, right?

11:28:30    20   A.  Right.  So I certainly said that drawing your sample only

11:28:34    21   from a subset of the custodians and leaving other custodians

11:28:38    22   out is not going to give you an appropriate statistical

11:28:42    23   estimate.

11:28:42    24   Q.  You didn't talk about custodians.  You said, Identify the

11:28:46    25   entire universe of documents to which the queries are going to

| | | |
|---|---|---|
| 11:28:50 | 1 | be applied, didn't you? |
| 11:28:50 | 2 | A. Right. |
| 11:28:50 | 3 | Q. That's what you said? |
| 11:28:52 | 4 | A. Yes, I did. |
| 11:28:52 | 5 | Q. Now, what have you done to investigate the size of the ESI |
| 11:28:58 | 6 | corpus for Georgia-Pacific's container board business? |
| 11:29:02 | 7 | A. I haven't looked into that. |
| 11:29:04 | 8 | Q. Right. |
| 11:29:04 | 9 | Now, prior to today's hearing, did you have an |
| 11:29:08 | 10 | opportunity to review the affidavit of Mr. Clancy from |
| 11:29:10 | 11 | Georgia-Pacific? |
| 11:29:10 | 12 | A. I believe I looked at that briefly, but I would need to |
| 11:29:20 | 13 | refresh my memory -- |
| 11:29:20 | 14 | THE COURT: Can you tell me, is that a 30(b)(6)? |
| 11:29:24 | 15 | Tell me which bucket Mr. Clancy belongs in. |
| 11:29:28 | 16 | MR. NEUWIRTH: This affidavit was submitted to your |
| 11:29:30 | 17 | Honor in the set of materials that Ms. Miller sent this past |
| 11:29:34 | 18 | Friday when you asked us to provide any exhibits that we may |
| 11:29:38 | 19 | wish to introduce at the hearing. |
| 11:29:38 | 20 | THE COURT: Okay. Who is he -- can you tell us who |
| 11:29:42 | 21 | Mr. Clancy is? |
| 11:29:44 | 22 | MR. NEUWIRTH: Yes. Mr. Clancy is the vice president |
| 11:29:46 | 23 | of information technology, or I.T., at Georgia-Pacific. And |
| 11:29:50 | 24 | he has personal knowledge of the matters stated in his |
| 11:29:56 | 25 | affidavit, and I have an extra copy. |

| | | |
|---|---|---|
| 11:29:58 | 1 | THE COURT:  Mr. Mogin is standing up. |
| 11:30:00 | 2 | MR. NEUWIRTH:  I am not surprised. |
| 11:30:00 | 3 | THE COURT:  What do you say, Mr. Mogin? |
| 11:30:02 | 4 | MR. MOGIN:  Well, the reason counsel isn't surprised |
| 11:30:04 | 5 | is because he knows how completely inappropriate this is. |
| 11:30:06 | 6 | Georgia-Pacific had its chance, they have their witnesses. |
| 11:30:10 | 7 | And now after those witnesses have testified to come forward |
| 11:30:12 | 8 | with an affidavit, to rely on the affidavit for the truth of |
| 11:30:16 | 9 | the matter in it, when I can't cross-examine the witness, and |
| 11:30:20 | 10 | now he's asking questions that assume not just the truth but |
| 11:30:26 | 11 | assume facts that haven't been admitted into evidence of this |
| 11:30:30 | 12 | witness. |
| 11:30:32 | 13 | MR. NEUWIRTH:  In all fairness, your Honor -- |
| 11:30:34 | 14 | MR. MOGIN:  Where are we with respect to evidence? |
| 11:30:36 | 15 | MR. NEUWIRTH:  In all fairness, your Honor, we heard |
| 11:30:38 | 16 | for the first time at the last hearing Mr. Lewis' opinion that |
| 11:30:42 | 17 | this should be done based on the entire corpus of documents. |
| 11:30:46 | 18 | We just heard him testify about it, it was in the transcript, |
| 11:30:48 | 19 | and so in the context of providing material for this hearing, |
| 11:30:50 | 20 | we thought it was important to put into the record what that |
| 11:30:52 | 21 | corpus involved. |
| 11:30:54 | 22 | MR. MOGIN:  More evidence -- more hearsay, your |
| 11:30:58 | 23 | Honor.  More evidence that can't be tested, no |
| 11:31:02 | 24 | cross-examination. |
| 11:31:16 | 25 | THE COURT:  What document?  I have possible |

| | | |
|---|---|---|
| 11:31:18 | 1 | additional exhibits.  Can I see this? |
| 11:31:22 | 2 | MR. NEUWIRTH:  I believe it may be the last one. |
| 11:31:34 | 3 | MS. MILLER:  It's 21. |
| 11:31:36 | 4 | MR. NEUWIRTH:  It's 21.  Ms. Miller has reminded me. |
| 11:31:50 | 5 | THE COURT:  Have you read this? |
| 11:31:50 | 6 | MR. MOGIN:  I have. |
| 11:31:54 | 7 | MR. NEUWIRTH:  There can't be anything objectionable. |
| 11:31:56 | 8 | And, in fact, this is a cross of an expert who has expressed |
| 11:32:00 | 9 | an opinion.  He has now said that he never even figured out |
| 11:32:04 | 10 | what this information was.  We are providing that, and I'd |
| 11:32:06 | 11 | like to ask him some questions about it based on the opinion |
| 11:32:08 | 12 | that he offered at the last hearing. |
| 11:32:28 | 13 | THE COURT:  Well, do you agree that he could ask a |
| 11:32:32 | 14 | hypothetical question of an expert? |
| 11:32:36 | 15 | MR. MOGIN:  Of course. |
| 11:32:36 | 16 | THE COURT:  Of course.  So if Mr. Neuwirth were to |
| 11:32:40 | 17 | say, Hypothetically, if I were to tell you hypothetically that |
| 11:32:46 | 18 | Georgia-Pacific had da de da de da de da, how does that fit |
| 11:32:50 | 19 | into looking over the entire system?  I think that's what he |
| 11:32:54 | 20 | is saying.  And I read it for the first time. |
| 11:32:56 | 21 | So if he asks it hypothetically, do you still have an |
| 11:33:04 | 22 | objection? |
| 11:33:04 | 23 | MR. MOGIN:  Assuming it's properly asked as a |
| 11:33:06 | 24 | hypothetical, no. |
| 11:33:06 | 25 | THE COURT:  Can you ask it as a hypothetical?  Just |

| | | |
|---|---|---|
| 11:33:08 | 1 | put your facts in a hypothetical -- |
| 11:33:10 | 2 | MR. NEUWIRTH:  Sure. |
| 11:33:10 | 3 | THE COURT:  -- because I think that's what you are |
| 11:33:12 | 4 | asking. |
| 11:33:16 | 5 | BY MR. NEUWIRTH: |
| 11:33:18 | 6 | Q.  Now, you testified that you didn't investigate what was |
| 11:33:20 | 7 | the size of the ESI's corpus for Georgia-Pacific's container |
| 11:33:24 | 8 | board business.  So now I'd like you to consider the |
| 11:33:28 | 9 | possibility that Georgia-Pacific has 7.6 terabytes, not |
| 11:33:36 | 10 | gigabytes, terabytes of data just in the shared drives for its |
| 11:33:40 | 11 | container board business as well as in headquarters' files |
| 11:33:46 | 12 | related to container board and packaging.  Can you consider |
| 11:33:50 | 13 | that? |
| 11:33:50 | 14 | THE COURT:  Do you have an objection to that? |
| 11:33:52 | 15 | MR. MOGIN:  Your Honor, that's not a hypothetical the |
| 11:33:54 | 16 | way he phrased it. |
| 11:33:54 | 17 | THE COURT:  Well, I think that is a hypothetical. |
| 11:33:58 | 18 | Suppose they do -- there has to be a good-faith basis for |
| 11:34:00 | 19 | asking a hypothetical question.  Okay?  I think there is a |
| 11:34:04 | 20 | good-faith basis for asking that question, which then gets |
| 11:34:10 | 21 | some -- because it's not going to the truth of the matter |
| 11:34:18 | 22 | asserted that there are 7 million.  I mean, it's not the exact |
| 11:34:22 | 23 | amount that's relevant here.  I don't think that's where |
| 11:34:26 | 24 | Mr. Neuwirth is going, but I don't know. |
| 11:34:28 | 25 | MR. NEUWIRTH:  You are correct, your Honor. |

| | | |
|---|---|---|
| 11:34:30 | 1 | THE COURT: So this is foundation for asking a |
| 11:34:32 | 2 | question. Objection overruled. |
| 11:34:34 | 3 | BY MR. NEUWIRTH: |
| 11:34:34 | 4 | Q. So I'd like you to assume that Georgia-Pacific has 7.6 |
| 11:34:40 | 5 | terabytes of data just in the shared drives for its container |
| 11:34:46 | 6 | board business and in its headquarters' files related to the |
| 11:34:52 | 7 | container board and box business. Okay? Just 7.6 terabytes. |
| 11:34:52 | 8 | A. Okay. |
| 11:34:56 | 9 | Q. Please assume that number. |
| 11:34:58 | 10 | A. All right. |
| 11:34:58 | 11 | Q. Now, a terabyte is 1,000 gigabytes, correct? |
| 11:35:02 | 12 | A. Correct. |
| 11:35:02 | 13 | Q. And as you went over this morning with Mr. McKeown, there |
| 11:35:10 | 14 | is a cost, isn't there, for uploading data onto a platform for |
| 11:35:14 | 15 | the purpose of applying the type of protocol that you have |
| 11:35:18 | 16 | proposed in this case? And you said, right, that different |
| 11:35:22 | 17 | vendors have different prices for doing that, correct? |
| 11:35:24 | 18 | A. Correct. |
| 11:35:24 | 19 | Q. And why don't you assume for now that that price is in the |
| 11:35:32 | 20 | range of, let's say, 400 to $800 per gigabyte. Okay? And why |
| 11:35:38 | 21 | don't we take the low end of that range, and let's say $400 |
| 11:35:44 | 22 | per gigabyte. |
| 11:35:48 | 23 | So if it's 7.6 terabytes, right, that's 7600 |
| 11:35:56 | 24 | gigabytes, correct? |
| 11:35:58 | 25 | A. Um-hmm. |

| | | |
|---|---|---|
| 11:36:00 | 1 | Q.  And multiplying 7600 times 400 yields over 3 million, |
| 11:36:06 | 2 | doesn't it? |
| 11:36:06 | 3 | A.  Yes. |
| 11:36:08 | 4 | Q.  So if you assume that just what I have described, just the |
| 11:36:16 | 5 | shared servers for the container board business and the |
| 11:36:18 | 6 | headquarters' files for container board and boxes, if we just |
| 11:36:22 | 7 | assume that that limited universe is the corpus of ESI that |
| 11:36:26 | 8 | would be uploaded for purposes of this exercise that you have |
| 11:36:30 | 9 | outlined in your proposal, and if you assume that the cost is |
| 11:36:36 | 10 | $400 per gigabyte to do that, just to put this material on |
| 11:36:40 | 11 | line to run your program would cost over $3 million, right? |
| 11:36:44 | 12 | A.  If all 7.6 terabytes of material are reasonable places to |
| 11:36:50 | 13 | look for responsive documents. |
| 11:36:52 | 14 | Q.  Right.  And, again, you don't know what's the reasonable |
| 11:36:56 | 15 | place to look; that's something that you still want everybody |
| 11:36:58 | 16 | else to figure out for implementing your protocol, right? |
| 11:37:02 | 17 | A.  I have not been asked to do an analysis of what the |
| 11:37:08 | 18 | reasonable places to look for responsive documents are. |
| 11:37:10 | 19 | Q.  Now, your proposal here, as we have gone over it, is not |
| 11:37:16 | 20 | to use the files of custodians for doing the testing, but |
| 11:37:20 | 21 | instead, as you put it, to take a random sample from across |
| 11:37:26 | 22 | the entire corpus of the ESI.  We went over that several |
| 11:37:30 | 23 | times. |
| 11:37:30 | 24 | Now, having expressed that opinion here, let me ask |
| 11:37:34 | 25 | you if you agree with the following statement:  One useful |

| | | |
|---|---|---|
| 11:37:40 | 1 | approach is to initiate the search and retrieval process by |
| 11:37:48 | 2 | focusing on the information collected from a few of the |
| 11:37:50 | 3 | custodians who were at the center of the facts at issue in the |
| 11:37:56 | 4 | litigation or investigation. |
| 11:37:58 | 5 | Do you agree with that or not? |
| 11:38:00 | 6 | A.  What are you saying that those documents would be used |
| 11:38:04 | 7 | for? |
| 11:38:04 | 8 | Q.  For initiating the search and retrieval process.  It says, |
| 11:38:10 | 9 | One useful approach to initiate the search and retrieval |
| 11:38:12 | 10 | process is by focusing on the information collected from a few |
| 11:38:18 | 11 | of the custodians who were at the center of the facts at issue |
| 11:38:22 | 12 | in the litigation or investigation. |
| 11:38:24 | 13 | Do you agree with that or not? |
| 11:38:24 | 14 | A.  I'm sorry.  It says, It says?  What says that? |
| 11:38:28 | 15 | Q.  You want to know what that quote is from before you tell |
| 11:38:32 | 16 | me whether you agree with it? |
| 11:38:32 | 17 | A.  No, I don't need to know where the quote is from.  I am |
| 11:38:36 | 18 | pretty sure about that. |
| 11:38:38 | 19 | Q.  Do you agree with it or not? |
| 11:38:38 | 20 | A.  I agree that can be a reasonable strategy for obtaining |
| 11:38:42 | 21 | the documents to be given the training.  I would not agree |
| 11:38:48 | 22 | that's a reasonable strategy to produce a sample that would |
| 11:38:50 | 23 | let you make a valid estimate of effectiveness across the |
| 11:38:54 | 24 | entire population. |
| 11:38:54 | 25 | Q.  Do you agree with the following statement:  Focusing on |

| | | |
|---|---|---|
| 11:39:00 | 1 | information collected from the core custodians which has a |
| 11:39:06 | 2 | higher likelihood of being relevant will help the team |
| 11:39:10 | 3 | efficiently develop its understanding of the issues and |
| 11:39:14 | 4 | language used by the custodians, thus allowing them to more |
| 11:39:18 | 5 | efficiently develop and implement an appropriate search and |
| 11:39:22 | 6 | retrieval process? |
| 11:39:24 | 7 | Do you agree with that? |
| 11:39:24 | 8 | A.  Again, that clearly -- that information is useful for |
| 11:39:32 | 9 | lawyers to help develop an understanding of the case, and |
| 11:39:34 | 10 | those documents would arguably be particularly useful for |
| 11:39:38 | 11 | initializing the training in the supervised learning system. |
| 11:39:42 | 12 | Q.  And this says, To develop and implement an appropriate |
| 11:39:44 | 13 | search and retrieval process, doesn't it?  That's what the |
| 11:39:48 | 14 | quote says, right, that I just read to you? |
| 11:39:50 | 15 | It doesn't limit it to these initial steps.  It says |
| 11:39:54 | 16 | that doing this would allow them to more efficiently develop |
| 11:39:56 | 17 | and implement an appropriate search and retrieval process, |
| 11:40:00 | 18 | right? |
| 11:40:00 | 19 | A.  That I -- you are quoting a document which I have not |
| 11:40:04 | 20 | seen. |
| 11:40:06 | 21 | Q.  Really?  Let me tell you what that document is.  You're |
| 11:40:08 | 22 | familiar with the Sedona Conference, aren't you? |
| 11:40:12 | 23 | A.  Yes. |
| 11:40:12 | 24 | Q.  In fact, you were just there recently? |
| 11:40:14 | 25 | A.  I was there -- |

11:40:14　1　Q.　And I take it you are familiar with the materials that the

11:40:18　2　experts in this case have submitted to the court, correct,

11:40:22　3　because you said you reviewed those materials, right?

11:40:24　4　A.　Yes.

11:40:24　5　Q.　Well, what I just read to you is from a document that's in

11:40:28　6　the record called Sedona Conference Best Practices Commentary

11:40:34　7　on the Use of Search and Information Retrieval Methods in

11:40:38　8　E-discovery at page 214.

11:40:44　9　　　　　And, in fact, in your own published writings, you

11:40:46　10　have cited to that article, haven't you?

11:40:48　11　A.　I believe I have.

11:40:50　12　Q.　Now, the third reason you gave for saying that

11:40:56　13　Georgia-Pacific's methodology can't be relied upon to find a

11:41:00　14　substantial portion of the relevant documents was your view

11:41:02　15　that spam filters were applied here, right?

11:41:08　16　　　　　There is no trick.　That's at page 245, line 19.

11:41:24　17　A.　Okay.

11:41:24　18　Q.　You said at that point that the third reason for your

11:41:28　19　criticism of the GP methodology, the Georgia-Pacific

11:41:32　20　methodology, was that spam filters were applied here, correct?

11:41:34　21　A.　What I said was the third was the question about the spam

11:41:38　22　filtering, the junk filtering that was brought up earlier.

11:41:40　23　That filtering on the string Expedia.com may have removed

11:41:44　24　responsive documents.　Now, I was a bit unclear from

11:41:48　25　Mr. Brown's testimony at what point that was no longer done.

| | | |
|---|---|---|
| 11:41:52 | 1 | In the November 22nd document, it was still described as part |
| 11:41:54 | 2 | of the process. |
| 11:41:54 | 3 | Q.  Now, in fact, you were present for Mr. Brown's testimony, |
| 11:41:58 | 4 | weren't you? |
| 11:41:58 | 5 | A.  Yes, I was. |
| 11:42:00 | 6 | Q.  And Mr. Brown testified quite unambiguously, didn't he, |
| 11:42:04 | 7 | that, in fact, spam filters ended up not being used here at |
| 11:42:08 | 8 | all, correct? |
| 11:42:08 | 9 | A.  Let's look at his testimony. |
| 11:42:10 | 10 | Q.  176, line 22, through 177, line 5. |
| 11:42:10 | 11 | THE COURT:  Page 17- -- |
| 11:42:10 | 12 | BY MR. NEUWIRTH: |
| 11:42:30 | 13 | Q.  176, line 22, through page 177, line 5.  Page 177, line 5. |
| 11:42:32 | 14 | He says, And standard in every e-discovery matter that I have |
| 11:42:36 | 15 | ever worked in specifically deduplication and demisting, which |
| 11:42:40 | 16 | I believe those terms were discussed this morning, it is not |
| 11:42:42 | 17 | uncommon to apply a domain, a set of domain name filters that |
| 11:42:48 | 18 | are historically regarded in the industry as being, for lack |
| 11:42:50 | 19 | of a better term, junk emails or junk domain names, such as, |
| 11:42:56 | 20 | you know, ESPN.com, WSJ, the WallStreetJournal.com, maybe |
| 11:43:00 | 21 | Expedia, Orbitz, that kind of thing.  But in this particular |
| 11:43:04 | 22 | case, that was not done.  We have looked at that possibility, |
| 11:43:08 | 23 | and we just didn't find that many, many domain names of that |
| 11:43:14 | 24 | nature that it warranted the exercise of suppressing them. |
| 11:43:18 | 25 | Now, what was ambiguous about that testimony, in your |

| | | |
|---|---|---|
| 11:43:22 | 1 | view? |
| 11:43:22 | 2 | A.  Well, I wasn't clear whether I should rely on the |
| 11:43:26 | 3 | testimony or on the November 22nd letter. |
| 11:43:28 | 4 | Q.  And the November 22nd letter, in your view, said that this |
| 11:43:30 | 5 | was done? |
| 11:43:30 | 6 | A.  Well, let's look at it, but I believe in the November 22nd |
| 11:43:36 | 7 | letter, it talks about Expedia.com. |
| 11:43:40 | 8 | Q.  Okay.  This is already marked as Plaintiffs' Exhibit 4. |
| 11:43:58 | 9 | MR. NEUWIRTH:  May I approach, your Honor? |
| 11:43:58 | 10 | THE COURT:  Yes. |
| 11:44:00 | 11 | From the last hearing? |
| 11:44:02 | 12 | MR. NEUWIRTH:  From the last hearing. |
| 11:44:02 | 13 | THE COURT:  I have that. |
| 11:44:04 | 14 | BY MR. NEUWIRTH: |
| 11:44:38 | 15 | Q.  Now, I take it you're referring on page 3 to the first |
| 11:44:42 | 16 | bullet point, which says that, The data set was reduced by |
| 11:44:46 | 17 | culling clear, nonresponsive junk materials by domain names, |
| 11:44:54 | 18 | such as WSJ.com, ESPN.com, Expedia.com, et cetera, right? |
| 11:44:56 | 19 | A.  Yes. |
| 11:44:58 | 20 | Q.  In fact, Mr. Brown was asked about this expressly by |
| 11:45:02 | 21 | Mr. Mogin, wasn't he, in the text that follows in the |
| 11:45:06 | 22 | transcript where we just looked, right? |
| 11:45:08 | 23 | A.  Where are you pointing? |
| 11:45:14 | 24 | Q.  Page 177 and 178.  He testified, correct, that that |
| 11:45:18 | 25 | statement in the letter was inaccurate and that, in fact, none |

11:45:22  1  of this domain name -- none of this domain culling was done,

11:45:30  2  right?

11:45:30  3  A.  Could you point me to exactly what lines you mean there?

11:45:36  4  Q.  Sure.

11:45:38  5      "QUESTION:  Mr. Mogin, so if you would, please refer to

11:45:40  6  plaintiffs' -- I'm sorry -- the November 22nd letter.

11:45:42  7      "ANSWER:  Thank you.  I would appreciate it if you

11:45:46  8  would refer to letters by their dates.  Yes.

11:45:58  9  A.  Shall I continue reading it for you?

11:46:00  10     "QUESTION:  On page 5 there, I believe you will see a

11:46:02  11  reference to confidence level.

11:46:04  12     "ANSWER:  Yes.

11:46:04  13     "QUESTION:  And did you author that sentence?

11:46:06  14     "ANSWER:  I did not author this sentence, no.

11:46:08  15     "QUESTION:  Just the sentence?

11:46:12  16     "ANSWER:  I provided information that was undoubtedly

11:46:14  17  used in the construction of the sentence, yes."

11:46:18  18      How far should I read?

11:46:20  19  Q.  So having read the testimony, you don't think anything

11:46:22  20  that Mr. Brown said in his testimony was unclear, right?

11:46:26  21  A.  Yes, I mean, if we have the -- well, I don't know -- I am

11:46:32  22  not making any statement about everything Mr. Brown said in

11:46:34  23  his testimony, but he does say that they did not bother to use

11:46:42  24  domain names.

11:46:42  25  Q.  Now, the next reason you gave, the fourth reason you gave

11:46:46  1  saying that Georgia-Pacific's methodology can't be relied on

11:46:50  2  to find a substantial portion of the relevant documents, is

11:46:52  3  that during the iterative process for developing the search

11:46:56  4  terms, the reviewers determining the effectiveness of the

11:47:00  5  search terms knew whether or not the documents they were

11:47:02  6  looking at had been hit by the search terms, right?

11:47:08  7       This is the point you were talking about earlier,

11:47:10  8  right?  Correct?

11:47:10  9  A.  Yes.

11:47:10  10  Q.  And you said that that creates a bias on the part of the

11:47:14  11  reviewers, correct, because --

11:47:14  12  A.  Yes.

11:47:16  13  Q.  -- they know whether a document was in the null set or

11:47:18  14  not, correct?

11:47:18  15  A.  Yes.

11:47:18  16  Q.  Now, your proposed method that you went over in detail

11:47:22  17  with Mr. McKeown this morning calls, doesn't it, for a small

11:47:28  18  group of attorneys familiar with the details of the case to

11:47:34  19  assess the responsiveness of a sample set of documents in

11:47:36  20  order to train the software to identify responsive and

11:47:40  21  nonresponsive documents, correct?

11:47:44  22       You have a small group of attorneys that take a pile

11:47:46  23  of documents, they choose which ones are responsive and which

11:47:48  24  ones aren't, they give that information to the software, the

11:47:54  25  software then learns from that, the software then makes

| Time | Line | Text |
|---|---|---|
| 11:47:56 | 1 | choices, and then in your proposal, without knowing what the |
| 11:48:02 | 2 | software chose, that set of attorneys then looks at the set of |
| 11:48:06 | 3 | documents that was identified by the software and tells the |
| 11:48:12 | 4 | software which ones are responsive and which ones aren't. And |
| 11:48:14 | 5 | that process continues until, as you said, the software has |
| 11:48:18 | 6 | learned well enough how to distinguish responsive from |
| 11:48:24 | 7 | nonresponsive documents, correct? |
| 11:48:24 | 8 | A. Could you restate the question? |
| 11:48:28 | 9 | Q. What didn't you understand about that question? |
| 11:48:30 | 10 | A. Well, it was a very long description of a process and |
| 11:48:36 | 11 | it's -- |
| 11:48:36 | 12 | Q. The process that you proposed in this case, isn't it? |
| 11:48:38 | 13 | A. It's the plaintiffs' process, so -- |
| 11:48:42 | 14 | Q. Right. And your process calls on using a software that |
| 11:48:46 | 15 | has to be taught what is responsive and what isn't, correct? |
| 11:48:52 | 16 | A. That is correct. |
| 11:48:52 | 17 | Q. And the way it is taught is that what you have described |
| 11:49:00 | 18 | as a small group of attorneys that are familiar with the |
| 11:49:02 | 19 | details of the case look at a sample set of documents, |
| 11:49:08 | 20 | determine which ones they believe are responsive and which |
| 11:49:12 | 21 | ones they believe are not, and then those choices are told to |
| 11:49:18 | 22 | the software so that the software can begin to learn from |
| 11:49:22 | 23 | those choices, correct? |
| 11:49:24 | 24 | A. That is plaintiffs' process. I want to clarify that in |
| 11:49:32 | 25 | plaintiffs' process, I am not responsible for |

11:49:36  1   characterizations of the personnel of whether they're

11:49:40  2   attorneys or paralegals or reviewers or whatnot.

11:49:44  3   Q.  You said this morning that they have to be people who

11:49:46  4   are --

11:49:48  5   A.  They must be knowledgeable.

11:49:48  6   Q.  -- familiar -- right, they must be knowledgeable about the

11:49:52  7   case?

11:49:52  8   A.  Knowledgeable about the responsiveness of the documents.

11:49:54  9   Q.  So now you are saying it could be a knowledgeable

11:49:56  10  paralegal, right?

11:49:56  11  A.  I'm saying that from my standpoint as an information

11:50:00  12  retrieval scientist, what's important is the people be able to

11:50:02  13  make accurate determinations of responsiveness.  I am not

11:50:04  14  expressing opinions about the qualifications of particular

11:50:08  15  types of legal personnel.

11:50:10  16  Q.  Right.  So this group of people --

11:50:10  17  A.  Right.

11:50:10  18  Q.  -- within this general framework of being okay that you

11:50:14  19  have just described, a small number of them are going to look

11:50:18  20  at a set of documents, decide which ones they consider

11:50:22  21  responsive and which ones they don't, and give that

11:50:24  22  information to the software, correct?

11:50:26  23  A.  Right.  So that is for producing the training documents

11:50:30  24  for training the software.

11:50:32  25  Q.  For training the software.

| | | |
|---|---|---|
| 11:50:34 | 1 | And the next thing that happens is the software takes |
| 11:50:36 | 2 | a set of documents, and it decides based on the information it |
| 11:50:40 | 3 | has, which it considers responsive and which it considers |
| 11:50:44 | 4 | nonresponsive.  That output is then given back to the same set |
| 11:50:48 | 5 | of attorneys, and in your proposal, they don't know what |
| 11:50:50 | 6 | choices the software made, but those attorneys then pick from |
| 11:50:54 | 7 | that set which they consider responsive, which they do not, |
| 11:50:58 | 8 | and that information is then given to the software again to |
| 11:51:02 | 9 | learn from those choices, and in that iterative process, the |
| 11:51:08 | 10 | feedback from the attorneys, your proposal is to have the |
| 11:51:10 | 11 | software learn what is a responsive document and what isn't, |
| 11:51:14 | 12 | correct? |
| 11:51:14 | 13 | A.  No.  You're confusing two issues. |
| 11:51:18 | 14 | The labeling of the data for training is done by |
| 11:51:22 | 15 | attorneys or whoever is able to make responsible -- able to |
| 11:51:26 | 16 | make accurate judgments of responsiveness.  There is also data |
| 11:51:32 | 17 | which is a sample set to be used for evaluating the system |
| 11:51:36 | 18 | that also needs to be labeled by people who can make accurate |
| 11:51:40 | 19 | judgments of responsiveness. |
| 11:51:42 | 20 | Q.  Right. |
| 11:51:42 | 21 | A.  You are mixing the two issues together.  You implied that |
| 11:51:46 | 22 | the attorneys who are reviewing documents for training the |
| 11:51:50 | 23 | system don't know what the system's decisions were on there. |
| 11:51:56 | 24 | I didn't specify that they couldn't know that for the training |
| 11:51:58 | 25 | data.  I specified that it's important that people who are |

| | | |
|---|---|---|
| 11:52:02 | 1 | labeling the sample to be used to evaluate the system do not |
| 11:52:04 | 2 | know what the system's behavior on that sample are, the test |
| 11:52:08 | 3 | set. |
| 11:52:08 | 4 | Q.  Do you agree -- you agree that there will be a small group |
| 11:52:12 | 5 | of attorneys that will decide which will label documents |
| 11:52:16 | 6 | responsive or not responsive and give that information to the |
| 11:52:22 | 7 | software so it can learn from those decisions how to identify |
| 11:52:26 | 8 | a responsive and a nonresponsive document, correct? |
| 11:52:30 | 9 | A.  I am not characterizing the type of personnel. |
| 11:52:32 | 10 | Q.  You agree that there are going to be a small number of |
| 11:52:34 | 11 | human beings that do that, correct? |
| 11:52:36 | 12 | A.  That seems likely that it will be a small number, yes. |
| 11:52:40 | 13 | Q.  Right.  Because that's what you recommend, isn't it? |
| 11:52:42 | 14 | A.  Yes, indeed. |
| 11:52:42 | 15 | Q.  Now, that happens at the start of the process in one of |
| 11:52:50 | 16 | your early steps, correct? |
| 11:52:52 | 17 | A.  So if we look at the protocol -- |
| 11:52:56 | 18 | Q.  I am just asking if it happens in one of your early steps. |
| 11:52:58 | 19 | You know that the answer to that is yes, don't you? |
| 11:53:02 | 20 | A.  Yes, yes. |
| 11:53:02 | 21 | Q.  So the answer to that is yes.  Let's just focus on the |
| 11:53:06 | 22 | questions being asked. |
| 11:53:08 | 23 | If the answer to that is yes, you agree, don't you, |
| 11:53:12 | 24 | that whatever reasons those human beings may have for making |
| 11:53:20 | 25 | the choices they make will be taught to the software, correct? |

| | | |
|---|---|---|
| 11:53:26 | 1 | Whatever decisions those human beings make are what the |
| 11:53:30 | 2 | software will learn, right? |
| 11:53:30 | 3 | A.  The software learns from the example documents that have |
| 11:53:40 | 4 | been assessed as responsive or nonresponsive.  The software is |
| 11:53:44 | 5 | obviously not aware of the reasons that are in people's heads. |
| 11:53:46 | 6 | Q.  But whatever biases those human beings may bring to their |
| 11:53:50 | 7 | selection process will be taught to the software, correct? |
| 11:53:54 | 8 | A.  That's a complicated issue in the science of machine |
| 11:54:02 | 9 | learning.  The -- |
| 11:54:04 | 10 | Q.  Whatever biases they have will be taught, won't it, to the |
| 11:54:08 | 11 | software? |
| 11:54:08 | 12 | MR. MOGIN:  Your Honor, is it possible that the |
| 11:54:10 | 13 | witness could be allowed to finish his answers before we move |
| 11:54:12 | 14 | to the next question? |
| 11:54:14 | 15 | THE COURT:  You're asking me to rewrite all of |
| 11:54:22 | 16 | cross-examination. |
| 11:54:24 | 17 | MR. MOGIN:  No, I am really not.  I am just asking |
| 11:54:26 | 18 | for a simple courtesy here. |
| 11:54:28 | 19 | THE COURT:  Well, okay. |
| 11:54:32 | 20 | Carolyn, would you read back the question for me? |
| 11:54:34 | 21 | (Record read.) |
| 11:54:46 | 22 | THE COURT:  So let's let Dr. Lewis answer that. |
| 11:54:50 | 23 | MR. NEUWIRTH:  Yes. |
| 11:54:50 | 24 | THE WITNESS:  So I am a little unclear when you're |
| 11:54:54 | 25 | using the word "biases" if you are talking about biased in the |

| | |
|---|---|
| 11:55:02 | 1 |
| 11:55:06 | 2 |
| 11:55:10 | 3 |
| 11:55:10 | 4 |
| 11:55:12 | 5 |
| 11:55:18 | 6 |
| 11:55:22 | 7 |
| 11:55:26 | 8 |
| 11:55:26 | 9 |
| 11:55:32 | 10 |
| 11:55:38 | 11 |
| 11:55:40 | 12 |
| 11:55:44 | 13 |
| 11:55:50 | 14 |
| 11:55:50 | 15 |
| 11:55:52 | 16 |
| 11:55:56 | 17 |
| 11:55:56 | 18 |
| 11:55:58 | 19 |
| 11:56:02 | 20 |
| 11:56:08 | 21 |
| 11:56:08 | 22 |
| 11:56:14 | 23 |
| 11:56:16 | 24 |
| 11:56:16 | 25 |

1 cyclical sense or if you're talking about some tendency doing

2 the review to make responsiveness decisions one way or the

3 other.

4 BY MR. NEUWIRTH:

5 Q.  Well, if the people doing the review have a belief, if

6 those human beings have a belief, that certain types of

7 documents shouldn't be included as responsive, that would be

8 taught to the software, correct?

9 A.  Yes, to the extent to which the software is able to

10 accurately model those decisions, it will attempt to do so.

11 Q.  You have a question of whether the software can accurately

12 model those decisions?  I thought the whole point of your

13 process here was to use the software because it can accurately

14 model those decisions?

15 A.  The point is the supervised learning software is -- in my

16 opinion, will likely give you the best chance of modeling

17 those decisions.

18 Q.  But you don't know if it can?

19 A.  I mean, it's very easy to pose tech classification

20 problems that no computer could solve.  I mean, I would love

21 to pose the tech classification system that told me the

22 newspaper stories about companies whose stock is going to go

23 up next week, but no computer is going to be able to do that

24 very well.

25 Q.  Well, in this case, this case is about whether the

| | |
|---|---|
| 11:56:18 | 1 |
| 11:56:22 | 2 |
| 11:56:28 | 3 |
| 11:56:30 | 4 |
| 11:56:36 | 5 |
| 11:56:40 | 6 |
| 11:56:46 | 7 |
| 11:56:48 | 8 |
| 11:56:52 | 9 |
| 11:56:58 | 10 |
| 11:57:00 | 11 |
| 11:57:10 | 12 |
| 11:57:10 | 13 |
| 11:57:12 | 14 |
| 11:57:14 | 15 |
| 11:57:18 | 16 |
| 11:57:24 | 17 |
| 11:57:26 | 18 |
| 11:57:34 | 19 |
| 11:57:38 | 20 |
| 11:57:42 | 21 |
| 11:57:42 | 22 |
| 11:57:42 | 23 |
| 11:57:46 | 24 |
| 11:57:48 | 25 |

1 defendants allegedly purposely reduced the output of their
2 production as a means to raise prices and did it through
3 collusion.  If one of the reviewing -- if one of the reviewers
4 in this initial set that's used to teach the software decides
5 that certain types of communications should not be included as
6 responsive, the software will learn it, won't it, not to
7 include those types of communications, right?
8 A.  Right.  So if all of the reviewers who are labeling
9 documents for training are consistent on that point, certain
10 types of communications are not considered responsive, the
11 system will, you know, attempt to build a model that will
12 reproduce that.
13       Now, if they have some insight into the
14 communication, for instance, that is not in the text or the
15 metadata, obviously the system can't -- can only look at
16 what's there.  But it's going to do its best job to reproduce
17 the distinctions that the reviewers are making.
18 Q.  But you don't disagree, do you, that in your method, you
19 propose to have a small number of people be involved in giving
20 this guidance to the software for it to learn, right?  You
21 said that.
22 A.  Yes.
23 Q.  You said a small number of senior attorneys.  Today, you
24 are saying it might be a paralegal.  But you said a small
25 number of people.  That's in your proposal, isn't it?

11:57:50 1 A. Plaintiffs' proposal refers to concepts like attorneys and

11:57:58 2 paralegals and whatnot. I am not responsible for the

11:58:00 3 characterization of particular types of personnel.

11:58:04 4 Q. So you're changing your testimony again?

11:58:06 5 A. No, I am not.

11:58:06 6 Q. Please look at the last day of testimony, page 258,

11:58:10 7 line 22.

11:58:16 8 Now, you were shown Plaintiffs' Exhibit 10, which

11:58:18 9 Mr. McKeown went over with you this morning, which is

11:58:22 10 plaintiffs' proposed CBA search process for each defendant.

11:58:24 11 And you were asked by Mr. Mogin, the plaintiffs' attorney:

11:58:28 12 "QUESTION: Dr. Lewis, is this the proposed process

11:58:30 13 that you have put together?

11:58:32 14 "ANSWER: Yes. I aided the plaintiffs in the

11:58:36 15 development of this, and in particular, I am responsible for

11:58:40 16 the technical aspects of this proposal."

11:58:44 17 So is this your proposal, or now are you just going

11:58:46 18 to call it the plaintiffs' proposal?

11:58:48 19 A. It is the plaintiffs' proposal. I am responsible for the

11:58:52 20 technical aspects of this proposal. I am not responsible for

11:58:56 21 the characterization of the particular types of legal

11:59:00 22 personnel who carry out the proposal.

11:59:02 23 Q. So this idea of having a small number of attorneys who are

11:59:08 24 familiar with the case teach the software what is responsive

11:59:12 25 and not responsive, is that something the plaintiffs came up

| | | |
|---|---|---|
| 11:59:14 | 1 | with, or is that something you came up with? |
| 11:59:16 | 2 | A.  I would, in my professional opinion, say that it should be |
| 11:59:22 | 3 | people who understand the case and can make accurate |
| 11:59:26 | 4 | determinations of responsiveness. |
| 11:59:28 | 5 | Q.  I didn't ask you what your opinion is.  I asked you who |
| 11:59:32 | 6 | came up with this idea that's in here?  Are you going to |
| 11:59:34 | 7 | attribute that to the plaintiffs, or are you going to take |
| 11:59:36 | 8 | responsibility for it? |
| 11:59:36 | 9 | A.  I am responsible for the characterization of the people as |
| 11:59:42 | 10 | being able to make accurate responsiveness judgments.  I am |
| 11:59:46 | 11 | responsible, in my opinion, that it is easier with a small |
| 11:59:52 | 12 | number of personnel to achieve consistency in response to |
| 11:59:56 | 13 | those judgments.  I am not expressing an opinion about what |
| 12:00:00 | 14 | their status in the legal world is. |
| 12:00:02 | 15 | Q.  Right.  And that's my point, what you just said.  The |
| 12:00:04 | 16 | smaller the number of people, as you just said, the more |
| 12:00:08 | 17 | likely there is to be consistency in their judgments, right? |
| 12:00:12 | 18 | You just said that, right? |
| 12:00:12 | 19 | A.  It is easier to achieve consistency among a smaller group. |
| 12:00:16 | 20 | Q.  Right.  So if there is a bias about excluding certain |
| 12:00:20 | 21 | documents that that small group of people has, that will be |
| 12:00:26 | 22 | taught to the software, won't it?  Because you just said there |
| 12:00:28 | 23 | is consistency, and the whole point here is to have the |
| 12:00:30 | 24 | software learn from what those people teach it, right?  Your |
| 12:00:36 | 25 | method depends on that happening, doesn't it? |

| | | |
|---|---|---|
| 12:00:38 | 1 | A. Could you restate the question? |
| 12:00:40 | 2 | Q. You really didn't understand that? |
| 12:00:42 | 3 | A. Well, there was, I believe, at least two separate |
| 12:00:44 | 4 | questions in there. |
| 12:00:46 | 5 | Q. You agree, don't you, that the smaller the number of |
| 12:00:54 | 6 | reviewers, the more likely you are to have consistency in the |
| 12:00:58 | 7 | decisions they make about what to tell the software as |
| 12:01:02 | 8 | responsive and not a responsive document, right? You said |
| 12:01:06 | 9 | that several times today, right? |
| 12:01:08 | 10 | A. It's easier to achieve consistency with a small team of |
| 12:01:12 | 11 | people. Obviously, there's factors such as the training the |
| 12:01:14 | 12 | people have and the processes they go through to compare |
| 12:01:18 | 13 | answers, for instance, and things like that. |
| 12:01:20 | 14 | Q. There are all sorts of variables, we understand. There |
| 12:01:22 | 15 | are all sorts of variables that can determine how effective |
| 12:01:24 | 16 | this training of the software is going to be. |
| 12:01:26 | 17 | A. Right. |
| 12:01:26 | 18 | Q. And none of those variables or what to do about that is |
| 12:01:32 | 19 | detailed in your proposal, right? But that has to be dealt |
| 12:01:34 | 20 | with, right? |
| 12:01:36 | 21 | A. There are process details that have to be dealt with in |
| 12:01:40 | 22 | carrying out any information retrieval exercise. |
| 12:01:42 | 23 | Q. Including yours? |
| 12:01:42 | 24 | A. Including mine. The process is important in any exercise. |
| 12:01:46 | 25 | Q. So now we know you have a -- a couple of reviewers, a |

12:01:52    1   small number of reviewers who are going to teach the software

12:01:54    2   what it has to consider responsive or nonresponsive, whatever

12:02:00    3   variables have to be dealt with presumably would be dealt with

12:02:02    4   one way or another, and now don't you agree that whatever

12:02:06    5   views those small number of people bring to the process and

12:02:10    6   what they consider to be responsive or not responsive will be

12:02:14    7   taught to the software?

12:02:14    8   A.   Right.   Whatever responsiveness assessments they make of

12:02:20    9   the training data are what the software is going to attempt to

12:02:24   10   model.

12:02:24   11   Q.   And so if they have a bias -- for example, Mr. Mogin says

12:02:28   12   that the case should cover a certain topic but these reviewers

12:02:32   13   don't agree with that -- they can teach the software not to

12:02:34   14   pick that up, right?

12:02:36   15   A.   So now you're talking about a situation where you have

12:02:42   16   multiple reviewers but they're systematically disagreeing?

12:02:46   17   Q.   Well, you said that a small number of reviewers are the

12:02:48   18   most likely to agree with each other to be consistent?

12:02:52   19   A.   I said it's easiest to achieve consistency in training a

12:02:56   20   small set of reviewers.

12:02:58   21   Q.   Right.

12:03:00   22        Now, when you criticized what Georgia-Pacific did

12:03:06   23   here, you said this morning that you were concerned that if

12:03:12   24   reviewers like Mr. Brown knew that the documents he was

12:03:18   25   looking at came from the null set, he would presumably be

12:03:24  1  biased towards finding that those documents were not

12:03:28  2  responsive?  That's the bias you're worried about, right?

12:03:32  3  A.  That is a concern that one has to have whenever you are

12:03:36  4  evaluating the sample that's going to be used to -- whenever

12:03:42  5  you're -- excuse me -- assessing a sample is going to be used

12:03:46  6  to evaluate a system, it is a potential source of bias if the

12:03:50  7  person doing that assessment knows what the behavior of the

12:03:52  8  system was.

12:03:54  9  Q.  Now, isn't it equally possible that knowing documents come

12:03:58  10  from the null set, Mr. Brown and the others who were involved

12:04:04  11  could be biased towards finding that documents are responsive?

12:04:08  12  Isn't that an equal possibility, that they could bend over

12:04:10  13  backwards to say something is responsive rather than, in your

12:04:14  14  view, to say it's not?  Aren't those both equal possibilities?

12:04:16  15  A.  Yes, they are.

12:04:18  16  Q.  And, in fact, didn't Mr. Brown testify here that what he

12:04:24  17  did was when he looked in the null set to see what was

12:04:28  18  responsive, he bent over backwards to include even documents

12:04:34  19  that he considered marginally responsive?  Meaning even when

12:04:36  20  he wasn't asserting they were responsive, he was counting them

12:04:40  21  as responsive.  He said that, didn't he?

12:04:42  22  A.  Yes, he did, and that was a form of bias.

12:04:44  23  Q.  Right.  But that's a bias that helps the plaintiffs

12:04:48  24  because it means he's finding more things to be responsive

12:04:50  25  rather than less, which is the bias you say you're worried

| | | |
|---|---|---|
| 12:04:54 | 1 | about? |
| 12:04:54 | 2 | A.  My goal is not to help one side or the other.  My goal is |
| 12:04:58 | 3 | to try to design a process that would yield a statistically |
| 12:05:02 | 4 | accurate estimate of the recall of the system.  I am not here |
| 12:05:04 | 5 | for one side or the other to win. |
| 12:05:06 | 6 | Q.  And, in any event, you're not an expert on psychology, |
| 12:05:14 | 7 | right? |
| 12:05:14 | 8 | A.  No, I would not characterize myself as an expert on |
| 12:05:18 | 9 | psychology.  I have some exposure to psychological principles |
| 12:05:22 | 10 | that are relevant to the design of information retrieval |
| 12:05:26 | 11 | systems. |
| 12:05:26 | 12 | Q.  Right.  But you don't consider yourself an expert on which |
| 12:05:30 | 13 | bias would apply in looking at a null set, the bias to bend |
| 12:05:32 | 14 | over backwards to include things or the bias that you say |
| 12:05:36 | 15 | might be there to exclude things?  You have no professional |
| 12:05:38 | 16 | way to know which is more likely, do you? |
| 12:05:40 | 17 | A.  I have only the common sense -- you know, sense of that |
| 12:05:46 | 18 | people, if they are aware that a system that they are involved |
| 12:05:52 | 19 | in using is going to be evaluated in some fashion, I have only |
| 12:05:56 | 20 | the common sense that they may have an interest in that system |
| 12:06:04 | 21 | looking good. |
| 12:06:04 | 22 | Q.  Right.  And then you also have -- apart from what you call |
| 12:06:06 | 23 | your common sense general knowledge, you also have the |
| 12:06:10 | 24 | specific testimony here from Mr. Brown that he and his team |
| 12:06:12 | 25 | bent over backwards to include documents that they even |

| | | |
|---|---|---|
| 12:06:16 | 1 | considered marginally responsive, right? |
| 12:06:18 | 2 | A.  I am aware that he has, in fact, testified to that. |
| 12:06:28 | 3 | Q.  Now, you also said that the review of documents in the |
| 12:06:30 | 4 | null set has to be consistent with the review of documents |
| 12:06:34 | 5 | that's done for the actual production, right?  You want the |
| 12:06:36 | 6 | review of the sample to be based on the same principles as the |
| 12:06:40 | 7 | review that is done for production, right? |
| 12:06:44 | 8 | A.  Could you point to the particular place you are talking |
| 12:06:48 | 9 | about there? |
| 12:06:50 | 10 | Q.  250, line 18 to 21. |
| 12:07:02 | 11 |         THE COURT:  This is Dr. Lewis' testimony -- |
| 12:07:04 | 12 |         MR. NEUWIRTH:  Dr. Lewis' testimony in his direct by |
| 12:07:06 | 13 | Mr. Mogin. |
| 12:07:06 | 14 |         THE COURT:  250, what did you say? |
| 12:07:08 | 15 |         MR. NEUWIRTH:  250; page 250, let's start at line 10. |
| 12:07:22 | 16 | BY MR. NEUWIRTH: |
| 12:07:22 | 17 | Q.  This is Dr. Lewis:  My understanding of Mr. Brown's |
| 12:07:24 | 18 | testimony of the description in the November 22nd letter, to |
| 12:07:26 | 19 | the extent that I could make out what they are saying in that |
| 12:07:28 | 20 | letter, is that their validation process is focused on |
| 12:07:32 | 21 | determining how many responsive documents are in the null set. |
| 12:07:36 | 22 | And that can be a reasonable way to evaluate an information |
| 12:07:40 | 23 | retrieval system.  There are some caveats that are important, |
| 12:07:44 | 24 | however. |
| 12:07:46 | 25 |         Question by Mr. Mogin: |

| | | |
|---|---|---|
| 12:07:46 | 1 | "QUESTION:  What are the caveats? |
| 12:07:48 | 2 | "ANSWER:  Number one, well, the caveats are that it's |
| 12:07:54 | 3 | extremely important if you do that that the review of the |
| 12:07:58 | 4 | documents in the null set be consistent with the review of the |
| 12:08:00 | 5 | documents that's done for production." |
| 12:08:04 | 6 | That's exactly what you said at the last hearing, |
| 12:08:06 | 7 | right? |
| 12:08:06 | 8 | A.  That's correct. |
| 12:08:06 | 9 | Q.  You are not changing that testimony today? |
| 12:08:08 | 10 | A.  No, I am not. |
| 12:08:10 | 11 | Q.  And then the reason you said that that was not done here, |
| 12:08:16 | 12 | right, was you said that Counsel on Call only had three people |
| 12:08:20 | 13 | reviewing the test set while a larger group of 15 or more were |
| 12:08:26 | 14 | reviewing the documents from the entire corpus hit by the |
| 12:08:30 | 15 | search terms to determine their responsiveness for production |
| 12:08:34 | 16 | to plaintiffs, right? |
| 12:08:34 | 17 | A.  Well, I would prefer to read what my actual testimony was |
| 12:08:40 | 18 | here. |
| 12:08:40 | 19 | Q.  Okay.  Go to line 23.  You were asked:  Did |
| 12:08:44 | 20 | Georgia-Pacific follow the process; namely, that the review of |
| 12:08:48 | 21 | documents in the null set be consistent with the review of |
| 12:08:50 | 22 | documents that's done for production?  Mr. Mogin asked you if |
| 12:08:54 | 23 | Georgia-Pacific followed that process. |
| 12:08:56 | 24 | And your answer was, Well, I am not aware of who did |
| 12:08:58 | 25 | the review for production.  Well, no, there is a whole -- |

12:09:02  1  that's right, because Mr. Brown testified to that.  Mr. Brown

12:09:04  2  and two of his colleagues reviewed the null sets or samples,

12:09:10  3  excuse me, samples from the null set, and I think there was a

12:09:12  4  team of I think 15 lawyers or something that were doing the

12:09:16  5  review for production.  So what would be critical is to, you

12:09:20  6  know, have some statistical guarantee that the two sets of

12:09:24  7  reviewers are actually making comparable decisions.  The

12:09:28  8  serious problem that could arise is that if you use a

12:09:30  9  stringent criterion for evaluating responsiveness in the null

12:09:34  10  set and then a more liberal criterion during the review and

12:09:38  11  then actually compared the quantities, you could think, well,

12:09:40  12  you found some, you know, incredibly large portion of the

12:09:42  13  documents that were out there, but that ratio would not be

12:09:46  14  correct because they were not being reviewed competently.

12:09:52  15       Do you see that?

12:09:52  16  A.  Yes.

12:09:52  17  Q.  And so if you expressed a concern, right, that because

12:09:54  18  there were three lawyers looking at the null set and 15

12:09:58  19  lawyers reviewing documents that had been hit by the search

12:10:04  20  terms to determine whether they should be produced to the

12:10:06  21  plaintiffs, you saw a potential problem of consistency, right?

12:10:10  22  A.  Yes.

12:10:14  23  Q.  Now, your proposal or what you're now sometimes calling

12:10:18  24  the plaintiffs' proposal, whoever it comes from, the proposal

12:10:20  25  that's been given to the court expressly says, doesn't it,

12:10:24 1 that the teaching to the software should be done by a small

12:10:30 2 number of people, right? And that makes sense because you

12:10:36 3 told us today that's a good way to guarantee consistency in

12:10:38 4 what's taught to the software, right?

12:10:40 5 A. Yes.

12:10:40 6 Q. Now, in a case where there's already millions of pages of

12:10:46 7 documents, just doing what the defendants have done, and there

12:10:52 8 could be tens of millions of documents added if we were

12:10:56 9 ordered to do what you and the plaintiffs or you or the

12:10:58 10 plaintiffs or whoever it is is suggesting that we do, is it

12:11:04 11 really your view that it's wrong for Georgia-Pacific to have a

12:11:10 12 team of 15 people assigned to reviewing those documents? Do

12:11:14 13 you really think they should limit that to just three people

12:11:16 14 so we can wait maybe five years to get the documents reviewed?

12:11:20 15 A. No, and I did not suggest that.

12:11:24 16 Q. Well, you said there is a problem that there were only

12:11:26 17 three people reviewing the documents in the null set as

12:11:32 18 compared to 15 who were reviewing the documents for

12:11:34 19 production. So which should happen? Should the number of

12:11:38 20 people reviewing the null set go up, or should the number of

12:11:40 21 people reviewing documents for production go down?

12:11:42 22 A. If we are using the indirect -- the so-called indirect

12:11:50 23 method -- sorry, the only thing that's important here is that

12:11:58 24 the sample that's being used to evaluate be reviewed with the

12:12:04 25 -- consistently between the two. Now, I guess there's several

12:12:08    1    things going on here, but you don't have to use -- the central

12:12:14    2    thing, which I think to answer your question, is you don't

12:12:16    3    have to use all of the data that's been reviewed for training.

12:12:22    4         So, you see, you might have a large staff of

12:12:24    5    reviewers who are producing the production set.  That doesn't

12:12:28    6    mean that all of the responsive judgments that they make have

12:12:30    7    to be fed back in training.  You could have the judgments that

12:12:34    8    are made only by a smaller group of people if that was

12:12:36    9    desirable.

12:12:38    10   Q.  So, in fact, the thing that you criticized Georgia-Pacific

12:12:40    11   for on the first day, having a small number of people review

12:12:44    12   the null set and a larger number of people review the

12:12:46    13   documents for production, actually makes perfect sense and

12:12:50    14   it's the only realistic way to get the document production

12:12:54    15   done, isn't it?

12:12:54    16   A.  What I was criticizing the Georgia-Pacific process was the

12:12:58    17   potential for inconsistent judgments in the sample that's used

12:13:04    18   to evaluate the system.

12:13:04    19   Q.  Okay.  So this line that we just read, And there was a

12:13:08    20   team of I think 15 lawyers or something that were doing the

12:13:10    21   review for production compared to what you said were Mr. Brown

12:13:14    22   and two of his colleagues reviewing the null sets, that whole

12:13:18    23   testimony you gave last time we should just throw out because

12:13:20    24   it's not critical to what you are saying, right?

12:13:22    25   A.  The testimony here was relevant to the use of a sample --

12:13:30   1   samples in evaluating the effectiveness of the Boolean queries

12:13:36   2   that Georgia-Pacific produced.

12:13:36   3   Q.  And they used three people to review the null set and 15

12:13:38   4   to review the documents for production.  So is that a problem

12:13:42   5   or is it not, the fact that they used three for one and 15 for

12:13:46   6   the other?

12:13:46   7   A.  It is a potential problem if the three people who are

12:13:50   8   reviewing a sample from the null set do not have consistent

12:13:56   9   responsiveness judgments with the 15 people.  And, in fact,

12:14:00   10   it's not clear to me how many of those 15 people were involved

12:14:02   11   in reviewing samples from the hit set.  That's not made clear.

12:14:06   12   Q.  But this problem, this hypothetical problem you are

12:14:10   13   talking about, and it is purely hypothetical, right, because

12:14:14   14   you don't know of any difference in what they do, you are just

12:14:16   15   speculating that maybe there is a difference, isn't that

12:14:18   16   hypothetical problem going to exist in any process where you

12:14:22   17   use a small number of people to do one thing and a large

12:14:26   18   number of people to do another?  It's just inevitable, isn't

12:14:30   19   it, that what you said before, that a small number of people

12:14:32   20   are more likely to be consistent than a larger group, that's

12:14:36   21   true in any process where you use different groups of people

12:14:40   22   to do different things, right?

12:14:40   23   A.  But there is no obligation to use different groups of

12:14:44   24   people to review a modest-sized random sample which is used

12:14:48   25   purely for the purpose of evaluating the system.

12:14:50   1   Q.  But you're criticizing Georgia-Pacific for using 15 people

12:14:54   2   to review documents for production to the plaintiffs?

12:14:56   3   A.  I am not criticizing that.

12:14:58   4   Q.  Okay.  You said -- we just read your testimony, and that's

12:15:00   5   why I said, Can we now throw this testimony out.  When you

12:15:04   6   were asked whether Georgia-Pacific followed the process of

12:15:06   7   having consistency between the review of the null sets and the

12:15:10   8   review of the documents for production, your answer was, I am

12:15:14   9   not aware of who did the review for production.  We will know

12:15:18   10  there is a hole that's right because Mr. Brown testified about

12:15:22   11  that.  Mr. Brown and two of his colleagues reviewed the null

12:15:24   12  sets of the samples -- excuse me, samples from the null sets,

12:15:28   13  and there was a team of I think 15 lawyers or something that

12:15:30   14  was doing the review for production.  So what would be

12:15:34   15  critical is to, you know, have some statistical guarantee that

12:15:36   16  the two sets of reviewers are actually making comparable

12:15:40   17  decisions.

12:15:40   18        Now, you talked expressly about the difference in the

12:15:44   19  numbers, and you said you want some guarantee that they're

12:15:46   20  making the same decisions.  That's not how human beings work,

12:15:52   21  but we are dealing with the real world of having to review a

12:15:56   22  very large corpus of documents and one that will be

12:16:00   23  megagigantic if you get what you're proposing here.

12:16:02   24        Don't we have to have a larger group of people

12:16:06   25  reviewing the documents for production than we do working on

12:16:08 1 the sample set or teaching the software what to do?  Or do you

12:16:08 2 not care about those practicalities and just want perfection

12:16:12 3 in the system at a statistical level?

12:16:16 4 A.  Could you ask the question again?

12:16:18 5 Q.  And what about that -- what about that don't you

12:16:20 6 understand, Dr. Lewis?

12:16:22 7 A.  It was a very long statement.

12:16:24 8 Q.  Well, you're a statistician.

12:16:26 9      MR. MOGIN:  Objection.  It was a compound question.

12:16:30 10 Can we do it that way?

12:16:30 11      THE COURT:  I agree with that.  If you want to break

12:16:36 12 it down, ask shorter questions to it, you may do that.

12:16:36 13 BY MR. NEUWIRTH:

12:16:40 14 Q.  Let me just ask one short question.

12:16:44 15      Do you agree or disagree that in the practical, real

12:16:48 16 world of document production, it makes sense to have a larger

12:16:56 17 group of people review documents for production than the

12:17:02 18 number of people that will be involved in reviewing sample

12:17:06 19 sets or teaching information to software?

12:17:10 20 A.  I agree with that.

12:17:12 21 Q.  So then the fact that Georgia-Pacific had 15 people

12:17:16 22 reviewing documents for production and only three reviewing

12:17:20 23 the null set makes perfect sense in the real world, doesn't

12:17:26 24 it?

12:17:28 25      You just said you agree it makes sense to have more?

12:17:30 1 A. I agree using a large set of people for production may, in

12:17:34 2 fact, be appropriate in large-scale cases.

12:17:36 3 What I am saying is important is that if a null set

12:17:40 4 testing approach is -- if a process is used which is drawing

12:17:46 5 samples from the null set and comparing that to the responsive

12:17:54 6 documents that are found in hit sets, it's important that

12:17:58 7 those two quantities be consistent.

12:18:00 8 Q. And you have no basis other than speculation at this point

12:18:04 9 to say that they weren't consistent, right?

12:18:06 10 A. I have only the evidence of potential sources of bias here

12:18:12 11 and the information retrieval literature on the --

12:18:16 12 Q. Right, from the literature, from the academic literature;

12:18:18 13 but you have nothing in this case that would allow you to

12:18:20 14 conclude that there was any discrepancy, right?

12:18:22 15 A. Yes, that's correct. There was no information that was

12:18:26 16 provided me on any index or consistency studies or any tests

12:18:28 17 that would have shown the degree of consistency among

12:18:32 18 reviewers. We know absolutely nothing about the consistency

12:18:36 19 of the reviewers that Georgia-Pacific used.

12:18:36 20 Q. Right.

12:18:38 21 Now, your second conclusion in criticizing the

12:18:42 22 methodology that Georgia-Pacific used was you said that

12:18:44 23 Georgia-Pacific cannot produce a statistically valid estimate

12:18:50 24 of effectiveness, right?

12:18:52 25 A. Let's look at that line.

| | | |
|---|---|---|
| 12:18:56 | 1 | Q.  252, line 6 through 10. |
| 12:19:06 | 2 | A.  Okay. |
| 12:19:06 | 3 | Q.  Quote -- this is your counsel, Mr. Mogin, or plaintiffs' |
| 12:19:14 | 4 | counsel, Mr. Mogin:  "Very good.  Now, let's go to your other |
| 12:19:18 | 5 | area of criticism, if you will, which was that the methodology |
| 12:19:22 | 6 | cannot be relied upon to produce a statistically valid |
| 12:19:26 | 7 | estimate of effectiveness." |
| 12:19:28 | 8 | Your answer:  "That's correct." |
| 12:19:30 | 9 | So that's your second criticism, right? |
| 12:19:32 | 10 | A.  That's correct. |
| 12:19:32 | 11 | Q.  Now, you have asserted, haven't you, that in order for |
| 12:19:38 | 12 | there to be value reporting, you need to have a confidence |
| 12:19:42 | 13 | level, what you went over with Mr. McKeown this morning; a |
| 12:19:48 | 14 | margin of error, which you went over with Mr. McKeown this |
| 12:19:50 | 15 | morning; and then the actual error rate, which you went over |
| 12:19:54 | 16 | with Mr. McKeown this morning, right?  Those would be three |
| 12:19:58 | 17 | things you would need to have to be able to have valid |
| 12:20:02 | 18 | reporting, right? |
| 12:20:04 | 19 | THE COURT:  What's the third? |
| 12:20:04 | 20 | MR. NEUWIRTH:  The actual error rate. |
| 12:20:10 | 21 | THE WITNESS:  Assuming that one wants to express a |
| 12:20:14 | 22 | confidence interval on error rate, the error rate is the |
| 12:20:18 | 23 | effectiveness measure that you are using, then you would need |
| 12:20:22 | 24 | your estimate of error rate, your central value, and your |
| 12:20:28 | 25 | margin of error, and your confidence level. |

BY MR. NEUWIRTH:

Q. Right. So you need what you went over with Mr. McKeown this morning. You need to know what is the percentage likelihood that this can be replicated over the overall sample, whether it's 99 percent, 95 percent, or whatever the number you're aiming for, correct?

A. And one of the components is the confidence level which expresses how likely you would be to see that result over a large number of random samples.

Q. You need your error rate, which is plus or minus 5 percent, or whatever percent you're using, right?

A. Actually, that's the margin of error.

Q. Margin of error, I'm sorry, plus or minus 5 percent margin of error, right?

And then you need the actual error rate: I found in the null set that 3 percent of the documents actually were responsive. That's your error rate, your actual error rate, right?

A. That would be the error rate within the null set.

Q. Now, Georgia-Pacific, in fact, has provided all of this information, hasn't it? It's provided the size of the null set that was tested, right? It provided that was 63,211 documents, right?

A. Could you point to the document that that's reported in?

Q. Sure. I will show you the latest version of that. Let me

| | | |
|---|---|---|
| 12:21:38 | 1 | mark as Plaintiffs' Exhibit -- I'm sorry -- Defendants' |
| 12:21:42 | 2 | Exhibit 10. |
| 12:21:46 | 3 | MR. MOGIN:  May we have a date of this version? |
| 12:21:48 | 4 | MR. NEUWIRTH:  As soon as I get to it. |
| 12:21:50 | 5 | It's the March 21st, 2012, letter to Mr. Mogin from |
| 12:21:54 | 6 | me that was discussed earlier today. |
| 12:22:00 | 7 | May I approach, your Honor? |
| 12:22:00 | 8 | THE COURT:  Yes. |
| 12:22:06 | 9 | MR. NEUWIRTH:  I have extra copies for you, your |
| 12:22:34 | 10 | Honor, if you need an extra copy. |
| 12:22:34 | 11 | May I approach, your Honor? |
| 12:22:34 | 12 | THE COURT:  Yes. |
| 12:22:36 | 13 | Was that in the big book? |
| 12:22:38 | 14 | MR. NEUWIRTH:  Yes. |
| 12:22:40 | 15 | THE COURT:  What number is the big book? |
| 12:22:44 | 16 | MS. MILLER:  I believe it's 11. |
| 12:22:44 | 17 | MR. NEUWIRTH:  Thank you, Ms. Miller. |
| 12:22:46 | 18 | THE COURT:  So this, now, is defendants' what? |
| 12:22:48 | 19 | MR. NEUWIRTH:  I marked it as Defendants' Exhibit 10, |
| 12:22:50 | 20 | but if it's easier for the court, we can just treat it as the |
| 12:22:52 | 21 | exhibit there.  Why don't we mark it as Exhibit 10 so it's in |
| 12:22:56 | 22 | the record. |
| 12:22:56 | 23 | THE COURT:  I think you should. |
| 12:23:00 | 24 | BY MR. NEUWIRTH: |
| 12:23:00 | 25 | Q.  Now, you reviewed this document before you testified |

| | | |
|---|---|---|
| 12:23:02 | 1 | today, right? |
| 12:23:02 | 2 | A.  Yes, I did. |
| 12:23:02 | 3 | Q.  So this document points out, doesn't it, at page 3 of 4, |
| 12:23:10 | 4 | that the size of the null set for final testing was 63,211 |
| 12:23:16 | 5 | documents, right? |
| 12:23:16 | 6 | A.  Where on the page are you? |
| 12:23:20 | 7 | Q.  At the carryover from page 3 to 4.  If you look at the |
| 12:23:26 | 8 | very bottom. |
| 12:23:28 | 9 | A.  Okay. |
| 12:23:28 | 10 | Q.  It says that the 83,544 documents comprising the testing |
| 12:23:34 | 11 | corpus for the October 2011 validation, 20,333 documents were |
| 12:23:40 | 12 | hit by the search terms, leaving the remaining 63,211 |
| 12:23:46 | 13 | documents as the null set? |
| 12:23:46 | 14 | A.  I see that. |
| 12:23:48 | 15 | Q.  Okay.  We also know, don't we, how the random sample from |
| 12:23:54 | 16 | this null set was created, right?  Mr. Brown testified that he |
| 12:24:02 | 17 | used the Raosoft software to create the random sample, right? |
| 12:24:08 | 18 | A.  Could we look at Mr. Brown's testimony? |
| 12:24:14 | 19 | Q.  Sure, page 180, lines 3 to 7. |
| 12:24:28 | 20 | A.  Okay. |
| 12:24:30 | 21 | Q.  Right. |
| 12:24:30 | 22 | So this was a software tool called Raosoft, right? |
| 12:24:32 | 23 | A.  I see that -- |
| 12:24:34 | 24 | Q.  So Raosoft was used to figure out the sample set size that |
| 12:24:38 | 25 | was needed, right? |

| | | |
|---|---|---|
| 12:24:40 | 1 | A.  I see that. |
| 12:24:40 | 2 | Q.  And then we had testimony from Mr. Koch from KPMG that |
| 12:24:50 | 3 | KPMG employed the randomizing function Clearwell to pull |
| 12:24:54 | 4 | random samples based on the sample size that Raosoft had |
| 12:24:56 | 5 | called for, right? |
| 12:24:58 | 6 | A.  I would have to look at Mr. Koch's testimony. |
| 12:25:00 | 7 | Q.  Okay.  Turn to page 64, line 12. |
| 12:25:06 | 8 | You were here for that testimony, right? |
| 12:25:08 | 9 | A.  Yes, I was. |
| 12:25:08 | 10 | Q.  64, line 12.  We applied and pulled the random sample |
| 12:25:16 | 11 | based on the information we were given so they would say |
| 12:25:18 | 12 | please create a random sample of this many documents and we |
| 12:25:24 | 13 | would provide that in Clearwell and then provide the results. |
| 12:25:28 | 14 | So you created the random sample? |
| 12:25:30 | 15 | "ANSWER:  Technically, we clicked the button in |
| 12:25:34 | 16 | Clearwell to create the random sample." |
| 12:25:36 | 17 | Right? |
| 12:25:36 | 18 | A.  I see that. |
| 12:25:36 | 19 | Q.  Right.  So you were there when this was described. |
| 12:25:40 | 20 | Now, we know, don't we, that the sample size of the |
| 12:25:46 | 21 | null set documents was 660 documents, right, which is what the |
| 12:25:54 | 22 | Raosoft program had said was needed to get a 99 percent |
| 12:26:00 | 23 | confidence level, right? |
| 12:26:00 | 24 | A.  Well, let's look at the testimony about -- |
| 12:26:06 | 25 | Q.  Well, let's first look at the March 21st letter on page 3. |

12:26:22  1    Mr. Brown testified that 27 -- I'm sorry.  660
12:26:28  2  documents in the sample set are referenced there.  Do you see
12:26:34  3  that in the paragraph request 1-E?
12:26:38  4  A.  Sorry.  Where are you looking again?
12:26:38  5  Q.  On page 2 of the March 21st letter.  The reference is
12:26:46  6  to --
12:26:46  7  A.  660 documents in the sample set, correct?
12:26:50  8  Q.  And, I'm sorry, page 3.  I apologize.  I apologize.
12:26:52  9  Page 3.
12:26:52  10    In request 1-J, talking about the last validation.
12:26:58  11  A.  Okay.
12:26:58  12  Q.  It refers to the 660 documents that were pulled, right?
12:27:04  13  A.  So I see down here specifically 28 documents, footnote 2,
12:27:12  14  4.2 percent of the 660 documents randomly selected to comprise
12:27:20  15  the statistically significant null set, which was based on a
12:27:20  16  99 percent confidence level with a margin of error of plus or
12:27:24  17  minus 5 percent would be determined to be arbitrarily
12:27:28  18  responsive to plaintiffs' document request.
12:27:30  19  Q.  Right.
12:27:30  20    So using the Raosoft program to determine the number
12:27:32  21  of documents that were needed to get a 99 percent confidence
12:27:36  22  level with a plus or minus 5 percent margin of error, 660
12:27:42  23  documents were pulled from the null set of 63,211 documents.
12:27:52  24  And then for your error rate of 4.2 percent, we have that from
12:27:58  25  having found 28 documents which were determined to be at least

| | | |
|---|---|---|
| 12:28:02 | 1 | arguably responsive to plaintiffs' document request, right? |
| 12:28:06 | 2 | A.  I see that. |
| 12:28:06 | 3 | Q.  So you have all the information you need here for a |
| 12:28:10 | 4 | statistical report, right?  You have the number of documents |
| 12:28:12 | 5 | that were in the null set, you have the sample set created |
| 12:28:16 | 6 | just as you described to Mr. McKeown this morning so that you |
| 12:28:20 | 7 | could have a certain confidence level here, 99 percent, with a |
| 12:28:26 | 8 | margin of error of plus or minus 5 percent, and you have the |
| 12:28:28 | 9 | result? |
| 12:28:30 | 10 | A.  Yes, in this March 21 letter, all three of those values |
| 12:28:34 | 11 | are specified. |
| 12:28:34 | 12 | Q.  Right.  And, in fact, it's true, isn't it, that a lot of |
| 12:28:40 | 13 | this information was in prior submissions to the court, wasn't |
| 12:28:42 | 14 | it, or you don't know that? |
| 12:28:46 | 15 | A.  You would have to point me to the prior submissions. |
| 12:28:48 | 16 | Q.  But do you know when you gave your testimony, when you |
| 12:28:50 | 17 | gave your testimony at the last hearing, that this method that |
| 12:28:54 | 18 | Georgia-Pacific used somehow wasn't -- let me use your exact |
| 12:29:06 | 19 | words -- that it somehow wasn't -- that it wasn't able to |
| 12:29:26 | 20 | produce a statistically valid estimate of effectiveness. |
| 12:29:30 | 21 | Had you determined how much of this information was |
| 12:29:32 | 22 | already in the record, or did you just make that assertion |
| 12:29:34 | 23 | without figuring it out? |
| 12:29:36 | 24 | A.  Oh, I looked very carefully, and I was not able to find |
| 12:29:40 | 25 | the actual central value of the confidence interval. |

12:29:42   1   Q. Even though a lot of it was in the testimony earlier that

12:29:46   2   day from Mr. Brown, right?

12:29:48   3   A. I don't recall if Mr. Brown testified to the particular

12:29:52   4   information that was admitted in the November 22nd letter.

12:29:56   5   Q. Let me ask you, are you familiar with someone named Ralph

12:30:02   6   Losey, L-o-s-e-y?

12:30:04   7   A. Yes, I am.

12:30:04   8   Q. And is he an expert in any field?

12:30:08   9   A. He is a lawyer who has considerable prominence in the area

12:30:14  10   of electronic discovery.

12:30:16  11   Q. And you noted during your testimony, didn't you, that even

12:30:26  12   with your proposed method, it's going to be important to

12:30:32  13   consult with whatever vendor is selected to figure out what

12:30:36  14   that vendor's best practices are for creating a sample set,

12:30:42  15   correct? That's what you told Mr. McKeown this morning,

12:30:46  16   right?

12:30:46  17   A. Yes.

12:30:46  18   Q. And here, Georgia-Pacific did exactly that with two

12:30:48  19   vendors, KPMG and Counsel on Call, correct?

12:30:52  20   A. Would you point me to where that was described?

12:31:02  21   Q. You were here for the first day of their testimony,

12:31:04  22   correct, and you heard about what their involvement was in the

12:31:10  23   creation of the sample set, right?

12:31:12  24   A. I would like to see where -- I mean, I did hear their

12:31:16  25   testimony, but to any particular detail, I would have to go

| | | |
|---|---|---|
| 12:31:18 | 1 | over that again. |
| 12:31:20 | 2 | Q.  Okay. |
| 12:31:20 | 3 | A.  And I also would like to stress that while one should |
| 12:31:28 | 4 | always consult with vendors about the appropriate way to use |
| 12:31:32 | 5 | their software, whether for sampling or training or any other |
| 12:31:36 | 6 | purpose, there are basic principles of statistics which need |
| 12:31:44 | 7 | to be followed in order to achieve statistically valid |
| 12:31:46 | 8 | results. |
| 12:31:46 | 9 | Q.  And what vendors follow those statistical methods at the |
| 12:31:52 | 10 | present time? |
| 12:31:52 | 11 | A.  I would have to look at -- I mean, I have not analyzed, |
| 12:32:00 | 12 | for instance, the random sampling functions in particular |
| 12:32:04 | 13 | e-discovery platforms -- |
| 12:32:04 | 14 | Q.  So as you sit here today, you couldn't even tell |
| 12:32:06 | 15 | defendants which vendors they should use for this program you |
| 12:32:10 | 16 | provided because you don't know which vendors use the |
| 12:32:14 | 17 | statistical methods that you say are important to consider, |
| 12:32:16 | 18 | right? |
| 12:32:16 | 19 | A.  The relevant aspects of vendor selection for the |
| 12:32:20 | 20 | e-discovery software that are crucial are laid out at the end |
| 12:32:26 | 21 | of the protocol -- |
| 12:32:26 | 22 | Q.  Well, you have a set of -- |
| 12:32:28 | 23 | A.  -- of plaintiffs -- |
| 12:32:28 | 24 | Q.  You have a set of ways that someone can pick a vendor, but |
| 12:32:32 | 25 | you can't tell us which vendor to use, right, because you |

12:32:36　1　don't even know a vendor that does what you are asking us to

12:32:40　2　do, do you?

12:32:40　3　A.  I have looked at the supervised learning capabilities that

12:32:44　4　have been described in the literature by several vendors, so I

12:32:48　5　do know that there are several vendors who could carry out

12:32:52　6　this process.

12:32:52　7　Q.  Yes, in literature, academic literature, promotional

12:32:56　8　literature; but you have never worked with any of these

12:32:58　9　vendors to actually do this in a case like this, have you?

12:33:02　10　A.  I have analyzed data sets that were collected during

12:33:08　11　e-discovery processes as part of algorithm development for

12:33:12　12　Kroll Ontrack.

12:33:12　13　Q.  I didn't ask what you did to develop algorithms.  I asked

12:33:16　14　whether you worked with any of these vendors to do the type of

12:33:20　15　thing that you put in this document or the plaintiffs put in

12:33:22　16　this document that you want the court to order the defendants

12:33:24　17　to do instead of what they have already done?

12:33:26　18　A.  I am not asking the court to do anything.  I am giving my

12:33:32　19　analysis of the processes.  I have not worked as a consultant

12:33:38　20　on active e-discovery matters using these technologies.

12:33:42　21　Q.  But you have been out, haven't you, as an advocate for

12:33:46　22　these technologies, right?  You have given presentations in

12:33:50　23　many forums in recent years advocating a move towards this

12:33:54　24　type of machine learning, correct?

12:33:56　25　A.  I have given a number of presentations in which I

12:34:02  1   expressed my belief that supervised learning such as rank

12:34:06  2   retrieval can bring additional efficiencies to the e-discovery

12:34:12  3   process.

12:34:12  4   Q.   That it can.  You have been an advocate for that.   And

12:34:16  5   this case, this protocol that's been put together for the

12:34:20  6   court to order the defendants to implement, this is an

12:34:24  7   opportunity to have what you have been advocating finally

12:34:28  8   required in a case, isn't it?

12:34:30  9   A.   I am always interested in people using the best possible

12:34:34  10  information retrieval technology.  I have worked for 25 years

12:34:38  11  in a variety of fields to teach and inform people about the

12:34:46  12  power of various sorts of information retrieval technology.

12:34:48  13  Q.   And notwithstanding all those speeches and articles and

12:34:52  14  academic forum and other things you've done, you can't even

12:34:58  15  tell us a vendor that does it?

12:35:00  16  A.   Is there a question there?

12:35:04  17  Q.   You can say yes or no or whatever else you want to say.

12:35:10  18  A.   Can you repeat the question?

12:35:12  19  Q.   Notwithstanding all that you have done to promote this

12:35:18  20  type of approach, notwithstanding the articles you've read and

12:35:24  21  advocacy that you've done on behalf of this approach, you

12:35:30  22  can't even tell the defendants in this case what vendor is

12:35:32  23  able to do the things that either you or the plaintiffs are

12:35:36  24  proposing in that protocol that the court is being asked to

12:35:42  25  order the defendants to implement, right?

12:35:42  1   A.  I can tell you vendors that can implement this protocol.

12:35:46  2   Q.  Oh, so your testimony before, you're changing now?

12:35:48  3   A.  No, I am not changing my testimony.

12:35:54  4            MR. NEUWIRTH:  No further questions.

12:35:54  5            THE COURT:  Thank you.

12:36:00  6        So do you want to do redirect?

12:36:12  7            MR. MOGIN:  It might be more efficient to wait until

12:36:16  8   after Mr. Regard's testimony, your Honor, as you previously

12:36:18  9   suggested.

12:36:28  10           THE COURT:  Well, you could do redirect on what we

12:36:30  11  heard this morning because what I was saying about calling --

12:36:34  12  giving Dr. Lewis an opportunity to comment on what Mr. Regard

12:36:42  13  is going to say, because he wouldn't have heard him already.

12:36:44  14  That's what I was talking about.  But you could do redirect

12:36:48  15  right now and then we could break for lunch.

12:36:52  16           MR. MOGIN:  Okay.

12:36:52  17           THE COURT:  You seem to have some points you wanted

12:36:54  18  to make or clarify, and I am following along pretty carefully

12:37:00  19  here, and I think this is supposed to be educating Chris and

12:37:10  20  I.  So that's what this exercise is about.

12:37:12  21                          - - -

12:37:12  22            DANIEL D. LEWIS, REDIRECT EXAMINATION

12:37:12  23  BY MR. MOGIN:

12:37:12  24  Q.  Dr. Lewis, let's start off with the question you weren't

12:37:14  25  allowed to answer.  What vendors could implement?

| | | |
|---|---|---|
| 12:37:16 | 1 | THE COURT:  Well, do you really need to -- okay. |
| 12:37:24 | 2 | MR. MOGIN:  Would a sidebar be helpful, your Honor? |
| 12:37:26 | 3 | THE COURT:  Yeah, I do, actually. |
| 12:37:26 | 4 | (Whereupon, a discussion was had at the bench outside the |
| 12:39:28 | 5 | hearing of the court reporter.) |
| 12:39:28 | 6 | THE COURT:  We are back on the record.  Do you want |
| 12:39:36 | 7 | to ask your next question? |
| 12:39:38 | 8 | MR. MOGIN:  Certainly. |
| 12:39:40 | 9 | BY MR. MOGIN: |
| 12:39:44 | 10 | Q.  Dr. Lewis, counsel asked you about some information that |
| 12:39:52 | 11 | was contained in the March 21st letter, which they have marked |
| 12:39:56 | 12 | as Exhibit 3. |
| 12:39:58 | 13 | A.  Okay. |
| 12:39:58 | 14 | Q.  In particular, the information which has no citation |
| 12:40:08 | 15 | regarding the number of documents in the test that hits and |
| 12:40:16 | 16 | the null set.  Do you see that? |
| 12:40:16 | 17 | A.  I see that. |
| 12:40:18 | 18 | Q.  That's in the information that's in the carryover from |
| 12:40:20 | 19 | pages 3 to 4? |
| 12:40:22 | 20 | A.  Yes. |
| 12:40:22 | 21 | Q.  Did you have all of that information at the time that you |
| 12:40:24 | 22 | were rendering your opinion last month? |
| 12:40:28 | 23 | A.  No. |
| 12:40:28 | 24 | Q.  But you relied on a letter, did you not, from -- also |
| 12:40:36 | 25 | signed by Mr. Neuwirth as part of the factual basis for your |

12:40:40    1    testimony, correct?

12:40:40    2    A.  Yes.

12:40:42    3    Q.  Is that the same letter that Mr. Neuwirth is now

12:40:46    4    criticizing you for relying on, as opposed to the testimony of

12:40:50    5    Mr. Brown?

12:40:52    6    A.  It's the November 22nd letter which Mr. Neuwirth was

12:41:00    7    discussing.  I guess I wouldn't characterize it as

12:41:04    8    criticizing.

12:41:06    9    Q.  So if there was a discrepancy between what Mr. Brown

12:41:08    10   testified to and Mr. Neuwirth attempted to exploit that

12:41:12    11   discrepancy as between the November 22nd letter, wouldn't you

12:41:16    12   be between the proverbial rock and a hard place as to whether

12:41:20    13   to rely on the testimony of a witness or the letter from

12:41:24    14   counsel?

12:41:24    15   A.  Well, it did certainly set up a bit of a conflict for me.

12:41:32    16   I am not a lawyer, so I am not so sure if one of those should

12:41:34    17   be taken to trump the other.

12:41:36    18   Q.  All right.  Dr. Lewis, under the terms of your proposal,

12:42:02    19   isn't it, in fact, designed to allow most companies with some

12:42:04    20   supervised learning capability to be used?

12:42:08    21   A.  That's the attempt in designing the technical aspects of

12:42:12    22   the proposal was that if a company had a platform that

12:42:16    23   supports supervised learning and that it would be able to be

12:42:20    24   used for this purpose.

12:42:22    25   Q.  So you're not in any way, shape, or form attempting to

| | | |
|---|---|---|
| 12:42:26 | 1 | drive the business to particular vendors? |
| 12:42:30 | 2 | A.  No, not at all. |
| 12:42:30 | 3 | Q.  You are not suggesting particular vendors? |
| 12:42:34 | 4 | A.  No. |
| 12:42:34 | 5 | Q.  The key is not as -- is simply that you can show |
| 12:42:40 | 6 | statistically valid testing protocol? |
| 12:42:42 | 7 | A.  Right.  So the idea is that the protocol describes how to |
| 12:42:48 | 8 | use statistical rank retrieval and supervised learning and |
| 12:42:50 | 9 | also how to use statistical methods to evaluate the |
| 12:42:54 | 10 | effectiveness of those.  Indeed, the statistical evaluation |
| 12:43:02 | 11 | could be done even if the platform didn't support that.  I |
| 12:43:06 | 12 | mean, one could do the random sampling in some other fashion, |
| 12:43:10 | 13 | one could use an online calculator in the way that defendants |
| 12:43:12 | 14 | have. |
| 12:43:12 | 15 | And so -- in fact, I did not include anything about |
| 12:43:18 | 16 | the statistical calculations like computing confidence |
| 12:43:24 | 17 | intervals in the proposals because you could do that in some |
| 12:43:28 | 18 | other software. |
| 12:43:28 | 19 | Q.  Now, one of the principles of science, is it not, is to |
| 12:43:32 | 20 | try to remove the possibility of human bias or human error |
| 12:43:38 | 21 | affecting testing?  Is that correct? |
| 12:43:42 | 22 | A.  Whenever possible. |
| 12:43:42 | 23 | Q.  And, for example, it's common, is it not, in the medical |
| 12:43:46 | 24 | profession when new drugs are being tested that certain people |
| 12:43:52 | 25 | in a sample set or in a population will be given placebos, |

| | | |
|---|---|---|
| 12:43:56 | 1 | correct? |
| 12:43:56 | 2 | A.  Correct. |
| 12:43:56 | 3 | Q.  And others will be given the drug that's being tested, |
| 12:44:00 | 4 | correct? |
| 12:44:00 | 5 | A.  Correct. |
| 12:44:00 | 6 | Q.  And those that are the patients, as it were, don't know |
| 12:44:08 | 7 | whether they are getting the placebo or getting the drug, |
| 12:44:10 | 8 | correct? |
| 12:44:10 | 9 | A.  Yes.  Indeed, in what's called a double blind experiment, |
| 12:44:14 | 10 | neither the patient nor the doctor knows which the patient has |
| 12:44:20 | 11 | gotten, and only third party scientists then analyze the |
| 12:44:24 | 12 | results afterwards.  So even the doctor -- there is the |
| 12:44:28 | 13 | attempt to make sure even the doctor is not biased by their |
| 12:44:30 | 14 | knowledge. |
| 12:44:32 | 15 | Q.  And is that a sort of double blind methodology to remove |
| 12:44:36 | 16 | bias used in other forms of statistical studies? |
| 12:44:40 | 17 | A.  Oh, yes.  Anywhere where there is a degree of human |
| 12:44:46 | 18 | subjectivity in interpreting results of the experiment, it's |
| 12:44:50 | 19 | desirable to do that.  I mean, obviously, there can be |
| 12:44:54 | 20 | situations where it can't be done, but whenever possible, |
| 12:44:56 | 21 | that's done. |
| 12:44:58 | 22 | Q.  Now, you were asked a series of questions about confidence |
| 12:45:04 | 23 | levels, correct? |
| 12:45:04 | 24 | A.  Yes. |
| 12:45:04 | 25 | Q.  Is it proper to compute the confidence level based on one |

12:45:10    1   random sample in a corpus the sizes that we're talking about

12:45:14    2   here?

12:45:14    3   A.  Oh, sure.  You can draw a single random sample and compute

12:45:22    4   confidence interval with a certain confidence level.  The

12:45:24    5   confidence level will depend on the size of the random sample,

12:45:24    6   and the margin of error will depend on the size of the random

12:45:28    7   sample.

12:45:28    8   Q.  Do you know how many random samples have been done on any

12:45:30    9   of the defendants other than Georgia-Pacific's documents?

12:45:34   10   A.  How many random samples have been done?

12:45:36   11   Q.  Yes.

12:45:38   12   A.  I don't know that with any certainty.  There was a chart

12:45:42   13   that suggested that at least one random sample had been done,

12:45:46   14   but I have not seen other material describing that.

12:45:48   15   Q.  Now, you testified previously, did you not, that recall is

12:45:52   16   perhaps one of the most important measurements of

12:45:56   17   effectiveness of a search technique, correct?

12:45:58   18   A.  Yes.  Particularly in an e-discovery context where there

12:46:02   19   is a premium on finding a large proportion of the responsive

12:46:06   20   documents, recall is a natural way to measure that.

12:46:10   21   Q.  Okay.  So give us the five-second definition of recall, if

12:46:12   22   you would, please.

12:46:14   23   A.  Recall is of all the material that's been agreed upon in

12:46:20   24   each search, it is the proportion of responsive documents that

12:46:24   25   have been found out of all of the responsive material in the

| | | |
|---|---|---|
| 12:46:32 | 1 | collection.  So it's what percentage of the good stuff did you |
| 12:46:34 | 2 | find. |
| 12:46:34 | 3 | Q.  Okay.  And have you been provided with the information |
| 12:46:38 | 4 | that you would need in order to compute recall for any of the |
| 12:46:42 | 5 | defendants? |
| 12:46:42 | 6 | A.  None of the other six defendants at the table, no.  One |
| 12:46:52 | 7 | could -- |
| 12:46:52 | 8 | Q.  You're referring to Mr. Regard's table? |
| 12:46:56 | 9 | A.  Yes, with Regard's table, there is nothing there that |
| 12:46:58 | 10 | would let you compute recall. |
| 12:47:00 | 11 | In the November 22nd letter from Georgia-Pacific, if |
| 12:47:04 | 12 | one ignores all the problems with the sampling, the bias, and |
| 12:47:08 | 13 | things like that, I believe one could extract a recall figure |
| 12:47:14 | 14 | from that, but I would not be confident that that would be a |
| 12:47:18 | 15 | valid estimate. |
| 12:47:18 | 16 | Q.  Why not? |
| 12:47:20 | 17 | A.  Well, because of the bias in the review and -- oh, sorry. |
| 12:47:26 | 18 | I should mention, it would only be a measure of the recall |
| 12:47:30 | 19 | with respect to those four custodians.  We would have no |
| 12:47:34 | 20 | information about the recall with respect to the entire |
| 12:47:36 | 21 | Georgia-Pacific collection. |
| 12:47:38 | 22 | Q.  Okay.  Now, you testified earlier that there is a |
| 12:47:44 | 23 | distinction between a confidence level and a probability.  Do |
| 12:47:50 | 24 | you recall that testimony? |
| 12:47:50 | 25 | A.  Yes. |

12:47:50    1    Q. Would you explain that, please.

12:47:52    2    A. Okay. Well, that's sort of one of the hardest things to

12:47:58    3    explain about frequentist statistics. So the confidence level

12:48:00    4    for a confidence interval refers to the fact that -- it's --

12:48:06    5    basically, it is a way to characterize the process by which

12:48:10    6    the confidence interval is produced. So that if you repeated

12:48:16    7    that process a large number of times, a 95 percent confidence

12:48:22    8    level indicates that 95 percent of the time you repeated that

12:48:26    9    sampling process, you would get a confidence interval that

12:48:30   10    contained the true value.

12:48:32   11    Q. So the confidence interval is a statistic that tells us

12:48:36   12    about the sampling process, correct?

12:48:40   13    A. Yes.

12:48:40   14    Q. It's not -- so if someone has a 95 percent confidence

12:48:46   15    level, that doesn't necessarily mean, does it, that the

12:48:48   16    probability is that 95 percent of the documents within the

12:48:54   17    margin of error have been retrieved by the system?

12:48:56   18    A. Oh, not at all. No, no, it's only a description of the

12:49:00   19    sampling process. So, for instance, you could have 95 percent

12:49:04   20    confidence that the recall was, you know, 10 percent plus or

12:49:08   21    minus 5 percent, so you would be 95 percent confident that

12:49:12   22    your recall was between 5 and 15 percent, that you had only

12:49:16   23    found between 5 and 15 percent of the responsive material.

12:49:20   24    Q. By the way, Dr. Lewis, how many documents does it take to

12:49:28   25    prove a price fixing conspiracy?

12:49:32  1  A.  Well, I'm not a lawyer, but my understanding is that, you

12:49:42  2  know, a single document could be used to -- a document that on

12:49:44  3  the face of it said, Let's fix prices or something would be

12:49:48  4  sufficient.  I mean, that's only my layperson's understanding.

12:49:50  5  Q.  Okay.  And if that document said, They are with us, if

12:49:56  6  that turned out to be the key document, which method is more

12:50:00  7  likely to find that document, Boolean searching or supervised

12:50:08  8  learning as you proposed it?

12:50:08  9  A.  Well, supervised learning would be more apt to find it

12:50:12  10  unless somebody had created a Boolean query that was

12:50:16  11  specifically designed to retrieve any known responsive

12:50:20  12  document.

12:50:20  13      But if you don't know, I mean, the point is you don't

12:50:22  14  know whether it might be they are with us, or it might be any

12:50:28  15  other unbelievable number of other ways to express

12:50:30  16  disagreement, what the supervised learning can do is take

12:50:34  17  advantage of the statistical properties of metadata as well as

12:50:36  18  the words, and it's likely to have the best chance of finding

12:50:40  19  a very difficult document like that.

12:50:42  20  Q.  Now, you mentioned about a query that was customized, I

12:50:52  21  think you said in your testimony, in order to find a

12:50:52  22  particular document?

12:50:54  23  A.  Oh, sorry.  You were talking about my testimony about

12:50:58  24  Georgia-Pacific or about the example I just gave?

12:51:00  25  Q.  The example you just gave.

12:51:02  1   A.  Well, what I was saying, you know, you could write a
12:51:08  2   Boolean -- if you knew through magic that there was an
12:51:12  3   important document out there that said, They are with us,
12:51:16  4   there is a way to express with proximity operators in Boolean
12:51:20  5   queries or even just quotation marks to sometimes support it
12:51:24  6   that you could retrieve all the documents that had exactly
12:51:28  7   that phrase, but you would have to know in advance that that
12:51:30  8   was exactly like a code phrase or something that was being
12:51:32  9   used.
12:51:34  10          So if you don't have that knowledge in advance, the
12:51:36  11  Boolean query is not going to be very helpful for finding
12:51:40  12  documents where all the terms are high frequency.
12:51:44  13          THE COURT:  Hold on, though.  But it is possible with
12:51:50  14  the Boolean search to find documents that can have -- I mean,
12:52:02  15  if you went back over 10 years of antitrust cases and looked
12:52:06  16  at the intent, looked at the kinds of documents that were
12:52:10  17  introduced, the kind of evidence that they introduced, and you
12:52:12  18  wanted to do a Boolean word search with some of the kind of
12:52:18  19  evidence that they used in other cases, that would be
12:52:24  20  possible, correct?
12:52:24  21          These are cases that went to trial, there was
12:52:26  22  evidence, some of the evidence would have letters in it, some
12:52:30  23  of them, the more recent ones, might have e-mail, they may
12:52:34  24  have documents, they could have something with the Boolean
12:52:38  25  search, you could -- it is possible to create a document that

12:52:44   1   could capture some of that, correct?

12:52:48   2        THE WITNESS:  One can certainly use Boolean queries

12:52:52   3   to try to find documents on particular topics.  It would be --

12:52:56   4   I think the difficulty is that if somebody was trying to be

12:53:00   5   coded or indirect in their language, there is an almost

12:53:04   6   infinite variety of ways to do that.  So that even if one

12:53:08   7   looked at a huge backlog of antitrust, and even if there was

12:53:12   8   examples of people using all sorts of coded language, you

12:53:16   9   wouldn't expect that the next use of coded language would be

12:53:20  10   something that you can anticipate from that.

12:53:32  11        THE COURT:  Even with your system -- not your system,

12:53:36  12   but the CBAA system, you are still telling the machine to do

12:53:44  13   something.  Now, I understand that you're telling them to go

12:53:48  14   over departments, you are telling them to go over groups of

12:53:52  15   words, you are telling them, but you're still telling the

12:53:56  16   machine.  The machine on its own isn't coming up with, I am

12:54:00  17   with you.  I mean, you're getting input into the machine of

12:54:04  18   what the machine is looking for, right?

12:54:08  19        THE WITNESS:  Right.  So the machine would be

12:54:12  20   learning from examples of responsive documents.

12:54:14  21        THE COURT:  So you have already found a respons- --

12:54:20  22   so somehow you have a responsive document in your hand, and

12:54:24  23   you're then telling the machine to go find more that are like

12:54:28  24   that, right?

12:54:32  25        THE WITNESS:  Right.  And where like that can include

12:54:34    1   not only aspects of the textual data but aspects of the
12:54:38    2   metadata, where a file was stored, who the custodian was, what
12:54:42    3   point in time, what time of day it was sent by.  There's a
12:54:46    4   variety of --
12:54:46    5           THE COURT:  But in Boolean searches, they can also do
12:54:52    6   metadata.  I mean, that kind of --
12:54:54    7           THE WITNESS:  That's right.  Many Boolean searches
12:54:56    8   also allow search on metadata.
12:54:58    9           THE COURT:  Okay.  That's a needle in a haystack.
12:55:04   10           Back to the -- this is called I want the smoking gun.
12:55:10   11   So go back to I want the smoking gun.
12:55:14   12   BY MR. MOGIN:
12:55:14   13   Q.  Is there a difference in the metadata that would be used
12:55:16   14   in a Boolean search methodology as opposed to the metadata
12:55:20   15   that would be used in supervised learning?  In other words, do
12:55:24   16   they both use metadata in the same fashion?
12:55:28   17   A.  They could both use the same metadata fields, but they
12:55:34   18   would be using them in different fashions.  So the supervised
12:55:36   19   learning system could differentially weight the metadata in a
12:55:44   20   fashion which would not be possible to express with a Boolean
12:55:48   21   query.
12:55:48   22   Q.  And what would be the effect of the differential weight?
12:55:50   23   A.  Well, the issue is that if one is looking for documents
12:56:00   24   which are -- basically, if the evidence that something is
12:56:08   25   responsive is that there are certain patterns in the metadata.

| | | |
|---|---|---|
| 12:56:12 | 1 | So, for instance, that, you know, documents related -- |
| 12:56:16 | 2 | previous responsive documents have been found, for instance, |
| 12:56:20 | 3 | tend to be sent in the middle of the night and that this was |
| 12:56:24 | 4 | unusual in comparison to nonresponsive documents or even that |
| 12:56:30 | 5 | they were sent from a particular email account or that |
| 12:56:34 | 6 | afterwards, they were stored in a particular portion of the |
| 12:56:36 | 7 | file system, a variety of sort of things like that, these |
| 12:56:40 | 8 | could be arguably very difficult to anticipate in writing a |
| 12:56:46 | 9 | Boolean query because there's so many different possible forms |
| 12:56:50 | 10 | of that evidence.  But these are the kind of pattern finding a |
| 12:56:54 | 11 | supervised learning method can do. |
| 12:56:56 | 12 | Q.  So is it correct then that in order to find what her Honor |
| 12:57:02 | 13 | just described as a smoking gun -- |
| 12:57:06 | 14 | THE COURT:  The smoking gun. |
| 12:57:08 | 15 | MR. MOGIN:  A smoking gun. |
| 12:57:08 | 16 | THE COURT:  The smoking gun. |
| 12:57:10 | 17 | BY MR. MOGIN: |
| 12:57:12 | 18 | Q.  -- (continuing) one would have to anticipate the phrase in |
| 12:57:14 | 19 | advance in a Boolean search methodology? |
| 12:57:18 | 20 | A.  If you're using a Boolean search, you would either have to |
| 12:57:22 | 21 | anticipate the phrase, or I guess you could anticipate some |
| 12:57:28 | 22 | characteristic in metadata too.  The point being that the -- |
| 12:57:32 | 23 | it's the anticipation that's difficult given the wide range of |
| 12:57:34 | 24 | possibilities.  The advantage supervised learning has is being |
| 12:57:38 | 25 | able to see the pattern from examples. |

| | | |
|---|---|---|
| 12:57:42 | 1 | Q.  How could you formulate a realistic Boolean query for |
| 12:57:50 | 2 | "they are with us"? |
| 12:57:50 | 3 | A.  If you knew exactly that phrase, they are with us, some |
| 12:57:54 | 4 | Boolean languages would just let you put it in quotation |
| 12:57:56 | 5 | marks, other ones you would do a proximity, this word within |
| 12:58:02 | 6 | this proximity to this word. |
| 12:58:02 | 7 | So, I mean, if you knew exactly that phrase in |
| 12:58:04 | 8 | advance, you could bring it back, but the point is you don't |
| 12:58:08 | 9 | know exactly that phrase in advance. |
| 12:58:10 | 10 | Q.  So if one was unaware of the particular phrase that |
| 12:58:14 | 11 | constituted a smoking gun, would it be feasible or possible or |
| 12:58:20 | 12 | even likely to find it in a Boolean query? |
| 12:58:26 | 13 | A.  Could you repeat that question?  Sorry.  I didn't hear the |
| 12:58:30 | 14 | beginning. |
| 12:58:32 | 15 | Q.  If one did not know the precise phrasing of a smoking |
| 12:58:36 | 16 | gun-type document in advance, what would be the likelihood of |
| 12:58:42 | 17 | locating it with a Boolean query as compared to supervised |
| 12:58:46 | 18 | learning? |
| 12:58:46 | 19 | A.  Right.  So if by "smoking gun," we in particular mean a |
| 12:58:50 | 20 | document that uses coded or indirect language, given the vast |
| 12:58:58 | 21 | range of possibilities for that coded or indirect language, it |
| 12:59:02 | 22 | would be very difficult to use a Boolean query to find that, |
| 12:59:04 | 23 | and you would have more hope of doing that with supervised |
| 12:59:08 | 24 | learning with its sort of pattern-finding abilities.  It's not |
| 12:59:12 | 25 | going to be easy in either case. |

12:59:14   1   Q.  Now, let's go back to files for just a moment.  When you

12:59:20   2   formulate a proposal or assist in the formulation of a

12:59:24   3   proposal, was there an underlying assumption that the

12:59:30   4   reviewing attorneys would be acting in good faith to find

12:59:32   5   responsive documents?

12:59:32   6   A.  I am always assuming people who are reviewing documents

12:59:38   7   are acting in good faith.

12:59:40   8   Q.  Well, did you plan for the possibility that the attorneys

12:59:42   9   would be trying to gain the system or cheating the system by

12:59:46  10   biassing the seed set, the training set?

12:59:50  11   A.  No.  I mean, my concern was with inadvertent bias that's

12:59:56  12   caused by knowing what the system did.  I wasn't -- I wasn't

01:00:00  13   asked to contemplate any possibility of bad faith.

01:00:04  14   Q.  Okay.  Now, would it be your understanding as an

01:00:16  15   e-discovery information retrieval expert that the attorneys

01:00:20  16   who were making the evaluation for the training set were

01:00:24  17   subject to some sort of ethical or legal requirements with

01:00:30  18   respect to their findings regarding responsiveness?

01:00:36  19           THE COURT:  Wait.  I need to hear the end of that

01:00:36  20   question.  Carolyn?

01:00:56  21     (Record read.)

01:00:58  22           THE COURT:  Regarding the software?

01:00:58  23           MR. MOGIN:  Regarding responsiveness.

01:01:02  24           THE COURT:  Regarding responsiveness.

01:01:04  25           THE WITNESS:  Well, I'm not a lawyer, but my

01:01:06  1  understanding is that lawyers have certain ethical

01:01:10  2  obligations.  I don't know the legal codes in detail to

01:01:14  3  specify those.

01:01:16  4  BY MR. MOGIN:

01:01:36  5  Q.  Let's go back to recall if we can for just a moment.  In a

01:01:50  6  case of this nature, would there be some expectation about the

01:01:52  7  percentage of documents that would likely be recalled?  In

01:01:56  8  other words, what would be an acceptable, in your view, level

01:01:58  9  of recall?

01:02:02  10  MR. McKEOWN:  Objection.  Asked and answered.  He

01:02:04  11  says he has no opinion on this, your Honor.

01:02:06  12  THE COURT:  I don't think anybody asked him quite

01:02:08  13  that directly, so I am going to overrule your objection.

01:02:14  14  You can answer that, Doctor, if you know.

01:02:16  15  THE WITNESS:  I don't have an opinion of what an

01:02:20  16  appropriate level of recall is.  That seems to me to be a

01:02:26  17  legal question.

01:02:28  18  BY MR. MOGIN:

01:02:30  19  Q.  Well, in terms of percentages, do you think that 10

01:02:36  20  percent recall would be an acceptable number?

01:02:40  21  MR. McKEOWN:  Foundation, your Honor.  He just said

01:02:42  22  he doesn't know.

01:02:46  23  THE COURT:  Mr. Mogin, this has really got me

01:03:06  24  stumped.  First of all, Mr. Lewis just said, honestly, he

01:03:08  25  doesn't know.

| | | |
|---|---|---|
| 01:03:10 | 1 | MR. MOGIN:  I withdraw it. |
| 01:03:12 | 2 | THE COURT:  And we don't have another case that I |
| 01:03:14 | 3 | know of where the recall level was the issue in a word search. |
| 01:03:18 | 4 | MR. MOGIN:  I will withdraw the question. |
| 01:03:20 | 5 | THE COURT:  So I don't know what we would be |
| 01:03:22 | 6 | comparing it to.  I mean, that's one of the problems here. |
| 01:03:32 | 7 | MR. MOGIN:  Question withdrawn. |
| 01:03:36 | 8 | THE COURT:  Thank you. |
| 01:03:36 | 9 | BY MR. MOGIN: |
| 01:03:36 | 10 | Q.  Dr. Lewis, would you please look at Plaintiffs' |
| 01:03:40 | 11 | Exhibit 10.  Or, rather, yes, Plaintiffs' Exhibit 10.  It's |
| 01:03:44 | 12 | the proposed protocol. |
| 01:03:44 | 13 | A.  Yes. |
| 01:03:46 | 14 | Q.  And if you would please go to step 6. |
| 01:03:58 | 15 | A.  Okay. |
| 01:04:00 | 16 | Q.  Now, you recall that Mr. Neuwirth badgered you with a |
| 01:04:02 | 17 | number of questions -- |
| 01:04:02 | 18 | THE COURT:  All right.  That's -- |
| 01:04:04 | 19 | BY MR. MOGIN: |
| 01:04:06 | 20 | Q.  -- regarding -- |
| 01:04:08 | 21 | THE COURT:  He vigorously cross-examined you, |
| 01:04:10 | 22 | correct.  Okay. |
| 01:04:12 | 23 | BY MR. MOGIN: |
| 01:04:14 | 24 | Q.  Well -- |
| 01:04:14 | 25 | THE COURT:  I mean, it's all a matter of what you |

01:04:16  1   call it, it is.

01:04:18  2          MR. MOGIN:  Without intending to insult the state

01:04:20  3   animal of Wisconsin.

01:04:24  4   BY MR. MOGIN:

01:04:24  5   Q.  In any event, you recall the questions that you were asked

01:04:28  6   that basically were to the effect that if the reviewing

01:04:32  7   attorneys game the system in some way, then the system

01:04:36  8   wouldn't be able to respond properly.  Do you recall that line

01:04:38  9   of questioning?

01:04:38  10  A.  I don't believe he used the word "game" --

01:04:42  11  Q.  He did not.

01:04:42  12  A.  -- but there was --

01:04:44  13         THE COURT:  Then why don't you use closer to what he

01:04:46  14  said.  Okay?

01:04:48  15  BY MR. MOGIN:

01:04:48  16  Q.  If the review was conducted in a biased fashion so that

01:04:50  17  because of responsiveness decisions, if that were to occur,

01:05:02  18  the point that he was trying to make was that no system would

01:05:04  19  be able to essentially recover from that, to be fully

01:05:10  20  utilized.  In other words, it would still depend on the front

01:05:12  21  end on good-faith decisionmaking in reviewing the terms?

01:05:20  22  A.  I wasn't entirely clear what point he was making, but my

01:05:24  23  testimony was that the system will attempt, to the extent it

01:05:30  24  can, to reproduce the pattern of responsiveness assessments

01:05:36  25  made by the people training it.

01:05:36  1  Q.  Okay.  And go to step 6, if you would, please, of

01:05:40  2  Exhibit 10.

01:05:42  3  A.  Um-hmm.

01:05:42  4  Q.  And one of the sentences that you were not asked to read

01:05:48  5  is that, Some or all of the non-privileged documents you added

01:05:54  6  to the training set according to the best practices, correct?

01:05:58  7  A.  Yes.

01:05:58  8  Q.  As well as sharing them with the plaintiffs.  Did I read

01:06:02  9  that part of it correctly?

01:06:04  10  A.  Yes, you did.

01:06:04  11  Q.  Okay.  And why did you include the sharing with the

01:06:08  12  plaintiffs in step 6?

01:06:10  13  A.  Well, my understanding of the legal context is that both

01:06:18  14  defendants and plaintiffs have notions of responsiveness, that

01:06:24  15  there might be some disagreement between those two notions of

01:06:28  16  responsiveness, and that it would be important to have an

01:06:34  17  attempt to -- to the extent possible to receive it, to achieve

01:06:38  18  a consistent notion of responsiveness between the two so that

01:06:42  19  the statistical measures of, say, a recall would mean the same

01:06:48  20  thing to both sides.

01:06:50  21  Q.  So --

01:06:52  22       MR. McKEOWN:  Your Honor, I move to strike.  It's

01:06:54  23  beyond the scope.  Foundation.  He is testifying as to legal

01:06:58  24  principles.

01:07:00  25       MR. MOGIN:  Your Honor, the question was about what's

01:07:02  1  in step 6 of the protocol and why it was put in there.

01:07:04  2  THE COURT:  Well, I am going to overrule your

01:07:06  3  objection.  I think that is.  And that was a -- that was part

01:07:10  4  of the protocol that wasn't asked about before.

01:07:16  5  We don't know whether Mr. Mogin put it in there or

01:07:20  6  did Dr. Lewis put it in there, but Dr. Lewis has sort of

01:07:24  7  adopted, I think he's kind of adopted -- he at least is aware

01:07:30  8  of what's in the protocol anyway.

01:07:30  9  So Mr. Mogin can ask that.  We are not going to put

01:07:34  10  Mr. Mogin on the stand to say what he believed the protocol

01:07:40  11  was, so we will do it with Dr. Lewis.

01:07:42  12  MR. MOGIN:  Could I have the last answer read back,

01:07:44  13  please?

01:08:18  14  (Record read.)

01:08:18  15  THE COURT:  That's a long question.  Okay.

01:08:20  16  MR. MOGIN:  Actually, that was the answer.

01:08:22  17  THE COURT:  Okay.  Mr. Mogin, you helped me out.  We

01:08:28  18  got through a half hour sort of like pre-lunch here.  You are

01:08:34  19  going to get to do this again.  Mr. Regard I hate to come back

01:08:38  20  a second time, I want to make sure we get Mr. Regard on.

01:08:44  21  MR. MOGIN:  So you want me to stop?

01:08:46  22  THE COURT:  Yes, if you don't mind.  Okay?

01:08:46  23  And if Dr. Lewis -- I am saying that if Dr. Lewis has

01:08:50  24  any comments he wants to make of Mr. Regard's testimony,

01:08:54  25  hopefully, we're going to be able to do this in plenty of time

01:08:58   1   so that we can stop at 10 to 3:00.

01:09:04   2            MR. NEUWIRTH:  Your Honor --

01:09:04   3            MR. MOGIN:  May I ask two short questions before we

01:09:06   4   do a break, please, your Honor?

01:09:08   5            THE COURT:  Sure.

01:09:08   6   BY MR. MOGIN:

01:09:08   7   Q.  Dr. Lewis, you made a statement during direct that in your

01:09:14   8   opinion, it would take about, in some systems, one minute to

01:09:20   9   impact a million documents?  Do you recall that?

01:09:22   10  A.  Yes.

01:09:22   11  Q.  And there was some frivolity in the courtroom.  Could you

01:09:26   12  explain that, please?

01:09:26   13  A.  Well, you know, it obviously depends on things like the

01:09:30   14  length of the documents and the amount of computing power you

01:09:36   15  have available.  But I am certainly aware of figures like that

01:09:40   16  for the large search engine companies.  You know, what the

01:09:46   17  exact throughput is for e-discovery platforms, I am really not

01:09:52   18  sure, and that would depend on the power of the computers and

01:09:56   19  the size of the memory and the particular software and

01:09:58   20  whatnot.

01:10:00   21            So, yeah, it's a -- you know, one would have to

01:10:04   22  determine for an actual e-discovery system how fast they can

01:10:08   23  index it.

01:10:08   24  Q.  But it's your understanding that the commercial search

01:10:14   25  engines like Google, Yahoo, et cetera, are capable of doing

| | | |
|---|---|---|
| 01:10:18 | 1 | that? |
| 01:10:18 | 2 | A. Yes, that's correct. |
| 01:10:18 | 3 | Q. My last question is this. Isn't it true that overall, the |
| 01:10:26 | 4 | key point in the validation process is recall? |
| 01:10:30 | 5 | A. I would say key effectiveness measure in e-discovery is |
| 01:10:36 | 6 | recall because of the need to find a substantial proportion of |
| 01:10:40 | 7 | the responsive documents. |
| 01:10:40 | 8 | Q. Okay. So what's the confidence level on the recall of any |
| 01:10:44 | 9 | of the defendants in this case? |
| 01:10:48 | 10 | A. There is no way you can tell. |
| 01:10:48 | 11 | MR. MOGIN: Thank you. |
| 01:10:50 | 12 | THE COURT: Mr. Neuwirth. |
| 01:10:52 | 13 | MR. NEUWIRTH: May I just cover one item that was |
| 01:10:54 | 14 | directly raised in Mr. Mogin's examination? |
| 01:10:58 | 15 | - - - |
| 01:10:58 | 16 | DANIEL D. LEWIS, RECROSS-EXAMINATION |
| 01:10:58 | 17 | BY MR. NEUWIRTH: |
| 01:10:58 | 18 | Q. Dr. Lewis, you will recall that Mr. Mogin focused in his |
| 01:11:04 | 19 | questioning at the beginning on my March 21st letter which we |
| 01:11:08 | 20 | had gone over today that I believe we marked as Exhibit 9, and |
| 01:11:16 | 21 | Mr. Mogin -- |
| 01:11:16 | 22 | A. Excuse me. I have an Exhibit 10, which is a March 21st |
| 01:11:22 | 23 | letter. |
| 01:11:22 | 24 | Q. Exhibit 10, thank you. |
| 01:11:24 | 25 | And Mr. Mogin asked you about the information we went |

01:11:28  1  over, that there were 660 documents in the sample set, that 27
01:11:34  2  of those were found to be at least marginally responsive, that
01:11:38  3  this was done to have a 99 percent confidence level and a 5
01:11:42  4  percent margin of error.
01:11:44  5        And Mr. Mogin asked you, he said, You didn't have all
01:11:46  6  that information in the March 21st letter at the time you
01:11:50  7  first testified, right?
01:11:50  8  A.  Actually, I don't recall if he is asking about the last
01:11:56  9  set of 660, which had 28 responsive, or the first set that had
01:12:02  10 27 responsive, or the middle set that had 31.
01:12:06  11 Q.  But the idea -- but he asked you whether information about
01:12:12  12 that type of confidence level, that margin of error, the size
01:12:16  13 of the sample set, and the number of documents that had been
01:12:18  14 found, he asked you whether you had that information when you
01:12:20  15 last testified, and you said no?
01:12:22  16 A.  Yeah, that's right, I did not have this information about
01:12:26  17 the size of the hits, the size of the null sets, and all of
01:12:30  18 the details of this last evaluation.
01:12:34  19 Q.  I would just ask you to take out Plaintiffs' Exhibit 4,
01:12:38  20 which is the November 22nd, 2011, letter that you were also
01:12:42  21 asked about that I sent to plaintiffs.
01:12:50  22        THE COURT:  Which is --
01:12:50  23        MR. NEUWIRTH:  It's Plaintiffs' Exhibit 4.
01:12:52  24        THE WITNESS:  So I have Plaintiffs' 4, yes.
01:12:54  25 BY MR. NEUWIRTH:

01:12:54   1   Q.  Okay.  And I have a copy --

01:12:56   2          MR. NEUWIRTH:  I have an extra copy for your Honor.

01:12:58   3          THE COURT:  I have it here.

01:13:00   4   BY MR. NEUWIRTH:

01:13:00   5   Q.  I'd like you to turn to the bottom of page 3.

01:13:02   6   A.  Okay.

01:13:02   7   Q.  This is from November 22nd, many months before you

01:13:06   8   testified.  Look at the last bullet on page 3.

01:13:12   9   Georgia-Pacific, in consultation with Counsel on Call, sought

01:13:16  10   to validate the null set to a 99 percent confidence level and

01:13:22  11   a 5 percent margin of error by reviewing and vetting of 660

01:13:26  12   randomly selected documents, the set validated with 27

01:13:32  13   marginally responsive documents.

01:13:34  14          So that information was in a November 22nd letter.

01:13:38  15   It was not provided for the first time on March 21st, correct?

01:13:42  16   A.  The size of the null set is not here, the size of the hit

01:13:48  17   set is not here, the actual statistic which the confidence

01:13:56  18   interval is being computed for is not here.

01:13:58  19   Q.  Right.  So the results are here, and there was

01:14:00  20   clarification in the March 21st letter, correct?

01:14:04  21   A.  That's an interesting interpretation.

01:14:08  22          MR. NEUWIRTH:  Thank you.

01:14:12  23          THE COURT:  Okay.  Time to eat.  Can you be back here

01:14:16  24   at a quarter to 1:00?

01:14:18  25          Yes.

01:14:18　1　　　　　　MR. ECHOLS:  One totally housekeeping matter, Judge.

01:14:22　2　Barack Echols.  We had marked Defendants' Exhibit 9 as the

01:14:26　3　Blair and Maron study, and then that affidavit of Mr. Clancy

01:14:30　4　was tendered, and it hadn't actually been marked.  I didn't

01:14:32　5　know if you wanted to have a number on it.

01:14:34　6　　　　　　THE COURT:  Are you going to move -- yes, well, let's

01:14:36　7　mark it anyway.

01:14:38　8　　　　　　MR. ECHOLS:  And 10 was this March --

01:14:40　9　　　　　　THE COURT:  Are you keeping track, I hope, because I

01:14:42　10　am not?

01:14:42　11　　　　　　MR. ECHOLS:  Would you prefer that that be 9-A or be

01:14:46　12　marked as Exhibit 11?

01:14:48　13　　　　　　MR. MAROVITZ:  I premarked.

01:14:54　14　　　　　　THE COURT:  Do you have a preference?

01:14:54　15　　　　　　MR. MOGIN:  None at all.

01:14:56　16　　　　　　THE COURT:  I am just glad somebody is doing it.

01:14:58　17　Thank you.

01:15:02　18　　　　　　MR. ECHOLS:  We will make it 9-A.

01:15:04　19　　　　　　THE COURT:  Let's make it a quarter to 1:00 as

01:15:06　20　possible.  That will give us two hours then.

01:15:08　21　　　　　　MR. MOGIN:  We are done with Dr. Lewis.

01:15:10　22　　　　　　THE COURT:  Dr. Lewis, we are finished with you for

01:15:12　23　now.  I don't know whether you will want to come back or not.

01:15:16　24　We are starting with Mr. Regard.
　　　　　　　　　(The trial was adjourned at 12:15 p.m. until 12:45 p.m. of
　　　　　25　this same day and date.)

1             IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3

   KLEEN PRODUCTS, LLC, et al.,      )   Docket No. 10 C 5711
4                                )
               Plaintiffs,   )
5                                  )
           vs.                 )
6                                  )
   PACKAGING CORPORATION OF AMERICA,   )   Chicago, Illinois
7   et al.,                        )   March 28, 2012
                                  )   1:45 o'clock p.m.
8               Defendants.   )

9

        TRANSCRIPT OF PROCEEDINGS - EVIDENTIARY HEARING
10     BEFORE THE HONORABLE MAGISTRATE JUDGE NAN R. NOLAN
                    VOLUME 2-B
11

12  APPEARANCES:

13

   For the Plaintiffs:        THE MOGIN LAW FIRM
14                        BY:  MR. DANIEL J. MOGIN
                       707 Broadway, Suite 1000
15                     San Diego, CA  92101
                       (619) 687-6611
16
                       FREED KANNER LONDON & MILLEN LLC
17                       BY:  MR. MICHAEL J. FREED
                       MR. ROBERT J. WOZNIAK
18                     2201 Waukegan Road, Suite 130
                     Bannockburn, IL  60015
19                     (224) 632-4500

20                       SCOTT & SCOTT
                       BY:  MR. WALTER W. NOSS
21                     707 Broadway, Suite 1000
                     San Diego, CA  92101
22                     (619) 233-4565

23

   Court Reporter:          MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                     Official Court Reporter
                     219 S. Dearborn Street, Suite 1854-B
25                     Chicago, Illinois  60604
                     (312) 435-5639

```
 1    APPEARANCES CONTINUED:

 2    For the Plaintiffs:        LOCKRIDGE GRINDAL NAUEN PLLP
                                 BY:  MR. BRIAN D. CLARK
 3                               100 Washington Avenue S.
                                 Minneapolis, MN  55401
 4                               (612) 239-6900

 5
      For Defendant Packaging    KIRKLAND & ELLIS LLP
 6    Corporation of America:    BY:  MR. BARACK S. ECHOLS
                                      MR. LEONID FELLER
 7                               300 North LaSalle Street
                                 Chicago, IL  60654
 8                               (312) 862-3144

 9
      For Defendant             FOLEY & LARDNER LLP
10    International Paper:       BY:  MR. JAMES T. McKEOWN
                                      MR. NATHAN EIMER
11                               777 East Wisconsin Avenue
                                 Milwaukee, WI  53202
12                               (414) 297-5530

13
                                 FOLEY & LARDNER LLP
14                               BY:  MS. JOANNE LEE
                                 321 North Clark Street, Suite 2800
15                               Chicago, IL  53202

16    For Defendant             MAYER BROWN LLP
      Temple-Inland:             BY:  MR. ANDREW S. MAROVITZ
17                                    MS. BRITT M. MILLER
                                 71 South Wacker Drive
18                               Chicago, IL  60606
                                 (312) 782-0600
19
      For Defendant             K & L GATES LLP
20    Cascades and Norampac:     BY:  MR. SCOTT M. MENDEL
                                 70 West Madison Street, Suite 3100
21                               Chicago, IL  60602
                                 (312) 372-1121
22

23    For Defendant             QUINN EMANUEL URQUHART &
      Georgia-Pacific:          SULLIVAN LLP
24                               BY:  MR. STEPHEN R. NEUWIRTH
                                 51 Madison Avenue, 22nd Floor
25                               New York, NY  10010
                                 212-849-7000
```

1   APPEARANCES CONTINUED:

2   For Defendant                    WINSTON & STRAWN LLP
    RockTenn CP, LLC:                BY:   MR. R. MARK McCARIENS
3                                          MR. JOSEPH L. SIDERS
                                     35 West Wacker Drive
4                                    Chicago, IL  60601
                                     (312) 558-5902
5

6   For Defendant                    McDERMOTT WILL & EMERY LLP
    Wayerhaeuser Company:            BY:   MS. RACHAEL V. LEWIS
7                                    600 13th Street NW
                                     Washington, DC   2005
8                                    (202) 756-8479

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following proceedings were had in open court:)

2    THE COURT:  Are you ready to call Mr. Regard?

3    MR. MAROVITZ:  I am, your Honor.  Thank you.

4    (Witness sworn.)

5    MR. MAROVITZ:  Your Honor, before I start, the first

6    exhibit that we are going to use is Defense Exhibit 11, which

7    is the report of Daniel Regard.  We didn't bring extra copies,

8    we sent so many around.

9    MR. MOGIN:  Is the report coming into evidence at

10   this point, your Honor?

11   MR. MAROVITZ:  I didn't ask that it be admitted.

12   It's just for identification purposes.

13   THE COURT:  He may need it to refresh recollection or

14   do whatever.  That's fine.  We all have -- everyone in the

15   courtroom who is part of the case I assume has a copy.  Thank

16   you.

17   MR. MAROVITZ:  Your Honor, do you mind if I approach?

18   THE COURT:  Of course.

19   MR. MAROVITZ:  Thank you.  Thank you, your Honor.

20                            - - -

21       DAN REGARD, DIRECT EXAMINATION CONTINUED

22   BY MR. MAROVITZ:

23   Q.  Welcome back.  State your name for the record.

24   A.  My name is Dan Regard.

25   Q.  With the Court's indulgence, I'd like to set the table

01:55:10　1　here very quickly to provide some context for your testimony

01:55:14　2　today, Mr. Regard, and to avoid undue repetition from your

01:55:16　3　testimony on February 21st.

01:55:18　4　　　　　So back on February 21st when you began your

01:55:22　5　testimony, you described your opinions, your qualifications,

01:55:28　6　your education, and your employment, and the work that you did

01:55:30　7　to familiarize yourself with defendants' discovery protocols,

01:55:34　8　correct?

01:55:34　9　A.　Yes, sir.

01:55:34　10　Q.　And you explained in your view ESI best practices and told

01:55:40　11　us the key words were very well accepted in ESI circles and,

01:55:44　12　when applied properly, could lead to a robust process and the

01:55:48　13　high quality results, correct?

01:55:50　14　A.　That is correct.

01:55:50　15　Q.　And to follow up on all of that, you submitted an expert

01:55:54　16　report on Wednesday, March 21st, correct?

01:55:58　17　A.　Yes, sir.

01:56:00　18　Q.　And I've handed you what's been marked as Defense

01:56:08　19　Exhibit 11 for identification a copy of that expert report.

01:56:12　20　Is that a true and accurate copy of your expert report in this

01:56:14　21　matter?

01:56:14　22　A.　Yes, it is.

01:56:18　23　　　　　MR. MAROVITZ:　Judge, just as an aside, I am sure we

01:56:22　24　can scare one up if you need one.

01:56:22　25　　　　　THE COURT:　I have one.　Thank you.

01:56:24    1  BY MR. MAROVITZ:

01:56:24    2  Q.  Now, that expert report at 1 describes the four opinions

01:56:28    3  that you issued during your February testimony, correct?

01:56:32    4  A.  Yes, sir.

01:56:32    5  Q.  Okay.  I'd like to start drilling down on the first

01:56:38    6  opinion that you already offered back in February by focusing

01:56:40    7  on the use of key words as part of the search methodology.

01:56:44    8          What, in your view, are the best practices for using

01:56:48    9  key words as part of your review process?

01:56:50   10  A.  Well, it's --

01:56:52   11          MR. MOGIN:  Your Honor, may I just remind the court

01:56:54   12  that we have a continuing objection with regard to best

01:56:56   13  practices testimony here?

01:56:58   14          THE COURT:  Yes.  Thank you.

01:57:00   15          Well, do you want to say -- do you want to state

01:57:04   16  again what your objection is based on best practices.

01:57:06   17          MR. MOGIN:  Yes, your Honor.  Particularly -- this is

01:57:08   18  particularly important with respect to Mr. Regard, who has

01:57:12   19  testified that he is an attorney by training and that the

01:57:16   20  issue is having best practices testimony come in or vice

01:57:24   21  versa.  It's having legal opinions come in disguised as best

01:57:30   22  practices testimony.  It's precisely the matter that's

01:57:32   23  described in the first motion we filed before the first

01:57:36   24  hearing, and you -- if you recall, your Honor, you have had

01:57:40   25  some reservations, but there are certain aspects of the

01:57:44   1   testimony that Mr. Regard got into talking about best

01:57:48   2   practices, you had some reservations about whether we should

01:57:50   3   be going in that area or not.

01:57:54   4          THE COURT:  I don't recall that; but yesterday, when

01:57:58   5   I got your motion and I was sitting thinking about it, I think

01:58:06   6   Mr. Regard is here as a lawyer, but as far as I know, most of

01:58:14   7   his business is he is an e-discovery consultant and happens to

01:58:22   8   be a lawyer.

01:58:28   9          So I know that you have multiple objections to

01:58:32   10  Mr. Regard, just like Dr. Lewis is very definitely quite

01:58:38   11  knowledgeable in statistics, in search retrieval, and he's

01:58:44   12  also been asked in this specific case to do -- to put on a

01:58:50   13  third hat, if you will, or at least a second hat.

01:58:54   14         So, Mr. Regard, as far as I am sitting here, you

01:58:58   15  know, I think he is also in the bucket of e-discovery expert.

01:59:06   16         Now, if you don't, then I guess you will talk to him

01:59:10   17  about that.

01:59:10   18         MR. MOGIN:  I certainly will, your Honor, but the

01:59:12   19  point has to do with best practices --

01:59:16   20         THE COURT:  Don't you think people -- consultants do

01:59:20   21  know best practices, whether they're lawyers or not?  I mean,

01:59:24   22  you're going to have to talk to me more specifically.

01:59:26   23         MR. MOGIN:  Well, we are going to get right back to

01:59:28   24  the example that I gave you before, your Honor.  If we were in

01:59:32   25  a criminal proceeding, Miranda would be a statement of the

| | | |
|---|---|---|
| 01:59:38 | 1 | law. |
| 01:59:38 | 2 | THE COURT:  Right. |
| 01:59:38 | 3 | MR. MOGIN:  How the police effectuate Miranda, did |
| 01:59:42 | 4 | you give a Miranda warning, might be best practices or come |
| 01:59:46 | 5 | within some testimony by an expert on police procedures |
| 01:59:50 | 6 | regarding best practices.  But the fact of the need to give |
| 01:59:54 | 7 | the Miranda warning is a matter of law. |
| 01:59:58 | 8 | Now, if we are going to have someone, particularly |
| 02:00:00 | 9 | someone who is a lawyer, give best practices testimony about |
| 02:00:06 | 10 | best practices in discovery when it's you, your Honor, who |
| 02:00:10 | 11 | ultimately makes a determination about whether defendants have |
| 02:00:14 | 12 | complied with or have done a reasonable search here, we can't |
| 02:00:20 | 13 | -- it's difficult if the lines get crossed. |
| 02:00:28 | 14 | THE COURT:  I think Dr. Lewis for two days said that |
| 02:00:32 | 15 | they didn't. |
| 02:00:32 | 16 | MR. MAROVITZ:  He also said -- |
| 02:00:34 | 17 | THE COURT:  I'm sorry.  But, you know, I don't know |
| 02:00:38 | 18 | whether he used those exact words, but it sure was the input. |
| 02:00:44 | 19 | MR. MOGIN:  Well -- |
| 02:00:44 | 20 | THE COURT:  I mean, I can't do this outside of the |
| 02:00:48 | 21 | context of a specific question, so I think what we ought to do |
| 02:00:52 | 22 | is get to a specific question; I am inviting you to jump up on |
| 02:00:58 | 23 | a specific question and let's deal with it.  Okay? |
| 02:01:00 | 24 | MR. MOGIN:  Very good. |
| 02:01:00 | 25 | THE COURT:  All right. |

BY MR. MAROVITZ:

Q.  Mr. Regard, what are your best practices for using key words other than due processing?

A.  In my experience, the best practices for using key words or really any technology are to have a thoughtful process in the front end where there's substantial thought and research that goes into developing your approach; it's to have an iterative process to revise and enhance, improve your application; it's to communicate with opposing parties or counter-parties the process you're going through; it's to apply your process, your key words, in this case, to the actual corpus of documents and to evaluate the results.

Q.  And by evaluating the results, what do you mean by that?

A.  Well, in this case, it was the -- after key words were applied, there was an evaluation done of the application of those key words in particular by testing the documents that were left behind that we have referred to so often as the null set to see if the results in the null set or the results that you would find in null sets are consistent with your expectations that you had done a good job.

Q.  For purposes of reaching your opinion in this case that the search methodology undertaken by the defendants meets or exceeds best practices, I'd like to walk through what you relied upon regarding what the defendants did.  Okay?

A.  Okay.

02:02:42  1  Q.  So first, do you understand that defendants, to use the
02:02:48  2  first element you talked about a minute ago, implemented a
02:02:52  3  well thought-out process with substantial input from the
02:02:54  4  lawyers and the business people?
02:02:56  5  A.  That's my understanding from my review of the materials
02:02:58  6  and my discussions, yes.
02:03:02  7  Q.  And what exactly did you review, and how did you come to
02:03:04  8  that understanding?
02:03:04  9  A.  What I reviewed was the descriptions in correspondence, in
02:03:14  10  pleadings, of the process the defendants went through in
02:03:16  11  developing their key words from the beginning; added to that
02:03:22  12  were my discussions with individual defendants and their
02:03:24  13  counsel and the consultants they work with; to understand the
02:03:34  14  process they went through at the very beginning of 2011 when
02:03:36  15  they received the request for the production from the
02:03:38  16  plaintiffs on how to develop an approach -- and in this case,
02:03:40  17  key words -- to respond to the document request they had been
02:03:44  18  delivered.
02:03:44  19  Q.  What next?
02:03:46  20  A.  Well, that was really the formation of the response.  And
02:03:52  21  there was a lot of testimony about what Georgia-Pacific ended
02:03:56  22  up doing.  That testimony was in February when we were last
02:04:00  23  here in court, and I can repeat some of that, but I don't know
02:04:02  24  that it's necessary in the interest of time.
02:04:06  25        Would you like me to go into more detail?

02:04:10  1   Q.  No, I don't think so.

02:04:10  2   A.  Okay.

02:04:10  3   Q.  So you had an understanding based upon the correspondence

02:04:14  4   and documents and the testimony of Mr. Koch and Mr. Brown and

02:04:20  5   Georgia-Pacific.  What happened next after the Georgia-Pacific

02:04:24  6   parties testified in court?

02:04:26  7   A.  Well, as we go through this process, I want to point one

02:04:28  8   thing out.  It talked about five different aspects of really

02:04:32  9   developing a robust process.  They don't necessarily happen in

02:04:36  10  sequence one after the other, so these can happen

02:04:38  11  simultaneously.  I just want to make sure that all five

02:04:42  12  elements are there:  that there was a thoughtful process,

02:04:44  13  there was iterative testing, there was communication, there

02:04:48  14  was application against real documents, and then there was an

02:04:50  15  evaluation at the end.

02:04:52  16          THE COURT:  All right.  I have a question right here.

02:04:54  17          THE WITNESS:  Yes, ma'am.

02:04:54  18          THE COURT:  I think you first said they developed a

02:05:00  19  word search, Georgia-Pacific developed a word search.  We

02:05:04  20  don't know -- while we sort of know from Brown and Koch how

02:05:08  21  they did it, we don't know anything how the other seven.  Did

02:05:12  22  they use the same words as Georgia-Pacific, because we have

02:05:18  23  heard you're it for the other six or seven?  So what do you

02:05:22  24  know about how they developed their word search?

02:05:26  25          THE WITNESS:  That's a great question, your Honor,

02:05:28   1   and I'm going to respond to that right now.

02:05:30   2            THE COURT:  Okay.

02:05:32   3            THE WITNESS:  Again, my understanding from what I

02:05:36   4   have read and what the discussion I have had with the

02:05:38   5   defendants is, they all participated in the development of the

02:05:42   6   initial search terms.  All seven defendants participated, even

02:05:46   7   though it was Georgia-Pacific that tested it against their

02:05:50   8   specific documents.  So they all had a chance to cooperate,

02:05:54   9   they all had a chance to give meaningful input, they all had a

02:05:58  10   chance to discuss with their own clients and the witnesses and

02:06:02  11   the employees from their clients as to what these requests

02:06:06  12   meant, how those requests might fit their organization, and

02:06:08  13   help create the initial set of search terms.

02:06:12  14            THE COURT:  So each of the defendants had the request

02:06:14  15   to produce before they started developing word search groups?

02:06:20  16            THE WITNESS:  They all received it at the same time

02:06:22  17   is my understanding, your Honor.

02:06:22  18            THE COURT:  Okay.  All right.

02:06:24  19            THE WITNESS:  And Georgia-Pacific took it upon

02:06:28  20   themselves on behalf of the entire group to first test these

02:06:32  21   search terms against their set of documents first, which ended

02:06:36  22   up -- and I think the earlier testimony was such -- that they

02:06:40  23   spent a lot of time and a lot of iterations and hundreds of

02:06:42  24   hours reviewing documents, testing search terms, revising the

02:06:46  25   search terms, until they got to a point where they felt they

| | | |
|---|---|---|
| 02:06:52 | 1 | were getting the type of performance that was acceptable given |
| 02:06:58 | 2 | the amount of effort that they were putting into the process. |
| 02:07:00 | 3 | THE COURT: Okay. |
| 02:07:00 | 4 | THE WITNESS: Then they tested that against a random |
| 02:07:04 | 5 | sample, Georgia-Pacific did, and came back with an answer of a |
| 02:07:08 | 6 | low residual number of responsive documents left behind in a |
| 02:07:14 | 7 | null set. And my understanding is that at that point, those |
| 02:07:18 | 8 | search terms were communicated to the plaintiffs. |
| 02:07:24 | 9 | THE COURT: Do you know when that was? |
| 02:07:24 | 10 | THE WITNESS: I believe it was in November, your |
| 02:07:28 | 11 | Honor, 2011, but I could have the date or the month wrong. |
| 02:07:34 | 12 | THE COURT: Okay. |
| 02:07:34 | 13 | BY MR. MAROVITZ: |
| 02:07:36 | 14 | Q. Can I suggest, Mr. Regard, it might have been August of |
| 02:07:38 | 15 | 2011? |
| 02:07:38 | 16 | A. It may have been August of 2011. That may be correct. |
| 02:07:42 | 17 | THE COURT: Okay. |
| 02:07:44 | 18 | THE WITNESS: There was a lot of activity back and |
| 02:07:46 | 19 | forth in the correspondence. |
| 02:07:48 | 20 | THE COURT: Okay. |
| 02:07:48 | 21 | THE WITNESS: At that point, a response was received |
| 02:07:50 | 22 | from the plaintiffs that said, These are the concerns we have |
| 02:07:54 | 23 | with your individual search terms for the individual requests, |
| 02:07:58 | 24 | and that the defendants, again led specifically by |
| 02:08:04 | 25 | Georgia-Pacific, but the defendants collectively revised those |

02:08:08    1    search terms, developed a second set, if you will.  It's

02:08:12    2    really not the second set because in the first round, they had

02:08:18    3    devised many iterative sets, but the second major set of

02:08:22    4    search terms, and those were, again, tested against the

02:08:24    5    Georgia-Pacific documents.  And when the revisions were

02:08:28    6    complete, the null set was created and the null set was tested

02:08:32    7    a second time.

02:08:36    8         Now, I want to get to your question, your Honor, what

02:08:38    9    did the individual defendants do?  It was at this point that

02:08:42    10   the search terms were distributed to the individual defendants

02:08:46    11   for them to use on their own documents, and it was at this

02:08:50    12   point that the individual defendants modified the search

02:08:54    13   terms, and they modified them in a number of ways.

02:09:00    14        One way that they modified them was to remove

02:09:04    15   references to Georgia-Pacific-specific facilities and to

02:09:10    16   replace that with specific facilities or terms that were

02:09:14    17   specific to their organizations.

02:09:18    18        Another way that they changed those search terms was,

02:09:22    19   for example, when Georgia-Pacific was looking for

02:09:24    20   communications as they were requested to produce with the

02:09:28    21   codefendants, the other defendants would remove their name

02:09:34    22   from that list and replace it with Georgia-Pacific because

02:09:36    23   they weren't looking for communications with themselves.

02:09:40    24        And then a third way that they changed those search

02:09:42    25   terms was to modify them as appropriate for the technology

02:09:46    1   that they were using to manage and search their own documents.

02:09:50    2   BY MR. MAROVITZ:

02:09:52    3   Q. Once those search strings were modified, was it one search

02:09:54    4   string per defendant?

02:09:56    5   A. No, sir. There were -- my recollection is about 15 search

02:10:04    6   strings in the original set responding to 15 different

02:10:10    7   document requests, but because of technology and complexity,

02:10:14    8   those ended up getting broken down into multiple strings. In

02:10:20    9   the case of one defendant, it was as many as 41 different

02:10:22   10   search strings.

02:10:24   11         And within those search strings -- it wasn't just a

02:10:28   12   single phrase, your Honor. So there was some testimony

02:10:30   13   earlier today that you could run a single search, like put in

02:10:34   14   a phrase in quotes. Rather, these search strings contained

02:10:40   15   multiple terms and Boolean operators, Boolean ands and ors and

02:10:48   16   parentheses that actually had the result of creating many,

02:10:54   17   many, many more search terms. Some of the search terms I

02:10:58   18   looked at had dozens of individual words, but because of the

02:11:02   19   way the Boolean operators worked, it would result in hundreds

02:11:04   20   of variations of searches being executed simultaneously.

02:11:10   21         And on top of that, compounded by that, different

02:11:14   22   defendants used technologies called either wild cards or

02:11:18   23   stemming that resulted in variations for each of the words in

02:11:22   24   the search strings. Because of wild cards and stemmings,

02:11:26   25   search strings that had dozens of words and hundreds of

02:11:28 1 permutations ended up having hundreds of thousands of
02:11:32 2 permutations.
02:11:34 3      When I look over the set of search strings, my
02:11:36 4 estimate is there were more than 2 million searches executed
02:11:40 5 simultaneously, which is a very complex set of searches.
02:11:44 6 Q.  And you've made this judgment based upon your review of
02:11:46 7 the letters and your discussions with representatives of the
02:11:52 8 defendants as you described that, correct?
02:11:54 9 A.  Well, I'm really not describing judgment at this point.
02:11:56 10 This is the information as I learned it.  This is the sequence
02:12:00 11 of chronology.
02:12:00 12 Q.  Did you have some personal involvement in some way in the
02:12:06 13 process as opposed to simply appearing here as an expert
02:12:08 14 witness?
02:12:10 15 A.  Well, I was engaged in this case in 2010, very early on
02:12:18 16 when this case was first filed is my understanding, and I was
02:12:22 17 hired then by Temple-Inland to help them with collection
02:12:28 18 methodologies for files.
02:12:30 19      So my involvement in the collection process was very
02:12:32 20 early on, but my evaluation of the search process only began
02:12:38 21 in late 2011.
02:12:40 22 Q.  And were you given free reign to ask questions of the
02:12:42 23 other defendants to make that evaluation?
02:12:46 24 A.  I was given an opportunity to ask any questions I wanted
02:12:50 25 to, not once but twice, and I was able to speak with

02:12:52  1   representatives of both defense counsel and the consultants

02:12:58  2   for each one of the defendants.

02:12:58  3   Q.  One of the things you mentioned, Mr. Regard, was that set

02:13:02  4   of letters that you reviewed that enabled you to come to your

02:13:08  5   -- well, that enabled you, essentially, you reviewed in effort

02:13:12  6   to come to your opinions that you're expressing today.  We put

02:13:14  7   those together as a group exhibit, so I want to have these

02:13:20  8   marked, if I may, as --

02:13:24  9          THE COURT:  Is this the book you sent me?

02:13:26  10          MR. MAROVITZ:  Not quite.  Everything that we are

02:13:28  11  handing over was previously sent.  These were all the letters

02:13:30  12  that were dated March 21st, 2012.

02:13:32  13          THE COURT:  Okay.

02:13:34  14          MR. MAROVITZ:  We are marking them as Group Exhibit

02:13:36  15  12, and it's A through, I think, G.  In the event that you get

02:13:44  16  a set that's doesn't have A through G, they're alphabetical

02:13:48  17  with past status going first.  So I will hand that up.

02:13:48  18          MR. MOGIN:  Again, your Honor, I assume this is

02:13:50  19  marking strictly for identification because these are the same

02:13:54  20  letters that we have been talking about all morning long as

02:14:00  21  being hearsay.

02:14:02  22  BY MR. MAROVITZ:

02:14:12  23  Q.  Mr. Regard, are these the letters to which you're

02:14:14  24  referring that you were able to review before today?

02:14:16  25  A.  Well, I definitely did review these letters before today,

| | | |
|---|---|---|
| 02:14:22 | 1 | but the letters I was referring to in the earlier testimony |
| 02:14:26 | 2 | were the letters and correspondence between the parties during |
| 02:14:30 | 3 | 2011 and the early part of 2012. And those were the letters |
| 02:14:36 | 4 | that described the process that was used to develop the search |
| 02:14:40 | 5 | terms, the testing, the disclosure of the search terms, and |
| 02:14:44 | 6 | the response from the plaintiffs to the initial set of search |
| 02:14:48 | 7 | terms. |
| 02:14:48 | 8 | Q.  Now, after each defendant customized its search strings, |
| 02:14:54 | 9 | as you mentioned, what happened next? |
| 02:14:56 | 10 | A.  Well, after they customized the search, while this process |
| 02:15:00 | 11 | of search string development was going on, the defendants were |
| 02:15:04 | 12 | also collecting documents; they were identifying key players, |
| 02:15:10 | 13 | they were collecting documents from those key players in other |
| 02:15:14 | 14 | locations, and they were preparing those documents.  And so |
| 02:15:16 | 15 | when the search terms were modified and customized for each |
| 02:15:22 | 16 | defendant, they then applied them against the documents they |
| 02:15:26 | 17 | had collected. |
| 02:15:26 | 18 | Q.  Didn't the defendants use the search strings to collect |
| 02:15:30 | 19 | their documents in the first place? |
| 02:15:32 | 20 | A.  No, they collected documents on a wholesale basis by |
| 02:15:34 | 21 | custodian.  They identified key players in the organization, |
| 02:15:40 | 22 | which was also part of the correspondence back and forth.  And |
| 02:15:44 | 23 | once they collected those documents, it was these wholesale |
| 02:15:48 | 24 | collections by custodian that they then applied the search |
| 02:15:52 | 25 | terms against. |

02:15:52  1   Q.  And after they applied the search terms against those

02:15:56  2   collections by custodian, what came next?

02:16:00  3   A.  Well, by definition, to be clear, when you apply the

02:16:06  4   search terms against a set of documents, you get a set of

02:16:10  5   hits.  And for every set of hits, you have a corresponding

02:16:12  6   non-hit set, which we call the null set.

02:16:16  7            So when they applied the search terms that they had

02:16:20  8   modified to the documents they had collected, they then went

02:16:24  9   to the null set, drew forth a random sample of documents, and

02:16:28  10  reviewed them.

02:16:30  11           Then they -- shall I continue?

02:16:32  12  Q.  Please.

02:16:34  13  A.  Then they made -- they conducted a measurement of what is

02:16:38  14  the ratio of the responsive documents in the null set to the

02:16:42  15  number of documents they tested in the null set and used that

02:16:46  16  to create an estimate of the number of documents that might be

02:16:48  17  residual in the null set.

02:16:50  18  Q.  If you're using the right methodology in the first place,

02:16:54  19  why did you expect to have any documents in the null set that

02:16:58  20  would be responsive?

02:16:58  21  A.  That's just one of the realities of document management

02:17:04  22  and information retrieval is that one of the reasons we have

02:17:10  23  the science of information retrieval is to improve our methods

02:17:14  24  of retrieving documents against an aspiration to try to do it

02:17:18  25  as well as possible but a reality that it's not going to be

| | | |
|---|---|---|
| 02:17:22 | 1 | perfect. |
| 02:17:22 | 2 | The question is not, was it perfect.  At least in the |
| 02:17:26 | 3 | cases I have worked in over the last 15, 20 years, the |
| 02:17:28 | 4 | question is, how imperfect is it and what is the ratio, what |
| 02:17:32 | 5 | is the proportionality of trying to work harder to get a |
| 02:17:36 | 6 | better result versus the cost, time, and effort to do that. |
| 02:17:38 | 7 | Q.  We haven't heard a lot about proportionality in this |
| 02:17:42 | 8 | hearing so far.  What do you mean by that? |
| 02:17:42 | 9 | A.  Well, every time you look at -- in this case, you look at |
| 02:17:48 | 10 | a set of search terms, you apply it against the corpus of |
| 02:17:52 | 11 | documents, you get results, you evaluate the results.  A |
| 02:17:56 | 12 | decision has to be made, can we look at more sample documents, |
| 02:18:00 | 13 | can we learn more about the documents, can we revise the |
| 02:18:02 | 14 | search terms, can we run the tests again, how long does that |
| 02:18:06 | 15 | take, how much money does that cost, and what are the |
| 02:18:10 | 16 | improvements we are getting in the system for exercising that |
| 02:18:12 | 17 | time and expense and effort. |
| 02:18:14 | 18 | Eventually, there's a proportionality of do we stop |
| 02:18:18 | 19 | trying to make it marginally better and spending more money, |
| 02:18:24 | 20 | or do we start reviewing documents and producing them to the |
| 02:18:26 | 21 | opposing party. |
| 02:18:28 | 22 | MR. MOGIN:  Popping up, your Honor, proportionality |
| 02:18:30 | 23 | is clearly a legal concept. |
| 02:18:32 | 24 | THE COURT:  It is. |
| 02:18:32 | 25 | MR. MOGIN:  Move to strike that testimony. |

02:18:34   1          MR. MAROVITZ:  Well --

02:18:36   2          THE COURT:  I mean, it is.  That is a -- in fact,

02:18:40   3   most of the lawyers in the room don't even know what it is,

02:18:42   4   but it is literally a legal concept.  I don't think most of

02:18:50   5   the vendors are thinking that.

02:18:52   6          MR. MAROVITZ:  They may be thinking about it a

02:18:54   7   different way.

02:18:54   8          THE COURT:  I have a question -- okay.  Your

02:18:56   9   objection is sustained.

02:18:58   10         Okay.  Are you saying that Temple -- Nan Nolan is one

02:19:06   11  of your custodians that you had picked out.  Am I

02:19:10   12  understanding you that when you began, you pulled every

02:19:12   13  document of Nan Nolan in Temple's entire system before you

02:19:18   14  applied the search terms?

02:19:20   15         THE WITNESS:  Just to be clear, your Honor, I didn't

02:19:24   16  pull the documents myself.  My understanding is that when

02:19:26   17  Temple identified Nan Nolan as a custodian --

02:19:30   18         THE COURT:  One of the key custodians, okay.

02:19:32   19         THE WITNESS:  -- Temple pulled that person's

02:19:34   20  information off of their computer, off the email sever, and

02:19:40   21  off of any storage areas they had on their servers.

02:19:42   22         THE COURT:  Okay.  And then -- so when they had all

02:19:48   23  Nan Nolan's documents, they then applied the key words to

02:19:52   24  those documents?

02:19:54   25         THE WITNESS:  Correct.  They collected the documents,

02:19:56   1    they moved them out of the normal company systems so they had

02:20:00   2    a preserved set, and it was on that set that they applied the

02:20:04   3    search terms.

02:20:04   4            THE COURT:   Thank you.

02:20:06   5    BY MR. MAROVITZ:

02:20:08   6    Q.  And to give this some more detail on the great question

02:20:12   7    that the judge asked you about, you know -- you may not know

02:20:16   8    each of the five custodians, but you know the basic

02:20:20   9    responsibilities that those custodians had with respect to

02:20:22  10    Temple-Inland that made part of that step?

02:20:26  11    A.  For Temple?

02:20:28  12    Q.  Yes.

02:20:28  13    A.  Key players?

02:20:28  14    Q.  Yes.

02:20:28  15    A.  Yes.   Those individuals had been described in the

02:20:32  16    correspondence.  I have seen that.  It wasn't just five

02:20:34  17    employees.  These were five senior-ranking executives within

02:20:40  18    the organization that had roles of president, vice president,

02:20:46  19    head of various divisions related to the corrugated box.

02:20:50  20    Q.  In fact, was Doyle Simons, the CEO, Pat Mayley, president,

02:20:54  21    Ron Zimbelman, Roy Lind, and Larry Norton all high-ranking

02:20:58  22    officials at Inland?

02:21:00  23    A.  I believe those are the correct names, yes.

02:21:02  24    Q.  Let me move on from proportionality.

02:21:06  25         How did each of the defendants here, each of the

02:21:10  1  defendants here, make a test for false negatives?

02:21:12  2  A. Well, again, each of the -- well, first of all,

02:21:20  3  Georgia-Pacific, working with the other defendants, had

02:21:22  4  already tested the search terms not once but twice on their

02:21:26  5  own documents. It was subsequent to that second testing that

02:21:30  6  the other six defendants took and customized the key words --

02:21:34  7  the search strings, not key words, search strings for their

02:21:38  8  own organizations. Each of those subsequent six again tested

02:21:44  9  -- executed the search terms against their documents, which

02:21:46  10  created a hit set and left behind a null set, and within the

02:21:52  11  null set drew forth a random sample of documents, between 500

02:21:58  12  and 600 documents, and looked at those for potential

02:22:04  13  responsiveness.

02:22:06  14        MR. MOGIN: Your Honor --

02:22:06  15        THE WITNESS: So they tested the null set.

02:22:10  16        MR. MOGIN: -- it gets back to my preliminary

02:22:12  17  objection. Is Mr. Regard testifying to the truth of the

02:22:14  18  matter of these facts about which he has no percipient

02:22:18  19  knowledge and the sole source of which is hearsay evidence or

02:22:22  20  evidence to way the plaintiffs have not been given access,

02:22:26  21  such as --

02:22:26  22        THE COURT: Such as what?

02:22:28  23        MR. MOGIN: Such as discussions with the vendors, his

02:22:30  24  discussions with defense counsel that he's testified that he

02:22:36  25  relied upon in forming his opinions. We have nothing.

02:22:38    1      MR. MAROVITZ:  Judge, it simply isn't true they have

02:22:44    2   nothing.  We provided all of the documents.  We provided the

02:22:46    3   information that's contained on the chart, in the chart.  We

02:22:50    4   provided all the letters that we have now put together for

02:22:54    5   your Honor.

02:22:56    6      MR. MOGIN:  Let me be clear, your Honor, because this

02:22:58    7   is just --

02:22:58    8      MR. MAROVITZ:  What this is, Judge --

02:22:58    9      MR. MOGIN:  This is just not so, what Mr. Marovitz is

02:23:02   10   saying.  It is just not so.

02:23:02   11      THE COURT:  Well, this is pretty easy to figure out.

02:23:06   12      MR. MOGIN:  It certainly is.

02:23:06   13      THE COURT:  I mean, it's pretty easy to figure out.

02:23:08   14      MR. MOGIN:  When he says he provided us with the

02:23:10   15   information, he is saying that so he doesn't have to tell you

02:23:14   16   that he didn't provide us with any documents.  The information

02:23:20   17   is solely the information that's contained in their March 21st

02:23:24   18   letters.  That's it.  And as we have demonstrated, those

02:23:28   19   letters are pure hearsay.  We do not have, for example,

02:23:32   20   Mr. Regard's hit count.  We don't have that.

02:23:36   21      All the stuff with respect to the bottom portion of

02:23:40   22   the chart, which really is the guts of the chart and it's the

02:23:44   23   guts of Mr. Regard's testimony, we do not have.  And you

02:23:48   24   have -- in the letter from Temple-Inland that was submitted on

02:23:52   25   March 21st, you have their explanation.  They are not going to

02:23:58  1  give it to us supposedly because it either doesn't exist or

02:24:00  2  because it's privileged.  If it's privileged and Mr. Regard

02:24:04  3  testifies to it, that can't possibly be admissible.

02:24:06  4         MR. MAROVITZ:  Mr. Regard -- if I can finish,

02:24:08  5  Mr. Regard is not testifying as to any privileged information.

02:24:12  6  The information that's contained in Defense Exhibit 4 is

02:24:16  7  information that was based upon information that was provided

02:24:22  8  by the individual companies.  Mr. Regard described the

02:24:24  9  conversations that he's had with those companies.  We then

02:24:30  10  went ahead and documented all of the information that

02:24:34  11  Mr. Mogin and the plaintiffs asked for in the letters.  That's

02:24:36  12  why we were here last time and why I started this examination.

02:24:40  13  And we went ahead and provided all this information.

02:24:46  14         There is no cache of documents that's being withheld

02:24:48  15  here.  Mr. Regard was not funneled a lot of documents as part

02:24:52  16  of his interview process.  He asked questions, he was given

02:24:56  17  answers.  The documents that were created as part of the

02:25:00  18  letters to provide this information have been provided.

02:25:04  19         And one other thing, Mr. Regard is an expert witness.

02:25:08  20  I don't understand the whole point about this being hearsay.

02:25:10  21  He is providing the information upon which he is relying.

02:25:16  22         THE COURT:  Well, one specific thing I do want to

02:25:18  23  talk about, and I think it came in a letter from you,

02:25:22  24  Mr. Marovitz, is I thought Mr. Mogin had said, We want the

02:25:28  25  null set materials.  I don't know whether I am calling them

02:25:32    1    the right thing because I have never seen that null set. I

02:25:36    2    don't know if you actually physically had a copy of the

02:25:42    3    documents that weren't responsive. I mean, you must.

02:25:46    4    Somebody must have what was not responsive. And that's the

02:25:50    5    only document, Mr. Mogin, that I understand they did not give

02:25:58    6    you.

02:26:00    7         MR. MOGIN: What we don't have, your Honor, is, if

02:26:04    8    you recall, Mr. Regard testified that he pulled together

02:26:08    9    documents and pulled together information from various

02:26:10   10    sources. Included in the sources were vendors who actually

02:26:14   11    performed the testing, the validation testing.

02:26:20   12         We have nothing as far as that goes. We don't have a

02:26:24   13    single document, for example, that shows the hit count, just

02:26:30   14    the hit count. We don't have a single document. What we have

02:26:34   15    are letters from the defendants --

02:26:36   16         THE COURT: Explaining what they did.

02:26:40   17         MR. MOGIN: Right. And if there is a better

02:26:44   18    illustration as to why those letters are not reliable in this

02:26:46   19    proceeding, it's the very fact that Mr. Neuwirth conceded this

02:26:52   20    morning that there was a mistake that was made, or at least a

02:26:56   21    distinction, between what he put on behalf of Georgia-Pacific

02:27:00   22    in the November 22nd letter and what his witness, Mr. Brown,

02:27:06   23    testified to, at least with respect to domain names.

02:27:10   24         Now, you can say, Oh, well, the domain names are a

02:27:12   25    small point. But the fact of the matter is they're asking us

02:27:16    1    to rely upon lawyer letters, unsworn lawyer letters, which

02:27:22    2    they then turn over to the expert, which the expert then is

02:27:26    3    trying to bring in through the back door as facts.  It's

02:27:28    4    hearsay inside of hearsay inside of hearsay, none of which is

02:27:32    5    admissible.

02:27:34    6          Now -- and this gets back to some of the other

02:27:36    7    problems with Mr. Regard's testimony.  Let's assume for the

02:27:40    8    sake of argument, I am not conceding this point, assume for

02:27:44    9    the sake of argument that best practices has some relevance in

02:27:48   10    this proceeding.  I don't believe that it does.  Does it mean

02:27:52   11    that if they complied with best practices, that they don't

02:27:54   12    have to do anything more with respect to search?  What does

02:27:58   13    best practices have to do with anything?

02:28:00   14          The real issue here is did the defendants comply or

02:28:06   15    are they likely to comply with our request for production of

02:28:10   16    documents and is their method sufficient?  Whether it meets

02:28:14   17    best practices or not, as Mr. Regard has defined it, is

02:28:18   18    irrelevant.

02:28:20   19          The issue is, what's going to be the end result?  Are

02:28:24   20    we going to spend the next three years coming before your

02:28:26   21    Honor every 60 days to argue motions to compel because we have

02:28:32   22    discovered something more in the case?  Is that going to

02:28:34   23    happen?  Are the motions to compel going to be this high,

02:28:38   24    higher than even myself, your Honor?  Not that that's a

02:28:44   25    particular high bar, but you understand the point.

02:28:48　1　　　　　MR. MAROVITZ:  Your Honor, a few things.

02:28:48　2　　　　　First, Mr. Regard has already testified today there

02:28:52　3　is no cache of documents to which he has been provided that

02:28:56　4　Mr. Mogin doesn't have.  So let's put that behind us.

02:28:58　5　　　　　MR. MOGIN:  If I --

02:29:00　6　　　　　MR. MAROVITZ:  If I could finish.  Second, if

02:29:02　7　Mr. Mogin wants to argue the case, there is an appropriate

02:29:04　8　time and place for that, and it's not during the middle of

02:29:06　9　witness testimony.

02:29:08　10　　　　　Third, the fact is that each of these defendants, if

02:29:12　11　your Honor believes it's important, could present declarations

02:29:14　12　or witnesses to walk through each of these.  That entire

02:29:18　13　process would take days, if not weeks.  I have never been

02:29:22　14　involved in a case like this before where that has been

02:29:26　15　required.

02:29:26　16　　　　　We have tried to streamline this in a way to provide

02:29:30　17　the court with a sufficient degree of education so that it

02:29:32　18　could make a reasoned, informed judgment, assuming, as

02:29:38　19　Dr. Lewis said before, that attorneys were operating in good

02:29:42　20　faith.  But we're happy, if the court believes that we need to

02:29:44　21　put in declarations or something like that, we will do that.

02:29:46　22　　　　　THE COURT:  I understand --

02:29:48　23　　　　　MR. MAROVITZ:  I would just like to get -- if I may,

02:29:50　24　your Honor, I appreciate Mr. Mogin is protecting his record.

02:29:52　25　I understand that.  But I am very concerned about getting

| | | |
|---|---|---|
| 02:29:56 | 1 | through Mr. Regard's testimony today. |

02:29:56  1  through Mr. Regard's testimony today.

02:29:56  2  THE COURT:  So am I.

02:29:58  3  MR. MAROVITZ:  And I'd like to be able to do that.

02:30:00  4  THE COURT:  Mr. Mogin, I am going to -- because I

02:30:02  5  have some idea on this case too.  You don't know the brilliant

02:30:10  6  ideas I have on the case.  I would like to hear what

02:30:12  7  Mr. Regard says.  I can do a number of things with his

02:30:16  8  testimony, I am fully aware of what I can do with it, but I am

02:30:22  9  going to -- you have a continuing objection.  I am going --

02:30:26  10  the record is clear.  You have a continuing objection on a

02:30:32  11  number of levels.  I think the record is clear.  Your motion

02:30:34  12  yesterday, you preserved your motion, and I would like to get

02:30:44  13  more information about these other six people.

02:30:48  14  I mean, this is the closest I've got to at least even

02:30:52  15  know what to ask as the next question.  Whether I need the six

02:30:56  16  people to come in here, whether I need an affidavit, I mean, I

02:31:00  17  do.  So I at least would like to hear what the fellow has got

02:31:04  18  to say here.

02:31:06  19  MR. MOGIN:  Very well, your Honor.  You had told me

02:31:08  20  to jump up, so I was jumping up.

02:31:10  21  THE COURT:  And I am the boss.  Okay.  Bye.

02:31:12  22  MR. MAROVITZ:  Thank you, your Honor.

02:31:12  23  BY MR. MAROVITZ:

02:31:14  24  Q.  Mr. Regard, I see that Judge Nolan has before her

02:31:16  25  Exhibit 4.  That's tab D, I think, to your report.  If you

| 02:31:20 | 1 | could open that up, maybe that's a good place to start. |

02:31:20   1   could open that up, maybe that's a good place to start.
02:31:24   2   A.  Yes, sir.
02:31:26   3   Q.  Tell us what Exhibit 4 is.
02:31:26   4   A.  Well, as I described earlier, in the course of my
02:31:34   5   engagement, I reviewed the historical correspondence and
02:31:38   6   pleadings in this case specifically around the selection of
02:31:42   7   key players and the development of search terms, but I was
02:31:46   8   also given the opportunity to have telephonic conversations
02:31:50   9   with the various defendants.  In preparation and in the course
02:31:54   10  of that discussion, your Honor, I realized I was going to have
02:32:00   11  a lot of information I wanted to track, and I wanted to make
02:32:02   12  sure I was focused on information I was asking, so I created
02:32:06   13  this chart to facilitate those discussions and to help me
02:32:10   14  organize the information that I was learning.  This was
02:32:12   15  originally created as a way to help me recall these
02:32:14   16  conversations.
02:32:18   17        And so I created this chart, which has one column for
02:32:22   18  each of the six defendants I spoke with, and the first column
02:32:26   19  is a list of textual descriptions of the input for each of the
02:32:30   20  other six columns.  So that's the high-level review of this
02:32:34   21  chart.
02:32:34   22  Q.  So walk us through the chart so we understand what it
02:32:38   23  means.
02:32:38   24  A.  Well, I will go line by line.  The first line is the
02:32:44   25  defendant.  For each of the columns, I listed the name of the

| | | |
|---|---|---|
| 02:32:46 | 1 | defendant for whom this information pertained. |
| 02:32:50 | 2 | The next line is counsel. For each of the |
| 02:32:52 | 3 | defendants, I listed the name of the counsel that I gathered |
| 02:32:54 | 4 | or that I learned through my conversations. |
| 02:32:58 | 5 | The next line is the technology consultants. I had a |
| 02:33:02 | 6 | chance to speak with the consultants for each one of the |
| 02:33:06 | 7 | defendants, and I recorded their organization here. The |
| 02:33:08 | 8 | documents were reviewed by. One of my questions was, who did |
| 02:33:12 | 9 | the document review for the testing purposes. And I recorded |
| 02:33:16 | 10 | here that it was in the -- for example, in the case of |
| 02:33:20 | 11 | Temple-Inland, it was Mayer Brown that did the document |
| 02:33:22 | 12 | review. |
| 02:33:24 | 13 | The next line, the processing and search term |
| 02:33:28 | 14 | technology. The defendants did not use the same software. |
| 02:33:32 | 15 | They didn't use the same consultant or vendor. Here I |
| 02:33:36 | 16 | recorded the various software tools that were used by the |
| 02:33:38 | 17 | defendants for this process of gathering -- not gathering, but |
| 02:33:42 | 18 | indexing documents, managing documents and providing search |
| 02:33:50 | 19 | technology and the other technologies that were used. |
| 02:33:52 | 20 | The number of custodians. Here, I marked down -- |
| 02:33:56 | 21 | again, originally, your Honor, this originally was to help me |
| 02:34:00 | 22 | remember all these conversations. |
| 02:34:00 | 23 | THE COURT: Okay. |
| 02:34:02 | 24 | THE WITNESS: It only became later the thought that |
| 02:34:04 | 25 | this would be helpful in this court as well. |

| | | |
|---|---|---|
| 02:34:08 | 1 | I marked down the number of custodians that had been |
| 02:34:10 | 2 | collected.  Each of these marks it down.  The only difference |
| 02:34:14 | 3 | really is Temple-Inland, which has a stroke, 28-stroke-five, |
| 02:34:20 | 4 | because I learned that they used five custodians for their |
| 02:34:22 | 5 | initial key word search testing but ultimately gathered 28 |
| 02:34:28 | 6 | custodians and used that for their document collection |
| 02:34:32 | 7 | processing and review. |
| 02:34:34 | 8 | Search terms used to collect documents.  I wanted to |
| 02:34:38 | 9 | know if search terms were used to collect documents from the |
| 02:34:40 | 10 | organization or if they were collected, as we discussed, |
| 02:34:44 | 11 | wholesale.  I learned that none of the defendants used search |
| 02:34:46 | 12 | terms to collect documents.  They collected them, which really |
| 02:34:50 | 13 | facilitates the subsequent review of the null set, because you |
| 02:34:54 | 14 | now have the documents in one sandbox, as it were, so you can |
| 02:34:58 | 15 | find out which ones are hits and which ones are null rather |
| 02:35:02 | 16 | than going back into the native systems, which is very |
| 02:35:04 | 17 | difficult. |
| 02:35:04 | 18 | The next item is modifications disclosed to |
| 02:35:12 | 19 | plaintiffs.  Part of best practices is to discuss with a |
| 02:35:16 | 20 | counter-party what the process is that you're going through. |
| 02:35:18 | 21 | Not everybody does that, but it certainly is something that's |
| 02:35:22 | 22 | highly recommended.  Here, each one of the defendants |
| 02:35:24 | 23 | disclosed the search terms that they were applying themselves, |
| 02:35:28 | 24 | and I marked down the dates that they were disclosed. |
| 02:35:32 | 25 | I took some notes in the current course of my |

02:35:34  1  conversations.  I wrote these down on the chart.  I can go

02:35:38  2  through those, your Honor, or I can just skip down to the

02:35:40  3  bottom.

02:35:44  4  BY MR. MAROVITZ:

02:35:44  5  Q.  Mr. Regard, unless --

02:35:44  6        THE COURT:  No, I don't.

02:35:44  7  BY MR. MAROVITZ:

02:35:46  8  Q.  Please skip down to the bottom for us.

02:35:48  9  A.  Down at the bottom again, I marked the names of the

02:35:50  10  defendants, how many documents they had collected for testing

02:35:56  11  purposes, especially the case of Temple-Inland.

02:35:58  12        THE COURT:  All right.  So where did you get that

02:36:02  13  information?

02:36:02  14        THE WITNESS:  When I was on the phone, I asked for

02:36:04  15  it.

02:36:04  16        THE COURT:  Well, I know, but, I mean, did -- when

02:36:08  17  you're saying you talked to the defendant, I mean, you must

02:36:12  18  have talked to -- okay.  So for Temple-Inland --

02:36:16  19        THE WITNESS:  I was on the phone.

02:36:18  20        THE COURT:  -- who or what type of person told you

02:36:20  21  about the collection?  That's what I want to know.  Or did you

02:36:26  22  have a printout on this?  How did you get 183,757, this

02:36:34  23  number?

02:36:34  24        THE WITNESS:  I was on the phone with counsel and the

02:36:38  25  consultants for Temple-Inland --

02:36:38  1    THE COURT:  Okay.

02:36:40  2    THE WITNESS:  -- and I asked them, do they know how

02:36:42  3 many documents they collected.  And they said, Yes, we do.

02:36:46  4    THE COURT:  All right.

02:36:46  5    THE WITNESS:  The number is, and they gave me the

02:36:48  6 number 183,757, and I recorded it.

02:36:54  7 BY MR. MAROVITZ:

02:36:56  8 Q.  Is the same thing true, Mr. Regard, for hits, null set,

02:36:58  9 test set, and test set responsive?  Why don't you walk us

02:37:04 10 through where that came from and how that works.

02:37:08 11 A.  I asked them how many documents they had collected, how

02:37:10 12 many hits they had when they ran the search terms.  I don't

02:37:12 13 recall if I asked them how large the null set was or if I did

02:37:16 14 the math myself, but you will note that the null set plus the

02:37:18 15 hits is equal to the collection, which is what I would expect.

02:37:22 16 I asked them if they had tested documents and, if so, how many

02:37:26 17 they had tested randomly.

02:37:30 18    These are the answers I recorded under the test set.

02:37:32 19 I asked how many documents had been found to be responsive.  I

02:37:36 20 recorded that down.  And either they had reported to me or I

02:37:42 21 did the math again.  In this case of Temple-Inland, the first

02:37:46 22 column, 1.4 percent is the result of dividing 7 by 500.

02:37:54 23 Q.  Now, Mr. Regard, your chart at the bottom in the left, it

02:38:00 24 says, The defendants are 95 percent confident that the null

02:38:04 25 set contains no more than this percent of potentially relevant

02:38:08  1   documents, plus or minus 5 percent or less.

02:38:10  2       What did you mean there by "potentially relevant

02:38:14  3   documents"?

02:38:14  4   A.  Well, that whole phrase is sort of the -- I want to say

02:38:20  5   the worst case scenario, it is the most conservative

02:38:24  6   interpretation of the various testings that all the defendants

02:38:30  7   did.

02:38:30  8       When I say potentially relevant documents, I'm

02:38:32  9   referring to documents relevant to this testing, documents

02:38:34  10  that would have been responsive to the search -- not to the

02:38:38  11  search terms, because they weren't responsive to the search

02:38:42  12  terms, but that the defendants found when they tested the null

02:38:44  13  set would have otherwise have been responsive to the document

02:38:48  14  requests from the plaintiffs.

02:38:48  15  Q.  Mr. Regard, does Defense Exhibit 4 fairly and accurately

02:38:54  16  summarize the information you obtained in your investigation

02:38:56  17  and study of document review procedures?

02:39:00  18  A.  It reflects it precisely.

02:39:06  19      MR. MAROVITZ:  I understand, your Honor, this is

02:39:06  20  subject to Mr. Mogin's objection and to your Honor's decision,

02:39:10  21  obviously, but we would move for admission of the report.

02:39:14  22      THE COURT:  I am certainly going to take that under

02:39:16  23  advisement.

02:39:16  24  BY MR. MAROVITZ:

02:39:20  25  Q.  By the way, Mr. Regard, do you understand the defendants

02:39:22  1  generate random samples?

02:39:24  2  A.  Yes, sir.

02:39:26  3  Q.  And are those samples generated in different ways by

02:39:32  4  different processing and search term technology platforms?

02:39:38  5  A.  They are.  Every platform that I am familiar with has the

02:39:42  6  ability to generate random samples, but as Dr. Lewis

02:39:46  7  testified, that can also be done external to the technology

02:39:50  8  itself.

02:39:50  9  Q.  Have you seen any literature in which you have seen that

02:39:56  10 there is a suggestion, for instance, Clearwell's randomizer,

02:40:02  11 features bias in some way?

02:40:04  12 A.  I have not seen anything like that.

02:40:06  13 Q.  What did the testing tell you as an experienced

02:40:08  14 practitioner who is familiar with best practices about the

02:40:12  15 performance of the ESI protocol used here?

02:40:16  16      THE COURT:  Well, as to what -- as to which part?  I

02:40:22  17 mean, we now all know there's a number of steps.  And so as

02:40:28  18 to --

02:40:32  19      MR. MAROVITZ:  Fair point, your Honor.  What I was

02:40:34  20 driving at was all the steps taken together as part of the ESI

02:40:38  21 protocol, Mr. Regard testified earlier that he thought that

02:40:40  22 defendants' process met or exceeded best practices, and I was

02:40:44  23 trying to bring to circle all the way from the end.

02:40:48  24      So I was curious after he has been through this

02:40:50  25 process, asked these questions to the defendants and to their

02:40:56  1   vendors, their consultants, what conclusions he reached based

02:41:00  2   upon all the data that he was given as an expert witness in

02:41:04  3   this case.

02:41:18  4         THE COURT:  Well, this is really hard to do because

02:41:30  5   we know, or at least I feel like I know about Georgia-Pacific,

02:41:38  6   how many random samples they took, what they did after they

02:41:42  7   got the random samples, and you're asking him a very general

02:41:44  8   question here where we have none of that subpart here at all.

02:41:50  9   He didn't perform any of the subpart.

02:41:56  10        So I don't know what he would know.  I don't know

02:42:00  11  what he would know -- I mean, I think he can tell us other

02:42:06  12  things.  I don't know what that question is -- how that

02:42:10  13  question is going to move the ball here.

02:42:12  14        MR. MAROVITZ:  Let me ask it a different way, if I

02:42:14  15  may, Judge?

02:42:14  16        THE COURT:  All right.

02:42:16  17  BY MR. MAROVITZ:

02:42:16  18  Q.  Just looking at the results that were obtained, you can

02:42:18  19  see, Mr. Regard, that the results that were obtained were

02:42:22  20  different for each of the six custodians, correct?

02:42:26  21  A.  Six defendants?

02:42:28  22  Q.  Fair enough, six defendants.

02:42:30  23  A.  Yes, sir.

02:42:30  24  Q.  And, obviously, this chart -- as Judge Nolan has pointed

02:42:34  25  out, this chart does not include Georgia-Pacific, so it's the

02:42:38   1   other six defendants.

02:42:40   2        What does the fact that these results are different

02:42:44   3   -- so you didn't perform these, but they were given to you.

02:42:46   4   What does the fact that these results are different tell you,

02:42:50   5   in your expert opinion?

02:42:52   6   A.  I think it would be natural to question whether or not

02:42:54   7   they would have been identical because each of the defendants

02:42:56   8   had different document sets, each of them used different

02:43:00   9   technologies, each one of them modified the search terms to

02:43:04   10  fit their personal technology and their personal organization.

02:43:10   11  And as I testified, each one of them relied on the initial

02:43:14   12  search terms that were developed through the iterative process

02:43:18   13  that Georgia-Pacific went through.  Not once, but

02:43:20   14  Georgia-Pacific went through it twice.  Again, they had input

02:43:24   15  to it, but it was only tried against Georgia-Pacific's

02:43:26   16  documents.

02:43:28   17       So the third round of application of search terms by

02:43:32   18  each of the defendants individually is where I would have an

02:43:36   19  interest in seeing how those search terms performed.

02:43:40   20       And these different numbers tell me two things.  One

02:43:48   21  is that, at least in this null set measuring, if you accept

02:43:50   22  these numbers, that the residual percentage of responsive

02:43:56   23  documents was very low; but more importantly, from a

02:44:02   24  confirmation of the process, that the variation between the

02:44:06   25  different defendants is very narrow.  That within the narrow

02:44:10    1    band of variance, they all had less than a 5 percent residual

02:44:14    2    rate of potentially responsive documents.

02:44:18    3         So it doesn't make the process a reasonable

02:44:22    4    thought-out process, but it does confirm that the reasonable

02:44:26    5    thought-out process that was ascribed to me did, in fact,

02:44:30    6    produce good results.

02:44:32    7    Q.  I'd like to focus on a different topic, if we can, and

02:44:36    8    that's particularly -- unless, Judge, you have any other

02:44:38    9    questions?

02:44:38    10        THE COURT:  No.

02:44:38    11    BY MR. MAROVITZ:

02:44:40    12    Q.  -- (continuing) particularly on advantages to properly use

02:44:44    13    key words.  Okay?

02:44:44    14    A.  Okay.

02:44:46    15    Q.  While you certainly have to look at the specifics of any

02:44:48    16    ESI collection search procedure, whether it's Boolean

02:44:54    17    searching, some form of predictive coding, some combination of

02:44:58    18    the two, or something entirely different, do you believe, in

02:45:02    19    your expert opinion, that Boolean key words present some

02:45:06    20    inherent advantages?

02:45:06    21    A.  Like any system, there are advantages -- every system has

02:45:08    22    its own advantages.  Boolean searching certainly has its

02:45:12    23    advantages.

02:45:12    24    Q.  And let's walk through some of those.

02:45:18    25        First, do you believe that there are transparency

| | | |
|---|---|---|
| 02:45:20 | 1 | advantages to Boolean searching? |
| 02:45:22 | 2 | A.  I do. |
| 02:45:24 | 3 | Q.  How so? |
| 02:45:24 | 4 | A.  Well, when we work with Boolean searching, and as Boolean |
| 02:45:30 | 5 | terms were used in the documentation in this case, they can |
| 02:45:34 | 6 | actually be printed out, they can be disclosed, they can be |
| 02:45:36 | 7 | discussed.  The idea that you can actually write them out |
| 02:45:42 | 8 | gives them that degree of transparency; you can see them, you |
| 02:45:46 | 9 | can work with them, you can see what the computer is using to |
| 02:45:48 | 10 | apply those search terms. |
| 02:45:50 | 11 | Q.  And how about familiarity?  Does Boolean searching provide |
| 02:45:56 | 12 | some familiarity to the process? |
| 02:45:58 | 13 | A.  I think it's one of the things we are talking about today |
| 02:46:00 | 14 | is, are we talking about existing technology versus emerging |
| 02:46:04 | 15 | technologies. |
| 02:46:04 | 16 | Boolean searching has been around for a very long |
| 02:46:08 | 17 | time.  We had searches going back -- the testimony this |
| 02:46:12 | 18 | morning, Blair and Maron study goes back to 1985, they were |
| 02:46:16 | 19 | already looking at Boolean search technology.  Thanks to the |
| 02:46:22 | 20 | Internet, it's something people are very familiar with. |
| 02:46:24 | 21 | Q.  How about proximity; does Boolean searching provide any |
| 02:46:28 | 22 | kind of advantage when it comes to proximity? |
| 02:46:30 | 23 | A.  Yes, it does.  The Boolean search tools that we use today |
| 02:46:34 | 24 | allow us to specify word proximity.  The ability to require |
| 02:46:42 | 25 | that two words be within a phrase, used in quotations, the |

02:46:48　1　ability to require that two words be within a certain number

02:46:50　2　of words of each other is helpful when trying to limit the

02:46:56　3　number of documents and focus documents on key phrases rather

02:47:00　4　than that those words would appear anywhere in the document.

02:47:04　5　Q.　Does the Boolean approach present advantages for

02:47:08　6　commutative properties?

02:47:10　7　A.　Again, I feel that it does in that Boolean search terms, I

02:47:14　8　find, are not commutative sensitive.  Obviously, a Boolean

02:47:22　9　mathematical string has commutative issues with ands and ors,

02:47:26　10　but once you have the string and you apply it to a set of

02:47:30　11　documents, you will get the same results whether you apply

02:47:32　12　that to documents 1 through 100 or documents 100 through 1.

02:47:38　13　It doesn't matter which order you apply the documents.  I

02:47:40　14　don't see that same commutative response with every type of

02:47:44　15　information retrieval system.

02:47:46　16　Q.　And you heard Dr. Lewis testify this morning about how

02:47:50　17　machine learning might produce different results based upon

02:47:56　18　different software that was used for different viewers.

02:47:58　19　　　　　Does a Boolean approach have advantages with respect

02:48:02　20　to repeatability?

02:48:04　21　A.　We tend to find that Boolean search strings execute

02:48:06　22　similarly, if not identically, across multiple platforms,

02:48:10　23　competing software tools.  So it's been my experience that

02:48:16　24　when I describe a search that I ran on a set of documents in

02:48:20　25　one software tool to someone and they execute it on the same

02:48:24  1  documents on a different software tool, they get the same
02:48:26  2  results.
02:48:26  3  Q.  You listed a number of advantages to Boolean searches.
02:48:30  4  Are there any advantages to machine learning that you are
02:48:32  5  aware of?
02:48:34  6  A.  Absolutely.
02:48:36  7  Q.  What's one of those, for example?
02:48:36  8  A.  One of the advantages of machine learning is that if you
02:48:44  9  are willing to rely on the training set and rely on the system
02:48:48  10  that you're using that you're training, then you can curtail
02:48:52  11  the number of documents you need to look at.  There are
02:48:56  12  tradeoffs for that, but you can -- in the interest of time, if
02:48:58  13  you're interested in the amount of time that it takes to
02:49:00  14  review documents, studies suggested that you can look at fewer
02:49:06  15  documents in a shorter amount of time using properly trained
02:49:12  16  machine learning systems.
02:49:12  17  Q.  You said, "There are tradeoffs for that."  What are some
02:49:14  18  of those?
02:49:16  19  A.  Well, machine learning is still expensive.  It's an
02:49:22  20  expensive process.  You need to still pay to have your
02:49:24  21  documents indexed, and the systems that I am familiar with
02:49:28  22  have a surcharge for machine learning indexing and technology
02:49:32  23  versus indexing for search terms.
02:49:34  24  Q.  Are there any others that you can think of in this
02:49:38  25  context?

02:49:38  1   A.  Well, I think that Dr. Lewis has described at great length
02:49:46  2   the amount of care necessary for the proper training of
02:49:48  3   machine learning systems.
02:49:50  4           You also -- when you use machine learning, you don't
02:49:52  5   need to go through the process of developing the key words,
02:49:56  6   though, that were done in this process.  So there is a
02:49:58  7   tradeoff there.  You spend more time perhaps on the training
02:50:02  8   but less time developing the key words.
02:50:04  9           In this case, the defendants in Georgia-Pacific spent
02:50:08  10  a lot of time developing key words.
02:50:10  11  Q.  Based upon all of this information that you received
02:50:14  12  during your conversations with the defendants, the
02:50:18  13  correspondence that you were given, based upon your expertise
02:50:20  14  and your knowledge as an expert in this particular industry,
02:50:24  15  do you have an opinion on whether the defendants' search
02:50:26  16  protocol, which included but was not limited to key words, met
02:50:30  17  or exceeded best practices?
02:50:32  18  A.  Well, you said included but not limited to key words.  We
02:50:36  19  didn't really discuss that.  I believe it's in my report.
02:50:40  20          But overall, in general, I find that the process
02:50:44  21  followed by the defendants is the same or exceeds the process
02:50:50  22  that I recommend to my own clients in cases that I have worked
02:50:52  23  on, and it's consistent with the work that I have done on best
02:50:56  24  practices at the Sedona Conference and elsewhere.
02:51:00  25  Q.  I don't want to cut you short on any part of something

02:51:04 1  that's important for the court to understand.  You said

02:51:06 2  there's something in your report about the fact that this

02:51:08 3  particular protocol relied upon key words but was not limited

02:51:10 4  to them, and we haven't discussed it.  What did you mean by

02:51:16 5  that?

02:51:16 6  A.  In the course of developing the key words, the defendants

02:51:20 7  also, and they disclosed this, have relied upon other -- not

02:51:28 8  machine learning, but the linguistic functionality of

02:51:32 9  Clearwell and the tools that they're using to test the null

02:51:34 10  set, to look at the residual documents, to use context

02:51:38 11  searching or topic searching, to use other methodologies to

02:51:42 12  see are there indices, that there are sets of identifiable

02:51:48 13  patterns and documents that are being left behind.

02:51:52 14      THE COURT:  All right.  Did Georgia-Pacific, because

02:51:54 15  I don't have that testimony memorized, did they go into -- on

02:52:02 16  their direct or on their cross, did they go into that they

02:52:10 17  used computer-assisted materials?

02:52:12 18      MR. NEUWIRTH:  Yes, I believe that that was discussed

02:52:14 19  in some detail by Mr. Koch and by Mr. Brown, and if it would

02:52:20 20  be helpful to the court, after the hearing, we can direct you

02:52:22 21  to where that is in the transcript.

02:52:26 22      THE COURT:  All right.

02:52:26 23      Now, do you know, do you actually know, or did you

02:52:32 24  discuss with any of the other six here what kind of

02:52:40 25  computer-assisted machine, whatever you want to call it, each

02:52:48 1 of the defendants used and at what stage they used it or how

02:52:54 2 they used it? Do you know?

02:52:56 3 THE WITNESS: I don't recall --

02:52:56 4 THE COURT: With Temple. Do you know, because you

02:52:58 5 were working for Temple? Do you know what Temple did?

02:53:02 6 THE WITNESS: Yes, ma'am.

02:53:02 7 THE COURT: Okay.

02:53:04 8 THE WITNESS: My recollection is after Temple ran the

02:53:08 9 search terms that they had modified for their organization,

02:53:14 10 they looked at the null set documents, they chose a random set

02:53:18 11 of the null set documents.

02:53:20 12 And then after they looked at the null set, they

02:53:22 13 also, using the Clearwell functionality of topics, looked at

02:53:30 14 the topics that Clearwell automatically generates associated

02:53:36 15 with the null set documents to see if there were phrases or

02:53:42 16 topics that seemed indicative of likely responsive documents.

02:53:48 17 THE COURT: All right. So then what did they do with

02:53:54 18 that information when they got it?

02:53:56 19 THE WITNESS: Then they identified a few topics that

02:54:00 20 looked as if --

02:54:02 21 THE COURT: Do you then make -- if you are using

02:54:04 22 Boolean, then do you turn what you learn from Clearwell into a

02:54:08 23 key word search? Do you add more key words? Is that what you

02:54:12 24 do?

02:54:12 25 THE WITNESS: You can, your Honor. Typically, what

02:54:14 1   would happen would be -- remember, we are looking at the end

02:54:18 2   of a testing process as opposed to the middle of the revisions

02:54:22 3   and modifications.  What would normally happen during

02:54:24 4   revisions and modifications is that you would run search terms

02:54:28 5   against your documents --

02:54:30 6         THE COURT:  Right.

02:54:30 7         THE WITNESS:  -- you would get some hits, you would

02:54:32 8   look at them and say, Some of these are actually responsive

02:54:36 9   and some of these are not.

02:54:38 10         THE COURT:  Okay.

02:54:38 11         THE WITNESS:  So if we are getting documents that are

02:54:40 12   not responsive, we probably want to change our search terms

02:54:44 13   and see if we can change them in a way that we continue to get

02:54:46 14   the ones we want and we don't get the ones we don't want.

02:54:50 15       And then you look at the documents you didn't get,

02:54:52 16   the null set, you look at some of those, and you say, We took

02:54:56 17   a sample of the null set.  Some of these were responsive, some

02:55:00 18   of these are not.  Why were these responsive documents not

02:55:02 19   responding to our search terms?  And you go back and

02:55:06 20   re-examine your search terms and decide, do you need to make

02:55:08 21   modifications and can you?

02:55:10 22       Sometimes you might see a word in a document you

02:55:14 23   missed and say, We should add that, but then when you add it,

02:55:18 24   it brings in 500 new documents that are totally nonresponsive.

02:55:22 25   So it's constantly a balancing test between am I getting more

02:55:26   1   good than bad when I make this change.

02:55:30   2   BY MR. MAROVITZ:

02:55:30   3   Q.  Mr. Regard, just to be clear, the non-GP defendants were

02:55:36   4   able as part of the entire process that you have described

02:55:38   5   before to benefit from the GP iterative process that we have

02:55:44   6   heard about in the last hearing, correct?

02:55:46   7   A.  Not just benefit.  They participated in it.  They gave

02:55:50   8   feedback, they gave commentary, and they helped create those

02:55:52   9   search terms.

02:55:52  10   Q.  I want to make sure the record is clear on one thing.  You

02:55:56  11   mentioned Clearwell a minute ago.  On your chart, Defense

02:56:00  12   Exhibit 4, if you look at the processing of search term

02:56:04  13   technology, some of the defendants used Clearwell and some of

02:56:06  14   the defendants used other processing search term technology.

02:56:10  15           Is it your testimony that all of the defendants used

02:56:12  16   Clearwell?

02:56:14  17   A.  No.  I thought I had made that clear.

02:56:16  18   Q.  I may have misheard you.

02:56:18  19   A.  No, they did not all use Clearwell.  I was talking

02:56:22  20   specifically about Temple.

02:56:22  21   Q.  And one other small point.  I think you had mentioned

02:56:24  22   earlier that there had been 15 search strings, one prepared

02:56:30  23   for each request for production.  In fact, some of the search

02:56:34  24   strings that the defendants prepared actually covered multiple

02:56:38  25   requests for production, did they not?

| | |
|---|---|
| 02:56:38 | 1 |
| 02:56:46 | 2 |
| 02:56:48 | 3 |

A.   I believe that's correct.  There is not a one-to-one
correlation between the search strings and individual requests
for production.

4   MR. MAROVITZ:  Your Honor, if I could turn to
5   custodians, I'd be pleased to do that unless the court has
6   additional questions on this.

7   THE COURT:  Is this -- this came to our office.  What
8   does this --

9   MR. MAROVITZ:  That's not mine.

10   MS. MILLER:  That's plaintiffs', your Honor.

11   THE COURT:  That's plaintiffs'.

12   MR. MAROVITZ:  You may see that later.

13   THE COURT:  Okay.

14   MR. MAROVITZ:  Mr. Regard may see that later.

15   THE WITNESS:  Would you like to see it in chambers?

16   THE COURT:  Okay.

17   Yes, you can go on to custodians.

18   BY MR. MAROVITZ:

19   Q.  Mr. Regard, are you familiar with the method -- let me
20   start again.

21   I think you have already testified today about the
22   method that the defendants used in identifying custodians and
23   document sources in this case.

24   Just describe for us, in general terms so we can
25   understand ourselves, how that's done.

02:57:50  1  A.  Well, in this particular case, the defendants chose

02:57:52  2  custodians based on the document requests they had received

02:57:56  3  from plaintiffs and the allegations in the case.  And it's

02:58:00  4  already been put forth in the record, or at least in the

02:58:04  5  correspondence, that they chose key players who had roles and

02:58:08  6  responsibilities consistent with the documents requested in

02:58:14  7  the allegations and they chose key players who were expected

02:58:18  8  to have the highest concentration of responsive documents.

02:58:22  9  Q.  You understand that Mr. Hanners, an expert who has

02:58:26  10  testified on behalf of plaintiffs, has taken the position that

02:58:30  11  defendants should be required to collect fully and completely

02:58:32  12  all information on a corporate function department or work

02:58:36  13  unit basis instead of by custodian only, correct?

02:58:40  14  A.  I did hear that testimony, yes.

02:58:42  15  Q.  And according to Mr. Hanners, the failure to do that in

02:58:46  16  general investigative terms is like searching a house for

02:58:50  17  computer information but not looking into every room of the

02:58:52  18  house, correct?

02:58:54  19  A.  I heard the testimony.  I don't necessarily agree with it.

02:58:58  20  Q.  Let me ask you about that.  Without regard to whether a

02:59:00  21  party uses a Boolean search approach, a machine learning

02:59:04  22  approach, or some other approach, do you have an opinion on

02:59:08  23  the current prevailing best practice for the source of

02:59:12  24  collection of ESI?

02:59:12  25  A.  I know from my experience what my clients have done in

02:59:20    1    multiple litigations over the last 15, 20 years, and that has
02:59:24    2    been to collect documents on a custodial basis.  The reason
02:59:28    3    behind that is because documents, by and large, are organized
02:59:32    4    on a custodial basis within organizations.  We all use the
02:59:36    5    information technology ourselves.  When I go to collect
02:59:42    6    documents within organizations, we see documents organized by
02:59:46    7    mailbox, by desktop, by individual storage area on the
02:59:50    8    servers, and so when we collect information, we collect it
02:59:54    9    also on that same custodial basis.  And my understanding is,
02:59:58    10   by and large, although not entirely, that's the way the
03:00:02    11   information is collected here.
03:00:02    12          To go instead to every single custodian or to every
03:00:06    13   single server or to every single system when there is no
03:00:10    14   expectation of finding responsive documents there as
03:00:14    15   Mr. Hanners would suggest is simply not done.  It's not
03:00:18    16   appropriate.
03:00:20    17   Q.  And you said "by and large" a minute ago, custodian-based
03:00:26    18   approach by and large.  What did you mean by that?
03:00:28    19   A.  Well, we find areas of document storage where it came that
03:00:36    20   people may share information.  And my understanding is that
03:00:38    21   those sources were also considered, especially applications
03:00:40    22   that have information.  Whether it be financial or inventory,
03:00:44    23   that type of information is not really a person-custodian
03:00:50    24   specific; it's a function specific.  It's also been identified
03:00:54    25   and collected.

| | | |
|---|---|---|
| 03:00:54 | 1 | Q.  What's the harm in searching every room in the house, |
| 03:00:58 | 2 | searching everywhere documents are located, and then |
| 03:01:02 | 3 | separating the wheat from the chaff later on? |
| 03:01:06 | 4 | A.  There's a lot of problems with that approach.  Number one, |
| 03:01:08 | 5 | it's obviously time-consuming to go everywhere instead of |
| 03:01:12 | 6 | where you naturally think the documents are.  To use the |
| 03:01:16 | 7 | analogy of a house, if it's your house and you needed to go |
| 03:01:18 | 8 | find a book, you wouldn't go in every room.  You'd go to where |
| 03:01:22 | 9 | you keep your books. |
| 03:01:22 | 10 |        And so it's a lot easier when companies understand |
| 03:01:26 | 11 | their own systems and their own organization to identify those |
| 03:01:30 | 12 | areas most likely to have the information that's being |
| 03:01:32 | 13 | requested.  I don't know if that's a best practice.  It's a |
| 03:01:36 | 14 | prevailing practice.  That's what I see in every case I work |
| 03:01:38 | 15 | in. |
| 03:01:40 | 16 |        The downside of collecting everything and, to use |
| 03:01:42 | 17 | your phrase, separating the wheat from the chaff, is that's an |
| 03:01:46 | 18 | expensive process.  It's expensive and it's time-consuming. |
| 03:01:50 | 19 | And these collections of documents, the processing, the |
| 03:01:54 | 20 | indexing, even the application of machine learning, if that |
| 03:01:58 | 21 | had been someone's choice, is not free.  There is an expense |
| 03:02:02 | 22 | associated with that.  And if you can just collect more and |
| 03:02:04 | 23 | more documents, you are just driving up the expense and the |
| 03:02:06 | 24 | delay. |
| 03:02:06 | 25 | Q.  Let me turn to the third thing that you offered of the |

03:02:12  1   four in this proceeding.  Have you reached an opinion as to

03:02:14  2   the organization and accessibility of defendants' ESI

03:02:20  3   productions?

03:02:20  4   A.  I have.

03:02:22  5   Q.  And with respect to that opinion, what exactly is it?

03:02:26  6   A.  My opinion is that the format of production that the

03:02:34  7   defendants have done or were in the process of doing is both

03:02:38  8   consistent with the stipulated order and it's consistent with

03:02:42  9   best practices on the production of ESI.

03:02:44  10  Q.  I want to get to the stipulated order in just a minute,

03:02:48  11  but first, let's talk about best practices with respect to

03:02:52  12  ESI.  What do you mean by best practices with respect to ESI

03:02:56  13  as it relates to the organization and accessibility?

03:02:58  14  A.  Well, best practices today doesn't relate specifically to

03:03:06  15  organization and accessibility; it relates to the manner in

03:03:10  16  which the information is provided and the richness of the

03:03:14  17  information that's provided.

03:03:16  18       In this litigation, producing documents by TIFF image

03:03:20  19  but with accompanying full text that was in the contents of

03:03:24  20  those documents and the metadata provides not only a

03:03:30  21  conveyance of those documents, both in photographic form, the

03:03:34  22  TIFF images, and the textual form; it provides anyone who

03:03:38  23  takes that production into a litigation management tool the

03:03:42  24  ability to conduct word searches, the ability to organize

03:03:46  25  those documents by any of the metadata fields, the ability to

| | | |
|---|---|---|
| 03:03:50 | 1 | organize by chronology, by recipient, by sender, or any subset |
| 03:03:54 | 2 | thereof, to look at the documents because of the path, by the |
| 03:04:00 | 3 | way that they were organized in their original physical |
| 03:04:04 | 4 | locations of the companies. |
| 03:04:06 | 5 | So you end up providing the recipient, whoever the |
| 03:04:08 | 6 | recipient may be, with a great deal of functionality and how |
| 03:04:12 | 7 | those documents were organized. |
| 03:04:14 | 8 | Q.  And in terms of the way electronic files are actually kept |
| 03:04:18 | 9 | within a company, for those of us who are not -- |
| 03:04:20 | 10 | THE COURT:  Did the plaintiffs ask for -- let's go |
| 03:04:24 | 11 | back to number 3.  Did the plaintiffs ask that the documents |
| 03:04:30 | 12 | be produced in any particular format that you know, |
| 03:04:36 | 13 | Mr. Regard? |
| 03:04:36 | 14 | THE WITNESS:  My understanding, your Honor, is that |
| 03:04:38 | 15 | they asked that the defendants would reorganize the documents |
| 03:04:42 | 16 | according to a list of 29 topics. |
| 03:04:48 | 17 | THE COURT:  That's not really the form of production, |
| 03:04:52 | 18 | though. |
| 03:04:52 | 19 | MR. MAROVITZ:  I might be able to help, your Honor, |
| 03:04:54 | 20 | with this question. |
| 03:04:54 | 21 | THE COURT:  I haven't been able to literally find |
| 03:04:58 | 22 | that in the thousands of pieces of paper.  So this is a lawyer |
| 03:05:02 | 23 | question as much as it's a Mr. Regard question. |
| 03:05:04 | 24 | MR. MOGIN:  I'm sorry, your Honor.  Are you asking |
| 03:05:06 | 25 | the physical format?  Did we request native format, for |

| | | |
|---|---|---|
| 03:05:10 | 1 | example?  Is that what you are asking? |
| 03:05:12 | 2 | THE COURT:  Yes.  Did you ask specifically that |
| 03:05:16 | 3 | they -- first of all, I don't even know, have you received one |
| 03:05:18 | 4 | document in this case?  I mean, last night I thought to |
| 03:05:24 | 5 | myself, I don't even know if you have received any documents. |
| 03:05:26 | 6 | And if you did, did you receive the documents in a particular |
| 03:05:30 | 7 | format that you have requested? |
| 03:05:32 | 8 | MR. MOGIN:  Your Honor, we specified the format in |
| 03:05:38 | 9 | the request for production. |
| 03:05:40 | 10 | THE COURT:  Which was what? |
| 03:05:40 | 11 | MR. MOGIN:  It was -- just bear with me just a |
| 03:05:44 | 12 | second. |
| 03:05:46 | 13 | And then that was essentially superseded by the |
| 03:05:50 | 14 | production format order; that is, with respect to whether we |
| 03:05:56 | 15 | get TIFF images for certain things, native images for other |
| 03:06:00 | 16 | things, the metadata that was required to be produced, et |
| 03:06:02 | 17 | cetera.  Nothing, nothing, it's our position, in the ESI |
| 03:06:10 | 18 | format order signed by Judge Shadur -- |
| 03:06:12 | 19 | THE COURT:  That's called agreed. |
| 03:06:14 | 20 | MR. MOGIN:  -- has anything whatsoever to do with the |
| 03:06:20 | 21 | organization of the documents. |
| 03:06:26 | 22 | THE COURT:  Is that the 29 categories? |
| 03:06:28 | 23 | MR. MOGIN:  It is. |
| 03:06:28 | 24 | THE COURT:  Okay. |
| 03:06:30 | 25 | MR. MOGIN:  And the 29 categories, and the need to |

03:06:32　1　organize -- actually, not to organize, but to label, if you

03:06:38　2　will, or to somehow give us an indication of which documents

03:06:46　3　respond to which request, which was specifically laid out in

03:06:48　4　the production of documents.

03:06:50　5　　　　　MR. MAROVITZ:  Judge, if I can focus us on this

03:06:52　6　particular issue.

03:06:52　7　　　　　If I could hand up to Mr. Regard the stipulation that

03:06:56　8　was just described, along with the order of Judge Shadur.

03:07:00　9　　　　　THE COURT:  Sure.

03:07:00　10　　　　　MR. NEUWIRTH:  Your Honor, I feel it's important to

03:07:02　11　say something to clarify the record, if I could.

03:07:04　12　　　　　I believe that Mr. Mogin misspoke because the 29

03:07:08　13　categories are not by request.  The 29 categories are 29

03:07:14　14　subject categories that the plaintiffs have come up with that

03:07:18　15　they are asking the defendants to organize the documents

03:07:22　16　around.  They are not by request.  There are over 95 requests

03:07:26　17　here.

03:07:26　18　　　　　MR. MOGIN:  As you will see, your Honor, if you

03:07:28　19　look --

03:07:30　20　　　　　THE COURT:  All right.  We are using the term "best

03:07:34　21　practice."  Okay?  What I understand by best practice is the

03:07:38　22　plaintiff, you give -- under Rule 34, if you want documents in

03:07:46　23　a certain form of production, it's usually the plaintiff asks

03:07:50　24　for it in a certain way.  This wasn't a tricky question, this

03:07:54　25　wasn't into indexing.  Mr. Regard said, What I understand is

03:08:00 1   they did TIFF image, they did metadata.  I am saying, did the

03:08:06 2   plaintiff request that in the first place?

03:08:10 3        THE WITNESS:  I don't know --

03:08:12 4        THE COURT:  Hello?  We are not into indexing.  We are

03:08:14 5   not into 29 categories.  We are not into you can't read the

03:08:20 6   request to produce.

03:08:20 7        MR. MOGIN:  Your Honor, yes.  In the first request

03:08:24 8   for production of documents, a format was specified.

03:08:28 9        THE COURT:  Here?

03:08:28 10       MR. MOGIN:  Correct.  And the format was superseded

03:08:32 11  by the format order.  So the instructions in our request,

03:08:38 12  except for the indexing issue, is superceded by the ESI format

03:08:44 13  order entered by Judge Shadur as document --

03:08:46 14       THE COURT:  Which is document number?

03:08:48 15       MR. MOGIN:  244.

03:08:48 16       THE COURT:  244, thank you.

03:08:50 17       MR. NEUWIRTH:  And, your Honor, defendants have

03:08:52 18  already produced over a million pages of documents consistent

03:08:56 19  with that order.

03:08:56 20       THE COURT:  Good.  I didn't know that.  You know,

03:08:58 21  actually, Mr. Neuwirth, I didn't know that.  One million,

03:09:02 22  okay.  That helps.  Thank you.

03:09:06 23       MR. MAROVITZ:  So for the record --

03:09:08 24       THE COURT:  Now, the other indexing issue is

03:09:10 25  something we had said we are going to deal with, but not

03:09:14  1  during this hearing.  We weren't going to deal with it during
03:09:18  2  the hearing.
03:09:20  3        I think it's a different body of law.  They seem to
03:09:24  4  be saying that if I went with some computer-assisted, it would
03:09:28  5  be easier to do indexing with computer-assisted.  I don't know
03:09:34  6  if Mr. Regard knows anything about Boolean, if that helps
03:09:38  7  indexing.  I suppose that would be one question that somebody
03:09:42  8  could ask.  In 14 years, I have not had an indexing issue
03:09:46  9  before, so I wasn't as familiar with that area.
03:09:50  10       MR. MAROVITZ:  And, Judge, just to be clear, what I
03:09:52  11  hope to go over with Mr. Regard in terms of indexing is
03:09:58  12  Mr. Regard's opinion, as expressed before, that the quality of
03:10:02  13  the information that's been provided to the plaintiffs in this
03:10:06  14  case is consistent with the information that's kept within the
03:10:12  15  companies themselves.
03:10:14  16       So that's -- when we talk about indexing, that's --
03:10:18  17  the encoding, that's where I am going.  I'm not intending to
03:10:22  18  tread upon the area that you just mentioned.
03:10:28  19       So what Mr. Regard is prepared to talk about is
03:10:30  20  whether or not the information that's provided in the
03:10:32  21  stipulation, which was agreed to by both parties, and the
03:10:34  22  order, Exhibits 13 and, as entered, 14, provide that sort of
03:10:42  23  robust, detailed information to the plaintiffs in this case.
03:10:48  24       And that's what he is prepared to testify about
03:10:52  25  today, not the 29 categories themselves, your Honor.

| | | |
|---|---|---|
| 03:11:00 | 1 | THE COURT:  Okay. |
| 03:11:00 | 2 | BY MR. MAROVITZ: |
| 03:11:04 | 3 | Q.  So, in any event, just so it's clear, Exhibit -- if I |
| 03:11:08 | 4 | numbered them right on the set -- Mr. Regard, maybe you can |
| 03:11:10 | 5 | confirm this -- Exhibit 13 says document number 244 on the |
| 03:11:18 | 6 | top? |
| 03:11:18 | 7 | A.  Yes, sir. |
| 03:11:18 | 8 | Q.  And Exhibit 14 has the two lines with document 245 on the |
| 03:11:24 | 9 | top.  They're identical with an exception.  Exhibit 13, which |
| 03:11:30 | 10 | is document 244, actually contains the appendices that were |
| 03:11:36 | 11 | stipulated to and that appendix 1, as you can see, provides |
| 03:11:40 | 12 | the file formats and appendix 2 provides for ESI metadata and |
| 03:11:44 | 13 | coding fields.  And when Judge -- the original one I had |
| 03:11:56 | 14 | didn't have them both.  Let's focus on Exhibit 14. |
| 03:11:58 | 15 | A.  Yes, sir. |
| 03:11:58 | 16 | Q.  Okay.  Is this the ESI protocol that you understand was |
| 03:12:04 | 17 | agreed to by the parties and that's one of the issues that we |
| 03:12:08 | 18 | are discussing today? |
| 03:12:10 | 19 | A.  Yes, it is. |
| 03:12:12 | 20 | Q.  Under the agreed-to ESI protocol, do you understand that |
| 03:12:16 | 21 | ESI is being produced in a manner organized similarly to ESIs |
| 03:12:22 | 22 | kept in the ordinary course of business? |
| 03:12:24 | 23 | A.  My understanding of ESI that's been produced, this issue |
| 03:12:40 | 24 | of how the information is kept in the normal course of |
| 03:12:42 | 25 | business is a little misunderstood, I think, when we come to |

03:12:48   1   the connection of computer science and how people actually

03:12:50   2   interact with their systems.

03:12:54   3          The way information is physically kept by the

03:12:58   4   computer systems in the normal course of business is not only

03:13:04   5   very complicated; it's largely irrelevant to the user.  What

03:13:08   6   the user does is they go to the operating system or they go to

03:13:10   7   their software and they say, Show me all my emails listed by

03:13:16   8   sender, or, Show me all my emails listed by recipient.  They

03:13:20   9   don't go into the actual hard drive and say, Show me where the

03:13:24  10   ones and zeros are that represent the letters and words that

03:13:28  11   represent the pieces of my email.

03:13:32  12          So it's not the physical ones and zeros level the way

03:13:34  13   it was kept in the normal course of business, but it's

03:13:38  14   functionally the same as the way it was kept in the normal

03:13:42  15   course of business, and in some aspects, it's superior to the

03:13:44  16   way it was kept in the normal course of business.

03:13:48  17   Q.  And so let's go down a minute.  Take a look at appendix 2

03:13:54  18   to Exhibit 14.  It's the last three pages.  Which metadata

03:13:56  19   fields associated with the ESI in this case, to the extent

03:14:02  20   they exist on the documents, are defendants producing to the

03:14:06  21   plaintiffs?

03:14:06  22   A.  My understanding is the ones that are listed in this

03:14:10  23   appendix, appendix 2.

03:14:12  24   Q.  So let's start with, say, custodian metadata.  How could

03:14:16  25   custodian metadata be used by either party in the case to

03:14:20  1   organize the ESI?

03:14:20  2   A.  Well, you've gone straight to custodian, which is actually

03:14:26  3   in a slightly different category than the rest of these

03:14:28  4   fields.

03:14:28  5   Q.  If you'd like to start with Bates, that's fine.

03:14:32  6   A.  Well, Bates is also slightly different than the ones in

03:14:34  7   this field as well.  Let me explain the difference.

03:14:38  8         Your Honor, we have metadata that is already in our

03:14:40  9   computer system or in our application, so when I have an

03:14:44  10  email, behind the scenes, there are certain fields of

03:14:48  11  information that that email has that are listed here, such as

03:14:52  12  on the top of page 17, what is the message ID?  That's a

03:14:56  13  number behind the scenes.  That's a metadata that's in my

03:15:00  14  email system.

03:15:00  15        The first few fields in this list of appendix 2, the

03:15:04  16  Bates number, the beginning Bates, the ending Bates, the

03:15:08  17  beginning attachment, the ending attachment, the page count,

03:15:12  18  and the custodian, those are fields that are actually added

03:15:16  19  through the course of collection and the processing of

03:15:20  20  documents in a litigation context.

03:15:22  21        So they're metadata fields, but they are added after

03:15:26  22  they have collected.  Those fields don't exist in the native

03:15:32  23  files in an organization or in a software system.  They are

03:15:34  24  added.

03:15:34  25        So when you ask about custodian, that's a very useful

03:15:38  1  field, it allows you to organize documents by whom they were
03:15:42  2  collected from, but it's not something you would normally find
03:15:46  3  in an organization on the document when you go and collect it.
03:15:50  4  You have to add that.
03:15:50  5       So that's -- when I say in some ways this may be
03:15:54  6  superior to the way it's stored in an organization, if that's
03:15:58  7  a field that's valuable to you, you wouldn't find it in the
03:16:00  8  organizations where these documents were collected.
03:16:02  9  Q.  How about some of the fields that follow that?
03:16:06 10  A.  The rest of the fields, it's after the word "custodian,"
03:16:10 11  you start talking about size and path, those would be part of
03:16:14 12  the operating system.  The MD 5 hash is something that are the
03:16:20 13  fingerprint in this case, is actually something that's, again,
03:16:22 14  generated after the documents are collected as part of the ESI
03:16:26 15  process.  A useful field to identify documents that are
03:16:32 16  identical, even though they might have been held by multiple
03:16:34 17  custodians to facilitate efficiencies, but it's added after
03:16:38 18  the fact.
03:16:38 19       Native file link would point to the native file.  I
03:16:46 20  don't know that that's been used in this case.  There are
03:16:50 21  provisions in the protocol to produce native files in certain
03:16:54 22  circumstances.  I don't know if any have been produced yet,
03:16:56 23  but that would allow you to associate the TIFF image with the
03:17:00 24  underlying native file where that was appropriate.
03:17:02 25       And then we go down, we have some here that are

03:17:04  1  email-specific, so obviously non-emails would not have these

03:17:08  2  fields of the subject of the email, the date sent, the date

03:17:12  3  modified, although you can't have date modified for

03:17:18  4  non-emails.

03:17:18  5      Would you like me to continue to go down the list?

03:17:22  6  Q.  No, unless there is something that's important for the

03:17:24  7  court to understand.

03:17:24  8      My question, unless there is something else,

03:17:26  9  Mr. Regard, is on this, is it possible for either side to go

03:17:30  10  ahead and sort documents by using these particular fields?

03:17:36  11  A.  Well, I think that if you can organize documents and

03:17:42  12  retrieve them by these fields or by the content of the message

03:17:46  13  itself, whether it's in the native application or whether it's

03:17:48  14  in a subsequent production, you are afforded the same facility

03:17:52  15  and functionality that you would have in the native

03:17:56  16  application.

03:17:56  17  Q.  Are plaintiffs or the defendants in this case able to

03:18:00  18  conduct key word searches on the ESI being produced by the

03:18:04  19  defendants pursuant to its protocol?

03:18:06  20  A.  Well, depending on the specific software that they use,

03:18:12  21  there are many out there that do, the answer is absolutely.

03:18:14  22  Q.  How would that be helpful in a case like this?

03:18:18  23  A.  Well, there's been some discussion earlier.  If you wanted

03:18:20  24  to find a particular phrase and you put that phrase in a

03:18:24  25  Boolean search, if could you identify the documents that had

03:18:26　1　that phrase, you could search within -- for communications

03:18:28　2　between two custodians by -- between two employees or two

03:18:34　3　recipients by searching for their names or their email

03:18:36　4　addresses.　You could search for key words within the body or

03:18:40　5　the subject matter.　You could rebuild conversations by

03:18:44　6　looking at the message ID, and you could link emails together

03:18:50　7　that were related to the same subject matter.

03:18:52　8　Q.　And given those email messages which we discussed

03:18:56　9　oftentimes have attachments, are emails produced pursuant to

03:19:00　10　this protocol somehow associated with those attachments, to

03:19:04　11　the extent they exist?

03:19:04　12　A.　Well, any documents that had a parent/child association

03:19:08　13　would normally be reflected in the Bates number range, the

03:19:14　14　beginning attachment, ending attachment range.　In the systems

03:19:16　15　that we use or, at least the ones I am familiar with, for

03:19:20　16　managing litigation productions would then allow you to

03:19:24　17　reassociate the attachments with the parent document.

03:19:26　18　Q.　In your opinion, Mr. Regard, is the ESI produced by

03:19:30　19　defendants at least as well organized as the ESI kept by

03:19:34　20　defendants in the ordinary course of their business?

03:19:36　21　A.　It is at least as well organized -- well, I think it's

03:19:42　22　slightly better organized because, remember, this information

03:19:46　23　is being gathered from multiple locations within the

03:19:48　24　organization.　We talked about custodial collections.　If you

03:19:52　25　collected documents for a custodian from an email and from

03:19:56  1   their network and from their desktop, in this case, they'd all

03:20:00  2   be organized in one collection.

03:20:02  3          So the organization is at least as good, if not

03:20:06  4   better, and the functionality of retrieval is at least as

03:20:10  5   good, if not better.

03:20:12  6   Q.  Okay.

03:20:14  7          MR. MAROVITZ:  Judge, I had a question or two on the

03:20:18  8   29 different fields.  I will save that for another time, I

03:20:20  9   gather.

03:20:22  10  BY MR. MAROVITZ:

03:20:22  11  Q.  Finally, very quickly, Mr. Regard, backup tapes.  I want

03:20:30  12  to keep this at an extremely high level, because I understand

03:20:34  13  that part of today's process is not to delve into the

03:20:40  14  specifics of backup tapes, but I just want to ask you one

03:20:44  15  question or two questions as long as you're here.

03:20:46  16         What are the well accepted ESI best practices for the

03:20:50  17  consideration and treatment of backup tapes and other off-line

03:20:54  18  media?

03:20:54  19  A.  The best practice --

03:20:58  20         MR. MOGIN:  Objection, your Honor.  You know, Rule

03:21:00  21  34, Rule 26 are fairly specific about this, and I don't think

03:21:02  22  the best practices has anything whatsoever to do with

03:21:08  23  modifying those rules.

03:21:08  24         THE COURT:  This is another one that I am so confused

03:21:12  25  on as the fact-finder.  So this is -- I really don't -- I know

03:21:20   1   what's not reasonably -- I know what the law is.  I do not

03:21:24   2   know -- I could not -- because I could not plow through the

03:21:28   3   seven volumes, which you were kind enough to give me, of the

03:21:34   4   30(b)(6)s.  I wish I had a chart of the backup systems for

03:21:38   5   each of the -- if each of the people actually went to the

03:21:44   6   backup system with Nan Nolan, I don't know.  I don't know -- I

03:21:50   7   thought some of them changed systems halfway through.  I

03:21:56   8   thought some of the companies merged, they merged.

03:22:00   9          I mean, this, to me, is the mushiest part of the

03:22:04  10   whole case.  It is so -- and this goes to the search, as far

03:22:08  11   as I'm concerned.  This is not -- if you're using by

03:22:18  12   custodians, or you are using however many custodians you have

03:22:20  13   here, and you think these are the key custodians, I don't know

03:22:24  14   if the people who use that searched the backup tapes.  And I

03:22:28  15   don't know whether Mr. Regard is going to know that.

03:22:30  16          MR. MAROVITZ:  Right, and that's not where I intended

03:22:34  17   to go at all.

03:22:34  18          THE COURT:  Well, I think -- you know, I don't think

03:22:36  19   this -- I mean, to me, when I am looking at the search here, I

03:22:42  20   understand if it's disaster.  I mean, I don't mean to sound so

03:22:46  21   cocky.  But when we're talking about front level, do they have

03:22:52  22   all the documents that go to Nan Nolan, has somebody run them?

03:22:58  23   I thought somebody even ran searches on some of the backup

03:23:04  24   tapes.  I thought that's what Chris told me.  But I don't know

03:23:06  25   which of the six did that.

03:23:10  1    So, actually, this is an issue I really am sort of
03:23:12  2  concerned with, if Mr. Regard knows.
03:23:18  3    MR. MAROVITZ:  By all means.  I am interested --
03:23:22  4    THE COURT:  Do you know on Temple?  Let's do the one
03:23:24  5  which you started on.  What's Temple's story -- I don't mean
03:23:28  6  story, but, you know -- so Temple had 28/5 custodians.
03:23:44  7    THE WITNESS:  Yes, ma'am.
03:23:44  8    THE COURT:  Okay.  And you're calling it online,
03:23:46  9  off-line, somebody else is calling it active, non-active,
03:23:50  10  somebody else is calling it backup tapes.  Okay.  Just so we
03:23:54  11  know the same thing, your five custodians, were all of the
03:24:00  12  data for the years on the five custodians, was it on active
03:24:08  13  data?  Do you know?  And correct me if I am wrong in my
03:24:14  14  terminology here.
03:24:14  15    THE WITNESS:  Your Honor, I received the same
03:24:16  16  multiple volumes of 30(b)(6)s that you received.
03:24:20  17    THE COURT:  Well, you are getting paid to read.  I am
03:24:26  18  not getting paid for this.
03:24:28  19    THE WITNESS:  You know, I can't buy more hours,
03:24:30  20  though, so I still have the same limitation of time that your
03:24:32  21  Honor does.
03:24:34  22    I am familiar with some of the information that's
03:24:38  23  been provided.  I can't say I am familiar with all of it
03:24:42  24  sitting here today.
03:24:42  25    I know that Temple has considered the online data

03:24:48   1   that was available for its five custodians and has focused on

03:24:50   2   the online availability.  I don't know that anyone has done an

03:24:56   3   analysis of whether there are any gaps in that data and

03:25:00   4   whether or not any gaps, if they even did exist, would

03:25:02   5   potentially be filled in by any of the off-line systems.

03:25:08   6           MR. MAROVITZ:  And, Judge -- oh, go ahead.  I'm

03:25:10   7   sorry.

03:25:10   8           THE WITNESS:  And I think that's kind of where we

03:25:12   9   were going initially is that at this stage in collecting

03:25:18  10   documents and looking at documents, that is what I see

03:25:20  11   consistently in other cases as well, that people consider the

03:25:24  12   online systems first before -- in a knee-jerk reaction going

03:25:32  13   immediately to backup tapes and pulling tapes before they have

03:25:36  14   had a chance to assess what information we already had access

03:25:38  15   to, period.

03:25:40  16           MR. MAROVITZ:  Can I suggest this, your Honor?  This

03:25:42  17   is obviously an important issue for the court.  It makes sense

03:25:44  18   for us to get it right.  I don't want to speak for all the

03:25:48  19   other defendants here.  We'd be glad to submit something

03:25:50  20   shortly that would answer the question for each of the

03:25:54  21   defendants.

03:25:58  22           THE COURT:  I am just trying to -- I want Mr. Mogin

03:26:02  23   to have plenty of time here.  I am thinking about calling

03:26:04  24   Judge Holderman is what I am thinking about doing.  Has

03:26:08  25   anybody, based upon the schedule, any key custodian here,

| | | |
|---|---|---|
| 03:26:14 | 1 | based upon the schedule, running off to a 5:00 o'clock plane? |
| 03:26:18 | 2 | If I go and change -- if I can get out of the 4:00 o'clock |
| 03:26:22 | 3 | meeting, does somebody have to run out the door? |
| 03:26:26 | 4 | MR. MAROVITZ: No, we'd very much like to have the |
| 03:26:28 | 5 | opportunity to have Mr. Regard go home after this, if we can. |
| 03:26:32 | 6 | THE COURT: I am not as worried about -- I want to |
| 03:26:36 | 7 | make sure Mr. Mogin has enough time now because under the |
| 03:26:38 | 8 | original schedule, he'd have 15 minutes, and he doesn't think |
| 03:26:42 | 9 | this is fair what is going on with Mr. Regard anyway. |
| 03:26:46 | 10 | MR. MAROVITZ: Absolutely. |
| 03:26:46 | 11 | THE COURT: I am going to go call the chief judge. |
| 03:26:48 | 12 | We will take five minutes. |
| 03:26:52 | 13 | MR. MOGIN: Thank you, your Honor. |
| 03:26:54 | 14 | (Short break.) |
| 03:32:56 | 15 | THE COURT: Okay. I guess I have until about 4:30. |
| 03:33:04 | 16 | So what we will do -- you can all sit down. Please sit down. |
| 03:33:12 | 17 | Thank you. |
| 03:33:12 | 18 | So I have until 4:30, so you are going to get -- |
| 03:33:14 | 19 | whatever you need to do on cross you are going to be able to |
| 03:33:18 | 20 | do, and I will cut off my -- I will cut short my talk with the |
| 03:33:22 | 21 | lawyers. |
| 03:33:24 | 22 | MR. MOGIN: Very good, your Honor. Obviously, we are |
| 03:33:24 | 23 | not going to be able to get to Dr. Tenny. |
| 03:33:30 | 24 | THE COURT: No, obviously we are not going to get to |
| 03:33:34 | 25 | Dr. Tenny today. |

03:33:36 1        MR. MOGIN:  I do want to be clear that the defendants

03:33:38 2  took four hours to cross Dr. Lewis, so we would expect

03:33:42 3  something close to the time for Dr. Tenny.

03:33:44 4        THE COURT:  I -- you're right.  You're right.  You're

03:33:48 5  right, you're right.

03:33:48 6        MR. MAROVITZ:  Well, Judge, to be fair, we tried to

03:33:50 7  pick and choose that, as we did not cross-examine Mr. Hanners

03:33:52 8  at all.  We tried to use our time in the way we thought it

03:33:58 9  should be used.

03:33:58 10       THE COURT:  Right.  I didn't give people time to eat

03:34:00 11  either.  I mean, this whole darn thing wouldn't have happened

03:34:04 12  if this meeting was not here, or if we wanted to take a break,

03:34:08 13  I will go to the meeting and come back.  I am not -- that's

03:34:12 14  what I am trying to say.

03:34:14 15       I want to make sure that Mr. Mogin has -- he had a

03:34:18 16  lot of questions, it sounded like he had a lot of questions.

03:34:20 17  I am more than willing to stop, I will run downstairs and I

03:34:24 18  will come back up again.  And what I needed to say to you, I

03:34:28 19  could also say to you on a telephone.  It would be better

03:34:32 20  coming in person, but I could do it in a telephone conference

03:34:36 21  too.  Okay?

03:34:38 22       What we can't do is the testimony.  And Dr. Tenny,

03:34:44 23  you know, she should be given her own clean, fresh time if we

03:34:48 24  are going to need her.  Okay?

03:34:54 25       MR. MAROVITZ:  Thank you.

03:34:54   1    THE COURT:  So you finish up, and then we will have
03:34:56   2  Mr. Mogin, you know, do what he wants to do
03:35:02   3  cross-examine-wise.
03:35:04   4    MR. MAROVITZ:  Very good, your Honor.
03:35:04   5  BY MR. MAROVITZ:
03:35:06   6  Q.  In conclusion, Mr. Regard, as a matter of best practices,
03:35:10   7  who is in the best position to decide on an appropriate search
03:35:14   8  and retrieval protocol for the production of documents?
03:35:18   9  A.  As a matter of best practices and consistent with the work
03:35:24  10  that I do at the Sedona Conference --
03:35:26  11    THE COURT:  Okay.  Number 6, Sedona principle
03:35:30  12  number 6, right?
03:35:32  13    THE WITNESS:  Yes, your Honor.
03:35:32  14    THE COURT:  Right.
03:35:34  15    THE WITNESS:  We are on the same page.
03:35:34  16    THE COURT:  Exactly.  So best practices, yes.
03:35:40  17    MR. MAROVITZ:  I could not have ended it better
03:35:42  18  myself, Judge.
03:35:44  19    We would like to formally move for admission for
03:35:48  20  Group Exhibit 12.
03:35:48  21    THE COURT:  I am thinking about that.
03:35:50  22    MR. MAROVITZ:  I understand that.
03:35:50  23    And also, just so the record is complete, I guess for
03:35:54  24  Defense Exhibit 14.  It's the court order.  I just want to
03:35:58  25  make sure it's in the record somewhere.

| | | |
|---|---|---|
| 03:36:00 | 1 | THE COURT:  Do you have any objection to that? |
| 03:36:02 | 2 | MR. MOGIN:  None whatsoever. |
| 03:36:02 | 3 | THE COURT:  That's admitted, No. 14 is admitted. |
| 03:36:04 | 4 | (Above-mentioned exhibit was received in evidence.) |
| 03:36:08 | 5 | THE COURT:  Okay.  Thanks, Mr. Marovitz. |
| 03:36:12 | 6 | MR. MAROVITZ:  Thank you, your Honor. |
| 03:36:12 | 7 | MR. MOGIN:  I didn't get to complete my objection, |
| 03:36:14 | 8 | your Honor, but I think ultimately, you are the one who gets |
| 03:36:18 | 9 | to decide what the best practices with respect to search is. |
| 03:36:20 | 10 | THE COURT:  Right. |
| 03:36:24 | 11 | - - - |
| 03:36:24 | 12 | DAN REGARD, CROSS-EXAMINATION |
| 03:36:24 | 13 | BY MR. MOGIN: |
| 03:36:58 | 14 | Q.  Mr. Regard. |
| 03:37:02 | 15 | A.  Good afternoon. |
| 03:37:04 | 16 | Q.  How are you? |
| 03:37:04 | 17 | A.  Fine. |
| 03:37:06 | 18 | Q.  So you are a lawyer, correct? |
| 03:37:12 | 19 | A.  I do not practice law, but I did go to law school, yes, |
| 03:37:16 | 20 | sir. |
| 03:37:16 | 21 | Q.  Are you admitted to practice law? |
| 03:37:16 | 22 | A.  I am. |
| 03:37:18 | 23 | Q.  Are you currently eligible to practice law? |
| 03:37:20 | 24 | A.  I am -- I don't know the answer to that.  I had to ask |
| 03:37:26 | 25 | Louisiana to put me on status so that I am not practicing so |

03:37:32   1   that I don't have to continue to submit my CLE credits.  So I
03:37:36   2   can actively activate that if I chose to.
03:37:38   3   Q.  So are you currently on inactive status?
03:37:42   4   A.  I believe that's correct.
03:37:42   5   Q.  Let me show you what the Louisiana bar has to say about
03:37:48   6   that.  Do you mind?
03:37:50   7   A.  I hope they don't show that I am deficient on my CLE
03:37:54   8   credits.
03:37:54   9   Q.  In fact, they say you are ineligible to practice law.
03:37:58   10  Would that surprise you?
03:37:58   11  A.  No, sir.  I haven't been trying to practice law.
03:38:02   12  Q.  Well, they say you're -- you are not a member in good
03:38:06   13  standing, as they say, not an active member in good standing.
03:38:10   14  A.  Okay.
03:38:10   15          MR. MOGIN:  Your Honor, may I have this marked as
03:38:30   16  Plaintiff's 11.
03:38:40   17          THE COURT:  Thank you.
03:38:52   18          MR. MAROVITZ:  Judge, just one quick objection.  The
03:38:56   19  email that we received before this proceeding suggested that
03:39:00   20  all exhibits were to be tendered in advance by last Friday.
03:39:06   21  This exhibit, and maybe others, that Mr. Mogin intends to show
03:39:10   22  Mr. Regard were not among those.
03:39:12   23          THE COURT:  Mr. Mogin?
03:39:12   24          MR. MOGIN:  This is cross-examination, your Honor.
03:39:16   25          MR. MAROVITZ:  There was no exception for that in the

| | | |
|---|---|---|
| 03:39:18 | 1 | order we received, Judge. |
| 03:39:20 | 2 | MR. MOGIN: In the normal course of proceedings, as |
| 03:39:22 | 3 | the court well knows, is that cross-examination -- |
| 03:39:24 | 4 | THE COURT: So you consider this impeachment? |
| 03:39:26 | 5 | MR. MOGIN: I certainly do. |
| 03:39:26 | 6 | THE COURT: Okay. |
| 03:39:28 | 7 | BY MR. MOGIN: |
| 03:39:30 | 8 | Q. So, Mr. Regard, do you see the certificate from the state |
| 03:39:36 | 9 | bar of Louisiana? |
| 03:39:36 | 10 | A. I do. |
| 03:39:38 | 11 | Q. And it indicates that you have been ineligible to practice |
| 03:39:42 | 12 | since June of 2011, correct? |
| 03:39:44 | 13 | A. That's what's reflected on here, yes. |
| 03:39:48 | 14 | Q. And when did you first become aware that you were |
| 03:39:50 | 15 | ineligible to practice in Louisiana? |
| 03:39:52 | 16 | A. Well, I haven't practiced in Louisiana, so it hasn't been |
| 03:39:58 | 17 | an issue for me to inquire on. |
| 03:39:58 | 18 | Q. When did you first become aware that your status in |
| 03:40:04 | 19 | Louisiana was ineligible? |
| 03:40:06 | 20 | A. I have actually been notified by Louisiana on several |
| 03:40:10 | 21 | occasions that my status was ineligible, and I have cured it |
| 03:40:14 | 22 | many times. I haven't seen this until just now. |
| 03:40:18 | 23 | Q. Are you suggesting that the certificate is inaccurate? |
| 03:40:20 | 24 | A. No, sir. I am trying to answer your question. |
| 03:40:22 | 25 | Q. When did you first become aware, then, Mr. Regard, that |

03:40:26  1   you were ineligible in Louisiana?

03:40:28  2   A.  Of this current ineligibility?

03:40:32  3   Q.  Have you been ineligible before?

03:40:34  4   A.  I just testified I have been noticed by Louisiana of

03:40:38  5   ineligibility in the past, and I have cured those.  The issue

03:40:42  6   arises from the status of active versus inactive and the

03:40:46  7   submission of CLE credits.

03:40:48  8   Q.  Well, this doesn't indicate inactive, it indicates

03:40:52  9   ineligible, does it not?

03:40:54  10  A.  This says ineligible on a -- I don't even know what the M

03:41:04  11  stands for, MCLE ineligible.

03:41:08  12  Q.  Correct.  You understand that Louisiana has a status of

03:41:10  13  active in good standing, ineligible to practice law for a

03:41:14  14  variety of reasons, and inactive, correct?

03:41:18  15  A.  I believe that's correct.

03:41:20  16  Q.  All right.  And your current status is ineligible,

03:41:24  17  correct?

03:41:24  18  A.  That's what this document says, yes, sir.

03:41:26  19  Q.  Okay.  Now, were you aware of that status at the time that

03:41:30  20  you submitted your resume and attached it to your report in

03:41:34  21  this matter?

03:41:34  22  A.  I was not.

03:41:36  23  Q.  Okay.  Did you make any attempt to verify that the

03:41:44  24  information that you had included in your resume with respect

03:41:46  25  to your status as a lawyer was correct?

03:41:50  1  A.  No, I relied upon my memory and my understanding of my
03:41:58  2  status at the time.
03:41:58  3  Q.  But you just testified, did you not, that Louisiana had
03:42:02  4  informed you several times that you were having problems
03:42:04  5  because of your non-compliance with their CLE requirements,
03:42:08  6  correct?
03:42:08  7  A.  And I also informed you that several times I have cured
03:42:12  8  that.  I was not aware of having ineligible status.  Thank you
03:42:16  9  for bringing it to my attention.  I will bring it up with the
03:42:20  10  bar this afternoon and cure it by tomorrow, if possible.
03:42:22  11  Q.  Okay.  Now, the fact that you are an attorney is an
03:42:26  12  important aspect of your consulting practice, is it not?
03:42:28  13  A.  The fact that I have a legal education I think is a
03:42:32  14  benefit to my clients and the work that I do, not whether I am
03:42:36  15  an active or inactive attorney.
03:42:38  16  Q.  But you do tell your clients that you are an attorney,
03:42:42  17  that you have a J.D., correct?
03:42:44  18  A.  I do have J.D.  I am an attorney.
03:42:46  19  Q.  And you tell them that you're licensed by Louisiana,
03:42:50  20  right?
03:42:50  21  A.  I do not tell them I am practicing law.  In fact, I make
03:42:54  22  it a point to tell them that I am not giving them legal
03:42:56  23  advice.
03:42:56  24  Q.  Well, it says, if we go to your website, does it not, that
03:43:00  25  you are admitted to the Louisiana state bar, just as it says

| | | |
|---|---|---|
| 03:43:04 | 1 | in your resume that you submitted here today? |
| 03:43:08 | 2 | A.  Yes, sir, just as this document says. |
| 03:43:10 | 3 | Q.  Well, is precision important, Mr. Regard? |
| 03:43:14 | 4 | A.  In what context, Mr. Mogin? |
| 03:43:18 | 5 | Q.  Do you mean to say that the word "precision" has more than |
| 03:43:22 | 6 | one meaning? |
| 03:43:22 | 7 | A.  In which context would you like to talk about precision? |
| 03:43:26 | 8 | Q.  Yes or no, can I have a yes-or-no answer to my question? |
| 03:43:30 | 9 | Does precision have more than one meaning? |
| 03:43:32 | 10 | A.  Precision can definitely have more than one meaning. |
| 03:43:36 | 11 | Q.  Is precision in one's testimony important when one is |
| 03:43:40 | 12 | acting as an expert witness? |
| 03:43:44 | 13 | A.  I don't associate precision with testimony.  I associate |
| 03:43:48 | 14 | accuracy with testimony. |
| 03:43:48 | 15 | Q.  Is there a difference between accuracy and precision? |
| 03:43:52 | 16 | A.  With respect to testimony, yes. |
| 03:43:52 | 17 | Q.  What's that difference? |
| 03:43:54 | 18 | A.  I don't know how to use the word precision in testimony. |
| 03:43:56 | 19 | "Accuracy" is in my opinion, trying to represent the |
| 03:44:02 | 20 | information as correctly as possible. |
| 03:44:02 | 21 | Q.  So precision could mean accuracy; is that right? |
| 03:44:06 | 22 | A.  I'm sorry? |
| 03:44:06 | 23 | Q.  Precision could mean accuracy? |
| 03:44:08 | 24 | A.  This is your definition.  If you want to put it into |
| 03:44:12 | 25 | context, I would be more than happy to talk about my |

03:44:14   1   understanding.

03:44:14   2   Q.  I put it in the context of your testimony.

03:44:16   3   A.  Okay.

03:44:16   4   Q.  Does precision mean accuracy?

03:44:20   5   A.  Precision of my testimony as to what I am testifying

03:44:26   6   about?

03:44:26   7   Q.  Yes.

03:44:28   8   A.  Or precision as a word that I have used in the course of

03:44:30   9   my testimony?

03:44:30  10   Q.  We will get to that.

03:44:34  11   A.  Please repeat the question.

03:44:36  12   Q.  The question is, is precision, as in accuracy, important

03:44:40  13   with respect to your testimony?

03:44:42  14   A.  I believe that accuracy is important with respect to my

03:44:46  15   testimony.

03:44:46  16   Q.  Is precision as in the context of accuracy important with

03:44:50  17   respect to your consulting practice?

03:44:52  18   A.  Accuracy is important to my consulting practice, yes.

03:44:58  19   Q.  Is precision of language important in both of those

03:45:02  20   contexts; that is, testifying as well as in your consulting

03:45:08  21   practice?

03:45:08  22   A.  I think using the language correctly is important in

03:45:10  23   testimony and in consulting.

03:45:12  24   Q.  Now, in e-discovery, and we will come back to what

03:45:18  25   e-discovery means, is it important that you're able to give

03:45:20    1   your clients precise explanations of technology and their

03:45:28    2   options?

03:45:30    3   A.  I think you have to -- I think you have to judge what I

03:45:36    4   should give a client at a given time.  When you talk about

03:45:40    5   precision, precision can mean different things to different

03:45:44    6   clients in different contexts.  What is sufficiently precise

03:45:48    7   for one client may be insufficiently precise for another, so

03:45:48    8   you need to choose what level of detail you are going to

03:45:48    9   provide.

03:45:52   10          In terms of being accurate, I always strive to be

03:45:54   11   accurate.

03:45:56   12   Q.  Okay.  Isn't part of your job, as you see it as a

03:45:58   13   consultant, to explain in as clear language as you possibly

03:46:02   14   can to guide your clients through the e-discovery journey?

03:46:08   15   A.  Yes, sir.

03:46:08   16   Q.  So that they really do understand their options, correct?

03:46:12   17   A.  Hopefully.

03:46:14   18   Q.  Now, e-discovery, let's just talk about what "e-discovery"

03:46:18   19   means.  As you use e-discovery, what does that encompass?

03:46:24   20   A.  Electronic discovery deals with the handling of electronic

03:46:28   21   information in a litigation context.

03:46:32   22   Q.  Okay.  And in your experience, have you spent more time in

03:46:38   23   the preservation and collection end of e-discovery or in the

03:46:42   24   search technology?

03:46:44   25   A.  I don't know if I can separate those.  My cases tend --

03:46:54  1   the projects I work on tend to involve both of those,

03:46:58  2   preservation, collection, processing, searching, posting,

03:47:02  3   those all fall under the rubric of what we deal with on a

03:47:08  4   regular basis.

03:47:10  5   Q.  Well, let's go through your resume.

03:47:12  6   A.  Yes, sir.

03:47:14  7   Q.  Do you have your resume in front of you?  It's attached to

03:47:18  8   your report.  Is your report still there?

03:47:18  9   A.  I believe it's Exhibit A to my report.

03:47:18  10  Q.  Tell me, if you would, please, let's look at the bullet

03:47:22  11  points where you list your selected consulting experience.

03:47:26  12  A.  Yes, sir.

03:47:26  13  Q.  The first one, broker/dealer industry effectively reducing

03:47:30  14  the cost of e-discovery by 80 percent, et cetera, et cetera.

03:47:36  15        Were you asked in that particular instance to consult

03:47:40  16  on the search methodology or the search technology?

03:47:44  17  A.  I am trying to recall that particular engagement.

03:48:00  18        Yes.

03:48:00  19  Q.  Okay.  What did you do?

03:48:02  20  A.  We completely changed the historical archiving

03:48:10  21  architecture of that particular client; we developed a new

03:48:14  22  searching algorithm; we gave them the ability to retrieve

03:48:16  23  records on a custodial basis rather than a chronological

03:48:20  24  basis; and as is reflected here, we reduced their cost of

03:48:26  25  e-discovery.

03:48:26   1   Q.  So did you develop that searching algorithm?

03:48:28   2   A.  Myself and my team, yes.

03:48:32   3   Q.  What was your personal involvement, please.

03:48:36   4   A.  Identification of the architecture, identification of the

03:48:40   5   replacement architecture, initial implementation of the

03:48:46   6   copying of historical data to the new architecture, working

03:48:52   7   with my programmers to help develop the algorithms and the

03:48:56   8   methodology to retrieve information, oversight of the project,

03:49:02   9   liaison with the client.

03:49:04   10       It's a while back, but that's what I recall.

03:49:08   11  Q.  Working with the programmers, precisely what did you do?

03:49:12   12  A.  Worked with them on the translation and transformation of

03:49:22   13  the emails, attachments, and documents from one format to

03:49:26   14  another; I worked with them on the programming of the SQL code

03:49:36   15  that was used to retrieve documents from the new environment;

03:49:42   16  gave them direction and worked with them to solve certain

03:49:48   17  programming problems.

03:49:48   18  Q.  But the bottom line on that engagement, however, is that

03:49:54   19  with respect to your work with the programmers and your

03:49:58   20  development of the algorithm, it didn't have anything to do

03:50:00   21  with selection of responsive documents in this discovery

03:50:04   22  context, did it?

03:50:06   23  A.  I wasn't tasked in that particular case to make a

03:50:12   24  relevancy determination, but a lot of the work that was being

03:50:18   25  done on that particular project was responding to SEC requests

03:50:22    1    for information on a per-broker basis within specific trades,

03:50:26    2    within specific industries.  I don't know that there was a

03:50:32    3    relevancy determination that needed to be made.  Either

03:50:34    4    communications fit the criteria or they did not.

03:50:36    5          So we have the client make these extractions from

03:50:40    6    these historical archives based on the name of the broker, the

03:50:44    7    date ranges that were of interest, and the stocks that were of

03:50:46    8    interest.

03:50:48    9    Q.  So the answer is no?

03:50:48   10    A.  The answer is if you want to consider fulfilling the SEC's

03:50:54   11    requirements as a relevancy requirement, the answer would be

03:50:56   12    yes.  If you don't consider that a relevancy, the answer would

03:51:00   13    be no.

03:51:00   14    Q.  The question was having to do with the development of the

03:51:02   15    algorithm and the responsiveness aspect of development of the

03:51:06   16    algorithm.  And if I understood your testimony correctly, your

03:51:10   17    answer was that you didn't have anything to do with that

03:51:14   18    determination either because it wasn't necessary or because

03:51:16   19    you didn't do it; isn't that true?

03:51:20   20    A.  Again, I helped develop the algorithm, so maybe I am not

03:51:24   21    understanding your question.

03:51:24   22    Q.  Okay.  Was the purpose of the algorithm in any way to help

03:51:32   23    the parties determine responsiveness in the same sense as we

03:51:40   24    are discussing it here today?

03:51:40   25    A.  The algorithm was not to determine responsiveness.  The

| | | |
|---|---|---|
| 03:51:44 | 1 | algorithm was designed to retrieve records that the company |
| 03:51:52 | 2 | determined would be responsive to the request.  So the company |
| 03:51:56 | 3 | received the letter from the SEC, the company wanted to find |
| 03:52:00 | 4 | records that met these particular criteria as responsive.  The |
| 03:52:04 | 5 | algorithm executed that criteria against the data set. |
| 03:52:08 | 6 | Q.  What were the criteria? |
| 03:52:08 | 7 | A.  Name of the broker, name of the stock, date ranges. |
| 03:52:14 | 8 | Q.  Nothing else? |
| 03:52:16 | 9 | A.  Not that I recall. |
| 03:52:16 | 10 | Q.  Thank you. |
| 03:52:18 | 11 | Okay.  So the next one that you have listed here is, |
| 03:52:26 | 12 | In the pharmaceutical industry advised, client on |
| 03:52:30 | 13 | International Safe Harbor, discovery, and disclosure, correct? |
| 03:52:34 | 14 | A.  Yes, sir. |
| 03:52:36 | 15 | Q.  "International Safe Harbor," what does that refer to? |
| 03:52:40 | 16 | A.  That's a program that the United States has with Europe. |
| 03:52:46 | 17 | Europe has very stringent guidelines on the release of |
| 03:52:52 | 18 | personally identifiable information and sensitive information. |
| 03:52:56 | 19 | The EU has a data protection authority program that enforces |
| 03:53:02 | 20 | and interprets the data protection laws of Europe.  Europe has |
| 03:53:08 | 21 | designated that the United States does not sufficiently meet, |
| 03:53:10 | 22 | under our legal guidelines and paradigm, the privacy |
| 03:53:16 | 23 | requirements of Europe for personal information. |
| 03:53:18 | 24 | As an exception to that, Europe has designated that |
| 03:53:22 | 25 | if companies are listed and registered as safe harbor, that |

03:53:28  1  they meet European guidelines and that those companies

03:53:32  2  individually, as opposed to the country of the United States,

03:53:36  3  are qualified to take possession of personal information

03:53:38  4  related to European citizens.

03:53:40  5  Q.  So you are giving legal advice on how to comply with an EU

03:53:48  6  policy?

03:53:48  7  A.  I spent a lot of time working with the Sedona Conference,

03:53:52  8  specifically working group 6, on developing international

03:53:58  9  programs and policies for the exchange of data.  I have worked

03:54:02  10  with the data protection authorities to get them to, if not

03:54:06  11  endorse, at least allow the publication of our recommended

03:54:10  12  best practices.  I don't know that I would call that legal

03:54:14  13  advice.  I am certainly helping clients understand what the

03:54:20  14  safe harbor options are in telling them what the data

03:54:24  15  protection authorities have told us with respect to those

03:54:26  16  programs.

03:54:26  17  Q.  In this particular engagement that you have listed here

03:54:30  18  under select consulting experience, the resume that you have

03:54:34  19  submitted to the court --

03:54:34  20  A.  Yes, sir.

03:54:34  21  Q.  -- did you provide legal advice on the International Safe

03:54:38  22  Harbor?

03:54:38  23  A.  No, sir.

03:54:40  24  Q.  So were you providing advice about best practices?

03:54:44  25  A.  Advice on the technologies used in that client to comply

| | |
|---|---|
| 03:54:52 | 1 |
| 03:54:56 | 2 |
| 03:55:00 | 3 |
| 03:55:04 | 4 |
| 03:55:06 | 5 |
| 03:55:08 | 6 |
| 03:55:12 | 7 |
| 03:55:16 | 8 |
| 03:55:16 | 9 |
| 03:55:18 | 10 |
| 03:55:18 | 11 |
| 03:55:20 | 12 |
| 03:55:22 | 13 |
| 03:55:24 | 14 |
| 03:55:26 | 15 |
| 03:55:28 | 16 |
| 03:55:38 | 17 |
| 03:55:40 | 18 |
| 03:55:42 | 19 |
| 03:55:48 | 20 |
| 03:55:52 | 21 |
| 03:55:58 | 22 |
| 03:55:58 | 23 |
| 03:56:00 | 24 |
| 03:56:00 | 25 |

1  with their own discovery and disclosure obligations and the

2  technology choices they made to enable a safe harbor program.

3        I was working with in-house counsel, and I was

4  working as a technology consultant to outside counsel.

5  Q.  Was Boolean search part of that?

6  A.  Not that I recall.

7  Q.  Was predictive coding?

8  A.  Not that I recall.

9  Q.  Were supervised learning?

10  A.  Not that I recall.

11  Q.  Statistically-ranked retrieval?

12  A.  Not that I recall.

13  Q.  Did you do any statistical analysis in connection with

14  that particular engagement?

15  A.  Not that I recall.

16  Q.  Okay.  So let's go down now to the tobacco industry

17  engagement that you have listed here.

18        It says that, In the tobacco industry, a team of 45

19  team members to assess and advise client on legacy media and

20  physical media inventories through collections, evaluations,

21  remediation, and reintroduction into the normal document life

22  cycle.

23        Did I read that correctly?

24  A.  Yes, sir.

25  Q.  Then precisely what does reintroduction into the normal

03:56:04  1  document life cycle mean?

03:56:06  2  A.  That means enabling the client to take media, whether that

03:56:12  3  be tapes or disks, thumb drives, understand the information

03:56:16  4  that's on them, and for the client to create the process to

03:56:16  5  identify the information as to their normal document

03:56:28  6  rentention life cycle, which may mean to retain the

03:56:30  7  information, which may mean to expire the information.

03:56:32  8  Q.  Thumb drives, correct?  You mentioned thumb drives?

03:56:38  9  A.  Yes, sir.

03:56:38  10  Q.  What other type of non-desktop, non-server media was

03:56:44  11  involved in that particular engagement?

03:56:46  12  A.  Thumb drives, diskettes, external drives, mobile devices,

03:56:56  13  backup tapes.

03:56:58  14  Q.  And in connection with that engagement, you recognized,

03:57:00  15  did you not, the need to collect information from those

03:57:06  16  sources, true?

03:57:08  17  A.  This was not done in a legal context.  We collected the

03:57:14  18  physical devices.

03:57:16  19  Q.  This was a non-legal matter, had no connection to document

03:57:22  20  organizations, document retention policy?

03:57:24  21  A.  Eventually, this was assessed by the client of their own

03:57:30  22  document retention policies.  This was not associated with any

03:57:34  23  particular litigation.

03:57:34  24  Q.  So it's not an e-discovery matter?

03:57:38  25  A.  It's a matter that deals with electronic information.  The

03:57:44  1  client felt that it was related to their legal obligations for
03:57:46  2  document retention.  I was engaged by counsel.  It has -- you
03:57:52  3  can call it an ESI, an e-discovery issue or not, it's
03:57:56  4  electronically-stored information.  It's the organization,
03:58:00  5  gathering, and identification of that information.
03:58:02  6  Q.  Well, did you do anything in that particular engagement
03:58:06  7  with respect to Boolean search or supervised learning or
03:58:10  8  statistically-ranked retrieval?
03:58:14  9  A.  I am considering whether or not we did any Boolean
03:58:22  10  searching on that.
03:58:24  11          I don't recall any Boolean searching.  We definitely
03:58:26  12  did not do any machine run or statistical ranking.
03:58:30  13  Q.  Did you perform any statistical analysis to verify your
03:58:34  14  findings or recommendations?
03:58:36  15  A.  There was quantifications made of the data we were
03:58:42  16  finding, of the devices we were finding.  There were
03:58:46  17  projections made of the expectations of data in other
03:58:48  18  locations.  I don't recall if that was a statistical
03:58:54  19  evaluation, but statistics were generated and statistics were
03:58:58  20  reported.
03:58:58  21  Q.  Okay.  Let's try to speed this up a little bit.
03:59:02  22          Looking at all the engagements that you have listed
03:59:06  23  here on your resume, can you please identify any of them in
03:59:10  24  which you personally were involved in the development or
03:59:16  25  evaluation of either Boolean search methodologies like those

03:59:20  1  at issue here, supervised learning like those at issue here,

03:59:24  2  statistically-ranked retrieval like those at issue here, or

03:59:28  3  statistical evaluation?

03:59:30  4  A.  Well, first of all, do you want to go over the first case

03:59:36  5  we just talked about, because I think we just talked about

03:59:38  6  Boolean searching?

03:59:38  7  Q.  I am asking about the balance of them.  I don't want to go

03:59:42  8  back and replow ground.

03:59:46  9       MR. MAROVITZ:  Pardon me, your Honor.  Just a

03:59:48  10  clarifying objection.  Just so the record is clear, I don't

03:59:50  11  know whether Mr. Mogin is asking about, for instance, the

03:59:54  12  testifying experience as well or whether it's simply the first

03:59:58  13  consulting experience on pages 1 through 2.

04:00:02  14       MR. MOGIN:  I think the record is pretty clear that

04:00:04  15  it's select consulting experience, but if it isn't, I'll

04:00:08  16  clarify.

04:00:08  17       THE COURT:  Select, are you saying?

04:00:08  18       MR. MOGIN:  Select -- as Mr. Regard phrased it,

04:00:12  19  select consulting experience, pages 1 and 2 of his C.V., which

04:00:20  20  was tendered before as Defendants' 3.

04:00:24  21       THE WITNESS:  Your Honor, this is my select section

04:00:26  22  because it's not a complete list of all the projects I have

04:00:30  23  done over the last 20 years.

04:00:36  24       THE COURT:  I understand that.  Thank you.

04:00:44  25       THE WITNESS:  Was the question apply those

04:00:58  1  technologies or to develop those technologies?

04:01:02  2  BY MR. MOGIN:

04:01:02  3  Q.  Well, we will break it up.

04:01:04  4  A.  Okay.

04:01:06  5  Q.  You clearly want to tell us about both, so tell us first

04:01:10  6  about applied.

04:01:10  7  A.  In the majority of these cases, there were various forms

04:01:14  8  of document searching relying on Boolean technology.  I don't

04:01:20  9  know how long of detail you'd like me to go into those, but I

04:01:24  10  am more than happy to.

04:01:24  11  Q.  Did you develop the Boolean strings?

04:01:32  12  A.  Many times, we were given direction by counsel as to which

04:01:36  13  strings to develop.  We executed the strings.  Counsel would

04:01:40  14  tell us to look for key words or key concepts, and we would

04:01:42  15  develop the strings and execute those.

04:01:44  16  Q.  I want to get back just for a moment to precision and

04:01:46  17  accuracy.  You used the term "we," and my question was you.

04:01:54  18  A.  I often lead people on projects that I manage.

04:01:58  19  Q.  Did you on any of these engagements develop the Boolean

04:02:02  20  strings?

04:02:02  21  A.  I think I just said it's usually counsel that indicates

04:02:08  22  which words or which terms they want us to search for, they

04:02:12  23  want me to search for, and I will either execute it myself or

04:02:16  24  I will have my team execute it.

04:02:16  25  Q.  So they ask you to operate the tool and execute a

04:02:20   1    preconstructed Boolean search?  Is that what you are saying?

04:02:24   2    A.  No, they ask me which words to organize, and I build that

04:02:28   3    into a Boolean language and then execute it against the

04:02:32   4    project.

04:02:32   5    Q.  They ask you which words to organize?

04:02:36   6    A.  They provide me the words, and I organize them in a

04:02:38   7    Boolean string.

04:02:40   8    Q.  So does that mean that you put in the operators?

04:02:44   9    A.  Sometimes, or the parentheses.

04:02:46  10    Q.  What else?

04:02:48  11    A.  Sometimes that's all I need to do.

04:02:50  12    Q.  Okay.  And how about with respect to -- so that's both

04:02:58  13    your testimony with respect to both development and

04:03:00  14    application, or is there more to that?

04:03:02  15    A.  Let me finish looking at this, please.

04:03:30  16        On page 3, there are some projects that I had more

04:03:36  17    significant hands-on programming and development with.

04:03:38  18    Q.  And which are those, please.

04:03:40  19    A.  In the first one, design, implemented a bank transaction

04:03:46  20    analysis and tracing database.  That involved the conversion

04:03:50  21    of paper documents that had been scanned in, the (inaudible)

04:03:56  22    of those documents, the building of a repository, and the

04:04:00  23    development of metadata analysis to correlate specific types

04:04:02  24    of transactions related to that investigation.

04:04:06  25    Q.  Please explain a little bit more about the development of

04:04:10    1   metadata analysis.

04:04:10    2   A.  The reverse -- for lack of a better term, the reverse

04:04:18    3   engineering of specific documents that were in paper, scanning

04:04:22    4   them in, these are trade confirmations in the broker/dealer

04:04:26    5   industry, converting that information back into tabular

04:04:32    6   format, and developing analyses to correlate dates, dollars,

04:04:38    7   stocks, and brokers, and clients to investigate specific

04:04:42    8   transactions.

04:04:42    9   Q.  Do you mean to say that you took paper documents, scanned

04:04:46   10   them in, and then engaged in further activity with respect to

04:04:52   11   that?

04:04:52   12   A.  Yes.

04:04:52   13   Q.  So the material that you were originally working with was

04:04:58   14   not ESI, correct?

04:04:58   15   A.  It became electronically stored once I converted it to

04:05:04   16   electronic information.

04:05:04   17   Q.  When did this take place?

04:05:06   18   A.  This would have been about 2001.

04:05:10   19   Q.  So in 2001, this bank didn't have ESI, didn't have the

04:05:18   20   confirmations in electronically-stored information?

04:05:20   21   A.  They weren't electronic information records for the

04:05:26   22   information I was dealing with at the time.  I don't find it

04:05:28   23   unusual at all to find paper documents in organizations and

04:05:32   24   not have the electronic sources of that, especially back in

04:05:36   25   2001.

04:05:36  1    Q.  Bank transactions in 2001, you don't find that unusual, in
04:05:42  2    your experience?
04:05:42  3    A.  In that particular case, the records were not available
04:05:46  4    electronically, so we dealt with what we had.
04:05:48  5    Q.  Okay.  Now, did you develop Boolean search strings in that
04:05:54  6    case?
04:05:54  7    A.  Boolean search strings and much more complicated
04:05:58  8    algorithms as well.  There was significant programming
04:06:02  9    involved in that case.  I did it myself.
04:06:04  10   Q.  Okay.  What programming language did you use?
04:06:08  11   A.  The majority of this was done in Visual Basic For
04:06:14  12   Applications, VBA.
04:06:16  13   Q.  Now, is VBA a language that you learned when you got your
04:06:20  14   BS in computer science?
04:06:22  15   A.  No, sir, I learned it subsequent.
04:06:24  16   Q.  Are there other computer languages that are currently in
04:06:28  17   use that you are conversant -- strike that -- that you are
04:06:34  18   able to program?
04:06:36  19   A.  I don't do a lot of programming today, but the programming
04:06:40  20   that I do is mostly in SQL.
04:06:42  21   Q.  Okay.  So are you familiar with C++?
04:06:44  22   A.  I am.
04:06:46  23   Q.  Can you program in C++?
04:06:48  24   A.  I have in the past.  I probably could again if I needed
04:06:52  25   to.

| | | |
|---|---|---|
| 04:06:52 | 1 | Q. When was the last time you did it? |
| 04:06:54 | 2 | A. Probably in the late '90s, early 2000s. |
| 04:07:00 | 3 | Q. How about Java, have you able to program in Java? |
| 04:07:04 | 4 | A. Never had a need to program in Java. |
| 04:07:06 | 5 | Q. Do you know the source programs, the source language |
| 04:07:10 | 6 | that's used in constructing any of the tools that were used by |
| 04:07:14 | 7 | defendants that are represented on your chart in Exhibit 4? |
| 04:07:18 | 8 | A. No, sir. |
| 04:07:18 | 9 | Q. Do you think that reviewing the algorithms was in any way |
| 04:07:24 | 10 | important to your analysis today? |
| 04:07:24 | 11 | A. No, sir. |
| 04:07:26 | 12 | Q. Did you make any attempt to look at the algorithm, to look |
| 04:07:30 | 13 | at the source code? |
| 04:07:30 | 14 | A. Since I didn't feel that I needed to, I did not make an |
| 04:07:34 | 15 | attempt to do so. |
| 04:07:34 | 16 | Q. All right. Now, on this page 3, were there other -- |
| 04:07:40 | 17 | strike that. |
| 04:07:40 | 18 | Let's go back to this bank transaction engagement. |
| 04:07:44 | 19 | A. Yes, sir. |
| 04:07:44 | 20 | Q. Did you engage in anything having to do with |
| 04:07:48 | 21 | statistically-ranked retrieval? |
| 04:07:56 | 22 | A. In that particular case, no. |
| 04:08:00 | 23 | Q. Okay. How about use of supervised learning technologies? |
| 04:08:06 | 24 | A. Also not in that case. |
| 04:08:08 | 25 | Q. So are there -- there's, what, three more cases here that |

04:08:12　　1　 are listed on page 3. Are any of those relevant to what we

04:08:16　　2　 have been talking about?

04:08:16　　3　 A. These are in the back of my resume. I am still trying to

04:08:56　　4　 recall exactly which clients --

04:08:58　　5　 Q. Take your time.

04:09:08　　6　 A. In the second to last one.

04:09:10　　7　 Q. That would be the (inaudible) the largest map of

04:09:12　　8　 restatement in U.S. history?

04:09:14　　9　 A. That would be the one.

04:09:18　　10　 　　　I was involved in a lot of hands-on programming and

04:09:22　　11　 development of the financial system analysis that we did in

04:09:26　　12　 that case. It would not be what I would consider Boolean

04:09:30　　13　 searching because this was largely financial and mathematical

04:09:34　　14　 transactions, but we ended up -- and I say "we," myself and my

04:09:38　　15　 team -- ended up, as it states here, forming over 8,000

04:09:42　　16　 different analyses and reports off of that data.

04:09:46　　17　 　　　So to the extent you're programming and data

04:09:50　　18　 management, that was a very significant effort over many, many

04:09:54　　19　 months.

04:09:56　　20　 　　　In the last matter --

04:09:58　　21　 Q. Hold on a second. When did that particular engagement

04:10:04　　22　 take place?

04:10:04　　23　 A. That engagement took place in the year 2000.

04:10:06　　24　 Q. And this says, Delivered over 8,000 separate data sets for

04:10:12　　25　 further analysis; is that correct?

04:10:12   1   A.  It is.

04:10:14   2   Q.  So did you deliver it to some other person or organization

04:10:18   3   for further analysis?

04:10:18   4   A.  There was a forensic analysis team of about a hundred

04:10:24   5   people there.  We were delivering analyses to them.

04:10:30   6   Q.  Is that the team that you were leading?

04:10:32   7   A.  No, sir.  I was leading a team of 30, as it says here, a

04:10:36   8   technology team supporting a forensic accounting team.

04:10:40   9   Q.  So your primary job there was to lead the team that was

04:10:42  10   engaged in providing technical support, correct?  And the

04:10:46  11   technical support consisted mostly of collection work, right?

04:10:50  12   A.  There was a lot of collection work here, but I think you

04:10:56  13   understate the role that I played on that team.  This entire

04:11:00  14   effort was an effort that I designed:  The coalescing of

04:11:04  15   information from over 18 different subledgers and general

04:11:08  16   ledger systems within this company, the inspection, the

04:11:14  17   categorization, the identification of backup tapes to restore

04:11:20  18   the analysis of online data that was available, the analysis

04:11:22  19   of off-line data, the restoration of that data.  This was a

04:11:26  20   project that I not only led, I designed and had a lot of

04:11:32  21   hands-on work with.

04:11:32  22   Q.  This is another engagement where what you just called

04:11:36  23   off-line data proved to be important, I take it?

04:11:38  24   A.  In this case, it was, yes.

04:11:40  25   Q.  And what were some of the criteria that you used to make a

| | | |
|---|---|---|
| 04:11:42 | 1 | determination then in that case off-line data might be |
| 04:11:46 | 2 | important? |
| 04:11:46 | 3 | A.  The company was in the process of making a restatement |
| 04:11:54 | 4 | over five years of financial information.  Their financial |
| 04:11:58 | 5 | system had kept its annual information on their tape library |
| 04:12:06 | 6 | system that they used at the time, and so we went there to get |
| 04:12:10 | 7 | the information in order to do the analysis. |
| 04:12:14 | 8 | Q.  So because there was a five-year period at issue, that was |
| 04:12:16 | 9 | the primary driver between looking at what was off-line; is |
| 04:12:16 | 10 | that correct? |
| 04:12:20 | 11 | A.  No, it was a correlation in that particular case of the |
| 04:12:22 | 12 | online availability of information, the off-line availability |
| 04:12:24 | 13 | of information, and the cost and effort of restoring that |
| 04:12:30 | 14 | information. |
| 04:12:32 | 15 | Q.  Well, could you have responded over that five-year period |
| 04:12:36 | 16 | without going to the off-line information? |
| 04:12:36 | 17 | A.  Yes. |
| 04:12:38 | 18 | Q.  But you chose not to.  Why not? |
| 04:12:40 | 19 | A.  The company chose not to.  They were given options, and |
| 04:12:44 | 20 | they chose to restore. |
| 04:12:44 | 21 | Q.  They instructed you in that regard? |
| 04:12:48 | 22 | A.  I'm sorry? |
| 04:12:48 | 23 | Q.  In other words, you didn't have the discretion; is that |
| 04:12:48 | 24 | right? |
| 04:12:52 | 25 | A.  I didn't make the choice to restore the off-line data. |

| | | |
|---|---|---|
| 04:12:54 | 1 | That was made at a higher pay scale than I was at. |
| 04:12:58 | 2 | Q. Did you advise them to go back and go after the off-line |
| 04:13:04 | 3 | data? |
| 04:13:04 | 4 | A. No. I advised them of their options. |
| 04:13:06 | 5 | Q. Did you advise them that it was your opinion that they |
| 04:13:12 | 6 | should not go and look at the off-line data? |
| 04:13:14 | 7 | A. I did not. I merely gave them their options. |
| 04:13:18 | 8 | Q. Okay. So the five-year time period was just -- in your |
| 04:13:22 | 9 | analysis, that wasn't important for the determination of |
| 04:13:26 | 10 | whether to look at the off-line data; is that right? |
| 04:13:30 | 11 | A. That was the time frame that I was instructed to work on. |
| 04:13:38 | 12 | That was the time frame that was relevant to the audit and the |
| 04:13:40 | 13 | restatement. |
| 04:13:42 | 14 | Q. Okay. |
| 04:13:42 | 15 | A. That's the time frame of information that either was on |
| 04:13:46 | 16 | the online systems or was augmented from data from the |
| 04:13:48 | 17 | off-line systems. There were other choices. That's what the |
| 04:13:52 | 18 | client decided to do. |
| 04:13:52 | 19 | Q. Have you ever heard the expression, preserve broadly and |
| 04:13:58 | 20 | produce narrowly? |
| 04:13:58 | 21 | A. I have. |
| 04:14:00 | 22 | Q. What does that mean to you? |
| 04:14:02 | 23 | A. That means that many times when companies are in a |
| 04:14:10 | 24 | litigation, they make the decision to preserve information |
| 04:14:14 | 25 | today, and because information is often commingled between |

04:14:20　1　relevant and non-relevant information, that preservation can

04:14:24　2　include non-relevant information and relevant information.  So

04:14:28　3　if you are preserving, you end up collecting -- you end up

04:14:32　4　locking down and ultimately collecting more information than

04:14:34　5　you ultimately intend to produce.

04:14:36　6　Q.  And what does the "produce narrowly" part of that mean?

04:14:42　7　A.  That means to try to produce the amount of information

04:14:46　8　that's actually relevant to the case and not to overproduce.

04:14:48　9　Q.  Okay.  And does that entail taking the restrictive view of

04:14:54　10　what's relevant to the case?

04:14:54　11　A.  It's not a review that I take either way.  It's to try to

04:15:02　12　tailor the ultimate handling of production of documents to the

04:15:06　13　needs of the case.

04:15:06　14　Q.  Do you advise clients to preserve broadly and produce

04:15:10　15　narrowly?

04:15:10　16　A.  I have used that phrase in the past.

04:15:14　17　Q.  Is that how you advised the clients here?

04:15:16　18　A.  I didn't advise the clients here on preservation or

04:15:20　19　production.

04:15:20　20　Q.  Okay.  In other words, you were just talking in the

04:15:24　21　beginning about collection; is that right?

04:15:28　22　A.  I'm sorry?

04:15:28　23　Q.  You didn't tell -- you didn't talk to the clients here

04:15:32　24　about preservation; is that correct?

04:15:32　25　A.  I didn't talk to them about the scope of preservation, I

04:15:36  1  didn't talk to them about the scope of collection.  They asked

04:15:38  2  me for advice on techniques, on how to execute a quality

04:15:42  3  selection, and I gave them advice.

04:15:44  4  Q.  Did you give advice with respect to other aspects of

04:15:48  5  preservation?

04:15:48  6  A.  I did not.

04:15:48  7  Q.  So you gave limited advice with respect to certain aspects

04:15:52  8  of collection; is that right?

04:15:54  9  A.  That's a fair statement, yes.

04:15:56  10  Q.  Okay.  So when you tell somebody in the context of your

04:16:00  11  job as an e-discovery consultant who advises those clients,

04:16:08  12  that you're also an attorney, that they should preserve

04:16:14  13  broadly but produce narrowly, do you think that that has any

04:16:20  14  impact on the decisions that they make as to relevance and

04:16:26  15  what should be produced because it's responsive or not?

04:16:30  16  A.  I certainly hope not.

04:16:36  17  Q.  Do you think it does?

04:16:36  18  A.  It's not the intent of what I do.  I can't tell you how it

04:16:40  19  lands.  I can only tell you the advice that I give.

04:16:44  20  Q.  Well, you say you can't tell me how it lands, but

04:16:46  21  certainly you've heard clients' responses when you make that

04:16:50  22  statement, haven't you?

04:16:50  23  A.  In what manner, Mr. Mogin?

04:16:56  24  Q.  Well, such as, you know, That's a good idea, producing

04:16:58  25  narrowly?

04:17:00  1  A.  If they asked me to explain what producing narrowly means,

04:17:04  2  I explain the way that I just said.  It means to produce the

04:17:06  3  information in a way that's tailored to meet your obligations

04:17:10  4  and not to overproduce.

04:17:12  5  Q.  Isn't it true, sir, that when you have advised people to

04:17:14  6  produce narrowly, that you know that they have taken that to

04:17:18  7  mean to be restrictive in their interpretation of

04:17:22  8  responsiveness?

04:17:24  9  A.  Not at all.

04:17:24  10  Q.  Never?

04:17:24  11  A.  Not that I'm aware of.

04:17:26  12  Q.  Now, let's go, if we can, please, to your testifying

04:17:34  13  experience.

04:17:36  14  A.  Yes, sir.

04:17:36  15  Q.  Which I believe is page 4 of the exhibit; that is,

04:17:40  16  Defendants' 3.

04:17:42  17  A.  Yes, sir.

04:17:42  18  Q.  It's a lengthy list.  Can you please tell me if there are

04:17:46  19  any engagements on that list where you testified -- that is,

04:17:52  20  like you're testifying today, not by declaration or affidavit,

04:17:56  21  live testimony -- about any of the subjects we are talking

04:18:02  22  about; that is, Boolean search, supervised learning,

04:18:06  23  statistically-ranked retrieval, statistical validation?

04:18:10  24  A.  Most of my testimony is not in live court, most of my

04:18:18  25  testimony is by deposition, but let me look over this list.

04:18:36   1          You only want court testimony, or would live

04:18:38   2   deposition suffice for your needs?

04:18:40   3   Q.  We are going to break it up into categories, so let's

04:18:44   4   start with court testimony.

04:18:46   5   A.  Okay.  In the In Re Devinney (phonetic) Universal matter,

04:19:12   6   which is about two-thirds of the way down the list.

04:19:14   7   Q.  Just a second.  Let me locate it.

04:19:18   8          Okay.  Thank you.

04:19:18   9   A.  I testified as to the construction of SQL query language

04:19:24   10   and the results that the defendants had produced in that

04:19:26   11   particular case with respect to database tables and methods

04:19:32   12   that they used to produce those tables.

04:19:32   13   Q.  Now, database tables are what's referred to as structured

04:19:36   14   data, correct?

04:19:38   15   A.  Most data is structured.  Databases are structured data.

04:19:42   16   In this case, they contained unstructured data within the data

04:19:48   17   fields.

04:19:48   18   Q.  Is email considered structured data or unstructured data?

04:19:52   19   A.  That's a great question.  I think of email as a database

04:19:56   20   that contains unstructured information.

04:19:58   21   Q.  Is that the consensus view in the computer forensics

04:20:04   22   industry?

04:20:04   23   A.  I couldn't tell you.  I haven't had it polled.

04:20:06   24   Q.  Well, how about this.  You know a lot about best

04:20:10   25   practices.  Is it best practices to treat email as a database?

04:20:12  1  A.  Most people treat email in the same fashion they treat

04:20:18  2  loose files, which is as an unstructured container.

04:20:22  3  Q.  And you mentioned seraquel (sic).  Would you explain to

04:20:26  4  the court what that is?

04:20:26  5  A.  I didn't catch that word.  Could you repeat the question?

04:20:28  6  Q.  Sequarrel, seraquel, I can't pronounce it.  You mentioned

04:20:32  7  that it's --

04:20:32  8  A.  "Sequel."

04:20:34  9  Q.  Go ahead.  If you could explain to the court what SQL is.

04:20:38  10  A.  "Sequel" is a pronunciation of the acronym SQL, Structured

04:20:44  11  (sic) Query Language.  It's a programming language methodology

04:20:46  12  used to handle electronic database systems.

04:20:50  13  Q.  And so did you use Boolean queries?

04:20:52  14  A.  SQL has many of the same aspects of Boolean because you

04:21:02  15  are using the same operations.  So when I say SQL, that

04:21:06  16  programming language often uses the same structure -- or the

04:21:10  17  same equivalent structure in terms that you can find in

04:21:14  18  Boolean searching.

04:21:16  19  Q.  Did you use Boolean key word searching in connection with

04:21:22  20  that engagement?

04:21:22  21  A.  Yes, sir.

04:21:22  22  Q.  And did you develop the Boolean search strings?

04:21:26  23  A.  I did.

04:21:26  24  Q.  And how did you go about doing that?

04:21:28  25  A.  By having discussions with counsel, reading the pleadings,

268

| | | |
|---|---|---|
| 04:21:40 | 1 | developing a plan with counsel as to how to derive the |
| 04:21:44 | 2 | information counsel is interested in either having it analyzed |
| 04:21:48 | 3 | or looking at, developing the strings against the database |
| 04:21:50 | 4 | fields to extract the information and prepare it for counsel. |
| 04:21:54 | 5 | Q.  What kind of information was in the database? |
| 04:21:54 | 6 | A.  My recollection is largely financial transactions. |
| 04:22:02 | 7 | Q.  So what sort of key words were you using in order to |
| 04:22:06 | 8 | examine financial transactions in the database? |
| 04:22:08 | 9 | A.  The name of the financial account, so if you had a chart |
| 04:22:14 | 10 | account, the name of that account, or maybe the account |
| 04:22:16 | 11 | number; the extent that there was a payee or a creditor, the |
| 04:22:20 | 12 | name of that client or that creditor; to the extent there were |
| 04:22:24 | 13 | descriptive texts within the fields as to what transactions |
| 04:22:28 | 14 | took place -- |
| 04:22:28 | 15 | Q.  I'm sorry.  As to? |
| 04:22:30 | 16 | A.  If there was a descriptive term within the description |
| 04:22:34 | 17 | field for that transaction, as to why that transaction took |
| 04:22:38 | 18 | place. |
| 04:22:38 | 19 | Q.  Thank you. |
| 04:22:38 | 20 | A.  We'd be looking for text.  If there was commentary from |
| 04:22:42 | 21 | the accounting department as to the backup meaning behind a |
| 04:22:50 | 22 | particular transaction. |
| 04:22:50 | 23 | So, again, there was dated information, there was |
| 04:22:54 | 24 | currency information, there was free-flowing, unstructured |
| 04:22:58 | 25 | text information both with the transaction nature and the |

04:23:00    1    commentary.

04:23:02    2    Q.  Were you looking for coded phrases?

04:23:04    3    A.  A lot of the information in financial database use

04:23:10    4    acronyms and codes.

04:23:12    5    Q.  Codes as in the sense of someone trying to obscure or

04:23:16    6    hide?

04:23:18    7    A.  Yes, sir.

04:23:20    8    Q.  And how did you go about formulating Boolean queries for

04:23:26    9    that particular information?

04:23:26   10    A.  We started by looking for information with respect to

04:23:32   11    particular financial accounts, particular participants in

04:23:34   12    those transactions.  We produced those to counsel.  We

04:23:40   13    identified particular transactions of interest to them and

04:23:44   14    asked us to see if we could find more transactions of that

04:23:46   15    nature.  We would look at the terminology that was used to try

04:23:48   16    to find additional transactions using the same terminology.

04:23:54   17    Q.  Are you saying that there were certain transactions that

04:23:56   18    were material to the investigation that might have been hidden

04:23:58   19    in some way?

04:24:00   20    A.  That might have -- excuse me?

04:24:02   21    Q.  That somebody might have tried to hide in some way and

04:24:06   22    that's what you were searching for?

04:24:06   23    A.  Not the transactions were hidden, but that the

04:24:08   24    transactions were in the accounting system, and we were trying

04:24:10   25    to narrow down the accounting system to just those

04:24:14  1  transactions.

04:24:14  2  Q.  So you were using the Boolean search in order to narrow;

04:24:14  3  is that correct?

04:24:20  4  A.  It is.

04:24:22  5  Q.  And in that particular regard, did you use

04:24:30  6  statistically-ranked retrieval?

04:24:32  7  A.  Not that I recall.

04:24:32  8  Q.  Did you use supervised learning?

04:24:34  9  A.  Not in that matter, no.

04:24:38  10  Q.  Did you do a statistical evaluation of the validity of

04:24:42  11  your own searches?

04:24:42  12  A.  No, sir.

04:24:46  13  Q.  Did you engage in random sampling?

04:24:48  14  A.  No, sir.

04:24:52  15  Q.  Let's go back then.  Any other court testimony that's

04:24:58  16  pertinent?

04:25:00  17  A.  I don't see any other testimony on Boolean search

04:25:38  18  terminology or machine language.

04:25:40  19  Q.  How about where you were engaged in validation,

04:25:46  20  statistical validation searches?

04:25:50  21  A.  No, sir.

04:25:50  22  Q.  How about -- then let's talk about the testimony that you

04:25:56  23  have given, the deposition testimony that you have given that

04:25:58  24  might cover those sections.  Can you identify any such

04:26:02  25  engagements on this exhibit?

04:26:02  1   A.  There was significant testimony in deposition in the
04:26:14  2   Gentex v. Armor Holdings matter, which is the second one from
04:26:18  3   the top.  That involved a significant amount of searching.
04:26:22  4   Q.  Okay.  And you were the forensics expert and computer
04:26:30  5   science expert in that particular case?
04:26:32  6   A.  Yes, sir.
04:26:32  7   Q.  What was your role as the computer forensics expert?
04:26:36  8   A.  My role in computer forensics was to assess, if possible,
04:26:40  9   the quantity of data that had been taken from company A by
04:26:46  10  exiting employees in transition to company B.  It was also to
04:26:52  11  identify the amount of information in company A's systems that
04:26:56  12  had been maliciously deleted by the exiting employees.  It was
04:27:02  13  to identify the manner in which the exiting employees
04:27:04  14  maintained that data after they left the company and how they
04:27:08  15  shared it with each other, with other people within company B.
04:27:12  16  It was to examine how they had deleted information in company
04:27:16  17  B after they had been filed, after they arrived and used the
04:27:24  18  information.
04:27:24  19      It was to examine how computer forensic examiners who
04:27:28  20  were hired by company B conducted their investigation.  It was
04:27:32  21  to evaluate the quality of the results of the forensic
04:27:36  22  examiners hired by company B in their investigation.  It was
04:27:40  23  to examine a purge activity conducted by the forensic
04:27:46  24  examiners at company B and the quality of that purge.  It was
04:27:48  25  to render an opinion on the sustained presence of additional

04:27:52  1   information from company A still in the possession of

04:27:56  2   company B.

04:27:56  3   Q.  So if I understand correctly, what you're saying is that

04:28:00  4   -- were you representing -- you were testifying on behalf of

04:28:04  5   defense in that case?

04:28:04  6   A.  No, sir, plaintiff.

04:28:06  7   Q.  So what you were doing on behalf of the plaintiff then was

04:28:10  8   you reviewed the work of the defense investigators and

04:28:14  9   testified about certain aspects of that?

04:28:16  10  A.  In part, yes.

04:28:16  11  Q.  And what did you do as the computer science expert that's

04:28:20  12  different than what you just described as the computer

04:28:24  13  forensics expert?

04:28:24  14  A.  One of the of the issues in this case was the accusation

04:28:28  15  or the theft of spreadsheets and databases from company A that

04:28:36  16  were then used at company B.  And from a computer science

04:28:40  17  perspective, my testimony included the identification of this

04:28:44  18  information as intellectual property or the kind of

04:28:48  19  information that could be identified as intellectual property;

04:28:52  20  and also to trace the evolution of these documents as they

04:28:56  21  were modified at company B and ultimately as they were used to

04:29:00  22  create fresh instances of databases and spreadsheets that were

04:29:04  23  in continuous use at company B.

04:29:06  24  Q.  So, precisely, did you create any Boolean search strings?

04:29:10  25  A.  Yes, sir.

04:29:12   1   Q. Okay. Tell me what you did as far as creating Boolean

04:29:18   2   search strings. How many?

04:29:20   3   A. Hundreds.

04:29:22   4   Q. Hundreds of different strings?

04:29:24   5   A. Yes, sir.

04:29:24   6   Q. You're not referring to hundreds of stems, you're talking

04:29:28   7   about hundreds of different queries?

04:29:30   8   A. Yes, sir.

04:29:30   9   Q. Okay. And were you the person that was responsible?

04:29:36   10   A. Some of these I did directly myself, some were done with

04:29:40   11   my team.

04:29:40   12   Q. How many did you directly do by yourself?

04:29:44   13   A. I don't recall.

04:29:44   14   Q. Well, you did hundreds with the team, correct?

04:29:48   15   A. My expert report was 4,000 pages long, Mr. Mogin. I don't

04:29:50   16   recall how many I did myself.

04:29:52   17   Q. Well, how about in terms of percentages?

04:29:58   18   A. 30 percent.

04:29:58   19   Q. 30 percent of the Boolean queries you developed and ran?

04:30:02   20   A. Yes, sir.

04:30:04   21   Q. Okay. Now, in that case, did you use supervised learning?

04:30:08   22   A. I did not.

04:30:08   23   Q. Did you engage in statistically-ranked retrieval?

04:30:12   24   A. No, sir.

04:30:18   25   Q. Did you do statistical validation, such as has been

04:30:22　1　discussed here today?

04:30:22　2　A.  No, sir.

04:30:24　3　Q.  Okay.  What's next in your testifying experience?

04:30:28　4　A.  I don't see or recall any other testifying experience on

04:31:12　5　this specific issue of Boolean search terms or the other areas

04:31:18　6　that you have asked for.

04:31:18　7　Q.  Okay.  So your personal hands-on experience, if you will,

04:31:26　8　please, with supervised learning, what is that?

04:31:28　9　A.  My experience with supervised learning is two-fold, but

04:31:40　10　it's not reflected in my resume.  The first is --

04:31:44　11　Q.  Let me just -- before you start so that I don't interrupt

04:31:48　12　that answer, was this resume created for this particular case;

04:31:54　13　in other words, modified or amended for this particular case?

04:31:56　14　A.  No, sir.

04:31:58　15　Q.  Did you review it before it was submitted in this

04:32:02　16　particular case?

04:32:02　17　A.  Yes, sir.

04:32:02　18　Q.  And you understood the nature of the testimony that you

04:32:06　19　would be rendering in this particular case at the time that

04:32:10　20　you submitted the resume, correct?

04:32:10　21　A.  Yes, sir.

04:32:12　22　Q.  Okay.  So please tell us about what's not on the resume

04:32:16　23　that has to do with supervised learning and your personal

04:32:20　24　hands-on experience.

04:32:22　25　A.  Yes, sir.  I have been involved in the development of

04:32:30    1   neural network programming, which is a form of supervised

04:32:32    2   learning. Neural network programming.

04:32:38    3   Q. And are you aware of anybody that's currently using neural

04:32:44    4   network programming in e-discovery?

04:32:46    5   A. I'm not familiar with all the techniques people are using

04:32:54    6   in e-discovery, though network programming is widely used

04:33:02    7   globally.

04:33:02    8   Q. For what?

04:33:02    9   A. One example is for the detection of airplanes for

04:33:06   10   ground-based airplane safety features. Another is for traffic

04:33:12   11   control within cities. Another is for predicting purchaser

04:33:18   12   decisions in various industries.

04:33:20   13   Q. So with respect to the issues that you understand you're

04:33:24   14   testifying about today, does neural network programming have

04:33:28   15   anything to do with it?

04:33:30   16   A. It does to the extent that it is a machine-learning

04:33:34   17   technique for supervised learning.

04:33:36   18   Q. Okay. Does it learn from a seed set of documents?

04:33:44   19   A. Yes. Not documents but decisions.

04:33:46   20   Q. So the answer then really is no, it doesn't learn from a

04:33:52   21   seed set of documents; is that right?

04:33:54   22   A. It learns from inputs, the same as machine learning

04:34:00   23   techniques that are not neural networking learning. You feed

04:34:06   24   it data, it develops relationships between the data you feed

04:34:10   25   it, you give it designations in the training set, later you

04:34:12   1   feed it new information from new documents or new data, and

04:34:18   2   it, based on what it's learned, makes decisions on what you

04:34:22   3   are now feeding it.

04:34:22   4   Q.  Okay.

04:34:26   5   A.  I think there is a gap here.  There's been no testimony as

04:34:32   6   to how machine-learning systems really work.

04:34:34   7   Q.  We'll get to it.

04:34:36   8   A.  I was hoping that your expert would have already covered

04:34:40   9   that.

04:34:40   10  Q.  He pretty well did cover it, Mr. Regard, but if you want

04:34:44   11  to fence, we can fence.

04:34:46   12  A.  Okay.

04:34:46   13  Q.  So you were telling us about neural network systems, and

04:34:52   14  then was there anything else that's not here on your resume

04:34:56   15  that's relevant to your testimony here today about Boolean

04:35:00   16  systems, about supervised learning, about statistically ranked

04:35:08   17  retrieval or about statistical validation in e-discovery?

04:35:12   18  A.  There are products I have worked on that are not on my

04:35:16   19  resume involving the statistical development, the development

04:35:20   20  of search terms, the improvement of the search terms, the

04:35:24   21  statistical testing of null sets, the development of query

04:35:28   22  sets, and, yes, along the development of machine learning

04:35:34   23  techniques.

04:35:34   24  Q.  And is there a reason that you didn't include those in the

04:35:40   25  material that you submitted to the court and to the parties to

| | | |
|---|---|---|
| 04:35:44 | 1 | establish your credentials to testify here? |
| 04:35:46 | 2 | A.  One, when I first was engaged in this case for this |
| 04:35:54 | 3 | testimony, the issue before me was whether or not the |
| 04:35:58 | 4 | methodologies used by the defendants in preparing their search |
| 04:36:04 | 5 | terms for the production of documents was sufficient.  And I |
| 04:36:12 | 6 | felt then and I still feel now that it was sufficient, |
| 04:36:14 | 7 | exceedingly sufficient. |
| 04:36:16 | 8 | Q.  Based upon your understanding of best practices, right? |
| 04:36:20 | 9 | A.  Both best practices and my personal experience in applying |
| 04:36:24 | 10 | those techniques within cases. |
| 04:36:26 | 11 | Q.  You know, in your consulting practice, do you ever look at |
| 04:36:28 | 12 | Federal Rules of Civil Procedure? |
| 04:36:30 | 13 | A.  Not as part of my consulting practice.  As part of my |
| 04:36:34 | 14 | academic work and part of my work at the Sedona Conference, I |
| 04:36:38 | 15 | do. |
| 04:36:40 | 16 | Q.  So you're familiar with the contours of the Federal Rules |
| 04:36:44 | 17 | of Civil Procedure 26? |
| 04:36:44 | 18 | A.  Generally, yes. |
| 04:36:46 | 19 | Q.  And how about Rule 34? |
| 04:36:48 | 20 | A.  As well, yes. |
| 04:36:50 | 21 | Q.  Okay.  And can you tell me the best practices with respect |
| 04:36:56 | 22 | to ESI or search technology or any of the subjects that you |
| 04:37:00 | 23 | have talked about today that are in either of those rules? |
| 04:37:06 | 24 | A.  I don't believe the rules reflect best practices in their |
| 04:37:08 | 25 | text. |

04:37:10  1  Q.  So in your opinion, what's the relationship between best

04:37:12  2  practices and the Federal Rules?

04:37:16  3  A.  Well, first of all, not all the cases I work on are under

04:37:22  4  the Federal Rules of Civil Procedure.  I work with cases in

04:37:24  5  state court as well.

04:37:26  6          Best practices, in my opinion, is how people

04:37:28  7  implement their processes and methodology to meet their

04:37:34  8  obligations under those rules.

04:37:34  9  Q.  And in order to understand best practices, then you have

04:37:38  10  to have a pretty good understanding of the obligations,

04:37:40  11  correct?

04:37:40  12  A.  Or a lot of experience with people who are working to meet

04:37:44  13  their own obligations.

04:37:46  14  Q.  I'm sorry.  I didn't understand that.  Could you explain,

04:37:50  15  please?

04:37:50  16  A.  Certainly.  One is working with clients and comparing

04:37:56  17  notes with other thought leaders on how to achieve goals

04:38:02  18  within the litigation context, combined with the experience of

04:38:06  19  working on multiple projects over the course of many years.

04:38:14  20  Q.  Do you review the case law?

04:38:18  21  A.  Yes, sir.

04:38:18  22  Q.  Do you consider yourself current on the case law?

04:38:22  23  A.  Yes, sir.

04:38:24  24  Q.  Are you familiar with the -- let me find this case.

04:38:36  25          THE COURT:  Unless you are going to start giving

| | | |
|---|---|---|
| 04:38:38 | 1 | Judge Nolan cases. Are you going to quiz him on something |
| 04:38:42 | 2 | else? |
| 04:38:46 | 3 | BY MR. MOGIN: |
| 04:38:48 | 4 | Q. Are you familiar with the O'Keefe case by -- |
| 04:38:52 | 5 | THE COURT: Judge Facciola. |
| 04:38:56 | 6 | MR. MOGIN: Thank you, your Honor. |
| 04:38:58 | 7 | THE COURT: Do you want the cite? |
| 04:39:02 | 8 | BY MR. MOGIN: |
| 04:39:04 | 9 | Q. Are you familiar with that, Mr. Regard? |
| 04:39:06 | 10 | A. I am. |
| 04:39:06 | 11 | Q. Can you tell us what Judge Facciola has to say about key |
| 04:39:12 | 12 | words? |
| 04:39:12 | 13 | A. I don't recall the exact -- |
| 04:39:14 | 14 | THE COURT: I am not going to allow this unless you |
| 04:39:16 | 15 | have everything Judge Facciola has ever said on key words. We |
| 04:39:20 | 16 | are not going to take one statement out of O'Keefe when Judge |
| 04:39:26 | 17 | Facciola has probably done more to help key word search than |
| 04:39:30 | 18 | anybody else. And if I could go upstairs and key word John |
| 04:39:36 | 19 | Facciola and we got everything he said, I mean, there is a |
| 04:39:40 | 20 | statement in there about eeehh (phonetic), that's one |
| 04:39:48 | 21 | statement. |
| 04:39:48 | 22 | MR. MOGIN: I am just concerned with one statement, |
| 04:39:50 | 23 | your Honor. |
| 04:39:50 | 24 | MR. NEUWIRTH: Your Honor -- |
| 04:39:50 | 25 | THE COURT: Okay, read it to him. |

04:39:52  1    MR. NEUWIRTH:  Your Honor, this has been briefed
04:39:54  2  before Judge Shadur, and you are correct that at least there
04:39:58  3  is a strong argument to be made that this one sentence we are
04:40:02  4  about to hear is not only out of context with the rest of the
04:40:04  5  case but also with other things Judge Facciola has said.  And
04:40:08  6  we would -- I think all defendants would object to the idea
04:40:12  7  that an expert is being asked --
04:40:14  8    THE COURT:  Well, this is kind of contrary to what
04:40:18  9  you said to me before.  Whether you think I am or not,
04:40:22  10  Mr. Mogin, you said to me, They're not supposed to be giving
04:40:26  11  legal opinions here.  Now we're quoting on cases and then you
04:40:32  12  want to ask him what he thinks of what Judge Facciola said?
04:40:38  13  Is that what you want to do?
04:40:38  14    MR. MOGIN:  No.
04:40:40  15    THE COURT:  What do you want to do?
04:40:40  16    MR. MOGIN:  Your Honor, I am not going to ask him
04:40:42  17  about legal opinions.  Mr. Regard testified that he keeps up
04:40:46  18  with the case law in this area --
04:40:48  19    THE COURT:  Right.
04:40:48  20    MR. MOGIN:  -- that forms his position with respect
04:40:52  21  to best practices.  Obviously, based upon the way that your
04:40:56  22  Honor can basically give us chapter and verse on this case,
04:40:58  23  this is an important case in the e-discovery context.
04:41:04  24    THE COURT:  It is.  Okay.  It is.
04:41:04  25    MR. MOGIN:  And so it's fair game with respect to

04:41:08  1  Mr. Regard's knowledge of this particular case as it relates
04:41:14  2  to the issues that we are dealing with today.
04:41:18  3      MR. MAROVITZ:  Judge, if I can be heard.  I was
04:41:22  4  precluded in a pretty substantial way from questioning
04:41:24  5  Mr. Regard both today and on February 21st about matters that
04:41:28  6  related to the law.  I didn't agree that I should be precluded
04:41:34  7  with respect to those rulings.  I think it is unfair now for
04:41:36  8  the plaintiff to be able to retread that same ground.
04:41:40  9      I know that -- that's in addition to the statement
04:41:42  10  that Mr. Neuwirth made.  And if, in fact, it is fair game,
04:41:46  11  then I should be permitted to ask the questions that I was not
04:41:50  12  permitted to ask before.
04:41:52  13      MR. MOGIN:  It goes to best practices, your Honor.
04:41:54  14      MR. NEUWIRTH:  But, your Honor, again, we would
04:41:58  15  object, and we can show you what we wrote to the court.  We
04:42:00  16  have formally told, I believe it was in our February 6th
04:42:04  17  brief, we believe that the out-of-context statement which I am
04:42:08  18  sure Mr. Mogin is now going to read is an incomplete and
04:42:14  19  misleading characterization of what Judge Facciola said in
04:42:16  20  this case.
04:42:18  21      THE COURT:  Well, he may have even said it in the
04:42:20  22  case, but he has a whole body of case law.
04:42:24  23      MR. NEUWIRTH:  Exactly, your Honor.
04:42:24  24      THE COURT:  He and Judge Grimm and Judge Peck have
04:42:30  25  been trying get people to cooperate, and in their quest to get

04:42:36    1    people to cooperate on an agreement on search terms, and

04:42:42    2    without pulling out their hair, they --

04:42:48    3             MR. NEUWIRTH:  And let's -- and as you know, your

04:42:50    4    Honor, what Judge Facciola was talking about in this case was

04:42:52    5    not that search terms are inaccurate; he was saying that the

04:42:56    6    defendants there were doing something wrong by suggesting that

04:43:02    7    the search terms -- that the government was using were

04:43:04    8    inadequate without making a sufficient showing of that

04:43:08    9    inadequacy.

04:43:08    10            What this quote is really saying is that arguably

04:43:12    11   what the plaintiffs are trying to do here is wrong.

04:43:14    12            MR. MOGIN:  What quote are we talking about because I

04:43:16    13   haven't asked a question yet.

04:43:18    14            THE COURT:  Okay.  Is this how you wanted to spend

04:43:22    15   the next 20 minutes or the next 25 minutes?  Is this really it

04:43:32    16   on Mr. Regard?  Do you want to ask him anything about the

04:43:34    17   chart?

04:43:36    18            MR. MOGIN:  We are going to get to the chart, your

04:43:38    19   Honor.

04:43:38    20            THE COURT:  I am telling you my chief said I have to

04:43:40    21   be someplace at 4:30.

04:43:42    22            MR. MOGIN:  I understand that.

04:43:44    23            THE COURT:  So I have to be somewhere, and I want a

04:43:46    24   few minutes to talk to the lawyers.

04:43:46    25            MR. MOGIN:  I did not understand that I was required

04:43:48 1   to finish with Mr. Regard today.  The defendants have spent

04:43:54 2   four hours cross-examining Dr. Lewis.  Time was supposed to be

04:44:00 3   equally divided.

04:44:00 4           THE COURT:  How about if you did the part of your

04:44:04 5   cross -- all right.  It's your time.  Judges get in real

04:44:26 6   trouble telling lawyers how to do their cross.

04:44:32 7   BY MR. MOGIN:

04:44:32 8   Q.  Mr. Regard, we have been talking about the O'Keefe case.

04:44:34 9   You're familiar with the case?

04:44:36 10  A.  I am.

04:44:36 11  Q.  Do you have a sense of when that case was decided?

04:44:38 12  A.  I don't recall exactly when it was decided.  The last

04:44:44 13  couple of years.

04:44:44 14  Q.  Well, if I said it was 2008, would that refresh your

04:44:46 15  recollection?

04:44:46 16  A.  It doesn't refresh --

04:44:50 17          THE COURT:  Do you agree with him?

04:44:50 18          THE WITNESS:  It doesn't refresh my recollection, but

04:44:52 19  I don't disagree.

04:44:54 20  BY MR. MOGIN:

04:44:54 21  Q.  So we can agree that I can use 2008 in my question?

04:44:56 22  A.  That's fine.

04:44:58 23  Q.  And you are aware, are you not, that in that case, the

04:45:00 24  court refers to the necessity to look to the learning that can

04:45:04 25  be provided by linguists and computer scientists, correct,

04:45:08  1   with respect to Boolean searches?

04:45:10  2   A.  That's part of what the judge references.  Can you show me

04:45:14  3   the exact text?

04:45:16  4   Q.  Okay.  Let's mark for just identification purposes -- I

04:45:22  5   guess this is Plaintiffs' 12, a copy of the decision.

04:45:32  6        MR. NEUWIRTH:  Can I have a continuing objection?

04:45:40  7        THE COURT:  Yes.

04:45:44  8   BY MR. MOGIN:

04:45:48  9   Q.  I am just going to refer you to the first page.  Do you

04:45:52  10  see the date there, February 18th, 2008?

04:45:54  11  A.  I do.

04:45:56  12  Q.  All right.  And the quote is on the last page, the second

04:46:08  13  sentence.

04:46:12  14       MR. MAROVITZ:  We really do need a copy of the

04:46:14  15  document, Judge.  Thank you.

04:46:16  16  BY MR. MOGIN:

04:46:18  17  Q.  Do you see that sentence there, please?

04:46:20  18  A.  I am on page -- I am on the last page, page 9.  Where

04:46:26  19  would you like me to look?

04:46:28  20  Q.  Yes, the last page, the second sentence.

04:46:40  21  A.  Yes, sir.

04:46:40  22  Q.  Okay.  Do you see the reference there to the knowledge of

04:46:46  23  linguists and computer scientists in connection with key word

04:46:50  24  searching?

04:46:52  25  A.  I do.

04:46:52    1    Q.   Okay.  And when did you first become familiar with this
04:46:56    2    case?  Was it shortly after it was decided?
04:46:58    3    A.   Most likely it would have been shortly after it was
04:47:04    4    decided.
04:47:04    5    Q.   So about four years ago, right?
04:47:06    6    A.   Yes, sir.
04:47:06    7    Q.   Okay.  So in those four years in connection with any of
04:47:12    8    your Boolean searches that you have been involved in, have you
04:47:16    9    engaged the services of a linguist?
04:47:20   10    A.   I have not.
04:47:20   11    Q.   Have you ever engaged the services of a linguist in
04:47:24   12    connection with the construction of Boolean key word strings?
04:47:28   13    A.   I have not engaged the services of a linguist, and in the
04:47:34   14    projects I have worked on, my clients have not felt that a
04:47:38   15    linguist would have contributed to the result.
04:47:40   16    Q.   And you yourself are not a linguist, correct?
04:47:42   17    A.   Well, I certainly understand language, and I speak several
04:47:46   18    languages, but I am not a linguist by profession.
04:47:48   19    Q.   Okay.  And let's talk about statistics.  Are you a
04:47:58   20    statistician?
04:47:58   21    A.   I do not have a doctorate degree in statistics.  I am not
04:48:04   22    sure what Mr. Lewis' degree is in.  I think it's computer
04:48:08   23    science.
04:48:08   24         I have studied statistics.  I have a degree in
04:48:12   25    computer science and mathematics, and part of my graduate

| | | |
|---|---|---|
| 04:48:16 | 1 | program included the study of statistics.  So I am familiar |
| 04:48:20 | 2 | with statistics. |
| 04:48:20 | 3 | Q.  When did you get that bachelor's degree? |
| 04:48:22 | 4 | A.  My bachelor's degree? |
| 04:48:24 | 5 | Q.  Yes, sir. |
| 04:48:26 | 6 | A.  1989. |
| 04:48:30 | 7 | Q.  And when did you get the MBA? |
| 04:48:30 | 8 | A.  1995. |
| 04:48:32 | 9 | Q.  And have you taken any classes in statistics at the |
| 04:48:36 | 10 | graduate level since 1995? |
| 04:48:38 | 11 | A.  No, sir. |
| 04:48:40 | 12 | Q.  Have you written any papers on statistics since 1995 that |
| 04:48:48 | 13 | have been peer reviewed? |
| 04:48:48 | 14 | A.  No, sir. |
| 04:48:50 | 15 | Q.  Have you taught statistics since 1995 in a college class |
| 04:48:56 | 16 | or university class? |
| 04:48:56 | 17 | A.  Not in a university class or college class, I have not.  I |
| 04:49:08 | 18 | was asked to teach statistics to Georgetown advanced institute |
| 04:49:14 | 19 | for e-discovery last year, and I did conduct a session on |
| 04:49:18 | 20 | statistical use within e-discovery. |
| 04:49:18 | 21 | Q.  Well, you were one of how many panelists? |
| 04:49:22 | 22 | A.  I was one of three panelists and one moderator. |
| 04:49:28 | 23 | Q.  And did you -- |
| 04:49:28 | 24 | A.  Three panelists, I think so, three. |
| 04:49:32 | 25 | Q.  Did you present a paper that you authored? |

04:49:34  1   A.  No, sir.

04:50:16  2          MR. MOGIN:  Your Honor, I'm going to mark as next in

04:50:18  3   order Temple-Inland's responses and objections to plaintiffs'

04:50:24  4   first request for production of documents directed to all

04:50:26  5   defendants.

04:50:26  6          THE COURT:  What number would that be?

04:50:28  7          MR. MOGIN:  I believe that's 13, Plaintiffs' 13.

04:50:30  8          THE COURT:  This is Plaintiffs' 13?

04:50:32  9          MR. NEUWIRTH:  Yes.

04:50:32  10          THE COURT:  Thank you.

04:50:42  11   BY MR. MOGIN:

04:50:42  12   Q.  Mr. Regard, are you familiar with Plaintiffs' 13?

04:50:46  13   A.  I don't recall sitting here if that was one of the

04:50:50  14   documents I reviewed or not.  Many, if not most, of these were

04:51:02  15   produced to me.

04:51:02  16   Q.  Do you recall if this one was?

04:51:06  17   A.  I don't offhand.

04:51:08  18   Q.  Do you want to look at Exhibit B of that report?

04:51:18  19          THE COURT:  What page are you on?

04:51:22  20          MR. MOGIN:  It's page 1 of Exhibit B.

04:51:24  21          THE COURT:  Page 1 of Exhibit B.

04:51:38  22          THE WITNESS:  I have listed all the materials that I

04:51:40  23   considered.  I am sure I looked at it at some point, I just

04:51:46  24   don't recall from looking on the face of it.

04:51:48  25   BY MR. MOGIN:

04:51:48   1   Q.  Can you identify for us any document request that

04:51:54   2   Temple-Inland did not tender an objection for?

04:51:58   3   A.  I haven't read the document at that level of degree.

04:52:06   4   Would you like for me to?

04:52:06   5          THE COURT:  No.

04:52:10   6          Sorry.

04:52:12   7   BY MR. MOGIN:

04:52:12   8   Q.  Will you accept my representation that there are none?

04:52:14   9   A.  Are you suggesting they are not responding to any of your

04:52:20  10   requests or they just lodged and preserved their objections to

04:52:24  11   your requests?

04:52:26  12   Q.  The latter.

04:52:28  13   A.  I would accept your representation.

04:52:30  14   Q.  Now, are you aware of which document requests the search

04:52:38  15   strings refer to?

04:52:40  16   A.  No, sir.

04:52:42  17   Q.  Do you have any idea how many of the document requests are

04:52:50  18   within the search strings?

04:52:50  19   A.  I believe there's documentation to the effect of which

04:52:56  20   document requests Temple has agreed to respond to.  I don't

04:53:02  21   have -- I don't know the correlation of which ones of those

04:53:06  22   were effected through the use of search strings versus which

04:53:08  23   ones were effected through other document collections, review,

04:53:12  24   and productions.

04:53:14  25   Q.  So are you suggesting that there's documentation about

04:53:16  1  requests that Temple has agreed to other than their formal

04:53:20  2  response?

04:53:20  3  A.  I am trying to remember if I have seen documentation

04:53:34  4  reflecting search strings against individual requests.  I

04:53:38  5  don't recall sitting here.  If I did, it was through the

04:53:42  6  documentation that was produced by defendants to plaintiffs.

04:53:44  7  Q.  So in your consideration of your opinions in this case,

04:53:52  8  did you consider whether or not the defendants had attempted

04:53:56  9  to construct search strings -- strike that.

04:54:00  10       Were you aware that in approximately July of 2011 at

04:54:08  11  the defendants' request, the plaintiffs broke the request for

04:54:14  12  production of document into several categories, one was

04:54:18  13  conduct requests, another was data requests, the third had to

04:54:22  14  do with inquiries and investigations, and the fourth was more

04:54:28  15  general?

04:54:28  16  A.  I don't recall that specific correspondence, no.

04:54:30  17  Q.  In fact, is that correspondence listed anywhere in your

04:54:40  18  documentation that you looked at?

04:54:42  19  A.  I don't see it offhand.

04:55:02  20  Q.  Okay.

04:55:02  21  A.  It may -- many of the earlier correspondence are, in fact,

04:55:10  22  attachments to some of these correspondences, so I can't say

04:55:14  23  definitively that I did not receive it.  I don't recall it.

04:55:16  24  Q.  All right.  Regardless of whether you received it or

04:55:22  25  reviewed it, were you aware that this had occurred?

04:55:26  1  A.  I am now.

04:55:28  2  Q.  Prior to my bringing it to your attention, were you aware

04:55:32  3  of it?

04:55:32  4  A.  I think I was aware that there had been a distinction made

04:55:36  5  between data requests, meaning non-emails and non-user files,

04:55:42  6  versus the requests that the defendants were seeking to

04:55:46  7  satisfy through the collection and review of documents, but I

04:55:50  8  don't recall sitting here seeing that categorized in the way

04:55:56  9  that you have described it.

04:55:56  10  Q.  Would it surprise you to learn -- strike that.

04:56:02  11       Have you reviewed the documentation that

04:56:06  12  Georgia-Pacific tendered last week having to do with search

04:56:10  13  string validation?

04:56:12  14  A.  I am.

04:56:12  15  Q.  Would it surprise you to learn that the defendants

04:56:18  16  responded or tried to create search strings to only

04:56:22  17  approximately 17 document requests?

04:56:24  18  A.  I believe you just told me that they objected to all of

04:56:32  19  your document requests --

04:56:32  20  Q.  That's correct.

04:56:34  21  A.  -- so that does not surprise me.

04:56:36  22  Q.  Okay.  And did you in any way consider that in forming

04:56:40  23  your opinions today as to whether or not defendants were

04:56:46  24  compliant with best practices?

04:56:48  25  A.  I don't find that relevant to the consideration of their

04:56:52  1   compliance with best practices.

04:56:54  2   Q.  Did you consider today, in connection with forming your

04:56:58  3   opinions that you have talked about today, did you consider

04:57:02  4   the fact that prior to receiving the documents last week from

04:57:08  5   Georgia-Pacific, the defendants had never specifically

04:57:12  6   identified which particular document request the search

04:57:18  7   strings were intended to respond to?

04:57:20  8   A.  I did not consider that, no, sir.

04:57:24  9   Q.  Do you consider such conduct to be within the realm of

04:57:28  10  transparency as you described it earlier?

04:57:34  11  A.  Back to your former question, you asked me if I considered

04:57:38  12  whether or not the defendants had considered which document

04:57:42  13  requests in responding to the development of search terms.  I

04:57:48  14  think my earlier testimony was my information is such that

04:57:50  15  they considered your request for documents very heavily in

04:57:54  16  developing their search terms.  That was part of the input

04:58:00  17  that went into the front of the process.

04:58:02  18       Exactly which ones they decided to respond to versus

04:58:04  19  not is definitely an important aspect that they made that

04:58:08  20  decision, not so much that I know which ones they decided to

04:58:12  21  respond to and which ones they did not decide to respond to.

04:58:16  22  Q.  Okay.  So 17 out of 94, does that strike you as consistent

04:58:22  23  with best practices?

04:58:24  24  A.  It strikes me as irrelevant to best practices.

04:58:26  25  Q.  Okay.  And does the fact that plaintiffs were not advised

04:58:32  1  which of the 94 the search strings related to prior to these

04:58:38  2  hearings have any bearing on your testimony with respect to

04:58:42  3  the transparency of the process?

04:58:44  4  A.   It does and it doesn't at the same time.  It does in that

04:59:02  5  I believe that describing the process that went through to

04:59:08  6  derive search terms, apply the search terms, and test the

04:59:12  7  results, that process I feel has had transparency.  I also was

04:59:20  8  informed when the search terms were produced to the

04:59:24  9  plaintiffs.

04:59:24  10       If there had been omissions there or that the

04:59:26  11  plaintiffs had felt, and I think you did in occasions, that

04:59:30  12  the search terms would not have satisfied your document

04:59:32  13  requests, you advised them, and they took that into

04:59:34  14  consideration in the revision of their search terms.

04:59:40  15       As to the communication of the individual search

04:59:42  16  terms that are being requested or being responded to versus

04:59:48  17  not responded to, I think this document is pretty clear, as

04:59:52  18  you have represented it, that they're objecting to all of your

04:59:54  19  requests.

04:59:58  20  Q.   If they didn't tell us what the search strings

05:00:02  21  corresponded to in terms of the particular requests for

05:00:06  22  production of documents, do you consider that to be

05:00:08  23  transparent in the meaning of transparency as you earlier

05:00:14  24  testified about in connection with best practices?

05:00:16  25  A.   I think it would be important for me to understand the

| | | |
|---|---|---|
| 05:00:22 | 1 | chronology of events more clearly than you have laid them out |
| 05:00:26 | 2 | here.  I don't know when those decisions were made, and I |
| 05:00:32 | 3 | don't know how that correlated to decisions of plaintiffs. |
| 05:00:36 | 4 | Q.  You are suggesting then that I have to walk you through |
| 05:00:38 | 5 | each of the search string developments -- |
| 05:00:40 | 6 |             THE COURT:  What number are your search strings? |
| 05:00:44 | 7 |             MR. MOGIN:  The search strings are -- |
| 05:00:48 | 8 |             THE COURT:  No.  They are in the requests? |
| 05:00:50 | 9 |             MR. MOGIN:  No, no. |
| 05:00:56 | 10 |        Your Honor, just to be clear, we didn't give them |
| 05:00:58 | 11 | search strings.  They made them up. |
| 05:01:00 | 12 |             THE COURT:  So that chart with the highlighting, the |
| 05:01:04 | 13 | one you dropped off? |
| 05:01:06 | 14 |             MR. MOGIN:  That goes with Ms. Tenny.  It's a |
| 05:01:08 | 15 | demonstrative. |
| 05:01:10 | 16 |             THE COURT:  That's Ms. Tenny.  Okay. |
| 05:01:12 | 17 |             MR. MOGIN:  She is going to kill me. |
| 05:01:34 | 18 | BY MR. MOGIN: |
| 05:01:34 | 19 | Q.  You are suggesting then I am going to have to walk you |
| 05:01:38 | 20 | through all of the correspondence and all of the search string |
| 05:01:42 | 21 | development documents that we received last week before you |
| 05:01:44 | 22 | can answer that question? |
| 05:01:44 | 23 |             THE COURT:  Or maybe if one of the defendants know |
| 05:01:48 | 24 | the answer, they could stipulate to whether or not -- say the |
| 05:01:54 | 25 | question again, please.  I was busy reading the responses.  I |

05:01:58    1    thought we were still on the first request for production.  I
05:02:02    2    was reading those.
05:02:04    3    BY MR. MOGIN:
05:02:04    4    Q.  Are you suggesting, Mr. Regard, that in order for you to
05:02:08    5    be able to answer my question, that we have to trace through
05:02:12    6    all of the correspondence and all of the search string
05:02:16    7    developments so that you can tell us about the transparency
05:02:20    8    that took place or didn't take place and whether that's
05:02:26    9    relevant to your opinion?
05:02:26    10   A.  The transparency that I testified to earlier is the
05:02:30    11   transparency of Boolean search terms, that when they are
05:02:34    12   produced, they can be read and they can be restored.  To the
05:02:36    13   extent they were provided to you, the plaintiffs, I have seen
05:02:40    14   correspondence that you responded to them, so the transparency
05:02:46    15   characteristic of search terms to be readable by people
05:02:50    16   obviously had an effect because you responded to them.
05:02:54    17          Separately, I have testified that it's important for
05:02:56    18   parties to relate to the counter-party the process they're
05:03:02    19   going through.  I'm not trying to muddle those two concepts
05:03:06    20   together.
05:03:08    21   Q.  Well, should the process be related to the counter-party
05:03:10    22   contemporaneously or after the fact?
05:03:14    23   A.  That varies from party to party, from litigation to
05:03:22    24   litigation.
05:03:22    25   Q.  What's best practice?

| | | |
|---|---|---|
| 05:03:26 | 1 | A.  I think that still relates from party to party to |
| 05:03:28 | 2 | litigation to litigation. |
| 05:03:28 | 3 | Q.  What's best practice under the Sedona principles? |
| 05:03:32 | 4 | A.  Under Sedona, it's to balance that transparency with your |
| 05:03:38 | 5 | client's interest and your advocacy. |
| 05:03:40 | 6 | Q.  When you advise clients, do you suggest to them that they |
| 05:03:44 | 7 | create the equivalent of an audit trail with respect to their |
| 05:03:48 | 8 | e-discovery processes? |
| 05:03:50 | 9 | A.  I don't usually advise clients of that.  I usually take |
| 05:03:58 | 10 | care of that in my company when we are applying our services. |
| 05:04:02 | 11 | We keep documentation usually on cases we work on and the |
| 05:04:08 | 12 | steps we take. |
| 05:04:08 | 13 | Q.  Was that done in this case? |
| 05:04:10 | 14 | A.  I didn't develop the search terms in this case. |
| 05:04:12 | 15 | Q.  But you did testify that the defendants complied in your |
| 05:04:14 | 16 | opinion with best practices? |
| 05:04:18 | 17 | A.  That's correct. |
| 05:04:18 | 18 | Q.  Okay.  So does best practices require some level of |
| 05:04:24 | 19 | replicability, accountability, the ability to recreate the |
| 05:04:32 | 20 | investigation? |
| 05:04:32 | 21 | A.  In best practices, yes, you'd want to have some |
| 05:04:38 | 22 | documentation of what you have done and the ability to |
| 05:04:40 | 23 | validate each individual step. |
| 05:04:42 | 24 | Q.  So when Mr. Brown testified that after he, quote, |
| 05:04:48 | 25 | rationalized the search strings, he was no longer able to |

05:04:54　1　correlate any particular search string to any particular

05:04:56　2　request, was that, in your opinion, consistent with best

05:04:58　3　practices as you've just described the need for replicability,

05:05:04　4　transparency?

05:05:04　5　　　　　THE COURT:  We have an objection.

05:05:06　6　　　　　MR. NEUWIRTH:  Lack of foundation.  That's not what

05:05:08　7　Mr. Brown said, and I have his testimony on that point right

05:05:10　8　in front of me.

05:05:12　9　　　　　THE COURT:  Well, you have to be accurately stating

05:05:14　10　what the testimony was, so take a look at it.

05:06:08　11　　　　　MR. MOGIN:  People are searching for it.

05:06:08　12　　　　　THE COURT:  You know what?  It's five after 4:00.  I

05:06:12　13　do actually want to talk to the lawyers.  This is a very hard

05:06:14　14　group to get together.  Folks who are not the lawyers, we

05:06:18　15　don't have enough time to go down to my chambers at the

05:06:22　16　moment, so I would just like to talk to you here in the

05:06:24　17　courtroom.  It's, of course, a public courtroom, but I would

05:06:28　18　really appreciate it if the visitors would leave and I could

05:06:30　19　just talk to the lawyers here.

05:06:32　20　　　　　I don't know -- it somewhat -- what I have to say

05:06:36　21　somewhat involves Dr. Lewis and Dan Regard, so if you want

05:06:40　22　them to stay, it's fine with me.

05:06:44　23　　　　　MR. MAROVITZ:  That's fine.

05:06:44　24　　　　　THE COURT:  Okay?

05:06:46　25　　　　　Dr. Tenny, where are you?  Thank you so much.  You

05:06:50  1   are the best sport for coming two days.  We will be back to

05:07:00  2   you shortly on what our next step will be here.

05:07:04  3          You can step down, Mr. Regard.

05:07:06  4          THE WITNESS:  Thank you, your Honor.

05:07:06  5    (Witness leaves the stand.)

05:07:06  6          THE COURT:  We are going to be finished if you are

05:07:08  7   running for a plane.  We are going to be finished in a few

05:07:10  8   minutes, I promise you.

05:08:18  9          Okay.  So this is what I am calling, if everybody can

05:08:20  10  hear me, when I received this referral in December, it was

05:08:30  11  from my darling Judge Shadur, who never sends anything to me.

05:08:34  12  I am putting this in context.  Okay?  And it said, Conduct an

05:08:38  13  evidentiary hearing.  So I thought -- being the obedient

05:08:44  14  little magistrate judge that I am, I thought, Oh, I better set

05:08:48  15  this thing real fast.  So we did.  And this is quite a large

05:08:54  16  group here.

05:08:56  17         If I had one thing to do over, and that's what I am

05:09:00  18  doing right now, if we could go back to that day, and I had

05:09:06  19  reviewed as many documents as I now have reviewed, I want to

05:09:12  20  say a couple things because I don't think it's too late to go

05:09:16  21  back to that original place.

05:09:18  22         I am a believer of principle 6 of Sedona, and I'm not

05:09:28  23  just because it's Sedona, but I think the people who are

05:09:30  24  producing the records, producing the documents, are in a

05:09:36  25  better position to know, since they have to do the work, spend

05:09:42  1   the money, spend the time, they know their people, they know

05:09:46  2   their material, so as a basic premise, I think that's a pretty

05:09:50  3   fair premise here.

05:09:52  4        I also think I don't quite understand why they went

05:10:00  5   so fast without getting you involved.  Okay?  But as soon as

05:10:06  6   they found out, I'm sort of assuming, they were trying to

05:10:10  7   figure out, all seven of them, of what the heck was going on,

05:10:14  8   I'd say by August, and Judge Shadur did not decide his motion

05:10:18  9   to dismiss until April.  So by August, I think the dialog

05:10:24  10  starts.

05:10:26  11       And the reason I'm even going to suggest what I am

05:10:30  12  going to suggest is I think -- I would give you a B plus for

05:10:38  13  cooperation, communication with each other.  I actually think

05:10:42  14  you really did -- once it got started, I think you did a

05:10:48  15  really good job.

05:10:50  16       I don't know whether the indexing issue started to

05:10:54  17  send this off on this kind of I'd almost call it a detour

05:11:02  18  we're on with quote, unquote, predictive quoting, what all the

05:11:08  19  blogs are talking about us.

05:11:10  20       I assume you and Dr. Lewis, what you really are

05:11:16  21  interested in is a search, regardless if it's Boolean or

05:11:24  22  computer-assisted, that is fair and statistically -- and that

05:11:32  23  can be validated statistically because that would be a good

05:11:38  24  word search.

05:11:40  25       My question to all of you right now -- really, it's

| | |
|---|---|
| 05:11:44 | 1 |
| 05:11:50 | 2 |
| 05:11:56 | 3 |
| 05:12:04 | 4 |
| 05:12:12 | 5 |
| 05:12:20 | 6 |
| 05:12:24 | 7 |

1  to you, and you don't have to answer me today; I even have a

2  time we are going to call up again -- is there a way, rather

3  than starting all over with all of the good work that is here,

4  if Dr. Lewis and Mr. Regard were able to help and we were able

5  to within a same framework take their search and be able to

6  tweak it and make it something that you could be comfortable

7  with?

8            MR. MOGIN:  You're right.  I won't answer you today.

9            THE COURT:  You don't have to answer me today.  And I

10  understand that I am sort of -- and I have no idea.  Now, I

11  have no idea if they want to go to the mat as the Godfather

12  would say, with their search as it is.  Maybe they don't want

13  to tweak anything.

14            MR. MOGIN:  I will --

15            THE COURT:  I don't know.  I don't know.

16            What I have gotten out of this -- and I think there

17  is a bigger hole in the case book of what is statistically

18  correct.  I have been walking around saying to Chris for the

19  last week, because we spend so much time fighting with parties

20  about agree, agree, agree, all of the case law, all of my

21  time, all of my opinions in this area, as Joe knows, is

22  beating people over the head to agree what the search terms

23  are.  We never get to -- I really, you know, you can all jump

24  in here.  You start telling me cases you know, other than Paul

25  Grimm kind of waxing on that it should be statistically valid,

05:13:48  1  and what Judge Facciola said, there hasn't -- judges just

05:13:54  2  haven't -- parties haven't been thinking like that, judges

05:13:58  3  haven't been thinking like that, and I actually think that's

05:14:02  4  probably the more helpful part of the case is what I am trying

05:14:08  5  to say.  And I happen to think it should be, it should be

05:14:14  6  valid.  It shouldn't be, Oh, my God, oh, my God, let's just

05:14:18  7  move on, let's just get rid of this.

05:14:22  8         So your homework assignment is I want you to talk to

05:14:28  9  each other, see if Dan would come up with -- if Dan would

05:14:34 10  agree that he would go -- he would go along with the Boolean

05:14:38 11  search and he tell you what kind of changes, what kind of

05:14:44 12  tweaking, what kind of running, whatever he needs, whatever

05:14:50 13  kind of validation they need, if you would be willing to do

05:14:52 14  that.

05:14:56 15         In exchange for that, here is my quid pro quo.  We

05:15:00 16  could take -- it is five months tomorrow that I leave here.  I

05:15:06 17  will work with you for the next five months on trying to

05:15:08 18  figure out privilege, indexing, 30(b)(6)s.  We could take the

05:15:18 19  five months and try to get you in some kind of shape where

05:15:24 20  maybe you could get your arms around the rest of the discovery

05:15:28 21  issues here.

05:15:30 22         I actually think -- I mean, when you say, you know,

05:15:34 23  you're not exaggerating that you could be coming in on motions

05:15:38 24  to compel on this for the next two years to whoever the new

05:15:42 25  magistrate judge is.

05:15:46   1    So I don't know.  I think it's kind of a matter of

05:15:48   2  where you want to put your resources.  I know you all have

05:15:54   3  clients, and you've got all those other plaintiffs' lawyers,

05:15:58   4  and I mean it as somebody who used to get kicked around every

05:16:04   5  courtroom in this building as a criminal defense lawyer, you

05:16:06   6  can imagine, I am not going to take this personal, but I did

05:16:10   7  not want to walk out of here today and not say to you, Hey,

05:16:16   8  why don't we all take a nice, big, deep breath, step back, and

05:16:22   9  see if there's not something we could do to save this right

05:16:26  10  now.  And not only save it, make it better.

05:16:28  11    MR. MOGIN:  I appreciate what you're saying.  I will

05:16:30  12  give it good-faith consideration.

05:16:32  13    THE COURT:  Good.

05:16:32  14    MR. MOGIN:  However, just so defense counsel hears it

05:16:36  15  loud and clear, so that they can't accuse us of any holding

05:16:40  16  back, since December 2010 when Mr. Neuwirth and I had a heated

05:16:48  17  exchange in the hallway, we have said we will not tolerate a

05:16:52  18  search that is restricted to these custodians.  It won't -- we

05:16:58  19  will not make that agreement.

05:17:00  20    THE COURT:  So that would be one of the things you

05:17:06  21  would come back, is you would want to propose custodians?

05:17:10  22    MR. MOGIN:  No.  It's going to have to be some other

05:17:12  23  way besides custodians.

05:17:16  24    THE COURT:  Oh, you won't do a custodian-based

05:17:18  25  search.

05:17:18  1    MR. MOGIN:  I certainly won't do these top custodians
05:17:20  2  that they have picked out.
05:17:22  3    THE COURT:  I see.
05:17:24  4    MR. ECHOLS:  Your Honor, Barack Echols.  Ms. Miller
05:17:28  5  and I, during the course of the summer and after, have had
05:17:30  6  some of those conversations.  I think you saw some of that
05:17:32  7  correspondence that we sent to you.  And our position has
05:17:36  8  always been that this is our position as to the ones that make
05:17:40  9  the most sense.  We think this may be all.  We understand you
05:17:44  10  disagree, we understand there may have to be a conversation
05:17:48  11  about additional custodians at some point, but we never have
05:17:50  12  been able to get into that, even at which seems to be a
05:17:54  13  reasonable place to be because, as you said, we took a little
05:17:58  14  bit of a detour.
05:18:00  15    THE COURT:  Can you do -- experts, could you do I
05:18:06  16  would call what Mr. Mogin is saying as some kind of concept or
05:18:12  17  a broader-based search, what would you call it, other than the
05:18:16  18  non-custodial?  Can you do that with Boolean?
05:18:24  19    DR. LEWIS:  You are asking me?
05:18:24  20    THE COURT:  Yes.
05:18:26  21    DR. LEWIS:  That is can you do a Boolean search on
05:18:28  22  material that wasn't gathered by custodians but were gathered
05:18:30  23  some other way?
05:18:32  24    THE COURT:  Yes.
05:18:32  25    DR. LEWIS:  Yes.

| | | |
|---|---|---|
| 05:18:32 | 1 | THE COURT:  Clusters or concepts or any -- |
| 05:18:34 | 2 | DR. LEWIS:  Well, no, I'm saying -- you are talking |
| 05:18:36 | 3 | about the collection procedure, whether it's collection -- |
| 05:18:38 | 4 | THE COURT:  You're right.  But you could use Boolean |
| 05:18:40 | 5 | for a non-custodial search? |
| 05:18:44 | 6 | DR. LEWIS:  Yes. |
| 05:18:44 | 7 | THE COURT:  All right. |
| 05:18:50 | 8 | MR. McKEOWN:  The scope of what is going to be in the |
| 05:18:52 | 9 | universe is a very big question.  We have other custodial |
| 05:18:56 | 10 | documents that we have collected and are reviewing, and we |
| 05:18:58 | 11 | have shared servers that we have collected and are reviewing. |
| 05:19:02 | 12 | But if it's -- we have to take every document in the company, |
| 05:19:04 | 13 | and that's a major problem. |
| 05:19:06 | 14 | THE COURT:  When I would like to talk to you is |
| 05:19:08 | 15 | Tuesday at 4:00 o'clock, if I can, Chicago time.  And one of |
| 05:19:14 | 16 | you must have a bridge line with all your technology -- |
| 05:19:22 | 17 | MS. MILLER:  We will provide it, your Honor.  We will |
| 05:19:24 | 18 | take care of it. |
| 05:19:26 | 19 | THE COURT:  And at least maybe you will give one |
| 05:19:28 | 20 | call, somebody, whoever has the most charm, some Irish person, |
| 05:19:34 | 21 | some other Irish person, and try to have a conversation here |
| 05:19:40 | 22 | before Tuesday, and if the answer is no, the answer is no. |
| 05:19:44 | 23 | And then we know what to do.  We will go back to -- we will |
| 05:19:50 | 24 | figure out who else has to be heard on the hearing.  I have |
| 05:19:54 | 25 | Friday, April 29th, a full day. |

| | | |
|---|---|---|
| 05:20:04 | 1 | MS. MILLER:  April 29th is a Sunday. |
| 05:20:06 | 2 | THE COURT:  Thank you.  April 27th.  I do have |
| 05:20:10 | 3 | Friday, April 27th, open.  We could do another round if you |
| 05:20:16 | 4 | wanted to have another day.  That gives you enough time.  This |
| 05:20:22 | 5 | group is just so darn hard -- now, here is the other thing. |
| 05:20:26 | 6 | That's my suggestion in here.  I would love to hear anybody |
| 05:20:32 | 7 | else's suggestion, what we could do, short of starting over |
| 05:20:38 | 8 | from scratch, and that would free Chris and I up. |
| 05:20:48 | 9 | If we spend all of our time, regardless of how we |
| 05:20:52 | 10 | turn out, I am not available to you to do anything else.  And |
| 05:20:58 | 11 | I am really good at some form of mediation in this.  So it's |
| 05:21:02 | 12 | kind of -- so if you have any other suggestion of what we |
| 05:21:10 | 13 | could do for the next five months, I also want to hear that. |
| 05:21:18 | 14 | MR. MAROVITZ:  Judge, can I -- |
| 05:21:20 | 15 | THE COURT:  Sure. |
| 05:21:20 | 16 | MR. MAROVITZ:  Far be it from me to throw a kink in |
| 05:21:24 | 17 | the works here, and I hope that we wouldn't need the 27th.  I |
| 05:21:28 | 18 | have a multiparty -- I can move many things, I have a |
| 05:21:30 | 19 | multiparty mediation scheduled for that day.  I cannot move |
| 05:21:34 | 20 | that. |
| 05:21:34 | 21 | THE COURT:  So Tuesday then.  When we talk Tuesday, I |
| 05:21:38 | 22 | will have to have -- you know, we might have to do it on a |
| 05:21:42 | 23 | Saturday. |
| 05:21:42 | 24 | MR. MAROVITZ:  I apologize. |
| 05:21:44 | 25 | THE COURT:  Maybe we will just do it on a Saturday or |

05:21:46  1  something in New York.

05:21:50  2          MR. MOGIN:  San Diego.

05:21:52  3          THE COURT:  Or San Diego.  Absolutely.

05:21:54  4          Anybody want to say anything?  You don't even have to

05:21:58  5  be on the record.

05:22:02  6          MR. McKEOWN:  We will communicate prior to Tuesday.

05:22:04  7          THE COURT:  Good.  And you talk to each other before

05:22:06  8  Tuesday and see if, you know, I am just being the old dreamer

05:22:12  9  that I am.

05:22:14  10         Thank you, everybody.

05:22:16  11         MR. McKEOWN:  Thank you.

05:22:16  12         MS. MILLER:  Thank you, your Honor.

05:22:18  13         MR. MAROVITZ:  Judge, one other final note just in

05:22:20  14  terms of my pet project, the witness rule.  Again, I am

05:22:24  15  hopeful that we won't need to come back, but if we do, can I

05:22:28  16  talk to Mr. Regard?

05:22:28  17         THE COURT:  You may talk to Mr. Regard, you may talk

05:22:30  18  to Dr. Lewis, you may talk to Ms. Tenny.  You may talk to --

05:22:38  19  Dr. Tenny, yes, excuse me.

05:22:40  20         MR. MAROVITZ:  Thank you, Judge.

05:22:40  21         THE COURT:  And you can talk to anybody else you

05:22:42  22  want, Mr. Marovitz.

05:22:44  23         Bye, everybody.

05:22:46  24         MS. MILLER:  Thank you, your Honor.

05:22:46  25         MR. McKEOWN:  Thank you, your Honor.

| | | |
|---|---|---|
| 05:22:48 | 1 | MR. NEUWIRTH:  Thank you, your Honor. |
| 05:22:56 | 2 | THE COURT:  Hold on. |
| 05:23:00 | 3 | MR. CAMPBELL:  I just think the question needs to be |
| 05:23:04 | 4 | about how do we satisfy our comfort level if the response -- a |
| 05:23:12 | 5 | vacuum is produced.  And I would hope that things don't have |
| 05:23:14 | 6 | to be taken off the table as long as you get to that comfort |
| 05:23:18 | 7 | level because that what we are talking about, producing |
| 05:23:20 | 8 | responsive documents. |
| 05:23:22 | 9 | THE COURT:  That's the way we are seeing it.  In the |
| 05:23:26 | 10 | end, that's what your responsibility to your clients are. |
| 05:23:32 | 11 | Okay?  Thanks, everybody. |
| 05:23:34 | 12 | MR. McKEOWN:  Thank you, your Honor. |
| 05:23:34 | 13 | MS. MILLER:  Thank you. |
| | 14 | (Which were all the proceedings had in the above-entitled |
| | 15 | cause on the day and date aforesaid.) |
| | 16 | I certify that the foregoing is a correct transcript from |
| | 17 | the record of proceedings in the above-entitled matter. |

```
18  Carolyn R. Cox                          Date
    Official Court Reporter
19  Northern District of Illinois

20  /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

21

22

23

24

25
```