```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
     KLEEN PRODUCTS, LLC, et al.,        )   Docket No. 10 C 5711
 4                                       )
                         Plaintiffs,     )
 5                                       )
                 vs.                     )
 6                                       )
     PACKAGING CORPORATION OF AMERICA,   )   Chicago, Illinois
 7   et al.,                             )   May 31, 2012
                                         )   2:00 o'clock p.m.
 8                       Defendants.     )

 9
             TRANSCRIPT OF PROCEEDINGS - RULE 16 CONFERENCE
10        BEFORE THE HONORABLE MAGISTRATE JUDGE NAN R. NOLAN

11

12   APPEARANCES:

13
     For the Plaintiffs:        THE MOGIN LAW FIRM
14                              BY:  MR. DANIEL J. MOGIN
                                707 Broadway, Suite 1000
15                              San Diego, CA  92101
                                (619) 687-6611
16
                                FREED KANNER LONDON & MILLEN LLC
17                              BY:  MR. MICHAEL J. FREED
                                     MR. ROBERT J. WOZNIAK
18                              2201 Waukegan Road, Suite 130
                                Bannockburn, IL  60015
19                              (224) 632-4500

20                              BERGER & MONTAGUE, P.C.
                                BY:  MR. CHARLES PEARSALL GOODWIN
21                              1622 Locust Street
                                Philadelphia, PA  19103
22                              (215) 875-3000

23
     Court Reporter:            MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                              Official Court Reporter
                                219 S. Dearborn Street, Suite 1854-B
25                              Chicago, Illinois  60604
                                (312) 435-5639
```

1   APPEARANCES CONTINUED:

2

3   For Defendant                QUINN EMANUEL URQUHART &
    Georgia-Pacific:             SULLIVAN LLP
4                                BY:   MR. STEPHEN R. NEUWIRTH
                                 51 Madison Avenue, 22nd Floor
5                                New York, NY   10010
                                 212-849-7000
6

7                                GEORGIA-PACIFIC
                                 BY:   MS. MARY K. McLEMORE
8                                133 Peachtree Street, N.E.
                                 P.O. Box 105605
9                                Atlanta, GA   30348
                                 (404) 652-4598
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

02:11:22   1   (The following proceedings were had in open court:)

02:11:22   2          THE CLERK:  10 C 5711, Kleen Products v. Packaging

02:11:26   3   Corporation.

02:11:28   4          THE COURT:  All right.  So this is our third meet and

02:11:34   5   confer in the Kleen case.  This case involves -- this meet and

02:11:40   6   confer is with the plaintiffs and with the lawyers for

02:11:46   7   Georgia-Pacific.  So let's put your names on the record.

02:11:50   8          MR. NEUWIRTH:  Thank you, Judge Nolan.  I am Stephen

02:11:52   9   Neuwirth from Quinn Emanuel, outside counsel for

02:11:56  10   Georgia-Pacific.

02:11:56  11          MS. McLEMORE:  And I am Mary McLemore, and I am

02:11:58  12   in-house counsel for Georgia-Pacific.

02:12:00  13          THE COURT:  Terrific.  And, Mr. Mogin, will you

02:12:10  14   introduce your team again?

02:12:12  15          MR. MOGIN:  I will, your Honor.  Dan Mogin on behalf

02:12:14  16   of plaintiffs; my esteemed co-counsel, Michael Freed; as well

02:12:20  17   as Bob Wozniak, from the Freed Kanner firm; and Mr. Goodwin,

02:12:20  18   who you just met.

02:12:22  19          THE COURT:  Good.  Thank you.

02:12:26  20          Well, we hope to be as fresh as you are.  You just

02:12:28  21   came in here raring to go, and we have done this two times

02:12:32  22   already, but I think you are really lucky because we have

02:12:36  23   gotten some of the kinks out.  I mean, I think being the

02:12:42  24   third, being our little caboose here, is going to be very

02:12:46  25   helpful.

02:12:48  1    So I want to -- very much I want to thank you both

02:12:52  2  for coming and to agreeing to this, I am calling it,

02:13:04  3  e-mediation and to actually choose to try to solve discovery

02:13:06  4  disputes in a brand new way.

02:13:08  5    One of the things that I was saying before is that we

02:13:16  6  have tons of rules in the 28 U.S.C. to tell us how do

02:13:26  7  discovery, but there really aren't any rules in how to do

02:13:28  8  e-mediation, so we are kind of making it up as we go along.

02:13:32  9    This morning -- I did this this morning, and I think

02:13:36  10  it set a better tone and was a little bit more helpful, and I

02:13:46  11  don't mean to catch anyone off guard, but I actually turned to

02:13:50  12  the defendants' lawyer and said, Can you tell us three things

02:13:52  13  you would like to accomplish today, because I think that will

02:13:56  14  make sure -- one of the things, Ms. McLemore --

02:14:04  15    MS. McLEMORE:  McLemore.

02:14:06  16    THE COURT:  -- Ms. McLemore, is it's very important

02:14:08  17  to me that I give individual attention to each of the

02:14:10  18  defendants.  One of the problems, as you can imagine, for a

02:14:14  19  judge when you have multiparty cases is not to clump everybody

02:14:22  20  "the defendants," "the plaintiffs."  And I -- not only is it a

02:14:28  21  just thing to do, but these sessions have helped me to learn

02:14:32  22  more about each person's -- not only the way you run your

02:14:36  23  company, but kind of what your particular take is to all of

02:14:40  24  this, which is, again, the reason I thank you for coming here.

02:14:46  25    MS. McLEMORE:  Glad to be here, Judge.

02:14:46    1    THE COURT: So in your wish list, what are the three

02:14:52    2    things you would like -- hope to accomplish? We have bullet

02:14:56    3    points to do, but specifically for Georgia-Pacific.

02:15:02    4    MR. NEUWIRTH: So let me see if I can frame it as

02:15:06    5    three points.

02:15:06    6    THE COURT: Okay.

02:15:08    7    MR. NEUWIRTH: I think what I could probably fairly

02:15:12    8    describe as the first point would be something that we have

02:15:18    9    really picked up from your Honor. I think that we are

02:15:24    10    genuinely hopeful that we can come up with a way that we can

02:15:30    11    reasonably be satisfied that we've got an effective and well

02:15:40    12    verified process, and we are genuinely pleased to have the

02:15:46    13    opportunity to work with your Honor today to try to get to

02:15:48    14    that goal.

02:15:50    15    THE COURT: Good.

02:15:50    16    MR. NEUWIRTH: I think reasonable is a standard that

02:15:54    17    we can all live with. We may have different views on what's

02:15:58    18    reasonable, but we are hoping that with your Honor, we can

02:16:02    19    reach some or at least make progress toward that end and set

02:16:06    20    up a framework for getting to that end.

02:16:10    21    I think a second very high priority for

02:16:16    22    Georgia-Pacific is to get to a point where we are able to deal

02:16:30    23    with what I might call the facts of the discovery process. I

02:16:36    24    think from our perspective, one of the challenges that we have

02:16:40    25    had in this process that I know your Honor has been struggling

02:16:42  1  to have us all cope with is that there has been a certain

02:16:50  2  extent to which there's been a lot of speculation about what's

02:16:54  3  going on with the discovery.  As you know from the hearing,

02:17:00  4  Georgia-Pacific was I think probably at the forefront of

02:17:06  5  developing and implementing the method that the defendants

02:17:10  6  have used to date, and as of today, with some very limited

02:17:14  7  exception, certain small categories of documents like travel

02:17:18  8  records that we disclosed to the plaintiffs are forthcoming,

02:17:26  9  Georgia-Pacific has completed its production.  And so there is

02:17:30  10  a full set of the documents from this process with the

02:17:36  11  custodians we use that we think would provide at least a

02:17:42  12  factual predicate for deciding what to do next, and we

02:17:46  13  certainly understand and appreciate a point that your Honor

02:17:50  14  has made about how there has to be an opportunity to review

02:17:56  15  what's there.

02:17:56  16          THE COURT:  Right.

02:17:56  17          MR. NEUWIRTH:  And, you know, I think that we accept

02:18:00  18  that premise.

02:18:04  19          And I think on the other hand, it's problematic if

02:18:10  20  assertions are made about what we have done that really are

02:18:14  21  counter to what has actually happened and that we know has

02:18:18  22  happened.

02:18:18  23          So the bottom line is for point two, we'd like to get

02:18:24  24  to a point where we can have discussions that are based on our

02:18:28  25  shared understanding of facts about the process so that we can

02:18:32  1   constructively work together to come up with this, and we

02:18:34  2   think that your, you know, phased discovery concept can work

02:18:40  3   as long as part two of the phase discovery has, you know, the

02:18:50  4   normal constraints that should be on that process where it's

02:18:52  5   not just we go to a new round of starting from scratch, but

02:18:56  6   there has to be a predicate for asking for more.

02:19:02  7           And then, I guess, the third category, which somewhat

02:19:06  8   relates to the second, if I had to come up with three which

02:19:10  9   you have asked for, would be -- I want to frame this in a fair

02:19:22  10  way.  I think that from our perspective, we have been dealing

02:19:26  11  with something of a moving target, but we think it's in part

02:19:30  12  because of what I described as the second issue.

02:19:32  13          THE COURT:  Right.

02:19:32  14          MR. NEUWIRTH:  That, you know, to the extent people

02:19:38  15  have not yet gone through the materials we produced, it's

02:19:46  16  almost inevitable that if the standard is let's just talk

02:19:52  17  about things to do in discovery and it's not rooted in what's

02:19:56  18  already happened, I think it's inevitable to some extent that

02:19:58  19  we would have a moving target.

02:20:00  20          So I think we're not at all suggesting -- look, as

02:20:04  21  Mr. Freed and others on the plaintiffs' side know, I do a lot

02:20:06  22  of work on the plaintiffs' side, and so I am not

02:20:10  23  anti-plaintiff by any means.

02:20:12  24          THE COURT:  Right.

02:20:14  25          MR. NEUWIRTH:  But all I'm saying is I think we'd

02:20:16  1  like there to be a -- we'd like to be able -- without

02:20:24  2  foreclosing people's rights to reasonably ask for things

02:20:26  3  later, we'd like to have a process where every time we answer

02:20:30  4  something, the request doesn't change to something new; you

02:20:36  5  know, well, since you proved that, now prove this.

02:20:38  6        THE COURT:  Right.

02:20:38  7        MR. NEUWIRTH:  We'd like there to be some, you know,

02:20:42  8  just -- again, without foreclosing people's rights down the

02:20:46  9  road, which we believe in and are not trying to prevent, we

02:20:48  10 just think a moving target makes discovery very, very

02:20:52  11 challenging and problematic.

02:20:52  12       THE COURT:  And it makes it very hard to go back to

02:20:54  13 your client because you tell your client here's what's going

02:20:58  14 on and then every iteration.

02:21:02  15       Well, you are certainly much more philosophical.  I

02:21:08  16 had something as mundane as litigation hold.  I mean, I kind

02:21:12  17 of like your -- it's funny.  Somebody asks somebody a

02:21:16  18 question, and they don't -- it's an open-ended question, and

02:21:20  19 those are really good ways to praise where we are right now.

02:21:26  20       I literally meant, What's your position on 30(b)(6),

02:21:30  21 litigation hold.  So I don't know, did you have a preview that

02:21:32  22 you were going to be asked what are the three goals you wanted

02:21:36  23 to get out of today?

02:21:38  24       MR. GOODWIN:  No one gave me that preview, your

02:21:40  25 Honor.

| | |
|---|---|
| 02:21:40 | 1 |
| 02:21:44 | 2 |
| 02:21:44 | 3 |
| 02:21:46 | 4 |
| 02:21:48 | 5 |
| 02:21:52 | 6 |
| 02:21:56 | 7 |
| 02:22:00 | 8 |
| 02:22:02 | 9 |
| 02:22:04 | 10 |
| 02:22:08 | 11 |
| 02:22:10 | 12 |
| 02:22:12 | 13 |
| 02:22:16 | 14 |
| 02:22:20 | 15 |
| 02:22:24 | 16 |
| 02:22:26 | 17 |
| 02:22:34 | 18 |
| 02:22:38 | 19 |
| 02:22:42 | 20 |
| 02:22:44 | 21 |
| 02:22:46 | 22 |
| 02:22:50 | 23 |
| 02:22:52 | 24 |
| 02:22:54 | 25 |

1    THE COURT:  Your team didn't tell you?  Okay.  They
2  should have.
3    MR. FREED:  We should have.
4    THE COURT:  Right.  Kind of like -- because we are
5  just talking about Georgia -- this is our real opportunity to
6  talk about Georgia-Pacific, and are there three things that
7  you walked in today that you would like to talk about, either
8  in general or specific?
9    MR. GOODWIN:  I am going to be somewhere between the
10  very pragmatic approach and the very philosophical approach.
11    THE COURT:  Good.  Okay.
12    MR. GOODWIN:  I think the first thing here is I would
13  like to see our discussions move past the sufficiency of the
14  ESI search issues that we have discussed a lot.  I think as I
15  have reviewed Georgia-Pacific's written responses to our
16  document requests and some of the correspondence, going
17  through that, there seemed to be some real areas where
18  Georgia-Pacific is not responding with information or not
19  providing responsive information, and I think a lot of those
20  areas are very important and very basic.
21    And so while we can always try and verify what they
22  did to search for what they agreed to produce, I think
23  plaintiffs have a large problem --
24    THE COURT:  Okay.
25    MR. GOODWIN:  -- with what they have agreed to or

02:22:56    1    what they're not agreeing to produce.

02:22:58    2          THE COURT: But on the RPDs.

02:23:00    3          MR. GOODWIN: Well, it spills over into the 30(b)(6)

02:23:04    4    process, it has something to do with the interrogatory

02:23:08    5    process, the sort of overall discovery areas.

02:23:20    6          Secondly, what I'd like to emphasize, the information

02:23:20    7    that plaintiffs are seeking in large part does go to the

02:23:24    8    sufficiency of discovery. We have asked for a lot of

02:23:28    9    personnel and organizational-type information that we haven't

02:23:30    10    received, and without that information, plaintiffs are simply

02:23:36    11    in a position that we can't judge the sufficiency of the

02:23:38    12    search that Georgia-Pacific has undertaken other than to do it

02:23:44    13    on the basis of taking their word for it and that's just not

02:23:48    14    how our litigation -- our adversarial system works. We are

02:23:56    15    supposed to verify that. A client would never let a lawyer

02:23:58    16    off for, I just took that guy's word for it.

02:24:00    17          THE COURT: Right.

02:24:02    18          MR. GOODWIN: And relatedly, there are a number of

02:24:04    19    requests we just seemed to be being stonewalled on. The

02:24:10    20    production, our discovery of information is really basic,

02:24:14    21    fundamental information that would be ordinarily

02:24:18    22    discoverable --

02:24:18    23          THE COURT: Can you give me an example?

02:24:20    24          MR. GOODWIN: The identities of people at GP who had

02:24:24    25    something to do with trade associations.

02:24:26  1       THE COURT:  Okay.

02:24:26  2       MR. GOODWIN:  I mean, in this case especially, given

02:24:30  3  the sort of allegations of coordinated price increases,

02:24:34  4  matching up with trade associations, that's of particular

02:24:38  5  importance; but in any antitrust case, that is routine, basic

02:24:44  6  discovery, and I'm a little shocked that I have to be here

02:24:48  7  talking to the court about this, to be honest, your Honor.

02:24:50  8       THE COURT:  Okay.  So I think if I'm hearing you

02:24:56  9  correctly, Mr. Neuwirth said his first point or his second

02:25:04  10  point was he wants to get comfortable with facts so that the

02:25:10  11  discovery -- since we all know the discovery process is based

02:25:14  12  upon facts.  So you're kind of saying the same thing, is that

02:25:18  13  you need some basic facts.

02:25:22  14       MR. GOODWIN:  We are just --

02:25:22  15       THE COURT:  You need some basic facts that would help

02:25:28  16  you to be able to move to the next stage too.

02:25:30  17       MR. GOODWIN:  Right.  I don't know how much this has

02:25:34  18  been in front of the court, but we have had the custodian

02:25:36  19  issue.

02:25:38  20       THE COURT:  And that's been a common issue.  And

02:25:40  21  there are some common issues, and I wanted to share with you

02:25:46  22  and the other plaintiffs' lawyers who have been here for the

02:25:50  23  other two.  So this is good because I actually think you're

02:25:56  24  both kind of looking for kind of a similar.

02:26:00  25       I wanted to say, and I particularly want to say to

02:26:04　1　you also, I think it's a little easier for the judge to bare

02:26:08　2　her soul than it is for the other side to bare their soul.  I

02:26:14　3　think what these lawyers have done is take such a risk because

02:26:22　4　I have been asking them to do something that is kind of

02:26:24　5　counter to or it first appeared to be counter to the adversary

02:26:30　6　system, and I am asking them at least when they are coming

02:26:34　7　together here, we're going to not react as defensively as

02:26:44　8　we -- and I am going to call myself a trial lawyer too -- kind

02:26:46　9　of our normal reaction is to react.

02:26:52　10　　　　　But there is a couple principles here that are kind

02:26:54　11　of underneath or this tension here that exists here because

02:27:00　12　this is a very asymmetrical case where the defendants, as I

02:27:06　13　said this morning, are giving, giving, giving and the

02:27:10　14　plaintiffs are taking, taking, taking and you are not getting

02:27:12　15　anything in return, and that can prove to be kind of

02:27:16　16　frustrating.

02:27:16　17　　　　　And the plaintiffs, because of the crazy system that

02:27:18　18　we have, did these 94 request to produce documents, I figured

02:27:28　19　it's about 60 days after the case started that Judge Shadur --

02:27:30　20　well, no, that Judge Shadur finally ruled on the motion to

02:27:34　21　dismiss.

02:27:36　22　　　　　MR. NEUWIRTH:  Yes.

02:27:36　23　　　　　THE COURT:  I mean, it was astounding, because of our

02:27:40　24　vertical system, this is the way you're supposed to do it,

02:27:42　25　nobody knew anything back then.

02:27:46    1    So instead of casting aspersions or blame, I think

02:27:52    2    you all did the very best you could do, and now we have a

02:27:58    3    little hindsight here.  I don't want to throw you off, but we

02:28:04    4    had kind of a disaster yesterday when we tried to talk in much

02:28:08    5    detail about the RFPs because I think that the better way to

02:28:14    6    handle this is for our next status is to give people -- we may

02:28:24    7    able to talk around it a little bit.  But this is so fraught

02:28:28    8    with problems because in the traditional case that I have

02:28:32    9    seen, you get something like you guys got.  What almost

02:28:38    10   everybody does in my cases is run to the judge and say, You

02:28:42    11   enter a protective order because this is ridiculous.  These

02:28:46    12   guys are out to lunch.

02:28:48    13          You tried to do the right thing back, okay, and they

02:28:52    14   did not run in and say, Hey, order them to compel.  So here we

02:28:58    15   are a year later with kind of a procedural nightmare is what I

02:29:02    16   am calling it.  So I don't want to -- other than to hear maybe

02:29:08    17   some specifics that go to you, I don't want to spend a lot of

02:29:12    18   time today because I need the next two weeks to try to see if

02:29:16    19   I can come up with any thoughts on how we can deal with this

02:29:22    20   in general.  But I want you to know in front of your client

02:29:26    21   that I think you did a fabulous job, and how could anybody in

02:29:30    22   this kind of a case do differently, I do mean it.  It's like

02:29:38    23   60 days after the case started.

02:29:42    24          And I was telling them this morning about the

02:29:44    25   Southern District of New York new complex case management.  I

02:29:50   1  don't think they've got it down perfectly, but they recognize

02:29:54   2  that the regular rules don't apply.

02:29:56   3         MR. NEUWIRTH:  Right, at least they are trying.

02:30:00   4         THE COURT:  They are trying, because this is pretty

02:30:02   5  hard -- it's hard for you to know what should be written, and

02:30:04   6  it's hard for them to know how they would respond because

02:30:08   7  nobody knows.

02:30:10   8         Second thread that went through, which seemed to make

02:30:16   9  life a lot easier that is fact-gathering, is these folks

02:30:20  10  really need organizational charts or, if you don't have

02:30:24  11  organizational charts, whatever the comparable is.  They need

02:30:30  12  to know the key players, not just the key executives, and we

02:30:36  13  can get down to this, they need to know who they are, what

02:30:40  14  their job is, and I said to Jim this morning, I think he is

02:30:46  15  afraid to give it because then you think they're going to turn

02:30:50  16  them into custodians.  It's like turning them into a monster

02:30:56  17  or something.  And I said we have to take one step at a time.

02:31:00  18  They can't tell you -- since they don't have an insider here,

02:31:06  19  they can't tell you what is key to them without having some

02:31:12  20  basic structure information.

02:31:16  21         So what you have reviewed so far, what do you know --

02:31:18  22  you tell me if you -- pretend you were talking to a jury right

02:31:22  23  now.  What do you know about GP's structure system?

02:31:28  24         MR. GOODWIN:  Well, it would be a mighty short

02:31:32  25  speech.  I mean, we know --

02:31:32  1        THE COURT:  You know names?

02:31:34  2        MR. GOODWIN:  No, we really -- we have some -- and I

02:31:38  3  believe Mr. Neuwirth actually reproduced that interrogatory

02:31:42  4  response in his binder --

02:31:52  5        THE COURT:  I didn't even know there were

02:31:54  6  interrogatories.

