1

```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3    KLEEN PRODUCTS, L.L.C., et al.,     )

4                    Plaintiffs,         )

5         vs.                            )   No. 10 C 5711
                                         )
6    PACKAGING CORPORATION OF AMERICA,   )
     et al.,                             )   Chicago, Illinois
7                                        )   May 22, 2012
                     Defendants.         )   2:30 o'clock p.m.
8
                        TRANSCRIPT OF PROCEEDINGS
9         BEFORE THE HONORABLE MAGISTRATE NAN R. NOLAN

10   APPEARANCES:

11   For the Plaintiffs:        THE MOGIN LAW FIRM
                                BY:  MR. DANIEL J. MOGIN
12                              707 Broadway, Suite 1000
                                San Diego, California  92101
13                              (619) 687-6611

14                              FREED, KANNER, LONDON & MILLEN, L.L.C.
                                BY:  MR. MICHAEL J. FREED
15                                   MR. ROBERT J. WOZNIAK
                                2201 Waukegan Road, Suite 130
16                              Bannockburn, Illinois  60015
                                (224) 632-4500
17
                                SCOTTSCOTT, L.L.P.
18                              BY:  MR. WALTER W. NOSS
                                707 Broadway, 10th Floor
19                              San Diego, California  92101
                                (619) 233-4565
20
                                BERGER & MONTAGUE, P.C.
21                              BY:  MR. CHARLES P. GOODWIN
                                1622 Locust Street
22                              Philadelphia, Pennsylvania  19103
                                (215) 875-3000
23
     For Defendant PCA:         KIRKLAND & ELLIS, L.L.P.
24                              BY:  MR. LEONID FELLER
                                300 North LaSalle Street
25                              Chicago, Illinois  60654
                                (312) 862-2000
```

APPEARANCES (Continued):

| For Defendant<br>International Paper: | FOLEY & LARDNER, L.L.P.<br>BY:  MR. JAMES T. McKEOWN<br>777 East Wisconsin Avenue<br>Milwaukee, Wisconsin  53202<br>(414) 297-5530 |
| --- | --- |
| | FOLEY & LARDNER<br>BY:  MS. JOANNE LEE<br>321 North Clark Street<br>Suite 2800<br>Chicago, Illinois  60610<br>(312) 832-4500 |
| | EIMER STAHL, L.L.P.<br>BY:  MR. NATHAN P. EIMER<br>224 South Michigan Avenue<br>Suite 1100<br>Chicago, Illinois  60604<br>(312) 660-7600 |
| For Defendants Norampac<br>and Cascades: | K&L GATES, L.L.P.<br>BY:  MR. SCOTT M. MENDEL<br>70 West Madison Street<br>Suite 3100<br>Chicago, Illinois  60602<br>(312) 372-1121 |
| For Defendant<br>Weyerhaeuser: | McDERMOTT WILL & EMERY, L.L.P.<br>BY:  MS. JENNIFER A. SMULIN DIVER<br>227 West Monroe Street<br>Suite 4400<br>Chicago, Illinois  60606<br>(312) 984-7528 |
| For Defendant Georgia<br>Pacific: | QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>BY:  MR. STEPHEN R. NEUWIRTH<br>51 Madison Avenue<br>22nd Floor<br>New York, New York  10010<br>(212) 849-7000 |
| For Defendant<br>Temple-Inland: | MAYER BROWN, L.L.P.<br>BY:  MR. ANDREW S. MAROVITZ<br>     MS. BRITT M. MILLER<br>71 South Wacker Drive<br>Chicago, Illinois  60606<br>(312) 782-0600 |

1      APPEARANCES (Continued):

2

       For Defendant RockTenn:   WINSTON & STRAWN, L.L.P.
3                                BY:  MR. R. MARK McCAREINS
                                      MR. MICHAEL P. MAYER
4                                35 West Wacker Drive
                                 Chicago, Illinois  60601-9703
5                                (312) 558-5600

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
                       COLLEEN M. CONWAY, CSR, RMR, CRR
23                           Official Court Reporter
                     219 South Dearborn Street, Room 2524-A
24                         Chicago, Illinois  60604
                                (312) 435-5594
25                     *colleen_conway@ilnd.uscourts.gov*

1           (Proceedings heard in open court:)

2               THE COURT:  Everyone have a seat, please.

3               THE CLERK:  10 C 5711, Kleen Products versus

4    Packaging Corporation.

5               THE COURT:  Good afternoon, everyone.

6           So let's start with our plaintiffs and we will have

7    the plaintiffs -- Mr. Mogin, if you will identify your team.

8               MR. MOGIN:  My co-counsel, who needs no

9    identification, Michael Freed.

10              THE COURT:  Hi, Mr. Freed.

11              MR. FREED:  Good afternoon, Your Honor.

12              MR. MOGIN:  Walter Noss from Scottscott.

13              THE COURT:  Is it K-n?

14              MR. MOGIN:  It's N-o-s-s.

15              THE COURT:  Thank you.

16              MR. MOGIN:  Although, some of the transcripts have

17   referred to him as Hoss.

18              THE COURT:  Hoss.  Okay.

19              MR. MOGIN:  This is Mr. Wozniak, also from

20   Mr. Freed's firm.

21              THE COURT:  Hi, Mr. Wozniak.

22              MR. WOZNIAK:  Good afternoon.

23              MR. MOGIN:  And this is Mr. Goodwin from the Berger &

24   Montague firm.

25              THE COURT:  Hi, Mr. Goodwin.

1          MR. GOODWIN:  Hello, Your Honor.

2          THE COURT:  Good.  Good afternoon.

3          Okay.  So let's go in order of our defendants, the

4   great order of being number one in the complaint.

5          MR. FELLER:  Good afternoon, Your Honor.

6          Leonid Feller for Packaging Corporation of America.

7          THE COURT:  Oh, is -- PCA is first?

8          MR. FELLER:  We do have that on there.

9          THE COURT:  Oh, you do?  Okay.  Good.

10          Okay.  Who's second?  Somebody just --

11          MR. MAROVITZ:  I don't know --

12          THE COURT:  You are all too polite.  Okay.  Hi, Jim.

13          MR. McKEOWN:  I don't know who's second, Your Honor.

14          James McKeown for International Paper.  With me are

15   Nate Eimer and Joanne Lee.

16          THE COURT:  Thank you.

17          MR. McCAREINS:  Good afternoon.  Mark McCareins for

18   RockTenn, and I also have Mike Mayer with me.

19          THE COURT:  Okay.  And Mr. Mayer.  Thank you,

20   Mr. McCareins.

21          MR. MENDEL:  Scott Mendel for Cascades and Norampac.

22          THE COURT:  Okay.  Thank you.

23          MS. DIVER:  Good afternoon, Your Honor.

24          Jennifer Diver for Weyerhaeuser Company.

25          THE COURT:  Okay.  Is it D-i-m-m-e-r?

1    MS. DIVER:  D-i-v-e-r.

2    THE COURT:  Oh, Diver.

3    MS. DIVER:  Yes.

4    THE COURT:  Diver.  Okay.  And you are from?  I'm

5  sorry, Ms. Diver.

6    MS. DIVER:  Weyerhaeuser Company.

7    THE COURT:  Okay.  Thank you.

8    MR. NEUWIRTH:  Good afternoon, Your Honor.

9    Stephen Neuwirth for Georgia Pacific.

10   THE COURT:  Thanks, Mr. Neuwirth.

11   MR. MAROVITZ:  Good afternoon, Your Honor.

12   Andy Marovitz.  I'm with Ms. Miller for

13  Temple-Inland.

14   THE COURT:  Okay.  Thank you.  Do we have anybody in

15  the back that hasn't been identified?  Everybody's identified?

16  Good.

17   Well, we have a very packed agenda here, or at least

18  I have a very packed agenda here today.  Welcome everybody

19  back.  This is our third status, our third kind of

20  on-the-record meet-and-confer that we are doing.

21   So let's do a couple housekeeping things first before

22  we start to talk about the agenda.

23   Who can give me a report of Judge Shadur this

24  morning?  I'd like to know that.

25   (Laughter.)

1    THE COURT:  So who wants to do that?  Okay.  Thanks,
2    Mr. Marovitz.
3    MR. MAROVITZ:  It is my pleasure, Your Honor.
4    My report will be longer than the appearance before
5    Judge Shadur.
6    THE COURT:  Okay.
7    MR. MAROVITZ:  It was quite short, actually.  Judge
8    Shadur simply told us that he thought it would be best if we
9    appeared before you first; and that --
10   THE COURT:  Oh.
11   MR. MAROVITZ:  -- if we had additional issues, it
12   would be best to bring those to him at some point in the future
13   after we appear in front of you; and that the next time that
14   we're in front of him, to the extent that he actually asks for
15   a status, we can call in advance to see if it still makes sense
16   to go forward if we're still trying to resolve things with you.
17   THE COURT:  Oh, good.
18   MR. MAROVITZ:  But he seems rightly to think --
19   THE COURT:  So he's all on board.
20   MR. MAROVITZ:  -- that things are in good hands.
21   THE COURT:  Well, thank you.  Good.
22   Well -- and I saw the status report that you filed
23   with him, so I thought that was a -- you know, that was a good
24   joint report of what we're trying -- since we are trying to do
25   something very original here, and we don't have too much -- you

1　know, I think this cooperation with seven different parties is

2　really the trick. I don't think cooperation is the trick. I

3　think it's really a trick to keep it fair for everybody.

4　　　　Okay. So that's housekeeping number one.

5　Housekeeping number two is Chris -- we want to invite you --

6　the Seventh Circuit Pilot committee wants to invite you to our

7　program we are having here in the court Thursday, June 14th.

8　It's called A Computer-Assisted Review Workshop, Mock

9　Meet-and-Confer and Hearing and Roundtable with Industry

10　Experts. And this is free. I think, from what I hear from the

11　people who are running it, I wouldn't be surprised if our case

12　is the topic of great conversation.

13　　　　Anyway, all you have to do is go to our website, and

14　it's free, and sign on. The speakers begin with a keynote by

15　Jason Baron, mock meet-and-confer. They should be just here

16　today. It's a meet-and-confer hearing with Ralph Losey, Martin

17　Tully, Sean Byrne, Karl Scheinmann, and Dr. Lewis.

18　　　　Then there is a panel of experts following that, if

19　everybody hasn't been put to sleep in the first two-and-a-half

20　hours, then we have Maura Grossman, Ralph Losey, Jeff Sharer,

21　Matt Nelson, Herb Rosenblatt, and Lisa Rosen. So it goes from

22　1:30 to 5:30. So -- but you do need to register, because it is

23　live in the ceremonial courtroom, if you are interested.

24　　　　Number two is kind of closely connected, but I wanted

25　to -- after our last meet-and-confer, I had a couple technical

1  questions that Chris wasn't able to answer.  Chris is very good

2  at some of the technical stuff.  He wasn't able to answer.  And

3  I called Maura Grossman and asked her a couple technical

4  questions.  They were nothing substantive.  I didn't call you

5  all first.

6          I want to put it on the record if anybody has any

7  question or problem or anything, please let me know.  In light

8  of what's going on in the case in New York, I don't want

9  something down the road here having an issue.  So I hope I did

10  not offend anybody or bother anybody by doing it.  It was --

11  we've worked together at Georgetown and Sedona over the years,

12  and I thought I could ask stupid questions to Maura, easier

13  than I could anybody else.

14          Also, when they are here, Jason and Maura I may

15  invite to breakfast.  Again, I'm not going to talk about -- I

16  know my ethical duties.  But if anybody thinks that's

17  inappropriate or your client might be bothered by it, please

18  just drop me an e-mail and let me know, okay?  Is that fair to

19  everybody?

20          Okay.  All right.  Scheduling today.  Anybody have a

21  plane that I need to know about?  No?  Okay.

22          So, as I just said, I really believe in cooperation,

23  as you know, but I think the more people that are involved in

24  the case -- I really see how difficult this is to give

25  individual cooperation.

1    So what I got from the seven status reports from the

2    defendants and from the plaintiffs' omnibus report addressing

3    everybody is that I think some of you are making more progress

4    than others is the way I would say it.

5    I would like to do two things today.  And this,

6    again, is an experiment.  I have picked three of the defendants

7    who normally aren't talking, who seem to be in a pretty good

8    relationship with the plaintiffs but have some unresolved

9    issues.  I would actually like to start with those three, see

10   how we do by talking them out here in court, which might help

11   us, then, with the other defendants.  Because certainly a lot

12   of the issues are common issues.

13   Then I have identified from your reports what I would

14   call -- I am calling them three overriding issues that we keep

15   circling the wagons on.  One is proper number of custodians.

16   Number two is something that is loosely called -- it started

17   with the word dictionary, then it is correlating search strings

18   to RPFs as an alternative to indexing, and anything else that

19   goes with this kind of categorization of words.  And three, I

20   think we should talk about sources of ESI.

21   I don't know whether we can do much more than that

22   today.  We are going to cover a couple other issues with the

23   specifics.  Can you -- any thoughts on that as a way -- I mean,

24   I really want to start a dialogue on these issues is what I

25   want to do.

1           And I think then you all are correct what we're

2   working towards is what is realistic that we can resolve, and

3   people still can maintain their positions, and what actually

4   has to be briefed.  I mean, I think that's kind of where we're

5   going.

6           Does that sound right to you, Mr. Mogin?

7           MR. MOGIN:  Yes, Your Honor.  I do think it's

8   important that we figure out what needs to be -- what can still

9   be talked through and what needs to be resolved by motion or

10  other means.

11          There is one thing I would inquire about that you

12  just mentioned.  It seems to me that with respect to the

13  category number two, as you phrased it, you have combined a lot

14  of issues that we have been treating separately.

15          THE COURT:  Right.  And I didn't -- but it sort of

16  started -- I mean, it didn't start.  It started -- you started

17  it obviously with the indexing.  Then we've been looking for

18  ways maybe to avoid indexing.  Okay?  Or ways around indexing

19  or alternatives to indexing.  Okay?

20          So the end of the last session, one thought -- not

21  that that was going to be the only one -- was the word

22  dictionary, and we seem to get some reaction to that.  Then you

23  have phrased it somewhat differently now in this word search.

24  And we went back to Georgia Pacific's.  Chris remembered they

25  have done that to a certain extent.  So I thought it would be

1    worthwhile kicking it --

2              MR. MOGIN:  I'm sorry, Your Honor.  I don't

3    understand what you mean when you say --

4              THE COURT:  When Georgia Pacific's expert was on the

5    stand at the hearing, they did -- if I understand what they

6    did, they did -- if not on every search term, they certainly

7    took a number of their search terms and they matched them to

8    the request to -- okay.  Well, then that's good.  We'll go back

9    to that, okay?  And I wasn't even sure what you were asking for

10   either.  So when we get to that part -- that's why I think it

11   will be easier to do it on the record with everybody here and

12   we'll get some clarification.

13             MR. MOGIN:  Very good.

14             THE COURT:  Okay?  Okay.  So our first person up.

15   Yes.

16             MR. MAROVITZ:  Judge, I just want to say for the

17   defendants, we're very much in favor of trying to narrow the

18   issues.

19             THE COURT:  Good.

20             MR. MAROVITZ:  We think we've made a lot of

21   progress --

22             THE COURT:  Right.

23             MR. MAROVITZ:  -- I mean, since the last time we were

24   here in front of you.  You know, now all told, we've produced

25   more than 3 million pages of paper.  We've given them, I think,

1 more than 25 million lines of words in the word indexes that we

2 promised, and we've had any number of meet-and-confers, both in

3 person and also by telephone.

4 So we're happy to go down the path the Court would

5 like in whatever order the Court would like.  We've done a lot,

6 and we want to make sure that we can come to a conclusion on

7 this part of the case --

8 THE COURT:  I agree.

9 MR. MAROVITZ:  -- as quickly as we can, because we

10 don't want to go back and do things again.

11 THE COURT:  Well, Mr. Marovitz, I mean, if I didn't

12 start off by saying I think you have done just a -- all of you

13 have done a phenomenal job.  And what I am trying to do is

14 there seem to be some concrete things, like the litigation hold

15 issue, which is going to come up in one of the first two, which

16 we haven't talked about before; something called parsing, which

17 I didn't -- I mean, there are just some things I haven't even

18 thought of that I thought while we are all in the same room

19 today, let's talk about them.

20 MR. MAROVITZ:  Yeah.  And that makes good sense to

21 us, Judge.  We're happy to talk about any of those issues.

22 We are, in the vernacular, itching to talk about

23 parsing because -- and, frankly, parsing is something that

24 prompted, at least, the timeline that we had sent to you

25 earlier today, and it's an issue that is very important to us.

1    So we're happy to talk to you.

2              THE COURT:  That's kind of way down.  That's not way

3    up.  But that's good.  Hopefully, we're going to get there.

4              MR. MAROVITZ:  At your pleasure.

5              THE COURT:  Thank you.

6              So why don't we -- if we can go according to my

7    schedule here, I would like to start with PCA.  See, and this

8    gentleman gets to even talk here today.  This is good.

9              MR. FELLER:  Your Honor, I got to talk last time,

10   too.

11             THE COURT:  You did.  But we are really putting you

12   on the spot here.

13             MR. FELLER:  Again, Your Honor, Leonid Feller for

14   PCA.

15             THE COURT:  Okay.  So where is PCA located?

16             MR. FELLER:  PCA is located right here in Lake

17   Forest, Illinois.

18             THE COURT:  Oh, they are.  Well, good.  Well, good.

19             All right.  So what I am looking at is PCA filed a

20   status report in advance of today's conference, and it's got --

21   Chris had kind of given you a little outline of suggested

22   topics, and --

23             MR. FELLER:  That's correct.

24             THE COURT:  -- you were kind enough to follow it.  It

25   appears that -- well, why don't you just tell us --

1           MR. FELLER:  Sure.  I can just --

2           THE COURT:  -- what you have produced already.

3           MR. FELLER:  Absolutely.

4           THE COURT:  Okay.

5           MR. FELLER:  I can go through the topics.

6           THE COURT:  Right, right.

7           MR. FELLER:  PCA has produced, in total,

8    approximately 86,000 documents that includes both hard copy and

9    ESI.  And those documents total, either in hard copy or in ESI

10   equivalent, approximately 1.85 million pages.

11          We still have some documents in the queue that may

12   have had technical issues, that may have privilege issues,

13   confidentiality issues, that may still be, to some extent, on

14   first-level review; but in terms of the documents that we have

15   gathered and collected to date, we have produced the

16   substantial majority of those.

17          That's not to say that we're not perfectly willing

18   and happy to talk to plaintiffs about additional custodians and

19   all the various other issues.  But based on what's been

20   gathered to date, the production is substantially complete with

21   the exception of those miscellaneous sorts of issues.

22          We do not know as far as the second category where

23   plaintiffs are in their review.  I believe, if I recall

24   plaintiffs' status report correctly, they have just begun that

25   review.  But plaintiffs will correct me if I'm wrong.

1      We did complete our 30(b)(6) deposition a couple

2   weeks ago, on May 10th.  We did produce a data dictionary on

3   May 4th.

4      With respect to custodians, plaintiffs have not yet

5   identified additional custodians for PCA.

6      Less than a week ago, on Wednesday, plaintiffs asked

7   us to provide them with additional organizational charts.  We

8   did that two days later, on Friday, and we are in the process

9   also of seeing what other organizational charts may be

10  available.

11     THE COURT:  So let me just stop you right here.  I am

12  neither impressed nor under-impressed with number of

13  custodians.  I don't think the issue is number alone.  Okay?

14  But how many -- I don't have Dan Regard's chart here.

15     MR. FELLER:  Sure.

16     THE COURT:  How many custodians had you identified?

17     MR. FELLER:  We've identified 14 custodians.  That

18  includes all of our top-level management, the CEO, the CFO, the

19  individuals responsible for both the container board and the

20  corrugated side of the business, the individual responsible for

21  trades of container board among the various defendants, I mean,

22  literally anyone in a top-management role who we thought could

23  have any role in any of the issues identified by plaintiffs in

24  their complaint or their document requests.

25     THE COURT:  I have to confess, I have not read all

1    those 30(b)(6)s, and so I haven't read your 30(b)(6).

