## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KLEEN PRODUCTS LLC, *et al.*,   )
   )
   Plaintiffs,   )
   )   No. 10 C 5711
   v.   )
   )   Magistrate Judge Nan R. Nolan
PACKAGING CORPORATION   )
OF AMERICA, *et al.*,   )
   )
   Defendants.   )

## MEMORANDUM OPINION AND ORDER

     Lawyers have twin duties of loyalty: While they are retained to be zealous advocates for their clients, they bear a professional obligation to conduct discovery in a diligent and candid manner. Their combined duty is to strive in the best interests of their clients to achieve the best results at a reasonable cost, with integrity and candor as officers of the court. Cooperation does not conflict with the advancement of their clients' interests—it enhances it. Only when lawyers confuse *advocacy with adversarial conduct* are these twin duties in conflict.

The Sedona Conference, *The Sedona Conference Cooperation Proclamation*, 10 Sedona Conf. J. 331, 331 (2009).

     This matter is before the Court on Plaintiffs' Motion to Compel Defendants to Produce Documents and Data from All Reasonable Accessible Sources [Doc. 347], Plaintiffs' Motion to Compel Temple-Inland to Include Additional Document Custodians [Doc. 366], Plaintiffs' Motion to Compel International Paper Company to Include Additional Document Custodians [Doc. 382], and Defendant Georgia-Pacific

LLC's Motion for Protective Order [Doc. 373].[1] However, this is a story as much about cooperation as dispute.

# I. BACKGROUND

## A. Procedural

This action is the outgrowth of a number of class actions that had been brought against Defendants Georgia-Pacific LLC ("GP"), Packaging Corporation of America ("PCA"), International Paper Company ("IP"), Cascades Canada, Inc./Norampac Holdings U.S., Inc. ("Norampac"), Weyerhaeuser Company ("Weyerhaeuser"), Temple-Inland, Inc. ("TIN") and Smurfit-Stone Container Corporation ("Smurfit")[2] charging violations of Sherman Act §1. The instant action, which is the first-filed case in these consolidated actions, was filed on September 9, 2010, and the related later-filed cases were subsequently reassigned to the District Judge. On November 8, 2010, Plaintiffs filed a Consolidated and Amended Complaint ("Complaint").

---

[1] Plaintiffs have also filed a Motion to Compel Defendants to Produce Documents and Data for the Time Periods Proposed by Plaintiffs [Doc. 345], which the Court will address in a separate order.

[2] On May 27, 2011, Smurfit was acquired by Rock-Tenn Company. To effect the acquisition, Smurfit was merged into a subsidiary of Rock-Tenn Company. The surviving entity from the merger became RockTenn CP, LLC ("RockTenn"), a limited liability company and wholly owned subsidiary of Rock-Tenn Company. On June 16, 2011, the Court allowed RockTenn to be substituted as a defendant in place of Smurfit.

## B. The Complaint[3]

Countless industrial and consumer products are manufactured from container-board, the principal raw material used to manufacture corrugated products such as linerboard and corrugated boxes. (Compl. ¶ 36.) Thus, the prices of those corrugated products are tied directly to the price of containerboard. (*Id.* ¶ 40.) From the 1930s onward, the containerboard industry has been subject to extensive antitrust litigation and other charges of unfair competition. (*Id.* ¶¶ 57–62.) In this instance, Plaintiffs allege the existence of anticompetitive behavior beginning in August 2005 and continuing through the present. (*Id.* ¶ 1.)

During the class period, the containerboard industry was heavily consolidated. (Compl. ¶ 39.) Significant barriers to entry in the form of capital-intensive startup costs and high transportation costs make that industry susceptible to an oligopolistic structure. (*Id.* ¶ 41.) Because of those barriers to entry and the degree of consolidation in the industry, containerboard industry firms share a similar cost structure. (*Id.* ¶¶ 47–48.) While the containerboard industry is consolidated, no single firm has sufficient market power to control the supply and price of the product. (*Id.* ¶ 52.) Because there are no close substitutes for containerboard, the demand for the product is inelastic. (*Id.* ¶¶ 50–51.)

In August 2005, the containerboard industry faced complex environmental factors, including declining profit margins, rising demand and a promising economic

---

[3] This summary of the Complaint is adopted from the Court's opinion denying Defendants' motions to dismiss.

environment. (Compl. ¶ 64.) Between 2003 and 2005, individual producers had tried and failed to institute price increases at least twice. (*Id.*) In 2005, many of the Defendants, including Smurfit, PCA, IP, TIN, GP and Norampac, significantly reduced their production capacity through plant closures, capacity idling or scheduled production downtime. (*Id.* ¶¶ 71–72, 75, 78–81, 84–87.) Those capacity reductions coincided in time with the existence of a high demand for containerboard. (*Id.* ¶¶ 73–75.)

There are a number of important industry groups and trade associations in the containerboard industry. (Compl. ¶¶ 53–56.) Most Defendants belong to one or both of two prominent organizations: the Fibre Box Association ("FBA") and the American Forest and Paper Association. (*Id.* ¶¶ 53–54.) In June 2005, industry leaders, including many representatives of Defendants, attended an industry conference where pricing strategies were discussed. (*Id.* ¶¶ 76–77.) Just over three months after the conference, Smurfit, PCA and GP each announced a $30 per ton price increase effective October 1, 2005. (*Id.* ¶¶ 83–84.) After an FBA conference on September 27, 2005, the remaining Defendants followed suit. (*Id.* ¶ 89.) Only a few months later, on November 28, the FBA Board of Directors met. (*Id.* ¶ 91.) At that meeting, both Weyerhaeuser and PCA announced $40 per ton price increases effective January 1, 2006, which was soon matched by all other Defendants. (*Id.* ¶¶ 91, 98.) Then on March 14, 2006, the FBA Executive Committee met again, and Defendants raised their prices by $50 per ton only a few weeks later. (*Id.* ¶ 104.)

Even though prices were increasing throughout 2005 and into 2006, during that period many of the Defendants reduced capacity. (Compl. ¶¶ 115, 117–18.) Such capacity decreases continued through 2007. (*Id.* ¶¶123, 125, 132.) Shortly after a large industry conference in June 2007, both PCA and Smurfit announced $40 per ton price increases effective August 1. (*Id.* ¶¶ 126–27.) On or about August 1, all other Defendants followed suit. (*Id.* ¶ 129.)

In late March 2008, as the economy was beginning to decline, the industry conducted a series of conferences. (Compl. ¶¶ 138–39.) Less than two months later, in early May 2008, both GP and Smurfit announced $55 per ton price increases to take effect July 1. (*Id.* ¶ 141.) Most of the remaining Defendants instituted identical price increase in the same time period. (*Id.*) About a month later, IP announced its intention to raise prices by an additional $60 per ton on October 1, 2008. (*Id.* ¶ 145.) IP's price increase was followed by the majority of the industry soon thereafter. (*Id.*) Over the course of the remainder of the year, the industry saw a continued decrease in production. (*Id.* ¶¶ 150, 152.)

Despite a drastic economic slowdown in 2009, containerboard prices were inelastic and, for the most part, remained at the levels achieved by earlier price increases. (Compl. ¶¶ 154–58.) In the face of economic weakness and normal seasonal weakness, Defendants raised prices by $50 per ton on January 1, 2010. Defendants continued to raise prices through the summer of 2010, raising prices by $60 per ton on April 1 and August 1, 2010. (*Id.* ¶¶ 163, 167.)

## II. DISCOVERY PROCESS

### A. Timeline

On January 14, 2011, Defendants each filed a motion to dismiss. On April 8, 2011, the Court entered a memorandum opinion and order denying Defendants' motions. *Kleen Prods., LLC v. Packaging Corp. of America*, 775 F. Supp. 2d 1071 (N.D. Ill. 2011). On May 2, 2011, Defendants filed their answers.

Following the Court's denial of the motions to dismiss, the parties began their initial discovery. On May 3, 2011, Plaintiffs served Defendants with their First Request for Production of Documents ("RPD"). The RPD had 94 requests, which Plaintiffs divided into three general categories: (1) conduct requests, (2) data requests, and (3) inquiries, investigations and prior litigation requests. Defendants each filed responses and objections to the RPD on June 6, 2011.

Defendants began producing responsive hard copy documents in August 2011. Shortly thereafter, the parties began meet-and-confer discussions in an attempt to resolve issues raised in Defendants' responses and objections and to draft a protocol for the production of ESI. On October 26, 2011, the Court entered a stipulated Order governing the production format of e-mail, e-files and paper documents and other related matters ("ESI Production Order") [Doc. 245].

