```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   KLEEN PRODUCTS, LLC, et al.,      )   Docket No. 10 C 5711
                                       )
 4                       Plaintiffs,   )
                                       )
 5              vs.                    )
                                       )
 6   PACKAGING CORPORATION OF AMERICA, )   Chicago, Illinois
     et al.,                           )   May 30, 2012
 7                                     )   10:00 o'clock a.m.
                         Defendants.   )
 8
            TRANSCRIPT OF PROCEEDINGS - RULE 16 CONFERENCE
 9      BEFORE THE HONORABLE MAGISTRATE JUDGE NAN R. NOLAN
                          VOLUME 1-A
10
     APPEARANCES:
11
     For the Plaintiffs:       THE MOGIN LAW FIRM
12                             BY:  MR. DANIEL J. MOGIN
                               707 Broadway, Suite 1000
13                             San Diego, CA  92101
                               (619) 687-6611
14

15                             FREED KANNER LONDON & MILLEN LLC
                               BY:  MR. MICHAEL J. FREED
16                             MR. ROBERT J. WOZNIAK
                               2201 Waukegan Road, Suite 130
17                             Bannockburn, IL  60015
                               (224) 632-4500
18

19                             MILLER LAW LLC
                               BY:  MR. MATTHEW VAN TINE
20                             115 South LaSalle Street, Suite 2910
                               Chicago, IL  60603
21                             (312) 332-3400

22

23

24   Court Reporter:          MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                              Official Court Reporter
25                            219 S. Dearborn Street, Suite 1854-B
                              Chicago, Illinois  60604
                              (312) 435-5639
```

APPEARANCES CONTINUED:

For Defendant              MAYER BROWN LLP
Temple-Inland:             BY:   MR. ANDREW S. MAROVITZ
                                 MS. BRITT M. MILLER
                           71 South Wacker Drive
                           Chicago, IL   60606
                           (312) 782-0600

| | | |
|---|---|---|
| 10:04:46 | 1 | (The following proceedings were had in open court:) |
| 10:10:00 | 2 | THE COURT:  Good morning, everyone.  We are on the |
| 10:10:04 | 3 | record in the courtroom.  My name is Nan Nolan. |
| 10:10:14 | 4 | THE CLERK:  10 C 5711, Kleen Products v. Packaging |
| 10:10:16 | 5 | Corporation. |
| 10:10:16 | 6 | THE COURT:  Okay.  Thank you.  It's a referral from |
| 10:10:20 | 7 | Judge Shadur, and we are having what we are calling, for want |
| 10:10:26 | 8 | of a better word, a Rule 16 conference, a number of discovery |
| 10:10:32 | 9 | issues.  The parties have been -- I think done this amazing |
| 10:10:38 | 10 | work cooperating.  We have run into -- as anybody would, we |
| 10:10:46 | 11 | have run into some issues that need further exploration to |
| 10:10:50 | 12 | either decide if we are going to be able to work them out, if |
| 10:10:58 | 13 | not today, with further meet and confers, or if we really run |
| 10:11:02 | 14 | into an impasse, if certain briefing is going to happen. |
| 10:11:04 | 15 | So we had -- Temple-Inland is our guinea pig for this |
| 10:11:16 | 16 | since the plaintiffs have to come to all three of them.  We |
| 10:11:20 | 17 | are doing them individually with three of the defendants.  So |
| 10:11:22 | 18 | let's have Mr. Mogin, will you introduce your team? |
| 10:11:26 | 19 | MR. MOGIN:  Good morning, your Honor.  Dan Mogin on |
| 10:11:28 | 20 | behalf of the plaintiffs.  With me is Matt Van Tine from the |
| 10:11:36 | 21 | Miller Law firm, who is our Temple-Inland specialist; Michael |
| 10:11:40 | 22 | Freed; and Robert Wozniak. |
| 10:11:46 | 23 | THE COURT:  And for one time you outnumber the |
| 10:11:48 | 24 | defendants. |
| 10:11:50 | 25 | Now, for Temple-Inland, Ms. Miller, will you |

| | |
|---|---|
| 10:11:52 | 1 | introduce people? |
| 10:11:54 | 2 | MS. MILLER: Sure. Britt Miller, from Mayer Brown on |
| 10:11:58 | 3 | behalf of Temple-Inland, and with me is Andrew Marovitz. |
| 10:12:02 | 4 | THE COURT: Good. |
| 10:12:06 | 5 | All right. So would anybody like to say anything |
| 10:12:08 | 6 | specific before we begin? And you can use this one, |
| 10:12:14 | 7 | plaintiffs, and we will kind of share this one here. |
| 10:12:20 | 8 | Anybody have any opening comments? |
| 10:12:22 | 9 | MR. MOGIN: Your Honor, you had sent out or had |
| 10:12:26 | 10 | Mr. Campbell send out a list of subjects the other day, and to |
| 10:12:32 | 11 | a large extent, we have been discussing those subjects as |
| 10:12:36 | 12 | discrete issues. But as we were preparing for today's |
| 10:12:42 | 13 | hearing, it dawned on us that some of those issues are |
| 10:12:46 | 14 | actually quite integrated. For example, the custodians issue, |
| 10:12:54 | 15 | which was first on your list. There are certain implications |
| 10:12:56 | 16 | for that issue in the parsing issue, which was fourth or fifth |
| 10:13:02 | 17 | on your list. So I think it would be -- I just wanted to |
| 10:13:08 | 18 | point that out so that we didn't think in terms of these issue |
| 10:13:14 | 19 | silos and that there was some understanding of the crossover |
| 10:13:16 | 20 | or integration of the issues. |
| 10:13:20 | 21 | I guess I could -- if you want me to start, I will. |
| 10:13:24 | 22 | MR. MAROVITZ: If I could, just quickly. There |
| 10:13:28 | 23 | certainly are among the topics some relationships. We did |
| 10:13:40 | 24 | begin to discuss many of these topics during our last session |
| 10:13:42 | 25 | last week with the court, and Temple-Inland is a little |

10:13:44　1　different than the two defendants about whom you will hear

10:13:48　2　tomorrow because I think with respect to those defendants,

10:13:50　3　there was no discussion about these individual topics; whereas

10:13:56　4　for Temple-Inland, there was substantial discussion about at

10:13:58　5　least some of them.

10:14:02　6　　　　　　We are happy to proceed as the court would like.  For

10:14:06　7　us, we really would like to have a chance to be heard on some

10:14:10　8　of the issues that time simply didn't permit us to be heard on

10:14:14　9　last week, and the issue for us that's primary is the parsing

10:14:20　10　issue.  That was one that we wanted to be heard on last week,

10:14:24　11　and there just were many parties and insufficient time.

10:14:28　12　　　　　　So our goal is not to --

10:14:32　13　　　　　　THE COURT:  Tell me what your initial -- what you

10:14:36　14　would like to cover today.

10:14:38　15　　　　　　MR. MAROVITZ:  For today, parsing is first and

10:14:40　16　foremost; and after that, I think in some respect, we have

10:14:44　17　covered the other topics that apply to Temple-Inland.

10:14:52　18　　　　　　THE COURT:  Tell me which one of our 400 lists that

10:14:56　19　we have made in the last two weeks are you talking about?

10:14:58　20　　　　　　MR. MAROVITZ:  So there were -- just to set the

10:15:00　21　stage, there were five topics that Mr. Campbell circulated,

10:15:04　22　and then there were three more that the plaintiffs wished to

10:15:06　23　have added.  The five topics that Mr. Campbell circulated

10:15:12　24　were, one, custodians; two, word indexes; three, litigation

10:15:18　25　holds; four, Rule 30(b)(6) depositions; five, parsing.

10:15:24    1          THE COURT:  Okay.

10:15:26    2          MR. MAROVITZ:  And then the three additional topics

10:15:28    3   were time periods for defendants' responses to the requests

10:15:32    4   for production.

10:15:32    5          THE COURT:  Right.

10:15:32    6          MR. MAROVITZ:  Organization correlation of search

10:15:36    7   strings to request for production, and then inactive data and

10:15:40    8   backup tapes was the last one.

10:15:42    9          So in some sense, we have covered --

10:15:44   10          THE COURT:  We can do that in the first hour.

10:15:46   11          MR. MAROVITZ:  Well, no, but all kidding aside, we

10:15:50   12   have actually covered for Temple-Inland many of these topics.

10:15:52   13   I think the conversation you have tomorrow with the other

10:15:56   14   defendants who didn't cover any part of this will be more

10:15:58   15   expansive.  But the one topic for us that we just didn't get a

10:16:04   16   chance to cover was parsing, so we would like to reserve

10:16:06   17   enough time so we can be heard fully on that topic.

10:16:10   18          That's the real -- you may remember, Judge, we were

10:16:12   19   sort of in between and betwixt with respect to the group of

10:16:18   20   defendants.  I think plaintiffs really wanted to proceed with

10:16:22   21   Georgia-Pacific and International Paper and had proceeded with

10:16:26   22   the other ones, we were sort of in the middle, and the reason

10:16:30   23   we were interested in being here today was so that we could

10:16:32   24   have a chance to educate the court about the parsing issue.

10:16:34   25          THE COURT:  When we were putting this together, when

10:16:44   1   Chris and I were putting this together, we see a large overlap
10:16:48   2   of issues too, which is, I think, true in all cases but
10:16:54   3   particularly in this case.

10:16:56   4        And we had first -- because I think whether we are
10:17:06   5   calling it parsing or request to produce documents -- I mean,
10:17:10   6   the request to produce documents, we thought maybe we should
10:17:16   7   start with that, and we should start with that because I need
10:17:22   8   to understand -- I need some basic understanding of how the
10:17:36   9   defendants decided to answer some of these questions, which I
10:17:42   10  don't know whether it is a custodian issue or not.  That's
10:17:44   11  what I need to know because I think that that would then frame
10:17:50   12  some of the other issues.

10:17:52   13       So I don't want the whole day.  In fact, I'd like to
10:17:56   14  give us until 11:15, see what we can do.  But I actually
10:18:02   15  wanted to walk through, if we could, the request to produce,
10:18:06   16  unless you have already had meet and confers on all of this
10:18:12   17  and you know the answer.

10:18:16   18       MR. MOGIN:  I can't say that we really had meet and
10:18:18   19  confers on all of this.

10:18:18   20       THE COURT:  I certainly don't mean all --

10:18:22   21       MR. MOGIN:  No, I mean, as it's framed within the
10:18:24   22  parsing context.  From our perspective, your Honor, we have to
10:18:28   23  this point been concentrating on what we have referred to as
10:18:32   24  the common issues, and the parsing issue is really more of an
10:18:38   25  individual issue because each defendant chose to respond,

10:18:42  1   while there are certain commonalities, you have to quite

10:18:46  2   literally parse through each individual defendant's response

10:18:52  3   to understand the differences, as well as to understand the

10:19:00  4   corpus of what's being produced.  And we have had a lot of

10:19:06  5   discussion about what's the proper corpus.

10:19:12  6          I will give you -- if you want, I can start and give

10:19:18  7   you our perspective of what's happened.

10:19:22  8          MR. MAROVITZ:  Judge, just to give you some

10:19:22  9   background as well.  Before I walk through the whole issue,

10:19:30  10  Mr. Van Tine wrote us a letter which I think you have in front

10:19:34  11  of you which is attached as tab 10 to the submission that we

10:19:40  12  put before you --

10:19:40  13         THE COURT:  Okay.

10:19:42  14         MR. MAROVITZ:  -- that identifies with precision the

10:19:46  15  various requests for production that interested the

10:19:52  16  plaintiffs, and we committed to getting them a letter in

10:19:54  17  response.  Given the amount of work we had over the last week

10:19:58  18  and a half, we haven't had a chance to do that response but

10:20:02  19  still intend to do it.  So we will be responding with a formal

10:20:06  20  letter that identifies more specifically responses that they

10:20:14  21  have called out in their May 14th, 2012, letter.

10:20:18  22         And so I agree with Mr. Mogin, we haven't had a meet

10:20:22  23  and confer yet over these specific responses that are -- I

10:20:30  24  will put it differently.  We haven't had a meet and confer yet

10:20:34  25  over the specific points raised by the May 14th letter, but as

10:20:38　　1　part of the parsing issue that we want to discuss today, we

10:20:40　　2　have had a lot of conversations about our requests for

10:20:44　　3　production and the responses.  And so that's -- that, I think,

10:20:46　　4　would be an appropriate focus for today.  We are happy to talk

10:20:50　　5　to you about what's in the letter too.  We just haven't

10:20:54　　6　responded formally to plaintiffs' letter yet of May 14.

10:20:58　　7　　　　　　MR. MOGIN:  And here I was going to ask the reporter

10:21:00　　8　to mark that sentence where you said I agree with Mr. Mogin,

10:21:04　　9　but then a paragraph later you took it back.

10:21:10　　10　　　　　　THE COURT:  All right.  Here's where fresh eyes

10:21:12　　11　sometimes help, which is one of the things that I think is

10:21:16　　12　good about a Rule 16 is since Chris and I haven't been

10:21:22　　13　involved in the case for the same period of time you folks

10:21:28　　14　have been looking at it.

10:21:30　　15　　　　　　The reason I wanted to start, just a straight start

10:21:34　　16　with RPD number 1, not with -- everything else, I want -- I

10:21:44　　17　have some real basic questions that I want to know, but I

10:21:50　　18　don't want to use your term "parsing" because I think it takes

10:21:52　　19　on some significance, but I want to ask them why they answered

10:21:58　　20　the question the way they did.  Okay?  Because I don't know --

10:22:04　　21　I just -- I think I know what the answer is, but I want to

10:22:08　　22　hear what they say the answer is.

10:22:12　　23　　　　　　So let's start, because these things build, and we

10:22:16　　24　are not going to do all 99, but I think we are going to get,

10:22:20　　25　Mr. Marovitz, to your P word, the parsing issue.

10:22:26   1        MR. MOGIN:  Your Honor, I don't mean to interrupt,

10:22:28   2 but please do recall as you go through these that we have

10:22:30   3 divided these up basically into two groups, the first group

10:22:34   4 being what we call the conduct-related requests.

10:22:38   5        THE COURT:  Thank you for reminding me.  What does

10:22:40   6 that go to, 1 to what?

10:22:46   7        MR. VAN TINE:  Basically, this May 14 letter is

10:22:52   8 directed at the conduct request.

10:22:52   9        THE COURT:  Are they -- certain numbers are conduct?

10:22:56  10        MR. MOGIN:  Yes, your Honor.

10:22:58  11        MR. VAN TINE:  If you look at the May 14 letter,

10:23:00  12 first page, footnote 1 identifies the conduct requests.

10:23:10  13 Although having said that, the RPD number 1 is not listed in

10:23:16  14 that footnote.

10:23:18  15        THE COURT:  And it should be?

10:23:20  16        MR. VAN TINE:  And it's the first one.  It should be.

10:23:22  17 Well, it's a general issue.

10:23:24  18        THE COURT:  All right.  Do you both have a common

10:23:26  19 understanding of what "conduct" means?

10:23:30  20        MR. MOGIN:  I think we do.  I think that's something

10:23:32  21 that's evolved over the past nine or 10 months.

10:23:34  22        THE COURT:  Why don't you tell us for the record,

10:23:38  23 what does conduct mean?

10:23:38  24        MR. MOGIN:  It's probably easier to define in terms

10:23:42  25 of what "data" means and say that the rest are conduct.

| | | |
|---|---|---|
| 10:23:48 | 1 | So data are basically various requests for operating |
| 10:23:52 | 2 | data of the companies of the type that is most useful for |
| 10:24:00 | 3 | expert analysis, although not exclusively.  So the data |
| 10:24:06 | 4 | requests tend to go to, for lack of a better term, the |
| 10:24:10 | 5 | economics of the case; whereas, the conduct tends to focus |
| 10:24:16 | 6 | more on the liability aspects of the case, although economics |
| 10:24:20 | 7 | and liability are not mutually exclusive terms. |
| 10:24:26 | 8 | THE COURT:  So when you're saying "economics," you |
| 10:24:28 | 9 | mean damages? |
| 10:24:30 | 10 | MR. MOGIN:  Damages, impact. |
| 10:24:34 | 11 | THE COURT:  Okay. |
| 10:24:34 | 12 | MR. MOGIN:  Economics set the context for a lot of |
| 10:24:40 | 13 | the conduct.  In other words, behavior that might be |
| 10:24:46 | 14 | competitively innocuous in one economic setting may be |
| 10:24:54 | 15 | anti-competitive in a different economic setting. |
| 10:24:58 | 16 | THE COURT:  Is this a definition you gave them when |
| 10:25:00 | 17 | you sent them the request to admit, or is this the way you are |
| 10:25:04 | 18 | looking at it a year later? |
| 10:25:06 | 19 | MR. MOGIN:  This evolved out of a meet and confer |
| 10:25:08 | 20 | that we had last summer with what was then known as the Echols |
| 10:25:14 | 21 | group or committee, which was headed by Mr. Echols |
| 10:25:18 | 22 | representing PCA, and Ms. Miller was on that task force for |
| 10:25:24 | 23 | the defendants as well.  It was basically a small group |
| 10:25:26 | 24 | negotiating with us, and they asked us because the issue arose |
| 10:25:32 | 25 | in the context of time periods.  So for data, we need a more |

10:25:38   1   extensive time period.  That's plaintiffs' position.  And for

10:25:42   2   conduct, we can take a somewhat shorter time period.

10:25:48   3          So they asked us to define which RPDs fell into which

10:25:52   4   of those two categories, and we did so with the one footnote,

10:25:58   5   that there were a number of requests that had to do with prior

10:26:00   6   litigation and investigation, which was originally treated as

10:26:06   7   a separate category altogether, a third category, for which

10:26:10   8   there was no time period associated.  And that more or less

10:26:16   9   has been recently collapsed into the conduct period, although

10:26:20   10  not with respect to the time period issue.

10:26:28   11         THE COURT:  All right.

10:26:30   12         MR. MOGIN:  So we have -- just so you know, your

10:26:32   13  Honor, we have put the data or the transactional requests on a

10:26:38   14  different track.  About a week and a half ago or so, we

10:26:44   15  received a proposal from Mr. McKeown on behalf of all of the

10:26:50   16  defendants for how to handle that in terms of extraction of

10:26:58   17  data from the defendants' various databases and presentation

10:27:02   18  to us, most particularly with respect to what field, what data

10:27:06   19  fields would be provided for us.  The time period still has

10:27:12   20  not been resolved, but we are going -- there is a little bit

10:27:16   21  of back and forth on that, and the plaintiffs have been

10:27:20   22  reviewing that with their experts and others, and we

10:27:22   23  anticipate that we will respond very shortly.

10:27:24   24         THE COURT:  Okay.  So that certainly is a cross

10:27:28   25  issue; that will be an issue that would cut across a number of

10:27:30   1    the requests.

10:27:32   2         MR. MOGIN: Yes, but I think for your purposes today

10:27:36   3    that if we focus -- we would probably make the most progress

10:27:40   4    if we focus on the conduct requests.

10:27:44   5         THE COURT: And we have just put number 1 in conduct.

10:27:48   6         MR. MOGIN: Number 1 should have been in conduct,

10:27:50   7    yes.

10:27:50   8         THE COURT: All right. Okay. So RPD says, Seeks

10:28:04   9    organizational charts or other documents sufficient to show

10:28:08  10    the complete organizational structure directly or indirectly

10:28:12  11    relating to containerboard products, including a description

10:28:18  12    of the business functions or responsibilities of each of the

10:28:22  13    following:

10:28:24  14         A, predecessors, parents, subsidiaries, affiliates,

10:28:28  15    and joint ventures;

10:28:30  16         B, division, departments, segments, units, or

10:28:36  17    subdivisions; and,

10:28:36  18         C, board or management committees, subcommittees, or

10:28:44  19    working groups, and each of their related persons.

10:28:52  20         Plaintiffs say, Rather than produce the requested

10:28:54  21    documents, subject to their objections, Temple-Inland's

10:28:58  22    response indicates it will only produce organizational charts

10:29:00  23    for those executives with primary decisionmaking authority and

10:29:04  24    those persons who directly report to them and documents

10:29:10  25    sufficient to show its board of directors. For reasons that

10:29:16   1    are well known at this point, plaintiffs believe that such a

10:29:20   2    response restricting the sources in this matter is

10:29:24   3    unacceptable.  This applies to all such responses.

10:29:28   4         Okay.  So for the record, you are calling "parsing"

10:29:36   5    -- tell me how they parsed that answer so we have -- at least

10:29:42   6    we have a clear definition of how you're using parsing.

10:29:46   7         MR. MOGIN:  All right.  Well, to put it in context,

10:29:50   8    your Honor, from our perspective, what's happened is that

10:29:58   9    through the parsing process --

10:30:02  10         THE COURT:  Well, I have to ask you something before

10:30:04  11    that.  Did you, in fact, get an organizational chart and

10:30:10  12    documents that go with the executives with primary

10:30:14  13    decisionmaking authority?  Is that what they actually turned

10:30:18  14    over to you?

10:30:20  15         MR. MOGIN:  To some extent, yes.

10:30:22  16         THE COURT:  Okay.

10:30:24  17         MS. MILLER:  Your Honor, we produced literally

10:30:28  18    hundreds of pages of organizational charts.

10:30:30  19         THE COURT:  Nobody is going to mention numbers today.

10:30:30  20         MS. MILLER:  Lots of pages.

10:30:32  21         THE COURT:  I mean, the numbers aren't the issue.

10:30:36  22    They really aren't.  Either underwhelmed, overwhelmed,

10:30:40  23    anything.

10:30:40  24         So they did turn over to you, executives with primary

10:30:50  25    decisionmaking authority, they gave you a chart of that, and

| | | |
|---|---|---|
| 10:30:54 | 1 | they gave you documents that go with that, correct? |
| 10:30:58 | 2 | MR. MOGIN: Yes. |
| 10:30:58 | 3 | THE COURT: Okay. Now -- |
| 10:31:04 | 4 | MR. MAROVITZ: I'm going to -- if I may, I'm going to |
| 10:31:06 | 5 | make one quick statement, and then I'm going to turn over the |
| 10:31:10 | 6 | specifics to Ms. Miller, who actually drafted the responses. |
| 10:31:12 | 7 | THE COURT: Yes. |
| 10:31:14 | 8 | MR. MAROVITZ: I'm glad the Court is asking about the |
| 10:31:18 | 9 | use of the word "parsing." We think that's a complete |
| 10:31:22 | 10 | misnomer. The word simply doesn't apply in this case, and I |
| 10:31:28 | 11 | know that the court wishes to go request by request, and we |
| 10:31:34 | 12 | are happy to do that because we think we have answered the |
| 10:31:36 | 13 | questions in a clear way that signals to the plaintiffs what |
| 10:31:40 | 14 | it is that we are and are not producing. |
| 10:31:44 | 15 | I do think it's really important for us to have an |
| 10:31:48 | 16 | opportunity to walk through the history of when the requests |
| 10:31:54 | 17 | came, what our objections were, what happened next, all the |
| 10:31:58 | 18 | meet and confers, and all the productions. I'd like to do |
| 10:32:02 | 19 | that this morning. I'd be happy to spend five minutes doing |
| 10:32:06 | 20 | it now. |
| 10:32:06 | 21 | THE COURT: Good. |
| 10:32:08 | 22 | MR. MAROVITZ: That would be great. We tried to put |
| 10:32:12 | 23 | together that chronology in some sense in tab 11. |
| 10:32:16 | 24 | THE COURT: Yes. |
| 10:32:16 | 25 | MR. MAROVITZ: Okay. So plaintiffs served their |

10:32:24    1    document production request on May 3rd of 2011, so it was more

10:32:30    2    than a year ago. And one month later, in June of 2011,

10:32:38    3    Temple-Inland and the other defendants filed their responses,

10:32:42    4    and those responses are the ones that we are looking at now

10:32:48    5    attached as tab 1. Those responses respond to every request,

10:32:54    6    they outline our objections, they say what we're going to

10:32:56    7    produce, they say what we're not going to produce. Both sides

10:33:00    8    proceeded on that basis, so we had a series of meet and

10:33:04    9    confers since more than a year ago about those responses.

10:33:10   10    Tab 3 in the binder that we presented has an analysis

10:33:16   11    of what happened on July 5th regarding time periods and search

10:33:22   12    scope. Those were two issues that came up during the meet and

10:33:24   13    confers about our responses.

10:33:28   14    And then tab 6, which refers to August 11th of 2011,

10:33:34   15    is a lengthy letter of that date reflecting another meet and

10:33:38   16    confer that we had about specific requests, again, that were

10:33:44   17    part of the responses that we provided to the plaintiffs back

10:33:48   18    in June.

10:33:48   19    So after all that happened, the defendants then

10:33:54   20    developed a series of search strings that your Honor knows all

10:33:58   21    about given the ESI hearings, and the defendants, including

10:34:06   22    Temple-Inland, told the plaintiffs what it is that we were

10:34:08   23    doing, both before, during these meet and confer conferences,

10:34:14   24    as well as during the ESI hearings. You may remember that

10:34:22   25    Sandy Brown (phonetic) testified about the fact that the

10:34:24  1  search strings were designed to capture terms to be produced

10:34:30  2  in the litigation.

10:34:30  3  So based upon what we turned over in our responses in

10:34:34  4  June of 2011, and then the meet and confers we had for several

10:34:38  5  months after that, and then what we told the plaintiffs we

10:34:42  6  were going to do, and then the ESI hearings, we started making

10:34:46  7  substantial document productions to the plaintiffs that built

10:34:48  8  upon all of that work, and those productions were made between

10:34:54  9  August of 2011 and May of 2012, so more than a half a year

10:35:00  10  during that time.  And those productions are recorded in the

10:35:04  11  time line that we provided in the last exhibits in the binder.

10:35:08  12  We then told the plaintiffs in the two statuses

10:35:10  13  before this one that we would be making a big production.

10:35:16  14  And, in fact, just earlier this month, we produced the

10:35:22  15  equivalent, when you look at all the ESI, of more than a

10:35:26  16  million pages of paper.  I won't say more about it than that.

10:35:30  17  I won't say more about it than that.

10:35:30  18  THE COURT:  Okay.  That's fine.

10:35:30  19  MR. MAROVITZ:  We produced a lot of pages.

10:35:32  20  THE COURT:  You did.

10:35:32  21  MR. MAROVITZ:  There is no dispute about that.

10:35:36  22  So we haven't run exact figures on the cost of all

10:35:38  23  this, but I believe personally that Temple-Inland spent more

10:35:42  24  than a million dollars on this process, probably a lot more

10:35:46  25  than a million dollars in this process.  Only after that

10:35:48   1   process was all done did we hear the word "parsing."  And in

10:35:58   2   the letter that we are looking at now, the May 14th, 2012,

10:36:02   3   letter that your Honor started with, there is a statement in

10:36:10   4   the first paragraph that says that your client did not follow

10:36:14   5   ordinary procedure by searching for and producing all

10:36:18   6   requested responsive documents in its possession, custody, or

10:36:22   7   control.

10:36:24   8          THE COURT:  Not August 11th.

10:36:24   9          MR. MAROVITZ:  No, it's tab 10.

10:36:26  10          THE COURT:  Tab 10, sorry.  Okay.

10:36:32  11          MR. MAROVITZ:  And then it's the third line, and it

10:36:34  12   says, Your client did not follow ordinary procedure by

10:36:38  13   searching for and producing all requested responsive documents

10:36:42  14   in its possession, custody, or control from the indicated

10:36:44  15   sources subject to such objections.

10:36:48  16          So what the plaintiffs are saying there is that it's

10:36:50  17   common procedure for lawyers to serve objections and then

10:36:56  18   produce everything anyway.  And that's not my experience.  I

10:37:00  19   don't think it's anybody's experience around this table.

10:37:04  20          What we did is we objected and we told the plaintiffs

10:37:10  21   what it was that we would produce, and then we spent months

10:37:14  22   and more than a million dollars putting it together and

10:37:18  23   producing it.  So the import of the May 14th letter is that

10:37:24  24   despite all that work, Temple-Inland should now simply

10:37:28  25   withdraw all its objections, go back and produce all the stuff

10:37:32   1   it said it wouldn't produce before.

10:37:36   2         The reason that we know that that's not the ordinary

10:37:40   3   way that people do productions in these sorts of cases is that

10:37:44   4   that's not the way the plaintiffs did it in this case.  So the

10:37:50   5   defendants also served document production requests to the

10:37:54   6   plaintiffs.  And if we look at tab 2 of what it was that we

10:38:02   7   gave you, this is the plaintiffs' responses and objections to

10:38:06   8   our requests for the production of documents.  And on page 11

10:38:14   9   of tab 2 in response to our request No. 16, if you look at the

10:38:20  10   bottom of that page, you can see that plaintiffs took the

10:38:24  11   position that they had objections and that they would not

10:38:28  12   produce documents in response to request No. 16.  And, indeed,

10:38:32  13   I believe plaintiffs have honored their commitment and not

10:38:38  14   produced those documents.  They said they weren't going to do

10:38:40  15   it, and I don't think they did it, and they told us they

10:38:42  16   weren't going to do it.

