```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
     KLEEN PRODUCTS, LLC, et al.,        )  Docket No. 10 C 5711
 4                                       )
                        Plaintiffs,      )
 5                                       )
                  vs.                    )
 6                                       )
     PACKAGING CORPORATION OF AMERICA,   )  Chicago, Illinois
 7   et al.,                             )  May 31, 2012
                                         )  10:00 o'clock a.m.
 8                       Defendants.     )

 9
             TRANSCRIPT OF PROCEEDINGS - RULE 16 CONFERENCE
10        BEFORE THE HONORABLE MAGISTRATE JUDGE NAN R. NOLAN

11

12   APPEARANCES:

13
     For the Plaintiffs:        THE MOGIN LAW FIRM
14                              BY:  MR. DANIEL J. MOGIN
                                707 Broadway, Suite 1000
15                              San Diego, CA  92101
                                (619) 687-6611
16
                                FREED KANNER LONDON & MILLEN LLC
17                              BY:  MR. MICHAEL J. FREED
                                2201 Waukegan Road, Suite 130
18                              Bannockburn, IL  60015
                                (224) 632-4500
19
                                HAGENS BERMAN SOBOL SHAPIRO LLP
20                              BY:  MR. JEFFREY T. SPRUNG
                                1918 Eighth Avenue, Suite 3300
21                              Seattle, WA  98101
                                (206) 623-7292
22
23   Court Reporter:            MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                                Official Court Reporter
24                              219 S. Dearborn Street, Suite 1854-B
                                Chicago, Illinois  60604
25                              (312) 435-5639
```

1   APPEARANCES CONTINUED:

2

3   For Defendant                    FOLEY & LARDNER LLP
    International Paper:              BY:  MR. JAMES T. McKEOWN
4                                         MR. NATHAN EIMER
                                     777 East Wisconsin Avenue
5                                    Milwaukee, WI  53202
                                     (414) 297-5530
6

7                                    FOLEY & LARDNER LLP
                                     BY:  MS. JOANNE LEE
8                                    321 North Clark Street, Suite 2800
                                     Chicago, IL  60654
9                                    (312) 832-4557

10

11                                   INTERNATIONAL PAPER
                                     BY:  MS. MEGAN A.F. BULA
12                                   6400 Popular Avenue
                                     Memphis, TN  38197
13                                   (901) 214-3967

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 10:05:54 | 1 | (The following proceedings were had in open court:) |
| 10:05:54 | 2 | THE CLERK: 10 C 5711, Kleen Products v. Packaging |
| 10:16:18 | 3 | Corporation. |
| 10:16:20 | 4 | THE COURT: Good morning. This is our second day of |
| 10:16:26 | 5 | experimentation here. We are on the record in the courtroom |
| 10:16:32 | 6 | of the Kleen matter, and today's Rule 16 conference is with |
| 10:16:40 | 7 | the plaintiffs Kleen Products, and this particular defendant |
| 10:16:46 | 8 | that we are meeting with is International Paper. |
| 10:16:48 | 9 | I want to -- I am sure you probably all got a |
| 10:16:56 | 10 | breakdown from yesterday, and I am hoping today -- I want to |
| 10:17:04 | 11 | say I thought that I could have done a better job yesterday. |
| 10:17:10 | 12 | Even though I was very prepared on paper, what I am realizing |
| 10:17:16 | 13 | is there are plenty of rules on how to do pretrial discovery |
| 10:17:20 | 14 | the old way; but this new method, there are no rules on how we |
| 10:17:26 | 15 | do this. And it was a little rambly yesterday, particularly |
| 10:17:32 | 16 | in the beginning, so I kind of regrouped last night, and I'd |
| 10:17:36 | 17 | like to try something a little bit different this morning. |
| 10:17:40 | 18 | So I actually would like to -- and this is also very |
| 10:17:50 | 19 | important and why I am so glad you are here, our company |
| 10:17:54 | 20 | person, is because I have been committed to giving each |
| 10:17:58 | 21 | defendant an individualized treatment, which for a court is |
| 10:18:04 | 22 | very hard to do in a multiparty case, and I think here more |
| 10:18:10 | 23 | than ever, it's important in the pretrial stage because |
| 10:18:14 | 24 | everyone keeps the material in such an individualized way. |
| 10:18:20 | 25 | You seem to be -- if I had to say, it seems like you're the |

10:18:22  1   largest of all of the defendants.

10:18:28  2           MR. McKEOWN:  That's right.

10:18:28  3           THE COURT:  And it must be hard for you to manage,

10:18:30  4   and it's hard for --

10:18:32  5           MS. BULA:  It's a challenge.

10:18:34  6           THE COURT:  -- me to manage.  Yes, right.

10:18:36  7           So that being said, I thought -- I have a bullet

10:18:40  8   point agenda, but, actually, I would like to ask one lawyer

10:18:48  9   for each side, Mr. McKeown, we will start with you, what are

10:18:54  10  three things you hope to accomplish?

10:18:56  11          We have probably until 1:00 o'clock.  I wanted to say

10:19:04  12  how long we are going to work because we are going to start

10:19:04  13  at 2:00 o'clock with Georgia-Pacific.  So I thought what we

10:19:08  14  would do today, where we got off so far is on the request to

10:19:12  15  produce documents, and that issue is so complicated, both

10:19:18  16  legally and factually, that I would like to put that until the

10:19:22  17  end of what we are going to talk about today because I want to

10:19:28  18  hear from you about it.  But it's going to really be one we

10:19:34  19  are going to have to -- it's going to be a work in progress.

10:19:38  20          So when you were getting ready for today, what are

10:19:40  21  three things IP would like to accomplish today?

10:19:50  22          MR. McKEOWN:  Well, I think the most pressing for us

10:19:52  23  in terms of time is International Paper is under court order

10:19:56  24  from the District of Columbia to divest three mills as part of

10:20:04  25  the consent decree reached with the Department of Justice

10:20:06    1   antitrust division in connection with the Temple-Inland

10:20:08    2   acquisition that occurred several months ago.  That

10:20:14    3   divestiture is likely to happen in the next 30 days or so.

10:20:20    4        We have had preliminary discussions with the

10:20:22    5   plaintiffs about trying to reach some type of agreement on

10:20:26    6   preservation as these mills are being divested.  We can set

10:20:32    7   aside for that part, you know, what's actually going to be

10:20:36    8   produced out of those because we have some different views

10:20:38    9   about where mills are in this whole scheme, but we would like

10:20:42   10   to reach agreement so that there is no question after, in

10:20:48   11   compliance of another court order, we divest the mills that we

10:20:52   12   did not keep something that we needed to keep.

10:20:54   13        THE COURT:  So that is an issue that is completely

10:20:58   14   related only to IP, maybe Temple, and not any of the other --

10:21:04   15   not any of the other defendants.

10:21:06   16        MR. McKEOWN:  Correct.  It's just IP and Temple.

10:21:12   17        THE COURT:  And it's not a common issue to the other

10:21:12   18   defendants.  Okay.

10:21:12   19        And that sounds like that needs some special work,

10:21:18   20   whether it be today or with you on that particular issue.

10:21:18   21        MR. McKEOWN:  Correct.  And we've given a proposal --

10:21:24   22        THE COURT:  And fairly imminent we've got to come to

10:21:28   23   something.  Good.

10:21:28   24        Number two.  It's almost like you knew what I was

10:21:30   25   going to ask you.

10:21:32   1   MR. McKEOWN:  I did not.

10:21:32   2   THE COURT:  What's number two?

10:21:34   3   MR. McKEOWN:  Number two, and this may be two and

10:21:36   4   three combined, is that we would like to find a way to wrap up

10:21:46   5   as many of these issues as we can in some type of negotiated

10:21:52   6   resolution, whether we -- you know, if we knew providing --

10:21:56   7   and we can talk about this in a bit, I think we are now up to

10:22:00   8   47 individuals who are custodians at some level or another.

10:22:04   9   And if we knew that providing a few more custodians or, you

10:22:10   10   know, taking it back one year on conduct, if we had some

10:22:12   11   package to get this resolved, we would really like to find

10:22:16   12   some way to move forward, and as I think is probably true for

10:22:20   13   all the defendants, and have the plaintiffs satisfied to the

10:22:26   14   extent that any party is ever satisfied with the other's

10:22:30   15   production and get into the next phase of the litigation.

10:22:34   16   And, you know, whether that goes to the custodian issue, you

10:22:38   17   know, any of the other issues that we are talking about, it's

10:22:42   18   all wrapped together for us.

10:22:44   19   THE COURT:  Okay.  Good.  That's great.

10:22:48   20   Are you going to tell us, Mr. Sprung, on behalf of

10:22:52   21   your folks?

10:22:54   22   MR. SPRUNG:  Yes, I'd love to.  Thank you.

10:22:56   23   THE COURT:  Because you have been zeroing in on

10:22:58   24   International Paper, so what do you think are the three

10:23:02   25   pressing things that you hope to talk about today?

10:23:06    1    MR. SPRUNG: Okay. The first would be the disclosure

10:23:12    2    to plaintiffs of recipients of litigation holds.

10:23:16    3    THE COURT: The names?

10:23:20    4    MR. SPRUNG: Yes.

10:23:20    5    THE COURT: Not the hold itself.

10:23:22    6    MR. SPRUNG: That's right.

10:23:24    7    THE COURT: Okay.

10:23:24    8    MR. SPRUNG: Names and I think dates of receipt of

10:23:30    9    the litigation hold.

10:23:30    10    THE COURT: All right.

10:23:32    11    MR. SPRUNG: The second would be custodians, to talk

10:23:38    12    about our differences --

10:23:38    13    THE COURT: Okay.

10:23:40    14    MR. SPRUNG: -- as to who are proper custodians.

10:23:42    15    THE COURT: Right.

10:23:42    16    MR. SPRUNG: And third would be talk about our

10:23:46    17    differences with regard to the source of documents that IP is

10:23:52    18    searching to produce documents to us.

10:24:00    19    THE COURT: Can you give me an example?

10:24:02    20    MR. SPRUNG: Dan has referred to it as the corpus

10:24:04    21    issue, but I can give you an example, your Honor.

10:24:06    22    THE COURT: Okay.

10:24:08    23    MR. SPRUNG: There is an exchange server which is

10:24:12    24    centrally located. And then at each mill, there's a server

10:24:20    25    that contains documents. The exchange server contains emails.

10:24:26　1　The server at each mill is called a My Docs server and it

10:24:32　2　contains, say, Word documents, PowerPoints, Excel

10:24:38　3　spreadsheets, reports.

10:24:40　4　　　　So there are areas in which IP and plaintiffs agree

10:24:44　5　with regard to whether they should produce a particular source

10:24:48　6　of -- documents from a particular source or search for

10:24:54　7　documents within that source for a particular custodian.  And

10:24:58　8　then there are areas where we disagree, where we want them to

10:25:02　9　search more of the sources, and I have a chart that is going

10:25:08　10　to explain this.  If I may share that with Mr. McKeown and his

10:25:16　11　colleagues.

10:25:18　12　　　　THE COURT:  Do you have a second one?

10:25:20　13　　　　MR. SPRUNG:  I do.  I have a whole stack of them.

10:25:22　14　　　　THE COURT:  Thank you.

10:25:28　15　　　　MR. SPRUNG:  And what this is, you know, fortunately,

10:25:32　16　we anticipated a little bit your desire, because we shared

10:25:36　17　also, to try to identify some concrete issues.  There are

10:25:40　18　issues on which we agree, and then there's some concrete

10:25:44　19　issues on which we just haven't been able to reach agreement,

10:25:48　20　and hopefully you can provide us guidance on those, your

10:25:52　21　Honor.  But we have prepared for those three issues and also

10:25:58　22　for the mill divestiture issue that Mr. McKeown raised, and we

10:26:02　23　prepared this to help your Honor understand --

10:26:08　24　　　　THE COURT:  On this third issue.

10:26:10　25　　　　MR. SPRUNG:  This is actually on all three of these

10:26:12    1    issues.  And it actually contains a little bit more about the

10:26:16    2    RFP.  There are some slides on the RFP issues which we are not

10:26:24    3    anticipating necessarily getting addressed today, but if we

10:26:26    4    can get to it, that would be great.

10:26:28    5         And so with your permission, your Honor, I'd like to

10:26:34    6    just walk you through what this is --

10:26:36    7         THE COURT:  Sure.

10:26:38    8         MR. SPRUNG:  -- and how we can cover the various

10:26:40    9    issues the parties have raised.

10:26:42    10         The first slide is intended to -- first, it sets out

10:26:48    11    what our understanding of their retention policy for email

10:26:52    12    that IP has.  And what it sets out, your Honor, is that

10:27:00    13    because of the retention and deletion policy that IP has,

10:27:04    14    there are very few emails that have been preserved when one

10:27:10    15    goes back a number of years.  And I actually have a count of

10:27:18    16    the emails.  And I apologize, I didn't print out additional

10:27:22    17    copies, but I am happy to just circulate that.

10:27:26    18         THE COURT:  Sure.

10:27:26    19         MR. SPRUNG:  That shows from the most recent

10:27:28    20    production when one looks at the number of emails that have

10:27:30    21    been produced --

10:27:32    22         THE COURT:  Total?

10:27:32    23         MR. SPRUNG:  Total number of emails in the most

10:27:34    24    recent production.  You can see that there are maybe 180 from

10:27:38    25    2004 and 10,000 or some, 30,000 or something like that, from

10:27:44   1   2010.

10:27:44   2            THE COURT:  Of all of the custodians?

10:27:50   3            MR. SPRUNG:  Of those custodians, yes, their named

10:27:52   4   custodians.  We are still dickering over additional

10:27:56   5   custodians; but, yes, all the custodians.

10:27:56   6            MR. McKEOWN:  The 26 named custodians for whom we

10:27:58   7   have originally produced.  I'm assuming that's the production

10:28:00   8   you are talking about.

10:28:00   9            MR. SPRUNG:  That's right.

10:28:02  10            MR. McKEOWN:  Because there are some more people in

10:28:04  11   the next production.

10:28:04  12            THE COURT:  Now, this is very interesting, though, on

10:28:06  13   a specific issue because their policy is certainly different

10:28:10  14   than the people we talked to yesterday.

10:28:14  15            MR. SPRUNG:  Okay.  So this lays out why we're seeing

10:28:20  16   what we're seeing, which is very few emails from relatively --

10:28:24  17   from the earlier period, more emails from 2010.  This slide

10:28:30  18   right here explains why that is, and we're setting this out

10:28:34  19   not to put IP in an embarrassing spotlight --

10:28:38  20            THE COURT:  Right.

10:28:38  21            MR. SPRUNG:  -- but to explain why it is that we want

10:28:42  22   other sources searched so thoroughly, because they have a very

10:28:50  23   aggressive email deletion or email -- you know, a policy

10:28:58  24   for --

10:28:58  25            THE COURT:  All right.  So this comes from the main

10:29:00    1    server; is that what you're saying?  Or let me ask you.  So in

10:29:08    2    your first production to them, did that come from many places?

10:29:14    3        MR. McKEOWN:  I'm assuming this came from the April

10:29:18    4    production.

10:29:18    5        MR. SPRUNG:  April 18th, I think it was.

10:29:20    6        MR. McKEOWN:  Right, which would have been the --

10:29:24    7    prior to that had been the hard copy documents for those 26

10:29:28    8    named custodians.

10:29:28    9        THE COURT:  Okay.

10:29:28   10        MR. McKEOWN:  This would have been the ESI, so there

10:29:32   11    would have been Word documents in there, PowerPoints, Excel

10:29:36   12    spreadsheets, and it would have also contained emails for

10:29:40   13    those individuals to the extent responsive.

10:29:42   14        MR. SPRUNG:  And the emails would be from --

10:29:44   15        THE COURT:  See, where I'm confused on your term

10:29:46   16    "sources of information," I didn't know if you meant different

10:29:50   17    kinds of servers or different kinds of material.  I am just

10:29:56   18    confused on your sources of information.

10:29:58   19        MR. MOGIN:  If I may.  Sure.  If I may, your Honor.

10:30:00   20    Most of -- usually in this case up to this point when we have

10:30:06   21    been talking about sources of information other than, quote,

10:30:10   22    main active servers or active data, we have focused on backup

10:30:14   23    tapes.

10:30:16   24        THE COURT:  Right.

10:30:16   25        MR. MOGIN:  But there are other sources as well:

| | | |
|---|---|---|
| 10:30:18 | 1 | laptops come to mind, thumb drives, things of that nature, |
| 10:30:24 | 2 | something that might be offline in the cloud.  Who knows?  But |
| 10:30:30 | 3 | what I would like to highlight to you why this is of |
| 10:30:34 | 4 | particular importance with respect to IP is that if you look |
| 10:30:38 | 5 | at the demonstrative at the very bottom of the page we were |
| 10:30:40 | 6 | looking at, there is the red box, and the red box says we've |
| 10:30:46 | 7 | got no backup tapes from IP.  So backup tapes aren't really an |
| 10:30:56 | 8 | issue. |
| 10:30:56 | 9 | THE COURT:  So other sources here -- |
| 10:30:58 | 10 | MR. MOGIN:  Exactly. |
| 10:31:00 | 11 | THE COURT:  -- potentially. |
| 10:31:02 | 12 | But let me just ask them right now. |
| 10:31:04 | 13 | MR. SPRUNG:  Yes. |
| 10:31:06 | 14 | THE COURT:  So is this aggressive email policy, we |
| 10:31:08 | 15 | are calling it aggressive because it's aggressive here -- |
| 10:31:10 | 16 | MR. McKEOWN:  I wouldn't actually call it aggressive; |
| 10:31:14 | 17 | but, yes. |
| 10:31:14 | 18 | THE COURT:  But your email deletion policy, was that |
| 10:31:16 | 19 | only to the main server, or is it also the same for laptops, |
| 10:31:20 | 20 | thumb drives, da de da de da? |
| 10:31:24 | 21 | MR. McKEOWN:  Well, the emails are all on one server |
| 10:31:28 | 22 | in Memphis, regardless of where the employees are based.  The |
| 10:31:32 | 23 | email policy would have been -- the delete policy would have |
| 10:31:36 | 24 | been suspended for legal hold, for those on legal hold, and |
| 10:31:44 | 25 | the -- |

| | | |
|---|---|---|
| 10:31:44 | 1 | THE COURT:  You mean in other cases too or just |
| 10:31:46 | 2 | this -- |
| 10:31:48 | 3 | MR. McKEOWN:  In other cases as well. |
| 10:31:50 | 4 | THE COURT:  In other cases too.  Okay. |
| 10:31:50 | 5 | MR. McKEOWN:  So, for example, when we pulled a |
| 10:31:52 | 6 | custodian's documents, if that person was previously on legal |
| 10:31:58 | 7 | hold in another case, those documents were also swept into |
| 10:32:02 | 8 | what was available to be captured here. |
| 10:32:06 | 9 | THE COURT:  Okay. |
| 10:32:06 | 10 | MR. MOGIN:  So a couple of things on that, your |
| 10:32:08 | 11 | Honor.  If you will flip to page 5. |
| 10:32:14 | 12 | THE COURT:  This is page 2. |
| 10:32:16 | 13 | MR. SPRUNG:  Yes. |
| 10:32:20 | 14 | MR. FREED:  They start getting numbered. |
| 10:32:22 | 15 | MR. SPRUNG:  There are numbers in the lower |
| 10:32:26 | 16 | right-hand corner. |
| 10:32:26 | 17 | MR. MOGIN:  If you look on the left-hand column, |
| 10:32:30 | 18 | those are sources. |
| 10:32:32 | 19 | THE COURT:  Okay. |
| 10:32:32 | 20 | MR. SPRUNG:  So we will -- your Honor, we will get to |
| 10:32:36 | 21 | walking through the sources with you.  But to answer the |
| 10:32:42 | 22 | specific question you just posed, this aggressive -- what we |
| 10:32:48 | 23 | call an aggressive, whatever the -- |
| 10:32:50 | 24 | THE COURT:  We will just call it email policy. |
| 10:32:54 | 25 | MR. SPRUNG:  Email management policy is what they |

10:32:56    1    call it, only applies to emails.  So we are not talking

10:33:00    2    about --

10:33:04    3                THE COURT:  Other kinds of documents.

10:33:06    4                MR. SPRUNG:  Yes, this slide only applies to that.

10:33:08    5    And there are other kinds of documents.  They have different

10:33:10    6    policies that apply to those, and none of them, none of the

10:33:14    7    policies are as aggressive as the email policy.

10:33:18    8                And if we can move on from this slide, really it's a

10:33:20    9    context to explain why it is that we want -- because

10:33:24   10    everything is done in emails, why it is that we want to, you

10:33:30   11    know, kind of turn every rock upside down to try to find other

10:33:34   12    documents.

10:33:34   13                MR. MOGIN:  I need to, at this point I think, your

10:33:36   14    Honor, draw a large footnote that is unique to IP, some of the

10:33:42   15    other defendants to a lesser extent.

10:33:46   16                During the motions to dismiss, the defendants argued

10:33:50   17    that the box aspect of these companies' business was not part

10:33:56   18    of the case.  Judge Shadur flatly and expressly rejected that

10:34:02   19    argument.  Nonetheless, in responding to the RPDs, defendants

10:34:10   20    have attempted to cut us off from information about what goes

10:34:14   21    on in the box businesses.

