IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KLEEN PRODUCTS LLC, *et al.*,

                Plaintiffs,

      v.

PACKAGING CORPORATION OF
AMERICA, *et al.*,

                Defendants.

Case No. 10 C 5711

Hon. Harry D. Leinenweber

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Plaintiffs' Objections to the September 28, 2012 Memorandum Opinion and Order of the Magistrate Judge [ECF No. 419] and Plaintiffs' Motion to Compel Defendants to Produce Documents and Data for the Time Periods Proposed by Plaintiffs [ECF No. 345]. For the reasons stated herein, Plaintiffs' Objections to the Magistrate Judge's Order are overruled and Judge Nolan's protective order in regards to the Sixth Interrogatory remains intact. However, the Court finds the Roles, Responsibilities and Expectations documents (the "RREs") at issue directly responsive to Request No. GP-1 in Plaintiff's Second Request for Production of Documents and orders their production in regards to those 21 employees. The Motion to Compel is granted in part and denied in part.

## I. **GENERAL BACKGROUND**

The Court will not replicate the extensive and excellent background of Magistrate Judge Nolan's Order of September 28, 2012 [ECF No. 412]. Familiarity with it is presumed. Suffice it to say that Plaintiffs, purchasers of containerboard products, accuse Defendants, producers of containerboard products, of collusively manipulating the price of their products in violation of the Sherman Act.

This case was recently assigned to this Court after having been before Judge Milton Shadur and Judge George Marovich. On December 6, 2012, the parties appeared before this Court and discussion indicated that, in order to make progress on a scheduling order, the parties needed rulings on the aforementioned outstanding matters. The Court indicated it would rule before the next status hearing of February 19, 2012 to try to expedite the setting of a scheduling order.

To review briefly the procedural history, Magistrate Judge Nan Nolan had multiple meetings and hearings with the parties regarding discovery matters and she heavily utilized *The Sedona Conference Cooperation Proclamation* (10 Sedona Conf. J. 331 (2009)) in an attempt resolve discovery disputes by agreement rather than pugnacious contention and judicial fiat. She largely succeeded. The September 28, 2012 order reflects the resolution, by agreement, of numerous disputes. However, some matters could not be resolved

by agreement and Judge Nolan issued rulings on those matters. Plaintiffs challenge two aspects of that ruling. The first aspect – Judge Nolan's denial without prejudice of a motion to compel Defendant Temple Inland to produce data from certain backup tapes – is now moot, since Temple Inland has agreed to produce that data. The second aspect involves Judge Nolan's ruling [Dkt. No. 412] granting Defendant Georgia-Pacific LLC's Motion for a Protective Order. [Dkt. No. 372] The Court set December 16, 2012 as the deadline for Georgia-Pacific's ("GP") response to those objections and that issue is now fully briefed. Additionally, Judge Nolan retired before she was able to issue a ruling on Plaintiffs' Motion to Compel [ECF No. 345] that dealt with the temporal scope of discovery, and the Court takes up where Judge Nolan left off.

## II.  OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER

### A.  Background of the Order

Plaintiffs have long requested from Defendant GP organizational charts and job descriptions. The very first item in Plaintiff's Second Request for Production (the "RFP") of Documents Directed to GP asked for "documents sufficient to identify (a) the job title, (b) job descriptions, (c) contact information, and (d) the specific duties for" 21 named current and former GP employees. See Pls.' Second Req. for Produc. Of Docs. Directed to [GP], 12, ECF No. 372-4, PageID # 8535. This request was made on October 25, 2011. GP steadfastly insisted (and still insists) that, as a

- 3 -

private company, it does not maintain organizational charts or job descriptions because those things are "not consistent with our culture. The roles are defined on an individual basis, and each individual's responsibilities are defined on an individual basis." Dep. of George Ragsdale, 145, ECF No. 388-1, PageID # 9641.

On February 6, 2012, GP's counsel responded in writing to the RFP that GP "has searched and does not believe such formal written job descriptions exist." ECF No. 388-1, PageID # 9683. GP maintains that the parties agreed at that time that this resolved the RFP. Plaintiffs maintain that they only agreed not to pursue further documents because of the representation that they did not exist.

