IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KLEEN PRODUCTS LLC, *et al.*, individually and on behalf of all those similarly situated, | Case No. 1:10-cv-05711 |
| Plaintiffs, | Hon. Harry D. Leinenweber |
| v. | *FILED UNDER SEAL* |
| PACKAGING CORPORATION OF AMERICA, *et al.*, | *PUBLIC REDACTED VERSION* |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

PAGE

I. INTRODUCTION ................................................................................... 1

II. FACTUAL BACKGROUND ................................................................. 6

    A. CONTAINERBOARD PRODUCTS ................................................ 6

    B. CONTAINERBOARD PRODUCTS ARE UNDIFFERENTIATED COMMODITIES ............................................................................. 7

    C. CONTAINERBOARD PRODUCTS ARE PRICED IN A UNIFORM MANNER ......................................................................................... 8

    D. MARKET STRUCTURE ............................................................... 11

    E. THE ALLEGED CONSPIRACY ................................................... 16

III. ARGUMENT ....................................................................................... 42

    A. HORIZONTAL CONSPIRACY CLAIMS ARE COMMONLY CERTIFIED AS CLASS ACTIONS AND ARE AN IMPORTANT MEANS OF ENFORCING THE ANTITRUST LAWS ...................... 42

    B. STANDARD OF REVIEW ............................................................ 44

    C. THE CLASS IS ASCERTAINABLE AND RULE 23(a) IS SATISFIED .......... 44

        1. The Class is Ascertainable ..................................................... 44

        2. The Proposed Class Satisfies All Requirements Under Rule 23(a) ............... 45

            a. Numerosity is Satisfied ................................................. 45

            b. Commonality is Satisfied ............................................. 45

            c. Typicality is Satisfied ................................................... 46

            d. Adequacy is Satisfied ................................................... 48

    D. PLAINTIFFS SATISFY RULE 23(b)(3)'s PREDOMINANCE REQUIREMENT ........................................................................... 49

        1. The Alleged Conspiracy is a Central Common Issue ..................................... 50

## TABLE OF CONTENTS

PAGE

2. Plaintiffs Can Prove Causation on a Common Basis....................................... 52

   a. Defendants' Statements Can Be Used to Establish Causation.................. 53

   b. Plaintiffs Will Show Causation Through Expert Analyses
     and Opinions ........................................................................................ 54

3. Plaintiffs Will Prove Class-Wide Damages on a Common Basis .................. 57

E. A CLASS ACTION IS THE SUPERIOR METHOD FOR
ADJUDICATING THE CLAIMS AT ISSUE....................................................... 60

IV. CONCLUSION......................................................................................................... 61

## TABLE OF AUTHORITIES

FEDERAL CASES                                                                     PAGE(S)

*Allan v. RealComp II, Ltd.*, No. 10-cv-14046 (E.D. Mich. Mar. 30, 2013) .............................................50

*In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609 (D. Kan. 1995)..........................46, 53

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)..........................................................2, 49

*Amgen v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) .........................................5, 50

*In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162 (S.D.N.Y. 2000)...............................43, 53

*In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222 (E.D. Pa. 2012) .........................................46

*In re Brand Name Prescription Drugs Antitrust Litig.*, Nos. 94 C 897,
    MDL 997, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994) .....................................................43

*In re Bromine Antitrust Litig.*, 203 F.R.D. 403 (S.D. Ind. 2001)....................................................43

*In re Bulk (Extruded) Graphite Products Antitrust Litig.*,
    No. Civ. 02-6030 (WHW), 2006 WL 891362 (D.N.J. Apr. 4, 2006)..............43, 54, 55, 56, 59

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) .......................................................61

*In re Carbon Black Antitrust Litig.*, No. Civ. A. 03-10191-DPW,
    MDL No. 1543, 2005 WL 102966 (D. Mass. Jan. 18, 2005) ........................43, 51, 53, 54, 55

*In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229 (M.D. Fla. 1993) .....................................43

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 326 (E.D. Mich. 2001) ..................................................................................43, 48

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ..........................................61

*In re Catfish Antitrust Litig.*, 826 F. Supp. 1019 (N.D. Miss. 1993)..........................43, 47, 51, 53

*In re Citric Acid Antitrust Litig.*, No. 95-1092, C-95-2963 FMS,
    1996 WL 655791 (N.D. Cal. Oct. 2, 1996) .................................................................43, 50, 51

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013)..............................................................................................5, 49, 50, 60

*In re Commercial Tissue Antitrust Litig.*, 183 F.R.D. 589 (N.D. Fla. 1998)..................................43

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
  216 F.R.D. 197 (D. Me. 2003)..................................................................................................43

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,*
  906 F.2d 432, 447 (9 Cir. 1990) ............................................................................................54

*In re Currency Conversion Fee Antitrust Litig.,* Nos. MDL 1409, M 21-95,
  2004 WL 2327938 (S.D.N.Y. Oct. 15, 2004) .......................................................................43

*DeLoach v. Philip Morris,* 206 F.R.D. 551 (M.D.N.C. 2002)..................................................43, 55

*In re Disposable Contact Lens Antitrust Litig.,* 170 F.R.D. 524 (M.D. Fla. 1996) ......................43

*In re Domestic Air Transportation Antitrust Litig.,* 137 F.R.D. 677 (N.D. Ga. 1991) .................43

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
  Case No. 02-1486, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ...............................43, 55, 59

*In re Electronic Books Antitrust Litig.,* No. 11 MD 2293,
  2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) .......................................................................49

*In re EPDM Antitrust Litig.,* 256 F.R.D. 82 (D. Conn. 2009) ...............................................43, 54

*In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472 (W.D. Pa. 1999) ............................43, 52, 55, 59

*In re Foundry Resins Antitrust Litig.,* Case No. 2:04-md-1638,
  2007 WL 1299211 (S.D. Ohio May 2, 2007) ............................................................. 43, 53, 59

*Fox v. Riverview Realty Partners,* No. 12 C 9350,
  2014 U.S. Dist. LEXIS 55260 (N.D. Ill. Apr. 22, 2014) ...................................................49, 50

*General Leaseways, Inc. v. National Truck Leasing Association,*
  744 F.2d 588 (7th Cir. 1984) ............................................................................................3, 52

*General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147 (1982) .................................................44

*In re Glassine and Greaseproof Paper Antitrust Litig.,* 88 F.R.D. 302 (E.D. Pa. 1980) ..............48

*Harman v. Lyphomed, Inc.,* 122 F.R.D. 522 (N.D. Ill. 1988).....................................................48

*Hawaii v. Standard Oil Co.,* 405 U.S. 251 (1972).....................................................................42

*In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651 (7th 2002) .......................... *passim*

*In re High Fructose Corn Syrup Antitrust Litig.*, 936 F. Supp. 530 (C.D. Ill. 1996) ....................43

*In re High-Tech Employee Antitrust Litig.*, 86 Fed. R. Serv. 3d 1459 (N.D. Cal. 2013) ................2

*In re Infant Formula Antitrust Litig.*, Dkt. No. 878,
    1992 WL 503465 (N.D. Fla. Jan 13, 1992) ...........................................................................43

*In re K-Dur Antitrust Litig.*, 686 F.3d 197 (3d Cir. 2012)...............................................................50

*Kohen v. Pacific Investment Management Company LLC*,
    571 F.3d 672 (7th Cir. 2009) ........................................................................................4, 48, 58

*In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001) ..........................................43, 47

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002).............................................. *passim*

*In re Linerboard Antitrust Litig.*, MDL1261, 2008 WL 4542669
    (E.D. Pa. Oct. 3, 2008) ...........................................................................................................12

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) .................................................5

*In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001)............................43

*Lumco Industries, Inc. v. Jeld-Wen Inc.*, 171 F.R.D. 168 (E.D. Pa. 1997)....................................43

*In re Magnetic Audiotape Antitrust Litig.*, No. 99 CIV. 1580 (LMM),
    2001 WL 619305 (S.D.N.Y. June 6, 2001) ...........................................................................43

*In re Master Key Antitrust Litig.*, 528 F.2d 5 (2d Cir. 1975).........................................................53

*In re Medical X-Ray Film Antitrust Litig.*, No. CV-93-5904,
    1997 WL 33320580 (E.D.N.Y. Dec. 26, 1997)......................................................................43

*In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180 (D.N.J. 2003).............................................43

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 801 (7th Cir. 2012) .......................... *passim*

*In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79 (E.D. Pa. 2003).........................43

*In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229 (D. Minn. 2001) .........................43

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ...............................................................43, 46, 49, 51, 56

*In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418
    (E.D. Pa. Aug. 3, 2007).............................................................................................2, 43, 52, 55

*Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*,
    231 F.R.D. 280 (N.D. Ill. 2005)...................................................................................46

*Paper Sys. Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601 (E.D. Wisc. 2000) ......................................43

*In re Plastic Cutlery Antitrust Litig.*, No. CIV. A. 96-CV-728,
    1998 WL 135703 (E.D. Pa. Mar. 20, 1998)...............................................................43

*In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231 (E.D.N.Y. 1998)............................................43

*In re Polyester Staple Antitrust Litig.*,
    2007 WL 2111380 (W.D.N.C. July 19, 2007).......................................................43, 55, 56, 58

*In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18 (N.D. Ga. 1997) ............................43

*In re Polyurethane Foam Antitrust Litig.*, MDL No. 2196 (N.D. Ohio Apr.16, 2014 Order) ..................50

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995) ......................................................53

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    2007 WL 4150666 (M.D. Pa. Nov. 19, 2007) ...................................................................43, 55

*In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005)................42, 47, 51, 55

*Saltzman v. Pella Corp.*, 257 F.R.D. 471 (N.D. Ill. 2009)..................................6, 45, 46, 47, 48, 50

*Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323 (N.D. Ill. 2010) ..........................................45

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) ..............................3, 6, 44, 52, 60

*Sebo v. Rubenstein*, 188 F.R.D. 310 (N.D. Ill. 1999) .....................................................................43

*In re Sugar Industry Antitrust Litig.*, 73 F.R.D. 322 (E.D. Pa. 1976) ...........................................55

*In re Sulfuric Acid Antitrust Litig.*, MDL No. 1356,
    2007 WL 898600 (N.D. Ill. Mar. 21, 2007)...............................................................43

*Sullivan v. DB Investments*, 667 F.3d 273 (3d Cir. 2011) ..................................................42, 43, 49

*Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001) ................................................44

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010)...............43, 55, 58

*In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318,
2013 WL 4110501 (D. Md. Aug. 14, 2013) .............................................................54

*Thillens, Inc. v. Community Currency Exchange Association,*
97 F.R.D. 668 (N.D. Ill. 1983).............................................................................46

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
209 F.R.D. 159 (C.D. Cal. 2002).......................................................................43, 55

*In re Universal Service Fund Tel. Billing Practices Litig.,*
219 F.R.D. 661 (D. Kan. 2004) ........................................................................43, 55

