**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KLEEN PRODUCTS LLC, et al., individually and on behalf of all those similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>INTERNATIONAL PAPER COMPANY, et al.,<br><br>        Defendants. | Civil Case No. 1:10-cv-05711<br><br>Hon. Harry D. Leinenweber<br><br>**PUBLIC – REDACTED VERSION** |


**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**[CORRECTED]**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION ...................................................................................................... 1

    A.    Plaintiffs Allege a Conspiracy Inconsistent with the Evidence ............................ 1

    B.    Plaintiffs' Proposed Class Fails To Satisfy Rule 23's Requirements ................... 3

        1.    Plaintiffs' Flawed Impact Model ................................................ 4

            a.    Plaintiffs' Model Fails To Isolate Antitrust Injury ........................ 4

            b.    Plaintiffs' Model Fails To Account for a Majority of Customers ....................................................................... 6

        2.    Plaintiffs' Flawed Damages Model ............................................ 6

        3.    Corrugated Products Are Particularly Inappropriate for Class Certification ....................................................................... 7

        4.    The Proposed Class Would Be Unmanageable ......................... 7

BACKGROUND ...................................................................................................... 8

I.    CONTAINERBOARD AND CORRUGATED PRODUCTS......................................... 10

    A.    The Class Products:  Containerboard, Sheets, and Corrugated Products ............ 10

    B.    Sellers of Containerboard and Corrugated Products............................................ 13

    C.    Sales of Containerboard and Corrugated Products .............................................. 14

II.    PLAINTIFFS HAVE NO FACTUAL OR ECONOMIC EVIDENCE OF AN UNLAWFUL AGREEMENT ......................................................................... 16

    A.    Capacity ................................................................................................ 16

    B.    Operating Rates................................................................................... 19

    C.    Downtime and Slowbacks.................................................................... 20

    D.    Trades................................................................................................... 22

    E.    The "Network" Theory ......................................................................... 22

ARGUMENT........................................................................................................... 23

I.     THIS COURT MUST APPLY A RIGOROUS ANALYSIS AND NOT SIMPLY ACCEPT PLAINTIFFS' FACTUAL ASSERTIONS OR THEIR EXPERTS' CONCLUSIONS.................................................................................. 23

       A.     Class Certification Standards in Light of *Wal-Mart* and *Comcast* ...................... 23

       B.     The Third Circuit's *Linerboard* Decision Does Not Reflect Current Law .......... 26

II.    PLAINTIFFS OFFER NO COMMON METHOD TO PROVE ANTITRUST IMPACT, PRECLUDING CERTIFICATION ................................................................ 27

       A.     Plaintiffs' Experts Do Not Even Try To Assess *Antitrust* Impact ...................... 28

              1.     A Common Impact Model Must Account for "But For" Changes in Price ......................................................................................... 28

              2.     Dr. Dwyer's Impact Model Fails To Account for "But For" Changes in Price ......................................................................... 30

       B.     Dwyer's Common Impact Model Is Incapable of Proving Antitrust Impact to at Least Two-Thirds of Potential Class Members ........................... 33

       C.     Dwyer's Model Is Unreliable Because It Creates False Positives ...................... 35

       D.     Neither Dr. Dwyer's Regression nor His Analysis of RISI Pricing "Corroborates" His Erroneous Impact Finding..................................................... 36

              1.     Dr. Dwyer's Damages Model Does Not "Corroborate" Impact .............. 36

              2.     Dwyer's RISI Index Pricing Analysis Is Meaningless ........................... 38

       E.     The Harris Structure/Conduct/Performance Analysis Cannot Demonstrate Common Impact or Overcome the Shortcomings of the Dwyer Analysis .......... 40

              1.     Dr. Harris Performed No Analysis To Define the Relevant Economic Market for Purposes of His SCP Theory and Class-wide Impact .................................................................................... 40

              2.     Harris Failed To Analyze the "But For" World...................................... 43

              3.     Dr. Harris's SCP Theory Fails Because Not All of Harris's Necessary "Factors" Are Present. ............................................................. 44

       F.     The Fact that Average Transaction Prices Follow Similar Trends Does Not Support Common Impact. ................................................................................... 45

       G.     Plaintiffs Cannot Establish Common Impact by Reference to Statements in Defendants' Documents. ................................................................................. 46

III.  PLAINTIFFS HAVE FAILED TO PRESENT AN ADEQUATE METHOD TO ADDRESS ANTITRUST DAMAGES FOR THE CLASS. ............................................ 47

    A.  Dwyer's Regressions Are Fundamentally Unreliable and Cannot Demonstrate Predominance of Class Issues with Respect to Damages ................ 48

        1.  Dr. Dwyer's Regression Model Shows No Damages for the Original (Pre-May 2014 Amendment) Purported Class Period. ............... 48

        2.  Dwyer's Regression Model Does Not Provide a Reliable Basis for Estimating Damages Even with the New Class Period. ........................... 49

    B.  Dr. Dwyer's Regression Models Provides No Common Means To Prove any Class Member's Damages ................................................................................. 54

IV.  REGARDLESS OF PLAINTIFFS' ARGUMENTS RELATING TO CONTAINERBOARD, PLAINTIFFS HAVE FAILED TO SHOW COMMON IMPACT AND DAMAGES FOR CORRUGATED PRODUCTS. ................................. 57

    A.  Corrugated Products Purchasers Cannot Be Combined in a Single Class with Containerboard Purchasers, Nor Can They Be Certified as a Class Based only on Plaintiffs' Analysis of Containerboard Markets. ......................... 58

    B.  Plaintiffs' Generalized Arguments Do Not Overcome This Failure ................... 61

V.  THE CLASS IS NOT MANAGEABLE OR SUPERIOR BECAUSE OF INDIVIDUAL ISSUES PRESENTED BY RELEASES AND DISQUALIFYING CONTRACTUAL PROVISIONS. ................................................................................... 63

    A.  There Are Overwhelming Individualized Issues Related to Releases. ................ 63

    B.  Individualized Issues Related To Disqualifying Clauses In Contracts And Terms And Conditions For Sale. ....................................................................... 68

CONCLUSION .................................................................................................................... 72

PUBLIC – REDACTED VERSION

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allan v. RealComp II, Ltd.*, No. 10-cv-14046 (E.D. Mich. Mar. 30, 2013)...................................32

*ATA Airlines, Inc. v. Federal Express Corp.*, 605 F.3d 882 (7th Cir. 2011) ................................25

*Bayshore Ford Truck v. Ford Motor Co.*,
  Case No. 99-741 (JLL), 2010 U.S. Dist. LEXIS 7454 (D.N.J. Jan. 29, 2010).......................55

*Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003) ......................................................67

*Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) .................................................................................................5

*Brown Shoe Co., Inc. v. United States*, 370 U.S. 294 (1962) .........................................................42

*Butler v. Sears, Roebuck and Co.*, 727 F.3d 796 (7th Cir. 2013) .............................................55,63

*Coleman v. General Motors Acceptance Corp.*,
  220 F.R.D. 64 (M.D. Tenn. Jan. 14, 2004)............................................................................72

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ........................................................... *passim*

*Creative Montessori Learning Ctrs. v. Ashford Gear L.L.C.*,
  662 F.3d 913 (7th Cir. 2011) .................................................................................................8

*Dahl v. Bain Capital Partners, LLC*,
  878 F. Supp. 2d 298 (D. Mass. July 18, 2012) ......................................................................65

*Disparte v. Corporate Exec. Bd.*, 223 F.R.D. 7 (D.D.C. Aug. 13, 2004) ......................................68

*DuFour v. BE LLC*,
  No. C 09-03770 LB, 2011 U.S. Dist. LEXIS 89046 (N.D. Cal. Aug. 10, 2011)...................70

*In re Electronic Books Antitrust Litigation*,
  Case No. 11 MD 2293 (DLC), 2014 U.S. Dist. LEXIS 42537
  (S.D.N.Y. Mar. 28, 2014) .....................................................................................................55

*In re Fla. Cement & Concrete Antitrust Litig.*,
  278 F.R.D. 674 (S.D. Fla. 2012)............................................................................................24

*In re Flash Memory Antitrust Litig.*,
  No. C 07-0086, 2010 WL 2332081 (N.D. Cal. 2010) ............................................................24

iv

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l,*
    695 F.3d 330 (5th Cir. 2012) ..................................................................................7

*In re Graphics Processing Units Antitrust Litig.,*
    253 F.R.D. 478 (N.D. Cal. 2008) .........................................................................40

*Hatchett v. Shinseki*, 957 F. Supp. 2d 960 (S.D. Ind. July 15, 2013) ...........................65

*Henderson v. AT&T Corp.*, 918 F.Supp. 1059 (S.D. Tex.1996).....................................68

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2009)..................24, 26

*IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union,*
    512 F.3d 989 (7th Cir. 2008) ...............................................................................69

*In re IKO Roofing Shingle Prod. Liab. Litig.,*
    757 F.3d 599 (7th Cir. 2014) .....................................................................25, 32, 63

*Johnson v. Advanced Bionics, LLC,*
    No. 2:08-cv-02376-JPM, 2011 WL 1323883 (W.D. Tenn. Apr. 4, 2011) ............68

*Kottaras v. Whole Foods Market, Inc.,*
    281 F.R.D. 16 (D.D.C. Jan. 30, 2012) .................................................................67

*In re Linerboard Antitrust Litig.,*
    305 F.3d 145, 150 (3rd Cir. 2002) ............................................................... *passim*

*In re Linerboard Antitrust Litig.,*
    No. MDL 1261, 2000 WL 1475559 (E.D. Pa. Oct. 4, 2000)..................................27

*Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007) ..............69, 71, 72

*Martins v. 3PD, Inc.,*
    Civ. A. 11-11313-DPW, 2013 WL 1320454 (D. Mass. Mar. 28, 2013) ................54

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ...............................47,56

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) .....41, 42, 43

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012) ...................................................................... *passim*

*Metro E. Ctr. for Conditioning & Health v. Qwest Commc'ns. Int'l, Inc.,*
    294 F.3d 924 (7th Cir. 2002) ...............................................................................69

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
    522 F.3d 6 (1st Cir. 2008)...................................................................8, 25, 26,28

*Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671 (5th Cir. 1982).........................25

*Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014) ........................................................4, 63, 72

*In re Photochromic Lens Antitrust Litig.*,
    MDL Docket No. 2173, 2014 WL 1338605 (M.D. Fla. April 3, 2014) .................6, 24, 34, 35

*In re Polyurethane Foam Antitrust Litig.*,
    Case No. 1:10 MD 2196, 2014 U.S. Dist. LEXIS 26191(N.D. Ohio Aug. 12, 2014).......69, 71

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
    261 F.3d 355 (3d Cir. 2001)......................................................................................64, 65, 67

*In re the Prudential Ins. Co. of Am. Sales Practices Litig.*,
    No. Civ. 95-4704 (DRD), 2006 WL 1479024 (D.N.J. May 26, 2006)...................................65

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ........................................................................................ *passim*

*Reed v. Advocate Health Care*, No. 06-3337, 2009 WL 3146999 (N.D. Ill. Sept. 28,
    2009) ...............................................................................................................................34, 45

*Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009) ...................................................24

*Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312 (7th Cir. 2006) ..........................................42, 43

*Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717 (7th Cir. 2004) ...............................40

*In re Rhone-Poulenc Rorer*, 51 F.3d 1293 (7th Cir. 1995)...............................................................8

*Roach v. T.L. Cannon Corp.*,
    No. 3:10-CV-0591, 2013 WL 1316452 (N.D.N.Y. Mar. 29, 2013) .......................................56

*Robinson v. Texas Automobile Dealers Ass'n*,
    387 F.3d 416 (5th Cir. 2004) ..................................................................................................68

*Rodney v. Northwest Airlines, Inc.*, 146 F. App'x 783 (6th Cir. 2005) .........................................56

*Sample v. Monsanto Co.*, 218 F.R.D. 644 (E.D. Mo. 2003) ..........................................................28

*Sargent-Welch Scientific Co. v. Ventron Corp.*,
    567 F.2d 701 (7th Cir. 1977) ..................................................................................................41

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
    No. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010)......................................34, 37, 45

*Stephan v. Goldinger*, 325 F.3d 874 (7th Cir. 2003) ....................................................................69

*Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465 (5th Cir. 2000).................................................25

*Tinder v. Pinkerton Sec.*, 305 F.3d 728 (7th Cir. 2002)................................................................71

*In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840 (D. Md. Aug. 26, 2013).........*passim*

*United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377 (1956) .........................................42

*Vulcan Golf, LLC v. Google, Inc.*, 254 F.R.D. 521 (N.D. Ill. Dec. 18, 2008) ...............................72

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) .......................................................3, 24, 27

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    No. 09-MD-2090, 2012 WL 3031085 (D. Minn. 2012) ..........................................................24

*Wu v. Pearson Educ., Inc.*, 277 F.R.D. 255 (S.D.N.Y. Sept. 30, 2011) .........................................69

## STATUTES

15 U.S.C. § 15a ...............................................................................................................................69

15 U.S.C. § 15b ...............................................................................................................................69

## OTHER AUTHORITIES

ABA Section of Antitrust Law, ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL
    ISSUES (2005) ....................................................................................................................37, 46

FBA FIBRE BOX HANDBOOK (2005) ....................................................................................*passim*

Fibre Box Association, 2014 North American Directory of Corrugated Plants,
    available at http://www.fibrebox.org .........................................................................................13

Fed. R. Civ. P. 23 .......................................................................................................................*passim*

Fed. R. Evid. 702 .............................................................................................................................40

Kennedy, A GUIDE TO ECONOMETRICS (6th ed. 2008) ..................................................................65

## INTRODUCTION

Plaintiffs' ever-shifting conspiracy theory cannot survive basic scrutiny, let alone satisfy the requirements of Rule 23 under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). Plaintiffs argue that antitrust cases are almost by definition certified for class treatment and that any alleged conspiracy to restrict supply necessarily impacts all customers. But the Supreme Court's decision in *Comcast* and Seventh Circuit precedent demonstrate that class certification standards have changed significantly in recent years and now require that (a) Plaintiffs come forward with sufficient economic evidence to satisfy Rule 23 standards and (b) the Court "rigorously analyze" Plaintiffs' purported economic proof.

As explained below and in the expert declarations from Professors Janusz Ordover and Dennis Carlton, Plaintiffs' economic experts fail to demonstrate common antitrust impact or a common methodology for damages. Specifically, Dr. Mark Dwyer's model for showing common antitrust impact ███████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████. Moreover, his damages model is economically unsound and ███████████████████████████████████████████████. Finally, Plaintiffs' attempt to lump all purchasers of "Containerboard Products" into a single class is riddled with individualized evidentiary issues and varying contractual provisions that make class treatment unmanageable, not least because it inappropriately combines purchasers of containerboard with the radically different purchasers of boxes and other corrugated materials ("Corrugated Products").

