**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KLEEN PRODUCTS LLC, *et al*., individually and on behalf of all those similarly situated, | Case No. 1:10-cv-05711 |
| Plaintiffs, | |
| v. | Hon. Harry D. Leinenweber |
| INTERNATIONAL PAPER CO., *et al*., | |
| Defendants. | **FILED UNDER SEAL** |
| | *PUBLIC REDACTED VERSION* |

**PLAINTIFFS' [CORRECTED] MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## Table of Contents

I.     INTRODUCTION ................................................................................................... 1

II.    BACKGROUND ..................................................................................................... 5

  A.   The Alleged Conspiracy............................................................................... 5

  B.   Factual Background....................................................................................... 6

    1.  Containerboard Products Industry........................................................... 6

    2.  Market Structure..................................................................................... 7

III.   LEGAL STANDARD............................................................................................ 11

IV.   ARGUMENT ....................................................................................................... 12

  A.   Case Law Supports Denying Summary Judgment......................................... 19

  B.   A Reasonable Jury Could Infer That Defendants Engaged in a Conspiracy to Raise Prices…………………………………………………………………………………………………23

    1.  Market Structure is Conducive to Conspiracy .......................................... 23

    2.  Defendants Had Motive to Conspire ........................................................ 26

    3.  Plaintiffs' Traditional Conspiracy Evidence Demonstrates a Conscious Commitment to a Common Scheme ................................................................................... 33

      a)  Defendants Battle Cries ........................................................... 35

      b)  Battle Cries Begat Lock-Step Price Increases ........................... 37

      c)  Defendants Restricted Supply to Facilitate Price Increases ....................................... 45

      d)  Direct Communications............................................................. 61

      e)  Conduit Evidence .................................................................... 73

      f)  Other Signaling Evidence......................................................... 77

    4.  Defendants Engaged In Conduct Against Self-Interest................................. 80

V.    CONCLUSION..................................................................................................... 85

**Table of Authorities**

**Cases**

*Alexander v. Phoenix Bond & Indem. Co.*
   149 F. Supp. 2d 989 (N.D. Ill. 2001) .................................................................. 13, 16, 17, 34

*Am. Needle, Inc. v. NFL*
   560 U.S. 183 (2010) ........................................................................................................ 24

*American Tobacco Co. v. United States*
   328 U.S. 781 (1946) ........................................................................................................ 17

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) .................................................................................................. 11, 12

*Apex Oil v. Di Mauro*
   822 F.2d 246 (2d Cir. 1987) ............................................................................................ 85

*Cont'l. Ore Co. v. Union Carbide & Carbon Corp.*
   370 U.S. 690 (1962) .................................................................................................. 13, 16

*Eastman Kodak Co. v. Image Technical Services, Inc.*
   504 U.S. 451 (1992) ............................................................................................... 3, 14, 15

*Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*
   172 F. Supp. 2d 1060, 1073 (S.D. Ind. 2001) ................................................................. 17

*Fragle & Sons Beverage Co. v. Dill*
   760 F.2d 469 (3rd Cir. 1985) .......................................................................................... 17

*In re Brand Name Prescription Drug Antitrust Litig.*
   No. 94 C 897, 1996 U.S. Dist. LEXIS 4335 (N.D. Ill. Apr. 4, 1996) .......................... passim

*In re Brand Name Prescription Drugs Antitrust Litig.*
   123 F.3d 599 (7th Cir. 1997) .......................................................................................... 16

*In re Brand Name Prescription Drugs Antitrust Litig.*
   186 F.3d 781 (7th Cir. 1999) .......................................................................................... 18

*In re Chocolate Confectionary Antitrust Litig.*
   999 F. Supp. 2d 777 (M.D. Pa. 2014) ............................................................................. 39

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*
   906 F.3d 432 (9th Cir. 1990) ............................................................................. 15, 22, 46, 54

*In re Corrugated Container Antitrust Litig.*
   556 F. Supp. 1117 (S.D. Tex. 1982) ............................................................................... 26

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*
   801 F.3d 762 (7th Cir. 2015) .......................................................................................... 35

*In re Drywall Antitrust Litig.*
   163 F. Supp. 3d 175 (E.D. Pa. 2016) ......................................................................... passim

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*
681 F. Supp. 2d 141 (D. Conn. 2009) ................................................................. 37

*In re Flat Glass Antitrust Litig.*
385 F.3d 350 (3d Cir. 2004) ...................................................................... passim

*In re Folding Carton Antitrust Litig.*
75 F.R.D. 727 (N.D. Ill. 1977), 557 F. Supp. 1091 (N.D. Ill. 1983), 687 F. Supp. 1223 (N.D. Ill. 1988) ........................................................................................................ 26

*In re High Fructose Corn Syrup Antitrust Litig.*
295 F. 3d 651 (7th Cir. 2002) ..................................................................... passim

*In re Indus. Diamonds Antitrust Litig.*
167 F.R.D. 374 (S.D.N.Y. 1996) ...................................................................... 18

*In re Linerboard Antitrust Litig.*
305 F.3d 145 (3rd Cir. 2002) ............................................................................. 5

*In re Linerboard Antitrust Litig.*
321 F. Supp. 2d 619 (E.D. Pa. 2004) .............................................................. 27

*In re Linerboard Antitrust Litig.*
MDL1261, 2008 U.S. Dist. LEXIS 7739 (E.D. Pa. Oct. 3, 2008) ............................ 5

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*
764 F. Supp. 2d 991 (N.D. Ill. 2011) ........................................................... 46, 54

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*
No. 09 C 7666, 2011 WL 462648 (N.D. Ill. Feb. 9 2011) ..................................... 52

*In re Polyurethane Foam Antitrust Litig.*
152 F. Supp. 3d 968 (N.D. Oh. Feb. 9, 2015) ................................................... 43

*In re Publ'n Paper Antitrust Litig.*
690 F.3d 51 (2d Cir. 2012) ........................................................................ 16, 61

*In re Sulfuric Acid Antitrust Litig.*
743 F. Supp. 2d 827 (N.D. Ill. 2010) ....................................................... 11, 12, 15

*In re Text Messaging Antitrust Litig.*
782 F.3d 867 (7th Cir. 2015) ...................................................................... passim

*In re Titanium Dioxide Antitrust Litig.*
959 F. Supp. 2d 799 (D. Md. 2013) ............................................................. passim

*In re Urethane Antitrust Litig.*
768 F.3d 1245 (10th Cir. 2014) ........................................................................ 18

*In re Urethane Antitrust Litig., (Urethane II)*
251 F.R.D. 629 (D. Kan. 2008) ........................................................................ 18

*In the Matter of Stone Container Corp.*
FTC File No. 9510006 ................................................................................. 5, 28

*Interstate Circuit, Inc. v. United States*
306 U.S. 208 (1939) ....................................................................................... 17, 84

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*
190 F.3d 775 (7th Cir. 1999) ................................................................................. 16

*Keach v. United States Trust Co., N.A.*
256 F. Supp. 2d 843 (C.D. Ill. 2003) ...................................................................... 12

*Kleen Prods. LLC v. Int'l Paper*
306 F.R.D. 585 (N.D. Ill. 2015) ..................................................................... passim

*Kleen Prods. LLC v. Int'l. Paper Co.*
831 F.3d 919 (7th Cir. 2016) ......................................................................... passim

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*
*475 U.S. 574 (1986)* ...................................................................................... 13, 14

*McCann v. Iroquois Mem. Hosp.*
622 F.3d 745 (7th Cir. 2010) ................................................................................. 12

*Minpeco S.A. v. Conticommodity Services, Inc.*
673 F. Supp. 684 (S.D.N.Y. 1987) ......................................................................... 85

*Monsanto v. Spray-Rite Service Corp.*
465 U.S. 752 (1984) ............................................................................... 15, 17, 54

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*
198 F.3d 823 (11th Cir. 1999) ......................................................................... 18, 59

*Nat'l. Athletic Sportswear, Inc. v. Westfield Ins. Co.*
528 F.3d 508 (7th Cir. 2008) ................................................................................. 12

*Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*
998 F.2d 1224 (3d Cir. 1993) ................................................................................. 16

*Poller v. Columbia Broadcasting Sys.*
368 U.S. 464 (1962) .............................................................................................. 12

*Products Liab. Ins. Agency v. Crum & Forster Ins. Companies*
682 F.2d 660 (7th Cir. 1982) ................................................................................. 85

*Toys "R" Us, Inc. v. Federal Trade Commission*
221 F.3d 928 (7th Cir. 2000) ................................................................................. 16

*United States v. Apple, Inc.*
791 F.3d 290 (2d Cir. 2015) ................................................................................. 16

*United States v. Consol. Packaging Corp.*
575 F.2d 117 (7th Cir. 1978) ................................................................................. 52

*United States v. Container Corp. of Am.*
393 U.S. 333 (1969) .............................................................................. 17, 26, 27, 42

*United States v. Hayter Oil Co. of Greeneville, Tenn.*
51 F.3d 1265 (6th Cir. 1995) ................................................................................. 43

iv

*United States v. Int'l Paper Co. v. Boise Cascade Corp.*
   457 F. Supp. 571 (S.D. Tex. 1978) ......................................................... 26

*Valspar Corp. v. E.I. DuPont De Nemours*
   152 F. Supp. 3d 234 (D. Del. 2016) ................................................. 39, 64

*Wigod v. Chicago Mercantile Exchange*
   981 F.2d 1510 (7th Cir. 1992) ............................................................... 13

## **Rules**

Fed. R. Civ. P. 56(c) ................................................................................. 11

## **Treatises**

Philip E. Areeda & Herbert Hovenkamp
   *Antitrust Law:  Analaysis of Antitrust Principles and Their Application* ............................... 80

Phillip E. Areeda & Herbert Hovenkamp
   *Fundamentals of Antitrust Law* (4th ed. 2011) ................................................ 16, 54

**Glossary:**

The following abbreviations are used herein:

- International Paper Company ("IP")
- Temple-Inland Inc. ("TIN")
- Georgia-Pacific LLC ("GP")
- WestRock CP, LLC (f.k.a. Smurfit-Stone Container Corp.) ("SSCC")
- Weyerhaeuser Company ("WY")
- Packaging Corporation of America ("PCA")
- Cascades/Norampac ("Norampac")
- Plaintiffs' Local Rule 56.1 Statement of Facts in Support of Opposition to Defendants' Motions for Summary Judgment ("PSOF")
- Defendants' Joint Memorandum of Law in Support of their Motions for Summary Judgment ("Defs. Mem.")
- Defendants' Joint Local Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue ("DSOF")
- Plaintiffs' Response to the DSOF ("Resp. to DSOF")
- Defendant Georgia-Pacific's Memorandum in Support of its Motion for Summary Judgment ("GP Mem.")
- Defendant Georgia-Pacific's Local Rule 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment ("GP SOF")
- Plaintiffs' Response to the GP SOF ("Resp. to GP SOF")
- International Paper Company's Memorandum of Law in Support of Summary Judgment ("IP Mem.")
- International Paper Company's Local Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue ("IP SOF")
- Plaintiffs' Response to the IP SOF ("Resp. to IP SOF")
- Defendant Temple-Inland Inc.'s Individual Memorandum of Law in Support of its Motion for Summary Judgment ("TIN Mem")
- Defendant Temple-Inland Inc.'s Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment ("TIN SOF")
- Plaintiffs' Response to the TIN SOF ("Resp. to TIN SOF")
- Defendant WestRock CP, LLC's Memorandum of Law in Support of its Motion for Summary Judgment ("SS Mem.")
- Defendant WestRock CP, LLC's Statement of Uncontroverted Material Facts in Support of its Motion for Summary Judgment ("SS SOF")
- Plaintiffs' Response to the SS SOF ("Resp. to SS SOF")
- Defendant Weyerhaeuser Company's Memorandum of Law in Support of its Motion for Summary Judgment ("WY Mem.")

- Defendant Weyerhaeuser Company's Local Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue ("WY SOF")
- Plaintiffs' Response to the WY SOF ("Resp. to WY SOF")
- Declaration of Michael J. Harris, Ph.D. in Support of Plaintiffs' Motion for Class Certification (Revised July 17, 2014) ("Harris Class Decl.")
- Reply Declaration of Michael J. Harris, Ph.D. (December 19, 2014) ("Harris Class Reply")
- Report of Mark Joseph Dwyer, Ph.D. In Support of Plaintiffs' Motion for Class Certification (June 11, 2014) ("Dwyer Class Rep.")
- Reply Report of Mark Joseph Dwyer, Ph.D. In Support of Plaintiffs' Motion for Class Certification (December 16, 2014) ("Dwyer Class Reply")
- Expert Report of Michael J. Harris, Ph.D. (February 4, 2015) ("Harris Merits Rep.")
- Expert Report of Mark Joseph Dwyer, Ph.D. (February 4, 2015) ("Dwyer Merits Rep.")
- Declaration of J. Douglas Zona, Ph.D. (February 4, 2015) ("Zona Merits Rep.")
- Reply Report of Michel J. Harris, Ph.D. (December 11, 2015) ("Harris Merits Reply")
- Reply Report of Mark Joseph Dwyer, Ph.D. (Amended January 16, 2016) ("Dwyer Merits Reply ")
- Amended Declaration of L. Douglas Zona, Ph.D. (December 23, 2015) ("Zona Merits Reply")
- Expert Report of Lawrence A. Cunningham – (Corrected February 10, 2016) ("Cunningham Merits Rep.")

## I.    INTRODUCTION

This case is about a classic *per se* horizontal conspiracy to fix prices of Containerboard Products.  These Defendants have a lengthy history of antitrust troubles – criminal, regulatory and civil; indeed, the conspiracy here essentially began as the *Linerboard*[1] era was ending.  Motivated by pressure from Wall Street and a "Holy Grail" to increase profits that preached "[g]roup behavior" over "individual "behavior,"[2] Defendants announced fifteen price increases during the Class Period, including three during the Great Recession, forcing benchmark linerboard prices up from $360 to $645 per ton. At the same time, capacity was cut, other supply restrictions proliferated, and inventories reached historically low levels; the 85% increase in prices was unmatched by increases in costs.

Defendants repackage arguments at summary judgment that have been rejected at every stage of this litigation, by both this Court and the Seventh Circuit.[3]  When it certified the Class, this Court recognized that Plaintiffs had "mustered a large amount of record evidence … of what appears to be coordinated price increases, coordinated supply reductions, and other similar conduct that, according to Plaintiffs, Defendants would not have engaged in unless acting as part of a conspiracy."  *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 596 (N.D. Ill. 2015).  In affirming, the Seventh Circuit said:  Plaintiffs have a "great deal of evidence designed to show that the hypothesis that Defendants had organized a cartel is one that a jury could accept;" Plaintiffs' "voluminous written materials of various types, which in the aggregate point[s] to the existence of both agreement and actions to violate the antitrust laws" is "extensive evidence that, if believed, would be enough to prove the existence of the alleged conspiracy;" and "no … chain of

---

[1] *See* Section II.A., *infra*.

[2] *See* Section IV.B.3.e., *infra*.

[3] This opposition addresses Defendants' Joint Motion for Summary Judgment (ECF Nos. 1098) and Defendants' respective individual Motions for Summary Judgment (ECF Nos. 1081/1128, 1083/1133, 1085/1106, 1086/1102, 1088/1120).  Plaintiffs' response to Defendants' Joint Motion for Partial Summary Judgment to Bar Released and Untimely Claims (ECF No. 1138) is addressed in a separate opposition, filed concurrently herewith.

assumptions taints the Purchasers' proof.  They have shown actual price increases, a mechanism for those increases, the communication channels the conspirators used, and the factors suggesting that cartel discipline can be maintained."  *Kleen Prods. LLC v. Int'l. Paper Co*., 831 F.3d 919, 924, 927-28 (7th Cir. 2016), *pet. for cert. docketed*, No. 16-841 (U.S. Jan. 4, 2017).[4]  Plaintiffs amassed this quantum of evidence even though Defendants' history has taught them to avoid creating direct evidence of their conspiracy and to utilize pretexts and methods for concealing it, including an industry policy of destroying ESI led by a Defendant-controlled trade association, whose General Counsel explained that the policy was adopted because ███████████████████████ ██████████████████  Further, when he denied Defendants' motion to dismiss, Judge Shadur found it "striking" that Defendants' price increase announcements frequently occurred "soon after industry gatherings" which included the same trade association.  *See* ECF No. 193.  He also rejected arguments that Defendants repeat here about variations in their supply restriction conduct, stating, "the conduct of some Defendants in permanently reducing capacity while others did not may stem in whole or in part from the latter group's having previously reduced capacity or not having enough existing capacity to threaten the conspiracy." *Id*.