02:31:54  7        MR. MOGIN:  Let me back up and explain that to you.

02:31:54  8        THE COURT:  Yeah.  Where did they come from?  I

02:31:54  9  didn't know there were any interrogatories.  Okay?

02:31:58  10        MR. MOGIN:  It's interesting and it's illustrative as

02:32:00  11  well.

02:32:00  12        In their answer --

02:32:02  13        THE COURT:  In their?

02:32:04  14        MR. MOGIN:  Answer to the complaint.

02:32:04  15        THE COURT:  Okay.

02:32:04  16        MR. MOGIN:  After the motions to dismiss.

02:32:06  17        THE COURT:  Okay.

02:32:08  18        MR. MOGIN:  GP dropped a footnote raising for the

02:32:12  19  first time the possibility that we had sued the wrong

02:32:18  20  Georgia-Pacific entity or entities.

02:32:18  21        THE COURT:  Oh.

02:32:20  22        MR. MOGIN:  As a result, a process between GP and the

02:32:24  23  plaintiffs ensued where we tried to get that basic

02:32:28  24  information.  And as I said, it's illustrative what happened,

02:32:38  25  and I think Mr. Goodwin has a demonstrative.  He can walk you

02:32:42    1    through sort of a who shot Jonathan. And this, I think, will

02:32:44    2    tell you -- this will give you an excellent idea of where we

02:32:50    3    are with GP.

02:32:50    4           THE COURT: Okay. Good.

02:32:52    5           MR. MOGIN: And the so-called facts of discovery that

02:32:56    6    Mr. Neuwirth alluded to.

02:33:04    7           MR. GOODWIN: And I don't know if it is -- the time

02:33:12    8    line probably contains far more detail than we need to discuss

02:33:16    9    and the main point of the time line. I guess if we start the

02:33:20    10    process in August, this was effectively a seven-month process

02:33:24    11    for this issue of whether we sued the right entity or not got

02:33:28    12    resolved. It resulted in October in plaintiffs' promulgating

02:33:32    13    a first set of interrogatories and supplemental document

02:33:38    14    requests onto Georgia-Pacific, and the supplemental

02:33:40    15    interrogatories which are reproduced, I believe that's tab D-1

02:33:46    16    in the binder that Steve put together, contains a series of

02:33:56    17    questions about corporate form and corporate structure and

02:34:02    18    what becomes relevant for present purposes.

02:34:06    19           After seven months of discussion among the parties, I

02:34:10    20    think that issue -- the corporate structure issue, we feel we

02:34:14    21    have sued the right entity and we have enough discovery to

02:34:16    22    defend that position.

02:34:16    23           THE COURT: Okay.

02:34:18    24           MR. GOODWIN: But for present purposes and where we

02:34:20    25    are now, there's the response to interrogatory 5. And the

02:34:26   1   response to interrogatory 5, interrogatory 5 asks some

02:34:34   2   identifying information about I believe 18 or 19 -- I guess it

02:34:38   3   was actually 20. One person I think we got their name wrong

02:34:42   4   and one person GP forgot to answer about them, for some

02:34:50   5   reason, and there was later subsequently a supplemental

02:34:54   6   interrogatory answer providing information for that person.

02:34:54   7   The plaintiffs asked about 20 people, of whom I believe 12 or

02:34:58   8   so were identified in the initial disclosures that GP provided

02:35:04   9   to plaintiffs.

02:35:06   10         So we have the response to interrogatory 5, and so

02:35:08   11   it's a limited response because the purpose of the

02:35:10   12   interrogatory is just to find out who these relevant personnel

02:35:16   13   worked for, who pays them, and what their job duties are so

02:35:20   14   that we can locate -- and that was a focused interrogatory to

02:35:24   15   hopefully end that corporate structure dispute.

02:35:30   16         And aside from what is in the corpus of the

02:35:34   17   documents, which is still something of an unknown country

02:35:38   18   because of the filing of production, this is all the

02:35:42   19   information we have about GP personnel in total, these -- I

02:35:46   20   think it goes from page 18 to page 23, these five pages, which

02:35:54   21   is basically that we know someone's job title and who they

02:35:58   22   were employed by, and then we have a very capsule description

02:36:04   23   of their responsibilities.

02:36:06   24         What we don't have is an indication of who reports to

02:36:10   25   whom or some kind of -- you know, something like this only

02:36:14   1   much thicker that as we're reviewing all the documents GP has

02:36:18   2   produced, we can know who the to and froms -- it's nice to

02:36:24   3   know Mike Adams is one person or is a sender or a recipient,

02:36:30   4   but we don't know who the Bob Smith who was the other part of

02:36:34   5   that email correspondence is.  I think there is an email, and

02:36:38   6   we only have --

02:36:38   7           THE COURT:  Okay.  That's why we're meeting, because

02:36:42   8   what we found out from Temple-Inland yesterday is the way they

02:36:50   9   organized themselves.  We found out from I.T. today, Jim

02:36:54   10   brought charts this thick across the country all the

02:36:58   11   divisions, and they're figuring that out.

02:37:00   12           So am I cutting you off, Charles, if I say, So how do

02:37:06   13   you guys organize yourself?

02:37:08   14           MR. MOGIN:  I think there is a little bit more to the

02:37:10   15   story.

02:37:10   16           MR. GOODWIN:  There is a little bit more to the

02:37:12   17   story, and what I -- there is somewhere buried in or among all

02:37:18   18   these papers, we have a structure or some information about

02:37:22   19   which corporation owns what corporation and some idea of the

02:37:26   20   structure there, and it's quite complicated, and I am sure tax

02:37:32   21   reasons are involved to be that complicated in structure.

02:37:36   22           THE COURT:  Sure.

02:37:36   23           MR. GOODWIN:  But I would, for instance -- and I only

02:37:40   24   -- I apologize because I only have one copy of this email that

02:37:46   25   is from Georgia-Pacific's production, and we used this in the

| | | |
|---|---|---|
| 02:37:50 | 1 | meet and confer, I think, with Mr. Neuwirth.  And about the |
| 02:37:58 | 2 | time before last, the date is now escaping me, but this was |
| 02:38:04 | 3 | produced.  Steve has seen this, so it shouldn't be too much of |
| 02:38:08 | 4 | a surprise.  And we have this huge list of people this |
| 02:38:14 | 5 | appointment was circulated to.  Two of them are custodians. |
| 02:38:16 | 6 | We don't know who the rest are. |
| 02:38:18 | 7 | THE COURT:  So you need this information. |
| 02:38:18 | 8 | MR. GOODWIN:  We don't even know if they worked for |
| 02:38:20 | 9 | GP. |
| 02:38:20 | 10 | THE COURT:  Okay.  Okay. |
| 02:38:22 | 11 | MR. GOODWIN:  I mean, and that's -- I had that -- |
| 02:38:26 | 12 | THE COURT:  This is a good example. |
| 02:38:26 | 13 | MR. GOODWIN:  Right. |
| 02:38:26 | 14 | THE COURT:  So when we're saying that things may be |
| 02:38:30 | 15 | sequential, one of them is you need to -- I mean, the more -- |
| 02:38:38 | 16 | you're lucky that they turned over so much already -- |
| 02:38:42 | 17 | MR. GOODWIN:  Yes. |
| 02:38:42 | 18 | THE COURT:  -- because most of the other people |
| 02:38:44 | 19 | haven't done your kind of production, so then you can come |
| 02:38:46 | 20 | back with some specific things. |
| 02:38:50 | 21 | MR. GOODWIN:  Right. |
| 02:38:50 | 22 | MR. MOGIN:  Your Honor, that's not just a list of |
| 02:38:52 | 23 | people.  If you look at the bottom of it where the actual |
| 02:38:54 | 24 | message is, let's think about what this is about.  Smurfit -- |
| 02:39:00 | 25 | and look at the time period.  Smurfit has announced a price |

02:39:04  1   increase of $50 a ton.  Let's all of these people get together

02:39:12  2   and discuss Smurfit's pricing reaction -- or Smurfit's pricing

02:39:16  3   action.  Obviously, it's highly relevant to the case,

02:39:20  4   certainly likely to lead to admissible evidence.

02:39:26  5          THE COURT:  They sure did a good job on giving it to

02:39:32  6   you.

02:39:32  7          MR. GOODWIN:  Yes, it was produced.

02:39:32  8          THE COURT:  It was produced.  Okay?  It was produced.

02:39:36  9   You know, it looks to me like it could be very informative.

02:39:42  10          So what you are missing, because this is what we are

02:39:46  11   doing here today, breaking it down, is you don't know who any

02:39:50  12   of these people are.

02:39:50  13          MR. GOODWIN:  Well, there are two custodians, and I

02:39:54  14   am not going to -- who I believe are mentioned here, but I

02:39:56  15   want to be fair.  But the other 23 are people we don't.

02:40:00  16          THE COURT:  Okay.  That's a good fact; to go back to

02:40:04  17   our first thing on discovering facts, this is obviously a

02:40:08  18   perfect example.

02:40:10  19          So do you have -- I mean, I don't know if you --

02:40:14  20          MR. NEUWIRTH:  It may be useful for me to address

02:40:16  21   this --

02:40:16  22          THE COURT:  Yes, it would.

02:40:18  23          MR. NEUWIRTH:  -- and maybe suggest how we move

02:40:20  24   forward.

02:40:24  25          I think that you correctly point out, your Honor,

02:40:26   1    that we did produce this document.

02:40:28   2           THE COURT:  Yes, right.

02:40:30   3           MR. NEUWIRTH:  And we would argue that the fact that

02:40:34   4    this document was produced and that there are at least two of

02:40:38   5    our custodians on the document is a reflection of the fact

02:40:44   6    that we have selected a good set of custodians.

02:40:48   7           Now, we understand that nothing in e-discovery is

02:40:52   8    perfect, and we have said repeatedly to the plaintiffs that we

02:40:58   9    don't have a problem with the idea that once you have reviewed

02:41:00   10   the documents we've produced, let's talk about what else needs

02:41:06   11   to be done.  But I think that this is one document out of the

02:41:12   12   more than million pages of documents we produced that's not

02:41:16   13   a -- we have heard a lot about the plaintiffs delving into the

02:41:18   14   PCA documents.  For whatever reason, they are not looking at

02:41:22   15   the full set of GP documents yet, it appears.  Maybe they are,

02:41:26   16   I don't know, but I haven't heard that they are.

02:41:28   17          But we would respectfully suggest that this is a very

02:41:32   18   good example of what we see as actually the problem that we

02:41:36   19   are hoping we can resolve with your Honor today because we did

02:41:40   20   produce the document.  We haven't been told that the

02:41:46   21   plaintiffs ran these names against the rest of the documents

02:41:50   22   that we produced.  We haven't been told that they did any of

02:41:56   23   the things that would be at their disposal to do to find other

02:41:58   24   documents about this meeting in what we have produced.  They

02:42:04   25   provided you with a set of interrogatories where we answered

02:42:08    1   all the questions.  They asked for the corporate structure of

02:42:12    2   Georgia-Pacific of certain entities.  It's all described here,

02:42:16    3   and no one ever came back to us and said that these

02:42:20    4   interrogatory answers were faulty or incomplete.

02:42:24    5        We answered the questions that we were asked about

02:42:26    6   the structure, we provided the job descriptions for every one

02:42:30    7   they asked about, and I would just, you know, very

02:42:34    8   respectfully say that I think that -- I think that the problem

02:42:40    9   that we are facing here is that we are sort of shooting in the

02:42:50   10   dark rather than looking at the production to assess what our

02:42:52   11   options are.  And maybe I can give just one or two examples

02:42:56   12   that I think will help to put this in perspective.

02:43:04   13        THE COURT:  Sure.  Sure.

02:43:04   14        MR. NEUWIRTH:  So one of the things that the

02:43:06   15   plaintiff said about our production, which I think has to be

02:43:12   16   the time when they haven't reviewed this, but they told your

02:43:16   17   Honor when they submitted their status report, and this is a

02:43:18   18   quote, that based on the way we answered the RFPs or the

02:43:24   19   RPDs --

02:43:24   20        THE COURT:  Whatever they are.

02:43:26   21        MR. NEUWIRTH:  -- the quote was, GP refuses to

02:43:28   22   provide discovery as to its and its personnel's participation

02:43:32   23   in trade association matters.  Now, that's a quote.  And

02:43:36   24   that's something Mr. Goodwin mentioned this morning.

02:43:40   25        Now, search string number two is the following.  FBA,

02:43:48  1  or Fibre Box Association, or AF and PA, or AFPA, or American

02:43:56  2  Forest and Paper Association, or ICCA, or International

02:44:00  3  Corrugated -- the list goes on and on.  This is a search term

02:44:04  4  just to find --

02:44:06  5       THE COURT:  Trade associations.

02:44:08  6       MR. NEUWIRTH:  -- the names of trade associations.

02:44:10  7  It's not connected to anything else.  It doesn't say it has to

02:44:14  8  be trade association plus.  It's a search just to find any

02:44:18  9  document that has the trade association names.  And

02:44:22  10  notwithstanding this assertion that was made, we know for a

02:44:26  11  fact that GP has produced over 10,000 documents, excluding

02:44:36  12  attachments, that were hit by this search string that are

02:44:42  13  trade association documents.

02:44:44  14       In fact, just so that there isn't any doubt about

02:44:48  15  this, we thought it would be helpful --

02:44:52  16       THE COURT:  You brought this all the way from New

02:44:54  17  York?

02:44:56  18       MR. NEUWIRTH:  Well, here is the reason.

02:44:58  19       MR. GOODWIN:  Hopefully Federal Express did.

02:45:00  20       MR. NEUWIRTH:  The reason that we brought it is

02:45:02  21  because, as it happened today, we have found ourselves -- the

02:45:12  22  court is being told we didn't produce things, and this is a

02:45:28  23  pile of documents that have already been produced, a sample of

02:45:34  24  trade association documents that we produced, American Forest

02:45:38  25  and Paper Association -- you can look at them.  These are all

02:45:42  1  documents.  They are agendas for meetings, who attended,

02:45:48  2  senior people at GP talking about trade associations.

02:45:52  3       And all that we're saying to your Honor is instead of

02:45:56  4  coming in and telling us, GP hasn't done this, GP hasn't done

02:46:02  5  that, GP hasn't given us documents, the one example they have

02:46:08  6  come up with is where we did give them the document using our

02:46:10  7  methodology, and this is just one example.

02:46:14  8       Another thing that they told us was --

02:46:18  9       MR. GOODWIN:  Can I respond to this point before we

02:46:22  10  get lost here?

02:46:22  11       THE COURT:  Just wait one minute.  You are going to

02:46:24  12  have all the time you need to talk.

02:46:26  13       MR. NEUWIRTH:  Another thing we were told was GP

02:46:28  14  attempts to limit document discovery as to pricing, and GP

02:46:34  15  attempts to limit document discovery as to competitive

02:46:36  16  conditions.

02:46:42  17       Search string number seven is price with other

02:46:44  18  connectors.  Search string number eight is pricing with

02:46:46  19  increase, decrease, raise, low, high, decline.  Of course this

02:46:52  20  document got picked up.  Demand, we have all the names of the

02:46:56  21  other defendants.  And just, again, so your Honor understands

02:47:00  22  what we're talking about, we understand the plaintiffs haven't

02:47:04  23  undertaken to look at this yet, but these, I believe -- these

02:47:14  24  are documents that we produced on pricing -- sample documents

02:47:16  25  on pricing and competitive conditions.  And just to give an

02:47:22　1　example, board of managers meeting, third-quarter review

02:47:30　2　packaging segment, they've got these for every single quarter,

02:47:34　3　all sorts of information about pricing, what's happening to

02:47:38　4　prices, what decisions should be made.

02:47:42　5　　　　　THE COURT:  And they could find this --

02:47:44　6　　　　　MR. NEUWIRTH:  They could find it by just using the

02:47:48　7　search string.

02:47:48　8　　　　　THE COURT:  All right.  Everybody is doing it

02:47:50　9　differently.

02:47:50　10　　　　　MR. NEUWIRTH:  Here is documents -- these are

02:47:52　11　quarterly board meeting reviews.  They have every single one

02:47:56　12　that exists has been produced.  This is on both boxes and

02:48:00　13　containerboard; and just to give you a sample of this

02:48:06　14　document, plans, key initiatives and progress per segment,

02:48:12　15　market update and point of view, talking about pricing, it's

02:48:16　16　all here, price per ton, what's expected to happen.

02:48:24　17　　　　　Another category that we produced is -- these are

02:48:28　18　called point of view reports.  They are done regularly.  Do

02:48:34　19　you know what these reports are?  These are reports on what's

02:48:38　20　happening in the market and when there are --

02:48:40　21　　　　　THE COURT:  In the cardboard box or cardboard

02:48:44　22　container --

02:48:44　23　　　　　MR. NEUWIRTH:  In containerboard and box.

02:48:46　24　　　　　THE COURT:  Okay.  Mark it.

02:48:48　25　　　　　MR. NEUWIRTH:  This one is called containerboard

| | | |
|---|---|---|
| 02:48:52 | 1 | sales point of view. |
| 02:48:54 | 2 | THE COURT: Okay. |
| 02:48:54 | 3 | MR. NEUWIRTH: This is OCC, one of the input's point |
| 02:48:58 | 4 | of view. Every time there was a major decision about |
| 02:49:06 | 5 | anything, a point of view document was either created or -- |
| 02:49:10 | 6 | THE COURT: Is that like a to/from? |
| 02:49:12 | 7 | MR. NEUWIRTH: It's something that's used by the |
| 02:49:14 | 8 | senior business people to explain decisions that are made and |
| 02:49:18 | 9 | to explain perspectives on what's happening in the market. |
| 02:49:24 | 10 | Another thing we have already produced are documents |
| 02:49:26 | 11 | called containerboard vision reports. This is containerboard |
| 02:49:32 | 12 | and boxing. They're done I think almost monthly. |
| 02:49:38 | 13 | What topics do the plaintiffs say they care about? |
| 02:49:42 | 14 | Capacity, business integration, point of view scenarios, by |
| 02:49:50 | 15 | region, by section of the packaging capabilities, details on |
| 02:49:54 | 16 | all the operations, returns by segment, this is all here in |
| 02:50:02 | 17 | the production that they have already received. And if one |
| 02:50:06 | 18 | simply -- the way we pulled these is we took the four search |
| 02:50:10 | 19 | strings that expressly dealt with pricing and easily pulled up |
| 02:50:16 | 20 | all of these documents. |
| 02:50:16 | 21 | This folder is another kind of document. What is |
| 02:50:24 | 22 | this? A monthly business review. What are the topics that |
| 02:50:28 | 23 | they'd like to hear about? 2006 objectives, plan target, |
| 02:50:38 | 24 | trade association monthly data, customer service and |
| 02:50:42 | 25 | production items, 2007 SOP master. |

02:50:48  1    We provided the plaintiffs a whole set of reports for
02:50:54  2  every output decision the company made.  There was something
02:50:56  3  called the SOP process that is fully documented for the entire
02:51:02  4  period.  Those have all been produced to the plaintiffs, and
02:51:06  5  they haven't looked at them yet.
02:51:08  6    THE COURT:  Now, just to be fair here for a minute --
02:51:10  7    MR. NEUWIRTH:  Yes.
02:51:10  8    THE COURT:  -- do they know -- I don't have any idea
02:51:16  9  what your SOP process is or who's in charge of your SOP
02:51:20  10  process --
02:51:22  11    MR. NEUWIRTH:  But it's all in the documents.
02:51:22  12    THE COURT:  -- or what group it would -- okay.
02:51:26  13    MR. NEUWIRTH:  So here's the problem --
02:51:28  14    THE COURT:  Part of why it's good that an outsider is
02:51:30  15  the mediator is what I don't know, you know, and there is no
02:51:38  16  way I would know these kind of details --
02:51:42  17    MR. NEUWIRTH:  Right.
02:51:42  18    THE COURT:  -- might happen to coincide with basic
02:51:44  19  information that they may not know.
02:51:48  20    MR. NEUWIRTH:  But in fairness, your Honor, in this
02:51:52  21  litigation, the plaintiffs have accused the defendants --
02:51:54  22    THE COURT:  I know.  And you feel very accused.
02:51:56  23    MR. NEUWIRTH:  No, no.  We understand this is a
02:51:58  24  litigation.  We understand that the response that we have to
02:52:02  25  provide is to give the plaintiffs documents, and I don't think

02:52:08  1   we disagree at all with your premise that it can be a good

02:52:16  2   thing in the process to do reasonable things to help out.

02:52:20  3        What we are saying with this is not that there isn't

02:52:24  4   information we can work with you today that would be helpful.

02:52:28  5   That's not our point at all.  Our point is that the nature of

02:52:32  6   the accusations that are being made about what we have done or

02:52:36  7   not done is not rooted in the facts of what have happened so

02:52:40  8   far.

02:52:40  9        And so when I talked about my second goal, my second

02:52:44  10  goal was simply to say, Let's try to get to a point where we

02:52:48  11  all are dealing with the same thing -- if the plaintiffs came

02:52:54  12  to us and said, We have seen all these documents about the SOP

02:52:56  13  process --

02:52:58  14       THE COURT:  What is it.