2              At the 30(b)(6), were there questions about

3    custodians?  Were there questions asking the 30(b)(6) person

4    about who in the organization might have pertinent information

5    to this?

6              MR. FELLER:  There were not, Your Honor.

7              THE COURT:  No.  Okay.

8              MR. FELLER:  The 30(b)(6), which was, I would say,

9    fairly uneventful, it involved -- we provided two witnesses.

10   The primary topics covered were the general methodology by

11   which we collected and produced documents.  It covered our ESI

12   systems, it covered backup tapes, and it covered, to a lesser

13   extent, document hold.  But those were the only issues that

14   were inquired of at the deposition.

15             THE COURT:  Okay.  And you say the plaintiffs haven't

16   asked for more custodians or additional custodians, but you are

17   open to that?

18             MR. FELLER:  Absolutely, Your Honor.

19             THE COURT:  All right.  Now, Mr. Mogin, do you want

20   to come up to the stand here?  Because, Mr. Mogin, I would --

21   that was a pretty fair telling about their working with you.

22             MR. MOGIN:  Yes, I think that's correct.

23             THE COURT:  And you do have some issues?

24             MR. MOGIN:  We do have some issues.  We are working

25   through those with PCA.

1    THE COURT:  Do you want to talk about them?

2    MR. MOGIN:  Well, I think with PCA that there are not

3    a lot of individualized issues at this point, and no indication

4    that we won't be able to resolve most of the individual issues

5    that do exist, assuming that PCA continues along the line that

6    it's been operating on, which is relatively forthcoming and

7    cooperative.

8    I think that the true issue with PCA are the primary

9    five, six, seven issues that are in common to all defendants.

10   I don't think that there are really a lot of unique issues with

11   respect to PCA.

12   With respect to the word index, if I could --

13   THE COURT:  Uh-huh.

14   MR. MOGIN:  -- PCA was the first to produce a word

15   index for us.

16   THE COURT:  All right.  Now, what do you mean by a

17   word index?

18   MR. MOGIN:  Well, I will actually show you, if

19   Mr. Feller won't object and think that I am somehow breaching

20   confidentiality or something, but -- is that all right?

21   MR. FELLER:  The actual word index?

22   MR. MOGIN:  Yeah, just a few pages.

23   MR. FELLER:  Yeah, sure.  Just hand it up to the

24   Court, sure.

25   THE COURT:  This is different than a word dictionary?

1          MR. MOGIN:  No.  This is what you have been

2   calling -- what happened, Your Honor, is that somehow the term

3   "data dictionary" got introduced, and "data dictionary" is a

4   term of art that doesn't have to do with this.  So I thought it

5   would be easier to simply refer to this as a word index.  But

6   it is the dictionary that we were talking about last time when

7   we were in court.

8          THE COURT:  Good.  I'd like to see it.

9          We thought it was what's at the end of a transcript,

10  when a court reporter takes the names and then prints off what

11  page "Mogin" was on, what page "Nolan" was on.

12          MR. MOGIN:  It's similar.

13          THE COURT:  Similar.  Good.

14          MR. MOGIN:  If I could hand this up?

15          THE COURT:  Please do.  So your folks did -- oh,

16  thank you.

17          (Document tendered to Court.)

18          THE COURT:  So your folks did this when you turned

19  your documents over?

20          MR. FELLER:  Not when we turned our documents over.

21  We did it in response to plaintiffs' response at the last

22  status conference.

23          THE COURT:  Okay.  Good.

24          MR. MOGIN:  So -- and their word index --

25          THE COURT:  But these are -- this is your word search

1    over on this?  Is this by word search?

2              MR. MOGIN:  Let me explain to you.

3              THE COURT:  Okay.

4              MR. MOGIN:  So PCA --

5              THE COURT:  Uh-huh.

6              MR. MOGIN:  This is --

7              THE COURT:  Is their name.

8              MR. MOGIN:  Is their name.

9              THE COURT:  Right.

10             MR. MOGIN:  And they've given us approximately

11   340,000 entries.  So what you have, obviously, is just a

12   sample.  And what you see is on the left-hand side is the

13   word --

14             THE COURT:  Okay.

15             MR. MOGIN:  -- followed by a document count, that is,

16   the number of documents that that particular word appeared in,

17   followed by the total number of hits in the corpus from which

18   this was drawn for that particular word.

19             THE COURT:  Okay.

20             MR. MOGIN:  Okay?  And this is typical of most of the

21   defendants' word indexes.

22             THE COURT:  Word index.

23             MR. MOGIN:  There are a couple of exceptions where

24   they were unable to produce one or more -- one of those

25   statistics, the hit count, if you will.

1      The issue -- and it has been discussed, it was

2  discussed during a May 16th meet-and-confer with Mr. Feller --

3  is that these are from a limited set of documents as opposed

4  from -- to being from the entire corpus that was searched.  So

5  we can't measure the usefulness or the efficiency, if you will,

6  of the search terms without the rest of the picture.

7      And, as I understand it, that's still under

8  consideration by Mr. Feller.

9      THE COURT:  And this does not correlate to your

10  request for production or your request for production of

11  documents?

12      MR. MOGIN:  Please think of this as a complete

13  standalone document.

14      THE COURT:  Right.  Okay.

15      MR. MOGIN:  That's what it is.

16      THE COURT:  Okay.

17      MR. MOGIN:  You had asked us if I could back up just

18  a little bit.

19      THE COURT:  For sure.

20      MR. MOGIN:  You had asked us to try to work within

21  the Boolean framework --

22      THE COURT:  Yes.

23      MR. MOGIN:  -- based upon the testimony, et cetera,

24  and after conferring with our experts, this is one device -- we

25  don't think it's -- it gets us where we want to go.

1          THE COURT:  Right.

2          MR. MOGIN:  But it's one device that we can use, if

3  we get the balance of what we're looking for, so that we will

4  have some understanding of the efficiency of the search terms

5  that were used.

6          THE COURT:  Yes.  That's great.  And I am glad you

7  said it that clearly.  Okay.

8          MR. FELLER:  Your Honor, if I may?

9          On the -- and I certainly appreciate Mr. Mogin's

10  comments about PCA and the fact that -- you know, I think we

11  certainly have been meeting and conferring in good faith and

12  trying to resolve our individual issues.

13          With respect to the word index, a little bit of

14  background may be useful.

15          The word index, the request for a word index came to

16  PCA for the first time about a half hour, if you recall, before

17  the last status conference.

18          THE COURT:  Uh-huh.

19          MR. FELLER:  In our meet-and-confer.  For some

20  defendants, they didn't even get such a request and it was

21  raised for the first time at the status conference.  Plaintiffs

22  said, "Gee, can we get a word index?"  And I think all the

23  defendants said, "We're not sure."

24          THE COURT:  Right.

25          MR. FELLER:  "We don't know."

1    THE COURT:  Right.

2    MR. FELLER:  "But if we can do it, we will do it."

3  But as with so many things in the world of ESI, it's not quite

4  that simple.  So some of the issues are:  Well, what corpus are

5  you going to draw that from?  Are you going to draw that from

6  the documents you've actually produced?  Are you going to draw

7  that from a somewhat bigger set, which is the set hit by your

8  search terms, which includes both produced documents and all

9  sorts of non-responsive documents?  Or are you going to produce

10  that from your entire universe?  There's also the question of

11  what do you do with privileged documents.

12    THE COURT:  Right.

13    MR. FELLER:  Right?  Are you giving them privileged

14  documents or are you somehow waiving privilege?  So there are

15  all sorts of technical issues.  But as PCA represented to the

16  Court, as other defendants did, we said we would do it, and we

17  did it, and we did it in good faith, and we did the best we

18  could.  For PCA, we gave them -- I think the number is actually

19  360,000 individual terms.  As Mr. Marovitz said, I think it's

20  something like 25 million total.

21    Now, why did we do it the way we did it?  And there's

22  both a practical answer to it and I think a legal answer to it.

23    The practical answer is, what we understood Mr. Mogin

24  wanted to use this for wasn't some sort of validation or

25  verification of the search strings.  What we understood, what I

1    recall hearing at the last hearing was that if we gave them

2    additional terms, that they could use those to try and work

3    with us on the search terms and say, "Gee, you didn't run this

4    term.  Here's a term that might be useful to you."

5              In that, to accomplish that, what we thought made

6    sense is let's give you terms from our responsive documents,

7    because those will contain terms that we know were hit, but

8    it's also likely to contain synonyms and other terms maybe that

9    we did or didn't pick, who knows, but that are likely to be

10   useful with respect to responsive documents, which are likely

11   to be useful with respect to the things we care about in this

12   case, and let's give you that in the first instance.

13             The legal answer -- the legal issue for us, Your

14   Honor, is to give them everything, to give them the null sets,

15   is to produce things that are clearly that we know that we've

16   done validation testing on, we know are at least 95%

17   non-responsive.  And I don't know of any case where a party or

18   a defendant opens up its doors and says, "Come on, take a look

19   at all this stuff that's non-responsive."

20             So that was -- again, we heard this for the first

21   time at the last reason -- at the last hearing.  We did the

22   best we could in the first instance.  We've produced an

23   incredible amount of information and -- we've spent time and

24   money to do it, and this is -- this sort of goes into, I think,

25   the broader issue for all defendants is -- you know, we came

1 before the Court with, you know, this concept-based analytics

2 issue. We knew we had this other issue. Out of nowhere we get

3 this new issue. We do our best to respond, we do it in good

4 faith, and still it's not good enough.

5 THE COURT: Well --

6 MR. FELLER: And so our -- I guess our -- my -- I'll

7 just speak for PCA. Our position is we're certainly willing to

8 take Mr. Mogin's request under advisement and consider it and

9 its feasibility and whatnot, but, again, we've produced 360,000

10 words. How about we look at those 360,000 words and see if

11 there's anything useful before you ask us to go back and do

12 more?

13 THE COURT: Well, you must have heard him say a lot

14 more than I heard him say here. I didn't hear him say the

15 words "null set." I didn't hear him say --

16 MR. FELLER: No.

17 THE COURT: I mean, I didn't. I mean, unless I, you

18 know, was so busy looking at this list here --

19 MR. MOGIN: Your Honor, this hardly comes out of

20 nowhere. It's in response to exactly what you asked us to do,

21 exactly what you asked us to do.

22 THE COURT: Well, see -- okay. I know both things.

23 Most things in the law are both and not either/or.

24 I think the defendants have been incredibly

25 productive, responsive. I -- there isn't even a question. But

1    this process began by Mr. Mogin wanting one method.  Okay?

2    And -- or like a different method that we're using, and now, I

3    mean, after my giving him an indication of the way that I was

4    leaning towards it, and for the reason I was, I basically think

5    now what we're trying to do is actually some of the

6    shortcomings of Boolean search.  I think what we were trying to

7    do is try to get him enough reliability and verification, which

8    is only good for you for the future, too.

9            So -- and I also agree, I have all over here:

10   Mr. Mogin, what have you learned?  What have you learned?  But

11   here's the problem.  He's getting it as we're talking about it.

12   I mean, this is the problem with you producing three -- I mean,

13   this is how crazy this case is.  With 300 million pieces of

14   paper, how can somebody be reviewing it at the same moment?  As

15   our former President used to say, I share your pain.  But I

16   don't know how to make these two things happen.  Okay?

17           But I do get it.  But the minute he leaves here, even

18   if he stayed up 24 hours a day, I don't know how he would be

19   reviewing it to tell you immediately who the custodians are.

20           It sounds like he gets the stuff.  He sends it to his

21   computer people.  They're putting it on a platform.  They are

22   sending it back to him, whatever they're able to -- I mean, I

23   thought that was a good explanation of what you're doing.

24           I mean, when -- whoever wrote the Rule 26, they

25   weren't taking into consideration this kind of volume and I

1   think this many defendants, if it was one defendant and one

2   plaintiff also.

3                MR. FELLER:  And, Your Honor --

4                THE COURT:  I am talking way too much.  But I just

5   want you to both understand that I get the human part of this

6   case.  I get all of it.  But I wanted to just know today -- I

7   mean, it sounds like Mr. Mogin thinks you are doing just -- you

8   get like an A- here on this, right?  I mean, isn't that

9   basically it?

10               MR. MOGIN:  That's basically it, Your Honor.

11               THE COURT:  You are basically saying to me:  Don't go

12  into the problems here, Judge.  You are going to open Pandora's

13  box.  Don't ask him about litigation hold is what you're really

14  saying here.

15               MR. MOGIN:  Well, we'll get to that.

16               MR. FELLER:  Yeah.

17               THE COURT:  I don't think -- so this is a sample.

18               MR. FELLER:  Yes, ma'am.

19               THE COURT:  This is a sample of what you have turned

20  over.  I hope -- I haven't asked how much money it cost.  I

21  haven't asked.

22               I am very aware of the fact that I haven't done

23  proportionality issues yet.  And I am very well aware of the

24  fact none of you are shy; that if you really had a burdensome

25  argument, you would bring it up.  But you also would take into

1    consideration you represent the largest, some of the largest

2    corporations in the country.  So that may not be the issue

3    here.  Okay?

4         So -- but I am assuming you were able to do this

5    without turning all of PCA upside down.  And you're trying to

6    figure out if this is going to be enough for you or something

7    like this would be enough for you.

8         MR. MOGIN:  That's pretty much it, Your Honor, yes.

9         THE COURT:  Okay.

10        MR. MOGIN:  So if I could -- if you would refer back

11   to that --

12        THE COURT:  So if I'd stop talking for a minute, then

13   you could talk, yes.

14        MR. MOGIN:  Well, first, Mr. Feller made a comment

15   about privilege, and I think that's a non-issue.  The

16   defendants have produced these subject to a non-waiver

17   condition, and that's perfectly acceptable with the plaintiffs.

18        THE COURT:  Okay.

19        MR. MOGIN:  Now, with respect to the documents that

20   were not hit by the search terms, if you go back and you review

21   the little description that we gave you of loading --

22        THE COURT:  About what?

23        MR. MOGIN:  Loading.

24        THE COURT:  Yes.

25        MR. MOGIN:  That's in the status conference

1 | statement.

2 | THE COURT: Yes.

3 | MR. MOGIN: As I understand it, most of the

4 | defendants loaded all of their collection into their review

5 | platforms. Having done that, whether a document is hit on with

6 | respect to search terms or whether it is a responsive document,

7 | it doesn't matter. The fact is that the words used in the

8 | document are indexed by the reviewing software.

9 | So that defendants do have the technical ability to

10 | give us what we're asking for which will then give us some

11 | comfort with respect to the efficiency of the search terms that

12 | were, in fact, used. There is no waiver of any kind of

13 | privilege. They're not opening the door to anything.

14 | As you can see from reviewing that list, it's pretty

15 | near impossible. Now, consider that there's 360,000 lines like

16 | what you are looking at. It's pretty near impossible to look

17 | at a word and see that it has a zero hit count and figure out

18 | the meaning of the document.

19 | The best, I think, that we'll be able to do is to

20 | look at a word, compare it to the words that were used for

21 | search terms, and perhaps improve the search terms.

22 | THE COURT: Do you understand that, Chris?

23 | THE LAW CLERK: Yes, we do.

24 | MR. MOGIN: And if I might add, Your Honor -- I

25 | realize that, you know, we're all working very fast, and I'm

1    not suggesting any lack of good faith here, but I received this

2    with the description without any kind of discussion as between

3    the last hearing and receipt regarding what its content would

4    be.  And had we been able to have the discussion, if the

5    defendant had informed us that that was what they were planning

6    on doing, certainly we would have asked them to give us the

7    non-hits as well at that time.

8              THE COURT:  Well, I -- do you mean -- are they using

9    the term "non-hit" to mean the null set, whether it -- I mean,

10   are you using that term?

11             MR. MOGIN:  I will never use that term.

12             THE COURT:  Well, I --

13             MR. MOGIN:  I think that the null set --

14             THE COURT:  Okay.

15             MR. MOGIN:  As you well know, I believe the null set

16   is a complete fiction.

17             THE COURT:  Okay.

18             MR. MOGIN:  Okay?  So what I'm talking about --

19             THE COURT:  But non-hits -- okay.

20             MR. MOGIN:  -- is documents that were loaded into

21   their platform for review that were not hit by the search

22   terms.

23             THE COURT:  Okay.  All right.  But now I will say --

24   I have a pile here of issues that still remain in the case, you

25   know, which we're not talking about today.  And you call them

1  non-hit.  I call them null.  You know, that's in that pot.  So

2  if there was a mis -- if there was a breakdown in communication

3  here, I don't feel like we've ever had that talk, what to do

4  with that kind of search.  Okay?  And I think we're going to

5  have it.  It just hasn't happened yet.

6         So -- well, maybe this will help everybody.  I'm

7  really glad you did it, that PCA did this.  Now, you -- so what

8  you on the plaintiffs' part would like are the non-response --

9  everything they've done is great.  You can read it the way it

10  is.  But what you'd like in addition to this are the

11  non-responsive breakdown, too?

12         MR. MOGIN:  The non-hits, correct.

13         THE COURT:  The non-hits.  Okay.  The non-hits.  Can

14  I keep this?

15         MR. FELLER:  You can, Your Honor.  That is under our

16  confidentiality designation that's marked outside "attorneys'

17  eyes only".  So if it is going to be part of the record, it

18  needs to be under seal.

19         THE COURT:  No, I just meant for us just --

20         MR. FELLER:  I certainly have no problem with the

21  Court --

22         THE COURT:  -- to talk about.  Okay.  And you want it

23  called non-hits?

24         MR. MOGIN:  Correct.  Please.

25         THE COURT:  Okay.  So in your status report, you did

1    mention three specific things about PCA, but I think it sounds
2    like you can work those out with counsel.
3                MR. MOGIN:  I think that's correct, Your Honor.
4                THE COURT:  Okay.
5                MR. FELLER:  Your Honor, let me just make -- and I
6    think this is probably just a typographical error.  But as long
7    as I'm up, and just to make the record clear --
8                THE COURT:  Yeah.  Good.
9                MR. FELLER:  -- with respect to backup tapes, the
10   last sentence of plaintiffs' status report says:  "Beginning in
11   January 2003, the tapes are searchable by title."  I think the
12   critical word that's missing there is "by file title."
13               So there is a very limited search capability in the
14   sense that if you know the exact name of the file that you are
15   looking for, you can type that file into the software program
16   and it will tell you what tape or tapes that particular file
17   might be located on.  There is no search capability to search
18   by custodian or type of document or anything that, as we
19   understand it, would be useful to the process of restoring
20   backup tape or somehow segregating things that would be
21   relevant to this litigation.
22               So I just wanted to make that clear.
23               MR. MOGIN:  Your Honor, at this point, I don't and
24   can't dispute what Mr. Feller has said.  I'm sure it is
25   probably accurate.

1        THE COURT:  Well, and we are going to talk about

2   active/inactive.  I mean, we are going to talk about -- in the

3   broader issue, we are going to talk about sources of data.

4   Okay?  And I guess we will talk about litigation holds kind of

5   in general, too.  Because we haven't had this issue, at least I

6   hadn't thought about this issue, until this status report

7   either.  So we're all -- this is a work in progress here.

8   Okay?

9        Well, thank you.

10       MR. FELLER:  Thank you, Your Honor.

11       THE COURT:  You are doing great.  That was very

12  clear.

13       MR. FELLER:  Thank you.

14       THE COURT:  Okay?  All right.  I have next on the

15  list is Weyerhaeuser.

16       Hi, Miss.

17       MS. DIVER:  Hello, Your Honor.  Jennifer Diver.

18       THE COURT:  So you want to tell us a little bit about

19  what you have been up to?

20       MS. DIVER:  Sure, Your Honor.

21       To date, we have produced the majority of our

22  electronically stored information for all of our custodians,

23  and that's totaling somewhere between 160 and 200,000 pages of

24  documents or page equivalents.  We produced many of our

25  electronic documents in native format, so we don't have an

1    actual page count for them.  So that 160 to 200,000 is based,

2    in part, on an estimate for the electronic files.

3            We expect to only have one more small production

4    which we will make in the next month, just sort of housekeeping

5    and tying up some loose ends.