Defendants served their First Set of Requests to Plaintiffs for the Production of Documents on May 6, 2011. Plaintiffs served their responses and objections on June

10, 2011. Plaintiffs began producing paper documents in August 2011 and completed their paper production in November 2011.

In November 2011, Plaintiffs served Rule 30(b)(6) notices on each Defendant relating to document preservation and information systems issues. After conducting meet-and-confer sessions, the parties agreed that Defendants would provide written responses to the information sought in the Rule 30(b)(6) notices and the depositions would be deferred pending Plaintiffs' review of the responses.[4]

While the parties were able to resolve many of their discovery issues through meet-and-confer sessions, by December 2011, four issues remained unresolved: (1) reconciling Defendants' production to the individual RPD requests; (2) ESI search methods, (3) scope of document searches, and (4) relevant time periods.

As to the first issue, Plaintiffs requested that each Defendant provide an index associating its produced documents with the 29 categories Plaintiffs included in the RPD. (Pls.' Statement [Doc. 266] 1.) Defendants asserted that complying with Plaintiffs' request would impose great expense and is not required by Rule 34. Defendants argued that the metadata required by the parties' agreed ESI Production Order provides Plaintiffs with sufficient identifying information. (Defs.' Statement [Doc. 267] 10.) Plaintiffs responded that metadata is not the issue and that the coding fields they are requesting are not addressed by the ESI Production Order. (Pls.' Statement 3.)

---

[4] The parties ended up supplementing the written responses with Rule 30(b)(6) depositions. Nevertheless, the Court commends the parties' efforts to address the 30(b)(6) issues without lengthy depositions.

With regard to the ESI search dispute, Plaintiffs criticized Defendants' use of a Boolean search method to identify responsive documents. (Pls.' Statement 4–16.) Plaintiffs argued that the Boolean keyword process is per se "subject to the inadequacies and flaws inherent when keywords are used to identify responsive documents." (*Id.* 8.) They requested that Defendants use "content-based advanced analytics ('CBAA') technology analytics to conduct natural language, subject matter searches across corporate departments or corporate functions, using content-based search technology rather than keywords." (*Id.* 5.)

Defendants defended their use of Boolean keywords, arguing that their testing and validations processes "will have a degree of accuracy that meets or surpasses not only industry standards but also the likely accuracy of any other available methodology." (Defs.' Statement 3.) Further, given that by December 2011, Defendants had already collected and produced a significant amount of responsive information, they contend that Plaintiffs' approach would involve additional costs and burdens not contemplated by the Federal Rules, the Seventh Circuit Electronic Discovery Pilot Program,[5] or case law. (*Id.* 8–10.)

As to the third issue, Plaintiffs criticized Defendants for limiting their search to "main active servers." (Pls.' Statement 16.) Defendants stated they were willing to consider searching for responsive archived documents if Plaintiffs both identify a "particular and compelling need" and agree to bear the costs of restoring the archived information. (Defs.' Statement 12–13.)

---

[5] *See* http://www.discoverypilot.com.

Finally, with regard to the temporal scope dispute, Plaintiffs broke down their document requests into the following time periods:

> Conduct Requests: January 1, 2002–December 31, 2010;
>
> Data Requests: January 1, 2000–December 31, 2010;
>
> Inquiries, Investigations and Prior Litigation Requests: January 1, 1996–December 31, 2010; and
>
> The prior antitrust litigation identified in the Complaint: no time limitation.

(Pls.' Statement 17.) In response, Defendants proposed to produce conduct request documents only back to January 1, 2004, and data request documents back to January 1, 2003. (Defs.' Statement 14.) They argued that those time periods were appropriate based on the Complaint's allegations that the conspiracy began in mid-2005. (*Id.*)

On January 10, 2012, the case was referred to the undersigned Magistrate Judge for discovery supervision. In February and March 2012, the Court conducted two full days of evidentiary hearings on the ESI search dispute issue. Over the next six months, the Court held 11 status hearings and Rule 16 conferences with all parties, many of which lasted a half day or longer. The Court also facilitated three Rule 16 conferences between Plaintiffs and individual Defendants. A client representative attended many of these conferences. Due to counsel's hard work, the parties and the Court were able to resolve a number of the issues through meet-and-confer discussions. These cooperative endeavors are described in the next section.

## B. Issues on Which Parties Have Reached Agreement

### 1. Search Methodology

As discussed above, the parties had a fundamental dispute over what search methodology Defendants should utilize to identify documents responsive to Plaintiffs' RPD. Defendants argued that in order to best identify potentially responsive ESI, they engaged leading consulting companies to develop Boolean search terms. (Pls.' Evidentiary Hr'g Br. [Doc. 288] 3.) During an iterative process, Defendants and their consultants revised and refined the search terms over the course of several months. (*Id.* 4.) Sampling procedures were used throughout the process to evaluate the effectiveness and reliability of the search terms. (*Id.*)

On the other hand, Plaintiffs argued that Defendants' search methodology is likely to find less than 25% of responsive documents. (Defs.' Evidentiary Hr'g Mem. [Doc. 290] 1.) They asserted that their proposed content-based advance analytics ("CBAA") search would find more than 70% of responsive documents at no greater cost. (*Id.* 1–2.) Plaintiffs contended that because CBAA searches do not focus on matching words but instead on identifying relevant concepts out of the documents, CBAA searches provide a richer, substantially more accurate return than Boolean searches. (*Id.* 5.) Thus, they concluded that "[a] CBAA search of documents collected by corporate or department function is the best and most practical method for locating responsive ESO in this case." (*Id.* 6.)

In an attempt to resolve this impasse, an evidentiary hearing was held on February 21 and March 28, 2012, with both sides presenting witnesses in support of

their positions. At the conclusion of the second day, the Court observed that under Sedona Principle 6, "[r]esponding parties are best situated to evaluate the procedures, methodologies, and techniques appropriate for preserving and producing their own electronically stored information." *See* The Sedona Conference, *The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*, 8 Sedona Conf. J. 189, 193 (Fall 2007). Accordingly, the Court urged the parties to consider whether there was a method to refine or supplement Defendants' Boolean search so that Plaintiffs had a reasonable assurance that they were receiving a high percentage of responsive documents without completely scrapping Defendants' search methodology.

Over the course of the next five months, the parties and the Court continued to meet and confer on this issue. Finally, in August 2012, the parties came to an understanding on the ESI search methodology issue, and on August 21, 2012, the Court entered a stipulated order relating to ESI search ("ESI Search Order") [Doc. 385].[6] In the ESI Search Order, Plaintiffs agreed to withdraw their demand that Defendants apply CBAA to documents that have been or will be collected in response to the RPD ("First Request Corpus"). As to any documents or ESI beyond the First Request Corpus, Plaintiffs agreed not to argue or contend that Defendants should be required to apply CBAA or "predictive coding" methodology with respect to any requests for productions served on any Defendant prior to October 1, 2013. With respect to any requests for production served on any Defendant on or after Oc-

---

[6] A copy of the ESI Search Order is attached as Exhibit A.

tober 1, 2013 that requires the collection of documents beyond the First Request Corpus, the parties agreed to meet and confer regarding the appropriate search methodology to be used for such newly collected documents.

### 2. Custodians

After Defendants filed their responses and objections to the RPD in June 2011, the parties began meet-and-confer sessions in an attempt to work out their differences. In August 2011, Defendants identified 109 individuals for which they intended to collect custodian-specific documents responsive to the RPD. Because the Complaint alleged that "Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives" (Compl. ¶ 192; *see id.* ¶ 6), Defendants included as custodians their higher-level executives with decision-making responsibility for the pricing and sale of containerboard and corrugated products during the relevant period, along with some of their subordinates. Plaintiffs complained that more custodians were needed, especially within the sales and marketing departments and at the plant level. Subsequent meet-and-confer discussions, some of which the Court supervised, resulted in a few additional custodians.

During the Court's meet-and-confer sessions with the parties, the Court encouraged Defendants to expand their lists of custodians and include at least a sample of lower-level and plant-level employees. At the Court's urging, Defendants produced

litigation hold lists to aid Plaintiffs in identifying appropriate custodians.[7] (*See*, *e.g.*, Docs. 325, 350–52.) Thereafter, to move the process along, the Court urged Plaintiffs to make formal requests for specific custodians from each Defendant. On July 27, 2012, after reviewing the litigation hold lists and documents produced by Defendants to date, Plaintiffs made formal requests for additional custodians. Thereafter, the parties promptly engaged in meet-and-confer discussions. Those discussions ultimately led to agreements with five of the seven Defendants.[8] (*See* Docs. 409, 410.) In those agreements, the parties agreed on specific additional custodians and a protocol for how they would handle future requests for additional custodians.