10:38:42  17         So the notion that everybody simply produces

10:38:48  18   everything and then puts forth all kinds of objections for

10:38:56  19   just some sort of -- to make some sort of a record is just not

10:39:02  20   the way it's done.

10:39:04  21         We know -- we know that the parties have been focused

10:39:08  22   on many common issues, like predictive coding and Boolean

10:39:14  23   searches and ESI hearings of the sort that I have never been

10:39:18  24   involved in before, and there's been a lot of work for

10:39:20  25   everybody.  But the notion somehow that, you know, 11 months

10:39:28   1   later, you can send a letter that accuses the other side of

10:39:34   2   parsing after all this work has been done by us, all this

10:39:38   3   money has been spent and all of these documents produced, and

10:39:42   4   where there have been actual meet and confers about these, at

10:39:46   5   least as to many general issues, and some specific ones, we

10:39:50   6   think is -- it's just not our perspective of the way that this

10:39:58   7   should have occurred, and we think that it's going -- that any

10:40:02   8   kind of sort of specific, you know -- well, let me just stop

10:40:12   9   there.  I think it's not the way that this should have

10:40:14  10   happened, and it's going to cause an incredible amount of

10:40:20  11   burden and cost to our client after it's done just a

10:40:26  12   remarkable amount of work in terms of responding and telling

10:40:28  13   the plaintiffs what we were and weren't going to do.

10:40:32  14           That's why I wanted to be heard on parsing.

10:40:34  15           THE COURT:  I understand.

10:40:36  16           MR. MAROVITZ:  That said, we are --

10:40:38  17           THE COURT:  All right.  So I am intending, the reason

10:40:42  18   I was going to use document -- okay.  So in the 14 years,

10:40:52  19   2,000 or so, more than 2,000 cases I have supervised in

10:40:58  20   discovery, granted, they're not antitrust cases.  Okay?  The

10:41:04  21   normal procedure in the non-cooperative mode, in a motion

10:41:10  22   mode, would be you get a request to produce, one person comes

10:41:18  23   in and says, It's overly broad -- they don't answer.  Okay?  I

10:41:22  24   mean, I half agree with what you are saying.  The normal is we

10:41:26  25   go into motion practice.  They come -- the defendants come in

10:41:32   1   and say, Overly broad, don't understand their terms, what's

10:41:38   2   the difference between relating and concerning, it's

10:41:40   3   burdensome, it's yada, yada, yada, the judge sits there with

10:41:44   4   92 for seven people, comes up with some order, and says, You

10:41:48   5   win this, you win that, you lose, take half, good-bye.  Okay?

10:41:54   6         I think to your credit, to both of your credit, all

10:42:02   7   the way through, you have tried to carve out this new way to

10:42:06   8   do discovery.  You haven't wasted one thing, even if we have

10:42:14   9   to tweak some of these requests to produce right now.  That's

10:42:16  10   all I am talking about.  I want to take waiver and timing off

10:42:22  11   the table on this.  I am not going to ask you to do

10:42:26  12   cooperation and then turn around and whack you with some --

10:42:32  13   somebody waived it, somebody -- why the heck didn't he come in

10:42:36  14   on a motion to compel?  I mean, truthfully, it's not just why

10:42:40  15   didn't you come in and say, Overly broad.  Why didn't they --

10:42:44  16   you know, my question is, Why the heck did you wait 11 months?

10:42:46  17   Okay?  I know I could do that.  I understand the power of this

10:42:54  18   job.  You folks have been trying your darndest to do it in a

10:43:04  19   new way, and this particular one has sort of fallen through

10:43:06  20   the cracks.

10:43:06  21         I am not thinking we could sit here, even if we sat

10:43:08  22   here for, you know, three days straight, could we agree on all

10:43:12  23   of this.  But Chris and I need to understand what your

10:43:20  24   rationale was on some of these decisions because they seem to

10:43:24  25   us that they really are about something else and not the exact

10:43:28    1    request that's in front of you.  And you may not have even

10:43:32    2    realized that back in '11.  I mean, you know so much more

10:43:36    3    about the case now.  I mean, maybe if we were writing a

10:43:42    4    protocol for the future on how to do a cooperative model,

10:43:50    5    maybe requests to produce shouldn't be done until a year into

10:43:54    6    discovery because you needed some of the information to even

10:43:58    7    be able to figure what these things were.

10:44:00    8          So what I am -- it's a long way of saying

10:44:06    9    Georgia-Pacific made a specific objection, kind of like an old

10:44:10   10    school kind of it's too late, you didn't object, you didn't do

10:44:14   11    that.  I think the only thing I can say in fairness right now

10:44:18   12    is -- to encourage you to keep cooperating is that if we are

10:44:24   13    going to change the rules, we should change the rule from now

10:44:26   14    going forward, it shouldn't be in the past, because you were

10:44:32   15    trying your darnedest to do it.

10:44:34   16          I'm telling you, Mr. Marovitz, the stuff you turned

10:44:38   17    over isn't wasted on anything.

10:44:40   18          Let's go to No. 1.  I will tell you what I am

10:44:44   19    thinking on No. 1.

10:44:46   20          All right.  So the No. 1 is -- the No. 1 says, Give

10:44:52   21    us an organizational chart or other documents sufficient to

10:44:58   22    show your complete organizational structure.

10:45:02   23          So, Ms. Miller, when you changed that or when you

10:45:08   24    answered, Yes, we will give you executives with primary

10:45:14   25    decisionmaking authority, what was your rationale for that?

10:45:20   1   MS. MILLER: The rationale for that -- and to be

10:45:22   2   clear, if you look at the actual response, we did not simply

10:45:24   3   limit it to that. We also agreed, as requested to produce,

10:45:30   4   documents sufficient to show our board of directors, which is

10:45:32   5   one of the things they say we didn't do, we would produce

10:45:36   6   documents sufficient to show our board of directors for the

10:45:38   7   period as well.

10:45:38   8   The rationale was -- I will talk about the rationale,

10:45:42   9   and then I will tell you what actually got produced to give a

10:45:44   10   little context.

10:45:44   11   THE COURT: Okay.

10:45:46   12   MS. MILLER: The rationale was simply if you look at

10:45:48   13   plaintiffs' complaint in terms of what they are alleging, they

10:45:50   14   are alleging price fixing and they are alleging restraint on

10:45:54   15   capacity. There are a certain number of people in the company

10:45:56   16   that can make those decisions. The folks on the floor of the

10:45:58   17   paper mill can't make those decisions.

10:46:00   18   THE COURT: Right.

10:46:00   19   MS. MILLER: The folks that are sitting out in local

10:46:02   20   sales offices can't make those decisions. The people that can

10:46:06   21   be involved in the conspiracy that plaintiffs are alleging are

10:46:10   22   the people that have the ability to set prices and to control

10:46:14   23   capacity and to make those other types of decisions to

10:46:16   24   participate in this alleged conspiracy.

10:46:20   25   THE COURT: Or to carry out the orders.

10:46:22    1      MS. MILLER:  Exactly.

10:46:22    2      So what we did is we provided -- in terms of actual

10:46:28    3  organizational charts, we provided our -- what we call our

10:46:30    4  main organizational chart which has the management structure,

10:46:36    5  essentially, of our containerboard and corrugated products

10:46:40    6  division.  We also produced a whole series of organizational

10:46:46    7  charts that showed the people underneath that.

10:46:48    8      THE COURT:  Oh, you did?

10:46:48    9      MS. MILLER:  Oh, yeah.  Including going down to sales

10:46:52   10  levels and regional sales levels, even though those weren't

10:46:56   11  the decisionmakers.  We provided those organizational charts

10:46:58   12  as well.

10:47:00   13      We are still looking for an organizational chart that

10:47:02   14  will show our board of directors, but that may just be our

10:47:06   15  10Ks and our 10Qs that shows who our board of directors were

10:47:12   16  during the relevant period.  There is no organizational chart

10:47:12   17  that shows who our board of directors were, but we are

10:47:16   18  producing documents that will be sufficient to show that

10:47:18   19  information.  We have produced organizational charts

10:47:22   20  sufficient to show all of the people that had decisionmaking

10:47:24   21  responsibility during the period, as well as the people

10:47:26   22  underneath them.

10:47:26   23      THE COURT:  Now, I didn't understand that.

10:47:30   24      MR. MOGIN:  Well, I would like to know, since they

10:47:32   25  seem to have such specific information about this, what

10:47:36   1   documents are we talking about and when were they produced,

10:47:40   2   Bates numbers and dates, and maybe we can verify that.

10:47:46   3         This gets back to the issue, another one of the

10:47:50   4   issues we have been talking about from the get-go, which was

10:47:54   5   organizational and correlation.  They seem to have the

10:47:56   6   information about what they actually produced in response to

10:47:58   7   specific RPDs.

10:48:00   8         THE COURT:  I thought in your parsing argument, your

10:48:02   9   argument was you only got an organizational chart of

10:48:08  10   executives with primary decisionmaking authority and those

10:48:14  11   persons who directly report to them.

10:48:18  12         MR. MOGIN:  No, your Honor.  You are missing the

10:48:20  13   chronology.  I'm sorry.  We got their response to the RPD

10:48:24  14   request before we ever got a document.

10:48:26  15         THE COURT:  Right.

10:48:26  16         MR. MOGIN:  So they're telling us what they're going

10:48:28  17   to produce.  And then it was during the Brown testimony that

10:48:32  18   it came out that based upon the objections, et cetera, that

10:48:38  19   matters were being excluded, and then that was confirmed

10:48:42  20   approximately a month ago when we had the first series of

10:48:46  21   individualized meet and confers with respect to Temple-Inland.

10:48:50  22   So it's not a situation where we can go and look at what's

10:48:54  23   actually been produced and compare it to the RPDs, not at this

10:48:58  24   point, not when they have just -- Temple-Inland is six months

10:49:02  25   away from completing their document production.

10:49:04　1　　　　　MR. VAN TINE:  Actually -- actually, the chronology

10:49:08　2　of the document production is that some general preliminary

10:49:14　3　documents were produced before this month.

10:49:20　4　　　　　THE COURT:  Okay.

10:49:20　5　　　　　MR. VAN TINE:  It was only this month that

10:49:24　6　Temple-Inland began its substantial document production, and

10:49:32　7　it's just the beginning.  And as Mr. Mogin just mentioned,

10:49:36　8　it's going to be -- they're telling us it's going to be a half

10:49:42　9　a year before we have all the documents that they say that

10:49:44　10　we're going to get.  So we have not had an opportunity to

10:49:52　11　review the large batch that we got this month, and, obviously,

10:49:58　12　we haven't reviewed what we haven't gotten yet.

10:50:02　13　　　　　So this -- this letter is based on what they said

10:50:08　14　they would produce to us in their response to the request to

10:50:14　15　produce.  It's not based on review of the documents.

10:50:18　16　　　　　THE COURT:  But, honestly, before we get to indexing,

10:50:22　17　correlation, whatever we want to call it, because you don't

10:50:24　18　have the documents yet, so you don't even know if they

10:50:28　19　correlate --

10:50:28　20　　　　　MR. VAN TINE:  Correct.

10:50:28　21　　　　　THE COURT:  -- I thought the parsing argument -- I

10:50:32　22　mean, I am just trying to get my arms around this parsing

10:50:34　23　argument.  I thought parsing argument number one was, you

10:50:40　24　said, Give us organizational charts of your whole

10:50:44　25　organization, and they came back and said, We're giving it to

| | | |
|---|---|---|
| 10:50:48 | 1 | you with executives with primary. |
| 10:50:50 | 2 | MR. VAN TINE:  Right. |
| 10:50:50 | 3 | THE COURT:  I thought the parsing was that. |
| 10:50:52 | 4 | MR. VAN TINE:  Yes, it is. |
| 10:50:54 | 5 | THE COURT:  Now it seems like they gave you more than |
| 10:50:56 | 6 | that. |
| 10:50:58 | 7 | MR. MOGIN:  Well, we just learned that just now. |
| 10:51:00 | 8 | MR. MAROVITZ:  Wait, Judge, if I could make the |
| 10:51:02 | 9 | record clear.  If you look at tab 11, the time line, and you |
| 10:51:08 | 10 | turn to August 11th of 2011, it's page 2 of the letter that we |
| 10:51:18 | 11 | sent, middle of the page, you can see that there is an entry |
| 10:51:24 | 12 | that says, Temple-Inland produces corporate documents, |
| 10:51:28 | 13 | including organizational charts and certain financial |
| 10:51:30 | 14 | information and third-party analyst reports, about 51,000 |
| 10:51:36 | 15 | Bates-labeled pages.  So on the org charts, it just isn't the |
| 10:51:42 | 16 | case that they just recently received these. |
| 10:51:44 | 17 | Now, it is certainly true that they have recently |
| 10:51:46 | 18 | received a lot of documents.  I agree. |
| 10:51:50 | 19 | THE COURT:  Right. |
| 10:51:50 | 20 | MR. MAROVITZ:  And I don't expect that they have been |
| 10:51:52 | 21 | through all those documents, but I want the record to be clear |
| 10:51:54 | 22 | about when we made productions of things. |
| 10:51:58 | 23 | MR. MOGIN:  This is what makes it so difficult to |
| 10:52:02 | 24 | deal with Temple in particular, your Honor, is we can't seem |
| 10:52:04 | 25 | to have an apples-to-apples discussion.  What has been |

10:52:08   1   produced in the past were precisely the organizational charts,

10:52:14   2   the limited organizational charts, the primary decisionmakers,

10:52:18   3   the ones that were essentially uninformative.

10:52:22   4        So, yeah, that's true, but that's not the same thing

10:52:26   5   we were discussing a moment ago, which was the more

10:52:30   6   comprehensive document set.

10:52:32   7        THE COURT:  All right.  Outside stranger looking at

10:52:38   8   this, okay, for whatever it's worth, I thought the reason that

10:52:44   9   the defendants may have limited it to organizational charts of

10:52:50   10  those executives with primary decisionmaking may be that they

10:52:56   11  thought this will be the custodians in the case.  And I didn't

10:53:02   12  even know Mr. Mogin was going to say what he said.

10:53:06   13       When I read it, I thought it was the way old-time

10:53:10   14  discovery was done down the road, as opposed to new kind of

10:53:14   15  transparency, like, Hey, Dan, what is it you really want?  Do

10:53:20   16  you really need to see -- if I tell you organization primary

10:53:26   17  responsibility, if I tell you these people down here, that

10:53:28   18  doesn't mean I'm going to agree to documents.  But in order

10:53:32   19  for him to know who it is, he might need to know both levels

10:53:40   20  of who the actors are and then jump to the next level of, Do I

10:53:44   21  get the stuff that backs it up.  That's what I thought when I

10:53:48   22  read it the first time because, I mean, who the heck cares

10:53:54   23  about an organizational chart?  It's probably on the Internet.

10:53:58   24  I mean, somewhere.

10:54:00   25       How could you be -- to me, as an outsider, how could

10:54:04    1   you be fighting about an organizational chart, I understand

10:54:08    2   all the -- I understand a lot of the other fights, unless I am

10:54:12    3   afraid the ESI started coloring things back when you didn't

10:54:18    4   know each other as well, when you didn't have systems in

10:54:20    5   place.

10:54:22    6          And so for me, who is trying to now come in a year

10:54:26    7   later, and not go to tons of briefing on things, if we could

10:54:32    8   agree to actually -- it doesn't mean if you give them an

10:54:36    9   organizational chart, they are going to turn into custodians.

10:54:40   10          Am I completely wrong?

10:54:42   11          MS. MILLER:  No, but, your Honor, what I am saying is

10:54:44   12   -- and Mr. Mogin has the same ability to find the documents

10:54:46   13   that I did because he has the same metadata that I did, if he

10:54:50   14   returns a search in our prior production, we can find the

10:54:52   15   hundreds of --

10:54:52   16          THE COURT:  I am not into indexing.

10:54:54   17          MS. MILLER:  I understand.

10:54:54   18          THE COURT:  I am literally --

10:54:56   19          MS. MILLER:  I am saying in terms of finding what we

10:54:58   20   already produced, he can easily put his hands on -- I didn't

10:55:02   21   bring the stack with me, and I don't have the Bates range of

10:55:04   22   all the organizational charts that we produced because I

10:55:08   23   didn't bring that Bates range or that stack with me, but those

10:55:10   24   are easily found in the production we have already given.

10:55:12   25          And as I said, we gave, from the CEO down to some

| | |
|---|---|
| 10:55:16 | 1 |
| 10:55:18 | 2 |
| 10:55:20 | 3 |
| 10:55:24 | 4 |
| 10:55:26 | 5 |

1 salespeople and some people at the mill and plant manager,

2 notwithstanding that, as your Honor said, we don't believe

3 they are proper custodians, but we have given them a

4 significant amount of organizational information of people

5 within our containerboard and corrugation --

6 MR. MAROVITZ:  Britt, real quick, can you just show

7 -- I know we're not talking about the pages, but can you show

8 the judge about how thick the org charts were that we

9 produced?

10 MS. MILLER:  About that big.

11 MR. VAN TINE:  Your Honor, apparently, it's not so

12 easy to find those.  I asked someone to find them yesterday,

13 and over the weekend, and believe me, although there were a

14 few stray documents, and I mean few, handful of stray

15 documents that we could identify in the prior production, and,

16 yes, there's some unexplained document showing people in a

17 mill, for example, I have not -- I have not seen more than

18 probably 20 pages, if that.

19 THE COURT:  Of organizational charts.

20 MR. VAN TINE:  Yes.  And a lot of it was -- and when

21 we talk about number of pages, we are talking about a mill

22 here, a mill there, and not a comprehensive organizational

23 chart and not a large amount of material.  The only

24 comprehensive organizational chart that I have seen is a

25 single-page chart that's limited very much.  And, actually, I

| | |
|---|---|
| 10:57:04 | 1 have marked this up for other reasons which we may get to |
| 10:57:22 | 2 later. This is the one comprehensive document that I have |
| 10:57:24 | 3 seen, and it is probably limited to decisionmakers, but -- |
| 10:57:34 | 4 THE COURT: That looks pretty comprehensive to me. |
| 10:57:36 | 5 MR. VAN TINE: But many of them are, as shown on |
| 10:57:42 | 6 here, not designated as custodians. |
| 10:57:44 | 7 THE COURT: Custodians. Which is a different issue. |
| 10:57:48 | 8 MR. VAN TINE: Yes. |
| 10:57:48 | 9 THE COURT: I mean, you folks used requests to |
| 10:57:54 | 10 produce in a way I have never seen it used before, as a |
| 10:57:58 | 11 mechanism. Okay? I mean, it is -- I am not saying it can't |
| 10:58:06 | 12 be done. I think maybe you're way ahead -- maybe you're way |
| 10:58:10 | 13 ahead. But, typically, requests to produce are not as |
| 10:58:16 | 14 comprehensive as you -- they sort of incorporate |
| 10:58:20 | 15 interrogatories in a way, I mean, they kind of swoop |
| 10:58:26 | 16 everything under the request to produce. So part of why we |
| 10:58:32 | 17 were having a hard time getting our hands on it, it doesn't |
| 10:58:34 | 18 fall into a category. |
| 10:58:38 | 19 Now, that to me looks like a pretty darn good |
| 10:58:40 | 20 organizational chart. |
| 10:58:42 | 21 MR. VAN TINE: Except, your Honor, in an antitrust |
| 10:58:46 | 22 case, a lot of salespeople become sources of information. |
| 10:58:56 | 23 THE COURT: I bet they do. |
| 10:58:58 | 24 MR. VAN TINE: And, for example, this single page |
| 10:59:04 | 25 only lists vice presidents with sales responsibility. They |

10:59:10    1   are not necessarily the people that are getting information

10:59:16    2   out in the field.  And so, I mean, for example, when there was

10:59:20    3   a comment a few minutes ago about people in sales offices,

10:59:24    4   they can be important in antitrust cases and the sorts of

10:59:30    5   documents that they have and the information that they may

10:59:34    6   pass up from those documents, although perhaps without the

10:59:38    7   documents themselves, up to someone that becomes an ultimate

10:59:44    8   decisionmaker.  I think -- when I think of a primary

10:59:50    9   decisionmaker, I think of the guy in the corner office --

10:59:56   10          THE COURT:  Right.

10:59:56   11          MR. VAN TINE:  -- that maybe he makes the decisions,

11:00:00   12   but he has a whole staff of people gathering information and

11:00:04   13   distilling it on his behalf.  And it can be important to know

11:00:12   14   who all those people are and all the people that are likely to

11:00:16   15   have contacts who may be out in the field.

11:00:20   16          MR. MOGIN:  Your Honor, if I may, request No. 1, yes,

11:00:26   17   we did ask specifically for organizational charts, but we also

11:00:30   18   asked for other documents.  And what we are trying to get at

11:00:32   19   here is, how is the business organized?  What are the

11:00:36   20   functional units within the company?  That's what we're

11:00:42   21   looking for, the functional units within the company that have

11:00:44   22   some bearing upon this aspect of their business, whether it's

11:00:50   23   their board of directors' committees, because maybe the

11:00:54   24   committees have specific operating unit functions, whether

11:00:58   25   there are executives who form informal committees to deal with

11:01:02  1   specific issues, whatever. This is our attempt to understand

11:01:08  2   the organizational structure of the business. Our attempt to

11:01:12  3   understand the nature of the personnel who are involved in the

11:01:16  4   business is really more request No. 3. Request No. 3 is our

11:01:22  5   attempt to find out, if you go back to No. 9, that is

11:01:28  6   instruction No. 9, where we list out the various corporate

11:01:32  7   functions, it's our attempt to identify individuals that are

11:01:42  8   performing various types of functions, not just

11:01:46  9   decisionmakers, although decisionmakers are included, but who

11:01:48  10  are the people on the planning staff, who are the people who

11:01:50  11  handle the budgets, who are the sales personnel, et cetera.

11:01:52  12  That's all we asked for is a list of who those people are, not

11:01:56  13  primary decisionmakers. Who are the people that perform the

11:02:00  14  functions.

11:02:00  15        And if you like, your Honor, we have a collection of

11:02:02  16  cases that we'd be happy to submit to you where cases --

11:02:06  17  antitrust cases have gone off on the testimony or evidence

11:02:10  18  gathered from salespeople or from the strategic planning staff

11:02:14  19  or from people who are not primary decisionmakers. You have

11:02:20  20  heard me speak I don't know how many times about the masters

11:02:22  21  and Sherpa situation that was present in the ADM case, and we

11:02:28  22  tried in advance of this hearing to find for you the testimony

11:02:32  23  of Barrie Cox, who is the person who put that in in the

11:02:36  24  criminal trial and talked about how the top guys got together

11:02:40  25  and outlined the broad strokes of the conspiracy, but it was

11:02:44   1   left to the underlings, the Sherpas, to try and effectuate the

11:02:50   2   conspiracy and to keep the books and records necessary to

11:02:52   3   balance things out.  So that went down.  Those were the

11:02:56   4   Sherpas.

11:02:56   5       So we don't want to know just who the masters are.

11:03:00   6   We also want to know who the Sherpas are.  I mean, there's

11:03:04   7   case after case after case talking about getting underneath

11:03:06   8   primary decisionmakers and understanding the business units

11:03:12   9   here.  And you'll learn more about why the business unit

11:03:16  10   question became important when we talk about Georgia-Pacific

11:03:22  11   on Friday.  But they couldn't have been more clear about

11:03:24  12   putting that entire issue into issue.

11:03:28  13       MR. MAROVITZ:  Judge, if I can speak briefly in

11:03:30  14   response to this?

11:03:30  15       MR. VAN TINE:  Can I just add one thing?

11:03:34  16       THE COURT:  Sure.

11:03:34  17       MR. VAN TINE:  Just before we lose that.

11:03:36  18       Here's an example of a vice president who would not

11:03:42  19   be considered an ultimate decision- -- primary decisionmaker

11:03:48  20   who is not on that organizational chart that I just handed to

11:03:54  21   you.  He is the trade association liaison for the company and

11:03:58  22   he apparently has been for perhaps 22 years.  Trade

11:04:04  23   associations are very important in antitrust cases, yet, you

11:04:12  24   know, this person does not appear on the organization chart,

11:04:18  25   he is not a custodian, he is not a primary decisionmaker.  And

11:04:24   1   this is why we need -- this is an example of someone that is

11:04:26   2   high up in the company that would fall through the cracks.

11:04:32   3          MR. MAROVITZ:  Judge, if I could briefly respond to

11:04:34   4   all that.

11:04:34   5          The org chart that we have been looking at you can

11:04:38   6   see is Bates stamped Temple-Inland, lots of zeros, and then 1.

11:04:44   7   It was actually the first document that we produced in the

11:04:46   8   case.  We produced it informally.  I went to Mike Freed's

11:04:54   9   office in Bannockburn and sat down with Mr. Freed and over the

11:04:58  10   phone with Mr. Mogin and talked through the organization.  And

11:05:00  11   then we later produced it, I am doing this from memory, but I

11:05:06  12   believe 16 or 17 months ago by email.

11:05:10  13          This is only one organization chart.  As Ms. Miller

11:05:16  14   pointed out, we produced many more.  So to suggest that there

11:05:22  15   is one person who doesn't appear on this one page doesn't

11:05:24  16   really say much about the organization charts we have

11:05:28  17   produced.

11:05:28  18          Now, we have told -- I don't want this to turn into a

11:05:32  19   custodian issue any more than you do, but we have told --

11:05:34  20          THE COURT:  Well, part of why I was doing what I was

11:05:38  21   doing was by Monday night, I was sort of saying to myself, is

11:05:48  22   this really about a damn organizational chart, or is it really

11:05:54  23   about something else, which is what I was trying to get to.  I

11:05:58  24   mean, that's what I'm saying.  Is it really about custodians?

11:06:04  25          And so I am not taking stuff off the table, but first

11:06:06    1   I'm trying to figure out what, in fact, they got, okay,

11:06:14    2   because reading their response, I did not -- I thought it was

11:06:16    3   limited to these people with this executive responsibility,

11:06:22    4   and either Temple-Inland, I'm sure, is a democratic place that

11:06:28    5   lets a lot of people make decisions --

11:06:30    6          MR. FREED:  Your Honor, may I make a broader point,

11:06:34    7   because I think we are getting to a very, very important major

11:06:36    8   point that somehow got diverted because you thought that

11:06:40    9   document request No. 1 might illustrate the issue.

11:06:42   10          The way that Mr. Marovitz and Ms. Miller have

11:06:48   11   described the situation is they have redefined our request for

11:06:52   12   production, they have made a search, and they have produced

11:06:54   13   the documents which have been responsive to that search;

11:06:58   14   whereas, if they had pursued it, as Mr. Marovitz says he

11:07:04   15   doesn't usually do it, which is the way I've always seen it

11:07:08   16   done, the reason the objections are made is not to withhold

11:07:10   17   the production of the documents, it is to maintain the

11:07:12   18   objection for the documents that are produced.