10:34:18   22                So what we are telling you now about sources and what

10:34:20   23    we know about sources is, as I understand it, unique to the

10:34:26   24    containerboard business.  But we have little or no information

10:34:30   25    at this point about the box businesses.

| | | |
|---|---|---|
| 10:34:34 | 1 | MR. McKEOWN:  That's not right.  We have a number of |
| 10:34:36 | 2 | custodians that came from the box side of the business. |
| 10:34:38 | 3 | MR. MOGIN:  We don't even have organizational charts. |
| 10:34:42 | 4 | MR. McKEOWN:  That's not true either, Dan. |
| 10:34:44 | 5 | THE COURT:  Okay. |
| 10:34:44 | 6 | MR. McKEOWN:  Mr. Sprung has the org charts because |
| 10:34:48 | 7 | we sent them to him prior to the 30(b)(6) deposition. |
| 10:34:50 | 8 | MR. SPRUNG:  No, I have them here. |
| 10:34:52 | 9 | MR. McKEOWN:  He has asked for some supplementation, |
| 10:34:54 | 10 | but we have provided some org charts. |
| 10:34:56 | 11 | MR. MOGIN:  We have been through the org charts, and |
| 10:34:58 | 12 | we see nothing about the box business.  There is not a single |
| 10:35:00 | 13 | box manager listed on any org chart. |
| 10:35:02 | 14 | MR. McKEOWN:  Plant manager? |
| 10:35:04 | 15 | MR. MOGIN:  Yes. |
| 10:35:04 | 16 | THE COURT:  Okay.  Okay. |
| 10:35:06 | 17 | MR. McKEOWN:  I'm sorry. |
| 10:35:06 | 18 | THE COURT:  That's why we are doing this.  Okay?  And |
| 10:35:10 | 19 | we have so many -- |
| 10:35:12 | 20 | MR. SPRUNG:  Sub-issues. |
| 10:35:14 | 21 | THE COURT:  Well, we also have -- I mean, this is |
| 10:35:18 | 22 | just huge, so that's why we are doing this. |
| 10:35:28 | 23 | MR. EIMER:  There does seem to be a basic |
| 10:35:30 | 24 | misunderstanding of what we have given them and what they have |
| 10:35:34 | 25 | found. |

10:35:34    1    THE COURT:  Because there is -- this is what I saw.
10:35:38    2    This is how I spent my Memorial Day is -- the imperfect part
10:35:46    3    of our system is you guys are going as fast as you can in
10:35:52    4    trying to get the material to them, but we haven't written in
10:35:56    5    any review -- we haven't review or absorption time.  There is
10:36:02    6    no way to absorb all this stuff that's coming in because of
10:36:08    7    the huge amount of data in this case.  I mean, it's like first
10:36:14    8    you notice a problem, and then you try to figure out how
10:36:18    9    you're going to be able to address it.
10:36:20    10    MR. EIMER:  Right.
10:36:20    11    THE COURT:  Unlike 99 percent of my cases in which
10:36:24    12    people could absorb what they received in the 30-day period of
10:36:28    13    time, you can't do that here.
10:36:30    14    MR. EIMER:  Well, this is unique for antitrust cases
10:36:34    15    too.  There is nothing unique about antitrust that causes this
10:36:36    16    to be different.
10:36:38    17    But I agree with you.  The normal course would have
10:36:40    18    been for us to produce the material, them to digest the
10:36:42    19    material, and for them to tell us what's missing.  For some
10:36:44    20    reason, what's missing came before the analysis.
10:36:48    21    THE COURT:  Which is why we are kind of breaking it
10:36:50    22    down, which is why I'm also so glad, again, you're here
10:36:54    23    because I would imagine that things look different from inside
10:36:58    24    the company, like, you know, what are you people doing, why
10:37:00    25    aren't you moving, moving, moving, and nothing is better for

10:37:06  1   you literally to see this, that it's a work in progress here.

10:37:10  2          MR. SPRUNG:  May I?

10:37:10  3          THE COURT:  Yes.

10:37:12  4          MR. SPRUNG:  So with regard to the org charts, you

10:37:14  5   know, I'd love to be educated on where box plants are in the

10:37:20  6   org charts, but let's do that -- since we are not prepared

10:37:24  7   right now to take that on, let's stick with the issues that we

10:37:28  8   have outlined.  Mr. McKeown and I are meeting this afternoon

10:37:32  9   continuing this.

10:37:32  10         THE COURT:  Good.  Good.

10:37:34  11         MR. SPRUNG:  And so, you know, we need to make sure

10:37:38  12  we have all the org charts, and hopefully we both agree about

10:37:44  13  that, and we can talk about it this afternoon.

10:37:46  14         So if you turn, your Honor, to slide 3, which I think

10:37:50  15  you're at.

10:37:50  16         THE COURT:  I am.

10:37:52  17         MR. SPRUNG:  These are the disputes that we have over

10:37:56  18  IP's custodian.  If I could start with the litigation hold.

10:38:02  19         So IP has refused to disclose the employee, and

10:38:06  20  that's the left-hand box, the employees of litigation holds.

10:38:12  21  And if you turn to the next slide, that slide specifically

10:38:16  22  addresses lit holds, the issue of lit holds, which is our

10:38:22  23  first issue.  So what we have done here is we have laid out

10:38:26  24  what Rule 26(a)(1) requires, which is that each party disclose

10:38:30  25  the name of each individual likely to have discoverable

10:38:34  1   information.

10:38:36  2          IP sent us a letter which said, Define custodians,

10:38:44  3   the people -- you know, Define people who received lit holds

10:38:50  4   as custodians and then define custodians as those people

10:38:54  5   likely to possess potentially relevant documents and data.  So

10:38:58  6   in our view, their definition of who received lit holds

10:39:04  7   matches very -- tracks very closely the definition of who a

10:39:08  8   party is required to disclose to the other side under Rule

10:39:12  9   26(a)(1).  And so we would like IP to disclose to us -- to

10:39:18  10  comply with Rule 26(a)(1) and disclose to us those people who

10:39:22  11  they have said, who they have determined, are likely to

10:39:24  12  possess potentially relevant documents and data.

10:39:26  13          THE COURT:  Okay.

10:39:28  14          MR. SPRUNG:  They refused to do that.  And if we

10:39:32  15  could make progress on that issue, I mean, we would like them

10:39:36  16  to disclose those individuals.  So far they have refused.

10:39:38  17          THE COURT:  Right.

10:39:40  18          MR. SPRUNG:  That's the first issue for us.

10:39:42  19          MR. EIMER:  Let me address that.  First, we have done

10:39:44  20  our 26(a)(1) disclosures.  This quote stops in the middle of a

10:39:50  21  sentence, as your Honor knows.  (A)(1) says we have to

10:39:54  22  disclose the name and, if known, the address and telephone

10:39:58  23  number of each individual likely to have discoverable

10:40:00  24  information, dash, along with the subjects of that

10:40:04  25  information.  Then what's missing is that the disclosing party

10:40:06  1  may use to support its claims or defenses. That's what's

10:40:10  2  missing.

10:40:12  3         So, first of all, we have disclosed those people.

10:40:14  4  It's not anybody who has discoverable information that's

10:40:16  5  required to be disclosed by that part of the rule that they're

10:40:20  6  citing. It's the people who support our claims or defenses.

10:40:22  7         Second on this, the people that get hold orders are

10:40:28  8  not necessarily those people who have discoverable

10:40:32  9  information. Those are sent out; I think Temple-Inland told

10:40:36  10  you yesterday they notified everybody in the company.

10:40:36  11         THE COURT: Right.

10:40:40  12         MR. EIMER: That was their way of doing it. That was

10:40:42  13  5,000 people, I think they said yesterday. We didn't get to

10:40:44  14  5,000, but we got to hundreds of people that it was sent to, a

10:40:48  15  substantial list, and I am very certain that the description,

10:40:52  16  the analysis of who got the hold order, was done by counsel,

10:40:58  17  and the selection of those names is our work product. They

10:41:02  18  are not entitled to that any more than they are entitled to

10:41:04  19  the list of the people that Mr. McKeown or I decide to

10:41:08  20  interview. Certainly those people they would like to know as

10:41:12  21  well, but if I decide I want to interview 500 people in the

10:41:14  22  company because I think they might have information relevant

10:41:18  23  to the case, they're certainly not entitled to know who I have

10:41:20  24  decided to interview. This is exactly the same thing, if it

10:41:24  25  has relevance at all.

10:41:26  1    Every company, when a suit is filed, in order to

10:41:30  2  avoid spoliation, sends out a mass mailing in order to cover

10:41:36  3  the waterfront and more.  No one wants to be accused of not

10:41:40  4  notifying the relevant people.  So to some extent, it does

10:41:44  5  contain people who we have on -- it contains all the people on

10:41:48  6  our custodian list, all of those people included:  the small

10:41:52  7  one, the expanded one, the people they are talking about

10:41:54  8  including later.  All of those people were included.  There is

10:41:56  9  no doubt about that.

10:41:58  10    This has never been my experience where the list of

10:42:00  11  the hold order -- the people getting the hold orders are

10:42:02  12  disclosed.  We give them, the plaintiffs, the information they

10:42:06  13  need to make selections of the people that are relevant.  They

10:42:10  14  have org charts.  We may debate whether they have the ones

10:42:14  15  they want or not, but at the end of the day, they are entitled

10:42:16  16  to org charts that they should get that are relevant.  We

10:42:20  17  agree with that.

10:42:20  18    They take discovery depositions of the people who

10:42:24  19  have knowledge of the organization of the company to see who

10:42:26  20  the relevant employees are.  That's the way it's always been

10:42:30  21  done.  And I have never seen these lists of names disclosed

10:42:34  22  any more than the lists of people I interview are disclosed.

10:42:38  23    THE COURT:  All right.

10:42:38  24    MR. SPRUNG:  I'd be happy to respond.

10:42:40  25    THE COURT:  Please do.

10:42:42  1    MR. SPRUNG:  There are cases that specifically
10:42:44  2    address this issue, and the eBay antitrust case, and I can get
10:42:50  3    the cite for your Honor.
10:42:50  4        THE COURT:  I have it.
10:42:52  5        MR. SPRUNG:  I think it was a 2010 case.  It
10:42:56  6    expressly says that -- the judge ruled that defendant is
10:43:02  7    required to disclose those individuals who received litigation
10:43:08  8    holds.
10:43:08  9        But let me address Mr. Eimer's -- as I understand it,
10:43:14  10   his main point, which is that this is attorney work product
10:43:18  11   because they have gone through and interviewed all these
10:43:22  12   people.  What happens here is we are not asking for disclosure
10:43:28  13   of every person that they have interviewed.  What they have
10:43:32  14   done is they have gone through and interviewed a bunch of
10:43:36  15   people and identified -- and here is the letter, your Honor,
10:43:40  16   with the language highlighted, that's the January 13th letter,
10:43:44  17   and they identified those people who are likely to possess
10:43:52  18   relevant information.  We are not asking them to disclose
10:43:56  19   everyone they talked to.  We are only asking them to disclose
10:44:00  20   those people that they made a determination are likely to
10:44:04  21   possess relevant information.  That's how they defined in
10:44:08  22   their own letter those people who received lit holds.  That's
10:44:12  23   what they said to us.  And we're now asking them -- and they
10:44:16  24   used the language from Rule 26(a)(1), and we are now asking
10:44:22  25   them to comply with 26(a)(1).

| | |
|---|---|
| 10:44:24 | 1 |
| 10:44:26 | 2 |
| 10:44:28 | 3 |
| 10:44:34 | 4 |
| 10:44:40 | 5 |
| 10:44:42 | 6 |
| 10:44:44 | 7 |
| 10:44:50 | 8 |
| 10:45:00 | 9 |
| 10:45:04 | 10 |
| 10:45:10 | 11 |
| 10:45:18 | 12 |
| 10:45:22 | 13 |
| 10:45:26 | 14 |
| 10:45:30 | 15 |
| 10:45:34 | 16 |
| 10:45:40 | 17 |
| 10:45:44 | 18 |
| 10:45:48 | 19 |
| 10:45:54 | 20 |
| 10:45:56 | 21 |
| 10:46:04 | 22 |
| 10:46:08 | 23 |
| 10:46:12 | 24 |
| 10:46:14 | 25 |

We are not saying to disclose everyone you interviewed.  We are just saying disclose those people who, after you interviewed them, you made a determination that they were likely to possess relevant information.  The eBay case requires them to do that.

THE COURT:  Right.  Okay.

I think this is a perfect example of what appears to be an issue about litigation holds but is a far broader issue.

There are two cases that I know of, eBay and another one, that I just pulled up the other day.  This is a very hot, contested issue.  It seems like the hold itself, you know, there's now litigation about I want the hold itself, the language of the hold.  We ascertained yesterday they are not asking that.  They are asking for the names of the people who were under the litigation hold.  And there's at least two and maybe three cases.  I really didn't have to say this on the record yesterday since Temple went the other way and had 5,000, they put everybody in the company in the hold, I certainly see some reasons.  I don't think it's -- I mean, I don't know whether it's work product.  I am not a hundred percent sure on that.

But the bigger issue here that is overriding everything are the number of custodians, not the number, not the actual number, because I actually think you could have one custodian who might have the smoking gun, who might have the

10:46:20  1    killer documents, and you would not need it.  But in a case as

10:46:24  2    broad as this and plaintiffs, without an insider who is giving

10:46:30  3    them information on which way to go here, are needing some

10:46:36  4    overall information so that they can get to what they really

10:46:44  5    need, is what I think.

10:46:48  6           I think this is like a Hail Mary -- another Hail Mary

10:46:54  7    pass on custodians, is what I think it is.  How do you get to

10:46:58  8    figure out who are the key players?  And, you know, this is

10:47:06  9    like -- in an asymmetrical case too, because I think there is

10:47:12  10   a tension that you guys are giving, giving, giving, they are

10:47:16  11   not giving a damn thing, and it doesn't seem fair.  Well, take

10:47:20  12   that off the table.  It's not fair.

10:47:24  13          And I don't see this litigation hold -- I think it's

10:47:28  14   just another way for them to kind of figure out -- here's what

10:47:32  15   I said to Temple even yesterday.  By giving the name on the

10:47:36  16   litigation hold doesn't mean they become custodians.  I am

10:47:42  17   going to give you my word of honor on this.  I think if you

10:47:46  18   tell them the names you think within two weeks, they're going

10:47:50  19   to come back with a new request, and they may come back, but

10:47:54  20   it's not up to them completely.  But that's what I'm saying

10:47:58  21   right now because -- can you tell us how many people were in

10:48:02  22   the litigation hold?  Can you tell me that?

10:48:06  23          MR. EIMER:  Over 500.  How that's going to help

10:48:10  24   anything, I have no idea.

10:48:10  25          THE COURT:  Well, because if they know what

10:48:12  1  departments they were in, if they know maybe time period, I

10:48:18  2  mean, I am speaking for them, but, you know, here's always

10:48:22  3  what the judge is doing.  They're talking in very overbroad

10:48:26  4  terms, you're talking in underbroad terms, and I am trying to

10:48:30  5  assimilate both things to be able to get it.

10:48:34  6        But I'm telling you, giving them the list is not

10:48:38  7  going to turn 500 people into custodians.

10:48:40  8        MR. EIMER:  No, I understand that, and I appreciate

10:48:42  9  that.

10:48:42  10        THE COURT:  Do you hear me on that?

10:48:46  11        MR. MOGIN:  Absolutely.

10:48:46  12        THE COURT:  Do you hear me loud and clear on that?

10:48:50  13        And this is going to be one thing we're going to talk

10:48:52  14  about with the big group in two weeks.  We are going to put it

10:48:54  15  on the agenda, we are going to put the cases on the agenda,

10:48:58  16  everybody read the cases.  You know, you could have other --

10:49:06  17  you could have other litigation considerations, you could have

10:49:08  18  other reasons why maybe it's better if I order it.  I hate to

10:49:12  19  say that, but maybe it's better if I order it than you

10:49:16  20  voluntarily do it, but the same result comes to them.

10:49:22  21        That's kind of where I am.  And this has got nothing

10:49:26  22  to do with the content of the hold.

10:49:28  23        But yesterday we circled custodians, we kept -- Dan

10:49:34  24  tried to say it in the beginning, he said maybe it really is a

10:49:38  25  custodian problem, I cut him off, you know; but it's like

10:49:44   1   certainly with requests to produce, certainly the way you guys

10:49:48   2   have paraphrased, Give me everything and you put it to

10:49:52   3   executives with.  That sort of framed the issue I think.

10:49:58   4         All right.

10:50:02   5         MR. McKEOWN:  In terms of -- you are talking about

10:50:04   6   names.

10:50:04   7         THE COURT:  Names.

10:50:04   8         MR. McKEOWN:  If we give names, the next thing we are

10:50:06   9   going to get from the plaintiffs is a request for titles, I

10:50:12  10   would gather.

10:50:12  11         THE COURT:  But here's something --

10:50:14  12         MR. McKEOWN:  Could we just give the titles?

10:50:16  13         THE COURT:  No.  Here is something that I thought of

10:50:20  14   last night, which is why it's so good that you've done all

10:50:22  15   this production already, is we were having a real battle

10:50:32  16   yesterday.  Unfortunately, they didn't have all the charts

10:50:36  17   that you brought today, so thank you for bringing those

10:50:40  18   charts.

10:50:40  19         All right.  They started to review the email.  Nan is

10:50:44  20   now the CEO of International Paper.  Okay?  Nice little

10:50:52  21   grandiose thought here.  So I have become the CEO.  You have

10:50:56  22   all Nan's emails.  I am writing to Chris.  These folks have no

10:51:02  23   idea who Chris is.  Okay?  One of the functions of broader

10:51:10  24   charts, which, again, yesterday was if you tell us broader on

10:51:16  25   the charts who all these people are, then again the fear is

10:51:20 1 Oh, my God, they're going to turn all those people into

10:51:22 2 custodians. I mean, I think that's what's going on. But how

10:51:28 3 can they read the email from Nan if they don't know who Chris

10:51:32 4 is?

10:51:32 5 MR. EIMER: They could find out from the org charts

10:51:36 6 or they could ask us.

10:51:36 7 THE COURT: Well, except you guys maybe have turned

10:51:40 8 over every one of the org charts, although our expert here is

10:51:46 9 kind of looking quizzical. This started with the most basic

10:51:54 10 thing, an organizational chart with people's names on it.

10:51:58 11 What could be more vanilla than that?

10:52:02 12 MR. EIMER: Right.

10:52:04 13 THE COURT: Right?

10:52:04 14 MR. EIMER: Right.

10:52:04 15 THE COURT: That's about as vanilla as you can get,

10:52:08 16 because how can they read the documents if they don't know who

10:52:10 17 these folks are?

10:52:12 18 MR. EIMER: But they have -- this is a discussion we

10:52:14 19 should have. We agree they should have them. We think they

10:52:18 20 have them.

10:52:18 21 MR. SPRUNG: So you agree that we should have all org

10:52:22 22 charts for the containerboard and box plant business? Because

10:52:26 23 I don't believe we have all org charts for the containerboard

10:52:32 24 and box plant business.

10:52:32 25 And, Judge Nolan, I mean, I think your analysis that

10:52:40   1   -- the fact that they give us these org charts and the fact

10:52:44   2   that they give us these lit hold recipients, all that does is

10:52:48   3   give us information so we can make an assessment and go back

10:52:50   4   to them.  It's not obligating them to agree --

10:52:54   5            THE COURT:  I understand, but I do understand in an

10:52:58   6   asymmetrical case which is underpinning this entire thing

10:53:02   7   where they are giving 90 percent of the material, so much is

10:53:08   8   at stake for them, why they're pushing back is all I'm saying.

10:53:12   9   And I'm saying if you're trying to do it in a mediation way as

10:53:16   10  opposed to the judge writing an opinion and telling you what

10:53:20   11  to do, it's also -- it may be harder for them to agree.  I am

10:53:26   12  acknowledging that, which is on the issues where we need to

10:53:30   13  agree Jim is going to put a red beanie on and he is going to

10:53:36   14  say, Okay, come on, you entered the order.

10:53:40   15           I am aware that this is hard, but I am telling them

10:53:44   16  by giving some basic stuff, like the names on the litigation

10:53:48   17  hold and the charts, that doesn't mean you're going off to the

10:53:54   18  races.

10:53:54   19           MR. McKEOWN:  On the org charts, let me say two

10:53:56   20  things.  I would like to go through some of the org charts we

10:54:00   21  have given where our custodians fall.

10:54:02   22           But second is we don't think there is a need to get

10:54:04   23  an org chart from every single box plant and every single

10:54:08   24  containerboard plant.  We have tried to give the org charts at

10:54:12   25  the higher level, and that's the information we have provided.

10:54:14  1    MR. MOGIN:  Respectfully, we went through the org

10:54:16  2  charts and there is no information about the box plants.  Zip.

10:54:22  3  Number one.

10:54:22  4    Number two is your company is pretty well organized.

10:54:26  5  We are talking about basically two levels of org charts:  IP

10:54:32  6  corporate and everything that relates to IP's industrial

10:54:36  7  packaging business.  That doesn't seem like that's

10:54:42  8  particularly difficult.  We really don't care about the

10:54:44  9  production employees.  We are really talking about sales,

10:54:48  10  management, management staff.

10:54:50  11    MR. McKEOWN:  There's over a hundred box plants out

10:54:54  12  there.

10:54:54  13    MR. MOGIN:  That would be -- if you gave us the

10:54:58  14  names, that would be a hundred names.

10:55:00  15    THE COURT:  The names of the plant and nothing else.

10:55:04  16    MR. MOGIN:  Okay, if it's a hundred box plants, then

10:55:06  17  it's a hundred pieces of paper for the org charts or maybe 2

10:55:12  18  or 300.

10:55:12  19    MR. McKEOWN:  But then you are going to ask for them

10:55:14  20  going back years, which makes it very difficult over a long

10:55:18  21  period of time because people will take positions so

10:55:20  22  frequently.