With no written descriptions of employees' duties or responsibilities, Plaintiffs continued to press for some sort of substitute. GP produced interrogatory answers describing positions and duties of certain executives, but Plaintiffs pressed on. Using the cooperative *Sedona Conference* model of discovery, Magistrate Judge Nolan suggested that GP turn over (without waiving any claims of privilege and without agreeing to an expansion of reasonable discovery responses) a copy of its litigation hold list to assist Plaintiffs in coming to their own understanding of GP's structure. GP voluntarily agreed to turn over the litigation hold list, consisting of 400 names. Exactly three days after receiving the list, Plaintiff served a broad, Sixth Interrogatory on GP with

respect to those 400 names, demanding job functions, identification of the GP entity that employed each employee, the identity of persons to whom each employee reported, and the identity of all persons who reported to that individual. GP asked Plaintiffs to withdraw this interrogatory; Plaintiffs responded that the interrogatory might become unnecessary depending on what they learned in an upcoming 30(b)(6) deposition of GP employee George Ragsdale ("Ragdale"). Ragsdale was deposed on August 1, 2012. In that deposition, Ragsdale provided a bit more context for the company's assertion that job descriptions do not exist. Specifically, the following exchange occurred:

> Q. How were job positions described to individuals who hold those jobs?
>
> **A. That's not an easy question to answer because it's going to change in the context of whatever the demands of the business are. The role is defined so that – to pick one, you know, Linda Brown is an executive assistant. That's her role as executive assistant. What her responsibilities are within that role are defined between her and her supervisor, Christian Fischer, and are defined – formally they're defined on an annual basis, but they are subject to change at any time.**
>
> Q. How are roles defined?
> [Defendant's Counsel]: Objection; asked and answered.
>
> . . .
>
> Q. Well, you said her role is executive assistant. Then despite – then her responsibilities are separately defined, but how is it – is there any other determination of what that role is?
> **A. Other than defining it as executive assistant?**
> Q. Right. Other than giving it those two words?
> **A. No.**

Q.    And how is it determined – but the – or it's
      annually determined, you said, what the
      responsibilities of the role are?
**A.    Correct.**
Q.    Is that memorialized in any way?
**A.    In most cases it is.**

                              . . .

Q.    Okay. And do you retain the role description?
**A.    The role description is only the title, so –**
Q.    Let me – the responsibilities, is there a name for
      that document that describes the responsibilities?
**A.    If you're asking if we retain it, it's retained as
      a living document between the boss and the
      subordinate. Is it – it's updated annually, or at
      least it's reviewed annually for update, and,
      theoretically, once it's updated, the old one goes
      away.**

                              . . .

Q.    Does that document have a name?
**A.    It has a name – I mean, I have a name for it. I
      can't tell you that it universally has a name in
      every location within the company, no.**
Q.    What's the name you use for it?
**A.    I usually call it "Roles, Responsibilities and
      Expectations."**

Dep. of George Ragsdale, 145-148, ECF No. 388-1, PageID # 9641-42.

Plaintiffs ended the deposition early, despite prompting from GP's

attorney that Plaintiffs should be sure they had enough to satisfy

themselves as to the information sought in the Sixth Interrogatory.

Plaintiff's counsel responded, "I believe . . . that I have

accomplished what plaintiffs, at a minimum to satisfy that

interrogatory, need to accomplish." GP's Motion for Prot. Order

and Memo., 7, ECF No. 372, PageID # 8479.

After the deposition, Plaintiff's attorneys searched the documents that had already been turned over to them and discovered a number of "Roles, Responsibilities and Expectations" documents (the "RREs"). They set forth "responsibilities" for specific employees such as "[r]esearch, develop, lead and implement short and long term containerboard sales and technical service team strategies." ECF 388-1, PageID # 9665. They list "expectations" like "compile and publish market data including North American Containerboard Customer and Competitive Mill Profiles." *Id*. One employee's RRE instructs him or her to "[p]rovide business leaders with cost and revenue forecasts for the key drivers required to implement strategic decisions that will drive improved profitability in our business segment performance [*e.g.,*] Sales price Tracking Reports." *Id*. at PageID # 9666. Another RRE instructs an employee to "[e]xplore use of demand/supply elasticity, diffusion, available swing capacity." *Id*. at PageID # 9667. Another sets a specific "regional volume plan" listing specific numeric goals that the employee should achieve. *Id*. at PageID # 9668. Still another instructs a regional sales manager to "[e]xecute price increase as market conditions permit." *Id*. at PageID # 9676.