*In re Urethane [Polyester Polyols] Antitrust Litig.,*
237 F.R.D. 440 (D. Kan. 2006) .............................................................55, 56, 60, 61

*In re Urethane [Polyether Polyols] Antitrust Litigation,*
251 F.R.D. 629 (D. Kan. 2008) ................................................................ *passim*

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) ..................................43, 49, 51, 55

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011) .......................................5, 44, 46

**FEDERAL STATUTES AND RULES**                                                    **PAGE(S)**

Fed. R. Civ. P. 23 ...............................................................................4, 5, 42, 61

Fed. R. Civ. P. 23(a) ...................................................................1, 45, 46, 47, 48

Fed. R. Civ. P. 23(b)(3) ..............................................................1, 49, 50, 51, 60

Fed. R. Civ. P. 23(c)(1)(B) ................................................................................44

15 U.S.C. § 1.........................................................................................................1

**MISCELLANEOUS**                                                                   **PAGE(S)**

6 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 18.28 (4th ed. 2002) .........51, 60

7 Charles Alan Wright, Arthur R. Miller & Mary Kane,
*Federal Practice & Procedure* § 1781 (3d ed. 2005) ............................................51

*Manual for Complex Litigation* § 21.222 (4th ed. 2005)................................................44

## I.  INTRODUCTION

Plaintiffs seek certification of a class of all persons or entities that purchased Containerboard Products directly from any of the Defendants[1] or their subsidiaries or affiliates for use or delivery in the United States from February 15, 2004 through November 8, 2010.[2] Plaintiffs allege a conspiracy among Defendants to artificially inflate prices of Containerboard Products, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs' central allegation is that the conspiracy was facilitated by agreements to restrict the supply of containerboard by cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory, all of which set the stage for coordinated price increases of all Containerboard Products.

At class certification, Plaintiffs need to satisfy Rule 23(a) (numerosity, commonality, typicality and adequacy) and establish "predominance" and "superiority" under Rule 23(b)(3). *See* Fed. R. Civ. P. 23. Here, as in most antitrust cases, Rule 23(a) and superiority of class proceedings are readily satisfied. The dispute will likely focus on predominance, which requires a showing that the key elements of Plaintiffs' case—antitrust conspiracy, causation (variously known as "antitrust injury", "fact of damage" or "impact"), and aggregate damages—can be

---

[1] Defendants are International Paper ("IP"); Cascades Canada, Inc. and Norampac Holdings U.S. Inc. ("Norampac"); Weyerhaeuser Co. ("WY"); Georgia-Pacific LLC ("GP"); Temple-Inland Inc. ("TIN"); RockTenn CP, LLC (f/k/a Smurfit-Stone Container Corp.) ("Smurfit" or "SSCC"); and Packaging Corporation of America ("PCA"). Plaintiffs and PCA entered into a settlement agreement, preliminarily approved by the Court. *See* Order Preliminarily Approving Settlement, Conditionally Certifying the Settlement Class, Appointing Class Counsel for the Settlement Class, Approving Notice Plan, and Setting a Final Approval Hearing (ECF #634).

[2] The Class definition is identical to the Settlement Class recently certified by the Court. *See* Order Preliminarily Approving Settlement, Conditionally Certifying the Settlement Class, Appointing Class Counsel for the Settlement Class, Approving Notice Plan, and Setting a Final Approval Hearing, at ¶3.2 (ECF #634).

established using common proof at trial. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012).

"[I]n antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification." *Id.* (internal citation and quotes omitted); *see also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."). Most antitrust cases involve a "common nucleus of operative facts and issues"—the touchstone for predominance. *Messner*, 669 F.3d at 815. *See also In re High-Tech Employee Antitrust Litig.*, 86 Fed. R. Serv. 3d 1459, at \*13 (N.D. Cal. 2013) (citing *Messner* and *Amchem*). Class certification is particularly appropriate in cases alleging collusive supply restriction. *See In re Linerboard Antitrust Litig*, 305 F.3d 145, 152-53 (3d Cir. 2002) ("*Linerboard*") (explaining economics of supply restriction and affirming class certification on similar facts involving the same industry and same defendants); *see also In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007). Class certification is warranted here.

First, as in most antitrust class actions, the alleged conspiracy is a common and predominating issue. *See, e.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("proof of the conspiracy is a common question that is thought to predominate") (internal citation omitted); *see also* Declaration of Michael J. Harris, Ph.D. In Support of Plaintiffs' Motion for Class Certification, ¶¶ I.C.1, at 5-6, VIII.1, 3., at 59-60 ("Harris Decl.") (summarizing economic opinions that evidence common to Class supports the conclusion that Defendants engaged in collusion to restrict supply and raise prices above competitive levels).[3]

---

[3] Dr. Harris is Class Plaintiffs' economics expert, offering opinions on liability and common impact. He is a distinguished Ph.D. in economics, specializing in Industrial Organization (sometimes referred to as

Any trial in this matter will concentrate on common facts relating to whether Defendants conspired.

Second, Plaintiffs will establish antitrust impact using common proof at trial. Antitrust impact is a causation inquiry. *See, e.g., In re Urethane [Polyether Polyols] Antitrust Litig.*, 251 F.R.D. 629, 634-36 (D. Kan. 2008) (impact "can be likened to the causation element in a negligence cause of action" and the "legal inquiry is whether, as a result of defendants' alleged price-fixing conspiracy, the putative class plaintiffs paid a price that was artificially high"). In an antitrust case involving supply restrictions, the basic law of supply and demand makes causation common across class members. Restraining supply invariably causes prices to rise for all or almost all purchasers—a point the Third Circuit emphasized in affirming class certification in the most recent prior case involving Containerboard Products. *Linerboard*, 305 F.3d at 152 ("A reduction in supply will cause prices to rise."); *see also Messner*, 669 F.3d at 816 (establishing common impact is "relatively simple" in cases involving straightforward theories of "supply and demand"); *General Leaseways, Inc. v. National Truck Leasing Assoc.*, 744 F.2d 588, 594 (7th Cir. 1984) (when "firms restrict output directly, price will as mentioned rise") (Posner, J.).

Plaintiffs will establish causation at trial using several independent categories of common evidence, all having class-wide application, including:

- *Statements and Documents.* Defendants' executives stated repeatedly that containerboard capacity and production cuts caused higher prices and profits for the industry as a whole. This evidence is powerful common proof of causation.

- *Expert Testimony on Market Structure.* Economic analysis shows that the structure of the industry was ripe for collusion and that restricting containerboard supplies and

---

"antitrust economics"), with a wealth of experience testifying in state and federal courts on issues pertinent to this case. Harris Decl., ¶¶ I.A., at 1-2.

coordinated price increases caused class-wide impact. *See* Harris Decl., ¶¶ V.I.1-3, at 33 (summarizing findings on market structure and concluding that "this industry structure provides to Defendants a powerful motive to collude . . . [and] that any collusion by the Defendants would ultimately be broadly and generally successful . . . having a widespread impact across all or nearly all customers.").

- *Pricing Data.* Prices of Containerboard Products followed similar trends during the relevant period—across Defendants—indicating common impact for all direct purchasers. *See* Report of Mark Dwyer, Ph.D. ¶ 24, at 9-10, and chart entitled "PPW Transaction Price Indexes" ("Dwyer Rep.") (showing that prices of Containerboard Products "move in strikingly similar patterns.").[4]

- *Econometric Evidence.* Econometric analysis shows that class members paid higher prices for Containerboard Products than they would have paid in a competitive market. This too is Class-wide proof of impact. *See* Dwyer Rep. *passim;* Harris Decl., ¶ I.C.3, at 6 (Dr. Dwyer's "empirical analyses reliably shows that all, or nearly all, class members were impacted by the price increases implemented during the class period.").

Each of these categories is common, probative and independently reliable proof of causation, which can be used on behalf of all class members at trial.

"[P]laintiffs' burden at the class certification stage" is "only to demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class." *Messner,* 669 F.3d at 818 (emphasis in original) (internal citations and quotes omitted). It is not whether Plaintiffs *have* in fact established impact though common evidence. *Messner,* 669 F.3d at 818-19; *Kohen v. Pacific Investment Management Co. LLC,* 571 F.3d 672, 676 (7th Cir. 2009) (rejecting argument that class certification requires proof of injury for every class member and cautioning against "putting the cart before the horse" at this stage). While "a court's class certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at

---

[4] Dr. Dwyer is Class Plaintiffs' econometrics expert, offering opinions on common impact and damages. He is a distinguished Ph.D. in economics with a specialty in econometrics and a wealth of experience testifying in state and federal courts on issues such as those here. Dwyer Rep., ¶ 5, at 3.

the certification stage." *Amgen v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) and noting further that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

To certify the class, the Court need not resolve Defendants' inevitable challenges to Plaintiffs' case on the merits; nor is it necessary for the Court to accept the opinion(s) of either side's expert(s) on the merits. Rather, the Court should scrutinize the record rigorously, including the parties' expert reports, making only those factual findings necessary to determine whether Plaintiffs' common proof is the type of proof on which a jury could rely. *Id.*; *see also Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475 (N.D. Ill. 2009); *Linerboard*, 305 F.3d at 152. That standard is met here, as the foregoing categories of evidence can be used to establish antitrust causation and injury on a class-wide basis at trial.

Third, Plaintiffs can use econometric modeling to establish impact and antitrust damages on a class-wide basis. *See, e.g., Scrap Metal*, 527 F.3d at 532-34; *see generally Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 491-93 (7th Cir. 2002) (explaining standard for proving antitrust damages); *see also* Dwyer Rep., ¶¶ 59-70, at 21-25 (multiple regression analyses reliably producing preliminary estimation of Class-wide damages). Dr. Dwyer's preliminary multiple regression analysis provides common, empirical proof of antitrust impact and damages, supporting Plaintiffs' motion for class certification. The model measures damages from the alleged conspiracy on a Class-wide basis using a common methodology applicable to all Class members and corresponds directly to Plaintiffs' theory of liability. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430, 1433 (2013).

-5-

## II. FACTUAL BACKGROUND

### A. CONTAINERBOARD PRODUCTS

"Containerboard Products" are linerboard, corrugated medium, containerboard sheets and corrugated containerboard products, including boxes and other containers. Some 90% of the goods shipped in the United States are shipped in corrugated containerboard boxes.[5] As of 2010, the Containerboard Products industry was ▮▮▮▮ vertically-integrated,[6] with Defendants' own vertical integration ranging from ▮▮▮▮▮▮.[7] To make Containerboard Products, wood pulp is first made into linerboard,[8] a flat paperboard.[9] Approximately ▮▮▮ of the linerboard produced in the U.S. is unbleached kraft linerboard ("UK"), most commonly produced in the 42 pound grade.▮ When fluted or crimped, linerboard becomes corrugated medium.[11] Linerboard and medium are produced in mills, where they are spooled onto rolls. A sheet feeder machine then laminates medium to linerboard, with linerboard serving as the inner and outer facings, to

---

[5] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Norton Associates Power Point Presentation, by Sarilee Norton, dated July 2011, "Implications for Containerboard Producers – Lightweight Containerboard." Available at: http://www.aiccbox.org/education/PDF/11_Implication_Lightweighting.pdf.