### A. Plaintiffs Allege a Conspiracy Inconsistent with the Evidence

Plaintiffs' "central allegation" is that Defendants conspired "to restrict the supply of containerboard," which in turn allegedly led to "coordinated price increases of all

Containerboard Products." Mot. for Class Certification and Supporting Mem. of Law at 1 [Dkt. Nos. 657-58] (collectively, the "Motion" or "Mot.").

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████.

By excluding these facts from their Complaint, Plaintiffs were able to survive a motion to dismiss, because the Court had to accept as true allegations such as "In 2005 many of the Defendants . . . significantly reduced their production capacity through plant closures, capacity idling or scheduled production downtime" and "Even though prices were increasing throughout 2005 and into 2006, Defendants reduced capacity during that period." *See* Order Denying Motion to Dismiss [Dkt. No. 193] at 8 (citing Compl. ¶¶ 71-72, 75, 78-81, 84-87, 115, 117-18). But mere pleading standards no longer apply, and Plaintiffs' allegations need not be taken as fact. The Court must now consider the evidence (including Plaintiffs' own expert reports) proving Plaintiffs' allegations to be inaccurate. For example, capacity in North America did not decrease in 2005, but *increased* by 110,000 tons. "Many" Defendants did not close mills in 2005 and 2006; fewer than half did—as did several non-Defendants (non-Defendants representing

approximately 24% of capacity accounted for 22% of closures during that period).[1]  Prices were not "increasing" in 2005, but instead *fell* three times and finished the year down ███ per ton.

In fact, Plaintiffs recently were forced to abandon their original theory of this case.  In April 2014—almost four years into this litigation, and just weeks after Defendants stipulated to extend the deadline for Plaintiffs' class certification motion—Plaintiffs sought to amend their Complaint because they "recently determined that [February 15, 2004] is the most appropriate starting date for the proposed Class Period."  Mot. to Am. [Dkt. No. 624] at 3.  Plaintiffs pointed to no specific facts to justify the abandonment of their prior allegations of a change in industry behavior after a failed price increase in early 2005.  Absent this change, it is now clear that Plaintiffs' regression model ████████████████████████████████████████████ ███████████████████████████████████████████████.  As this Court said when ruling on Plaintiffs' motion to amend, Plaintiffs "will have to live with their previous Complaint which alleges, what you say, an inconsistency which may—they may have difficulty doing."  Hearing Tr. of May 13, 2014, at 6.

**B.     Plaintiffs' Proposed Class Fails To Satisfy Rule 23's Requirements**

The "rigorous analysis" now required by the Supreme Court, *Comcast*, 133 S. Ct. at 1432 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 (2011)), includes scrutiny of the experts on whom Plaintiffs rely to establish two essential prerequisites to class certification: common proof that Defendants' alleged wrongdoing caused class-wide injury (antitrust impact) and quantification of that injury (antitrust damages).  *Id.*  Where "an expert's report or testimony is critical to class certification," the district court "must make a conclusive ruling on any

---

[1] Harris Decl. at 12, Table 1 (citing RISI World Containerboard Archive); *id.* at Ex. 3 (████████ ████); *id.* at 24 (███████████████████████████████████████████████████████████). Ex. 1 (RISI World Containerboard Archive).

3

challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012) (internal quotation marks and citation omitted). In order to make this threshold "conclusive ruling," the Court should—as the Seventh Circuit recently held—take evidence to test the expert opinions on which class certification rests. *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) (reversing class certification and explaining that "[t]he judge should have investigated the realism of the plaintiffs' injury and damage model in light of the defendants' counterarguments, and to that end should have taken evidence").[2] That hearing will confirm that neither the analyses of Plaintiffs' experts—Dr. Mark Dwyer and Dr. Michael Harris—nor any of the other "evidence" put forth by Plaintiffs satisfies the prerequisites for class certification under *Comcast*.

### 1.   Plaintiffs' Flawed Impact Model

Plaintiffs' proposed common proof of antitrust impact fails for two reasons: ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████.

### a.   Plaintiffs' Model Fails To Isolate Antitrust Injury

Plaintiffs rely primarily on Dwyer's "empirical model" as common proof of antitrust impact, or injury-in-fact, to the class. This model does not even attempt to show the most basic precept of antitrust impact: that the alleged anticompetitive conduct *caused* the class members to pay higher prices. As Harris was forced to admit: ████████████████████████████

████████████████████████████████████████████████████████

---

[2] Evidentiary hearings are now the norm at class certification in the Seventh Circuit, when expert testimony is offered. Earlier this year, Judge Zagel held a three-day evidentiary hearing in *Standard Iron Works (Steel Antitrust Litigation)* to consider the evidence for and against class certification.

██████ Ex. 2 ███████████████ (emphasis added). Yet, Dwyer's model ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ Such a model is not measuring the impact of an alleged conspiracy, but rather measuring the impact of *all* market forces. *See infra* Argument Part II.

In other words, Plaintiffs' model does not separate the price effects allegedly caused by a conspiracy from events that would have occurred "but for" the alleged conspiracy, nor does it make any causal link between the prices charged and the challenged conduct. It thus suffers from the same defects as models rejected by the Supreme Court in *Comcast* and by the Seventh Circuit in *Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*, 152 F.3d 588, 592-93 (7th Cir. 1998) (rejecting a model that failed "to make a responsible estimate of the prices that [plaintiff] would have paid had it not been for the conspiracy"). As Judge Posner explained, "Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment." *Id.* at 593.

Plaintiffs' model also detects injury where none could exist. Applying Dwyer's ████



████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████, Ex. 2 (Harris Dep.) at ████████) yields the conclusion that ████

████████████████████████████████████████████████████████████████████

██████████████ These ████████ prove that the model is fatally flawed and cannot

support certification of a class. *See*, *e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (rejecting a model that found damages where none could exist).

### b. Plaintiffs' Model Fails To Account for a Majority of Customers

Plaintiffs' impact model also makes no attempt to assess impact for "all or nearly all" of the proposed class. As Dwyer admitted, the model he designed ██████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ .

Without any econometric method to prove antitrust impact to nearly ███████ of the class, class certification must be rejected. *See*, *e.g.*, *In re Photochromic Lens Antitrust Litig.*, MDL Docket No. 2173, 2014 WL 1338605, at *23 (M.D. Fla. April 3, 2014) (rejecting class certification where impact analysis only applied to part of the proposed class).

### 2. Plaintiffs' Flawed Damages Model

Dwyer claims that ████████████████████████ . But ███████████████ ██████████████████████████████████████████████████ . ████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████ *See* Dwyer Rep. Ex. ██ . ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ That means that Dwyer's own model finds that ███████████████████████████████████ ████ . In other words, Plaintiffs' model █████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████ . Ordover Rep. ████

6

█████ ; Ex. 3 (Dwyer Dep.) at ███████ .  Without a viable damages model, Plaintiffs' Motion

must be denied.  *See, e.g.*, *Rail Freight*, 725 F.3d at 253 ("No damages model, no predominance,

no class certification").

### 3. Corrugated Products Are Particularly Inappropriate for Class Certification

Without a viable method to show impact or damages across the class, Plaintiffs' request

for class certification should be rejected in its entirety.  *See Comcast*, 133 S. Ct. at 1432-33; *Rail

Freight*, 725 F.3d at 253.  Moreover, Plaintiffs' effort to include all U.S. purchasers of both

containerboard and the Corrugated Products made with containerboard (like boxes) in a single

class is fatally flawed.  There are thousands of different types of Corrugated Products, which are

sold by various Defendants and non-Defendants to different kinds of customers, for different

uses, in competition with different substitutes, in different regional geographic markets

throughout the United States.  Neither Plaintiffs nor their experts even attempt to define the

relevant product or geographic markets for Corrugated Products—much less assess impact in

those markets. ████████████████████████████████████████████████

████ precludes any finding of impact to the customers of Corrugated Products purchasing in those

markets.  *See Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 348 (5th Cir.

2012) (affirming denial of class certification and explaining "[r]ecovery under § 4 of the Clayton

Act … requires proof of antitrust impact, which in turn requires proof of the relevant market.").

### 4. The Proposed Class Would Be Unmanageable

Plaintiffs ignore practical considerations that, individually and collectively, would make

the management and trial of this case as a class action unwieldy and inefficient.

- Plaintiffs are asserting that Defendants engaged in an antitrust conspiracy while they
  were spending ███████████ to defend and settle similar antitrust allegations related
  to the mid-1990s.  Mot. at 16.  Not only is this implausible, but the releases from the prior

litigation bar various class members from introducing evidence against various Defendants, making it impossible to try this case on behalf of a class.

- Thousands of class members made purchases pursuant to contractual provisions, ███████ ████████ The existence, applicability, and enforceability of these ████████████ will raise thousands of individual issues that would predominate over common issues, rendering a class unmanageable.

*      *      *      *      *      *

The issues raised by Plaintiffs' Motion are not to be left for another day. Class certification is a time for Plaintiffs to provide "a more thorough explanation of *how* the pivotal evidence behind [their] theory can be established." *New Motor Vehicles*, 522 F.3d at 29. The Seventh Circuit has cautioned about the serious impact of certification which often leads to "blackmail settlements" given the "irresistible pressure to settle" due to the potential for an immense judgment, regardless of the merits of the plaintiffs' claim. *In re Rhone-Poulenc Rorer*, 51 F.3d 1293, 1298 (7th Cir. 1995) (Posner, J.) (quoting Henry J. Friendly); *see also Creative Montessori Learning Ctrs. v. Ashford Gear L.L.C.*, 662 F.3d 913, 915 (7th Cir. 2011) ("certification as a class action can 'coerce the defendant into settling on highly disadvantaged terms, regardless of the merits of the suit'"). Consistent with those principles, the Supreme Court requires a rigorous analysis that, Defendants respectfully submit, compels denial of Plaintiffs' Motion for Class Certification.

**BACKGROUND**

Plaintiffs' "central allegation" is that Defendants agreed "to restrict supply of containerboard by cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory, all of which set the stage for coordinated price increases for all Containerboard Products." Mot. at 1. In support of their request to certify a class, Plaintiffs claim to present:

8

- **Common economic evidence of the conspiracy**: ███████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████ .

- **Common economic evidence to demonstrate impact (or antitrust injury) to all or nearly all class members as a result of the conspiracy**: ████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████████████.

- **Common economic evidence to calculate damages to the class**: ███████████████ ████████████████████.

Two highly renowned economics professors have submitted declarations in support of the Defendants and in rebuttal to Dwyer and Harris: (1) Dr. Janusz Ordover, a Professor of Economics at New York University (the "Ordover Rep."); and (2) Dr. Dennis Carlton, a Professor of Economics at the University of Chicago (the "Carlton Rep.").[3] Ordover and Carlton each served as the United States Department of Justice's chief economist in the Antitrust Division. In that role, each analyzed numerous alleged cartels and alleged collusion, and each helped draft the DOJ Merger Guidelines that Plaintiffs' expert Harris relies upon in his report. As described by Ordover and Carlton, and in this brief, Plaintiffs' economic evidence is unreliable and insufficient to satisfy Rule 23.

This Background first addresses—and corrects—Plaintiffs' and Harris's mischaracterizations of the products and markets at issue (Part I below), which are critical to the question of class certification. It then addresses Plaintiffs' purported conspiracy (Part II below). After four years of litigation and the production of millions of pages of documents, Plaintiffs have unearthed *no* direct evidence to support the alleged conspiracy—██████████████████ ████. Ex. 2 (Harris Dep.) at ███████████████████████████████████████); Ex. 3

---

[3] Dr. Ordover submits a declaration on behalf of International Paper, RockTenn CP, Weyerhaeuser, Temple-Inland, and Norampac-Cascades. Dr. Carlton submits a declaration on behalf of Georgia-Pacific.

(Dwyer Dep.) at ████████████████████████████████████████████

████████████████████████████████████████████).   And the "economic

evidence" of a conspiracy they now proffer—namely, the opinion of Harris—cannot fill the gap.

# I.   CONTAINERBOARD AND CORRUGATED PRODUCTS

This case involves widely varying products that compete in numerous different product and geographic markets.  As described below (Part IV), the failure of Plaintiffs and their experts even to identify the relevant markets—much less reliably assess impact to all or nearly all class members in those markets—is fatal to their request for class certification.

## A.   The Class Products:  Containerboard, Sheets, and Corrugated Products

The putative class includes purchasers of three different products:  containerboard, sheets, and Corrugated Products (including boxes).  Containerboard is a type of thick paper used to make corrugated boxes, corrugated packaging, and other Corrugated Products. Containerboard includes linerboard and medium.  Linerboard makes up the two facings of a corrugated sheet, while medium is used in the fluted interior portion.  These two products— which are made from different blends of wood fibers and which have different performance characteristics—are made at large, capital-intensive mills ("Mills").  Significant differences exist across Mills and even across machines in Mills in terms of production quantity, fiber sources, type of containerboard produced and efficiency.  *See* Ex. 4 (FBA FIBRE BOX HANDBOOK (2005)) ("FBA HANDBOOK") §§ 1.1-1.3.

Rolls of liner and medium produced at Mills are shipped to converting facilities ("Plants").[4]  Some containerboard manufacturers own Plants as well as Mills, but there are

---

[4] There are several kinds of converting facilities or Plants.  A "Box Plant" is a facility that can both corrugate containerboard into sheets and convert corrugated sheets into finished boxes.  A "Sheet Feeder" is a facility that only corrugates containerboard into sheets.  A facility that only converts sheets into boxes

numerous Plants owned by independent companies. Plants contain corrugators that combine linerboard and medium into containerboard "sheets." Sheets are then used to make boxes and other end products ("Corrugated Products").[5] *Id.* ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████ *See* Ex. 5 ██████████████████████████. There are more than 1,300 Plants in the United States that manufacture different Corrugated Products for specific uses required by their customers. *See* FBA HANDBOOK, Introduction at i.

Plaintiffs' premise that "a box is a box"—and that all boxes are "commodities"—ignores reality. Corrugated Products are customer-specific in design, construction and printing. There are literally hundreds of thousands of different Corrugated Products.[6] A corrugated box intended to ship produce is made differently than one that will be used to ship athletic shoes. *See* FBA HANDBOOK §§ 3.7-3.9. Produce requires refrigeration during shipment; the box must be designed to withstand humid conditions. Boxes for meat or chicken receive a wax coating or other treatment during the corrugating process; these boxes must be durable and able to survive being frozen. *See, e.g.,* ████████████████████████. These products have different prices, costs and profit margins, and are sold to different customers. ████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

or other finished products is known as a "Sheet Plant." Mills may sell containerboard to Sheet Feeders, which in turn sell sheets to end users of sheets, or Box Plants. *See* FBA HANDBOOK §§ 1.4-1.9.