 Defendants' motions for summary judgment fail for a number of reasons. First, Defendants have failed to meet their burden of demonstrating that there is no genuine triable issue of fact. Second, neither the facts nor the law support Defendants' motions. Third, Defendants' motions are directed against their highly-distorted reconstruction of Plaintiffs' allegations.  Plaintiffs have always alleged a conspiracy to fix prices, aided by, among other things, numerous supply restrictions; not a conspiracy to reduce capacity. Fourth, the law is clear that the evidence must be considered in the context of the *Plaintiffs'* theory of the case, not Defendants' version. *See In re*

---

[4] On December 30, 2016, Defendants IP, WY, and TIN filed a petition for certiorari with the Supreme Court seeking review of the Seventh Circuit's ruling on class certification, specifically the appellate court's rulings on classwide injury and damages.  *See* Pet. For Writ of Cert., *Int'l Paper Co. v. Kleen Prods. LLC,* No. 16-841 (U.S. filed Dec. 30, 2016).  Plaintiffs opposed the petition on March 6, 2017; Defendants SSCC and GP submitted responses in support of the petition on February 3, 2017.

[5] PSOF 34 (Kirshner Dep. 60:14-61:2).

*Brand Name Prescription Drug Antitrust Litig.*, No. 94 C 897, 1996 U.S. Dist. LEXIS 4335, *34-36 (N.D. Ill. Apr. 4, 1996). Finally, the Court must reject what Judge Posner characterizes as one of three defendant "traps" of antitrust summary judgment motions: attempting to dismember the conspiracy and have the Court examine each part in isolation rather than as whole. *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F. 3d 651 (7th Cir. 2002) (Posner, J.) ("*Fructose*").

The existence of a conspiracy must only be a reasonable inference that a jury could draw; it need not be the sole inference. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468, 478 (1992) ("*Kodak*"). Nor are Plaintiffs required to completely exclude or dispel the possibility of independent action. *See, e.g., In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 824 (D. Md. 2013) ("*Titanium Dioxide*"). And, because Plaintiff's theory of supra-competitive pricing coupled with supply restrictions makes "economic sense," there is no basis to limit the allowable inferences as Defendants' advocate. In fact, Plaintiffs' economic evidence is unambiguous, so there is no need for outsized inferences. As Judge Wood found, Plaintiffs' case does not depend on "any chain of assumptions." *Kleen Prods LLC*, *supra*, 831 F.3d at 928.

Defendants' arguments are also highly dependent on a misconstruction of *In re Text Messaging Antitrust Litig.*, 782 F.3d 867 (7th Cir. 2015) ("*Text Messaging*"), which stands for the unremarkable proposition that mere conscious parallelism, without more, does not violate Section 1 of the Sherman Act. Defendants then gloss over the Seventh Circuit's explicit confirmation in *Text Messaging* that collusion "can be proved by circumstantial evidence" (*id*. at 879), just as they attempt to discount the "extensive" circumstantial evidence tendered by Plaintiffs. In addition to the fifteen lockstep price increase announcements, Plaintiffs' evidence includes the mechanics of those increases (Section IV.B.3.a.-b.), communications among conspirators through direct conduct and via conduits (Section IV.B.3.d.-f.), a market structure conducive to collusion (Sections II.B.2, IV.B.1), cartel discipline (Section IV.B.3.f.), supply restrictions (Section IV.B.3.c.), motive (Section IV.B.2), battle cries, calls-to-arms, and uncanny predictions (Section IV.B.3.a.), faux

merger talks and pretexts designed to conceal the cartel (Section IV.B.3.d), and acts that were inconsistent with Defendants' independent economic interests. (Section IV.B.4.).

Not surprisingly, Defendants fail to acknowledge the similarities between this case and other Seventh Circuit decisions. For example, like this case, *Fructose* involved standardized products with few substitutes, few sellers accounted for the vast majority of sales, and the industry experienced lockstep price increases. *See Fructose*, 295 F.3d at 656-59. The court found that the product market was "favorable" to price fixing, which meant that there was no need for elaborate communications to enable coordination. *Id.* Both cases involve significant inter-defendant commerce. The *Fructose* Court asked rhetorically, "if the firm *could* supply its customer… *and* at a lower cost than its competitor would charge, why would it buy from the competitor rather than expanding its own production?" The possibility that "springs immediately to mind" in both *Fructose* and this case "is that this is a way of shoring up a sellers' cartel by protecting the market share of each seller." Cartel participants buy what they need from competitors "rather than by expanding [their] own production, [which] protects the other firm's market share and so preserves peace among the cartelists." *Fructose*, 295 F.3d at 659. Documentary evidence from the *Fructose* defendants' executives showed that they would not undercut each other's prices and, notoriously, that they considered competitors to be "friends" and customers "the enemy." *Id.* at 662-63. Here, containerboard industry consultants taught that pricing is a conversation ███████████████ ████████████ and good behavior was required to restore industry profits. *See* Section IV.B.3, *infra*; *see also* PSOF 25. The *Fructose* defendants agreed not to "make irrational decisions," and "discipline" meant adhering to cartel rules. *Id.* at 662-63. Similarly, Defendants here were frequently "rationalizing" their supply systems and the record is replete with references to supply and pricing "discipline." *See* Section IV.B.3. *infra*; *see also* PSOF 153.

In other words, notwithstanding an antitrust history that taught Defendants to make every effort to conceal collusion, Plaintiffs present extensive and strong circumstantial evidence that requires very few reasonable inferences to allow a jury to determine the existence of the alleged

conspiracy. Plaintiffs' economic evidence of supra-competitive pricing coupled with supply restrictions is unambiguous, makes economic sense and tends to exclude the possibility of independent action with no chain of assumptions. When, as required, the evidence is viewed in the context of the allegations actually pleaded, with the benefit of all reasonable inferences and avoiding the three "traps" of summary judgment, Plaintiffs have shown that there are genuine triable issues of fact that should be left for the jury to decide. For these reasons, and as further detailed below, summary judgment must be denied.

## II.    BACKGROUND

### A.    The Alleged Conspiracy

Defendants are no strangers to antitrust enforcement proceedings.[6]    Most recently, Defendants faced antitrust scrutiny for similar collusive conduct between 1993 and 1995 in the *Linerboard* action and related FTC proceedings, which is discussed in more detail below.[7]

Since initiating this lawsuit, Plaintiffs have consistently alleged that Defendants conspired to fix prices for Containerboard Products, facilitated by a variety of mechanisms including, *inter alia*, supply restrictions. Compl. ¶¶ 6, 66, 69. *See* ECF Nos. 1, 65, 627, 777. Throughout the Class Period, Defendants simultaneously announced fifteen separate price increases while also restricting supply to facilitate those increases, including through: (a) permanent and temporary capacity closures; (b) downtime; (c) "slowbacks"; (d) inventory restraints; (e) public and private pronouncements concerning future supply reductions, (f) exchanging crucial information regarding output, pricing, and inventory targets; (g) inter-Defendant transactions; and (h) permanent mill closures. *See* Section IV.B.3, *infra*. The evidence further shows that consultants

---

[6] *See* Complaint (ECF No. 65), ¶¶57-63.

[7] *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 148-49 (3rd Cir. 2002); *In re Linerboard Antitrust Litig.*, MDL1261, 2008 U.S. Dist. LEXIS 7739, *1 (E.D. Pa. Oct. 3, 2008) ("Class plaintiffs … alleged that [defendants] conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/ or curtailing inventories") (Cascades/Norampac was not a defendant); *In the Matter of Stone Container Corp.*, FTC File No. 9510006, Agreement Containing Consent Order to Cease and Desist. http://www.ftc.gov/sites/default/files/documents/cases/1998/02/9510006.agr_.htm (last visited Feb. 16, 2017).

5

advised company leaders to adopt strategies to ███████████████ and framed pricing as a communication with competitors, not with customers. Phone records show that numerous telephone calls and faxes were exchanged between Defendants' senior executives, including CEOs, around the times of price increases. *See* Section IV.B.3.d., *infra*. Defendants also used earnings calls and Wall Street analysts as tools to disclose and monitor each other's compliance with price increases, strategy decisions, and supply levels. *See* Section IV.B.3.e.-f., *infra*. Their trade association activities provided a venue for coordination and often coincided with significant price and supply events. *See* Section IV.B.3.d., *infra*. As a result of the FTC action against Stone Container and the *Linerboard* actions, Defendants developed an even more sophisticated scheme to fit within the interstices of the illegal conduct alleged in *Linerboard* and the FTC consent decree. Once established, like a rocket ship, the conspiracy only required periodic adjustments to stay on course.

### B. Factual Background

The Containerboard Products industry and its structural features are discussed at length in Plaintiffs' Motion for Class Certification (ECF Nos. 658, 826). Plaintiffs summarize the relevant points as follows:

### 1. Containerboard Products Industry

"Containerboard Products" consist of linerboard, corrugated medium, containerboard sheets ("Intermediate Containerboard Products" or "ICP") and corrugated containerboard products, including boxes and other containers ("Final Containerboard Products" or "FCP").[8] Approximately 80% of the linerboard produced in the U.S. is unbleached kraft linerboard ("UK"), most commonly produced in the 42-pound grade.[9] Containerboard is then converted into corrugated containers (boxes) at box plants.[10]

---

[8] PSOF 2.

[9] PSOF 3.

[10] *Id.*

6

Containerboard Products are commodities, and therefore are priced in a uniform manner and pegged to published commodity price indices (including inter-Defendant deals), particularly the price of 42 lb. kraft linerboard as published by Pulp and Paper Weekly ("PPW," now a part of RISI). *See* ECF No. 657, p. 8-11.[11]  Both contract and non-contract prices are pegged to changes in the ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ Increases in the PPW index price for linerboard are passed through to box prices, including by contract; Defendants' business records and testimony suggest that the pass-through rate is uniformly ████ ████

The overwhelming evidence in this case demonstrates that Containerboard Products are interchangeable, undifferentiated, homogenous commodities, readily susceptible to the alleged price-fixing conspiracy.  More goods are shipped in FCP boxes than any other type of packaging in the United States.[14]

### 2.  Market Structure

Defendants are the principal integrated North American producers of Containerboard Products, in several senses of that term.  Originally, the term meant that Defendants owned their own sources of wood pulp and produced both linerboard, corrugated medium and containerboard sheets (Intermediate Containerboard Products or "ICP") as well as various corrugated products, including boxes and other containers (Finished Containerboard Products of "FCP").  However, not only are they highly vertically integrated in that sense,[15] but Defendants have also integrated horizontally through both actual consolidation (mergers and acquisitions) and "virtual

---

[11] PSOF 4-6.

[12] *Id.*

[13] PSOF 6.

[14] PSOF 7.

[15] PSOF 1.  As of 2010, the Containerboard Products industry was ██████ vertically-integrated, with Defendants' own vertical integration ranging from ██████████ *Id.*

integration,"[16] or measures taken to treat their supply and inventories jointly.  In affirming class certification, the Seventh Circuit noted that the structural factors of the Containerboard Products market were "conducive to successful collusion" and are "well accepted characteristics of a market that is subject to cartelization."  *Kleen Prods. LLC*, 831 F.3d at 927.

As one example of virtual integration, Defendants created numerous joint venture box and sheet plants.[17]  In early 2005, SSCC's CEO proposed a joint venture █████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ thereby enhancing a collusive market structure.

While the ███████████████████ did not manifest as a new entity, Defendants found other ways to achieve the same objective.  Instead of increasing their own supply and capabilities to compete, Defendants relied on competitor trades and sales to create a *de facto* industry-wide inventory.[21]  Defendants became each other's largest ICP customers, acquiring product from each other either through direct purchases or trades.[22]  Examples of this abound in the evidence. The volume of SSCC's inter-Defendant sales was comparable to ██████████████████ ████████████ Inter-Defendant purchases provided GP with at least an ███████████ ████████████████████████████████████████████████████████████ GP

---

[16] *Id.*

[17] PSOF 8.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] PSOF 9.  *See also* Resp. to IP SOF 68; Resp. to WY SOF 3.

[22] *Id.*

[23] *Id.*

[24] *Id.  See also* Resp. to GP SOF 48.

8



became ███████████████████████ TIN characterized ██████████████████████ ██████████████████████████████████████ Norampac's trading partners ██████████████████████

Defendants first looked to each other as customers when engaging in sales or trades, rather than other "competitors."[29] ████████████████████████████████ ██████████████████ SSCC offered to assist ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ Norampac systemically traded with ████████████████████ Defendants directly shipped traded production to each other's customers[32] and agreed not to compete for each other's customers.[33] Despite ostensibly being competitors, ████████████████████████████████████ ████████ than were offered to their own customers.[34] Leading a price increase ████████ ████████████████████████████████████████████████████████ ████████ – again not competing.

Defendants also planned their supply restrictions with confidence that they would be supplied by other Defendants.[36] They relied on each other to supply them in geographic areas

---

[25] *Id.*

[26] PSOF 9.

[27] *Id.*

[28] *Id.*

[29] PSOF 159.

[30] PSOF 160. GP considered ████████████████ with whom it had a ████████████████████ ████████████████ Resp. to GP SOF 48.

[31] PSOF 161.

[32] PSOF 162.

[33] PSOF 158.

[34] PSOF 163.

[35] PSOF 164.

[36] PSOF 10.

where they had closed, reduced or never established capacity.[37]  In some instances, Defendants did not even attempt to compete for customers based on geographic advantage.[38]  A TIN employee frankly admitted that ███████████████████████████████████████████████████ ██████████  but Defendants did it nonetheless.  They engaged in the practice for more than efficiencies; their inter-reliance was a supply restriction device to influence prices.  They purposefully created a market environment that restrains unilateral competitive behavior and supports collusion.  As discussed in more detail below, their *de facto* consolidation provided significant opportunities to communicate concerning price and supply, as well as to monitor one another's prospective pricing and supply decisions. In short, Defendants became a cartel.  *See, e.g., Kleen Prods. LLC*, 831 F.3d at 924 (Plaintiffs' evidence showed "that the hypothesis that Defendants had organized a cartel was one that a jury could accept").

The market for manufacture and sale of Containerboard Products has become increasingly concentrated due to actual mergers and acquisitions since the end of the *Linerboard* case.  In the 1990s and at the time of the *Linerboard* cases, the top five containerboard producers had a collective market share of approximately ████  Defendants' market share increased to ████ total box production in 2005,[41] and rose again to ████ two years later.[42]  Among other transactions, GP was acquired by Koch Industries in 2005, while IP acquired Weyerhaeuser's Containerboard Products business in 2008.[43]  Since this case has been pending, TIN was acquired by IP in 2012,[44] and SSCC first merged with RockTenn CP, LLC in 2011, which then combined with

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] PSOF 17.

[41] PSOF 11.

[42] *Id.*

[43] PSOF 12.  *See also* Resp. to IP SOF 46.

[44] *Id.*  The acquisition increased IP's current market share to ████  *Id.*

10

MeadWestvaco in 2015.[45]  Numerous formerly independent producers have been acquired along the way.[46]

Although Defendants' have tried time and again to mischaracterize the conspiracy in terms of an agreement to coordinate capacity reductions, Plaintiffs at all times have alleged that Defendants engaged in a classic, horizontal *per se* illegal price-fixing conspiracy, and have never changed this characterization.  *See* EFC No. 1, ¶ 6; ECF. No. 65 ¶6; ECF No. 627, ¶6.  While Plaintiffs allege that the price fixing conspiracy was facilitated by the enumerated interlinkages and supply restrictions, Defendants' pricing behavior is and always has been the focus of the case and the object of the conspiracy.