02:53:00  15       MR. NEUWIRTH:  -- can we talk about it, or, Here is

02:53:02  16  an interrogatory, tell us everyone who was involved in it.  I

02:53:04  17  think the documents, I would suggest, make very clear who was

02:53:08  18  involved and who the people are that are in charge and the

02:53:10  19  people in charge of it are all custodians, so you have all

02:53:14  20  their documents.

02:53:16  21       But when we're at the level of being told, We ignored

02:53:20  22  pricing, or, We didn't do things about -- or, We didn't tell

02:53:22  23  them how the company is structured, even though they show you

02:53:26  24  an interrogatory with all the answers, then I think it becomes

02:53:28  25  very hard for us to make the type of progress we should be

| | |
|---|---|
| 02:53:32 | 1 |

making.

02:53:32    2    And so all that we're suggesting is that we believe

02:53:38    3    that as we hope we demonstrate at the hearing, in a world

02:53:42    4    where we know we couldn't be perfect, because ESI could never

02:53:46    5    be perfect, we really tried very hard to do the right thing.

02:53:52    6    And without foreclosing the plaintiffs' right to reasonably

02:53:56    7    ask for more, all that we're asking is, please, we're almost

02:54:00    8    begging the plaintiffs to look at what we produced, and then

02:54:06    9    let's talk because we think you will find we really have given

02:54:10    10    you a lot of very helpful material that we believe will prove

02:54:12    11    that the allegations are false, the plaintiffs will do what

02:54:16    12    they want to do to prove that they are true, but we really

02:54:20    13    have not withheld the things that we are being accused of

02:54:22    14    withholding, and we genuinely made an effort through our

02:54:26    15    custodians to find the people who would really have been

02:54:28    16    involved in any of the type of conduct that the plaintiffs had

02:54:32    17    suggested, and we hope that by looking through the documents,

02:54:36    18    you know, a document like the one they showed, can be a good

02:54:42    19    road map to other things to look for.

02:54:44    20    But they haven't looked in what we produced.  I am

02:54:50    21    confident there are other documents about this meeting or

02:54:52    22    other documents about these people or other information.  And,

02:54:56    23    again, I want to be clear, this is not to say we don't want to

02:54:58    24    cooperate.

02:54:58    25    THE COURT:  Okay.  You can see, I hope, Charles, the

02:55:06   1   power of words.  I mean, if you were a judge and you got

02:55:12   2   pleadings from both sides and see the way people talk about

02:55:16   3   each other, part of my early push on cooperation and trying to

02:55:22   4   really change a different way, it can set the whole tone of

02:55:28   5   the case just because of choice of words, and some people have

02:55:44   6   -- when Chris and I -- on Monday, I spent, you know, as I have

02:55:48   7   already bored you with, two full days on the RPDs.  I was

02:55:54   8   trying to, the little bit I know, tried to figure out if I

02:56:00   9   were prosecuting the case, I thought the trade associations

02:56:04   10  would be high, high up there.  I mean, there is a lot of

02:56:08   11  dribble in there.  But I thought, God, I was married to a

02:56:12   12  lobbyist, divorced from a lobbyist, I get it, and then my

02:56:18   13  criminal defense background here --

02:56:22   14          MR. MOGIN:  Do the two coincide, your Honor?

02:56:24   15          THE COURT:  So, anyway, when I looked at trade

02:56:26   16  associations and I think, you know, I read -- you said they

02:56:32   17  didn't give you anything.  I thought -- now, I just want to

02:56:34   18  tell you, my stranger reaction was, whoa, it would seem like

02:56:42   19  this is a pretty -- this is a pretty fertile area, would be

02:56:48   20  trade associations in a price fixing case or allegedly price

02:56:56   21  fixing case.

02:56:56   22          So I took what you said -- because I am in the same

02:57:00   23  boat.  I am trying to absorb thousands of pages into a little,

02:57:04   24  tiny bit here.  That stuck with me, and that image stuck with

02:57:10   25  me, and little did I know that -- now, maybe these papers say

02:57:14　1　nothing, I don't know, but they have certainly produced a lot

02:57:20　2　of material here.  So whatever you're going to say back,

02:57:24　3　please watch -- just kind of the words you use in answering

02:57:30　4　back because I do think they actually affect people.

02:57:34　5　　　　　MR. GOODWIN:  I understand, your Honor.  We take GP's

02:57:42　6　words very seriously, and I know your Honor does not want to

02:57:44　7　go into --

02:57:46　8　　　　　THE COURT:  Inflammatory.

02:57:46　9　　　　　MR. GOODWIN:  Well, we don't want to do a deep dive

02:57:50　10　into the document request.

02:57:50　11　　　　　THE COURT:  See, what do you need to -- see --

02:57:52　12　　　　　MR. GOODWIN:  This is actually --

02:57:54　13　　　　　THE COURT:  -- we can cut through the whole thing.

02:57:56　14　What do you need to understand their documents?  That's what

02:57:58　15　I'm trying to get you.

02:58:00　16　　　　　MR. GOODWIN:  Well, that's part --

02:58:02　17　　　　　MR. MOGIN:  Your Honor, not to interrupt, but we need

02:58:04　18　to respond to what Mr. Neuwirth said because he has painted a

02:58:08　19　very interesting picture.

02:58:10　20　　　　　MR. GOODWIN:  It seems, at least in my estimation,

02:58:12　21　and I don't want to cast aspersions, but there is something of

02:58:14　22　a gap between the representations that Mr. Neuwirth is making

02:58:24　23　here to your Honor and the quality of their written responses

02:58:30　24　to the document requests.

02:58:30　25　　　　　Now, maybe this is a matter that they have actually

02:58:32 1 exceeded what they promised they would do in the document

02:58:36 2 requests and they need to go back and amend their document

02:58:38 3 request answers and say, Well, yes, we did give you all this

02:58:42 4 stuff we said we weren't giving you at least by negative

02:58:46 5 implication.

02:58:46 6     And I know this document -- this is actually not

02:58:50 7 intended to be comprehensive of all the disputes we have with

02:59:00 8 sort of the very careful language that gets used in GP's

02:59:02 9 document request responses.

02:59:04 10     If the trade associations matter is the easiest to

02:59:10 11 comprehend, if we just go to -- it's request No. 7, which is

02:59:18 12 sort of our big opening request to GP of, you know, give us

02:59:24 13 all your trade association documents, and GP, you know,

02:59:28 14 narrows that and whittles it --

02:59:32 15     MR. NEUWIRTH:  We didn't narrow -- if you look at

02:59:34 16 what we said --

02:59:34 17     MR. MOGIN:  I don't think we interrupted

02:59:36 18 Mr. Neuwirth's presentation, your Honor, tempted as we were.

02:59:40 19     THE COURT:  Okay.

02:59:40 20     MR. GOODWIN:  There's a series of requests about

02:59:42 21 trade associations and industry meetings where it's not

02:59:46 22 satisfied just by running, you know, a search string with a

02:59:52 23 name of a trade association.  What if, you know, Fibre Box

02:59:56 24 Association, I guess, they're in suburban Chicago here, what

03:00:00 25 if there was reference to the Chicago meeting?  It requires

| | | |
|---|---|---|
| 03:00:04 | 1 | going and interviewing your personnel and saying, Well, was |
| 03:00:08 | 2 | there any other way you described those meetings, who did you |
| 03:00:10 | 3 | go with. |
| 03:00:12 | 4 | These aren't e-discovery disputes.  These are just |
| 03:00:16 | 5 | ordinary discovery disputes that happened in the paper age, |
| 03:00:18 | 6 | and they don't transmogrify just because we're in e-discovery. |
| 03:00:22 | 7 | It's basic searching, asking your client so you can find |
| 03:00:26 | 8 | responsive information. |
| 03:00:28 | 9 | And, sure, the trade association name shows up over |
| 03:00:32 | 10 | and over again.  What about the personnel at the trade |
| 03:00:34 | 11 | association?  If you dealt with Mr. Johnson from FBA, is there |
| 03:00:40 | 12 | a search for Mr. Johnson's name?  I mean, that's the kind of |
| 03:00:46 | 13 | thing that comes from the simple task, the good-lawyering |
| 03:00:50 | 14 | task, of interviewing your client. |
| 03:00:50 | 15 | MR. FREED:  But there is another thought which I |
| 03:00:52 | 16 | think is so much simpler.  It would help us to review that |
| 03:00:58 | 17 | boxload of documents that Mr. Neuwirth brought if they would |
| 03:01:02 | 18 | tell us who these people are. |
| 03:01:04 | 19 | THE COURT:  That's what I'm trying -- Charles hasn't |
| 03:01:04 | 20 | been here the last day and a half.  What got clear yesterday, |
| 03:01:18 | 21 | and which I -- you know, I think you guys answered this in |
| 03:01:20 | 22 | kind of a fit because of the overbreadth of the band thing. |
| 03:01:24 | 23 | So you decided -- I mean, this is the way hindsight is looking |
| 03:01:28 | 24 | at it.  By limiting it by this limitation of executives with |
| 03:01:34 | 25 | the -- you know, you were trying to do what you were hoping |

03:01:36  1  the judge was going to do, by limiting it to every one of them

03:01:42  2  were -- how did they say it? -- executives --

03:01:44  3       MR. GOODWIN:  Actually, the terminology shifts.  In

03:01:48  4  the document request response, they are described as primary

03:01:54  5  decisionmakers, but in some of the correspondence, though,

03:01:56  6  they are described as key decisionmakers with day-to-day

03:01:58  7  authority over pricing.

03:02:00  8       THE COURT:  Okay.  But we are going back to a year

03:02:02  9  ago before any e-discovery was decided upon.  They are

03:02:08  10  inundated with 92 things that could take somebody a year to be

03:02:14  11  able to figure out.  Okay?  The number one thing that we got

03:02:18  12  out of the last two is with all the paper and all the

03:02:24  13  gibberish and all the everything else, they don't understand

03:02:28  14  who, the names, literally, the names of not just the 50

03:02:36  15  custodians or however many custodians you have, but who the

03:02:40  16  structure is so, as Charles just said, he sees an email, he

03:02:44  17  doesn't know who Nan Nolan is -- Nan Nolan, the CEO, is

03:02:50  18  sending an email to Chris Campbell, and they don't understand

03:02:54  19  who Chris Campbell is.

03:02:56  20       We are talking basic 101 information that they need.

03:03:02  21       MR. FREED:  If I could amplify, if I may.

03:03:06  22       THE COURT:  Yes, please do.

03:03:08  23       MR. FREED:  If the answer to that is, Well, load up

03:03:10  24  our million documents -- I am speaking rhetorically -- search

03:03:14  25  this, you will come up with the names extracted from 2200

03:03:20   1   documents as opposed to, We're going to tell you --

03:03:22   2           THE COURT:  Right.

03:03:22   3           MR. FREED:  -- so that when you start -- and there is

03:03:24   4   one other person who is very discrete, and to me, this has

03:03:28   5   been the most mystifying thing, is they have a CEO by the name

03:03:32   6   of Hannan and they won't designate him as a custodian.  And he

03:03:36   7   is very involved in trade associations, and he is constantly

03:03:40   8   talking about the containerboard market.

03:03:42   9           MR. MOGIN:  He is even mentioned in the complaint by

03:03:44  10   name --

03:03:44  11           THE COURT:  So he is one -- this is a specific --

03:03:48  12           MR. FREED:  I know.

03:03:48  13           THE COURT:  When we're talking about specific things

03:03:52  14   that should be discussed in a mediation standpoint, either

03:03:58  15   with or without the judge, that's a good example.

03:04:02  16           But is there a way, this is what we did with Temple

03:04:06  17   and with IP this morning.  Is there a way to get them some

03:04:12  18   kind of basic -- if it's not called an organizational chart, a

03:04:20  19   function chart with names and who the people are and also

03:04:26  20   where they work.

03:04:26  21           We approached it two ways this morning:  one is

03:04:28  22   organizational chart, the other is the names of the people who

03:04:36  23   got the litigation hold.

03:04:38  24           Now, another way to go at this same fact-gathering in

03:04:44  25   order to be able to get them, and I am telling you, and you

03:04:50  1   are going to just have to trust me, it doesn't mean it's

03:04:54  2   automatically going to more custodians.  It's not.  They can't

03:04:58  3   read these documents without a road map.  This is like the

03:05:02  4   road map to the documents.

03:05:06  5        MR. NEUWIRTH:  So I don't think we have a problem

03:05:10  6   with you, and I don't think -- hopefully, we won't have a

03:05:12  7   problem -- I don't think we have a problem with what you just

03:05:16  8   said, and let me explain the background.

03:05:20  9        THE COURT:  Good.  Good.

03:05:22  10       MR. NEUWIRTH:  With respect to organizational charts,

03:05:26  11  we have told the plaintiffs, and Mary will confirm this, as

03:05:30  12  you may know, Georgia-Pacific is a privately-held company.

03:05:34  13       THE COURT:  Okay.

03:05:36  14       MR. NEUWIRTH:  Since 2005, it has not been a public

03:05:38  15  company.  And there are not in existence organizational

03:05:44  16  charts.  They don't exist.

03:05:46  17       THE COURT:  Okay.

03:05:46  18       MR. NEUWIRTH:  Now, there is no doubt that -- and I

03:05:56  19  did have a preview about this -- there is no doubt that there

03:06:02  20  are documents that we produced where the word count includes

03:06:04  21  reference to organizational or reference to charts or maybe

03:06:08  22  even both, but that doesn't mean that that was talking about

03:06:16  23  Georgia-Pacific organizational charts.

03:06:18  24       And, you know, Mr. Mogin can laugh, but Ms. McLemore

03:06:22  25  is here, and she can speak on behalf of the company.

03:06:24   1      THE COURT:  I am not laughing.

03:06:26   2      MR. NEUWIRTH:  So that's number one.

03:06:26   3      Number two is that the plaintiffs to this point have

03:06:30   4   made one request to us, which you heard reiterated today,

03:06:34   5   which is that we give the name of every person in the company

03:06:40   6   whoever did anything related to a trade association, and there

03:06:44   7   is no -- what we have said over and over again is that that

03:06:48   8   request is so overbroad that the way it's defined, we don't

03:06:52   9   even know how we could leave anybody out.

03:06:56   10      So all that we have been trying to do is come up with

03:07:00   11   some reasonable parameters on providing a list of names.  Now,

03:07:06   12   what we did here, in fairness, I really don't think this was

03:07:10   13   so much about a fit of peak as it was taking something that

03:07:16   14   was tremendously overbroad, particularly in the context of

03:07:20   15   these 92 or four requests and coming up with something that we

03:07:26   16   thought would be a reasonable alternative.

03:07:34   17      So I don't think we have a problem with giving more

03:07:38   18   information about trade associations as long as we can put

03:07:40   19   some parameters on it so it's an implementable task, because

03:07:44   20   if the question is, Tell us everyone who ever had an

03:07:46   21   involvement in a trade association, Mary would literally have

03:07:50   22   to ask every single person in the company from 2003 to the

03:07:54   23   present if they had ever done anything, defined as anything,

03:08:02   24   related to a trade association.

03:08:04   25      And also on the issue of the people who got the

03:08:12   1   litigation hold, as we have explained to the plaintiffs -- and

03:08:16   2   I didn't mean to be too opaque; if I was, I apologize -- the

03:08:22   3   constraint that we have been facing -- and I think I expressly

03:08:24   4   mentioned this, Chuck, in our last call -- is this privilege

03:08:26   5   issue, and I told you that if we can find a way to work around

03:08:32   6   the privilege issue, we are part of a group of defendants, and

03:08:36   7   we don't want to trigger a waiver, and I know there's some

03:08:38   8   strongly-held views that --

03:08:40   9        THE COURT:  Right.

03:08:40   10       MR. NEUWIRTH:  But if we could get an understanding.

03:08:42   11       THE COURT:  It's not the document itself.

03:08:44   12       MR. NEUWIRTH:  No.

03:08:44   13       But if we could get an understanding that the

03:08:48   14   production of the names --

03:08:50   15       THE COURT:  Are not waiving anything.

03:08:52   16       MR. NEUWIRTH:  -- would not constitute a waiver, and

03:08:54   17   particularly if we could get something from the court which

03:08:58   18   says that the fact that these are being provided does not mean

03:09:02   19   that someone becomes a custodian and the normal standards

03:09:08   20   would apply, we would give the list today.

03:09:10   21       MR. FREED:  Did you mean work product?  You're saying

03:09:14   22   privilege.

03:09:14   23       MR. NEUWIRTH:  Well, privilege meaning work product

03:09:16   24   -- and it is an attorney-client communication.

03:09:18   25       MR. FREED:  Not what I'm saying.  But the reason I

03:09:18  1  mentioned that is at an earlier meeting, one of the positions

03:09:22  2  taken was the selection of who we sent litigation hold notices

03:09:26  3  to is a work product issue.

03:09:28  4      MR. NEUWIRTH:  I think it's a work product issue and

03:09:30  5  potentially an attorney-client issue.

03:09:34  6      MR. FREED:  I think we got past it when we

03:09:38  7  understood, and I think with your suggestion, we can get past

03:09:40  8  it.  So I'm trying figure out, is there some other privilege

03:09:42  9  notion here which I am not aware of?

03:09:44  10     MR. NEUWIRTH:  The privilege --

03:09:46  11     MR. FREED:  I can't imagine it's privileged who

03:09:48  12 belongs to a trade association.

03:09:50  13     MR. NEUWIRTH:  We are talking about litigation hold.

03:09:52  14 The litigation hold is all we're talking about here.

03:09:54  15     MR. FREED:  That's not a privilege either.

03:09:56  16     MR. NEUWIRTH:  Look, all that I have said in very

03:10:02  17 good faith to Dan and Chuck the last time we spoke, I think I

03:10:06  18 said this expressly, is we are part of a joint defense group,

03:10:08  19 there is a privilege issue that has been raised --

03:10:12  20     THE COURT:  Right.

03:10:12  21     MR. NEUWIRTH:  -- we want to avoid a waiver of that

03:10:14  22 privilege to the extent we are not ordered to waive it --

03:10:16  23     THE COURT:  Correct.

03:10:16  24     MR. NEUWIRTH:  -- and all that we're asking for is an

03:10:20  25 agreement that the production of the list of people who got

| | | |
|---|---|---|
| 03:10:24 | 1 | the hold won't be treated as a waiver or won't be treated, as |
| 03:10:32 | 2 | your Honor said -- |
| 03:10:34 | 3 | THE COURT: It may be -- |
| 03:10:36 | 4 | MR. NEUWIRTH: -- as a basis. |
| 03:10:36 | 5 | THE COURT: It may be a basis for more custodians. |
| 03:10:38 | 6 | MR. NEUWIRTH: Of course. |
| 03:10:38 | 7 | THE COURT: That might happen, of course. |
| 03:10:40 | 8 | MR. NEUWIRTH: But the nominal burdens for doing that |
| 03:10:44 | 9 | -- normal burdens would apply. |
| 03:10:44 | 10 | MR. MOGIN: What would those normal burdens be? |
| 03:10:48 | 11 | MR. NEUWIRTH: That there is a reasonable basis to |
| 03:10:48 | 12 | add the custodian. |
| 03:10:50 | 13 | MR. MOGIN: GP, excuse me, your Honor, they talk the |
| 03:10:56 | 14 | talk and they won't walk the walk and Mr. -- |
| 03:10:58 | 15 | THE COURT: You're being very difficult. |
| 03:11:00 | 16 | MR. MOGIN: I am. |
| 03:11:00 | 17 | THE COURT: You are. Mr. Freed, make Mogin be quiet. |
| 03:11:06 | 18 | MR. MOGIN: Your Honor, the situation with the CEO, |
| 03:11:10 | 19 | Mr. Hannan, is very illustrative. |
| 03:11:12 | 20 | THE COURT: We are going to get that next. I'm doing |
| 03:11:16 | 21 | litigation holds. You just got all the damn names. Now wait |
| 03:11:18 | 22 | a minute. |
| 03:11:20 | 23 | MR. NEUWIRTH: I will do more. |
| 03:11:22 | 24 | THE COURT: Wait. We finish that up. We are going |
| 03:11:24 | 25 | to get to Mr. Hannan. Hold on. |

03:11:24  1        MR. NEUWIRTH:  I am ready to do more, your Honor.

03:11:26  2        THE COURT:  Thank you.  Okay.

03:11:28  3        MR. NEUWIRTH:  We are also willing to give the titles

03:11:30  4  of all the people who got the litigation hold, not just the

03:11:34  5  name, if they have titles.

03:11:34  6        THE COURT:  I have a couple other follow-up questions

03:11:38  7  on the charts.

03:11:40  8        MR. FREED:  I understand.  I have asked Mr. Mogin to

03:11:42  9  wait, your Honor.

03:11:42  10        THE COURT:  Thank you, Mr. Freed.  That's great.

03:11:46  11        See, that's the kind of -- that's the kind of give

03:11:46  12  and take we -- I mean, I really understood it from the way

03:11:54  13  they talked about it yesterday.  This is -- this is a problem

03:11:58  14  for the court, not knowing who these people are.  I am a much

03:12:02  15  better judge when I know the facts, and, you know, not that I

03:12:08  16  have to know every one of the custodians, but -- so this is

03:12:12  17  great.