6            THE COURT:  Now, when you -- yeah, this is for all of

7    you, too.  When you say "production," this is of non-privileged

8    documents, right?

9            MS. DIVER:  That's correct, Your Honor.

10           THE COURT:  Okay.  And -- okay.  So you just have a

11   small amount left, then you're finished?

12           MS. DIVER:  Yes.

13           THE COURT:  Okay.

14           MS. DIVER:  We believe we have a small amount left of

15   hard-copy documents, some expense reports, some financials.

16   And then any documents that we reviewed for privilege and

17   determined were actually not privileged ultimately, those will

18   also be produced, along with our privilege log.  And we

19   anticipate that to be done by the end of June at the latest.

20           THE COURT:  Okay.

21           MS. DIVER:  The --

22           THE COURT:  How many custodians were in Dan Regard's

23   chart?

24           MS. DIVER:  We have eight.  I'm actually not positive

25   how many were in that chart.

1       THE COURT:  Right.

2       MS. DIVER:  We have eight total right now, which are

3   all of our current Weyerhaeuser employees that were part of the

4   container board business at the time Weyerhaeuser owned that

5   business.  As you know, it was sold to International Paper in

6   2008.

7       THE COURT:  No, I didn't.  So that's --

8       MS. DIVER:  You didn't?

9       THE COURT:  I mean, I knew it sometime, then I forgot

10  it.  So that's key, then.

11      MS. DIVER:  Sure.

12      THE COURT:  So that --

13      MS. DIVER:  It is key for us, Your Honor.

14      THE COURT:  Okay.

15      MS. DIVER:  So we no longer have the business and we

16  no longer have a lot of the information related to the

17  business, because we sold it in --

18      THE COURT:  To 2008?

19      MS. DIVER:  Correct.

20      THE COURT:  Okay.

21      MS. DIVER:  And we also --

22      THE COURT:  Did it stay -- when they were bought out,

23  did it stay as a division of International Paper or is it part?

24  I mean, did it get absorbed?  I don't mean like --

25      MR. McKEOWN:  It's all within the corporation,

1    International Paper, and they're all operated as International

2    Paper mills and plants.

3            THE COURT:  Okay.  Thank you.  Okay.

4            MS. DIVER:  And then as a result of recent

5    meet-and-confer negotiations with plaintiffs, we have agreed to

6    add the current Weyerhaeuser CEO as a document custodian as

7    well as the former Weyerhaeuser CEO.  So we added those two

8    additional custodians as --

9            THE COURT:  Is that what you were asked for?  Or did

10   Mr. Mogin ask for other people?

11           MS. DIVER:  They asked for those two people.  They

12   also asked for an administrative assistant for the vice

13   president of the container board business.  However, we did not

14   have any material for her, as she's a former employee, so we

15   were not able to produce any material for her.

16           In addition, we have agreed to search Weyerhaeuser's

17   travel and expense report database for a total of 22

18   custodians.  So all of our document custodians, plus I think 15

19   former -- or, sorry, 16 former Weyerhaeuser employees that had

20   business -- had titles in the container board business.

21           THE COURT:  So what I couldn't figure out from the

22   status were are you checking them only for travel or are you

23   checking them for in general against your database?

24           MS. DIVER:  We're checking them only for travel, Your

25   Honor.  Weyerhaeuser's policy is to delete all electronically

1    stored information and e-mail accounts for its former

2    employees, and these additional 16 people are former employees,

3    so we do not have ESI for them.

4              THE COURT:  Okay.  But the travel is saved on a

5    separate server or it's saved -- it's saved somewhere?

6              MS. DIVER:  That's correct, Your Honor.  It is a

7    centrally kept database that the company keeps and preserves

8    pursuant to requirements under tax law.  They have preserved

9    all the records that are contained in that database.  So we

10   have been able to search it for former employees.

11             THE COURT:  Okay.

12             MS. DIVER:  And we have done so.

13             THE COURT:  And then on the people you did -- the

14   eight people you did produce, you also did their expense

15   report?  I mean, you did everything for those?

16             MS. DIVER:  Yes.

17             THE COURT:  Did those eight people go to IP?

18             MS. DIVER:  No.  Those eight people -- well --

19             THE COURT:  Or some of them?

20             MS. DIVER:  No.  All eight people are either current

21   Weyerhaeuser employees --

22             THE COURT:  So Weyerhaeuser still exists?

23             MS. DIVER:  It still exists, Your Honor, yes.  It

24   just does not have a container board business anymore.  Some of

25   the container board executives and employees stayed with

1 | Weyerhaeuser and transferred to different business divisions.

2 | THE COURT: Oh, okay.

3 | MS. DIVER: Yes. So all eight of our custodians are

4 | either current Weyerhaeuser employees. And there's also one

5 | former Weyerhaeuser employee for whom we had some

6 | electronically stored information because he was the former

7 | CEO, and we were able to retrieve that information and search

8 | it.

9 | THE COURT: Okay. And so, Mr. Mogin?

10 | MR. MOGIN: Thank you.

11 | THE COURT: Or do you have it divided among -- I

12 | thought that might help in these future statuses. If you have

13 | different people responsible, maybe that would help, too.

14 | Do you have to do all of these folks?

15 | MR. MOGIN: At present except for Georgia Pacific.

16 | THE COURT: I see. Okay.

17 | MR. MOGIN: But I would like to point out something

18 | with respect to Weyerhaeuser.

19 | THE COURT: Uh-huh.

20 | MR. MOGIN: What you just heard is that Weyerhaeuser

21 | has a policy that they wipe out the e-mails of their former

22 | employees, and that they have not or will not search for other

23 | records beyond those travel records of those former employees.

24 | The underlying presumption in that is that the policy

25 | has been complied with. I don't think it's enough to simply

1    rest on the policy.  I think that there has to be some level of

2    search made.  And let me tell you two things from other

3    meet-and-confers that informed this.

4            Last time when we met-and-conferred, my colleague,

5    Mr. Goodwin, came up with a hypothetical for Georgia Pacific

6    about the crazy janitor who maybe stored backup tapes in his

7    closet.  And we all had a good laugh about that.  And GP, of

8    course, said, "Oh, no such thing ever existed."

9            Well, in the meet-and-confer yesterday, speaking with

10   Temple-Inland, we found out that there was, in fact, an

11   employee who retained in their cubicle 600-and-some backup

12   tapes of who knows what.

13           So these things do happen.  Not everyone complies

14   with policy.

15                   THE COURT:  Okay.

16                   MR. MOGIN:  And I don't think that we should merely

17   assume that policy has been complied with.

18           I do think that, particularly given Weyerhaeuser's

19   situation, that it is important that some search of some level

20   be made for these former employees.

21                   MS. DIVER:  Your Honor, I --

22                   MR. MAROVITZ:  Wait.  Excuse me.

23                   THE COURT:  Well, two things.

24                   MR. MAROVITZ:  Since my client's name was used, I

25   thought I'd -- for Temple-Inland, we disclosed months ago that

1  we had over 600 backup tapes, and their location that they were

2  in a cubicle is of no relevance whatsoever. They could have

3  been on a shelf. They could have been in a drawer.

4      There is nothing new about this. We have disclosed

5  the existence of backup tapes like several other defendants

6  have backup tapes. So, to link that between the crazy janitor

7  seems --

8      THE COURT: Well, I --

9      MR. MAROVITZ: -- just bizarre to me.

10      THE COURT: Okay.

11      MR. MOGIN: Well, I think --

12      THE COURT: I am glad you are defending your client

13  very vigorously, but I don't think it was really meant to be

14  that you did anything wrong. Okay? I think Mr. Mogin was

15  using it as -- I think he was just using it as an example that

16  he would like Ms. Diver --

17      MS. DIVER: Diver.

18      THE COURT: -- Diver --

19      MS. DIVER: Yes, Your Honor.

20      THE COURT: -- to double-check with her client --

21  more than double-check, but actually do a search or do

22  something to verify that they, in fact, aren't on the system.

23      Is that what you want?

24      MR. MOGIN: That's precisely it, Your Honor.

25      THE COURT: Okay.

41

1  MS. DIVER:  And, actually -- I didn't want to
2  interrupt you, Dan, but we have done that for --
3  THE COURT:  Right.
4  MS. DIVER:  -- the custodian -- for the former
5  employees for whom we are searching the travel and expense
6  reports.  We also did check, and we do not have electronically
7  stored information for them.  We do not have their e-mails, and
8  we do not have hard drives from their computers.
9  THE COURT:  All right.  So because this is a
10  bifurcated system -- A, because it's bifurcated and, B, I will
11  no longer be here in October when the new magistrate judge
12  comes in and hears this, I think it would be a good procedure
13  for all of you, when you do your due diligence, is get somebody
14  to certify; whoever checked, get a certification.  And I don't
15  mean a -- but get some kind of a statement from who checked,
16  give it to Mr. Mogin, and we can move on.  Correct?
17  MR. MOGIN:  Thank you, Your Honor.
18  THE COURT:  And then for Judge Shadur, for the new
19  magistrate judge, it takes -- it's that quick and then that
20  issue is over.
21  MR. MOGIN:  The next issue with Weyerhaeuser is a
22  wholesale refusal to search the legal department for responsive
23  documents regardless of privilege.  In other words, it's a kind
24  of blanket privilege assertion without actually looking for
25  particular documents.  And it seems to me quite possible, if

1    not likely, that there are responsive documents within the

2    legal department, or a good chance that there may be such

3    documents.

4              MS. DIVER:  I'd like to clarify Weyerhaeuser's

5    position on the legal department.

6              THE COURT:  Uh-huh.

7              MS. DIVER:  Because Mr. Mogin doesn't have it exactly

8    right.

9              THE COURT:  Okay.

10             MS. DIVER:  We have produced documents.  One of our

11   document custodians is in the legal department, the associate

12   general counsel, and we believe that she had -- was likely to

13   have many responsive documents with respect to the IP

14   acquisition of Weyerhaeuser, and, therefore, we named her as a

15   document custodian and her documents have been produced.  Her

16   name is Clare Grace.

17             In addition, plaintiffs have asked us for the HSR

18   filing in connection --

19             THE COURT:  What is that?

20             MS. DIVER:  Hart-Scott-Rodino filing.  When a company

21   is being acquired --

22             MR. MOGIN:  It's a pre-merger notification that's

23   required to go to the government, Your Honor.

24             MS. DIVER:  Right.  And Mr. Mogin asked us for those

25   documents.  We went to where they would be found.  We agreed to

1    search for them.  We went to where they would be found, which

2    is the legal department, to find them, and we are reviewing

3    them for responsiveness to plaintiffs' request.  So we have

4    gone to the legal department for that purpose.

5              We have not named additional attorneys at

6    Weyerhaeuser as document custodians because other than Ms.

7    Grace, their roles, in general, were not business related.

8    They were purely legal, reviewing contracts, reviewing

9    agreements, et cetera.  And, therefore, the overwhelming

10   majority, if not 100%, of their materials would be privileged,

11   and it would be incredibly burdensome for Weyerhaeuser to have

12   to review and search and log all of those documents.

13             MR. MOGIN:  It's --

14             MS. DIVER:  And we just believe that the plaintiffs

15   are getting the business, container board business information

16   that they're seeking from the other custodians.  And unless

17   Mr. Mogin can identify something that he thinks would come from

18   the legal department that he can't get elsewhere, I don't

19   understand why we would be required to do that.

20             THE COURT:  Well -- okay.  Without opening Pandora's

21   box here, have any of the other defendants refused

22   categorically the legal department?  I mean, is this something

23   that's done in anti-trust cases?  I mean, I'm really asking

24   this.  Is there a reason?  Because if you are saying even

25   documents that conceivably have to do with containers,

1    container cardboard, you -- those are -- you are not even

2    logging them?

3         MS. DIVER:  Well, Your Honor, if Mr. Mogin is asking

4    for attorneys in the legal department to be named as document

5    custodians, our position is that that is not appropriate

6    because they will not have non-privileged container board

7    business information.

8         If they reviewed a contract for the container board

9    business and provided legal advice to the container board

10   business, those documents would be privileged.  And because

11   that was the nature of the role of the attorneys in the legal

12   department who had any contact with the container board

13   business, it would be extremely burdensome.  And I just don't

14   see the necessity for us to have to search their documents,

15   review their documents, and log what could be thousands of

16   e-mails providing legal advice with respect to contracts.

17        THE COURT:  Okay.  And you may be a hundred percent

18   right.  I'm asking, has any other defendant categorically said

19   documents in their legal department are -- they're not turning

20   them over?

21        MR. MOGIN:  To my knowledge, no other defendant has

22   categorically refused.

23        THE COURT:  Okay.  This may give you some ideas,

24   but -- okay.

25        MS. DIVER:  And, Your Honor --

1          MR. McKEOWN:  Your Honor --

2          THE COURT:  I have never had this in 14 years.  I

3  mean, I haven't.  I mean, it is a -- you know, it is just a

4  different approach is what it is.  I --

5          MR. MOGIN:  May I explain?

6          MS. DIVER:  But, Your Honor, if I may --

7          THE COURT:  How big is this legal department?

8          MS. DIVER:  Well, there are -- I mean, the legal

9  department services different businesses, and over the course

10  of the class period, there could have been several attorneys

11  who had contact with the container board business.

12          THE COURT:  Did Weyerhaeuser do anything other than

13  cardboard boxes?

14          MS. DIVER:  Yes, Your Honor.

15          THE COURT:  What else did they do?

16          MS. DIVER:  They have a forest products division.  I

17  mean, it is a humongous company with several different

18  businesses.

19          THE COURT:  Okay.

20          MS. DIVER:  I mean, and I also want to just clarify,

21  we didn't categorically refuse to search.  We went to the legal

22  department where we thought the HSR material would be found.

23  It was found there.  We are searching it.  We provided an

24  attorney from the Weyerhaeuser legal department as a custodian.

25  Simply, we --

1      THE COURT:  Okay.

2      MS. DIVER:  We're only refusing to add additional

3  custodians from the legal department because we don't think

4  that they will have unique information.

5      THE COURT:  Are there lawyers assigned to certain

6  kinds of work?  I mean, I am not -- this is really interesting.

7  I have never thought of this.  I mean, I have never thought of

8  this before, that -- I mean, the problem with privilege is the

9  other side has no idea what went through everybody's thought

10 process here.

11     Do you think another meet-and-confer on this topic

12 would be -- I mean, it seems to me that you could have a little

13 transparency in the discussion about it and -- have you ever

14 taken this approach in other cases?  Has any judge ever ruled

15 on this?

16     MR. MOGIN:  Your Honor, the reason that it's

17 important here is that the sources of information that we have

18 for Weyerhaeuser are very limited in light of the fact that

19 they transferred a large bulk of their records to International

20 Paper and, in some circumstances, as we understand it,

21 International Paper is unable to determine what those records

22 were.  Some of them, they can't be located, not through any

23 fault of their own.  That's just the nature of integration.

24     But in this particular instance, it seems to me quite

25 probable that within the legal department, there will be

1    business documents of the type that we're searching for.  It's

2    one source that we can go to.  It's -- if anybody in

3    Weyerhaeuser is going to continue to have container board

4    records, it's going to be the legal department; it's going to

5    be the accounting department.

6            And I do think that to a certain extent, what Ms.

7    Diver is saying is pointing out to you the difference that we

8    have been maintaining all along between a strict

9    custodial-based search and a corporate-function search.  What

10   she keeps coming back to is custodians, and what we're looking

11   for is responsive documents.

12           THE COURT:  Well, you can get them with -- I mean,

13   they're not mutually exclusive, necessarily.

14           Okay.  Is that your biggest issue with Weyerhaeuser?

15           MR. MOGIN:  At the moment, other than the common

16   issues.

17           THE COURT:  Okay.  All right.  I need to think about

18   that, whether, you know -- I mean, maybe it's time to key it up

19   to a motion.  I don't know.  But let's see where we go.  Okay?

20           Thank you, Miss.

21           MS. DIVER:  Thank you, Your Honor.

22           THE COURT:  Glad to hear your voice.  Okay.  I

23   thought that was an easy one.  Okay.

24           Let's do RockTenn.  Okay?

25           THE COURT REPORTER:  Your name again, sir?

```
 1              MR. McCAREINS:  Mark McCareins.  I was afraid I
 2    wouldn't get picked.
 3              THE COURT:  Oh, really?
 4              MR. McCAREINS:  Then I got picked.
 5              THE COURT:  Do you think this is a beauty contest?
 6    This isn't a beauty contest.
 7         (Laughter.)
 8              THE COURT:  This is a beauty contest here?
 9              MR. McCAREINS:  Well, I would finish last if this
10    was.
11              THE COURT:  You're very distinguished, Mr. McCareins.
12    Okay.
13              MR. McCAREINS:  May I -- may it please the Court.
14              THE COURT:  Yes, sir, it does please me.
15              MR. McCAREINS:  To provide a little bit of context.
16              THE COURT:  Yes, please do.  That's why really this
17    is important --
18              MR. McCAREINS:  Okay.
19              THE COURT:  -- for me to have individual facts about
20    each defendant.  Okay?
21              MR. McCAREINS:  Well, I have a personal bias --
22              THE COURT:  Okay.
23              MR. McCAREINS:  -- against discovery disputes.
24              THE COURT:  Uh-huh.
25              MR. McCAREINS:  I love appearing in front of Judge
```

1   Ashman and Judge Denlow and Judge Cole, *Daubert* motions.  I do

2   not like to be on this floor on discovery disputes.  I just

3   don't find it --

4              THE COURT:  You don't like me?

5              MR. McCAREINS:  -- productive.  No.  I have not ever

6   appeared in front of you, which is why I am saying this.

7              THE COURT:  Yes, right.

8              MR. McCAREINS:  And maybe there is a reason.  Because

9   I don't like -- anything I can do to avoid discovery disputes

10  for my client and put the resources in more productive

11  measures, like winning the case, I would prefer to do.

12             THE COURT:  I agree.

13             MR. McCAREINS:  I don't like them.  Number two, I had

14  never had the occasion to deal with Mr. Mogin before this case.

15  So anytime I get a lawyer I've never dealt with -- I called

16  Mr. Mogin early on in the case and I said, "Listen, if you

17  shoot straight with me, I will shoot straight with you."  And I

18  don't think he believed me, I really don't, because he started

19  and his legion of lawyers started sending us, little

20  RockTenn --

21             THE COURT:  Little RockTenn.  All right.

22             MR. McCAREINS:  -- all kinds of single-spaced letters

23  asking us to jump through all these discovery disputes.

24             THE COURT:  Right.

25             MR. McCAREINS:  And I think he thought he would wear

1    us down. But my mantra to my team, one of whom is here, and he

2    would attest to this under oath, is that -- I said to all the

3    legion of letters that Mr. Mogin and his team of lawyers sent,

4    let's try to respond to those as best we can. So he erected

5    all these hoops and things we had to jump through, and we

6    jumped through most of them.

7            THE COURT: Good.

8            MR. McCAREINS: To the point where we had our last

9    meet-and-confer last Friday, May 18th. And Mr. Mogin can speak

10   for himself. It was a magical meet-and-confer. We were

11   singing Kumbaya, and he gave me an A. Now, not an A-. I got

12   an A last Friday. So I'm expecting that he repeats that.

13           Well, now on to the matters at hand.

14           THE COURT: So we are now going to ask you to go to

15   every other meet-and-confer.

16           MR. McCAREINS: No. My client will not pay for that,

17   and I don't have the patience to do that.

18           THE COURT: I might deputize you --

19           MR. McCAREINS: Oh, boy.

20           THE COURT: -- to go to every other meet-and-confer.

21           MR. McCAREINS: Okay. I'm going to try to follow

22   your list.

23           THE COURT: Okay.

24           MR. McCAREINS: I got to find my glasses first.

25           THE COURT: Okay. Do that, please.

1        MR. McCAREINS:  I don't have them.

2        THE COURT:  I have an extra pair here you could

3   borrow.