### 3. *Document Requests*

Plaintiffs have objected to the form and substance of many of Defendants' objections and responses to the RPD. They contend that the responses make it difficult to determine what was produced in response to each document request. During meet-and-confer sessions facilitated by the Court, Defendant IP prepared a chart that described the specific ESI searches it made to respond to each of the separate RPD requests. Plaintiffs agreed that this chart was helpful and could alleviate some of their concerns. Thereafter, IP agreed to revise its RPD responses to incorporate the information in the chart. IP served its revised RPD responses on July 23, 2012.

The Court determined that the most efficient use of the Court's and the parties' time is to address the RFP issue in stages. During phase one, Plaintiffs are meeting

---

[7] A copy of the order is attached as Exhibit B.

[8] A copy of one such agreement is attached as Exhibit C.

and conferring solely with IP in an effort to address Plaintiffs' objections to IP's revised responses. After Plaintiffs finish their review of the revised responses, they will meet and confer with IP to see if they can work out any remaining disputes. After the meet-and-confer process is completed, Plaintiffs may file a motion to compel against IP regarding any unresolved RFP responses. Phase two will include the remaining Defendants and will commence after the Court has ruled on Plaintiffs' motion to compel against IP. To narrow any remaining disputes, the Court expects the parties to use the IP process as a guide.

### 4. *Sources of Data*

Plaintiffs have asserted that Defendants should search and produce responsive information regardless of where it is stored. Defendants countered that they will search all active files for each of their custodians. Defendants are also prepared to search for categories of data that are stored in centralized corporate systems and exist on media or servers which can be searched using Defendants' current system capabilities and without incurring undue costs. With regard to archived media, Defendants will consider searching for responsive documents where Plaintiffs identify a specific need and agree to bear the costs of restoring the archived documents.

The parties and the Court have conducted meet-and-confer sessions in an effort to find some common ground on these issues. While the parties continue to dispute both the cost and the need to restore information from archived media, Defendants have agreed to preserve all such media during the pendency of the case. Further, each Defendant has agreed that to the extent it has not already done so, it will de-

termine if any of its custodians maintained potentially responsive information on any personal device not synced to its servers. If any potentially responsive information is identified, it will be reviewed and responsive, nonduplicative, nonprivileged information will be produced.[9]

## III. DISCUSSION

The following issues remain in dispute.

## A. Georgia-Pacific Motion for Protective Order

On August 14, 2012, Defendant Georgia-Pacific filed a Motion for Protective Order. In its Motion, GP requests that the Court quash Plaintiffs' Sixth Interrogatory.

### 1. Background

The Court facilitated a Rule 16 Conference between GP and Plaintiffs on May 31, 2012. Prior to the Conference, the parties engaged in numerous discussions concerning GP's responses to Plaintiffs' initial document requests. (Resp. 6.) Plaintiffs complained that "GP refuses to identify which of its personnel were involved in Containerboard Products business other than 'primary decision makers' or reveal its corporate structure." (Mot. Ex. 7 at 11.) During the Conference, GP explained that since 2005, it has been a privately-held company and does not maintain organizational charts or job descriptions. (Hr'g Tr., May 31, 2012, at 36, 46.) However, in the interests of cooperation and compromise, GP agreed to produce a list of the individ-

---

[9] The parties also continue to meet and confer in an effort to agree on the information Defendants will provide in response to Plaintiffs' transactional data requests.

uals who received the litigation-hold notice in connection with this litigation, along with their job titles. (*Id.* 36–41, 48–50.)

On June 26, 2012, GP produced the list of litigation-hold recipients. (Mot. Ex. 1, Attach. A.) The list included not only the names and titles of the litigation-hold recipients, but also the GP division in which each recipient works. (*Id.*)

Three days later, on June 29, 2012, Plaintiffs served their Sixth Interrogatory request, demanding various background information over an eight-year period for each of the approximately 400 persons on the litigation-hold list. (Mot. Ex. 1.) GP informally objected to the request, contending that it was unfair and burdensome. (Mot. 5.) Thereafter, the parties met and conferred in an effort to address GP's concerns. (*Id.* 5–6, Ex. 9.) During a telephonic status conference on July 25, 2012, GP indicated to the Court that it may have to move for protection from the Sixth Interrogatory. (*Id.* Ex. 10 at 27–29.) In response, Plaintiffs stated that they expected the upcoming Rule 30(b)(6) deposition, scheduled for August 1, to largely eliminate Plaintiffs' need for the Sixth Interrogatory. (*Id.* Ex. 10 at 29–30.)

Plaintiffs took the Rule 30(b)(6) deposition on August 1, 2012. GP's designee, George Ragsdale, was prepared to answer questions about the structure of, and personnel in, GP's containerboard and packaging businesses, including specific questions about the individuals and job titles on GP's list of litigation-hold recipients. (Ragsdale Dep. 166–68, 192–99.)[10]  When Plaintiffs' counsel announced, well before

---

[10] The transcript of the Rule 30(b)(6) deposition is available at Exhibit 11 to GP's Motion and Exhibit C to Plaintiffs' Response.

the expiration of seven hours, that he had completed questioning the witness, GP's counsel reminded Plaintiffs' counsel that the witness was available to answer questions about the litigation-hold list. (*Id.* 205–08.) Thereafter, Plaintiffs continued the deposition, asking the witness further questions, but ultimately ended the deposition before the expiration of seven hours. (Mot. 8.)

The next day, GP requested that Plaintiffs withdraw the Sixth Interrogatory, believing that Plaintiffs had obtained all of their needed information during the Rule 30(b)(6) deposition. (Mot. 8.) Plaintiffs refused, stating that the Sixth Interrogatory "is hardly burdensome" and can be "answered by a small production of paper." (*Id.* Ex. 12 at 13.)

### 2. Analysis

GP contends that the Sixth Interrogatory (a) "imposes undue and disproportionate burdens, and constitutes an abusive response to GP's agreement voluntarily to provide its list of litigation hold recipients and their job titles;" (b) "with its multiple subparts, both on its own and when combined with prior interrogatories, exceeds the number of interrogatories permitted by the Federal Rules;" and (c) "violates Plaintiffs' express commitment not to seek further discovery about GP's organizational structure after GP responded to previous interrogatories on these subjects." (Mot. 3.) Plaintiffs disagree, contending that the Sixth Interrogatory "can be answered through the production of documents pursuant to Fed. R. Civ. P. 33(d), if GP would produce the job descriptions that it maintains in the ordinary course of its

business." (Resp. 1–2.) After carefully reviewing the issue, the Court finds that a protective order is warranted.

First, issuing the Sixth Interrogatory within days of receiving the list of litigation-hold recipients violated the spirit of cooperation that this Court has encouraged the parties to pursue. The Rule 16 conference was held to facilitate cooperative discussions between the parties on issues related to Defendants' document production. During the conference, the discussion largely focused on Plaintiffs' need to understand GP's key personnel and who some of the individuals are whose names were appearing in the document production. GP explained that it is a privately-held company and does not maintain organizational charts or job descriptions. (Hr'g Tr., May 31, 2012, at 36, 46.) The Court, acting as a neutral, facilitated an *informal* brainstorming discussion with the parties.

The Court observed that without a formal organizational chart, Plaintiffs need a better understanding of GP's organizational structure. In this context, the Court *suggested* that one possible solution might be to provide Plaintiffs with a list of GP's litigation-hold recipients. (*See*, *e.g.*, Hr'g Tr. 10, 11, 14, 20, 31, 33, 35, 36.) However, the Court's suggestion was never intended to generate additional discovery obligations. Accordingly, the Court expected that Plaintiffs would use the list of litigation-hold recipients, which included the recipients' job titles and the division in which they worked, in conjunction with their review of GP's documents to create their own organizational charts. (*Id.* 50.) Instead, Plaintiffs violated the spirit of cooperation and used the list of litigation-hold recipients to request the additional discovery.

Such a response could have a chilling effect on both litigants and courts to engage in candid discussions.