11:07:16   19          But by making the cut on the basis of I object to

11:07:20   20   these documents, I will not produce them, I will not search

11:07:24   21   them, we have no idea whether the relevant materials are

11:07:26   22   actually being reviewed and searched.  And it's really I think

11:07:32   23   a cutting edge issue here.  Do you redefine a request for

11:07:36   24   production and say, This is how I redefined it and this is

11:07:40   25   what I am going to produce and this is what I am going to

| | | |
|---|---|---|
| 11:07:42 | 1 | search; or do you say I will review the corpus of documents |
| 11:07:48 | 2 | where there are some as to I have an objection because I think |
| 11:07:52 | 3 | this person is too low in the organization or I think it's |
| 11:07:56 | 4 | outside the time frame, I'm going to reserve all my objections |
| 11:07:58 | 5 | but I'm going to produce it?  And that's how I have always |
| 11:08:00 | 6 | understood the production. |
| 11:08:02 | 7 | Now, when Mr. Marovitz refers to our answer to 16 as |
| 11:08:06 | 8 | illustrative of our support of his position -- you brought the |
| 11:08:12 | 9 | downstream discovery. |
| 11:08:12 | 10 | MR. MAROVITZ:  That's part of 16, yes. |
| 11:08:18 | 11 | MR. FREED:  So that's a whole separate issue.  Cases |
| 11:08:20 | 12 | are legion that in a direct purchaser case, the defendants are |
| 11:08:22 | 13 | not entitled to downstream discovery, and that's what was at |
| 11:08:26 | 14 | issue there.  And that was the only reason in that particular |
| 11:08:30 | 15 | response we took that position that we are not going to |
| 11:08:32 | 16 | produce it. |
| 11:08:32 | 17 | But with everything else, you can't -- as we see it, |
| 11:08:36 | 18 | you can't just say, This is what you've asked for, this is |
| 11:08:38 | 19 | what we think you are entitled to, and this is what we are |
| 11:08:42 | 20 | going to produce, because it just cuts out of the production |
| 11:08:44 | 21 | potentially very important material. |
| 11:08:48 | 22 | MR. MAROVITZ:  I respectfully disagree with Mr. Freed |
| 11:08:50 | 23 | on that.  We could have -- as your Honor I think understood, |
| 11:08:52 | 24 | we could have in June of 2011 said, We believe your requests |
| 11:08:58 | 25 | are overly broad, we think you're asking for far too much in |

| | | |
|---|---|---|
| 11:09:02 | 1 | terms of scope and people, it's your duty as the plaintiffs to |
| 11:09:06 | 2 | give us requests that are not overly broad, we are going to |
| 11:09:10 | 3 | object, and we are not going to produce anything.  We could |
| 11:09:12 | 4 | have done that. |
| 11:09:14 | 5 | THE COURT:  Right. |
| 11:09:14 | 6 | MR. FREED:  But then -- |
| 11:09:16 | 7 | MR. MAROVITZ:  Let me finish, Mike. |
| 11:09:18 | 8 | MR. FREED:  Sorry. |
| 11:09:18 | 9 | MR. MAROVITZ:  We did not do that.  Instead, we made |
| 11:09:20 | 10 | the objections and we said, Here's what we think you're really |
| 11:09:24 | 11 | entitled to, and with specificity we said, Here's what we're |
| 11:09:26 | 12 | going to produce.  That's what we did. |
| 11:09:28 | 13 | THE COURT:  And if we were playing according to the |
| 11:09:30 | 14 | old rules, which we are not -- |
| 11:09:32 | 15 | MR. FREED:  You would have decided that issue. |
| 11:09:34 | 16 | THE COURT:  No, or they could have done it that way, |
| 11:09:40 | 17 | or you could have come in on a motion to compel, complete |
| 11:09:42 | 18 | answers to the request to produce.  Now, we are not doing the |
| 11:09:46 | 19 | blame -- we are not doing numbers and we are not doing blame. |
| 11:09:48 | 20 | MR. FREED:  No, I am not trying to do the blame. |
| 11:09:52 | 21 | THE COURT:  And both of you, because I think you were |
| 11:09:54 | 22 | in a new mode of trying to work it out.  Okay?  I do.  I |
| 11:09:58 | 23 | believe that, Mr. Freed.  I think we have got, you know, this |
| 11:10:02 | 24 | new way that I 100 percent support. |
| 11:10:10 | 25 | So we have now spent one hour on what constitutes an |

| | | |
|---|---|---|
| 11:10:12 | 1 | organizational chart. |
| 11:10:16 | 2 | MR. FREED:  But it goes to the bigger issue. |
| 11:10:16 | 3 | THE COURT:  But it's good, but it's good, because it |
| 11:10:20 | 4 | is helping.  Okay?  It is helping me to kind of get inside |
| 11:10:26 | 5 | your head here.  Okay?  And I thought they only gave you high |
| 11:10:30 | 6 | level executives. |
| 11:10:32 | 7 | Now, your question had two parts to it, which is one |
| 11:10:38 | 8 | of the things I see running through a lot of these.  One is, |
| 11:10:44 | 9 | Give me the organizational chart, and the other is, Give me |
| 11:10:48 | 10 | all the documents that go with it, which are kind of, you |
| 11:10:52 | 11 | know, what the heck does that mean?  So the broader you go on |
| 11:10:58 | 12 | the organizational chart, therefore, you're committing to more |
| 11:11:00 | 13 | documents.  The narrower the organizational chart, the |
| 11:11:10 | 14 | narrower would be the document production. |
| 11:11:12 | 15 | So there is kind of a complication here that it's not |
| 11:11:20 | 16 | just organizational charts. |
| 11:11:20 | 17 | MR. FREED:  I think there is a fundamental |
| 11:11:22 | 18 | misunderstanding.  It's not a blame game. |
| 11:11:24 | 19 | THE COURT:  Good. |
| 11:11:24 | 20 | MR. FREED:  I thought, and Mr. Mogin thought, based |
| 11:11:26 | 21 | on my experience, which is even longer, maybe not better, but |
| 11:11:30 | 22 | longer than Mr. Mogin's, that when the documents are produced |
| 11:11:34 | 23 | subject to objections, it doesn't mean that the documents are |
| 11:11:38 | 24 | culled and nothing that is objectionable is produced.  I |
| 11:11:42 | 25 | thought it meant and have always thought it meant that -- and |

11:11:46  1  I believe it's been the case -- that they are produced with

11:11:48  2  all objections maintained for purposes of evidence so that if

11:11:52  3  you attempt to use a document which has been produced subject

11:11:54  4  to objection, the defendant hasn't waived the objection in

11:11:58  5  terms of use of the document.

11:12:00  6  THE COURT:  When I read that in your statement, I

11:12:02  7  have not seen that in 14 years.  I haven't.  I haven't.  I

11:12:06  8  have not seen -- because, you know, this building, federal

11:12:10  9  courts across the country, are so -- you know, I mean, our

11:12:16  10  bread and butter are motions.  So every single time somebody

11:12:20  11  doesn't like something or they don't understand it or they

11:12:24  12  don't usually talk about it, they run into the judge and say,

11:12:28  13  Give me or don't give me; either, Give it to me or don't let

11:12:32  14  them have it.

11:12:34  15  So I haven't seen this we'll turn them over.  It

11:12:40  16  seems kind of counter-intuitive once kind of the cat is out of

11:12:46  17  the bag.  Once you see the documents, I don't know --

11:12:50  18  MR. FREED:  Because the documents may be relevant or

11:12:52  19  lead to the discovery of relevant material because that's the

11:12:54  20  broad scope of Rule 26.

11:12:58  21  THE COURT:  Well, I understand.  I do understand

11:13:00  22  that.  But I have people all the time where I'm having to

11:13:02  23  order -- I could give you way too many opinions on where I

11:13:08  24  have had to either order or stop the production.

11:13:12  25  MR. FREED:  I mean, we may reach a point where we

| | | |
|---|---|---|
| 11:13:16 | 1 | have to come in on motion then, if that's going -- |
| 11:13:20 | 2 | THE COURT: That's why this could take us 90 hours. |
| 11:13:24 | 3 | This could take us 90 hours to do the requests to produce. |
| 11:13:28 | 4 | MR. MOGIN: Only 60. |
| 11:13:30 | 5 | THE COURT: Well, no. So now I am going to figure, |
| 11:13:32 | 6 | Is it better for me to give it to Chris to do, or is it better |
| 11:13:36 | 7 | if I sit in the courtroom and you guys -- we are going to |
| 11:13:44 | 8 | figure this out. Okay. |
| 11:13:48 | 9 | I have never seen an example of people who gave them |
| 11:13:50 | 10 | the documents -- I mean, I certainly have seen examples of |
| 11:13:54 | 11 | interrogatories where you object and then you go ahead and |
| 11:13:56 | 12 | answer it. And I don't know, everything in discovery is on |
| 11:14:00 | 13 | trust. I'm assuming when they answer it, it's a full answer. |
| 11:14:04 | 14 | Maybe I will now look at it a different way after this. I |
| 11:14:08 | 15 | have seen that much more in interrogatories than I have in |
| 11:14:12 | 16 | requests to produce. |
| 11:14:12 | 17 | MR. FREED: See, I think it's exactly the same. I |
| 11:14:16 | 18 | think it's exactly the same. |
| 11:14:16 | 19 | THE COURT: I know that's your position. |
| 11:14:18 | 20 | MR. FREED: Let's assume that we were incorrect, |
| 11:14:20 | 21 | because there's certainly two possibilities, we were right or |
| 11:14:26 | 22 | we were wrong, we still don't have the material, we still |
| 11:14:30 | 23 | don't know what they held back based on their unilateral |
| 11:14:34 | 24 | determination that's not responsive and their redefinition of |
| 11:14:36 | 25 | interrogatory, and that's why we are -- we don't know what's |

11:14:40　　1　behind the curtain.

11:14:40　　2　　　　THE COURT:  Well, no.  See, I think now, you know, I

11:14:46　　3　could -- now that I understand that, A, you want the charts

11:14:54　　4　and, B, you want the documents to go with it.  So we could

11:15:00　　5　probably get you -- but then what you don't know is which

11:15:04　　6　documents go with any of these people, as I understand it.

11:15:08　　7　　　　I mean, now, Britt is going to save us all because

11:15:12　　8　she is going to tell us something that I have been afraid to

11:15:18　　9　admit that I don't understand what she is talking about how

11:15:22　　10　metadata ties it all in, but maybe she can tell us how we can

11:15:26　　11　do it through the metadata, maybe.

11:15:30　　12　　　　MR. MOGIN:  Do what through the metadata?

11:15:32　　13　　　　THE COURT:  How you can identify which document goes

11:15:34　　14　with which person through the metadata chain.

11:15:40　　15　　　　MR. FREED:  That only solves half the problem.

11:15:42　　16　　　　MR. MOGIN:  That's a different issue, your Honor,

11:15:44　　17　because we still don't know what they produced.  The metadata

11:15:46　　18　only applies to what's been produced.

11:15:50　　19　　　　THE COURT:  All right.  Let me ask it another way.

11:16:00　　20　　　　Would you produce -- of this organizational chart,

11:16:06　　21　when you were doing your document production, how far do you

11:16:10　　22　go down -- forget about if you can tie it to a person.  How

11:16:14　　23　far does your document production go on this organizational

11:16:18　　24　chart?

11:16:20　　25　　　　MS. MILLER:  Well, with respect to the documents

| | | |
|---|---|---|
| 11:16:22 | 1 | belonging to the people represented, I'm looking -- I haven't |
| 11:16:26 | 2 | verified all of Mr. Van Tine's check marks, but assuming that |
| 11:16:30 | 3 | he is correct, if there is a check mark next to these people, |
| 11:16:32 | 4 | so starting with Doyle Simons (phonetic) at the CEO down to |
| 11:16:36 | 5 | the sales executives, Wayne Vanderberg, Erin Copeland |
| 11:16:38 | 6 | (phonetic) -- |
| 11:16:38 | 7 | THE COURT: Anybody with a check mark? |
| 11:16:40 | 8 | MS. MILLER: Yeah. |
| 11:16:42 | 9 | MR. VAN TINE: Well, the check, just to be clear what |
| 11:16:44 | 10 | I did here, all I have done is compare their stated list of |
| 11:16:50 | 11 | custodians to people on this chart and given them check marks. |
| 11:16:56 | 12 | The people with Xs are people that would seem to certainly |
| 11:17:02 | 13 | have some interest that are not listed as custodians. And |
| 11:17:08 | 14 | although we are talking about this in terms of the |
| 11:17:12 | 15 | organization chart issue, this issue about primary |
| 11:17:16 | 16 | decisionmakers runs through many of the ones -- |
| 11:17:20 | 17 | THE COURT: It does. |
| 11:17:22 | 18 | MR. VAN TINE: -- that we have before the court. |
| 11:17:22 | 19 | THE COURT: Right. |
| 11:17:24 | 20 | MR. VAN TINE: So it's not just an organization chart |
| 11:17:26 | 21 | issue. |
| 11:17:48 | 22 | THE COURT: So the check mark is the plaintiff -- |
| 11:17:50 | 23 | that's your check mark. |
| 11:17:52 | 24 | MR. VAN TINE: Yes. I added check marks -- |
| 11:17:54 | 25 | THE COURT: That's really helpful. |

| | | |
|---|---|---|
| 11:17:56 | 1 | MR. VAN TINE:  -- in the commentary in the boxes. |
| 11:17:58 | 2 | MS. MILLER:  And to be clear, this is one of the |
| 11:18:00 | 3 | organizational charts we produced.  There are other |
| 11:18:02 | 4 | custodians.  We have a total of 28 custodians, all of whom are |
| 11:18:06 | 5 | on this one sheet.  The majority of them are on this one |
| 11:18:08 | 6 | sheet, but there are additional custodians that are on other |
| 11:18:14 | 7 | organizational charts that are being produced as well. |
| 11:18:16 | 8 | THE COURT:  Okay.  Well, for the future, I think one |
| 11:18:22 | 9 | of the things happened is a statement that says, Complete |
| 11:18:30 | 10 | organizational structure directly or indirectly relating to |
| 11:18:34 | 11 | container products.  That is rather broad.  And then you're |
| 11:18:38 | 12 | kind of, you know, answering back, We're giving you executives |
| 11:18:44 | 13 | with primary decisionmaking authority, that kind of took it |
| 11:18:50 | 14 | from so broad over here and to executives with primary -- I |
| 11:18:56 | 15 | mean, I know you have to answer it some way, but that somewhat |
| 11:19:00 | 16 | made it like a polar -- |
| 11:19:04 | 17 | MS. MILLER:  Well, we said we would give primary |
| 11:19:06 | 18 | decisionmaking and those people that reported directly to |
| 11:19:08 | 19 | them. |
| 11:19:08 | 20 | THE COURT:  To them, yes. |
| 11:19:10 | 21 | MR. MOGIN:  What's wrong with identifying the other |
| 11:19:12 | 22 | organizational structures within the company, identify -- we |
| 11:19:18 | 23 | are not talking about producing by custodian or anything like |
| 11:19:22 | 24 | that. |
| 11:19:24 | 25 | THE COURT:  Do you think we could have that? |

| | | |
|---|---|---|
| 11:19:24 | 1 | MS. MILLER:  Perhaps I am not understanding, but I |
| 11:19:26 | 2 | don't know that there are documents that reflect any internal |
| 11:19:30 | 3 | organization in terms of informal committees that may have met |
| 11:19:36 | 4 | or anything else that would give the kind of information that |
| 11:19:38 | 5 | Mr. Mogin is asking.  We have produced a lot of organizational |
| 11:19:40 | 6 | charts that show the people within our corrugated packaging |
| 11:19:46 | 7 | group.  The only other group in the company is building |
| 11:19:48 | 8 | products, which is a completely different product group that |
| 11:19:52 | 9 | has nothing to do with this litigation. |
| 11:19:52 | 10 | So we are -- we have produced the organizational |
| 11:19:54 | 11 | charts that show all the people in our corrugated packaging |
| 11:19:58 | 12 | group. |
| 11:20:00 | 13 | MR. MOGIN:  So that the word index for Temple-Inland |
| 11:20:02 | 14 | won't have the word "committee" or any derivation of that? |
| 11:20:08 | 15 | THE COURT:  Well, no -- |
| 11:20:08 | 16 | MS. MILLER:  I'm sorry.  I don't even understand the |
| 11:20:14 | 17 | question. |
| 11:20:14 | 18 | MR. FREED:  Planning committee, would that be in your |
| 11:20:18 | 19 | index? |
| 11:20:18 | 20 | MR. MOGIN:  So if I go to your word index and I |
| 11:20:22 | 21 | search for the word committee or derivations of the word |
| 11:20:26 | 22 | committee, are you suggesting that those won't be found? |
| 11:20:28 | 23 | MS. MILLER:  No, I'm not suggesting that at all. |
| 11:20:30 | 24 | MR. MOGIN:  Precisely.  So that would indicate that |
| 11:20:30 | 25 | there are committees.  And if there are committees and if the |

11:20:34 1 word committee appears in the word index, that means that

11:20:38 2 there are documents that discuss those committees.

11:20:40 3 MS. MILLER: There could be any number of documents

11:20:42 4 that discuss any number of committees that have nothing to do

11:20:46 5 with the organizational structure you are seeking.

11:20:48 6 MR. MOGIN: I am asking if you maintain committees.

11:20:50 7 Are there committees that are relevant to the operation of

11:20:54 8 this business?

11:20:56 9 THE COURT: What you had said before was -- what

11:21:02 10 Mr. Mogin said before was informational committees or board of

11:21:10 11 directors that might have committees. But, truthfully, how

11:21:14 12 would you get that out of this question here?

11:21:18 13 MR. MOGIN: Actually, your Honor, this one is a

11:21:22 14 pretty standard question that comes out of the Department of

11:21:24 15 Justice manual.

11:21:26 16 THE COURT: Okay. Is that, now that you know

11:21:36 17 everything that you know and a year later, is that something

11:21:40 18 you feel like you need is more information about the committee

11:21:44 19 structure?

11:21:46 20 MR. MOGIN: Yes, because the committee structure will

11:21:48 21 tell us about the decisionmaking structure.

11:21:52 22 THE COURT: Okay. Am I being Pollyanna? Doesn't it

11:22:04 23 seem like we have sort of -- the committee structure seems to

11:22:10 24 be another layer. Is there any other problem the plaintiffs

11:22:14 25 have with this other than if there is a committee structure?

| | | |
|---|---|---|
| 11:22:18 | 1 | Is there any other problem that you have been able to |
| 11:22:20 | 2 | identify? |
| 11:22:24 | 3 | MR. MOGIN:  Not that we have been able to identify, |
| 11:22:26 | 4 | but the whole function here is identification of the |
| 11:22:30 | 5 | organizational structure. |
| 11:22:34 | 6 | THE COURT:  Well, no, but, I mean, could you start |
| 11:22:38 | 7 | taking deps?  Could you write interrogatories?  I mean, isn't |
| 11:22:42 | 8 | that what the next step is?  You haven't done any |
| 11:22:46 | 9 | interrogatories, right? |
| 11:22:46 | 10 | MR. MOGIN:  Just to Georgia-Pacific, and I don't |
| 11:22:48 | 11 | think that you would allow 10,000 interrogatories. |
| 11:22:50 | 12 | THE COURT:  I am not.  I am not. |
| 11:22:58 | 13 | MR. FREED:  To answer a question or make a comment on |
| 11:23:00 | 14 | something you said earlier, the reason in antitrust cases in |
| 11:23:04 | 15 | particular you use the request for production as the driving |
| 11:23:06 | 16 | vehicle is 90 times out of a hundred, the answer to the |
| 11:23:10 | 17 | interrogatories seek production. |
| 11:23:10 | 18 | THE COURT:  I see.  I see.  I didn't know that.  I |
| 11:23:14 | 19 | didn't know that. |
| 11:23:14 | 20 | MR. FREED:  It was really typical -- and I think |
| 11:23:18 | 21 | Mr. Marovitz would agree with that, that is typically how it's |
| 11:23:22 | 22 | done.  So interrogatories are an enormous amount of time and |
| 11:23:24 | 23 | don't get you any further than a reference. |
| 11:23:28 | 24 | Now, they do have one advantage in retrospect is |
| 11:23:32 | 25 | maybe that would be the functional equivalent of an index, |

11:23:34  1   which would give us some kind of response to that kind of an

11:23:36  2   interrogatory directing it to production.  But, typically, you

11:23:40  3   don't spend a lot of time on interrogatories in these cases.

11:23:42  4            MR. VAN TINE:  But the important thing in an

11:23:44  5   antitrust case are the documents, which we are beginning to

11:23:50  6   get, and they drive the depositions.

11:23:52  7            But circling back to this request, you know, if I am

11:23:56  8   looking at an email string and it's got 10 people on it, I'd

11:24:04  9   like to know who those people are, and they may not all be

11:24:08  10  primary decisionmakers.

11:24:10  11           THE COURT:  But isn't that the problem right now?  I

11:24:14  12  mean, this basic tension that's going on, the defendants feel

11:24:20  13  like they are doing nothing but giving, giving, giving, and

11:24:24  14  you guys haven't -- you know, you haven't had enough time to

11:24:28  15  receive and review.

11:24:34  16           MR. MOGIN:  But they are giving what they want to

11:24:36  17  give, not what we have asked for.

11:24:38  18           THE COURT:  Well -- or what they have been ordered

11:24:40  19  to.

11:24:40  20           No, I mean, I hope you're not so -- but they need

11:24:56  21  from you -- and I don't know how to factor this in timewise

11:25:00  22  because you have to review some of the stuff first to be able

11:25:02  23  to say what you just said.  Look at the five people on this

11:25:06  24  email here.  This is important.  But I am not -- I am going to

11:25:10  25  give you as much time as it took them to put the materials

11:25:16　1　together to review the materials, which is the reason I was

11:25:20　2　suggesting phasing and not cutting people off.  I don't even

11:25:26　3　know here and why I am telling Mr. Marovitz he hasn't wasted

11:25:32　4　any time because this was the first round of these things.

11:25:40　5　Not the first round, but kind of the first pass-through here,

11:25:44　6　and then we would see -- because I don't care if you have 20

11:25:50　7　people in your office looking at all this stuff.  Your lead

11:25:56　8　lawyers still have to have time to absorb it.  A computer can

11:26:00　9　only do so much.  You can feed all the junk into it, but then

11:26:04　10　you've got to be able to do the analysis of what's important.

11:26:14　11　　　　　So something on an interim level here would be after

11:26:30　12　a discussion, say, of this discussion, if you were to go back

11:26:34　13　or I were to say, if you want me to do it with Ms. Miller and

11:26:38　14　talk to her, if she could come back with a committee

11:26:42　15　structure.  And, you know, we now know enough about language,

11:26:46　16　whether you call it committee or whatever the synonyms for

11:26:50　17　committee is, whatever -- you know, however Temple-Inland, if

11:26:54　18　she can go back and figure out -- it sounds like that's

11:27:00　19　different than a trade association or a lobbyist.  I mean,

11:27:04　20　these are internal committees you're looking for?

11:27:08　21　　　　　MR. MOGIN:  Precisely.

11:27:08　22　　　　　THE COURT:  That's what you're looking for?

11:27:10　23　　　　　Ms. Miller and Mr. Marovitz have been in as many

11:27:14　24　antitrust cases as you guys have been.  Is this something

11:27:16　25　that's kind of normal in companies asking for this committee

| | | |
|---|---|---|
| 11:27:20 | 1 | or whatever they call them? |
| 11:27:24 | 2 | MR. MAROVITZ: Have you seen it? |
| 11:27:26 | 3 | MS. MILLER: No. |
| 11:27:28 | 4 | THE COURT: I mean, it's logical what they are saying |
| 11:27:30 | 5 | if the committees are -- |
| 11:27:30 | 6 | MR. MAROVITZ: Organizational charts certainly are |
| 11:27:34 | 7 | relevant in antitrust cases. |
| 11:27:36 | 8 | THE COURT: And you have done that. |
| 11:27:38 | 9 | MR. MAROVITZ: We have done that. Not just in this |
| 11:27:40 | 10 | case, but in other cases. |
| 11:27:42 | 11 | I don't know -- I can't recall specifically being |
| 11:27:44 | 12 | asked about committee structures internal to a party. I am |
| 11:27:48 | 13 | not saying that makes it right or wrong. |
| 11:27:52 | 14 | MS. MILLER: It usually comes out in depositions, you |
| 11:27:54 | 15 | know, did you meet with anybody on a regular basis. |
| 11:27:58 | 16 | MR. FREED: But you want to know there was a planning |
| 11:28:00 | 17 | committee, a strategic committee, and to get those documents |
| 11:28:02 | 18 | for the committees before the deposition. That's the whole |
| 11:28:06 | 19 | thing. It has to be efficient. |
| 11:28:06 | 20 | MR. MAROVITZ: Judge, I don't mind having this |
| 11:28:08 | 21 | conversation at all. I do not want our silence on this to |
| 11:28:12 | 22 | somehow suggest that there are 15 different committees at |
| 11:28:14 | 23 | Temple-Inland. I suspect that that's not the case at all. |
| 11:28:20 | 24 | THE COURT: I am not also taking your silence as |
| 11:28:24 | 25 | you're agreeing to do this either. I mean, we are having a |

| | | |
|---|---|---|
| 11:28:28 | 1 | discussion.  We are basically having a discussion. |
| 11:28:30 | 2 | MR. MAROVITZ:  Sure. |
| 11:28:30 | 3 | THE COURT:  I am saying to Mr. Mogin, if we basically |
| 11:28:34 | 4 | were able to figure out the committee structure that doesn't |
| 11:28:40 | 5 | get us to how does he know which document goes with which |
| 11:28:42 | 6 | level here, I understand that, but would that move it along on |
| 11:28:48 | 7 | the first level of -- for Temple if we knew who the -- if |
| 11:28:54 | 8 | there was a committee structure, and then you want to know |
| 11:28:58 | 9 | which of these folks are on which committee? |
| 11:29:02 | 10 | MR. MOGIN:  Of course. |
| 11:29:02 | 11 | THE COURT:  Of course.  Okay. |
| 11:29:06 | 12 | MR. MAROVITZ:  And, Judge, can I just interject real |
| 11:29:08 | 13 | quickly?  We may not be the perfect defendant to have this |
| 11:29:12 | 14 | conversation as the guinea pig, and the reason for it is this. |
| 11:29:18 | 15 | As was reported publicly a while ago and also as was reported |
| 11:29:24 | 16 | at the last status, we have been acquired by International |
| 11:29:28 | 17 | Paper. |
| 11:29:30 | 18 | THE COURT:  I forgot that. |
| 11:29:32 | 19 | MR. MAROVITZ:  Yes.  So we are in a slightly |
| 11:29:34 | 20 | different position.  There may be some other defendants in |
| 11:29:38 | 21 | terms of getting information of this sort.  I'm not saying you |
| 11:29:44 | 22 | can't get it.  I'm just saying it's -- sometimes as a result |
| 11:29:46 | 23 | of that, it makes it more cumbersome.  So that has nothing to |
| 11:29:52 | 24 | do with preservation or anything else.  It's just the people |
| 11:29:56 | 25 | who used to be running our company just in some respects |

| | | |
|---|---|---|
| 11:30:02 | 1 | aren't there anymore. |
| 11:30:04 | 2 | THE COURT:  They are not -- they didn't go over to -- |
| 11:30:06 | 3 | MR. MAROVITZ:  Some have, some have not. |
| 11:30:08 | 4 | THE COURT:  Okay. |
| 11:30:08 | 5 | MR. MAROVITZ:  So it makes it more of a challenge. |
| 11:30:18 | 6 | MR. MOGIN:  Respectfully, your Honor, I'm surprised |
| 11:30:20 | 7 | to hear Mr. Marovitz say that.  We have had a number of |
| 11:30:24 | 8 | discussions about the preservation and our ability to get |
| 11:30:26 | 9 | documents and to deal with this situation of the acquisition, |
| 11:30:32 | 10 | and we have been basically told on each occasion, don't worry |
| 11:30:36 | 11 | about it, it's not going to impede discovery here. |
| 11:30:40 | 12 | MR. MAROVITZ:  I don't think that's quite what I |
| 11:30:42 | 13 | said.  We have not -- |
| 11:30:44 | 14 | THE COURT:  Would you like to be off the record? |
| 11:30:46 | 15 | MR. MAROVITZ:  No, I think I'd like to be on the |
| 11:30:48 | 16 | record. |
| 11:30:52 | 17 | We have done our very best with respect to our |
| 11:30:56 | 18 | preservation obligations and will continue to do that.  What I |
| 11:31:00 | 19 | am saying is that as a matter of practice, it is more |
| 11:31:02 | 20 | challenging to get information from folks who are no longer |
| 11:31:10 | 21 | with the company.  That has nothing to do with preservation or |
| 11:31:14 | 22 | obtaining documents or anything else. |
| 11:31:16 | 23 | MR. MOGIN:  I understand what you're saying.  I just |
| 11:31:20 | 24 | wasn't sure that it was consistent with what had been said |
| 11:31:22 | 25 | before about the effect of the acquisition on discovery, and |

11:31:28   1   we received a number of representations about that.

11:31:32   2         MR. MAROVITZ:  I think those representations were

11:31:34   3   accurate.

11:31:34   4         MR. MOGIN:  I hope so.  I sincerely do hope so.

11:31:38   5         THE COURT:  Well, that's what he knew at the time he

11:31:42   6   made them.  I mean --

11:31:42   7         MR. MOGIN:  I mean that for all concerned.

11:31:44   8         THE COURT:   -- I make statements all the time to

11:31:46   9   people, and it's what I know at the time I make it.

11:31:54   10         MR. MOGIN:  Well, the reason I bring that up, your

11:31:56   11   Honor, is it's standard practice to seek some sort of

11:32:00   12   representation of that type when there is an acquisition in

11:32:04   13   these cases.  And if we are unable to get the representation

11:32:08   14   that we are comfortable with to seek some kind of protective

11:32:12   15   order from the court so that the integrity of the information

11:32:14   16   isn't lost through the acquisition process.  And we received

11:32:18   17   that -- those representations here and thought that they were

11:32:22   18   sufficient so that we would be able to avoid involving the

11:32:26   19   court in issuing a protective order.

11:32:30   20         But if I'm hearing something different, I just want

11:32:34   21   to be crystal clear so that if I have to go back and

11:32:38   22   reconsider the motion, that I have full information.

11:32:42   23         MR. MAROVITZ:  Judge, I think we are way off track

11:32:44   24   here.  Let me give you a for example.  We started this

11:32:50   25   conversation by whether or not there were committees that we

11:32:52   1    could provide to them.  So if that request had come a couple

11:32:58   2    years ago, there are certain people on this chart, maybe more

11:33:02   3    than one person, who I could talk to easily about finding out

11:33:06   4    about the existence of committees.  That has nothing to do

11:33:10   5    with preservation.

11:33:12   6        Many of the people on the chart that we have provided

11:33:14   7    are former employees now, so it's frankly harder to get their

11:33:18   8    attention.  It has nothing to do with representations or

11:33:22   9    preservation or anything else.  I'm just not sure how we got

11:33:28   10    on that topic.