10:55:20  23    MR. FREED:  How many are box plants -- it seems to me

10:55:22  24  what you are trying to do is get it both ways.  Either you

10:55:26  25  give us the names of the people on the lit hold and the

10:55:30   1    position, which to me is the simplest way in the world, and

10:55:32   2    the magistrate has made it very clear it doesn't obligate you

10:55:36   3    to then be considered as custodians, or you give us the names

10:55:38   4    on all the org charts so we can figure it out.  Why we would

10:55:42   5    go the second way is beyond me.

10:55:44   6          MR. McKEOWN:  So you are suggesting if you got the

10:55:44   7    names and the position titles of the people on the lit hold,

10:55:50   8    that --

10:55:50   9          MR. FREED:  That will help us make the analysis.

10:55:50   10   And, yes, we may come back and say of that number, we think

10:55:56   11   some should be designated custodians.  You may actually agree,

10:55:58   12   shockingly, or you may not agree, and the magistrate has

10:56:04   13   already said she hasn't made any determination whatsoever as

10:56:06   14   to whether we're right just because you gave us the name and

10:56:08   15   position of the people on the lit hold.  But somewhere along

10:56:10   16   the line, to break this log jam, I think that would be

10:56:14   17   helpful.  If you don't want to give us the org charts, tell us

10:56:16   18   who they are and what they do.

10:56:18   19          THE COURT:  So you take one or the other.

10:56:20   20          MR. FREED:  Yeah.  It seems you're trying to block us

10:56:24   21   both ways.

10:56:24   22          THE COURT:  Okay.  Okay.  One thing that would be

10:56:28   23   very helpful this afternoon at your mini meeting, the meeting

10:56:32   24   after the meeting with Mr. Sprung, would be if you'd actually

10:56:36   25   go over the charts, because maybe the title -- I mean, I have

10:56:44　1　seen like just literally the title.  Maybe the box plants,

10:56:46　2　some of them are there and maybe they are labeled in a

10:56:50　3　different way.

10:56:50　4　　　　　MR. FREED:  I am making a ridiculous point, but if

10:56:54　5　the person who got the lit hold notice is director of refuse

10:57:00　6　-- getting rid of it --

10:57:00　7　　　　　MR. MOGIN:  Distribution.

10:57:00　8　　　　　MR. FREED:  -- distribution, thank you, we wouldn't

10:57:02　9　care about it.

10:57:04　10　　　　　THE COURT:  Right.

10:57:04　11　　　　　MR. FREED:  It would give us enough information to at

10:57:06　12　least at some level make a cursory determination that we just

10:57:10　13　don't care about these people.

10:57:12　14　　　　　I want to make another point.

10:57:14　15　　　　　THE COURT:  Yes.

10:57:14　16　　　　　MR. FREED:  You have really stated it perfectly, that

10:57:16　17　we do need -- because of the absence I acknowledge on our side

10:57:22　18　of total information on their side, we do need to try to get

10:57:26　19　as broad a brush as we can.  But if we get millions of pieces

10:57:30　20　of paper, we have no interest, and I mean this sincerely, in

10:57:32　21　getting another half a million of useless pieces of paper.

10:57:36　22　That is not our objective.  This is not to punish them.  We

10:57:40　23　don't have the ability to punish them or make them give up

10:57:44　24　because we are trying to get so much stuff.  We are actually

10:57:46　25　trying to get to relevant stuff.

10:57:48   1       THE COURT:  Right.

10:57:48   2       MR. FREED:  And if they can give us the names and the

10:57:50   3    titles of these people, it will really assist us in whittling

10:57:56   4    this down.  We may reach disagreements, we may come back to

10:57:58   5    you, you may have to decide, hopefully not, but at least let's

10:58:02   6    get the process started.  The way they're doing it now is

10:58:06   7    we're blocked totally.

10:58:06   8       THE COURT:  Okay.

10:58:06   9       MR. MOGIN:  Your Honor, let me just make this one

10:58:10   10   additional point.  International Paper, there's only one

10:58:12   11   company in this mix who is not a publicly-held company.

10:58:16   12   International Paper is a publicly-held company.  The idea that

10:58:20   13   they don't have very detailed org charts going back is not

10:58:26   14   fathomable because the auditors would never allow it.

10:58:30   15      THE COURT:  Okay.  That's going to be -- that's the

10:58:34   16   easiest thing on the table, I mean, to me, to see if they have

10:58:38   17   them, if they sent them, what you need in between, if they're

10:58:42   18   willing to give it.  And I actually, Mr. McKeown, is -- I

10:58:50   19   mean, you're going to leave today with your own take on kind

10:58:58   20   of what sincerity every other thing is here.  But if it is a

10:59:04   21   matter of organizational charts and these names to kind of get

10:59:08   22   us going to the next place, then you're going to decide

10:59:14   23   whether you can trust or them or not or you can trust me to

10:59:18   24   enforce what I am saying to you.

10:59:18   25      MR. McKEOWN:  I understand what you are saying, your

| | | |
|---|---|---|
| 10:59:20 | 1 | Honor. |
| 10:59:22 | 2 | THE COURT:  Okay.  Is this helping you?  Is this |
| 10:59:26 | 3 | giving us like a little structure here? |
| 10:59:28 | 4 | MR. McKEOWN:  Somewhat, although I think it might be |
| 10:59:30 | 5 | useful if we went through a little bit of who our custodians |
| 10:59:32 | 6 | are because that sort of gap is -- |
| 10:59:38 | 7 | THE COURT:  Is that one of your pages? |
| 10:59:40 | 8 | MR. SPRUNG:  No. |
| 10:59:40 | 9 | THE COURT:  Oh, you've got it. |
| 10:59:46 | 10 | MR. SPRUNG:  I've got it.  But I'd love to -- it |
| 10:59:48 | 11 | looks like it might be an org chart. |
| 10:59:50 | 12 | MR. McKEOWN:  It's several org charts.  So we start |
| 11:00:06 | 13 | at the officer level.  This is an officer org chart from March |
| 11:00:12 | 14 | of 2010.  You can see from the Bates number, it's been |
| 11:00:14 | 15 | previously produced.  The individuals circled in red are among |
| 11:00:18 | 16 | our custodians. |
| 11:00:18 | 17 | THE COURT:  Okay. |
| 11:00:20 | 18 | MR. McKEOWN:  And so John Feracci is the chairman and |
| 11:00:22 | 19 | CEO of International Paper.  If you go to the far left column, |
| 11:00:26 | 20 | that's the industrial packaging group, which includes both |
| 11:00:30 | 21 | containerboard and the container group. |
| 11:00:34 | 22 | THE COURT:  Now, wait, because they are making a |
| 11:00:36 | 23 | distinction here. |
| 11:00:36 | 24 | So this is containerboard, and what's the second |
| 11:00:42 | 25 | thing you said? |

11:00:44    1        MR. McKEOWN:  Containers, boxes.

11:00:46    2        THE COURT:  All right.

11:00:48    3        MR. CAMPBELL:  Could you tell us very quickly what

11:00:50    4    the difference is?

11:00:50    5        MR. McKEOWN:  Sure.  If you think of the

11:00:54    6    containerboard division, it is trees come in, they get chopped

11:01:00    7    up, or recycled materials come in, they get mixed into this

11:01:04    8    pulp, this sort of milky slurry, that then goes through a huge

11:01:10    9    paper-making machine, through all the rollers.  It's as long

11:01:16    10   as a football field.  It's 300 feet long.  It comes off on

11:01:26    11   gigantic rolls.  It would probably fill two-thirds of this

11:01:28    12   courtroom.  And when it comes off of there, it could be 300

11:01:30    13   inches wide.  Then it gets rewound and sliced into great big

11:01:34    14   rolls of what they call containerboard, but you and I would

11:01:38    15   see it and say it looks like brown paper.  Okay?

11:01:40    16       THE COURT:  Okay.

11:01:40    17       MR. McKEOWN:  So the product of containerboard is

11:01:42    18   that linerboard, which is the outside of the corrugated

11:01:46    19   material, and then there's also a product known as medium,

11:01:50    20   which is the wavy material in the middle of the corrugated,

11:01:54    21   that's called medium, that's also made in the same type of

11:01:58    22   process, but when it comes off, what you have are these

11:02:02    23   gigantic rolls of linerboard and medium.  That's the

11:02:08    24   containerboard division.  That's made at a mill, as

11:02:10    25   distinguished from the plant.

11:02:12    1       A box plant, or sometimes converting plant, and I
11:02:16    2   think both Mr. Mogin and I mix the terms occasionally as to
11:02:20    3   which we are using, but what happens at those plants is there
11:02:26    4   is a large machine known as a corrugater.  These very large
11:02:30    5   rolls, two linerboard rolls and a medium roll, are fed through
11:02:38    6   this very high-speed machine.  In the machine is a big wheel
11:02:46    7   that creates the curved part for what you see is the medium,
11:02:50    8   the corrugated in the middle, and because it comes in a roll,
11:02:54    9   it's just a flat roll of material.
11:02:56   10       What comes out at the other end are sheets, sheets of
11:03:00   11   corrugated material.  Those then may be sold as sheets or, in
11:03:06   12   a box plant or converting facility, what usually happens is
11:03:10   13   there's a number of other machines where those sheets are then
11:03:12   14   fed and they come out as your pizza box or the box the apples
11:03:16   15   are going to be shipped in or the box that the iPods are all
11:03:20   16   going to put in, et cetera, and that's a box plant or a
11:03:24   17   converting facility.
11:03:26   18       THE COURT:  So because I have not memorized the
11:03:28   19   complaint, does the conspiracy involve both containerboards
11:03:32   20   and container boxes, the object of the conspiracy is both?
11:03:38   21       MR. MOGIN:  Yes.
11:03:38   22       MR. McKEOWN:  The plaintiffs' claim is an increase in
11:03:40   23   price in both.
11:03:42   24       THE COURT:  In both.  Okay.  Got it.  That helps.
11:03:44   25       MR. McKEOWN:  Now, if you look at this chart, the far

11:03:48    1    left -- this is just the officer chart now.

11:03:50    2             THE COURT:  Right.

11:03:52    3             MR. McKEOWN:  We go to the IPG org chart in a moment.

11:03:54    4    The far left column is industrial packaging.

11:03:58    5             THE COURT:  For board --

11:04:00    6             MR. McKEOWN:  Industrial packaging group contains

11:04:02    7    both containerboard and containers and the box side.  So that,

11:04:12    8    for example, if you go down to the fourth box in that column,

11:04:16    9    there is William Hoel, H-o-e-l, VP, Container of the Americas.

11:04:24   10    That's the box group.

11:04:28   11             Also on this chart to the right side among our

11:04:30   12    custodians is Timothy Kelly, the vice president of

11:04:36   13    manufacturing for containerboard side, and farther over, the

11:04:42   14    CFO and the investor relations person.

11:04:44   15             THE COURT:  Okay.

11:04:46   16             MR. McKEOWN:  Then there's also an IPG org chart, and

11:04:50   17    we have produced these at various periods of time.

11:05:10   18             MR. SPRUNG:  Can I ask you a question?

11:05:12   19             MR. McKEOWN:  Yes.

11:05:14   20             MR. SPRUNG:  So we have only gotten this org chart of

11:05:16   21    the executive officers back through 2008.

11:05:18   22             MR. McKEOWN:  Correct.  We are looking for the rest.

11:05:22   23    I was not aware that you had not received it earlier.  But I

11:05:26   24    got your letter or email.  I can't remember what it is.

11:05:28   25             MR. FREED:  And the other thing, correct me if I'm

| | |
|---|---|
| 11:05:30 | 1 |
| 11:05:34 | 2 |
| 11:05:36 | 3 |
| 11:05:38 | 4 |
| 11:05:42 | 5 |
| 11:05:46 | 6 |
| 11:05:48 | 7 |
| 11:05:50 | 8 |
| 11:05:52 | 9 |
| 11:05:54 | 10 |
| 11:05:56 | 11 |
| 11:05:58 | 12 |
| 11:05:58 | 13 |
| 11:06:00 | 14 |
| 11:06:02 | 15 |
| 11:06:04 | 16 |
| 11:06:06 | 17 |
| 11:06:10 | 18 |
| 11:06:10 | 19 |
| 11:06:14 | 20 |
| 11:06:14 | 21 |
| 11:06:16 | 22 |
| 11:06:18 | 23 |
| 11:06:18 | 24 |
| 11:06:24 | 25 |

1  wrong, if you look at that column on the left, we would have
2  no way of knowing that that included boxes because there isn't
3  an identifying word which signals that.
4          MR. McKEOWN:  I am guessing, though, that by now, you
5  have read our 10(k)s and it would be pretty clear.
6          MR. FREED:  We shouldn't have to go to external
7  sources to do that.
8          MR. McKEOWN:  Mike, as I recall, you were also in the
9  linerboard case a number of years ago.
10          MR. MOGIN:  Actually, I just read the 10(k) as we
11  were sitting here as you were speaking, and it says nothing
12  that I saw --
13          THE COURT:  Okay.
14          MR. MOGIN:  -- when describing the business units
15  that containers of americas was the box business.
16          MR. McKEOWN:  All right.
17          THE COURT:  That's good.  Okay.  So this helps us.
18          MR. FREED:  Yes.
19          MR. McKEOWN:  The IPG org chart --
20          THE COURT:  What is IPG?
21          MR. McKEOWN:  This is industrial packaging group.
22          THE COURT:  Okay.
23          MR. McKEOWN:  This is further breakdown of what was
24  the left column on the officer org chart.  And again circled
25  in red are folks that are within our custodians.

11:06:28   1         And so, you know, Carol Roberts was a senior vice

11:06:34   2 president of Industrial Packaging at this time. She and her

11:06:36   3 assistant are both included. Tim Kelly is the vice president

11:06:40   4 of manufacturing. He is there. Glenn Landau is the vice

11:06:46   5 president and GM of containerboard and recycling. And you see

11:06:48   6 three of his direct reports, including the manager of domestic

11:06:52   7 sales for containerboard is there.

11:06:56   8         Bill Hoel is the vice president and GM of Container

11:07:00   9 of Americas. That's the box business. And under him, each of

11:07:04  10 the VPs and general managers in the box business are listed as

11:07:10  11 custodians. There is a VP of finance, and one of his analysts

11:07:12  12 and there is a senior communications manager.

11:07:16  13         We also have, I don't want to necessarily go into

11:07:20  14 detail, Mr. Sprung and I can do it later on some of these

11:07:24  15 other org charts, but we think we have provided far more

11:07:26  16 custodians than any of the other defendants and that we have

11:07:30  17 gone about it in a reasonable way. And while, you know, we

11:07:36  18 are willing to talk about a few more custodians, again, I

11:07:38  19 think as I said with my second point at the beginning, we'd

11:07:42  20 like to reach some resolution and move on.

11:07:44  21         MR. FREED: We would like to help you do that,

11:07:46  22 believe it or not, and that's why this list of who these

11:07:48  23 people are on the lit hold and their titles would help us get

11:07:52  24 there.

11:07:52  25         We would also like to make closure to this. This

| | |
|---|---|
| 11:07:56 | 1 | doesn't benefit anybody to go through this. |
| 11:07:58 | 2 | THE COURT: Good. That's very positive. |
| 11:08:04 | 3 | MR. SPRUNG: And if I may just address, agree, these |
| 11:08:10 | 4 | are very helpful, and we -- and showing what has been -- those |
| 11:08:20 | 5 | people who have been designated as custodians is helpful. |
| 11:08:24 | 6 | There are some people on here individuals with whom |
| 11:08:26 | 7 | we have disagreement. We haven't -- you haven't agreed to |
| 11:08:30 | 8 | designate them. And we can talk about those individuals; we |
| 11:08:34 | 9 | have a little already. |
| 11:08:36 | 10 | I think the more important thing is if you look at |
| 11:08:40 | 11 | the IPG org chart, there are a couple of categories that stand |
| 11:08:46 | 12 | out, and I think it might be useful to talk about that a |
| 11:08:50 | 13 | little bit. |
| 11:08:50 | 14 | THE COURT: Okay. As an example? |
| 11:08:52 | 15 | MR. SPRUNG: Yes. |
| 11:08:52 | 16 | THE COURT: I think that's good. |
| 11:08:54 | 17 | MR. SPRUNG: So here for the IPG org chart, the |
| 11:08:58 | 18 | middle one, as I understand it, Jim, the people who you've |
| 11:09:06 | 19 | circled in the boxes going down under Bill Hoel are the |
| 11:09:14 | 20 | general managers or the VPs for sales. |
| 11:09:18 | 21 | MR. McKEOWN: They are the regional VPs, correct. |
| 11:09:20 | 22 | MR. SPRUNG: Regional VPs. |
| 11:09:22 | 23 | And under those people are the salesmen, the sales |
| 11:09:24 | 24 | representatives, the people who are going out and selling. |
| 11:09:28 | 25 | MS. BULA: That's not correct. |

| | | |
|---|---|---|
| 11:09:30 | 1 | MR. SPRUNG: Okay. That would be helpful to know who |
| 11:09:32 | 2 | those people are. |
| 11:09:32 | 3 | MS. BULA: The people who you are looking at here are |
| 11:09:34 | 4 | the vice president and general manager are functional business |
| 11:09:38 | 5 | folks for those particular regions. The individuals who are |
| 11:09:42 | 6 | listed below them are the region GMs. They are not |
| 11:09:48 | 7 | necessarily sales folks. |
| 11:09:52 | 8 | MR. SPRUNG: Okay. |
| 11:09:56 | 9 | MS. BULA: They are more the functional business |
| 11:09:58 | 10 | manager. For example, under Peter Heist, you will see |
| 11:10:02 | 11 | segment/region GM, and you have a number of names who are |
| 11:10:04 | 12 | listed there. |
| 11:10:06 | 13 | MR. SPRUNG: Okay. |
| 11:10:08 | 14 | MR. MOGIN: So, for example, there one guy would be |
| 11:10:10 | 15 | northern California, somebody else southern California, that |
| 11:10:12 | 16 | kind of thing? |
| 11:10:14 | 17 | MS. BULA: Correct. |
| 11:10:16 | 18 | MR. MOGIN: And they run the totality of the business |
| 11:10:18 | 19 | in those districts, correct? |
| 11:10:20 | 20 | MS. BULA: Correct. |
| 11:10:20 | 21 | MR. MOGIN: So they are not the salespeople in this |
| 11:10:24 | 22 | district. |
| 11:10:24 | 23 | MS. BULA: They are not the salespeople. The sales |
| 11:10:26 | 24 | group would report up to those region general managers. |
| 11:10:30 | 25 | MR. MOGIN: Do they have support staff within the |

| | | |
|---|---|---|
| 11:10:32 | 1 | district or within the region in terms of strategic planning, |
| 11:10:36 | 2 | in terms of budgeting, et cetera? |
| 11:10:38 | 3 | MS. BULA:  They would have support staff in that they |
| 11:10:40 | 4 | would have a controller.  There is a controller for each |
| 11:10:44 | 5 | region.  For example, there is a controller for the west. |
| 11:10:48 | 6 | MR. MOGIN:  And does pricing authority reside in the |
| 11:10:50 | 7 | region? |
| 11:10:52 | 8 | MS. BULA:  No.  Pricing authority goes up higher. |
| 11:10:56 | 9 | MR. MOGIN:  That's helpful.  Thank you. |
| 11:10:58 | 10 | MR. SPRUNG:  The issue that I wanted to raise was |
| 11:11:02 | 11 | that what often happens in price-fixing cases is that there |
| 11:11:12 | 12 | are salespeople who are told to sell their product at a |
| 11:11:18 | 13 | particular price, at a fixed price, and they object to that. |
| 11:11:24 | 14 | They object that the price is too high.  They say, We're going |
| 11:11:26 | 15 | to get business taken by our competitors if we sell it at this |
| 11:11:32 | 16 | price. |
| 11:11:32 | 17 | THE COURT:  The individual salespeople themselves. |
| 11:11:34 | 18 | MR. SPRUNG:  The individual salespeople say that. |
| 11:11:36 | 19 | And they report back to these functional managers or |
| 11:11:40 | 20 | some supervisor, and they say, I don't want to have to sell my |
| 11:11:46 | 21 | product at that price because I am not going to be able to |
| 11:11:48 | 22 | sell it and our competitor is going to take the business.  And |
| 11:11:54 | 23 | what the manager says to the salesperson is, We have made a |
| 11:11:58 | 24 | decision that we want you to sell at that price. |
| 11:12:00 | 25 | And those emails from the sales representatives are |

11:12:08  1   extremely hot documents in these cases.  And I have cited, you

11:12:12  2   know, some cases, and your Honor is probably familiar with

11:12:16  3   them from your preparations, but on page 9 of our little sheet

11:12:20  4   here, this just talks about -- this page 9 talks about one

11:12:30  5   particular RFP, and I don't want to get caught mucked down in

11:12:36  6   the details of this RFP.  I want to talk about the broad point

11:12:40  7   of production of documents from non-managers.

11:12:42  8         And the bullets down below, we believe that what has

11:12:46  9   been excluded are, first, documents from non-management

11:12:50  10  employees.  And we have cited several cases where on summary

11:12:56  11  judgment, the courts have said, Boy, it was the pocket

11:13:00  12  calendar of the branch manager, it was the memorandum from a

11:13:06  13  subordinate personnel describing a meeting with a market

11:13:10  14  participant, it's an email to an account manager, it's these

11:13:14  15  lower-level employees' documents that are important in

11:13:22  16  evidencing the conspiracy because the senior level people who

11:13:26  17  are engaged in the conspiracy are less likely to create

11:13:30  18  documents evidencing the conspiracy.