Plaintiffs refused to withdraw the Sixth Interrogatory. GP filed for a protective order, claiming the request (a) imposed undue burdens, (b) exceeded interrogatory limits posed by the

Federal Rules of Civil Procedure and (c) violated Plaintiff's express commitment not to seek further discovery about GP's organizational structure. Plaintiffs said they would consider the interrogatory answered if GP merely produced the RREs for all 400 employees on the litigation hold list, and that gathering those documents would not be unduly burdensome. They contended the interrogatories were within numerical limits and that their pledge to not seek further discovery on organizational structure was based on GP's incorrect representation that there were no written job descriptions.

Judge Nolan granted the protective order, finding that Plaintiff abused the cooperative process the parties were pursuing by immediately taking the voluntarily shared litigation hold list and using it to expand upon their discovery requests. "Such a response could have a chilling effect on both litigants and courts to engage in candid discussions," wrote Judge Nolan. *Kleen et al. v. Packaging Corp. of Am. et al.*, No. 10 C 5711, 2012 U.S. Dist. LEXIS 139632, at *29 (N.D. Ill. Sept. 28, 2012). She also ruled that Plaintiffs had not addressed the Rule 26 proportionality principle as required (since GP had submitted affidavits estimating that answering the Sixth Interrogatory would take 800 hours to accomplish). The Court dismissed the offer to accept RREs as a complete answer, in part, because she found the RREs were not a "job description" but a performance review document. Citing case

law, Judge Nolan found job descriptions to be position-specific, generic documents while RREs were "highly personal documents that apply to a single employee at a particular point in time." *Id.* at *34 (citing *Hooper v. Total Sys. Servs., Inc.*, 799 F.Supp.2d 1350, 1362 (M.D. Ga. 2011) and *Loeb v. Best Buy Co., Inc.*, No. 05-720, 2007 WL 2264729, at *1, *15 (D. Minn. Aug. 6, 2007)). She ruled Plaintiffs had not explained how the burden of producing these documents were outweighed by the benefit, particularly when "much of the information sought in the Sixth Interrogatory has already been obtained." *Id.* at *36.

### B. Legal Standard for Assessing Plaintiffs' Objections

Under Rule 72(a), this Court reviews a magistrate judge's ruling on non-dispositive matters under a "clearly erroneous" standard of review. Fed. R. Civ. P. 72(a). A finding is clearly erroneous if the reviewing court, after duly acknowledging the superior proximity of the factfinder to the witnesses, is firmly convinced that the finding is erroneous." *Sante Fe Pac. Corp. v. Central States, S.E. & S.W. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994).

### C. Analysis of Plaintiff's Objections

Plaintiffs argue Judge Nolan erred in several respects: (1) she failed to address the argument that the RRE documents are responsive to Plaintiffs' Request for Production No. 3; (2) she erred in concluding that the RRE documents were not job

- 9 -

descriptions; (3) she erred in failing to credit Plaintiff's representations they would accept the RREs as fully satisfying the Sixth Interrogatory; and (4) she erred in crediting GP's testimony that the retrieval of RREs would take 800 hours, while simultaneously accepting that the RREs are "living documents" being constantly updated. If the "living document" description is true, Plaintiff argues, then each person on the litigation hold list would have such documents at their fingertips, and a simple e-mail to everyone on the litigation list could produce them effortlessly.

This Court can quickly dismiss the first objection. Judge Nolan never said the RREs were not responsive; she said the burden of producing them outweighed their value under Rule 26. Similarly, the third objection is easily dispatched. Judge Nolan did credit the Plaintiffs' offer of compromise, even quoting verbatim that "Plaintiffs would accept their Sixth Interrogatory as answered" if all 400 employees' RREs were produced. *Id.* at *33. As to the fourth objection, this Court cannot say Judge Nolan was clearly erroneous in crediting GP's affidavit as to the 800 hours it estimates retrieval would take. Even if every employee had access to their current RRE, there would doubtless be old versions that exist and would have to be searched for and produced. More than a mere mass e-mailing would likely be needed. Given that Judge Nolan met with the parties numerous times and understood the complexity

involved in discovery in this large antitrust case, the Court cannot say she was wrong in this finding.