[6] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[7] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[8] ▮▮▮▮▮▮▮ There are two source of wood pulp—virgin fibers and recycled corrugated that is "re-pulped", also known as Old Corrugated Containers ("OCC"). For most of the proposed Class Period, Defendants relied primarily on virgin fiber, but their reliance on OCC has increased over time. RockTenn Company, which acquired Defendant Smurfit-Stone (subsequently renamed RockTenn CP, LLC) after the lawsuit was filed, used mostly OCC.

[9] ▮▮▮▮▮▮▮▮▮▮▮.

[10] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[11] ▮▮▮▮▮▮▮▮▮▮▮

produce containerboard.[12] Containerboard is then converted into corrugated containers (boxes) at box plants.[13]

## B. CONTAINERBOARD PRODUCTS ARE UNDIFFERENTIATED COMMODITIES



"[c]ommodity markets are more susceptible to collusive activity than markets with highly differentiable products"). Defendants admit that containerboard (liner and medium) are commodities in their contemporaneous business records, including SEC filings.[15]

[16] The Department of Justice considers containerboard to be a commodity.[17]

The other Defendants' contemporaneous documents agree,[21] as do documents and testimony from Defendants' trade organizations,

---

[12] *Id.*

[13]

[14]

[15] Ex. 9 (2005 PCA 10-K excerpt) ("Containerboard is a generally considered a commodity-type product and can be purchased from numerous suppliers."); Ex. 10 (2009 Temple-Inland 10-Q excerpt) ("Given the commodity nature of our manufactured products, we have little control over market pricing or market demand"). *See also* Ex. 11 (Affidavit of Matthew T. Denton), ¶5.

[16]

[17] Department of Justice, Antitrust Division, *United States v. International Paper Company, et al.*, Proposed Final Judgment and Competitive Impact Statement (DOJ Statement) IV. The Relevant Market. http://www.gpo.gov/fdsys/pkg/FR-2012-02-22/pdf/2012-3975.pdf.

[18]

[19]

[20]

[21]

including the 

The proposed class representatives view boxes as commodities and order the same boxes from multiple sources[25]: "a box basically is a box, so we could get it from different suppliers, and price is what was a driving factor."[26] "There isn't a difference in the design whatsoever."[27]

## C. CONTAINERBOARD PRODUCTS ARE PRICED IN A UNIFORM MANNER

As commodities, Containerboard Products are priced in a uniform manner. This Court has correctly recognized that the "prices of corrugated products are of course tied directly to the





In its 2010 bankruptcy proceeding, Smurfit-Stone submitted an Affidavit stating: "The contract prices for many sales of containerboard and corrugated containers are linked to the Linerboard Index Price. However, these contracts have price movement mechanisms that lag the movement of the Linerboard Index Price."[34]



Both contract and non-contract prices

---

[29] Order Denying Motions to Dismiss (ECF #193) at p. 6.

[30] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[31] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[32] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[33] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[34] Ex. 11 (Denton Aff.) at p.4.

[35] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



Increases in the PPW index price for linerboard are passed through to box prices.

In sum, product characteristics, pricing dynamics, contract conventions, as well as customers'

statements and buying behavior, establish that the relevant Containerboard Products are interchangeable, undifferentiated, homogenous commodities, readily susceptible to the alleged price-fixing conspiracy.[43]

### D. MARKET STRUCTURE

Market structure is probative of the existence and efficacy of an anticompetitive scheme.





Defendants are the principal integrated North American producers of Containerboard Products, in several senses of that term. As shown above, they are highly vertically integrated. Defendants have also integrated horizontally creating a market structure favorable to their continued collusion. They have accomplished this through actual consolidation, like mergers and acquisitions, as well as by actions that defendants' self-describe as                    [44] that is, measures taken to treat jointly their supply and inventories. This                    amounts to *de facto* horizontal consolidation.

This *de facto* consolidation provides opportunities to communicate concerning price and supply, as well as to monitor one another's prospective pricing and supply decisions. The extent of Defendants' structural interdependence goes far beyond a typical oligopolistic market structure, instead they have purposefully created a market environment that restrains unilateral competitive behavior and supports collusion.

---

[43]

[44]

Industry history is one facet of market structure. *See* Harris Decl., ¶ VI.H.1, at 57-58 (discussing history of antitrust violations in wood products industry). The forest products and paper industries and the Containerboard Products industry in particular, have lengthy histories of being the subject of antitrust charges.[45] Most recently, in the *Linerboard* action and related FTC proceedings, which concerned the years 1993-1995,[46] the Defendants here (other than Cascades/Norampac) were alleged to have engaged in coordinated supply restrictions to support price increases.[47] The *Linerboard* case resulted in payments of hundreds of millions of dollars to impacted purchasers[48] and Stone Container (a predecessor of Smurfit-Stone) resolved the FTC case by entering into a restrictive consent decree with the United States government.[49]

At that time, the top five containerboard producers had a collective market share of approximately ▮▮▮.[50] Since the *Linerboard* case, the North American containerboard industry has become increasingly concentrated. Defendants' market share increased to ▮▮▮ of total box production in 2005,[51] and rose again to ▮▮▮ two years later.[52] As detailed in the Plaintiffs' Complaint and admitted in Defendants' Answers, among other transactions, GP was acquired by Koch Industries in 2005, while IP acquired Weyerhaeuser's containerboard business in 2008.[53]

---

[45] *See* Complaint (ECF #65), ¶¶ 57-63.

[46] *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 148-49 (3rd Cir. 2002).

[47] *In re Linerboard Antitrust Litig.*, MDL1261, 2008 WL 4542669, *1 (E.D. Pa. Oct. 3, 2008) ("Class plaintiffs … alleged that [defendants] conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/ or curtailing inventories.").

[48] *Id.* at *2 (detailing settlement figures each defendant entered into with class plaintiffs).

[49] *In the Matter of Stone Container Corp.*, FTC File No. 9510006, Agreement Containing Consent Order to Cease and Desist. http://www.ftc.gov/sites/default/files/documents/cases/1998/02/9510006.agr_.htm (last visited June 9, 2014).

[50] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[51] ▮▮▮▮▮▮▮▮.

[52] ▮▮▮▮▮▮▮▮▮▮▮▮.

[53] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ IP acquired Temple-Inland in 2012, giving it a current market share of approximately 37%. *See* http://www.reuters.com/article/2012/02/10/us-templeinland-internationalpaper-antit-idUSTRE8191FF20120210 (last visited June 5, 2014).

This growing consolidation both facilitates Defendants' collusion and means that the supply restrictions – and commensurate price increases – impact the vast majority of box customers.



Beyond mergers, Defendants have

thereby enhancing a collusive market structure.



As another form of *de facto* consolidation,



-13-



Instead of increasing their own capacity and capabilities to compete,

– again not competing. Trades were even contemplated as a means of sanctioning producers that did not increase price:

-14-



73

This is a type of cooperative behavior not generally observed in competitive markets. In a competitive market, firms with higher inventory would use that inventory to gain market share from the firm lacking inventory rather than use that inventory to strengthen its competitor."

As expected, inter-Defendant transactions provided frequent opportunities to exchange proprietary information about capacity, including downtime and closures, so that they could ensure industry supply remained static or dropped.



The evidence above shows that competitor-Defendants used "virtual integration" to monitor, facilitate and enforce their conspiratorial conduct.

Taken together, Defendants actual and *de facto* horizontal consolidation, the extreme degree of vertical and virtual integration, and inter-Defendant transactions make the Containerboard Products industry highly susceptible to output restrictions and price-fixing.[86]

### E.    THE ALLEGED CONSPIRACY

Plaintiffs allege that Defendants conspired to raise prices for Containerboard Products, facilitated by a variety of mechanisms to restrict the supply of containerboard. Complaint, ¶¶ 6, 66, 69.  Throughout the Class Period, Defendants concurrently announced and implemented price increases while reducing output through: (a) capacity closures; (b) downtime; (c) "slowbacks"; (d) inventory restraints; (e) public and private pronouncements concerning future output reductions, (f) exchanging crucial information regarding output, pricing, and inventory

---



[86] Complaint, ¶ 41 (citing Li, Haizheng and Jifeng Luo. *Industry Consolidation and Price in the US Linerboard Industry.* Journal of Forest Economics 14 (2008) at 98 ("the US linerboard industry may have a certain degree of oligopolistic structure such that leading producers can exercise some pricing power, for example, through either barometric price leadership or collusive price leadership.")).

targets; (g) inter-Defendant transactions; and (h) permanent closures of mills.



Defendants also used earnings calls and Wall Street reports as tools to disclose and monitor each other's compliance with price increases, strategy decisions, and output levels. As a result of an FTC consent decree (discussed below), and the subsequent antitrust class actions against most of them, Defendants developed a common scheme that they could claim was within the interstices of the conduct restrictions imposed by the consent decree against one of their members, Stone Container Corporation, a predecessor to Defendant SSCC. Defendants' trade association activities provided another venue for coordination and often coincided with significant price and output events. As Judge Shadur observed in denying Defendants' motions to dismiss, "It is striking that all Defendants repeatedly—twice in each of 2005 and 2006 and once in each of 2007 and 2008—raised their prices soon after an industry event. . . . , belonging to a trade association or attending industry events and exchanging price information is 'not illegal in itself' but 'facilitates price fixing.' Where price increases are consistently and closely timed soon after industry gatherings, significant weight is lent to allegations of a conspiracy."[87]

While class certification is not a time to litigate the merits of Plaintiffs' conspiracy claims, a sampling of the evidence developed to date provides useful context for the Court's analysis. Every piece of evidence described below is common to all Class members and will assist every Class member in proving its case.

In the years leading up to the beginning of the Class Period, demand for Containerboard Products was steady, prices were low and production capacity was abundant. During the period

---

[87] Order Denying Motions to Dismiss (ECF #193) at 18 (internal citations omitted).

in and before 2003-04, Defendants' conduct verged on the competitive, despite the fact that "[f]rom the 1930s onward the containerboard industry has been subject to extensive antitrust litigation and other charges of unfair competition."[88] At this time, SSCC was subject to a 1998 FTC consent decree.[89] The FTC charged that Stone had attempted to effect a coordinated price increase for linerboard and found that, similar to the conspiracy here, Stone had communicated plans to take downtime, reduce production, and drawdown inventory levels while buying linerboard from competitors, believing that these actions would support an industry-wide price increase.[90]

Toward the end of 2003, prior expectations of steady demand were replaced by forecasts of moderate growth. In the third quarter of 2003, SSCC renounced its recent history of competitive behavior and trumpeted a plan to curtail its supply "enough … to force price increases throughout the industry."[91] The company vowed not to add capacity, even if demand improved.[92] Wall Street expressed skepticism that this would be enough to boost profits. Overall, Defendants had sufficient capacity to readily increase production to meet demand growth. But Defendants' behavior changed after SSCC's proclamation. *See* Harris Decl., ¶¶ IV.K.1 and 2, at 21-22 (describing changes in industry fundamentals between pre-Class period (2000-03) and Class period (2004-2010)).