[5] Plaintiffs' expert Dr. Dwyer divides the products into ████████████████████████████████

As discussed above, sheets are corrugated and not made at Mills. They are more properly considered part of Corrugated Products and will thus be included in all such references to "Corrugated Products" herein, unless otherwise specified.

[6] ███████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████). And not every Plant can manufacture the same kinds of boxes. Thus, while *some* boxes manufactured by *some* Defendants and sold to *some* class members for *some* uses are "commodities," as Plaintiffs and Harris suggest, that is not true for all types of boxes.[7] Indeed, ██████████ a named Plaintiff ████████████████████████ ████████████████████████████████:



In addition, ████████████████████████████████, many boxes face competition from significant substitutes. *See* Ex. 11 at 12. In general, for nondurable goods, boxes face ████████████████ packaging. *See, e.g.,* Ex. 8 at ██████████████. In produce and beverages, boxes compete with plastic stretch and shrink wrap; for other end uses, boxes face competition from folding cartons. *See, e.g., id.* at ████████████ ████████████. Plaintiffs and their experts have done nothing to assess any such

---

[7] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████

[8] ████████████████████████████████████████████████ In addition to boxes, containerboard is used to make a wide range of different products, including floor and counter displays for retail stores, slip sheets, pallets and interior dividers (such as those used to separate bottles inside of boxes). *See* FBA HANDBOOK §§ 2.18-2.19.

differences or any such competition. *See* Ex. 2 ███████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

### B. Sellers of Containerboard and Corrugated Products

Defendants are all "integrated" manufacturers in that they own and operate both Mills *and* Plants and typically at least 50% of the containerboard used in their Plants comes from their own Mills. There are numerous integrated manufacturers who are not defendants in this case and hundreds of "independent" Plants. Defendants thus sell containerboard to independent Plants— which would be members of the proposed class—and also *compete* with independent Plants for end use customers (also members of the proposed class).

The geographic area of competition for containerboard and Corrugated Products varies significantly. Containerboard can typically be shipped a long distance, and thus the relevant "geographic market" might include large regions.[9] The geographic market for boxes is much smaller. Harris concedes that ███████████████████████████████████████████

█████████████████████████ Ex. 2 ████████████████. The Fibre Box Association ("FBA")—a trade association including Defendants, proposed class members and other box makers—divides the continental United States into six areas and 25 "regions," each with a different mix of Defendant and non-Defendant producers. Fibre Box Association, 2014 North American Directory of Corrugated Plants, available at http://www.fibrebox.org (last visited September 19, 2014). Moreover, depending on the *type* of box, the geographic market may be larger or smaller. Thus, the competitive analysis of boxes and all Corrugated Products

---

[9] ███████████████████████████████████████████████████████████████████████████
██████.

13

requires an analysis not just of a single, unified "Containerboard Products" market; to the contrary, competition varies by product type and region.

### C.  Sales of Containerboard and Corrugated Products

Like many paper products, third parties publish an index price for containerboard.  The most commonly referenced is published by RISI in a publication called Pulp & Paper Week ("PPW").  However, the PPW price is not a mathematical reflection of actual transaction prices;



*See* Ex. 12 at 4.

*Id*. at 6.

*Id*. at 6-7.  Given these facts, and as the empirical evidence in this case shows, the PPW index is

Dwyer Rep.        .

Contracts for Corrugated Products are typically negotiated directly between the Plant and the customer and may or may not be written.  Ex. 5

.  Although containerboard is a primary component in manufacturing Corrugated Products, the correlation between containerboard pricing and Corrugated Product pricing is not as simplistic as Plaintiffs suggest.

.  *See* Ordover Rep.        . But some agreements guarantee pricing for a fixed period of time, regardless of any fluctuations in containerboard pricing.  For instance,



████████████████████. *See, e.g.*, Ex. 14.  Other contracts █████████████

████████████████████████████████████████. *See, e.g.,* Ex.

15.

Indeed, because of the custom nature of Corrugated Products and the sheer volume of different boxes, there is no "standard" when it comes to pricing Corrugated Products.  When asked what factors drive container pricing, the ██████████████████████:



Ex. 10 (███████████████████████████.

Pricing for Corrugated Products is dictated by the region in which the Defendants' Plants—and Plants of non-Defendants—compete.  Given the number of participants, fierce competition—often marked by price wars and ongoing battles for market share—was a hallmark of the Corrugated Products sector.  *See, e.g.*, Ex. 16.  Pricing was by no means uniform across competitors, as ██████████████████:



Ex. 10 ██████████████████████

15

PUBLIC – REDACTED VERSION



## II. PLAINTIFFS HAVE NO FACTUAL OR ECONOMIC EVIDENCE OF AN UNLAWFUL AGREEMENT

Plaintiffs spend the majority of their Motion (pages 16-42) attempting to establish the alleged conspiracy. They also rely on the opinion of Harris, ██████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

Neither Harris's opinion nor Plaintiffs' conspiracy theory can be squared with the facts—the most critical of which they completely ignore. Plaintiffs and Harris fail to acknowledge perhaps the most important fact: ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████ As explained and detailed by Carlton: ████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████ Carlton Rep. ████. Nor do Plaintiffs or Harris account for the following critical facts, which refute their conspiracy theory.

### A. Capacity

Although Plaintiffs suggest that Defendants used capacity reductions to restrict supply in support of the alleged conspiracy, they fail to note the following:

*First, overall capacity did not decrease.* Containerboard capacity in the United States did not change dramatically in 2004—the beginning of the alleged conspiracy—compared to prior years. ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████. *See* Ordover Rep.

████████████. According to the capacity numbers relied upon by Plaintiffs' expert, ██████

████████████████████████████████████████████████

██████████████████████████████████████████ *Id.*

██ During the seven-year "conspiracy" period, 2004 through 2010, ████████████████████

████████████████████████████████████████████[10]

*Second, Defendants added capacity.* The reason overall capacity did not decrease is because Defendants *added* capacity during the class period—a fact completely ignored by Plaintiffs and Dr. Harris. They ignore every Mill opening, every investment to increase a Mill's capacity and every conversion of other paperboard mills into containerboard Mills.[11] Mot. at 21. For example, ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[10] The containerboard and Corrugated Products industries have been in decline since the late 1990s as a result of manufacturing shifting from the United States to China and businesses in China opening local Mills and Plants, reducing the need for China's product manufacturers to import containerboard and boxes from North America. ██████████████████████████████████████████

[11] These capacity additions are *explicitly* identified in the very documents Plaintiffs cite. *See, e.g.,* ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████.

██████████████████████ *See* Ex. 19 at 36.[12] ███████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ *See* Ex. 20. ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

*Third, some Defendants did not reduce capacity, but non-defendants did.* The only dramatic change in Mill closure activity from the pre-conspiracy period to conspiracy period were the Mill closures by *non-defendants*. Mill closures by non-defendants, who are not alleged to be part of the conspiracy, ████████████████████████████████. Ordover Rep. ███. By contrast, two Defendants ██████████████████████████████ ███████████████████████████ *Id.* ████ A third Defendant, ██████████████ ████████████████████████████████████████████████████ ████████████████████ *Id.* ████ .

*Fourth, Defendants closed Mills for non-conspiratorial reasons.* There can be no real dispute that Defendants closed Mills for non-conspiratorial reasons during the alleged conspiracy period. ██████████████████████████████████████████████████ ████████████████████████████████████████████████████ *See* Ex. 21. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[12] ██████████████████████████████████████████████████████████████

██████████ [13] ████████████████████████████████████████████

███████████████████████████████     *See* Ex. 23 at 80; Ordover Rep. █████

**B.    Operating Rates**

Plaintiffs claim that, at the same time that they took out capacity, Defendants dramatically, and as part of the conspiracy, increased their operating rates. Plaintiffs support their assertion by ████████████████████████████████████████████████████████

██████████████  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████



---

[13] Smurfit Stone filed for voluntary chapter 11 relief on January 26, 2009, in the United States Bankruptcy Court for the District of Delaware. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 22 at ████████████████████████.

Plaintiffs and Harris completely ignore the benefits of high operating rates: █████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Carlton Rep. ████.

While Plaintiffs deem high operating rates ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████. *See id.*

### C.    Downtime and Slowbacks

Plaintiffs ████████ claim that downtime and slowbacks were part of a conspiracy but fail to address the reasons for downtime and ███████████████████████████

██████████████ Nothing is conspiratorial about this strategy. Demand for Corrugated Products (primarily boxes) is driven by the demand for the products that are shipped in the boxes. In turn, the demand for containerboard is driven by the demand for Corrugated Boxes. Thus, with respect to containerboard, demand is inelastic.

From 2004 through mid-2008, demand for Corrugated Products was █████████████

█████; when the recession hit in late 2008, demand plummeted an unprecedented ████. *See* Ex. 53 at 12. Plaintiffs repeatedly (and mistakenly) suggest that ████████████████████

███████████████████████████████████████████. Even if ████████████ is a reasonable strategy under some circumstances and for some companies,[14] that is certainly not the only approach and would have been a bad business decision for many containerboard companies.

Containerboard reels can weigh 15-45 tons and need to be "trimmed" (or cut) into rolls at the width required for the customer's corrugator. A roll too wide will not fit on the corrugator; a

---

[14] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

roll too narrow will not maximize the Plant's output.  As explained above, ███████████ ████████████████████████████████████████████████████████ *See*, *e.g.*, Ex. 5 ████████████████████████████████████████. Given the need to meet the customer's specifications and the cost of carrying inventory in the hope of future orders for that precise basis weight and trim size, some manufacturers—including several Defendants—manufacture containerboard rolls based on actual or forecasted orders. ████████████████████████████████ ████████████████████████████████████████ *See*, *e.g.*, Ex. 25 ( ████████████████████████; Ex. 26 at ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████.

Harris opines that ████████████████████████████████████████ ████████████████████████████████ Harris Decl. ██████  Of course, there is a cost associated with inventory (often referred to as "carrying cost").  Harris was asked whether he knew ████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 2 (Harris Dep.) at ████████ (emphasis added).  Harris claimed to ████████████████████████████████████████ ████████. *Id*. at 194:14-16.  Yet ████████████████████████████████████████ ████████:

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Mot. at Ex. 171 ████████████████████.

### D. Trades

Plaintiffs also attempt to describe as nefarious a long-time practice in multiple industries: trades. But Defendants trade containerboard to ensure that they have the right mix and type of linerboard and medium needed at their Plants in various regions of the country. Harris admits that, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Harris Decl. at ██. Thus, it is unsurprising that Defendants engage in trades with other manufacturers (both Defendants and non-Defendants).[15] Moreover, Harris admits ████████████████████████████████████████████████

*Id.*; Ex. 2 (Harris Dep.) at ████████.

### E. The "Network" Theory

More recently, Plaintiffs cobbled together an equally unavailing conspiracy theory involving a "network" of third parties made up of industry analysts, consultants and even long-established trade associations. ████████████████████████████

████████████████████████████ *See* Mot. at 31-38; *see also* Ex. 27 at 5. Plaintiffs' basic theory appears to be that, if any employees of competing companies had an opportunity to speak, they must have conspired. Plaintiffs have even suggested that ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Ex. 27 at 5. Plaintiffs ignore that the trade associations have their own antitrust specialists heavily involved to assure compliance with antitrust laws and that the

---

[15] Thus, for example, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

majority of the board of the FBA consists of owners of independent Plants, *i.e.*, purchasers of containerboard and Plaintiffs' purported class members.  *See* Ex. 28; Ex. 29; Ex. 30; Ex. 31; Ex. 32.  Not surprisingly, Plaintiffs *still* cannot identify a single communication among the Defendants that was conspiratorial, and it has long been established that the mere *opportunity* to collude—present in *every* industry—proves nothing.

## ARGUMENT

## I.  THIS COURT MUST APPLY A RIGOROUS ANALYSIS AND NOT SIMPLY ACCEPT PLAINTIFFS' FACTUAL ASSERTIONS OR THEIR EXPERTS' CONCLUSIONS.

### A.  Class Certification Standards in Light of *Wal-Mart* and *Comcast*

Plaintiffs seek to certify their class under Rule 23(b)(3), which "permits certification only if 'the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members.'"  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2012) (quoting Fed. R. Civ. P. 23(b)(3)).[16]  In order to satisfy the "predominance" requirement, Plaintiffs must demonstrate that common evidence available to the class can be used to demonstrate:  (a) antitrust injury (impact) and (b) damages.  Mot. at 49 (stating "the essential elements" of an antitrust claim—including impact and damages—must be capable of proof through common rather than individualized evidence); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 818 (7th Cir. 2012) (plaintiffs have the burden of "demonstrat[ing] that the element of antitrust impact is capable of proof at trial through *evidence that is common to the class rather than individual to its members*" (emphasis added)).  A party seeking class certification must affirmatively prove that predominance and the other elements of Rule 23 are

---

[16] Plaintiffs also must "be prepared to prove" each element of Rule 23(a) (numerosity, commonality, adequacy and typicality).  *Comcast*, 133 S. Ct. at 1432 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).  The latter three sometimes overlap with predominance issues, which is the requirement upon which this brief focuses.

"*in fact*" satisfied. *Comcast*, 133 S. Ct. at 1432 (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. at 2551 (2011)).

Plaintiffs assert that, because this is an antitrust case, class certification almost naturally follows. *See generally* Mot. at 2. That is not the law.[17] This Court must conduct a "rigorous analysis" of Plaintiffs' proposed evidence supporting the elements of Rule 23. As recent Supreme Court cases make clear, this includes both a review of the evidence and scrutiny of whether the models offered by Plaintiffs' experts to show common impact and damages are realistic and reliable. *See Comcast*, 133 S. Ct. at 1432 (holding Court of Appeals erred "by refusing to entertain arguments against respondents' damages model that bore on the propriety of class certification"); *Wal-Mart*, 131 S. Ct. at 2552 ("Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim."). As the Supreme Court explained in *Comcast*, rejecting the old "any expert model will do" standard:

> The Court of Appeals simply concluded that respondents "provided a method to measure and quantify damages on a classwide basis," finding it unnecessary to decide "whether the methodology [was] a just and reasonable inference or speculative." *Under that logic, at the class-certification stage any method of measurement is acceptable so long as it can be applied class-wide, no matter how arbitrary the measurements may be. Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity.*

133 S. Ct. at 1433 (internal citation omitted) (emphasis added).

As *Comcast* shows, in an antitrust case a district court must be particularly careful to ensure that an expert model is measuring *only* antitrust injury and antitrust damage. The

---

[17] In fact, class certification has been rejected in numerous cases in the last five years, including: *Comcast v. Behrend*, 133 S. Ct. 1426 (2013); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2009); *In re Photochromic Lens Antitrust Litig.*, MDL Docket No. 2173, 2014 WL 1338605 (M.D. Fla. 2014); *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674 (S.D. Fla. 2012); *In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090, 2012 WL 3031085 (D. Minn. 2012); *In re Flash Memory Antitrust Litig.*, No. C 07-0086, 2010 WL 2332081 (N.D. Cal. 2010); *Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009).