## III.  LEGAL STANDARD

Summary judgment may only be granted if the "'pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact,'" entitling the moving party to judgment as a matter of law.  *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 851-52 (N.D. Ill. 2010) ("*Sulfuric Acid*") (*quoting* Fed. R. Civ. P. 56(c)).  The moving party carries the burden of showing that no genuine issue of material fact exists, entitling it to judgment as a matter of law.  *In re Brand Name Prescription Drugs Antitrust Litig*, 1996 U.S. Dist. LEXIS 4335, at *11. In antitrust cases, a defendant may not prevail on summary judgment "simply by enunciating *any* economic theory supporting its behavior." *Id*. at *11-12.  Rather, they must affirmatively show that there are no genuine factual issues that should only be resolved by a finder of fact.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

---

[45] *See* ECF Nos. 202, 1048.

[46] *See, e.g.,* http://www.prnewswire.com/news-releases/kapstone-completes-acquisition-of-longview-fibre-paper-and-packaging-inc-216041891.html (last visited March 7, 2017);
http://www.businesswire.com/news/home/20131025005574/en/Packaging-Corporation-America-Completes-Acquisition-Boise (last visited March 7, 2017);
http://www.businesswire.com/news/home/20160706005290/en/Packaging-Corporation-America-Announces-Agreement-Acquire-TimBar (last visited March 7, 2017);
http://www.recyclingtoday.com/article/containerboard-columbus-pca-paper-recycling/ (last visited March 7, 2017).

"A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Sulfuric Acid*, 743 F. Supp. 2d at 852. In determining that a genuine issue of material exists, the Court is to view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id., citing Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"). *See also McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010); *Sulfuric Acid*, 743 F. Supp. 2d at 852 (noting that the Court's role is "'not to evaluate the weight of the evidence, to judge the credibility of the witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact'") (*quoting Nat'l. Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008)).

> [S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice."

*Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473 (1962).[47] Summary judgment must be denied where, as here, a reasonable fact-finder could return a verdict for the non-moving party. *Keach v. United States Trust Co., N.A.*, 256 F. Supp. 2d 843, 846 (C.D. Ill. 2003) (*quoting Anderson*, 477 U.S. at 248).

## IV. ARGUMENT

Defendants seek judgment based on a number of previously rejected arguments. In denying Defendants' motions to dismiss, Judge Shadur (1) rejected Defendants' assertions that the "parallel nature" of their fifteen lockstep price increases were the result of lawful interdependent conduct in a consolidated industry; (2) rejected their arguments that their supply restrictions were "not truly parallel;" (3) determined that Plaintiffs' evidence of price increases coming "soon after

---

[47] Although *Matsushita* modified its stricture (*see, e.g., Matsushita*, 475 U.S. at 586-588), *Poller* has never been overturned.

industry gatherings" was "striking," and gave it "significant weight;" and (4) admonished Defendants for disregarding the "basic tenet" of antitrust law, as they have done again at summary judgment, that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  ECF No. 193 (*quoting Cont'l. Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

This Court recognized at Class Certification that Plaintiffs had "mustered a large amount of record evidence … of what appears to be coordinated price increases, coordinated supply reductions, and other similar conduct that, according to Plaintiffs, Defendants would not have engaged in unless acting as part of a conspiracy."  *Kleen Prods. LLC*, 306 F.R.D. at 596.  In affirming this Court's class certification ruling, the Seventh Circuit explained first that Plaintiffs had submitted "voluminous written materials of various types, which in the aggregate pointed to the existence of both agreement and actions to violate the antitrust laws," further stating that "extensive evidence that, if believed, would be enough to prove the existence of the alleged conspiracy"; and found that "no … chain of assumptions taints the Purchasers' proof.  They have shown actual price increases, a mechanism for those increases, the communication channels the conspirators used, and factors suggesting that cartel discipline can be maintained."  *Kleen Prods. LLC*, 831 F.3d at 927-28.

With these prior rulings in mind, Defendants' motions must be considered against the well-established maxim that, "'in complex antitrust cases, summary judgment should be used sparingly, unless the record is clear that the antitrust claims cannot succeed.'" *Alexander v. Phoenix Bond & Indem. Co.*, 149 F. Supp. 2d 989, 998 (N.D. Ill. 2001) (*quoting Wigod v. Chicago Mercantile Exchange*, 981 F.2d 1510, 1514 (7th Cir. 1992)).  The record in this case contains "extensive evidence" that is more than sufficient to prove the existence of the alleged conspiracy (*Kleen Prods. LLC,* 831 F.3d at 927) and clearly demonstrates that summary judgment should be denied.

Defendants argue that under *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ("Matsushita")*, the evidence is ambiguous and therefore does not excludes the

possibility that they were acting in furtherance of their independent interests. *See* Defs. Mem. p. 1. *See also* GP Mem. pp. 8-10; IP Mem. p. 3; TIN Mem. pp. 12-13; SS Mem. pp. 9-11; WY Mem. p. 3. But *Matsushita* did not create a presumption in favor of summary judgment for the defense or otherwise elevate Plaintiffs' burden at summary judgment. *See Kodak*, 504 U.S. at 468, 478.

In *Matsushita*, the plaintiffs alleged a 20-year conspiracy among Japanese consumer electronics producers to price their products at below cost in the United States in hopes of expanding their market share at some point in the future. *Matsushita*, 475 U.S. at 577-582. The plaintiffs sought an inference of conspiracy from the defendants' price-cutting conduct, which the court was concerned about allowing because "cutting prices in order to increase business often is the very essence of competition." *Id.* at 594. The alleged conspiracy required the defendants to sustain losses for decades with no foreseeable future, leading the Supreme Court to find that the plaintiffs' theory made no practical or economic sense and thus summary judgment was warranted, even with all reasonable inferences drawn in the plaintiffs' favor. *Id*. at 588, 590, 593-98. As the Supreme Court later clarified:

> The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision.

*Kodak*, 504 U.S. at 468 (emphasis in original). *Matsushita*'s restriction of inferences concerned only inferences from ambiguous economic evidence that might chill legitimate competitive activity—n that case, sustained low prices. There is no such ambiguous economic evidence here. The conduct in this case—*per se* illegal horizontal price fixing—is "facially anticompetitive and exactly the harm that antitrust laws aim to prevent. In this situation, *Matsushita* does not create any presumption in favor of summary judgment for the defendant." *Id*. at 478.

14

In evaluating summary judgment, courts in the Seventh Circuit divide the inquiry into two parts: first, whether the conspiracy evidence is economically ambiguous, meaning as consistent with independent interests as with a conspiracy.[48]  *In re Sulfuric Acid*, 743 F.Supp.2d at 857.  If the answer is in the affirmative, then the inquiry turns to whether there is "any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests."  *Id*. Evidence that reasonably tends to prove a conscious commitment to a common scheme designed to achieve an unlawful objective may be direct or circumstantial.  *Id*. (*quoting Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984)).  *See also Fructose*, 295 F.3d at 662 (direct evidence is "evidence tantamount to an acknowledgment of guilt," whereas circumstantial evidence is "everything else *including* ambiguous statements.  These are not to be disregarded because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial") (emphasis in original); *Titanium Dioxide*, 959 F. Supp. 2d at 829 ("[a]mbiguous statements by competitors, taken as a whole, may support the inference of a price-fixing conspiracy").  As noted above, the evidence is to be viewed as a whole, and not "in isolation apart from other parts of the record."  *In re Brand Name Prescription Drug Antitrust Litig.*, 1996 U.S. Dist. LEXIS 4335 at *34-36 ("It is the defendants' argument that parallel conduct alone does not amount to a conspiracy; isolated statements and observations of industry members do not alone prove a conspiracy; meetings and communications between and among the defendants are innocent activity and do not in and of themselves prove a conspiracy; and the systematic exchanges of competitive information and trade data do not amount to a conspiracy.  While each piece of the plaintiffs' evidence, when looked at in isolation, would not be sufficient to establish a conspiracy, when the evidence is looked at as a

---

[48] As noted above, *Matsushita* did not deal with ambiguous, *e.g.*, circumstantial, evidence, but an economically ambiguous theory of harm. *See e.g., Kodak*, *supra*, 504 U.S. at 468-69. *See also Fructose*, 295 F.3d at 661 ("[t]he question is simply whether this evidence, considered as a whole and in combination with the economic evidence, is sufficient to defeat summary judgment"); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 906 F.3d 432, 439-440 (9th Cir. 1990) ("*Petroleum Products*").

15

whole and in the context of the plaintiffs' theory of its case, we believe that the evidence is sufficient to raise a reasonable inference of the existence of a conspiracy among all of the Manufacturer Defendants").  *See also Cont'l Ore Co.*, 370 U.S. at 699; *Fructose*, 295 F.3d at 661; *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004); *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993).

As is commonly the case with complex antitrust cases, the evidence on which Plaintiffs rely to prove the alleged conspiracy is of two types: "economic evidence suggesting that Defendants were not in fact competing, and non-economic evidence suggesting that they were not competing because they had agreed not to compete." *Fructose*, 295 F. 3d at 655.

Importantly, Plaintiffs "do not have to exclude all possibility that the defendants acted independently because 'that would amount to an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred.'" *Alexander*, 149 F. Supp. 2d at 998 (N.D. Ill. 2001) (*quoting Toys "R" Us, Inc. v. Federal Trade Commission*, 221 F.3d 928, 935 (7th Cir. 2000)).[49]  Defendants are "'not entitled to summary judgment simply because they demonstrated a plausible rational for their behavior.  Rather, the focus must remain on the evidence proffered by the plaintiff and whether that evidence 'tends to exclude the possibility that [the defendants] were acting independently.'"  *In re Drywall Antitrust Litig.* 163 F. Supp. 3d 175, 189 n.11 (E.D. Pa. 2016) ("*Drywall*") (*quoting Petruzzi's IGA Supermarkets, Inc.*, 998 F.2d at 1232).[50]

---

[49] *See also JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 779 (7th Cir. 1999) (Posner, J.) (reversing grant of summary judgment and holding that while "[t]here may be an innocent explanation" for defendants' conduct, a rational jury could infer a conspiracy from the evidence); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 614 (7th Cir. 1997) (explaining that summary judgment is improper even if evidence is "susceptible of an innocent interpretation" because, while "defendants' interpretations may be correct[,] they are not inevitable"); *In re Flat Glass*, 385 F.3d at 368; *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) (reversing summary judgment decision and explaining that plaintiff need not "disprove all nonconspiratorial explanations for the defendants' conduct. Not only did the court [in *Matsushita*] use the word 'tend,' but the context made clear that the Court was simply requiring sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not.") (quoting Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 14.03(b), at 14-25 (4th ed. 2011) (emphasis added); *United States v. Apple, Inc.*, 791 F.3d 290, 315-16 (2d Cir. 2015) (same); *Titanium Dioxide*, 959 F. Supp. 2d at 821 (same).

[50] *See also In re Publ'n Paper*, 690 F.3d at 63 ("Requiring a plaintiff to 'exclude' or 'dispel' the possibility of independent action places too heavy a burden on the plaintiff.  Rather, if a plaintiff relies on

*See also Monsanto Co.*, 465 U.S. at 764. "Put more simply, plaintiffs evidence must reasonably show that defendants engaged in a conspiracy, but is not expected to disprove all other possible inferences." *Alexander*, 149 F. Supp.2d at 999.

Since Defendants deny the existence of the conspiracy based on a conscious parallelism defense, Plaintiffs may defeat summary judgment by presenting evidence of "plus factors" which reduce the probability of independent action. *Alexander*, 149 F. Supp. 2d at 1000. The "exact nature of 'plus factors' has not been exhaustively articulated by any court," but include actions against self-interest, a high level of inter-defendant communication, trade associations activities at time proximate to price increases and access to pricing information, all of which are present here. *See id.* (collecting cases). *See also Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226-28 (1939) (actions against self-interest). Other "plus factors" include exchanging pricing information or information concerning specific sales to customers (*United States v. Container Corp. of Am.*, 393 U.S. 333, 334-335 (1969)) ("*Container Corp.*"), raising prices when market conditions are not conducive to such conduct *American Tobacco Co. v. United States*, 328 U.S. 781, 805-806 (1946) (raising prices during period of surplus is a "plus factor")) and pretextual reasons for action (*Fragle & Sons Beverage Co. v. Dill*, 760 F.2d 469, 474 (3rd Cir. 1985)). The "plus factor" analysis rests on the "unique factual proof of this case." *Alexander*, 149 F. Supp. 2d at 1000. Where, as here, the "cumulative weight" of Plaintiffs' evidence casts serious doubt on the Defendants' depiction of the case, summary judgment should be denied. *See Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 172 F. Supp. 2d 1060, 1073, 1079 (S.D. Ind. 2001).

Directly on point here is the Seventh Circuit's admonition to be aware of and reject three "traps," all of which Defendants have "cleverly laid" in their motions here. *See Fructose*, 295 F. 3d at 655. First, the Court is to avoid "weigh[ing] conflicting evidence (the job of the jury)"; a recitation of facts favorable to Defendants with an interpretation favorable to them of the remaining

---

ambiguous evidence to prove its claim, the existence of a conspiracy must be a reasonable inference that the jury could draw from that evidence; it need not be the *sole* inference.") (emphasis in original); *In re Titanium Dioxide*, 959 F. Supp. 2d at 821 (same).

evidence, as Defendants have done here (*see, e.g.,* IP Mem. pp. 3-14; SS Mem. 9-14; TIN Mem. 5-13; WY Mem. 6-14; GP Mem. 8-15), is the character of a trial brief. *Id.*

The second trap to be rejected is the suggestion (made by Defendants) that if no single item of evidence presented by Plaintiffs points unequivocally to conspiracy, then their evidence as a whole cannot defeat summary judgment. *Id.* As the Seventh Circuit explained:

> It is true that zero plus zero equals zero. But evidence can be susceptible of different interpretations, only one of which supports the party sponsoring it, without being wholly devoid of probative value for that party. Otherwise what need would there be for a trial? The question for the jury in a case such as this would simply be whether, when the evidence was considered as a whole, it was more likely that the defendants had conspired to fix prices than that they had not conspired to fix prices.

*Id.*, 295 F. 3d at 655-56 (*citing In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781,787 (7th Cir. 1999)).

The third trap, also set by Defendants, is "failing to distinguish between the existence of a conspiracy and its efficacy." *Fructose*, 295 F.3d at 656. Defendants' evidence that some sales were made below "list price" (*e.g.*, the PPW price) during the conspiracy period does not merit granting summary judgment. *See* Defs. Mem. pp. 12-13; GP Mem. p. 15, n.11; IP Mem. pp. 13-14; TIN Mem. pp. 8-9; SS Mem. p. 8; WY Mem. pp. 13-14. "An agreement to fix list prices is … a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices." *Id. See also* ECF No. 193, n. 10 (after prices have been increased, "'no further action by the conspirators is required to effect the objectives of the conspiracy' because 'each sale at the fixed price continues to benefit the conspirators'") (*quoting Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 838 (11th Cir. 1999)). Courts have long held that Plaintiffs may demonstrate the efficacy of a conspiracy by showing that it caused an increase to the standard market price of the product at issue. *Kleen Prods. LLC*, 306 F.R.D. at 595 (*citing In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254-55 (10th Cir. 2014); *In re Urethane Antitrust Litig.*, *(Urethane II)*, 251 F.R.D. 629, 638 (D. Kan. 2008); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996) ("[I]f a plaintiff proves that the alleged conspiracy resulted in

18

artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury")). *See also In re Flat Glass Antitrust Litig*., 385 F.3d at 362-63 (the defendant "does not – it cannot – seriously contend that the flat glass producers increased their list prices with no intention of affecting transaction prices. 'Sellers would not bother to fix list prices if they thought there would be no effect on transaction prices.' … a horizontal agreement to fix prices need not succeed for sellers to be liable under the Sherman Act; it is the attempt that the Sherman Act proscribes") (*quoting Fructose*, 295 F.3d at 656).

Here, when the traps are properly avoided and the evidence is considered as a whole, Plaintiffs have made a sufficient showing that tends to exclude the possibility that Defendants were acting independently, and summary judgment must be denied. *See Drywall*, 163 F. Supp. 3d at 189.

## A. Case Law Supports Denying Summary Judgment

Courts within the Seventh Circuit have considered cases very similar to this one, and have denied summary judgment in each instance. Given the similarities here, a discussion of these cases is merited.