03:12:12  18        Okay.  So you are -- if we are able to, there are,

03:12:16  19  Mr. Wozniak, two new cases, I mean at least two cases, on

03:12:24  20  giving the names of litigation holds in which judges have

03:12:30  21  e-discovery, the one from California and someplace else,

03:12:34  22  finding that it's not privileged or work product.  This is not

03:12:38  23  to the hold itself.  We are not asking that.

03:12:42  24        I think you make a very good point, no one else made

03:12:44  25  it, about waiver.  You happen to be in a really much better

03:12:48  1  circuit here than the Second Circuit.  We have a true

03:12:54  2  privilege.  We respect the privilege here.  We don't think

03:12:58  3  it's hiding the truth.  And waiver, giving one document, 10

03:13:06  4  documents isn't going to waive the whole thing, but I think

03:13:08  5  it's better to incorporate it in the order.

03:13:10  6          MR. NEUWIRTH:  Thank you, your Honor.

03:13:12  7          MR. FREED:  There is a third addition which I don't

03:13:14  8  want to speak for Jim McKeown, but I think he agreed to this,

03:13:20  9  and that is the date of the litigation hold.

03:13:20  10         MR. NEUWIRTH:  We have no problem telling you the

03:13:22  11  date --

03:13:24  12         MS. McLEMORE:  Whoa, whoa, whoa, whoa, whoa.

03:13:24  13         MR. NEUWIRTH:  I'm sorry.

03:13:26  14         MR. FREED:  Let me just say why.

03:13:28  15         THE COURT:  Tell why.

03:13:30  16         MR. FREED:  Because it will give us an indication of

03:13:32  17  where there may have been spoliation or destruction between

03:13:36  18  the time of the complaint being filed and the time the person

03:13:40  19  was notified.

03:13:42  20         MS. McLEMORE:  Can I explain how we did this and what

03:13:44  21  the practical problem with that is?

03:13:46  22         MR. FREED:  Sure.

03:13:48  23         MS. McLEMORE:  It was an iterative process.  We have

03:13:50  24  about 400 people on the litigation hold.

03:13:54  25         THE COURT:  Good.

03:13:54  1    MS. McLEMORE:  Just so that we are talking numbers.
03:13:56  2   Okay?  Just slightly south of 400.
03:14:00  3        What we did is we immediately put a core group of
03:14:06  4   people on the hold.  The hold -- the first hold went out on a
03:14:10  5   Friday, and I know that because I stayed late to get the
03:14:14  6   litigation hold out.  Then we went through the normal process
03:14:22  7   of talking to people, who else should be added.  I mean, we
03:14:26  8   literally, the day we learned of the complaint, got the
03:14:28  9   litigation hold out to the core people.
03:14:30  10       THE COURT:  Okay.
03:14:32  11       MS. McLEMORE:  And so there have -- I'm going to have
03:14:36  12  22 dates -- don't hold me to that; that's not accurate -- but,
03:14:42  13  I mean, different people got the hold on different days.  And
03:14:44  14  then at some point, there was an amendment, and everybody who
03:14:50  15  was on the hold up to that point got the litigation hold yet
03:14:54  16  again because it had been amended.
03:14:56  17       And so to say this person got the hold on this date
03:15:00  18  is something that I am not really capable of doing in the way
03:15:06  19  that I think the plaintiffs want.
03:15:08  20       THE COURT:  All right.  Could you do a range between
03:15:12  21  the first time they did it and their last date with the
03:15:18  22  amendment and then if you have a specific person or persons
03:15:22  23  who you think might have a spoliation, they can go back and
03:15:26  24  get the date then?
03:15:28  25       MR. FREED:  And spoliation has a really negative

03:15:32    1   connotation.  I don't mean to suggest if there is a time

03:15:34    2   period when somebody didn't get a hold, we are not going to

03:15:36    3   say that means there was spoliation, but it helps us

03:15:40    4   understand, again, what we are getting.

03:15:42    5        So if it is, These are the people in the first group

03:15:42    6   and the people in the second group were within this range or

03:15:46    7   the person in the first group may have gotten a further

03:15:50    8   notice --

03:15:50    9        THE COURT:  Is it within like a three-week period or

03:15:54   10   four-week --

03:15:54   11        MS. McLEMORE:  No.  Like I said, this was a very

03:15:58   12   iterative process.  We found old holds unrelated to this case

03:16:04   13   where some of the custodians, some of the people that we

03:16:08   14   believed probably should be added to the -- because we think

03:16:12   15   our obligation to preserve is much broader than our obligation

03:16:16   16   to produce.

03:16:16   17        THE COURT:  It is.

03:16:18   18        MS. McLEMORE:  So we went very broad.  We found old

03:16:20   19   litigation holds that some of our custodians were a part of,

03:16:24   20   and so we grabbed those old litigation holds --

03:16:26   21        THE COURT:  Got it.

03:16:28   22        MS. McLEMORE:  -- and added it to this hold.  I mean,

03:16:30   23   I have so many different --

03:16:32   24        MR. FREED:  Just tell us what you can tell us, I

03:16:34   25   guess.

03:16:34  1    THE COURT:  Well, how about this, though.  If that's

03:16:36  2  a specific and they can go back and resurrect the date if

03:16:40  3  you've got it, won't that be enough for you?

03:16:42  4    MR. FREED:  If we have an issue, then we would like

03:16:46  5  to talk to them.

03:16:46  6    THE COURT:  Right.

03:16:46  7    MR. NEUWIRTH:  But I would just make one request to

03:16:50  8  your Honor which alludes to something that you had said

03:16:52  9  earlier about giving and taking in this process.

03:16:56  10    THE COURT:  Yes.

03:16:56  11    MR. NEUWIRTH:  It's -- I would think especially based

03:17:00  12  on Mr. Freed's reference to spoliation, it would only be

03:17:02  13  appropriate that the plaintiffs tell us all the people who got

03:17:08  14  their litigation holds and the dates on which the plaintiffs

03:17:12  15  gave their litigation holds.

03:17:14  16    MR. WOZNIAK:  I don't think that's a problem at all.

03:17:16  17    THE COURT:  That's not a problem at all.

03:17:20  18    MR. FREED:  It's a great deal easier for us.

03:17:24  19    MR. NEUWIRTH:  We have some questions about what's

03:17:24  20  been done on the plaintiffs' side.  And I am not assuming

03:17:28  21  spoliation at all.  I am just saying if we are going to go

03:17:30  22  down the path of treating this information as relevant, we

03:17:32  23  should have the goose/gander approach.

03:17:36  24    MR. FREED:  Okay.

03:17:36  25    MR. GOODWIN:  If I can back up to some of

03:17:38   1   Mr. Neuwirth's earlier comments on the -- I believe in

03:17:44   2   addition to GP saying that it does not have organization

03:17:48   3   charts, I believe we have also heard -- and I am certain Steve

03:17:52   4   will correct me if I'm wrong -- that there are no job

03:17:56   5   descriptions for its personnel?  Did I misapprehend something?

03:18:00   6            MR. NEUWIRTH:  We gave you job descriptions.

03:18:02   7            MS. McLEMORE:  There are no written job descriptions

03:18:04   8   in our system.

03:18:06   9            MR. GOODWIN:  And this -- what puzzles me here, even

03:18:10   10   though GP is a private company, and I appreciate that, and so

03:18:14   11   you don't have all the reporting and, you know, shareholder

03:18:18   12   relations kinds of things that a public company would have, GP

03:18:22   13   is still subject to discrimination laws, and the federal

03:18:24   14   employment laws and the state employment laws were applicable,

03:18:28   15   and, you know, if you have to fire somebody for falling short

03:18:32   16   of their job description who is in a protected category, if

03:18:36   17   there is no preexisting job description, how do you defend

03:18:38   18   your case?  I mean, it seems like you have to have these

03:18:42   19   documents to manage a corporation.

03:18:44   20            MR. NEUWIRTH:  Do you have an authority for that?

03:18:46   21            MR. GOODWIN:  Well, we fired them.  Why?  They

03:18:50   22   weren't doing their job.  Well, is there a description of

03:18:52   23   their job?  No, there's no preexisting description --

03:18:54   24            MR. NEUWIRTH:  I'm just asking the question.  Do you

03:18:54   25   have an authority for your proposition --

03:18:56  1       MR. GOODWIN:  No, I don't.  I'm just --

03:18:56  2       MR. NEUWIRTH:  Let me just --

03:18:56  3       MR. GOODWIN:  Steve, I am going to answer your

03:18:58  4   question.  I don't.  It just seems puzzling to me.  It's how

03:19:02  5   do I run a company -- how does someone run a company if you

03:19:04  6   don't know what someone who you're paying does for a living?

03:19:16  7     (Judge Nolan exited.)

03:19:18  8       MR. FREED:  So you gave us titles?

03:19:22  9       MS. McLEMORE:  Correct.

03:19:26  10      MR. GOODWIN:  And -- well, I don't want to speak

03:19:28  11  without the magistrate.

03:19:30  12      MR. FREED:  No, I was just asking you.

03:20:12  13    (Judge Nolan entered.)

03:20:12  14      THE COURT:  Let me be very pedantic.  If I go and

03:20:16  15  call up Georgia-Pacific right now and you're lucky enough to

03:20:22  16  have an operator who answers the phone and I say, I want to

03:20:26  17  talk to somebody in marketing, don't you have a call sheet

03:20:32  18  that says who is in marketing?

03:20:36  19      Or if I said, I want to talk to the head of

03:20:38  20  marketing, now, whether you call it a chart, okay, there must

03:20:46  21  be some way to have like an organizational way to know how to

03:20:56  22  get Nan to the marketing department.

03:21:04  23      This is a secret organization here.

03:21:06  24      MR. NEUWIRTH:  One thing I was going to say, as

03:21:12  25  Ms. McLemore has explained, we have about 400 people on the

03:21:16   1   list of people who got the litigation hold, and we have

03:21:20   2   offered today to provide all of their titles.

03:21:24   3           THE COURT:  Okay.

03:21:24   4           MR. NEUWIRTH:  So that is not --

03:21:26   5           THE COURT:  We should first take a look at that.

03:21:28   6           MR. NEUWIRTH:  Well, I am saying I think it's a step

03:21:30   7   towards what you want.

03:21:32   8           THE COURT:  Right.

03:21:32   9           MR. NEUWIRTH:  It does not organize people by who

03:21:34   10  does what relative to whom, but it certainly will get insight

03:21:38   11  into what they do.  So if someone is, you know, analyst

03:21:44   12  marketing department, that will show up if there is such a

03:21:46   13  thing as an analyst and such a thing as a marketing

03:21:50   14  department.

03:21:50   15          MR. MOGIN:  Could I just have that back again?  It

03:21:54   16  doesn't show who relates to whom?

03:21:56   17          MR. NEUWIRTH:  Well, giving titles is not -- giving a

03:22:00   18  list of titles next to a list of names is different -- if I

03:22:04   19  may show this?

03:22:04   20          THE COURT:  Please do.

03:22:04   21          MR. NEUWIRTH:  -- (continuing) is different from a

03:22:06   22  chart like this which organizes people with lines.  That's all

03:22:10   23  I'm saying.

03:22:10   24          MR. MOGIN:  I agree.

03:22:10   25          MR. NEUWIRTH:  It's a list.

03:22:12    1    MR. MOGIN:  It certainly is different.

03:22:12    2    MR. NEUWIRTH:  Yes.

03:22:12    3    THE COURT:  But you're going to have the name, and

03:22:14    4  you're going to have the title, and then you can make your

03:22:18    5  own, basically.

03:22:20    6    MR. GOODWIN:  Well, I don't think the titles really

03:22:22    7  tell us, your Honor, who works for who.

03:22:26    8    MR. NEUWIRTH:  The titles --

03:22:26    9    THE COURT:  And then what they did, and then what

03:22:30   10  they did, because you are going to kind of make your own,

03:22:32   11  which is what people do in discovery anyway, and then they

03:22:34   12  went through and they were able to check who the custodians

03:22:38   13  were, then they were able to circle and say, Well, this looks

03:22:42   14  like somebody who might be important here when they start

03:22:46   15  seeing the emails.

03:22:48   16    Okay.  So were you going to say you were going to do

03:22:52   17  something besides the litigation holds and I so abruptly cut

03:22:56   18  you off?

03:22:58   19    MR. NEUWIRTH:  No, all I said was the extra thing I

03:23:00   20  was going to do -- and you did not cut me off -- is I said we

03:23:02   21  would also give the titles, not just the list of names.

03:23:06   22    THE COURT:  Okay.

03:23:06   23    MR. GOODWIN:  Does someone else have an org chart or

03:23:08   24  job description for GP's personnel, say an auditor or parent

03:23:12   25  company?

03:23:12  1    THE COURT:  Charles, could we do this, though?  This

03:23:16  2  is the first of many meetings.  I think on this one, you ought

03:23:20  3  to get these 400 names as quickly as possible with these

03:23:24  4  titles, and then you are a very organized person here, and see

03:23:30  5  what you can do with the computer with these people and see if

03:23:32  6  we start to get it on this particular issue.

03:23:38  7    You hear us.  I am telling you that yesterday was

03:23:42  8  startling to me on how basic information I think they need in

03:23:54  9  order to, you know, be able to amass this wealth of

03:24:02  10  information here.

03:24:02  11    MR. NEUWIRTH:  I would just reiterate again, your

03:24:04  12  Honor, we don't have -- we are not disputing that principle at

03:24:06  13  all.

03:24:08  14    THE COURT:  Right.

03:24:08  15    MR. NEUWIRTH:  We just want it to be done relative to

03:24:10  16  what's actually happened so far so that the tools that are

03:24:14  17  also available at their disposal can be used as well.

03:24:16  18    MR. FREED:  It will help us.

03:24:18  19    THE COURT:  It will.

03:24:18  20    MR. GOODWIN:  It will be a step in the right

03:24:20  21  direction.

03:24:20  22    MR. NEUWIRTH:  We will give it to you.  We are

03:24:22  23  agreeing.  We haven't said we won't help.

03:24:24  24    MR. FREED:  Good.

03:24:24  25    MR. GOODWIN:  There was one other thing --

03:24:26  1    MR. NEUWIRTH:  We said, Please don't ignore what we

03:24:28  2  have given you as well because that can help you too.

03:24:30  3    MR. GOODWIN:  To come back to one of the points

03:24:32  4  Mr. Neuwirth raised earlier on, what he said, and I'm going to

03:24:36  5  probably get this wrong, but basically that everyone in the

03:24:38  6  company had some involvement with trade associations, so,

03:24:42  7  therefore, plaintiffs' request for that information was

03:24:48  8  extraordinarily burdensome.

03:24:50  9    And this is one where we have really been scratching

03:24:52  10  our heads because you mentioned the phone operator.  I doubt

03:24:56  11  she had any -- I shouldn't be so sexist, he or she --

03:25:00  12    THE COURT:  Right.

03:25:02  13    MR. GOODWIN:  -- didn't have any involvement with a

03:25:04  14  trade association in any meaningful way, and I think the same

03:25:08  15  thing would be true for a receptionist at the front desk, a

03:25:12  16  janitor, or mailroom staff.  I think we can sit here and

03:25:16  17  easily imagine the people who work for GP who have no

03:25:18  18  meaningful involvement with trade associations, so we are

03:25:20  19  scratching our heads as to how this claim that everyone in

03:25:24  20  the --

03:25:26  21    THE COURT:  Do you think it's fair to say, though,

03:25:28  22  when you go to their string cites of trade associations, which

03:25:36  23  you haven't had sufficient time to do, which nobody has had

03:25:40  24  enough time to do, and you start putting all those documents

03:25:44  25  into the platform, you work with your string cites on the

03:25:48  1  trade association, do you think if I invite you back again

03:25:54  2  with Mr. Neuwirth when you've got some specific -- more

03:25:58  3  specific -- or you don't even have to come back, you can pick

03:26:04  4  up the phone or send an email and say, I'm really struggling

03:26:08  5  with this, I don't know -- I can't figure out who the heck

03:26:12  6  these people are, are they in-house, are they lobbyists, are

03:26:16  7  they with the trade association, will you help him out if he

03:26:22  8  has information?

03:26:22  9      MR. NEUWIRTH:  Not only will we help out, but I think

03:26:24  10  -- I think you're right, Chuck, and I'm not saying it was

03:26:26  11  intentional, but you misunderstood what I said or

03:26:30  12  mischaracterized it because what I said was the negative we

03:26:34  13  were being asked to prove, basically when you said, Tell us

03:26:36  14  the name of everybody in the company who participated or had

03:26:40  15  some direct or indirect involvement in trade association,

03:26:44  16  obviously leaving out janitors or secretaries, you would

03:26:48  17  really have to ask thousands of people at the company whether

03:26:52  18  they ever did that.  If the question is, Here is a list of

03:26:54  19  names we gleaned from the documents, can you tell us who these

03:26:58  20  people are, of course we would answer that.

03:27:00  21      THE COURT:  Without a formalistic process.

03:27:06  22      MR. GOODWIN:  I mean, we have these 400 custodians

03:27:08  23  that they put a lit hold on.  Could we find out if any of

03:27:12  24  those have had trade association involvement and one line of

03:27:16  25  what that involvement is?  I mean, this would seem to me to be

03:27:18　1　an email to 400 people saying, Have you had anything to do

03:27:20　2　with these 14 associations, listing the names.  If so, can you

03:27:24　3　tell me what you did?  And it will take them about a week to

03:27:26　4　10 days to produce that.

03:27:28　5　　　　　THE COURT:  Mr. Freed wants to speak.

03:27:30　6　　　　　MR. FREED:  It just shows I don't know the

03:27:32　7　nitty-gritty even of our own request to this extent, to this

03:27:36　8　level of detail; but did we list the particular associations?

03:27:40　9　Because you mentioned five, all of which, of course, are well

03:27:44　10　recognized --

03:27:44　11　　　　　MR. NEUWIRTH:  No, I read our list as much more than

03:27:48　12　five.  I stopped in the middle of the list because we would be

03:27:50　13　here for 15 minutes.

03:27:52　14　　　　　MR. FREED:  No, no, but you recognized those which

03:27:54　15　we're very familiar with.

03:27:56　16　　　　　What I'm saying is, would it help refine the process

03:27:58　17　if we said to you, Here are the six or seven or eight or 10

03:28:00　18　associations, or have we already gotten to that level of

03:28:04　19　detail?

03:28:04　20　　　　　MR. NEUWIRTH:  We know what the associations are.

03:28:04　21　　　　　MR. GOODWIN:  I think we all agree on what the

03:28:06　22　relevant associations are.

03:28:08　23　　　　　MR. NEUWIRTH:  The problem is the breadth of what we

03:28:10　24　are being asked, direct or indirect involvement in trade

03:28:14　25　associations.  And even for 400 people, that's a daunting

03:28:18 1  task.

03:28:20 2          MR. GOODWIN:  Well, and the reason for raising

03:28:20 3  indirect, I mean, obviously, we are not trying to get the mail

03:28:24 4  room staff who carried the FedEx package from the fourth floor

03:28:28 5  to the mail room, but, your know, there are people,

03:28:30 6  presumably, who are putting together reporting information who

03:28:32 7  don't have a direct relationship with a trade association but

03:28:34 8  they are in charge of gathering information that goes into

03:28:36 9  that document.

03:28:40 10         MR. NEUWIRTH:  Look, the breadth of what you are

03:28:42 11 asking us to do is tremendous, and the nature of that question

03:28:46 12 that you just posed means this is more than just an email.

03:28:50 13 It's an interview.  It's a discussion.  And I just think that

03:28:54 14 at this point in the process, you have all these documents

03:29:02 15 that you apparently didn't realize we had produced to you.

03:29:04 16 And what I just brought here was a sample.  I actually have

03:29:10 17 the number of documents that we produced.  We produced -- KPMG

03:29:16 18 said that the documents produced in response to this trade

03:29:20 19 association search string were 9,757 documents constituting

03:29:26 20 380,578 pages.  And if you also include the attachments to

03:29:32 21 those documents, it's 493,933 pages.

03:29:38 22         THE COURT:  All right.  Now, Charles, for you,

03:29:44 23 yesterday's point of -- for you, it's trade associations.

03:29:48 24 Yesterday, it was committees; we were bigger on committees

03:29:52 25 yesterday and who was on what.  So this is interesting also

03:30:00   1   how each of your team is going to take maybe a different

03:30:08   2   priority here too.  And I say that only to show how human this

03:30:16   3   is.

03:30:16   4          MR. MOGIN:  Actually, your Honor, I think it was more

03:30:18   5   of an attempt not to be going over the exact same issues day

03:30:22   6   after day.

03:30:22   7          THE COURT:  Well, but, I mean --

03:30:28   8          MR. MOGIN:  My point is --

03:30:28   9          THE COURT:  -- until we figure out -- all right.  I

03:30:32  10   have a different word.  Okay?  My sequential.  I will give you

03:30:36  11   a preview of my word on the RFPs is instead of saying phases,

03:30:44  12   I am using the word sequential.

03:30:46  13          We are not going to be able to clear this up in a

03:30:50  14   three-week period of time on all 92 of them.  We are not.

03:30:54  15   And, I mean, I think the only thing I can try to figure out is

03:31:02  16   to make some suggestions on how we can get to what is your

03:31:06  17   biggest priority at the moment, what is it that you need,

03:31:12  18   which is what I have been trying to get out of this, because

03:31:20  19   -- and how much -- one of the questions I had this morning is,

03:31:24  20   When do you anticipate roughly the production, and roughly,

03:31:28  21   they're going to tell us in two weeks when they can review

03:31:30  22   each one of these productions because it is so important that

03:31:36  23   they have enough time to do the review, and then we will know

03:31:38  24   when we can go on to the next.