4        MR. McCAREINS:  These are my Walgreens specials.

5        THE COURT:  Okay.  Yep.

6        MR. McCAREINS:  I got these from Mr. Ed Foote.

7        THE COURT:  3.0 or 2.75?  What are they?

8        MR. McCAREINS:  I don't think it's that --

9        THE COURT:  See, I am giving my age away here.

10        MR. McCAREINS:  Number one, documents produced to

11   date.  I was informed this morning that we are over 700,000

12   documents, which excludes this data dictionary issue, which I

13   will get to shortly, with the remainder of our production being

14   produced by the end of July.  So we are making good progress.

15        THE COURT:  So end of July.  You've got a target

16   date.

17        MR. McCAREINS:  That's the target, end of July.

18        THE COURT:  Okay.  Good.

19        MR. McCAREINS:  And we've got these contract

20   attorneys with the pipeline full of documents, and they're busy

21   reviewing as we speak.  And that's --

22        THE COURT:  Good.

23        MR. McCAREINS:  We're doing very well in that regard.

24        Two, custodians.  Now, we had a little bit of

25   pushback and give-and-take on custodians.  I think we

1  identified 13 or 14.  There's a dispute about whether it's 13

2  or 14 custodians originally, but let's take 14.

3  And we had a discussion in our meet-and-confer last

4  Friday, and Mr. Mogin had requested Matt Blanchard to be added

5  to our list, another five or so other regional VPs.  And I

6  consulted my client, without waiving any privilege, and said,

7  can we do that?  And they said fine.  So we have voluntarily,

8  unilaterally, and in the spirit of good faith in Sedona VI, or

9  whatever the principle is, we have added six custodians and we

10  are now up to 20, and I hope that that ends that issue.

11  I know Mr. Mogin is now estopped from going down that

12  road.  But as a measure to try to resolve this, he asked for

13  six more people and we gave it to him.  So we're up to 20.

14  THE COURT:  Okay.

15  MR. McCAREINS:  On the data dictionary, or whatever

16  it's being called now --

17  THE COURT:  He specified the six he wanted?

18  MR. McCAREINS:  Mr. Blanchard by name.  I don't know

19  what he knows about Mr. Blanchard.

20  THE COURT:  Okay.

21  MR. McCAREINS:  But he said Mr. Blanchard and the

22  five regional VPs.

23  THE COURT:  Okay.

24  MR. McCAREINS:  John Does 1 through -- and Jane Does

25  1 through 5.

1        THE COURT:  Okay.

2        MR. McCAREINS:  And we added those.  So we gave him

3    what he wanted.

4        THE COURT:  Okay.

5        MR. McCAREINS:  Point three, data dictionary.  At our

6    last hearing, I didn't know what a data dictionary was.

7        THE COURT:  Well, I didn't either.  That was the

8    problem.

9        MR. McCAREINS:  I think that is part of our issue.

10   So I went back to my team and with our client, and without

11   waiving a privilege, I said, what is a data dictionary?  Do we

12   have one?  Can we create one without a huge burden?  And they

13   said, we think we can do that.  And Mr. Mayer, who's in the

14   courtroom, supervised that process, and we produced what we

15   thought was the data dictionary.  That came up in our

16   meet-and-confer on May 18th.

17        Apparently, in our data dictionary, we included a lot

18   of numbers in addition to words.  And Mr. Mogin said, well, can

19   you get the numbers out and just give us words?  And, again,

20   this is Friday, and I left Saturday for an all-day or

21   all-weekend business conference.  I came back last night.  Mr.

22   Mayer informs me that we can submit the data dictionary without

23   the numbers.  And whether that resolves the issue or not, I

24   don't know, but that's my latest and best information on data

25   dictionary.

1          THE COURT:  Okay.

2          MR. McCAREINS:  Fourth, 30(b)(6) issues.  I was --

3    even though I'm anti-discovery dispute, I was not a big fan of

4    the 30(b)(6) deposition process early.  I resisted that.  I

5    thought it was, at best, untimely and, at worst, not required.

6    I came around on that issue as well.

7          THE COURT:  Good.

8          MR. McCAREINS:  And we had a 30(b)(6) deposition.

9          THE COURT:  Well, good.  Well, good.

10         MR. McCAREINS:  And then the legion of plaintiffs'

11   lawyers sent me follow-up letters, single-spaced, six, eight,

12   ten pages, you didn't do this.  What about this?  What about

13   this?  And I said to my team again, go back and try to answer

14   all their questions, and we responded.

15         And I'm happy to report, which may be one reason why

16   we got an A, that I think most, if not all, of the outstanding

17   issues on the 30(b)(6) deposition, which related to backup

18   tapes and things like that, have been resolved.

19         THE COURT:  Cool.

20         MR. McCAREINS:  Next issue, the parsing issue.  I

21   don't have a letter from Mr. Mogin relating to parsing.  I

22   don't --

23         THE COURT:  What do you mean by "parsing"?

24         MR. McCAREINS:  Well, somebody raised that here.

25         THE COURT:  I did.

1          MR. McCAREINS:  I know.

2          THE COURT:  I mean, I --

3          MR. McCAREINS:  He hasn't yelled at me about parsing,

4     though.  He hasn't sent me a letter saying, you haven't parsed

5     or you parsed too much --

6          (Laughter.)

7          MR. McCAREINS:  -- or whatever -- whatever the

8     parsing issue is I am not -- you know, it's -- I would make a

9     reference to my wife here, but I'm not going to do that.

10         THE COURT:  Right.

11         MR. McCAREINS:  So on the parsing issue, I don't know

12    where we stand because we haven't received a deficiency letter

13    on that.

14         THE COURT:  I see.  Okay.  We need the linguist for

15    the parsing issue.

16         MR. McCAREINS:  Well, maybe.

17         THE COURT:  What is parsing.

18         MR. McCAREINS:  So we are continuing to produce

19    documents and we are hopeful -- my client --

20         THE COURT:  Do you have a legal department?  Not you,

21    but does RockTenn have a legal department?

22         MR. McCAREINS:  We do.

23         THE COURT:  And did you make -- did you turn over --

24    as part of your production, are there documents produced from

25    the legal department?

1     MR. McCAREINS:  The successor to Smurfit Stone is

2  RockTenn.  So Smurfit Stone's legal department was really at

3  issue here.  We designated a custodian, general counsel, Craig

4  Hunt, and any document that would have gone through the legal

5  department of any significance relating to anything would go

6  through Craig Hunt.  He's a custodian, and his documents,

7  nonprivileged and responsive, are being produced.

8     THE COURT:  Okay, okay.

9     MR. McCAREINS:  And I think they only had three

10  lawyers max, anyway.

11     THE COURT:  Okay.  And Smurf -- when did RockTenn --

12  were they absorbed?  Was Smurf absorbed by RockTenn, bought by

13  RockTenn?  Are you -- is it a division of RockTenn now?  I

14  mean --

15     MR. McCAREINS:  They were acquired, and they are now

16  called RockTenn -- uh-oh.

17     MR. MOGIN:  CP.

18     THE COURT:  Smurf.

19     MR. McCAREINS:  Thanks.  CP.

20     THE COURT:  CP.

21     MR. McCAREINS:  Smurfit Stone does not exist anymore.

22     THE COURT:  I see.  Okay.

23     MR. McCAREINS:  That interesting building on north

24  Michigan Avenue with the diamond shape?

25     THE COURT:  Uh-huh.  That's it?

1    MR. McCAREINS:  That was the old Smurfit Stone

2  building.  I think somebody has taken it over.

3    THE COURT:  Okay.

4    MR. McCAREINS:  So we are anxious, Your Honor, in all

5  seriousness, to dispense with these issues and get on with the

6  adjudication of the merits.  And anything within reason that

7  doesn't -- that my client refuses to do or we find impossible

8  or costs too much money we've done up to this point, and we're

9  anxious to get some closure on all these issues floating

10  around.  So I have ended my homily.

11    THE COURT:  Mr. Mogin, what do you have to say about

12  RockTenn?

13    MR. MOGIN:  Well, first, Your Honor, in reference to

14  the beauty contest --

15    THE COURT:  Yes.

16    MR. MOGIN:  -- I can't miss a beat and have to say

17  that you have to be the winner.

18    THE COURT:  Thank you.  No.  Both Colleen and Lynette

19  and I and Britt and -- yes, we are going to do all the women.

20  We'll do this nice sexist thing.  We'll have all the women in

21  the courtroom as the beauties here.  Thank you, Mr. Mogin.

22    MR. MOGIN:  And second, I would compliment

23  Mr. McCareins for the comic relief.  It is much appreciated.

24    THE COURT:  Right.  Doesn't it help when things are

25  tense?  I mean --

1      MR. MOGIN:  Of course, it does.

2      THE COURT:  I mean, I really think it does.

3      MR. MOGIN:  I agree.

4      THE COURT:  I wish more lawyers did it, so --

5      MR. McCAREINS:  I learned from the master.

6      MR. MOGIN:  Thank you.

7      MR. McCAREINS:  Mr. Ed Foote.

8      THE COURT:  That's true.

9      MR. McCAREINS:  Yes.

10      THE COURT:  That's true.

11      MR. MOGIN:  I have no quarrels with anything that

12  Mr. McCareins has said.

13      THE COURT:  Good.

14      MR. MOGIN:  The only issues that we have open with

15  RockTenn are the same issues that are open with respect to most

16  of the other defendants, the common issues that we've been

17  talking about all the time.

18      THE COURT:  Which we will, which we will.  But as it

19  is right now, custodians you asked for, and you got more

20  custodians.  They're calling it a word index.  I mean, that's

21  the same thing we're -- this word dictionary, word.  And your

22  30(b)(6) is over, and you're in the process of -- your

23  production's actually happening already.

24      MR. McCAREINS:  I mean, we produced 700,000 pages.  I

25  don't know how many more we have to go.

1          THE COURT:  Okay.

2          MR. McCAREINS:  But we've got a lot in the pipeline.

3          THE COURT:  Okay.

4          MR. MOGIN:  I will say that --

5          THE COURT:  Well, I mean, this is one of the problems

6     of being a common defendant, too.  I mean, unless, you know,

7     you could get a separate trial, your client is just going to

8     have to wait till everybody else is ready.  Either that or

9     you're going to have to go to all these meet-and-confers and

10    use your Irish wit and charm and move it along.

11         MR. McCAREINS:  Well, I'm trying.

12         THE COURT:  You're trying.

13         MR. MOGIN:  Now, with respect to the A, I will say

14    that at the conclusion of the meet-and-confer that we had on

15    Friday, it was such a pleasure -- I think the meet-and-confer

16    was mostly conducted by Mr. Clark from our side, who you met

17    last time -- is not with us today -- and Mr. McCareins'

18    partner, Mr. Mayer.  We just sort of sat back in the background

19    and provided --

20         THE COURT:  That's good.

21         MR. MOGIN:  -- comic relief as was necessary.

22         THE COURT:  Good.

23         MR. MOGIN:  And the relationship and the way those

24    two handled it was truly exemplary to the point where I thought

25    it was important to tell them.  So that's basically where we

1    are with RockTenn.

2              THE COURT:  Well, thank you.

3              MR. McCAREINS:  He didn't tell me that.  He told Mr.

4    Mayer that.

5              MR. MOGIN:  That's true.

6              THE COURT:  Well, good.  Okay.

7              MR. McCAREINS:  All right.  Am I done?  Thank you.

8              THE COURT:  Yep, you are done.  Thank you.

9              Okay.  Let's do Norampac.

10             MR. MENDEL:  Norampac.

11             THE COURT:  Hi.  How are you today?

12             MR. MENDEL:  Your Honor, Scott Mendel for Cascades

13   and Norampac.  It's a hard act to follow.

14             THE COURT:  I appreciate -- well, it might be, but I

15   still appreciate it.  The first time we tried to do this, you

16   were the first person to volunteer for a meet-and-confer.  So I

17   liked your spirit.  Thank you.

18             MR. MENDEL:  Thank you.

19             THE COURT:  Okay.  So how are you moving along?

20   What --

21             MR. MENDEL:  I think we are moving well, Your Honor.

22   We have done three document productions up to now totaling

23   about 125,000 pages.  It's largely hard-copy documents from our

24   ten custodians, some ESI consisting of our regular financial

25   reports and that sort of thing.

1    We are in the process now of doing a very intensive

2  review of the ESI of our custodians.  Hope to have a first

3  production of that sometime in June.  And then to follow up

4  with, you know, the shared drives and hopefully complete

5  production sometime late this summer would be my guess.

6    THE COURT:  Now, I noticed in yours -- I think yours

7  is the only one that had this.  The plaintiffs requested

8  historical organization charts and a description of how you

9  selected your ten custodians based on plaintiffs' corporate

10  function.  So -- and you did provide that?

11    MR. MENDEL:  Yes.  We provided both historical org

12  charts and then we took our --

13    THE COURT:  What do you mean by "historical"?  People

14  who at the time --

15    MR. MENDEL:  Yes.

16    THE COURT:  -- as opposed to now?

17    MR. MENDEL:  Right.  So we went back to 1/1/04 and

18  asked our client to provide all the org charts between 1/1/04

19  and 12/31/10 --

20    THE COURT:  Uh-huh.

21    MR. MENDEL:  -- and we provided those to the

22  plaintiffs so they could look back and see who held what

23  positions at what point in time, again, as part of the process

24  of potentially identifying additional custodians.

25    Now, you know --

1       THE COURT:  Which you are willing to do?

2       MR. MENDEL:  Willing to consider additional

3   custodians.

4       THE COURT:  Okay.

5       MR. MENDEL:  I was told at our meet-and-confer

6   yesterday that sometime in the next few days, next week, we

7   will get a list from the plaintiffs of the custodians they

8   would like us to consider, and I told them we would consider

9   those and then get back to them.

10      THE COURT:  And in your written explanation, this is

11  a written explanation of how to match up -- how your custodians

12  match up to the job?  Is that what it was?

13      MR. MENDEL:  What we had done, Your Honor, was --

14  initially they asked us to describe the responsibilities of

15  each of our custodians, and so we actually gave them what our

16  human resources folks had as job descriptions for each of those

17  folks.

18      THE COURT:  Okay.

19      MR. MENDEL:  The plaintiffs came back and said, you

20  know, this is a lot of HR speak.  We don't really --

21      THE COURT:  Right, right.

22      MR. MENDEL:  -- understand.  And how does it match up

23  with our corporate functions?  So if you recall in their

24  request for production of documents, they listed -- I think it

25  was -- I forget how many corporate functions, some 20 or so

1    corporate functions that they were interested in.  And so what

2    we said we'd do is go down to each of our custodians and say

3    which corporate functions they have involvement in or

4    responsibility for.

5         And so that's what we did in our letter to the

6    plaintiffs last week.  Because we went down to each of our ten

7    custodians and said this guy, our CEO, is responsible for the

8    following corporate functions, our VP sales is involved in the

9    following corporate functions, to show that, you know, we've

10   selected custodians that cover all of the corporate functions

11   that they have listed.

12        THE COURT:  Mr. Mogin?

13        MR. MOGIN:  Yes, Your Honor.

14        THE COURT:  Where are you?  I can't see you over

15   there.  So does that -- so that sounds like a pretty

16   interesting idea.  Did that work when they gave you that

17   information back?

18        MR. MOGIN:  It was very helpful, Your Honor.

19        THE COURT:  So how did you make up your list?  I

20   mean, this is like an interesting idea.  So how did you know

21   what to ask him?  I mean, do you know this from other

22   anti-trust?  I mean, is this kind of like categories of

23   information?

24        I don't mean some secret how did you know this, but

25   that sounds like that would be a very helpful thing to be able

1    to direct them in a specific way.

2            MR. MOGIN:  Yes.  That's precisely what we did.  If

3    you go back to the requests for production, we listed -- I

4    believe it was 14 corporate functions, things like production,

5    sales, strategic planning, things of that nature, and those

6    were the -- to us, those were the important corporate

7    functions.  In other words, as you recall, we've been

8    anti-custodian --

9            THE COURT:  Right.

10           MR. MOGIN:  -- since the inception, and this was our

11   alternative to custodians, was to identify the people who

12   performed functions --

13           THE COURT:  Sort of a quasi department.

14           MR. MOGIN:  Exactly.

15           THE COURT:  I mean, it's like a quasi department

16   function.

17           MR. MOGIN:  Exactly.

18           THE COURT:  Okay.

19           MR. MOGIN:  And so --

20           THE COURT:  So the way they did it is helpful to you?

21   I mean, is getting you the kind of information you need?  Is

22   that what you're saying?

23           MR. MOGIN:  Yes, Your Honor.

24           Your Honor, also with Mr. Mendel's permission, I can

25   show you the organizational charts he was referring to, the

1 historical organizational charts, so that you have a better

2 sense of what it is that we're speaking about.

3 THE COURT: Sure, I'd love to see it. Have you

4 shared any of this with the other defendants to give them an --

5 you know, I mean, I know International Paper and GP are much

6 bigger kinds of companies, but, I mean, if somebody hits on

7 something in a cooperative mode that seems to be working, if

8 there's not privilege here, it might be a good idea to show it

9 to somebody else.

10 MR. MENDEL: Your Honor, one of the first things all

11 the defendants did in this case -- and now we're talking about

12 a year and a half ago -- was to give the plaintiffs a set of

13 our organization charts.

14 Now, again, recently we were asked for historical

15 charts, so we went back and gave them historical charts.

16 THE COURT: Right.

17 MR. MENDEL: But I believe a number of the defendants

18 have done the same.

19 THE COURT: Well, good. This is a work in progress,

20 honest to God. How anybody would know a year and a half ago --

21 (Document tendered to Court.)

22 THE COURT: Now --

23 MR. MOGIN: And if you look in the lower --

24 THE COURT: Français.

25 MR. MOGIN: If you look in the lower left-hand corner

1    on most of the charts, you will see that there's a date.

2              THE COURT:  Yes.

3              MR. MOGIN:  So that's what we refer to as historical.

4    So based upon --

5              THE COURT:  I got it.

6              MR. MOGIN:  -- the prior charts and these charts, we

7    can put it all together.

8              THE COURT:  So -- all right.  So you're getting

9    tweaked here today, that Mr. Mogin and his team, his -- what

10   did you call them, his --

11             MR. McCAREINS:  Legions of lawyers.

12             THE COURT:  -- legions of lawyers over here on the

13   right side of the courtroom are getting tweaked; that he has to

14   look at the documents, that it's his responsibility to look at

15   the documents, look at these millions of e-mails, and tell us

16   more people you want when you get a chance to look at this.

17             This also, though, this is a way you are adding to --

18   if you are going to be allowed to increase the number of

19   custodians.  One way is obviously look at the e-mail, look at

20   the documents, look at the CC, see who -- then another way

21   would be through a chart.  What's another way you're using,

22   since we're talking about custodians at the moment?

23             MR. MOGIN:  Well, the narrative description of the

24   type that Mr. Mendel has provided.

25             THE COURT:  So that really helped?

1      MR. MOGIN:  That helps.

2      THE COURT:  Okay.

3      MR. MOGIN:  It's much more helpful than the HR speak.

4      THE COURT:  Right.  Okay.

5      MR. MOGIN:  I mean, it's unfathomable to me --

6      THE COURT:  Did your company have to do that

7   specifically for this case?

8      MR. MENDEL:  Yes, yes, we did, yep.

9      THE COURT:  Okay.

10     MR. MOGIN:  "That" being, Your Honor?

11     MR. MENDEL:  The matching the individual to the

12   corporate function.  It was not something -- not a document

13   that existed at the company.

14     THE COURT:  Right, right.

15     MR. MENDEL:  We had to go back to the client and say,

16   you know, please help us do this.

17     THE COURT:  Are all these people in Paris?

18     MR. MENDEL:  No, no.  They're in Montreal, Your

19   Honor.

20     THE COURT:  Oh, in Montreal.  I like Montreal, too.

21   Okay.  And are the documents in French?  Was that one of the

22   issues, too?

23     MR. MENDEL:  There's about -- yeah.  There's about 30

24   to 40% of the documents in French.

25     THE COURT:  Okay.

1      MR. MOGIN:  And what we are trying to figure out is a

2  common protocol, expense sharing, et cetera, so that we're all

3  working off of the same page with respect to all the documents.

4      THE COURT:  Okay.  So do you agree, you and Norampac

5  are on good terms here?