Second, GP has established an undue burden in responding to the Sixth Interrogatory. "All discovery is subject to the limitations imposed by Rule 26(b)(2)(C)." Fed. R. Civ. P. 26(b)(1). The Rule 26 proportionality test allows the Court to "limit discovery if it determines that the burden of the discovery outweighs its benefit." *In re IKB Deutsche Industriebank AG*, No. 09 CV 7582, 2010 WL 1526070, at *5 (N.D. Ill. Apr. 8, 2010). Rule 26(b)(2)(C)(iii) requires a court to limit discovery if it determines that "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." In other words, "Rule 26(b)(2)(C)(iii) empowers a court to limit the frequency or extent of discovery if it determines that the burden or expense of the proposed discovery outweighs its likely benefit or that it is unreasonably cumulative or duplicative." *Sommerfield v. City of Chicago*, 613 F. Supp. 2d 1004, 1017 (N.D. Ill. 2009) *objections overruled*, 06 C 3132, 2010 WL 780390 (N.D. Ill. Mar. 3, 2010). "The 'metrics' set forth in Rule 26(b)(2)(C)(iii) provide courts significant flexibility and discretion to assess the circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources." The Sedona Conference, *The Sedona Conference Commentary on Proportionality in Electronic Discovery*, 11 Sedona Conf. J.

289, 294 (2010); *see Sommerfield*, 613 F. Supp. 2d at 1017 ("The application of Rule 26(b)(2)(C)(iii) involves a highly discretionary determination based upon an assessment of a number of competing considerations.").

The Sixth Interrogatory requests for each of the approximately 400 persons on the litigation-hold list, and for an eight-year period, that GP:

> (a) describe their job functions;
>
> (b) identify their employer;
>
> (c) identify all the persons to whom they reported, the period during which they so reported, and the job titles, employer and division of the person to whom they reported; and
>
> (d) identify all the persons who reported to them, the period during which they so reported, and the job titles, employer and division of the reporting person.

(Mot. Ex. 1.) GP has demonstrated that it "does not maintain any single report in the ordinary course of business from which this information could be readily obtained." (Mary K. McLemore Decl. ¶ 4.) Indeed, given the temporal scope of the request, some of this information would be difficult, or perhaps impossible, to obtain. (*Id.* ¶¶ 4–8.) To attempt to respond to the Sixth Interrogatory, GP would need to (a) conduct a multi-step process to compile the information that is available in its SAP Data Warehouse, and then (b) interview each of the litigation-hold recipients—along with their supervisors and direct reports—to confirm the information. (*Id.* ¶¶ 4–6.) GP estimates that the process could take as many as 800 hours to accomplish. (*Id.* ¶ 7.) Even after these hours were devoted, the response would likely be incomplete and could be impossible to verify. (*Id.* ¶ 8.)

In responding to the Motion, Plaintiffs do not address the Rule 26 proportionality principle. In other words, they do not explain how the value of the proposed discovery outweighs its burden. Instead, Plaintiffs contend that GP can answer the Sixth Interrogatory by producing the job descriptions that it maintains. (Resp. 13) ("GP can readily answer Plaintiffs' Sixth Interrogatory through the production of a defined set of documents that GP can readily assemble and produce.") However, GP has consistently stated that it does not maintain formal organizational charts or job descriptions. (*See, e.g.*, Hr'g Tr. 36 ("Since 2005, [GP] has not been a public company [and] there are not in existence organizational charts."), 46 ("There are no written job descriptions in [GP's] system."); Resp. Ex. E at 2 (GP "has searched and does not believe such formal written job descriptions exist.").)

Plaintiffs assert that at the Rule 30(b)(6) deposition, "Plaintiffs learned for the first time that as an organization, GP's practice was to generate a Roles, Responsibilities and Expectations ("RRE") document for each employee that sets forth that employee's duties, as well as providing pertinent reporting information." (Resp. Ex. E at 2.) Thus, Plaintiffs assert that "[w]ere GP to produce its RREs for the individuals identifies on GP's litigation hold list, Plaintiffs would accept their Sixth Interrogatory as answered." (*Id.* 2–3.)

But Plaintiffs misapprehend the testimony of GP's representative. The phrase "job description" does not appear in the transcript, and Plaintiffs' counsel did not even inquire if RREs were job descriptions. On the contrary, the witness testified that job descriptions would be meaningless because an individual employee's re-

sponsibilities are defined annually on an individual basis by the employee and his or her supervisor and are subject to change at any time. (Ragsdale Dep. 144–45.) Thus, the RRE is retained locally "as a living document between the boss and the subordinate[;] it's updated annually, or at least it's reviewed annually for update, and, theoretically, once it's updated, the old one goes away." (*Id.* 147–48.) Furthermore, the RREs do not necessarily provide all of the information required by the Sixth Interrogatory. "For example, rather than providing a fixed job description for a title, a RRE is intended to be a negotiated framework between each employee and his or her supervisor that is used to focus an employee on planned outcomes for each year." (McLemore Decl. ¶ 11.) And, while the RREs identify the employee's supervisor, they do not provide the additional reporting relationships sought by Plaintiffs. (*Id.*)

The Court agrees. The RRE is a document used as part of an individual employee's job performance review, not a document used by GP to describe a particular job. Significantly, job descriptions are generic documents meant to apply to all individuals at all times, while performance evaluations are highly personal documents that apply to a single employee at a particular point in time. *See, e.g., Hooper v. Total System Services, Inc.*, 799 F. Supp. 2d 1350, 1362 (M.D. Ga. 2011) (describing "job descriptions" as "generic and meant to be used across business units"); *Loeb v. Best Buy Co, Inc.*, No. 05-720, 2007 WL 2264729, at *1, *15 (D. Minn. Aug. 6, 2007) (describing "job descriptions" as "fairly generic and broad" and "performance reviews" as means to determine if employee is meeting current expectations).

In any event, the Rule 26 proportionality test cautions against producing the RREs. Indeed, producing the RREs as an alternative to responding to the Sixth Interrogatory would be no less burdensome. "RREs are not centrally maintained in any location and can be updated more than once each year." (McLemore Decl. ¶ 12.) Thus, "GP would have to interview each of the [litigation-hold recipients] to determine whether they maintain any current or historical RREs." (*Id.*) "GP would also be required to interview each of their supervisors to determine if they maintain any RREs for the identified individuals." (*Id.*) Plaintiffs contend that GP could simply request all RREs by emailing each of the litigation-hold recipients. (Resp. 13–14 & n.8.) But Plaintiffs fail to discuss how this process would work with former employees. Furthermore, GP could not provide a complete, accurate and verified response to the Sixth Interrogatory without also determining who the employees' supervisors were during the eight-year period and contacting them to collect any RREs in their possession. (*See* McLemore Decl. ¶¶ 5, 12.) Moreover, Plaintiffs do not explain how any benefit from securing more RREs outweighs the burden of producing them. Despite having identified some 25 RREs in GP's production (Resp. 13), Plaintiffs do not describe how these documents have aided their document review or could lead to relevant information.

Finally, much of the information sought in the Sixth Interrogatory has already been obtained through a more convenient, less burdensome, and less expensive method. "[T]he court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that . . . the discovery sought is

unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive . . . ." Fed. R. Civ. P. 26(b)(2)(C)(i). "In other words, where relevant information is available from multiple sources, the Rules give courts the authority to limit discovery to the least burdensome source, thus empowering courts to control litigation costs and promote efficiency in accordance with Rule 1." The Sedona Conference, *The Sedona Conference Commentary on Proportionality in Electronic Discovery*, 11 Sedona Conf. J. 289, 296–97 (2010); *see* Fed. R. Civ. P. 1 (The Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding.").

Here, GP provided a Rule 30(b)(6) witness to provide testimony about the litigation-hold recipients, specifically "their responsibilities at GP, the identities of those reporting to him or her, and the identities of those to whom he or she reported, whether directly or in a 'dotted line' relationship." (Resp. Ex. R.) The witness answered almost all of the questions asked of him regarding GP's organizational structure and job titles, and Plaintiffs concluded the deposition early rather than asking any additional questions of the deponent. (Ragsdale Dep. 166–68, 192–99, 205–08.) In fact, in response to GP's request that Plaintiffs use the remaining time to ask additional questions, Plaintiffs' counsel responded that while "[t]here may be small areas that remain where we need some further information," "I believe, on my recollection without review of the transcript, that I have accomplished what Plaintiffs, at a minimum to satisfy [the Sixth Interrogatory], need to accomplish." (*Id.*

206.) Thereafter, Plaintiffs continued the deposition, asking the witness further questions, but ultimately ending the deposition before the expiration of seven hours. (*Id.* 206–30.)

Plaintiffs do not dispute that GP's corporate witness was qualified and able to provide significant information on the above topic. Instead, they argue that "there were more than a half dozen instances where Mr. Ragsdale was either unable to testify concerning the nature of a position or had to speculate about job functions." (Resp. 12 & n.7.) In response, GP has provided verified written answers to each of the specific questions referenced in footnote 7 to Plaintiffs' Response. (Doc. 407.) These additional answers, together with the Rule 30(b)(6) deposition, provide Plaintiffs with a proportional response to their Sixth Interrogatory.