11:33:28   11        MR. MOGIN:  You brought it up.

11:33:30   12        MR. MAROVITZ:  I did not.

11:33:30   13        THE COURT:  No, he didn't.  No, he didn't, Mr. Mogin.

11:33:32   14    He said that he was answering, and you know a lot more about

11:33:36   15    the case than I know because of your private conversations,

11:33:40   16    and I think that, you know, your concerns -- well...

11:34:00   17        MR. MAROVITZ:  Let me suggest this, Judge.

11:34:08   18        THE COURT:  I have so many more topics we have to

11:34:10   19    talk about.  I mean, we have many more things to talk about.

11:34:14   20    I was hoping we were going to be able to -- I mean, in some

11:34:18   21    ways, this is the hardest topic because it's so large and it

11:34:24   22    has so many moving parts to it.  And I don't think it should

11:34:34   23    necessarily be the judge who is -- or the mediator who is

11:34:40   24    bringing up the topics.  I mean, part of it is I think you

11:34:42   25    know your case better.

11:34:46   1       Would you like to suggest we just kind of put this on

11:34:50   2   hold for a moment and do you want to talk about a different

11:34:54   3   topic?  Why don't we do that.

11:34:56   4       MR. MOGIN:  I think the next topic that makes sense

11:35:00   5   to talk about is No. 3.

11:35:00   6       THE COURT:  Which is?

11:35:02   7       MR. MOGIN:  No. 3 is our request for identification

11:35:04   8   of who are the individuals -- it's our attempt to get an

11:35:10   9   understanding of who might be the proper custodians.

11:35:12   10       THE COURT:  I'm sorry?

11:35:12   11       MR. MOGIN:  It's our attempt to get an understanding

11:35:14   12   of who might be the proper custodians and who might be the

11:35:18   13   information sources.  And one of the reasons that it's

11:35:24   14   particularly important, and I know this may seem a little off

11:35:26   15   track, but remember that in this particular case or cases like

11:35:32   16   this, your Honor, email is the primary communications

11:35:38   17   methodology, and Temple-Inland, like many of the other

11:35:40   18   companies involved in this case, has a highly restrictive

11:35:46   19   email policy, including there is a certain amount of loss of

11:35:52   20   former employee email.

11:35:56   21       So we really need to know who are the individuals

11:36:02   22   that were in these particular positions during the relevant

11:36:08   23   time period so that if we have to undertake our own efforts to

11:36:12   24   locate them, we can.

11:36:16   25       And on that, let me show -- this is a little

11:36:18  1  demonstrative that we have created, but it comes from the

11:36:20  2  deposition, the 30(b)(6) deposition. There's Temple-Inland's

11:36:26  3  what we have called an aggressive policy for email

11:36:30  4  destruction.

11:37:02  5  So that's the background that we are dealing with.

11:37:06  6  That's one of the reasons that we -- it underlies many of the

11:37:14  7  positions that we have taken with respect to search

11:37:16  8  methodology. And a lot of the other issues there is what we

11:37:18  9  considered to be very aggressive email destruction policy.

11:37:22  10  Now, going to request No. 3, it's another little

11:37:30  11  demonstrative that we have here, and this will show you

11:37:32  12  precisely what's been asked for. So here we are just asking

11:37:50  13  for, identify for us the people who performed, the

11:37:52  14  individuals, or give us the documents that show who are the

11:37:54  15  individuals that performed various tasks. And, for example,

11:38:00  16  here, management, planning staff, sales personnel, ESI

11:38:08  17  personnel, and paper document archive personnel are all

11:38:12  18  defined terms. And you can go back to instruction No. 9 in

11:38:16  19  the RPDs and see precisely what those definitions are.

11:38:20  20  So for each of the people, give us whatever you can,

11:38:24  21  their names, their titles, what they did in the organization,

11:38:30  22  job descriptions, business affiliations, which would tie back

11:38:32  23  to trade associations, it might tie back to committees, et

11:38:38  24  cetera, and give us their contact information, and let us know

11:38:42  25  who worked with them in terms of the administrative support.

| | | |
|---|---|---|
| 11:38:46 | 1 | So that's what we have asked for.  And Temple says, |
| 11:38:48 | 2 | We won't give you that.  We are back to primary decisionmakers |
| 11:38:52 | 3 | and their direct reports.  So that means that we don't get to |
| 11:39:00 | 4 | figure out who their salespeople are or may be, who is the |
| 11:39:04 | 5 | management, who is the planning staff, who are the proper ESI |
| 11:39:06 | 6 | personnel, and who might be the actual custodians or |
| 11:39:12 | 7 | archivists with respect to their paper documents. |
| 11:39:18 | 8 | And it even gets down to the point where we wouldn't |
| 11:39:22 | 9 | know who within the organization was tasked with gathering the |
| 11:39:28 | 10 | market information that's so relevant to the case. |
| 11:39:34 | 11 | So on the one hand, going back to No. 1, we have a |
| 11:39:38 | 12 | very restricted structure.  Now we go to No. 3 and we have a |
| 11:39:44 | 13 | very much restricted set of information about the individuals. |
| 11:39:58 | 14 | Again, this is identification stuff.  There is no |
| 11:40:02 | 15 | doubt that we are entitled to this information.  There is no |
| 11:40:04 | 16 | excuse for refusing to give us the business affiliation and |
| 11:40:08 | 17 | contact information.  I mean, that's just black letter law. |
| 11:40:12 | 18 | It's been that way for God knows how long. |
| 11:40:26 | 19 | MS. MILLER:  Your Honor, let me know when you'd like |
| 11:40:28 | 20 | us to respond. |
| 11:40:28 | 21 | THE COURT:  I am ready. |
| 11:40:30 | 22 | MS. MILLER:  Okay.  First, with respect to their |
| 11:40:32 | 23 | first demonstrative, this is not a full and accurate |
| 11:40:34 | 24 | recitation of Mr. Dunn's deposition testimony, but I'm not |
| 11:40:38 | 25 | sure that that's relevant for purposes of this discussion. |

11:40:42  1  Things that are not X'd, there was a 60-day deletion feature

11:40:48  2  in there for any email that wasn't accessed within 60 days, so

11:40:52  3  most emails were not destroyed after 74 days.  And we have

11:40:56  4  produced a ton of email from years -- more than 74 days ago

11:41:00  5  that were not deleted, thousands and thousands of emails, so

11:41:02  6  this is not exactly a -- it's an overly simplistic recitation

11:41:06  7  of a single policy and doesn't necessarily reflect how it was

11:41:10  8  employed or how actually it was implemented with respect to

11:41:12  9  Temple-Inland's email.

11:41:14  10        With respect to RPD No. 3, again, here it is -- they

11:41:20  11  have accurately written what their requests are.  And this is

11:41:24  12  somewhat indicative of kind of all of their requests.  Under

11:41:30  13  plaintiffs' theory as their RPDs are drafted, they essentially

11:41:34  14  want Temple-Inland to identify virtually every single person

11:41:36  15  in their organization, period, and produce every single

11:41:40  16  document that belongs to every one of those people within our

11:41:42  17  organization.  That's a theme that kind of goes throughout all

11:41:46  18  of the RPDs.

11:41:48  19        We -- again, going to the point of we are producing

11:41:50  20  the people, and as indicated on the organization chart, we are

11:41:56  21  identifying the people that have the ability to make the

11:42:00  22  decisions to participate in and carry out the conspiracy that

11:42:04  23  is alleged by plaintiffs, but we were not providing people --

11:42:08  24  planning staff, if you look at our actual objection, we

11:42:12  25  objected to a lot of the terms that they said, saying, you

11:42:14   1   know, As drafted, this request purports to require

11:42:18   2   Temple-Inland to identify each and every affiliation or

11:42:20   3   business relationship of dozens and dozens of people.

11:42:24   4        Similarly, the term "contact information," if they

11:42:26   5   want to contact, you know, an existing employee, they come to

11:42:30   6   us.  If they want to talk to somebody else and they are not an

11:42:34   7   existing employee, we can talk about those things, but to

11:42:36   8   download our entire HR files and give everybody's home email

11:42:40   9   and home address and home telephone number, it was an attempt

11:42:46  10   by us to put a limitation, a reasonable limitation, on them

11:42:48  11   asking short of every single document that identifies every

11:42:52  12   single piece of information about every person that fits into

11:42:54  13   one of those categories.

11:42:56  14        MR. MAROVITZ:  It would have been simple for us to

11:42:58  15   say the requests are far too broad, and we are just going to

11:43:02  16   object and you can go see the judge.

11:43:04  17        THE COURT:  Right.

11:43:04  18        MR. MAROVITZ:  We tried to avoid that so that we

11:43:06  19   could provide information that --

11:43:08  20        THE COURT:  Would get you started.

11:43:10  21        MR. MAROVITZ:  -- would move the case forward.

11:43:12  22        MR. MOGIN:  Pure hyperbole.

11:43:14  23        THE COURT:  No, it's -- why do you say that,

11:43:16  24   Mr. Mogin?

11:43:16  25        MR. MOGIN:  Because every single document, every

11:43:18   1   single employee, every single email address or telephone

11:43:22   2   number, every single business affiliation? Not even. We have

11:43:28   3   asked for several discrete categories of people. That's it.

11:43:32   4   We haven't asked for the thousands of mill and plant

11:43:38   5   employees. We haven't even asked in this request for anybody

11:43:42   6   responsible for manufacturing. We simply asked the

11:43:46   7   executives, the board, the planners, the salespeople, and who

11:43:54   8   is responsible for the ESI and the paper archivists.

11:43:58   9           THE COURT: No, you have ESI personnel, paper

11:43:58   10   document archive personnels. I think there's six here.

11:44:02   11           MR. MOGIN: Okay. But it's certainly a far cry from

11:44:04   12   everybody in the organization. And the standard isn't the

11:44:14   13   defendants' unilateral decision about what's relevant. The

11:44:18   14   standard is what's likely to lead to admissible evidence.

11:44:22   15   It's broad, and it's intentionally broad.

11:44:26   16           THE COURT: I'm aware of that.

11:44:28   17           MR. MOGIN: I'm sure you are.

11:44:28   18           MR. MAROVITZ: Judge, their definition of sales

11:44:30   19   personnel is contained in paragraph 27, and it says, Sales

11:44:34   20   personnel shall be construed broadly and means, without

11:44:38   21   limitation, any employees or other persons that had

11:44:42   22   responsibility directly or indirectly relating to sales to

11:44:48   23   customers of containerboard products sold in the U.S.,

11:44:52   24   including any role or responsibility for selling, determining,

11:44:56   25   or establishing pricing, effectuating or establishing terms

11:44:58   1   and conditions of sales and purchases.

11:45:02   2        It's those sorts of very broad definitions that would

11:45:06   3   call for the production of documents and identification of

11:45:10   4   people that are well overly broad.

11:45:12   5        MR. MOGIN:  So does the breadth of the request mean

11:45:16   6   that Temple-Inland is allowed to exclude all sales personnel?

11:45:22   7   Does it mean that they are allowed to exclude all management

11:45:24   8   personnel?

11:45:26   9        THE COURT:  Well, it makes it harder to reach -- I

11:45:36  10   don't think it's a happy medium, but it does make it harder

11:45:38  11   here, which is why I am sort of saying -- I am making this up

11:45:42  12   as I am going along -- what are you going to go to the mat on?

11:45:52  13        MR. MOGIN:  Primary decisionmakers.

11:45:54  14        THE COURT:  No, but what is it you really want here

11:45:58  15   is what I am trying to say.  I mean, I am sort of bouncing the

11:46:04  16   ball back to you because I don't think you're going to get all

11:46:08  17   salespeople.  You're saying you didn't ask for all

11:46:12  18   salespeople, although it sounds like you asked for all

11:46:16  19   salespeople, so I am bouncing it back to you and trying to

11:46:20  20   figure out in this discussion what is it that they could go

11:46:26  21   back?  We have found out already the committee structure is

11:46:30  22   important.

11:46:32  23        It sounds like they gave you some of these other

11:46:34  24   categories, but I -- okay.  You have given some sales.  They

11:46:44  25   are part of some organizational chart.

11:46:46  1    MS. MILLER:  Yes.

11:46:46  2    MR. MOGIN:  They have only given us their very top

11:46:50  3  salespeople, those that they have identified on their own as

11:46:52  4  the primary decisionmakers.

11:46:54  5    MS. MILLER:  There are other salespeople in the

11:46:56  6  organizational charts that we have produced.

11:47:06  7    MR. MOGIN:  I don't know when that production was

11:47:08  8  made.

11:47:08  9    MS. MILLER:  August 11th of last year.

11:47:16  10    MR. WOZNIAK:  Can I just ask for a point of

11:47:18  11  clarification, because I wasn't involved in all this, so in

11:47:20  12  some ways, I am in the same position you are.

11:47:22  13    The organizational charts that you produced go beyond

11:47:24  14  the limiting language that are in the written RFP request; is

11:47:30  15  that accurate?

11:47:30  16    MS. MILLER:  Yes, because some of the charts that

11:47:32  17  show the decisionmakers and also include people underneath

11:47:36  18  them, so there's all sorts --

11:47:38  19    MR. WOZNIAK:  Was that fact disclosed prior to today

11:47:40  20  so that everyone knew that you had, in fact, produced org

11:47:42  21  charts -- and I'm seriously asking this because I don't

11:47:44  22  know -- org charts that go well beyond the response that one

11:47:48  23  would expect -- the production one would expect to see based

11:47:52  24  on the written response to the RFP?

11:47:58  25    MR. MAROVITZ:  Sure, because we identified 22 key

| | | |
|---|---|---|
| 11:48:00 | 1 | custodians and then six administrative assistants in the org |
| 11:48:04 | 2 | charts and how many people are listed on the org charts that |
| 11:48:08 | 3 | were produced? |
| 11:48:08 | 4 | MS. MILLER:  I don't know. |
| 11:48:08 | 5 | MR. MAROVITZ:  Hundreds? |
| 11:48:10 | 6 | MS. MILLER:  Well over a hundred. |
| 11:48:10 | 7 | MR. MOGIN:  Respectfully, this isn't the org chart in |
| 11:48:16 | 8 | question.  This is our attempt to figure out who may be the |
| 11:48:20 | 9 | proper custodians, who do we need to talk to in the |
| 11:48:22 | 10 | organization, who is going to be our most likely sources of |
| 11:48:26 | 11 | information.  And, again, it's simple identification. |
| 11:48:40 | 12 | THE COURT:  I just saw something which I hadn't seen |
| 11:48:44 | 13 | before, that list of everybody's custodians. |
| 11:48:56 | 14 | MS. MILLER:  It's attached in several places.  Do you |
| 11:48:58 | 15 | want all defendants or just ours? |
| 11:49:00 | 16 | THE COURT:  Yours. |
| 11:49:02 | 17 | MS. MILLER:  Ours?  If you go to the January 10th |
| 11:49:04 | 18 | letter, which is Exhibit 8, and the last exhibit in that, |
| 11:49:06 | 19 | which is Exhibit 8, so the last few pages of Exhibit 8 are our |
| 11:49:10 | 20 | list of key custodians. |
| 11:49:34 | 21 | THE COURT:  So you're saying -- Mr. Mogin, what |
| 11:49:36 | 22 | you're saying is when you were asking for No. 3, what you were |
| 11:49:42 | 23 | asking in RPD No. 3, really was a custodian issue? |
| 11:49:48 | 24 | MR. MOGIN:  Identifying people, exactly.  Identifying |
| 11:49:50 | 25 | individuals. |

11:49:58  1    THE COURT:  Do you understand that?

11:50:00  2    MS. MILLER:  And in response to No. 3, that's as

11:50:04  3  Mr. Mogin said a while ago, 20 minutes ago, 1 and 3 are kind

11:50:08  4  of related and 3, from our standpoint, was an organizational

11:50:12  5  identifying who these people are.  It gives their titles, it

11:50:16  6  gives who they are and where they fit in the organization.  So

11:50:18  7  we produced organization charts to show this information.  And

11:50:20  8  in addition to showing the people with the top executives, it

11:50:24  9  shows other people below the top executives.

11:50:40  10    THE COURT:  Well, when this says, Other board members

11:50:42  11  excluded, that means you do have some board members?  I mean,

11:50:50  12  is that what this means, that plaintiffs have some board

11:50:56  13  members?

11:50:56  14    MR. VAN TINE:  Well, I assume that somebody that

11:51:04  15  would be considered an ultimate or a primary decisionmaker by

11:51:08  16  the defendant may sit on the board of directors, but I don't

11:51:14  17  think that, for example, it's like -- you know, I personally

11:51:20  18  do not know this, but, for example, the CEO of the company

11:51:26  19  often sits on the board.

11:51:28  20    THE COURT:  Right.

11:51:28  21    MR. VAN TINE:  On the other hand, boards often have

11:51:34  22  individuals that are outside the company or are formerly

11:51:42  23  former executives with the company that would no longer be a

11:51:50  24  primary decisionmaker, could include different sorts of

11:51:56  25  people.

| | | |
|---|---|---|
| 11:52:10 | 1 | THE COURT:  Do you have your actual answer to No. 3 |
| 11:52:16 | 2 | here? |
| 11:52:16 | 3 | MS. MILLER:  Yes, it's tab number 1 in that book. |
| 11:52:24 | 4 | MR. MAROVITZ:  It's on page 21 and 22. |
| 11:53:56 | 5 | THE COURT:  So you already -- I mean, I'm trying to |
| 11:54:20 | 6 | -- in order to prepare this chart, you must have their |
| 11:54:24 | 7 | documents that you consider answer No. 3 somehow, right? |
| 11:54:30 | 8 | MR. VAN TINE:  No, no, I am discussing what their |
| 11:54:36 | 9 | response to the request to produce states that they are going |
| 11:54:42 | 10 | to produce.  Now, for example, I said that I asked people to |
| 11:54:50 | 11 | pull organizational charts.  Did I see a chart of the board of |
| 11:54:56 | 12 | directors?  No, I did not.  I cannot say with, you know, great |
| 11:55:02 | 13 | certainty that it's not possible that one is in there |
| 11:55:04 | 14 | somewhere, or -- but, no, I did not review all of the |
| 11:55:14 | 15 | documents that they have produced to this point rather than |
| 11:55:22 | 16 | relied upon their representation of what they were going to |
| 11:55:26 | 17 | produce and what they did not intend to produce. |
| 11:55:30 | 18 | MR. MOGIN:  Remember, your Honor, that that ties back |
| 11:55:32 | 19 | into the Brown testimony. |
| 11:55:36 | 20 | THE COURT:  Which part of Brown's testimony? |
| 11:55:38 | 21 | MR. MOGIN:  Where he said that the -- only those |
| 11:55:44 | 22 | matters that the defendants said they would be producing in |
| 11:55:50 | 23 | these responses are what is actually being produced.  In other |
| 11:55:54 | 24 | words, even if there was a hit from a search terms, it doesn't |
| 11:56:00 | 25 | necessarily mean that it's being produced. |

11:56:04  1   THE COURT:  Well, that's the way Georgia-Pacific was

11:56:08  2   doing it.  We don't know if everyone did it.

11:56:10  3   MR. MOGIN:  You heard from Mr. Marovitz earlier with

11:56:14  4   his reference to the Brown testimony.

11:56:16  5   MR. MAROVITZ:  I don't have perfect recall about it,

11:56:18  6   but I think Mr. Brown testified about the relationship between

11:56:20  7   the search terms in the Boolean searches and requests.  I

11:56:26  8   don't know that he testified, he certainly didn't testify

11:56:28  9   about the way in which the other defendants actually handled

11:56:32  10  the documents to be produced.  But if you say that's the way

11:56:38  11  he testified, as I say, I don't remember with perfect recall

11:56:44  12  what his testimony is, but it is what it is.

11:56:46  13  MR. MOGIN:  I am glad we are talking about recall.

11:57:00  14  Your Honor, I know you wanted to break at 12:30, but

11:57:04  15  could I possibly take a personal break for just a couple of

11:57:08  16  minutes?

11:57:08  17  THE COURT:  Absolutely.

11:57:16  18  (Short break.)

12:06:38  19  MR. MOGIN:  I would submit that three things have

12:06:42  20  emerged from this morning's session.  The first is that there

12:06:48  21  is an overarching need with Temple, as there is with the other

12:06:50  22  defendants, to deal with the limitation to primary

12:06:54  23  decisionmakers, but we knew that before we got here.

12:06:58  24  We also knew before we got here something about we

12:07:04  25  didn't know what had been hit but had been culled out.

12:07:10    1           THE COURT:  What do you mean?

12:07:10    2           MR. MOGIN:  We understood that we needed to drill

12:07:14    3   down on that issue.  In other words, there are documents that

12:07:18    4   were hit using the search terms, putting aside the validity of

12:07:22    5   the search terms themselves, but that those documents, not all

12:07:26    6   those documents were produced.  There were quite a number of

12:07:30    7   non-privileged documents, as we understand it, that have been

12:07:32    8   culled out of the production based upon these objections, and

12:07:38    9   we need to still deal with that issue.

12:07:44   10           And then, lastly, it appears from what we have heard

12:07:48   11   this morning that there may be some documents that have in

12:07:54   12   fact been produced that one would have thought would not have

12:07:58   13   been produced based upon these objections, which,

12:08:06   14   unfortunately, and I will just leave it at that, gets us back

12:08:10   15   to the organizational indexing correlation issues.  I am not

12:08:14   16   saying we should take them up.

12:08:16   17           THE COURT:  Right.

12:08:16   18           MR. MOGIN:  But that's what's emerged.

12:08:18   19           So think about it from -- well, I will just put it,

12:08:22   20   from plaintiffs' perspective, here's where we stand based upon

12:08:26   21   what we have heard and learned this morning.

12:08:30   22           First, we have what we consider to be the

12:08:34   23   redefinition that appears in the responses to the request for

12:08:42   24   production.

12:08:44   25           The second redefinition that we think takes place is

12:08:48   1   when all those get compressed into the search strings that we

12:08:56   2   had very little input on.  If you think about it, kind of the

12:09:00   3   way we are going, maybe what we should have done is just given

12:09:02   4   them search strings and not bothered with request for

12:09:08   5   production of documents, but maybe that will be the new

12:09:08   6   protocol.

12:09:10   7         Now we have a situation where --

12:09:12   8         THE COURT:  You know what?  You have to explain what

12:09:14   9   you mean by that.  I don't know what that means.

12:09:16   10         MR. MOGIN:  Well, if you take our requests for

12:09:18   11   production of documents, and this is an aside, but if you take

12:09:22   12   our request for production of documents and you just boil that

12:09:24   13   down into a set of search strings that we don't get to submit

12:09:28   14   the search strings, that's kind of a backwards way of doing

12:09:32   15   things.  And maybe a lot of this could have been avoided if we

12:09:36   16   had just submitted, instead of RPDs, search your ESI for the

12:09:40   17   following using these search strings or these search tools or

12:09:44   18   something.

12:09:44   19         But the point really was not so much the method as it

12:09:48   20   is the redefinition.  And now we've learned that we can't rely

12:09:54   21   entirely on these responses because some things may have been

12:09:58   22   produced where there was an indication that they weren't going

12:10:04   23   to be produced.

12:10:06   24         So from plaintiffs' perspective, what we have are a

12:10:08   25   lot of documents, but we don't know what we have.  And we

12:10:16  1   don't really know, absent going through them one at a time,

12:10:20  2   what we have and what we don't have.  To us, that doesn't seem

12:10:28  3   to be a particularly efficient process, and what we're trying

12:10:32  4   to do by raising these issues now is get to them now.

12:10:36  5          THE COURT:  All right.  I want to talk to Ms. Miller

12:10:40  6   about this very issue.

12:10:42  7          MS. MILLER:  Okay.

12:10:44  8          THE COURT:  I have no idea, having never worked in a

12:10:48  9   law firm, having never been a civil lawyer, having never done

12:10:52  10  a search, having never been to a deposition even, when you

12:10:58  11  produced -- when you produced whatever it was to No. 3 or to

12:11:04  12  any one of the 91, tell me how it looked.  When it left your

12:11:10  13  door, was it in paper, was it on a disk --

12:11:14  14          MS. MILLER:  Sure.

12:11:14  15          THE COURT:  -- and what does the cover letter say?

12:11:18  16          MS. MILLER:  Sure.

12:11:20  17          THE COURT:  Help me out with that.

12:11:20  18          MS. MILLER:  Well, okay.  We will talk about the

12:11:22  19  ones -- since the organizational charts are part of the prior

12:11:26  20  production, I will tell you what that one looked like.  We

12:11:28  21  have produced no physical paper to plaintiffs.

12:11:30  22          THE COURT:  Okay.

12:11:32  23          MS. MILLER:  Everything has been in an electronic

12:11:36  24  form, whether it was a TIFF image, or if it was an Excel

12:11:38  25  spreadsheet, we would have produced it natively.  They were

12:11:38   1   given the actual Excel with a Bates number page linked to the

12:11:38   2   Excel spreadsheet.  PowerPoints, we did the same.

12:11:46   3          So it would come to them either on a hard drive or a

12:11:48   4   DVD or a CD ROM, some sort of electronic media, and the cover

12:11:52   5   letter would simply say, Here is our whatever number

12:11:56   6   production we're on, 1 through -- I think we are on our

12:11:58   7   seventh production, here is the Bates range.  And within that,

12:12:02   8   within the actual documents that get produced, there is an

12:12:04   9   agreed ESI protocol order that says, Here is the metadata that

12:12:08  10   you have to provide with respect to each of your documents,

12:12:12  11   and you have to provide OCR texts so it's fully text

12:12:16  12   searchable, you have to provide certain fields on custodians,

12:12:20  13   date -- I don't have them memorized, one of you may, but it's

12:12:22  14   all set forth in the ESI order that's on the docket.

12:12:24  15          So everybody has to -- their productions need to

12:12:28  16   comply with that ESI protocol in terms of the types of

12:12:30  17   metadata so that both sides have the same ability to search

12:12:36  18   the productions for information that has been produced.

12:12:38  19          So they have -- the same database that I have of

12:12:42  20   documents they have because I have produced all the same

12:12:44  21   metadata to them.

12:12:44  22          THE COURT:  Okay.

12:12:46  23          MS. MILLER:  And so it's all electronic on a hard

12:12:48  24   drive or CD ROM, and they load it into, presumably, based on

12:12:50  25   their prior letters, some sort of review platform which they

| | | |
|---|---|---|
| 12:12:54 | 1 | can search and review and do all sorts of other things. |
| 12:12:58 | 2 | THE COURT: So on the CD ROM, when you were |
| 12:13:02 | 3 | responding to the 92, could you go to your responses, you |
| 12:13:10 | 4 | found what you have here written, and then are the documents |
| 12:13:16 | 5 | with it? |
| 12:13:16 | 6 | MS. MILLER: No. |
| 12:13:18 | 7 | THE COURT: They are not with it. |
| 12:13:18 | 8 | MS. MILLER: No. |
| 12:13:18 | 9 | THE COURT: Okay. Is there a way to reference the |
| 12:13:26 | 10 | documents that you turned over that, in your mind, answered |
| 12:13:32 | 11 | No. 3? |
| 12:13:32 | 12 | MS. MILLER: No. I would know the types of documents |
| 12:13:36 | 13 | I committed and I would run searches for those documents and |
| 12:13:40 | 14 | pull up those documents. |
| 12:13:42 | 15 | THE COURT: From the -- |
| 12:13:42 | 16 | MS. MILLER: From the corpus. |
| 12:13:44 | 17 | THE COURT: From the corpus. |
| 12:13:44 | 18 | MR. MAROVITZ: So there are many documents that might |
| 12:13:46 | 19 | be responsive to more than one request. |
| 12:13:48 | 20 | THE COURT: More than one category. |
| 12:13:48 | 21 | MS. MILLER: Yes, there is a lot of overlap in these. |
| 12:13:52 | 22 | One document could respond to five different requests. |
| 12:13:54 | 23 | THE COURT: So are your documents by custodian? |
| 12:14:12 | 24 | MS. MILLER: Yes, ma'am. |
| 12:14:12 | 25 | THE COURT: They are. |

| | | |
|---|---|---|
| 12:14:16 | 1 | And they do know which documents go to which |
| 12:14:20 | 2 | custodian? |
| 12:14:22 | 3 | MS. MILLER:  Yes, ma'am.  It's in the metadata. |
| 12:14:24 | 4 | THE COURT:  So what do you mean by that's "in the |
| 12:14:26 | 5 | metadata"? |
| 12:14:26 | 6 | MS. MILLER:  First, within each electronic document, |
| 12:14:28 | 7 | there is information in the background that you don't see when |
| 12:14:30 | 8 | you are on the screen. |
| 12:14:32 | 9 | THE COURT:  Right.  Right. |
| 12:14:32 | 10 | MS. MILLER:  It records things like the date it |
| 12:14:34 | 11 | records, who creates the document -- |
| 12:14:36 | 12 | THE COURT:  Physically.  I know what it looks like. |
| 12:14:38 | 13 | But how does -- |
| 12:14:40 | 14 | MS. MILLER:  There is a load file that is provided |
| 12:14:42 | 15 | when we produce documents that includes -- within that ESI |
| 12:14:44 | 16 | stipulation is a whole series of fields that we have to |
| 12:14:48 | 17 | provide to the extent it's available in the document that says |
| 12:14:50 | 18 | we have to provide a load file so that when they load it into |
| 12:14:54 | 19 | their review system, they can pull up, you know, first our |
| 12:15:00 | 20 | CEO, Doyle Simons, they can say, Okay, in the custodian field, |
| 12:15:04 | 21 | Doyle Simons, give me all of Doyle Simons' documents, and they |
| 12:15:08 | 22 | can run a search, and all the documents that identified a |
| 12:15:10 | 23 | custodian as Doyle Simons will come in their search, and they |
| 12:15:14 | 24 | can look at all of Doyle Simons' documents where he is the |
| 12:15:18 | 25 | custodian. |

12:15:18    1    So each of those fields you can search on that have

12:15:20    2    been agreed upon within that ESI protocol, so they can search

12:15:24    3    by custodian or they can search by -- I believe date is one of

12:15:26    4    the other fields.