11:13:34  19        And so what we would like is an agreement from IP

11:13:40  20  that -- not to just restrict their production to these senior

11:13:46  21  people, but to negotiate with us about lower-level people

11:13:54  22  because that's where in other cases hot documents are coming

11:14:00  23  in.

11:14:02  24        MR. EIMER:  Those cases, as I understand the

11:14:04  25  complaint here, are very different.  This is not a

| | | |
|---|---|---|
| 11:14:06 | 1 | price-fixing case in the sense of these where the plaintiffs |
| 11:14:10 | 2 | allege everybody got in a room and they agreed on what the |
| 11:14:14 | 3 | price is.  And that's where in the past, there might have been |
| 11:14:18 | 4 | emails of people complaining about the so-called agreed-to |
| 11:14:20 | 5 | price. |
| 11:14:22 | 6 | What's alleged here is that the very senior people of |
| 11:14:24 | 7 | these companies somehow got together and agreed to reduce the |
| 11:14:30 | 8 | production of containerboard and through supply/demand forces, |
| 11:14:36 | 9 | that forced the price of containerboard up.  That's a very |
| 11:14:42 | 10 | different kind of case. |
| 11:14:44 | 11 | MR. MOGIN:  Your Honor, you can review the complaint, |
| 11:14:46 | 12 | and you will not find any allegation that the senior people |
| 11:14:52 | 13 | did this.  The allegation is that the companies did this. |
| 11:14:52 | 14 | There is no specification that it was done by senior |
| 11:14:54 | 15 | management whatsoever.  And the supply restriction is a |
| 11:15:02 | 16 | facilitating device or a mechanism in order to effectuate and |
| 11:15:08 | 17 | to a certain extent police the price fix. |
| 11:15:12 | 18 | So it's not simply a supply restriction case.  There |
| 11:15:20 | 19 | are both elements that are in play. |
| 11:15:22 | 20 | MR. EIMER:  There is no allegation that the companies |
| 11:15:24 | 21 | got together and agreed on a price. |
| 11:15:28 | 22 | THE COURT:  Is that correct? |
| 11:15:28 | 23 | MR. MOGIN:  That's ludicrous. |
| 11:15:30 | 24 | THE COURT:  Don't use adjectives. |
| 11:15:32 | 25 | MR. MOGIN:  I'm sorry, your Honor.  That's exactly |

11:15:34　1　what the complaint alleges. The complaint couldn't be more

11:15:36　2　clear.

11:15:36　3　　　　THE COURT:  What did Judge Shadur say the complaint

11:15:38　4　alleged?  I think since he is sort of your arbiter of when he

11:15:44　5　denied their motion to dismiss -- you know, you don't have to

11:15:48　6　go back to the opinion.

11:15:48　7　　　　But I want to say something here, though.  Mr.

11:15:54　8　Sprung, thank you for thinking I don't know anything about

11:15:58　9　antitrust.  I don't.  This is only my second in 14 years.  But

11:16:02　10　my background is in federal criminal defense.  And one of the

11:16:06　11　things I do know a lot about is RICO and mail fraud and

11:16:10　12　corporate, you know, conduct or whatever we would call it.  So

11:16:16　13　I've been analogizing a lot to the -- I was in 47 juries in

11:16:22　14　this building.  I mean, I have a lot of experience on cases

11:16:26　15　that actually went to trial, and I was very surprised when I

11:16:32　16　got into this, Mr. Mogin was -- there was much more stress on

11:16:38　17　these upper-level people.  And so I didn't understand some of

11:16:44　18　the documents asking for -- I mean, I never saw a CEO in 30

11:16:50　19　years that they ever had a piece of paper on.  Okay?

11:16:54　20　　　　So I couldn't -- I was very surprised by the whole

11:16:58　21　thing because I thought that's kind of counter to everything I

11:17:04　22　knew in my white-collar commercial kind of cases, that it was

11:17:10　23　usually people -- but that isn't the way -- when I got into

11:17:14　24　this case in February, the way it was being told were all of

11:17:20　25　these very high-level people, so I think there is a little bit

11:17:26  1   of a disconnect here.  I don't think it's misstating anything.

11:17:30  2   Maybe the case began -- maybe that's why there are 27

11:17:34  3   custodians were the top people from the company.

11:17:38  4        Now, maybe there's been a shift in what you folks

11:17:40  5   have understood too or you have been thinking, and you're now

11:17:48  6   saying, No, we also need -- maybe we need some, as you have it

11:17:56  7   here on the chart, non-manager, that you're interested.

11:18:00  8        Again, Mr. Sprung, when I went over everything over

11:18:04  9   the weekend in the darn old request to produce, they were

11:18:08  10  saying across all these boards.  I mean, there was such broad

11:18:16  11  requests that it was like hard to get -- you know, what is it

11:18:22  12  you really want kind of issue is what I am saying.

11:18:26  13       Now you're being much more specific here on, you

11:18:36  14  know, whether or not there's anything that falls there.  But

11:18:38  15  you're saying that salesmen in San Diego maybe got told to go

11:18:46  16  and try to sell stuff at this higher price.  He sends an email

11:18:48  17  to his supervisor, who says, If you do that, they're going to

11:18:54  18  turn us down and in fact making less money for the company

11:18:58  19  than more money for the company and how do you as a plaintiff

11:19:02  20  get to that kind of evidence.  And these folks are saying,

11:19:08  21  Hey, we didn't know that's what the case was about.

11:19:14  22       Right?  Is that what you are saying?

11:19:16  23       MR. McKEOWN:  In part.  I mean, as we understand

11:19:20  24  their theory of a conspiracy, it is different than, for

11:19:26  25  example, the school milk cases in Florida a number of years

11:19:32   1   ago where there was an allegation that plant managers of local

11:19:34   2   milk plants got together and rigged bids. That would be a

11:19:38   3   local conspiracy involving branch managers or plant managers.

11:19:42   4           Here, as we understand their allegations of the

11:19:44   5   conspiracy, it is a conspiracy to restrict capacity and

11:19:48   6   thereby limit the amount of containerboard and thereby

11:19:50   7   increase the price. The decision to restrict capacity at

11:19:54   8   International Paper is made at the highest levels. It's not

11:19:58   9   going to be made by someone out in the field at a low level.

11:20:00   10   It's an executive-level decision. And that's why we selected

11:20:04   11   our --

11:20:06   12           We have already spent in this process, just the

11:20:08   13   document review processing, third-party vendors, outside

11:20:12   14   counsel, over $4 million to get where we are today. And we've

11:20:18   15   given a lot of custodians, we have heard other folks get an A

11:20:22   16   when they came into court with a fifth of our custodians, and,

11:20:26   17   you know, at some point, there has to be some balancing of

11:20:30   18   what do they really need and really want for this case and

11:20:34   19   what are we going to give.

11:20:36   20           MR. MOGIN: Let me respond briefly, if I may, your

11:20:38   21   Honor. First and foremost --

11:20:38   22           THE COURT: Try to do it calmly, though. Okay?

11:20:40   23           MR. MOGIN: First and foremost, we have been talking

11:20:44   24   about masters and Sherpas. You have heard me use that --

11:20:46   25           THE COURT: Yes.

11:20:48  1    MR. MOGIN:  -- ad nauseam.

11:20:48  2    THE COURT:  Your favorite one, yes.

11:20:50  3    MR. MOGIN:  Okay.  So that's lower level and upper

11:20:52  4  level.

11:20:54  5       Second, what you just heard Mr. McKeown do was to

11:20:58  6  redefine the entire case in terms of an aspect of the case.

11:21:04  7    THE COURT:  Okay.

11:21:06  8    MR. MOGIN:  The allegation is that prices were fixed.

11:21:10  9  We have talked about the mechanism of supply restriction, but

11:21:14  10  that is not the totality of the fix that's alleged.

11:21:20  11       For example, and this is becoming more important as

11:21:24  12  we review the documents, there is an allegation about fixing

11:21:30  13  of indexes; that is, a lot of the prices in this business are

11:21:36  14  set based on third-party indexes.  So, for example, something

11:21:40  15  called official board markets will say the price of

11:21:46  16  containerboard this week is X dollars per ton, to put it in

11:21:50  17  simplest form.  And so a lot of contracts are expressed as you

11:21:54  18  pay the OBM price plus or minus over the OBM price.  So if the

11:22:00  19  companies manipulate the OBM price, that's another mechanism

11:22:06  20  for effectuating the fix.  That's alleged in the complaint as

11:22:12  21  well.  That's not what you just heard from counsel.

11:22:18  22       So it's another instance of redefinition in order to

11:22:24  23  fit what they want to defend and what they want to produce.

11:22:28  24    THE COURT:  Well, that's your spin.

11:22:30  25    MR. SPRUNG:  Your Honor?

11:22:30    1    THE COURT:  That wouldn't be my spin.  Because I
11:22:34    2    think you're actually -- this is so mammoth that you're
11:22:40    3    actually both defining and redefining -- with notice pleading,
11:22:48    4    you are defining and redefining what the claims and defenses
11:22:52    5    are.  You are.  This is not unusual, and thank God you haven't
11:22:56    6    started the depositions before we get it figured out.
11:23:00    7         Yes?
11:23:00    8         MR. SPRUNG:  Yes.  Thank you.
11:23:02    9         So we're going to -- we disagree about whether there
11:23:10   10    is price fixing.
11:23:12   11         THE COURT:  That's true.
11:23:14   12         MR. SPRUNG:  And Mr. Eimer -- whether we're alleging
11:23:18   13    that, Mr. Eimer believes we are only alleging capacity
11:23:22   14    restrictance (sic).  That was not my understanding, frankly,
11:23:26   15    of our complaint.
11:23:26   16         THE COURT:  Right.
11:23:26   17         MR. SPRUNG:  We believe, I believe, that we are
11:23:28   18    alleging agreements on prices, and we are going to look at
11:23:36   19    some documents and find out if there is some evidence of --
11:23:40   20    you know, not just on supply but on prices as well, and we
11:23:42   21    have already in looking at documents seen some indication that
11:23:46   22    there are discussions about indices used to set prices.
11:23:54   23         So the point I was -- so we have a disagreement about
11:23:58   24    that, and I think that one way to resolve or move forward is
11:24:06   25    if your Honor looks at page 5, page 5 lists all these sources

11:24:14   1   of documents that IP has identified that the company has for

11:24:26   2   collections of documents. And on the right-hand side, all the

11:24:30   3   way over on the right, so on the left-hand side going down are

11:24:36   4   the different sources of documents. Some of those are

11:24:38   5   understandable, some of those are kind of code words that we

11:24:44   6   have gotten to understand by talking to Mr. McKeown, but most

11:24:48   7   of them are understandable. All the way on the right are

11:24:50   8   containerboard sales employees below VP and GM level.

11:24:58   9   We can agree -- we have room to negotiate over which

11:25:04   10   sources of documents we should get documents for for this

11:25:10   11   category of employee. And so, you know, we would like, for

11:25:16   12   example, emails. Do we need Lotus Notes applications for

11:25:24   13   sales employees? Probably not. They have said we are not

11:25:30   14   going to give you anything for these sales employees between

11:25:38   15   VP and GM level, but we would at least like to negotiate with

11:25:42   16   them over -- maybe all we need are their laptops and desktops

11:25:46   17   and their emails and travel and expense reports.

11:25:54   18   But we are not able to even negotiate with them over

11:25:58   19   these categories because they have said, We are not going to

11:26:02   20   give you any of those because it's too expensive for us to

11:26:08   21   search and produce documents from those individuals. And

11:26:10   22   that's just not going to work for us.

11:26:12   23   THE COURT: Is that what you said? Did you say

11:26:14   24   expense? Did you say expense? Because that's the first time

11:26:18   25   I have heard anybody say expense in the case.

11:26:20  1        MR. McKEOWN:  We have said burden.

11:26:22  2        THE COURT:  Burden, okay.

11:26:22  3        MR. McKEOWN:  Which is related to expense.

11:26:24  4        THE COURT:  Okay.

11:26:24  5        MR. McKEOWN:  But on this particular category, your

11:26:26  6   Honor, I may be mistaken, but I think until today when we got

11:26:30  7   this chart, we hadn't seen containerboard sales employees

11:26:34  8   below VP/GM level on their list.  We got a list from

11:26:40  9   Mr. Sprung on April 16 that had 27 categories or individuals

11:26:48  10  listed.  A number of these, I think nine of them, we agreed to

11:26:54  11  add as custodians.

11:26:58  12        THE COURT:  Is this category part of it?

11:27:02  13        MR. McKEOWN:  And I don't believe this category of

11:27:04  14  containerboard sales VPs below VP/GM level was on that list,

11:27:08  15  not that I would agree to it.  He is correct in assuming what

11:27:12  16  my position would be, but I say that only as an example of the

11:27:16  17  plaintiffs are being very good about being aggressive and

11:27:18  18  trying to get more and more custodians, and we think at some

11:27:24  19  point, there is a balancing that has to be done.  Every

11:27:26  20  salesperson is not going to be happy with the price he is

11:27:28  21  offered because he gets a commission if he sells product, and

11:27:32  22  he's always going to want a lower price rather than a higher

11:27:34  23  price.  And the fact that his sales manager may tell him, you

11:27:38  24  know, this is the price doesn't mean there is a conspiracy at

11:27:42  25  some high level of the sort that's alleged here.

11:27:44   1    MR. MOGIN:  But that has little, if anything, to do

11:27:48   2  with discovery of that information.

11:27:50   3    And, your Honor, with respect to whether we've asked

11:27:52   4  for it before, I'd simply refer you right back to one of the

11:27:56   5  RPDs we were talking about yesterday, No. 3.

11:28:02   6    MR. McKEOWN:  I am talking about in the meet and

11:28:04   7  confer context.

11:28:04   8    THE COURT:  Right.

11:28:06   9    MR. SPRUNG:  And, Jim, we have not identified -- I

11:28:12  10  mean, you're right, we haven't identified in our letters every

11:28:16  11  single category of employee that we are going to seek.  We

11:28:24  12  don't yet have org charts.  We haven't yet figured out what

11:28:28  13  categories of employees exist.

11:28:32  14    And so our letter did identify the issues that we

11:28:38  15  have been debating over up to now.  We haven't even gotten --

11:28:42  16  until recently, we haven't gotten some general managers on the

11:28:52  17  list.

11:28:56  18    So, you know, we're picking our fights right now

11:28:58  19  about things that you said you have already disagreed --

11:29:02  20  you're already disagreeing with us about.  You know, there

11:29:06  21  might be additional employees once we see org charts or once

11:29:10  22  we see this list that we are going to identify.  I would say

11:29:14  23  that these sales employees are in that category.

11:29:18  24    THE COURT:  Okay.

11:29:20  25    MR. CAMPBELL:  Can you give us an idea of how many

| | |
|---|---|
| 11:29:24 | 1 |
| 11:29:26 | 2 |
| 11:29:28 | 3 |
| 11:29:28 | 4 |
| 11:29:30 | 5 |
| 11:29:30 | 6 |
| 11:29:34 | 7 |
| 11:29:36 | 8 |
| 11:29:40 | 9 |
| 11:29:54 | 10 |
| 11:29:58 | 11 |
| 11:30:02 | 12 |
| 11:30:10 | 13 |
| 11:30:18 | 14 |
| 11:30:26 | 15 |
| 11:30:32 | 16 |
| 11:30:38 | 17 |
| 11:30:50 | 18 |
| 11:30:52 | 19 |
| 11:30:58 | 20 |
| 11:31:02 | 21 |
| 11:31:10 | 22 |
| 11:31:12 | 23 |
| 11:31:20 | 24 |
| 11:31:24 | 25 |

1   employees would fall in that category?

2          MS. BULA:  I would be guessing.

3          THE COURT:  Guess.

4          MR. CAMPBELL:  A thousand?

5          MS. BULA:  Hundreds.

6          THE COURT:  Hundreds of thousands?

7          MR. McKEOWN:  No.

8          MR. CAMPBELL:  Hundreds.

9          THE COURT:  Well, so if we were doing real mediation

10  here and the mediator was summarizing what both sides are

11  saying, which is what I do in my real mediations, my real

12  non-e-mediations, you somewhat internally summarize what you

13  hear both sides as saying is I hear IP saying they are scared

14  to death to increase the scope because every time they are

15  going to increase the scope, you guys are going to want more.

16          And you're saying realistically this is a really good

17  -- page 5 is a very good best-that-you-can-do-for-June-1st

18  guess at what your categories are, but I think you are very

19  realistically saying there may be more from what we find.  So

20  I think that one of the goals of the mediation is to be able

21  to take both sides' fears because that's what is it's about, a

22  lot is what people's fears are, and to be able to give each

23  side some kind of comfort here.

24          I mean, if we were to be able to figure out a way,

25  say, through sampling or some way to get you some

| | |
|---|---|
| 11:31:30 | 1 |
| 11:31:38 | 2 |
| 11:31:40 | 3 |
| 11:31:46 | 4 |
| 11:31:48 | 5 |
| 11:31:52 | 6 |
| 11:31:56 | 7 |
| 11:32:04 | 8 |
| 11:32:08 | 9 |
| 11:32:12 | 10 |
| 11:32:14 | 11 |
| 11:32:18 | 12 |
| 11:32:20 | 13 |
| 11:32:26 | 14 |
| 11:32:32 | 15 |
| 11:32:36 | 16 |
| 11:32:36 | 17 |
| 11:32:38 | 18 |
| 11:32:38 | 19 |
| 11:32:40 | 20 |
| 11:32:42 | 21 |
| 11:32:54 | 22 |
| 11:32:54 | 23 |
| 11:32:58 | 24 |
| 11:33:02 | 25 |

1 containerboard information about these VP/GM level -- and I
2 don't really know if you're really going to depose all these
3 people with these red circles. I mean, they're also thinking
4 -- think about it from their perspective since they are the
5 ones that have to produce all these people. I mean, it looks
6 -- you know, you look at these flow charts, this is way over
7 50 deps or, you know, 30 deps right here, so how the heck are
8 you even going to get to -- even with a liberal judge, how the
9 heck are you going to get to -- then you're going to start
10 thinking -- I don't know if this is what Jim is thinking, but
11 I am thinking he is thinking then how the heck are you going
12 to do all of that down there too? It's not just get them the
13 documents, put the hold, everything the company has to do to
14 make this happen. And then their fear is six months from now,
15 you're going to have four more categories. Am I right or
16 wrong?

17        MR. McKEOWN: You are correct.

18        MR. EIMER: Correct.

19        THE COURT: I am correct.

20        And people are biting their tongues. I tell Mogin to
21 stop it because he is the most feisty. But, I mean, I think
22 internally, that's where we are.

23        So what are we going do to -- it seems to me like
24 this category looks important, but I don't know if we ought to
25 go full fledge ahead with the category, particularly before

11:33:08　1　there's even been this real review of what look like the top

11:33:12　2　level.

11:33:14　3　　　　　MR. SPRUNG:  And that's -- so, your Honor, that's why

11:33:18　4　we --

11:33:18　5　　　　　THE COURT:  But I like these categories because this

11:33:20　6　is kind of saying this is probably -- this is probably, in the

11:33:26　7　end, don't you think that looks like the way the case would

11:33:30　8　kind of come in if you were doing your list of witnesses for

11:33:32　9　trial?  I mean, you know --

11:33:34　10　　　　　MR. MOGIN:  Plus boxes; boxes aren't on the chart.

11:33:38　11　　　　　THE COURT:  Well, now, so containerboard sales

11:33:42　12　employees below VP/GM level, now that we know the difference

11:33:50　13　between containerboard and container boxes, does that have to

11:33:54　14　have another column then for container boxes?  Same thing?

11:34:00　15　　　　　MR. MOGIN:  One of the important issues in the case

11:34:02　16　-- well, go ahead, Mike.  You talk about the common impact

11:34:04　17　issue.

11:34:04　18　　　　　MR. FREED:  I wasn't going to talk common impact, but

11:34:08　19　I was going to say there is not necessarily and not usually a

11:34:10　20　correlation between custodians and number of depositions

11:34:12　21　taken, and moving all the way to the far right of sales

11:34:14　22　personnel below a certain level, we may get documentation and

11:34:18　23　do in most cases for any number of sales personnel, we may

11:34:22　24　take a relatively small percentage of the depositions, just

11:34:26　25　enough to illustrate the point.

11:34:28   1   So even with the top-level people, while frequently

11:34:30   2   the number of depositions we take is higher, we don't take the

11:34:34   3   deposition always of every one of them because you can make

11:34:36   4   the point if there is a document which goes out to five or six

11:34:40   5   people, all regional sales executives, and it's an important

11:34:46   6   document in our view, we may depose one or two.  We are not

11:34:50   7   going to depose 11 or 12 regional sales executives.

11:34:54   8   So while it's true we are trying to consider the

11:34:58   9   importance and necessity of custodians, or sources, because

11:35:02   10   it's not -- I don't want to go into the fact that sometimes

11:35:04   11   these documents don't come from custodians but departments,

11:35:08   12   expense reports and things of that kind, it isn't necessarily

11:35:10   13   going to follow, your Honor, that a high percentage of those

11:35:12   14   people whose documents -- people whose documents we see are

11:35:16   15   going to be deposed.

11:35:16   16   THE COURT:  Okay.

11:35:18   17   MR. FREED:  Because we know that even though there's

11:35:22   18   liberal judges are not going to allow 40 depositions from

11:35:26   19   seven defendants.  It's not going to happen.  We are not

11:35:28   20   suggesting that's where we want to go with this, but it does

11:35:32   21   help us and refine those people we want to depose to know the

11:35:34   22   kinds of documents that are being exchanged even among the

11:35:38   23   people who we think are important custodians.  And sometimes,

11:35:44   24   yes, it's at the high levels, you always hope to find that,

11:35:48   25   but a lot of times these cases are made -- I won't use the

11:35:54   1   example Sherpa, but they are made of the people who actually

11:35:56   2   are the people who encounter the pushback from customers over

11:36:00   3   company policies, and the way that they then are responded to

11:36:04   4   by their superiors is often very revealing.