However, the Court agrees with Plaintiffs that Judge Nolan clearly erred in finding that these RREs are not "job descriptions." As demonstrated by the above quotations from RREs, these documents, although they are written with specific employees in mind, nonetheless describe those employees' jobs. To parse the meaning of "job descriptions" in the way GP does is to encourage every future litigant before this Court and others to hide the ball in discovery based on the thinnest of distinctions of what a document is called rather than what content it contains. The Court notes it is not, at this juncture, accusing GP's lawyers of deliberately hiding this information from Plaintiffs. It remains possible that the attorneys were misled by their client, or more likely (as is often the case in discovery in a case of this magnitude) were unaware of these specific documents until after representing they did not have them, possibly as late as Mr. Ragsdale's deposition. But this Court cannot agree that metaphysical distinctions are grounds for withholding documents in discovery. To the contrary, the case law is replete that attorneys and parties have a duty to make their responses "accurate and *complete*." *Johnson v. Cook County Bureau of Health Servs.*, 2010 U.S. Dist. LEXIS 22670, at *14 (N.D. Ill. March 11, 2010) (emphasis added) (awarding sanctions for a defendant's evasive answers based

on prevarications and noting "[d]iscovery is not a game of hide-and-seek."). Further, the Court does not find the cases cited by the Magistrate Judge applicable. Those cases were not discovery cases but employment discrimination cases discussing "job descriptions" in the context of whether positions were equivalent as defined under specific statutes. If anything, *Hooper*, an Equal Pay Act case, stands for the proposition that a clearer picture emerges of what an employee does by looking at that individual's actual responsibilities (akin to an RRE here) rather than a generic "job description" (what GP insists it does not have). *Hooper*, 799 F.Supp.2d at 1361-1362 ("Given that job titles and job descriptions at [the company] were generic and meant to be used across business units, the Court must focus on the actual job duties of the employees.") (internal citations omitted). Actual job duties of specific employees are what Plaintiffs were seeking here and, indeed, their Second RFP requested not only "job descriptions" but "the specific duties for" 21 named employees. That request for documents detailing "actual job duties" means that, even if GP's hyper-technical definition of "job descriptions" were correct, Plaintiff's request in its Second RFP for "specific job duties" of 21 employees still encompassed the RREs.

Again, this Court must emphasize that it does not, at this juncture, accuse GP's lawyers of hiding the ball. In a case of this scale, documents are not easy to discover, and sheer volume

dictates that searches be selective. In fact, the GP attorneys' good faith was demonstrated by their willingness to share their litigation hold list when they did not necessarily have to – at least not without a fight. (Although the Court notes its disconcertion with Mr. Ragsdale's evasive answers to Plaintiff's questions regarding the RREs. When Ragsdale answered "no" to the question of whether there was any other determination of an employee's "role" beyond her two-word title, it was at best technically correct (because GP uses the word "role" synonymously with "title") but inherently misleading.)

GP's cooperation in turning over that litigation hold list is among the reasons why this Court does not substantially modify Judge Nolan's order. Her basic conclusion remains not clearly erroneous: the wholesale turnover of RREs for all 400 employees on that list, going back eight years, is overly burdensome when Plaintiff has not demonstrated its benefit would outweigh the costs. Litigation hold lists are deliberately expansive, and not everyone on the list is crucial to Plaintiff's case.

So although Judge Nolan's conclusion about job descriptions not equating with RREs was erroneous, the overly burdensome conclusion she reached remains correct, and the protective order in regards to the Sixth Interrogatory remains undisturbed.

That said, the Court is sensitive to Plaintiff's position that cooperation by GP in one area does not mean that, when it is

discovered that GP possesses something it represented that it did not have (either deliberately or through honest misunderstanding), GP is no longer obligated to turn over those previously requested documents.

Accordingly, the Court finds that, on the separate but related issue of the Second RFP that sought documents reflecting specific job duties of 21 named employees, the RREs of those 21 employees, going back eight years, are directly responsive to Plaintiffs' request and must be turned over. These documents are relevant because, in order to prove anticompetitive conspiracy, Plaintiffs must first know which employees would be the ones engaged in anticompetitive activities (*e.g.*, knowing, via job descriptions, which employees are involved in pricing). Additionally, interrogatory responses that describe job duties may not be an effective substitute for these RREs. The RREs (created in candid moments when litigation is a distant concern and focusing on the nitty-gritty of what an employee actually does on a day-to-day basis) may be infinitely more revealing than a sanitized description of someone's duties created by an attorney writing with an eye toward winning the case for his client.