---

[88] *Id.* at p. 7.

[89] Pursuant to the consent decree, Stone Container (and by virtue of its acquisition, SSCC) was ordered to cease and desist from "[r]equesting, suggesting, urging, or advocating that any manufacturer or seller of linerboard raise, fix, or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties" and from "entering into… any combination, conspiracy, agreement, understanding, plan or program with any manufacturer or seller of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties." *In the Matter of Stone Container Corporation.* FTC DOCKET NO. C-3806, Decision and Order, May 18, 1998. The Order terminates on May 18, 2018. Available at: http://www.ftc.gov/sites/default/files/documents/cases/1998/02/9510006.agr_.htm

[90] *See id.*

[91] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[92] *Id.*

First, as the table below summarizes, Defendants announced ▉ containerboard price increases between 2004 and 2010.[93] Defendants announced their price increases within days of each other for almost simultaneous implementation, and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ as announced.



---

[93] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇.



Second, Defendants restricted output through capacity reductions and diminished production through downtime, "slowbacks," or other mechanisms, antecedent to or concurrent with the price increases. The table below summarizes Defendants' output reductions throughout the course of the Class Period.[94]

---

[94] ▓▓▓▓▓▓▓▓▓▓ The table does not include box plant closures. Nor does it include slowbacks ▓▓▓▓▓▓▓▓▓. *See* discussion *infra*.

| Year | Quarter | Event |
|------|---------|-------|
| 2003 | Q4 | ● █████████████ |
| 2004 | Q1 | ● *March 2004 Price Increase.* |
|  |  | ● █████████████ |
|  | Q2 | ● █████████████ |
|  |  | ● *June 2004 Price Increase.* |
|  | Unknown | ● █████████████ |
| 2005 | Q1 | ● █████████████ |
|  |  | *March 2005 Price Increase.* |
|  | Q3 | ● █████████████ |
|  |  | ● █████████████ |
|  | Q4 | ● █████████████ |
|  |  | ● *October 2005 Price Increase.* |
| 2006 | Q1 | ● *January 2006 Price Increase.* |
|  |  | ● █████████████ |
|  | Q2 | ● *April 2006 Price Increase.* |
|  | Q4 | ● █████████████ |
| 2007 | Q1 | ● *January 2007 Price Increase.* |
|  | Q2 | ● *Spring 2007 Price Increase.* |
|  | Q3 | ● █████████████ |
|  |  | ● *August 2007 Price Increase.* |
|  | Q4 | ● █████████████ |
| 2008 | Q1 | ● *March 2008 Price Increase.* |
|  | Q3 | ● *July 2008 Price Increase.* |
|  | Q4 | ● █████████████ |
|  |  | ● █████████████ |
|  |  | ● █████████████ |
| 2009 | Q4 | ● █████████████ |
|  |  | ● █████████████ |
| 2010 | Q1 | ● *January 2010 Price Increase.* |
|  | Q2 | ● *April 2010 Price Increase.* |
|  | Q3 | ● *August 2010 Price Increase.* |



The supply restrictions were irrational as unilateral actions, but led to the two waves of industry-wide price increases in 2004. *See* Harris Decl., ¶¶ VI.A.1-9, at 35-39 (discussing mill closures and finding that "[s]hutting capacity in the circumstances Defendants faced during the class period is both a facilitating practice and a potential 'plus factor' used to evaluate collusive behavior. . . . The actions undertaken by the Defendants to close capacity do not appear to be consistent with their unilateral self-interests. Rather, it is only rational in the context of coordinated collective action.").



The same month that the 2004 price increase was implemented, Defendants each internally circulated similar "battle cry" memoranda.

Two months later,



95

96

97

98

99          ).

100



Although they stabilized prices at their inflated levels, Defendants' initial rounds of closures were not enough to support further price increase attempts in early 2005.



SSCC publicly announced the closure of three mills reducing capacity by 681,000 tons.[106] Weyerhaeuser publicly explained that the company was going to take "the actions necessary" to ensure that it was not overproducing and announced that it would shutter a plant producing 350,000 tons.[107] Norampac announced the closures of one mill machine and two corrugated products plants[108] and its CEO said, "[i]f everyone would remove the same amount of capacity percentage-wise as we have, I think our business would look a lot better. You have to be ready

---

[101]

[102]

[103]

[104]

[105]

[106]     ).

[107]     .

to let go of business if you want to keep the price up."[109]   IP , announced the closure of two mills (one operated jointly with SSCC), and took [redacted].[110] In total, Defendants removed just under one million tons of production capacity from the market in 2005.

Output reductions continued after the mill closures of 2005.

In sum, Defendants removed just under [redacted] tons of capacity from the market for a total reduction of [redacted] million tons/year of production in 2005 and 2006.

Having implemented three price increases in ten months between October 2005 and August 2006, Defendants announced another _three_ price increases in 2007, although only one would be fully implemented.  All told, Defendants' four price increases in under two years had

---

[109] Complaint, ¶ 88.



raised containerboard prices by $160 per ton, or by approximately 41%. The first 2007 increase, slated for January, was announced in October-December 2006. 

The first increase of 2007 was not fully implemented.

Accordingly, Defendants again reduced capacity.

In May 2007, IP CEO John Faraci publicly stated that taking additional downtime was "entirely possible"[121] and, within two weeks, the company announced a 190,000 ton per year mill closure.[122]

---



[117]

[118] ).

[119]

[120] .

[121] .

[122] *See* http://www.prnewswire.com/news-releases/international-paper-announces-closure-date-for-terre-haute-mill-57943822.html (last visited June 3, 2014). *See also* Ex. 152.

[123]

[124] ).



In late 2007, the general economy began to falter, first sinking into recession, then collapsing in the second half of 2008 and continuing to decline through the middle of 2009, when an anemic recovery commenced. Notwithstanding the grim economic climate, Defendants tried to raise prices six times between 2008 and 2010, three of which were fully implemented.



Plaintiffs' ongoing review of telephone records obtained in discovery demonstrates that, immediately following ▮▮▮ price increase announcement, there were numerous telephone calls and faxes between Defendants, including calls from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ . In addition, extensive fax and telephone communications between Defendants

125 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
126 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
127 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .
128 ▮▮▮▮▮▮▮▮▮▮▮
129 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

occurred the morning of May 28,



Officially, the Great Recession ended and economic growth renewed in mid-2009. Nevertheless, in the second half of the year, IP announced the permanent closure of 1.4 million tons of containerboard capacity.[135]



---

[130]

[131]

[132] *See* price increase table above.

[133] ).

[134]

[135] ).

[136]



Defendants' 2009 closures set the stage for a ▮▮▮ price hike in January 2010 (announced between November 23 and December 12, 2009), notwithstanding the generally depressed economy.[139]

Just one month later, IP announced another containerboard price increase of ▮▮▮ per ton, effective April 1, 2010.[145] Two days later, GP announced an identical price increase, followed





Defendants tried to raise prices a third time in 2010 but, according to Wall Street, the effort was thwarted by this litigation.[148] The AICC said that the third price increase of 2010 "calls into question the integrity of our industry", explicitly comparing defendants actions to the price increases of *Linerboard* years and allegations of inventory collusion.[149]

Defendants' synchronous price increases and capacity reductions, often undertaken in the face of contrary economic trends, are not the only evidence of their unlawfully concerted action. The record, even at this juncture, contains substantial contemporaneous evidence that tends to exclude the possibility that Defendants acted independently. *See e.g., In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 661 (7th Cir. 2002).

**Defendants Acted Against Unilateral Self-Interest**. In general, reducing supply in the face of increasing demand, as Defendants did from 2004 into 2007, is contrary to unilateral independent self-interest,[150] as is announcing price increases when demand is plummeting, as Defendants did in 2008–2009. Aside from these fundamental acts against individual self-interest, the following examples reflect additional actions against self-interest:



[146] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[147] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[148] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[149] ▮▮▮▮▮▮

[150] *See* Harris Decl., ¶¶ VI.A.1-9, at 35-39.

[151] ▮▮▮▮▮▮▮▮▮▮▮▮

-29-

- Defendants' capacity reductions created a shortage of product in 2005, 

- With respect to the January 2006 price increase, several of Defendants lost business



- IP's Marianne Parrs publicly announced in a November 2007 earnings call that "[w]e've intentionally passed on volume in favor of balancing our capacity with customers demand and this has enabled us to realize higher average selling prices."[157]   During the same earnings call, CEO John Faraci publicly acknowledged that the company had "passed on volume in favor of balancing [its] capacity", in order to "realize higher average selling prices."[158]

- [redacted]                                                                        rather than capitalize on an opportunity to gain more customers.[160]



152
153

).

154
155
156
157
158
159

160



- Defendants' capacity cuts in 2009 artificially created a severe shortage of product.



- ████████████████████████████████████ CEO publicly stated that it would "be difficult to contract much further"; nonetheless, the company "need[ed] to dump every legit ton [it] can."[166]

**Wall Street.** Wall Street provided Defendants with a means to have ongoing discussions with each other about pricing and output levels. Reports from, and informal contacts with, Wall Street analysts – particularly Mark Wilde, formerly of Deutsche Bank[167] – concerning contemporaneous price increases and output restrictions facilitated Defendants' monitoring of each other's behavior to ensure that each was acting in-line with the conspiracy. Rather than focus on the usual analyst topics of valuations, margins, and earnings, Wall Street spent an inordinate amount of time communicating about the granular details of prices and supply of containerboard. *See* Harris Decl., ¶¶ VI.E.1-16, at 49-55 (analyzing conduct of industry

---

161 ████████████████████████

162 ████████████████████████

163 ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████ ).

164 ████████████████████

165 ████████████████████

166 ██████████████████████████████████████████████████████

[167] Notably, in 2006, Deutsche Bank went from owning no stock in SSCC to being the company's fourth-largest shareholder. *See* Ex. 247 (SSCC, Schedule 14A, April 3, 2007) at 8 (Deutsche Bank AG listed as owning 7.11% of common stock).

consultants as "focal points" that both "facilitated coordinated behavior . . . [and] provided to Defendants a means to collude.").

Expert testimony from Stephen R. Read, former CEO and President of independent producer Shiffenhaus Company, during SSCC's 2010 bankruptcy proceedings is startling.[168] Mr. Read explained that industry analysts could discuss pricing among the containerboard companies, whereas people working at the individual companies could not.[169] When asked by the presiding judge, "They [the analysts] could collude for you?" Mr. Read replied, "That's exactly right . . . the analysts, they have this unique position in life where they can go out and – and talk to everybody."[170]

Indeed, Defendants used Wall Street coverage to publicly comment on the industry and capacity positions.