Supreme Court there rejected class certification because the model reflected higher prices, but could not tie those prices to conduct that was "anticompetitive." *Id.* at 1435. Thus, as the Seventh Circuit recently explained—quoting *Comcast* and the Federal Judicial Center's Reference Manual on Scientific Evidence—"[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *In re IKO Roofing Shingle Prod. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014) (Rule 23(b)(3) "requires matching the theory of liability to the theory of damages") (quoting *Comcast*, 133 S. Ct. at 1435) (emphasis from *Comcast* decision); *see also*, *e.g.*, *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 485 (5th Cir. 2000) ("[T]he fact of damages . . . means that the antitrust violation must cause injury to the antitrust plaintiff.") (quoting *Nichols v. Mobile Bd. of Realtors, Inc.,* 675 F.2d 671, 675-76 (5th Cir. 1982)). "Without a theory of loss that match[es] the theory of liability," a class cannot be certified. *IKO Roofing*, 757 F.3d 599, 602.

Even before *Comcast*, Judge Posner rejected a model—like the one offered by Plaintiffs here—that attributed the "entire difference between the prices" to the illegal conduct, "with no correction for any other factor" that may have caused the price difference. *See Marshfield Clinic*, 152 F.3d at 593. As Judge Posner summed it up, "Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment." *Id.* Given the significance of regression analysis in antitrust and other cases, the Seventh Circuit requires a district court to analyze regression models in detail and has "remind(ed) district judges that, as painful as it may be, it is their responsibility to screen expert testimony, however technical." *See ATA Airlines, Inc. v. Federal Express Corp.*, 605 F.3d 882, 889-96 (7th Cir. 2011).[18]

---

[18] Likewise, in *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008), the defendants had engaged in some legally permissible vertical restraints, but plaintiffs alleged the

### B.      The Third Circuit's *Linerboard* Decision Does Not Reflect Current Law

To support their argument, Plaintiffs rely heavily on the certification of the class in the earlier *Linerboard* case—but the law has changed. Specifically, in *Linerboard*, the Third Circuit *did not resolve any merits disputes* and *did not even consider any expert testimony offered by Defendants* related to class certification. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 325 (3d Cir. 2008) (explaining "[i]n *Linerboard* we did not address whether [an] expert opinion offered by the party opposing class certification would have been properly considered by the district court in the exercise of its discretion"). Today, that would be reversible error. *See id.* (reversing district court for not considering expert testimony of Dr. Janusz Ordover that contradicted points of plaintiffs' class certification expert); *see also Messner*, 669 F.3d at 812 (district court must make "a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification" (citation omitted)); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013) (courts must take a "hard look at the soundness" of the proposed method to ensure it is reliable).

The facts also differ materially. In *Linerboard*, an executive was alleged to have conducted a "telephone survey of competitors" and to have "'invite[d] some of [his] competitors to join in a 'coordinated price increase,'" which resulted in the Federal Trade Commission ("FTC") filing an administrative complaint that was resolved by a consent decree with only that executive's company. *In re Linerboard Antitrust Litig.*, 305 F.3 145, 150 (3rd Cir. 2002); *In re*

---

defendants also engaged in an illegal horizontal conspiracy. *Id.* at 27. The First Circuit held that, in order to gain class certification, the plaintiffs' methodology for showing common impact had to "sort out the effects of any permissible vertical restraints from the effects of the alleged, impermissible horizontal conspiracy." *Id.* In rejecting certification, the First Circuit explained: "If plaintiffs do not have a viable means for distinguishing between these two sets of effects"—i.e., the price effects caused by the alleged unlawful horizontal conspiracy and the price effects caused by the lawful conduct—"they cannot show that it was the horizontal conspiracy that caused the impact on the domestic national market upon which their theory depends." *Id.*

*Linerboard Antitrust Litig.,* No. MDL 1261, 2000 WL 1475559, *1 (E.D. Pa. Oct. 4, 2000)

(setting forth allegations in FTC complaint and details of consent decree). Plaintiffs then filed a

class action in which they alleged that, "[b]etween the summer of 1993 and March 1995, seven

containerboard price increases were implemented in the industry." *In re Linerboard*, 305 F.3d at

151. The district court granted class certification (and the Third Circuit affirmed), under the pre-

*Wal-Mart* and *Comcast* class certification standard. *Id.* at 155.

In this case, there was no government investigation and, ███████████████, no

direct evidence suggesting the possibility of conspiracy. ██████████████████



████████████████████████ Ordover Rep. ████████████. The only

common fact between *Linerboard* and this case are the products involved.

## II. PLAINTIFFS OFFER NO COMMON METHOD TO PROVE ANTITRUST IMPACT, PRECLUDING CERTIFICATION

Plaintiffs assert that Defendants' containerboard supply restrictions enabled nine

"successful" price increase announcements ████████████████████████,

which, in turn, resulted in antitrust injury to all or nearly all customers of both containerboard

and Corrugated Products. *See* Mot. at 1; Dwyer Rep. ██. But the "rigorous analysis" required

under Rule 23 shows that the evidence offered by Plaintiffs (almost entirely comprised of their

experts' reports)[19] cannot "demonstrate that the element of antitrust impact is capable of proof at

---

[19] The only other means Plaintiffs offer for proving common impact is a selective reading of a handful of
Defendants' documents. *See* Mot. at 53. As noted below, this is not a means of proving that all or nearly
all class members were actually impacted. *See infra* Argument Part II.G.

PUBLIC – REDACTED VERSION

trial through evidence that is common to the class rather than individual to its members." *See Messner*, 669 F.3d at 818 (internal citations and emphasis omitted).

Plaintiffs rely primarily on an "impact model" prepared by Dr. Dwyer, as well as the "market" analysis by Dr. Harris.[20]  Neither provides a reliable method of assessing common impact suffered by the purported class *as a result of the alleged antitrust violation*.

### A. Plaintiffs' Experts Do Not Even Try To Assess *Antitrust* Impact

#### 1. A Common Impact Model Must Account for "But For" Changes in Price

Plaintiffs must have a method to show common *antitrust* injury (*i.e.*, a method to show that all or almost all class members' prices were greater than what the prices would have been "but for" the alleged conspiracy).  Thus, courts have rejected impact models that are incapable of showing "that it was the horizontal conspiracy that *caused* the impact."  *In re New Motor Vehicles Canadian Export Antitrust Litig*, 522 F.3d 6, 27 (1st Cir. 2008) (denying class certification where impact from the alleged illegal conduct could not be sorted out from "any permissible vertical restraints").  Plaintiffs do not disagree that they must prove more than mere price increases; indeed, Dwyer admits that ███████████████████████████████

████████████████████████████████████████████████████  Ex. 3 (Dwyer Dep.) at ██████████ (emphasis added).

████████████████████████████████████████████████████

Ex. 2 (Harris Dep.) at ████████.  The first step in establishing common proof of *antitrust* impact is to create a model capable of separating price effects caused by the alleged anticompetitive conduct from those caused by other, non-conspiratorial factors—that is, factors that would exist in the absence of ("but for") the conspiracy.  *See Sample v. Monsanto Co.*, 218 F.R.D. 644, 650

(E.D. Mo. 2003) ("To establish antitrust impact, an expert is 'required to construct a hypothetical market, a but for market, free of the restraints and conduct alleged to be anticompetitive.'" (citations omitted)). A model that simply measures price changes over time without controlling for "but for" changes in demand, supply and inflation is not isolating the alleged conspiratorial price effects.

Plaintiffs agree that numerous non-conspiratorial factors caused prices to vary during the alleged class period. Harris admitted that ███████████████████████████████████ ████████████████████████████████████████████████████████████████ Ex. Ex. 2 (Harris Dep.) at █████████.[21] Other changes that would have occurred in the absence of conspiracy (such as non-defendants' changes in capacity and supply) would also have affected prices during the proposed class period. For example, Ordover Figure ██████████████ ████████████████████████████████████████████████████████████████ Ordover Rep. ████████. Bleached softwood kraft pulp is not a part of the alleged conspiracy but ████████████████████████████████████████████████████████████████ ███ Ordover Rep.████. ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████.[22] This confirms Harris's admission that ██████████████████████ ██████████████████████████████ That high correlation between non-conspiratorial pulp pricing and containerboard pricing emphasizes the need for Plaintiffs to separate *antitrust*

---

[21] Likewise, Dwyer knows that ██████████████████████████████. Dwyer's damages model (but not his impact model) in this case ██████████
████████████████████████████████████ Dwyer Rep ████████.

[22] Dwyer recognizes that ██████████████████████████████████████████████
████████████████████████████████. Dwyer Rep. ████████.

PUBLIC – REDACTED VERSION

impact—impact caused by the alleged conspiracy—from lawful and non-conspiratorial factors also driving changes in the price.



### 2. Dr. Dwyer's Impact Model Fails To Account for "But For" Changes in Price

Despite Dwyer's admission that ███████████████████████████████ ███████████████████████████████████ (Ex. 3 (Dwyer Dep.) at ████████), neither █ ██████████████ do so.  Dwyer offers a model that ████████████████████████ █████████████████████████.  Plaintiffs' experts make no attempt to ████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████ *Id.* at ████████; Ex. 2 (Harris Dep.) at ████████.  In other words, Plaintiffs assume ██████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████.



Specifically, Dwyer █████████████████████████████████████████████

████████████████████████████████████████ Ex. 3 (Dwyer Dep.) at

█████████████████████████████████████████████████████████████.

Dwyer's impact model ████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████"[23] Dwyer makes this assumption ███████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████. *Id.* at ███████████████

█████████████████████████████████████████████████████████████

███████████████████████████████; *id.* at ████████████████████████████

████████; *id.* at █████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████. In other words, Dwyer █████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████.

Indeed, Dwyer's decision ██████████████████████████████████████████

█████████████████████████████████████████████████████████. For

---

[23] Dr. Dwyer claims ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
Dwyer Rep. ████ Specifically, ████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████ *See* Ex. 33 (Dwyer Dep. Ex. 18) (█████████████████████).
████████████████████████████████████████████████████████████████████
████████████████████████████████████



example, Carlton ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ Carlton Rep. ████████

Adding these ██████████████████████████████████████████████████

████████████████████████████.[24] *Id.* Thus, even by █████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████.[25]

This deficiency in Dwyer's impact model is akin to the fatal flaws discussed in *Comcast*

and *Marshfield Clinic*. In *Comcast*, the Supreme Court rejected an expert model that did not

isolate the damage caused by the only viable theory of antitrust wrongdoing from other conduct,

holding that a model "must measure *only* those damages attributable" to the theory of

wrongdoing and cannot include "damages that are not the result of the wrong."[26] *Comcast*, 133

S. Ct. at 1434 (emphasis added). As the Seventh Circuit recently explained, *Comcast* held that,

"without a theory of loss that matched the theory of liability, the class could not get anywhere."

*In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014). This has long

---

[24] It is important to note that, as shown below, Dr. Dwyer is ████████████████████████

████████████████████ With Dr. Carlton's controls, █████████████ Carlton Rep. ███.

[25] *See also* Ordover Rep. at ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████.

[26] Plaintiffs, recognizing this weakness in their impact model, compare this case to *Allan v. RealComp II, Ltd.*, No. 10-cv-14046 (E.D. Mich. Mar. 30, 2013) ("*Comcast* is distinguishable . . . . Here, Plaintiffs have alleged a single, unified theory, and the expert model accounts for it"). However, *RealComp II* involved a regression model that controlled for the "but for" world. *See id.* at 12 (noting that the model used "multiple regression analysis"), 13 (noting that regression-based models test for "the but-for cause of a statistically significant rise in prices in the relevant market"), 22 (finding that the model "purports to demonstrate that a percentage of overcharge for real estate brokerage services can be empirically demonstrated for the entire market"). In other words, *RealComp II* involved a model that isolated a "single, unified theory" from the "but-for" world—████████████████████████████. Thus, Dwyer's model measures "damages that are not the result of the wrong." *Comcast*, 133 S. Ct. at 1434.

been the law in the Seventh Circuit, as "[s]tatistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment." *Marshfield Clinic*, 152 F.3d at 593 (Posner, J.) (rejecting expert's proposed model because—like the model here—it attributed the "entire difference between the prices" to the illegal conduct, "with no correction for any other factor" that may have caused the price difference). Because the only impact model that Plaintiffs offer ███████████████████████████████████████████ ███████████████—it fails to show common *antitrust* impact and must be rejected.

**B.    Dwyer's Common Impact Model Is Incapable of Proving Antitrust Impact to at Least Two-Thirds of Potential Class Members**

As Plaintiffs concede, ████████████████████████████████████ ██████████████████████████████████████████████████. Dwyer Rep. ███.    The data Dwyer used for the model contains ████████████████ ██████████████[27] *Id.*████████0.  Thus, Dwyer's model must be able to ████████████ ████████████████████████████████.

Dwyer's model is ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████  As Dwyer admits, ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████. *See also* Ex. 3 (Dwyer Dep.) at

---

[27] While a number of these may represent the same purchasing entity, Dwyer admits that ███ ████████████████████████████████████████████████████████████ ████████████████████████ Dwyer Rep. ████.  But Dwyer performed ████████ ██████ Ex. 3 (Dwyer Dep.) at ████████████.

██████. Dwyer concedes that ████████████████████████████████

██████████████████. *Id.* at ████████.

Nor does Dwyer ████████████████████████████████████

████████████████████████████████████████████████ When

asked if ████████████████████████████, Dwyer answered with a

double negative: ████████████████████████████ *Id.* at ████████.

When pressed, Dwyer could only speculate: ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ *Id.* at ████████. Dwyer

performed ████████████████████████████████████████

████████████████.[28] Instead, ████████████. But evidence of common

impact to some class members cannot be *presumed* to apply to all. *In re Photochromic Lens

Antitrust Litigation*, 2014 WL 1338605, at *23 (M.D. Fla. Apr. 3, 2014) (noting "[e]xperts are

required to demonstrate their methodology is capable of utilizing common evidence, yet Dr.