In *Fructose*, the plaintiffs alleged a horizontal price-fixing conspiracy among the principal manufacturers of high fructose corn syrup from 1989 to 1995. 295 F.3d at 653-54. The district court granted summary judgement for the defendants, but the Seventh Circuit reversed unanimously in an opinion written by Judge Posner.

Much like Plaintiffs here, the *Fructose* plaintiffs submitted economic evidence demonstrating that the high fructose corn syrup market, consisting of five defendants who accounted for 90% of the sales of the largely standardized product, is favorable to collusion. *Id*. at 656-57. The defendants had substantial excess capacity, a condition which "makes price competition more than usually risky and collusion more than usually attractive." *Id*. at 657. Although high fructose corn syrup was sold under two different types of contracts, a "straight sale" or a "tolling agreement," these contracts and the differences between the two selling methods did

19

not get in the way of the alleged conspiracy. *Id*. at 657-68. Nor did the existence of some very large buyers such as Coca-Cola and Pepsi-Cola. *Id*. Plaintiffs also submitted econometric evidence in the form of a regression analysis showing that prices were higher during the conspiracy period than both before and after. *Id*. at 660.

The Seventh Circuit found the non-economic traditional conspiracy evidence to be compelling. Similar to Plaintiffs here, the *Fructose* plaintiffs submitted evidence demonstrating lock-step price increases, that the defendants purchased from each other rather than expanding their own production to supply customers at lower costs, and written statements from the defendants' executives suggesting collusion, such as the president of defendant ADM stating that "our competitors are our friends. Our customers are the enemy" or the use of the word "discipline" acknowledging that competitors will "play by the rules." *Id*. at 660-663. This evidence, the Seventh Circuit found, was sufficient to "support [] the hypothesis of a price-fixing conspiracy to prevent the grant of summary judgment to the defendants." *Id*. at 666.

Like *Fructose*, the facts of this case include lockstep price increases, standardized products, few sellers, and significant inter-defendant commerce. *See* Sections II.B, IV.B.1.-3.a., *infra*. Here, pricing is a conversation ███████████████████████████ The record includes multiple references to Defendants' supply and pricing "discipline" and "rationalization" of their supply systems, constituting good behavior. *See* Section IV.B.3, *infra*.

The Northern District of Illinois' denial of summary judgment in *In re Brand Name Prescription Drugs* is likewise insightful. The class plaintiffs alleged a price-fixing conspiracy among the manufacturing defendants to eliminate price competition and keep prices for "Prescription Brand Name Drugs' artificially high to retail pharmacies. *In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 U.S. Dist. LEXIS 4335, at *1-3. In support of their claims, they submitted evidence consisting of incriminating statements and observations made by various defendants and industry members and, similar to evidence tendered by Plaintiffs here, that competing manufacturers held meetings, discussed pricing issues and engaged in a pervasive

20

exchange of trade and pricing information. *Id.* at *18. The manufacturing defendants attempted to refute the plaintiffs' collusion claims by arguing that pricing decisions were independently made and that their responses to requests for discounts were not uniform. *Id.* at *7.

The district court disagreed with the defendants, and found that class plaintiffs' evidence that the manufacturers "engaged in conduct consistent with the plaintiffs' theory" to be "ample circumstantial evidence to raise a reasonable inference that the Manufacturer Defendants engaged in collusive, anti-competitive conduct." *Id.* at *18-19. Of particular relevance here, the district court explained that "conduct need not be point-for-point consistent to be deemed parallel." *Id.* at *21-22. The plaintiffs in that case did not claim that *all* competition ceased, but rather the specific uniform decision not to discount to an entire segment of the retail industry. The evidence tendered by the class plaintiffs supported that theory, and the fact that discounting began at varying times and to varying degrees (like Defendants' various supply restrictions during the Class Period in this case) did not undermine that theory. *Id.*

In a recent case, the District of Maryland followed *Fructose* and ruled in the same manner. In *Titanium Dioxide*, a class of titanium dioxide purchasers claimed that the manufacturer defendants engaged in an unlawful conspiracy to fix, raise or maintain the price of titanium dioxide in the United States. *Titanium Dioxide*, 959 F. Supp. 2d at 802. The plaintiffs relied on circumstantial evidence to prove the agreement, centering on evidence strikingly similar to the evidence here: the industry was in crisis prior to the Class Period; one defendant's entry into a European trade group, attendance and participation in another trade association which provided opportunities for interaction among the defendants; a statistics program which allowed the defendants to collect and monitor global industry information; routine communication of confidential and commercially sensitive information among competitors and industry consultants during the class period, including the use of the word "discipline"; repeated price increase announcements executed in lockstep fashion; and substantial interfirm sales of titanium dioxide. *Id.* at 803-04.

21

The district court rejected the defendants' argument – the same as Defendants' argument here – that the conduct "happened as a result of the Defendants' lawful, procompetitive business purposes, and that the evidence therefore cannot withstand summary judgment." *See id*. at 816, 823-24. Although the record contained some evidence of competition, that portion of the record was weighted against the "substantial portion on which a jury could permissibly infer a conspiracy." *Id*. at 823. The court concluded that the record contained "ample evidence for concluding that the Defendants agreed to raise prices and shared commercially sensitive information – by way of industry consultants, face-to-face meetings, and the Titanium Dioxide Manufacturers Association's Global Statistics Program – to facilitate their conspiracy." *Id*. at 823. The court further found the fact that the case rested on circumstantial evidence to "hold[] no sway," citing *Fructose* for the proposition that "'most cases are constructed out of a tissue of [ambiguous] statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial.'" *Id*. at 823 (*quoting Fructose*, 295 F.3d at 662). "More importantly, the interpretation and weighing of conflicting circumstantial evidence is a role assigned to the jury at trial … 'requiring judges to ask whether the circumstantial evidence is more "consistent" with the defendants' theory … would essentially convert the judge into the thirteenth juror.'" *Id.* (*quoting Petroleum Products*, 906 F.2d at 438). The evidence submitted by the plaintiffs was determined to defeat summary judgment "because a jury, viewing the evidence in the totality, could reasonably infer a price-fixing conspiracy by the Defendants." *Id*. at 824-830 ("[h]aving considered the sheer number of parallel price increase announcements, the structure of the titanium dioxide industry, the industry crisis in the decade before the Class Period, the Defendants' alleged acts against their self-interest, and the myriad of non-economic evidence implying a conspiracy, this Court finds that the Plaintiffs put forward sufficient evidence tending to exclude the possibility of independent action").

Similar to the *Titanium Dioxide* plaintiffs, Plaintiffs have submitted evidence of pervasive lockstep price increase announcements (15 between 2004 – 2010) coupled with other evidence

indicative of collusion (*see, e.g., id.* at 825, noting that the "sheer number of parallel price increases, when coupled with the other evidence in this case, could lead a jury to reasonably infer a conspiracy"), competitor statements regarding industry "discipline," sharing of industry information through trade associations, evidence demonstrating that Wall Street analysts served as conduits in the alleged price-fixing conspiracy, and statements revealing Defendants' awareness of potential collusion in the Containerboard Products industry which, when viewed as a whole, is sufficient to defeat summary judgment. We turn to that evidence now.

**B. A Reasonable Jury Could Infer That Defendants Engaged in a Conspiracy to Raise Prices**

**1. Market Structure is Conducive to Conspiracy**

One factor lending support to the existence of the alleged conspiracy is the concentrated Containerboard Products market structure. *See Drywall*, 163 F. Supp. 3d at 190 ("Plaintiffs typically establish motive by showing market factors that would be conducive to collusion (*e.g.*, market concentration, high barriers to entry, etc.")). *See also* Harris Class Cert. Decl., ¶¶ V.1, at 22-23 (economic academia recognizes that market share and market concentration affect the possibility and success of collusion), and V.I.1, at 33 ("[t]he structural characteristics of this industry . . . above are consistent with and would facilitate successful collusion among the Defendants. . . [and] provides to Defendants a powerful motive to collude."). As noted in Section II.B.2. above, Defendants are the main producers of Containerboard Products, which are uniform, commodity goods. They are vertically integrated in and among themselves, but have also integrated horizontally through mergers, acquisitions, trades, joint ventures and taken other measures to treat their supply and inventories as joint product, and use these interlinkages to exchange information.[51] The Seventh Circuit agrees that the structural factors of the Containerboard Products industry were conducive to successful collusion and describe a market subject to cartelization. *Kleen Prods. LLC*, 831 F.3d at 927.

---

[51] *See* Section II.B.2, *supra*. *See also* Resp. to IP SOF 2.

The evidence shows that the Defendants often were each other's best customers and acted in each other's best interest, rather than in their unilateral self-interest. For example:



Because of the extraordinarily high level integration, the traditional oligopolistic interdependence analysis cannot be applied. Indeed, oligopolistic interdependence assumes that each firm has an independent business decision center, responsible for executing business decisions in favor of the independent firms. *See, e.g., Am. Needle, Inc. v. NFF,* 560 U.S. 183, 195 (2010) ("discussing importance of "'separate economic actors pursuing separate economic interests,' ... such that the agreement 'deprives the marketplace of independent centers of decisionmaking,' … and therefore of 'diversity of entrepreneurial interests'") (internal citations omitted). Because of Defendants' numerous interlinkages, the traditional measure of market concentration, the Herfindahl-Hirshman Index ("HHI"), does not accurately depict the level of

---

[52] Resp. to GP SOF 48.

[53] Resp. to GP SOF 48.

[54] PSOF 157.

[55] *Id.*

[56] PSOF 158.

[57] PSOF 155.

[58] *Id. See also* Resp. to TIN SOF 3, 11.

concentration for the Containerboard Products market. If the HHI were calculated while accounting for Defendants' horizontal and virtual integration, it would be in the range that the Department of Justice considers "highly concentrated."[59]

Defendants' market shares also indicate their ability to conspire. During the Class Period alone, Defendants' collective market share has increased from ███ of total box production in 2005 to ███ in 2007. And the number of significant players in the industry has drastically reduced, with IP acquiring Weyerhaeuser's and TIN's respective containerboard businesses and SSCC merging with Rock-Tenn Co. and MeadWestvaco. Defendants' documents confirm that they were in fact the largest Containerboard Products producers, and all others were ████████████ ████████████████████████

Barriers to entry in the Containerboard Products industry are high given the length of time and significant amount of capital needed. According to Defendants' documents, Containerboard Products mills and plants can take ████████████████████████ ████████████████████████████████ ████████

Defendants argue that market structure alone is insufficient to defeat summary judgment (Defs. Mem. at pp. 26-17;), and that, in any event, the fifteen lockstep price increases were not the product of collusion but rather oligopolistic interdependence. With respect to the former argument, as demonstrated below, Plaintiffs have amassed much more evidence than just market structure to demonstrate the alleged conspiracy. With respect to the latter argument, Defendants' contentions that their collusion to fix prices was merely oligopolistic interdependence has been repeatedly rejected, including by the Supreme Court in the case against Container Corporation of America,

---

[59] *See* PSOF Ex. 7 (Harris Class Decl., ¶¶V.1.A. at 23-24).

[60] *See* PSOF 13.

[61] *Id.*

[62] *See* PSOF Ex. 7 (Harris Class Decl., ¶ V.B.4 at 26).

[63] PSOF 14.

where the Court held that the exchange of industry information coupled with an effect on prices was indicative of collusion. *See Container Corp.*, 393 U.S. at 334-35.

Nor, as Defendants suggest, does the existence of very large customers for each Defendant defeat Plaintiffs' alleged conspiracy. *See, e.g.*, IP Mem. pp. 13-14. "[I]t does not follow that the defendants could not and did not fix [] price[s]" simply because "there are some very large buyers … [who] drove hard bargains and obtained large discounts from the list price." *Fructose*, 295 F.3d at 658.[64]  As Judge Posner explained in that case:

> There is a difference between a market in which all or virtually all of the buyers are large and one in which there are some large and some small buyers.  Suppose the buying side of the HFCS market were as concentrated as the selling side, meaning that five firms bought 90 percent of all of the HFCS sold.  They would be able to whipsaw the sellers into granting large discounts, and probably therefore any effort at fixing prices would quickly collapse.  When instead there are some large and some small buyers, which is the situation here, this need not prevent price fixing; it may simply cause the price fixers to engage in price discrimination, giving large discounts to the big buyers and no (or small) discounts to the small ones.

*Fructose,* 295 F.3d at 658.   Thus, the Containerboard Products market conditions support Plaintiffs' conspiracy allegations.

## 2. Defendants Had Motive to Conspire

Defendants understood that acting competitively did not lead to increased profits as demanded by Wall Street and that collusion was necessary.  However, having been caught fixing prices on prior occasions, Defendants also knew that their conduct had to be concealed – better than in prior efforts.[65]

---

[64] *See also* Resp. to IP SOF 3 (customer decreases not due to independent decision-making), 6.

[65] In addition to *Linerboard* and the related FTC consent decree, Defendants were involved in the following price-fixing cases:  *In re Folding Carton Antitrust Litig*., 75 F.R.D. 727 (N.D. Ill. 1977), 557 F. Supp. 1091, 1093 (N.D. Ill. 1983), 687 F. Supp. 1223 (N.D. Ill. 1988) (Defendants IP, WY. PCA and GP defendants in alleged nationwide price-fixing conspiracy among manufacturers of folding cartons from 1960 – 1974; class action settled for approximately $200 million); *United States v. Int'l Paper Co. v. Boise Cascade Corp.*, 457 F. Supp. 571 (S.D. Tex. 1978) (federal grand jury in Southern District of Texas indicted Defendants IP, WY and Stone Container Corp. (predecessor to SSCC), among others, for participating in a conspiracy to fix prices of corrugated containers and sheets east of the Rocky mountains; WY and Stone and almost all other defendants pleaded *nolo contendere*); *In re Corrugated Container Antitrust Litig*., 556 F. Supp. 1117, 1125 (S.D. Tex. 1982) (in related proceedings, Defendants PCA, IP, Stone Container Corp., and GP were defendants in alleged price-fixing cartel over corrugated containers and corrugated cardboard sheets from 1964-1975; all defendants settled except for one, who

In the early 1990s, domestic manufacturers of corrugated sheets and containers faced declining prices and revenues. Prior to 1993, Stone Container (predecessor to SSCC) acquired several rival manufacturers, which it financed by issuing new debt. But declining revenue made it difficult for Stone Container to service its debt obligations. In the spring and summer of 1993, CEO Roger Stone determined that excess inventory was hampering the industry's ability to raise prices, so he enlisted his competitors (some of the Defendants here) to help reduce unwanted inventory, allowing price increases to be sustained.

In 1999, Stone Container, IP, GP, WY, TIN, PCA and non-defendant Pactive were named as defendants in two separate class action lawsuits, eventually consolidated in the Eastern District of Pennsylvania and known as the *Linerboard* class actions.[66] The complaints alleged, among other things, that the defendants had conspired to fix and raise the price of linerboard (and hence corrugated sheets and containers) in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). As noted above, linerboard is a component of *containerboard*.[67]

In September 2001, the case was certified as a class action by the District Court for the Eastern District of Pennsylvania.[68] Defendants ultimately settled the *Linerboard* class action for an estimated $202 million, which, according to the court in that action, was one of the largest antitrust settlement of all class actions between 1972 and 2003.[69] Of the $202 million dollars, SSCC agreed to pay $92.5M.[70] And, in a separate proceeding related to the anticompetitive behavior at issue in *Linerboard*, SSCC entered into a settlement decree with the FTC barring the

---

was found liable for participating in the alleged conspiracy); *Container Corp.*, 393 U.S. 333 (civil antitrust action by the Department of Justice against Container Corp. of America (predecessor to SSCC), Inland Container Corporation (predecessor to TIN), IP, and WY, among others, for alleged conspiracy to fix prices of corrugated containers in Southeastern United States).

[66] *See* PSOF 15-17; Resp. to IP SOF 12.

[67] *Id.*

[68] *See* PSOF 15-17. Defendants appealed class certification to the Third Circuit, which affirmed the lower court's ruling in 2002. *See id.*

[69] *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 624 (E.D. Pa. 2004).

[70] PSOF 15-17.

company, *inter alia*, from signaling future capacity decisions to Defendants.[71]  There was also substantial follow-on litigation from purchasers who opted out of the class.