03:31:42  25          MR. NEUWIRTH:  In fairness.

03:31:42   1          THE COURT:  Yes?

03:31:44   2          MR. NEUWIRTH:  A chunk of our documents were produced

03:31:50   3   in 2011.

03:31:52   4          THE COURT:  Okay.

03:31:52   5          MR. NEUWIRTH:  Apparently, they were not uploaded or

03:31:56   6   reviewed at that time.

03:31:58   7          MR. WOZNIAK:  That's not true.

03:32:00   8          MR. NEUWIRTH:  Then I misread your letter.  Whatever

03:32:02   9   they are.

03:32:02   10          MR. WOZNIAK:  I can clarify it, if it helps.

03:32:04   11          THE COURT:  Well, tell us.  Tell us.

03:32:06   12          MR. WOZNIAK:  I can tell you that at the last status

03:32:08   13   hearing, I think what I said was that GP's most recent

03:32:14   14   production had not --

03:32:16   15          MR. NEUWIRTH:  Then I misunderstood.

03:32:18   16          MR. WOZNIAK:  -- was not being subjected to human

03:32:20   17   review at that time.

03:32:20   18          THE COURT:  Right.

03:32:20   19          MR. WOZNIAK:  It is now.  The previous productions

03:32:22   20   have largely, if not completely, been reviewed.  And I know

03:32:26   21   that, for instance, the one document that Chuck passed around

03:32:28   22   earlier I think came from a January production.

03:32:30   23          MR. NEUWIRTH:  Okay.  Good.

03:32:32   24          MR. WOZNIAK:  So the most recent production is

03:32:34   25   underway, earlier productions have largely or completely been

03:32:38    1    reviewed, so we are trying to keep things moving along as we

03:32:42    2    receive the productions.

03:32:42    3        THE COURT: Right. And nobody -- at least nobody

03:32:46    4    from the judiciary is doing anything except saying you're

03:32:50    5    doing a great job.

03:32:52    6        MR. NEUWIRTH: Right. And we're not -- my point was

03:32:54    7    not to say they are not doing a good or bad job. It was not

03:32:58    8    to opine on their job, but it was more to say -- and I clearly

03:33:04    9    misunderstood what was said at the last conference, so I'm

03:33:08   10    happy to hear you're going through them, thank you for the

03:33:08   11    clarification --

03:33:08   12        THE COURT: And then.

03:33:10   13        MR. NEUWIRTH: -- but -- I apologize, your Honor, for

03:33:12   14    cutting you off.

03:33:12   15        THE COURT: Go ahead.

03:33:12   16        MR. NEUWIRTH: I was just going to say that GP, apart

03:33:14   17    from the travel and very limited categories, is done with its

03:33:20   18    production based on what it said it would do so far, and so

03:33:24   19    there is a full set at this point that the plaintiffs have.

03:33:26   20    That's all I was going to say.

03:33:28   21        THE COURT: So I think getting the names, it's not

03:33:32   22    going to be the end-all, but this is iterative. But at least

03:33:34   23    getting the names of the litigation holds hopefully will help

03:33:40   24    put some structure.

03:33:44   25        MR. GOODWIN: As long as we are talking about trade

03:33:46   1   associations, I didn't want -- I mean, it dovetails a bit with

03:33:52   2   the custodian issue, and I just wanted to discuss Mr. Hannan

03:33:58   3   earlier.

03:33:58   4           THE COURT:  Oh, yes.

03:34:00   5           MR. GOODWIN:  But Mr. Hannan is an officer --

03:34:02   6           THE COURT:  Who is he?  I don't know.

03:34:04   7           MR. GOODWIN:  He is the CEO of the company.  He is an

03:34:08   8   officer of the American Forestry & Paper Association, which is

03:34:10   9   a trade group, which has a number of other CEOs of defendant

03:34:14   10  companies and other companies as officers of that

03:34:18   11  organization.  He's quoted making speeches, which, of course,

03:34:22   12  are party admissions for our purposes here on the nature of

03:34:26   13  the industry to the Fibre Box Association, which is another

03:34:30   14  trade association.

03:34:32   15          We have asked nicely.  We have been told he is not --

03:34:36   16  and this is a change -- I mean, this is one of the problems we

03:34:40   17  have is just with changing language here because whereas their

03:34:46   18  document responses talk about primary decisionmakers, GP tells

03:34:50   19  us that Hannan is going to be excluded as a custodian because

03:34:52   20  he is not a key decisionmaker in the day-to-day operation of

03:34:58   21  the containerboard business, which is -- it's a different

03:35:02   22  phrase, your Honor.  It means something different than primary

03:35:04   23  decisionmaker.  I think, by all colors, we have to call the

03:35:08   24  CEO a primary decision- -- I mean, the buck stops there.

03:35:16   25          THE COURT:  Well, but, see, now, in the last day and

03:35:24  1  a half, I'd say we had a discussion.  When the case kind of

03:35:28  2  started, it seemed like the key players were the big boys, and

03:35:36  3  now it seems like sales, marketing, and some of the people

03:35:42  4  down here, as Mr. Mogin loves to say, the Sherpas and -- you

03:35:50  5  know, that they are the Sherpas here.  I am not saying you may

03:35:54  6  not want both, but it seemed to me that we're having some kind

03:36:02  7  of a redefinition of where the main sources might be.  That's

03:36:06  8  all.

03:36:08  9          MR. FREED:  It isn't, your Honor.  It's a

03:36:10  10  redefinition --

03:36:10  11          THE COURT:  Redefinition.

03:36:12  12          MR. FREED:  -- in the sense of we have always, always

03:36:14  13  thought that the people at the top are important.

03:36:16  14          THE COURT:  Okay.

03:36:16  15          MR. FREED:  We don't think that the regional

03:36:18  16  salespeople get together and fix the prices, although I guess

03:36:22  17  that's not without precedent.  What we are saying is what

03:36:24  18  happens with them as they go out and try to implement these

03:36:28  19  price increases or the way they chatter among themselves is

03:36:32  20  also relevant.

03:36:32  21          So it's not that we no longer think the senior people

03:36:36  22  -- nobody could be more relevant -- I mean, it's inconceivable

03:36:38  23  to me that the CEO of a company who is a member of one of the

03:36:42  24  major trade associations who is constantly speaking to the

03:36:46  25  press and organizations where other corporate executives are

03:36:50 1 in attendance wouldn't be a custodian.  I think where the

03:37:00 2 defendant got exercised was we have just been exasperated on

03:37:02 3 this issue.

03:37:02 4         MS. McLEMORE:  Can I explain something?

03:37:04 5         THE COURT:  Yes.  That's why we are so glad you are

03:37:08 6 here.

03:37:08 7         MS. McLEMORE:  GP has numerous different businesses.

03:37:10 8 Containerboard and packaging is one.

03:37:12 9         THE COURT:  Okay.

03:37:14 10         MS. McLEMORE:  Okay?

03:37:14 11         THE COURT:  Approximately how many others?

03:37:18 12         MS. McLEMORE:  Well, in broad categories, we have

03:37:20 13 building products; we have containerboard and packaging; we

03:37:24 14 have chemicals which is underneath one of the other businesses

03:37:28 15 but is really a separate business; and then the cellulose

03:37:36 16 business is part of containerboard and packaging but really

03:37:38 17 has nothing to do with the businesses they're interested in;

03:37:44 18 we have our consumer products, which is things like Dixie, so

03:37:48 19 Dixie cups, Dixie plates and paper towels and toilet tissue

03:37:54 20 for commercial restrooms, those types of things.

03:37:58 21         Mr. Hannan sits over all of those businesses.  Each

03:38:04 22 one of those businesses then has a president.  Those are the

03:38:08 23 people who are running each business.  And they have Christian

03:38:14 24 Fischer's name.  Christian Fischer is the president of the

03:38:18 25 containerboard and packaging business.  And with all due

03:38:20   1   respect, I think we know better who are the people at our

03:38:24   2   company who are involved in these kinds of decisions and who

03:38:32   3   are implementing the kinds of activities that are at issue in

03:38:36   4   the complaint.  And Mr. Hannan simply is not one of them.

03:38:42   5       MR. GOODWIN:  He is in paragraph 54, I believe, of

03:38:42   6   the complaint.

03:38:44   7       MR. NEUWIRTH:  That is a fact.  There are many things

03:38:46   8   in the complaint.  And what the complaint does is reference a

03:38:52   9   speech -- in the entire complaint, there is one reference to I

03:38:58   10   think you quote from a speech, and I think the only thing that

03:39:02   11   you have here on this document is a reference to

03:39:04   12   correspondence between us and a quote from paragraph 54 of the

03:39:10   13   complaint, which I believe is the only place --

03:39:12   14       MR. GOODWIN:  One is a quote, actually, from paper --

03:39:14   15   from Pulp & Paper Magazine.  Is that the FBA's, the Fibre Box

03:39:22   16   Association --

03:39:22   17       MR. NEUWIRTH:  Right, but that's a quote from the

03:39:24   18   complaint.  That was in the complaint.

03:39:24   19       So let me just supplement what Mary said by a couple

03:39:28   20   of points.

03:39:30   21       I think it is very well established law that you

03:39:38   22   don't just get to go to the top officer of a giant company

03:39:44   23   because you want to do it, that you need to establish that

03:39:50   24   that officer has information that is not available from other

03:39:54   25   witnesses who might be more readily available, and Wes

03:40:00  1   Ferdinson (phonetic) to produce, as Ms. McLemore noted,

03:40:06  2   Christian Fischer is the head of the entire business at issue

03:40:06  3   in the case.  He is the person who oversees everything about

03:40:10  4   containerboard and everything about packaging.

03:40:12  5           We would also respectfully point out to your Honor,

03:40:16  6   if I may go back to the boxes, that, in fact, we have produced

03:40:24  7   documents that relate to --

03:40:32  8           THE COURT:  Mr. Hannan.

03:40:32  9           MR. NEUWIRTH:  -- Mr. Hannan because to the extent

03:40:36 10   that there would be anything about him that's relevant, we

03:40:42 11   believed it would have shown up, for example, in the documents

03:40:48 12   of Mr. Fischer --

03:40:48 13           THE COURT:  To Mr. Hannan.

03:40:50 14           MR. NEUWIRTH:  Well, this is not even to Mr. Hannan.

03:40:52 15   It's just a reference to something about Mr. Hannan.

03:40:58 16           But what, again, we would respectfully suggest here

03:41:02 17   is that one option is for the plaintiffs to run a search for

03:41:06 18   Hannan in the documents that we produced.  We think there are

03:41:10 19   a lot of ways that they could skin the cat here.

03:41:12 20           But our point is before jumping to the conclusion

03:41:16 21   that Mr. Hannan should be a custodian or a witness, let's work

03:41:22 22   with what we produced from the custodians that we have made a

03:41:28 23   good-faith effort to identify as the right custodians.  And if

03:41:32 24   it emerges from those documents that there is a basis to talk

03:41:34 25   to Mr. Hannan or to get more from Mr. Hannan, we can discuss

03:41:40   1   that then, but I would put this in the same category as some

03:41:44   2   of the other topics we have looked at.  There really are

03:41:46   3   things we produced that would demonstrate that he is not a

03:41:48   4   necessary witness.  Let's look at those together and then come

03:41:56   5   back and talk if there is more to do.

03:41:58   6               MR. GOODWIN:  There's some questions here.

03:42:00   7               MR. FREED:  If I may, I'd like to say something.  We

03:42:04   8   have known each other professionally, we actually were on the

03:42:06   9   same side of a case, so I have to reference a case we were

03:42:08   10  both involved in.  And I say this -- it doesn't sound

03:42:14   11  respectful -- I think it's a ludicrous argument.

03:42:16   12              In the fructose case where we were on the same side

03:42:20   13  of the case, the businesses were run by Nick Andreas and Terry

03:42:26   14  Wilson.  So that would be the same as saying you have no right

03:42:28   15  to get discovery of Duane Andreas because he is not involved

03:42:32   16  in the day-to-day operations of the business, yet he was a

03:42:38   17  very, very important person.

03:42:40   18              We are not looking for confrontation, we are not

03:42:42   19  looking to tee up arguments for resolution, but if we are at

03:42:46   20  the point now where this is their position, we would

03:42:50   21  respectfully ask for the opportunity to put this to a motion

03:42:54   22  because I think this is so out of bounds in terms of saying

03:42:58   23  counsel said -- he's at the top of every part of the

03:43:02   24  organization, including the part of the organization

03:43:06   25  containerboard and boxes which this case is about, and they

03:43:08  1   report to him.  And if there is a conspiracy at this higher

03:43:12  2   level of executive, the notion that he wouldn't somehow be

03:43:18  3   involved or knowledgeable just -- it runs contrary to sense,

03:43:22  4   law, and experience.

03:43:24  5          MR. MOGIN:  I might also add, your Honor, that if

03:43:28  6   this is illustrative of the process that GP is putting forth

03:43:32  7   and this is their idea of a reasonable basis for adding

03:43:36  8   custodians, this is utterly unworkable.  If ever there is

03:43:42  9   somebody that we have demonstrated a reasonable basis for,

03:43:46  10  it's Mr. Hannan.

03:43:46  11         THE COURT:  Okay.  Yes.  Tell us.  Your turn to

03:43:52  12  speak.

03:43:52  13         MS. McLEMORE:  We told them in a letter he is a

03:43:58  14  custodian.  He has been put on the litigation hold.  He has --

03:44:04  15  we haven't processed his documents and produced them, but he

03:44:08  16  is on the litigation hold.  His documents are going nowhere.

03:44:12  17         THE COURT:  So he's -- there is a preservation hold.

03:44:16  18         MS. McLEMORE:  That's correct.

03:44:18  19         THE COURT:  That was my question.

03:44:18  20         MS. McLEMORE:  That's correct.

03:44:18  21         The one speech that they referenced has been produced

03:44:22  22  because, again, it was in the files of the people that we have

03:44:26  23  identified as the most likely people to have responsive

03:44:30  24  documents.  Mr. Hannan doesn't have a copy of that speech.

03:44:36  25         And we have told them that after they look at the

03:44:40　1　documents, if they have a good-faith basis to say, Please

03:44:44　2　process these documents and produce them, we are willing to do

03:44:50　3　that.  The documents are going nowhere.

03:44:54　4　　　　　　MR. GOODWIN:  How do we know that Mr. Hannan doesn't

03:44:56　5　have a copy of that speech when we haven't looked at his

03:44:58　6　documents?  You said you loaded them up but you didn't search

03:45:00　7　them.

03:45:02　8　　　　　　MS. McLEMORE:  I asked them.

03:45:02　9　　　　　　THE COURT:  Because they knew this was going to come

03:45:04　10　up today.

03:45:06　11　　　　　　MR. GOODWIN:  Right.  And have you admitted -- his

03:45:06　12　documents have already been segregated now and are subject to

03:45:08　13　snapshot or whatever, so his documents can be searched without

03:45:10　14　any inconvenience to Mr. Hannan; is that correct, Counsel?

03:45:14　15　You said his documents have been grabbed --

03:45:16　16　　　　　　THE COURT:  Why are you doing this, Charles?

03:45:18　17　　　　　　MR. GOODWIN:  I'm sorry.  You're right, I am losing

03:45:20　18　my temper.  Pardon me, your Honor.

03:45:22　19　　　　　　THE COURT:  You are setting the tone here.  We are

03:45:24　20　trying to have a discussion.  Okay?

03:45:26　21　　　　　　MR. GOODWIN:  Your Honor is correct, I am losing it.

03:45:28　22　Maybe it would be a good time for a comfort break because I am

03:45:32　23　very angry, your Honor.  I really am.  I apologize.

03:45:36　24　　　　　　THE COURT:  I think this would be a good time for a

03:45:36　25　break.  Let's come back at 4:00 o'clock.

| | | |
|---|---|---|
| 03:45:40 | 1 | MR. FREED:  Thank you, your Honor. |
| 03:45:48 | 2 | THE COURT:  You're going to be out of here, guys, for |
| 03:45:50 | 3 | your plane at 5:00 o'clock. |
| 03:45:52 | 4 | MR. NEUWIRTH:  I actually need to leave at 5:00. |
| 03:45:56 | 5 | THE COURT:  You can leave your boxes here, and they |
| 03:45:58 | 6 | can pick them up. |
| 03:45:58 | 7 | MR. NEUWIRTH:  That is fabulous. |
| 03:46:00 | 8 | THE COURT:  So you don't have to worry about that. |
| 03:46:06 | 9 | (Short break.) |
| 04:07:42 | 10 | MR. NEUWIRTH:  We've tried to listen carefully to |
| 04:07:46 | 11 | your Honor today and the objectives that you've set out which |
| 04:07:50 | 12 | we think are consistent with what we hoped to achieve as well, |
| 04:07:56 | 13 | and -- or I should more politely say what we hope to achieve |
| 04:08:04 | 14 | is what your Honor set out.  And during the break, |
| 04:08:06 | 15 | Ms. McLemore and I spoke, and although we believe that there |
| 04:08:12 | 16 | would be good reasons to maintain the position that we have |
| 04:08:18 | 17 | maintained with respect to Mr. Hannan, in an effort to advance |
| 04:08:24 | 18 | the process, what we'd like to propose, if it would please |
| 04:08:28 | 19 | your Honor, is that if again there is an understanding that |
| 04:08:36 | 20 | this does not automatically mean that Mr. Hannan becomes a |
| 04:08:40 | 21 | witness for deposition or trial testimony and if it would |
| 04:08:46 | 22 | please the court to enter an order to that effect, that our |
| 04:08:52 | 23 | doing this does not mean that and that the regular standards |
| 04:08:56 | 24 | for deposing a person of his position at the company would |
| 04:09:00 | 25 | apply, we'd be prepared to turn over -- to treat him as a |

04:09:06   1   custodian and to produce the documents from his files to the
04:09:10   2   extent they exist.
04:09:16   3           MR. GOODWIN:  I need to confer with my other
04:09:36   4   colleagues.
04:09:38   5           THE COURT:  Yes.
04:09:40   6           MR. MOGIN:  It's consistent with what we have been
04:09:42   7   asking for from us.
04:09:44   8           MR. GOODWIN:  Reserving to what the appropriate
04:09:46   9   standard is to depose a CEO, because I imagine that we won't
04:09:50   10  see eye to eye on that one what the law is there.
04:09:54   11          MR. FREED:  We understand they are reserving their
04:09:56   12  right.  They said it on the record.  We get that.
04:10:00   13          MR. NEUWIRTH:  We would just request, your Honor,
04:10:02   14  again, if it would please your Honor, given that we are in a
04:10:06   15  circumstance where this issue could come up again at a time
04:10:10   16  when your Honor is no longer here.
04:10:14   17          THE COURT:  My demise.
04:10:16   18          MR. NEUWIRTH:  Although we would be happy to support
04:10:18   19  an extension so you could keep working on the case.
04:10:22   20          But to the extent that that possibility exists again,
04:10:26   21  without -- with respect, we would ask, if it please your
04:10:30   22  Honor, to do an -- to have it be a provision of the order we
04:10:36   23  talked about earlier with reserving everybody's rights to take
04:10:40   24  a position that that would be helpful to us so that there
04:10:44   25  wouldn't be any misunderstandings in the future.

04:10:46   1   THE COURT:  So Chris and I will work on some language

04:10:48   2   before we enter it.  We will send it to the both of you.

04:10:52   3   MR. NEUWIRTH:  Thank you.

04:10:52   4   THE COURT:  This probably isn't going to happen until

04:10:54   5   Monday on this particular thing.

04:10:56   6   MR. NEUWIRTH:  Thank you, your Honor.

04:10:56   7   THE COURT:  And it will try to capture both the

04:10:58   8   spirit and why you may want this particular protection or this

04:11:06   9   particular extra language here.

04:11:08  10   MR. NEUWIRTH:  Thank you, your Honor.

04:11:08  11   MR. FREED:  We appreciate the compromise.

04:11:10  12   THE COURT:  I was just going to say, thank you very

04:11:14  13   much.

04:11:14  14   So far, this has been a motionless case.  I mean, do

04:11:20  15   you know that?  I mean, for every penny you're paying, at

04:11:26  16   least you are not paying for any motions and you're also not

04:11:30  17   waiting for the court to rule on motions.  I mean, that's the

04:11:34  18   part that I think is actually quicker and cheaper.

04:11:40  19   MS. McLEMORE:  I don't think you have any clue how

04:11:42  20   much money we have spent so far.

04:11:44  21   THE COURT:  No, but it is -- I mean, with this

04:11:48  22   mammoth amount that's going on that you have done this in a

04:11:52  23   year is phenomenal to me.

04:11:54  24   MS. McLEMORE:  I can only tell you, your Honor, that

04:11:56  25   we have a lot of big cases.  This is only one of them.  This

04:11:58  1  case has cost us more money than any other case, and we are

04:12:04  2  nowhere close to the end of discovery.

04:12:06  3          THE COURT:  That's interesting.  Right.