6      MR. MOGIN:  Yes, Your Honor.  I think that things are

7  progressing well with them.  The common issues are really the

8  primary issues that need to be dealt with.

9      THE COURT:  This is helpful.  Thank you.

10     (Document tendered back to counsel.)

11     MR. MENDEL:  Thank you, Your Honor.

12     THE COURT:  Okay.  We are on to number five.  We are

13  on to Temple.

14     (Court conferring with her law clerk.)

15     THE COURT:  Sorry, Mr. Marovitz.

16     MR. MAROVITZ:  No worries, Your Honor.

17     THE COURT:  Okay.  How are you?

18     MR. MAROVITZ:  I'm well.  Thank you.

19     THE COURT:  Good.

20     MR. MAROVITZ:  We had a meet-and-confer in person

21  with Mr. Mogin and his team yesterday.  I thought it went well.

22  We had a good exchange.

23     And let me track down the things that we discussed

24  and the issues that I think are individual to Temple-Inland.

25     In addition, I have noted that Mr. Mogin has

1    mentioned there are several common issues.  I won't address
2    those unless you ask, Your Honor.
3               THE COURT:  Right.
4               MR. MAROVITZ:  First, Temple-Inland has produced an
5    estimated 1.3 million pages.  The way that we come up with
6    those figures I think, as all parties do, is that some of those
7    documents are produced in TIFF images with Bates numbers and
8    others are native.  And so you take the estimate of the native
9    ESI and you estimate how many actual pages those would
10   constitute.  So we have 1.3 million pages that we have
11   produced.
12              THE COURT:  And that's produced already?
13              MR. MAROVITZ:  Already produced.
14              THE COURT:  Okay.
15              MR. MAROVITZ:  Already produced.  Those productions
16   that we've made over a period of time have come from 28 named
17   custodians.
18              THE COURT:  Okay.
19              MR. MAROVITZ:  So we have a pretty substantial number
20   of custodians; 22 primary custodians and then 6 assistants.
21              We intend at Temple-Inland to make at least three
22   more productions.  First is a production of hard-copy
23   documents.
24              THE COURT:  Okay.
25              MR. MAROVITZ:  Second is a production of documents

1    that are sufficient to show.  What I mean by that is the

2    plaintiffs may ask for certain information and they may say,

3    we're looking for the information.  We're not looking

4    necessarily for each and every document that relates to that

5    information.  So if you can give us a document that is

6    sufficient to show that information, that will be enough.  And

7    so we are searching for that information.  That's the second

8    kind of information that we will be providing.

9         And third, and finally, we have a set of documents

10   that would be kept on shared drives and shared-point drives,

11   and we're in the process of going through those for additional

12   documents that conform to what we said we'd produce.

13        We anticipate having those productions done

14   September, maybe October.  We're working very hard on it.  We

15   have a lot of pages of documents we have to go through.

16        On custodians, I have already mentioned, we have 28.

17   And on the data dictionary, we've already produced our data

18   dictionary or word index, I think, as Mr. Mogin called it.  We

19   have more than 3 million entries in that that we've produced

20   some time ago.

21             THE COURT:  Do you think that's going to be helpful

22   to you?

23             MR. MAROVITZ:  Not particularly, no.

24             THE COURT:  Not particularly.

25        (Laughter.)

1          MR. MAROVITZ:  No.

2          THE COURT:  I'm trying to make --

3          MR. MAROVITZ:  I'm sorry.  It took me a second --

4          THE COURT:  -- lemonade out of lemons here.  Okay.

5          MR. MAROVITZ:  -- to figure that out here.  And I

6     thought about it, and I --

7          THE COURT:  I just thought, well, maybe there was

8     something helpful to you.

9          MR. MAROVITZ:  No.

10         (Laughter.)

11         THE COURT:  Okay.  That's honest.

12         MR. MAROVITZ:  I'm limited by the facts I have.

13    On --

14         THE COURT:  Additional custodians, has Mr. Mogin

15    asked you for any more?

16         MR. MAROVITZ:  No.  And, of course, he has retained

17    the right, properly, once he goes through our documents --

18         THE COURT:  Right.

19         MR. MAROVITZ:  -- to identify additional custodians.

20    And we've told him that we would certainly take a look at any

21    he identifies and consider those in good faith.  So we will be

22    happy to do that.

23         But we had a -- we started with a pretty broad list.

24    28's a lot.  In my experience in anti-trust cases, 28

25    custodians is a lot, so -- and then if he has -- if after

1  reviewing our documents they come up with more, they will

2  surely let us know.

3          The other issues, I guess, that were raised with

4  other defendants are 30(b)(6) issues, and then there are a

5  couple issues in their status report that I'd like to take a

6  moment on.

7          THE COURT:  Right.  Good.  Please do.

8          MR. MAROVITZ:  So on the 30(b)(6) issues, we actually

9  presented two witnesses to testify with respect to the 30(b)(6)

10  questions.  And, in our view, both witnesses were able to fully

11  answer plaintiffs' questions about e-mail systems, backup

12  tapes, preservation issues, and production systems.  They,

13  frankly, were not able to fully testify about privilege issues

14  nor were those issue, frankly, properly on the table.

15          So we presented those witnesses over a series of two

16  days for a 30(b)(6) deposition.  We provided a lengthy letter

17  in January in response to the plaintiffs' request with the

18  hope, frankly, that no 30(b)(6) deposition would be necessary;

19  and then after that letter was submitted, we then submitted two

20  additional witnesses to testify about the 30(b)(6) issues, and

21  we thought they answered all the questions.

22          We actually have a copy of our 30(b)(6) transcript

23  which we'd be glad to give to the Court.  It was not previously

24  provided.  You asked for a sample, Judge.

25          THE COURT:  Right.

1    MR. MAROVITZ:  But the Court can come to its own

2  conclusion on that.

3    And then, Your Honor, with respect to the issues --

4    THE COURT:  I haven't heard Mr. Mogin say any

5  insufficiencies with the 30(b)(6).  I mean, I have some

6  questions for Mr. Mogin about sources of data.  I'm assuming

7  that when we get to the sources of data, I'm assuming that the

8  issues are going to come up, how well the custodians knew about

9  what was active and inactive.  I mean, that to me is where it's

10  going to come up more than anything, I think.

11    MR. MAROVITZ:  All I can tell you is that our

12  deponents spent hours and hours and hours preparing for those

13  depositions.

14    THE COURT:  Good, good.

15    MR. MAROVITZ:  They took the process --

16    THE COURT:  I haven't heard anything, because we

17  really haven't gotten to, you know -- actually start to get

18  into this issue.  Every time Mr. Mogin says the word, I go

19  under the desk because I don't want to deal with it, so -- but

20  I am going to deal with it today.

21    MR. MAROVITZ:  Okay.  And, frankly, as to individual

22  issues with respect to Temple-Inland, I think there may be less

23  here than meets the eye without regard to the common issues.

24  There are, I guess, five issues that are listed in the status

25  report.

1       THE COURT:  Okay.

2       MR. MAROVITZ:  The first and the fifth issue, in our

3   estimation, are linked.  The first issue is backup tapes, and

4   the fifth issue is time period.  And here, Judge, is where

5   proportionality, which you mentioned before, really does come

6   into play.

7       We offered in our meet-and-confer, I guess, two

8   meet-and-confers ago before the last status conference that we

9   would be willing to go back from where we were, 2004 to 2003,

10  for responsive liability-type requests if, in return, the

11  plaintiffs would not require us to do what we believe we should

12  not be required to do anyway, but to take it out of the realm

13  of a dispute, which is to search through a countless number of,

14  frankly, poorly or completely unidentified backup tapes where

15  we don't have any reason to believe there will be responsive

16  information.  So we said let us, you know, confine ourselves to

17  our active systems, take the offline systems, take the backup

18  systems off the table, and we would reach a compromise with you

19  to go back to 2003.

20      I know that they were considering that.  So, you

21  know, I'm still hopeful that before the end of this process

22  that they'll have -- be able to reach a resolution of that

23  issue with us.

24      THE COURT:  Okay.

25      MR. MAROVITZ:  It just seems to be a reasonable way

1   to proceed.

2         On search scope, which is the number two issue in

3   their agenda, there's simply -- I don't -- I think there's just

4   an oversight in what the plaintiffs have written.

5         What the plaintiffs wrote and submitted to this Court

6   was that T-In, which is Temple-Inland, has put live e-mail

7   files for all users as of September 9, 2010 in its document

8   review platform but is unwilling to run searches across all

9   users.

10         That factual statement is simply a misstatement.

11   It's incorrect.  As I said, I think it's just --

12         THE COURT:  Tell us what's incorrect.

13         MR. MAROVITZ:  I think it's just a mistake.

14         THE COURT:  Okay.

15         MR. MAROVITZ:  We have not at Temple-Inland put all

16   e-mail files for all users on our document review platform.

17         THE COURT:  Okay.

18         MR. MAROVITZ:  I can't be more clear than that.

19         THE COURT:  Okay.

20         MR. MAROVITZ:  E-mail files for all users who are the

21   custodians with whom we have spoken are in our vault system,

22   but they're not on the document review platform.

23         And just an estimate -- we haven't done a tremendous

24   amount of digging, but an estimate to add all those to the

25   document review platform through the technology and the cost,

1    I'm told, would be around a million dollars.  So that's not an

2    expense for people who we really don't think have much to do

3    with this case that Temple-Inland ought to be required to bear.

4           So, again, I just think that's an oversight, but

5    because it's listed as an outstanding specific issue, I thought

6    it ought to be raised.

7           And then the other two issues, search terms and

8    strings and validation testing, really are common issues.  I

9    don't think they're specific to Temple-Inland.  And if I'm

10   mistaken about that, I'm sure you will hear from Mr. Mogin

11   about it.

12          I think that's it with respect to Temple-Inland.  As

13   I say, I think that -- I just don't think there are that many

14   specific issues as to us, but there are some common ones, and I

15   know --

16          THE COURT:  It sounds like you have made a lot of

17   progress, though.  It does.  Mr. Mogin?

18          MR. MOGIN:  Well, Your Honor, frankly, Temple-Inland

19   is a bit of a hard slog.

20          Let me begin by reading from a letter from Ms. Miller

21   dated the 25th of April:  "We confirmed plaintiffs'

22   understanding that (a) the e-mail of all Temple-Inland e-mail

23   users was ingested into the Symantec Enterprise Vault™ system

24   shortly after the filing of the instant litigation, but (b) for

25   reasons previously discussed at length, Temple-Inland would

1    only be searching the e-mails of the identified custodians for
2    responsive material."

3         The date of that letter is the 25th, which was after
4    the last hearing, and this was a follow-up letter to the
5    meet-and-confer.

6         So while the technical distinction I think that
7    Mr. Marovitz was making is that they have it in a Symantec
8    Enterprise Vault™.  They haven't put it over into their
9    document review system being used for this purpose.  However,
10    the fact of the matter is that if it's in a system like
11    Symantec Enterprise Vault™, it's our understanding that it can
12    be searched, cross users, and that an index can be provided
13    from what runs again in the background there.

14         So that is actually somewhat typical of the situation
15    with respect to Temple-Inland.

16         Backup tapes, backup tapes.  Temple-Inland has a
17    large number of backup tapes.  We don't really know the content
18    of the backup tapes.  It's been represented to us that there is
19    no real index, per se, of the backup tapes.

20         So without any information -- PCA, as you heard
21    earlier, provided some rudimentary information.  Without any
22    information, there's nothing that we know to do to narrow the
23    scope except to, in a blind, accept the representation and
24    possibly give up on responsive documents.

25         It's particularly difficult for Temple-Inland, to the

1    extent that their employees complied -- and they may not have

2    fully complied, but to the extent that they did comply with the

3    document destruction policy -- because there is in place a lot

4    of automatic deleting that takes place.  I can't, as I sit here

5    today, recite for you the specifics of that, but it's

6    essentially 90, 120 days, there's an automatic delete that goes

7    on.  And that's the situation for a number of the defendants

8    which is what makes the backup tapes particularly important.

9           So the only thing that we will have from the earlier

10   time periods will be whatever residual -- and perhaps it's

11   either residual that didn't comply with the policy or it's

12   something that somebody kept perhaps in compliance with the

13   policy, perhaps not.  But for whatever reason, those are

14   documents that were singled out.  So we don't know what to do

15   with the backup tapes.

16          Now, you have asked about parsing, what is parsing,

17   and it's an area of great contention today.  So I'll give you

18   my version of parsing.

19          And Temple-Inland is perhaps one of the most -- well,

20   I'll just say that the problem is more pronounced with

21   Temple-Inland than it is with other defendants.

22          So we asked -- and Your Honor said that you read our

23   requests for production of documents.  You understood the logic

24   of them.

25          THE COURT:  Did I say that?

1          MR. MOGIN:  You did.

2          THE COURT:  Okay.

3          MR. MOGIN:  And that there appear to be a logical

4    sequence.  And I will tell you that those document requests

5    didn't just come off the word processor.  I won't say that some

6    of those questions haven't been asked in some form or another

7    in other cases, but for the most part, we sat down, considered

8    the unique circumstances of the case, what we knew about the

9    defendants and their operations at that time, and carefully

10   crafted what we thought were targeted requests that would get

11   us what we need.

12          The defendants' response -- Temple-Inland's in

13   particular -- their responses and objections run to 135 pages.

14   Now, there's only 94 requests.  So if you put in the

15   definitions and the instructions and all that other happy

16   stuff, you get out to about one page per request.  A request is

17   about a sentence or two.  Sometimes they're lengthy because

18   they list exemplary documents.

19          What Temple-Inland and some of the other defendants

20   have done -- and this is the parsing issue -- is not only have

21   they listed general objections, and then said subject to those

22   objections, they will produce documents, but they have

23   redefined or limited after that "subject to" the documents that

24   they will produce.  In our terminology, a redefinition.

25          And as I tried to explain in the status conference

1    statement, that's the first redefinition or deconstruction.

2    The second takes place when the search strings get applied and

3    collapsed, and there's no way to trace particular search

4    strings to particular RPDs.

5            So, at this point, based upon the testimony that you

6    heard as to how defendants constructed and applied the search

7    strings, which included that they did not search for documents

8    that they objected to to some degree -- I'm not attempting to

9    quote Mr. Brown's testimony, but there is something of that

10   gist in there -- what we --

11           THE COURT:  I -- wait, hold on.  They didn't search

12   for the documents or they didn't produce the documents?

13           MR. MOGIN:  Good question.  I think I misspoke.

14           THE COURT:  I mean --

15           MR. MOGIN:  They didn't produce documents.

16           THE COURT:  Right.  Okay.

17           MR. MOGIN:  To which they had objected.  Now, in my

18   experience in other cases, certainly I have seen this technique

19   used.  The more common technique is that after stating the

20   objections, subject to defendants will or will not produce, and

21   it's an absolute, for some categories of documents, there's

22   some level of limitation of the type that Temple-Inland has

23   attempted here.  But here in this case, it is much more

24   extensive than anything that I have seen in my 30-plus years of

25   experience.

1              So that's the -- that requires that for us to

2      understand what Temple-Inland has, in fact, produced that we

3      parse -- that's where the word comes from -- each and every

4      response, compare the response to what was requested, make a

5      comparison of that to the search strings -- and you understand

6      at this point the lack of information that we have about the

7      search strings.

8              THE COURT:  That it's -- well, okay.  In some cases,

9      you have search strings, but they're not matched to the RPD.

10             MR. MOGIN:  Yes.  But think about it this way.  I

11     carefully craft a request for production of documents.

12     Defendants object, and there's a redefinition or a partial

13     redefinition --

14             THE COURT:  Right.

15             MR. MOGIN:  -- that takes place.  Then it rolls into

16     collapsing it into the search string, removing from what's

17     being produced that which was objected to, and then not being

18     able to or refusing to put Humpty Dumpty back together again in

19     the sense of telling me which search strings apply to which

20     requests for production of documents.  Thus, like I said, we

21     have to parse.

22             In addition to parsing and the parsing letters, if

23     you will, two of them were attached as exhibits to the -- to

24     our status conference statement.  We'll have to go through an

25     entire meet-and-confer with respect to each and every one of

1    those.

2            And so, based on that, we are unable to know the

3    extent to which our requests for production of documents have

4    been complied with.

5            THE COURT:  All right.

6            MR. MOGIN:  What we have to do is we have to review

7    the documents, complete the review, on our own figure out

8    what's missing and ask for it.  Now, that's a task that could

9    take, given the volume that's being produced here, quite a long

10   time.  So that's the parsing issue.

11           THE COURT:  Okay.

12           MR. MOGIN:  And Temple-Inland is the --

13           THE COURT:  So for Temple --

14           MR. MOGIN:  -- model for that.

15           THE COURT:  -- -Inland, you've got a parsing issue

16   and you have -- we need more information on the backup tapes?

17           MR. MOGIN:  Precisely.

18           THE COURT:  Okay.  Any other issues for Temple?  I

19   mean, I know they're common issues to everybody, but --

20           MR. MOGIN:  Well, there is the common issues.

21           In Temple's case, for example, they have restricted

22   their custodians to what they describe as primary

23   decision-makers.

24           THE COURT:  Okay.

25           MR. MOGIN:  Okay?  And, as I've said a number of

1    times, the primary decision-makers are unlikely to be the

2    primary record-keepers, and we need further information here.

3    Temple-Inland is going to have to go beyond those primary

4    decision-makers if we're to have anything approaching a

5    compliance of document production.

6            THE COURT:  All right.  You have been in as many

7    anti-trust cases, I'm assuming, as Mr. Marovitz has been in.

8    I've had one other in 14 years with Ms. Miller in which she was

9    the plaintiffs' lawyer, actually.

10           I was very confused back in the beginning when I

11   think you told me at the first hearing that it was your

12   experience that in anti-trust cases, the nature of kind of the

13   covert activity or covert meetings that go on are among very

14   high level -- we're not talking about the defendants here at

15   all.  I'm talking hypothetically.  Okay?  That your experience

16   hypothetically is that unlike other kinds of cases where

17   usually named officials don't know what the underlings are

18   doing, mostly because they don't want to, or that's the way

19   they set it up, or they're so busy doing their CEO thing, they

20   don't know what's going on underneath them, that I thought you

21   told me in anti-trust cases, very often it is the high-level

22   people who are in a very secretive and a lot of coded kind of

23   behavior.

24           So if I did hear you correctly, Mr. Mogin, and I may

25   not, that sort of surprised me from what I know about RICO and

1    what I know about mail fraud and -- I mean, that isn't always

2    true in other kinds of conspiracies.  I thought, well, I guess

3    things happen different in anti-trust cases.

4         So then if that were true, maybe they pick those

5    primary people kind of based on the same thing you did.  I

6    mean, we didn't have a common understanding here of who might

7    be the movers and shakers.

8              MR. MOGIN:  Let me explain.

9              THE COURT:  Uh-huh.

10             MR. MOGIN:  It isn't true in every case.  It's true

11   in many cases that the fix, if you will, is put in by the

12   higher level people.

13             THE COURT:  Right.

14             MR. MOGIN:  Those are the people who actually make

15   the arrangements and effectuate it.

16             THE COURT:  Who are talking to each other and --

17             MR. MOGIN:  Talking to each other or talking through

18   subordinates.

19             THE COURT:  Right.

20             MR. MOGIN:  And -- but that is not necessarily the

21   people who keep the records of what's going on in the

22   conspiracy or who create the evidence that will reveal the

23   existence of the conspiracy.

24         And I have on a number of occasions -- and I believe

25   it's cited in some of the briefs -- referred you to the *Archer*

1   *Daniels Midland* case that took place here in the --

2              THE COURT:  Yeah, right.

3              MR. MOGIN:  -- Northern District some time ago.  The

4   terminology that was revealed is there was masters,

5   m-a-s-t-e-r-s, and sherpas, s-h-e-r-p-a-s.  The sherpas did the

6   dirty work, if you will, in terms of the day-to-day work of

7   keeping the conspiracy going and keeping such records as were

8   necessary or as existed.  The masters, on the other hand, met

9   in secret.  And you have seen, perhaps, the FBI films from that

10  case, where they talk about things like, well, the first thing

11  we need to do is form a trade association so we can all have an

12  excuse to get together.  So that's the situation that we're

13  concerned with.