In sum, the Court finds that the Sixth Interrogatory violated the spirit of cooperation. Further, the Sixth Interrogatory does not pass the Rule 26 proportionality test. GP's burden of responding to the Sixth Interrogatory outweighs any benefits, and Plaintiffs were able to get much of the information in a less burdensome way. Defendant Georgia-Pacific LLC's Motion for Protective Order is granted. Plaintiffs' Sixth Interrogatory is quashed.

## B. Custodians

As discussed above, the Court facilitated meet-and-confer discussions with the parties in an effort to find a cooperative solution to the parties' disputes over who is an appropriate custodian. Those discussions ultimately led to agreements with GP,

Norampac, Weyerhaeuser, PCA and RockTenn. (Docs. 409, 410.) However, Plaintiffs were unable to come to agreements with IP and TIN and have filed motions to compel additional custodians from them.

Plaintiffs contend that "[i]n this price-fixing conspiracy, [IP and TIN] should not have the unilateral ability to select their own 'priority' document custodians, limit such custodians to high level executives with 'primary decision making authority,' and reject Plaintiffs' reasonable requests for additional custodians that are believed likely to possess responsive documents." (Custodian Mem. 7.) In their motions, Plaintiffs request 19 additional custodians from TIN (TIN Mem. 6) and 16 additional custodians from IP (IP Mem. 8).

IP and TIN oppose the motions. IP and TIN were each willing to include 16 additional custodians but only if Plaintiffs agreed to limit the document sources for the additional custodians and a written assurance that any future custodian requests be accompanied with substantive support. (IP Resp. 1–5, 15; TIN Resp. 1–4.) Plaintiffs are unwilling to make this compromise. They assert that limiting sources to a subset of ESI documents would preclude paper documents, which may the only viable source of discovery for the earlier time periods and for former employees. (TIN Reply [Doc. 392] 14; *see* IP Reply [Doc. 402] 6.) Plaintiffs also contend that IP's and TIN's "efforts to tie any additional custodians to specific allegations in the [Complaint] or documents already produced" is inconsistent with the Federal Rules, especially Rule 26. (TIN Reply 4–5; *see* IP Reply 2–3.)

In antitrust cases, courts generally take an expansive view of relevance and permit broad discovery. *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 21960, at *7–8 (E.D. Penn. Oct. 29, 2004); *see U.S. v. Int'l Bus. Machs. Corp.*, 66 F.R.D. 186, 189 (S.D.N.Y. 1974) (observing that "discovery in antitrust litigation is most broadly permitted and the burden or cost of providing the information sought is less weighty a consideration than in other cases") (citation omitted). "Broad discovery is permitted because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence, such as business documents and other records." *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 21960, at *8; *see Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976) (In antitrust cases, relevant evidence is "largely in the hands of the alleged conspirators.") (citation omitted); *Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Penn. 1996) ("Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct. Such conduct is generally covert and must be gleaned from records, conduct, and business relationships.") (citation omitted). Courts also note "the public importance of the decision, the need of large corporate defendants to know which of their many activities are attacked, [and] the issue narrowing function of discovery." *Bass v. Gulf Oil Corp.*, 304 F. Supp. 1041, 1046 (S.D. Miss. 1969). These factors create a predisposition among courts to allow broad discovery of antitrust defendants.

However, "[a]ll discovery, even if otherwise permitted by the Federal Rules of Civil Procedure because it is likely to yield relevant evidence, is subject to the court's obligation to balance its utility against its cost." *U.S. ex rel. McBride v. Halliburton Co.*, 272 F.R.D. 235, 240 (D.D.C. 2011) (Facciola, M.J.); *see* Fed. R. Civ. P. 26(b)(2)(C). More specifically, Rule 26(b)(2)(C) requires the court to consider whether "(1) the discovery sought is unreasonably cumulative or duplicative, or obtainable from a cheaper and more convenient source; (2) the party seeking the discovery has had ample opportunity to obtain the sought information by earlier discovery; or (3) the burden of the discovery outweighs its utility." *McBride*, 272 F.R.D. at 240–41; *see Willnerd v. Sybase, Inc.*, No. 09 C 500, 2010 WL 4736295, at *3 (D. Idaho Nov. 16, 2010) ("In employing the proportionality standard of Rule 26(b)(2)(C) . . . , the Court balances [the requesting party's] interest in the documents requested, against the not-inconsequential burden of searching for and producing documents."). The third factor requires the court to consider (a) the needs of the case; (b) the amount in controversy; (c) the parties' resources; (d) the importance of the issues at stake in the action; and (e) the importance of the discovery in resolving the issues. Fed. R. Civ. P. 26(b)(2)(C)(iii). Nevertheless, "[t]he party opposing a motion to compel carries a 'heavy' burden of persuasion." *U.S. v. AT&T Inc.*, No. 11-1560, 2011 WL 534178, at *5 (D.D.C. Nov. 6, 2011).

While the record does not afford a precise calculation, the Court can presume, given the nature of the antitrust claims and the size of the companies involved, that the amount in controversy is very large and that Defendants' resources are greater

than Plaintiffs'. Further, claims of collusion in the containerboard and corrugated box industries raise important, vital issues of public importance. Thus, these factors weigh in favor of the discovery sought by Plaintiffs. *See McBride*, 272 F.R.D. at 241.

On the other hand, Defendants protest that Plaintiffs have not demonstrated that the proposed additional custodians will have important, nonduplicative information. (IP Resp. 9; TIN Resp. 11–14.) Indeed, Plaintiffs do not point to any specific, noncumulative evidence they expect to find with the additional custodians. Instead, they selected the additional custodians by examining each Defendant's organizational charts and the list and titles of persons who received a litigation hold notice[11] and using metadata to analyze which individuals were sending and receiving emails from the sales and marketing people that were already identified as custodians. (Hr'g Tr. 18–21, Aug. 21, 2012.) Thus, Plaintiffs contend that the proposed individuals should be included as custodians because they are senior executives with responsibilities in containerboard, boxes, pricing, strategic planning, marketing and sales, and who "exchanged an unusually large" number of emails with top sales and marketing executives already named as custodians. (IP Reply 3–4; *see* TIN Reply 13–15.)

But just because a proposed custodian exchanged a large number of emails with a current custodian does not mean that the proposed custodians will have a significant number of important, *non-cumulative* information. Further, until Plaintiffs have had an opportunity to review the huge quantity of information already pro-

---

[11] Because Temple-Inland sent a litigation-hold notice to all employees, it did not produce a litigation-hold list.

duced from the existing custodians, it is difficult for the Court to determine the utility of the proposed discovery. *See McBride*, 272 F.R.D. at 241 ("Without any showing of the significance of the non-produced e-mails, let alone the likelihood of finding the 'smoking gun,' the [party's] demands [for additional custodians] cannot possibly be justified when one balances its cost against its utility."); *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the United States*, No. 09 C 6437, 2011 WL 7568591, at *2 (N.D. Ill. Oct. 21, 2011) ("The Court finds that Plaintiffs' untargeted, all-encompassing request fails to focus on key individuals and the likelihood of receiving relevant information."); *Garcia v. Tyson Foods, Inc.*, No. 06-2198, 2010 WL 5392660, at *14 (D. Kan. Dec. 21, 2010) (Waxse, M.J.) ("Plaintiffs present no evidence that a search of e-mail repositories of the 11 employees at issue is likely to reveal any additional responsive e-mails. . . . Plaintiffs must present something more than mere speculation that responsive e-mails might exist in order for this Court to compel the searches and productions requested.").

The Court also notes that IP already has 75 custodians—by far the most of any Defendant—and has engaged in good faith meet-and-confer discussions with Plaintiffs that enlarged the scope of document collection and production that IP initially agreed to undertake. (*See* IP Resp. 1, 6–7.) Similarly, TIN already has 28 custodians, which is more than most of the other Defendants.