12:15:28    5    In addition to that, so they can search -- so they

12:15:28    6    can search by those fields, but they can also search using

12:15:32    7    general terms in the corpus of the documents because all of

12:15:36    8    the documents are text searchable.  So they can put the word

12:15:40    9    -- they could put my name if in, if they wanted to, and any

12:15:44    10    document that happened to have my name on it would come back

12:15:46    11    in their search to the extent the OCR picked up my name.

12:15:50    12    Everybody agree with that description?

12:15:58    13    MR. WOZNIAK:  I think that's fair.  I mean, the only

12:16:00    14    point I was going to add is that at least some of these early

12:16:04    15    productions took place before the ESI production format

12:16:04    16    stipulation was in place, so I don't know to what extent --

12:16:08    17    you know, Temple-Inland, I can't sit here today and say

12:16:10    18    whether or not they provided all the metadata with that early

12:16:12    19    production that they did for the later productions.  Let's

12:16:16    20    assume that they did or came close to doing something like

12:16:18    21    that.  That's fine.

12:16:20    22    As for hard-copy documents that are scanned and then

12:16:24    23    OCR text file is created, I believe the stipulation requires

12:16:28    24    that certain metadata fields, if they are not -- they are not

12:16:32    25    associated with a hard copy, they have to be populated and

| | |
|---|---|
| 12:16:36 | 1 |
| 12:16:36 | 2 |
| 12:16:38 | 3 |
| 12:16:44 | 4 |
| 12:16:46 | 5 |
| 12:16:46 | 6 |
| 12:16:48 | 7 |
| 12:16:50 | 8 |
| 12:16:52 | 9 |
| 12:16:54 | 10 |
| 12:16:58 | 11 |
| 12:16:58 | 12 |
| 12:17:04 | 13 |
| 12:17:10 | 14 |
| 12:17:16 | 15 |
| 12:17:20 | 16 |
| 12:17:28 | 17 |
| 12:17:38 | 18 |
| 12:17:42 | 19 |
| 12:17:52 | 20 |
| 12:18:00 | 21 |
| 12:18:08 | 22 |
| 12:18:20 | 23 |
| 12:18:22 | 24 |
| 12:18:24 | 25 |

provided to us.

MS. MILLER:  So as we are collecting hard-copy documents, if I am collecting Doyle Simons' hard-copy documents, I have to provide them with a field that says these are Doyle Simons' hard-copy documents.

THE COURT:  I see.  And there aren't too many hard-copy documents, right?

MS. MILLER:  No.  They are mostly electronic.

THE COURT:  Even in the mill, even mill documents or even in places that might not be as --

MR. VAN TINE:  I don't think that given the restrictions that they put on these requests to produce there would be documents that they haven't objected to in the mills, but in any -- as it is, they are saying that they are producing the documents from the people on this list, and none of these people work in a mill.

MR. MOGIN:  Or a box plant.

MR. VAN TINE:  The -- actually, if you look at the organization chart, over toward the right, there is a list of mill managers, and what you will see is that with the exception of George Obernesser, who is listed on this document as a mill manager, they did not say -- actually --

MS. MILLER:  George Obernesser is not a key custodian.  That check mark is incorrect.

MR. VAN TINE:  Okay.  But I believe that he showed up

12:18:28　1　on another chart of yours.  Yeah, he showed up -- then he

12:18:34　2　showed up on a star because there is some confusion.

12:18:40　3　　　　　He is listed as a custodian whose non-email ESI has

12:18:46　4　been ingested into their file system archive tool which is on

12:18:52　5　Exhibit A to Ms. Miller's January 10, 2012, letter, but he is

12:19:00　6　not a custodian.  So none of the mill managers were identified

12:19:04　7　as custodians.

12:19:08　8　　　　　MR. MOGIN:  And, thus, their documents are not being

12:19:10　9　produced.

12:19:10　10　　　　　MR. MAROVITZ:  Right.  Judge, just to be clear,

12:19:14　11　during the Rule 30(b)(6) deposition that took place over a

12:19:18　12　period of two days, there was a substantial description of the

12:19:24　13　way that data flow from the mills and the box plants.

12:19:28　14　　　　　THE COURT:  I am so sorry I said the stupid mill.

12:19:32　15　That just came out of my mouth.

12:19:34　16　　　　　MR. MAROVITZ:  But there is a substantial description

12:19:34　17　which I won't attempt to repeat about the way the data flow

12:19:38　18　from the mills and the box plants to the centralized systems.

12:19:44　19　　　　　So the fact that certain data and documents are not

12:19:48　20　being produced from the mill does not mean that the relevant

12:19:52　21　data and documents are not being produced from the centralized

12:19:56　22　systems.  It's rolled up.

12:20:00　23　　　　　MR. VAN TINE:  I would actually take some issue with

12:20:02　24　that.  There are categories of data, particularly with respect

12:20:06　25　to mills, that do not flow to the centralized data system.

12:20:14    1   One of the allegations in this suit has to do with down time

12:20:20    2   of paper machines and paper mills.

12:20:22    3        THE COURT: Yes.

12:20:24    4        MR. VAN TINE: And, in fact, down time of paper

12:20:26    5   machines and paper mills is a category of data that does not

12:20:30    6   flow to the centralized systems and instead, at most, there

12:20:38    7   was some sort of report that the 30(b)(6) deponent wasn't

12:20:46    8   certain exactly what it was. It was given to Jeremy Toohey,

12:20:52    9   who is another person whose role is sort of ambiguous because

12:20:58   10   we just were discussing Mr. Obernesser, who was listed as

12:21:04   11   someone that they collected documents for but is not a

12:21:08   12   custodian.

12:21:10   13        Mr. Toohey seems to be in the opposite situation.

12:21:14   14   They listed him as a custodian, but they did not list him as

12:21:18   15   someone that they were collecting non-email ESI for. In

12:21:22   16   fairness, I will say that they did produce emails from him in

12:21:30   17   the May production, but his status as a custodian is

12:21:34   18   ambiguous.

12:21:36   19        MR. MAROVITZ: Judge, we need to set the record

12:21:38   20   straight on this.

12:21:38   21        MS. MILLER: Yes. Mr. Van Tine is conflating a

12:21:42   22   couple of things.

12:21:42   23        The people that we have identified as our custodians

12:21:46   24   are the people that are identified in this chart. The people

12:21:48   25   that are identified on Exhibit A to my letter are not people

12:21:52    1    -- are not people for whom -- that is simply people that at

12:21:56    2    the initial of our outset of the litigation as we were

12:21:58    3    collecting documents, we initially ingested their documents

12:22:02    4    into the FSA.  Ultimately, we didn't ingest everybody's who

12:22:08    5    was a custodian, we ingested some people that weren't a

12:22:12    6    custodian.  That was at the outset of this litigation back in

12:22:12    7    September 2010, when we were first preserving documents.

12:22:16    8            So Exhibit A doesn't -- other than the fact that

12:22:20    9    those people do exist in our FSA, has nothing to do with who

12:22:24   10    our identified custodians are.  Mr. Toohey is an identified

12:22:28   11    custodian, and we are collecting all of his email and we have

12:22:30   12    produced all of his email and his loose e-files.

12:22:32   13            So you have to set aside the Exhibit A.  That's a

12:22:34   14    conflagration of two points.

12:22:36   15            THE COURT:  It looks like it's a good thing you're

12:22:38   16    saying this because Mr. Wozniak is looking very confused.

12:22:42   17            MR. WOZNIAK:  As to preservation, was his non-email

12:22:48   18    ESI in fact preserved or ingested into the archive system at

12:22:50   19    the commencement of the litigation?

12:22:52   20            MS. MILLER:  Our 30(b)(6) deposition is very clear on

12:22:54   21    this in terms of how everybody's stuff was -- I beg to

12:22:58   22    disagree.  It's very clear, and our January 10th letter lays

12:23:02   23    out exactly how everybody's stuff was collected and how it was

12:23:04   24    ingested and how we have dealt with it.

12:23:08   25            So Mr. Toohey is one of the people who we have

12:23:10    1    collected his email and we collected his e-files as laid out

12:23:16    2    in that January 10th letter. Those have been processed,

12:23:20    3    reviewed, and the responsive documents have been produced.

12:23:22    4         The FSA tool was an original one. It was a tool that

12:23:24    5    we originally implemented at the outset of the litigation but

12:23:28    6    ultimately didn't end up using for collecting all of our,

12:23:32    7    quote, unquote, loose e-files or other related information.

12:23:36    8         MR. MOGIN: Respectfully, I believe we have a list,

12:23:36    9    do we not, of whose email we have at this point from Temple?

12:23:42    10        MR. WOZNIAK: We do. And there is no dispute.

12:23:44    11        MR. MOGIN: I don't believe Mr. Toohey is on that.

12:23:46    12        MR. WOZNIAK: Mr. Toohey did, in fact, produce email.

12:23:50    13    Matt made that point a moment ago.

12:23:54    14        But the confusion is over this --

12:23:56    15        MR. VAN TINE: Exhibit A, which is not about email,

12:24:00    16    which Ms. Miller had attached to a January 10, 2012, letter,

12:24:04    17    which is not limited.

12:24:20    18        MS. MILLER: Yes, exactly. This is part of tab 8 of

12:24:28    19    the January 10th letter. If you read the January 10th letter

12:24:34    20    in its entirety, it explains what it is, but it does not speak

12:24:38    21    to what documents we ultimately searched for and produced

12:24:42    22    because merely because a document was not in the FSA does not

12:24:44    23    mean it was not preserved and does not mean it was not looked

12:24:46    24    at or reviewed for purposes of production.

12:24:50    25        With respect to the down time recitation that Mr. Van

12:24:54  1  Tine made a moment ago, I have to take issue with that as well

12:24:56  2  because that's not what -- what the 30(b)(6) made clear was

12:25:00  3  that the system that he is talking about, that, quote,

12:25:02  4  unquote, tracks down time in the mills, it is not an accurate

12:25:04  5  report of down time.  It is a system that gets -- according to

12:25:08  6  our 30(b)(6) witness, gets turned off periodically, and as a

12:25:12  7  result, there are these reports that are made by the mills

12:25:14  8  that are then sent to Jeremy Toohey for purposes of tracking

12:25:20  9  what the actual down time in the mills are.

12:25:22  10      And one of the separate questions that plaintiffs

12:25:24  11  have asked us which we have agreed to look into is to how far

12:25:26  12  back we have these reports, and we are looking into how far

12:25:30  13  back we have them.

12:25:34  14      But we have also kind of gotten off track again.

12:25:36  15      THE COURT:  We did.  I thought I was so organized.

12:25:42  16  I'm sorry.

12:25:44  17      Let's kind of decide how we're going to use the

12:25:46  18  afternoon.  We are going to take a break.  I have to eat.  I

12:25:52  19  don't know about you guys, but I need to eat something.

12:25:56  20      So 12:30 to 1:15; and then I think we could try to go

12:26:02  21  1:15 to 3:00, 3:15, something like that.  What do you think?

12:26:10  22      MR. MOGIN:  That's fine with us, your Honor.

12:26:12  23      MR. MAROVITZ:  Sure.

12:26:12  24      MR. FREED:  I do think your suggestion of discrete

12:26:16  25  items, if we can isolate discrete items --

12:26:20  1    THE COURT:  I think we can list them right now if you
12:26:22  2  know what you'd like to talk about.
12:26:22  3    MR. FREED:  Certainly.
12:26:24  4    THE COURT:  Favorite hit lists, not the null set,
12:26:26  5  not --
12:26:28  6    MR. FREED:  Lit hold I think is discrete.
12:26:28  7    THE COURT:  Litigation hold.  Definitely.  We have
12:26:32  8  even done some research on it.
12:26:32  9    MR. MAROVITZ:  I don't know that that's the right
12:26:34  10  issue for us.  Just to be clear, our foothold was sent to
12:26:42  11  people with email addresses.  So that may be a better issue
12:26:46  12  for Georgia-Pacific or International Paper.
12:26:52  13    THE COURT:  What do you mean?  Your --
12:26:52  14    MR. MAROVITZ:  Our lit hold notice was sent to
12:26:54  15  Temple-Inland employees who had email addresses.  Anybody with
12:26:56  16  an email address at Temple-Inland received a litigation
12:27:00  17  notice.
12:27:00  18    MS. MILLER:  Thousands.
12:27:02  19    MR. MAROVITZ:  So it's not really a Temple-Inland
12:27:06  20  issue is what we're saying.  Or we could say it is a
12:27:08  21  Temple-Inland issue and we can check it off the list.
12:27:12  22    MR. VAN TINE:  Well, the question with Temple-Inland
12:27:12  23  is more what the lit hold was.
12:27:16  24    THE COURT:  Well, that's a different question.  The
12:27:18  25  law is very up for grabs on that.  We're not talking -- I

12:27:22   1   thought --

12:27:22   2         MR. VAN TINE:  Or what someone --

12:27:24   3         THE COURT:  I thought what we were trying to do was

12:27:26   4   another way to gather more custodians and if you had the names

12:27:32   5   of the people who have the litigation hold.  I have a list

12:27:36   6   here of ways to get more custodians or ways to increase the

12:27:40   7   number of custodians.

12:27:44   8         The content of the litigation hold I think is a legal

12:27:48   9   issue that's got to be briefed.  I mean, that's up for grabs.

12:27:52   10   I don't imagine with the way the case law is anybody is going

12:27:56   11   to agree to that one.

12:27:56   12         MR. VAN TINE:  There is also an issue about what was

12:27:58   13   done in response.

12:28:00   14         MR. MOGIN:  But you're separating that out from the

12:28:02   15   identification of the people who received the lit hold.

12:28:04   16         THE COURT:  Yes, because I cut you off again, and I'm

12:28:08   17   sorry, in the beginning, after 18 hours locked in my house, I

12:28:14   18   don't know whether this doesn't boil down to who the heck are

12:28:18   19   the custodians here, and if you've got a larger group of

12:28:24   20   custodians, would you shut up about everything else?

12:28:28   21   Literally.

12:28:30   22         MR. FREED:  I can give you the answer, no.

12:28:32   23         THE COURT:  Right.  No.  But because I think we are

12:28:38   24   circling the wagon on custodians is what we are doing in a

12:28:42   25   real big way.  And in the same way that I don't want to talk

12:28:46  1    about how many thousands, millions of pages you've turned

12:28:50  2    over, I don't think, if you had the one right custodian, one

12:28:54  3    would be enough.  I don't think it's a numerical -- I don't

12:29:00  4    think it's a numerical magic number here, one or a thousand of

12:29:10  5    them, because what would you do if you got a thousand of them?

12:29:12  6    You'd never leave your office.

12:29:16  7         MR. FREED:  I think -- and I am speaking perhaps for

12:29:20  8    Mr. Mogin, who hasn't had a chance to respond.  I think

12:29:22  9    getting more custodians would be helpful.  I don't think it

12:29:26  10   would solve --

12:29:26  11        THE COURT:  But we are not going to go down the

12:29:28  12   track, get more custodians, and then there is another issue

12:29:32  13   here.  See, that's kind of what -- it kind of happened -- I

12:29:34  14   got very discouraged on this darn old word dictionary thing

12:29:40  15   because it was going to be like a Band-Aid to help something

12:29:44  16   else, and then we get the word dictionary and -- I mean,

12:29:48  17   that's what -- part of what I think our discussion is about

12:29:50  18   today is to try to figure out what the issues are.

12:29:54  19        So I am a little discouraged, but I am not because I

12:29:58  20   certainly have a better grasp of like the request to produce

12:30:04  21   documents than I did at 10:00 o'clock.

12:30:06  22        So I would like to talk -- okay.  What else did

12:30:10  23   anybody have here?  What were some of our other issues, Chris,

12:30:16  24   on the topics so we can think about them over lunch?

12:30:18  25        I know what I need.  This transactional data index, I

| | | |
|---|---|---|
| 12:30:22 | 1 | have no idea what you are talking about, and I now have charts |
| 12:30:26 | 2 | on it.  So can you talk about that for five minutes -- |
| 12:30:30 | 3 | MR. MAROVITZ:  Yes, let's -- |
| 12:30:30 | 4 | THE COURT:  -- this afternoon, since I don't know |
| 12:30:32 | 5 | what it is? |
| 12:30:34 | 6 | MR. MAROVITZ:  Yes.  We can -- Mr. Mogin mentioned it |
| 12:30:40 | 7 | before. |
| 12:30:40 | 8 | THE COURT:  Right. |
| 12:30:40 | 9 | MR. MAROVITZ:  The plaintiffs would like to have, |
| 12:30:46 | 10 | like many plaintiffs would like to have, a database, |
| 12:30:50 | 11 | essentially, of transactional data so that they get certain |
| 12:31:00 | 12 | kinds of data from all the defendants that they can populate |
| 12:31:02 | 13 | their database with. |
| 12:31:04 | 14 | So Mr. McKeown sent Mr. Mogin a draft list of fields |
| 12:31:10 | 15 | of the sorts of data that, if they're available, the |
| 12:31:14 | 16 | defendants might be able to send over to the plaintiffs.  And |
| 12:31:16 | 17 | Mr. Mogin is consulting with his expert to figure out whether |
| 12:31:20 | 18 | that list is sufficient or needs to be amended, and then he |
| 12:31:24 | 19 | will get back to us and he will tell us.  That's really what |
| 12:31:26 | 20 | that is. |
| 12:31:26 | 21 | THE COURT:  Okay. |
| 12:31:30 | 22 | MR. MOGIN:  I'm going to say I agree.  Could you mark |
| 12:31:34 | 23 | that in the record? |
| 12:31:34 | 24 | THE COURT:  Sure.  So then we are only going to -- |
| 12:31:36 | 25 | the whole afternoon, we are only going to discuss |

12:31:40    1    transactional data indexes.

12:31:42    2        MR. MOGIN: No, no, just conduct. We don't have to

12:31:44    3    talk about those.

12:31:48    4        MR. FREED: I think the only item we haven't at least

12:31:50    5    touched on would be 30(b)(6).

12:31:52    6        THE COURT: Yes.

12:31:54    7        MR. FREED: And I am not aware that there is any

12:31:56    8    issues.

12:31:56    9        MR. MAROVITZ: I don't think there is. I really

12:31:58   10    don't. Again, I think all lawyers here are willing to stay as

12:32:02   11    long as the court believes it would be productive; but it

12:32:04   12    might also be the case that some of these issues might be

12:32:08   13    framed better by others. I am sure, for example, you will

12:32:12   14    hear tomorrow that the list of people that got the litigation

12:32:16   15    hold doesn't bear any relationship to the list of proper

12:32:20   16    custodians.

12:32:20   17        THE COURT: Well, it can, it cannot, depending on how

12:32:24   18    they did it.

12:32:24   19        MR. MAROVITZ: Right. All I'm saying, Judge, is

12:32:26   20    that's not an argument that really relates to us.

12:32:28   21        THE COURT: Right. Right.

12:32:30   22        MR. MAROVITZ: It's just -- it's a better argument

12:32:30   23    that ought to be between the plaintiffs and either

12:32:34   24    International Paper or Georgia-Pacific.

12:32:52   25        THE COURT: We will come back at 1:15 and we will see

12:32:54  1  where we are.

12:33:00  2     (Whereupon, the hearing was adjourned at 12:30 p.m. until

12:33:04  3  1:15 p.m. of this same day and date.)

<pre>
 1                   IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    KLEEN PRODUCTS, LLC, et al.,        )    Docket No. 10 C 5711
                                          )
 4                          Plaintiffs,   )
                                          )
 5              vs.                       )
                                          )
 6    PACKAGING CORPORATION OF AMERICA,   )    Chicago, Illinois
      et al.,                             )    May 30, 2012
 7                                        )    1:15 o'clock p.m.
                            Defendants.   )
 8
             TRANSCRIPT OF PROCEEDINGS - RULE 16 CONFERENCE
 9       BEFORE THE HONORABLE MAGISTRATE JUDGE NAN R. NOLAN
                            VOLUME 1-B
10
      APPEARANCES:
11
      For the Plaintiffs:        THE MOGIN LAW FIRM
12                               BY:  MR. DANIEL J. MOGIN
                                 707 Broadway, Suite 1000
13                               San Diego, CA  92101
                                 (619) 687-6611
14

15                               FREED KANNER LONDON & MILLEN LLC
                                 BY:  MR. MICHAEL J. FREED
16                               MR. ROBERT J. WOZNIAK
                                 2201 Waukegan Road, Suite 130
17                               Bannockburn, IL  60015
                                 (224) 632-4500
18

19                               MILLER LAW LLC
                                 BY:  MR. MATTHEW VAN TINE
20                               115 South LaSalle Street, Suite 2910
                                 Chicago, IL  60603
21                               (312) 332-3400

22

23
      Court Reporter:            MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                               Official Court Reporter
                                 219 S. Dearborn Street, Suite 1854-B
25                               Chicago, Illinois  60604
                                 (312) 435-5639
</pre>

APPEARANCES CONTINUED:

For Defendant                          MAYER BROWN LLP
Temple-Inland:                         BY:   MR. ANDREW S. MAROVITZ
                                             MS. BRITT M. MILLER
                                       71 South Wacker Drive
                                       Chicago, IL  60606
                                       (312) 782-0600

01:22:22   1    (The following proceedings were had in open court:)

01:22:22   2        THE COURT:  Okay.  So we are back on the record in

01:22:26   3    Kleen and our Rule 16 conference.

01:22:30   4        I do have a couple -- I just want to kind of close it

01:22:36   5    off on the request for production.  Mr. Mogin, the other day,

01:22:44   6    with the four defendants, who either gave themselves A pluses

01:22:50   7    on their progress or we gave them A pluses, are you satisfied

01:22:56   8    with their answers on the requests to produce documents, or

01:23:02   9    have you been able to work it out with them?

01:23:06   10       MR. MOGIN:  The answer is no and no with a big

01:23:10   11   caveat, and the caveat is that I think we will be able to work

01:23:14   12   it out with them.  In part, our ability to work it out with

01:23:18   13   them will depend on how the next two days go.

01:23:20   14       THE COURT:  Okay.

01:23:22   15       MR. MOGIN:  In other words, from my perspective,

01:23:26   16   those defendants with respect to these common issues like

01:23:28   17   parsing, et cetera, or whatever word we use or we care to use.

01:23:34   18       THE COURT:  Right.

01:23:34   19       MR. MOGIN:  There is a bit of follow the leader.  And

01:23:36   20   the extent to which they engaged in the practice is not quite

01:23:42   21   as much as the three defendants that we are working with these

01:23:48   22   two days.

01:23:48   23       THE COURT:  Well, do you think if you tried to do it,

01:23:54   24   tried to figure it out with them, we could learn something

01:23:58   25   that would help us in trying to figure it out here?

01:24:02  1    MR. MOGIN:  I am a little skeptical of that approach
01:24:04  2  because of what I perceive to be the follow-the-leader
01:24:08  3  pattern, and I think the three defendants that you have culled
01:24:10  4  out, if you will, for these two days are more or less the
01:24:14  5  leaders, but Temple gets a leader minus, I guess.
01:24:20  6    MS. MILLER:  I won't take that personally.
01:24:26  7    MR. VAN TINE:  They are not a primary decisionmaker,
01:24:28  8  you're saying?
01:24:32  9    THE COURT:  Well, okay.  Do you have -- I think you
01:24:38  10  mentioned this before.  Do you have any authority, any legal
01:24:48  11  cases on this issue of the request to produce the way that you
01:24:54  12  framed these and sort of the procedure on the way people
01:25:02  13  either objected or filed or answered or parsing or anything?
01:25:08  14  Do you have any authority on this at all?
01:25:10  15    MR. MOGIN:  Yes.
01:25:10  16    THE COURT:  Oh, good.  What do you have, either
01:25:14  17  helpful or not helpful?  I mean, anything.  Can you get us all
01:25:20  18  those cites?
01:25:20  19    MR. MOGIN:  Yes.
01:25:20  20    THE COURT:  I'd love to see them.
01:25:22  21    MR. MOGIN:  I can think of two cases off the top of
01:25:26  22  my head.  Unfortunately, I can't give you the cites.  They may
01:25:30  23  both be out of the district court in Kansas, and the procedure
01:25:38  24  that was followed here was rejected in those two cases.  And I
01:25:40  25  will try to get you the cites.  In fact, next time we break, I

01:25:44   1   will send an email, and I think I can get the cites.

01:25:46   2           THE COURT:  All right.

01:25:48   3           MR. MOGIN:  The other authority, of course, is the

01:25:52   4   rule, which basically says -- it gives you a binary choice, as

01:25:58   5   I understand the rule, which is say that you're going to

01:26:00   6   produce or say that you're not going to produce, and there

01:26:04   7   doesn't really seem to be a third way; although, frankly, I

01:26:08   8   won't tell you that I've never seen the third way, but I will

01:26:12   9   say that it's much more isolated than anything -- than what I

01:26:16   10  have seen in this case.  So it's usually, say, if I were to

01:26:20   11  put out in another case 90-some RPDs, maybe half a dozen,

01:26:24   12  maybe a dozen, something like that, would be qualified like

01:26:26   13  that, not what we have seen in this case.

01:26:32   14          MR. MAROVITZ:  Judge, we obviously would be

01:26:34   15  interested in seeing the authority as well.

01:26:34   16          THE COURT:  Right.

01:26:34   17          MR. MAROVITZ:  And we'd like an opportunity to submit

01:26:38   18  authority that we think supports what we have.

01:26:40   19          THE COURT:  And I am not saying -- I am giving up on

01:26:42   20  this issue for today, but I am a stubborn Irish woman, as you

01:26:46   21  know, and I am not -- I just feel like --

01:26:50   22          MR. MOGIN:  Your Honor, you shouldn't discriminate on

01:26:52   23  the basis of gender.

01:26:54   24          THE COURT:  Or national origin.

01:26:58   25          MS. MILLER:  And nationality.

01:27:00   1       THE COURT:  I don't know.  I don't know.  I can't get

01:27:06   2   my hands around it.  Over lunch I looked at one.  I was trying

01:27:10   3   to think are there any specifics that I had a guttural

01:27:18   4   reaction to when I read them the first time, because that's

01:27:22   5   how I actually kind of know, and are there any things we could

01:27:24   6   take off the table.  But we are going to have plenty of time

01:27:30   7   to revisit this.

01:27:32   8       As you can tell, I am trying very hard.  If we are

01:27:38   9   going to have to go to written motions, my goal is to get them

01:27:42   10  as narrow as can be.  So even if we in the end as a group

01:27:46   11  decide something has to be briefed, then at least we should

01:27:50   12  get it down to hard-core issues.  We are way far -- as far as

01:28:00   13  I'm concerned, today was the first crack at this.

01:28:04   14      So let's talk about with Temple, specifically with

01:28:10   15  Temple, because I did want some individual focus.  Right

01:28:14   16  before the break, I thought you all agreed that there are no

01:28:18   17  more 30(b)(6) issues.  I thought in a status report, you told

01:28:22   18  us how long -- you had two people who testified, it was for a

01:28:28   19  very long period of time.  Are you satisfied with their

01:28:32   20  30(b)(6)?

01:28:32   21      MR. MOGIN:  Mr. Van Tine took those depositions.

01:28:34   22      MR. VAN TINE:  Generally, yes.  I mean, it was not

01:28:38   23  perfect.  I mean, there were issues that they could not

01:28:44   24  answer, but --

01:28:48   25      THE COURT:  Because they also did -- it wasn't just

01:28:52   1   the 30(b)(6), but also there were letters prior to the

01:28:54   2   30(b)(6).

01:28:56   3         So if you have a follow-up, if you've got any like

01:29:00   4   cleanup questions, do you think you can just send those in a

01:29:04   5   letter and ask what the answers are and be satisfied and move

01:29:08   6   on is what I am saying?

01:29:10   7         MR. MOGIN: We think so, yes, Judge.