11:36:08   5          So I guess I am trying to -- I talk a lot, but the

11:36:12   6   limited point I am saying is I am not correlating depositions

11:36:14   7   and custodians.  I think that's --

11:36:18   8          THE COURT:  But you can understand what their concern

11:36:18   9   is --

11:36:20   10          MR. FREED:  Of course.

11:36:20   11          THE COURT:  -- that the broader the corpus gets

11:36:22   12   here --

11:36:22   13          MR. McKEOWN:  And it's even beyond depositions, even

11:36:24   14   the fact of having to produce documents --

11:36:26   15          THE COURT:  Right.

11:36:26   16          MR. McKEOWN:  -- and collect documents --

11:36:28   17          THE COURT:  And to preserve.

11:36:30   18          MR. McKEOWN:  -- and all these various types of

11:36:30   19   documents from all these --

11:36:32   20          THE COURT:  Now, we are going to take a potty break

11:36:34   21   in a moment, but I want to end with something I forgot to say

11:36:40   22   yesterday, that going back to my 30 years -- don't you love

11:36:42   23   people's war stories? -- in white collar, they are not -- in

11:36:48   24   white-collar matters, across the board, the number one defense

11:36:54   25   to everything is some form of lack of intent, lack of

11:36:58  1   agreement, good faith, if you will.

11:37:02  2        I want to say, and this is why I am really glad you

11:37:06  3   are here today, you need the documents as much as they need

11:37:10  4   the documents.  The one time in this building when a document

11:37:16  5   was helpful and it wasn't the government shoving some document

11:37:20  6   down our throat, we needed the documents in order to defend

11:37:24  7   good faith.  So there is here -- I understand, again, this

11:37:30  8   basic tension, give me, give me, give me, no, go away, but you

11:37:36  9   need the documents as much as they need them.

11:37:38  10       MR. McKEOWN:  I agree completely.

11:37:40  11       THE COURT:  And I think today is very helpful, even

11:37:42  12  though it seems like it's getting broader, you're getting

11:37:46  13  inside their head where they're going.

11:37:48  14       MR. McKEOWN:  Your Honor, I agree completely that we

11:37:52  15  need the critical documents as much as they do.  We are also

11:37:56  16  comfortable that the people who would be making the decisions

11:38:00  17  that would be playing in this question as to the conspiracy

11:38:02  18  alleged are within our named custodians.

11:38:04  19       THE COURT:  Okay.

11:38:04  20       MR. MOGIN:  Your Honor --

11:38:06  21       THE COURT:  All right.

11:38:06  22       MR. MOGIN:  -- we didn't ask for the people who made

11:38:10  23  the decisions.  We asked for information.

11:38:10  24       THE COURT:  Right.

11:38:12  25       MR. MOGIN:  And, secondly, the idea of burden --

11:38:14  1      THE COURT:  Of what?

11:38:14  2      MR. MOGIN:  Of burden.  It's a two-way street.  It

11:38:18  3  costs us time and money to review worthless documents as well

11:38:24  4  as it costs us time and money to review good documents.

11:38:26  5      THE COURT:  Okay.

11:38:26  6      MR. MOGIN:  We have no interest in burden for the

11:38:30  7  sake of burden, of requesting documents for the sake of

11:38:34  8  requesting documents.  Volume is irrelevant to us.  We are

11:38:38  9  looking for the right documents.

11:38:44  10      THE COURT:  All right.  Ten minutes.  We will be back

11:38:48  11  here at a quarter to 12:00.  And then I think we will stop on

11:38:54  12  your chart and we will go to -- I have some bullet points

11:38:56  13  here.  I have a couple bullet points that I'd like to go over,

11:39:02  14  if we can?

11:39:02  15      MR. SPRUNG:  Yes.  Your Honor, can I just make one

11:39:04  16  last point?

11:39:06  17      THE COURT:  Yes.

11:39:06  18      MR. SPRUNG:  That is, I was hoping that this would be

11:39:10  19  a mechanism for bridging our difference because there are

11:39:16  20  maybe nine or 10 different sources of documents, and we can

11:39:22  21  negotiate over what sources they look at for.  And so, you

11:39:30  22  know, we can both give on sources.  What we don't want to do

11:39:36  23  is just exclude an entire group of potential category of

11:39:44  24  individuals.

11:39:44  25      MR. FREED:  We can give on individuals too once we

| | | |
|---|---|---|
| 11:39:46 | 1 | have vetted them. |
| 11:39:46 | 2 | THE COURT:  Right. |
| 11:39:48 | 3 | MR. SPRUNG:  Yes. |
| 11:39:48 | 4 | THE COURT:  Well, that's why it's good that we have |
| 11:39:52 | 5 | two and a half weeks before our next meeting because we are |
| 11:39:56 | 6 | going to have some time to I feel like absorb what we even |
| 11:40:02 | 7 | learned here today. |
| 11:40:02 | 8 | So 10 minutes, everybody. |
| 11:41:48 | 9 | (Discussion off the record.) |
| 11:41:52 | 10 | (Short break.) |
| 11:52:58 | 11 | MR. McKEOWN:  Your Honor, we have a proposal to try |
| 11:53:00 | 12 | to break the log jam and see if we can't do something here to |
| 11:53:04 | 13 | move this along. |
| 11:53:08 | 14 | International Paper has a number of mills.  It has |
| 11:53:10 | 15 | over a hundred box plants.  What we propose is that the |
| 11:53:18 | 16 | plaintiffs can pick any two of the mills and any two of the |
| 11:53:22 | 17 | box plants, and we will do a search of the emails for the |
| 11:53:28 | 18 | managers for those facilities and for the salesperson who is |
| 11:53:36 | 19 | responsible for those facilities.  They may not be in the |
| 11:53:40 | 20 | plant or mill, because the mill salesperson, for example, |
| 11:53:42 | 21 | won't be in the mill.  And, you know, we will review the |
| 11:53:46 | 22 | documents of those four individuals, and if, you know, our |
| 11:53:52 | 23 | view would be that they would need to then come forward with |
| 11:53:54 | 24 | some reason based on what they find to demonstrate why they |
| 11:53:58 | 25 | should go any further. |

| | | |
|---|---|---|
| 11:54:00 | 1 | THE COURT:  Okay. |
| 11:54:00 | 2 | MR. FREED:  Just so I understand, is that in lieu of |
| 11:54:04 | 3 | also giving us the lit hold individuals or in addition to? |
| 11:54:10 | 4 | MR. McKEOWN:  We have taken the lit hold individual |
| 11:54:16 | 5 | question under advisement.  We understand. |
| 11:54:18 | 6 | MR. FREED:  That's separate. |
| 11:54:18 | 7 | MR. McKEOWN:  That's a separate issue.  This is going |
| 11:54:20 | 8 | to -- |
| 11:54:22 | 9 | MR. FREED:  I thought so, but you should never assume |
| 11:54:24 | 10 | those things. |
| 11:54:24 | 11 | MR. McKEOWN:  This is going to the issue that |
| 11:54:28 | 12 | Mr. Sprung raised before about these folks, and I can't |
| 11:54:30 | 13 | remember if it was Judge Nolan or someone else that said, What |
| 11:54:32 | 14 | about a sample? |
| 11:54:34 | 15 | THE COURT:  Me. |
| 11:54:34 | 16 | MR. MOGIN:  Your Honor, I don't know if you are a |
| 11:54:36 | 17 | movie fan, but Jerry Maguire, there was a famous line, you had |
| 11:54:42 | 18 | me at hello. |
| 11:54:42 | 19 | THE COURT:  Show me the money. |
| 11:54:44 | 20 | MR. MOGIN:  And show me the money.  He had me at |
| 11:54:50 | 21 | hello and then he took it away. |
| 11:54:52 | 22 | THE COURT:  Well, no.  He had me at hello, so what's |
| 11:54:54 | 23 | the problem here?  Because he just finished the sentence by |
| 11:54:56 | 24 | saying he is going to give you four, he is going to do as much |
| 11:55:00 | 25 | as they can, see what you find out from that, and then you're |

| | |
|---|---|
| 11:55:08 | 1 |
| 11:55:12 | 2 |
| 11:55:20 | 3 |
| 11:55:24 | 4 |
| 11:55:28 | 5 |
| 11:55:32 | 6 |
| 11:55:34 | 7 |
| 11:55:40 | 8 |
| 11:55:40 | 9 |
| 11:55:44 | 10 |
| 11:55:48 | 11 |
| 11:55:52 | 12 |
| 11:55:58 | 13 |
| 11:56:06 | 14 |
| 11:56:08 | 15 |
| 11:56:14 | 16 |
| 11:56:18 | 17 |
| 11:56:24 | 18 |
| 11:56:30 | 19 |
| 11:56:34 | 20 |
| 11:56:40 | 21 |
| 11:56:44 | 22 |
| 11:56:50 | 23 |
| 11:56:52 | 24 |
| 11:56:56 | 25 |

1  going to come back.  If anything looks like it's fruitful from
2  that, that doesn't cut you off.  It doesn't cut you off.
3       It seems to me -- I have a new favorite word
4  overnight.  It's called "sequential," as opposed to phase
5  discovery.  Now I am into sequential here.
6       MR. MOGIN:  Do we need to parse that?
7       THE COURT:  Right.  I do.
8       MR. SPRUNG:  Can I ask --
9       THE COURT:  Can I say, Chris and I last night, our
10  take away from yesterday is that you guys have done the most
11  extraordinary one year of work I have ever seen.  Chris and I
12  have two cases that are single plaintiffs that go back to 2008
13  and they haven't finished fact discovery.  If I am correct,
14  Milt Shadur, your opinion came down about one year ago this
15  week.  In one-year period of time, you have done so much
16  discovery, I cannot believe it, considering what you have had
17  on your plate.  Unbelievable communication back and forth.
18       And as much as Jim wants us to go fast, it can't go
19  this fast.  That doesn't mean it's going to take 10 years, but
20  it's somewhere in between now -- and I think this is a
21  brilliant idea because this is kind of -- this is a little bit
22  down the -- you know, the food -- this is a little bit down
23  the tree here.
24       MR. MOGIN:  I don't disagree.  My issue was --
25       THE COURT:  And that they affirmatively came up with

11:56:58    1    this suggestion themselves is terrific.

11:57:02    2        MR. MOGIN:  Well, they actually were taking advantage

11:57:04    3    of your suggestion about sampling.

11:57:08    4        THE COURT:  Right.  Because I'm so brilliant.  Right.

11:57:08    5        MR. McKEOWN:  We were, your Honor.

11:57:10    6        THE COURT:  No, but isn't that good?

11:57:12    7        MR. MOGIN:  It is good.  The only issue is, from my

11:57:16    8    perspective, A, I think it's light on the mills in terms of

11:57:20    9    the numbers.

11:57:20   10        THE COURT:  Right.

11:57:20   11        MR. MOGIN:  But, B, it was the very last thing that

11:57:26   12    was said is that the plaintiffs come back with some sort of

11:57:32   13    reasoned basis, and I can just see -- for proceeding, and I

11:57:38   14    can just see the mischief in that.

11:57:42   15        THE COURT:  Well, I know, because you're operating in

11:57:46   16    the old style, not in the new style, and this new style is you

11:57:50   17    can go back to people, and hopefully you're building some

11:57:52   18    trust over this.  They're trusting that they're going to give

11:57:58   19    you two, they're going to give you four, and if you don't need

11:58:02   20    anymore, you're not going to ask for anymore.

11:58:02   21        MR. FREED:  So I am going to put on my paranoid hat.

11:58:02   22        THE COURT:  Yeah, right.

11:58:06   23        MR. FREED:  They are going to give us four, but that

11:58:08   24    gives them a certain ability to select the results --

11:58:12   25        THE COURT:  No, you get to pick.

11:58:12   1          MR. McKEOWN:  No, you pick.

11:58:14   2          THE COURT:  You pick.

11:58:14   3          MR. FREED:  Oh, okay.  That's what I was going to

11:58:16   4   ask.

11:58:16   5          MR. McKEOWN:  You pick the list of mills, you pick

11:58:20   6   the list of plants.

11:58:20   7          THE COURT:  You pick, and they are going to give you

11:58:24   8   the emails?  They are going to kind of give you just emails,

11:58:26   9   or what --

11:58:26   10         MR. McKEOWN:  We would just do the emails.  That

11:58:28   11   seems to be what's in the most interest.

11:58:30   12         THE COURT:  You do the emails to start, and you look

11:58:32   13   at these four.

11:58:32   14         And this is simultaneous with other things.  This

11:58:36   15   isn't just that.

11:58:38   16         MR. FREED:  I get it.  This is a variation on Zagel's

11:58:42   17   approach in Steel --

11:58:42   18         MR. EIMER:  Right.

11:58:44   19         MR. FREED:  -- which Andy actually alluded to

11:58:46   20   yesterday.  I'm not sure if --

11:58:46   21         THE COURT:  I didn't know.  It was over my head.

11:58:48   22         MR. FREED:  I didn't think you picked up on it, but

11:58:50   23   both Mr. Marovitz and Mr. Eimer and I are in the case with --

11:58:54   24   among other things, Judge Zagel did something like this.  This

11:58:58   25   is a variation on it.

11:59:00    1    MR. EIMER: What Judge Zagel -- first he picked two

11:59:02    2    defendants only, and he suggested that the two defendants pick

11:59:06    3    the top 10 people.

11:59:10    4    It was also -- they may disagree, but it's also a

11:59:14    5    supply restriction case.

11:59:16    6    MR. FREED: I disagree with the characterization

11:59:18    7    here, but it is a supply restriction.

11:59:20    8    MR. EIMER: Supply restriction case. He said --

11:59:20    9    Judge Zagel said a supply restriction case has to be

11:59:24    10    implemented from the top, so pick your top 10 people, and then

11:59:28    11    respond to the request for documents. And so two of us did.

11:59:30    12    I was one of the unlucky two.

11:59:32    13    We did our production. U.S. Steel was the other one.

11:59:36    14    They did their production. And then Judge Zagel looked at

11:59:40    15    that and said, Okay, now I understand how it works, now the

11:59:44    16    others do that. And the other defendants then followed up and

11:59:46    17    they did their production after that.

11:59:46    18    MR. FREED: Can we think about this and maybe come

11:59:50    19    back with -- we certainly aren't rejecting it. We would be in

11:59:54    20    no position to reject it anyway. But think about it and come

11:59:58    21    back with maybe some refinements or maybe say yes or --

12:00:00    22    THE COURT: That's perfect, don't you think?

12:00:02    23    MR. McKEOWN: Sure.

12:00:04    24    THE COURT: I mean, nobody is walking out of here

12:00:06    25    with -- okay.

12:00:08  1    MR. FREED:  I think if we can refine it, we might be

12:00:12  2    able to work that out.

12:00:12  3    THE COURT:  Good.

12:00:16  4    Now, let me go back to the beginning here.  So my

12:00:36  5    bullet points here were -- so the litigation hold names and --

12:00:48  6    MR. SPRUNG:  Dates.

12:00:48  7    THE COURT:  -- titles and dates, IP is considering

12:00:56  8    that, right?

12:00:58  9    MR. EIMER:  Right.

12:00:58  10   THE COURT:  You are considering that.  That's on

12:01:04  11   considered to get back to you.

12:01:04  12   Okay.  Even though I have to say the RPD to get to

12:01:08  13   this, the first RPD on the -- we are still not talking about

12:01:18  14   it, but on the board of directors or on the list of all the --

12:01:22  15   first request under the RPD is all of the -- what do you call

12:01:28  16   it? -- the board of directors.  And you are saying yes, you

12:01:36  17   think that you have turned them over, but you are going to go

12:01:38  18   over that at the meeting today.

12:01:40  19   MR. McKEOWN:  Correct.

12:01:40  20   THE COURT:  You don't have any opposition to giving

12:01:42  21   them --

12:01:44  22   MR. McKEOWN:  I don't want to go down to every single

12:01:46  23   mill and every single plant for org charts --

12:01:50  24   THE COURT:  Right.

12:01:52  25   MR. McKEOWN:  -- but with respect --

12:01:52  1    THE COURT:  You're willing to talk about it.  Okay?

12:01:52  2    MR. McKEOWN:  -- to the other org charts, it's not an

12:01:54  3  objection; it's a question of do we have them with respect to

12:01:58  4  something, one of the areas that's at issue in this case.

12:02:02  5    You are obviously not asking about the paper

12:02:04  6  division, for instance.

12:02:04  7    MR. SPRUNG:  Yes.  I mean, it would be helpful to

12:02:06  8  have a better understanding of what those positions are that

12:02:10  9  are on the org chart.  I mean, Megan, what you said was the

12:02:14  10  first I had heard it, I didn't -- so I don't understand

12:02:18  11  necessarily from the title what the job is.

12:02:22  12    THE COURT:  Well, here is something I thought of.  I

12:02:24  13  actually -- I think there was a little tension between both

12:02:28  14  sides, but I thought the pre-30(b)(6) letters were incredibly

12:02:40  15  helpful.  And then they had -- you know, it was going to be an

12:02:46  16  alternative to 30(b)(6), and it was really a good try to kind

12:02:52  17  of make it, but I am sure the 30(b)(6) deps probably went

12:02:56  18  better as a result of the letter.

12:03:00  19    I don't want to be turning everybody into letter

12:03:04  20  writers, but some of the questions, Mr. Sprung, you might have

12:03:10  21  when you start reviewing the documents, if you were to be able

12:03:12  22  to ask pointed questions regarding the document just like we

12:03:20  23  did here today might be a great way to be able to move things

12:03:24  24  on, kind of -- would you have any problem with that, you

12:03:28  25  answering?

12:03:28   1   MR. McKEOWN:  It depends on what's all in the letter.
12:03:30   2   If I get the equivalent of very lengthy interrogatories, I may
12:03:34   3   have some concerns.
12:03:34   4         THE COURT:  Right.
12:03:36   5         MR. McKEOWN:  We have exchanged a number of letters
12:03:36   6   that I think --
12:03:36   7         THE COURT:  I can tell.
12:03:38   8         MR. McKEOWN:  -- and I hope have helped provide
12:03:40   9   things.  We also provided a big stack of charts at the
12:03:44  10   30(b)(6) deposition to explain all the IP systems which go to
12:03:50  11   the transactional data which are fairly complex.
12:03:58  12         THE COURT:  Okay.  Let's talk about -- let's talk
12:04:02  13   about IP's backup tapes for a moment.  And what I mean by that
12:04:10  14   is I've been talking -- here is where I have been talking
12:04:22  15   phased discovery trying to get people to agree, but I haven't
12:04:24  16   put it to a vote yet, is I saw phase one as active data.
12:04:36  17         Phase two were going to be the privilege logs -- I
12:04:38  18   mean, where I am right now, phase two would encompass
12:04:42  19   privilege log review and backup tapes.  I am not saying the
12:04:48  20   plaintiffs agree with me, but I am trying to sort of get my
12:04:52  21   arms around this.
12:04:54  22         So I wanted to know individually what is the story on
12:04:58  23   your backup tapes, do you have them, are they preserved, are
12:05:06  24   they searchable, and do the plaintiffs understand -- whether
12:05:14  25   they agree with you or not that you're giving it, do they

| | | |
|---|---|---|
| 12:05:16 | 1 | physically understand factually what your story is? |
| 12:05:22 | 2 | MR. McKEOWN: I think so. |
| 12:05:24 | 3 | THE COURT: Mr. Sprung? |
| 12:05:26 | 4 | MR. MOGIN: Go to the charts, your Honor. |
| 12:05:26 | 5 | THE COURT: Go to the chart. Okay. |
| 12:05:28 | 6 | MR. MOGIN: To the red box. |
| 12:05:32 | 7 | THE COURT: On page 1. |
| 12:05:38 | 8 | MR. SPRUNG: So, your Honor, I can tell you our |
| 12:05:44 | 9 | understanding of backup tapes for emails, and then when we get |
| 12:05:48 | 10 | to this chart which has some of their other types of |
| 12:05:52 | 11 | documents, my understanding gets much -- |
| 12:05:56 | 12 | THE COURT: Fuzzier. |
| 12:05:56 | 13 | MR. SPRUNG: Fuzzier, exactly. |
| 12:05:58 | 14 | THE COURT: Good. |
| 12:05:58 | 15 | MR. SPRUNG: So it would be helpful to have a better |
| 12:06:00 | 16 | understanding. |
| 12:06:00 | 17 | THE COURT: Right. |
| 12:06:02 | 18 | MR. SPRUNG: So our understanding with email is that |
| 12:06:08 | 19 | IP preserved their backup tapes for their exchange server at |
| 12:06:16 | 20 | the time of the litigation hold on September 10th, 2010, which |
| 12:06:20 | 21 | would mean that there are backup tapes for the exchange server |
| 12:06:26 | 22 | that are preserved from September 6th through September 10th. |
| 12:06:34 | 23 | MR. McKEOWN: No, I don't think that's right. What |
| 12:06:36 | 24 | happens is, first of all, I don't think backup tapes on emails |
| 12:06:40 | 25 | are the same issue for us as they are for some of the other |

12:06:42  1   defendants because IP only does five days.  At the time of the

12:06:46  2   litigation hold, a non-disaster recovery copy, which some

12:06:54  3   might call a backup, of all these emails in my doc folders

12:06:58  4   were made.

12:07:02  5          MR. SPRUNG:  Okay.

12:07:04  6          MR. McKEOWN:  It's not the case that there is a

12:07:06  7   backup tape dated September 6, 2010.