While 400 employees' RREs are clearly excessive (thus leaving Judge Nolan's ultimate conclusion intact), 21 employees' RREs (even for the full 8-year period) will not be excessive. Additionally, it may be that in the course of further discovery, as Plaintiffs

get a better sense of who the key GP players are, they may need to
see additional RREs, and the Court will be open to a limited
expansion beyond the 21 employees already requested. But in light
of the cooperation shown by the parties already, the Court would be
highly distressed if Plaintiffs and GP cannot reach an agreement
between 21 and 400 that would allow Plaintiffs adequate insight
while still not being overly burdensome to GP.

### D. Conclusion Regarding Judge Nolan's Protective Order

The objection to the magistrate judge's order is overruled,
and the protective order in regards to the Sixth Interrogatory
remains intact. However, the Court finds the RREs of the 21 named
employees directly responsive to Request No. GP-1 in Plaintiff's
Second Request for Production of Documents Directed to Georgia
Pacific LLC (ECF No. 372-4) and orders their production.

### III. PLAINTIFFS' MOTION TO COMPEL

Plaintiffs and Defendants disagree over which time periods are
relevant to the Complaint and should be the subject of discovery.
The issue of temporal scope [Pls.' Mot. to Compel, ECF No. 345]
appears to be, in many respects, both related and subservient to
the issue of which computer backup tapes and data sources need be
searched and produced [Pls.' Mot. to Compel, Dkt. No. 346]. This
is so because of the large costs associated with the restoration of
computer data backup tapes and because some Defendants argue much
of their older data is not kept in any form other than backup

tapes. Even if the Court were to order unlimited time frames in every category, restrictions on computer data backup tape recovery would likely have the side effect of limiting the temporal scope – at least in certain instances. That it why the issues are related. That the temporal scope issue is somewhat subservient to the data source issue is demonstrated by the Defendants' briefing. Defendant Temple-Inland Inc. authored the combined opposition response while the other defendants submitted six supplemental briefs to that combined response. Each supplement dealt only with the data source issue; not the temporal scope issue.

Because Judge Nolan has already given a tentative ruling on the data source issue (she denied the motion to compel without prejudice because it was premature until Plaintiffs finish reviewing documents already in their possession), and neither side objects to that ruling, this Court must bifurcate the issues and rule on the temporal scope issue.

To do so, the Court utilizes what is a convenient fiction: that the two discovery topics are unrelated. In other words, the Court puts out of mind, for the moment, that the two are inherently linked and the fact that limiting the data sources may also limit the temporal scope the Court is about to set. The Court also assumes that any objections Defendants make to the temporal scope must be justified separate and apart from the data source issues. The Court does this because (1) the parties have already bifurcated

the issues this way and (2) logistically, it will be easier to address the data source issue in the future if the temporal issue is resolved and no longer a moving target. However, the Court wishes to avoid any misconception that today's temporal ruling necessarily means that, should the Court later order some data tapes produced, that automatically means tapes must be produced for the entire temporal period set today. Electronically stored information presents its own discovery challenges and considerations, as evidenced by its own subrule within Rule 26. FED. R. CIV. P. 26(b)(2)(B). This is also consistent with Judge Nolan's order on data sources, which anticipates that "if feasible and cost efficient, sampling methods should be pursued" rather than initial wholesale production. *Kleen*, 2012 U.S. Dist. LEXIS 139632, at *57.

With that preliminary issue out of the way, the Court recounts the dueling discovery proposals as framed by the parties:

1. "Conduct" requests (documents relating to Defendants' conduct): Plaintiff seeks documents from January 1, 2002 through December 31, 2010; Defendants seek to limit the range to January 1, 2004 through 12/31/2010.

2. "Data" requests (Transactional and related data for expert economic analysis): Plaintiffs seek documents from January 1, 2000 through the present; Defendants seek to limit the range to January 1, 2003 through December 31, 2010.