Additional examples of Wall Street's role follow:

<u>2004</u>



---

[168] [redacted]

[169] *See* Ex. 249 (S. Read testimony, Smurfit-Stone bankruptcy proceeding) at 28-29.

[170] *Id.*

[171] [redacted]

[172] [redacted]



**2005**

Defendants announced the January 2006 price increase promptly after these reports were issued.

---

[373] ████████.

[374] ████████

[375] ████████████████████████████████████████████
████████████████████

[376] ████████████████████

[177] Discussed *supra.*

[378] ████

[379] ████████████████

[380] ██████

[381] ████████████████████████████████████████

[382] ████████████████████



**2007**

One month later, Defendants collectively attempted to raise prices.

**2008**

Defendants responded accordingly and, by June 2008, Wall Street reported





**2009**

- Telephone records obtained by Plaintiffs during discovery show that approximately one week earlier,

That prediction proved accurate as reflected in Defendants' supply reductions throughout 2009.

**Discipline.** Defendants' frequent use of the term "discipline" and the contexts in which it appears suggest that it is a signal for and a monitor of "good (*i.e.*, non-competitive) conduct" that facilitated the alleged conspiracy.



194

195

196

197

198

199

200

201

Wall Street spread Defendants' messages of "discipline" and "good conduct."



**Trade Association Meetings.**  Trade association meetings, such as those organized by the American Forest and Paper Association ("AF&PA") and Fibre Box Association ("FBA"), provided opportunities for Defendants to meet in person to discuss and effectuate the conspiracy throughout the Class Period. *See* Harris Decl., ¶ V.H.1, at 32 ("It is well documented that trade associations tend to facilitate collusive conduct.").

Defendants' attendance at trade association coincided with several significant events.  For example:





- Shortly after the March 2005 price increase attempt, in April, Defendants attended an AF&PA seminar entitled "Are You Vulnerable to Lawsuits?", specifically referring to antitrust litigation.[212]

- As Defendants were announcing their Spring 2005 price increases

- Defendants began announcing the January 2007 price increase.

- 

- 

[207] .

[208] ).

[209]

[210]

[211]

[212] *See* Complaint, ¶ 63.

[213]

[214] ).

[215]

[216]

[217]

[REDACTED]

- While Defendants were announcing the April 2010 price increase, [REDACTED]

- At the same time that the August 2010 price increases were being announced, [REDACTED]

As noted above, Judge Shadur found it "striking" that price increases at issue in this case often came "soon after industry gatherings" and gave this evidence "significant weight" in denying Defendants' motion to dismiss.[221]

**Inter-Defendant Communications.** In addition to all of the above, evidence demonstrates that Defendants directly communicated with each other, including Defendants' CEOs. Aside from the communications listed below, [REDACTED] that coincide with Defendants' price increase initiatives.

- [REDACTED]

- [REDACTED]

---

[218] [REDACTED]

[219] [REDACTED]

[220] [REDACTED]

[221] Order Denying Motions to Dismiss (ECF #193) at 18.

[222] [REDACTED]

[223] [REDACTED]

- ███████████████████████████████████████████████████████
  ████████████████ shortly after a price increase was implemented.[224]

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

- As noted above, IP led the April/May 2007 price increase. ████████████
  ███████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████
  █████████.

- ███████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████
  Defendants began announcing the March 2008 price increase the next month.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

- In the midst of implementing capacity cuts in 2009, ████████████████
  ███████████████████████████████████████████████████████

- ███████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████

---

224 ███████████████████████████
225 ███████████████████████████████
226 ████████████
227 ██████████████████████████
228 ████████████████████████████
229 ███████████████████████████████████████████████████████
230 ███████████████████
231 ██████████████████████████



**Inter-Defendant Trades and Exchanges.** Trades also provided Defendants with a means to communicate directly concerning the conspiracy. *See* Harris Decl., ¶ VI.B.5, at 41 As noted above, trades were one mechanism through which Defendants achieved *de facto* consolidation, Under the guise of a trade relationship, Defendants also discussed their anticompetitive schemes, including pricing and capacity decisions. Examples of inter-Defendant communications, ostensibly concerning "trades", are listed below:

---



**Incestuous Hiring of Senior Executives**. Senior personnel moved between companies, revealing the common nature of operations among these producers and fostering collegial behavior and exchange of information among these "rivals." For instances:



All of the evidence accumulated thus far and detailed above is common among Class members as proof of Defendants' liability under the antitrust laws. Defendants engaged in simultaneous price increases and waves of output reductions, and their contemporaneous business records reveal that, *inter alia*, they undertook numerous actions against their unilateral



self-interest, often communicated directly with one another, and used Wall Street to transmit messages concerning price, output and "discipline." Common proof demonstrates that throughout the Class Period Defendants were acting collusively and not as would be expected from rational, individual profit-maximizing firms.

III.     **ARGUMENT**

A. **HORIZONTAL CONSPIRACY CLAIMS ARE COMMONLY CERTIFIED AS CLASS ACTIONS AND ARE AN IMPORTANT MEANS OF ENFORCING THE ANTITRUST LAWS**

Over 40 years ago, the Supreme Court recognized the importance of private litigation in enforcing federal antitrust laws:

> Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. . . . Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured in their business or property by an antitrust violation. By offering potential litigants the prospect of recovery of three times the amount of their damages, Congress encouraged these persons to serve as "private attorneys general." . . . Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture.

*Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) (citation omitted).

In recent years, federal courts have certified classes in dozens of antitrust conspiracy cases involving a wide range of products and industries, reflecting the fact that these cases are "particularly well suited" for class treatment under Rule 23. *See, e.g., Urethane*, 251 F.R.D. at 635; *Messner*, 669 F.3d at 815; *Sullivan v. DB Investments*, 667 F.3d 273, 298 (3d Cir. 2011) (en banc); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) (". . . a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers.")

(citations omitted).[247] The conduct of defendants, the showing of impact, and the measurement of damages are central issues in antitrust conspiracy cases. *See Urethane*, 251 F.R.D. at 635; *Sullivan*, 667 F.3d at 298. Here, Plaintiffs meet all the requirements for class certification under Rule 23.

---

[247] Some of the many cases granting or affirming class certification in antitrust actions include: *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010), *abrogated on other grounds by In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012); *In re EPDM Antitrust Litig.*, 256 F.R.D. 82 (D. Conn. 2009); *Scrap Metal*, 527 F.3d 517; *In re Pressure Sensitive Labelstock Antitrust Litig.*, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007); *In re Polyester Staple Antitrust Litig.*, 2007 WL 2111380 (W.D.N.C. July 19, 2007); *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393 (S.D. Ohio 2007); *In re Sulfuric Acid Antitrust Litig.*, MDL No. 1356, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007); *OSB*, 2007 WL 2253418; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166 (N.D. Cal. June 5, 2006); *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, 2006 WL 891362 (D.N.J. Apr. 4, 2006); *In re Carbon Black Antitrust Litig.*, 2005 WL 102966 (D. Mass. Jan. 18, 2005); *In re Currency Conversion Fee Antitrust Litig.*, 2004 WL 2327938 (S.D.N.Y. Oct. 15, 2004); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003); *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79 (E.D. Pa. 2003); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180 (D.N.J. 2003); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159 (C.D. Cal. 2002); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002); *DeLoach v. Philip Morris*, 206 F.R.D. 551 (M.D.N.C. 2002); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145 (3d Cir. 2002); *In re Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305 (S.D.N.Y. June 6, 2001); *In re Bromine Antitrust Litig.*, 203 F.R.D. 403 (S.D. Ind. 2001); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001); *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229 (D. Minn. 2001); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162 (S.D.N.Y. 2000); *Paper Sys., Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601 (E.D. Wisc. 2000); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999); *Sebo v. Rubenstein*, 188 F.R.D. 310 (N.D. Ill. 1999); *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231 (E.D.N.Y. 1998); *In re Plastic Cutlery Antitrust Litig.*, 1998 WL 135703 (E.D. Pa. Mar. 20, 1998); *In re Commercial Tissue Antitrust Litig.*, 183 F.R.D. 589 (N.D. Fla. 1998); *In re Medical X-Ray Film Antitrust Litig.*, 1997 WL 33320588 (E.D.N.Y. Dec. 26, 1997); *Lumco Indus., Inc. v. Jeld-Wen Inc.*, 171 F.R.D. 168 (E.D. Pa. 1997); *In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18 (N.D. Ga. 1997); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996); *In re Citric Acid Antitrust Litig.*, No. 95-1092, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996); *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996); *In re High Fructose Corn Syrup Antitrust Litig.*, 936 F. Supp. 530 (C.D. Ill. 1996);*In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019 (N.D. Miss. 1993); *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229 (M.D. Fla. 1993); *In re Infant Formula Antitrust Litig.*, 1992 WL 503465 (N.D. Fla. Jan. 13, 1992); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677 (N.D. Ga. 1991).

## B. STANDARD OF REVIEW

The inquiry at class certification centers on whether predominantly common proof can be presented to support a plaintiff's allegations. *Messner*, 669 F.3d at 818; *Saltzman*, 257 F.R.D. at 475. Plaintiffs need not prove their case on the merits at the class certification stage. *Id.* In deciding class certification, courts perform a "rigorous analysis" under Rule 23. *Dukes*, 131 S. Ct. at 2551 (quoting *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001). Such an analysis requires courts to "probe beyond the pleadings," scrutinize the record presented (including the expert reports), and determine whether Plaintiffs' claims are susceptible to common proof at trial. *Szabo*, 249 F.3d at 677.

## C. THE CLASS IS ASCERTAINABLE AND RULE 23(a) IS SATISIFIED

### 1. The Class is Ascertainable

Plaintiffs' proposed Class definition satisfies the threshold requirement that a class definition be ascertainable. *See* Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must define the class[.]"); *Manual for Complex Litigation* § 21.222, at 270 (4th ed. 2005) ("The definition must be precise, objective, and presently ascertainable."). Here, the proposed Class is defined as:

> All persons that purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010.

> Specifically excluded from this Class are the Defendants; officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his or her immediate family and judicial staff, and any juror assigned to this action.

-44-

This definition is sufficiently precise and includes all direct purchasing customers of Containerboard Products identified in sales data produced by Defendants. The products at issue include containerboard (linerboard and medium), containerboard sheets, and corrugated products (including boxes), all of which are commodity products produced by all Defendants. *See* Harris Decl., ¶ II.B.1., at 8; ¶ V.D.1-6, at 27-30 (Containerboard Products are commodities). The proposed Class Period has clear beginning and ending dates, and the class is limited to purchases of Containerboard Products directly from Defendants for delivery in the United States. For these reasons, the Class is properly defined and Class members can be identified (and notified) with the use of Defendants' sales records. *See Saltzman*, 257 F.R.D. at 476; *Urethane*, 251 F.R.D. at 632 (approving similar class definition). This Class definition is precisely the same as that certified by this Court as a result of Plaintiffs' settlement agreement with PCA.[248]

## 2. The Proposed Class Satisfies All Requirements Under Rule 23(a)

### a. Numerosity is Satisfied

The first Rule 23(a) requirement is that the proposed class is so numerous that joinder is "impracticable." Fed. R. Civ. P. 23(a)(1). The electronic sales data produced by Defendants in discovery identifies many thousands of direct purchasers of Containerboard Products, which easily establishes numerosity. *See* Dwyer Rep., ¶ 32, at 11, fn. 20 (describing analysis of thousands of customers and hundreds of thousands of class products transactions). *See also Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010) ("a class of more than 40 members is generally believed to be sufficiently numerous") (citation omitted).