Singer does not even attempt to do so for an overwhelming majority of the class").

---

[28] Dwyer offered an additional explanation: ████████████████████████████████

████████████████████████ Ex. 3 (Dwyer Dep.) at ████████. But Dwyer's analysis ██████

In fact, as shown by Dr. Ordover (Ordover Rep. ████████████████████ ), ████████████

████████████████████████████████████ Thus, here—as in many other cases—an analysis of
average prices is useless in assessing impact. *See Sheet Metal Workers Local 441 Health & Welfare Plan
v. GlaxoSmithKline, PLC*, No. 04-5898, 2010 WL 3855552, at *30 (E.D. Pa. Sept. 30, 2010) ("Average
prices falter as a method for proving class-wide injury, because averaging 'by definition glides over what
may be important differences.'") (quoting *Reed v. Advocate Health Care*, No. 06-3337, 2009 WL
3146999, at *17 (N.D. Ill. Sept. 28, 2009)).

Moreover, Dwyer's presumption is incorrect.  As just one example, ███████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ Carlton

Rep. █████.  These ████████████████████████████████

████████████████████████████, *see* Ex. 3 (Dwyer Dep.) at ████████

████████████████████████████████████████████████████

█████████.  *See also* Ex. 33 (Dwyer Dep. Ex. ███) (████████████

████████████████████).  Dwyer does ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Class certification must be rejected on this ground alone.  *See Photochromic Lens*, 2014 WL

1338605, at *23 (rejecting class certification where impact analysis failed to analyze "an

overwhelming majority" of the class).

### C. Dwyer's Model Is Unreliable Because It Creates False Positives

Dwyer's model not only fails to measure *antitrust* impact, it also fails to reliably measure

*any* impact.  As Carlton shows, Dwyer's model ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Carlton Rep.█████████.  Thus, Dwyer's

model ████████████████████████████████████.

As discussed above,████████████████████████████████████

████████████████████████████████████ Yet  common  sense

suggests otherwise. ████████████████████████████████████

████████████████████████████, and  Dwyer's  model  will ████████

████████████████████.  Carlton tested this ████████████████████████,

35

Carlton Rep. ███. Carlton's analysis shows that ████████████████

████████████████████████████████████████.

     In other words, Dwyer's model ████████████████████. As

the D.C. Circuit has held:

> We have already laid out the damages model's propensity toward false positives
> …. The plaintiffs are right that the defendants' critique does not disprove the
> damage model's claim of classwide overcharges as a matter of logical necessity;
> absence of evidence is not evidence of absence. But they misapprehend their
> burden. *It is not enough to submit a questionable model whose unsubstantiated
> claims cannot be refuted through* a priori *analysis. Otherwise, at the class-
> certification stage* any *method of measurement is acceptable so long as it can be
> applied classwide, no matter how arbitrary the measurements may be.*

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 254 (citing *Comcast*, 133 S. Ct. at

1433) (emphasis added). While *Rail Freight* discusses a damages model, the logic applies with

equal force here. It is not enough for Dwyer to ████████████████████

████████████████████████████████████████

████████████████.

**D.**     **Neither Dr. Dwyer's Regression nor His Analysis of RISI Pricing
"Corroborates" His Erroneous Impact Finding**

    Dwyer claims that ████████████████████████████

████████████████████████████████████████

████████████████████████████████. *See* Dwyer Rep.

██. Neither is accurate: Dwyer's damages model ████████████████

████████████████████████████████.

**1.**     **Dr. Dwyer's Damages Model Does Not "Corroborate" Impact**

    At his deposition, Dwyer suggested that ████████████████

████████████████████████. Ex. 3 (Dwyer Dep.) at ████. Yet, as

Ordover explains, ██████████████████████████████████████

████████████████████████████████████.[29] Ordover

Rep. ███.  Since Dwyer's ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ *See* Ex. 3 (Dwyer Dep.) at ███████; Dwyer

Rep. ██████████████████████████).[30]

    Moreover, when Dr. Ordover ████████████████████████

████████████████████████████████████████████

██████████████,[31] ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████. Ordover Rep. █████████.

Thus, Dwyer's regression—████████████████████████████████

██████████████████████████████████████████. *Id.*

---

[29] Dwyer's ██████████████████████████████
████████████ Dwyer Rep. ███. As Ordover states, ████████████████
█████████████████████████ Ordover Rep. █████.

[30] *See infra* at 45 (citing *Sheet Metal Workers*).  To illustrate the fallacy of using averages to prove common impact, assume 10 members are in a class. Nine pay exactly the "but for" price (in other words, they are not impacted). One pays $10 more than the "but for" price. The "average" overcharge is $1, even though 9 out of 10 class members were not impacted. *See* Ex. 34 (ABA Section of Antitrust Law, ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES 220 (2005)) ("Using … averages can lead to serious analytical problems.  For example, averages can hide substantial variation across individual cases, which may be key to determining whether there is common impact.").

[31] Ordover made this ███████████████████████████████████████; Ordover and Carlton also identify other errors in the aggregate regression rendering it unreliable as a model for damages, which are discussed *supra*.

Thus, rather than "corroborating" Dwyer's ██████████████████, the ████████████████████████████ refutes it.[32]

### 2. Dwyer's RISI Index Pricing Analysis Is Meaningless

Dwyer's attempts to use RISI index pricing to establish common impact to members of the proposed class fare no better. Dwyer suggests that: ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████ Dwyer Rep. ██████. According to Dwyer, ████████████████████

████████████████████████████████. *Id.* ████

Putting aside Dwyer's ████████████████████████

██████████████████████—Dwyer's analysis fails on its own terms.

First, Dwyer finds ████████████████████████████

████████████████████████████████████████

*Id.* ████. Dwyer then concludes this ████████████████████

████████████████████████████ *Id.*

Dwyer has uncovered nothing more than that ████████████████████

████████████████████. *See* Ordover Rep. ████. What Dwyer cannot show is ████████████████████████

████████████████████ Carlton tested Dwyer's theory by ████████████████

_____

[32] As discussed in Part II.A.1 below, Dwyer's regressions also ████████████████████ ████

38

Carlton Rep. ███. This, too, is unsurprising, as ███████████████████

████████████████████████████████████████████████████

██████████. Dwyer Rep ███

Second, while Dwyer's ████████████████████████

███████████████████████ ignores ██████████████ (Ex. 3 (Dwyer

Dep.) at ██████), Dwyer conducted ████████████████████████

████████████████████████. Carlton tested Dwyer's

speculation by ████████████████████████████████████

████████████████████████████████████. Carlton

found ████████████████████████████████████

████████████████.[33] Carlton Rep. ███.

Dwyer also argues that ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ Dwyer Rep ███. Carlton tested

this claim, too, finding ██████████████. Specifically, Carlton

████████████████████████████████████████████

████████████████████. And, again, this analysis showed that

████████████████████████████████████.[34]

---

[33] As discussed *supra*, ████████████████████████████

████████████████.

[34] This result is unsurprising given that ████████████████████

████████████. *See* Ordover Rep. ███. The result is even less

surprising for ████████████████████████████████. *Id.*

Carlton Rep. ███████     Thus, Dwyer's ████████████████████████████████

████████████████████████████████ .

### E.   The Harris Structure/Conduct/Performance Analysis Cannot Demonstrate Common Impact or Overcome the Shortcomings of the Dwyer Analysis

Plaintiffs also offer Harris's opinions that ███████████████████████████

████████████████████████████████████████████████████████

███████████████████████ Mot. at 3-4.  But Harris's non-empirical

analysis of the market structure—██████████████████████████████████

████████████████████—permits no inference that any reduction of supply or

price increase would result in a common impact across all customers in the market.[35]

Even if Dr. Harris's "description of the industry is accurate, it does not suffice on its own

as a method of demonstrating impact to the specific direct purchasers at issue here through

common proof.  *Plaintiffs must show not that 'market conditions are favorable for impact' (Opp.

8) but that there is a common, formulaic method of proving that if defendants conspired to raise

prices, the direct purchasers plaintiffs bought from paid an overcharge."*  *In re Graphics*

*Processing Units Antitrust Litig.*, 253 F.R.D. 478, 502 (N.D. Cal. 2008) (emphasis added).  In

either event, for the reasons described below, Harris's testimony is unreliable and does not

support a finding of common impact.

### 1.   Dr. Harris Performed No Analysis To Define the Relevant Economic Market for Purposes of His SCP Theory and Class-wide Impact

There can be no inference of common impact based on Dr. Harris's SCP analysis because

it is, in the words of the Seventh Circuit, "virtually meaningless" unless tied to a relevant

economic market.  *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th

---

[35] Defendants expressly reserve their right to move to exclude Harris's and Dwyer's testimony under *Daubert* and Rule 702.

Cir.2004). Indeed, Harris concedes that ███████████████████████████████

██████████████████████████[36] Ex. 2 (Harris Dep.) at ██████. But Harris's

conclusion that ████████████████████████████████████ (Compl.

¶ 36)—█████████████████████████████████████████████████

██████ (*see* Ex. 2 (Harris Dep.) at ████████)—finds no support in any economic

analysis he conducted, and fails for that reason alone. *Menasha Corp. v. News Am. Mktg. In-*

*Store, Inc.*, 354 F.3d 661, 664 (7th Cir. 2004) (discussing the need for evidence to prove the

existence of the relevant market). Instead, Harris simply observed that ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████. *See* Harris Decl. ████ Ex. 2 (Harris Dep.) at ██████████. Neither of

these observations support ████████████████[37]

> First, Harris's suggestion that █████████████████████████████████

██████████████████████████████████████████████████ (Ex. 2 (Harris

Dep.) at ████████) is contrary to well-established principles of economics and law. Precisely

because containerboard is an "input" into finished Corrugated Products, containerboard and

Corrugated Products are not substitutes for each other, and thus by definition they cannot belong

in the same economic market. *See, e.g.*, *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d

701, 710 (7th Cir. 1977) (different products "are considered to be in the same market" when

---

[36] Significantly, Harris admits that ████████████████████████████████████
████████████████████████████ Ex. 2 (Harris Dep.) at ██████.

[37] Harris is similarly wrong when he asserts that ██████████████████████████████
████████████████████. Under the 2010 Horizontal Merger Guidelines
published by the United States Department of Justice (the "Merger Guidelines"), during the alleged
conspiracy period, ████████████████████████████████████████████████

██████████ *See* Ordover Rep. █████████████████████.

those "products are 'reasonably interchangeable by consumers for the same purposes'") (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)); *accord Reifert*, 450 F.3d at 318 ("'The outer boundaries of a product market are determined by the reasonable interchangeability of use'" between different products, as demonstrated by "'the cross-elasticity of demand between the product itself and substitutes for it.'") (quoting *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 325 (1962)); *Menasha*, 354 F.3d at 664.[38] ██████████████████ ██████████████████████████████████████████ *See* Ex. 2 (Harris Dep.) at ████████ .

Second, Harris's observation that ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ (*see* Harris Decl. ████ ; Ex. 2 (Harris Dep.) at ████████ ) fares no better. Even if allegations in a DOJ consent decree were evidence (which they are not), the DOJ's market definition is completely *different* from Harris's. The DOJ never suggested ████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████ *See, e.g.*, Ex. 36 at 3 ████████████████████████████ ████████████████████████████████████████████ . There is good reason why it does not do so: containerboard and Corrugated Products are sold to different customers, for different uses, at different prices.[39] *See supra* at Background Part I.

---

[38] Plaintiffs cannot dispute that Harris's novel ████████████ market definition in this case runs contrary to these decisions. Harris agrees, for example, that ████████████████████████████████ . *See* Ex. 2 (Harris Dep.) at ████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ). Indeed, if Harris's ████████████████████████████████████████████████████████████████████████ ████████████████████ *Id.* at ████████ .

[39] Further, Harris's opinion that ████████████████████████████████████ (Ex. 2 (Harris Dep.) at ████ ; *see also* Harris Decl. ████ ) is another sweeping generalization, with no economic support. And it is contradicted by ████████████████████████ . *See* Ex. 10 ████████████

Finally, Harris assumes that ███████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████. Ex. 2 (Harris Dep.) at ████████████████. Again, Harris

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████. *Id.* at

█████████. In fact, Harris only considered ██████████████████████████████

███████████████. *See id.* at ████████████████. For all these reasons, Harris fails to demonstrate a

relevant economic market for purposes of his SCP analysis, which, accordingly, is unreliable and

useless to plaintiffs to determine impact. *See Reifert*, 450 F.3d at 318; *Menasha*, 354 F.3d at

664-65.

### 2. Harris Failed To Analyze the "But For" World

As discussed above, *antitrust* impact cannot reflect "impact" from events that would have

occurred "but for" the conspiracy. Thus, in order to assess antitrust impact, Harris *first* would

have to assess which of the myriad events he identified (*e.g.*, Mill closures and downtime) would

have happened but for the conspiracy and *then ask* whether the *conspiratorial events* (not those

that would have occurred regardless of a conspiracy) raised prices above a competitive level to

all or nearly all class members. Yet Harris admitted that ████████████████████████████

████████████████████████████████████:

- Production. Ex. 2 (Harris Dep.) at ████████████████████████████████████
  ████████████.

███████████████████████████████████. When asked to give the basis for his relevant market opinion on
manufacturing capabilities, Harris ██████████████████████████████████████████████
█████████████████. Ex. 2 (Harris Dep.) at ████████████. But Harris █████████
█████████████████████████ (*id.* at ████████████), and uncontroverted
testimony in the record flatly contradicts his view. *See, e.g.*, Ex. 5 ████████████████████
████████████████████████████████████████████████████

- **Mill Closures.** ███████████████████████████████████
  ████████████████████.

- **Capacity.** ████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ████████████████████████████████████████████████████

- **Downtime.** ████████████████████████████████████████
  ███████████████████████████████████

- **Operating Rates.** ████████████████████████████████████
  ███████████████████████████████████

- **Inventory.** ███████████████████████████████████████
  ███████████.

This failure to engage in any type of "but for" analysis prevents Harris from drawing any

meaningful conclusions from the market conduct he perceived.

### 3. Dr. Harris's SCP Theory Fails Because Not All of Harris's Necessary "Factors" Are Present.

Finally, when Harris was asked to identify ████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████ Harris explained—under

oath—that ████████████████████:



Ex. 2 (Harris Dep.) at ███████. That is a burden that Plaintiffs have not met and cannot meet.[40]

Their proffered evidence of a conspiracy—even as they characterize it in their own brief—does

not show that ████████████████████████████████████████████████████

████████████████████████████████████████. For example, ███████████████████

████████████████████████████████████████████████████████████

██████████████████████████ (*see* Ordover Rep. ███████).