Following *Linerboard*, industry conditions and Defendants' behavior revealed a competitive market.  For instance, after the "Dot-Com" bubble burst in early 2000, production of containerboard tracked demand and declined to 2,680 tons in June of that year, but steadily and gradually increased to 2,922 tons in February of 2004.[72]  In February 2000, transaction prices for unbleached kraft linerboard 42lb. East stood at $460.  From that point forward prices trended noticeably down until reaching a low of $360 in February 2004.[73]

In April 2001, Deutsche Bank analyst Mark Wilde, whose role in the alleged conspiracy is discussed at length both below as well as in Plaintiffs' Motion for Class Certification, called the Containerboard Products industry a



A competitive market existed in the post-*Linerboard* years.  For instance,

---

[71] *In the Matter of Stone Container Corp.*, FTC File No. 9510006, Agreement Containing Consent Order to Cease and Desist. http://www.ftc.gov/sites/default/files/documents/cases/1998/02/9510006.agr_.htm (last visited Feb. 16, 2017).

[72] PSOF 18.

[73] *Id.*

[74] PSOF 19.

[75] *Id.*

[76] PSOF 18.

The next month, management consulting firm McKinsey & Company, who was also advising ███ at the time – ████████████████████

Early the following year, Mr. Wilde reported that ████████████ In May 2003, Defendants' efforts ████████████ prompting Mr. Wilde to ████████████

---

[77] *Id.*

[78] *Id.*

[79] PSOF 20.

[80] *Id.*

[81] PSOF 21.

[82] PSOF 22. ████████████████████

[83] PSOF 23; Resp. to GP SOF 46.

[84] *Id.*

███████████████████████████████████████████████████

McKinsey and industry trade association American Forest & Paper Association ("AF&PA") then set the table to "Cash in on Consolidation ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[85] *Id.*

[86] *See* PSOF 23.

[87] PSOF 18.

[88] PSOF 24.

[89] PSOF 25; Resp. to IP SOF 17.

[90] Resp. to IP SOF 19.

[91] PSOF 25. On February 19, 2004, the president of the Association of Independent Corrugated Convertors ("AICC") noted that containerboard suppliers had removed ████████████████████ ████████████████████████████████████████████████ PSOF 26.



The General Counsel's Committee felt "strongly" that changes were needed

The AF&PA General Counsel's committee recommended that the Guidelines be distributed

A few months later,

---

<sup>92</sup> PSOF 27.

<sup>93</sup> PSOF 27.

<sup>94</sup> *Id.*

<sup>95</sup> *Id. See also* Resp. to GP SOF 5.

<sup>96</sup> PSOF 32-34.

<sup>97</sup> PSOF 32. *See also* Resp. to WY SOF 39

<sup>98</sup> PSOF 32.

<sup>99</sup> PSOF 33. Neither Mr. Kirshner nor the AF&PA were able to produce the final version of the seminar's materials in response to Plaintiffs' subpoenas.

<sup>100</sup> PSOF 34.

Indeed,

AF&PA's General Counsel explained that

Pressure from Wall Street to deliver returns continued to mount.  In the summer of 2003,

---

[101] *Id.*

[102] *Id.*

[103] PSOF 28.

[104] PSOF 29.

[105] PSOF 30.

[106] *Id.*

[107] *Id.*



That same month, SSCC reported

Several of Defendants' executives attended an

Shortly thereafter, SSCC announced

And the first successful price increase of the Class Period, announced in January 2004, took hold.

### 3. Plaintiffs' Traditional Conspiracy Evidence Demonstrates a Conscious Commitment to a Common Scheme

In addition to market structure and motive to conspire, Defendants' contemporaneous business records and testimony confirms the existence of the alleged conspiracy and Defendants' pledged commitment to a common scheme. The "extensive evidence" in this case is "untainted" by any "chain of assumptions" and, if believed by a jury, "would be enough to prove the existence of the alleged conspiracy." *Kleen Prods. LLC*, 831 F.3d at 927. Plaintiffs "have shown actual price increases, a mechanism for those increases, the communication channels the conspirators used, and factors suggesting that cartel discipline can be maintained." *Id. See also Titanium Dioxide*, 959 F. Supp. 2d at 829.

As detailed below, Defendants began the Class Period with calls to arms. Those "battle cries" resulted in fifteen separate lock-step price increases, enacted at times that were contrary to industry and economic conditions and, in some instances, contrary to Defendants' own planning documents. Defendants' price increase announcements were essentially simultaneous, in identical amounts marked for implementation on or around the same dates. Defendants admitted that they

---

[108] PSOF 31.

[109] *Id.*

[110] *See* PSOF 85.

[111] PSOF 35.

would be ███████████████████████████████████  Price increase announcements
and implementations were transparent and easily monitored due to public reporting by Wall Street
analysts. Industry periodical Pulp & Paper Week's ("PPW's") weekly price index moved in
connection with implemented price increases. *See Kleen Prods. LLC*, 831 F.3d at 923, 928.
Defendants also frequently engaged in strategic supply restrictions to support price increases.

Evidence further demonstrates that Defendants communicated directly with one another in
a manner that cannot be explained away as unilateral conduct, communicated indirectly through
conduits such as financial analysts, and signaled pricing and capacity information to one another
through public statements (and in violation of the FTC consent decree). By virtue of their *de facto*
consolidation, Defendants were each other's best customers, an arrangement they used to pass
information to one another. As a result, they had long-advanced knowledge of each other's actions,
could monitor their co-conspirators, and acted in their collective best interests rather than their
own. This evidence more than "reduces the probability of independent action" (*Alexander*, 149 F.
Supp. 3d at 1000), and demonstrates a genuine issue of fact as to whether Defendants conspired to
raise prices from 2004 – 2010, which should be left for the jury to determine at trial.

Defendants contend that the evidence in this case is much like the evidence in *Text
Messaging*, which the Seventh Circuit found insufficient to withstand summary judgment. *See
Text Messaging*, 782 F.3d at 877-79. *See also* Defs. Mem. pp. 12-17; GP Mem. pp. 2, 6, 10, 15;
IP Mem. pp. 2, 12; TIN Mem. pp. 11-13; SS Mem. pp. 9, 11 n.5; WY Mem. pp. 5, 7, 13-14.
However, Plaintiffs' evidence in this case is far more robust and detailed than the evidence
considered in *Text Messaging*. In that case, the plaintiffs' evidence centered on an unpersuasive
alleged "smoking gun," combined with evidence of attendance at trade association meetings and
ensuing price increases that did not move in lockstep. *Id.*, 782 F.3d at 872. Unlike *Text Messaging*,

---

[112] *See* PSOF 40.

███

Plaintiffs' "extensive evidence;"[113] includes much more than attendance at trade association meetings and price increases. Plaintiffs have shown, *inter alia*, communications among Defendants surrounding the price increases and trade association meeting attendance followed almost immediately by simultaneous price increase announcements, evidence *Text Messaging* found lacking in that case but, had it been present, it would have been "compelling" enough to defeat summary judgment. *See id.*, 782 F.3d at 878. *See also Drywall*, 163 F. Supp. 3d at 197 ("opportunities to conspire may be more probative of a conspiracy when meetings of Defendants are closely followed in time by suspicious actions or records") (citing *Text Messaging*). Plaintiffs have also shown that Defendants sometimes announced price increases just before industry meetings, using those meetings to negotiate and solidify the increase. For these same reasons, Defendants' reliance on *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 762-63 (7th Cir. 2015), is equally unpersuasive.

Nor have Plaintiffs alleged a conspiracy to reduce capacity, despite Defendants' repeated efforts to reframe the allegations. *See* Defs. Mem, pp. 6-9; GP Mem. pp. 1, 11; IP Mem. p. 3; TIN Mem. pp. 1, 4-5, 7; SS Mem. pp. 1, 8; W Mem. p. 6. Rather, Plaintiffs allege that Defendants restricted *supply* relative to demand at opportune moments for the purpose of facilitating their price-fixing conspiracy. In sum, the evidence *in this case*, summarized below, when considered as a whole and in the context of *Plaintiffs'* horizontal *per se* illegal price-fixing theory, is sufficient to defeat summary judgment. *See In re Brand Name Prescription Drug Antitrust Litig.*, 1996 U.S. Dist. LEXIS 4335 at *35-36.

### a) Defendants' Battle Cries

Towards the end of 2003, with pressure from Wall Street mounting and forecasts predicting only moderate growth for Containerboard Products producers, SSCC – ringleader of the *Linerboard* conspiracy – renounced its recent history of competitive behavior and publicly

---

[113] *Kleen Prods. LLC*, 831 F.3d at 927. Notably, Chief Justice Wood authored *Kleen Prods. LLC* and served on the *Text Messaging* panel.



trumpeted a plan to curtail supply ███████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████ And then Defendants' collective behavior

changed.[116]  In 2004, each joined in the call to arms, circulating remarkably similar internal "battle

cry" memoranda calling ███████████████████████████████████████

██████████ In March 2004, IP's CEO John Faraci gave a ███████████████

████████████████████████████████████████████████ Days later,

PCA's Executive Vice President demanded ███████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ SSCC sought to ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████ In the midst of the price increase, in May 2004, GP Executive Vice

President Christian Fisher explained that ███████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ In August 2004, SSCC's CEO, Pat Moore, publicly

announced ███████████████████████████████████████████████████

(Notably, the battle cry time period roughly coincided with the previously described AF&PA

---

[114] PSOF 35; Resp. to SS SOF 4 ██████████████████████████████████
████████████████████████████████████ Resp. to SS SOF 8.

[115] *Id.*

[116] *See* PSOF 35-38.

[117] *Id.*

[118] PSOF 36

[119] PSOF 36.  *See also* Resp. to WY SOF 22.

[120] PSOF 35.

[121] PSOF 37.

[122] PSOF 38.

activities designed to reduce vulnerability to antitrust lawsuits.)  With the stage set, Defendants
went to work to fix prices collectively and, at the right moment, restrict supply to carry out their
scheme.  In fact, ███████████████████ became remarkably prescient, as between March
2004 and October 2005, the industry saw ██████████████████████████████████████
████████████████████████████████████

### b) Battle Cries Begat Lock-Step Price Increases

After sounding the drums, Defendants collectively announced ██████████████████
█████████ between 2004-2010. As the table in **Appendix A** demonstrates, each price increase was
announced within days of each other for almost simultaneous implementation, and nine were fully
implemented as announced. *See Titanium Dioxide*, 959 F. Supp. 3d at 827 (simultaneous price
increases at times of declining demand evidence of collusion). *See also In re Ethylene Propylene
Diene Monomer (EPDM) Antitrust Litig.,* 681 F. Supp. 2d 141, 167 (D. Conn. 2009) ("six lockstep
price increases" strong circumstantial evidence of a price-fixing agreement).

While the Defendants contend that their conduct was nothing more than conscious parallelism
(*see* Defs. Mem. pp. 12, 15; GP Mem. pp. 2, 10; IP Mem. p. 12; TIN Mem. p. 12; SS Mem. p. 9;
WY Mem. p. 2), the evidence demonstrates otherwise and shows a commitment to a common
scheme:



---

[123] *See* Appendix A.

[124] PSOF 40.

[125] *Id.  See also* Resp. to TIN SOF 42.

[126] *Id.*

[127] *Id.*



This evidence, combined with Defendants' 15 lockstep price increase announcements, readily distinguishes *Text Messaging* from this case. *Text Messaging* did not involve lockstep

---

[128] PSOF 41. *See also* Resp. to SS SOF 48.

[129] *Id.* While IP may have been the decision maker, SSCC frequently led IP in announcements. *See* Appendix A.

[130] Resp. to IP SOF 6.

[131] PSOF 44. *See also* Resp. to GP SOF 15.

[132] *Id.*

[133] *Id.*

[134] PSOF 46.

[135] PSOF 50. *See also* Resp. to GP SOF 34.

[136] *See* Appendix A.

[137] PSOF 45. *See also* Resp. to WY SOF 17.

[138] PSOF 48.

price increases because, according to the Seventh Circuit, price differences among the defendants lasted for "months on end" and, during most of the class period at issue, T-Mobile's price was five cents below Sprint's. *Text Messaging*, 782 F.3d at 877. Here, the price increase announcements were essentially simultaneous, for the same amounts and effective dates. And after the price increase announcements, no Defendant announced lower pricing.

Defendants also mischaracterize *Valspar Corp. v. E.I. DuPont De Nemours,* 152 F. Supp. 3d 234, 241-42 (D. Del. 2016) ("*Valspar*") on this point. There, the District of Delaware merely concluded that the lockstep price increases were not sufficient alone to support an inference of conspiracy, and that other plus factors must be present, as they are here. *Id*.

Defendants further argue that the price increases were not collusive because ███████ ████████████████████████████ *See* Defs. Mem. p. 13; GP Mem. pp. 10-11; IP Mem. p. 12; TIN Mem. p. 11; WY Mem. pp. 4-5, 15. First, Defendants conflate the existence of the conspiracy with its efficacy. *See Fructose*, 295 F.3d at 656. It is an axiom of antitrust law that all price increase attempts do not have to be successful for the underlying conspiracy to exist. *See e.g., Fructose,* 295 F.3d at 656 ("An agreement to fix list prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices"); *see also In re Flat Glass Antitrust Litig.,* 385 F.3d at 362; *In re Chocolate Confectionary Antitrust Litig.,* 999 F. Supp. 2d 777, 788 (M.D. Pa. 2014) (amended, No. 2:08-CV-00414, 2014 WL 4104474 (M.D. Pa. Aug. 19, 2014).

Second, Defendants fail to acknowledge that the unsuccessful price increase attempts are common in cartels[139] and served to stall declines and stabilize prices. Moreover, the fact that price increases could not be sustained on occasion without corresponding supply restrictions is evidence that demand conditions did not justify those price increases, and that the increases were contrary to Defendants' independent self-interest and consistent with collusion. *See Titanium Dioxide*, 959 F. Supp. 3d at 827. For example, before leading the ████████████████, SSCC's Vice

---

[139] PSOF 42. *See also* Resp. to DSOF 24-25.

President of Containerboard Sales Matthew Blanchard thought it ████████████████████████
████████████████████████████████████████████████████████████████████████

Yet, contrary to its own analysis, ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

That price increases failed after the financial crisis is even stronger evidence that demand

played little role in Defendants' decisions, and that those decisions were not those of rational actors

acting competitively. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

These illogical price increase attempts occurred because Defendants believed that the

conspiracy might overpower market conditions. The July 2008 price increase is illustrative. GP

was ████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ Thus,

the price increase made no economic sense unless ████████ trusted that Defendants would follow. Not

surprisingly, ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[140] PSOF 47.

[141] PSOF 47.

[142] PSOF 49.

[143] *Id* ████████████████████████████ also joined the effort. *See* Appendix A.

[144] PSOF 50.

[145] *Id.*

[146] *Id.* ████████████████████████████████████████████████████████████████
████████████████████████████████████████████ *See id.*
████

And, ███████████████████████ notwithstanding the generally depressed economy.[147] Noting ████████████████████████████████████
███████████████████████████████████████████████████
██████ One SSCC executive later observed that █████████████████████
████████████████████████████████ – a less than subtle reference to the *Linerboard* litigation time period. ██████████████████████████████████
███████████████████████████████████████████████████
IP internally circulated ████████████████████████████████
████████████

Just one month later ███████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████

Defendants tried to raise prices a third time ██████ but, according to Wall Street, the effort was thwarted by this litigation.[156] ████████████████████████████

---

[147] *See* PSOF 51.

[148] PSOF 52.

[149] *Id.*

[150] *Id.*

[151] PSOF 53.

[152] PSOF 54.

[153] PSOF 55.

[154] *Id.  See also* Resp. to GP SOF 42.

[155] PSOF 55.

[156] *See* PSOF 56.

██

 explicitly comparing Defendants' actions to the price increases of *Linerboard* years and allegations of inventory collusion.[157]

Just two examples from Defendants' own records disprove their claim of independent conscious parallelism: Countless other examples are discussed within, and the plethora of evidence demonstrating that Defendants exchanged pricing information with the effect to stabilize or otherwise influence prices is in and of itself sufficient to defeat summary judgment. *See Container Corp.*, 393 U.S. at 336-338 (exchanging pricing information with the effect of keeping prices "within a fairly narrow ambit" sufficiently evidences a conspiracy to withstand summary judgment).