04:12:08  4          MS. McLEMORE:  So I mean, you just have to

04:12:08  5  understand, with respect to Mr. Hannan, we now have to get his

04:12:14  6  documents to our vendors, load them onto the platform, have

04:12:18  7  all of the processing done, have them reviewed --

04:12:22  8          THE COURT:  You are only doing his that relate to the

04:12:24  9  container --

04:12:26  10         MS. McLEMORE:  Correct.

04:12:26  11         MR. NEUWIRTH:  But we are using --

04:12:28  12         THE COURT:  The same standard.

04:12:28  13         MR. NEUWIRTH:  Whatever we did for any other

04:12:30  14  custodian, we will do for him, which is it's not a simple

04:12:34  15  process --

04:12:34  16         THE COURT:  Right.

04:12:36  17         MR. NEUWIRTH:  -- as Ms. McLemore was pointing out.

04:12:36  18  And I think --

04:12:38  19         THE COURT:  No, this is a huge -- as far as -- I

04:12:44  20  mean, Chris and I, just in the minute we had, I mean -- part

04:12:46  21  of what I am trying to do here is to get information, but it's

04:12:52  22  also to set the tone.  And so what you have just offered has

04:12:56  23  really gone like so far as far as setting the tone and

04:13:00  24  continuing to work together, so thank you.

04:13:04  25         Let's do something simple now.  Okay?  How about word

04:13:12　1　index?  How about that?  Shouldn't that be like simple?

04:13:18　2　　　　　What I am trying to do before you come back in two

04:13:20　3　and a half weeks is I want to see what issues we can take off

04:13:24　4　the table.  So what I am doing on some of these things is I am

04:13:28　5　just asking is there any issue.  So you have given your word

04:13:34　6　index.

04:13:34　7　　　　　MR. NEUWIRTH:  Subject to the constraint we described

04:13:36　8　to the plaintiffs that I think there was one aspect of the

04:13:40　9　information they were looking for which, after many weeks of

04:13:46　10　trying, KPMG advised us --

04:13:52　11　　　　　THE COURT:  They can't do.

04:13:50　12　　　　　MR. NEUWIRTH:  -- it could not do.

04:13:52　13　　　　　THE COURT:  Is that the same as -- no.

04:13:54　14　　　　　MR. MOGIN:  They can't give us the document count.

04:13:58　15　They can just give us the word count.

04:14:00　16　　　　　THE COURT:  Okay.  All right.

04:14:02　17　　　　　MR. FREED:  Is that the Clearwell issue?

04:14:04　18　　　　　THE COURT:  Is that Clearwell?

04:14:06　19　　　　　MR. NEUWIRTH:  It's not a Clearwell issue because

04:14:08　20　this was actually done -- Clearwell was used for the process

04:14:12　21　we described to the court, which was something that might

04:14:16　22　generally be called the early case assessment process, but it

04:14:24　23　was the KPMG platform on which all the documents were uploaded

04:14:28　24　for the review and production, and it was within that context

04:14:30　25　that they faced the constraints.

04:14:32 1   But I can assure you, while I wasn't in the room with
04:14:36 2   them, having seen what happened, I know they were really
04:14:38 3   trying, and that in itself, just the trying was expensive.
04:14:40 4   THE COURT:  Right.
04:14:42 5   MR. MOGIN:  But we still have the issue about the
04:14:44 6   non-hits.
04:14:48 7   THE COURT:  Okay.  So this is how I had to do -- this
04:14:52 8   is like word index for dummies.  So we made -- the first
04:15:02 9   column over here was the word, second is the -- no, this is
04:15:08 10  the hits -- no, the hits are over here.
04:15:10 11  This is the number of documents, right, is in the
04:15:14 12  middle, guys?  Is that what -- where is my -- I will show you.
04:15:22 13  Here.  Okay.  This is the one we were working off of.
04:15:26 14  This is the number of docs.  This is the number of hits.  As
04:15:30 15  you said in your opening, when we are -- you are moving
04:15:38 16  towards developing a plan, an overall plan for phase one
04:15:44 17  before we would go to phase two that at the end of phase one,
04:15:48 18  we were talking about some kind of verification validation.
04:15:56 19  My question that Chris and I came up with on our own,
04:15:58 20  and I haven't gotten any agreement from the plaintiffs on
04:16:02 21  this, but if you added a fourth column to this, which is what
04:16:10 22  Mr. Mogin would like here, so I know he'd like this part, but
04:16:14 23  I am not saying that he agrees with me that this could be the
04:16:18 24  verification, words that are in the document that got no hits,
04:16:26 25  right?

| | | |
|---|---|---|
| 04:16:28 | 1 | MR. CAMPBELL: Right. |
| 04:16:30 | 2 | THE COURT: So it's kind of the null set. |
| 04:16:32 | 3 | MR. NEUWIRTH: So it's doing the same exercise -- |
| 04:16:34 | 4 | THE COURT: Right. |
| 04:16:34 | 5 | MR. NEUWIRTH: -- to the documents that were not hit |
| 04:16:36 | 6 | by the search terms as opposed to the documents that were. |
| 04:16:38 | 7 | THE COURT: Right. So all I am asking you for today |
| 04:16:40 | 8 | is before you come back -- this is something he says he would |
| 04:16:44 | 9 | like done. I am thinking -- because one of your homework |
| 04:16:50 | 10 | assignments for the next is to come back with each of your |
| 04:16:56 | 11 | ideas on verification, I am suggesting would you think about |
| 04:16:58 | 12 | this for the next two weeks, would this be something you could |
| 04:17:04 | 13 | sign on? And they haven't signed on that this would be the |
| 04:17:08 | 14 | verification, but at least I want to know what your thoughts |
| 04:17:10 | 15 | are. |
| 04:17:12 | 16 | MR. NEUWIRTH: Okay. |
| 04:17:12 | 17 | THE COURT: With your Clearwell problem, that |
| 04:17:18 | 18 | wouldn't be a problem with -- |
| 04:17:20 | 19 | MR. NEUWIRTH: Well, we could do to the null set what |
| 04:17:24 | 20 | we did to the hit set. It would just again have two columns |
| 04:17:30 | 21 | rather than three. |
| 04:17:32 | 22 | THE COURT: I see. |
| 04:17:34 | 23 | MR. NEUWIRTH: For us. For the other defendants -- I |
| 04:17:36 | 24 | think IP and GP both ran into the same problem. |
| 04:17:40 | 25 | THE COURT: Okay. |

| | |
|---|---|
| 04:17:40 | 1 |
| 04:17:44 | 2 |
| 04:17:48 | 3 |
| 04:17:52 | 4 |
| 04:17:54 | 5 |
| 04:17:58 | 6 |
| 04:17:58 | 7 |
| 04:18:04 | 8 |
| 04:18:08 | 9 |
| 04:18:20 | 10 |
| 04:18:24 | 11 |
| 04:18:26 | 12 |
| 04:18:26 | 13 |
| 04:18:30 | 14 |
| 04:18:34 | 15 |
| 04:18:40 | 16 |
| 04:18:50 | 17 |
| 04:18:54 | 18 |
| 04:19:00 | 19 |
| 04:19:04 | 20 |
| 04:19:06 | 21 |
| 04:19:08 | 22 |
| 04:19:10 | 23 |
| 04:19:14 | 24 |
| 04:19:18 | 25 |

1  MR. NEUWIRTH:  But I think that the other defendants
2  were able.  So at least if you used that method -- again, I am
3  not opining on whether -- I am just saying if you use that
4  method, you would have, I think, five defendants that would
5  give all three columns and two that would give two, so you
6  would have a lot of information.
7       THE COURT:  Right.
8       Did we discuss -- this is how much the two days are
9  blurring together on me.
10      Have we talked about your backup tapes?
11      MR. NEUWIRTH:  Yes, we did.  We did.
12      THE COURT:  No, what I want to talk --
13      MR. NEUWIRTH:  That was a joke, Madam Court Reporter.
14      THE COURT:  What I want to talk about is if the
15  plaintiffs understand your backup tapes and what -- in fact,
16  if they are indexable is a word I made up, or if they have got
17  searchable -- if they are searchable, if you have an index,
18  and what it consists of.  I'm assuming you did this at the
19  30(b)(6), but I am being a good mediator here, I should know
20  what it is too.
21      So what's the story?  Charles.
22      MR. GOODWIN:  First of all, we haven't had a 30(b)(6)
23  yet, but that's neither here nor there.  I think -- my
24  understanding, or plaintiffs' understanding, really, is that
25  at least officially, GP's backup tapes or backup media is a

04:19:24   1   look back of a relatively short period of time, whether it's

04:19:30   2   three days, a week, or two months is immaterial, so that the

04:19:36   3   backup material or the backups -- the backup, in other words,

04:19:44   4   is for disaster recovery, so if the plant burned -- I guess

04:19:48   5   the office burns down today, you can bring the computers back

04:19:52   6   to, you know, yesterday's data a week from now when you are in

04:19:56   7   temporary offices.

04:19:58   8          And I think we have established that there is no sort

04:20:02   9   of archival backing up.  I think we raised the question of

04:20:10   10  what GP does to preserve the documents it must preserve, and I

04:20:14   11  believe the response at that point was to refer us -- such as

04:20:20   12  contracts and that sort of thing, was to refer us to the

04:20:22   13  document retention policies as their sole description of how

04:20:28   14  that sort of thing was preserved where you didn't need to have

04:20:38   15  some sort of archive.  I assume there are many other types of

04:20:40   16  corporate -- you know, personnel records, things that you have

04:20:42   17  to -- expense records, things that have to go back for IRS

04:20:44   18  purposes.

04:20:46   19         I think one area of dispute we have had is really

04:20:56   20  whether there's been any point in time when GP hasn't followed

04:21:02   21  -- or I should say GP staff hasn't followed the stated policy

04:21:06   22  but has -- for reasons we shouldn't even speculate about, but

04:21:10   23  has set aside or created archival backups for their own

04:21:16   24  purposes -- when I say their own purposes, for the purposes

04:21:18   25  that an employee, thinking he is actually doing his job and

04:21:22   1   thinking it's important perhaps to exceed his job description
04:21:24   2   or sometimes break the stated rules of the job to accomplish
04:21:26   3   the objective of the job, might have decided to set aside
04:21:32   4   tapes.  And I believe we have asked GP to survey the relevant
04:21:38   5   -- at least informally to survey the relevant I.T. personnel
04:21:42   6   to verify that there is none of that sort of, you know,
04:21:46   7   underground archiving of data just because it's a good idea to
04:21:50   8   do that in somebody's estimation.
04:21:52   9        THE COURT:  In a formal -- or like Temple-Inland,
04:21:56   10  they found 77 on somebody's floor.
04:22:00   11        MR. WOZNIAK:  700.
04:22:02   12        THE COURT:  700.  So do you mean it like --
04:22:06   13        MR. GOODWIN:  Yeah, to make sure that hasn't gone on
04:22:10   14  at GP.  I think what Mary has given us is a logical
04:22:14   15  explanation of why that couldn't be so, but that's -- at least
04:22:16   16  to me, that doesn't give me the same comfort as we sent an
04:22:20   17  email to the relevant I.T. staff and asked them all whether
04:22:22   18  they had ever, you know, secured backups, you know, maintained
04:22:28   19  or retained backup tapes other than as provided in the policy
04:22:32   20  and just gotten the negative answer to that question or found
04:22:36   21  out if there was one guy who just thought it was -- if he was
04:22:40   22  really going to do his job the right way, he was really going
04:22:44   23  to save stuff because somebody would want that document down
04:22:48   24  the road and make sure.
04:22:48   25        THE COURT:  Okay.  Is that accurate?  When somebody

04:22:52    1    outside is describing your system, do you think that's --

04:22:58    2            MR. NEUWIRTH:  Well, I think the first part about the
04:23:00    3    nature of the backups that exist is generally accurate.  I
04:23:08    4    think the issue that's been identified that you just heard
04:23:14    5    about was this question of what is the method we should have
04:23:20    6    to go through to prove the negative that there wasn't someone
04:23:24    7    violating company policy and perhaps the law sequestering
04:23:28    8    things away.

04:23:30    9            Now, my understanding of the Temple-Inland situation
04:23:34   10    is that it was an extraordinary situation involving, you know,
04:23:38   11    a particular circumstance with a particular employee that I
04:23:40   12    would suggest is not a predictor of the likelihood that
04:23:46   13    something like that would happen at any other company.

04:23:50   14            And when this issue first came up -- and I say this
04:23:52   15    not to mischaracterize the issue but just to explain why it's
04:23:58   16    so hard for us.  When this issue first came up, the example
04:24:02   17    that Chuck gave was an employee who is worried about a
04:24:08   18    corporate policy to get rid of documents because that employee
04:24:12   19    thinks the documents would be wanted sometime and takes them
04:24:14   20    home and puts them in his garage or her garage.

04:24:16   21            THE COURT:  Yes.

04:24:18   22            MR. NEUWIRTH:  And, you know, again, I can't prove to
04:24:20   23    you -- no one can prove to you that no one at Georgia-Pacific
04:24:24   24    ever did something like that, but the notion that we should
04:24:26   25    have to go and ask every employee of Georgia-Pacific who had

04:24:30  1   access to documents whether they ever did that or who was ever

04:24:36  2   involved in I.T. backup if they ever did that, putting aside

04:24:40  3   how daunting a task it is, it just seems unreasonable in the

04:24:44  4   absence of some prima facie showing that there is a reason to

04:24:48  5   believe something like that happened.

04:24:54  6          MR. GOODWIN:  It seems to me this is, you know, the

04:25:00  7   email era, and really we are talking about I.T. staff, maybe

04:25:06  8   two or three people at a location.  And it may be, you know,

04:25:08  9   well, we have had a bunch of discussions of why this could be,

04:25:14  10  it could just be, We upgraded our tape deck, or whatever you

04:25:16  11  call the dohickey, and you know what?  We just didn't throw

04:25:20  12  out the last set of a cassettes from the prior one and they

04:25:24  13  are sitting back in a room somewhere.  And it's just a matter

04:25:26  14  of emailing people and saying, Do you know of any backup media

04:25:30  15  that have been kept somewhere?

04:25:32  16         And it's easy -- I mean, we have -- in my office, we

04:25:36  17  have like voting buttons on our emails, and if you open the

04:25:38  18  email, it's like sort of the final step in our conflicts

04:25:42  19  check, can we sue and so, and we send an email to all the

04:25:46  20  lawyers, and sometimes people, you know, say, Press that no,

04:25:48  21  you can't sue them button, and you will find out a reason why

04:25:52  22  you can't bring the case you wanted to bring.  And it just

04:25:54  23  seems like an easy enough --

04:25:58  24         THE COURT:  Well, even if it were easy enough, I

04:26:02  25  mean, I think it's a question -- I was asking so much more

04:26:06    1   basic of trying -- in data and fact gathering here.  I was
04:26:12    2   really talking about basic information that I think you're
04:26:18    3   entitled -- that I'm much more concerned about, like we did
04:26:24    4   this morning.  And it isn't fair; you weren't here this
04:26:28    5   morning.  I mean, I thought that was really good to find
04:26:36    6   out -- so let me go to you and say, so your backup system, if
04:26:44    7   that needs to be -- if we need to get to that, because I have
04:26:48    8   been talking all the way through the backup tapes, what you
04:26:52    9   have produced already has been from active data?
04:26:56    10          MR. NEUWIRTH:  It's been from active data, but I
04:26:58    11  should say, as we pointed out in our submissions, there is a
04:27:00    12  lot of material from earlier years that's included in our
04:27:04    13  production.  I don't have the piles to show you, but I can
04:27:06    14  tell you that we --
04:27:10    15          THE COURT:  So your active data does go back?
04:27:12    16          MR. NEUWIRTH:  We produced 23,248 emails from 2004;
04:27:18    17  19,354 from 2005; 10,000 from 2006; 18,000 from 2007; 22,000
04:27:28    18  from 2008; et cetera.  And we have provided all that
04:27:32    19  information to the plaintiffs.
04:27:34    20          And so we understood one of Mr. Mogin's concerns
04:27:36    21  about the process was that it might not capture older
04:27:40    22  material.
04:27:42    23          THE COURT:  Right.
04:27:42    24          MR. NEUWIRTH:  But I believe our process has, and
04:27:46    25  so --

04:27:48    1        THE COURT:  So this may not be an issue.

04:27:48    2        MR. NEUWIRTH:  -- for GP, it may not be an issue,

04:27:50    3   combined with the fact that, as Mr. Goodwin noted, there isn't

04:27:54    4   a lot of old backup material that still exists anyway.

04:27:58    5        MR. GOODWIN:  And I was just trying to prove -- since

04:28:00    6   the backup -- it's not what we would call archival backup

04:28:06    7   where I have on some floppy disks in my attic all those papers

04:28:10    8   I wrote in college.

04:28:14    9        We've got their representation that sort of thing

04:28:16   10   doesn't happen, at least as a matter of policy, and I will

04:28:20   11   have to double-check and confirm whether that policy has been

04:28:24   12   consistent throughout the relevant period.  My recollection is

04:28:26   13   that it has, but I am not looking at those papers right now,

04:28:30   14   so I don't know.

04:28:34   15        You know, and it's a question of whether -- I mean,

04:28:36   16   you know, if the backup tape is, you know, a week before, you

04:28:42   17   know, whatever D-Day was, it's not so interesting to us, at

04:28:46   18   least at this point.  It may change later if there was an

04:28:52   19   opportunity for some spoliation, which we will find out, I

04:28:58   20   know that's a loaded term, but if there is an employee who for

04:29:00   21   some reason is uncomfortable with the contents of these files

04:29:06   22   and decides to get rid of them a lot and, you know, on D-Day,

04:29:10   23   and there is a D-Day minus seven days tape out there, that

04:29:16   24   circumstance is something we'd visit.

04:29:16   25        But I don't think that -- you know, assuming

04:29:20  1  everything was Kosher right now, I don't think we have much

04:29:24  2  interest in what's on the backup media unless there is

04:29:26  3  something from further in the past.  I am just thinking from

04:29:28  4  the way Mr. Wozniak was rustling papers, he might have

04:29:32  5  something to say about --

04:29:34  6         MR. WOZNIAK:  No, I just wanted to verify which

04:29:36  7  document Steve was reading off of on the email counts?

04:29:40  8         MR. NEUWIRTH:  It's my own notes for this meeting.

04:29:42  9  But we previously gave you a letter that had -- there were two

04:29:46  10 different numbers.  Today I only provided one.  We gave you

04:29:50  11 numbers about emails and we gave you emails plus attachments.

04:29:56  12        MR. WOZNIAK:  And just to confirm --

04:29:56  13        MR. NEUWIRTH:  And that was in the letter that we

04:29:58  14 sent you in response to Chuck's letter about the meet and

04:30:02  15 confer.  We sent it to you several weeks ago, and all of these

04:30:06  16 numbers were also in the status report that we gave to the

04:30:10  17 court that you have all had for a couple of weeks.

04:30:12  18        MR. WOZNIAK:  I am not questioning that we haven't

04:30:14  19 seen it.  I just was verifying what the source was.  And I

04:30:16  20 just wanted to confirm, I can look back at this myself,

04:30:20  21 obviously, but are those the numbers from all of GP's

04:30:24  22 productions to date, I assume?

04:30:24  23        MR. NEUWIRTH:  It's the total amount we produced as

04:30:26  24 of the time we gave you the list, as of the time of the last

04:30:32  25 meet and confer that we had in Chicago I think on April 14th

04:30:36  1  with Chuck and Nick.

04:30:38  2      MR. WOZNIAK:  We will go back and make sure that our

04:30:40  3  numbers check out.

04:30:42  4      MR. GOODWIN:  Our analytics are different, but maybe

04:30:44  5  we need to work more on our analytics.

04:30:48  6      MR. WOZNIAK:  I know that we've looked, for instance,

04:30:48  7  at the most recent GP production, which our vendor tells us

04:30:54  8  includes something close to 11,000 emails.  And as you go back

04:30:58  9  in time, there were relatively very few from the early years

04:31:00  10  of the relevant period.

04:31:02  11      So we will look at our numbers again.  I don't want

04:31:04  12  to sort of get into a dispute about this now because I don't

04:31:08  13  want to question the accuracy --

04:31:08  14      MR. NEUWIRTH:  I think the dispute may be -- and if I

04:31:12  15  used the word "produced," I may have misspoke.  What we have

04:31:16  16  always said is, These are the numbers of what was collected

04:31:18  17  from the search terms and then there was the production.  So

04:31:22  18  the absolute production numbers may be lower, and I apologize

04:31:26  19  if I used the word produced because that would have been the

04:31:28  20  wrong word.

04:31:28  21      MR. GOODWIN:  Although that would be if there was

04:31:30  22  some reason that the search terms -- I mean, just speaking

04:31:34  23  from my dark past in doing some statistics, if for some reason

04:31:38  24  the frequency of hits was to diminish as we go back further in

04:31:42  25  time for your Boolean search terms, that's probably something

04:31:48    1    we should talk about because that's kind of weird.

04:31:52    2           MR. NEUWIRTH:  I don't think it's weird at all.  It's

04:31:54    3    not weird.  It reflects the fact that fewer documents exist

04:31:58    4    from many years ago.

04:32:00    5           MR. GOODWIN:  Maybe I didn't speak clearly, but the

04:32:02    6    percentage.  In other words, if 5 percent of the documents

04:32:04    7    today contain FBA for the Fibre Box Association acronym from,

04:32:10    8    you know, 2010, contained FBA, we have 5 percent and 1 percent

04:32:18    9    from the 2004 documents, there is a question of why would, you

04:32:22   10    know, the reference to FBA be so much more common in the

04:32:26   11    recent documents and in the old documents -- and this -- we

04:32:30   12    are really getting into the tall grass here.