14             So just giving us the -- in other words, Your Honor,

15  those primary decision-makers are highly unlikely to be the

16  primary record-keepers.  It's important that we see what they

17  say, but it's also important that we see what's going on

18  beneath that surface or under that glass ceiling, if you will.

19             And, for example -- this is an anti-trust case.  A

20  lot of evidence generally comes out of sales and marketing

21  departments in cases like this, not out of -- not necessarily

22  from the senior vice presidents.  It comes from the guys who

23  are running the plants, to some extent, because they've got a

24  different set of economic incentives.  And sometimes you even

25  see internal pushback because their economic incentives won't

1    come to fruition.  They'll get paid less as a result of

2    something that's going on at headquarters.  That's why we've

3    asked from the beginning for a non-custodial search.

4              THE COURT:  Well, I --

5              MR. MOGIN:  That's why we've maintained throughout

6    that it was necessary to go beyond primary decision-makers.

7    That's why we keep pushing for more information about who are

8    the people that are involved in the organizations.  That's why

9    we keep asking for more organizational charts.

10             And the organizational charts typically --

11             THE COURT:  Aren't they giving you those?

12             MR. MOGIN:  Some yes; some no.  Some we've gotten.

13   Some are restricted to higher level people.  Some are not.

14   It's a whole panoply of production of organization charts.

15             THE COURT:  See, I -- I mean, I was going to say this

16   in a few minutes when we get to it.  But I see this as the

17   perfect example of phase discovery, honestly.  Because until

18   you have a fair amount of time to look at the first level of

19   documents, this isn't fair to you.  And it's not fair to you

20   because -- on some of these folks, it's -- what's interesting

21   about today is everybody isn't created equal here.  Okay?  Not

22   just in the way they're dealing with you, but the way they

23   organize their material, how much material they've got.

24             I mean, for a judge to order anybody -- and this can

25   be a numbers game.  This million, two million, I understand

1    that.  Okay?  But these folks have spent a gazillion dollars

2    already.  Okay?  And for me to now -- before you have even

3    gotten an opportunity -- it's not that you haven't.  You're

4    working 24 hours a day.  Now you need to absorb what you've got

5    already and then say to the magistrate judge sitting in this

6    chair, Okay.  Here's what I have found, and I really think

7    there's a bunch of very fruitful stuff here we need to go

8    through.

9               I would hope who's ever sitting in this chair would

10   say, "Gee, Dan, I agree with you."

11              MR. MOGIN:  At some point, yes, Your Honor, we do

12   have to absorb the material and get back to the defendants,

13   but --

14              THE COURT:  Right.

15              MR. MOGIN:  -- understand that, you know, we want

16   to -- we're trying to be efficient.  The defendants want to be

17   efficient.

18              THE COURT:  I know, but --

19              MR. MOGIN:  They've got their army of contract

20   lawyers working.  They don't want to stop the process.

21              THE COURT:  Well, and they don't have to stop.  I

22   mean, I am kind of talking and thinking.  But, I mean, this to

23   me -- not all of it has to be phased.  But this to me seems

24   like the perfect thing.  Then you are not hurt, you are not cut

25   off.  If they have to go back and do more searches, then that's

1    the cost to them.

2         You know, I know double depositions.  I know -- you

3    know, I re-read Judge Shadur a while ago.  It looked like he

4    was saying, you know, it probably would take two years to get

5    through the discovery.  And he has done -- unlike me, he has

6    done a gazillion -- that's an exaggeration.  He has done many

7    anti-trust cases.  Other than Mr. McCareins, I don't hear

8    anybody saying like give me -- you know, wrack them up.  I

9    don't.

10         I mean, so -- on this particular issue, okay, I don't

11   know whether, you know, I'm inclined to go order them to do

12   more custodians till you look at the first 25.  I'm not saying

13   to you you're not going to get it.  And I mean that.  I mean

14   it.  It's just I think we need a little bit more information

15   right now.  But maybe not, maybe not.

16         That's a different issue than the backup tapes.

17   Okay?

18              MR. MOGIN:  It is --

19              THE COURT:  Because I have an idea on the backup.  I

20   actually have an idea on the backup tapes.

21         And the parsing.  Okay.  I got your three issues.

22              MR. MOGIN:  I understand.  Nobody wants --

23              THE COURT:  You have primary.  You think they

24   narrowly defined custodians to only say primary -- what did

25   they say?  Primary --

1          MR. MOGIN:  Decision.

2          THE COURT:  Primary decision-makers.  You thought

3    that was too narrow.  But they did come back -- you did come

4    back with non-primary?  What did you come back with?  Did you

5    only do --

6          MR. MOGIN:  Six executive assistants.

7          THE COURT:  Six executives.

8          MR. MOGIN:  Executive assistants.

9          THE COURT:  Mr. Marovitz is there.  Yeah.  Okay.

10         MR. MAROVITZ:  Yeah, we have 22 non-executive

11   assistants.  So the notion somehow that we've limited our

12   custodians to the CEO and his, you know, one or two chief

13   deputies is just undermined by the number of custodians that

14   we've chosen.

15         I don't think there's any issue here for right now.

16   That is, Mr. Mogin and I have talked about the fact that if, in

17   fact, the plaintiffs upon reviewing the documents believe that

18   there is an additional custodian or several additional

19   custodians that ought to be included, he'll let us know that

20   and we'll consider that.

21         But, Judge, I would like to be heard on the other

22   issues, because as I -- at the outset, I mentioned that we were

23   itching to talk about parsing, and I really do want to be heard

24   on that.

25         THE COURT:  Well, can we -- before you leave -- and

1    you're not catching a plane, so you could be here at 10:00

2    o'clock tonight.  Okay?  All right.  I mean, we're going to get

3    to -- I'm trying to figure out if the next conference should be

4    individual -- Chris and I meeting with a plaintiff and one

5    defendant individually on some of the issues.

6           What I'm trying to figure out is what's the next

7    group effort and then do we need some individual ones in

8    between.  It seems to me like the parsing we are going to have

9    to do individually.  That's the only reason I don't --

10           MR. MAROVITZ:  Yeah.  And we're --

11           THE COURT:  I don't know what to do.  I do get it.

12           MR. MAROVITZ:  I'm -- our -- I'm not -- our

13   understanding of the parsing issue is very different than --

14           THE COURT:  Mr. Mogin.

15           MR. MAROVITZ:  -- what Mr. Mogin has described.

16           THE COURT:  Yes.

17           MR. MAROVITZ:  And we want to be able to provide that

18   to the Court.  That may be an issue that affects several

19   defendants.  I won't speak for others.  We're happy to do it

20   whenever the -- whenever Your Honor wants.

21           THE COURT:  Well, I hope every one of them didn't do

22   103 pages.

23           MR. MAROVITZ:  Well, but there were -- to be fair,

24   Judge --

25           THE COURT:  No, I understand.

1        MR. MAROVITZ:  -- there were 90-some requests.

2        THE COURT:  No, no.  You were right.  You were right.

3   But maybe if we figure out two of them, if we figure out how to

4   answer two of them, it might --

5        MR. MAROVITZ:  Well, but --

6        THE COURT:  You have to protect yourself, and he

7   needs to know what did he get and what did he not get.

8   That's --

9        MR. MAROVITZ:  No, it's more than that, Judge.  We

10  objected to their requests in June of 2011.  The objections

11  were not just stock objections.  They identified with precision

12  the sorts of documents that we would be producing.  So -- I

13  mean, I brought some.  I can show you an example.  Let me hand

14  you --

15       THE COURT:  Can we not do parsing this minute?

16       MR. MAROVITZ:  Sure.  As you can tell --

17       THE COURT:  Of all the issues --

18       MR. MAROVITZ:  -- I'm itching to do parsing.

19       THE COURT:  Of all the issues --

20       MR. MAROVITZ:  I'm happy to do it whenever the Court

21  would like.

22       THE COURT:  Everybody has -- okay.

23       MR. MAROVITZ:  But we feel very strongly about it and

24  we'd like to be heard at your leisure.

25       The two issues, Judge, the two issues that are really

1   specific that I just want the record to be clear on first, we

2   have not limited our custodians to, I guess, the masters, as

3   Mr. Mogin said.  We have a far more extensive list than that.

4           In that regard, by the way, in a case that Mr. Freed

5   is in and Mr. Eimer is in and I'm in in front of Judge Zagel,

6   the *Steel* anti-trust litigation, Judge Zagel started with the

7   prospect in that case that's going on right now that there

8   would be a limited number of custodians at the beginning of the

9   case and a limited number of defendants whose documents would

10  be searched on the theory that in anti-trust price-fixing cases

11  and in market curtailment cases, the people at the top have to

12  know.  And, you know, Judge Zagel's a pretty smart guy.

13          THE COURT:  He is a pretty smart guy.

14          MR. MAROVITZ:  So I'm not saying that we've only

15  listed the people at the top.  We have not.  We have gone much

16  lower than that.  But I don't think -- in any event, I wanted

17  the Court to know that active case is the way that Judge Zagel

18  has dealt with it.

19          The only other issue that I wanted to raise was I

20  think that, again, there may be less daylight between

21  Mr. Mogin's position and ours on the -- what's on the review

22  platform and what's on the vault.  What he read you --

23          THE COURT:  Right.

24          MR. MAROVITZ:  -- was precisely correct, and it's

25  precisely what I said; that is, there is information and

1    e-mails on the vaults, but those are not on our review

2    platform.  And our understanding is that to move it to a review

3    platform and to get it in a position where it could be reviewed

4    would cost roughly $1 million.

5              And I know the Court is interested in

6    proportionality.  And we have spent a lot of time talking about

7    the defendants' production and how much money the defendants

8    have spent in this case.  And the costs of these sorts of

9    issues and of finding out the unknown about --

10             THE COURT:  Well, how I would -- the bucket I would

11   put that into, okay -- I guess in my buckets, how are we going

12   to validate the accuracy of the search?

13             And one of -- I think what Mr. Mogin is saying here

14   is this is -- could be one way to validate it.  Okay?  One way.

15   Another way could be to take these search terms and match them

16   up to the RPDs.  I mean, I don't -- we -- I'm hoping at the end

17   of our dialogue, okay, about this we're going to have some --

18   one method that maybe everybody can even agree to.  Because I

19   believe the defendants want an accurate search as much as

20   Mr. Mogin wants an accurate search.  Okay?

21             I think that's what -- is that what you are talking

22   about?  Or am I parsing?

23             MR. MOGIN:  If I understand you correctly, I think

24   we're on the same page, yes.

25             THE COURT:  I mean, I think it is like -- in the

1    sense, you know, given his caveat, we don't have computer --

2    you know, we're using -- we're in the word search world here.

3    So how do you verify the accuracy of the word search?  And

4    these are kind of all, you know, floating around ideas here.

5           So I am moving us -- the more conversation we have to

6    have some method that hopefully isn't going to be Court-imposed

7    that people can agree to, that your computer people will give

8    us input to, so we're not going to have you doing ten kinds of

9    verification -- hopefully we're going to have some kind of

10    verification.  And I'm not saying that's the one.

11           MR. MAROVITZ:  Right.  And, Judge, just to be

12    clear --

13           THE COURT:  Even if you could do it.

14           MR. MAROVITZ:  -- the defendants' perspective on

15    this, of course -- and I understand that plaintiffs disagree.

16    But the defendants' perspective on this is that we have already

17    done that.

18           THE COURT:  I know, I know, and we --

19           MR. MAROVITZ:  We don't shy away from null set

20    testing, a concept that, you know, is pretty well recognized in

21    the ESI world, and we had hoped that the data dictionaries or

22    word dictionaries would get us to a place where we would have

23    confidence that we could move forward.

24           THE COURT:  Well, and, you know, the left-behind

25    documents are, you know -- you know, we're in new -- there is

1  not another case.  Forget about is there predictive coding, is

2  there word search, is the judge -- there is not a case that has

3  come up with a helpful way to test this accuracy.  Okay?  I

4  don't know whether "accuracy" is the right word or not.  There

5  hasn't.  I mean, if we could do this as a group, do you know

6  what we would be doing for the legal profession?  This would be

7  wonderful.

8       MR. MAROVITZ:  I know.  And I just don't -- I don't

9  know of any -- and there's a lot of experience in this room on

10 both sides.  I don't know of any case -- I've never been

11 involved in a case in which there has been more meeting and

12 conferring and more document production --

13      THE COURT:  Right.

14      MR. MAROVITZ:  -- and more information production

15 that would allow the parties to gain confidence that what is

16 being done is appropriate under the circumstances.  I don't

17 know of a single case, and --

18      THE COURT:  I agree.  And I think after the first

19 five here today, we can say we've really made a ton of progress

20 here.  Okay?

21      I need a ten-minute break.  Hope you do, too.  Okay?

22 Bye.

23      (Recess.)

24      MR. McCAREINS:  Your Honor, could I intervene for one

25 second?

1      THE COURT:  Yes.

2      MR. McCAREINS:  I have a family matter --

3      THE COURT:  Uh-huh.

4      MR. McCAREINS:  -- that I need to attend to at 5:30.

5      THE COURT:  Gotcha.

6      MR. McCAREINS:  And there's a ripple effect if I

7  don't show up, like dominos.  If it was just me, I would stay.

8      THE COURT:  Right.

9      MR. McCAREINS:  So I'm going to exit at 5:30.  But

10  Mr. Mayer is going to take my spot.

11      THE COURT:  Good.  That's just fine.

12      MR. McCAREINS:  Maybe you will be done by 5:30.

13      THE COURT:  Maybe we will.  And family is more

14  important.

15      MR. McCAREINS:  This one is.  Thank you.

16      THE COURT:  It is.  No, it is.  And I'm sure Mr.

17  Mayer will be just fine covering for us.

18      Okay.  Thanks, Mr. Mayer.

19      MR. MAYER:  Sure.

20      THE COURT:  Thank you.  Okay.  Well -- all right.  So

21  we haven't heard from Georgia Pacific or IP, and I think they

22  have a lot of common issues, do you think, or do you have

23  specifics?  Do you want to do specifics?  Are there any?

24      MR. NEUWIRTH:  I think we have the common issues with

25  the other defendants, Your Honor, but then I think each --

1    Georgia Pacific and International Paper each have their own

2    specific issues.

3            MR. FREED:  Your Honor, if I may, I would like to

4    raise an issue and perhaps present a thought.

5            While Mr. Mogin has ably and admirably discharged all

6    of his responsibilities with respect to his meet-and-confers --

7    I have attended a number of them -- and without in any way

8    casting aspersions on any counsel, I think the issues with

9    Georgia Pacific and IP, maybe for different reasons, run a lot

10   deeper and are more complex and are more interrelated perhaps

11   to the common issues.

12           THE COURT:  Uh-huh.

13           MR. FREED:  And it is not just to expedite this

14   hearing, but I think it might be extremely useful if we could

15   have the next meet-and-confer with Your Honor in attendance in

16   that.  Because I really feel it would help --

17           MR. NEUWIRTH:  What did he say?

18           MR. FREED:  -- not only move forward the

19   resolution --

20           THE COURT:  Mr. Neuwirth didn't hear you.

21           MR. NEUWIRTH:  The next meet-and-confer would do

22   what?

23           MR. FREED:  With the Magistrate Judge in attendance,

24   I think it could be extremely helpful.  Because I think it

25   would not only help resolve -- we have reached a lot of

1  impasses, where we've actually said, are we at an impasse?

2  And, in fact, we still have room to go.

3          THE COURT:  Right.

4          MR. FREED:  But I think in light of so many issues

5  and so many of them that overlap, it might be helpful.  It's

6  just a suggestion that I would make to Your Honor, if other

7  counsel and Your Honor think it would be a good suggestion.

8          MR. McKEOWN:  Your Honor, for International Paper,

9  we'd be prepared to come back Friday or Tuesday and have a

10  meet-and-confer before Your Honor on the issues between the

11  plaintiffs and International Paper.

12          THE COURT:  Sounds good.  How about you,

13  Mr. Neuwirth?  You are a little bit -- unless you have a child

14  who lives in Chicago here --

15          THE COURT REPORTER:  Your name, sir?

16          MR. NEUWIRTH:  Stephen Neuwirth.

17          We are certainly prepared to do whatever is necessary

18  to try to get these issues resolved, including a meeting with

19  Your Honor.

20          And I know I speak for all the defendants and

21  probably all the parties in expressing our appreciation for the

22  focus that Your Honor has given to this matter.  And, frankly,

23  we believe that with all the time you've invested in this, we

24  and I think all the parties would like to make as much progress

25  as we can with you on these issues.

1       And so like Mr. McKeown, to the extent we are going

2   to do something with you, we would like to do it as quickly as

3   possible.

4           THE COURT:  Right.

5           MR. NEUWIRTH:  So that, as you said at the beginning

6   of the hearing, we can try to narrow what issues are left and,

7   if necessary, if it is necessary to have any motions, they can

8   be heard by Your Honor so that we can, you know, take advantage

9   of all that we've all done together.

10          I -- the one observation I would make is that, you

11  know, I think that it is inherent in what we're dealing with,

12  which is ESI, that anything we come up with is, by definition,

13  going to be imperfect.  Because the whole point of this -- and

14  it's reflected in all the Sedona principles -- the whole point

15  of this is to try to come up with a way to manage something

16  very big in a practicable way.

17          And so we -- to the extent that we feel some

18  frustration with the process that might be resolved, to a

19  certain extent, through a meeting with you, I think you know

20  from the process that, you know, GP has been working very hard

21  to move this forward.  Because, like Mr. McCareins said, we

22  want very much to get the record developed and litigate the

23  case hopefully to a conclusion on the merits.

24          And we do feel, to a certain extent, that it's not

25  quite hitting the nail on the head to say no good deed goes

1    unpunished, but we do feel, to a certain extent, that no matter

2    what we do, it is going to be a truism that it is not going to

3    be perfect.  And, you know, sometimes, as we all know, the

4    perfect can become the enemy of the good if we don't make the

5    progress that we're trying to.

6              So that's a long-winded way of saying that we really

7    do want to make as much progress as we can.  We'd like to do it

8    as quickly as possible.  And if it is going to be with Your

9    Honor, like Mr. McKeown, the sooner, the better.

10             MR. MAROVITZ:  Judge, Andy Marovitz for

11   Temple-Inland.

12             THE COURT:  Yes.

13             MR. MAROVITZ:  I know I speak for Temple-Inland, and

14   I may speak for the other defendants as well, we absolutely

15   agree with what Mr. Neuwirth just said about trying to get this

16   to the end.  And to the extent --

17             THE COURT:  But now, guys, if -- I know that

18   discovery that takes longer at times can be more expensive, but

19   if we are really shortcutting motions, shortcutting judge's

20   ruling, shortcutting appeals to Judge Shadur -- I mean, to me,

21   we have accomplished so much in three months.  I mean,

22   honestly, I actually think, compared to the rest of my

23   caseload, this is really fast.  I mean, and we have to factor

24   in here today that they have to get it to their computer

25   people.  They then have to review it.  You guys have to review

1    it.  I mean, I -- you know, I looked the other day.  I think it

2    was only one year ago that Judge Shadur ruled on the -- you

3    know, he ruled on the motion to dismiss.  I think it's amazing

4    what you have done in a year --

5                MR. MAROVITZ:  Both sides.

6                THE COURT:  -- is what I think, and I am more

7    surprised than anybody, you know, saying like we should be

8    going quicker.  But --

9                MR. MAROVITZ:  My point was slightly different, Your

10   Honor.  Both sides have worked very hard.

11               THE COURT:  Right.

12               MR. MAROVITZ:  There's no dispute about that.  My

13   point was for the other defendants, and at least for

14   Temple-Inland, to the extent that we can continue to burden the

15   Court with --

16               THE COURT:  You are not -- I'm not saying a word.

17               MR. MAROVITZ:  No, no.  I mean that in a positive way

18   with participation in -- I mean, Mr. Freed just offered, for

19   example --

20               THE COURT:  Right.

21               MR. MAROVITZ:  -- a suggestion, which we think is a

22   good one.  That is that the Court would in some way attend the

23   meet-and-confers with respect --

24               THE COURT:  I tried --

25               MR. MAROVITZ:  -- to Georgia Pacific and

1    International Paper, and my only point was --

2            THE COURT:  You want a private one?  Do you want this

3    private session?