However, the selection of custodians is more than a mathematical count. The selection of custodians must be designed to respond fully to document requests and to produce responsive, nonduplicative documents during the relevant period. *See*, *gen-*

*erally*, *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-4168, 2012 WL 1299379, at *9 (D.N.J. April 16, 2012). First of all, Plaintiffs are entitled to discovery about Defendants' box businesses. The Complaint adequately alleges a conspiracy both of containerboard and of corrugated products, including corrugated boxes. *See Kleen Prods.*, 775 F. Supp. 2d at 1082. Further, while the Complaint alleges a conspiracy mostly among higher-level executives (Compl. ¶ 192), it does not exclude lower level employees. More importantly, even if the conspiracy is *among* higher-level executives, lower-level employees may *possess* important, relevant information which could reasonably lead to admissible evidence. Fed. R. Civ. P. 26(b)(1); *see In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 453 (9th Cir. 1990) ("With regard to the appellees' contention that Rogers was too low-level an employee to be of significance, we see no reason for concluding that such information gathering cannot be delegated to subordinates. Accordingly, the fact that Rogers did not himself have authority to make ARCO pricing decisions is not dispositive."); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) ("One of Staley's HFCS plant managers was heard to say: 'We have an understanding within the industry not to undercut each other's prices.' (He was commenting on a matter within the scope of his employment and his comment was therefore admissible as an admission by a party. Fed. R. Evid. 801(d)(2)(D).)"); *see also In re SRAM Antitrust Litig.*, No. 07-1819, 2010 U.S. Dist. LEXIS 132171, at *40, *45–48, *51 (N.D. Cal. Dec. 10, 2010). Thus, in an antitrust case such as this,

Plaintiffs are at least entitled to a sample of lower-level and plant-level employees to determine if they possess significant and nonduplicative information.

Further, IP and TIN have not established an undue burden to producing information from the additional custodians. IP contends that its burden is undue because it has "*already* produced more than 4 million pages, with more to come based upon prior agreements with Plaintiffs." (IP Resp. 7 (emphasis added); *see id.* 11.) Similarly, TIN requests "an acknowledgment of the considerable burdens it already has been subjected to and some assistance . . . in controlling this burden going forward." (TIN Resp. 11.) But a party must articulate and provide evidence of its burden. While a discovery request can be denied if the "burden or expense of the proposed discovery outweighs its likely benefit," Fed. R. Civ. P. 26(b)(2)(C)(iii), a party objecting to discovery must specifically demonstrate how the request is burdensome. *See Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 598 (7th Cir. 2011); *Sauer v. Exelon Generation Co.*, No. 10 C 3258, 2011 WL 3584780, at *5 (N.D. Ill. Aug. 15, 2011). This specific showing can include "an estimate of the number of documents that it would be required to provide . . . , the number of hours of work by lawyers and paralegals required, [or] the expense." *Heraeus Kulzer*, 633 F.3d at 598. Here, TIN's and IP's conclusory statements do not provide evidence in support of their burdensome arguments.

In sum, in this situation, the Rule 26(b)(2)(C) factors do not overwhelmingly favor either Plaintiffs or Defendants. However, because Plaintiffs had no input on the initial custodian determinations and the case is still in the early stages of discovery,

the Court finds that Plaintiffs should be allowed a small number of additional cus-
todians. Accordingly, Plaintiffs may select eight additional custodians from the pri-
oritized list it sent to IP. (IP Mot. Ex. 9.) Similarly, Plaintiffs may select eight addi-
tional custodians from the proposed list it sent to TIN, two of whom should be a
random sample of the individuals identified as mill managers. (*See* TIN Mot. Ex. A.)

TIN and IP argue that they should not have to search all sources of information
for any new custodians. (TIN Resp. 9–11; IP Resp. 10–11.) They generally propose
to search only ESI from particular servers. (*Id.*) They contend that "the burden and
expense of searching [other] sources . . . would certainly outweigh its likely benefit."
(IP Resp. 11; *see* TIN Resp. 11.)

The Court disagrees. While Plaintiffs have focused their review on email and
other ESI documents, they have not asserted that non-ESI documents are unim-
portant. Given the dearth of emails produced in the early time periods, hard copy
documents for those periods may prove valuable. Similarly, for former employees,
hard copy documents may be the only information available.

TIN and IP also seek a written assurance that any future custodian request
would be subject to a good faith belief that the individual possesses information
tending to prove the alleged conspiracy. (*See* IP Resp. 12; TIN Resp. 4.) Specifically,
IP requests assurance that "[a]ny future request for custodians would be based on a
good faith belief, arising from a review of the documents produced in this case and
taking depositions, than an individual possesses information tending the prove the
allege conspiracy, and Plaintiffs agree to provide the basis for their good faith belief

to IP." (IP Resp. 12) (emphasis omitted). Similarly, TIN seeks confirmation that "if Plaintiffs seek to add any additional custodians, it would have to be based on specific evidence from the record indicating that the proposed custodian would have responsive evidence tending to prove the alleged conspiracy." (TIN Resp. 4.) Plaintiffs counter that the agreement they reached with PCA provides sufficient protection for all parties and is consistent with Rule 26. (IP Reply 4–5.)

The Court declines to set any restrictions on future custodian requests. The Court finds that IP's and TIN's requests are too restrictive and run contrary to the Federal Rules. For example, discoverable information "need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible information." Fed. R. Civ. P. 26(b)(1). Nevertheless, the parties are free to enter into any stipulations or agreements that fit their needs. Absent any agreements, however, the Court will be guided in any future custodian disputes by the Federal Rules and applicable case law.[12] *See*, *e.g.*, Fed. R. Civ. P. 1, 26(b)–(c).

Plaintiffs' motions to compel IP and TIN to include additional custodians are granted in part.

## C. Data Sources

In Plaintiffs' Motion to Compel Defendants to Produce Documents and Data from All Reasonably Accessible Sources, they request that Defendants be compelled

---

[12] Plaintiffs are cautioned, however, that the Court expects them to support any future custodian requests with specific evidence of the expected utility of the additional custodians derived from their review of existing documents. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii).

to search all reasonably accessible sources that potentially contain nonduplicative responsive documents or data, including backup tapes. (Mot. 10.) Defendants respond that their backup tapes are not reasonably accessible and Plaintiffs have not shown good cause for requiring their production. (Resp. 16–27.)

The resolution of Plaintiffs' motion is dependent on the application of Rule 26(b)(2)(B). This Rule provides:

> *Specific Limitations on Electronically Stored Information.* A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

"Pursuant to this Rule, defendants must produce electronically stored information that is relevant, not privileged, and reasonably accessible, subject to the discovery limitations in Rule 26(b)(2)(C)." *Major Tours, Inc. v. Colorel*, No. 05-3091, 2009 WL 3446761, at *2 (D.N.J. Oct. 20, 2009). If Defendants establish that the requested backup tapes are "inaccessible" within the meaning of Rule 26(b)(2)(B), the information must still be produced if Plaintiffs establish good cause considering the limitations in Rule 26(b)(2)(C). "The decision whether to require a responding party to search for and produce information that is not reasonably accessible depends not only on the burdens and costs of doing so, but also on whether those burdens and costs can be justified in the circumstances of the case." Fed. R. Civ. P. 26(b)(2), advisory committee's note (2006). Factors to examine in this analysis include:

> (1) the specificity of the discovery request; (2) the quantity of information available from other and more easily accessed sources; (3) the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources; (4) the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources.

Id.

"Under this framework, a court does not reach the two-fold question of whether inaccessible sources of electronically stored information should be searched and, if so, which party should bear the associated costs unless it is first satisfied that the request seeks relevant information that is not available from accessible sources." *Baker v. Gerould*, 03-CV-6558L, 2008 WL 850236, at *2 (W.D.N.Y. Mar. 27, 2008) This is because relevant considerations in determining whether to order a search of inaccessible sources include "the quantity of information available from other and more easily accessed sources" and "the likelihood of finding relevant information that seems likely to have existed but is no longer available on more easily accessed sources." Fed. R. Civ. P. 26(b)(2), advisory committee's note (2006); *see Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 323 (S.D.N.Y. 2003) (Scheindlin, J.) (one of the two most important considerations is "the availability of such information from other sources").

Courts generally agree that backup tapes are presumptively inaccessible. *See, e.g., Zubulake*, 217 F.R.D. at 319–20 (" 'Inaccessible' data . . . is not readily usable. Backup tapes must be restored using a process similar to that previously described,

fragmented data must be de-fragmented, and erased data must be reconstructed, all before the data is usable. That makes such data inaccessible."); *Major Tours*, 2009 WL 3446761, at *3 (Backup tapes are "typically classified as inaccessible."); *Go v. Rockefeller Univ.*, 280 F.R.D. 165, 175–76 (S.D.N.Y. 2012) ("Information stored on backup tapes is generally considered 'not reasonably accessible.' ") (citation omitted); *Clean Harbors Envtl. Servs., Inc. v. ESIS, Inc.*, No. 09 CV 3789, 2011 WL 1897213, at *2 (N.D. Ill. May 17, 2011) (Courts have already agreed that when information is stored on backup tapes, it is 'likened to paper records locked inside a sophisticated safe to which no one has the key or combination.' ESIS has given us no reason to believe that the information on the backup tapes in this case would be more easily accessible.") (quoting *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 291 (S.D.N.Y. 2003)).