01:29:12   8         MR. VAN TINE: Yes.

01:29:12   9         THE COURT: Good. All right. On the issue of the

01:29:16   10   litigation hold, this was not in a formal discovery request,

01:29:22   11   but we are, as I am saying, circling ways to get or ways to

01:29:32   12   talk about more custodians. I understood from the plaintiffs

01:29:36   13   that they wanted to know who the litigation hold was issued to

01:29:44   14   and today it seems you also want the content of the hold. I

01:29:46   15   think those are two separate issues.

01:29:50   16         And will you just put on the record what your client

01:29:54   17   did litigation hold-wise.

01:29:56   18         MS. MILLER: Sure. As set forth in our January 10th

01:29:58   19   letter and as testified during our 30(b)(6), shortly after the

01:30:04   20   litigation was filed, the litigation hold was sent to every

01:30:06   21   single Temple-Inland employee with an email address.

01:30:12   22         THE COURT: How many people is that?

01:30:12   23         MS. MILLER: Over 5,000.

01:30:14   24         THE COURT: Okay. And that hasn't been modified

01:30:22   25   since you begun?

01:30:24  1    MS. MILLER:  Not as of yet.  We are looking to see

01:30:28  2  whether or not there are whole swaths of people that we don't

01:30:32  3  have to look at; but, no, it has not been modified as of yet.

01:30:36  4    THE COURT:  And the litigation hold was just

01:30:36  5  approximately the filing of the complaint?

01:30:40  6    MS. MILLER:  It was within a matter of a week or so

01:30:42  7  after the complaint, I believe, a couple weeks.  I don't

01:30:48  8  remember the exact date.

01:30:48  9    THE COURT:  So this thing, regardless of whether or

01:30:52  10  not it was accurate, because it's not a matter of accuracy, so

01:30:58  11  the litigation hold, so this was suspended during the

01:31:02  12  litigation hold?

01:31:04  13    MS. MILLER:  Yes, ma'am.  And it was laid out in our

01:31:04  14  January 10th letter.  We suspended the automatic deletion

01:31:10  15  feature.

01:31:10  16    THE COURT:  January 10th, 2012?

01:31:12  17    MS. MILLER:  The January 10th letter, yes.  It's

01:31:16  18  Exhibit 8.

01:31:22  19    Yes, ma'am, Exhibit 8 lays out what we did in terms

01:31:26  20  of the litigation hold, who it was instituted to and who we

01:31:30  21  sent it out to.

01:31:32  22    THE COURT:  Does that satisfy you with Temple-Inland,

01:31:36  23  or do you still have on the table you want the content of --

01:31:40  24    MR. VAN TINE:  Well, they did not allow the 30(b)(6)

01:31:44  25  witness to testify about the content or really what he did in

01:31:50    1    response, what he personally did.  He was not a lawyer.  You

01:31:58    2    know, when I asked him -- and I am referring to Shawn Dunn --

01:32:04    3    when I asked him what sort of documents did you not delete as

01:32:10    4    a result of this, he was instructed not to answer the

01:32:12    5    question.

01:32:24    6         So the issue is really what it said and what it

01:32:30    7    stopped people from doing, what people actually did.  One of

01:32:38    8    the general -- I don't want to get off topic, but one of the

01:32:42    9    general issues here has been that Temple-Inland relies -- has

01:32:46    10    relied on collection methods or policing for the collection,

01:32:56    11    which may be not adequate or may not be as professional as it

01:33:06    12    might be.

01:33:08    13         THE COURT:  So we actually have identification which

01:33:10    14    could go to custodians, we have the language of the hold, and

01:33:18    15    then I guess preservation is also -- I mean, I guess there's

01:33:20    16    kind of like three components to it.  And are they all willing

01:33:26    17    to tell you who the litigation holds went to?

01:33:30    18         MR. MOGIN:  To the contrary, none of them are willing

01:33:32    19    to tell us who got the hold.

01:33:36    20         MR. FREED:  Well, you just told us.

01:33:40    21         MS. MILLER:  We told you back in January.

01:33:40    22         THE COURT:  They did.  They just said 5,000 people.

01:33:44    23         MS. MILLER:  Okay.  Just to be clear, and I just

01:33:48    24    looked at the deposition, it is true that we instructed

01:33:50    25    Mr. Dunn not to answer with respect to what the litigation

| | | |
|---|---|---|
| 01:33:52 | 1 | hold said, but Mr. Van Tine did inquire what he did with |
| 01:34:00 | 2 | respect to his documents, and he did testify. |
| 01:34:02 | 3 | THE COURT: That's enough on this. |
| 01:34:04 | 4 | MR. VAN TINE: Okay. |
| 01:34:04 | 5 | THE COURT: This is -- in my quest, Mr. Mogin has a |
| 01:34:10 | 6 | quest for custodians, I have a quest too, of maybe getting |
| 01:34:18 | 7 | more custodians at some time down the road. And to me when |
| 01:34:20 | 8 | you folks said, Tell us who you sent the litigation hold to, |
| 01:34:24 | 9 | that seemed to be a logical way to do it. |
| 01:34:28 | 10 | MR. MAROVITZ: Judge, can I make one observation on |
| 01:34:30 | 11 | custodians? |
| 01:34:30 | 12 | THE COURT: Yes. |
| 01:34:32 | 13 | MR. MAROVITZ: We had an original list of people who |
| 01:34:34 | 14 | we had thought would be the custodians in our original initial |
| 01:34:38 | 15 | Rule 26 disclosures. And then we actually had a meet and |
| 01:34:42 | 16 | confer with the plaintiffs, and we expanded the list to |
| 01:34:46 | 17 | include the list that we are talking about now. So we started |
| 01:34:50 | 18 | more narrow, then we had a discussion, and we expanded it. |
| 01:34:54 | 19 | Since that time, we have mentioned to the plaintiffs, |
| 01:34:58 | 20 | and I think probably all defendants have said this, that if |
| 01:35:00 | 21 | there are other custodians who they believe should be added |
| 01:35:06 | 22 | and we agree should be added, just as we added the earlier |
| 01:35:10 | 23 | ones, that we would do so. |
| 01:35:12 | 24 | There may be disputes. I am not suggesting -- |
| 01:35:16 | 25 | MR. FREED: There are disputes. |

01:35:16    1    MR. MAROVITZ:  There may be disputes, but I want to

01:35:20    2    be clear that it is not our intention simply to add custodians

01:35:26    3    for the sake of adding custodians; that is, if there are

01:35:30    4    people who are, in our view, proper custodians, then we surely

01:35:36    5    will be interested in adding them.

01:35:36    6    THE COURT:  Good.  That's what I was hoping you were

01:35:42    7    going to say.

01:35:44    8    Let's talk about discovery.  Let's talk about

01:35:48    9    something safe here.  This is very safe.  All right.  Let's

01:35:54    10   talk about the overall discovery in this case with Judge

01:35:58    11   Shadur.

01:35:58    12   Have you talked about, if the class is going to be

01:36:04    13   bifurcated, are you doing class discovery first, are you

01:36:12    14   doing -- you know, I don't have any idea how he approaches

01:36:18    15   class cases and specifically antitrust cases.

01:36:26    16   MR. MOGIN:  Well, first off, your Honor, in our view,

01:36:34    17   bifurcation of discovery is simply -- it's very inefficient

01:36:42    18   for all the parties, and it raises the prospect of disputes

01:36:46    19   about what is proper for class and what's proper for post

01:36:50    20   class.  And as the law on class certification has evolved and

01:36:56    21   more and more of the merits get considered on class

01:37:00    22   certification, the idea of bifurcating has gotten even more

01:37:04    23   distasteful, if you will.  It's just not practical.  Judge

01:37:10    24   Shadur hasn't said anything about bifurcating.

01:37:14    25   With all that said, we'd obviously like to get class

01:37:18    1   sooner rather than later.  There's really nothing to

01:37:24    2   bifurcate.

01:37:26    3          THE COURT:  Right.

01:37:26    4          MR. MOGIN:  You know, we have to talk about

01:37:28    5   liability, we have to talk about damages, we have to talk

01:37:32    6   about common impact.

01:37:36    7          MR. VAN TINE:  The hydrogen peroxide case that

01:37:40    8   everyone talks about was actually cited to and followed the

01:37:46    9   seventh circuit's case in Szabo, S-z-a-b-o, v. Bridgeport

01:37:58   10   Machinery, which itself stated that long before hydrogen

01:38:06   11   peroxide came out of the third circuit, that it was necessary

01:38:10   12   to look at the merits to the extent that they were relevant to

01:38:16   13   the class certification decision when deciding whether or not

01:38:20   14   to certify a class.

01:38:24   15          THE COURT:  How many -- what do you think is the

01:38:26   16   projected class size here?

01:38:30   17          MR. MOGIN:  In terms of the number of members?

01:38:32   18          THE COURT:  Yes.

01:38:32   19          MR. MOGIN:  I don't know.  I can tell you the amount

01:38:36   20   of commerce, perhaps, but not the amount of members in the

01:38:38   21   class.

01:38:38   22          THE COURT:  Do you do an actual -- they are not going

01:38:42   23   to be individuals?  It's going to be companies?

01:38:44   24          MR. MOGIN:  By and large, yes.

01:38:46   25          MR. FREED:  Yes.

| | | |
|---|---|---|
| 01:38:46 | 1 | THE COURT:  But you don't know if it's five or a |
| 01:38:48 | 2 | hundred? |
| 01:38:52 | 3 | MR. WOZNIAK:  It's well in excess of a hundred.  I |
| 01:38:54 | 4 | don't know if we are talking about how many thousands or |
| 01:38:58 | 5 | hundreds. |
| 01:38:58 | 6 | MR. MOGIN:  I believe in the liner board case, which |
| 01:39:00 | 7 | was a similar case about 10 years ago, that the number of |
| 01:39:04 | 8 | class members exceeded 10,000. |
| 01:39:18 | 9 | THE COURT:  One of the reasons I asked that is that |
| 01:39:22 | 10 | when I threw out the other day how would people feel about |
| 01:39:30 | 11 | some discovery being phase one and phase two, and I was |
| 01:39:34 | 12 | talking about e-discovery, but here it's mostly e-discovery. |
| 01:39:38 | 13 | I think it's fair to say we're mostly talking e-discovery. |
| 01:39:42 | 14 | So I don't know -- I guess to answer the question, if |
| 01:39:46 | 15 | Judge Shadur were sitting around this table right now and he'd |
| 01:39:50 | 16 | say, Dan, do you want to bifurcate for the class, it sounds |
| 01:39:54 | 17 | like you don't want to -- |
| 01:39:54 | 18 | MR. MOGIN:  I do not. |
| 01:39:54 | 19 | THE COURT:  -- so the defendants usually don't want |
| 01:39:58 | 20 | to bifurcate, do you? |
| 01:40:00 | 21 | MR. MAROVITZ:  You know, this is the first time we |
| 01:40:02 | 22 | have heard this.  I don't really have a view at this point. |
| 01:40:08 | 23 | THE COURT:  I think the way the e-discovery is going, |
| 01:40:10 | 24 | you know, I was trying to figure out within phase one and |
| 01:40:26 | 25 | phase two, this is my next question, if we are going to be -- |

01:40:34　　1　which I want to talk about, when do you think your production

01:40:38　　2　of what you have agreed to right now, just approximately, when

01:40:48　　3　they could receive it?  And then the question to them is when

01:40:52　　4　they receive it, approximately how long before they can review

01:40:58　　5　it?

01:40:58　　6　　　　　　　　MS. MILLER:  And we talked about this at the

01:41:00　　7　April 19th meet and confer between the parties.  And at that

01:41:06　　8　time, we had largely divided our production to tranches,

01:41:12　　9　groupings of types of documents that would be produced.

01:41:12　　10　　　　　　　THE COURT:  Tell me what they were, if you will.

01:41:14　　11　　　　　　　MS. MILLER:  Sure.  The first grouping was the named

01:41:18　　12　custodian's email and their -- what we call their loose

01:41:22　　13　e-files.  And by those, I mean word documents, PDFs, Excel

01:41:30　　14　spreadsheets, and other things that are stored on their

01:41:32　　15　personal computers, their desktops and their laptops, and on

01:41:36　　16　their personal network drives.

01:41:38　　17　　　　　　　So that was the production we just made, the 1.3 --

01:41:42　　18　no, the big production, the huge production we made on

01:41:46　　19　May 9th.  That was that grouping.

01:41:48　　20　　　　　　　The second grouping is hard copy documents.

01:41:50　　21　　　　　　　THE COURT:  Hard copy?

01:41:52　　22　　　　　　　MS. MILLER:  Hard copy.  So those have to be scanned

01:41:54　　23　and reviewed.  So that was -- we are in the process of doing

01:41:58　　24　that now.  As I sit here, I don't have an estimate yet.  I'd

01:42:02　　25　have to check with my review team as to when we think that

01:42:06    1    grouping would be available for production, but we are

01:42:08    2    shooting for that being the next big chunk.

01:42:12    3             THE COURT:  Okay.

01:42:12    4             MS. MILLER:  The third was the -- third grouping was

01:42:16    5    the documents responsive to what we're calling the

01:42:18    6    sufficient-to-show requests.  As you read through the document

01:42:22    7    requests, there were a number of document requests that say,

01:42:24    8    Give us documents sufficient to show this information, give us

01:42:28    9    documents sufficient to show that information.  So those are

01:42:32   10    what we are considering non-custodian specific, necessarily,

01:42:34   11    so we are going and finding documents from wherever they

01:42:38   12    reside in the company sufficient to show the information

01:42:40   13    requested.

01:42:42   14             THE COURT:  Is that going to be correlated to the

01:42:44   15    number?  I mean, is that one going to be correlated --

01:42:48   16             MS. MILLER:  That one will be more easily correlated

01:42:52   17    -- for example, I think it's request No. 4, as I'm sitting

01:42:56   18    here is the one I'm thinking about, request No. 4 asks for...

01:42:56   19             THE COURT:  Let me run get something.  I'll be right

01:42:56   20    back up.

01:42:56   21       (Brief pause.)

01:43:46   22             MS. MILLER:  This is not a sufficient to show.  This

01:43:46   23    is a grouping that's going to be produced.  For example, we

01:43:46   24    are going to produce our expense reports all together.  That's

01:43:50   25    where I was going with it.

01:43:52    1           THE COURT:  Okay.

01:43:56    2           MS. MILLER:  I can pick a different one if you'd

01:43:58    3   like.

01:43:58    4           THE COURT:  Okay.

01:44:02    5           MS. MILLER:  To be clear, request No. 4 is not a

01:44:04    6   sufficient-to-show request, but it's what I'm putting in one

01:44:08    7   of these type of category requests.  So request No. 4 asks for

01:44:12    8   people's calendars and their expense reports and their

01:44:14    9   telephone number logs, and their contact folders, and that

01:44:18   10   kind of stuff.  And so we are -- for our named custodians, we

01:44:22   11   are pulling the expense reports for all the named custodians.

01:44:26   12   Those will be produced together as a group.  The calendars for

01:44:30   13   the named custodians will be produced together as a group.

01:44:34   14           And things that would not be -- this is not something

01:44:36   15   -- an expense report we would not search for using search

01:44:40   16   terms.  We would pull the expense reports of the named

01:44:42   17   custodians.  So that's something we will be producing as part

01:44:44   18   of that third grouping, so to speak.

01:44:46   19           In addition to documents, there are a number of --

01:44:50   20   No. 8 is documents sufficient to identify current or former

01:44:56   21   officers, directors -- that's not a good one.

01:45:00   22           There are a number of them throughout the request

01:45:02   23   that say sufficient to show.

01:45:04   24           THE COURT:  Okay.

01:45:04   25           MS. MILLER:  It's usually dated information.  So we

01:45:08  1  are collecting that information and producing that together as

01:45:10  2  a grouping.

01:45:12  3       And then the fourth grouping is the company has what

01:45:14  4  we call SharePoint, which is a specific program, and shared

01:45:18  5  drives, which is exactly what it sounds like, drives that are

01:45:22  6  shared by more than one person.  And so we are in the process

01:45:24  7  of going -- figuring out the best way to go through those

01:45:30  8  shared drives and those SharePoint sites to collect

01:45:34  9  potentially responsive documents because there are some

01:45:36  10  technological hurdles associated with that, we are still in

01:45:40  11  the process, which is why we put it as No. 4.

01:45:42  12       When we were in our April 19th meet and confer, we

01:45:44  13  estimated at that point it would take between four and six

01:45:48  14  months to get everything complete and out the door.  We are

01:45:50  15  trying to accelerate that to beat that estimate, but we didn't

01:45:52  16  want to promise something that would be next month and we

01:45:56  17  couldn't meet it.

01:45:58  18       THE COURT:  So if, let's say, it did take September,

01:46:02  19  let's just say for the sake of discussion here September, does

01:46:08  20  that include privilege?

01:46:10  21       MS. MILLER:  Does that -- the privilege log, you

01:46:12  22  mean?

01:46:14  23       THE COURT:  Yes.

01:46:14  24       MS. MILLER:  The privilege log would follow shortly

01:46:16  25  after --

01:46:16    1             THE COURT:  Each one of the phases?

01:46:18    2             MS. MILLER:  No, a privilege log is coming at the end

01:46:22    3   to cover the entire production.

01:46:22    4             THE COURT:  Okay.  Are each of them -- plaintiffs,

01:46:30    5   are each of the defendants doing production kind of the same

01:46:34    6   way, in phases like this -- not phases -- yeah, phases?

01:46:42    7             MR. WOZNIAK:  I haven't been involved in all of those

01:46:46    8   discussions, but I think the answer is no.  I mean, for

01:46:48    9   instance, PCA has represented that they are largely finished

01:46:50   10   with their production, with their most recent ESI production

01:46:54   11   we received just a week or so ago.  There's a little bit of

01:47:00   12   staggering with each defendant, but I don't know --

01:47:04   13             MR. MAROVITZ:  I think it's different.  It varies.  I

01:47:08   14   think it's defendant by defendant.

01:47:08   15             MR. WOZNIAK:  And Dan can correct me if I'm wrong.  I

01:47:12   16   don't think anyone has estimated -- that's not to say it's

01:47:14   17   necessarily outrageous or unheard of, but I think that the

01:47:18   18   four- to six-month estimate is the longest one we received

01:47:22   19   from any one defendant.

01:47:24   20             MR. MAROVITZ:  And that's why we're trying to produce

01:47:24   21   it in stages.  We are not producing everything at the end.  We

01:47:28   22   are getting it to them in stages.

01:47:30   23             THE COURT:  So which of you has PCA?

01:47:34   24             MR. WOZNIAK:  No one here today has PCA.

01:47:40   25             THE COURT:  So if you have all of PCA, then tell us

01:47:44  1  about your review, kind of what goes into that.  I have never

01:47:50  2  done it.

01:47:50  3  MR. WOZNIAK:  Of course, it's going to depend on the

01:47:52  4  overall volume.

01:47:54  5  THE COURT:  Right.

01:47:54  6  MR. WOZNIAK:  For PCA, the volume is probably --

01:47:58  7  MR. MOGIN:  About a hundred thousand documents.

01:48:00  8  MR. WOZNIAK:  Yeah, it's about a hundred thousand

01:48:02  9  documents.

01:48:04  10  THE COURT:  Including email?  That's everything?

01:48:06  11  MR. WOZNIAK:  Yes.  We are trying not to review every

01:48:08  12  single document that gets produced to us, at least not right

01:48:10  13  away.  We have ways of focusing in --

01:48:12  14  THE COURT:  Good.

01:48:14  15  MR. WOZNIAK:  -- and trying to prioritize the

01:48:16  16  documents that get reviewed initially.  So that process is

01:48:18  17  underway.

01:48:18  18  I know that at least with the April, the mid-April

01:48:24  19  PCA production that was made to us, those documents are being

01:48:26  20  reviewed, they are undergoing the first pass human review, the

01:48:32  21  ones that have been prioritized.  The more recent production

01:48:34  22  has been loaded into our review platform, has not yet been

01:48:38  23  prioritized and batched out; but I would estimate if we were

01:48:42  24  looking at the entire production, the fact that we received

01:48:46  25  PCA a week or so ago, I think we could be largely finished

| | |
|---|---|
| 01:48:50 | 1 |
| 01:48:56 | 2 |
| 01:48:58 | 3 |
| 01:49:04 | 4 |
| 01:49:06 | 5 |
| 01:49:10 | 6 |
| 01:49:14 | 7 |
| 01:49:14 | 8 |
| 01:49:16 | 9 |
| 01:49:18 | 10 |
| 01:49:26 | 11 |
| 01:49:28 | 12 |
| 01:49:32 | 13 |
| 01:49:38 | 14 |
| 01:49:42 | 15 |
| 01:49:46 | 16 |
| 01:49:52 | 17 |
| 01:49:56 | 18 |
| 01:50:04 | 19 |
| 01:50:10 | 20 |
| 01:50:14 | 21 |
| 01:50:16 | 22 |
| 01:50:22 | 23 |
| 01:50:26 | 24 |
| 01:50:30 | 25 |

reviewing those documents by -- you know, I have to factor in vacation schedules and the summer, but I would be surprised if we are still reviewing PCA documents at the end of July.

THE COURT:  So three months, maybe.

MR. WOZNIAK:  There may be some residual.

MR. FREED:  That may be ambitious.

MR. WOZNIAK:  That's ambitious, but, again, that's a hundred thousand documents from one defendant.

THE COURT:  Then here's what -- the reason I'm asking that is then I am expecting, on the issue of custodians, okay -- well, two issues come at the end.  I would think you're going to have to come up -- we're going to have to have our statistically valid verification ready to go by that, whatever we're doing, and if you're going to ask for more custodians based upon the review that you've done.  And I haven't heard any of the defendants say they would refuse.  I mean, everyone said, Sure, we will listen.  Now, we'll see what that listen means, but at least then it would be based on specific to us. So that could be maybe July.

MR. WOZNIAK:  Yeah, I would say end of July for PCA.

MR. MOGIN:  So that you get perhaps a fuller picture, your Honor, there are several aspects to the PCA review.  And PCA is an interesting example to focus in on because of their relative size, so we can get to them pretty quickly relative to the other defendants.  There is not a lot of documents.

01:50:34   1      But here are some of the processes that we have to go

01:50:36   2   through.  So it's not a question of just what we call linear

01:50:40   3   or human review document by document.  That's one aspect of

01:50:44   4   it.  Another aspect of it is the content-based analytics that

01:50:50   5   we are going to subject it to, which is done by another group.

01:50:56   6   The economic and financial documents get culled out to go to a

01:51:00   7   specialized review group as well because what's the point of

01:51:04   8   having attorneys review spreadsheets that can't even add, by

01:51:08   9   and large.

01:51:08   10      THE COURT:  Right.

01:51:10   11      MR. MOGIN:  And then there are various levels of

01:51:14   12   quality control that have to take place as well.

01:51:18   13      THE COURT:  All right.

01:51:20   14      MR. MOGIN:  And we have now the tool of the word

01:51:22   15   indexes and --

01:51:24   16      THE COURT:  Is that going to help?

01:51:26   17      MR. MOGIN:  With PCA, yes, because PCA is

01:51:30   18   particularly -- it's relatively easy to get a handle on.  It's

01:51:34   19   one of the smaller word indexes that goes with one of the

01:51:36   20   smaller document productions.  So they have roughly 350,000

01:51:42   21   words.  Well, the word indexes are really helpful.  So, for

01:51:46   22   example, during the break, I asked somebody to take a quick

01:51:50   23   look, because we were talking about committee before, and

01:51:54   24   could you look at Temple-Inland's word indexes and see how

01:51:56   25   many times "committee" was mentioned.  And we've got a couple

01:51:58 1    of screen shots, it's the best we could do in a limited time,

01:52:02 2    but there are hundreds of references to committees in these

01:52:06 3    documents, if not thousands.  I'm trying to interpret the

01:52:10 4    document myself.

01:52:14 5         But there's audit committee, there's subcommittee,

01:52:18 6    there's standard committee, there's legislative committee,

01:52:20 7    there's this committee, there's that committee.  And so that's

01:52:24 8    one of the things that we can do with these word indexes.

01:52:30 9         But the word index is a relatively new tool, and we

01:52:34 10   just don't know quite how long it will take to cut through

01:52:36 11   PCA.  We are trying some experiments --

01:52:38 12        THE COURT:  Good.

01:52:38 13        MR. MOGIN:  -- as we speak.

01:52:46 14        THE COURT:  That could be our little guinea pig.

01:52:52 15        MR. WOZNIAK:  I may have misunderstood your question.

01:52:54 16   I thought you were asking in the context of when would we be

01:52:58 17   ready to suggest more custodians.  And in that sense, I do

01:53:04 18   think that we would be largely through, assuming that PCA has

01:53:06 19   in fact completed their production, I think that we would --

01:53:06 20   setting aside the economic-type documents that Mr. Mogin

01:53:08 21   mentioned and the content-based analytics that we intend to

01:53:12 22   apply, I think we would be in a position to identify

01:53:16 23   additional custodians by the end of July.

01:53:18 24        MR. MOGIN:  But understand that it's a subset because

01:53:20 25   those would only be people that were referenced in the

01:53:24  1  documents.  So if somebody was excluded, say PCA's former

01:53:30  2  chairman, we won't have their documents.

01:53:34  3          THE COURT:  Right.

01:53:36  4          MR. MOGIN:  So we still do have to go through some

01:53:38  5  level of the custodian and litigation hold exercise with PCA,

01:53:44  6  although they are a relatively good lab rat for us.

01:53:58  7          THE COURT:  When you are doing these economic folks

01:54:00  8  that are looking at that, that basically goes to damages?  I

01:54:04  9  mean, are you dividing it between liability and damages?

01:54:06  10          MR. MOGIN:  No, your Honor.  It's an antitrust case.

01:54:08  11          THE COURT:  They are all combined.

01:54:10  12          MR. MOGIN:  Yes, the economics and the damages are --

01:54:14  13          THE COURT:  Okay.

01:54:14  14          MR. FREED:  But there's also fact damage or impact or

01:54:18  15  injury.  Different words are used.

01:54:24  16          MR. VAN TINE:  The sort of analysis that an expert

01:54:28  17  might choose to do in an antitrust case for liability per fact

01:54:38  18  of injury and for computation amount of damages is often done

01:54:48  19  with the same information, the same data.

01:54:52  20          THE COURT:  Well, that's good.  That's practical.

01:54:56  21          MR. VAN TINE:  So they are very -- they can be

01:54:58  22  closely related depending on what the methodology of the

01:55:02  23  expert is.

01:55:04  24          MR. MOGIN:  For shorthand, think of fact of injury or

01:55:10  25  antitrust injury; think of it in terms of causation.

01:55:14   1      THE COURT:  Got it.

01:55:24   2          So you are not going to start depositions until we

01:55:28   3   have all of -- is that your present intent is not to start

01:55:32   4   depositions until we basically have these documents in hand,

01:55:38   5   at least phase one documents in hand?

01:55:40   6      MR. MOGIN:  Well, not to any significant degree, but

01:55:42   7   I would like to talk with you a little bit about the phasing

01:55:46   8   notion.  One of the issues, of course, is overall efficiency

01:55:54   9   because people have their review teams in place.

01:55:58  10      THE COURT:  Right.

01:55:58  11      MR. MOGIN:  But what I am particularly concerned

01:56:00  12   about, your Honor, is your Honor.  You're going to leave.

01:56:08  13      THE COURT:  I know.

01:56:08  14      MR. MOGIN:  And then some other magistrate is going

01:56:10  15   to take over, and they will see what you have done, but they

01:56:16  16   won't -- it will now be their interpretation.  And typically

01:56:22  17   when this happens, we start going down a completely different

01:56:26  18   path.  Nobody ever intends it that way, but that is what

01:56:32  19   happens.  And as we go down that path, the original intent

01:56:38  20   gets lost and a lot of the efficiencies get lost.

01:56:42  21          So while iterative is one thing, formalized phasing

01:56:46  22   is a different issue altogether.

01:56:48  23      MR. MAROVITZ:  And we -- I can say without

01:56:52  24   hesitation, that we at Temple-Inland, and I believe this to be

01:56:56  25   true for the other defendants as well, would like to have as

01:56:58  1  many of these issues resolved by the time that you decide to

01:57:04  2  step down.  We know how much time and effort you have put into

01:57:08  3  it.

01:57:08  4          THE COURT:  I am running out the door.

01:57:14  5          MR. WOZNIAK:  We need one more ruling.  Don't go.

01:57:18  6          MR. MOGIN:  Will you be leaving contact information?

01:57:20  7          MR. MAROVITZ:  I think it's very important to us,

01:57:22  8  given the amount of time that you and your court have spent

01:57:28  9  and the parties have spent with you.  We have had a lot of

01:57:32  10  thought about that.

01:57:38  11          Judge, just one thing.  As much as Britt and I enjoy

01:57:42  12  answering questions about our production, we do have requests

01:57:46  13  to the plaintiffs as well.

01:57:46  14          THE COURT:  Good.  Can I say something --

01:57:48  15          MR. MAROVITZ:  Sure.