12:07:08  8          MR. FREED:  No, I think he said for the four days.

12:07:14  9          Isn't that the same thing you're saying; you had it

12:07:16  10  for the five days preceding September 10?

12:07:18  11         MR. McKEOWN:  There was a copy made of everything

12:07:20  12  that would be on the backup tape taken and put into the lit

12:07:24  13  hold.

12:07:26  14         MR. FREED:  So it's not a backup tape, per se, got

12:07:28  15  it.

12:07:28  16         MR. McKEOWN:  There is confusion in the 30(b)(6)

12:07:30  17  deposition because when you talk to an I.T. specialist, they

12:07:34  18  only want to use the word backup tape in the context of

12:07:38  19  disaster recovery --

12:07:38  20         THE COURT:  Right.

12:07:38  21         MR. McKEOWN:  -- as opposed to a copy which was made

12:07:40  22  for purposes of everybody that's on the litigation hold for

12:07:46  23  all their emails and My Docs.

12:07:50  24         MR. SPRUNG:  And so what IP did is it made a copy of

12:07:54  25  the exchange server?

12:07:56    1    MR. McKEOWN: I believe that's correct. I think it's

12:07:58    2    described in some of our 30(b)(6) letters. If we had to go

12:08:04    3    back through that, we could do that.

12:08:06    4    MR. SPRUNG: As of the date of the litigation hold.

12:08:10    5    MR. McKEOWN: September 10.

12:08:10    6    THE COURT: And how far back does it go?

12:08:12    7    MR. McKEOWN: Everything that was on the system at

12:08:14    8    the time.

12:08:16    9    THE COURT: Good.

12:08:16   10    MR. SPRUNG: Which is -- yeah, I mean --

12:08:20   11    MR. McKEOWN: So we don't have -- unlike some

12:08:22   12    defendants may have a December 31, 2004, tape sitting

12:08:26   13    somewhere, we do not have that issue.

12:08:30   14    THE COURT: So is there -- and I learned this from

12:08:32   15    reading the other defendants -- about all the other

12:08:38   16    defendants, some people on their backup tapes have some kind

12:08:40   17    of an index on this photograph that you took or this snapshot

12:08:46   18    you took. Is there any way to index any of these tapes?

12:08:52   19    MR. McKEOWN: I'd have to check. I don't think so.

12:08:54   20    I think they get processed and put into review.

12:09:00   21    MR. SPRUNG: I think, Judge, you mean not the tapes

12:09:02   22    but this image, that the image of the exchange server that has

12:09:08   23    been maintained --

12:09:10   24    MR. EIMER: Right.

12:09:10   25    MR. SPRUNG: -- can that be searched?

12:09:16  1    THE COURT:  Searched or indexed.

12:09:16  2    MR. SPRUNG:  Can you create a word index?

12:09:20  3    THE COURT:  Right.  Can you do that.

12:09:22  4    I think -- from what I found out from Sedona is some

12:09:26  5  of these things, you take the picture and there's nothing

12:09:28  6  there except really just the picture for disaster purposes and

12:09:34  7  does a lawsuit constitute disaster.  But some of them have got

12:09:40  8  an index searching function, and others are just snapshots.

12:09:44  9    MR. McKEOWN:  We can inquire.

12:09:48  10    THE COURT:  Okay.

12:09:48  11    MR. McKEOWN:  I have some copies of this.

12:10:02  12    This, again, was marked for outside attorneys only.

12:10:08  13  We are providing this for use.

12:10:14  14    This is one of the documents that was prepared by

12:10:18  15  International Paper for the 30(b)(6) deposition that goes

12:10:22  16  through the various computer systems and what backup exists.

12:10:28  17    MR. SPRUNG:  But does this contain the My Docs

12:10:32  18  server?  I think this is the transactional data.

12:10:38  19    MR. McKEOWN:  Correct.

12:10:40  20    MR. SPRUNG:  Which is a different animal.  This is

12:10:42  21  transactional data.

12:10:44  22    THE COURT:  Does that mean non-email?

12:10:46  23    MR. SPRUNG:  Non-email, non-Word documents,

12:10:50  24  non-PowerPoint slides.

12:10:50  25    MR. FREED:  Primarily financial.

| | |
|---|---|
| 12:10:52 | 1 |
| 12:10:56 | 2 |
| 12:10:58 | 3 |
| 12:11:00 | 4 |
| 12:11:06 | 5 |
| 12:11:08 | 6 |
| 12:11:12 | 7 |
| 12:11:18 | 8 |
| 12:11:24 | 9 |
| 12:11:24 | 10 |
| 12:11:26 | 11 |
| 12:11:28 | 12 |
| 12:11:34 | 13 |
| 12:11:38 | 14 |
| 12:11:42 | 15 |
| 12:11:44 | 16 |
| 12:11:48 | 17 |
| 12:11:52 | 18 |
| 12:11:56 | 19 |
| 12:12:02 | 20 |
| 12:12:06 | 21 |
| 12:12:16 | 22 |
| 12:12:20 | 23 |
| 12:12:28 | 24 |
| 12:12:32 | 25 |

THE COURT:  Thank you.  This would be like --

MR. EIMER:  Sales numbers, like that.

MR. McKEOWN:  And so we have provided the plaintiffs with a list of -- for the transactional data fields, and this is getting back to the backup question, the transactional data fields, we have provided them a list of what dates we can pull from what systems to fill the various fields.  We are not going back to backup tapes.  We have given them what we have available.

THE COURT:  Okay.

MR. SPRUNG:  Your question, your Honor, was whether -- and I think it's a great question -- when the exchange server was on September 10th, the date of the litigation hold, when the exchange server was preserved, can you create a word index?

MR. McKEOWN:  A word index or an index?

THE COURT:  Sometimes it's not a word -- some of them, at least from what I read, actually had an index system in them, which I don't know whether it would be word or date or category or what it would be, but that's what Jim said he would find out is if it is either searchable or indexable.

MR. SPRUNG:  Okay.  And then there also was an image made of another server called the My Docs server.

THE COURT:  What is My Docs?  My documents?

MR. SPRUNG:  Yeah, it's the one that contains, right,

12:12:34　1　the employees' Word documents and other applications, other

12:12:40　2　types of documents.

12:12:42　3　　　　MR. FREED:  Let me ask this, Jim.  When they made the

12:12:44　4　copies on September 10th, there was emails, PowerPoint,

12:12:50　5　SharePoint, everything that was on there?  That's a question.

12:12:56　6　　　　MR. McKEOWN:  You know --

12:12:58　7　　　　MR. FREED:  I am trying to get a handle on what was

12:13:02　8　copied.

12:13:02　9　　　　MR. McKEOWN:  I know the email was copied, I know the

12:13:04　10　My Docs was copied.  You know, hundreds of hours went into

12:13:06　11　trying to respond to these various questions in the 30(b)(6).

12:13:10　12　　　　MR. FREED:  Could you tell us, just send us a letter

12:13:12　13　or inform us once you know for sure, or do you know for sure?

12:13:16　14　　　　MR. McKEOWN:  Sure, we can send a letter.  I think

12:13:18　15　it's already there.

12:13:20　16　　　　MR. FREED:  Yeah.

12:13:20　17　　　　MR. McKEOWN:  I don't want to misstate from my

12:13:22　18　recollection.

12:13:22　19　　　　THE COURT:  This purpose is I am trying to take

12:13:24　20　issues off the table.

12:13:26　21　　　　MR. FREED:  Yes.  I think that's really helpful.

12:13:30　22　　　　THE COURT:  So I am trying to find out -- you

12:13:32　23　probably don't agree with me that we are not going to backup

12:13:34　24　tapes unless, you know -- I am sort of saying backup tapes are

12:13:40　25　in phase two.

12:13:42  1      MR. FREED:  You're saying not now.

12:13:44  2      THE COURT:  What?

12:13:44  3      MR. FREED:  You're saying not now.  You are not

12:13:48  4  saying we are not going to them period; you're saying we're

12:13:50  5  not going to them now in your present --

12:13:52  6      THE COURT:  Right.  I mean, what I'm saying is I

12:13:52  7  can't deal with anything more than this active data at the

12:13:56  8  moment.

12:13:56  9      MR. FREED:  You left off the word "now."  I just want

12:13:58  10  to make sure.

12:14:00  11      THE COURT:  Yes.

12:14:00  12      And this is one of these things maybe we can get some

12:14:02  13  agreement on, and then if you're going to be doing backup

12:14:06  14  tapes, it would be in phase two, it wouldn't be right now, but

12:14:12  15  how can people agree to it unless they know?  How can you

12:14:14  16  folks agree or at least ascend without information of what it

12:14:20  17  is?

12:14:20  18      MR. FREED:  Right.

12:14:22  19      MR. McKEOWN:  But the copy that was made, for

12:14:24  20  example, in September 2010 for the custodians for whom we have

12:14:28  21  pulled the information, all that information was pulled into

12:14:30  22  the process to be reviewed.  I mean, it's --

12:14:34  23      THE COURT:  So you're doing that already?

12:14:36  24      MR. McKEOWN:  We have taken it from -- yes.

12:14:38  25      THE COURT:  The backup tapes.

12:14:40　1　　　　　MR. McKEOWN:  It's not the case that there is a

12:14:42　2　copy --

12:14:42　3　　　　　MR. FREED:  So there is no phase two for you because

12:14:46　4　of the way you have preserved everything.

12:14:48　5　　　　　MR. McKEOWN:  Exactly.

12:14:48　6　　　　　MR. SPRUNG:  And what is confusing to me is that

12:14:50　7　there are some -- sometimes when your letters refer to copies

12:14:54　8　made of, for example, the exchange server and sometimes refer

12:14:58　9　to copies made for custodians only.  So, you know, we have --

12:15:06　10　we have created this list --

12:15:08　11　　　　　MR. McKEOWN:  Right.

12:15:08　12　　　　　MR. SPRUNG:  -- of each of these, and I am not sure

12:15:12　13　-- in fact, the first category is what was preserved for the

12:15:20　14　people who received lit holds, preserved for unknown number of

12:15:22　15　employees.  I am not sure that laptops and desktops and

12:15:32　16　external drives were preserved for non-custodians, people who

12:15:36　17　aren't in that 26 people you identified.

12:15:40　18　　　　　Exchange servers, my impression from your letters is

12:15:46　19　that you preserved the exchange servers for all people who

12:15:50　20　received lit holds, not just named custodians, and, in fact,

12:15:52　21　the entire exchange server.  And then, you know, I don't have

12:16:00　22　an understanding as we go down this of what was preserved.

12:16:04　23　　　　　MR. McKEOWN:  I am not sure we are going to get

12:16:06　24　through this in the time we have left.

12:16:08　25　　　　　THE COURT:  I think that should go on your to-do

12:16:10   1   list.

12:16:10   2          MR. McKEOWN:  I think some of it has been attempted

12:16:12   3   to be explained in letters, and perhaps it needs to be

12:16:16   4   clarified.

12:16:16   5          THE COURT:  Okay.  That's on your to-do list.

12:16:18   6          All right.  This is just a work in progress here, but

12:16:26   7   that's kind of where we are.  We will learn more about backup

12:16:34   8   tapes.

12:16:34   9          Your 30(b)(6), you have completed your 30(b)(6), and

12:16:38   10  there is nothing left over.  I want to make sure on the

12:16:42   11  30(b)(6), correct?

12:16:44   12         MR. SPRUNG:  No, your Honor.  We -- well, there's --

12:16:46   13  we completed a 30(b)(6) and concluded it with the agreement

12:16:52   14  that we would try to resolve some issues that we didn't

12:16:54   15  understand through discussions like this.

12:16:56   16         THE COURT:  I was just going to say.  See, I think if

12:17:00   17  there's cleanup, if two of you can do it without having to

12:17:04   18  have a separate 30(b)(6), another 30(b)(6), you might be able

12:17:10   19  to do it like that.

12:17:10   20         MR. McKEOWN:  At the 30(b)(6), we had four witnesses

12:17:14   21  available, and then I think around lunchtime, Mr. Sprung and I

12:17:18   22  reached an agreement that given the charts we had provided,

12:17:22   23  that we weren't going to bring in the last two witnesses, that

12:17:26   24  he would study them and that we would have some informal

12:17:32   25  exchange to try to work it out rather than try to go through

12:17:36　1　all the depositions.

12:17:36　2　　　　　THE COURT:  All right.  Production, IP's production.

12:17:38　3　And I have to ask what sounds like silly questions, but I am

12:17:42　4　trying to keep everybody straight too.

12:17:44　5　　　　　So you've done some of the production already, right?

12:17:48　6　　　　　MR. McKEOWN:  We have.

12:17:48　7　　　　　THE COURT:  And what is your target for -- these are

12:17:56　8　for the custodians -- you have 26 custodians that you have

12:18:00　9　been --

12:18:02　10　　　　　MR. McKEOWN:  I think we are closer to 47 now.

12:18:04　11　　　　　THE COURT:  47.  Okay.

12:18:06　12　　　　　MR. McKEOWN:  But with the various individuals that

12:18:08　13　we have added for the emails, the predecessors and the

12:18:12　14　administrative assistants.

12:18:14　15　　　　　MR. SPRUNG:  At least for some of these categories.

12:18:16　16　　　　　THE COURT:  Right.

12:18:16　17　　　　　MR. McKEOWN:  Correct.

12:18:18　18　　　　　THE COURT:  So when -- here's what I'm trying -- the

12:18:22　19　reason I'm asking you a range of when you're going to be, I am

12:18:28　20　trying to figure how much review time the plaintiffs need

12:18:36　21　before we get to my sequence of how things can happen because

12:18:42　22　how these stupid RFPs or whatever the heck they're called is

12:18:48　23　there wasn't any time to absorb anything.  So to try to get

12:18:56　24　your production, their first pass review, I need -- in trying

12:19:02　25　to come up with an overall scheme here, I am trying to figure

| | |
|---|---|
| 12:19:06 | 1 |
| 12:19:10 | 2 |
| 12:19:12 | 3 |
| 12:19:18 | 4 |
| 12:19:24 | 5 |
| 12:19:24 | 6 |
| 12:19:26 | 7 |
| 12:19:28 | 8 |
| 12:19:28 | 9 |
| 12:19:30 | 10 |
| 12:19:32 | 11 |
| 12:19:34 | 12 |
| 12:19:38 | 13 |
| 12:19:40 | 14 |
| 12:19:42 | 15 |
| 12:19:42 | 16 |
| 12:19:48 | 17 |
| 12:19:54 | 18 |
| 12:19:56 | 19 |
| 12:20:00 | 20 |
| 12:20:00 | 21 |
| 12:20:02 | 22 |
| 12:20:04 | 23 |
| 12:20:10 | 24 |
| 12:20:14 | 25 |

1  out when you might be finished -- just a range; I am not

2  talking about exact day -- and then how much time they are

3  going to need to review it and say whether they need more,

4  whether in certain areas they can proceed.  Okay?

5          So what do you think?

6          MR. EIMER:  This would be assuming we are doing it

7  for the 47 custodians --

8          THE COURT:  Yes.

9          MR. EIMER:  -- as we have defined our search?

10          THE COURT:  Right.

11          And not your privilege review, unless you're doing

12  your privilege review simultaneous.  Some of the people are

13  doing their privilege review not at the same time.

14          MR. McKEOWN:  I think we are a hybrid on that.

15          THE COURT:  Okay.

16          MR. McKEOWN:  We have produced about a month ago now

17  or a little less about I think over 500,000 documents.

18          THE COURT:  Okay.

19          MR. McKEOWN:  It was 500,000 Bates pages.

20          MS. LEE:  642,000 pages.

21          Mr. McKEOWN:  642,00 pages.  I stand corrected.

22          THE COURT:  And you looked at every one of them.  We

23  give you a prize.  Okay.

24          MR. McKEOWN:  That related to the ESI for the 26

25  named custodians.  We had previously produced the hard copy

12:20:16    1    documents.

12:20:16    2          THE COURT: Wait, 642,000 emails?

12:20:20    3          MR. McKEOWN: Bates numbers, not email.

12:20:22    4          MS. LEE: That's the total.

12:20:24    5          MR. McKEOWN: And Bates numbers don't match up with

12:20:26    6    pages because there are certain categories, including Excel

12:20:30    7    files and PowerPoints, we produce in native, so they only get

12:20:36    8    a single Bates number.

12:20:38    9          THE COURT: I get it.

12:20:38    10          MR. McKEOWN: The next production that is coming out,

12:20:40    11    which should be coming out in a couple of weeks, I think, is

12:20:44    12    the administrative assistants.

12:20:46    13          THE COURT: To the 26?

12:20:46    14          MR. McKEOWN: To the 26.

12:20:48    15          THE COURT: Okay.

12:20:48    16          MR. McKEOWN: There are 14 of those. I don't know if

12:20:52    17    our new custodians we added made it in in time or not.

12:21:00    18          There's something known as the Auburn server, which

12:21:04    19    is a server that had originally been a Weyerhaeuser server

12:21:06    20    that had some materials there that we have processed.

12:21:10    21          THE COURT: Because you acquired Weyerhaeuser.

12:21:14    22          MR. McKEOWN: They acquired the containerboard

12:21:18    23    business of Weyerhaeuser. Weyerhaeuser, the company, is still

12:21:22    24    a separate independent company.

12:21:22    25          THE COURT: The board, but not the box.

12:21:24  1      MR. McKEOWN:  No, board and box.

12:21:26  2      THE COURT:  Board and box.  Okay.  Thank you.

12:21:28  3      MR. McKEOWN:  Also --

12:21:30  4      THE COURT:  The Auburn server would pick up the

12:21:34  5  Weyerhaeuser.

12:21:34  6      MR. McKEOWN:  Right.  And I believe there's also some

12:21:36  7  finance drive documents coming in that group.

12:21:40  8      After that, I believe the next wave will be from a

12:21:44  9  variety of shared drives, which are shared by various

12:21:52  10  custodians we have named.  And what happens with those is once

12:21:56  11  we have identified the relevant shared drive, we apply the

12:22:02  12  search terms to the documents in that folder regardless of

12:22:06  13  whether or not they were by one of the 26 custodians or they

12:22:08  14  were written by somebody else.  If they're in the folder, the

12:22:12  15  search terms are applied to them, and then that's coming in

12:22:14  16  the next wave.

12:22:18  17      THE COURT:  Okay.  You got that, Mr. Sprung?  We

12:22:30  18  don't have the Bates, but you've got a sequence.

12:22:30  19      MR. SPRUNG:  Yes, I do.

12:22:32  20      MR. McKEOWN:  The other thing I forgot is that's

12:22:32  21  coming in the next wave later this month, excuse me, in June,

12:22:36  22  is the expense reports.

12:22:38  23      MR. FREED:  Did you have SharePoint?  I don't

12:22:40  24  remember.  Because yesterday they had both shared drive and

12:22:42  25  SharePoint.

12:22:42   1   MR. McKEOWN:  We have shared drive and SharePoint.

12:22:44   2   That's also in the -- shared drive, SharePoint is the final

12:22:50   3   phase of what's currently envisioned.

12:22:52   4   MR. FREED:  Okay.

12:22:54   5   THE COURT:  And your privilege is somewhat

12:22:56   6   simultaneous -- I mean review?

12:23:00   7   MR. McKEOWN:  We are working on it.

12:23:02   8   THE COURT:  Okay.  Mr. Sprung, not to pin you because

12:23:18   9   I'm just doing in general, so if you were to have all of that

12:23:22   10  July on your team in Seattle, so I assume this is going to

12:23:28   11  your team in Seattle, how long is it going to take you to put

12:23:32   12  it on a platform, get it in, da, da, da, da, da, da, da, or

12:23:38   13  wherever this is that happens --

12:23:40   14  MR. MOGIN:  We are all on one platform, Judge.

12:23:42   15  THE COURT:  You are all on one platform.

12:23:46   16  MR. SPRUNG:  Yeah.  So we have lawyers from different

12:23:48   17  -- not just our firm in Seattle, but --

12:23:48   18  THE COURT:  All over, yeah.

12:23:50   19  MR. SPRUNG:  -- maybe a group of 10 lawyers or so

12:23:52   20  across the country who are --

12:23:52   21  THE COURT:  Going to do that.

12:23:54   22  MR. SPRUNG:  -- going through this.

12:24:04   23  MR. FREED:  Is Bob in charge of that?  Bob will be

12:24:08   24  here later.

12:24:08   25  THE COURT:  Before our next big thing.

| | |
|---|---|
| 12:24:10 | 1 |
| 12:24:12 | 2 |
| 12:24:14 | 3 |
| 12:24:14 | 4 |
| 12:24:16 | 5 |
| 12:24:22 | 6 |
| 12:24:22 | 7 |
| 12:24:22 | 8 |
| 12:24:28 | 9 |
| 12:24:32 | 10 |
| 12:24:32 | 11 |
| 12:24:34 | 12 |
| 12:24:38 | 13 |
| 12:24:44 | 14 |
| 12:24:50 | 15 |
| 12:24:54 | 16 |
| 12:25:06 | 17 |
| 12:25:14 | 18 |
| 12:25:18 | 19 |
| 12:25:24 | 20 |
| 12:25:26 | 21 |
| 12:25:28 | 22 |
| 12:25:34 | 23 |
| 12:25:36 | 24 |
| 12:25:38 | 25 |

MR. FREED:  I didn't mean to cut you off.

MR. SPRUNG:  But is your question when we are going to get through those?

THE COURT:  Yes.

MR. SPRUNG:  Yeah, I would need to look at --

THE COURT:  Right.  So you will think about it in a couple weeks.

Okay.  Word indexes.  What was your position on my favorite?

MR. McKEOWN:  Well, we provided one.