3. Inquiries, Investigations and Prior Litigation requests: Plaintiffs seek documents from January 1, 1996 through December 31, 2010; Defendants seek to limit the range to January 1, 2004 through December 31, 2010.

4. Prior Antitrust Litigation requests: Plaintiffs want no time limits whatsoever; Defendants seek to limit the range to January 1, 2004 through December 31, 2010.

### A. "Conduct" Requests

Defendants object that because Plaintiffs alleged in their Complaint that the price-fixing began in 2005, "conduct" documents going back to 2002 are irrelevant. They also claim production would be unduly burdensome.

The ground rules of discovery provide that "[t]he Court construes relevancy broadly to encompass any matter that bears on or that reasonably could lead to other matters that could bear on, any issue[] that is or may be in the case." *Osada v. Experian Info. Solutions*, No. 11 C 2856, 2012 U.S. Dist. LEXIS 179991, at *25-26 (N.D. Ill. Dec. 20, 2012) (internal citations and punctuation omitted).

When a party objects to discovery, "[t]he burden rests on the objecting party to show why a particular discovery request is improper." *Id.* (internal citations and punctuation omitted). Additionally, Judge Nolan warned the parties in this case that "if burdensomeness and cost is a real issue . . . you have to give

specific[s]. I am very strict on burdensomeness. If you are going to allege burdensomeness, I need to know what that means. Okay?" Tr. of Proceedings, July 13, 2012, ECF No. 396-1, PageID # 10173.

The factors in considering an undue burden are: relevance, the need of the party for the documents, the breath of the documents, the time period covered, the particularity of the documents requested, the burden imposed and whether the party subpoenaed is a non-party. *WM High Yield v. O'Hanlon*, 460 F.Supp.2d 891, 895 (S.D. Ind. 2006).

Defendants clearly have not met their burden in regards to showing how they would be unduly burdened by the scope of the temporal requests. Although they did an excellent job giving specifics (cost and time estimates) in regards to the burden of certain data sources, they provided no specifics in regards to temporal parameters – or at least they mentioned none in their response brief. Given Judge Nolan's specific admonition to the parties, this lack of specificity must weigh heavily against Defendants.

That said, relevance must still be demonstrated. Defendants argue that conduct documents dating back to January 1, 2002 are clearly irrelevant because Plaintiff's Complaint alleges the price-fixing began in 2005. Plaintiffs argue:

> The conspiracy did not form at the beginning of the class period, but beforehand. Defendants' conspiracy, involving capacity reductions through mill and plant shutdowns, required advanced planning and coordination.

> Thus, it is entirely plausible that the Defendants'
> failed price increases before the class period were
> actually part of the conspiracy. At the very least, they
> provided the Defendants with the motivation to conspire.

Pls.' Reply, 3, ECF No. 396. The Court finds persuasive Defendants' argument that Plaintiffs must be at least somewhat constrained by the allegations in their Complaint. The fact that price increase attempts failed in 2003 and 2005 does not bode well for the argument that evidence of a conspiracy can be found within those time frames. However, given the lack of burden demonstrated by Defendants, and the fact that the Complaint outlines Smurfit-Stone's announcement in 2003 that it intended to reduce capacity (Am. Compl. ¶ 65), the Court finds there very well may be relevance in the stage-setting events of 2003-2005. However, Plaintiffs have pointed to no events whatsoever that occurred in 2002. Therefore, Defendants must produce conduct documents only as far back as January 1, 2003.

### B.  "Data" Documents

Plaintiffs want transactional and related data for a period of time before the class period to demonstrate the "before" and "after" effect of the alleged conspiracy upon prices. They argue that the "before" period must be equal in time (five years) to the conspiracy period (2005-2010). They also cite cases allowing for discovery after the class period. Defendants argue two years of "before" data is sufficient. Plaintiffs cite cases where longer periods of pre-conspiracy discovery have been allowed; Defendants