### b. Commonality is Satisfied

Second, Rule 23(a) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs must show that resolution of an issue of fact or law "is central

---

[248] *See* Order Preliminarily Approving Settlement, Conditionally Certifying the Settlement Class, Appointing Class Counsel for the Settlement Class, Approving Notice Plan, and Setting a Final Approval Hearing, dated May 6, 2014, at ¶3.2 (ECF #634).

to the validity of each" class member's claim and "[e]ven a single [common] question will" satisfy the commonality requirement. *Dukes*, 131 S. Ct. at 2551, 2556 (internal citation omitted). Here, the common issues include:

- Whether Defendants participated in an unlawful conspiracy to fix, raise, maintain, and/or stabilize prices for Containerboard Products in violation of Sherman Act §1 ;

- The duration and extent of the unlawful conspiracy;

- Whether Defendants' conduct in fact caused damages to the Class arising from their purchases of Containerboard Products;

- The appropriate measure of damages to the Class; and

- Whether the Class is entitled to injunctive and other equitable relief.

All of these issues are central to Class members' claims, and any one of them establishes commonality under Rule 23(a). Courts routinely find that cases involving conspiracy allegations present common questions. *See, e.g., Thillens, Inc. v. Cmty. Currency Exch. Ass'n*, 97 F.R.D. 668, 677 (N.D. Ill. 1983) ("the overriding common issue of law is to determine the existence of a conspiracy"); *NASDAQ*, 169 F.R.D. at 509 (same); *see also In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222, 233 (E.D. Pa. 2012); *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, 613 (D. Kan. 1995).

### c. Typicality is Satisfied

Rule 23(a)'s third requirement is that class representatives' claims be "typical" of the proposed class's claims. Fed. R. Civ. P. 23(a)(3). Typicality "is closely related to commonality and should be liberally construed." *Saltzman*, 257 F.R.D. at 479. When "the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory", factual differences among class members do not defeat typicality. *Id.* (citation omitted). Typicality is a "low hurdle", requiring "neither complete coextensivity nor even substantial identity of claims." *Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005).

In antitrust cases, typicality is satisfied where "plaintiffs and all class members alleg[e] the same antitrust violations by defendants." *Rubber Chemicals*, 232 F.R.D. at 351 (quotation marks omitted); *see also Urethane*, 251 F.R.D. at 640 ("[t]ypicality refers to the nature of the claims ... not the individual characteristics of the plaintiff") (citation omitted). Where "it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical[.]" *Linerboard*, 203 F.R.D. at 207 (quoting *Catfish*, 826 F. Supp. at 1035).

The proposed Class representatives here are the named Plaintiffs: Kleen Products LLC; Mighty Pac, Inc.; RHE Hatco, Inc.; Chandler Packaging, Inc.; R.P.R. Enterprises, Inc.; Distributors Packaging Group, LLC;[249] and Ferraro Foods, Inc./Ferraro Foods of North Carolina, LLC. Like all members of the proposed Class, each representative purchased Containerboard Products (containerboard sheets and/or containerboard boxes) directly from at least one named Defendant during the proposed Class Period and paid higher prices as a result of Defendants' collusion. Dwyer Rep., ¶ 50, at 19 (explaining that "defendants price increases not only caused market-wide price increases, but that these price increases were disseminated to all or nearly all class members.").

All the named Plaintiffs and proposed Class members allege that Defendants conspired to restrict containerboard supply and raise prices of Containerboard Products during the relevant period. The claims arise from the same events or course of conduct, are based on the same legal theory, seek the same remedy, and thus satisfy typicality under Rule 23(a). *See Saltzman*, 257 F.R.D. at 479.

---

[249] ██████████████████████████████████████████████████████████████████████ continues to prosecute this action and recently testified at deposition. Plaintiffs intend to seek leave of Court to substitute MTM for DPG.

#### d. Adequacy is Satisfied

Finally, Rule 23(a) requires that the proposed class representatives fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a)(4). Adequacy is a two-part test: (i) the named Plaintiffs cannot have claims in conflict with other class members, and (ii) the named Plaintiffs and proposed class counsel must demonstrate their ability to litigate the case vigorously and competently on behalf of named and absent class members alike. *See Kohen*, 571 F.3d at 679; *Urethane*, 251 F.R.D. at 644.

Here, the named Plaintiffs have no conflicts with other members of the putative Class. Rather, their interests are aligned because they, like all direct purchasers, have been injured by the same alleged conduct – a conspiracy to raise prices – and they, like all direct purchasers, share a strong interest in establishing Defendants' liability under the antitrust laws and maximizing class-wide damages. The first prong of the adequacy requirement is satisfied. *See Harman v. Lyphomed, Inc.*, 122 F.R.D. 522, 528 (N.D. Ill. 1988); *see also Cardizem CD*, 200 F.R.D. at 306 ("Defendants' arguments about potential conflicts of interest are thus insufficient to deny class certification.").

Plaintiffs are represented by counsel with substantial antitrust and class action litigation experience. *See* ECF Nos. 100, 101 (Memorandum in Support of Motion to Appoint the Mogin Law Firm, P.C. and Freed Kanner London & Millen LLC as Interim Co-Lead Class Counsel and Joint Declaration of Daniel J. Mogin and Michael J. Freed). Throughout the pendency of this case, both the named Plaintiffs and Class Counsel have pursued the matter vigorously and competently on behalf of the putative Class, most recently in reaching a settlement with Defendant Packaging Corporation of America, which Plaintiffs submit is an excellent result for all proposed Class members. Accordingly, "there is no ground for supposing that plaintiffs will not adequately represent the class" going forward. *In re Glassine and Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302, 306 (E.D. Pa. 1980).

### D.  PLAINTIFFS SATISFY RULE 23(b)(3)'s PREDOMINANCE REQUIREMENT

Plaintiffs must also satisfy the "predominance" and "superiority" requirements under Rule 23(b)(3) by showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As to predominance, "[c]onsiderable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts." *Saltzman*, 257 F.R.D. at 484. Every issue in the case need not be common; the question, rather, is whether substantial common issues predominate. *See Messner*, 669 F.3d at 815; *NASDAQ*, 169 F.R.D. at 517 (predominance is satisfied unless "it is clear that individual issues will overwhelm the common questions"). Predominance typically is met where "there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis[.]" *Vitamins*, 209 F.R.D. at 262. Predominance is "readily met" in many antitrust cases. *Amchem*, 521 U.S. at 625.

Plaintiffs establish predominance if common proof may be used at trial to support the key elements of their claims – here, whether Defendants conspired, whether the conspiracy impacted prices and the measure of damages. *See, e.g., Messner*, 669 F.3d at 815; *Sullivan*, 667 F.3d at 298-301 (predominance is met because antitrust conspiracy claims necessarily turn on Defendants' common course of conduct and a common theory of market impact); *Fox v. Riverview Realty Partners*, No. 12 C 9350, 2014 U.S. Dist. LEXIS 55260, at **16-24 (N.D. Ill. Apr. 22, 2014) (distinguishing *Comcast*, 133 S. Ct. 1426, and finding that plaintiffs' proposed damages methodology satisfied the predominance requirement under Rule 23).[250]

---

[250] Defendants may argue that the Supreme Court's *Comcast* requires presentation of a final formal damages study at the class certification stage, but several courts have rejected an overbroad reading of *Comcast* in antitrust cases that have been certified as class actions, including *In re Electronic Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL 1282293, at *26 (S.D.N.Y. Mar. 28, 2014) (noting that

The Supreme Court instructs that Rule 23(b)(3) requires a finding that questions common to a proposed class predominate, not a determination of those questions on the merits. *See Amgen*, 133 S. Ct. at 1191. Defendants in antitrust conspiracy cases invariably contend that pricing dispersion or product variation preclude a finding of predominance, but "[t]he issue for Rule 23(b)(3) purposes is not whether there are individualized issues—there are some individualized issues in virtually every situation in which class certification is sought—but rather whether common issues predominate over any individualized issues." *Fox v. Riverview Realty*, 2014 U.S. Dist. LEXIS at *17; *see also Citric Acid*, 1996 WL 655791 at *7 ("Contentions of infinite diversity of product[s], marketing practices, and pricing have been made in numerous cases and rejected."); *accord In re K-Dur Antitrust Litig.*, 686 F.3d 197, 221-22 (3d Cir. 2012) (price variations not sufficient to defeat predominance), *vacated by Upsher-Smith Labs v. Louisiana Wholesale Drug.*, 133 S. Ct. 2849, *reinstated as to class cert.*, 2013 WL 5180857 (3d Cir. Sept. 9, 2013).

### 1. The Alleged Conspiracy is a Central Common Issue

A trial in this case will involve common proof of conspiracy—through witness testimony, documents, email and phone records, and other evidence relating to Defendants' conduct. In addition, there is the economic evidence common to the class. Class Plaintiffs' economics expert, Dr. Harris, conducted a standard structure-conduct-performance analysis[251] of the Containerboard industry and concluded: "The structure, conduct and performance of this industry support my economic opinion that the Defendants engaged in collusive behavior rather

---

"although [defendant] cites *Comcast* [] no fewer than ten times in its briefing of its motion to exclude [expert's] opinions, it seems to have overlooked the Court's recognition that, in an antitrust case, damages 'calculations need not be exact.'") (quoting *Comcast*); *Allan v. RealComp II, Ltd.*, No. 10-cv-14046 (E.D. Mich. Mar. 30, 2013) (slip op. attached as Ex. 309) ("*Comcast* is distinguishable. . . . Here, Plaintiffs have alleged a single, unified theory, and the expert model accounts for it." *Id.* at 23 n.4); and, most recently, *In re Polyurethane Foam Antitrust Litig.*, MDL No. 2196 (N.D. Ohio) (April 9, 2014 opinion sealed; April 16, 2014 Order attached as Ex. 310).