> ### F. The Fact that Average Transaction Prices Follow Similar Trends Does Not Support Common Impact.

Plaintiffs also claim that ███████████████████████████████████████

████████████████████████████████████████████████████████████

███████████ Mot. at 4. But, as numerous cases have held, the fact that average prices move

similarly does not support common impact. *Sheet Metal Workers Local 441 Health & Welfare*

*Plan v. GlaxoSmithKline, PLC*, No. 04-5898, 2010 WL 3855552, at *30 (E.D. Pa. Sept. 30,

2010) ("Average prices falter as a method for proving class-wide injury, because 'averaging by

definition glides over what may be important differences.'") (quoting *Reed v. Advocate Health*

*Care*, No. 06-3337, 2009 WL 3146999, at *17 (N.D. Ill. Sept. 28, 2009) (internal citation

---

[40] Plaintiffs recognize ███████████████████████████████████████████████████████ (Ex. 2

(Harris Dep.) at ███████):



*Id.* at ███████. Harris testified that ██████████████████████████████████████████████

███████████. *Id.* at ███████. However, the two are facially inconsistent:

██████████████████████████████████████████████████ *Id.* at ███████.

omitted)); *see also* Ex. 34 (ABA Section of Antitrust Law, ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES 220 (2005)) ("Sometimes the prices used by economists are averages of a number of different prices charged to different customers or for somewhat different products. Using such averages can lead to serious analytical problems. For example, averages can hide substantial variation across individual cases, which may be key to determining whether there is common impact."). Indeed, as Dr. Ordover shows in ███████ of his declaration, ███████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ .

### G. Plaintiffs Cannot Establish Common Impact by Reference to Statements in Defendants' Documents.

Without economic evidence, Plaintiffs cannot satisfy their burden to prove common impact and a method to determine damages based on some common approach. Plaintiffs'

citations to statements or documents by Defendants are insufficient. Mot. at 53. They do not empirically demonstrate any form of impact to all or nearly all class members, much less *antitrust* impact—that is, price increases caused by the alleged wrongdoing, as opposed to non-conspiratorial factors that even Plaintiffs' experts admit influence price. Indeed, despite purporting to rely on "*Statements and Documents*," Plaintiffs understandably do not specify any statement or document on which they rely in making this argument. *See* Mot. at 3, 53. Moreover, merely reading Defendants' documents does not provide any evidence that would show, on a common or indeed any basis, whether or not any putative class member actually paid more for any product as a result of any alleged anticompetitive conduct.

## III. PLAINTIFFS HAVE FAILED TO PRESENT AN ADEQUATE METHOD TO ADDRESS ANTITRUST DAMAGES FOR THE CLASS.

Plaintiffs do not offer any reliable method for dealing with the individual damage claims of each class member or for estimating class-wide damages. While the fact that damages are not identical may not always preclude class certification, individualized issues relating to damages are a basis for refusing to certify a class where—as here—they cannot be addressed on a class-wide basis or through some easily applied computation. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008) (reversing certification of class because of, among other things, complications involved in determining individual damages); *see also* cases cited *infra* Argument Part III.B. Plaintiffs argue that ███████████████████████████████████ ██████████████████████████ (Mot. at 57-58), but this assumes that the regression is ███ ██████████ In an attempt to show aggregate damages, Plaintiffs offer ███████████ by Dwyer. But they are used improperly. The regressions f███████████████████████ ██████████████████████████████████ (Dwyer Rep. ███), ████████████████ ████████████████████████████████████

47

████████████████████████████████████████████████████████████████████

█████████████████████████████ Ex. 3 (Dwyer Dep.) at ████████████████████

██████ ; Ex. 2 (Harris Dep.) at ████████ .

**A. Dwyer's Regressions Are Fundamentally Unreliable and Cannot Demonstrate Predominance of Class Issues with Respect to Damages**

Dwyer designed ████████████████████████████████████████████████

████████████████████████████████████ are unreliable and results oriented.  In fact, had

Plaintiffs not changed their proposed class period at the last minute, Dwyer's model ████████

████████████████ .  More importantly, Dwyer's model ████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████ .  Moreover, the model is unstable and cannot yield reliable damages results if a

jury, or the Court, determines that the conspiracy started or ended at a date different from what is

alleged by Plaintiffs.

**1.  Dr. Dwyer's Regression Model Shows No Damages for the Original (Pre-May 2014 Amendment) Purported Class Period.**

Dwyer's methodology is unreliable and results oriented, which is reflected in the fact that

██████████████████████████████████████████████████ .  For nearly four years,

Plaintiffs' theory was that the conspiracy took effect in August 2005.  *See generally* First Am.

Compl. [Dkt. No. 401].  But on the eve of filing their class certification motion, Plaintiffs

amended their complaint to extend the alleged class period, claiming that they had "recently

determined that [February 15, 2004] is the most appropriate starting date for the proposed Class

Period."  *See* Mot. to Am. [Dkt. No. 622] at 3.

When Dwyer's ████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

48



*Dwyer conceded that* ███████████████████████████████████████

███████████████████████████████████████████████████████

█████. Ex. 3 (Dwyer Dep.) at ██████████. Thus, his own ████████████

██████████████████████████████████████████.

### 2. Dwyer's Regression Model Does Not Provide a Reliable Basis for Estimating Damages Even with the New Class Period.

Dwyer's ████████ model contains fatal flaws that render it unreliable and insufficient to provide any common method to establish damages. Dwyer's ████████████ methodology, when applied as he says it should be, does not reliably show damages from the alleged conspiracy. ███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████  ███████████████████

███████████████████████████████████████████████

████████████████████████

A typical multiple regression model seeks to measure variations in the dependent variable (here, a measure of price) as a function of changes in the values of a number of independent factors (variables) that are believed to affect price. For example, in a sex discrimination case, an economist might create a model in which the salary of the employee (the dependent variable) is regressed across a number of independent variables, such as education level, years of experience, particular skills relevant to the position, sales (if the person were in a sales position), and any

---

[41] Specifically, ████ Dwyer's ████████████████████████████████████████████████████████ ███████████████████████████████████████████ Ordover Rep. ████. Dwyer's ██████████████████████████████████████████████ *Id.*

other factors believed to affect salary. The regression model would also include a variable for gender to attempt to measure any difference in salary that is not explained by the other, non-discriminatory factors. If the model yields a statistically significant negative coefficient for the gender variable, that would suggest—assuming the remainder of the model comports with econometric standards—that women employees in the sample, for example, were paid less than men with comparable attributes.

As explained more fully by Ordover and Carlton, Dwyer's ██████████████ varies dramatically from this approach, and the results of Dwyer's regressions do not demonstrate antitrust impact or damages. Ordover Rep. ███████████; Carlton Rep. ██. Unlike the typical regression model that regresses the dependent variable of interest (price) on the independent economic factors believed to affect price, Dwyer ████████████████████ ████████████████████████████████████████████████████████████ ██████████████████.[42] Dwyer Rep. ███; Carlton Rep. ████████.

Dwyer chose to ███████████████████████████████████████ ████████████████████████████████████████████████████.[43] He then did ████████████████ ████████████████████████████████████.

[42] As Dwyer asserts, ███████████████████████████████████████ ██████████████████ Dwyer Rep. ████. For example, in the discrimination analysis described above, it could be that education, experience and skills are highly related: more education plus more experience equals more skills. This can skew the standard errors in the regression. However, as Ordover and Carlton note, ████████████████████████ ██████████████████. Ordover Rep. Carlton Rep. ████████.
[43] Dwyer allowed ████████████ ████████████████████ Ex. 3 (Dwyer Dep.) at 1 ████████; Carlton Rep. ████████. The problem with doing this, however, is that ████████ ████████████████████████████████████████████████ ██████. As a result, ████████ ████████████████████████████████████████ Ordover Rep. ██████████; Carlton Rep. ████████████.

50

██████████████████████████████████████████████████

████████████ Dwyer Rep. ███; Carlton Rep ████.

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████.[44] Ex. 3 (Dwyer Dep.) at ████████; Ordover Rep. ████████; Carlton

Rep. ████. ████████████████████████████████████

███████████████████████████.

Economists have criticized the use of stepwise multiple regression, which supports the rejection of Dwyer's analysis. Ordover Rep. ████████; Carlton Rep. ██████; *see* Ex. 37 (Kennedy, A GUIDE TO ECONOMETRICS 49 (6th ed. 2008)) ("stepwise regression is to be avoided"). But, even more importantly, Dwyer's ████████████████████████ provides no support for Plaintiffs' claim that they can provide common economic proof of aggregate damages.

First, despite his ██████████████████████, Dwyer ████████████████████ ████████████████████████████████████. To the contrary, Dwyer ████████████████████████████████████████████ ████████████████.[45] Ordover Rep. ████████; Carlton Rep. ██████; Ex. 3 (Dwyer

_____

[44] As Ordover explains, ████████████████████████████████ ████████████████████████████████████████████████ Ordover Rep. ████. By contrast, here Dwyer i████████ ████████████████████████████████████████████████ Ex. 3 (Dwyer Dep.) at ████████.
[45] When he ████████████████████████, Dwyer ██████ ████████████████████████████████████████████████

Dep.) at ██████████. In other words, he ████████████████████████████

████████████████████████████████████████████████████████

████████████████ Dwyer also ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

Dwyer's ████████████████████████████████████████████

████████. As Ordover and Carlton found, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ Ordover Rep. ██████████; Carlton Rep. ██████████. By Dwyer's own admission,

████████████████████████████████████████████████████████

████████████████ Ex. 3 (Dwyer Dep.) at ██████████. Stated differently, ████████████

████████████████████████████████████████████████████████.[46] And,

while ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

████████████████████████████████████████████████████████ Ex.
3 (Dwyer Dep.) at ████████████████████████ Carlton Rep. ████. ████████████████████████████████████████████████

████████████ Ex. 3 (Dwyer Dep.) at ██████████.

[46] Instead, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Ordover

Rep. ████████████████████; Carlton Rep. ██████. In other words, ████████████

████████████████████████████████

52

███████████████████████████████████████████████.[47]  Ordover Rep. ████; Carlton Rep.

████████.  Dr. Dwyer provided ████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

Second, Dwyer ███████████████████████████████████████████████████████

████████████████████.  As Professor Ordover explains (Ordover Rep. ████), ███████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

*See* Ex. 37 (Kennedy), *supra*, at 197 ("a composite variable should be created only if the

variables included in the composite have some useful combined economic interpretation;

otherwise the empirical results will have little meaning").  Dwyer ████████████████████████

███████████████████████████████████████████████████████████████████████

████████████  Ordover Rep. ████.  Ordover also explains that, ████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

*Id.* ████.  Making that change, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████.  Ordover Rep. ████████████.

Moreover, Dwyer's model is unstable.  ████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████.  Carlton Rep. ████████

[47]



. *Id.* .

Dwyer's

. First, as noted above, a

. *See supra* Argument Part

III.A.1.  Second, Dwyer's

. *Id.* . 

. *Id.* . 

Carlton Rep. .

### B. Dr. Dwyer's Regression Models Provides No Common Means To Prove Any Class Member's Damages

Dwyer admitted at his deposition that

Ex. 3 (Dwyer Dep.) at

. His

*Id.*

That is not enough for Plaintiffs to carry their burden to show that common issues predominate.

Plaintiffs suggest that issues relating to the individual damages of each putative class member can be addressed at a later date and should not preclude class certification.  Mot. at 49-50.  But this is not a case in which the individual issues relating to calculation of damages "will neither be particularly complicated nor overwhelmingly numerous."  *See, e.g., Martins v. 3PD, Inc.*, Civ. A. 11-11313-DPW, 2013 WL 1320454 at *8 n.3 (D. Mass. Mar. 28, 2013) (court noting that, even before *Comcast*, predominance was not satisfied where "questions of damage

calculation are so complex or implicate so many potential class members, that they present a 'Herculean task' and overwhelm liability issues") (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001) (affirming district court's holding that, where "proof of fact of damage requires evidence concerning individual class members, the common questions of fact become subordinate to the individual issues, thereby rendering class certification problematic")).[48]

Dwyer's ███████████████████████████████████████████. As made clear in many jurisdictions before *Comcast*, and certainly evident since *Comcast*, a class should not be certified if the plaintiffs fail to present a damages model applicable to individual class members on a class-wide basis or through a simple computation. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013).[49] In the *Rail Freight* case, the plaintiffs alleged a price fixing conspiracy. The D.C. Circuit found problems with plaintiffs' expert's models and held that, after *Comcast*, "[i]f the damages model cannot withstand . . . scrutiny then, that is not just a merits issue. [Plaintiffs' expert's] models are essential to the plaintiffs' claim they can offer common evidence of class-wide injury. No damages model, no

---

[48] *See also, Bayshore Ford Truck v. Ford Motor Co.*, Case No. 99-741 (JLL), 2010 U.S. Dist. LEXIS 7454 (D.N.J. Jan. 29, 2010) (decertifying damages class, because "a common class-wide method may not be used to short cut the requirement of individual damage proof" and finding that plaintiffs' expert's "methodology, which expressly begins with a national aggregate damage estimate and only uses individual dealer data as a tool to allocate the national number, is not an appropriate common method for the individual damage calculations in this case").

[49] The availability of an acceptable method to "readily determine[]" damages in individualized hearings also distinguishes this case from *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013), in which the damage would be either the replacement of the washing machine or the previously incurred cost to repair. Moreover, the *Butler* court specifically distinguished that case from *Comcast* because in *Butler*—unlike here—"there is no possibility … that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis." *Id.* at 800. The other cases relied on by Plaintiffs are to similar effect. For example, *In re Electronic Books Antitrust Litigation*, Case No. 11 MD 2293 (DLC), 2014 U.S. Dist. LEXIS 42537 (S.D.N.Y. Mar. 28, 2014), cited by Plaintiffs (Mot. at 49), involved an expert report that used a "damages model [that] produces individualized damage estimates based on individual transaction records," and it involved a uniform price paid by all purchasers for e-books, which the court noted "were not purchased by a consumer haggling over a price in a bookstall on a street corner." 2014 U.S. Dist. LEXIS 42537 at *43-44.

predominance, no class certification." *Id.* at 253 (internal citations omitted). Other courts, both before and after *Comcast*, have recognized that the failure of plaintiffs to offer a workable method to calculate and address individual damages is fatal to their efforts to certify a class.[50]

Plaintiffs point to the Seventh Circuit's decision in *Messner* as support for their assertion that they do not need to meet any standard with respect to damages. Mot. at 49 (citing *Messner*, 669 F.3d at 815). However, *Messner* does not carve damages entirely out of the predominance requirement. The court in *Messner* simply approved a proposed methodology that was common for all class members and could be used to show individual damages. *Id.* at 818-19.[51] Here, unlike in *Messner*, Plaintiffs offer no such common methodology that, by refinement, could actually show individual damages. To the extent that Plaintiffs suggest that the need to address individual damages can never defeat predominance in the Seventh Circuit, that is not the holding of any Seventh Circuit decision, and, if it were, it would be at odds with the Supreme Court's *Comcast* decision.