Defendants' argument that pricing was not reflected in the PPW index (*see* Defs. Mem. p. 13; *see also* SS Mem. p. 8) is belied by evidence that As demonstrated by Plaintiffs' expert Dr. Mark Joseph Dwyer, the PPW index (*i.e.,* the prices charged to customers) rose in tandem with successful price increase announcements.[161] Both this Court and the Seventh Circuit recognized that the PPW price index rose as a result of the price increases, demonstrating that nearly all class members suffered antitrust impact. *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D.

---

[157] *Id.*

[158] PSOF 57. *See also* Resp. to IP SOF 6 (discussing Defendants' sharing of pricing information).

[159] TIN SOF 50, 51.

[160] Resp. to DSOF 22-23; Resp. to IP SOF 5, 8.

[161] Resp. to DSOF 23.

at 600 (finding strong evidence that Defendants' price increase announcements caused the PPW index to increase); *Kleen Prods. LLC*, 831 F.3d at 928-29 (affirming district court). Further, while Defendants introduce anecdotal evidence of some competition in transaction prices, as with *Titanium Dioxide*, *supra*, "while the record contains some evidence of competition, that portion of the record must be weighed against the substantial portion on which a jury could permissibly infer a conspiracy." 959 F. Supp. 2d at 824. *See also In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 994-95 (N.D. Oh. Feb. 9, 2015) (the court may not weigh evidence demonstrating competition and price negotiation at summary judgment; "[t]he Sherman Act proscribes effective as well as ineffective price-fixing conspiracies" (*citing United States v. Hayter Oil Co. of Greeneville, Tenn.*, 51 F.3d 1265, 1273-74 (6th Cir. 1995))).

The fact that non-defendant ███████████████████████████████ ████████████████ both toward the end of the Class Period, does not undermine the conspiracy. *See* Defs. Mem. p. 14; GP Mem. p. 6 n.6; SS Mem. p. 11. Defendants do not take into account the fact that after Longview ██████████████████████████████ ████████████ Moreover, as Dr. Harris stated, there "is nothing in the economic theory of cartels that suggests that non-cartel members cannot attempt to raise prices . . . [and] if a fringe firm believes that there is coordination among larger firms, it may be motivated to attempt a price increase to piggyback on the already aligned incentives of the other firms



---

162 Resp. to DSOF 26. *See also* Resp. to GP SOF 40.

163 Resp. to DSOF 26. "Agreeing to collectively match the price of a fringe firm is still an agreement." *Id.*

164 *Id.*

165 *Id.*

[REDACTED]

Finally, SSCC incorrectly asserts (1) that Plaintiffs' claims are limited to the post-bankruptcy period; and (2) that there is no evidence that it communicated with Defendants about pricing after being discharged from bankruptcy in June 2010. SS Mem. pp. 4-5, 6-8, 10. With respect to the former argument, this Court already found, and the Seventh Circuit affirmed, that it may be held jointly and severally liable for actions undertaken by its coconspirators before the discharge based on post-discharge participation. *See Kleen Prods. LLC*, 831 F.3d at 930. As for the latter argument, the question is not whether SSCC communicated with competitors, but rather whether it engaged in behavior that demonstrated participation in the alleged conspiracy. Here too this Court determined that the answer is yes. *See Kleen Prods LLC*, 306 F.R.D. at 608 ("Plaintiffs have provided evidence that RockTenn [SSCC] participated in the alleged conspiracy post-bankruptcy"). Evidence shows that the *day after* emerging from bankruptcy, [REDACTED]

[REDACTED] Not coincidentally, that evening [REDACTED]

[REDACTED] The evidence is clear that, bankruptcy notwithstanding, SSCC never left the conspiracy that it was instrumental in initiating and continued its participation post-discharge.[171]

---

[166] *Id.*

[167] *Id.*

[168] *See* Appendix A.

[169] PSOF 98.

[170] PSOF 48, 59.

[171] *See* Resp. to SS SOF 46 [REDACTED]

### c) Defendants Restricted Supply to Facilitate Price Increases

Traditional conspiracy evidence further confirms that Defendants undertook strategic supply restrictions to support their collusive price increases. Defendants argue that they are entitled to judgment because each Defendant dealt with capacity in different ways during the Class Period, with some not reducing capacity at all. *See* Defs. Mem. p. 7; GP Mem. pp. 1, 4-7, 11; IP Mem. pp. 2, 4-9; TIN Mem. p. 1, 3, 6; SS Mem. p. 7; WY Mem. pp. 1, 3-4, 6-8. This argument is a red herring. First, Plaintiffs have not alleged a conspiracy to reduce capacity, but rather a conspiracy to fix prices facilitated at times by various supply restrictions, including capacity but also inventory, downtime, slowbacks, trades, and other mechanisms. Second, the *mechanism* Defendants took to restrict supply or the fact that each Defendant restricted supply in a different manner is irrelevant. What matters is that Defendants restricted supply relative to demand, and did so to achieve the common objective to bolster their price increase initiatives.[172] And the evidence, including deposition testimony, shows that Defendants did just that through capacity reductions, diminished production through downtime, "slowbacks," or other mechanisms as a precursor to or concurrent with the price increases.[173] ███████████████████████████████ ██████████████████████████████████████████████████████████████ The table in **Appendix B** summarizes Defendants' supply restrictions in proximity to price increases throughout the course of the Class Period, excluding box plant closures and slowbacks.

---

██████████████████████████████████████ *See also* PSOF 58 (Executive Jeff Arp testified that ██████████████████████ SSCC's claims that Plaintiffs have not demonstrated antitrust injury likewise fail. As Plaintiffs previously explained, the company's post- (and pre-) bankruptcy conduct had post-bankruptcy price effects. *See* ECF No. 835, pp. 9-10.

[172] *See* Resp. to IP SOF 15; Resp. to TIN SOF 21. *See also* Resp. to SS SOF 9 (SSCC's supply restrictions were necessary because the company ████████████████████████████████ ████████ 45 (according to former COO Steven Klinger, it was easier ██████████████████ ██████████████████

[173] *See* PSOF 60; Resp. to IP SOF 15, 20-24.

[174] *See* Section IV.B.3.b.*, supra.*

[175] PSOF 60. *See also* Resp. to IP SOF 47; Resp. to GP SOF 14-43 ███████████████ ██████████

**The supply restrictions were frequently against Defendants' unilateral self-interest.**
Throughout the Class Period, Defendants reacted to increasing demand by eliminating product from the market. Defendants' documents explain that, from at least 2004 to 2008, demand ███ ███████████████████████████ yet Defendants restricted supply to increase prices. They knew that ███████████████████████████████████ ██████████████████ As stated by Plaintiffs' expert Dr. Harris: "[s]hutting capacity in the circumstances Defendants faced during the class period is both a facilitating practice and a potential 'plus factor' used to evaluate collusive behavior . . . The actions undertaken by the Defendants to close capacity do not appear to be consistent with their unilateral self-interests. Rather, it is only rational in the context of coordinated collective action."[178] This district has recognized that various supply restrictions are in fact "plus factors' indicative of collusion. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011) (capacity reductions were "plus factor" suggesting "consciously parallel behavior is the result of an illegal agreement"). *See also Petroleum Products*, 906 F.2d at 463 ("[t]he risk involved in leading a supply reduction suggests that purely interdependent supply restrictions are unlikely").

Consider supply restrictions taken in 2004, which led to two waves of industry-wide price increases. Starting with the "Battle Cry" memoranda, *supra*, ████████████████████ █████████████████████████████████████████████ GP, which ██████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████ Shortly after Christian Fisher circulated GP's battle cry ███████ ██████████████████████████████████████████████████████████████

---

[176] PSOF 59.

[177] Resp. TIN SOF 21.

[178] PSOF 59.

[179] *See* Section IV.B.3.a., *supra*.

[180] PSOF 61.



████████████████████████████████████████ TIN Executive Ron Zimbelman noted ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ These capacity restrictions came while inventories were ████████████████████████████ As a result, Defendants were able to ████ ████████████████████████████████

Although the ████████████████████████████████████ To that end, Defendants ████████████████████████████████████ SSCC announced the closure of ████████████████████████████████████ WY explained to Wall Street (and other Defendants listening to the earnings call) that it was going to take "the actions necessary" to ensure that it was not overproducing and announced that it would ████████████████████████████████████ Norampac announced the closure of ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ IP idled ████████████████████

████████████████████████████████████████████████████████

---

[181] *Id.*

[182] *Id.*

[183] *Id.*

████████████████████████████ PSOF 62.

[185] PSOF 63.

[186] *Id.*

[187] *Id.* ████████████████████████████████████ ████████ Resp. to WY SOF 12-15, 25.

[188] PSOF 63.

[189] *Id.*

█

An internal document suggests that IP took

Supply restraints continued in 2006. In February, PCA CEO Paul Stecko publicly explained that

TIN wrote

A GP employee stated that

---

[190] *Id.*

[191] *Id.*

[192] Defendants point to closures by PCA and Norampac as evidence that their capacity reductions were the product of legitimate business decisions. DSOF 12-16. However, PCA public statements indicate that

[193] PSOF 64.

[194] *Id.*

[195] *See* n.187, *supra.*

[196] *See* Appendix A.

[197] PSOF 64.



GP's Mike Adams told subordinates

In November, SSCC

Norampac thought its decision to remove

All told, Defendants removed just under

in 2005 and 2006.

Having implemented

WY explained

Defendants reduced capacity accordingly.  In April 2007, SSCC announced the closure of

and PCA CEO Paul Stecko announced that the company's containerboard inventories were

---

[198] Resp. to GP SOF 5, at Ex. 8.

[199] *Id.*

[200] PSOF 64.

[201] Resp. to DSOF 19.

[202] PSOF 64.

[203] PSOF 65.

[204] PSOF 66.

[205] PSOF 67.

[206] *Id.*

████████████████████████████████████████████████████
████████████████████████████████████ Defendants then announced
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████

Defendants continued to restrict supply in 2008.  While it is probable that business would slow during this period due to the decline in demand, Defendants' supply restrictions "outpaced" the decrease.[211]  And their successive price hikes in the face of such decreases in demand defy rational explanation.[212]

Officially, the Great Recession ended and economic growth renewed in mid-2009. Defendants concede that they restricted supply during this time, but claim this was a rational response to the steep decline in demand. *See* Defs. Mem. pp. 10-12; GP Mem. pp. 3-5; IP Mem. pp. 2, 10-11; TIN Mem. pp. 1-2, 6-7.  Evidence demonstrates otherwise.  For instance, in the second half of the year, IP announced the elimination of ████████████████████████████ ████████████████████████████████████████████████████████████████

---

[207] *Id.*

[208] *Id.*

[209] *See* Appendix A.

[210] PSOF 93.

[211] PSOF 68.  *See also* Resp. to DSOF 21.

[212] ████████████████████████████████████ *See* Appendix A.

[213] PSOF 69.  *See also* Resp. to IP SOF 48.  █████████████████████████████ ████████████████████████████████████████ Resp. to IP SOF 55, 57-58.

██



The 2009 supply restrictions set the stage for █████████████████████████████
████████████████████████████████████████████████████████████████████████████

██████████████ If that assertion is correct, it proves the point that price increases were not justified by market conditions.

Defendants' motivations for restraining supply are further evidenced by the way they closed mills, especially SSCC. In short, Defendants made sure that once mills were closed, they stayed closed. For instance:

█████████████████████████████████████████████████████████████████████████████
███████████████████████████████████
██████████████████████████████████

---

[214] PSOF 70. *See also* Resp. to SS SOF 24, 26, 31, 34 ████████████████████████
█████████████████████████████████ *See* Resp. to SS SOF 40.

[215] *Id.*

[216] PSOF 71.

[217] *Id. See also* Resp. to TIN SOF 26. ████████████████████████████████████
██████████████████████████████████████████████████ *Id.*

[218] PSOF 71 ██████████████ *See* Resp. to DSOF 17.

[219] *See* Resp. to GP SOF 25-27, 33-35.

[220] *See* PSOF 56.

[221] PSOF 75.

[222] *Id.*



**Defendants restricted supply to facilitate the conspiracy**. Defendants argue that their capacity and production decisions varied substantially and were independent business decisions, and they therefore could not have participated in a conspiracy to reduce capacity. Defs. Mem. pp. 7-12; *see also* GP Mem. pp. 8-11; IP Mem. pp. 4-10; TIN Mem. pp. 5-8; SS Mem. pp. 2, 13-14; WY Mem. pp. 2, 7-8. First, as previously noted, Plaintiffs have not alleged an agreement to reduce capacity, but rather that Defendants restricted supply in order to facilitate their price-fixing agreement and that the capacity reductions are a plus factor. Notwithstanding, "variations in the size of capacity reductions do not disprove the existence of a conspiracy, just as '[e]ven a single act may be sufficient to draw a defendant within the ambit of a conspiracy.'" ECF No. 193, n.8 (*quoting United States v. Consol. Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978)). Nor do capacity reductions need to be simultaneous to demonstrate the alleged conspiracy. *Id*. at n. 9 (*citing In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09 C 7666, 2011 WL 462648, at *7 (N.D. Ill. Feb. 9 2011)). Moreover, to the extent relevant in a *per se* case,

---

[223] PSOF 72. The mill was owned by ███████████ *See also* Resp. to SS SOF 15-16.

[224] PSOF 75. *See also* Resp. to SS SOF 15-16.

[225] PSOF 75.

[226] *Id.*

[227] PSOF 76. *See also* Resp. to IP SOF 36.

Defendants' claims that independent business decisions such as cost savings justified drawing down inventory levels are contradicted by Defendants' executives' testimony and documents. The following are just a few examples:



---

[228] PSOF 77. *See also* Resp. to TIN SOF 14, 26.

[229] Resp. to TIN SOF 21.

[230] PSOF 77.

[231] PSOF 60.

[232] *Id.*

[233] PSOF 76; Resp. to IP SOF 36.

[234] Resp. to IP SOF 15 at Ex. 96- 97.

[235] PSOF 60.

[REDACTED]

Defendants' arguments that they did not take downtime or slowbacks at the same exact time and in the same amount is similarly irrelevant. *See* Defs. Mem. pp. 3-5, 8-10; GP Mem. pp. 3-5; IP Mem. pp. 4-8; TIN Mem. pp. 6-7; SS Mem. p. 8; WY Mem. pp. 1, 6. As noted above, the supply restrictions did not need to be simultaneous in this case (*see* ECF No. 193, n.9), but even so, the contemporaneous business records discussed above confirm Defendants' understanding that supply restrictions would facilitate price increases. It does not matter that they took different forms of supply restrictions, including downtime and slowback among others, is irrelevant. The issue is whether Defendants consciously committed to a common goal to raise prices, and the evidence here strongly points to the affirmative. *See Monsanto*, 465 U.S. at 764-765. As noted above, decisions to cut back production or reduce capacity where supply expansion must be planned well in advance are indicative of collusion. *In re Plasma-Derivative Therapies Antitrust Litig.*, 764 F. Supp. 2d at 1002. "This sort of parallel behavior has been described as 'perilous leading' because, absent an agreement, the first firm to move takes a significant risk that competitors won't follow. … If [one defendant] had cut is production, but [another defendant] refused to follow, [the first defendant] might not have realized its error until months later when [the second defendant] would have the ability to capture a greater share of the market." *Id.*, at 1002 (*citing* 6 Areeda & Hovenkamp ¶ 1425d; *Petroleum Products*, *supra*, 906 F.3d at 463).

Nor were supply restrictions limited to containerboard mills. A corrugator is a machine that combines linerboard and medium to make the containerboard sheet that is then used to produce corrugated products. If a box plant is closed and the corrugator is removed from service, the ability to make containerboard is reduced.[237] GP closed [REDACTED]

---

[236] *Id.*

[237] PSOF 79.