04:32:32   13           THE COURT:  Yeah.

04:32:32   14           MR. GOODWIN:  So it's probably better that we not use

04:32:36   15    the magistrate's time --

04:32:38   16           MR. NEUWIRTH:  Well, no, but I think there is a

04:32:38   17    different problem.  I would respectfully say, Chuck, you and I

04:32:42   18    worked together a lot, but I think what you are doing now is

04:32:46   19    like me saying, You know, Saturn and Jupiter might hit each

04:32:50   20    other tomorrow, so let's worry about that.  There is no prima

04:32:52   21    facie basis for any of the things you just said, just like

04:32:56   22    there is no prima facie basis for the reference that both you

04:33:00   23    and Mike made to the spoliation.

04:33:04   24           All that we're saying is when I said at the beginning

04:33:06   25    I want to talk about facts, let's address problems that are

04:33:08  1  rooted in some basis for raising a problem, not speculation

04:33:12  2  about things that might happen when -- what you just talked

04:33:16  3  about is something you can check.

04:33:18  4        MR. GOODWIN:  Well, actually --

04:33:18  5        MR. NEUWIRTH:  And if you check it and you see an

04:33:20  6  issue, come back and talk to us.

04:33:22  7        MR. GOODWIN:  Steve, that's why I flagged the point

04:33:24  8  that our analytics are different from your analytics.  You

04:33:32  9  made a possible verbal correction to your prior statement to

04:33:34  10  the court.  We want to be absolutely one hundred percent our

04:33:38  11  analytics are correct before we use the court's time and your

04:33:42  12  time with them; but if our analytics are telling us something

04:33:46  13  very different from what your analytics are telling you, and

04:33:48  14  if there is a difference in the analytics from the global --

04:33:52  15  whatever you call it, the null set plus the produced set,

04:33:56  16  between the global analytics for the big bucket and the

04:34:00  17  analytics for the small bucket --

04:34:04  18        THE COURT:  So that's something --

04:34:04  19        MR. GOODWIN:  -- that's an interesting question.

04:34:06  20        THE COURT:  But that's something maybe we should

04:34:08  21  write into the process going forward is even --

04:34:14  22        MR. GOODWIN:  Right.

04:34:14  23        THE COURT:  I mean, actually, that might be an

04:34:16  24  interesting thing that I never thought of.

04:34:18  25        MR. NEUWIRTH:  Your Honor, it's interesting, but I

04:34:20   1   can assure you, because I am certain, that Mr. Goodwin doesn't

04:34:24   2   have any of those statistics even in front of him as he is

04:34:30   3   speculating about the prospect --

04:34:30   4         MR. GOODWIN:  I defer to Mr. Wozniak --

04:34:32   5         MR. WOZNIAK:  I mean, I can say with a fair degree of

04:34:36   6   confidence that based on the metadata that was provided with

04:34:40   7   the most recent Georgia-Pacific production, if you go back in

04:34:42   8   time, the number of emails that were produced to us is

04:34:44   9   dramatically lower for the earlier portions of the class

04:34:48   10   period.  So I am talking a big disparity.  In fact, it goes

04:34:52   11   down -- 2008 and 2007 are surprisingly very similar in the

04:34:56   12   counts.  You go back to 2006, it drops way off.  And then 2005

04:35:00   13   is down about as low as 2006 and not much more of a drop-off

04:35:04   14   to 2004, but it's noticeable.  I can pass this around.

04:35:08   15         MR. NEUWIRTH:  It's consistent with my numbers.  Our

04:35:10   16   number for 2010 is 64,000.  Our number for 2006 is 10,000.

04:35:16   17         MR. WOZNIAK:  Right.  And I am talking about a number

04:35:18   18   here of over 3,000 for 2010 and down to fewer than 300 for

04:35:24   19   2004.

04:35:28   20         THE COURT:  Well, that's something -- again, don't

04:35:32   21   you think when you start the review, when you really get into

04:35:36   22   the review, you're going to have a little bit more concrete to

04:35:42   23   discuss.

04:35:42   24         MR. WOZNIAK:  We will certainly build on this very

04:35:44   25   sort of -- you know, this is sort of aggregate data.  It only

04:35:48  1    tells you what it tells you.

04:35:50  2            THE COURT:  Yes.

04:35:50  3            MR. WOZNIAK:  We will certainly have much more to say

04:35:52  4    once we have substantially completed the substantive review of

04:35:56  5    the documents.

04:35:56  6            THE COURT:  Right.

04:35:56  7            MR. WOZNIAK:  But I think this is rather telling in

04:35:58  8    terms of the concerns we have about active versus inactive

04:36:04  9    data.

04:36:04  10           THE COURT:  Right.

04:36:04  11           MR. MOGIN:  As well as the difference between search

04:36:08  12   terms, the hits and what's getting produced to us.

04:36:12  13           THE COURT:  Well, again, I think you guys are doing

04:36:16  14   great, but that's -- what do I know?  I am a criminal defense

04:36:22  15   lawyer who never got any discovery.  I take that.  I

04:36:26  16   understand that.  I had to go do my own investigation.

04:36:28  17           Okay.  So do you want to talk about -- have you

04:36:40  18   reached -- because if you have reached, I don't want to go

04:36:42  19   there.  Have you reached an accommodation on the 30(b)(6), or

04:36:46  20   is that something that we need to work out?

04:36:50  21           MR. NEUWIRTH:  We, I have to say, have been confused

04:36:54  22   because we told the plaintiffs I don't know if it was months

04:37:02  23   or at least many weeks ago that we were prepared to do a

04:37:06  24   30(b)(6) deposition notwithstanding --

04:37:10  25           THE COURT:  All your letters.

04:37:10 1    MR. NEUWIRTH:  Well, notwithstanding the fact that we

04:37:14 2    believe written responses are going to be more helpful on many

04:37:18 3    of the topics, but for whatever reason, the plaintiffs have

04:37:20 4    not told us they want to take the deposition, notwithstanding

04:37:24 5    they took all the others.

04:37:24 6    MR. GOODWIN:  Well, your Honor, if you look at tab

04:37:26 7    A-8 in Mr. Neuwirth's rather helpful binder, and at the back,

04:37:30 8    this is a letter from Mr. Greenwold (phonetic) to me, and I am

04:37:36 9    not proposing that we work out all the disputes here, but in

04:37:40 10   that letter, you will find from pages 2 forward --

04:37:46 11   THE COURT:  A-8?

04:37:48 12   MR. GOODWIN:  A-8.

04:37:54 13   THE COURT:  A-8.  Here it is.

04:37:58 14   MR. GOODWIN:  And starting on the third page of the

04:38:00 15   letter and proceeding through the eighth page of the letter,

04:38:04 16   there's sort of a very casual -- I was really trying to put

04:38:08 17   things in practical terms when I devised this outline of sort

04:38:12 18   of discussionary (sic) as it were then important.  And the

04:38:20 19   crossed-through stuff, it's a tongue twister there, is the

04:38:24 20   stuff that GP objected to for one reason or another to having

04:38:28 21   discussed the 30(b)(6) deposition, and that's sort of where

04:38:36 22   our discussions broke down on the 30(b)(6) route.  And maybe

04:38:40 23   it's -- some of these things GP was urging were outside the

04:38:44 24   scope of the notices that had been promulgated, we're

04:38:48 25   promulgating a new notice, but we want to take hopefully one

04:38:52  1  30(b)(6) deposition at least relating to discovery and

04:38:56  2  documents and the sort of mundane stuff of who works for whom

04:39:00  3  and who went to what meeting kind of thing.

04:39:06  4      You know, so that's -- and it got dragged into the

04:39:08  5  more complex disputes, and some of these topics, I suppose in

04:39:14  6  fairness to Mr. Neuwirth, you know, are matters that are best

04:39:18  7  handled with an interrogatory, or maybe we should devise a

04:39:24  8  rifle shot document request.  Some of these topics go to the

04:39:30  9  kind of organizational things that we all seem to be talking

04:39:34  10  about here to no end and I gather are being talked about in

04:39:38  11  the other three -- pardon me, other two meet and confers.

04:39:42  12      You know, we appreciate they have offered a live

04:39:44  13  witness on certain of the topics.  We have offered -- I think

04:39:50  14  it would probably be most efficient for us to revise our

04:39:54  15  30(b)(6) notice.  I guess we have to -- and perhaps coordinate

04:39:58  16  some with Mr. Neuwirth and his client to make sure that --

04:40:04  17  because we are trying to give him these are the topics we want

04:40:06  18  information on.  You know, we really -- we are assuming we can

04:40:10  19  have some verification of the veracity of the responses.  We

04:40:14  20  don't care whether these come from a request for admission or

04:40:20  21  30(b)(6) deposition.  We just want to get the information so

04:40:24  22  we can put on our case and, you know, win or lose or draw.

04:40:28  23      MR. NEUWIRTH:  So, Judge Nolan, I think you can tell

04:40:30  24  from looking at this that according to the list -- this is the

04:40:36  25  list that's here is the list, as it says in our letter, this

04:40:40   1    list from pages 2 through 4 -- actually, it goes on, 2

04:40:48   2    through 8, there are about a hundred topics here for this

04:40:52   3    30(b)(6) deposition.

04:40:58   4        And you know -- I'm sure you know -- let me withdraw

04:41:02   5    that comment. I am familiar with the fact that there is a lot

04:41:08   6    of case law and subparts and everything else in discovery, but

04:41:12   7    you can tell just from looking at this, we have about a

04:41:14   8    hundred topics here. And if you look at the number that have

04:41:16   9    been identified as ones that we either considered to be beyond

04:41:22  10    the scope of the notice or, as in the case of questions about

04:41:26  11    the document hold seeking privileged information, it's really

04:41:32  12    not that many relative to the size of the whole list.

04:41:34  13        So if the plan at this point -- and as you know, this

04:41:40  14    is from April 5th, 2012, and I don't believe there's been

04:41:44  15    communication back since then. But if Mr. Goodwin -- and I

04:41:50  16    said I don't think because I may not have been involved in

04:41:52  17    some communication, but if Mr. Goodwin's proposal is taking

04:41:56  18    account of all we've discussed today and everything here they

04:41:58  19    want to promulgate a revised notice, we can look at that. And

04:42:02  20    we are happy to have a deposition. I just think we need

04:42:06  21    reasonable parameters.

04:42:08  22        THE COURT: And hopefully it would be narrower.

04:42:08  23        MR. NEUWIRTH: I would hope so.

04:42:10  24        THE COURT: See, maybe what I am really saying is,

04:42:14  25    you know, it's like the chicken and the egg with all this

| | | |
|---|---|---|
| 04:42:16 | 1 | stuff.  Is it better to do it first, or, actually, would it |
| 04:42:22 | 2 | make more sense when you've got some documents and you can |
| 04:42:24 | 3 | actually talk to somebody about some of the documents.  So we |
| 04:42:28 | 4 | are all going to learn something from this.  This might be a |
| 04:42:30 | 5 | better time for the next case to wait a little bit more. |
| 04:42:36 | 6 | So I am glad to hear you're open to it, you're |
| 04:42:38 | 7 | reserving any specific objections you've got, but you're |
| 04:42:42 | 8 | willing to get the person together, and you will try to do |
| 04:42:48 | 9 | something that can be done in one day. |
| 04:42:50 | 10 | MR. GOODWIN:  And it's eight topics.  This was my |
| 04:42:54 | 11 | attempt to actually try and literally give people -- these are |
| 04:42:58 | 12 | the questions I want to ask you at a 30(b)(6) deposition -- |
| 04:43:00 | 13 | THE COURT:  Good. |
| 04:43:02 | 14 | MR. GOODWIN:  -- so that you won't be surprised when |
| 04:43:04 | 15 | I say, Well, do your personnel use Outlook?  Do they keep |
| 04:43:08 | 16 | contacts in Outlook?  Is there a group contact or is it by |
| 04:43:10 | 17 | individual? |
| 04:43:10 | 18 | THE COURT:  Good. |
| 04:43:12 | 19 | MR. GOODWIN:  The kind of things you would rattle |
| 04:43:14 | 20 | off, it's like a 30-second examination, so that -- the problem |
| 04:43:18 | 21 | with 30(b)(6) depositions, as I am sure your Honor is aware, |
| 04:43:22 | 22 | is you go in and one side inevitably thinks you're asking |
| 04:43:26 | 23 | questions out of bounds of the notice and the other side |
| 04:43:28 | 24 | thinks you're ignoring the notice and you want to take a day's |
| 04:43:32 | 25 | deposition and then you get motions practice.  Let's avoid |

04:43:36    1    that.  I just want my answers.

04:43:38    2            THE COURT:  Good.  That's a nice practical approach.

04:43:40    3    That's good.

04:43:40    4            MR. GOODWIN:  And I was thinking, you know, we were

04:43:44    5    trying to avoid a deep dive.  I just want to pick up something

04:43:48    6    I said in the morning to avoid a deep dive into the document

04:43:52    7    requests here, and I am wondering whether it isn't worth --

04:43:58    8    because some of Mr. Neuwirth's representations here seem very

04:44:00    9    different from what was written in the --

04:44:06   10            THE COURT:  In the answers a year ago.

04:44:08   11            MR. GOODWIN:  -- in the answers.

04:44:08   12            THE COURT:  In the answers a year ago, and they are

04:44:10   13    because of what we know a year later.

04:44:14   14            MR. GOODWIN:  And I am just picking an example.

04:44:16   15            THE COURT:  Sure.

04:44:16   16            MR. GOODWIN:  I don't want to fight over the example,

04:44:18   17    but we had like a list of I think it's competitive conditions,

04:44:24   18    and we talked about market shares, consolidation, production,

04:44:26   19    capacity -- maybe I will just show the reporter this.  But if

04:44:34   20    you look at request 45, and I'm just -- but we had a list of

04:44:38   21    12 things.  And GP in its responses came back and said, We're

04:44:44   22    talking to you about pricing, production, and capacity, and

04:44:46   23    they used that phrase throughout their answers.

04:44:48   24            Now, maybe it is that they have produced all sorts of

04:44:52   25    stuff about market shares and consolidation and fixed or

04:44:58    1  variable costs or inventories or entry and exit conditions and

04:45:02    2  all these other economic factors that go into the market.

04:45:06    3  Maybe that's all in their production today, in which case, my

04:45:10    4  mind becomes easier if I get a revised answer.  Or maybe they

04:45:16    5  haven't and maybe we have to have a serious conversation about

04:45:20    6  inventory.

04:45:20    7        MR. NEUWIRTH:  With all respect, again, I think the

04:45:24    8  problem we are having here is the problem of speculation

04:45:28    9  versus reality.

04:45:30   10        MR. GOODWIN:  Well --

04:45:30   11        MR. NEUWIRTH:  Let me explain why I am saying that.

04:45:32   12  It is clearly a reality that we gave the answer that we did to

04:45:36   13  your document request.  However, you are imposing an

04:45:42   14  interpretation on what we said that I think understates what

04:45:46   15  we said.  The category -- we got 92 requests that I think you

04:45:52   16  will have to acknowledge were tremendously broad and put

04:45:56   17  almost no constraints on what we'd have to look at.

04:46:00   18        So in responding to your request, we did what we

04:46:06   19  believed federal courts throughout the country have said is

04:46:08   20  the right approach, which is you can't just -- if you're going

04:46:12   21  to object to a request, you should make a good-faith effort to

04:46:16   22  produce what you do think is responsive to that request within

04:46:22   23  the scope of that request.

04:46:24   24        So what we tried to do is tell you, Look, we think

04:46:26   25  what you have asked for here is grossly overbroad, but here is

04:46:30    1    what we are going to give you.  And as I believe I

04:46:34    2    demonstrated earlier today, the documents that we knew we

04:46:36    3    would be producing within those categories we believe

04:46:40    4    legitimately capture anything you could reasonably want to get

04:46:44    5    about these topics within the request.

04:46:46    6          And so, again, it is correct that these words from

04:46:52    7    your perspective without looking at the documents may be too

04:46:58    8    narrow, but I think if you look at the documents, you will see

04:47:00    9    that we really did make a good-faith effort to define things

04:47:04   10    in a way based on what we know about the business to really

04:47:06   11    get you what you're supposed to get.

04:47:14   12          MR. GOODWIN:  This is --

04:47:16   13          THE COURT:  I feel like you have been locked in a

04:47:18   14    room, is my interpretation.  I feel like you have been like

04:47:22   15    locked in a room with all of this, and this is the first time

04:47:26   16    you have had like a real chance to be able to talk about, you

04:47:32   17    know, being locked in a room focused on one thing.

04:47:36   18          You did miss the last day and a half.  I am exerting

04:47:42   19    my authority as the queen here that we are not really going

04:47:46   20    into requests to produce right at the moment until I figure

04:47:54   21    out -- until I figure out some kind of a -- it's going to be

04:48:00   22    on your homework for the next status, what to do about the --

04:48:04   23    what are your specific suggestions for getting us out of this

04:48:10   24    quagmire.  And Chris and I are trying to figure some ways out,

04:48:16   25    whether it is asking you to prioritize what you need at this

04:48:22  1  point, whether it is rephrasing, whether it is because I don't

04:48:28  2  know what to do about these things.

04:48:32  3      So you make some good points on maybe it's not

04:48:36  4  answered exactly, but I don't want you to go back to the

04:48:38  5  drawing board and start trying to draft it until we have some

04:48:44  6  kind of overall plan here.

04:48:46  7      MR. GOODWIN:  My purpose in raising this really was

04:48:48  8  to try and start a dialog between the parties that seriously

04:48:52  9  addresses the RFPs and the answers.  I'll avoid reference to

04:48:58  10  my favorite example of language.  They are just terms of

04:49:02  11  phrase and a little differences in phrasing.  You know, maybe

04:49:06  12  it's the fault of having spent too much time in liberal arts

04:49:10  13  college.

04:49:10  14      THE COURT:  Maybe.  Maybe.

04:49:10  15      MR. GOODWIN:  But I take the words they have given us

04:49:14  16  seriously, and I want to know -- they said they are going to

04:49:18  17  produce X in response to request A, and did they produce X or

04:49:24  18  did they produce X prime or did they produce Y, and I want to

04:49:26  19  really have a conversation with them about that.

04:49:30  20      THE COURT:  That's why I am saying I think you were

04:49:30  21  locked in a room and you want to talk to somebody about all

04:49:34  22  you know about this case.  I think you know a ton about

04:49:38  23  Georgia-Pacific.

04:49:40  24      You should hire this guy.  I think he knows all kinds

04:49:42  25  of stuff.

| | | |
|---|---|---|
| 04:49:42 | 1 | MR. GOODWIN:  I have a conflict, I hear. |
| 04:49:44 | 2 | THE COURT:  He knows all kinds of stuff here. |
| 04:49:46 | 3 | Okay.  Do we have any other topics?  Let's see here. |
| 04:49:56 | 4 | Do you have anything else that you want to specifically -- |
| 04:49:58 | 5 | MR. WOZNIAK:  You wanted to ask some questions I |
| 04:49:58 | 6 | think about -- |
| 04:49:58 | 7 | THE COURT:  Oh, about plaintiffs. |
| 04:50:00 | 8 | MR. WOZNIAK:  I know we covered it a little bit |
| 04:50:02 | 9 | yesterday. |
| 04:50:06 | 10 | THE COURT:  You wanted to discuss the plaintiffs' |
| 04:50:08 | 11 | discovery and how they're doing it, because they are using the |
| 04:50:10 | 12 | CBAA both on your -- I found this out yesterday.  Their |
| 04:50:16 | 13 | analytics, they are using it on their own, and you're using -- |
| 04:50:20 | 14 | MR. WOZNIAK:  And on the defendants, and that was one |
| 04:50:22 | 15 | -- just a point of clarification of the status last week.  I |
| 04:50:24 | 16 | think I was confused by one of your questions, and I answered |
| 04:50:26 | 17 | it in a way -- my interpretation was I thought you were asking |
| 04:50:28 | 18 | where we stood in terms of loading defendants' productions up |
| 04:50:34 | 19 | for content-based analytics. |
| 04:50:36 | 20 | THE COURT:  Right. |
| 04:50:36 | 21 | MR. WOZNIAK:  And that process is still -- well, it's |
| 04:50:38 | 22 | further along than it was last week, but that's what created |
| 04:50:40 | 23 | some of the confusion with Steve thinking that we hadn't been |
| 04:50:44 | 24 | as far along in reviewing GP's documents.  We have for certain |
| 04:50:48 | 25 | of the defendants' productions already batched those up, and |

04:50:50  1  we have been reviewing those with live human reviewers

04:50:56  2  simultaneously.

04:50:56  3  At any rate, that's just a point of clarification.

04:50:58  4  THE COURT:  Is there anything specific you're waiting

04:51:00  5  for that you might need right now in order for you to --

04:51:08  6  MR. NEUWIRTH:  Well, look, I want to be fair.  It is

04:51:12  7  inherent, as you know, in this type of case that there isn't

04:51:18  8  necessarily going to be proportionality between what the

04:51:22  9  defendants have to do and what the plaintiffs have to do.

04:51:22  10  THE COURT:  Right.