4            MR. MAROVITZ:  The answer is yes.  Judge, the answer

5    is yes.

6            THE COURT:  Okay.

7            MR. MAROVITZ:  And I think that may be the case for

8    some other defendants as well.  That is, we think we can make

9    expeditious but complete progress with the attendance of the

10   Court.  And that's the only point I wanted to raise.

11           THE COURT:  What I thought was it looked like four

12   were doing pretty well and don't need --

13           MR. McKEOWN:  Right.

14           THE COURT:  -- to come to private conferences.  Two

15   definitely need private conferences.  And you are sort of in

16   the middle is what I'd say.

17           MR. FREED:  That was actually my reading of it as

18   well, Your Honor.  I'm certainly not opposing it.

19           THE COURT:  And they are local, so that's even -- I'm

20   also thinking of folks that are out of town, too.

21           But what I am thinking, Mr. Marovitz, everybody, is

22   we would try to do these individual, either two or three

23   individual.  And if Mr. Freed could lead the ball on this, then

24   we don't have to drag Mr. Mogin back and forth, unless he wants

25   to come.  Then we set our next all-together session, and we

1  will have an agenda for that, what we're going to be working

2  on; but in between, we won't have to burden everybody with

3  individual issues.

4          How do the rest of you feel about that, about not

5  attending those?

6          MR. McCAREINS:  On behalf of my client, I'm happy.

7          THE COURT:  You are thrilled.

8          MR. McCAREINS:  Yeah, not to be invited to that

9  party.  We have enough parties to attend to.

10          THE COURT:  Okay.

11          MR. McCAREINS:  It sounds like fun, but we are going

12  to pass.

13          THE COURT:  Right.  How about --

14          MR. MENDEL:  Yes.  We agree on behalf of Norampac.  I

15  think we can make progress.

16          THE COURT:  Okay.  Don't leave yet, though.  We have

17  a few more things to do.

18          MR. MENDEL:  Yes.

19          THE COURT:  Ms. Diver?

20          MS. DIVER:  Yes, we agree.  We are happy to be

21  excluded from those private meetings.

22          THE COURT:  And how about you?

23          MR. FELLER:  Your Honor, for PCA, we agree as well.

24  And please let me invite Mr. McCareins to a party at our

25  office.

1          THE COURT:  Okay.  So I think then we could figure

2     individuals.  So then I want to talk a little bit about some

3     common issues here and see if we could come up with -- and then

4     our homework that I want you to work on for the next general

5     one -- and we'll pick a date on that.

6          So did Judge Shadur give you a date even to come

7     back?

8          MR. MAROVITZ:  No.

9          MR. McKEOWN:  No.

10         MR. MOGIN:  No.

11         THE COURT:  He didn't.  Okay.  And when I said that

12    if we have to get to motions, I wasn't inviting motions.  Okay?

13    I mean, we're still trying to do this paperless.  But if we

14    can't make it paperless, then we're going to get it down to

15    what the real issues are.

16         So my three -- the three overriding issues that I

17    saw -- where's my little sheet of paper here?  And, obviously,

18    we have been talking about them in individual determination --

19    but are the custodian issue.  The second is sources of

20    information, which could mean more than active/inactive, but it

21    also could mean devices and stuff.  But I am going to ask

22    Mr. Mogin in a moment about that.  And then the third, whoever

23    said -- I'm talking about more than one thing here, but --

24    we're talking about -- it came up in your reports as word

25    dictionary.  It came up correlating search strings to RPDs.  It

1    originally began as wanting indexing.  And I suppose, in a way,

2    we're talking about some kind of verification of the search

3    process, which really does encompass everything.  So I don't

4    know -- that might be the homework project.

5          Okay.  So let's -- Mr. Mogin, here's what I have

6    never let you get out the full sentence on.  So I think it

7    looked like you have done five 30(b)(6)s, right?  Something

8    like that?

9          MR. MOGIN:  Six, Your Honor.

10          THE COURT:  Six.

11          MR. MOGIN:  Only Georgia Pacific remains.

12          THE COURT:  All right.  Now --

13          MR. NEUWIRTH:  Excuse me.  What did he just say?

14          MR. McKEOWN:  Only Georgia Pacific remained.

15          THE COURT:  Okay.  Here's what I need.  Okay.  Do you

16    now understand after the 30(b)(6)s, and all those incredible

17    letters they wrote to you before the 30(b)(6)s -- but that is

18    actually what I really read more than the darned transcripts of

19    them.  Do you understand for each of the seven defendants which

20    of their data is active -- and can we call it backup?  I mean,

21    I know inactive -- Mr. McKeown -- somebody help me out here,

22    okay?  Backup tapes.  I am not limiting myself.  But do you

23    know for each one of them their active versus their non-active

24    data?

25          MR. MOGIN:  I believe except for Georgia Pacific

1    whose 30(b)(6) deposition has not been conducted --

2              THE COURT:  Okay.

3              MR. MOGIN:  -- that we have a general sense as to

4    each defendant.  I cannot tell you that we have a full

5    understanding of all of the specifics or that we have

6    completely digested all of the information that's been given to

7    us.  But a general understanding is evolving, yes.

8              THE COURT:  Okay.  So from an information standpoint,

9    just a fact-gathering standpoint, you don't need any more

10   information before we come up with maybe a plan on what to do

11   with active/inactive data?

12             MR. MOGIN:  I think that may be correct, subject

13   again to the Georgia Pacific exception.

14             THE COURT:  Okay.  Which we can also talk about at

15   the private session.  That could be another thing we could have

16   on our agenda.  Because I would like to know what it is, too.

17             MR. MOGIN:  Are you familiar, Your Honor, with the

18   30(b)(6) deposition notices?

19             THE COURT:  Yes.

20             MR. MOGIN:  Okay.

21             THE COURT:  I did read those.  I didn't read the

22   boring 30(b)(6).  And I read their letters.  I read their

23   letters.  I thought their letters were great.  And I have sat

24   through enough ESI conferences where people beg, Don't do

25   30(b)(6)s.  Do the letters.

1        But, you know, I mean, the letters were great, but I

2   think you had questions then.  And then it got into kind of a

3   letter-writing campaign there.  So, you know, hopefully the

4   30(b)(6) answered your questions.

5        MR. MOGIN:  Hopefully, yes.

6        THE COURT:  Okay.  Here's my proposal.  If you had --

7   if we were to engage in a real phase discovery plan, that was

8   written out, that had protections for you, that you are not

9   going to be precluded, would you agree, if this is the way the

10  defendants want to go -- and I don't know if they want to go

11  like this -- that phase I would only involve active data?  And

12  we would have a time limit on it.  And you then would be

13  allowed with not only time depositions, whatever you needed,

14  and whatever objections you wanted to be made could be made in

15  the phase II inactive, non-active backup tapes, whatever --

16  we'll agree on a term.

17       Because I think you are such a thorough lawyer that

18  if you have time to absorb some of this material here, you're

19  going to be able to get to the backup tapes and really find out

20  even if you need them or what you need.  You're going to

21  understand their system so much better six months from now than

22  you understand it now, than having some dog fight over backup

23  tapes when we haven't even looked at the active stuff.

24       MR. MOGIN:  I would like to consider that.  I think

25  that preliminarily what you're proposing may be workable.

1  However, a couple of issues, one of which is that that

2  necessarily implies a potential for a great deal of redundancy.

3          THE COURT:  It could, yes.

4          MR. MOGIN:  And redundancy is expense --

5          THE COURT:  Right.

6          MR. MOGIN:  -- for all parties concerned.

7          THE COURT:  Right.  And they may not like it for the

8  same reason.  But I am trying to get you some review time in

9  here.

10          MR. MOGIN:  Thank you.

11          THE COURT:  I mean, is what I am trying to do.  And I

12  call it back-burner time.  I have to put things on a back

13  burner to be able to think about this.

14          They're giving you a million pages of paper.  How

15  could you absorb that?  So we would try to build in, if you

16  would do it, a way that your rights are going to be protected

17  is what I'm saying.

18          MR. MOGIN:  Can I have just a moment?

19          THE COURT:  You don't have to answer me today.

20          MR. MOGIN:  I don't?

21          THE COURT:  You answered number one that factually

22  you don't need any more information other than GP.  You now

23  understand -- I don't, but you do, and that's the only thing

24  that counts, is you understand what's active and what's

25  inactive.

1    MR. MOGIN:  I believe that's correct, yes.

2    THE COURT:  How does that idea strike anybody over

3    there?  Not a definitive answer.  How does that strike you, if

4    we were to do active data in phase I?

5    MR. MAROVITZ:  I think we definitely want to give

6    that some thought, Your Honor.  We actually share Mr. Mogin's

7    thought about how to do it in a way that would avoid

8    inefficiencies and redundancies, but if you give us maybe a day

9    to caucus about that --

10   THE COURT:  You can have till you come back.  I mean,

11   you can have till you come back.

12   MR. MAROVITZ:  We will give that some very serious

13   thought.

14   THE COURT:  One way you might be able to do it --

15   some of the deps that might overlap could maybe go towards the

16   end and then you would know where you were.  Maybe.  Something

17   like that.

18   All right.  Here's my other that kind of goes with

19   phase I and phase II.  And this just came up with custodians.

20   What about -- you may not like the phrase that Temple used, but

21   I kind of like it.  Primary source?  What was it?  Okay.

22   All right.  Again, if we're doing a phase I/phase II

23   discovery, to begin with, that everything's going to be in a

24   phase, what about if we were to shoot for -- maybe by August

25   1st, we would have the custodians, who would be in phase I, and

```
1    then people you're discovering, as you're reviewing, people
2    that you are discovering through -- hopefully you discover
3    something at these depositions.  You're discovering something
4    in your RFDs, your answers that we're going to work out here,
5    and those people you would have an opportunity in phase II?
6            So we're not grading them as I is more important than
7    the other, but it's like you would not be precluded.  Would you
8    think about that?
9            MR. MOGIN:  I will think about that, Your Honor.  I
10   do want to mention one impediment, if you will.
11           THE COURT:  Uh-huh.
12           MR. MOGIN:  Is that with respect to e-mails and
13   certain other ESI, as we mentioned in the status conference
14   report, we're going to submit that to the technology-assisted
15   review, that is, the content-based review, and it's more
16   efficient and more thorough for us to -- the more information
17   we have at a single time -- it's an expensive process.
18           THE COURT:  Right.
19           MR. MOGIN:  It's 350, 400 dollars a gigabyte.  So --
20           THE COURT:  So the more you have there -- okay.
21           MR. MOGIN:  Right.
22           THE COURT:  And it seems, certainly, what
23   Mr. McCareins was certainly saying is he's not just saying for
24   himself -- I'm sure he's speaking for his client.  They want to
25   move it ahead, too.  But maybe we could leave ourself -- it's
```

1    not exactly as clean as active/inactive, but maybe we could

2    leave cleanup for phase II and then you wouldn't have to worry

3    quite as much if you were not getting it immediately and giving

4    you some discovery, some discoverability time.

5              MR. MOGIN:  Understood, Your Honor.  And I will

6    certainly give it the most serious consideration.  But please

7    do recall that the whole custodians issue has been the sticking

8    point from day one.

9              THE COURT:  I will go to my grave with the whole

10   custodian issue.

11             MR. FREED:  Your Honor, if I may, I think there's one

12   other, I think, big-picture issue which --

13             THE COURT:  Uh-huh, good.

14             MR. FREED:  -- just inadvertently you might not have

15   put in.  That is the temporal scope of production.  We still

16   have that as well.  And I just mention that because I don't

17   know if that would fit into your thinking for phase I or phase

18   II, but it's still in dispute.

19             THE COURT:  And the difference is you all agree to

20   2003 to 2010 for -- no.  What is it, Ms. Miller?

21             MR. NEUWIRTH:  '04.

22             MS. MILLER:  '04 to 2010.

23             MR. MAROVITZ:  It's '04.

24             THE COURT:  2004 to 2010 is what the defendants want.

25   No.  But isn't there a difference between Paper -- yes.  Now,

1    what --

2              MR. NEUWIRTH:  It's 2004 to 2010 for substantive

3    documents.

4              THE COURT:  Everything.  Okay.

5              MR. NEUWIRTH:  And 2003 to 2010 for transactional

6    data.

7              THE COURT:  And do you agree with that?

8              MR. NEUWIRTH:  That's what we've -- that's what the

9    defendants have agreed to from day one.

10             THE COURT:  But the plaintiffs want 2000?  No?

11             MR. NEUWIRTH:  Plaintiffs want 2000 for transactional

12   data and either 2003 or 2002 for documents.

13             MR. MOGIN:  We had originally asked for 2002, Your

14   Honor.  We had indicated that we would accept 2003 with some

15   limitations.

16             THE COURT:  Okay.  All right.

17             MR. MOGIN:  And on the transactional data, we did

18   want from 2000.

19             THE COURT:  Okay.

20             MR. MOGIN:  And the reason for that is we have a

21   five-year class period, and our experts need to do a before and

22   after.  And so since we need a five-year class period, we need

23   at least a five-year-before period.  That's our view.

24             THE COURT:  Okay.

25             MR. MAROVITZ:  And the defendants think that a much

1  shorter period is warranted.  It's unusual to have a five-year

2  pre-period in cases like this.

3           THE COURT:  How much does that affect the ESI backup

4  tapes?

5           MR. MAROVITZ:  That's why -- Judge, that's why for

6  Temple-Inland, at least, we had made an offer to try to resolve

7  both issues.  We had made an offer that with respect to active

8  systems, we would go back with respect to conduct-based

9  requests to January of 2003.

10           THE COURT:  I see.

11           MR. MAROVITZ:  If, in return, we wouldn't have to

12  search the inactive systems.

13           THE COURT:  I see.  Okay.

14           All right.  Well, when you're thinking about this,

15  how about -- so how -- wait.  Let me ask this.  How much of the

16  data you have received from them has gone to your computer

17  folks already?

18           MR. MOGIN:  I'm going to defer to Mr. Wozniak on

19  that.

20           THE COURT:  Good.

21           MR. WOZNIAK:  You are talking about -- you put me on

22  the spot.

23           THE COURT:  Well, I mean --

24           MR. WOZNIAK:  If we're talking about the most recent

25  productions?

1           THE COURT:  Uh-huh.

2           MR. WOZNIAK:  And you're talking about for the

3    purpose of content-based review, correct?  I mean, you put that

4    out there.  If that's what we're talking about, it's in the

5    process of making its way to the vendor.  It's not all there

6    yet.  Some of these productions we've only received in the past

7    week.

8           THE COURT:  Okay.

9           MR. WOZNIAK:  So, you know, some we received as early

10   as just prior to the last status conference.  Some we

11   received --

12          THE COURT:  Right.

13          MR. WOZNIAK:  -- you know, just within the last week.

14          MR. FREED:  Is the heavier volume --

15          THE COURT REPORTER:  I'm sorry, Mr. Freed?

16          MR. FREED:  I'm sorry.  I was asking Mr. Wozniak

17   something which might help explain it a little bit better.  If

18   I may just speak with him for a moment?

19          THE COURT:  Sure.

20       (Counsel conferring.)

21          MR. FREED:  We feel, Your Honor -- Michael

22   Friedman -- it would -- we could give that information.  We

23   want to be sure we give you the correct information, so we'd

24   like to have an opportunity to review that.

25          THE COURT:  Sure.  Of course, of course.  Okay.  I

1    mean, I was just trying to figure out some timing.  I was just

2    trying to figure out timing issues.  That's all.

3            Well, my third overriding issue was starting -- they

4    all start with word, word dictionary, word search, word string,

5    search string.

6            All right.  Do you think we have an agreement on word

7    dictionary?  Are we going to continue on with word dictionary,

8    everybody?

9            I didn't get IP and I didn't get Georgia Pacific, and

10   we -- I mean, we didn't do that part for you.  But is everybody

11   else on board on the -- what do you like it called?  Word what?

12           MR. MOGIN:  Word index, Your Honor.

13           THE COURT:  Word index.  Are we doing that?

14           MR. McKEOWN:  I think, Your Honor, every defendant

15   has already provided a word index on the group of documents

16   that were hit by the search terms.

17           THE COURT:  Okay.  I understand their objection.  I

18   mean, that -- I understand what they would prefer, but the word

19   index --

20           MR. McKEOWN:  The list of all the terms that appear

21   in our documents, which for International Paper is over 10

22   million terms because of all the numbers that are in there and

23   all the other types of symbols that are in documents, that's

24   been produced.  My understanding is each of the other

25   defendants has also produced that word or term list with the

1  number, and that the issue left is the one that Mr. Mogin

2  described before.

3           THE COURT:  Okay.  Can you find me this?  Just

4  before -- we're getting close for people to be able to leave,

5  but I want to show you what we found in getting ready for

6  today.  Because this is not to be decided today.

7           This is from defendants' possible additional exhibits

8  for use at the March 28th hearing.  In here, in GP's -- no.

9  This was -- whose letter is this?  This is Mr. Mogin's letter.

10  This is from you referring to documentation linking search

11  strings to specific requests for production.  Okay?  And it is

12  attached.  And it says:  "See document production accompanying

13  this letter."  This is GP's answer.  Because I wanted everyone

14  to see this.  I want to ask you if this is what you're talking

15  about.  Okay?

16           And where is it?  Where was it, Chris?  I mean, where

17  is the chart?

18      (Court conferring with her law clerk.)

19           THE COURT:  Is this --

20           MR. MOGIN:  May I approach, Your Honor?

21           THE COURT:  Uh-huh.  Because I think part of this

22  confusion --

23           MR. McKEOWN:  May I?

24           MR. NEUWIRTH:  May I come up, too, Your Honor?

25           THE COURT:  Sure, of course.  I think --

1           (Document tendered to counsel.)

2           THE COURT:  I just want to make sure we are all on

3    the same page of what you were asking for.

4           MR. MOGIN:  That's correct, Your Honor.  That we --

5           THE COURT:  Let's go down around the table here.

6    Here, show it to me.  Because I haven't -- no.  Let's take it

7    over here to the table.

8           Can you hear me?  Or just for a minute, Colleen,

9    stop.  It's okay.

10          (Discussion held off the record.)

11          THE COURT:  I now can ask a question.  So thank you.

12          So I think here's the homework, or at least suggested

13   homework.  Mr. Mogin in the beginning threw out if you're using

14   Boolean search, how are you going to be able to verify -- how

15   are you going to be able to correlate, how are you going to be

16   able to verify the accuracy of the search.  Your people, each

17   of your folks have been or attempted to do that, too.  This is

18   what I said to you before that's so -- just desolate in the

19   case law on how to do this.  I mean, people are talking about

20   sampling.  But when you get down to the nitty gritty of it,

21   okay?

22          So Mr. Mogin in the original meeting last December

23   wanted us to do indexing.  Okay?  And I tried my darnedest.

24   There are a couple index cases, but nothing in a case that

25   involves seven defendants and quite as much as this.

1    Then I think -- and he's not giving up arguments here

2    yet.  Okay?  But then he said, well, how about if you

3    correlate -- if we're not doing indexing, how about search

4    terms to each RFD?  Correct?  Wasn't that, too?

5         MR. MOGIN:  Correct, Your Honor.

6         THE COURT:  That was like the next one there.  Okay.

7    We didn't get too many takers for that.

8    And it's not just word search, but it's string of

9    words, too.  It's string of words also.

10   So I think we're going to have three individual

11   meetings and then we're going to come back here for our next

12   meeting.  And I would like us in a non-combative way -- not

13   that we're going to have one; I think it will be fun if we had

14   four or five different ways -- to bring approaches to how

15   people can do valid verification.

16   And I don't think it's just my job and Chris' job to

17   try to come up with something.  I'd love your input on this.

18   You each have computer people.  And I would like to -- that

19   would be right on the top of our agenda.

20   We're way too early -- we're too early to do it right

21   now.  But, I mean, that's certainly going towards -- I'm trying

22   to get you comfortable, Mr. Mogin, because I got to turn to you

23   before I leave on September 30th and -- so you're not happy

24   with this, but you're going along for the ride, aren't you?