In addition, Defendants have demonstrated a cost burden to restoring the backup media. They provided affidavits indicating that to restore the backup tapes would cost each Defendant at least $200,000, with some estimates well over $1,000,000. (*See* Resp. Exs. D, H.) Plaintiffs dispute the cost to restore Defendants' backup media. They contend that sampling the media to determine whether they contain responsive nonduplicative information could reduce costs. (Reply 6–7; Hanners Decl. ¶ 5.)

In any event, the Court finds that Plaintiffs' request to produce the backup tapes is premature. There is no discovery cutoff date in this case, and Plaintiffs are only 20% complete with their first level review of Defendants' documents. Thus, Plain-

tiffs should complete their review of Defendants' ESI, including the information produced from the additional custodians, before seeking to have archived backup tapes restored. "The volume of—and the ability to search—much electronically stored information means that in many cases the responding party will be able to produce information from reasonably accessible sources that will fully satisfy the parties' discovery needs." Fed. R. Civ. P. 26(b)(2), advisory committee's note (2006). Accordingly, Plaintiffs "should obtain and evaluate the information from such sources before insisting that the responding party search and produce information contained on sources that are not reasonably accessible." *Id.*

If, at the appropriate time, Plaintiffs decide to pursue the backup tapes, the parties and their experts are urged to work together in a cooperative manner to determine the actual cost of restoring the archived media. If feasible and cost efficient, sampling methods should be pursued. However, because each Defendant's ESI storage protocoal is unique, it may be difficult or impossible to extrapolate any sampling results from one Defendant to the others.

Plaintiffs' Motion to Compel Defendants to Produce Documents and Data from All Reasonably Accessible Sources is denied without prejudice.

## IV. CONCLUSION

Since its publication in 2009, more than 100 federal judges have endorsed the Cooperation Proclamation. In an effort to aid courts and counsel, The Sedona Conference has published guides and toolkits to facilitate proportionality and coopera-

tion in discovery.[13] Moreover, a number of courts have instituted model orders to assist counsel in transitioning to the cooperative discovery approach.[14]

In pursuing a collaborative approach, some lessons have been learned. First, the approach should be started early in the case. It is difficult or impossible to unwind procedures that have already been implemented. Second, in multiple party cases represented by separate counsel, it may be beneficial for liaisons to be assigned to each party. Finally, to the extent possible, discovery phases should be discussed and agreed to at the onset of discovery.

The Cooperation Proclamation calls for a "paradigm shift" in how parties engage in the discovery process. The Sedona Conference, *The Sedona Conference Cooperation Proclamation*, 10 Sedona Conf. J. 331, 332–33 (2009). In some small way, it is hoped that this Opinion can be of some help to others interested in pursuing a cooperative approach.[15] The Court commends the lawyers and their clients for conducting their discovery obligations in a collaborative manner.

---

[13] See The Sedona Conference, The Sedona Conference Cooperation Proclamation: Resources for the Judiciary (2011), available at http://www.thesedonaconference.org; The Sedona Conference, The Sedona Conference Cooperation Guidance for Litigators & In-House Counsel (2011), available at http://www.thesedonaconference.org.

[14] *See, e.g.*, Seventh Circuit Electronic Discovery Pilot Program, *Model Standing Order*, *available at* http://www.discoverypilot.com; Southern District of New York Pilot Program, *available at* http://www.nysd.uscourts.gov; District of Delaware, *Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI")*, *available at* http://www.ded.uscourts.gov; *see also* David J. Waxse, *Cooperation—What Is It and Why Do It?*, XVIII Rich. J. L. & Tech. 8 (2012), *available at* jolt.richmond.edu/v18i3/article8.pdf.

[15] The Court notes that there are very few model agreements available for parties and courts to follow. Accordingly, the Court suggests that The Sedona Conference and the Seventh Circuit Electronic Discovery Pilot Program serve as repositories for gathering ESI discovery agreements.

For the foregoing reasons, Plaintiffs' Motion to Compel Defendants to Produce Documents and Data from All Reasonable Accessible Sources [347] is **DENIED WITHOUT PREJUDICE**; Plaintiffs' Motion to Compel Temple-Inland to Include Additional Document Custodians [366] is **GRANTED IN PART AND DENIED IN PART**; Plaintiffs' Motion to Compel International Paper Company to Include Additional Document Custodians [382] is **GRANTED IN PART AND DENIED IN PART**; and Defendant Georgia-Pacific LLC's Motion for Protective Order [373] is **GRANTED**.

E N T E R:

Dated: September 28, 2012

_Nan R. Nolan_

Nan R. Nolan
United States Magistrate Judge

**EXHIBIT A**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KLEEN PRODUCTS LLC, et al.
individually and on behalf of all those
similarly situated,

          Plaintiff,

v.

PACKAGING CORPORATION OF
AMERICA,  et al,

          Defendants.

Civil Case No. 1:10-cv-05711

Hon. Milton I. Shadur

Hon. Nan R. Nolan

## STIPULATION AND ORDER RELATING TO ESI SEARCH

WHEREAS, in response to plaintiffs' May 3, 2011 Request for Production of Documents (the "First Request") in this matter, defendants have collected electronic and hard copy documents;

WHEREAS, defendants will continue to collect certain documents in response to the First Request, including without limitation such documents that may be collected for review in response to  discovery conferences or pursuant to judicial orders arising out of motions brought on the First Request (*e.g.*, any documents that the Court orders included for review and production based on the motions to be filed in July and August, 2012) (collectively all of the documents that have been or will be collected in response to the First Request shall be referred to in this Stipulation as the "First Request Corpus");

WHEREAS, defendants have employed ESI vendors to process the electronic documents contained within the First Request Corpus, and those ESI vendors have done so and continue to do so;

1

WHEREAS, defendants have applied and continue to apply their ESI search methodology (hereafter "Defendants' ESI Methodology"), which was described during the evidentiary hearings conducted on February 21, 2012 and on March 28, 2012 (the "Evidentiary Hearings"), to those processed electronic documents within the First Request Corpus;

WHEREAS, plaintiffs have challenged Defendants' ESI Methodology for the identification of documents responsive to the First Requests and asked the Court to order defendants to employ a "Content Based Advanced Analytics" ("CBAA") approach, as defined by plaintiffs, instead of Defendants' ESI Methodology;

WHEREAS, defendants have opposed this challenge;

WHEREAS, the parties have made a substantial number of written submissions and oral presentations to the Court with their views on this issue, and the Court held the Evidentiary Hearings to address this dispute; and

WHEREAS, the parties continue to have a number of disputes, but in order to narrow the issues, the parties have reached an agreement that will obviate the need for additional evidentiary hearings on the issue of the technology to be used to search for documents responsive to the First Requests.

THEREFORE, based upon and incorporating the foregoing, the parties, through their respective counsel of record, hereby stipulate to and the Court hereby orders:

1.      Plaintiffs withdraw their demand that defendants apply CBAA to documents contained within the First Request Corpus.  Plaintiffs will not claim that defendants must use an electronic search process other than Defendants' ESI Methodology to locate relevant documents contained in the First Request Corpus.

2.     As to any documents or ESI beyond the First Request Corpus, plaintiffs will not argue or contend that defendants should be required to use or apply the types of CBAA or "predictive coding" methodology and technology that were proposed by plaintiffs in connection with the Evidentiary Hearings with respect to any requests for production served on any defendant prior to October 1, 2013.  With respect to any requests for production served on any defendant on or after October 1, 2013, that requires the collection of documents beyond the First Request Corpus, the parties will meet and confer regarding the appropriate search methodology to be used for such newly collected documents.  If the parties fail to agree on a search methodology, either party may file a motion with the Court seeking resolution.

3.     Plaintiffs do not waive any additional objections they may have to defendants' search methodology for the First Requests, including any additional objections relating to defendants' identification, collection, custodians, data sources, search terms, statistical validation, review or production of documents, and that defendants' objections to the First Request unduly narrowed the scope of responsive documents, and defendants will not argue or contend that plaintiffs, in whole or in part, have waived or otherwise failed to fully reserve such additional objections by entering into this Stipulation.  The Court has established briefing schedules and other processes to resolve some of  these issues by the end of September 2012.

4.     Defendants reserve all rights they currently have with respect to their position that their document collection and production efforts met or exceeded relevant legal standards.