01:57:50  16          THE COURT:  -- on this?  I hadn't brought this up,

01:57:52  17  and this is a little easier to talk when it's just a smaller

01:57:58  18  group.

01:58:02  19          So one possibility could be a special master if you

01:58:06  20  wanted consistency.  I don't know -- we hardly in this

01:58:12  21  district use special masters at all.  But if we were going to

01:58:16  22  continue to have e-discovery throughout, one of the things I

01:58:22  23  had thought of kind of seamlessly to be able to try to keep it

01:58:28  24  as seamless as possible would be, since Judge Shadur has

01:58:32  25  basically told you that he don't know too much about

01:58:34  1   e-discovery, okay, and I love that.  I think when you're as
01:58:40  2   secure as he is, you can admit what he doesn't know.  I think
01:58:44  3   we're going to have two great magistrate judges coming on
01:58:50  4   board.  We will know who they are June 28th, so you don't have
01:58:54  5   to do -- I think they're going to be two really good civil
01:58:56  6   practitioners myself who are going to be up to date on
01:59:02  7   e-discovery, so I don't think it's going to be an issue,
01:59:04  8   regardless of who took over whose caseload.
01:59:08  9        So you would have hopefully -- and I mean this, I
01:59:14  10  think you are going to have two people that are going to be
01:59:16  11  perfect.  You could consider -- and you could consider as a
01:59:20  12  group hiring a special master and just having them take you
01:59:26  13  all the way through the case.
01:59:28  14       Have you ever worked with a special master?
01:59:30  15            MR. MOGIN:  Not happily.
01:59:34  16            THE COURT:  Not happily.  You know, I have heard
01:59:34  17  that.  I have heard that.  But I think of it more like a
01:59:36  18  special master who is going to do mediation, as much as
01:59:42  19  reports to Shadur but who is going to try to keep it going.
01:59:50  20            MR. MOGIN:  My experience may be unique, it may be
01:59:52  21  more common.  I have just not had great experiences with
01:59:54  22  special masters.
01:59:56  23            THE COURT:  I am glad you're saying that.  Our goal
01:59:58  24  is to literally -- part of why I am asking about this, Chris
02:00:04  25  hopefully will have -- Chris also hopefully will be one of the

02:00:08   1   law clerks to one of the two magistrate judges, and maybe

02:00:12   2   Margaret to the other one, so we are going to have a lot of

02:00:16   3   consistency.

02:00:20   4          MR. MOGIN:  So it's not like in some civilizations

02:00:24   5   where somebody passes on to something new and then the old

02:00:26   6   person gets executed or something.

02:00:28   7          THE COURT:  These guys love being clerks, and they

02:00:32   8   are just the most fabulous clerks in the world.  They are two

02:00:36   9   folks who have made a career of it, and I could not have done

02:00:40   10  this without their having my back, as I say.

02:00:46   11         MR. MOGIN:  Well, that breeds a lot more confidence

02:00:48   12  in the idea of continuity here.

02:00:50   13         THE COURT:  It does.  It does.  So both Margaret and

02:00:54   14  Chris, and there will probably be one with each one.  And

02:00:58   15  you're going to know -- this is the most civilized system in

02:01:02   16  the world.  They walk in at 4:00 o'clock in the afternoon and

02:01:06   17  the judges vote that day, so you know who they are.  It's not

02:01:08   18  like any of the Article III stuff, and you will know who the

02:01:14   19  folks are.

02:01:16   20         But this helps me -- now on phase one, Mr. Mogin, the

02:01:22   21  only thing I have been -- I think I would have a hard time

02:01:26   22  doing privilege, objections to privilege, because that takes

02:01:34   23  months and months and months, and somebody else could do that

02:01:38   24  without knowing the whole history here, I think.

02:01:40   25         I wanted to get you to agree with me on backup tapes.

02:01:46   1    If we have a flow going of active data, I thought -- and you

02:01:54   2    don't have to agree with me today, but we are talking about

02:01:56   3    when I was saying phase two, what I wanted to clarify today on

02:02:02   4    Temple-Inland is do you understand of what they're producing,

02:02:08   5    if they're active and inactive or backup tapes, do you

02:02:14   6    understand their system enough or do you need any more

02:02:18   7    information from them just informationally?  Do you know

02:02:24   8    what's active and what's on backup tapes?  I was reading one

02:02:30   9    the other day that has a great index to it.  I don't know what

02:02:32   10   your system is like.

02:02:38   11        Do you have a preservation hold on your backup tapes

02:02:42   12   so that if somebody else is getting to it in a while, at least

02:02:46   13   is it being preserved, or is that too much to answer?

02:02:50   14        MS. MILLER:  Yes.  The answer is yes.  The backup

02:02:54   15   tapes that were in place when the legal hold went into place

02:02:58   16   are being preserved.  They are not being overwritten.  And we

02:03:02   17   lay out in the January 10th letter how far back for various

02:03:06   18   systems we have backup tapes, and that's also a big topic in

02:03:08   19   the 30(b)(6).

02:03:10   20        THE COURT:  Good.  That's kind of what I assumed.

02:03:16   21        So, Mr. Temple-Inland, do you have any questions

02:03:18   22   about the backup tapes that you need more information on?

02:03:24   23        MR. VAN TINE:  Well, there are questions that did

02:03:28   24   come up in the deposition, and there are questions that have

02:03:32   25   come up since then.  Right now, Temple-Inland is taking the

02:03:36    1    position that it will not do anything to search or produce

02:03:42    2    documents from backup tapes.  Certain information, certain

02:03:52    3    kinds of data, may only be on backup tapes, and some of that

02:04:08    4    information may also be on backup tapes or systems that

02:04:12    5    Temple-Inland claims it cannot retrieve the information

02:04:18    6    because they do not currently use the system.

02:04:24    7            There was -- there were some backup tapes identified

02:04:30    8    in the 30(b)(6) deposition at the mills that actually were not

02:04:36    9    being preserved, and that may be gone.  The information on

02:04:40   10    those may have been overwritten since the litigation hold was

02:04:48   11    in place.

02:04:50   12            In addition, there were 766 backup tapes found in the

02:04:58   13    cubicle of a fired employee, and Temple-Inland, other than

02:05:10   14    some general categorization based on paper labels on

02:05:16   15    approximately 150 or somewhere between 150 and 200 of the 766

02:05:22   16    tapes, apart from some general handwritten two-word notes,

02:05:30   17    there's no index of that.  I believe that Temple-Inland has

02:05:32   18    taken the position that generally with respect to its normally

02:05:36   19    kept backup tapes, that those -- that there isn't an index to

02:05:44   20    exactly what is on any of those and that they cannot be

02:05:48   21    searched either.

02:05:48   22            Now, we understand from our ESI consultant that, in

02:05:54   23    fact, a service exists that for $50 a tape can at least tell

02:06:02   24    you generally what may be on the tape, but --

02:06:08   25            THE COURT:  Is that a camera?

02:06:10   1         MR. VAN TINE:  No, no.  It would read the tape.

02:06:12   2         THE COURT:  Oh, it would read the tape.

02:06:12   3         MR. VAN TINE:  It would read the tape to some extent.

02:06:18   4      So there are issues here, and in part, this is what

02:06:26   5  -- this is part of the reason why this aggressive email

02:06:32   6  destruction policy is relevant to us because as we look back

02:06:36   7  in time for Temple-Inland, the amount of email that exists

02:06:44   8  goes down considerably.  And although the emails may be gone,

02:06:52   9  there are backup tapes of what Ms. Miller refers to as loose

02:06:58  10  ESI, the word documents and things.  There are backup tapes

02:07:02  11  for those that go back seven years.

02:07:10  12      In addition, I referred to there being some issues

02:07:12  13  with how some of the collection was done for Temple-Inland.

02:07:16  14  With respect to the individual -- with respect to people that

02:07:22  15  are not on their custodian list, 26 or 28 people, basically,

02:07:32  16  the litigation hold went out, and for the next six months,

02:07:38  17  they were collecting the information.  It wasn't all collected

02:07:42  18  at once.

02:07:44  19      Now, the email that was on the email server, they may

02:07:50  20  have collected that all at the beginning in one fell swoop;

02:07:54  21  but with respect to what was on people's computers, basically,

02:08:00  22  they've been told that there is a -- well, we don't know

02:08:04  23  exactly what they were told, but they have been told something

02:08:06  24  about a lawsuit, something about what it might be about, and

02:08:08  25  we are going to come and get your data.  And it may take six

02:08:12  1   months.  You know, someone's computer may die, someone may

02:08:18  2   delete documents.

02:08:20  3        So we do have some issues where we would want to get

02:08:28  4   information off of backup tapes and think that it would be

02:08:32  5   appropriate in this suit.

02:08:34  6        THE COURT:  Okay.

02:08:36  7        MR. MOGIN:  Would it be possible to find out the name

02:08:38  8   of the employee who had contact information, the one who

02:08:44  9   squirreled away all those backup tapes?

02:08:46  10        MS. MILLER:  Just to give some background, the 766

02:08:50  11   backup tapes belonged to -- were in the cubicle of a person

02:08:52  12   who used to work on the systems that created those tapes.  We

02:08:56  13   don't use that system anymore, and so that person's job was

02:08:58  14   eliminated because we don't use the system that he was

02:09:02  15   responsible for working with.

02:09:02  16        So fired employee is a little bit much.  His job was

02:09:08  17   phased out because what the company did no longer needed his

02:09:12  18   services.

02:09:12  19        So the 766 were in his cubicle because those were the

02:09:20  20   systems that he worked with, so it wasn't some random person

02:09:24  21   squirreling away backup tapes.  I don't know his name as I sit

02:09:26  22   here.  That's the 766.

02:09:28  23        I am happy to spend some time talking to some of the

02:09:30  24   points that Mr. Van Tine raised which I take issue with in

02:09:34  25   terms of how long it took us to collect things and whatnot.  I

02:09:38　1　mean, the reality is you can't -- the purpose of sending out a

02:09:40　2　legal hold is to get everybody to stop deleting things, but

02:09:44　3　you can't collect every piece of paper and every single

02:09:48　4　electronic thing on the instantaneous moment the complaint was

02:09:50　5　filed, so, yes, it took us some time to collect everything.

02:09:52　6　But we have a significant amount of active data that we have

02:09:56　7　collected and preserved, and as evidenced by the numbers which

02:10:00　8　we won't talk about of the materials that we have produced, it

02:10:04　9　demonstrates how much active systems that we are still

02:10:06　10　producing.  We still have several more groupings of documents

02:10:10　11　coming off of active systems that we have yet to produce.

02:10:14　12　　　　　　　THE COURT:  Here is a question that I have.

02:10:14　13　　　　　　　MS. MILLER:  Sure.

02:10:16　14　　　　　　　THE COURT:  Even after you did the first grouping,

02:10:18　15　the second grouping, the litigation hold continues on; you're

02:10:22　16　not removing that litigation hold after you complete one of

02:10:28　17　these segments?

02:10:28　18　　　　　　　MS. MILLER:  Well, we have agreed on -- the parties

02:10:32　19　have agreed -- we are still fighting on the front end on some

02:10:36　20　time period, but there is largely agreement on the back end.

02:10:38　21　So stuff that's like created today isn't preserved.

02:10:44　22　　　　　　　THE COURT:  Okay.  You're right.

02:10:46　23　　　　　　　Speaking of time periods, have you been meeting and

02:10:50　24　conferring on time periods?  And what is Temple-Inland's -- do

02:11:02　25　you have it divided between content?

02:11:04  1           MS. MILLER:  Conduct.

02:11:06  2           MR. MOGIN:  Conduct.

02:11:06  3           THE COURT:  Conduct and --

02:11:10  4           MS. MILLER:  Conduct and data.

02:11:10  5           THE COURT:  The plaintiffs want what for conduct?

02:11:14  6           MR. MOGIN:  With respect to conduct, with one small

02:11:16  7  exception, which I will come back to, we want from -- our

02:11:20  8  original request was from 2002 through the end of the class

02:11:24  9  period.

02:11:28  10           THE COURT:  Which is the filing of the complaint,

02:11:32  11  yes?

02:11:32  12           MR. MOGIN:  For practical purposes, yes.

02:11:34  13           THE COURT:  Okay.

02:11:34  14           MR. MOGIN:  I say "for practical purposes" because

02:11:38  15  that's not quite how the class period is defined.  It goes

02:11:42  16  through present time.

02:11:44  17           However, we had agreed that we would parrot back to

02:11:50  18  2003, and that's been our position consistently, but that was,

02:11:58  19  of course, subject to agreement on the data time period.  The

02:12:04  20  data time period, we originally wanted 10 years, so that would

02:12:08  21  go to '95, but I was able to pare it back to 2000.  So a

02:12:18  22  five-year before period and then a five-year conspiracy period

02:12:22  23  and then we wanted a short after period.  So, yes, we will

02:12:24  24  want after period data.

02:12:34  25           And the reason for that is our experts need to create

02:12:36  1   a but-for world.  There will certainly be a Daubert challenge.

02:12:42  2   If it's a five-year but-for world, we need a five-year before

02:12:46  3   period.  They prefer 10, but you know how experts are, so I

02:12:52  4   got them pared back to five.

02:12:56  5         MR. MAROVITZ:  Judge, as a reminder, we had offered

02:12:58  6   to agree on conduct to 2003 if the plaintiffs will take off

02:13:04  7   the table the off-line and off-line data and backup tapes.

02:13:10  8         THE COURT:  I see.

02:13:10  9         MR. MAROVITZ:  We made that offer a number of times,

02:13:14  10  and I don't think we have heard back one way or the other on

02:13:18  11  that.

02:13:24  12        On the data, our proposal I think was 2003, and that

02:13:30  13  would provide more than two years of pre-period data, which is

02:13:34  14  ample.  It is true, as Mr. Mogin said, that economists want as

02:13:42  15  much data as is humanly possible, but that doesn't make it

02:13:46  16  relevant or necessary in a case, and additional data brings

02:13:50  17  additional burdensome costs.  So that's where we are in

02:13:54  18  connection with those two points.

02:13:58  19        MR. MOGIN:  One thing that I had a couple of points

02:14:00  20  there, your Honor.  I think I have made it pretty clear that

02:14:04  21  I'm uninterested in being leveraged on those backup tapes.

02:14:08  22        THE COURT:  Right.

02:14:08  23        MR. MOGIN:  Secondly, with respect to the data, I had

02:14:14  24  offered some time ago that if the defendants were willing to

02:14:18  25  stipulate that they wouldn't raise objection to our expert's

02:14:22   1   calculation based upon a shorter time period, that we would

02:14:24   2   consider it.  And I received an unequivocal no, that they

02:14:30   3   weren't prepared to do that.

02:14:32   4        THE COURT:  You're not saying -- they could object on

02:14:36   5   any other level, but not object based solely on time?

02:14:40   6        MR. MOGIN:  Right.  They couldn't say that your

02:14:42   7   expert's model is no good because it's only two years.

02:14:46   8        MR. MAROVITZ:  And I am not criticizing Mr. Mogin for

02:14:48   9   this:  Mr. Mogin probably doesn't know his expert's model yet

02:14:54   10  because he doesn't have all the data.  Nobody knows that yet.

02:15:00   11  So there are a variety of ways that experts can construct

02:15:02   12  models in this cases.

02:15:02   13       So the fact is that a request for 10 years of

02:15:06   14  pre-period data, which the plaintiffs' economists, together

02:15:14   15  with Mr. Mogin, had made is unprecedented.  I am glad he drew

02:15:18   16  it back to five years, but that is still an enormous time

02:15:20   17  period for the pre-period in this case.

02:15:24   18       MR. MOGIN:  Respectfully, it's not unprecedented.  We

02:15:26   19  certainly have Northern District of Illinois cases that go

02:15:30   20  back further than that.  We may even have Judge Shadur cases

02:15:32   21  that go back further than that.

02:15:34   22       THE COURT:  Well, that's going to be something.  I

02:15:36   23  mean, I like this idea of throwing out, you know, sort of like

02:15:38   24  what you did, if you give up -- I mean, I think individual

02:15:42   25  deals isn't such a bad thing.  It could move the ball along,

02:15:48 1 and if you had wanted to give up the backup tapes or if they

02:15:52 2 wanted to give up the backup tapes, that wouldn't have been

02:16:00 3 bad.  I do in class, I have so many class cases, that I

02:16:02 4 definitely try to convince the defendants to stipulate to one

02:16:06 5 or two of the elements.

02:16:08 6 Are you using -- is this a 23 class?  It is.  I mean,

02:16:14 7 I have been doing this more and more lately.  I am trying to

02:16:16 8 get people to stipulate to one or two elements and then get

02:16:20 9 down to really what the issue is.  And I have really been

02:16:22 10 getting some takers lately because --

02:16:24 11 MR. MOGIN:  I am pretty sure they will stipulate on

02:16:28 12 numerosity.

02:16:28 13 THE COURT:  No, but that's even a big thing.  That

02:16:30 14 would even be a big thing that takes one thing off the table.

02:16:36 15 MR. FREED:  Our proposal to Mr. Marovitz, however,

02:16:38 16 would have to be accepted by all the defendants.  If he were

02:16:40 17 to say, That's fine, Temple-Inland will agree with that, we

02:16:42 18 still wouldn't be --

02:16:44 19 THE COURT:  I just wrote a note to myself, probably

02:16:46 20 needs some legal ruling on this time thing because you are

02:16:50 21 going to probably need one scope.

02:16:54 22 MR. FREED:  Right.

02:16:54 23 THE COURT:  I think everybody is going to have to

02:17:02 24 agree to the same time frame.

02:17:04 25 MR. MOGIN:  That's true, and the time period --

02:17:04    1        THE COURT:  So then maybe that's when we don't spend

02:17:06    2   a lot of time -- I mean, we just say, Okay, that goes --

02:17:08    3        MR. FREED:  We have been at issue on that, I would

02:17:10    4   say, for six or more meet and confers.

02:17:14    5        THE COURT:  This is the rule:  If it takes more than

02:17:18    6   six or more meet and confers, give it to the judge.

02:17:22    7        MR. FREED:  There hasn't been any acrimony.  It's

02:17:26    8   just --

02:17:26    9        THE COURT:  Right.  So the index, I wanted to know if

02:17:30   10   that index, are we calling it a word -- what are we calling it

02:17:32   11   now?  It's not a word dictionary.  A word index?  Is that what

02:17:36   12   we're calling it?

02:17:36   13        MS. MILLER:  That's what we called ours when we

02:17:40   14   produced it.

02:17:40   15        THE COURT:  So are you satisfied with their word

02:17:42   16   index?  Have you taken a look at that?

02:17:44   17        MR. MOGIN:  No, we are not satisfied, because they

02:17:50   18   have the ability to tell us words that were used in documents

02:17:54   19   that were not produced, and they haven't done that.  They have

02:18:02   20   culled that out.  They have the ability to tell us words that

02:18:04   21   were used -- words that were used in non-hits.  So, in other

02:18:06   22   words, a search term may or may not hit on a document.

02:18:16   23        THE COURT:  Okay.

02:18:16   24        MR. MOGIN:  But that's a separate issue from what

02:18:20   25   words were used in that document.  So we need to know the

02:18:24　1　words that were used in the non-hits. That doesn't reveal to

02:18:28　2　us much about the content or context of the documents, but we

02:18:30　3　need to know so that we can have some understanding of how

02:18:34　4　effective are the search terms.

02:18:38　5　　　　　MS. MILLER: Just one quick note of clarification.

02:18:40　6　The last part of what Mr. Mogin said was absolutely correct.

02:18:44　7　The first part was slightly inaccurate. Our word index gives

02:18:48　8　not just the words that are contained in documents that we

02:18:50　9　have produced. It is all the words contained in documents

02:18:52　10　that were hit by one of our search terms, so the ones that

02:18:56　11　were produced and the ones that were not produced.

02:18:58　12　　　　　So as we detailed in our letter when we produced it,

02:19:02　13　our word index includes words that are included in all of the

02:19:06　14　documents that were hit by one of our search terms.

02:19:08　15　　　　　So produced and not produced. He is correct, it does

02:19:10　16　not include ones that were not hit by a search term.

02:19:14　17　　　　　THE COURT: Did PCA give you -- this perfect little

02:19:18　18　PCA that isn't at our table.

02:19:20　19　　　　　MR. MOGIN: The defendants are uniform with respect

02:19:22　20　to that, except Georgia-Pacific and one other defendant, and I

02:19:30　21　don't know whether it was Temple as I sit here because I am

02:19:34　22　drawing a blank, were unable to produce one of the categories

02:19:40　23　of documents.

02:19:40　24　　　　　MS. MILLER: Not us.

02:19:42　25　　　　　MR. MOGIN: Not you.

02:19:42    1           MS. MILLER:  In terms of the columns?

02:19:44    2           MR. MOGIN:  Yeah.

02:19:44    3           MS. MILLER:  No, we were able to produce all three.

02:19:46    4  I have an excerpt if you would like to see it.

02:19:50    5           MR. MOGIN:  So they are a three-column defendant, so

02:19:54    6  that was the best any defendant did was the three columns.

02:19:56    7           MR. MAROVITZ:  So we get an A plus in that.

02:20:00    8           MR. MOGIN:  For columns.

02:20:00    9           MR. MAROVITZ:  End of the semester, I will take

02:20:02   10  whatever.

02:20:02   11           MR. MOGIN:  How you got to 3.5 million words is an

02:20:06   12  interesting issue, but we are still missing the non-hit docs.

02:20:14   13           MR. MAROVITZ:  And that is, Judge, from our

02:20:14   14  perspective, any word index that gets generated that contains

02:20:20   15  three and a half million words is plenty of words.  If the

02:20:24   16  plaintiffs want to use that word index to check to see what

02:20:30   17  words are and are not contained in the documents that we

02:20:32   18  produced, you know, they have those three and a half million

02:20:36   19  lines, and then they have several million lines from another

02:20:40   20  defendant, and I think in total, they have something like 25

02:20:42   21  million lines?

02:20:42   22           MS. MILLER:  More than that.

02:20:44   23           MR. MAROVITZ:  Now, there's surely some duplication,

02:20:48   24  but that sort of quantity of words in an index, there is

02:20:54   25  plenty of information there.

02:20:56    1          Now, let me just add one other little thing to that.
02:21:00    2          I will stop.
02:21:02    3          THE COURT:  What are you using this for?
02:21:06    4          MR. MOGIN:  Several things.
02:21:06    5          THE COURT:  Okay.  What are they?
02:21:08    6          MR. MOGIN:  For example, we found Weyerhaeuser, just
02:21:16    7    in the PCA documents.  We found maybe another dozen
02:21:18    8    references, names for Weyerhaeuser, that were not in the
02:21:22    9    search terms, just names, abbreviations, what have you.
02:21:28   10    That's just Weyerhaeuser.  That's a dozen of them.
02:21:30   11          THE COURT:  Okay.
02:21:30   12          MR. MOGIN:  So that's one way we used them.
02:21:34   13          Again, with respect to the non-hits, how will we test
02:21:40   14    the efficiency of the search terms without knowing what was
02:21:44   15    missed?  They are not giving us the documents; they are just
02:21:48   16    giving us words.  It's not as if we can take those words and
02:21:54   17    piece together a document.  That would be an impossibility.
02:21:58   18    But it will give us some idea of what the search strings
02:22:04   19    aren't getting.
02:22:04   20          MR. MAROVITZ:  And this is the point, Judge, where
02:22:06   21    the plaintiffs and the defendants just have a fundamental
02:22:08   22    disagreement.  I want to be crystal clear.  We believe that
02:22:12   23    the testing that's been done is more than sufficient and that
02:22:18   24    it is not appropriate for there, months from now, to be yet
02:22:26   25    another set of testing by using documents and terms that

02:22:28  1   weren't contained in any corpus.

02:22:32  2       The fact that we have had a couple days of testimony

02:22:36  3   about it, we've laid bare in any transparent approach, I

02:22:42  4   understand Mr. Mogin and other plaintiffs' counsel disagree.

02:22:46  5   I just want the record to be clear that from our perspective,

02:22:50  6   his methodology has undergone a far more substantial testing

02:23:00  7   and review than nearly any other case that I have been

02:23:02  8   involved in.

02:23:02  9       THE COURT:  Since none of the other cases have ever

02:23:06  10  done testing.  I mean, that's true, Mr. Marovitz.  They just

02:23:10  11  haven't.  Which is why your homework was for coming back to

02:23:16  12  the next general meeting was I wanted to hear from people what

02:23:22  13  you thought at the end of phase one, which maybe I wasn't when

02:23:30  14  I sent it out, I wanted to hear your proposals on what kind of

02:23:34  15  testing we could do at the end of phase one because hopefully

02:23:42  16  we could get some agreement, and maybe people will say what we

02:23:46  17  have done already is sufficient.

02:23:50  18      But I think we could also -- since I believe,

02:23:52  19  honestly, unless you are very different than my word search

02:23:58  20  cases have gone, I haven't seen any testing in any case.  Now,

02:24:08  21  I think people may have done it internally so they don't get

02:24:10  22  caught at the end of the case, but, I mean, to me, a real

02:24:18  23  contribution of the work we are doing here would be to propose

02:24:20  24  something that people could do that you could live with.

02:24:22  25      MR. MAROVITZ:  We started talking about it --

02:24:24    1    THE COURT:  Yeah.

02:24:24    2    MR. MAROVITZ:  -- among the defendants.

02:24:26    3    THE COURT:  The defendants, right.

02:24:26    4    MR. MAROVITZ:  We will remind folks before our next

02:24:28    5    general conference to do that, but I just wanted the record to

02:24:32    6    be clear on our view.

02:24:34    7    THE COURT:  Now, do you guys -- "you guys" being

02:24:44    8    Ms. Miller and Mr. Marovitz -- have any requests of the

02:24:48    9    plaintiffs?  So when are the plaintiffs turning over your

02:24:50   10    materials to them, and how far have you -- you know, are you

02:24:54   11    going to do 30(b)(6)s of their point?  I mean, what are you

02:25:02   12    doing about the stuff, since they're corporations too, right?

02:25:08   13    MR. MAROVITZ:  There was one 30(b)(6) deposition of

02:25:12   14    Chandler, one of the plaintiffs, and I don't want to steal the

02:25:16   15    thunder of Georgia-Pacific, who undoubtedly will talk to you

02:25:20   16    about that tomorrow because I think they put it on their list.

02:25:22   17    So I am sure they will talk about that.

02:25:24   18    THE COURT:  Have you made any requests of them that

02:25:26   19    you'd like any help with or you want to talk about while

02:25:30   20    you're here?

02:25:30   21    MR. MAROVITZ:  We've made document production

02:25:32   22    requests to the plaintiffs.  We've had a meet and confer or

02:25:36   23    two meet and confers.  Those were reflected in the letters

02:25:42   24    that I pointed out earlier today.  We have the time line --

02:25:46   25    actually, it's probably worth turning to it.  A time line that

02:25:50  1   we have attached as the last page of Exhibit 11 shows the

02:25:56  2   chronology for our document production requests to the

02:26:00  3   plaintiffs, and it shows that plaintiffs have made some

02:26:08  4   production, I guess, on August 10th of 2011, and then Mighty

02:26:14  5   Pac made a production on November 1st, and Chandler made a

02:26:16  6   production on February 1st.

02:26:18  7            MS. MILLER:  It's the last page of that, your Honor.

02:26:26  8            MR. MAROVITZ:  And at the last status conference, I

02:26:30  9   think we were told that the plaintiffs had their

02:26:36  10  electronic-stored information in process, so I gather that's

02:26:42  11  somewhere between them and their vendor, but it would be

02:26:44  12  helpful for us to know for planning purposes when we might

02:26:46  13  expect that and how much there is.

02:26:54  14           MR. WOZNIAK:  I will try to address whatever

02:26:56  15  questions come up on this point because I have sort of become

02:26:58  16  the point person for the plaintiff, ESI, and other documents.

02:27:02  17  I want to point out that while we did not object to including

02:27:04  18  this as a topic for today, in some ways, we think it's

02:27:08  19  inappropriate because none of the defendants have reached out

02:27:10  20  to meet and confer with us on any of these issues, with the

02:27:12  21  exception of -- I brought some letters with me.  There was a

02:27:18  22  letter from Mr. Eimer on behalf of all defendants back in

02:27:24  23  early February asking us where we stood in terms of searching

02:27:30  24  for and producing electronic documents, and we responded to

02:27:32  25  that letter the next week by his requested deadline.  And then

02:27:36  1   there was an exchange of letters following the Chandler

02:27:40  2   30(b)(6) deposition between Mr. Neuwirth's firm and my firm,

02:27:46  3   and those have been -- those letters have been the extent of

02:27:50  4   any discussions that have taken place, to my knowledge, over

02:27:54  5   the past many months.