THE COURT:  Okay.

MR. McKEOWN:  I think it had over 10 million lines because it picks up every term, so every number, every piece of gobbledegook, for lack of a technical term, that's in a document gets picked up and identified as a term.

Ours was taken from all of the ESI to which were hit by the search terms and, you know, our hope was that it would be of use to plaintiffs to try and move this forward, and that's the way we produced it.  But it's a very long list.

THE COURT:  Okay.  So you've complied.  So number one, you have given it to them.

MR. McKEOWN:  I think Mr. Mogin disagrees as to the scope.  He would like it also for applying to all of the documents or the remainder of the documents that we had, not just those that were hit by the certain terms.

| | |
|---|---|
| 12:25:40 | 1 |
| 12:25:42 | 2 |
| 12:25:48 | 3 |
| 12:25:50 | 4 |
| 12:25:54 | 5 |

MR. MOGIN:  Additionally, your Honor, I don't quite understand this because IP is using the same review platform as some of the other defendants.  But both IP and Georgia-Pacific were unable to provide -- if you recall, PCA gave us three columns.

THE COURT:  Hold on.  I am getting my graphic out here.

I have it right here.  Chris and I did this last night.  Here is our sample.

MR. MOGIN:  So you see there are three columns.

THE COURT:  Here was our sample last night.

MR. MOGIN:  And IP is only able to provide one of the right-hand columns, which was they can't tell us the document hits, they can only tell us the number of times the term was used in the database.

MR. McKEOWN:  And I think you will find the same with the other defendants that used the Clearwell platform.

MR. MOGIN:  Only one other defendant.

THE COURT:  All right.

MR. FREED:  Are those the only two that used Clearwell?

MR. MOGIN:  No.

THE COURT:  Because this is where I really needed education.  I still don't understand this.

All right.  Here is the term, second is the number of

12:27:02  1  times it was hit, this is the number of documents --

12:27:10  2          MR. MOGIN:  Reverse that.  So first is the number of

12:27:12  3  documents and second --

12:27:16  4          THE COURT:  This is the number of documents?

12:27:18  5          MR. MOGIN:  Correct.

12:27:18  6          THE COURT:  Okay.  This is number of documents.

12:27:22  7          MR. MOGIN:  And then the last column is number of

12:27:24  8  hits.

12:27:26  9          THE COURT:  Number of hits.  And what you want on

12:27:30  10  your wish list is words that are in the documents that got no

12:27:40  11  hits?

12:27:42  12          MR. MOGIN:  Correct.

12:27:44  13          THE COURT:  Now, no one has bought to that.  Okay.

12:27:58  14          And why do you want that?

12:28:00  15          MR. MOGIN:  Because it will tell me the efficiency of

12:28:04  16  the search terms.

12:28:06  17          MR. CAMPBELL:  Could you give us an example?

12:28:08  18          MR. MOGIN:  Certainly.  Assume for the sake of

12:28:12  19  argument that the word "conspiracy" --

12:28:20  20          THE COURT:  How about "committee."  We were doing

12:28:22  21  committee yesterday.

12:28:22  22          MR. MOGIN:  Well, yesterday we did committee.

12:28:24  23          THE COURT:  Right.

12:28:24  24          MR. MOGIN:  All right.  I would like to know if

12:28:28  25  committee appears in the non-hit documents, and then I can

| | | |
|---|---|---|
| 12:28:34 | 1 | begin to unpeel the onion as to why an important word like |
| 12:28:38 | 2 | committee was in the non-hit documents, and I can also begin |
| 12:28:42 | 3 | to revise the search strings both for my own internal purposes |
| 12:28:50 | 4 | as well as to ask defendants to run additional search strings |
| 12:28:52 | 5 | based upon real live words that are in their documents. No |
| 12:28:58 | 6 | guesses. |
| 12:29:00 | 7 | So, for example, yesterday, committee was an issue. |
| 12:29:04 | 8 | THE COURT: Right. |
| 12:29:06 | 9 | MR. MOGIN: They told you they didn't have |
| 12:29:08 | 10 | committees, but using this list with the -- |
| 12:29:10 | 11 | THE COURT: You ran it. |
| 12:29:12 | 12 | MR. MOGIN: We ran it and we found the word committee |
| 12:29:14 | 13 | a hundred and some times. |
| 12:29:16 | 14 | THE COURT: Right. |
| 12:29:16 | 15 | MR. MOGIN: Who knows how many times committee is in |
| 12:29:18 | 16 | what wasn't produced. |
| 12:29:20 | 17 | THE COURT: Okay. |
| 12:29:22 | 18 | MR. CAMPBELL: And you used the word index provided |
| 12:29:24 | 19 | by them? |
| 12:29:24 | 20 | MR. MOGIN: Correct. |
| 12:29:26 | 21 | MR. CAMPBELL: So it was only the hit docs? |
| 12:29:28 | 22 | MR. MOGIN: Correct. |
| 12:29:30 | 23 | Another example -- I'm sorry, your Honor. |
| 12:29:32 | 24 | THE COURT: No, go ahead. |
| 12:29:32 | 25 | MR. MOGIN: Another example is we have been talking a |

12:29:34　1　lot about organizational charts, and you will hear at the next

12:29:38　2　hearing that GP doesn't have organizational charts.  So we ran

12:29:44　3　org chart against GP, and, lo and behold, we got hits.

12:29:48　4　　　　Now, what would happen if we ran org chart against

12:29:52　5　the non-hit documents in that circumstance?

12:29:54　6　　　　THE COURT:  All right.  So just so IP knows what I

12:30:00　7　sort of said yesterday is one of my goals at the end of phase

12:30:08　8　one, I think as a real public service to future cases, not

12:30:14　9　only here, but people who are trying to do a mediation or more

12:30:20　10　than work, is some kind of testing the efficacy of the process

12:30:26　11　that you did.  That's what we have been talking about all the

12:30:32　12　way along.

12:30:34　13　　　　One of the reasons I have been interested in this

12:30:36　14　fourth column is --

12:30:38　15　　　　MR. McKEOWN:  I'm sorry, what's the fourth column,

12:30:40　16　your Honor?

12:30:40　17　　　　THE COURT:  Words that are in the document that got

12:30:44　18　no number of hits.

12:30:46　19　　　　If in the end that could be our verification.  Okay?

12:30:52　20　I am exploring different ways to verify, what would be the

12:30:58　21　simplest, cheapest, fairest way to be able to verify the

12:31:06　22　search.  That was your homework for the next --

12:31:08　23　　　　MR. McKEOWN:  For the 19th.

12:31:12　24　　　　THE COURT:  -- status.  For the 19th.

12:31:12　25　　　　So one of the things I have been doing trying to

| | | |
|---|---|---|
| 12:31:14 | 1 | understand this is looking at this as maybe not just we are |
| 12:31:18 | 2 | going to give something else right now, but could this |
| 12:31:22 | 3 | possibly be our potential verification?  And we are going to |
| 12:31:26 | 4 | hear from everybody on it.  And I didn't understand -- I still |
| 12:31:30 | 5 | haven't completely understood what it was.  This helped; this |
| 12:31:34 | 6 | visual helped when I could see that. |
| 12:31:38 | 7 | Okay.  So you've provided your word index. |
| 12:31:46 | 8 | MR. MOGIN:  Sort of. |
| 12:31:46 | 9 | THE COURT:  Sort of.  Sort of, sort of, sort of. |
| 12:31:50 | 10 | MR. MOGIN:  They are still missing a column whether |
| 12:31:52 | 11 | they get to non-hits or not. |
| 12:31:54 | 12 | MR. McKEOWN:  And, again, we asked Clearwell if we |
| 12:31:56 | 13 | could do it, and -- |
| 12:31:58 | 14 | THE COURT:  And they said no. |
| 12:31:58 | 15 | MR. McKEOWN:  -- they said they could not.  We tried. |
| 12:32:00 | 16 | We took this up to higher levels of Clearwell to try and get |
| 12:32:06 | 17 | this done. |
| 12:32:06 | 18 | THE COURT:  All right.  Are you the person who had -- |
| 12:32:08 | 19 | who had the self-selection problem?  I ran across this |
| 12:32:16 | 20 | self-selection, and I don't understand what self-selection is, |
| 12:32:20 | 21 | and it may not be you. |
| 12:32:24 | 22 | MR. SPRUNG:  Your Honor, we did raise a |
| 12:32:28 | 23 | self-selection issue. |
| 12:32:30 | 24 | THE COURT:  With IP? |
| 12:32:30 | 25 | MR. SPRUNG:  With IP.  And IP has clarified the way |

12:32:38   1   that they collected, particularly with shared drives and
12:32:42   2   SharePoint sites, that for those two eliminated the concern of
12:32:50   3   self-selection.
12:32:52   4          THE COURT:  All right.
12:32:52   5          MR. SPRUNG:  And, I apologize, I haven't gone back
12:32:56   6   and looked at each of the categories that we had originally
12:33:00   7   identified and checked if they mollified our concerns with
12:33:10   8   regard to each of those.  So we still have a little work to do
12:33:12   9   on that.
12:33:12  10          THE COURT:  But you can talk about it?
12:33:14  11          MR. SPRUNG:  Yes.
12:33:14  12          THE COURT:  I didn't even know what self-selection
12:33:16  13   meant.
12:33:32  14          MR. McKEOWN:  Your Honor, will we also have a chance
12:33:34  15   today to talk about the domestic mills?
12:33:36  16          THE COURT:  Yes -- well, do you think that's a better
12:33:38  17   thing to do here, or do you think that should be -- do you
12:33:44  18   think we need Temple here to do it with you, and would that
12:33:50  19   be -- I am happy to talk about it.  I didn't even know --
12:33:56  20   nobody said anything.
12:33:58  21          Temple mentioned yesterday that you were going
12:34:02  22   through a process, but we didn't get into any detail.
12:34:06  23          MR. McKEOWN:  I am also happy to try to deal with it
12:34:08  24   in a separate session with Mr. Sprung or Mr. Mogin.
12:34:12  25          THE COURT:  But with Mr. Mogin -- maybe we should at

12:34:16  1   least talk about it while Mr. Freed and Mr Mogin --

12:34:18  2        MR. FREED:  He did reach out to us maybe three weeks

12:34:20  3   ago, but I don't think it was on the agenda.

12:34:22  4        THE COURT:  What is this deadline?  What is this

12:34:24  5   deadline coming up?  We should know about this.  You said

12:34:28  6   Justice Department?

12:34:28  7        MR. McKEOWN:  I think it's around the end of the

12:34:30  8   month, but I am not sure.

12:34:32  9        MS. BULA:  June.

12:34:34  10       MR. McKEOWN:  June, not the end of May.

12:34:36  11       THE COURT:  So what's Justice doing and what are you

12:34:40  12  doing?

12:34:40  13       MR. McKEOWN:  What is being done is that three mills,

12:34:48  14  two that were previously Temple-Inland mills and one which was

12:34:54  15  International Paper mill, are being divested, sold to

12:34:58  16  purchasers.  We made a proposal about for preservation

12:35:06  17  purposes that we would preserve all the documents for the mill

12:35:08  18  managers and that we have -- in terms of what we provided in

12:35:14  19  our fields for the transactional data fields, we have

12:35:16  20  centralized data for those mills that we have for

12:35:20  21  International Paper that Temple-Inland, I guess we would need

12:35:24  22  to talk to Temple-Inland about their transactional data.  But

12:35:28  23  what we wanted to just get on the table and have decided

12:35:32  24  before the mills are sold to a third party and we don't

12:35:36  25  control them anymore is if there is a disagreement about what

12:35:38  1   we need to preserve, we'd like to work that out.

12:35:42  2        MR. FREED:  In preparation for the meeting today,

12:35:44  3   Jeff Sprung has actually put together some very preliminary

12:35:48  4   observations extensively --

12:35:50  5        THE COURT:  On this topic?

12:35:50  6        MR. FREED:  Yes.  Extensively preliminary.

12:35:54  7        So Dan and I really haven't had a chance to talk

12:35:56  8   about it.  I think it might be more productive to do it

12:36:00  9   outside of today's session.

12:36:00  10        MR. McKEOWN:  That's fine.

12:36:02  11        If we reach -- if we can't reach agreement, it may be

12:36:08  12   the case, your Honor, that we are going to be coming to you --

12:36:10  13        THE COURT:  With a motion and some kind of order.

12:36:12  14        MR. McKEOWN:  -- with a motion on some type of

12:36:14  15   expedited basis.

12:36:16  16        MR. FREED:  We understand.

12:36:18  17        THE COURT:  Well, if it's an agreed order, that's not

12:36:20  18   a problem at all.

12:36:24  19        MR. FREED:  We have had similar issues because this

12:36:28  20   is an industry which is consistently integrated, so this is

12:36:30  21   not the first time we have run across this request.  I think

12:36:34  22   we should be able to work this out.

12:36:34  23        MR. McKEOWN:  And there was an agreement a couple of

12:36:36  24   years ago, I think, before I was involved in the case with

12:36:38  25   respect to some plants that were closing and what was done.

12:36:42  1     THE COURT:  Okay.

12:36:42  2     MR. McKEOWN:  And that's why we just --

12:36:44  3     MR. FREED:  And we had some issues.

12:36:48  4     MR. McKEOWN:  Yeah, I wasn't involved in that.

12:36:50  5     MR. FREED:  No, I'm saying this isn't the first time

12:36:52  6  we've had this happen.  It's just that we understood the

12:36:52  7  importance of it.  We have had a lot on our plate as well, and

12:36:58  8  this is really -- will help us get there.

12:37:00  9     MR. SPRUNG:  One question.  Are all of the mill

12:37:04  10  managers and assistant mill managers, are their emails all at

12:37:12  11  the -- on the exchange server in Levelland?

12:37:18  12     THE COURT:  Texas?

12:37:20  13     MR. SPRUNG:  No, it's not Levelland.

12:37:22  14     MS. BULA:  Memphis.

12:37:24  15     By way of clarification, I don't think there are

12:37:26  16  assistant mill managers, just to get that off the table.

12:37:28  17     MR. SPRUNG:  Okay.

12:37:30  18     MS. BULA:  Some of these mills --

12:37:32  19     MR. SPRUNG:  People in charge of areas other than --

12:37:34  20  I mean, there are production people.  We looked at the org

12:37:38  21  chart.

12:37:38  22     MS. BULA:  The answer to your question would be no

12:37:40  23  because two of these mills are Temple mills, one of them is an

12:37:44  24  International Paper mill.

12:37:46  25     MR. McKEOWN:  That's true.

| | | |
|---|---|---|
| 12:37:46 | 1 | MS. BULA:  Correct. |
| 12:37:48 | 2 | MR. McKEOWN:  But that's why perhaps we are going to |
| 12:37:50 | 3 | have to talk to Mr. Marovitz and Mr. Miller as well. |
| 12:37:56 | 4 | MR. FREED:  Andy at least I don't think has brought |
| 12:37:58 | 5 | that up with us independent of your communication. |
| 12:38:04 | 6 | MS. BULA:  That's because they are now International |
| 12:38:06 | 7 | Paper mills. |
| 12:38:06 | 8 | MR. FREED:  No, I understand.  Maybe I didn't say |
| 12:38:10 | 9 | that right. |
| 12:38:12 | 10 | At least talk to Mr. Marovitz, which impacts this |
| 12:38:14 | 11 | discussion, and I'm not sure that's been -- |
| 12:38:16 | 12 | MR. McKEOWN:  Why don't we try to set a call with the |
| 12:38:18 | 13 | three of us, and we can talk about it.  I wanted to tee it up |
| 12:38:22 | 14 | as a timing issue -- |
| 12:38:24 | 15 | THE COURT:  No, I am glad. |
| 12:38:24 | 16 | MR. McKEOWN:  -- just in case your Honor was going on |
| 12:38:26 | 17 | vacation for the last two weeks in June. |
| 12:38:28 | 18 | THE COURT:  Very good point.  I am going to Door |
| 12:38:32 | 19 | County, I am going to Mayor Jim's house, or close, for the 4th |
| 12:38:38 | 20 | of July.  So I am here until the 30th.  Otherwise, you come to |
| 12:38:44 | 21 | Door County and I will sign it up there. |
| 12:38:48 | 22 | MR. EIMER:  Very good. |
| 12:38:48 | 23 | THE COURT:  It's a local thing. |
| 12:38:50 | 24 | MR. MOGIN:  I got that. |
| 12:38:52 | 25 | MR. FREED:  Not that local. |

| | | |
|---|---|---|
| 12:38:54 | 1 | THE COURT: Very local. |
| 12:38:56 | 2 | MR. McKEOWN: Less local for Chicago. |
| 12:39:02 | 3 | MR. SPRUNG: But for the mill that is the IP mill, |
| 12:39:08 | 4 | all of those employees who are at that mill, their emails go |
| 12:39:10 | 5 | through the exchange server? |
| 12:39:12 | 6 | MS. BULA: Correct. |
| 12:39:14 | 7 | MR. MOGIN: Is the same true for box plants? |
| 12:39:16 | 8 | MS. LEE: All emails for International Paper, as far |
| 12:39:20 | 9 | as I understand, go through exchange. They are not separated |
| 12:39:22 | 10 | or located separately. |
| 12:39:32 | 11 | THE COURT: Okay. So that's to talk about, and we |
| 12:39:34 | 12 | will get a report at the general meeting. |
| 12:39:40 | 13 | MR. FREED: Hopefully the report will be it's not an |
| 12:39:42 | 14 | issue. |
| 12:39:42 | 15 | THE COURT: Right. |
| 12:39:46 | 16 | What else, Mr. McKeown, did you have down on your |
| 12:39:48 | 17 | agenda? |
| 12:39:48 | 18 | MR. McKEOWN: Well, since we are not going to |
| 12:39:50 | 19 | apparently resolve all issues this afternoon, that was the end |
| 12:39:54 | 20 | of my list for today. |
| 12:39:56 | 21 | THE COURT: Well, on the RPDs, this is my work in |
| 12:40:00 | 22 | progress. I am trying to figure this out. But did you answer |
| 12:40:06 | 23 | -- even if Mr. Mogin doesn't agree with the completeness of |
| 12:40:10 | 24 | your answer, did you answer every one of them, or were there |
| 12:40:16 | 25 | any that you didn't answer at all, like GP? |

| | | |
|---|---|---|
| 12:40:22 | 1 | MR. McKEOWN:  I'd have to go back.  I suspect there |
| 12:40:26 | 2 | were probably a few requests for production to which there was |
| 12:40:30 | 3 | an objection but not an agreement to produce certain |
| 12:40:34 | 4 | categories of documents. |
| 12:40:36 | 5 | THE COURT:  There were.  There were a few, okay. |
| 12:40:42 | 6 | I didn't really see that in Temple, but I may have |
| 12:40:48 | 7 | been mistaken about Temple.  It's a very -- I just want to say |
| 12:41:02 | 8 | Mr. Mogin sent me some cases last night on parsing and on |
| 12:41:16 | 9 | judges' takes on the requests to produce documents. |
| 12:41:20 | 10 | What I said yesterday, just so you hear it right from |
| 12:41:24 | 11 | the horse's mouth, is that procedurally in the 14 years, what |
| 12:41:30 | 12 | I have seen happen is if someone received what they considered |
| 12:41:34 | 13 | to be an overly-broad request to produce documents, they come |
| 12:41:38 | 14 | before me and ask for a motion for protective order. |
| 12:41:44 | 15 | Conversely, the requesting party comes within the 30 |
| 12:41:48 | 16 | days for a request -- a motion to compel.  So this is not any |
| 12:41:54 | 17 | blame to anybody here.  I think we have a procedural sticky |
| 12:42:00 | 18 | wicket since nobody came to Judge Shadur within the one-year |
| 12:42:06 | 19 | period of time. |
| 12:42:06 | 20 | MR. FREED:  You know, I was reflecting on that, your |
| 12:42:10 | 21 | Honor, and what happened, as I recall, is we actually |
| 12:42:12 | 22 | suggested at one of the last status conferences that we had |
| 12:42:16 | 23 | reached impasse at certain issues and might be bringing |
| 12:42:18 | 24 | motions to compel. |
| 12:42:20 | 25 | THE COURT:  Right. |

12:42:22   1    MR. FREED:  And that sort of got subsumed when the

12:42:24   2  ESI issues --

12:42:24   3    THE COURT:  Took over.

12:42:26   4    MR. FREED:  Yes.

12:42:30   5    THE COURT:  But the reason I'm saying is it's not

12:42:32   6  blame is that all the cases that Mr. Mogin sent me last night

12:42:38   7  are in a motion to compel or motion for protective order, and

12:42:44   8  they're stressing the 30 days, they're stressing everything,

12:42:48   9  and here we are a year later.

12:42:50  10    So legally we have -- we could have -- if you had

12:42:54  11  somebody else, you could have a legal challenge.  I am looking

12:42:58  12  at this as another way to negotiate a sort of very complicated

12:43:08  13  issue and I haven't gotten too much further than that on

12:43:14  14  either the propriety, what are we going to do about it, and

12:43:18  15  that's going to go down on your list of to-do things for the

12:43:22  16  next conference is going to be your suggestion on what do we

12:43:30  17  do about this for now.  And you're going to get -- from Chris

12:43:34  18  you are going to get an email, and anybody have any great

12:43:38  19  ideas on how to solve this dilemma because it's a mutual

12:43:44  20  dilemma.

12:43:46  21    MR. FREED:  I was actually agreeing with you and

12:43:48  22  saying how I think we got to the posture.

12:43:52  23    THE COURT:  Right.

12:43:52  24    MR. EIMER:  I guess I have a little different take on

12:43:54  25  this because as I read those cases, they were directed towards

12:43:56    1    general objections that were made by the defendants that were

12:44:00    2    blanket which for almost -- I think entirely, except for a

12:44:06    3    couple, don't exist here.