cite cases where much shorter periods were all that was granted. Given, as Judge Nolan noted, that courts generally take an expansive view of discovery in antitrust cases (*Kleen*, 2012 U.S. Dist. LEXIS 139632, at *40) and given Defendants' lack of demonstration of a burden, the Court grants Plaintiffs' Motion to Compel Production of Transactional Data from January 1, 2000 through the date of the filing of Plaintiff's Motion, July 27, 2012. The larger window of economic data (as opposed to conduct documents) is warranted in order to provide an accurate economic picture. *See Jays Foods, Inc. v. Frito-Lay, Inc.*, 614 F.Supp. 1073, 1078 (N.D. Ill. 1985) (criticizing Plaintiff's predatory price study for "meager" data on prices and costs); *see also New Park Entertainment LLC v. Electric Factory Concerts, Inc.*, No. Civ. A. 98-775, 2000 WL 62315 at *2-3 (allowing discovery for seven years prior to alleged conspiracy); *see also Caldwell-Clements, Inc. v. McGraw-Hill Pub. Co.*, 12 F.R.D. 531, 536 (S.D.N.Y. 1952) (granting discovery period of 25 years prior to Plaintiff's existence).

### C. "Prior Antitrust Litigation" documents

The Court takes this fourth item out of order because it appears related to the request for documents related to the third item, "prior inquiries, investigations, and litigation concerning antitrust-related activities" from January 1, 1996 to December 31, 2010. In fact, the Court is unable to distinguish a difference

between "prior antitrust litigation" and "prior . . . litigation concerning antitrust-related activities."  Nor can the Court gain enlightenment on the distinction by reading the First Request for Production of Documents Directed to All Defendants (the "First RPD") because neither party attached that document to their briefs, as far as the Court can tell.

The Court also takes this item out of order because it finds Plaintiffs' request for an unlimited time frame patently absurd. Plaintiffs cite adequate case law for the proposition that prior antitrust litigation can be relevant and therefore discoverable, but it cites no case law for the proposition that such relevance extends backward to the dawn of time.  True, Plaintiffs seek discovery of only that litigation mentioned in its Amended Complaint, but that would include litigation approximately 80 years old.  As noted in *WM High Yield*, *supra*, the time period of the request is decidedly a factor in whether a request is unduly burdensome.  Having set no temporal parameter, Plaintiff's request is unduly burdensome and is denied.

### D. "Inquiries, Investigations and Prior Litigation Requests"

As to the related request for documents related to inquiries, investigations and prior litigation concerning antitrust activities, Plaintiffs seek a more reasonable start date of January 1, 1996.  Defendants argue that *United States v. Andreas* dictates that prior conspiracies must involve related products and

occur during overlapping periods. *United States v. Andreas*, 216 F.3d 645, 665 (7th Cir. 2000). The Court notes that *Andreas* regarded admissibility in a criminal case, not discoverability in a civil case. *Id.* Many things are discoverable that may not be admissible, (*ARTRA 524(g) Asbestos Trust v. Transp. Ins. Co.*, No. 09 C 458, 2011 U.S. Dist. LEXIS 110272, at *38 (N.D. Ill. Sept. 28, 2011)) so it is doubtful the strictures set in *Andreas* apply to discovery. Moreover, the Court agrees with Plaintiffs that the products clearly overlap, and at least within the 1996 parameter, some employees may overlap as well. Therefore, the request seems reasonably calculated to lead to the discovery of admissible evidence, and its production is ordered, particularly in light of Defendants' lack of specificity as to why the time frame might be overly burdensome.

## IV. **CONCLUSION**

For the reasons stated herein, the Court rules as follows:

1. Plaintiffs' Objection to the Magistrate Judge's Order is overruled and Judge Nolan's protective order that found overly burdensome the request for the RREs of all 400 employees remains intact.

2. However, on a related matter, because the RREs are directly responsive to Plaintiffs' Second Request for Production that sought documents reflecting specific job duties of 21 named

employees, Georgia Pacific is ordered to turn over RREs as to those employees.

3. Plaintiffs' Motion to Compel production of "Conduct" Documents is granted in part and denied in part. The Court orders the production of such documents, but only within the time frame of January 1, 2003 through December 31, 2010.

4. Plaintiffs' Motion to Compel production of "Data" requests is granted in its entirety for the period of January 1, 2000 through July 27, 2012.

5. Plaintiffs' Motion to Compel production of documents relating to "Inquiries, Investigations and Prior Litigation Requests" from January 1, 1996 through December 31, 2010 is granted in its entirety.

6. Plaintiffs' Motion to Compel production of documents regarding prior antitrust litigation, unlimited in temporal scope, is denied.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 1/9/2013

- 24 -