[251] Dr. Harris describes a structure-conduct-performance analysis as a "paradigm . . . utilized by economists to understand economic outcomes." Harris Decl., ¶ V.1, at 22.

than independent behavior. The Defendants had the motive, opportunity and means to collude."
Harris Decl., ¶ VIII.1, at 59. Dr. Harris found that the economic structure of the industry was
one that was "consistent with and would facilitate successful collusion among the Defendants."
*Id.*, ¶ V.I.1, at 33. He further found that his preliminary review of defendants' conduct was
"more consistent with collusion than with independent economic decision-making, with each
Defendant exhibiting conduct that was contrary to its unilateral self interest, acting
independently. The conduct only makes economic sense if the Defendants were engaged in
collective action[.]" *Id.*, ¶ I.C.1, at 6.[252] Finally, Dr. Harris reviewed the empirical analyses of
Dr. Dwyer, found them to be reliable and concluded that they showed that the performance of
this industry was "indicative of collusion among Defendants and is to be expected based on the
structural attributes of the industry and the conduct of the Defendants." *Id.*, ¶ VII.2, at 59.

Such common proof is precisely why the issue of conspiracy "is a common question that
is thought to predominate over other issues in the case and has the effect of satisfying the first
prerequisite in Rule 23(b)(3)."[253]

---

[252] As Dr. Harris explains:

> [T]he economic evidence shows that Defendants' behavior with respect to mill closures,
> inventory levels, downtime and trades all were contrary to their independent self-interests
> and made economic sense only in the context of concerted behavior. Further, the
> Defendants conduct included the use of signaling, focal points and use of consultants that
> were both facilitative of collusion and constituted means of carrying out collusion.
> Finally, Defendants direct communications of competitive information and persistent
> monitoring of their competitors was consistent with maintenance, monitoring and
> policing a collusive agreement.

*Id.*, ¶ VI.I.1, at 58.

[253] 7 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 at 228 (3d ed. 2005); *see also*
6 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 18.28 at 102 (4th ed. 2002) ("As a rule,
the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions.");
*Messner*, 669 F.3d at 815 ("common nucleus of operative facts" generally satisfies predominance); *Scrap
Metal*, 527 F.3d at 535 ("proof of the conspiracy" is the central common issue "that is thought to
predominate"); *Rubber Chemicals*, 232 F.R.D. at 352-53; *Carbon Black*, 2005 WL 102966, at *15;
*NASDAQ*, 169 F.R.D. at 517; *Citric Acid*, 1996 WL 655791, at *6; *Catfish*, 826 F. Supp. at 1039 ("If
proven, evidence of any meetings . . . telephone conversations, or other electronic communications in
pursuit and furtherance of the alleged conspiracy would be the most relevant evidence that could be
introduced"); *Vitamins*, 209 F.R.D. at 264-65 (rejecting defendants' argument that the complexity,

## 2. Plaintiffs Can Prove Causation on a Common Basis

Causation, also known as antitrust impact or injury in fact, can be shown here through common proof. Impact turns on whether the alleged conspiracy caused higher market prices. The record is filled was with common proof that the containerboard industry is structurally prone to collusion. *See* Harris Decl., ¶ V.I.1., at 33 ("[t]he structural characteristics of this industry . . . are consistent with and would facilitate successful collusion among the Defendants"). It is an established economic view that, in such an industry, agreements among producers to restrict output will typically cause higher prices. *See, e.g., Fructose*, 295 F.3d at 656 (explaining structural conditions under which collusion is likely to "have an effect on price"). Concerted action to restrict supply will raise prices throughout the market under the basic law of supply and demand, as Judge Posner had explained:

> An agreement on output also equates to a price-fixing agreement. . . . [If] firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effect.

*Gen'l Leaseways*, 744 F.2d at 594-95 (emphasis added). *See also Linerboard*, 305 F.3d at 152.

Based on this economic reality, courts routinely find that causation can be shown through common proof in antitrust conspiracy cases—particularly cases involving supply restrictions of basic commodities to facilitate higher prices. *See Linerboard*, 305 F.3d at 155 (supply restriction); *OSB*, 2007 WL 2253418, at *2 (same); *Messner*, 669 F.3d at 816 (establishing common impact is "relatively simple" in cases involving straightforward theories of "supply and demand").[254]

---

fragmented nature, and diversity of the product markets negated predominance where the alleged industry-wide conspiracy was the overriding issue) (collecting cases); *Flat Glass*, 191 F.R.D. at 484 (same).

[254] *See generally Urethane*, 251 F.R.D. at 636-37 ("there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market.")

The following additional common proof strongly supports a finding that causation can be established on a Class-wide basis: (1) statements and documents from Defendants' top management; (2) expert testimony on market structure and common impact; (3) pricing data; and (4) econometric evidence showing that Class members did, in fact, pay higher prices as a result of Defendants' supply restriction. This showing easily satisfies Rule 23. *See Linerboard*, 305 F.3d at 153 (characterizing a lesser showing as "belt and suspenders" proof under Rule 23).

### a. Defendants' Statements Establish Causation

The record here includes numerous statements from Defendants' top executives and actions designed to limit supply and facilitate price increases. Defendants were all aware of the impact of their supply restrictions and coordinated price increases. *See* Harris Decl., ¶ VI.F.3., at 55-56 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ How they communicated their intentions to each other, whether directly or otherwise, is immaterial.[255]

---

(citations and internal quotation marks omitted); *Aluminum Phosphide*, 160 F.R.D. at 614-15 ("If successful on this [collusion] claim, it is likely that each plaintiff would have experienced the same impact of paying more for aluminum phosphide products than they would have paid in a truly competitive market.") (citation omitted); *Catfish*, 826 F. Supp. at 1040-41 ("In an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price."); *Foundry Resins*, 242 F.R.D. at 409 ("Where, as here, Plaintiffs have alleged a conspiracy to fix-prices and allocate markets, courts have presumed class-wide impact.") (citing *Carbon Black*, 2005 WL 102966, at *15); *Auction Houses*, 193 F.R.D. at 166 ("Price fixing conspiracies, at least to the extent they succeed in fixing prices, almost invariably injure everyone who purchases the relevant goods or services."); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 695 (D. Minn. 1995) ("[B]ecause the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market."); *In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975) ("[I]f the appellees establish . . . that the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive levels, and further establish that the appellees were consumers of that product, we would think that the jury could reasonably conclude that appellants' conduct caused injury to each appellee.").

[255] *See, e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9 Cir. 1990) ("the form of an exchange . . . should not be determinative of its legality) (internal citation omitted); *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 WL 4110501, at *28

### b. Plaintiffs Will Show Causation Through Expert Analyses and Opinions

In addition to showing causation using Defendants' own statements, Class Plaintiffs will establish causation through the analyses and opinions of both their experts, Drs. Harris and Dwyer. Those analyses and opinions constitute, and are based on, evidence common to the Class. *See* Harris Decl., ¶ VIII.3., at 60; Dwyer Rep., ¶ 7, at 4; ¶ 12, at 5-6.

Both of Class Plaintiffs' experts offer consistent opinions on common impact—that all or nearly all class members would have been harmed by Defendants collusive conduct, as alleged by the plaintiffs. Dr. Harris based his opinion on his economic analysis that showed that the structure, conduct and performance of the containerboard industry were not only consistent with collusion (*see* Harris Decl., ¶ VIII.1, at 59) but also that any collusion would have been "broadly and generally successful . . . affect[ing] prices throughout the entire industry [and] having a widespread impact across all or nearly all customers." *Id.*, ¶ V.I.3., at 33. It is widely accepted that structural conditions such as those found in this industry facilitate more effective collusion, rendering common impact likely and class certification appropriate. *See generally Fructose*, 295 F.3d at 656-57 (explaining structural conditions that facilitate successful collusion).[256]

███████████████████████████████████████████████████████

██████████████████████████████████████. In economic terms, Dr. Harris explains that

---

(D. Md. Aug. 14, 2013) (at summary judgment, crediting plaintiffs' proffered evidence that industry consultant served as information conduit in alleged conspiracy); *Urethane*, 251 F.R.D. at 638-39 (crediting "documents from the defendants showing that the defendants viewed their allegedly collusive behavior as successful").

[256] *See, e.g., EPDM*, 256 F.R.D. at 95 (impact a common issue where expert opined that market structure was ripe for effective collusion); *Urethane*, 251 F.R.D. at 637 (same); *Linerboard*, 305 F.3d at 153-55 (same); *Bulk (Extruded) Graphite*, 2006 WL 891362, at *12-14 (same); *Carbon Black*, 2005 WL 102966, at *15-19 (same). *See generally Fructose*, 295 F.3d at 655 (surveying structural conditions of a collusion-prone market).

cartels are more likely to occur and succeed in basic commodity industries since reaching and policing agreements is easier and restricting commodity output necessarily causes widespread market impact. *Id.*, at 34-35.; *see also Fructose*, 295 F.3d at 657 (product standardization facilitates a more "successful conspiracy"). Indeed, antitrust impact is routinely found to be a common issue in cases involving undifferentiated or commodity goods.[257]

Cartels commonly collude at the commodity input level to raise prices for the finished downstream goods that they sell. *See, e.g. Linerboard*, 305 F.3d at 153 (certifying class where defendants restricted supply of primary input); *OSB*, 2007 WL 2253418 (same); *Flat Glass*, 191 F.R.D. 472 (certifying class where primary input cartel impacted various end products); *Urethane*, 251 F.R.D. at 630 (same); *TFT-LCD*, 267 F.R.D. 291 (same); *Vitamins*, 209 F.R.D. at 256 (same); *cf. In re Sugar Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978) ("to deny recovery in this instance. . . would allow the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element into another product").

Dr. Dwyer based his common impact opinion on statistical analyses of industry pricing. First he performed a standard econometric analysis that compared prices paid by class members for class products both before and after the price increases announced by Defendants during the

---

[257] *See, e.g., Messner*, 669 F.3d at 816 (proof of common impact is "relatively simple" in cases involving "supply and demand" for a commodity); *Polyester Staple*, 2007 WL 2111380 , at \*21 (emphasizing interchangeable nature of products); *Linerboard*, 305 F.3d at 153 (affirming certification where expert emphasized "fungible nature of the products"); *Pressure Sensitive Labelstock*, 2007 WL 4150666, at \*12-13 (crediting expert opinion on commodity issue); *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 450-51 (D. Kan. 2006) (certifying class where expert opined that "the products are fungible commodity products"); *DRAM*, 2006 WL 1530166, at \*8 (common proof of impact is possible because "DRAM is a commodity"); *Graphite*, 2006 WL 891362, at \*12 (certifying class where expert found "that extruded graphite products can be considered undifferentiated commodities"); *Rubber Chemicals*, 232 F.R.D. at 354 n.3 ("Rubber Chemicals are highly fungible"; class certified); *Carbon Black*, 2005 WL 102966, at \*19 (class certified where "carbon black is a commodity-like product"); *Universal Serv. Fund*, 219 F.R.D. at 678 (class certified where "product is a fungible, homogeneous product"); *Thomas & Thomas*, 209 F.R.D. at 166-67 (same); *DeLoach*, 206 F.R.D. at 562-63 (same); *Vitamins*, 209 F.R.D. at 267 (same).

class period (2004-2010). He made these comparisons using both (1) industry-wide representations of prices paid by class members and (2) prices paid by Class members as reflected in Defendants sales transaction data. Both sets of comparisons showed that Class members systematically paid higher prices for Containerboard Products after the price increase announcements examined. Dwyer Rep., ¶¶ 19-50, at 7-19.

In his analysis using industry-wide prices, Dr. Dwyer examined whether the PPW Index, a well-recognized survey of prices charged and paid for Containerboard Products,[258] rose after the 15 price increases announced by Defendants during the Class Period. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, ¶ 26, at 10-11. As Dr. Dwyer stated: "That a market-wide price index, which is both a survey largely oriented towards the inclusion of class member Containerboard Product purchases and a determinant of class member Containerboard Product prices, reflects these 9 announcements is evidence that these events impacted class Containerboard Product purchase prices." *Id.*

In his empirical analysis of the prices actually paid as reflected in Defendants own sales transaction data Dr. Dwyer found that "the overwhelming number of class members examined

---

[258] As Dr. Dwyer showed, the PPW index is closely focused on Containerboard Products prices, is used by Defendants themselves in analyzing prices in the market and is used as a reference for price adjustments in Containerboard Product contracts. *Id.*, ¶ 23, at 9. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Pricing evidence of this nature can be used as common proof of impact. *See, e.g., Linerboard*, 305 F.3d at 153 (affirming class certification where pricing for class products "behaved similarly over time"); *Urethane*, 237 F.R.D. at 50-51 (crediting similar evidence); *Bulk (Extruded) Graphite*, 2006 WL 891362, at *13 (same). Moreover, "[n]either a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally." *NASDAQ*, 169 F.R.D. at 523. *See also Urethane*, 251 F.R.D. at 638 ("individualized negotiations and a diversity of prices paid do not" defeat class certification where "the alleged antitrust violation has caused widespread injury to the class as a whole"); *Polyester Staple*, 2007 WL 2111380, at *22-23 (rejecting argument that different transaction prices defeat common proof of impact); *DRAM*, 2006 WL 1530166, at *9 (certification appropriate "regardless whether some members of the class negotiated price individually").

(92%), constituting almost all of the dollar volume of class purchases examined (more than 99%), and the bulk of transactions examined (82%) were impacted, that is, showed elevated prices following [at least one price increase announcement]. These results were consistent across Defendants and product groups. Overall, this analysis shows that these Defendants' price increase implementations systematically pervade class member purchases, supporting the conclusion that all or nearly all class members were impacted." *Id.*, ¶¶ 31-38, at 12-15.[259] Dr. Dwyer also based his opinion on common impact on the multiple regression damages model he specified. *Id.*, ¶ 14, at 5 ("The results of this regression analysis are consistent with the allegations of cartel behavior. Also, these results are consistent with, and corroborate, my impact conclusions drawn from the price increase implementation analysis summarized above.").

Dr. Harris's and Dr. Dwyer's opinions provide relevant, probative and common evidence on the element of impact. See *Fructose*, 295 F.3d at 660-61 (expert's statistical analysis held admissible to establish class-wide impact at trial). In short, the element of causation (or antitrust "impact") can be established on a Class-wide basis.

### 3. Plaintiffs Will Prove Class-Wide Damages on a Common Basis

Dr. Dwyer also has expressed his opinion that class-wide damages arising from the Defendants' collusive conduct as alleged by the plaintiffs can be estimated, using evidence that is common to the class. Dwyer Rep., ¶ 12 at 5 ("Finally, I have employed standard econometric methods, multiple regression analysis, on a class-wide basis to demonstrate, preliminarily, that

---

[259] Dr. Dwyer's analysis of Defendants' own sales transaction price data in reaching his opinion on common impact was based on net prices—that is prices after discounts and rebates. Dwyer Rep., ¶ 33, at 13. Dr. Dwyer also took into consideration the potential for discounts and rebates that were not clearly given as reflected in Defendants sales transaction databases and for lump-sum payments not identified to particular purchases and found that neither of these undermined his opinion of common impact. *Id.*, ¶¶ 39-50, at 13-16.

such methods may be used to quantify aggregate overcharge damages to the class."). While a formal econometric model is not required at this stage of the case, *see Kohen*, 571 F.3d at 676, "courts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis." *TFT-LCD*, 267 F.R.D. at 313; *see also Polyester Staple*, 2007 WL 2111380, at *26-27 (expert regression analysis accepted as common proof of impact).

In his damages analysis, Dr. Dwyer compared prices charged to Class members for Containerboard Products in the Class Period (2004-2010) to prices during a benchmark period before and after the alleged conspiracy, during which it is presumed that prices were not affected by collusion. *Id.*, ¶¶ 55-56, at 20-21. Consistent with textbook econometrics,[260] Dr. Dwyer accounted for the factors influencing price in a competitive marketplace—using market data to estimate what competitive prices should have been during the class period, absent the alleged conspiracy:

> "This preliminary regression analysis explains the movements in aggregate Containerboard Product prices in response to supply and demand factors over two periods: a benchmark period in which there is no allegation that the defendants colluded, and the class period, within which it is alleged that the defendants colluded. The regression analysis includes variables to account for the effects of important competitive (supply and demand) factors on the observed prices, thus allowing me to isolate the direct price effects of the alleged collusion. This analysis also included an indicator (dummy) variable for measuring the extent of price elevation during the class period not explained by the competitive factors controlled for. This regression analysis produces estimates of the percentage increase in aggregate prices due to the measured collusive effects."[261]

---

[260] Dwyer Rep., ¶ 57, at 21 ("In comparing prices between a benchmark period and the class period, I employ standard econometric methods to adjust for non-conspiratorial factors that may distinguish prices in these two periods.").

[261] Dr. Dwyer specified separate models for two groupings of Containerboard Products: (1) a grouping which he calls Intermediate Containerboard Products ("ICP") (linerboard, medium and corrugated sheets) and (2) a grouping he calls Final Containerboard Products ("FCP") (boxes and other finished corrugated products). *Id.*, ¶ 52, at 19-20; ¶ 67, at 23-24. After specifying these preliminary models, Dr. Dwyer then

*Id.*, ¶ 12, at 5-6. These estimated overcharges amount to ▓▓▓▓▓▓▓▓▓▓.[262]

Dr. Dwyer then applied these percentage overcharges to the total dollar volume of relevant class purchases to arrive at a calculation of aggregate Class-wide damages. *Id.*, ¶ 69, at 24-25. Based on these multiple regression analyses of the relevant market data, Dr. Dwyer determined that putative class members were injured by an overcharge of ▓▓▓▓▓▓. *Id.*

Multiple regression modeling, as Dr. Dwyer proposes, is a well-established tool for estimating antitrust damages on a Class-wide basis [*see, e.g., Scrap Metal*, 527 F.3d at 532-34; *Fructose*, 295 F.3d at 660-61] that numerous courts have accepted at the class certification stage for establishing the element of damages.[263] Plaintiffs' damages methodology "need not be exact," but "must be consistent with [Plaintiffs'] liability case." *Comcast*, 133 S. Ct. at 1433. Here, Dr. Dwyer's methodology ties directly to Plaintiffs' liability theories. The estimated overcharge stems from Defendant's containerboard supply restrictions, which facilitated the alleged price-fixing. Dwyer Rep., ¶ 12, at 5 ("The regression analysis includes variables to account for the effects of important competitive (supply and demand) factors on the observed prices, thus allowing me to isolate the direct price effects of the alleged collusion.").

---

modified the specifications somewhat, resulting in two additional sets of additional models, in order to show the robustness of the basic specification. This exercise showed that his models were robust. *Id.*, ¶¶ 67, 68, at 20-22.

[262] These estimated overcharges are the averages across the specifications described above.

[263] *See Foundry Resins*, 242 F.R.D. at 411 (characterizing multiple regression models as "reasonable damage methodologies"); *DRAM*, 2006 WL 1530166, at *10 ("other courts have already upheld [multiple regression models] as valid means for proving damages on a class-wide basis, and this court has found no reason to reject them at this stage of the proceedings.") (collecting cases); *Bulk (Extruded) Graphite*, 2006 WL 891362, at *15 (proposed regression "methods are widely accepted"); *Flat Glass*, 191 F.R.D. at 485-87 ("[t]here is no dispute that when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation"); *Urethane*, 237 F.R.D. at 452 ("damages are also likely susceptible to class-wide proof" using multiple regression analysis); *Linerboard*, 305 F.3d at 153-55 (same); *Newberg on Class Actions* § 18:53 at 177 (4th ed. 2002).

## E. A CLASS ACTION IS THE SUPERIOR METHOD FOR ADJUDICATING THE CLAIMS AT ISSUE

Rule 23(b)(3) provides that certification is warranted if a class-wide trial is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Class certification is more efficient than any other procedure available for resolving the relevant factual and legal issues raised here. *See Messner* 669 F.3d at 815 n.5 ("There are so many common issues of law and fact relating to the issue of [liability], however, that the superiority requirement likely poses no serious obstacle to class certification here."). The record to date—showing that Plaintiffs can establish their claims on a Class-wide basis using predominantly common proof—underscores the manageability of this case.

Denying class certification would be inefficient and unfair, potentially leading to duplicative and wasteful litigation or, alternatively, claims abandoned due not to merit, but rather to their relatively small individual size of potential individual recovery relative to the high costs of complex antitrust litigation. In finding superiority satisfied, courts have explained that an alternative—litigating hundreds or thousands of lawsuits individually—would be wasteful, inefficient and infeasible for many plaintiffs:

> Here, the obvious alternative to a class action would be for plaintiffs to bring individual suits against defendants. This would be grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation. The hundreds, and perhaps thousands, of class members are dispersed across the country, each with relatively similar claims. Certainly, the most feasible way for these plaintiffs to pursue their claims is by way of a class action.

*Urethane*, 237 F.R.D. at 453. *See also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("the more claimants there are, the more likely a class action is to yield substantial economies in litigation") (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir.

2004)). This reasoning applies here and class treatment is the superior way for this case to proceed.

## IV.   CONCLUSION

For all the reasons set forth above, Plaintiffs respectfully submit that they meet all requirements under Rule 23 and request that the Court certify the proposed Class, appoint the named Plaintiffs as Class Representatives, and confirm Michael J. Feed of Freed Kanner London & Millen LLC and Daniel J. Mogin of The Mogin Law Firm, P.C. as Co-Lead Class Counsel.

Dated:   June 11, 2014                    Respectfully submitted,

                                          */s/ Michael J. Freed*
                                          Michael J. Freed
                                          Robert J. Wozniak
                                          FREED KANNER LONDON & MILLEN LLC
                                          2201 Waukegan Road, Ste. 130
                                          Bannockburn, IL 60015
                                          Tel: (224) 632-4500

                                          Daniel J. Mogin
                                          THE MOGIN LAW FIRM, P.C.
                                          707 Broadway, Ste. 1000
                                          San Diego, CA 92101
                                          Tel: (619) 687-6611

                                          ***Interim Co-Lead Counsel for Plaintiffs
                                          and the Proposed Class***