Dwyer's 

. Ex. 3 (Dwyer Dep.) at ████.

In fact, he agreed that:

---

[50] *See, e.g.*, *McLaughlin*, 522 F.3d at 232 (refusing to certify in part because of individualized issues relating to damages and noting that "fluid recovery [may not be used] to mask the prevalence of individual issues" and expressing due process concerns); *Rodney v. Northwest Airlines, Inc.*, 146 F. App'x 783 (6th Cir. 2005) (pre-*Comcast*, holding class could not be certified, because plaintiffs had not offered formula to calculate damages); *Roach v. T.L. Cannon Corp.*, No. 3:10-CV-0591 (TJM/DEP), 2013 WL 1316452, at *3 (N.D.N.Y. Mar. 29, 2013) (applying *Comcast* and holding that plaintiffs failed to meet burden by not providing a workable damages model at the class certification stage).

[51] In *Messner*, based on a methodology that could be applied to individual plaintiffs, the court noted that the need to determine individual damages is often not an obstacle to class certification. The court did cite authority from another circuit, however, noting that there may be cases where "individual issues of damages [would] be so complex as to defeat class certification." *Messner*, 669 F.3d at 815 (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004)). This is such a case.



- ████████████████████████████████████████████ Ex. 3 (Dwyer Dep.) at ██████.

- ██████ *Id.* at ██████████.

- ████████████████████████████████████████ *Id.* at ██████████.

Thus, Dwyer's ████████████████████████████████. Given the ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, Dwyer's work ████████████████████████████. But that is precisely Plaintiffs' burden.

## IV. REGARDLESS OF PLAINTIFFS' ARGUMENTS RELATING TO CONTAINERBOARD, PLAINTIFFS HAVE FAILED TO SHOW COMMON IMPACT AND DAMAGES FOR CORRUGATED PRODUCTS.

The class Plaintiffs seek to certify includes not only purchasers of containerboard, but also purchasers of the many different Corrugated Products made from containerboard. However, Plaintiffs do none of the required separate analyses of Corrugated Products, drastically multiplying the already-fatal flaws in their arguments for class certification.

Plaintiffs do not assert that the alleged conspiracy directly restricted the supply or raised the price of Corrugated Products. Rather, Plaintiffs claim that Defendants' alleged restriction of containerboard supply *indirectly* raised the price of Corrugated Products because containerboard is one of the primary materials from which Corrugated Products are made.[52] But Plaintiffs do

---

[52] Many Corrugated Products purchasers are indirect purchasers for whom no federal antitrust damages claim could ordinarily be brought. Plaintiffs attempted to sidestep that bar by pursuing only the claims of buyers who bought Corrugated Products from the vertically integrated defendants, arbitrarily abandoning

nothing to account for the fact that "Corrugated Products" encompasses a wide range of distinct products with different customers, components, characteristics and end uses. Their assertion that reducing the supply of containerboard automatically raises the price of Corrugated Products would be insufficient to carry Plaintiffs' burden, even if it were correct. In fact, containerboard and Corrugated Products purchasers present drastically different conditions and require different class certification analyses, which Plaintiffs do not even try to perform.

### A. Corrugated Products Purchasers Cannot Be Combined in a Single Class with Containerboard Purchasers, Nor Can They Be Certified as a Class Based only on Plaintiffs' Analysis of Containerboard Markets.

As discussed above, *supra* Argument Part II.E.1, and based upon their approach here, Plaintiffs must define the relevant product and geographic markets before the Court can certify a class. This requires determining which products are substitutes (product market), and from what places those substitute products can be obtained (geographic market).[53] *See, e.g.*, Ex. 35 (Merger Guidelines) § 4 ("Market definition focuses solely on demand substitution factors, *i.e.*, on customers' ability and willingness to substitute away from one product to another . . .").

Plaintiffs' experts failed to do so for any of the products at issue. *See supra at* Introduction Part B.3. Indeed, with respect to Corrugated Products, Plaintiffs' experts admit ▮



Dwyer ▮ Ex. 3 (Dwyer Dep.) at ▮. ▮. As Harris conceded,

▮[54] Ex. 2 (Harris Dep.) at ▮

---

any claims (now time-barred) that could have been brought for any purchases of Corrugated Products from non-integrated producers.
[53] *See also* cases cited at 42-44.
[54] In Harris's deposition, ▮ Ex. 2 (Harris Dep.) at ▮.

█████████████████████████████

████████. Harris ██████████████████████

██████████████████████████████

███████████████████████████████, (*see id.* at ██████████); ███████████████

██████████████████████████████

██████████████████████████████

(*see id.* at ██████████████████████████████████

██████████████████████████); or █████████████

██████████████████████████████

████████████████████████.[55]

As discussed above, Harris's ██████████████████████

██████████████████████████████

████████████ (*id.* at ████████████████████

████████████████)), ████████████████████████. Ex. 2

(Harris Dep.) at ████████.[56] When pressed, Harris admitted that ████████████████

██████████████████████████████

████████████████████████████ *Id.* at ████████████.

───────────────────

[55] *See* Ex. 2 (Harris Dep.) at ████████████████████████████████████████████████████████████████████████ In fact, some Corrugated Products face significant substitutes.

[56] Harris attempted to explain by stating that ████████████████████ *See* Ex. 2 (Harris Dep.) at ██████. Yet Harris ████████████████████████████████████████████████████████ (*id.* at ████████████), ████████████. *See id.* at ████████████

59

Harris also █████████████████████████████████████████████████
████████████████████████████████████████. *See supra* at Background Part I.B.
Yet Harris ████████████████████████████████. *See* Ex. 2 (Harris Dep.) at ███████████████
████████████████████. Nor did Harris █████████████████████████████████████████
████████████████████████████████████████████████████████████
*See supra* at Background Part I.B. And, ██████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████ Ex. 2 (Harris Dep.) at ███████████████
███████████████████; Ex. 3 (Dwyer Dep.) at █████████.

Plaintiffs' motives for bypassing the market definition requirement are obvious. Were Plaintiffs to admit that there are many relevant product and geographic markets for Corrugated Products, it would be fatal to their attempt to certify a class. The record evidence here establishes that ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████. *See* Carlton Rep. ████████████. A manufacturer of high-graphic display bins in Chicago does not compete with a manufacturer of waxed produce boxes in Fresno. Competition in Fresno for produce containers could be robust enough to avoid any effect from the alleged conspiracy, regardless of any alleged effects on high-graphic display bins in Chicago.

Moreover, the ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
*See* Ordover Rep. ████. For example, customers that buy boxes to ship produce sometimes lock

60

in price for a season, preventing subsequent price increases from impacting the produce customer. ███████████████████████████████████████████████

██████████████████████████████████████████████ Ex. 2 (Harris Dep.) at

███████████████████████████████████████████████████████████████████████

████████████████████). These varying issues with Corrugated Products create differing markets and competitive conditions that preclude class certification.

**B.      Plaintiffs' Generalized Arguments Do Not Overcome This Failure**

Contrary to Plaintiffs' claims, ████████████████████████████████████

██████████████████████████ Mot. at 3.  Indeed, ███████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████ *See id.* at Ex. 37 at 863-68.  This is because where, as here, ████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████. *See* Carlton Rep. █████. The ███████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████ *Id.* █████.

Even Harris concedes that █████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████. Ex. 2 (Harris Dep.) at █████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

61

[REDACTED]

[REDACTED] [57]

Likewise, Dwyer's [REDACTED]

[REDACTED]. Merely observing that [REDACTED]

[REDACTED]

[REDACTED]. Class

certification would require empirical evidence—an analysis of competitive conditions in the

wide range of Corrugated Products markets or of pass-through in such markets. But Dwyer's

[REDACTED].

Dwyer's [REDACTED]. Dwyer's [REDACTED]

[REDACTED]

[REDACTED]. Moreover, as discussed above, if Dwyer's [REDACTED]

[REDACTED]

[REDACTED]. And even running the model [REDACTED]

[REDACTED]

[REDACTED]. Thus, Plaintiffs do not have a reliable model to show damages to these customers. *See*

*Rail Freight*, 725 F.3d at 253 ("No damages model, no predominance, no class certification.").

---

[57] Plaintiffs will likely reply that Dr. Harris [REDACTED]
[REDACTED] *See* Ex. 2 (Harris Dep.) at [REDACTED]
However, Dr. Harris admitted that [REDACTED]

[REDACTED] *See id.* at 58:5-22 [REDACTED]

[REDACTED]

In short, Plaintiffs have completely failed to meet any of the elements—defining markets, showing common impact and showing common evidence of damages—required to include Corrugated Products customers in any class.

## V. THE CLASS IS NOT MANAGEABLE OR SUPERIOR BECAUSE OF INDIVIDUAL ISSUES PRESENTED BY RELEASES AND DISQUALIFYING CONTRACTUAL PROVISIONS.

This Court "has discretion to evaluate practical considerations that may make class treatment unwieldy despite the apparently common issues." *IKO Roofing*, 757 F.3d at 603; *see also Parko,* 739 F.3d at 1085 ("[p]redominance is a qualitative rather than a quantitative concept"). Here, two practical considerations reveal that a class is not manageable or superior to individual trials and that individualized issues would predominate over common ones. First, thousands of putative class members entered into releases that bar them from presenting evidence against various Defendants during the class period, presenting individualized evidentiary issues that would preclude a common trial. Second, thousands of putative class members bought pursuant to provisions—███████████████████—that disqualify or limit their ability to participate in this case, again presenting thousands of individualized inquiries.[58]

### A. There Are Overwhelming Individualized Issues Related to Releases.

Thousands of putative class members already released portions of their claims against many of the Defendants. Those Defendants were sued in a prior antitrust class action in the containerboard industry, *In re Linerboard Antitrust Litigation*, MDL 1261 (E.D. Pa. 2000) ("*Linerboard*"), which spanned from 1998 through 2008. While the *Linerboard* class settled in 2003, thousands of those class members—consisting of some of the largest companies in the

---

[58] Plaintiffs cite to *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) as support for superiority, but unlike here, these practical concerns were not an issue and it was a consumer case with very small claims for each class member.

world ██████████████████████████████████—opted out of the class and filed

separate antitrust suits against International Paper, Smurfit-Stone Container Corporation,

Georgia Pacific, Temple-Inland and Weyerhaeuser (collectively, the "Released Defendants").

Ultimately, the thousands of opt-out plaintiffs settled their claims (the "Releasor

Plaintiffs") and ████████████████████████████████. ███████████

████████████████████████████ They ████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████ ████[59]  As the chart below shows, dozens of these settlement

agreements exist, and they affect the claims of potentially thousands of putative class members

in this case.

| Total Number of Settlements At Varying Dates | 39 |
|---|---|
| Total Number of Claims Released By Releasor Plaintiffs At Varying Dates | 9653 |

*See* Ex. 39 (Settlement Summary Chart).

These varying releases create untold individual issues that will predominate over any

common issues in this action. The reason for this is plain—Releasor Plaintiffs cannot use pre-

release conduct to establish liability against the Released Defendants. *See, e.g.*, *In re Prudential

Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 367 (3d Cir. 2001) (precluding "class

members from relying upon the common nucleus of operative facts underlying claims on the

---

[59] Specifically, a typical settlement in *Linerboard* █████████████ :

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████ █

Ex. 38 at ████████ (emphasis added).

PUBLIC – REDACTED VERSION

Class Policies to fashion a separate remedy against Prudential outside the confines of the Released Claims" in prior class action settlement); *Dahl v. Bain Capital Partners, LLC*, 878 F. Supp. 2d 298, 299 (D. Mass. July 18, 2012) (holding, in antitrust conspiracy case, that transactions subject to settlement releases are only admissible "*as they relate to the non-released Defendants*") (emphasis added); *Hatchett v. Shinseki*, 957 F. Supp. 2d 960 (S.D. Ind. July 15, 2013) (finding that broad release language in settlement agreement precluded court from considering conduct prior to release date in deciding later lawsuit).

For example, in *In re Prudential Insurance*, the Third Circuit upheld an order enjoining plaintiffs (former class members) from "pursuing discovery, presenting evidence or undertaking any other action in furtherance" of claims that were based on facts and circumstances underlying a prior class action that was settled and subject to a release. 261 F.3d at 363. Although plaintiffs agreed that they would not seek damages based on the discovery, the court concluded that plaintiffs could not rely upon the facts underlying settled and released claims "to fashion a separate remedy against Prudential outside the confines of the Released Claims." *Id.* at 363; *see also In re the Prudential Ins. Co. of Am. Sales Practices Litig.*, No. Civ. 95-4704 (DRD), 2006 WL 1479024, at *5 (D.N.J. May 26, 2006), *aff'd*, 232 F. App'x 161, 167 (3d Cir. 2007) ("[T]his is precisely the kind of conduct that the class action settlement prevents class members from using. To permit such discovery and the use of such evidence would go far to deprive the class action defendants of the benefits for which they bargained when agreeing to the settlement.").

Similarly, ██████████████████████████████, each Releasor Plaintiff here has ████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████. Permitting the Releasor Plaintiffs in this case to use evidence relating to the released

conduct would "deprive the class action defendants of the benefits for which they bargained when agreeing to the settlement." *Id.* Hence, each of the thousands of Releasor Plaintiffs will have different claims, covering different time periods, based on different evidence, against different Defendants in this case.

The chart below presents just one sample settlement agreement for each Released Defendant and illustrates only a fraction of the complexities created by the releases.



*See* Ex. 39 (Settlement Summary Chart).

Numerous trial complexities would follow from this cluster of settlements alone.

████████████████████████████████████████████████████████.  *See In re*

*Prudential Ins.*, 261 F.3d at 367.  Endless permutations of this same problem will exist with the

dozens of other settlements and thousands of Releasor Plaintiffs.

Indeed, based on the dozens of other settlements at varying times with different plaintiffs

and Defendants, there will be hundreds, if not thousands, of individual issues to consider,

including:  whether a particular class member granted an applicable release; the effective date of

the releases; the Defendants to which the releases apply; the class periods applicable to each of

the covered class members; the time period to which the release applies; the evidence that can

and cannot can be used by the thousands of individual Releasor Plaintiffs against individual

Defendants; and how (and whether) the various permutations of evidence admissible against

certain Defendants—but not others—would be admissible in a trial.  This quagmire causes

individual issues to overwhelm and predominate over common issues.  *Kottaras v. Whole Foods

Market*, *Inc*., 281 F.R.D. 16, 22 (D.D.C. Jan. 30, 2012) ("Evidence is considered 'common' to

the class if the same evidence can be used to prove an element of the cause of action for each

member.  If, however, members of the proposed class would need to present evidence that varies

from person to person, the matter to be proved is considered an individual question.") (internal

citation omitted); *see also Bell Atl. Corp. v. AT&T Corp*., 339 F.3d 294, 302 (5th Cir. 2003)

(holding that, "where fact of damage cannot be established for every class member through proof

common to the class, the need to establish antitrust liability for individual class members defeats

Rule 23(b)(3) predominance").

In addition, the varying combinations of releases binding on different class members

would make a common trial unmanageable.  *See* Fed. R. Civ. P. 23(b)(3)(D) (stating that "the

likely difficulties in managing a class action" are pertinent to predominance inquiry).   Limiting

PUBLIC – REDACTED VERSION

instructions would be required for innumerable pieces of evidence to direct the jury as to the particular class members and the particular Defendants for which the evidence may be considered. But such limiting instructions would result in juror confusion, as jurors would attempt to separately assess many different combinations of evidence relating to each class member's claim against each Defendant, which would undoubtedly result in unfair prejudice to the Defendants. The risks of juror confusion and prejudice are particularly significant where different plaintiffs require different evidentiary records. *See Johnson v. Advanced Bionics, LLC*, No. 2:08-cv-02376-JPM, 2011 WL 1323883, at *5 (W.D. Tenn. Apr. 4, 2011) (where "a substantial amount of evidence admissible in [one plaintiff's] case will be inadmissible in the [other plaintiff's] case," a "cumulative presentation of the evidence would risk that the jury would 'resolve the confusion by considering all the testimony to pertain to all the claims, despite any limiting instructions'") (quoting *Henderson v. AT&T Corp.*, 918 F.Supp. 1059, 1063 (S.D. Tex.1996) (internal citations omitted).[60] As a result, class treatment should be denied. *See Robinson v. Texas Automobile Dealers Ass'n*, 387 F.3d 416, 426 (5th Cir. 2004) (reversing certification of antitrust class action for manageability reasons, explaining that "the parties have an interest in ensuring that the jurors will have a reasonable chance of remembering which party presented which evidence").

### B. Individualized Issues Related To Disqualifying Clauses In Contracts And Terms And Conditions For Sale.

Numerous putative class members purchased containerboard and packaging products pursuant to clauses that foreclose or limit their ability to proceed in this case (the "disqualifying clauses"). These disqualifying clauses include:

---

[60] *See also Disparte v. Corporate Exec. Bd.*, 223 F.R.D. 7, 15 (D.D.C. Aug. 13, 2004) (allowing joint plaintiffs to pursue their claims at joint trial "would prejudice the defendant because there is a significant likelihood that a single jury would be confused by the different items of evidence and different witnesses' testimony").



- ███████████. *See In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 863 (D. Md. Aug. 26, 2013) (upholding arbitration clauses and excluding class members that purchased pursuant to an arbitration clause); *In re Polyurethane Foam Antitrust Litig.*, Case No. 1:10 MD 2196 (N.D. Ohio Aug. 12, 2014) (Ex. 40) (upholding arbitration clauses and enforcing them).

- ███████████. *See Titanium Dioxide*, 962 F. Supp. 2d at 858-59 (upholding forum selection clauses and excluding class members that purchased pursuant to a forum selection clause); *Wu v. Pearson Educ., Inc.*, 277 F.R.D. 255, 265 (S.D.N.Y. Sept. 30, 2011) (forum selection clauses do not "lose their force in the context of a class action").

- ███████████. *See Titanium Dioxide*, 962 F. Supp. 2d at 859-60 (upholding jury waivers and excluding class members that purchased pursuant to jury waivers); *see also IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union*, 512 F.3d 989, 992 (7th Cir. 2008) (holding jury waiver enforceable).

- ███████████████████████ *See, e.g., Stephan v. Goldinger*, 325 F.3d 874, 876-77 (7th Cir. 2003) (holding a limitations period in a statute can be modified by contract).

- ███████████████████████[62] *See Metro E. Ctr. for Conditioning & Health v. Qwest Commc'ns. Int'l, Inc.*, 294 F.3d 924, 928 (7th Cir. 2002) (holding, "[a]s far as we know, the Supreme Court has never held that *any* entitlement is outside the domain of contract, unless the statute forbids waiver") (emphasis in original).

The existence, applicability and enforceability of these disqualifying clauses will raise thousands of individual issues that would predominate over common issues, rendering a class unmanageable and inferior to individual proceedings. For this reason alone, the court should deny class certification. *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir.

---

[61] The Clayton Act imposes a four-year limitations period. 15 U.S.C. § 15b. The contractual clauses at issue ████████████████. *See, e.g.*, Ex. 41 at ██████████████████████████████████████

[62] The Clayton Act allows for treble damages. 15 U.S.C. § 15a. The contractual clauses at issue ████████████. *See, e.g.*, Ex. 42 at ██████████████████████████████████

2007) (affirming district court's conclusion that "predominance was defeated because AWS's intent to seek arbitration of the class would necessitate a state-by-state review of contract conscionability jurisprudence"). At the least, the Court should exclude from any class those customers that purchased pursuant to a disqualifying clause. *See Titanium Dioxide*, 962 F. Supp. 2d at 863 (excluding from class definition customers that purchased pursuant to an arbitration clause, forum selection clause, jury waiver or class action waiver).

Throughout the almost seven-year class period, thousands of putative class members purchased pursuant to disqualifying clauses. These disqualifying clauses were included in written contracts between various Defendants and putative class members. Exhibit 46 identifies those putative class members that, based on the evidence gathered to date, purchased pursuant to a contract with a Defendant that contains a disqualifying clause.



In addition, from at least July 19, 2006 through the end of the class period, ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ *See* Ex. 43

(Ragsdale Decl.) ███ Similarly, from at least ███████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.* ¶ 12.

Lists of customers that purchased pursuant ███████████████████████ can be

found at Exhibit 44 (Neumann Decl.) ████████ [63]

---

[63] To develop the list of customers ████████████████████████

█████████████████████████████████████████████ *See* Ex. 44 (Neumann Decl.)

█████ ; *see also* Ex. 43 (Ragsdale Decl.) ████████████████ ; Ex. 45 (McLemore Decl.) ████████████

████████████████. Courts routinely hold that this "list form" of evidence is sufficient to demonstrate the customers that bought pursuant to a particular contractual provision. *See, e.g.*, *DuFour v. BE LLC*, No. C 09-03770 LB, 2011 U.S. Dist. LEXIS 89046 at *3 (N.D. Cal. Aug. 10, 2011) (allowing

Numerous individualized issues likely will arise as a result of challenges to the enforceability or applicability of these disqualifying clauses. For example, some of the contracts with disqualifying clauses are not signed by one or all parties. *See* Ex. 46 ███████ ███████████████████████████████████████. In prior cases, class plaintiffs have attempted to challenge the enforceability of unsigned agreements to arbitrate, albeit without success. *See Titanium Dioxide*, 962 F. Supp. 2d at 855 (rejecting argument that agreements to arbitrate between class members and defendants were unenforceable because they were unsigned); *see also Tinder v. Pinkerton Sec.*, 305 F.3d 728, 736 (7th Cir. 2002) (arbitration agreements must be written but not signed). In addition, class plaintiffs have challenged the enforceability of specific disqualifying clauses. *See, e.g., Lozano*, 504 F.3d at 728 (explaining the analysis of whether waiver was unconscionable varied across states, presenting individualized issues). These challenges to enforceability would raise issues under the myriad of state laws governing the purchases within the class, further complicating and multiplying the required inquiries.[64]

Class members also inevitably will challenge the applicability of certain disqualifying clauses to this case. As Exhibit 46 reflects, there are dozens of varying versions of the disqualifying clauses. Class members likely will challenge application of some of these clauses to the antitrust claims at issue based on particular language. *See, e.g., In re Polyurethane Foam Antitrust Litig.*, Case No. 1:10 MD 2196, 2014 U.S. Dist. LEXIS 26191 at **32-41 (N.D. Ohio Feb. 25, 2014) (rejecting argument that arbitration clause's language did not apply).

---

defendant to identify customers that purchased pursuant to arbitration clauses in "list form" and rejecting that the defendant had "to produce the actual contracts and records" for its customers).

[64] The ███████████████████████████████. *See, e.g.,* Ex. 47 at ███



; Ex. 49 at ███████; Ex. 48 at █████████; Ex. 50 at ██████); Ex. 51 at ██████████); Ex. 52 at ████); ██████).

This case thus presents "precisely the type of class-member-by-class-member and contract-by-contract inquiry" that courts have held defeat predominance and render a case unmanageable. *Titanium Dioxide*, 962 F. Supp. 2d at 862 (citing *Lozano*, 504 F.3d at 728). Here, the multitude of individualized issues (under the laws of multiple states) presented by the disqualifying clauses—particularly when combined with the other manageability challenges in this case—render the class action mechanism inefficient.[65]

At the very least, if the Court certifies a class, it should exclude from the class definition putative class members that bought pursuant to one of the disqualifying clauses, as the court recently did in *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840 (D. Md. Aug. 26, 2013). There, the court—facing a multitude of class members that had purchased pursuant to arbitration clauses, forum selection clauses, jury waivers and class action waivers—held that "individual questions of law and fact as to the enforcement of provisions of class members' contracts predominate over any common issues." *Id.* at 862. As a result, the court excluded from the class definition all class members that made *one* purchase pursuant to *one* of these disqualifying clauses from *any* defendant during the class period. *Id.*

## CONCLUSION

For all of the reasons stated above, Plaintiffs' Motion for Class Certification should be denied.

---

[65] The Court cannot simply punt this question until a later stage. *Cf. Coleman v. General Motors Acceptance Corp.*, 220 F.R.D. 64, 91 (M.D. Tenn. Jan. 14, 2004) (proposing to address customers that purchased pursuant to an arbitration agreement at "a later juncture" after the class is certified). As the Seventh Circuit explained, district courts must consider the "efficiency of a class action as an alternative to individual suits" *before certifying a class*. *Parko*, 739 F.3d at 1085; *see also Lozano*, 504 F.3d at 728 (holding that the district court correctly considered the potential impact from defendants' intent to enforce arbitration clauses in rejecting class certification); *Vulcan Golf, LLC v. Google, Inc.*, 254 F.R.D. 521, 531 (N.D. Ill. Dec. 18, 2008) ("The existence of affirmative defenses which require individual resolution can be considered as part of the court's analysis to determine whether individual issues predominate under Rule 23(b)(3).").

Dated:  September 22, 2014

Respectfully submitted,

/s/ *James T. McKeown*

Nathan P. Eimer
Susan M. Razzano
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604-2516
Telephone: (312) 660-7600
Facsimile: (312) 698-1718
neimer@eimerstahl.com
srazzano@eimerstahl.com

James T. McKeown
Brett H. Ludwig
Trent M. Johnson
FOLEY & LARDNER LLP
777 East Wisconsin Ave.
Milwaukee, WI 53202
Telephone: (414) 271-2400
Facsimile: (414) 297-4900
jmckeown@foley.com
bludwig@foley.com
tjohnston@foley.com

Michael D. Leffel
FOLEY & LARDNER LLP
150 East Gilman St., Ste. 5000
Madison, WI 53703
Telephone: (608) 258-4216
Facsimile: (608) 258-4258
mleffel@foley.com

Joanne Lee
FOLEY & LARDNER LLP
321 N. Clark. St., Ste. 2800
Chicago, IL 60654
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
jlee@foley.com

*Counsel for International Paper Company*

/s/ *Andrew S. Marovitz*

Andrew S. Marovitz
Britt M. Miller
Matthew D. Provance
Joshua A. Faucette
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
Telephone:  (312) 782-0600
Facsimile:  (312) 701-7711
amarovitz@mayerbrown.com
bmiller@mayerbrown.com
mprovance@mayerbrown.com
jfaucette@mayerbrown.com

*Counsel for Temple-Inland Inc.*

/s/ *Scott M. Mendel*

Scott M. Mendel
John E. Susoreny
Lauren N. Norris
K&L GATES LLP
70 West Madison, Suite 3100
Chicago, Illinois 60602
Telephone: (312) 807-4252
Facsimile: (312) 827-8131
scott.mendel@klgates.com
john.susoreny@klgates.com
lauren.norris@klgates.com

*Attorneys for Cascades Canada ULC and Norampac Holdings U.S. Inc.*

/s/ *D. Bruce Hoffman*
D. Bruce Hoffman
Ryan A. Shores
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, NW
Washington DC 20037-1701
Tel: (202) 955-1500
Fax: (202) 778-2201
bhoffman@hunton.com
rshores@hunton.com

James R. Figliulo
FIGLIULO & SILVERMAN, P.C.
10 South LaSalle Street, Suite 3600
Chicago, Illinois 60603
Tel.: (312) 251-4600
Fax: (312) 251-4610
jfigliulo@fslegal.com

*Attorneys for Georgia-Pacific LLC*

/s/ *Matthias A. Lydon*
Matthias A. Lydon
James F. Herbison
Michael P. Mayer
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700
mlydon@winston.com
mmayer@winston.com
jherbison@winston.com

*Attorneys for RockTenn CP, LLC*

/s/ *David Marx, Jr.*
David Marx, Jr.
Stephen Y. Wu
Michelle S. Lowery
227 W. Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
dmarx@mwe.com
swu@mwe.com
mslowery@mwe.com

Megan Morley
500 North Capitol Street, NW
Washington, DC 20001
Telephone: (202) 756-8000
Facsimile: (202) 756-8087
mmorley@mwe.com

*Counsel for Weyerhaeuser Company*

74

## CERTIFICATE OF SERVICE

I, Andrew S. Marovitz, an attorney, hereby certify that on September 29, 2014, I caused a true and correct copy of the foregoing **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [CORRECTED] – PUBLIC VERSION**, to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Andrew S. Marovitz*

Andrew S. Marovitz
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 701-7711 – Facsimile
amarovitz@mayerbrown.com