54

████████████████████████████████████████████████████ Other Defendants also closed box plants.[239]

GP's conduct during the Class Period is illustrative. GP argues that it could not have participated in the alleged conspiracy because it did not close a mill during the Class Period. *See* GP Mem. pp. 1, 3, 8, 15; GP SOF 4-6. Regardless of whether GP may have closed a containerboard mill, the company restricted supply through other mechanisms throughout the Class Period to prop up the conspiracy.[240] Significantly, GP engaged in ████████████████████████████ ████████████████████████████████████████████████ As GP described it:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████ is inefficient and only makes economic sense if done as part of an understanding with competitors, thereby shifting the industry-wide demand curve to a higher

---

[238] PSOF 80.

[239] *Id.*

[240] *See* Resp. to GP SOF 5.

[241] *Id.*

[242] *Id.* ████████████████████████████████████████████
████████████████████ *Id.*

█

price level.[243]



TIN likewise claims exoneration because it did not close, shutter or indefinitely idle its containerboard mills during the Class Period.  *See* TIN SOF 21.  However, TIN closed at least

<br>

---

[243] *Id.* ██████████████████████████████
████████████████████████

[244] *See* Resp. to GP SOF 5. ████████████████
███████████████

[245] *Id.*

[246] *Id.*

[247] *See id.*

[248] *See* Resp. to TIN SOF 21.

[249] *Id.*

[250] *Id.*

Indeed, the evidence against TIN is compelling. The company was not performing well during the early 2000's; its market share had diminished and its system was running poorly, which it tried to correct by behaving competitively.[251] When that strategy failed, TIN turned to collusion. It engaged in every price increase during the Class Period,[252] and understood that



Executives' statements are similar to those found in *Fructose*, *supra*, with one saying that TIN would be

By 2011, TIN confirmed to the United States Department of Justice as part of its acquisition by IP that

To negate the existence of the alleged conspiracy, Defendants contend that they closed less capacity per year during the Class Period as compared to 1998 -2003. Defs. Mem. p. 7. *See also* IP Mem. p. 2; WY Mem. pp. 1, 4. This argument fails for many reasons. First, the data on which

---

[251] *See* TIN SOF 9. *See also* PSOF 18.

[252] *See* Appendix A.

[253] *See* PSOF 40.

[254] Resp. to TIN SOF 45.

[255] *See* Resp. to TIN SOF 11. *See also* TIN SOF 45.

[256] *See* Resp. to TIN SOF 45.

[257] Resp. to TIN SOF 49-50.

[258] PSOF 170, Resp. to TIN SOF 18.

[259] PSOF 170.

Defendants rely to support this point is misleading. The data cited refers only to mill *closures*,[260] which is but only one of the many ways in which Defendants restricted supply. *See* pp. 51-56. Second, Defendants' argument hinges on their mischaracterization of the conspiracy as a capacity reduction conspiracy as opposed to price-fixing. Third, Defendants' argument fails to couple closures and other supply restrictions with price increase announcements, which distinguishes the Class Period from pre-class behavior. Finally, Defendants' claim that they increased capacity by reducing the amount of downtime or slowback taken (*see, e.g.,* GP SOF 10) is not feasible, as neither downtime nor slowback affect capacity – they affect operating rates, inventory and/or output.[261]

In addition, capacity closures occurring *before* the Class Period set the stage for coordinated price increases *during* the Class Period.[262] Just after the first price increase of the Class Period was announced, the president of the AICC informed members that producers had ███████████████████████████████████████████████ The Seventh Circuit noted that "[c]apacity in the industry [during the Class Period] was declining in North America, though increasing elsewhere; meanwhile, demand was constant or increasing. Defendants increased prices at least once during the recession of 2008 and 2009, and they raised prices again twice in 2010. Inventory levels were decreasing, because of several steps they took: they closed many mills; they indefinitely idled some; they temporarily idled others; and they slowed down production. In 2005, they announced mill closures representing 931,000 tons of capacity, and shortly thereafter

---

[260] *See* PSOF Ex. 7 (Harris Class Decl. p. 35). *See also* PSOF Ex. 556 (Zona Merits Rep., ¶¶25-26, 28-30) (explaining that Defendants closed more mills and decreased capacity at a higher rate during the Class Period than during the benchmark periods, and that the capacity reductions were not explained by other factors; he similarly concluded that Defendants reduced box plant capacity at a higher rate during the Class Period).

[261] *See* Resp. to GP SOF 10.

[262] *See* PSOF 25. *See also* Resp. to IP SOF 17.

[263] PSOF 26.

they raised prices $30/ton. They did much the same thing in 2009. Communication among the Defendants was easy, thanks to trade associations." *Kleen Prods. LLC*, 831 F.3d at 924.

**Defendants did not increase domestic capacity during the Class Period.** Defendants further claim that they could not have conspired because they increased their overall production or capacity during the Class Period. Defs. Mem. at 9; *see also* GP Mem. pp. 1, 4-7, 11; IP Mem. pp. 2, 4-9; TIN Mem. pp. 1, 3, 6; SS Mem. p. 7; WY Mem. pp. 1, 3-4, 6-8. This Court has already considered Defendants' capacity increase argument and found it "unconvincing," citing *Fructose*.[264] ECF No. 193, n.10. However, Dr. Harris has shown that Defendants did not add net capacity for Containerboard Products to be sold in the United States.[265] And, as noted above, closing mills is only one way in which Defendants restricted supply; every Defendant, including GP and TIN, removed product from the market during the Class Period.[266] Moreover, Defendants' collective capacity restrictions routinely dwarfed any additions.[267]

Moreover, new capacity not intended for the domestic market, but rather was specifically earmarked for export.[268] TIN used the export market ███████████████ IP manager Minh Zhu explained that ████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ While IP cites the conversion of its

████████████████████ as an example of expansion (IP Mem. p. 9), it fails to mention

---

[264] To the extent Defendants claim that capacity increases took place after price increases, "'no further action by the conspirators is required to effect the objectives of the conspiracy' because 'each sale at the fixed price continues to benefit the conspirators.'" ECF No. 193, n.10 (*quoting Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 838 (11th Cir. 1999)).

[265] *See* PSOF 77. *See also* Resp. to IP SOF 40-44; Resp. to TIN SOF 10, 12, 17 (TIN did not increase market share during the Class Period).

[266] *See* discussion *supra*, pp. 45-56. *See also* Resp. to TIN SOF 8.

[267] *See* discussion *supra*, pp. 45-56.

[268] PSOF 81.

[269] Resp. to TIN SOF 8.

[270] PSOF 81.

evidence showing that ████████████████████████████ As IP CEO John Faraci later explained, ████████████████████████████████████████ ████████

SSCC's claims of increased Containerboard Products production and capacity after emerging from bankruptcy (SS Mem. p. 7) likewise does not excuse it from the conspiracy, as ample evidence demonstrates its continued participation. *See* Section IV.B.3.a, *supra*; *Kleen Prods*, 306 F.R.D. at 608 (finding that evidence supports that SSCC participated in the alleged conspiracy post-bankruptcy). The record not only shows that SSCC met



Finally, observations about absolute levels of capacity and production without consideration of demand and market structure are irrelevant if not misleading.[277] Supply restrictions must not be viewed in a vacuum, but in the context of the conspiracy as a whole. As the Seventh Circuit has explained, "[t]his behavior does not disprove the existence of the conspiracy." *Fructose*, 295 F. 3d at 657. "Maintenance of excess capacity discourages new entry,

---

[271] *Id.*; Resp. to IP SOF 39-40. In fact, IP shuttered ████████████████ *See* Resp. to PSOF 81.

[272] Resp. to IP SOF 39.

[273] PSOF 98.

[274] *See* PSOF 82. To the extent SSCC claims it could not have participated in the conspiracy during bankruptcy because of oversight, Plaintiffs have demonstrated that, as the debtor in possession, SSCC retained control over all of its business decisions, including price increases and capacity reductions. *See* ECF No. 1145, p. 8-9, 11-12.

[275] PSOF 177.

[276] PSOF 82.

[277] *See* Ex. 5 (Harris Class Reply pp. 32-35).

█

which supracompetitive prices would otherwise attract, and also shores up a cartel by increasing the risk that its collapse will lead to a devastating price war ending in the bankruptcy of some or all of the former cartelists." *Id*.

### d) Direct Communications

The record is also replete with evidence of direct communications among Defendants, including communications regarding pricing and supply (which were followed by across-the-board price increases), summarized below. *See Titanium Dioxide,* 959 F. Supp. 2d at 830 ("Communications between competitors, followed by price increases by multiple sellers, may indicate that prices rose pursuant to an agreement.") (*citing In re Flat Glass Antitrust Litig.,* 385 F.3d at 364-67 and *In re Publ'n Paper Antitrust Litig.,* 690 F.3d at 57-59).

**Trade Association Meetings**. Trade association meetings, such as those organized by the American Forest and Paper Association ("AF&PA") and Fibre Box Association ("FBA"), provided opportunities for Defendants to meet in person to discuss and effectuate the conspiracy throughout the Class Period.[278] As Robert Kirshner, former General Counsel for the AF&PA, testified, the association's largest members (which included Defendants) served ██████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ ▎

Defendants' membership in the Paperboard Export Association of the United States ("PEA") also provides a striking example of their use of trade associations to mask cartel behavior. PEA members, ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████ *Id*

---

[278] *See also* Resp. to DSOF 31-32. *See also Kleen Prods. LLC*, 831 F.3d at 924 ("Communication among the Defendants was easy, thanks to trade associations").

[279] PSOF 83.

[280] *Id*.

[REDACTED] However, record evidence demonstrates that they routinely discussed [REDACTED]

Defendants point out that non-Defendants attended trade association meetings, but fail to acknowledge that these meetings provided opportunities for Defendants to have private meetings, as well as to attend association-sponsored social events. As SSCC explained to TIN, [REDACTED]

[REDACTED] Most importantly, Defendants' trade association attendance coincided with significant events. For example:

- [REDACTED] While the first price increase was being implemented in [REDACTED]

- [REDACTED] Around the same time, the AF&PA issued its [REDACTED] [288]

- [REDACTED] In April 2005, shortly after [REDACTED] Defendants attended [REDACTED]

---

[281] Resp. to WY SOF 18.

[282] *Id.*

[283] PSOF 84. *See also* PSOF 84 at Ex. 7 (Harris Class Decl., ¶ V.H.1, at 32 [REDACTED])

[284] PSOF 84.

[285] *Id.*

[286] *See* Section IV.B.3.a., *supra*.

[287] PSOF 86. [REDACTED] *Id.*

[288] *See* PSOF 32-34.

[289] *Id.*

- As Defendants were announcing ███████████████████ company representatives attended ████████████████████████████████████████████████████████████████████████ ████████████████████████████████ [9]

█ On February 8, 2006, IP's CEO ████████████████████████████ ███████████████████████████████████████ The next day, ██ ████████████████

- The ████████████████████████████████████████ five days after ████████████████████████████████

█████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Tr ██████████████████ [8] [296]

- Just prior to announcing ████████████████████████████ ████████████████████████████████████████ IP, SSCC, TIN PCA and WY attending an AF&PA meeting held around the same time. [296]

█ While Defendants were █████████████████████████████████ ████████████████████████████ n [5]

---

[290] PSOF 89.

[291] *Id.*

[292] PSOF 88; Resp. to WY SOF 26; Resp. to IP SOF 67.

[293] PSOF 88; Resp. to IP SOF 67.

[294] PSOF 93.

[295] PSOF 90.

[296] PSOF 92. ██████████████████████████████ ██████████████████ PSOF 91.

[297] PSOF 94.

[298] *Id.*

[299] PSOF 97; Resp. to SS SOF 59.

- GP and IP announced the ███████████████████████████
███████████████████████████████████████████████████
███████████

As noted above, Judge Shadur found the evidence of price increases "soon after industry gatherings" "striking," and gave this evidence "significant weight."[301]  *Text Messaging* likewise instructed that such evidence would be "compelling" to defeat summary judgment.  782 F.3d at 878.  *See also Drywall*, 163 F. Supp. 3d at 197 ("opportunities to conspire may be more probative of a conspiracy when meetings of Defendants are closely followed in time by suspicious actions or records").

Defendants contend that, because various trade association sub-committee meetings occurred "frequent[ly]," it could be unfairly argued that any price increase announcement would be suspicious.  Defs. Mem. p. 19; *see also* GP Mem. pp. 14-15; TIN Mem. p. 13; SS Mem. pp. 2, 11-12; WY Mem. pp. 2, 4. 14-15.  This argument ignores the fact that a number of price increases came contemporaneously or within days of a trade association meeting and often after private meetings between conspirators took place, distinguishing this case from *Valspar* (on which Defendants rely), where price increases occurred within 30 days of a trade association meeting.  *See* 152 F. Supp. 3d at 245-247.  Further, unlike *Valspar*, other district courts have concluded that price increase announcements occurring within 30 days of a trade association meeting did raise an issue of fact to preclude summary judgment.  *See Titanium Dioxide,* 959 F. Supp. 2d at 809 (88 percent of price increases occurring within 30 days of a trade association meeting probative of collusion).

---

[300] PSOF 98.

[301] ECF No. 193, p. 18.

**Inter-Defendant Telephone Calls and Meetings**. Evidence further demonstrates that Defendants' CEOs and top executives directly communicated with each other regularly throughout the Class Period, and records reveal numerous telephone calls and meetings that coincide with Defendants' price increase initiatives.[302] For instance:



▪ Between January 7, 2005 and February 23, 2005, SSCC made numerous phone calls █

▪ SSCC first called █

[302] Plaintiffs obtained telephone records from certain Defendants directly; others claimed to not have records for the Class Period. In those instances, Plaintiffs were required to subpoena telephone and cellular phone carriers to obtain a more comprehensive depiction of telephone calls placed between all Defendants. The phone records produced by the telephone and cellular phone companies were, in some instances, incomplete because the company no longer had records dating back to the beginning of the Class Period. A complete production of all telephone records for the entire class period would likely reveal even more communications between Defendants. The records relevant to responding to Defendants' summary judgment motions have been summarized in Exhibit 1 to the Affidavit of Mary Frantz ("Frantz Aff."). *See* PSOF 99-117. *See also* Resp. to IP SOF 6, 67 (describing inter-Defendant communications).

[303] PSOF 99. *See also* Resp. to WY SOF 21.

[304] *See* Appendix A.

[305] PSOF 99; Resp. to WY SOF 21.

[306] *See* Appendix A.

[307] PSOF 100.

[308] *See* Appendix A.



On August 1, 2005, ▓▓▓ On August 26, 2005,

On September 6, 2005 ▓▓▓ That same day, SSCC telephoned ▓▓▓. On September 8, WY CEO Steven Rogel called

On January 27, 2006, a TIN Vice President of Sales spoke with ▓▓▓ A few days later, the General Manager of Containerboard at Norampac called

On September 6, 2006 ▓▓▓ On October 26,

---

[309] PSOF 100.

[310] *See* Appendix A.

[311] PSOF 101. *See also* Appendix A.

[312] PSOF 102.

[313] PSOF 102. *See also* Appendix A. Notably, shortly after the price increase was implemented, IP CEO John Faraci met with ▓▓▓ PSOF 103.

[314] PSOF 104.

[315] *See* Appendix A.

- SSCC's Brian McGurk emailed ███████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

- The price increase was not implemented; SSCC CEO Patrick Moore spoke with ██████
██████████

██████████████████████████████████████

- The price increase was led by █████ IP CEO John Faraci called ████████████████
██████████ When the price increase was not implemented, Mr. Faraci called ███████████

███████████████████████████████████████

- Starting on June 29, 2007, SSCC attempted to reach ███████████████ On July 1, 2007,
███████████████████████

- On July 3, PCA and GP announced.  SSCC contacted ████████████████████████
████████████████████

████████████████████████████████████

- A December 2007 internal SSCC ████████████████████████████████████
███████████████████████████████████████

---

[316] PSOF 105.

[317] *See* Appendix A.

[318] PSOF 106.

[319] *See* Appendix A.

[320]  PSOF 107.

[321] *Id.*

[322] PSOF 108.

[323] *See* Appendix A.

[324] PSOF 108.

[325] PSOF 109.



On January 30, 2008, TIN contacted █████████████████████████████████
████████████████████████████████████████████████████████████████████

On February 1, 2008, SSCC ████████████████████████ On February 4, 2008 TIN
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████ SSCC CEO Patrick Moore
███████████████████████████████████████████████████████

███████████████████████████████████████████

IP led █████████████████████████████████ The company then began
███████████████████████████████████████████

On September 2, SSCC President Steve Klinger called ████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████ The next day, both GP and SSCC ████████████████████
████████████████████████

████████████████████████████████████████████████████████

In the midst of implementing capacity cuts in ████ IP CEO Faraci spoke directly with ████
████████████████████████████████████████████████████

---

[326] PSOF 94.

[327] PSOF 110.  *See also* Appendix A.

[328] PSOF 112.

[329] *See* Appendix A.

[330] PSOF 113.

[331] PSOF114. ████████████████████████████████████ *Id*.



- On November 10, 2009, the CEO's of ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- On December 1, a TIN Vice President contacted ████████████████ That same day, TIN and SSCC ████████████████████████████████████████████████████████████████████████████████████████

The number and extent of communications among Defendants surrounding the May 2008 price increase announcements is particularly telling. *See* **Appendix C**. The day before GP's ████████████████████████████████████ the company called ████████████████████████████ ████████████████████████████ The morning of the announcement, a flurry of phone calls and faxes were exchanged between Defendants, including a call between ████████ ████████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████████ ████████████████████ Also compelling is the number of calls between the Defendants surrounding other price increases, as well as the calls proximity to the announcements, as depicted in **Appendices D, E** and **F**.

**Inter-Defendant Trades and Exchanges**. Trades also provided Defendants with a means to communicate directly concerning the conspiracy. *See* Harris Decl., ¶ VI.B.5, at 41("The use of trades between Defendants as well as inter-Defendant sales of product also provide the opportunity

---

[332] *Id. See also* Appendix A.

[333] PSOF 116.

[334] PSOF 115.

[335] PSOF 111.

for communication between the Defendants. Not only were Defendants discussing their trade needs but also the downtime and closures of their mills.").[336] As noted above, trades were one mechanism through which Defendants achieved *de facto* consolidation, serving as each other's largest customers. Record evidence shows that, under the guise of trade relationships, Defendants discussed their anticompetitive schemes, including pricing and supply decisions.[337] Some examples:



- In September 2007, SSCC met with ██████████████████████████ ████████████████████████

  ██ One of SSCC's true objectives in trading with ███████████████████████ ████████████████████████

  ██ IP's Donna Lajeunesse told ███████████████████████████ ██████████████████████████████ ████████████████████

  ██ Weyerhaeuser notified competitors who were also trading partners of ████████ ████████████

---

[336] Defendants' contend that Dr. Harris concedes that he found no evidence Defendants used trades to share confidential pricing or production information. (Citing Joint Ex. 73 (Harris Dep.) at 396:8-23.) However, Dr. Harris actually testified that he has not seen evidence that trades were used as "side payments." He has always contended that the evidence demonstrates that Defendants used trades to facilitate conspiratorial discussions, as stated above.

[337] *See* Resp. to TIN SOF 45 (TIN and competitors discussed ████████████████████ ████████████████)

[338] PSOF 119.

[339] PSOF 122.

[340] *Id.*

[341] PSOF 123.

[342] PSOF 121.

███ SSCC executive Brian McGurk directly informed ███████████████████████████
██████████████████

███ Although IP's antitrust policy ████████████████████████████████████████████
████████████████████████████████████████████████████████

**Misuse of Merger and Acquisition Talks.**   Merger and Acquisition talks provided a forum for direct communications between high level executives about pricing and capacity.   For example, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

It is reasonable to infer from these discussions that GP and IP were using merger discussions as a pretext to collude.   ████████████████████████████████████

---

343 PSOF 120.

344 *Id.*

345 PSOF 124.

346 *Id.  See also* Resp. to DSOF 33 (additional examples of trades being against Defendants' respective unilateral interests).

347 PSOF 125. *See also* Resp. to GP SOF 50.

348 *Id.*

349 *Id.*

350 *Id.*

██



■■ ██████████████████████████████████

██████████████████████████████████ - behavior inconsistent

with wanting to take on additional capacity from GP.  Significantly, ████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████ Additional examples of pretextual mergers and

acquisitions discussions include:

---

[351] PSOF 114, 126.

[352] PSOF 114, 127.

[353] PSOF 127.  *See also* Resp. to IP SOF 57.

[354] ████████████████████████████████████ PSOF 127.

[355] *Id.*

[356] *Id.*

[357] Resp. to IP SOF 67.

[358] Resp. to IP SOF 67; Resp. to TIN SOF 18.

[359] *Id.*  Resp. to TIN SOF 18.

[360] Resp. to TIN SOF 18.  *See also* Resp. to WY SOF 42.

[361] Resp. to TIN SOF 18 █████████████████████ *Id. See also* Resp. to SS SOF 67.

[362] PSOF 130.

██



### e) **Conduit Evidence**

Wall Street analysts served as Defendants' conduits, facilitating price increases while allowing Defendants to avoid direct communication. As IP explicitly stated, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Consistent with Mr. Read's testimony, the evidence here shows that the Defendants used certain analysts, Mark Wilde of Deutsche Bank in particular, to exchange information, such as when supply needed to be restricted

---

363 *Id.*

364 *Id.*

365 PSOF 131.

366 PSOF 128.

367 *Id.*

368 *Id.*

369 PSOF 132.

370 PSOF 133.

371 *Id.*

▉

to facilitate a price increase, and that Mr. Wilde was aware of his role.[372]  Similar conduit evidence was found compelling in *Titanium Dioxide*.  959 F. Supp. 2d at 829.    The following illustrates analysts' involvement in the cartel:



**2004**

Following Defendants' 2003 and early 2004 supply restrictions

**2005**

In April, Mr. Wilde told Defendants that

- Defendants announced                              promptly after these reports were issued.

---

[372] *See* Resp. to DSOF 35-37.

[373] PSOF 134.

[374] PSOF 135.
                                              *Id.*

[375] PSOF 136.

[376] *See* Section IV.B.3.c., *supra*.

[377] PSOF 137.

[378] *Id.*

[379] PSOF 138.



One month later, Defendants attempted to raise prices.

---

[380] *Id.*

[381] Resp. to SS SOF 7.

[382] PSOF 139.

[383] *Id.*

[384] *Id.*

[385] *Id.*

[386] PSOF 140.

[387] *Id.*

[388] *Id.*

[389] *Id.*

[390] PSOF 141.  In response to Mr. Wilde's report, WY commented that it was ███████████ █████████████████████████████████████████ *Id.*

███



---

391 *Id.*

392 *Id.*

393 *See* Ex. 1 to Frantz Aff. at 22.

394 PSOF 47.

395 PSOF 142.

396 *Id.*

397 *Id.* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓ *Id.*

398 PSOF 142.

399 *Id.*

400 PSOF 113.

401 PSOF 144.

402 *See* Section IV.B.3.c., *supra.*



Defendants' interactions with Mr. Wilde was beyond that of a typical Wall Street analyst relationship. For example,

Mr. Wilde's numerous conversations and interactions with IP's Tom Cleves are discussed at length above.

### f) Other Signaling Evidence

As another means of signaling, Defendants used earnings calls to transmit pertinent information, such as supply restrictions, that would allow for price increases. The calls did not repeat information contained in public filings, but rather provided granular details and public

---

[403] PSOF 145.

[404] *See* Resp. to IP SOF 6. *See also* Ex. 1 to Frantz Aff. at 54.

[405] PSOF 146. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Appendix A.

[406] PSOF 148.

[407] *Id.*

[408] PSOF 149.

[409] *Id.*

commitments to other Defendants.[410]  For example, in October 2005, SSCC CEO Pat Moore, announced in an earnings call that "market inventory levels are at a very low 3.9 weeks of supply and we are implementing price increases to our customers."[411]  In January 2007, IP executive Carol Roberts advised CEO John Faraci that the ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ Sure enough, in IP's February 1, 2007 earnings call, Mr. Faraci announced that IP was taking a "huge amount of downtime … in the first quarter as a result of maintenance outages ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

Other examples include TIN's CEO Doyle Simons reassurance that TIN was "not sacrificing price in order to gain volume,"[416] and explanation that operating rates were high and inventories were low.[417] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[410] *See, e.g.,* Opposition to Defendants' Motion to Exclude Expert Larry Cunningham, filed concurrently herewith.  *See also* ECF No. 1109 (Motion to Exclude Expert Opinions and Testimony of John J. Huber).

[411] PSOF 150.

[412] *Id.*

[413] *Id.*

[414] *Id.  See also* Resp. to IP SOF 21 (discussing other public downtime announcements).

[415] PSOF 151.

[416] PSOF 150.

[417] *Id.*

[418] Resp. to WY SOF 5.  *See also* Resp. to WY SOF 16 (discussing signaling in for price increases).

[419] *Id.*

Defendants also used trade association presentations as a means of signaling. For instance,

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

████████ This admonition was perceived to be a call for less price competition for customers between the integrated producers – *e.g.,* Defendants.[422] ██████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████

Defendants also frequently used terms such as "discipline" as shorthand for capacity and inventory reduction, and "good conduct" (*i.e.,* non-competitive) as an indicator of actions that facilitated the conspiracy. *See e.g., Titanium Dioxide,* 959 F. Supp. 2d at 829 (competitor statements regarding industry "discipline" probative of a conspiracy). SSCC explained that it had

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████

Wall Street enthusiastically spread Defendants' messages of "discipline" and "good conduct." ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ as

---

[420] PSOF 152.

[421] *Id. See also* Resp. to GP SOF 22. ████████████████████████████
████████████████████████████████████████████ PSOF 152.

[422] PSOF 152.

[423] *Id.*

[424] PSOF 153.

[425] *Id.*

[426] *Id.*



### 4. Defendants Engaged In Conduct Against Self-Interest

In addition to the traditional conspiracy evidence noted above, record evidence confirms that Defendants acted contrary to their economic self-interest, or undertook "actions that are 'inconsistent with competition in the industry.' '[A]bsent increases in marginal cost or demand, raising prices generally does not approximate – and cannot be mistaken as – competitive conduct.'" *Titanium Dioxide*, 959 F. Supp. 2d at 827 (evidence that defendants shared confidential and commercially sensitive information about their businesses, helped each other maintain market share, engaged in interfirm sales rather than competing, and increased prices at times of declining demand are evidence of actions against self-interest) (*quoting In re Flat Glass Antitrust Litig.*, 385 F.3d at 358, 361-62). As Areeda and Hovenkamp explain, acts against self-interest indicative of collusion are those that "would be against self-interest unless rivals act the same but where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such agreement. In that event, common action would imply a traditional agreement." Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: Anal ysis of Antitrust Principles and Their Application*, ¶ 1434c1. The record is replete with examples of Defendants engaging in conduct that no reasonable firm would take absent agreement.

---

[427] *Id.*

[428] PSOF 25.

[429] PSOF 154.



Shortly after Defendants announced

---

[430] PSOF 165; Resp. to GP SOF 5.

[431] PSOF 63.

[432] PSOF 166.

[433] *Id.*

[434] PSOF 167.

[435] PSOF 168.

[436] PSOF 169; Resp. to IP SOF 11.

[437] *Id.*

IP's handling of the ████████████████████ is a prime example of behavior against self-interest.

In 2009, during a severe economic downturn and at a point when they presumably should have had excess supply due to the drastic demand shortage, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

438 PSOF 170. ██████████████████████████████████████████
████████████████████████████████████████████

*Id.*

439 *Id.*

440 PSOF 171.

441 Resp. to IP SOF 6.

442 *Id.*

443 *Id.*

444 PSOF 171.

445 PSOF 97.

The supply shortage extended into 2010, when Defendants ██████████████████████████ ███████████████████████ Supply was so low that SSCC's CEO publicly stated that it would "be difficult to contract much further"; nonetheless, the company ████████████████████████

---

446 PSOF 172.

447 *See* Appendix A.

448 PSOF 173. ██████████████████████████████████████████
████████████████████████████████████ *Id.*

449 PSOF 174. *See also* Resp. to IP SOF 3.

450 *Id.*

451 *Id. See also* Resp. to IP SOF 15.

452 Resp. to IP SOF 15.

453 PSOF 172; IP SOF 15.

454 *See* Appendix A.

455 PSOF 175.

Evidence further demonstrates that, rather than attempt to add customers, Defendants chose to help each other maintain market share. For instance, in



Defendants attempt to refute Plaintiffs' conspiracy evidence by pointing to emails from low-level employees purporting to show competitive behavior. Noticeably absent is similar evidence from each company's decision-makers, raising the inference that such evidence "would have been unfavorable" to them.[461] *Interstate Circuit, Inc.*, 306 U.S. at 226. As the Supreme Court explained, the "production of weak evidence when strong is available can only lead to the conclusion that the strong would have been adverse. … Silence then becomes evidence of the most convincing character." *Id. See also In re Flat Glass Antitrust Litig.*, 385 F.3d at 368-369 ("price

---

[456] PSOF 157.

[457] *Id.*

[458] PSOF 176.

[459] *Id.*

[460] PSOF 177.                                            *Id.*

[461] *See* Resp. to TIN SOF 47, 51; Resp. to WY SOF 44-45; Resp. to SS SOF 55-56.

discussion among low level sales people has little probative weight; we distinguished the far different situation where upper level executives have secret conversations about price").

Defendants further claim that summary judgment is warranted because their executives have denied the conspiracy's existence. However, such self-serving denials carry very little weight in the Seventh Circuit, particularly against the volume of evidence discussed above indicating that Defendants were acting pursuant to a common scheme.[462] *See Products Liab. Ins. Agency v. Crum & Forster Ins. Companies*, 682 F.2d 660, 662 (7th Cir. 1982) (Posner, J) (holding "conclusional denials of conspiracy" entitled to "little weight in deciding whether to grant an antitrust defendant's motion for summary judgment"). *See also Apex Oil v. Di Mauro*, 822 F.2d 246, 256 (2d Cir. 1987) ("the finder of fact should decide whether the denial of conspiracy by the defendants should be accepted"); *Minpeco S.A. v. Conticommodity Services, Inc.*, 673 F. Supp. 684, 692 (S.D.N.Y. 1987) (it is for the jury to decide whether "denials should be accepted and how to resolve the apparently conflicting evidence").

## V.    CONCLUSION

The mountain of evidence submitted here confirms the Seventh Circuit's findings at class certification: the "extensive evidence [] if believed, would be enough to prove the existence of the alleged conspiracy," and thus should be left as an issue for the jury to decide at trial. *Kleen Prods. LLC*, 831 F.3d at 927. This evidence raises a myriad of triable issues of material fact and is clearly sufficient for a reasonable jury to infer the existence of an agreement among Defendants to fix prices for Containerboard Products between 2004 and 2010. Plaintiffs therefore respectfully request that the Court deny Defendants' motions for summary judgment in their entirety.

---

[462] *See also* Resp. to DSOF 28-29; Resp. to IP SOF 69.

Dated:  March 21, 2017

Respectfully submitted,

*/s/ Michael J. Freed*

Daniel J. Mogin
Jodie Williams
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
T: (619) 687-6611
F: (619) 687-6610
dmogin@moginlaw.com
jwilliams@moginlaw.com

Michael J. Freed
Robert J. Wozniak
FREED KANNER LONDON
  & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
T: (224) 632-4500
F: (224) 632-4521
mfreed@fklmlaw.com
rwozniak@fklmlaw.com

*Co-Lead Class Counsel*

Amy T. Brantly
Trevor V. Stockinger
KESSELMAN BRANTLY
STOCKINGER LLP
1230 Rosecrans Ave. Ste. 690
Manhattan Beach, CA 90266
(310) 694-5833

Anthony D. Shapiro
Ronnie S. Spiegel
HAGENS BERMAN SOBOL
SHAPIRO LLP
1918 Eighth Ave, Suite 3300
Seattle, WA 98101
(206) 623-7292

W. Joseph Bruckner
Brian D. Clark
Devona L. Wells
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

H. Laddie Montague
Martin I. Twersky
Jennifer MacNaughton
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Marvin A. Miller
Matthew E. Van Tine
Kathleen E. Boychuck
MILLER LAW LLC
115 South LaSalle St., Suite 2910
Chicago, IL 60603
(312) 332-3400

*Class Counsel*

86

# Appendix A – Appendix F

# Filed Under Seal