04:51:24  11  MR. NEUWIRTH:  However, you know, there are certain

04:51:32  12  basic things that I think the defendants are entitled to, and

04:51:38  13  that is at least the same level of commitment to preservation

04:51:50  14  production and that is being insisted upon from the

04:51:52  15  defendants.  And so the two-minute version of the answer to

04:52:00  16  your question is that in February of this year, the defendants

04:52:08  17  asked the plaintiffs as the plaintiffs had asked the

04:52:12  18  defendants to provide information about the steps that each

04:52:16  19  named plaintiff had taken to identify, collect, and produce

04:52:22  20  responsive ESI.  And about a week later, the plaintiffs

04:52:30  21  responded and said the following:  For ESI, relevant files

04:52:32  22  were imaged by information technology specialists and sent

04:52:36  23  initially to plaintiffs' ESI vendor for processing and

04:52:40  24  deduplication pursuant to the stipulated agreement regarding

04:52:46  25  electronically-stored information and other tangible items.

04:52:50   1           Having received that representation and also with our

04:52:54   2   understanding that the named plaintiff Chandler had made its

04:53:02   3   production of documents, Georgia-Pacific took a 30(b)(6)

04:53:10   4   deposition of plaintiff Chandler in mid April, and the witness

04:53:18   5   at that deposition testified that prior to that month, the

04:53:24   6   only email collection that had ever been undertaken was for

04:53:28   7   this witness to go through his own email and print out

04:53:32   8   whatever emails he thought had to do with the purchase of

04:53:36   9   containerboard.  And he testified that the ESI of Chandler

04:53:44   10  hadn't even been collected until March of 2012, which was a

04:53:48   11  month after the letter where the plaintiffs had said they

04:53:52   12  already collected the ESI.

04:53:56   13          And so we sent a letter after the deposition asking

04:54:00   14  that Chandler produce its emails and other ESI.  And a few

04:54:08   15  days later, this is now May 4th, the plaintiff sent a letter

04:54:14   16  that said that, in fact, notwithstanding what had been said in

04:54:18   17  their letter of February, ESI from only three of the eight

04:54:22   18  named plaintiffs had ever been collected and sent to the

04:54:26   19  plaintiffs' ESI vendor by the end of March 2012 and that

04:54:32   20  Chandler, the party that we had deposed, had not been one of

04:54:36   21  those three.

04:54:42   22          And the May 4th letter included a promise -- not a

04:54:48   23  promise, but a statement by the plaintiffs that, quote, they

04:54:50   24  expect to make an ESI production within the next several

04:54:54   25  weeks.  So several, I guess, is not a specific number, but

04:55:00　1　it's now the end of May, and no ESI, no further ESI, to our

04:55:08　2　understanding, has been produced by the plaintiffs.

04:55:10　3　　　　Now, I don't want to overstate or understate this.  I

04:55:14　4　am really trying not to be shrill about this.  Just to make

04:55:18　5　the observation that I just think there is a certain irony

04:55:26　6　associated with the fact that in the face of all the

04:55:28　7　defendants have done, we are being highly criticized for not

04:55:32　8　having done enough, and it's a much simpler task that the

04:55:38　9　plaintiffs have to produce their ESI.  They don't seem to be

04:55:42　10　doing the sort of fundamental things that one would expect.

04:55:44　11　And this has implications for us because depending on what ESI

04:55:48　12　now gets produced, we would ask to be able to reopen the

04:55:52　13　30(b)(6) deposition to ask questions about any new documents

04:56:00　14　that seem to merit it.  And, again, we are not saying we have

04:56:02　15　to do it.  We preserved our right to do that.

04:56:06　16　　　　So, again, I want to be clear.  I don't want to

04:56:08　17　overstate this, but we thought it was important in this

04:56:10　18　context to bring to your Honor's attention.

04:56:14　19　　　　MR. WOZNIAK:  Sure.

04:56:14　20　　　　THE COURT:  I think this is a very fair point because

04:56:18　21　up until the last two years, most plaintiffs really didn't

04:56:22　22　have ESI, come along pension.  I mean, this is -- whether it's

04:56:30　23　a small amount or not, the preservation is an issue, I mean,

04:56:38　24　as you know.  You represent plaintiffs.

04:56:40　25　　　　So I don't know whether they're sitting around dying

04:56:44   1   to review it, but I think there should be some dialog on

04:56:48   2   what's going on with it.  And we will have a report -- that

04:56:52   3   will be -- this is on the homework list too.  I mean, can you

04:56:56   4   tell us today, Mr. Wozniak, where you are?

04:57:00   5        MR. WOZNIAK:  Sure.  And, Steve, there is no dispute.

04:57:02   6   He raises some fair points and good questions.  I am happy to

04:57:06   7   answer them to the best of my ability.

04:57:08   8        It is true that a representation was made in that

04:57:12   9   February letter that Mr. Neuwirth referred to that all ESI had

04:57:16   10  been imaged.  That was, in fact, a -- I guess a misstatement,

04:57:20   11  for lack of a better term.  It's absolutely true that all ESI

04:57:26   12  was preserved from the outset.  I was not personally involved

04:57:28   13  in all of those efforts, but I can tell you that for the three

04:57:32   14  -- what we have referred to as the three big ESI plaintiffs,

04:57:36   15  Mighty Pac, Hadco, and Ferraro (phonetic), that ESI was all

04:57:42   16  collected I believe it's fair to say in a forensically sound

04:57:48   17  manner, it was ingested into a platform by our ESI vendor, and

04:57:52   18  some analytics were applied to that ESI as early as I think

04:57:56   19  late 2011 and into early 2012.  That process was then put on

04:58:02   20  hold pending the outcome of the evidentiary hearings, at which

04:58:06   21  time --

04:58:06   22        THE COURT:  Right.

04:58:08   23        MR. WOZNIAK:  -- we talked a little bit about this

04:58:10   24  yesterday, we made a decision, are we going to proceed --

04:58:12   25        THE COURT:  Reviewing or producing --

04:58:14    1        MR. WOZNIAK:  Well, doing the analytics or maybe use

04:58:16    2    some kind of Boolean search term, which, in all honesty, with

04:58:22    3    all our criticisms of Boolean search terms, there are some

04:58:22    4    situations where they arguably work well when you are looking

04:58:26    5    for a discrete sort of set of documents and you know what

04:58:28    6    you're looking for.  I think arguments can be made that

04:58:30    7    Boolean search terms are fine, and we have an idea of what we

04:58:34    8    are looking for.

04:58:34    9        So we weighed whether or not to sort of step back and

04:58:38   10    use a Boolean approach or some quasi-Boolean approach.  We

04:58:44   11    decided to move forward with the analytics approach.  I was

04:58:48   12    hoping, as I stated yesterday, that by now, we would have at

04:58:50   13    least commenced our ESI production.  I can tell you that I am

04:58:54   14    continually in contact with our vendor.  Some of their efforts

04:58:58   15    have been slowed somewhat by the fact that they have been

04:59:02   16    involved in some of these status hearings and meet and

04:59:08   17    confers, but I can tell you that we are starting to get

04:59:10   18    results which I hope to turn around into a production within

04:59:14   19    the next couple of weeks.  I can say -- you know, I hesitate

04:59:18   20    to put a firm date on it, but I really am hopeful that as soon

04:59:22   21    as next week, we can start producing the electronic

04:59:26   22    information.

04:59:26   23        Now, as to the collection, for reasons that I am not

04:59:32   24    entirely certain of, for the other non-big ESI plaintiffs, a

04:59:38   25    forensic collection was not performed at the same time as the

04:59:42   1   other three.  All of that data was preserved.  In light of

04:59:48   2   some of the testimony that came out from our own and what we

04:59:50   3   learned from our own expert, Mr. Hannan, about the importance

04:59:58   4   of forensically-sound collection, we decided to go back and I

05:00:00   5   think go above and beyond what is necessary to collect data.

05:00:02   6   I think we have collected way too much, we are going to find

05:00:06   7   out, but we did that for Chandler, we did that for our other

05:00:10   8   three named plaintiffs in light of some of what Mr. Hanner

05:00:14   9   testified to at the first evidentiary hearing.

05:00:16   10          So all of that ESI has been ingested into -- or at

05:00:20   11   least I believe -- yes, I believe it's fair to say that all

05:00:24   12   the ESI that's been forensically collected has been ingested

05:00:28   13   into our review platform, it's been -- or into our vendor's

05:00:32   14   platform for analytics, and we are starting to see those

05:00:36   15   results, and we hope to be producing that ESI in very short

05:00:40   16   order.  There are a few main plaintiffs who have such small

05:00:46   17   amounts of ESI that we are going to review that in a linear

05:00:50   18   fashion.

05:00:52   19          THE COURT:  Do you have litigation holds on each of

05:00:54   20   yours --

05:00:56   21          MR. WOZNIAK:  Absolutely.

05:00:56   22          THE COURT:  -- and are you willing to give them the

05:00:58   23   names of the people --

05:00:58   24          MR. WOZNIAK:  We already covered that earlier.  I

05:01:02   25   don't think that's going to be a problem.

05:01:02  1      THE COURT:  I missed that one.  That's good.

05:01:06  2      MR. WOZNIAK:  I hope that answers all of

05:01:08  3  Mr. Neuwirth's concerns.  I am happy to discuss, you know, any

05:01:10  4  of these issues in further detail.

05:01:12  5      THE COURT:  See, the rest of the folks are still knee

05:01:16  6  deep into producing.  I mean, maybe Mr. Neuwirth is actually

05:01:20  7  looking for something to do now that he has produced all this

05:01:28  8  material, he needs to like start investigating these class

05:01:32  9  members here.

05:01:34  10      MR. NEUWIRTH:  We did take the deposition because we

05:01:36  11  thought it was important.

05:01:38  12      THE COURT:  You did.

05:01:38  13      MR. NEUWIRTH:  As we have said from day one, we

05:01:40  14  really would like to get to the merits.

05:01:42  15      THE COURT:  I know.

05:01:42  16      MR. NEUWIRTH:  And our main concern was --

05:01:44  17      THE COURT:  I am teasing.

05:01:46  18      MR. NEUWIRTH:  I know you were, but our main concern

05:01:48  19  was just that having taken this deposition and learned, as we

05:01:54  20  have all agreed, about what happened, we just wanted to

05:01:56  21  preserve our right to be able to reopen that.

05:02:00  22      THE COURT:  Well, here is the advantage of having our

05:02:04  23  courtroom -- I mean, everything is on the record here, so

05:02:06  24  everything is really preserved here.

05:02:08  25      Yes?

05:02:08  1      MR. WOZNIAK:  Only one further point in response --

05:02:10  2      THE COURT:  Good.  So you are in charge.  I think you

05:02:12  3  said that -- I mean, they kind of described their team

05:02:16  4  yesterday, and Mr. Wozniak is the plaintiffs' --

05:02:20  5      MR. NEUWIRTH:  I understand.

05:02:20  6      MR. WOZNIAK:  For better or worse, I am the point

05:02:22  7  person on plaintiff ESI.

05:02:26  8      Just a short response to Mr. Neuwirth's suggestion

05:02:28  9  about the deposition possibly having to be reopened for

05:02:32  10  Chandler.  We made very clear, and the correspondence will

05:02:36  11  confirm this, that Chandler had not produced ESI at the time

05:02:40  12  of the deposition, and defendants chose to move forward with

05:02:44  13  the deposition notwithstanding.  We believe that any ESI -- as

05:02:48  14  I made clear yesterday, or tried to make clear, any ESI that

05:02:52  15  is produced will be duplicative and cumulative of what's

05:02:54  16  already been produced, so I am confident that no issue will

05:02:58  17  arise in terms of the need for further testimony, but we will

05:03:00  18  cross that bridge when we get to it.

05:03:02  19      THE COURT:  Good.  Well, I think it's the bewitching

05:03:06  20  hour.  So Chris and I are going to work next week.  We are

05:03:10  21  scheduled to reconvene -- is it two weeks or three weeks?

05:03:16  22      MR. NEUWIRTH:  I think it's the 19th.

05:03:18  23      MS. McLEMORE:  The 19th.

05:03:18  24      THE COURT:  It's the 19th.  And we are going to send

05:03:22  25  out a little status report, suggestions for agenda.  We have

| | |
|---|---|
| 05:03:28 | 1 |
| 05:03:36 | 2 |
| 05:03:44 | 3 |
| 05:03:54 | 4 |
| 05:04:04 | 5 |
| 05:04:08 | 6 |
| 05:04:08 | 7 |
| 05:04:10 | 8 |
| 05:04:12 | 9 |
| 05:04:14 | 10 |
| 05:04:18 | 11 |
| 05:04:20 | 12 |
| 05:04:24 | 13 |
| 05:04:26 | 14 |
| 05:04:34 | 15 |
| 05:04:40 | 16 |
| 05:04:46 | 17 |
| 05:04:54 | 18 |
| 05:04:56 | 19 |
| 05:04:58 | 20 |
| 05:05:02 | 21 |
| 05:05:06 | 22 |
| 05:05:10 | 23 |
| 05:05:46 | 24 |
| 05:05:52 | 25 |

1 some homework -- as a good mediator, I have to summarize.

2 So our main points here, but main points that came

3 out of today is Georgia-Pacific is going to give you the names

4 and titles or names of labels, whatever they call them, of

5 their litigation hold. And do you think you can get that to

6 them --

7 MR. MOGIN: Don't forget the dates, your Honor.

8 THE COURT: No, we decided no dates.

9 MR. FREED: Well, I thought it was going to be the

10 best they could give us. We understood it's not precise.

11 THE COURT: It's not precise. But if you have a

12 specific that you need further information on the date, that's

13 what we got the agreement on.

14 Okay. Mr. Hannan has been added as a custodian, and

15 we are going to put in an order which we are going to float

16 with you guys first, by adding somebody as a custodian, that's

17 really true for everybody, it does not automatically qualify

18 -- that's why we are going to work on the language.

19 MR. NEUWIRTH: Here we also had the special

20 circumstance of Mr. Hannan's status as a senior CEO.

21 THE COURT: Right. There is quite a bit of law in

22 the Seventh Circuit about that. Everybody wanted to depose

23 Mayor Daley on everything.

24 Okay. So Mr. Hannan is number two main point.

25 30(b)(6), GP is willing and able, when you guys

05:06:02 1  decide you want to do it, they have agreed that they will go.

05:06:06 2       MR. NEUWIRTH:  And I believe, I may have

05:06:08 3  misunderstood, but I believe that the plaintiffs were going to

05:06:12 4  consider whether they wanted to issue a refined notice.

05:06:14 5       THE COURT:  Yes.  You did.  That's right.  Because

05:06:20 6  you know a lot more than you knew --

05:06:22 7       MR. GOODWIN:  We certainly volunteered that, and we

05:06:24 8  don't want to reinvent the wheel.

05:06:26 9       THE COURT:  Okay.  I think when I say plaintiffs, I

05:06:36 10  mean Charles.  It seemed to me from today that you had -- I

05:06:42 11  wanted to make sure you didn't need more information in

05:06:46 12  general about backup tapes, not maybe there's going to be more

05:06:52 13  information coming down the road, but while people were

05:06:54 14  sitting here directly, did you have any specific questions.

05:07:00 15  But we can go back to that again.  At least we've covered

05:07:04 16  that.

05:07:06 17       MR. GOODWIN:  I think maybe this actually folds into

05:07:08 18  the 30(b)(6), or perhaps we just have a dispute between the

05:07:12 19  parties on, you know, the existence of any preserved backup

05:07:16 20  tapes from yonder in time.

05:07:24 21       THE COURT:  Just that you have the information on it,

05:07:26 22  not that anybody is searching it, but at least we know

05:07:28 23  factually.

05:07:30 24       Okay.  Next one is word index.  We understand they

05:07:32 25  have two columns, and the defendants are thinking about if

05:07:40   1  |  they would add the fourth column.  You all know what I mean by

05:07:48   2  |  this, I hope.  And we are going to discuss that if we were

05:07:50   3  |  going to do that in general or if we were going to do it as a

05:07:56   4  |  way to do verification in the search.  You don't have to say

05:08:00   5  |  anything today.

05:08:04   6  |        Okay.  Custodians, I would say where we are on

05:08:08   7  |  custodians, on adding custodians, and this is across the board

05:08:14   8  |  for everybody, is -- but particularly with you, other than

05:08:22   9  |  Mr. Hannan right now, it is your preference, you think is the

05:08:32  10  |  most feasible is review some documents first, look at the

05:08:34  11  |  litigation, the names of the people who have the litigation

05:08:38  12  |  hold, and if you have something specific you want to talk to

05:08:44  13  |  us about, we are willing to talk to you about it.

05:08:46  14  |        MR. NEUWIRTH:  Correct.

05:08:46  15  |        THE COURT:  Is that correct?

05:08:48  16  |        MR. NEUWIRTH:  That is correct, your Honor.

05:08:48  17  |        THE COURT:  On custodians.  So it's a work in

05:08:54  18  |  progress.

05:08:56  19  |        The queen got to say we are putting the RFPs on hold

05:09:08  20  |  until I can figure out something to do or suggest, and it's

05:09:12  21  |  going to be on your homework assignment too for the next

05:09:16  22  |  status.

05:09:18  23  |        Is this where we said the status is starting at 2:00

05:09:22  24  |  o'clock too?  Did you know that?

05:09:22  25  |        MR. MOGIN:  1:30.

05:09:24　1　　　　　　　MR. NEUWIRTH:  1:30.

05:09:24　2　　　　　　　THE COURT:  1:30.

05:09:26　3　　　　　　　MR. NEUWIRTH:  Right.

05:09:26　4　　　　　　　THE COURT:  Because Jim can be here at 1:30.

05:09:30　5　　　　　　　MR. NEUWIRTH:  And he can't be there earlier.  And I

05:09:34　6　believe -- I don't know if it was communicated to the court,

05:09:36　7　but I requested that we start at 1:30 instead of 2:00 because

05:09:40　8　that's a day when I really do need to leave by late afternoon.

05:09:44　9　　　　　　　THE COURT:  And that would be fine.  And it would

05:09:44　10　give Mr. Mogin conveniently time if there are any follow-up

05:09:50　11　meetings, Mr. Mogin, Mr. Freed, anybody else.  And since it's

05:09:56　12　a Tuesday, you could -- are you coming in on Monday, do you

05:10:00　13　think?

05:10:00　14　　　　　　　MR. MOGIN:  I will probably come in on Sunday.

05:10:02　15　　　　　　　THE COURT:  On Sunday.  So maybe if there are any

05:10:04　16　follow-up meetings that need to be done individually -- I am

05:10:10　17　not just saying this:  I have never done this before.  I mean,

05:10:14　18　it's not like -- I have done 1500 mediations, but not one that

05:10:22　19　was focused and had so many levels here.  I want your ideas as

05:10:30　20　we're going along.  I want your ideas for topics, I want your

05:10:34　21　ideas for timing, and so when we send these suggestions out,

05:10:38　22　we mean it.  I am just doing the best I can to make it up.

05:10:48　23　　　　　　　MR. FREED:  Well, your Honor, I think if it gives you

05:10:50　24　any degree of comfort, we have achieved more over the last

05:10:52　25　three days because we were all together with somebody

05:10:56   1   overseeing it, and I think it's been correct.

05:11:00   2            THE COURT:  I think we are going to do another round.

05:11:02   3   I know we have this countdown to September 30th, so we will

05:11:06   4   see where we are, but there were certainly certain things, and

05:11:10   5   we will have this beautiful transcript --

05:11:12   6            MR. FREED:  Right.

05:11:12   7            THE COURT:  -- that Carolyn will give us.

05:11:14   8            MR. NEUWIRTH:  May I make one comment about your

05:11:16   9   list?

05:11:16   10            THE COURT:  Yes.

05:11:18   11            MR. NEUWIRTH:  On the first item, which is the names

05:11:20   12   and the titles of the people who got the litigation hold and

05:11:26   13   the rough date information, you had spoken about that with

05:11:30   14   respect to what GP was going to do, but my understanding was

05:11:34   15   that we had agreed earlier that the plaintiffs would give us

05:11:38   16   the same information.

05:11:38   17            THE COURT:  Thank you.

05:11:38   18            MR. FREED:  Right.

05:11:40   19            THE COURT:  We did.

05:11:44   20            Okay, everybody, peace.  So glad you came.  Hope you

05:11:50   21   come back again.

05:11:52   22            MS. McLEMORE:  Thank you, your Honor.  I expect I

05:11:54   23   will be back.

05:11:54   24            THE COURT:  Well, I hope so.  I think it's good for

05:11:56   25   you and it's really good for us to have a real client in front

05:12:02  1   of us.   This gets very abstract, and I think it reminds us why

05:12:06  2   we do what we do.

05:12:08  3           MS. McLEMORE:   I appreciate the opportunity, your

05:12:10  4   Honor.

05:12:12  5           MR. GOODWIN:   Thank you, your Honor.

05:12:12  6           MR. NEUWIRTH:   Thank you very much, your Honor.

        7   (Which were all the proceedings had in the above-entitled

        8   cause on the day and date aforesaid.)

        9     I certify that the foregoing is a correct transcript from
            the record of proceedings in the above-entitled matter.
       10

       11   _____          _____
            Carolyn R. Cox                              Date
            Official Court Reporter
       12   Northern District of Illinois

       13   /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25