25   So I think we should all do this together and not

1    something imposed on anybody.  Because if we've got to do it,

2    why impose it.  So that would be on the agenda.  And then we'll

3    come up with more issues.

4         Now, any of the other defendant -- does anybody else

5    have any other new issues specific to their client that they'd

6    like to bring up?  Short of the individual issues.  Yes.

7         MR. McKEOWN:  Your Honor, this is an individual

8    issue, but I wanted to put it on --

9         THE COURT:  The record?

10        MR. McKEOWN:  -- the radar, Your Honor.

11        THE COURT:  Okay.

12        MR. McKEOWN:  That is, as the Court may be aware, as

13   part of the acquisition of Temple-Inland by International

14   Paper, there is a court order to divest certain mills.  We're

15   having discussions with Mr. Mogin and Mr. Freed about what

16   preservation steps will be taken before those mills are sold to

17   a third party, and we hope to be able to work that out.

18        THE COURT:  Okay.

19        MR. McKEOWN:  But that is something that will need to

20   be addressed sooner rather than later.

21        THE COURT:  Good.  Okay.  I am glad you are bringing

22   that up.  And if obviously you work together on it, it would

23   make it easier.  And whatever kind of protective order you need

24   for the sale.  I mean, this might be highly confidential or

25   whatever.  We could come up with a protective order for it.

1           Anybody else have anything?

2           MR. MAROVITZ:  Judge, if I might, just obviously

3    despite my zeal to discuss parsing today, it's not the time.

4           THE COURT:  Oh, I have --

5           MR. MAROVITZ:  We would like to --

6           THE COURT:  But parsing is on for the individual.

7           MR. MAROVITZ:  Terrific.  As long as I get a chance.

8           THE COURT:  I mean, that's -- I mean, I think that's

9    why -- I don't want to put everybody to sleep here with

10   everybody else's answers to these questions, so -- I mean --

11   and here's what my goal is.  Now, I need you to bring -- I'm

12   assuming if we sit down -- when we're going to sit down at the

13   table all together, you're going to bring the -- we're going to

14   maybe do three to five, under five, and then you should be able

15   to get a role of your own on how to -- you know, how these

16   things should be done or what you meant by them.

17          Now, you need to bring -- if the answer is, if I'm

18   getting this, object, object, object.  However, however, here's

19   the answer --

20          MR. MAROVITZ:  Right.  And, Judge, again, without

21   arguing it, what all we did is we told the plaintiffs with

22   precision what we were producing.  This is not a situation

23   where we said we have all these objections and we're going to

24   produce some documents and not tell you what they are.

25          So at least for Temple-Inland, our answers say what

1    we're producing.  But we're happy to address that with you

2    whenever we have our meet-and-confer.

3         THE COURT:  So do you actually -- so here's my

4    question, what I wanted you to bring.  Do you actually say, And

5    we are turning over the contract?  Suppose the question was the

6    contract we had with Mr. Freed and here's the contract?  Is

7    that what you -- I mean, is it that specific?  Because maybe it

8    would help if you brought the documents that go with it so we'd

9    actually be able to talk about it.

10        MR. MAROVITZ:  But there are some examples where we

11   say we will be producing documents sufficient to show and then

12   we have the declaration of what it is that we are producing

13   documents sufficient to show.

14        THE COURT:  Okay.  But, I mean, this is like really

15   like just sitting down, teaching me what this means, and then

16   just like five heads better than two on how to get it across to

17   Mr. Mogin.

18        MR. MAROVITZ:  We'd be happy to bring whatever we can

19   to help it.

20        THE COURT:  Okay.  So whatever specifically goes with

21   the request.  Is that what you guys want?

22        MR. MOGIN:  I think so, Your Honor.  I can discuss

23   this further with counsel.

24        THE COURT:  Pardon me?

25        MR. MOGIN:  I think so.  We can discuss this further

1    with counsel.

2              THE COURT:  With them directly --

3              MR. MOGIN:  Yes.

4              THE COURT:  -- on what your questions are.

5              MR. MAROVITZ:  There are -- to be fair, there are --

6              THE COURT:  92.

7              MR. MAROVITZ:  -- many -- yeah, there are like 92,

8    but in addition to that --

9              THE COURT:  We're not doing 92.

10             MR. MAROVITZ:  When you see it, you will see the

11   individual requests are not for a particular contract.  They

12   are for many documents.  And so we -- I don't want to mis --

13             THE COURT:  Right.

14             MR. MAROVITZ:  I don't want the Court to have a

15   misunderstanding.  It is not as though we could bring a

16   document that's somehow responsive.  But we will bring some

17   materials that might aid the process.

18             THE COURT:  Like a little show-and-tell.

19             MR. MAROVITZ:  That -- we'll try and do that.

20             THE COURT:  Okay.

21             MR. McCAREINS:  On that note, may I be excused?

22             THE COURT:  See, aren't you lucky?  Your Irish humor

23   got us through.  Now, Mr. McCareins, now just one more thing

24   before you walk out.  I want a date for our next joint session,

25   okay?  Hold on.

1         MR. McCAREINS:  Mr. Mayer is my surrogate.

2         THE COURT:  For your calendar?

3         MR. McCAREINS:  Drop the paper.

4         THE COURT:  Really?  Are you here?  You are not going

5    away in July?

6         MR. McCAREINS:  Not to my knowledge.

7         THE COURT:  I am thinking the week of July 9th is

8    what I am thinking.  You can't do it that week?  Okay.  I can

9    do it --

10        MR. McCAREINS:  What are we talking about, the next

11   big powwow?

12        THE COURT:  Uh-huh.

13        MR. McKEOWN:  Your Honor, it might be useful if we

14   could do it before then to try to keep these issues moving

15   along.

16        THE COURT:  Okay.

17        MR. McKEOWN:  Sometime in June, perhaps.

18        THE COURT:  Well -- oh, you are right.  Are you

19   here -- who -- okay.  I can do that, I think.  I can do

20   Tuesday, June 26th.  Going, going, gone.

21        MR. FREED:  No.  I'm going to be away.  Is it

22   possible to sort of tie it into the 14th conference, maybe do

23   it June 15th or something of that nature?

24        THE COURT:  Well, I couldn't agree -- I have,

25   unfortunately, a week of criminal duty, which I could have two

1    cases or 50 cases.  And this is not the best because you are

2    going to be sitting in here with all the defendants.  So I

3    don't think -- or you'd have to clear out every -- you know,

4    whatever we have.

5              That's the week of June 11th.  The week after that is

6    the week of June 18th, I do have time.  I could do Wednesday,

7    June 20th --

8              MR. FREED:  The 20th would be fine.

9              THE COURT:  -- Thursday, June 21st.

10             MR. NEUWIRTH:  Thursday, the 21st, would be better.

11             THE COURT:  Thursday?  You like that Thursday, June

12   21st?

13             MR. McCAREINS:  I vote for the 21st.

14             MR. MAROVITZ:  I can't do the 21st.

15             THE COURT:  20th?

16             MR. NEUWIRTH:  I can't do the 20th.

17             MR. FREED:  The 20th works better for us.

18             MR. NEUWIRTH:  I can't do the 20th.  The 19th would

19   be --

20             THE COURT:  How about the 22nd, Friday?

21             MR. MAROVITZ:  The 19th.

22             MR. NEUWIRTH:  The 19th.

23             MR. FREED:  The 19th, I think, works for us.

24             THE COURT:  I have a -- no, I don't.

25             MR. McKEOWN:  The 19th?

1          THE COURT:  Hold on.

2          MR. McCAREINS:  I can't do the 19th.

3          MR. MAROVITZ:  18th.

4          MR. NEUWIRTH:  18th is an option.

5          MR. FREED:  The 18th is fine.

6          THE COURT:  The 18th, I have a settlement all day.  I

7     can't do that.  But I can do -- Chris, I think I set something

8     for the 19th, so go look in my --

9          THE LAW CLERK:  I will have to look.

10         THE COURT:  Yeah.  But I can do Wednesday, Thursday,

11    Friday.

12         MR. FREED:  I can't do Friday.

13         THE COURT:  And then we're into the week of the 25th

14    where somebody said they're out the whole week.

15         MR. NEUWIRTH:  No, not the whole week.  I think you

16    just mentioned the 26th.

17         THE COURT:  I can do the 27th.

18         MR. NEUWIRTH:  The 27th is okay.

19         THE COURT:  How about the 27th?  Can people make it?

20    Please, please, please.

21         MR. MOGIN:  I'm sorry, Your Honor.  I can't do the

22    27th.  I could do the 28th.

23         THE COURT:  I can't.

24         MS. MILLER:  The 19th, 20th, 21st?

25         MR. MOGIN:  19th, 20th, that week, the week of the

1    18th.

2            THE COURT:  That's the one day I can't.  I have a

3    huge settlement set.

4            MR. MOGIN:  On the 18th it's set?

5            THE COURT:  On the 18th.  But I can do the 19th, the

6    20th, or the 21st or the 22nd.

7            MR. MOGIN:  I will do any of those.

8            MR. FREED:  I can't do the 20th.

9            THE COURT:  All right.  So this side of the room is

10   on for the 19th, 20th, 21st, or 22nd.

11           MR. NEUWIRTH:  How about the 19th?

12           MR. McKEOWN:  Your Honor, let me see if my problem is

13   just in the morning or afternoon, if we could have a day or so

14   to be flexible and if we could switch it --

15           MR. NEUWIRTH:  Could we tentatively hold the 19th and

16   confirm it?

17           THE COURT:  Uh-huh, yeah.

18           MR. FREED:  That's perfect.

19           THE COURT:  And if you can just -- and we will work

20   with -- Jim, we will work with you, whenever you want to start.

21   Okay?

22           MR. McKEOWN:  Thank you.

23           THE COURT:  All right.  That's the group date,

24   hopefully.  Now, that means we have got a ton of work to do.

25   We're having our three privates.  Now, do you want to do -- oh,

1    I can't do the 18th.  I was trying to think of a way,

2    Mr. Neuwirth, you could do both, but I think --

3              MR. NEUWIRTH:  Well, I don't mind coming twice.

4              THE COURT:  Yeah, I think we ought to come twice.

5              MR. NEUWIRTH:  And we'd be very interested in doing

6    it as soon as Your Honor is available --

7              THE COURT:  Yeah, yeah, yeah.  Okay.

8              MR. NEUWIRTH:  -- and that it's convenient for the

9    parties.

10             THE COURT:  All right.  Well -- okay.  So is

11   everybody else excused other than the plaintiffs and our three

12   individual caucus people?  And then, Colleen, we're almost

13   finished, okay?

14             Thanks, everybody.  We will try to prepare an order.

15   Your homework is try to work on validation.

16             Dr. Lewis, come up with some ideas for us.

17             DR. LEWIS:  I'm just a civilian here today.

18             THE COURT:  I see.  Did you see we handed out your

19   invitation?  We invited everybody to come to the search

20   program.

21             DR. LEWIS:  Yeah, yeah.  I think Herb and I are

22   switching places on that.

23             THE COURT:  Oh, you are?

24             DR. LEWIS:  The paper says, yeah.

25             THE COURT:  Oh, good.  Well, I'm on criminal duty.  I

1    don't think I'm even going to get to go.

2              DR. LEWIS:  That's a shame.

3              THE COURT:  Yeah.  All my buddies are there.  Thanks

4    for coming down today.  Okay.

5              MR. McKEOWN:  Your Honor, for International Paper,

6    for the individual meet-and-confer, depending on the

7    plaintiffs' schedule, other than --

8              THE COURT:  Well, who is going to do it for the

9    plaintiffs?

10             MR. MOGIN:  Well, I am, Your Honor.

11             THE COURT:  You are going to be back three times or

12   are we going to try to do it back to back?  Why don't we try to

13   do it back to back.

14             MR. MOGIN:  Please.

15             MR. McKEOWN:  Fine.  Other than Wednesday morning of

16   next week, any time next week is fine.

17             MR. NEUWIRTH:  If I could invoke the travel rule?  If

18   -- for Georgia Pacific, if there's any way we could do

19   Thursday, the 31st, that would be a day when both of us could

20   travel here very conveniently.

21             MR. MOGIN:  That's Memorial weekend?

22             MR. NEUWIRTH:  No.

23             MS. MILLER:  No.  Memorial Day weekend is the 28th.

24             THE COURT:  This weekend, yeah.

25             MR. McKEOWN:  Since we have this coming weekend for

1    Memorial Day weekend.

2              MS. MILLER:  Yeah, the 28th.

3              MR. NEUWIRTH:  So Thursday, the 31st.  We could do it

4    any time of day that works for Your Honor.

5              MR. MOGIN:  The 31st would work for International

6    Paper.

7              MR. NEUWIRTH:  For what?

8              MR. MOGIN:  If we wanted to do two in a day.

9              THE COURT:  So if we did -- pardon me?

10             MR. MOGIN:  If we wanted to do two in a day.

11             THE COURT:  Two in a day.  Yeah, that would even be

12   better.

13             MR. MAROVITZ:  Yeah.  We could do June 1st, if that

14   would be --

15             THE COURT:  No.  I have a family thing.  My

16   granddaughter has a publication party I have to go to.  She's

17   written a book.

18             MR. NEUWIRTH:  On ESI?

19             THE COURT:  At age seven.  I have to go and read her

20   book.

21             MR. NEUWIRTH:  So it is not on predictive coding?

22             THE COURT:  No.  And it is not on the computer.  She

23   actually wrote it.

24             MR. McKEOWN:  Perhaps we could do GP and

25   International Paper on the 31st, on Thursday?

1          MR. MOGIN:  That's fine.

2          MR. McKEOWN:  Does that work with you?

3          MR. MAROVITZ:  We could do the 30th.  I have a

4   problem with the afternoon, but the morning is fine.  I know

5   that may not be optimal.  But if you could make that work, we

6   could do IP the day before.

7          THE COURT:  Well, then it would only be one night

8   over, then.

9          MR. McKEOWN:  Right.

10         THE COURT:  Are people going to be mad at me?  That's

11  another Judge Shadur case that's getting kicked here, so --

12         MR. MOGIN:  So the 30th and the 31st, Your Honor?

13         THE COURT:  Yeah.  What are we going to do to get

14  ready for this?  I mean, what do we need?  What homework do we

15  need to do to get ready?

16         MR. McKEOWN:  Well, Your Honor, for International

17  Paper, we had a session on a meet-and-confer yesterday

18  afternoon that went about two hours, I think.  There were a

19  number of issues.  Mr. Sprung and I are supposed to speak again

20  on Thursday afternoon with respect to some custodian issues,

21  and I think that we have a list of where each side is and there

22  are probably ten to twelve items --

23         MR. FREED:  Maybe if we --

24         MR. McKEOWN:  -- that are specific.

25         MR. FREED:  Maybe if we submitted a joint statement,

1   not necessarily where we agree about everything, but we agree

2   what the issues are; and then where there are differences of

3   opinion, a brief statement of where the difference lies.

4           THE COURT:  Tell me this.  So you -- gentlemen, did

5   you want to do -- you wanted to do Wednesday morning, not

6   afternoon?

7           MR. NEUWIRTH:  No, I cannot do Wednesday.  I think we

8   were talking about doing GP and --

9           MR. McKEOWN:  Doing IP the 31st.

10          MR. NEUWIRTH:  IP on Thursday.  And that was Mr.

11  Marovitz.

12          MR. MAROVITZ:  For Temple-Inland, we would like to go

13  ahead on Wednesday morning, if that's possible.

14          THE COURT:  The morning.  Okay.

15          Okay.  So you got that down?  Temple-Inland, a.m.

16      (Court conferring with her law clerk.)

17          THE COURT:  Who's in the morning on the --

18          MR. NEUWIRTH:  What time would you be planning to

19  start?

20          THE COURT:  I have a -- 10:00 o'clock.  Can you fly

21  in?

22          MR. NEUWIRTH:  Can you do that -- 10:00 o'clock that

23  morning will work.

24          MS. MILLER:  Yeah, I think the flights --

25          THE COURT REPORTER:  I'm sorry, Judge.  Do you want

1  this all on the record?

2  THE COURT:  No, actually we don't.  Can we let

3  Colleen go home, too?  Bye.

4  (Discussion held off record.)

5  THE COURT:  Okay.  Now, what about this next status

6  report?

7  MR. McKEOWN:  I think, Your Honor -- I spoke briefly

8  with Mr. Mogin.  Our thought would be perhaps we could send you

9  a list just of the topics.

10  THE COURT:  Yeah.

11  MR. McKEOWN:  I think if we try to do a status

12  report --

13  THE COURT:  No.  Just topics.

14  MR. McKEOWN:  -- it'll take too long.

15  THE COURT:  Just the topics.  Then I have everything

16  you filed for today, so we'll go back and look at those.

17  But bring the show-and-tell on particularly the

18  parsing, okay?  So bring an example to me -- if parsing is an

19  issue of yours -- of how you answered it, and we will talk

20  about it.  I mean, I am the queen of discovery answers.  I've

21  probably done -- not like this, but on people, general

22  objections and then -- so maybe we can figure this out.  Okay?

23  MR. MAROVITZ:  That would be great.  We won't -- I

24  mean, just to be clear, we will try to bring you an example or

25  two.

1          THE COURT:  Yeah.

2          MR. MAROVITZ:  But we obviously don't want --

3          THE COURT:  I don't -- maybe two.  I want them.

4          MR. MAROVITZ:  That's great.

5          MR. MOGIN:  Your Honor, with respect to these

6     statements, if we could have them from the defendants either by

7     Friday --

8          THE COURT:  Yes.

9          MR. MOGIN:  -- if they could get --

10         THE COURT:  I mean, this is next week, so, I mean --

11         MR. MOGIN:  If they could get them to us by this

12    Friday so we could respond?

13         THE COURT:  You know, we're closed Monday, too.

14         MR. NEUWIRTH:  But what statements --

15         MR. FREED:  No, I don't think we're doing statements.

16         MS. MILLER:  Just a list.

17         MR. McKEOWN:  We're not doing statements.

18         MR. MAROVITZ:  A list of what the topics are that

19    will be --

20         THE COURT:  I think you should do that just -- you

21    mean one, two, three, four is all I need.

22         MR. NEUWIRTH:  Right.  And I think the idea is we

23    would work with Mr. Mogin to try to come up with a joint

24    recommendation.

25         THE COURT:  Right.

1          MR. MOGIN:  My point is it's a very short time

2     period.  I've got to fly back and forth across the coast.

3          THE COURT:  Right.

4          MR. MOGIN:  And if the defendants could take the

5     laboring oar on putting together the list --

6          MR. McKEOWN:  That's fine.

7          MR. NEUWIRTH:  Fine.

8          MR. MOGIN:  -- and get the list to us by Friday --

9          THE COURT:  By Friday.

10         MR. MOGIN:  -- so we can respond; in turn, get you --

11         THE COURT:  By Tuesday.

12         MR. MOGIN:  -- a response by Tuesday.

13         MR. NEUWIRTH:  That's fine.

14         THE COURT:  Because we're not here Monday, so don't

15     bother --

16         MR. NEUWIRTH:  That's fine.

17         MR. FREED:  Okay, good.

18         THE COURT:  Peace, everybody.

19         MR. FREED:  Thank you, Your Honor.

20         THE COURT:  Bye.  Good to see you.  Thanks, Colleen.

21     You're a doll.

22         MR. McKEOWN:  Thank you, Your Honor.

23         MR. NEUWIRTH:  Thank you, Your Honor.

24         MR. MAROVITZ:  Thank you.

25          (Proceedings concluded.)

1                    C E R T I F I C A T E

2

3

4

5              I, Colleen M. Conway, do hereby certify that the

6      foregoing is a complete, true, and accurate transcript of the

7      proceedings had in the above-entitled case before the

8      HONORABLE NAN R. NOLAN, one of the Magistrate Judges of said

9      Court, at Chicago, Illinois, on May 22, 2012.

10

11

12         _/s/ Colleen M. Conway, CSR,RMR,CRR_        _05/25/12_

13              Official Court Reporter                Date
                United States District Court
14              Northern District of Illinois
                   Eastern Division
15

16

17

18

19

20

21

22

23

24

25