5.     In light of this agreement by the parties, the Evidentiary Hearings are discontinued.

Stipulated and agreed:


By: _____

Daniel J. Mogin
Matthew T. Sinnott
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA  92101
(619) 687-6611
dmogin@moginlaw.com
msinnott@moginlaw.com

INTERIM CO-LEAD COUNSEL
FOR THE PROPOSED CLASS

By:_____

Michael J. Freed
Steven A. Kanner
FREED KANNER LONDON
  & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
(224) 632-4500
mfreed@fklmlaw.com
skanner@fklmlaw.com

INTERIM CO-LEAD COUNSEL
FOR THE PROPOSED CLASS

By: _____
Stephen R. Neuwirth
Deborah Brown
Sami H. Rashid
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
stephenneuwirth@quinnemanuel.com
marcgreenwald@quinnemanuel.com
samirashid@quinnemanuel.com

James R. Figliulo
Stephanie D. Jones
FIGLIULO & SILVERMAN, P.C.
10 South LaSalle Street, Suite 3600
Chicago, IL 60603
(312) 251-4600
jfigliulo@fslegal.com
sjones@fslegal.com

COUNSEL FOR DEFENDANT
GEORGIA-PACIFIC LLC

By: _____
Douglas J. Kurtenbach, P.C.
Daniel E. Laytin
Barack S. Echols
Leonid Feller
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
douglas.kurtenbach@kirkland.com
daniel.laytin@kirkland.com
barack.echols@kirkland.com
leonid.feller@kirkland.com

COUNSEL FOR DEFENDANT
PACKAGING CORPORATION OF
AMERICA

By:_____
Nathan P. Eimer
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604-2516
(312) 660-7600
neimer@eimerstahl.com

James T. McKeown
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
(414) 297-5530
jmckeown@foley.com

COUNSEL FOR DEFENDANT
INTERNATIONAL PAPER COMPANY

By:_____
R. Mark McCareins
Michael P. Mayer
James F. Herbison
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
rmccareins@winston.com
mmayer@winston.com
jherbison@winston.com

COUNSEL FOR DEFENDANT
ROCKTENN CP, LLC

By: _____

Andrew S. Marovitz
Britt M. Miller
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
amarovitz@mayerbrown.com
bmiller@mayerbrown.com

COUNSEL FOR DEFENDANT
TEMPLE-INLAND INC.

By: _____

Scott M. Mendel
John E. Susoreny
Lauren N. Norris
K&L GATES LLP
70 W. MADISON ST.
SUITE 3100
CHICAGO, IL 60602
(312) 372-1121
scott.mendel@klgates.com
john.susoreny@klgates.com
lauren.norris@klgates.com

COUNSEL FOR DEFENDANTS
CASCADES, INC. AND NORAMPAC
HOLDING U.S. INC.

By: _____._____

David Marx Jr.
Jennifer S. Diver
Rachel Lewis
McDERMOTT WILL & EMERY LLP
227 W. Monroe Street
Chicago, IL 60606
(312) 372-2000
dmarx@mwe.com
jdiver@mwe.com
rlewis@mwe.com

COUNSEL FOR DEFENDANT
WEYERHAEUSER COMPANY

E N T E R :

Dated: August 21, 2012

Nan R. Nolan
_____

NAN R. NOLAN
United States Magistrate Judge

**EXHIBIT B**

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 10 C 5711 | **DATE** | 6/25/2012 |
| **CASE TITLE** | Kleen Products, et al. vs. Packaging Corporation of America, et al. | | |

**DOCKET ENTRY TEXT**

Rule 16 conference between Plaintiffs and Defendant Georgia-Pacific held on 5/31/2012. As stated below and on the record, various agreements were reached.

■[ For further details see text below.]

Notices mailed by Judicial staff.

---

### STATEMENT

At the 5/31/2012 Rule 16 conference, Plaintiffs and Defendant Georgia-Pacific each agreed to produce the names and titles of all persons who have received a litigation hold notice related to this action, along with the date that the notice was made. If the exact date of the notice cannot be readily determined, an approximate range of dates will be provided. The production of the names of persons receiving the litigation hold notice shall not constitute a waiver of the work-product doctrine or any other privilege. In addition, the inclusion of a person on the list of those receiving the litigation hold notice shall not create any presumption, or change the applicable standards for determining, that the person is an appropriate document custodian for purposes of ESI and document searches, or is otherwise subject to discovery.

Defendant Georgia-Pacific also agreed to include James Hannan, Chief Executive Officer and President, as a document custodian. Defendant Georgia-Pacific's willingness to compromise, in the context of a meet and confer supervised by the Court, on the foregoing issues of litigation hold recipients and making Hannan a document custodian shall not be a factor in determining whether Hannan shall be subject to any further discovery in this litigation.

**EXHIBIT C**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| KLEEN PRODUCTS LLC, et al. individually and on behalf of all those similarly situated,<br><br>            Plaintiff,<br><br>v.<br><br>PACKAGING CORPORATION OF AMERICA,  et al,<br><br>            Defendants. | Civil Case No. 1:10-cv-05711<br><br>Hon. Milton I. Shadur<br><br>Hon. Nan R. Nolan |

## STIPULATION AND ORDER RELATING TO CUSTODIANS

In order to fully and finally resolve the parties' custodian disputes as outlined in their submissions to the Court, Plaintiffs and the undersigned defendants ("Defendants") agree as follows:

1.      Defendants have agreed, in connection with this Stipulation and Order and their respective agreements with Plaintiffs, to add certain additional custodians to the document review.  Plaintiffs have no present intention of seeking additional custodians from any of the Defendants.

2.      Plaintiffs shall not make a future request for custodians from Defendants unless Plaintiffs' counsel have a good faith belief, arising from a review of the documents produced in this case, from depositions, or from some other identifiable source, that each requested individual custodian has information, not unreasonably cumulative or duplicative, that is relevant to the conduct alleged in Plaintiffs' Complaint.

1

3.      Plaintiffs will provide the Defendant from whom they are seeking any additional custodians with a written summary explanation of their basis for requesting each additional custodian, including a specific articulation of the basis for the request, such as Plaintiffs' review of documents and deposition testimony.  In providing this information, Plaintiffs do not waive any work product protection that might apply.

4.      If, after receiving the written explanation described in paragraph 3, an agreement cannot be reached among the relevant parties, then either party may take the issue up with the Court.

5.      Defendants reserve the right to oppose the addition of future custodians.

6.      Nothing in this agreement is intended to modify the applicability of the standard set forth in Fed. R. Civ. P. 26(b)(2)(C) in the event that a future dispute arises with respect to custodians.

STIPULATED AND AGREED:


By: *Daniel J. Mogin*                                     By: *Michael J. Freed*
Daniel J. Mogin                                             Michael J. Freed
Matthew T. Sinnott                                       Steven A. Kanner
THE MOGIN LAW FIRM, P.C.                   FREED KANNER LONDON
707 Broadway, Suite 1000                           & MILLEN LLC
San Diego, CA  92101                                   2201 Waukegan Road, Suite 130
(619) 687-6611                                             Bannockburn, IL  60015
dmogin@moginlaw.com                              (224) 632-4500
msinnott@moginlaw.com                            mfreed@fklmlaw.com
                                                                     skanner@fklmlaw.com

INTERIM CO-LEAD COUNSEL
FOR THE PROPOSED CLASS                   INTERIM CO-LEAD COUNSEL
                                                                     FOR THE PROPOSED CLASS

By: _R. Mark McCareins_____
R. Mark McCareins
Michael P. Mayer
James F. Herbison
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
rmccareins@winston.com
mmayer@winston.com
jherbison@winston.com

COUNSEL FOR DEFENDANT
ROCKTENN CP, LLC

By: _Scott M. Mendel_____
Scott M. Mendel
John E. Susoreny
Lauren N. Norris
K&L GATES LLP
70 W. MADISON ST.
SUITE 3100
CHICAGO, IL 60602
(312) 372-1121
scott.mendel@klgates.com
john.susoreny@klgates.com
lauren.norris@klgates.com

COUNSEL FOR DEFENDANTS
CASCADES, INC. AND NORAMPAC
HOLDING U.S. INC.

By: _Jennifer S. Diver_____
David Marx Jr.
Jennifer S. Diver
Rachel Lewis
McDERMOTT WILL & EMERY LLP
227 W. Monroe Street
Chicago, IL 60606
(312) 372-2000
dmarx@mwe.com
jdiver@mwe.com
rlewis@mwe.com

COUNSEL FOR DEFENDANT
WEYERHAEUSER COMPANY

E N T E R :

Dated: September 17, 2012

_Nan R. Nolan_____
NAN R. NOLAN
United States Magistrate Judge