02:27:54  6         Now, having said that, I am happy to let you know

02:27:58  7   exactly where we stand and when we expect to produce

02:28:00  8   documents, and I can even -- it might be helpful to sort of

02:28:04  9   step back and explain how we got to where we are now.  And

02:28:08  10  part of that is that before I sort of took over this point

02:28:12  11  person role, we had commenced the process of using

02:28:18  12  content-based analytics for purposes of analyzing and

02:28:22  13  processing and producing ESI on behalf of our named

02:28:26  14  plaintiffs.

02:28:32  15        THE COURT:  Here's a question.  Are you using it on

02:28:34  16  your documents you are turning over to them, or are you using

02:28:36  17  it on the documents they turned over to you?

02:28:40  18        MR. WOZNIAK:  Both.

02:28:42  19        MR. MOGIN:  Yes.

02:28:44  20        MR. WOZNIAK:  Both and both.  We are using it for

02:28:48  21  purpose of locating and then assessing --

02:28:50  22        THE COURT:  So it's a form of --

02:28:54  23        MR. WOZNIAK:  I wouldn't -- I don't want to label it

02:28:56  24  as predictive coding.  It's close to that.  It's content-based

02:29:00  25  analytics.  It's similar to the predictive coding process that

02:29:04   1   we talked about --

02:29:04   2         THE COURT:  Do they have to have the machinery in

02:29:06   3   order to read it?

02:29:08   4         MR. WOZNIAK:  No.  They won't need anything more than

02:29:12   5   they would need --

02:29:12   6         THE COURT:  All right.

02:29:14   7         MR. WOZNIAK:  The format that we had ultimately

02:29:14   8   produced documents in will be subject to -- dictated by the

02:29:18   9   ESI production format stipulation.

02:29:20   10         THE COURT:  Okay.

02:29:22   11         MR. WOZNIAK:  So, in essence, we will be giving them

02:29:24   12   the same kind of information data that they provide to us when

02:29:26   13   they produce documents, or similar.

02:29:28   14         THE COURT:  So your folks, your CBAA folks, are

02:29:34   15   putting together your documents or they are in the process of

02:29:38   16   putting your class people's documents together to give to

02:29:46   17   them.  Is it the same document request for all seven, or did

02:29:50   18   you get seven separate documents?

02:29:52   19         MR. WOZNIAK:  We received one set of document

02:29:56   20   requests to all of our plaintiffs.

02:29:58   21         And I would point out that the time line, the

02:30:00   22   chronology that was provided to you by Temple-Inland's

02:30:02   23   counsel, indicates that we have produced I think 45,000-some

02:30:08   24   documents.  We believe that's going to be the bulk of what our

02:30:12   25   plaintiffs produce in this case.  A few of them have rather

02:30:16   1   large ESI collections, but we think that what we are going to

02:30:20   2   see and what we have been seeing are largely duplicative-type

02:30:24   3   documents, so they may get more volume for -- they are going

02:30:30   4   to get more volume for likely all of our plaintiffs.  Whether

02:30:32   5   that's merely cumulative or essentially duplicative remains to

02:30:38   6   be seen.  I suspect that it's it going to be largely

02:30:44   7   cumulative and duplicative.  I don't think we are going to see

02:30:46   8   a lot of unique-type documents that they haven't already seen

02:30:50   9   because they have been provided with all of our purchase

02:30:52   10  records that we were able to find in terms of hard copy

02:30:56   11  purchase records.

02:30:56   12         And I would also add that the analytics that we're

02:31:00   13  applying, we started that process several months ago.  We sort

02:31:04   14  of put it on hold pending the outcome of the evidentiary

02:31:06   15  hearings, and we told defendants as much.

02:31:10   16         We then had to make a decision at some point when it

02:31:14   17  became clear that our request for content-based analytics was

02:31:18   18  sort of at least being put on hold.

02:31:22   19         THE COURT:  Right.

02:31:22   20         MR. WOZNIAK:  We had to make a decision as to whether

02:31:24   21  we simply wanted to use Boolean search terms on our own

02:31:28   22  plaintiff ESI or continue down the CBA path that we had

02:31:32   23  started.  We ultimately decided, for many reasons, primarily

02:31:36   24  efficiency reasons, we had already started down that path, but

02:31:40   25  also because we believe in the approach.

02:31:40   1        THE COURT:  I know.

02:31:42   2        MR. WOZNIAK:  And, quite frankly, we want to see how

02:31:44   3   well it works so the next time this comes up, we can say,

02:31:48   4   based on personal experience, this is what we have done, this

02:31:50   5   is how it works.

02:31:52   6        So having said all that, I think we will be in a

02:31:54   7   position, I know that our vendor already sent very recently a

02:31:58   8   number of document hits that we are in the process of starting

02:32:02   9   to assess for responsiveness.  We are also going to be

02:32:06   10  tracking statistically I guess the testing methodology.  We

02:32:12   11  have a large sample size that's being assessed for

02:32:16   12  responsiveness.  We are tracking all the metrics.  We are

02:32:18   13  basically going to try to do everything that we outlined --

02:32:22   14       THE COURT:  Suggested.

02:32:22   15       MR. WOZNIAK:  -- and suggested to defendants.

02:32:24   16       THE COURT:  So you are not using custodian based,

02:32:26   17  you're using -- so let's take an example.  What's one of your

02:32:30   18  plaintiffs?  I don't even know who they are.

02:32:32   19       MR. WOZNIAK:  Sure.  I'll take the one with the

02:32:34   20  largest amount of ESI is probably Mighty Pac.

02:32:36   21       THE COURT:  Mighty Pac.  Okay.  So you are searching

02:32:38   22  by department, not by custodian?

02:32:44   23       MR. WOZNIAK:  What happened with respect to all of

02:32:44   24  our plaintiffs is that essentially all -- the ESI that was

02:32:50   25  collected was collected on a very broad sort of company-wide

02:32:54    1    basis.

02:32:54    2            THE COURT:  Okay.

02:32:56    3            MR. WOZNIAK:  I guess you could say function, it was

02:32:58    4    based on corporate function.

02:32:58    5            THE COURT:  What's your time frame?

02:33:00    6            MR. WOZNIAK:  Time frame?

02:33:00    7            MR. MOGIN:  Your Honor, you should understand the

02:33:04    8    relative size of these companies.  These are very small

02:33:06    9    companies as compared to Temple-Inland.  Mighty Pac may be

02:33:10   10    among the larger, and I think that their total ESI was

02:33:14   11    something like 80,000 documents or something like that.

02:33:18   12            MS. MILLER:  80,000 documents?

02:33:20   13            MR. MOGIN:  80,000 emails total for the whole

02:33:24   14    company, for the whole class period.

02:33:28   15            MR. WOZNIAK:  And that's our largest company.  On the

02:33:28   16    other end, we have some very small outfits that may have a

02:33:32   17    couple of emails.

02:33:34   18            THE COURT:  So what year are you -- I mean, I was

02:33:36   19    just wondering if you're doing the same years that you want

02:33:38   20    from them?

02:33:40   21            MR. WOZNIAK:  We used the years that were defined in

02:33:42   22    the defendants' document requests, and in some cases, we went

02:33:48   23    beyond that just because it was easier to do.

02:33:50   24            THE COURT:  Okay.

02:33:50   25            MR. WOZNIAK:  And some of our companies had never

02:33:52  1  deleted anything, so we were able to find emails that may go

02:33:56  2  back further beyond that time period.

02:33:58  3       But certainly as we've advised defendants, all of our

02:34:02  4  plaintiffs have put in place preservation measures, and

02:34:06  5  nothing has -- so we have covered all of our steps.

02:34:10  6       THE COURT:  Okay.

02:34:12  7       MR. MAROVITZ:  Judge, just for planning purposes, we,

02:34:14  8  would just like to know about when we are going to get it.

02:34:18  9       MR. WOZNIAK:  I would say -- it's a hard -- it's a

02:34:24  10  really hard question to answer.  I would expect -- I had

02:34:30  11  hoped, quite frankly, when I took over this role that by now,

02:34:34  12  we would have begun or been largely completed with our

02:34:36  13  production, so I'm hopeful that within the next few weeks.

02:34:42  14       MR. MOGIN:  We can say that we are confident that you

02:34:44  15  will get it before we get Temple-Inland's privilege log.

02:34:48  16       MR. WOZNIAK:  Absolutely.

02:34:50  17       MR. MAROVITZ:  That's really not -- we have produced

02:34:52  18  more than a million pages.  And you're quite right; the fact

02:34:56  19  is that your companies are smaller.  And so, frankly, the

02:35:00  20  discovery in this case has been extremely one-sided, and I

02:35:10  21  recognize in antitrust cases that that happens sometimes, but

02:35:14  22  we are entitled to get the discovery that we requested too,

02:35:18  23  and I sometimes fear that we forget that.

02:35:20  24       THE COURT:  So, again, under my rubric of phase one,

02:35:22  25  I am hoping that this is going to be coming much sooner rather

02:35:26  1  than later, because if we need further meet and confers, I

02:35:32  2  mean, part of this also is they need to see it.  If you need

02:35:34  3  any help --

02:35:38  4       MR. WOZNIAK:  Let me go back to reiterating, though.

02:35:40  5  What we are going to see -- I mean, they know what we have

02:35:46  6  produced so far, and they know what they are going to see

02:35:48  7  coming.  It's going to be more of the same.  The fact is, yes,

02:35:52  8  it's taking us a little bit longer than I would like, but part

02:35:56  9  of that is because we were caught up in three months of

02:35:58  10  evidentiary hearings, during which time we were sort of

02:36:00  11  putting everything on hold.

02:36:02  12       THE COURT:  Right.  So sooner rather than later.

02:36:06  13       Okay.  Anything else?

02:36:10  14       MR. MOGIN:  I would like to go back to the backup

02:36:14  15  issue, and I was serious about asking for the identity of the

02:36:18  16  person who had those backup tapes that were found in the

02:36:20  17  cubicle.

02:36:24  18       THE COURT:  That can be the post script of this case,

02:36:28  19  who was that person.  I always envisioned that -- see, now

02:36:32  20  here's where -- sitting in my chambers, I have this vision of

02:36:36  21  these backup tapes being like a science fiction kind of movie.

02:36:46  22  I had no idea.  I did.  I thought they were going to be these

02:36:50  23  huge reel-to-reel kind of things.

02:36:52  24       MS. MILLER:  Not anymore.

02:36:52  25       MR. MAROVITZ:  The robot in Lost in Space.

02:36:54   1         THE COURT: No, I could just envision that.

02:37:00   2         Are you willing to at least entertain the thought?

02:37:02   3 Talk to your client or whatever you want to do on identifying

02:37:06   4 this person.

02:37:08   5         MR. MAROVITZ: We will take it under advisement,

02:37:10   6 Judge.

02:37:10   7         THE COURT: There you go.

02:37:12   8         All right. Let's see what else I have here. We

02:37:46   9 actually covered a number of things we hadn't talked about

02:37:50 10 before, so I am glad about that.

02:37:52 11         Mr. Mogin sent us a -- when Chris sent his out,

02:38:06 12 Mr. Mogin sent back time periods for defendants' responses to

02:38:10 13 the RPDs. Now, you have actually gotten an original response

02:38:16 14 from everybody on the RPD, I assume. I mean, I looked at

02:38:22 15 them.

02:38:22 16         MR. MOGIN: I'm sorry, your Honor?

02:38:24 17         THE COURT: Time periods for defendants' responses to

02:38:28 18 the RPDs.

02:38:30 19         MR. MOGIN: Those were the time period issues we were

02:38:32 20 discussing before.

02:38:32 21         THE COURT: Not anything different. Organization

02:38:36 22 correlation of search strings to RPDs.

02:38:48 23         Do you have any thoughts on that for Temple-Inland?

02:38:52 24         MR. MAROVITZ: I don't think that Temple-Inland's

02:38:52 25 position on that is different than anybody else's on the

02:38:56    1  defense side, and I think we have covered that in part today,

02:38:58    2  and we certainly covered it last time.  I don't think there is

02:39:02    3  anything new.

02:39:04    4          THE COURT:  I think I keep hunting because I don't

02:39:12    5  quite -- you know, I had thought after convening this, if it

02:39:18    6  would have been helpful to bring either an e-discovery liaison

02:39:28    7  and tech person to the meeting to talk about some of these

02:39:32    8  things if we were to do this again.  Do you think that would

02:39:38    9  help, or do you think you're all agile enough that you

02:39:40   10  understand how to do these things?

02:39:44   11          MR. MOGIN:  Based on today's discussion?  I think we

02:39:48   12  didn't need the help.

02:39:48   13          MS. MILLER:  No.

02:39:50   14          THE COURT:  You didn't need the help.

02:39:50   15          MR. MOGIN:  Not based on today.  We have had plenty

02:39:54   16  of input along the way.

02:39:54   17          THE COURT:  When you have your private meet and

02:39:56   18  confers, do you bring your tech people with you?

02:39:58   19          MR. MOGIN:  We do.  The defendants haven't, but we

02:40:00   20  have brought ours.

02:40:02   21          MR. MAROVITZ:  We have not, but we have been in

02:40:04   22  contact with ours.

02:40:04   23          THE COURT:  Because of everything, I do not -- I know

02:40:10   24  what Mr. Mogin keeps saying.  It's not that I don't get the

02:40:14   25  words.  But I don't get how you would do this.  I mean, I hope

02:40:18   1   you know more than -- I mean, if you're saying no, I hope you

02:40:24   2   at least understand what you're saying no to because I don't

02:40:28   3   get it.

02:40:28   4          MS. MILLER:  We do.

02:40:28   5          THE COURT:  I don't get it.  Okay.

02:40:30   6          MR. MOGIN:  Your Honor, you seem to be winding down.

02:40:34   7          THE COURT:  I am.

02:40:34   8          MR. MOGIN:  I have something here that I was able to

02:40:38   9   get during the break.  Unfortunately, it's just on my iPad.  I

02:40:40   10  wonder if I can show this around.

02:40:42   11         MS. MILLER:  I don't know what it is.

02:40:44   12         MR. MOGIN:  Well, these are from the word indexes.

02:40:46   13         THE COURT:  Okay.

02:40:46   14         MR. MOGIN:  This is from Temple-Inland's word index,

02:40:50   15  and it's what we could do in our 45 minutes.  And we were able

02:40:52   16  to find, I can't tell if it's 47 hits or 147 hits, on the word

02:41:00   17  "committee," and that's with a proper spelling.  No

02:41:02   18  abbreviation or anything like that.  And it reveals the use of

02:41:08   19  the term in a number of different contexts, and perhaps this

02:41:14   20  would be useful to you.

02:41:14   21         THE COURT:  Okay.

02:41:18   22         MR. MOGIN:  I am going to step around.

02:41:18   23         THE COURT:  Sure.  Come on over.  Then you guys can

02:41:22   24  see.

02:41:22   25         MR. MOGIN:  You can take a look.

02:41:28  1    So these are screen shots.  Unfortunately, I can't
02:41:30  2 scroll down, so think of this as being a photograph of what
02:41:34  3 somebody saw on their screen.  And you see up here the
02:41:38  4 reference to the hits and the number of files.
02:41:40  5    So this is -- like I said, it's just the word
02:41:42  6 committee.  So you see several references here to audit
02:41:46  7 committee, committee draft, committee chore, committee
02:41:52  8 something --
02:41:52  9    MS. MILLER:  I can't read it.  You are one up on me.
02:41:56  10    MR. MOGIN:  Committee Michael.
02:42:02  11    MR. MAROVITZ:  Is that from the word index?
02:42:02  12    MR. MOGIN:  It is.
02:42:04  13    MS. MILLER:  It's from the imported version.  It's in
02:42:08  14 their system.
02:42:08  15    MR. MOGIN:  So subcommittee is in there, for example,
02:42:14  16 activity committee, desktop standards committee, economic
02:42:18  17 modeling committee, conference committee, compensation
02:42:22  18 committee.  Those are just some of the -- it looks like
02:42:28  19 management, but I can't swear to what it says.  It's a little
02:42:32  20 mushy down there.
02:42:34  21    Up here we have references to Tennessee committee,
02:42:46  22 compensation conference, economic modeling, some sort of data
02:42:52  23 service committee, desktop standards.
02:42:56  24    MS. MILLER:  You have to use the arrows, Dan.  There
02:42:58  25 you go.

02:43:00  1       MR. MOGIN:  Union negotiating, ethics and human
02:43:02  2   something committee, several subcommittees, steering
02:43:06  3   committees, mill committee, it looks like, management
02:43:12  4   committee, market advisory committee, I.T. committee, more
02:43:18  5   steering committees.
02:43:22  6       Anyway, those are just the examples that we have come
02:43:26  7   up with quickly.
02:43:30  8       MR. MAROVITZ:  Judge, I guess I'd raise two points on
02:43:34  9   that.  If I were the one making an argument that the requests
02:43:38  10  for production were overly broad, I would probably rely on
02:43:42  11  exactly what Mr. Mogin just showed you, dozens and dozens and
02:43:48  12  dozens of different kinds of committees that likely have no
02:43:50  13  bearing on this case.  That's exactly why we shouldn't have to
02:43:52  14  produce everything that says committee on it.
02:43:56  15      But the second point I would make is that the kinds
02:44:02  16  of tools that the lawyers have at their disposal, the
02:44:08  17  plaintiffs' lawyers and the defense lawyers have, to be able
02:44:10  18  to look not just at a word index but also in the documents for
02:44:16  19  the word committee, for example, allows lawyers to go back and
02:44:20  20  see all the documents where the word committee is used.
02:44:24  21      For instance, one thing that we are going to do when
02:44:26  22  we go back to the firm is we're going to go back and look to
02:44:30  23  see in our production set all the times that the word
02:44:34  24  "organization" or "organizational chart" is used so we can
02:44:38  25  pretty quickly figure out whether the plaintiffs are right and

02:44:42   1    whether we have only produced 20 pages of organizational

02:44:44   2    charts or whether what we think is right, whether we have

02:44:48   3    produced a stack that's at least an inch, if not higher.

02:44:50   4    That's what we are going to do.  I presume the plaintiffs are

02:44:54   5    going to do the same thing.

02:44:54   6         So these tools that the lawyers have to be able to

02:44:58   7    search for specific words like committee or like

02:45:00   8    organizational chart are pretty powerful and they provide an

02:45:04   9    awful lot of information to both sides, based upon the

02:45:08  10    documents that have been produced.

02:45:10  11         MR. MOGIN:  But we can only use the tools on the

02:45:12  12    documents that have been produced.  We don't know from that

02:45:16  13    that any of those documents have been produced.  That's just

02:45:20  14    the words from the word index.

02:45:24  15         THE COURT:  What I saw today, I actually thought I

02:45:32  16    didn't do a very good job on the request to produce

02:45:36  17    considering I spent 16 hours.  I thought I was so specific on

02:45:40  18    what I was going to do with every one of them, and I just --

02:45:44  19    it was like -- I was like a deer in the headlights here, I

02:45:48  20    think.

02:45:48  21         But of what I did come away from was trying to get

02:45:52  22    you to tell the other side what are the issues you're the most

02:46:00  23    concerned with because I think some of your requests were

02:46:06  24    overly broad and I think they were somewhat restrictive.

02:46:12  25         So what I see the meet and confer is a way to narrow

02:46:18    1    without the judge flipping a coin or doing what judges do in

02:46:22    2    order to get the happy medium.

02:46:24    3            This committee came out very specific.  I think what

02:46:30    4    Mr. Mogin said, this is what I heard him say, is, Let's take

02:46:36    5    even your 28 top executives.  Let's just even take those

02:46:42    6    people.  If the way Temple organized itself and those folks

02:46:46    7    were part of committees, went to committee meetings, did

02:46:52    8    committees, there might be documents with them, now they want

02:46:56    9    a much broader scope of who you're searching, but this is

02:47:02   10    important; he thinks that conspiratorial acts might be somehow

02:47:12   11    exposed.  If you had committee meetings and you knew who was

02:47:16   12    on it, it might give him an idea of somebody else who might be

02:47:18   13    involved in this.  And it didn't seem to them, they didn't

02:47:22   14    think you gave any committee information, but I don't know

02:47:30   15    what they're basing it on because they don't -- I mean, I

02:47:34   16    don't know.  But that seemed to be an important thing.

02:47:38   17            MR. MAROVITZ:  Let me --

02:47:40   18            THE COURT:  Unlike just a general give me more.

02:47:42   19            MR. MAROVITZ:  Let me say this.  As I sit here, I

02:47:48   20    don't know the answer to the question that I proposed.  I

02:47:52   21    don't know, for instance, whether or not we have committee

02:47:54   22    organizational charts.  We will endeavor to find out.

02:47:58   23            THE COURT:  Good.  That's good.  That's good.

02:48:00   24            MR. MAROVITZ:  But what we don't want to be put in a

02:48:04   25    position of having to do is to reconstruct who was on which

02:48:10  1  committee from the sorts of documents that are truly available

02:48:14  2  to both sides.  There are a variety of -- you know, we

02:48:20  3  produced -- I'm going to say it, we produced more than a

02:48:24  4  million pages of documents in this case, so those documents

02:48:26  5  consist of emails and Word documents and all sorts of things,

02:48:32  6  and they describe events, and they describe communications

02:48:38  7  between theme people, and if people went to a committee

02:48:40  8  meeting, maybe they're in those documents.  We have a green

02:48:44  9  committee at our firm.  People probably email about the green

02:48:48  10  committee and say what the agenda is for the day.

02:48:50  11       My only point is that we should -- org charts

02:48:58  12  themselves are -- we understand what they are.  We have

02:49:00  13  produced a lot of them, and we will take a look to see whether

02:49:04  14  there is a committee-type org chart, but we shouldn't be asked

02:49:06  15  to create things that aren't in this form for the purposes of

02:49:10  16  responding to a request for production.

02:49:12  17       MR. MOGIN:  Nobody has asked that they create

02:49:14  18  documents.

02:49:14  19       THE COURT:  Right.

02:49:14  20       MR. MOGIN:  But we also haven't restricted it to

02:49:16  21  organizational charts.  We have asked for documents that

02:49:20  22  discuss organizational structure.  We have used organizational

02:49:24  23  charts as an exemplar.

02:49:26  24       MR. MAROVITZ:  And that's where we think it's very

02:49:28  25  broad.  That's the problem.  So that's why I say --

02:49:30  1      THE COURT:  And that's why I think without giving

02:49:34  2   anything up, the godfather was right.  That what are you going

02:49:40  3   to go to the mat on?  That's what I am sort of saying to you

02:49:44  4   is that what issues are your real issues here, not for today,

02:49:50  5   but before we come back -- I can give you one example.  What's

02:49:54  6   the one -- my favorite one where I agree with the plaintiffs

02:50:00  7   on the go get it from the third party.  There is some answers,

02:50:04  8   go get it from a third party.

02:50:08  9      MR. VAN TINE:  That appeared in many the responses

02:50:08  10  concerning trade associations.

02:50:12  11     THE COURT:  I didn't understand that at all.  Okay?

02:50:14  12  I was trying to look for some common kind of responses, and I

02:50:20  13  didn't understand with this kind of iterative process, for one

02:50:26  14  thing, I don't see that kind of response as helpful, and it

02:50:34  15  seems like it would be more direct to just get it.

02:50:38  16     So like on that issue, that's like a category of

02:50:42  17  things that I could give you.  If I had to be writing a darn

02:50:44  18  opinion on all of this, I could tell you right now.  So kind

02:50:48  19  of move on, move on, let's just do it, and get it over with.

02:50:54  20     MR. MAROVITZ:  Loud and clear, Judge.

02:50:56  21     THE COURT:  Loud and clear.  Right.

02:50:58  22     But having said that, okay, and you really have to --

02:51:02  23  because you've got all this experience in antitrust and you're

02:51:06  24  going to have to prosecute this case, in other cases that you

02:51:16  25  have had, has it been -- has committee structure and what kind

| | | |
|---|---|---|
| 02:51:20 | 1 | of committees, not their green committee, I don't think their |
| 02:51:22 | 2 | green committee is -- you know, you're going to have to make a |
| 02:51:26 | 3 | conspiratorial act -- I mean, if you could kind of be more -- |
| 02:51:34 | 4 | not today, but actually give them more what they're looking |
| 02:51:42 | 5 | for.  And then if they say no, then come to me, and I then say |
| 02:51:46 | 6 | whether that's fair game or not. |
| 02:51:48 | 7 | MR. MOGIN:  Fair enough, your Honor, but I will tell |
| 02:51:50 | 8 | you off the top of my head, in my experience, I have never |
| 02:51:54 | 9 | ever had to fight like this in any case for this basic |
| 02:51:58 | 10 | organizational material, ever. |
| 02:51:58 | 11 | THE COURT:  Well, I am sure they are going to go back |
| 02:52:02 | 12 | because I want to see -- you know, I go way back with |
| 02:52:06 | 13 | Ms. Miller on her other antitrust case where she was the |
| 02:52:10 | 14 | plaintiff's lawyer, I want you to know, and she was a mighty |
| 02:52:14 | 15 | plaintiff's lawyer, and Mr. Marovitz here, so I'm sure she is |
| 02:52:18 | 16 | going to go back and she is going to pull out every |
| 02:52:20 | 17 | organization chart, and maybe you can't find it because we |
| 02:52:24 | 18 | didn't give you an index, but she is going to go back and find |
| 02:52:26 | 19 | them.  That's true.  When she says anything to me, her word is |
| 02:52:34 | 20 | really good with me.  So I am sure those organization charts |
| 02:52:38 | 21 | are there. |
| 02:52:42 | 22 | Now, do the organization charts include committee, |
| 02:52:48 | 23 | now that's another question. |
| 02:52:50 | 24 | MS. MILLER:  Which I have written down. |
| 02:52:50 | 25 | THE COURT:  Which you have written down. |

| | | |
|---|---|---|
| 02:52:52 | 1 | And then maybe there's something else other than |
| 02:52:54 | 2 | committee. My kind of -- when I was doing criminal for 25 |
| 02:52:58 | 3 | years in this building, none of my people in the mob ever had |
| 02:53:06 | 4 | committees. We didn't have committees. I mean, mine was like |
| 02:53:10 | 5 | much easier. Mine was much easier to defend. |
| 02:53:14 | 6 | MR. MOGIN: It wasn't hard to prove a conspiracy |
| 02:53:16 | 7 | either. |
| 02:53:16 | 8 | THE COURT: It wasn't. |
| 02:53:18 | 9 | MR. FREED: They had organizations. |
| 02:53:20 | 10 | MS. MILLER: It was a little more clear cut. |
| 02:53:22 | 11 | THE COURT: Anybody have anything else? It's just |
| 02:53:24 | 12 | about 3:00 o'clock. We have to do this two times tomorrow. |
| 02:53:26 | 13 | MR. MAROVITZ: We want to thank you very much. |
| 02:53:28 | 14 | MS. MILLER: For taking the time. |
| 02:53:30 | 15 | THE COURT: I felt like we -- I mean, this is a work |
| 02:53:32 | 16 | in progress. I mean, there aren't any books on how to do |
| 02:53:36 | 17 | this. I think we will be more successful tomorrow. I am |
| 02:53:40 | 18 | going to be a little bit tighter. |
| 02:53:42 | 19 | Who is coming in the morning? |
| 02:53:44 | 20 | MR. MOGIN: We have Mr. McKeown in the morning and |
| 02:53:46 | 21 | Mr. Neuwirth in the afternoon. So save your strength, your |
| 02:53:50 | 22 | Honor. |
| 02:53:54 | 23 | THE COURT: Mr. McKeown and I. |
| 02:53:58 | 24 | MR. MOGIN: I mean for the afternoon. |
| 02:54:00 | 25 | THE COURT: Is it going to be that kind of afternoon? |

02:54:02  1        MS. MILLER:  I won't be here.

02:54:04  2        THE COURT:  I better get some candy or something,

02:54:06  3   cookies.

02:54:08  4        MR. MAROVITZ:  I am sure it will be as professional

02:54:10  5   as it's always been.

02:54:12  6        THE COURT:  It will.  Thank you very much.

02:54:14  7        MS. MILLER:  Thank you.

02:54:14  8        THE COURT:  We will send out any ideas.  I mean, I --

02:54:18  9   and mostly if this process is ever going to work, you are

02:54:22  10  going to go back after today and you're going to come back

02:54:26  11  with -- particularly with any ideas on what to do with this

02:54:30  12  mess of these requests to produce documents.  If you have any

02:54:34  13  ideas at our meeting in a couple weeks or that you could

02:54:40  14  really disseminate between everybody between now and then, I'd

02:54:44  15  love to hear your ideas on that to move the ball along.  Okay?

02:54:50  16       MR. MAROVITZ:  Thank you.

02:54:50  17       MS. MILLER:  Thank you, your Honor.

02:54:52  18       MR. FREED:  Thank you.

02:54:54  19       MR. MOGIN:  Thank you.

02:54:54  20       THE COURT:  Hope you are staying someplace nice.  Go

02:54:56  21  to a great dinner.  It looks like it's beautiful outside.

          22    (Which were all the proceedings had in the above-entitled

          23  cause on the day and date aforesaid.)

          24

          25

1     I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
2

3     _____          _____
      Carolyn R. Cox                    Date
      Official Court Reporter
4     Northern District of Illinois

5     /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25