12:44:06    4         THE COURT:  Right.

12:44:08    5         MR. EIMER:  And so I think -- I thought more

12:44:10    6    traditionally in this district, if it's a plaintiff serving

12:44:14    7    the document request and that defendant objects, put in the

12:44:18    8    specificity that the court requires, that's different in

12:44:22    9    different courts.  I understand that.

12:44:22    10        But I think putting aside the general objections that

12:44:26    11   were -- the cases criticize, there were very specific

12:44:28    12   objections to almost all, if not all, of the requests and then

12:44:32    13   a description of what was going to be produced, to me, the

12:44:36    14   burden then shifts to the plaintiff.  They want to enforce

12:44:38    15   their document request beyond what's agreed to, that's their

12:44:42    16   burden, not ours.

12:44:42    17        THE COURT:  And that's why I am saying I don't even

12:44:46    18   know -- but Judge Barker, you know, was sort of accusing

12:44:54    19   Mr. Mogin of making up the word parsing.  Actually, "parsing"

12:44:58    20   is in that case.

12:44:58    21        MR. EIMER:  It is in that case.

12:45:00    22        THE COURT:  And you know what she had to say about

12:45:02    23   it.  She says, How dare you, you are not the judge and jury of

12:45:06    24   this.

12:45:06    25        Now, do I agree with Judge -- I mean, that's why I'm

12:45:10  1   saying we are going to have to stand back, take three deep

12:45:16  2   breaths, what it is is it's a need on the part of the

12:45:20  3   plaintiffs to get some documents.  And I don't want to get

12:45:30  4   into a hyper-technical argument here --

12:45:34  5        MR. EIMER:  Right.

12:45:34  6        THE COURT:  -- because I think -- these cases also,

12:45:40  7   Mr. Mogin, were, you know, single plaintiff cases.  I actually

12:45:46  8   could not get -- my head was spinning last night, how anybody

12:45:52  9   in 30 days or, in your case, 90 days following Judge Shadur's

12:45:58  10  denial of the motion to dismiss, logically, how anybody could

12:46:02  11  ever be prepared to answer anything like that.  I mean, it's

12:46:06  12  just -- it just is impossible in a complex, big case like

12:46:12  13  this.  And it sent me to the Southern District of New York's

12:46:18  14  new order.

12:46:22  15       You know, you probably know -- it doesn't really help

12:46:24  16  this -- I mean, I will tell you, I checked it at 7:00 o'clock

12:46:28  17  this morning.  But unlike our pilot program for e-discovery,

12:46:34  18  they have just started, Judge Scheindlin just started a

12:46:38  19  special plan for complex cases because complex cases don't fit

12:46:44  20  into the dum-dum rules for you will do this and you will do

12:46:50  21  this and you will do this.  You've got to have like special

12:46:54  22  rules for these cases.  Because I was thinking even if

12:46:56  23  everybody did everything perfectly, how could they know before

12:47:02  24  they even started collecting the materials?  If we were going

12:47:06  25  along with Rule 34 and 30 days, it would be impossible to do

12:47:12  1   that.  The whole thing was like a setup for failure.

12:47:16  2           MR. EIMER:  Right.

12:47:18  3           MR. MOGIN:  It wasn't a negotiated response date,

12:47:20  4   your Honor.

12:47:20  5           THE COURT:  Well, I know, but, I mean, it's just a

12:47:26  6   new world out there --

12:47:26  7           MR. EIMER:  Right.

12:47:28  8           THE COURT:  -- is what I am saying.  It really is a

12:47:30  9   new world out there, and how are we all going to be fair and

12:47:34  10  just in this new world.

12:47:36  11          MR. EIMER:  Well, that's -- and I think your Honor is

12:47:40  12  exactly on the right track with that because there is

12:47:42  13  something that could be manifestly unfair to this if it plays

12:47:46  14  out in a certain way to us -- and, again, this is our

12:47:50  15  perception -- but our perception is we were very clear as to

12:47:54  16  the objections we were making and the documents we had agreed

12:47:56  17  to produce.  And we are clear with the plaintiffs that we

12:47:58  18  would be getting this enormous machine, we started up this

12:48:02  19  engine that's now cost over $4 million to produce.  And

12:48:06  20  certainly they watched us produce, welcomed the documents,

12:48:10  21  asked for documents, needed the documents, and we did that.

12:48:14  22          If we have to start all over again and re-review the

12:48:18  23  thousands and thousands of documents that have been put aside

12:48:20  24  as not responsive because now the requests got broadened

12:48:26  25  somehow, we have wasted millions of dollars.

12:48:28   1    THE COURT:  But I said to Andy -- to Mr. Marovitz

12:48:32   2  yesterday, I don't think you have -- I mean, they sort of said

12:48:36   3  that, not on this request to produce stuff, because I don't

12:48:40   4  think you've wasted anything because I think you would have

12:48:42   5  needed to do that to even know as much as you know right now.

12:48:46   6  I mean, I think there's kind of a self-education that goes on

12:48:50   7  in a case.

12:48:50   8    MR. EIMER:  No, there's some of that, and there is no

12:48:52   9  question that some of this would be more efficient going

12:48:56  10  forward.

12:48:56  11    THE COURT:  Right.

12:48:56  12    MR. EIMER:  But a huge quantity of documents have

12:48:58  13  been reviewed and determined to be not responsive.

12:49:02  14    THE COURT:  Right.

12:49:02  15    MR. EIMER:  All of those now have to be brought back

12:49:04  16  up again and re-reviewed a second time, and that will cost

12:49:08  17  millions of dollars, it will, to do that a second time, your

12:49:10  18  Honor.

12:49:10  19    THE COURT:  If you were required to do it.

12:49:12  20    MR. EIMER:  If we were required to do that, and

12:49:14  21  that's our concern.  That's our worry in this.

12:49:16  22    THE COURT:  That's why I am saying I have to -- after

12:49:18  23  yesterday, it was kind of a big mishmosh on our discussion

12:49:22  24  about it.

12:49:22  25    But I am just saying to you I am going to have to ask

12:49:26    1    your input on -- all of your input on a plan to get ourselves

12:49:32    2    out of this bunker.

12:49:34    3          MR. EIMER: Right. We appreciate that.

12:49:38    4          MR. FREED: Your Honor, I don't know if -- I would

12:49:40    5    like to say I understand what Mr. Eimer is saying. I really

12:49:44    6    do. But I also want to point out, and I think you would

12:49:46    7    concur, that from the earliest conception of the process, we

12:49:50    8    had a different idea about how the search should be done, and

12:49:52    9    we were looking at predictive coding. And we told them

12:49:56   10    consistently, we have letter after letter, saying we want to

12:49:58   11    be part of the process, we felt we were excluded from the

12:50:02   12    process, and that if as a result of that it was necessary for

12:50:06   13    them to make more production, we wanted to put them on notice

12:50:08   14    that we would expect them to do that.

12:50:12   15          So I understand what he is saying, we are where we

12:50:14   16    are, but we tried to at the very earliest possible time alert

12:50:18   17    them that we didn't want to be met with that argument.

12:50:20   18          THE COURT: Right. Well, this airing is good. These

12:50:24   19    guys have been very gracious. They got their big issue taken

12:50:28   20    away from them by this little pushy judge very quickly without

12:50:32   21    even a formal opinion, and I think you've been -- I mean, at

12:50:38   22    least I know this anyway. I know that.

12:50:42   23          And I'm telling you, when Chris and I looked at two

12:50:46   24    of our many dysfunctional cases that are from '08 and '09 and

12:50:50   25    they haven't finished fact discovery and it's a single

12:50:54    1    plaintiff and a single defendant, I am amazed at what you have

12:51:00    2    done in one year.

12:51:00    3          MR. EIMER:  It's good not to be in the category of

12:51:04    4    dysfunctional.

12:51:06    5          MR. SPRUNG:  Not yet.

12:51:08    6          MR. EIMER:  Not yet.

12:51:08    7          MR. MOGIN:  Your Honor, that's interesting.  We were

12:51:10    8    having a similar discussion, and we didn't come out the same

12:51:12    9    way.  This was just between ourselves.

12:51:14    10          THE COURT:  Maybe things are different in San Diego.

12:51:18    11    I know they are in the Southern District of New York.  I know

12:51:22    12    things are much more of a rocket docket there, but I am too

12:51:28    13    old for that.

12:51:28    14          Okay.  Thank you all --

12:51:30    15          MR. EIMER:  Thank you, Judge.

12:51:30    16          MR. McKEOWN:  Thank you, your Honor.  I appreciate

12:51:32    17    your time.

12:51:32    18          THE COURT:  -- for your very hard work.  You have an

12:51:36    19    office to meet this afternoon?

12:51:38    20          MR. McKEOWN:  We do.  We are going to our offices.

12:51:40    21          MR. MOGIN:  Your Honor, before we break very quickly?

12:51:42    22    Since the subject of what's at issue in the complaint, et

12:51:46    23    cetera, has come up, I did pull up Judge Shadur's order, and

12:51:48    24    if you wanted to review it over the break --

12:51:50    25          THE COURT:  Good.

| | | |
|---|---|---|
| 12:51:52 | 1 | MR. MOGIN: -- pages 6 through 12 -- |
| 12:51:54 | 2 | THE COURT: Good. |
| 12:51:54 | 3 | MR. MOGIN: -- and then 22 and 23 would be the most |
| 12:52:02 | 4 | important points. |
| 12:52:02 | 5 | THE COURT: 22 and 23. Thank you. |
| 12:52:02 | 6 | MR. MOGIN: And 22 and 23 is the specific discussion |
| 12:52:06 | 7 | about boxes. |
| 12:52:06 | 8 | THE COURT: Okay. Good mediator that I am, we are |
| 12:52:10 | 9 | going to summarize this kind of quickly, I think the two of |
| 12:52:12 | 10 | you have been taking good notes, but -- so that people know |
| 12:52:16 | 11 | what they have committed to talk about. |
| 12:52:18 | 12 | MR. EIMER: Right. |
| 12:52:18 | 13 | THE COURT: That's all I am talking about. |
| 12:52:20 | 14 | So defendants are going to get back to you and |
| 12:52:26 | 15 | discuss naming litigation holds, names on the litigation |
| 12:52:32 | 16 | holds, not the content, and its name and title. And what did |
| 12:52:36 | 17 | you say -- did you say something on when they were -- |
| 12:52:38 | 18 | MR. SPRUNG: Date. |
| 12:52:40 | 19 | THE COURT: Date when they were -- if they're still |
| 12:52:42 | 20 | there and you don't care, it's if they're gone? |
| 12:52:46 | 21 | MR. SPRUNG: The date is important to us because if |
| 12:52:48 | 22 | the litigation hold was placed, let's say, six months after |
| 12:52:52 | 23 | the case was filed, then we would know that the witness had an |
| 12:52:56 | 24 | opportunity to destroy documents. |
| 12:53:00 | 25 | MR. EIMER: The date is the date that they were |

| | | |
|---|---|---|
| 12:53:00 | 1 | notified?  Is that the date you are talking about? |
| 12:53:04 | 2 | MR. SPRUNG:  The date that they received the |
| 12:53:06 | 3 | litigation hold. |
| 12:53:06 | 4 | THE COURT:  Okay.  Got it.  So you're going to |
| 12:53:10 | 5 | discuss that. |
| 12:53:10 | 6 | You are going to discuss the Justice Department. |
| 12:53:20 | 7 | Jim is getting back to you on information regarding |
| 12:53:24 | 8 | indexability of backup tapes. |
| 12:53:30 | 9 | Plaintiffs are getting back to you regarding your |
| 12:53:34 | 10 | suggestion on the two plants, the sampling of the two plants. |
| 12:53:50 | 11 | MR. CAMPBELL:  And that was four people, correct, two |
| 12:53:54 | 12 | managers, two sales. |
| 12:53:54 | 13 | MR. FREED:  Box and containerboard. |
| 12:53:58 | 14 | MR. McKEOWN:  Correct. |
| 12:54:00 | 15 | MR. EIMER:  It's actually eight people. |
| 12:54:00 | 16 | MR. McKEOWN:  Eight people. |
| 12:54:04 | 17 | MR. CAMPBELL:  Thank you. |
| 12:54:20 | 18 | THE COURT:  Let me ask you something.  Here is |
| 12:54:22 | 19 | something I want to talk about too, just for the heck of it. |
| 12:54:26 | 20 | I'm doing a little informal polling here on this fourth |
| 12:54:28 | 21 | column. |
| 12:54:28 | 22 | MR. EIMER:  Okay. |
| 12:54:30 | 23 | THE COURT:  If you would consider doing Mogin's |
| 12:54:32 | 24 | fourth column, we'll call it. |
| 12:54:34 | 25 | MR. EIMER:  This would be indexing the words, the |

| | | |
|---|---|---|
| 12:54:38 | 1 | word index for the null set. |
| 12:54:44 | 2 | THE COURT: Basically, right. |
| 12:54:44 | 3 | MR. MOGIN: Would that be the title of a horror |
| 12:54:46 | 4 | movie, your Honor, Mogin's Fourth Column? |
| 12:54:50 | 5 | THE COURT: It is. It is. Said very affectionately, |
| 12:54:54 | 6 | Mr. Mogin. |
| 12:54:56 | 7 | We have decided that -- I said last night there was |
| 12:54:58 | 8 | another one, there was another one of your words in here, a |
| 12:55:00 | 9 | map index. Not only was there a word index, then there was a |
| 12:55:04 | 10 | map index. |
| 12:55:06 | 11 | MR. CAMPBELL: Category index. |
| 12:55:08 | 12 | THE COURT: Category index, yes. We found that too. |
| 12:55:10 | 13 | We decided you are a frustrated writer, honest to God, who |
| 12:55:14 | 14 | just is like dressed as a lawyer here. I have no idea what |
| 12:55:20 | 15 | the category index was or the map index or any of them. |
| 12:55:26 | 16 | Just tell me what your take is on this. Since I |
| 12:55:34 | 17 | didn't know what it was, I don't know how hard it is to do. |
| 12:55:36 | 18 | MR. FREED: On the to-do list, I shouldn't even say |
| 12:55:38 | 19 | this because the burden is on us, but I think you also wanted |
| 12:55:42 | 20 | us to try to give you an estimate of when we would complete a |
| 12:55:44 | 21 | review of the documents, but that was for later. |
| 12:55:46 | 22 | THE COURT: Yes, right. |
| 12:55:46 | 23 | Well, that's for the next -- |
| 12:55:48 | 24 | MR. FREED: Right. |
| 12:55:48 | 25 | THE COURT: I mean, to give me an idea if we are |

| | |
|---|---|
| 12:55:50 | 1 |
| 12:55:52 | 2 |
| 12:55:54 | 3 |
| 12:55:58 | 4 |
| 12:56:04 | 5 |
| 12:56:06 | 6 |
| 12:56:08 | 7 |
| 12:56:10 | 8 |
| 12:56:14 | 9 |
| 12:56:16 | 10 |
| 12:56:22 | 11 |
| 12:56:24 | 12 |
| 12:56:32 | 13 |
| 12:56:38 | 14 |
| 12:56:42 | 15 |
| 12:56:46 | 16 |
| 12:56:52 | 17 |
| 12:56:56 | 18 |
| 12:57:00 | 19 |
| 12:57:02 | 20 |
| 12:57:06 | 21 |
| 12:57:08 | 22 |
| 12:57:10 | 23 |
| 12:57:10 | 24 |
| 12:57:12 | 25 |

1  talking about phase one.

2       MR. FREED:  Right.  Right.

3       THE COURT:  Yesterday's folks were in agreement too.

4  I forgot to tell you this.  It was another informal poll, do

5  you think you wanted bifurcated class discovery, and nobody

6  wanted bifurcated class discovery.

7       MR. McKEOWN:  I would have to think about that,

8  although I think the growing trend is not to bifurcate.

9       THE COURT:  Right.  Right.  And it's going to be up

10  to Judge Shadur anyway, but I am trying to get a plan to Judge

11  Shadur.  That's a goal, okay?

12       I assured everyone yesterday that with my demise come

13  September 30th, with my pending demise here, that our two new

14  magistrate judges will be picked on June 29th, I am positive,

15  because I am clairvoyant on top of everything else, that you

16  are going to have two perfect civil litigators who are going

17  to understand what this is about, and they probably will be on

18  board October 1st.

19       My two law clerks also happen to be applying to these

20  two magistrate judges, so you very well may have either Chris

21  or Margaret.

22       MR. EIMER:  So it will be assigned to one of the two

23  new magistrate judges?

24       THE COURT:  Uh-huh.  It's not going back to the whole

25  group.

12:57:12    1        MR. EIMER:  That's what I mean.

12:57:14    2        THE COURT:  And we will know by the end of June who

12:57:16    3    they are.  And because I am so clairvoyant, they are both

12:57:22    4    brilliant.

12:57:24    5        MR. MOGIN:  Your Honor, is that an automatic process

12:57:26    6    or something Judge Shadur is involved with?

12:57:28    7        THE COURT:  With what?

12:57:30    8        MR. MOGIN:  The reassignment.

12:57:32    9        MR. FREED:  To the new magistrate judge.

12:57:34   10        THE COURT:  No, he is not involved in it unless he

12:57:36   11    were to take it back.  But, I mean, after those comments -- I

12:57:40   12    think Nan knows a lot more about that.  I don't think Milt has

12:57:44   13    ever said anybody knows more about anything than he does.

12:57:48   14        MR. MOGIN:  Well, that's the point, that he was quite

12:57:50   15    specific that he had comfort sending it to you.

12:57:52   16        THE COURT:  Yes.  But I think he will -- I mean and

12:57:54   17    particularly if you ask that it stay with the new magistrate

12:58:00   18    judge.

12:58:00   19        MR. SPRUNG:  Are there two -- did you cover, Judge

12:58:04   20    Nolan, the issue of getting -- we need to get clarification on

12:58:12   21    where there were images made on the date of the litigation

12:58:22   22    hold --

12:58:22   23        MR. FREED:  The scope of the copy.

12:58:24   24        MR. SPRUNG:  -- what was preserved.  And you had said

12:58:26   25    indexability and backup tapes, and I think maybe that --

| | | |
|---|---|---|
| 12:58:32 | 1 | THE COURT:  Well, they are looking to see if it's |
| 12:58:34 | 2 | either searchable, indexable, I am calling it.  That's not a |
| 12:58:44 | 3 | word. |
| 12:58:44 | 4 | MR. SPRUNG:  And then we also want to know what was |
| 12:58:46 | 5 | preserved for -- because it's unclear to us what was preserved |
| 12:58:50 | 6 | for the 26 named custodians, what was preserved for the people |
| 12:58:54 | 7 | on the lit hold, which is a much -- 500 people, apparently, |
| 12:59:02 | 8 | and what was preserved in total.  It sounds like the exchange |
| 12:59:08 | 9 | server may have been preserved in total. |
| 12:59:10 | 10 | MR. EIMER:  When you say what was preserved, you want |
| 12:59:10 | 11 | to know what we took a snapshot of? |
| 12:59:12 | 12 | THE COURT:  Yes. |
| 12:59:16 | 13 | MR. SPRUNG:  That's what you're asking. |
| 12:59:16 | 14 | THE COURT:  Yes.  So you're just giving me |
| 12:59:18 | 15 | information.  That's all. |
| 12:59:18 | 16 | MR. FREED:  And then just a list of everything else. |
| 12:59:20 | 17 | THE COURT:  Sure. |
| 12:59:24 | 18 | MR. FREED:  I forgot to mention that. |
| 12:59:26 | 19 | MR. MOGIN:  We are the fourth column. |
| 12:59:28 | 20 | THE COURT:  That's the fifth column. |
| 12:59:30 | 21 | MR. SPRUNG:  And then we were going to have some |
| 12:59:32 | 22 | discussion about org charts and whether we've got all the -- |
| 12:59:38 | 23 | THE COURT:  Hopefully, you're going to look at that |
| 12:59:40 | 24 | this afternoon. |
| 12:59:40 | 25 | MR. FREED:  About what org chart he might belong to? |

12:59:40    1   Maybe I'm missing --

12:59:46    2           THE COURT:  He thinks he gave everything.

12:59:48    3           MR. McKEOWN:  We are checking on some -- we can talk

12:59:52    4   about some of that this afternoon.

12:59:54    5           THE COURT:  You're welcome to come any time.  I love

12:59:58    6   -- on our committee, on our e-discovery committee, we have a

01:00:00    7   number of clients, as we call you, clients, in-house people

01:00:06    8   who we never -- at least the court very, very rarely gets the

01:00:10    9   input from anybody, so you are welcome to come anytime you

01:00:14   10   want.

01:00:14   11           MS. BULA:  Thank you.

01:00:14   12           THE COURT:  Thank you for traveling.

01:00:18   13           MR. FREED:  You should invite her for June 14th.

01:00:20   14           THE COURT:  I did, but I'm sure you have better

01:00:22   15   things to do than come sit around.

01:00:28   16           And thank you for coming.  We are very glad you came

01:00:32   17   too.

01:00:34   18           MR. EIMER:  Thank you, your Honor.

01:00:36   19           MR. MOGIN:  Thank you, your Honor.

01:00:36   20           MR. McKEOWN:  Thank you, your Honor.

01:00:40   21           MS. BULA:  Thank you so much.

01:00:44   22           MS. LEE:  Thank you.

           23      (Which were all the proceedings had in the above-entitled

           24   cause on the day and date aforesaid.)

           25

1    I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

2

3    ————————————————    ————————————
Carolyn R. Cox                  Date
Official Court Reporter

4    Northern District of Illinois

5    /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR