## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KLEEN PRODUCTS LLC, *et al.,*
Individually and on Behalf
of all those similarly
situated,

          **Plaintiffs,**

       **v.**

**INTERNATIONAL PAPER,** *et al.,*

          **Defendants.**

Case No. 10 C 5711

Judge Harry D. Leinenweber

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Motions to Exclude the testimonies of four of the Plaintiffs' experts and seven of the Defendants'. For the reasons stated herein, the Court denies Plaintiffs' Motions to Exclude the testimony of Kevin Murphy [ECF No. 1101], Steven Davis [ECF No. 1100], Robert Topel [ECF No. 1103], John Huber [ECF No. 1109], Mark Ready [ECF No. 1110], and Donald Skupsky [ECF No. 1111]. It likewise denies Defendants' Motions to Exclude the testimony of Mark Dwyer [ECF Nos. 1082 and 1089], Douglas Zona [ECF Nos. 1104 and 1090], and Michael Harris [ECF Nos. 1125 and 1094]. It grants in part and denies in part the Motion to Strike Lawrence Cunningham's opinion [ECF No. 1096]. It grants Plaintiffs' unopposed Motion to Exclude part of the testimony of Dennis Carlton [ECF No. 1105].

# I. <u>BACKGROUND</u>

This case is an antitrust class action in which Plaintiffs accuse Defendants International Paper, Temple-Inland, Georgia-Pacific, Westrock (f/k/a Smurfit-Stone or RockTenn), and Weyerhaeuser of conspiring to fix prices. Plaintiffs were direct purchasers of containerboard products from Defendant paper companies. They allege that, in between February 15, 2004 and November 8, 2010 ("the Class Period"), Defendants engaged in a series of agreed-upon actions to raise the price of containerboard products. These include lock-step announcements of price increases and reductions in the supply of containerboard achieved by "cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory." *Kleen Prods. LLC v. Int'l Paper,* 306 F.R.D. 585, 589 (N.D. Ill. 2015) (internal quotation marks omitted).

To support their contention that these actions were the result of an illegal agreement, or conspiracy, and not legal tacit collusion, Plaintiffs bring evidence that Defendants had the motive, means, and opportunity to conspire. Crucially, much of this evidence comes in the form of expert testimonies. For example, Plaintiffs rely on experts who would testify that Defendants operated in a concentrated industry where "a

conspiracy among the Defendants could succeed in increasing prices"; that Defendants used their public announcements as a means to coordinate their price increases and supply reductions; and that Defendants had many opportunities to come to an agreement, as they attended the same trade shows and had documented contacts with each other. *See, Kleen Prods. LLC v. Int'l Paper Co.,* 831 F.3d 919, 922 (7th Cir. 2016). Plaintiffs also rely on their experts to calculate the amount of damages they say they suffered as a result of the elevated prices.

Defendants counter with their own expert testimonies. Defendants' experts generally opine that Defendants' actions were consistent with actions taken in unilateral self-interest and inconsistent with conspiracy. They offer direct rebuttals to Plaintiffs' expert testimonies, pointing out the weaknesses in their counterparties' methodologies and calling into question their conclusions. Primarily on the strength of these rebuttals, Defendants seek to bar Plaintiffs from making use of their experts at summary judgment or trial. Plaintiffs respond in kind, asking the Court to strike Defendants' expert reports.

Both Plaintiffs and Defendants argue that the other side's proffered expert testimonies do not pass muster under the standard set in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). This is the Court's first opportunity to apply

*Daubert* scrutiny to the parties' expert reports, even though some of the reports had been introduced into evidence earlier for the purpose of class certification. As the Seventh Circuit noted when it affirmed this Court's decision to certify the class, Defendants did not challenge Plaintiffs' expert testimonies at the certification stage. *See, Kleen Prods.,* 831 F.3d at 922. As such, both the Court and the Seventh Circuit took the evidence at face value. *See, id.* The case no longer allows for that luxury, and the Court must decide whether the parties' expert testimonies are admissible under Federal Rule of Evidence 702 and the *Daubert* line of cases interpreting that rule.

## II. <u>LEGAL STANDARD</u>

While the details of the standard for the admission of expert testimony are fleshed out as the Court examines the specific arguments raised in regard to each expert's testimony, the Court here notes the general outlines of that standard. First, before it may admit any expert's testimony, the Court "must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 893 (7th Cir. 2011)

(quoting FED. R. EVID. 702). Second, even evidence that meets this standard may be excluded under other rules of evidence, most notably Rule 403's weighing of the probative value of the evidence against the danger of the expert misleading or confusing the jury. *See, Daubert,* 509 U.S. at 595. Third, the Court must make sure not to abrogate the role of the jury as it examines the admissibility of the evidence. *See, Bielskis*, 663 F.3d at 894. In particular, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000). Thus, even when the Court is convinced that one side's experts have the better argument than the other, it is to let "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" expose the weaker side's "shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

The Court exercises discretion in deciding to admit or exclude evidence under this standard. *See, GE v. Joiner,* 522 U.S. 136, 138-39 (1997) (holding that abuse of discretion is the standard an appellate court should apply in reviewing a trial court's decision to admit or exclude expert testimony under

*Daubert*). Ultimately, it is the proponents of the evidence who must persuade the Court by the preponderance of the evidence that the expert testimony should be admitted. *See, Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

### III. <u>ANALYSIS</u>

Many of the experts in this case offer testimonies that either overlap with or directly respond to the opinions of other experts. The Court thus begins the analysis with the economic experts who opine on broad issues of liability and damages, follows the thread to those who build on or challenge those conclusions, and ends with experts who testify as to specific facets within the broader framework.

#### A. Mark Dwyer

Mark Dwyer ("Dwyer") is Plaintiffs' main damages expert. He offers a calculation on the amount of damages that Defendants owe to Plaintiffs, assuming that Defendants are found liable. While Dwyer insists that he does not give an opinion as to whether Defendants indeed are liable, he nonetheless says that the amount of damages he arrives at – a large, positive number of roughly $3.9 billion – is "consistent" with Defendants' having engaged in a conspiracy. Dwyer's opinion is rebutted by Defendants' primary economics expert, Kevin Murphy ("Murphy").

The methodology Dwyer used to arrive at his damages number was discussed at length in the Court's opinion on class certification. *See, Kleen Prods.,* 306 F.R.D. at 603-05. Dwyer has since supplemented his reports to respond to various criticisms, but he stands steadfast by his original method. The Court here recaps the essential details of his analysis as well some of the ways in which it falls short as pointed out by Murphy.

Dwyer's ultimate goal is to quantify how much Plaintiffs were harmed by having to pay artificially inflated containerboard prices during the Class Period. To do so, he regresses the price of containerboard products on a set of control variables and the variable of interest, a Class Period Dummy. The technique that Dwyer uses is called a regression analysis. *See generally,* Daniel Rubinfeld, *Reference Guide on Multiple Regression, in* Reference Manual on Scientific Evidence (3d ed. 2011). The price of containerboard is called the dependent variable; and the control variables and Class Period Dummy are variously referred to as regressors, explanatory variables, or independent variables. *See, id.* at 352-56. Running a regression produces a set of estimated coefficients on the independent variables, where the coefficients describe a "line" having the property that the sum of the squared

differences between the line and the dependent variable is as
small as possible. *See, ATA Airlines, Inc. v. Fed. Express
Corp.,* 665 F.3d 882, 890-91 (7th Cir. 2011) (outlining the
basics of a regression and citing sources). The coefficients
are interpreted as the effects that the independent variables
have on the dependent variable. *See, id.*

In this case, the estimated coefficient on the Class Period
Dummy is intended to capture the increase in Defendants' prices
during the Class Period that is unexplained by any of the
economic factors that drive prices in a competitive market.
(The variable is called a dummy because it takes only two
values, a value of 1 for the months during the Class Period and
0 otherwise. *See,* David Kayne & David Freedman, *Reference Guide
on Statistics, in* Reference Manual on Scientific Evidence, 283,
286, 294-95 (3d ed. 2011).) Assuming that it does so and
assuming that the unexplained difference in prices is due to
illegal conspiracy, the coefficient yields a supra-competitive
overcharge that serves as a measure of Plaintiffs' damages.

Defendants challenge Dwyer's testimony on reliability
grounds. To beat back the challenge, Plaintiffs must show that
Dwyer's testimony "is the product of reliable principles and
methods," which is "based on sufficient facts and data," and
that Dwyer "has reliably applied the principles and methods to

- 8 -

the facts of the case." FED. R. EVID. 702(b)-(d).  In determining
whether Plaintiffs have met this challenge, the Court may
consider such factors as: (1) whether the methods that Dwyer
employs "can be (and ha[ve] been) tested," (2) whether they
"ha[ve] been subjected to peer review and publication," (3)
whether the techniques command widespread acceptance within the
relevant scientific community, (4) whether there are "standards
controlling the technique's operation," and (5) the "known or
potential rate of error" of the methods.  *See, Daubert,* 509 U.S.
at 593-94; *see also,* FED. R. EVID. 702, Advisory Committee's Notes
(listing additional factors that courts have found "relevant in
determining whether expert testimony is sufficiently reliable to
be considered by the trier of fact").  However, as the Supreme
Court has explained, "the law grants a district court the same
broad latitude when it decides *how* to determine reliability as
it enjoys in respect to its ultimate reliability determination."
*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141-42 (1999)
(emphasis in original).  As such, the Court need not apply all
the factors "to all experts or in every case," and it may
consider factors other than those listed. *Id.*

Defendants point to three features of Dwyer's methodology
that they argue show the method to be unreliable.  First, they
argue that Dwyer's regression produces estimated effects that

are "absurd." In particular, Defendants highlight the fact that Dwyer obtains negative coefficients on variables that reflect the costs of producing containerboard, *e.g.,* variables like hourly wages, pulp prices, and energy costs. *See,* ECF No. 1093, Ex. 6 (Murphy's April 2016 Report) ¶ 43, App'x S13; ECF No. 1093, Ex. 2 (Dwyer's December 2014 Report) at Ex. 3. This means that the costs of the inputs and the price of the output are negatively related – the more it cost Defendants to make containerboards, the more cheaply they sold those boards. Defendants argue that such results cannot be right.

Plaintiffs, *inter alia,* respond that the negative coefficients should not be interpreted as the causal impact of costs on prices. According to Plaintiffs, "Dr. Dwyer has constructed a 'reduce form' model where individual variables do not express specifically supply-side effects or demand-side effects. Instead, they express complex relationships between supply and demand effects on the structure of a market." ECF No. 1207 at 9-10. The Court understands that Plaintiffs are saying that even though Dwyer chooses the original, cost variables because "they address costs of Containerboard Product production and delivery," because of the way the different variables interact with one other in his regression model – *i.e.,* because of the "complex relationships" – he can no longer

say that any of the coefficients on those variables actually capture the causal effect of costs on prices – *i.e.,* the "supply-side effects." ECF No. 1093, Ex. 1 ¶ 62. The long and short of it is that Plaintiffs have some argument as to why the negative coefficients are not "absurd."

The Court agrees that the estimated effects, even in reduced form, are counter-intuitive. However, the Court is mindful that it "usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc. v. Ins. Co. of Pa.,* 732 F.3d 796, 806 (7th Cir. 2013). The conclusion that Dwyer comes to – that costs are negatively related to price – is suspect, but the Court better trains its eyes on the method that produces that conclusion. In this case, Defendants do not challenge the regression itself; instead, they say that the methods by which Dwyer generates his independent variables and selects the specific variables to include in the regression are indefensible. The Court thus directly examines those methods, called principal components and forward selection, rather than strike Dwyer's testimony on the indirect evidence that the "wrong" signs on his estimated coefficients suggest that the model he uses is misspecified.

Second, Defendants argue that Dwyer's results are not robust, as small changes in how the variables are defined produce large changes to the results. Such criticism goes to the credibility of Dwyer's conclusion, and it calls into question the reliability of the method for arriving at it. *See, Joiner,* 522 U.S. at 146 (stating that "conclusions and methodology are not entirely distinct from one another"). The call is thus a close one. However, as the Court believes that Defendants can readily explain such weaknesses to a jury (if the case goes to trial), the Court will not strike the testimony on this ground. *See, Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753, 766 (7th Cir. 2013) ("The judge should permit the jury to weigh the strength of the expert's conclusions, provided such shortcomings are within the realm of a lay juror's understanding."). (Throughout the remainder of this memorandum, the Court will drop the conditional "if the case goes to trial" and speak as if the next stage of the proceeding is a trial by jury. This is done for ease of exposition and to account for the possibility that the experts may testify at trial. The Court expresses no opinion at this time on whether Plaintiffs' case will, in fact, survive summary judgment and proceed to be tried.) Furthermore, as the Court explained previously, it

ought to look at the methods that produced this arguably unstable result and not at the instability itself.

Finally, and perhaps most complicated to explain to a jury, Defendants say that the methods Dwyer employs to generate his independent variables and select which of them to include in the final regression are "unreliable and create omitted variable bias." This takes some explaining as to what these methods are. Based on his economic judgment, Dwyer has opined that 150 economic variables (not including the Class Period Dummy) drive containerboard prices. However, these economic variables are highly correlated, and regression analysis generally cannot estimate with precision coefficients on such highly correlated (or "collinear") variables. Dwyer deals with the problem by applying a technique called principal components. The use of this technique allows him to obtain independent variables from the original, correlated variables.

The technique works as follows. Suppose there are two variables, X and Y, with X measuring the price of crude oil and Y the price of heating oil. Because energy prices tend to move together – for instance, if OPEC decides to cut production, then the price of crude and heating oil would both rise – X and Y are correlated. By applying some linear algebra, the principal component procedure delivers two different variables, call them

P1 and P2, that consist of those "components" of X and Y that do not move together. That is, unlike X and Y, P1 and P2 are independent of each other. Roughly speaking, this means that when OPEC cuts production, P1 and P2 move in such a way such that knowing P1 does not help one to predict what P2 will be (and vice versa).

In addition, while his economic judgment calls for 150 explanatory variables, Dwyer has only 144 observations of containerboard prices to explain. His economic judgment thus results in an over-specified model – something like a whack-a-mole game in which there are more mallets than mole holes. Such a model is impossible to estimate by a regression.

To solve the problem that he has a theoretical model (in which all 150 variables have some causal relationship to prices) that cannot be empirically estimated, Dwyer neither collects more data nor offers an alternative model that could be estimated given the data limitation. Instead, he turns to a technique by the name of forward selection. This technique (subject to some restrictions imposed by Dwyer that will be discussed below) selects from all the independent variables a subset that will best explain, or "fit," the price data. Forward selection enables Dwyer to run a regression with fewer than 144 independent variables while accounting for much of the

variation in containerboard prices. However, both experts agree that forward selection selects the variables based on their mechanical fit with the data to be explained (in this case, containerboard prices) rather than any causal relationship between those variables and prices.

In addition, Murphy points out that Dwyer essentially "stacks the deck" by starting forward selection with a base model in which the Class Period Dummy is already present before allowing the procedure to select other variables. According to Murphy, doing things in this manner favors a regression specification that delivers a statistically significant coefficient on the Class Period Dummy even if prices were not elevated beyond a level justified by economic conditions during the Class Period. This is because with the Class Period Dummy in the base model, forward selection tends to omit variables that, if included, would absorb the effects now captured by the dummy and thus result in a smaller or statistically insignificant coefficient on the dummy being estimated. (In layman's terms, a statistically insignificant coefficient means a coefficient estimate that is indistinguishable from zero, indicating that prices did not rise above competitive levels during the Class Period.) The problem of omitted variables causing the coefficients in the regression to be systematically

and wrongly estimated is known as omitted variable bias. Murphy further argues that the use of principal components worsens the omitted variable bias in this case.

The most persuasive evidence that Murphy offers to illustrate this point is to show how principal components and forward selection spuriously pick up a "conspiracy-consistent effect" even on data containing no such conspiracy. Murphy simulates 100 data sets in which, by construction, there was no elevation in prices during the Class Period. He then applies the principal component and forward selection procedures to the simulated data and shows that, on this "clean" data, the estimation still produced a statistically significant coefficient on the Class Period Dummy 66 to 89% of the time (depending on how exactly the data is simulated). This means that the methods are prone to producing false positives, showing that prices changed in a statistically significant way the majority of the time even when there was no actual change in prices. If one were to look only at statistically significant and positive coefficients (*i.e.,* those interpreted as reflecting damages), then one would still find them in as many as 35 to 47 simulations.

The Court thinks that a method that produces false results the majority of the time cannot be reliable. An error rate of

60% signifies that, given that prices were the same during the Class Period and outside it, the method would more often than not lead one to conclude wrongly that prices changed in a significant way during the Class Period. However, due to various technical hurdles, Murphy did not quite replicate Dwyer's methodology in his simulated data analysis. The Court thus cannot say that Dwyer's exact methodology is unreliable. As such, although Murphy's criticism exposes weaknesses in Dwyer's analysis, the Court is not prepared to conclude that the analysis is so flawed as to be inadmissible. *See,* FED. R. EVID. 702, Advisory Committee's Notes ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.").

The Court's conclusion that Dwyer's methods are closer to shaky than unreliable is bolstered by comparing the methods used in this case with those that the Seventh Circuit has found so lacking as to be justifiably excluded. In *ATA Airlines,* for instance, the court eviscerated an analysis where the expert opined that revenues explained costs on no other basis than that he had data on revenues but no other "more plausible variables"; estimated the relationship between revenues and costs with a "tiny sample" of 10 observations; and "improperly implemented" the flawed model he had. *See, ATA Airlines,* 665 F.3d at 893-96.

Likewise, in *Blue Cross & Blue Shield United v. Marshfield Clinic,* the court found an expert's testimony to be "worthless" when his regression analysis included only the variable of interest and a single control. *See, Blue Cross & Blue Shield United v. Marshfield Clinic,* 152 F.3d 588, 593 (7th Cir. 1998). Finally, in *Zenith Elec. Corp. v. WH-TV Broad. Corp.,* the Seventh Circuit affirmed the lower court's decision to exclude the expert's testimony when the expert offered no explanation as to why he did not employ the "extensively used" method of regression analysis but rather resorted to "my expertise" to justify his estimation. *See, Zenith Elec. Corp. v. WH-TV Broad. Corp.,* 395 F.3d 416, 418-20 (7th Cir. 2005).

In contrast to these experts, Dwyer here performs extensive quantitative analysis. He chooses economic variables that plausibly explain prices, relies on a sample size of 144 observations, and includes a number of controls in his regressions. The Court thus finds that the identified weaknesses in Dwyer's methodologies affect the probativeness of his testimony rather than its admissibility. *See, In re Titanium Dioxide Antitrust Litig.,* No. RDB-10-0318, 2013 U.S. Dist. LEXIS 62394, at *56-58 (D. Md. May 1, 2013) ("[I]nadequacies in a multiple regression analysis normally

'affect the analysis' probativeness, not its admissibility.'")
(quoting *Bazemore v. Friday,* 478 U.S. 385, 400 (1986)).

The Court nonetheless is concerned that a lay jury may not
be able to grasp the techniques of principal components and
forward selection and so may be easily misled by the expert.
*See, Daubert,* 509 U.S. at 595 ("Expert evidence can be both
powerful and quite misleading because of the difficulty in
evaluating it.") (internal quotation marks omitted). The
techniques are complicated, as evidenced by the many pages that
the experts took to explain them, as well as the pages that the
Court just now devoted to lay out its understanding of the
methods. To alleviate the problem and avoid exclusion of the
testimony under Rule 403, the Court suggests that Plaintiffs
build up to their preferred model in incremental steps so as to
allow the jury to see what each layer of the methodology is
delivering. Plaintiffs should first show graphs of the raw data
of containerboard prices before, during, and after the Class
Period. This will help the jury to understand whether elevated
prices are visible to the "naked eye" or isolated by the
econometrics to follow. Plaintiffs should then show an ordinary
least squares regression with the original economic variables as
independent variables, followed by a regression with the
principal components of the economic variables, and then a

regression with regressors chosen by the forward selection technique.

Subject to the above, the Court denies Defendants' Motions to exclude Dwyer's testimony. Defendants remain free to impeach Dwyer with the various arguments they raised in the Motions.

### B. Douglas Zona

Like Dwyer, Plaintiffs' next expert, Douglas Zona ("Zona"), calculates damages that Plaintiffs allegedly suffered. Unlike Dwyer, however, Zona aims to link Plaintiffs' damages – the increase in prices that Plaintiffs had to pay – to Defendants' reductions in containerboard supply. To do so, Zona performs a two-step analysis. In the first step, he assesses how much Defendants, as a group, reduced their capacity during the Class Period over and above reductions predicted for a comparison group not accused of having engaged in a conspiracy. In the next step, he estimates how containerboard prices changed in response to changes in containerboard supply. By combining the results from these two stages, Zona is able to calculate how much containerboard prices rose because of the supply reduction he identified. Assuming that the additional, more-than-predicted reduction is attributable to Defendants' conspiracy, this increase in prices is a measurement of damages.

Defendants raise multiple challenges to Zona's analysis. The Court takes the analysis, and its criticisms, piece by piece. In the first step of his analysis, Zona employs a method called multinomial logit to show that Defendants reduced the capacity at their paper mills by more than is predicted for a comparison group. Multinomial logit is a method for modeling behavior that involves discrete, as opposed to continuous, choices, *e.g.,* whether a person played a whack-a-mole game in the last month (the discrete choices are yes/no), or where the person last played a whack-a-mole game (the discrete choices may be at home/at a friend's/at an arcade). One can think of multinomial logit as an alternative estimation method to ordinary least squares regression when one is dealing with discrete data. *See, The Tao of Pleading: Do Twombly and Iqbal Matter Empirically?* 59 Am. U.L. Rev. 553, 616 n.280 (explaining that "[a] multinomial logistic regression['s] . . . purpose is the same as the more commonly known multiple linear regression, except that in multiple regression, the dependent variable is linear (also called 'continuous' or 'quantitative'), while in logistic regression, the dependent variable is categorical") (citing Damodar Gujarati, *Essentials of Econometrics,* 451-53 (2d ed. 1999)).

Of course, capacity does not present such discrete data. A firm's production capacity, for all practical purposes, can take any numerical value from zero to whatever is the upper range imposed by total resources. Nonetheless, Zona uses multinomial logit because he models Defendants' capacity as four discrete choices: maintain capacity, increase capacity, reduce capacity, or close mill. Specifically, Zona looks at capacity data, as published by a third-party industry watch group called RISI, for Defendant and non-Defendant mills during the years 1998-2010. Based on this capacity data, he categorizes a mill as "maintain" if its capacity changed by no more than 20% from one year to the next; "increase" if its capacity jumped by more than 20%; "decrease" if its capacity dropped by more than 20%; and "closed" if the mill shut down production altogether. After categorizing the data in this way, Zona sums up the number of mills falling into each category for all of the Defendants. He then uses multinomial logit as a means to compare how Defendants ran their mills during the Class Period against a benchmark group that consists of Defendants outside the Class Period, non-Defendants outside the Class Period, and non-Defendants during the Class Period.

Defendants raise a number of issues with this part of the analysis. First, they object that by lumping all Defendants

into one group, Zona leaves no room for any particular Defendant to exonerate itself by showing that it did not reduce its containerboard capacity more than the benchmark group. Defendants present data indicating that five of seven Defendants actually had capacity level above that of the benchmark group, and Georgia-Pacific and Temple-Inland in particular emphasize how high their production was relative to their competitors.

The Court agrees that Zona's analysis cannot establish that any particular Defendant restricted supply in a manner consistent with either tacit collusion or conspiracy. However, this does not mean that the analysis is irrelevant. If believed, the analysis indicates that Defendants, as a group, behaved differently than how they behaved outside of the period of the alleged conspiracy and how non-Defendants behaved. This piece of evidence increases the probability that there was a conspiracy during the Class Period, even if it does not shed light on who among the Defendants actually cut supply in accordance with the alleged conspiracy. Defendants remain free to put on individual defenses at trial that call into doubt the strength of the evidence against any of them, and the jury is entitled to find that, say, two of the Defendants conspired but not the other five. *See, Alexander v. Phx. Bond & Indem. Co.,* 149 F.Supp.2d 989, 1000 (N.D. Ill. 2001) ("[E]ven in a

conspiracy case, liability remains individual and is not a matter of mass application.") (citing *Kotteakos v. United States,* 328 U.S. 750, 772 (1946)). In short, the evidence is not inadmissible on this basis. *See, Smith,* 215 F.3d at 720 ("[E]xpert testimony need only be relevant to evaluating a factual matter in the case. That testimony need not relate directly to the ultimate issue that is to be resolved by the trier of fact.").

Second, Defendants argue that Zona constructs the wrong benchmark with which to compare their capacity. Recall that Zona is here comparing Defendants' behavior during the Class Period to that both of Defendants outside of the Class Period and non-Defendants during all of the years for which he has data. Defendants point out that, because the benchmark group mixes in non-Defendants, any identified differences between Defendants' capacity choices during the Class Period and the benchmark group could be driven solely by the differences between Defendants and non-Defendants that have nothing to do with the alleged conspiracy. In fact, Defendants demonstrate that this is the case by running what is called a difference-in-difference analysis. The analysis controls for any inherent difference between Defendants and non-Defendants, that is, any difference found outside the Class Period and so is unrelated to

the alleged conspiracy. With such an adjustment in the benchmark group, Defendants show that any difference in capacity attributable to the alleged collusion dissipates.

Without quibbling with any part of this difference-in-difference analysis, the Court nonetheless concludes that whether Zona "might have done a better job is not the test for the admissibility of his testimony." *Traharne v. Wayne/Scott Fetzer Co.,* 156 F.Supp.2d 697, 712 (N.D. Ill. 2001). Even if Zona had only compared Defendants to non-Defendants during the Class Period and opined that any difference between them is attributable to Defendants' alleged collusion, still, the Court would not find his method unreliable. A comparison between firms accused of conspiracy and the firms not accused conspiracy appears to the Court to be a valid method to assess the impact of the alleged conspiracy where, as here, the two groups are from the same industry, face the same economic conditions, and produce the same "standardized" containerboard products. *See, Kleen Prods.,* 831 F.3d at 923 ("Containerboard is a commodity, sold in standardized compositions and weights. The final products are also standardized. . . .").

Even if it turned out that, despite these similarities, the two groups are different in important ways such that the expert's conclusion is subject to doubt, still such doubts are

best left to the jury. *See, Stollings,* 725 F.3d at 766 ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt."). In this case, Defendants can easily point out the ways in which Defendants and non-Defendants are different and so argue that the difference between the two groups had nothing to do with the claimed illegal collusion – precisely as they have done in their motions. The jury can then decide whom to believe. The matter is not particularly complicated, and the Court does not believe that Zona's testimony is "too complex for the jury to appreciate important issues of credibility." *Id.* The Court thus will let the testimony stand.

Third, Defendants press that Zona's method is unreliable by pointing to several results produced by the model that are demonstrably false. In particular, Zona's model predicts capacity levels for Defendants that are lower than their actual capacity for the period during the alleged conspiracy. That is, Defendants' real-world capacity levels, allegedly depressed by the conspiracy, were in fact higher than what Zona predicts them to be in the absence of such conspiracy. Zona explains that such discrepancies occurred because his model is intended to

estimate capacity growth rates rather than their levels. While the Court is not convinced this explanation puts the matter to rest, it thinks that the push and pull of the adversarial process will best expose the truth as to the correctness of Zona's conclusions. The testimony can be tested and the potential for error exposed, as the Defendants have shown. *See*, *Daubert*, 509 U.S. at 594.

Fourth, Defendants contend that the expert makes a conceptually unjustifiable choice by measuring capacity on a mill-by-mill instead of firm-by-firm basis. Defendants argue that capacity decisions are made at the firm level and should be modeled as such. After all, a firm decides how to run individual mills based on the mills' contribution to the firm's overall profitability and not just the profitability at a particular mill. The Court conceives of this as an attack on the data that Zona uses, essentially an argument that he should have aggregated his mill data to the firm level.

To put things this way is to give away the answer that the testimony should go to the jury. The Seventh Circuit has made clear that unless there was no rational connection between the data used and the conclusion arrived at, "arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally

be left to the jury." *Manpower,* 732 F.3d at 808-09; *see also,* *Hannah's Boutique, Inc. v. Surdej,* No. 13-cv-2564, 2015 U.S. Dist. LEXIS 79501, at *19-21, 25-27 (N.D. Ill. June 19, 2015). To illustrate where no such rational connection exists, the court gave an example where a hypothetical expert uses "changes in the size of the white rhino population in Africa" to project earnings for a recruiting firm headquartered in Milwaukee. *See,* *Manpower,* 732 F.3d at 808-09. Similarly, it described a situation where an expert relies on "sales to only one customer" to estimate average gross sales. *See, id.* In contrast to such irrational methodologies, Zona here uses mill-level capacity data to study capacity changes. The Court thus leaves the evaluation of his data-input choice to the jury.

Likewise, other criticisms that Defendants levy at Zona's testimony are data-related. For example, Defendants say that Zona should have used the Defendant-provided data rather than third-party data from RISI. But even if the RISI data are flawed, "Rule 702 [] does not condition admissibility on . . . a complete and flaw-free set of data." *Lees v. Carthage Coll.,* 714 F.3d 516, 524-25 (7th Cir. 2013) (internal quotation marks omitted).

As another example of a data issue, Defendants criticize how Zona chooses to code mill closures in his dataset. The

Court does not find his choices to be so outrageous so as to justify exclusion. The decision to code a mill that closed in the middle of the year as a "decrease" for that year and a "closure" for the next year is a choice made to deal with the fact that a mill's capacity is not zero in the very year that it closed. While Zona could have done things differently, the choice that he did make is reasonable (even if not the most conservative). If the choice was driven by the *ex post* discovery that, without such coding of the data, any looked-for effect would have disappeared, then this is something Defendants are free to point out during cross-examination or presentation of their own expert witnesses. *See, Miller UK Ltd. v. Caterpillar, Inc.,* No. 10-cv-03770, 2015 U.S. Dist. LEXIS 147843, at *11 (N.D. Ill. Nov. 1, 2015) ("[A] party who finds an expert's conclusion disagreeable is entitled to challenge the expert and his or her opinion through cross-examination and, of course, to put on his own expert to offer a counter opinion."). The attack goes to the robustness and hence probativeness of Zona's testimony, not its reliability.

Criticisms relating to the second part of Zona's analysis – that devoted to quantifying how decreases in containerboard supply raise the product's price – are simpler. In this part of the analysis, Zona used an "off-the-shelf" model based on a

paper published in the *Journal of Forest Economics*. However, Zona made some modifications to the model, including by dropping some control variables during his estimation. Defendants show that adding the controls back in undermines the magnitude and statistical significance of Zona's estimated coefficients. This is evidence that Zona's estimated model suffers from omitted variable bias.

While such a challenge raises concerns about the accuracy of Zona's results, the Court will not bar the expert testimony on such grounds. *See, Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012) ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy."). The model Zona here employs "has been subjected to peer review and publication," and it is a matter of his economic judgment whether and how the model should be modified in applying it to the particular facts of the case. *Daubert,* 509 U.S. at 593-94; *see also, Stollings,* 725 F.3d at 768 ("The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible."). The Court again burdens the jury with assessing whether that judgment is sound.

In sum, the Court denies the Motions to Strike Zona's testimony.

## C. Kevin Murphy

Kevin Murphy ("Murphy") is Defendants' expert who rebuts Dwyer's and Zona's testimonies. As such, much of the content of his reports has already been discussed. In general, the Court finds Murphy's arguments to be cogent, his exposition lucid, and his role as a rebuttal witness crucial given the technical sophistication of Plaintiffs' proffered expert testimonies. Plaintiffs' arguments for barring Murphy from testifying basically boil down to the assertions that the Court had rejected similar opinions offered at class certification and that Murphy's testimony will confuse or mislead the jury. For the reasons explained below, the Court must disagree.

The Court begins with the simplest issues: the use of examples and the choice of data. To explain the difference-in-difference concept, Murphy used an example of two different plants growing at different rates, irrespective of any treatment that one but not the other plant received. Plaintiffs object that the "hypothetical is not economically relevant" and is "confusing." The objection is without merit. The Court read the hypothetical, found it clear, and believes it will aid a lay jury in understanding the technical concept of difference-in-difference. *See, Stollings,* 725 F.3d at 765 ("Expert testimony is permitted to assist the trier of fact with technical issues

that laypeople would have difficulty resolving on their own.");
FED. R. EVID. 702(a).   Likewise, Plaintiffs' quibble about how
Murphy deals with some data problems does not go to the
admissibility of his testimony.   *See, Manpower,* 732 F.3d at 808-
09.

The Court next addresses issues that Plaintiffs claim were
definitively settled in the Court's class certification order or
the Seventh Circuit's opinion affirming the decision.   Two
arguments fall into this category. The first is the back-and-
forth between the parties about whether Dwyer exercises
"economic judgment" when he relies on forward selection to
select the variables to use as regressors in his analysis.
Murphy phrases the issue thusly:   "Beyond choosing an initial
'pool' of candidate variables for the [forward selection]
procedure to select from, the analyst exercises *no* additional
economic judgment as to whether the resulting model is properly
specified or whether the coefficient estimates from the model
make sense as a matter of economics."   ECF No. 1093, Ex. 5
(Murphy's June 2015 Report) at 57-58 n.10.   Dwyer's disagreement
is not over the accuracy of this statement, but its emphasis.

Unsurprisingly, Dwyer emphasizes that because he chose an
initial pool of candidate variables, he has exercised economic
judgment.   The Court is still puzzled as to the question of what

causal reason justifies leaving some of the 150 variables out of the final regression if, in Dwyer's economic judgment, all 150 causally explain containerboard prices. In any case, "economic judgment" is not some kind of talismanic shield; Murphy is entitled both to call into question the soundness of Dwyer's judgment and to point out how far it extends. The Court finds nothing in its own or the Seventh Circuit's opinions that warrant exclusion of Murphy's criticism.

The second issue swirls around the effect of "baking in" the Class Period Dummy to the forward selection method. As may be recalled, Dwyer ran the forward selection procedure with a base model where the Class Period Dummy was already included. This means not only that the procedure always had to "choose" the dummy, but also that it chose other variables while taking into account the presence of the dummy in the final model. Plaintiffs now seek to bar Murphy from testifying as to how performing the procedure in this way may bias the estimation of the Class Period Dummy.

It is true that during class certification, the Court thought that the inclusion of the dummy was innocuous. As it stated, "[p]resumably, if the conspiracy had no effect on price, the model would show that the conspiracy variable had a zero or statistically insignificant effect on price." *Kleen Prods.,* 306

F.R.D. at 604. However, the Court only thought this because it had understood Dwyer to be doing something different than what he was actually doing. The Court thought that Dwyer was only "manually" adding the Class Period Dummy into the final regression, not that he was constraining the forward selection procedure in the way that he did. As such, the Court's presumption, however intuitive, was false as applied to the actual facts of the case. The simulation analysis that Murphy performed shows that even "if the conspiracy had no effect on price," the estimated coefficient on the dummy still may not be zero or statistically insignificant. Since the Court was mistaken about Dwyer's actual method, what it said cannot be a basis to exclude testimony that corrects the mistake.

Plaintiffs nonetheless contend that Murphy's opinion should be excluded because it does not conclusively undermine Dwyer's methodology. Plaintiffs say that Murphy did not demonstrate that the estimated coefficient on the Class Period Dummy is, in fact, biased since he did not identify the variables omitted from the regression that, if included, would change the estimation results. It is true that courts generally do not strike an expert's testimony when his counterparty complains that the expert's analysis suffers from omitted variable bias but goes no further to identify those specific omitted

variables. *See, Bazemore,* 478 U.S. at 400-01 ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *In re Polypropylene Carpet Antitrust Litig.,* 93 F.Supp.2d 1348, 1365 (N.D. Ga. 2000) ("Unless the party challenging a regression model proffers evidence that an omitted variable is correlated with the [in]dependant *[sic]* variable and is likely to affect the result of the regression analysis, the Court will not find that omission of the variable implicates the reliability of the model.") (internal quotation marks omitted).

However, the issue here is not whether Dwyer's testimony should be struck but whether Murphy should be allowed to criticize it. The Court thinks he should. Murphy's opinion that Dwyer's estimation is susceptible to omitted variable bias is not speculation. Far from "simply assert[ing] a bottom line," Murphy explains the econometric theory underpinning his opinion and goes to some length to ensure that the explanation is intelligible to a lay person. *See, Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 761 (7th Cir. 2010) (stating that a qualified witness may offer an opinion where he explains the methodologies and principles that support his opinion). Since the Court admits testimony even when it is demonstrated that the results do not stand up to the inclusion of additional controls

(recall Zona's analysis), it will not strike testimony that falls just short of proving that the results do not withstand scrutiny.

Finally, Plaintiffs focus on Murphy's rebuttal of Dwyer's impact analysis. Plaintiffs argue that Murphy's rebuttal is contrary to law and his testimony therefore is unreliable. While the Court agrees that "[e]xpert opinions that are contrary to law are inadmissible," it does not think that Murphy here is offering such an opinion. *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 806 (N.D. Ill. 2005). Indeed, he does not offer a legal opinion at all. Murphy does not opine that Dwyer's definition of an "impacted" customer as somebody who paid a supra-competitive price in a transaction during the Class Period is legally inadequate. Rather, he offers the opinion that Dwyer's method to identify "impacted" customers is unreliable because it relies on a mathematical property of regression residuals that has nothing to do with whether a customer actually paid an artificially containerboard price. That is, Murphy does not believe that Dwyer has identified any customer who suffered harm from the alleged conspiracy or was "impacted." Such an opinion is within the scope of an expert's testimony. *See,* Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue.").

Having found no basis to exclude Murphy's testimony, the Court denies Plaintiffs' Motion to Strike his reports.

### D. Michael Harris

Michael Harris ("Harris") is Plaintiffs' liability expert. Using a framework known as Structure-Conduct-Performance ("SCP"), Harris offers testimony most directly intending to establish that Defendants had the motive, means, and opportunity to engage in an illegal conspiracy.

Defendants argue that Harris' testimony should be struck on both Rule 702's reliability grounds and Rule 403's weighing of the likelihood that the testimony will mislead the jury. To take the second argument first, the Court agrees that Harris' opinion is capable of misleading the jury in exactly the manner Defendants suggest – namely, it may confuse jurors into thinking that tacit collusion is unlawful. This would be a mistake of law since "[e]xpress collusion violates antitrust law; tacit collusion does not." *In re Text Messaging Antitrust Litig.,* 782 F.3d 867, 872 (7th Cir. 2015). Plaintiffs' case rests on their establishing express collusion. Put differently, Plaintiffs ought to lose if their evidence only shows that Defendants engaged in tacit collusion, or consciously paralleled behavior, and not express collusion, or collusion by prior agreement. *See, id.* at 879.

Despite this burden, Plaintiffs' experts, Harris included, deploy the word "collusion" with imprecision, sometimes using it interchangeably with illegal, express collusion and sometimes not. In discussing the specific details of their analysis, the experts say that Defendants' conduct suggests "collusion" and by this tend to mean deliberate parallel action. In their final conclusion, however, they say that Defendants' conduct is consistent with "collusion" and mean that Defendants likely engaged in an illegal conspiracy. *See, e.g.,* ECF No. 1093, Ex. 1 (Dwyer's June 2014 Report) ¶¶ 3, 14, 59 ("The results of the damages model are consistent with plaintiffs' allegations of collusion."); ECF No. 1093, Ex. 8 (Zona's February 2015 Declaration) ¶¶ 11, 20, 26, 55 ("The conclusion that defendants acted in a manner consistent with collusion based on simple statistics is supported by this more complete model."); ECF No. 1131, Ex. 6 (Harris' February 2015 Report) ("The economic evidence reveals that the conduct of the defendants was consistent with collusion."). This makes their testimonies especially prone to misinterpretation.

Imprecise language causes problems elsewhere as well. For instance, Plaintiffs' and Defendants' experts seem to talk past each other when they use the term "unilateral self-interest." Plaintiffs seem to contend that a firm acts in its unilateral

self-interest when it takes actions to further its own interests, assuming that other firms will not do what it does. In contrast, Defendants appear to define the term as a firm acting in its own best interest, assuming that other firms are free to do whatever it is that they choose to do, which may include responding to the first firm's actions. Thus, Plaintiffs contend that Defendants act in a way inconsistent with their "unilateral self-interest" and consistent with conspiracy (or confusingly, "collusion") when they take actions that are profitable only if other firms adopt the same actions. *See, e.g.,* ECF No. 1131, Ex. 4 (Harris' June 2014 Report) at 6 ("[T]he economic evidence shows that the conduct of the Defendants was more consistent with collusion than with independent decision-making, with each Defendant exhibiting conduct that was contrary to its unilateral self-interest, acting independently. The conduct only makes economic sense if the Defendants were engaged in collective action. . . ."). Defendants, on the other hand, say they act in a way consistent with their "unilateral self-interest" even if they "watch each other like hawks," and sometimes follow their competitors' strategy or hope that their own strategy will be followed. *See, e.g.,* ECF No. 1210 ("Dr. Davis [Defendants' expert] recognized that Defendants each had strong *unilateral* incentives to

anticipate how competitors would respond to pricing and production decisions.") (emphasis in original).

To alleviate the problem of imprecise language confusing or misleading the jury, the Court orders that the parties adopt a standardized vocabulary and have their experts phrase their testimonies in accordance with the stipulated vocabulary. Whatever definitions the parties settle on, their experts should not use the same terms to mean different things. The Court further suggests that the parties avoid the unmodified "collusion" and instead use the unambiguous "express collusion," "tacit collusion," or one of their synonyms. This will make clear to the jury whether Plaintiffs' evidence is that Defendants acted in a way consistent with the illegal behavior they have been accused of (*i.e.,* agreeing to fix prices in violation of the Sherman Act) or in a way consistent with lawful behavior even if inconsistent with price competition. *See, In re Text Messaging,* 782 F.3d at 873 ("[T]he Sherman Act imposes no duty on firms to compete vigorously, or for that matter at all, in price."). The Court leaves the details to the parties and expects that they will do enough to avoid the Court having to strike the testimonies on Rule 403 grounds.

The Court now reaches Defendants' argument that Harris' testimony should be struck because it is unreliable. Harris

opines that the Structure, Conduct, and Performance of the Defendants' businesses support the conclusion that they unlawfully colluded during the Class Period. Defendants do not challenge Harris on his analysis of the structure of the containerboard industry, recognizing that this piece of the testimony is inadequate to establish that Defendants conspired to fix prices during the Class Period. *See, Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.,* 971 F.2d 37, 50 (7th Cir. 1992) ("It is well-established . . . that the mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws.") (internal quotation marks omitted).

This is only sensible. An industry structure is shared by Defendant and non-Defendant firms alike throughout the Class and non-Class Periods. As such, by itself, details of an industry structure cannot show that Defendants conspired during the Class Period any more than they can show that all containerboard firms conspired at all times. This is not to say that the evidence is irrelevant, but that the evidence is irrelevant unless it is accompanied by something tending to show unlawful collusion among the specific Defendants during the relevant period.

As the Seventh Circuit recognized in its order affirming class certification, that necessary "something" is provided by the Conduct and Performance prongs of the SCP analysis. *See, Kleen Prods.*, 831 F.3d at 928 (naming "actual price increases, a mechanism for those increases, the communication channels the conspirators used, and factors suggesting that cartel discipline can be maintained" as factors "beyond the structural" that overcome the flaw in the SCP's thinking that "it was enough to know the structure of a market in order to predict what kind of conduct would ensue"). Defendants choose not to attack the Performance piece of Harris' analysis since that analysis is based on Dwyer's testimony purporting to show that Defendants priced above competitive levels during the Class Period, and Defendants had separately challenged Dwyer's testimony. This leaves only the Conduct prong.

As part of his Conduct inquiry, Harris considers ten different business strategies of the Defendants that he says support the conclusion that Defendants conspired to raise containerboard prices during the Class Period. These include Defendants' "mill closures, operating rates/inventories/trades, downtime/slowback, coordinated pricing, the use of focal points, monitoring inter-firm behavior, direct communications among them, and prior antitrust violations." *See, e.g.,* ECF No. 1131,

Ex. 4 at 34.  Defendants argue that all of these factors are as suggestive of a lawful "follow-the-leader" strategy as they are consistent with an unlawful agreement to collude.  They further argue that Harris offers nothing more than his *ipse dixit* to explain why, on the basis of this ambiguous evidence, he comes to a conclusion of illegal agreement.

On the balance of the evidence, the Court believes that Harris has not so failed to consider obvious alternatives or to explain his reasoning as to be deemed unreliable.  Whether Harris has drawn a reasonable conclusion based on his analysis and actually made a *prima facie* case for conspiracy is a matter to be examined at summary judgment, and whether he has made a persuasive case is a matter left to the jury.  *See, Smith,* 215 F.3d at 718.  As such, the Court will allow Harris to testify as to each piece of his analysis, including the first nine of the factors listed above.

However, the Court will bar any testimony on the tenth factor, that regarding "prior antitrust violations."  With one exception, the prior conduct that Harris mentions consists of *accusations* of antitrust violations, cumulating in settlements and consent decrees, rather than actual findings of wrongdoing. The exception concerns a single Defendant and involves conduct that occurred more than four decades ago.  As such, the evidence

is more prejudicial than probative and so excluded. *See, In re Polypropylene Carpet,* 93 F.Supp.2d at 1354 ("The Court also excludes expert testimony based on the existence of litigation involving allegations of price-fixing of nylon carpet products. Such testimony from an expert is prejudicial and inadmissible."); *Aetna, Inc. v. Blue Cross Blue Shield of Mich.,* No. 11-15346, 2015 U.S. Dist. LEXIS 48534, at *30-32 (E.D. Mich. Apr. 14, 2015) ("The Court finds that because the DOJ, the Michigan AG and *The Shane Group* class action cases have been resolved without any finding of liability against [Defendant] Blue Cross in those cases, any reference to those cases would be more prejudicial than probative. . . .").

In addition, the Court will deny Harris a forum to offer the opinion that Defendants likely engaged in illegal price-fixing rather than lawful conduct. This is because the Court does not think that economic expertise is needed to draw such a conclusion from the testimony Harris offers. For example, after Harris testifies that "[i]n six days all the Defendants announced identical price increases and effective dates," ECF No. 1131, Ex. 4 at 48-49, a layperson is as capable as an economic expert to evaluate whether this evidence makes it more likely than not that (1) Defendants had an agreement to announce the same price increase, (2) Defendants followed each other's

price increase without agreement, or (3) neither, as both options remain equally likely. The expert should not offer his own opinion that Defendants acted in accordance with an illegal agreement when the jury is just as competent to decide for itself whether that is the case. *See, Jamsports & Entm't, LLC v. Paradama Prods.,* No. 02 C 2298, 2005 U.S. Dist. LEXIS 59, at *30-33 (N.D. Ill. Jan. 3, 2005) (barring an expert's testimony when "[t]here is nothing in [the expert's economic] expertise that suggests that he is any more competent than the average juror in interpreting these communications or in divining from them" the defendants' motivation for taking certain actions); *In re Processed Egg Prods. Antitrust Litig.,* 81 F.Supp.3d 412, 421 (E.D. Pa. 2015) ("[T]he cases are clear that an economist's testimony is not admissible where he or she simply reads and interprets evidence of collusion as any juror might, or where an economist infers intent to collude from mere documentary evidence, unrelated to his or her economic expertise.").

Subject to these limitations, the Court denies the Motions to Bar Harris' testimony.

### E. Steven Davis

Steven Davis ("Davis") is Defendants International Paper and Temple-Inland's answer to Harris' testimony. Davis examines many of the same factors found in Harris' comment and concludes

that "an economic analysis of the available data does not support the allegation that Defendants engaged in the alleged conspiracy." ECF 1140, Ex. 2 (Davis' June 2015 Report) ¶ 57.

As their opening salvo to why Davis' testimony should be struck, Plaintiffs recount certain discovery disputes between the parties and argue that this "discovery gamesmanship" is a reason for the Court to bar Davis from taking the stand. The discovery tussle Plaintiffs speak of was over whether Davis has turned over notes generated during his interviews of Defendants' employees. Discovery has closed by this time, and Plaintiffs appear to have gotten all the notes subject to production. As such, the Court is disinclined to let an already resolved discovery matter drag into the current Motion. It thus considers Plaintiffs' Motion to Strike only on the basis that Davis' testimony does not meet the standard set by Federal Rule of Evidence 702.

Davis is the first expert that Plaintiffs seek to bar on qualification grounds under Rule 702. The Rule stipulates that a witness may be qualified to testify as an expert by virtue of his "knowledge, skill, experience, training, or education." FED. R. EVID. 702. The Seventh Circuit has cautioned that a determination into whether an expert is qualified "must be applied with due regard for the specialization of modern

science." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). Accordingly, "[a] theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer." *Id.*

Plaintiffs assert that Davis' proffered opinion in this antitrust case is such an instance of a theoretical economist improperly opining on an econometrics question. In fact, Davis is not a theoretical economist; he is an applied economist, and so presumably versed in econometrics and able to answer questions that require knowledge of econometric techniques. More substantively, Plaintiffs have not pointed to any particular part of Davis' report that requires the application of principles and methods beyond the purview of Davis' extensive education, experience, and attendant skill or knowledge. Instead, Plaintiffs emphasize that Davis' primary area of research is neither "antitrust nor industrial organization" but macroeconomics. This may be true, but Davis has taught and published in the field of industrial organization and he has consulted on antitrust matters – something Plaintiffs do not dispute. Being an expert in the additional field of

macroeconomics does not detract from his qualifications to opine on industrial organization or antitrust matters.

Putting labels of economic sub-specialties aside, the Court further finds little merit in the examples Plaintiffs bring to demonstrate that Davis does not understand "modern industrial organization and antitrust economics." *See,* ECF No. 1100 at 11-15. The Court does not think that Davis, a tenured professor of economics at the University of Chicago, reveals in his report that he misunderstands basic economics concepts like profit-maximization or monopoly pricing. *See, Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn,* 98 F.Supp.2d 729, 732 (W.D. Va. 2000) ("Though the necessary degrees, titles or credentials do not govern by themselves the issue of qualifications, it cannot be denied that these accomplishments aid one in obtaining the requisite knowledge, and thus, are pertinent in determining whether an individual qualifies as an expert.").

For example, Plaintiffs insist that Davis is equating "profit maximization" with behavior taken in "unilateral self-interest." *See,* ECF No. 1100 at 11. They then argue that "whether firms yield higher profits has no bearing on whether conduct undertaken by these firms during the Class Period is also the product of collusion." *Id.* However, Davis does not say what Plaintiffs claim he says. He is not opining that a profit-

maximizing firm would never conspire – after all, it is because collusions have the potential to boost profits that firms sometimes break the law to collude. Rather, he testifies that some of the actions that Plaintiffs say point to conspiracy are actually actions a non-conspiring firm takes to maximize its profits, *e.g.,* a firm acting independently may decide to close an old, inefficient plant. Davis calls such actions those taken in a firm's "unilateral self-interest" or actions for which the firm has a business justification to pursue. As far as the Court can tell, there is nothing flat out wrong in Davis' testimony to suggest that he is unqualified to offer the opinion at hand.

Likewise, the Court does not find that Davis' testimony regarding Defendants' business justifications conflicts with case law, as Plaintiffs claim. *See,* ECF No. 1100 at 24-25. It is true that "price fixing is a *per se* violation of the Sherman Act." *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 654 (7th Cir. 2002). Accordingly, "an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs" to hold the defendants liable, regardless of whether the defendants had a business reason to take the actions they did. *Id.* However, there has been no such admission in this case. Liability has not been established, and it remains

relevant whether Defendants engaged in the challenged conduct for legitimate reasons. *See, Reserve,* 971 F.2d at 49 (noting that in price-fixing cases, courts should inquire into "whether the defendants have offered evidence tending to show that the conduct complained of is [] compatible with the defendants' legitimate business activities"). If Defendants can show that, say, they closed some mills for reasons of efficiency (a legitimate business justification), then they will have moved the needle away from the inference they closed the mills only to reduce capacity in furtherance of their price-fixing scheme.

In other words, Davis' testimony is relevant both to undermine Harris' conclusions and to challenge head-on Plaintiffs' case for liability. *See, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986) (holding that because "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy," a plaintiff must "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action"). Far from being contrary to law, the testimony helps to establish the classic alibi for defendants accused of antitrust violations.

Plaintiffs complain that Davis' opinion is contrary to law in another way. In a section labeled "Some Background and

Economics of the Containerboard Products Industry," Davis discusses certain background facts concerning Defendants' business. For example, he states that "[c]ontainerboard comes in multiple grades and basis weights." ECF No. 1140, Ex. 2 ¶ 59. Plaintiffs contend that this flies in face of the Seventh Circuit's opinion, which, in the relevant part, said that "[c]ontainerboard is a commodity, sold in standardized compositions and weights." *Kleen Prods.,* 831 F.3d at 923.

The Court declines to find that the juxtaposition of such statements compels it to strike Davis' testimony. First, the Court does not see how the statements found in Davis' report and the Seventh Circuit's opinion contradict each other. For instance, the Seventh Circuit recognized that there are different, even if standardized, "compositions and weights" to containerboard, and Davis likewise says that there are multiple "grades and weights" to the product even if he does not acknowledge that they are standardized. Second, the Seventh Circuit's statements that Plaintiffs cite were not holdings of law, but descriptions of the facts as they were then established. Furthermore, the appellate court noted that it was "not saying" that any of the facts it relied on for class certification "have been proven." *Id.* at 928. The Court takes this to mean that Defendants are entitled to try to disprove

such facts at the merits stage of the litigation.  Third, in light of the rule that a certified class may later be decertified, *see,* FED. R. CIV. P. 23(c)(1), certification should not operate as a final finding on facts relevant to the merits. Lastly, Plaintiffs overreach in asking the Court to strike all of Davis' testimony on the basis of a few statements they find objectionable.  This is especially bold since Plaintiffs do not even argue that those statements were crucial to what is said in the remainder of Davis' 350-plus page report.

Plaintiffs also hurl the same charge at Davis' testimony that Defendants levy at Harris' – namely that the expert relies on his *ipse dixit* to support his opinion.  The Court thinks that the two experts employ essentially the same methodology.  They look at certain actions that Defendant firms took during the Class Period and explain why those actions were either consistent or inconsistent with Defendants' unilateral self-interest.  Davis has an easier case to make because he does not need to rule out the possibility that Defendants engaged in tacit collusion, something that may be in the Defendants' self-interest and is not illegal.  Even so, the Court does not find either expert's approach to be unreliable.  The soundness of their conclusions, as well as how well they reason from the facts to the conclusion, are matters left to the merits stage.

The final ground for exclusion that Plaintiffs bring revolves around data-selection issues. For instance, Plaintiffs complain about the fact that Davis uses RISI data, the same data their experts used, when he has criticized the reliability of such data. The Court incorporates its reasoning from before for declining to exclude the expert testimony on this basis. *See, supra,* Section III.B. The Court thus denies the motion to strike Davis' testimony.

### F. Robert Topel

Like Davis, Robert Topel ("Topel") offers the opinion that the accused acted in a manner consistent with unilateral self-interested behavior and inconsistent with conspiratorial conduct. Topel's testimony, however, is limited to Defendant Westrock ("Westrock"). Westrock stands in a unique position because it was in bankruptcy during all but the last four months of the Class Period. The company emerged from bankruptcy on June 30, 2010, the date of its bankruptcy discharge. Due to the effect of the discharge, Westrock can be held liable only if it joined or rejoined the alleged conspiracy after this date. *See, Kleen Prods.,* 831 F.3d at 930. That is, Westrock can be held liable only for its post-discharge conduct. *See, id.; Kleen Prods.,* 306 F.R.D. at 607-09. (But, if found liable, Westrock would be responsible for the entire amount of damages accrued

during the Class Period because of the rule of joint and several liability.  *See, Paper Sys. v. Nippon Paper Indus. Co.,* 281 F.3d 629, 632 (7th Cir. 2002) ("If Nippon Paper was among those conspirators, then it is responsible for the entire overcharge of *all five* [defendant] *manufacturers* – and any direct purchaser from any conspirator can collect its own portion of damages (that is, the damages attributable to its direct purchases) from any conspirator.") (emphasis in original).)

Westrock's bankruptcy is important for the current Motion because Topel examines Westrock's conduct pre- and post-bankruptcy discharge in coming to the conclusion that Westrock acted in a manner indicative of independent action post-discharge.  As Topel states in one of his opinions, "there is no evidence that Smurfit changed its behavior in any way after it emerged from bankruptcy protection on June 30, 2010 that would suggest it participated in the alleged conspiracy."  ECF No. 1211, Ex. 1 (Topel's April 2016 Report) ¶ 10.  (Topel refers to Westrock as Smurfit, while Plaintiffs in their briefs refer to it as SSCC.  The Court presumes that the parties will have settled on a single name by the time the case goes to trial, if indeed it does.)  Plaintiffs challenge Topel's testimony on various grounds, including qualifications, reliability, and helpfulness in assisting the trier of fact to understand the

evidence. Despite the different labels, however, Plaintiffs'
arguments boil down to the assertion that because Topel is not a
bankruptcy expert, he cannot reliably establish that Westrock's
bankruptcy was a "clean" benchmark with which to compare the
company's post-discharge conduct.

The Court finds Plaintiffs' arguments unavailing as a basis
for striking Topel's testimony. Substantial parts of the
testimony draw on facts unrelated to Westrock's bankruptcy. For
example, Topel points out that Westrock "did not close any
mills" and did not take "any economic downtime" during the post-
discharge period – behavior inconsistent with the economic
prediction that the company would reduce capacity or restrict
supply once it joined the alleged conspiracy. *See,* ECF No. 1211
¶¶ 66-68, 80-84. Similarly, Topel opines that when Westrock
closed a mill during the period in which it was in bankruptcy,
it "considered all the factors that I, as an economist, would
expect a firm acting in its unilateral interest to consider:
the cost of the closed mills relative to the cost of Smurfit's
other mills; the lost profits on foregone sale, if any; the
fixed cost savings; and expected future demand and cost
conditions." *See, id.* ¶¶ 52-63.

In short, Topel gives economic reasons for why he thinks
Westrock's behavior was inconsistent with it being part of the

alleged cartel during both the pre- and post-discharge period. Crucially, these reasons do not depend on any fact specific to the bankruptcy context. As such, that Topel is not a bankruptcy expert is immaterial to his ability or qualifications to give such testimony. *See, Shirley Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir. 1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."). It is also immaterial to the reliability of his opinion. Indeed, what Topel is doing – looking at certain conduct to see if it more likely indicates cartelized behavior or unilateral interest – is sufficiently similar to what Harris and Davis do that the Court feels it need not repeat itself as to why his methodology is reliable. *See, supra,* Section III.D & E.

This is not to deny that Topel's analysis also makes use of constraints on Westrock's behavior that are unique to bankruptcy. For instance, Topel opines that "the oversight of the bankruptcy court and the unsecured creditors' committee make it highly unlikely that Smurfit participated in a cartel during the bankruptcy period." *See,* ECF No. 1211 ¶¶ 47-51. Plaintiffs argue that Topel may not give such opinions because he has no understanding of the bankruptcy process. As an example to

illustrate their point, Plaintiffs point to Topel's statement that the unsecured creditors' committee ("UCC") "approved Smurfit's decision to reduce its capacity." *Id.* ¶ 47. This is false, Plaintiffs assert, because Smurfit "retained control over all of its business decisions" and so had no need for such approval from the UCC. *See,* ECF No. 1103 at 8-9.

The parties appear to be splitting hairs. They do not dispute that Westrock needed the UCC and various oversight personnel to approve its plan of reorganization, without which it could not be discharged from bankruptcy. Accordingly, Westrock presumably took the views of these supervisory entities into account when it made its business decisions. Whether Westrock's decisions, made in the face of such constraints and disclosed to the relevant authorities, can be said to have been "approved" by them is a dispute that the parties can air during cross-examinations or presentation of rebuttal testimonies. *See, Smith,* 215 F.3d at 718-19; *Miller*, 2015 U.S. Dist. LEXIS 147843 at *11 ("The law entrusts the powers of cross-examination to highlight lapses in logic and good sense."). Such a dispute is not a reason to keep Topel from taking the stand.

Moreover, even if Topel is wrong in some details as to how the bankruptcy process works, then still that does not render his testimony inadmissible. Westrock's bankruptcy is relevant

to Topel's testimony insofar as it allows him to infer that the scrutiny the company faced in bankruptcy prevented it from being a part of the conspiracy during that time. As such, says Topel, decisions that the company made while in bankruptcy, and carried out post-discharge, are scrubbed of the conspiratorial taint. If Topel is wrong and the company was not as constrained as he asserts, then this makes his testimony "less powerful" but does not affect its admissibility. *See, Stollings,* 725 F.3d at 768; *see also, In re Pool Prods. Distrib. Mkt. Antitrust Litig.,* 166 F.Supp.3d 654, 678-80 (E.D. La. 2016) (rejecting the argument that if a benchmark period (here, the bankruptcy) "is not completely clean, [then the] analysis should be excluded as unreliable"). Simply put, because the Court does not examine the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis," it must accept that some of the facts underpinning the expert's testimony may be wrong but still allow the testimony. *Smith,* 215 F.3d at 718.

For these reasons, the Court declines to bar Topel from testifying.

### G. John Huber

John Huber ("Huber") is the first of Defendants' experts to opine on a relatively narrow issue in the case – whether

Defendants used their public statements as a means to signal "confidential competitive information" to each other in furtherance of the alleged conspiracy. According to Plaintiffs, such confidential information includes the Defendants' "production, capacity, downtime, inventory, pricing and business strategies," all of which Defendants revealed in their public filings, earning calls, and other industry events. ECF No. 1109 at 1. Plaintiffs further allege that such communications were made for the improper purpose of coordinating Defendants' actions and facilitating the conspiracy.

Huber seeks to rebut this allegation. He argues that the disclosures serve a legitimate purpose and so provides support for the inference that they were not done for the surreptitious reason of leaking information to alleged co-conspirators. In particular, Huber opines that Defendants' formal public filings with the Securities Exchange Commission ("SEC") and their informal, public and non-public (invitees only) communications with investors and industry analysts were either required by the SEC or expected by the agency. Huber bases this opinion on his review of Defendants' public disclosures and an assessment of how the content of those disclosures fits with specific securities laws, SEC rules, the agency's interpretations of those rules, and its expectations for the entities that it

oversees.   In performing this analysis, Huber relies on his experience, which includes more than a decade working as an SEC attorney, 25 years in private practice advising clients on regulatory and compliance issues, and another five as a consultant in the area of corporate public disclosure.

Plaintiffs attack Huber's opinion on the now-familiar fronts of helpfulness, qualifications, and reliability. Plaintiffs' most persuasive argument may be that, even assuming what Huber says is true, he cannot dispel the possibility that Defendants used the SEC's requirements and expectations as either pretext or *post hoc* rationalization.   That is, even if the disclosed information was arguably required or expected by the SEC, that was not why Defendants actually released it. Plaintiffs claim that if Defendants want to argue about their motivation for making the disclosures, they should call to the stand their own employees, the people who made the disclosures, and not rely on Huber's testimony.

Plaintiffs' argument is beguiling.   For one, it has some legal merit.   *See, Jamsports,* 2005 U.S. Dist. LEXIS 59 at *33 ("[T]he relevant issue for purposes of antitrust liability is whether [the defendant] actually engaged in the challenged conduct for legitimate reasons, not whether, after the fact, the conduct can, in hindsight, be rationalized in some way.").   For

another, it has some factual basis. Huber indeed does not testify to Defendants' actual motivation in making a disclosure (something which likely would be impermissible anyway). *See, id.* Instead, he says that, from a "hindsight" "after the fact" review, he thinks the disclosures were proper.

Upon closer inspection, however, Plaintiffs' argument must fail. Despite what Plaintiffs say, Huber's testimony does provide a basis for inferring that Defendants are not using legitimate business reasons as *ad hoc* rationalizations for their public statements. In formulating his opinion, Huber reviews both disclosures that are suspect – that is, those made during the Class Period and touched on containerboard products – and those that are not – *i.e.,* those involving non-containerboard products or that were made outside the Class Period. He concludes that these disclosures were similar to each other. *See, e.g.,* ECF No. 1109, Ex. 1 (Huber's June 2015 Report) ¶ 4 ("SSCC's containerboard disclosures in Forms 10-K and 10-Q were similar to disclosures made in SSCC's comparable non-containerboard segments during the Class Period."). Thus, insofar as Defendants only had legitimate reasons to announce one set of statements, they likely did not make the other, similar set of statements for inappropriate reasons, using the SEC's requirements only as a cover.

Furthermore, that Defendants' employees may testify does not render Huber's expert testimony irrelevant. Instead, the lay witnesses' and expert's evidence may complement each other. Suppose that Defendants' employees testify that they made public certain information to comply with the law. In such a case, Huber's testimony bolsters the employees' credibility by showing that the disclosures did, in fact, comply with specific securities laws, SEC rules, or expectations. Securities law is a complicated subject, and the expert testimony here is appropriate because it does not simply "regurgitate facts . . . that are readily understandable by an average person." *Aponte v. City of Chi.,* No. 09-CV-8082, 2011 U.S. Dist. LEXIS 52130, at *6-8 (N.D. Ill. May 12, 2011). That is, it is not the case that after Defendants' employees testify, the jury can simply take a look at the communications, the securities regulations, and decide whether the employees likely told the truth because the communications really did or did not satisfy the regulations. *Cf., SEC v. Lipson,* 46 F.Supp.2d 758, 761, 764 (N.D. Ill. 1998) (finding that an expert's proffered testimony would not be helpful when a fact witness "will testify to fundamentally the same points that are the subject of Mr. Perks' [the expert's] opinion" and "Defendant has not established that the financial evidence he [the fact witness] will testify about is so

complicated that the jury will be unable to understand it without repetition by Mr. Perks").

Plaintiffs also object that Huber's opinions are impermissible legal conclusions. They base this objection on the principle that "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003). But the legal conclusion that Huber here offers – that regarding the propriety of Defendants' public communications – is not the kind of legal conclusion "that will determine the outcome of the case," except through the indirect channel of weakening Plaintiffs' *prima facie* case. *See, Mkt. Force, Inc. v. Wauwatosa Realty Co.,* 906 F.2d 1167, 1171, 1174 (7th Cir. 1990) (articulating a two-part test that has become the standard for deciding antitrust cases at the merits stage and holding that "[a] defendant is entitled to summary judgment when it 'provides a plausible and justifiable alternative interpretation of its conduct that rebuts the alleged conspiracy'"). Huber is not opining that there was no conspiracy, that Defendants engaged in lawful conscious parallelism, or otherwise giving an opinion on any matter for which the Court is likely to give an instruction as part of its duty to instruct the jury. *Cf., Dowe v. AMTRAK,* No. 01 C 5808,

2004 U.S. Dist. LEXIS 7233, at *5-6 (N.D. Ill. Apr. 26, 2004) ("An expert cannot testify about legal issues on which the court will instruct the jury.") (citing *United States v. Sinclair,* 74 F.3d 753, 757 n.1 (7th Cir. 1996)).

Huber's testimony thus is distinguishable from that excluded in *Good Shepherd.* In that case, the plaintiff had brought suit alleging violations of the Fair Housing Amendment Act ("FHAA"). *See, Good Shepherd,* 323 F.3d at 560. The Seventh Circuit affirmed the lower court's decision to bar the expert when her proffered testimony "was largely on purely legal matters and made up solely of legal conclusions, such as conclusions that the city's actions violated the FHAA." *Id*. at 564. In contrast, Huber here offers no bottom-line, legal conclusion as to whether Defendants did or did not violate Section 1 of the Sherman Act. In fact, as Plaintiffs readily admit, he does not testify to an antitrust issue at all.

Yet Plaintiffs also complain that Huber is not an antitrust expert, asserting that this makes him unqualified to testify in this case. However, Huber does not need antitrust expertise to offer the opinion that he does. At bottom, Huber's testimony is relevant in this case because it helps Defendants "rebut an allegation of conspiracy by showing a plausible and justifiable reason for [their] conduct that is consistent with proper

business practice." *Mkt. Force,* 906 F.2d at 1171 (quoting with approval from *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir. 1987)). In this particular instance, the "proper business practice" is making disclosures that comply with the SEC's rules or expectations. Given the subject matter of Huber's testimony and his experience in the areas of securities law and corporate public disclosures, the Court finds him qualified to give the opinion at hand. *See, Shirley,* 896 F.2d at 212; *Crawford Supply Grp., Inc. v. Bank of Am., N.A.,* No. 09 C 2513, 2011 U.S. Dist. LEXIS 117670, at *7-8 (N.D. Ill. Oct. 12, 2011) ("There can be no doubt that 'an expert might draw a conclusion from a set of observations based on extensive and specialized experience.'") (quoting *Kumho,* 526 U.S. at 156).

Likewise, Plaintiffs' reasons for challenging the reliability of Huber's methodology are unavailing. They amount to arguments about the quality of the data inputs and the accuracy of the generated outputs. Neither is a ground for exclusion. *See, Manpower,* 732 F.3d at 806; *Daubert,* 509 U.S. at 594-95 ("The focus [of a Rule 702 inquiry] must be solely on principles and methodology, not on the conclusions that they generate."). The arguments regarding inputs – for instance, that Huber did not consider Defendants' internal antitrust policies – are analogous to charges that an expert used too few

data points or unreliable data sources (*e.g.,* RISI numbers instead of Defendant-provided data). Similarly, the arguments regarding outputs – for instance, that Huber's conclusions are inconsistent with each other – are like arguments about the estimated coefficients having the wrong signs. The Court rejected such arguments as a proper basis for striking expert evidence previously, and it rejects them now. *See, supra,* Section III. A and B.

## H.  Mark Ready

On the theory that its status as a privately held company distinguishes it from other Defendants, Georgia-Pacific hired Mark Ready ("Ready") to examine its own public disclosures. Ready addresses a specific allegation Plaintiffs make, namely that "Defendants coordinated and furthered the alleged conspiracy through various means, including (1) through securities analysts and primarily Mark Wilde, a securities analyst formerly employed by Deutsche Bank; and (2) by 'signaling' in earnings calls." ECF No. 1110, Ex. 1 ¶ 7. Ready concludes that Plaintiffs have not "identified any communication between Georgia-Pacific and a securities analyst" nor "any statement by Georgia-Pacific" or the other Defendants "on an earnings call that is inconsistent with normal behavior observed in public securities markets." *Id.* ¶ 8.

As far as the Court can tell, Ready's methodology for arriving at these conclusions is quite straightforward. He takes the communications that Plaintiffs have alleged to be indicative of Defendants signaling to each other, picks out phrases that purportedly contain the signals, *e.g.,* "reduce capacity," and uses these phrases as search terms to locate other analyst reports and earnings call transcripts that contain the same terms. Ready finds that there are numerous reports and calls fitting the search parameters that are not attributable to Georgia-Pacific or the other Defendants. He reads a sample of these returned results and determines that they are indeed similar in content to those communications that Plaintiffs have said indicated collusive behavior. Ready concludes that, because many other companies talk about the topics covered by the search terms, that Georgia-Pacific and other Defendants did the same is not suggestive of wrongdoing.

Of course, Ready does not quite phrase his conclusions in the way the Court just did. Instead, he describes Defendants' earnings calls and Georgia-Pacific's communications with the analysts as "normal behavior observed in public securities markets." ECF No. 1110, Ex. 1 ¶ 8. Plaintiffs object that Ready never defined "normal," and what he calls "normal" appears to be based only on his subjective views.

The Court thinks that such criticism is well taken but easily remedied. Ready calls the communications "normal" because his search uncovers so many instances where the key terms from those communications appear that discussions on those topics do not seem to indicate anything out of the ordinary. Ready's judgment is thus based on a quantitative count – *e.g.,* "there were 14,935 analyst reports that included the words 'capacity reduction' or similar phrases" – not his ineffable subjective belief or speculation. ECF No. 1110, Ex. 1 ¶ 52; *cf., Metavante,* 619 F.3d at 761 ("Nor may the testimony be based on subjective belief or speculation."). But he must convey that judgment, precise and quantitative in nature, with some precision, and "normal" appears too fraught with subjectivity to do the job. The Court thinks that what Ready means by "normal" is something like "frequently occurring," "commonly found," or simply, "common," but with this guidance, it will leave him to choose the appropriate verbiage. Assuming that he does so, the Court believes that his testimony will not run afoul of the rules governing the admissibility of expert evidence.

Plaintiffs contend otherwise. They raise a number of arguments, some of which were bandied about in the motion to bar Huber's testimony as well. These include the charge that the experts cherry-picked facts to support their opinions.

Specifically, Plaintiffs say that Ready, like Huber, failed to consider things like Defendants' own internal antitrust policies, the Federal Trade Commission ("FTC") consent decrees, and other documents relating to the limits that antitrust law places on corporate disclosures. Plaintiffs claim that the exclusion of such evidence amounts to "a selective use of facts [that] fails to satisfy the scientific method and *Daubert*," and so urge the Court to strike Ready's and Huber's testimonies. *Barber v. United Airlines, Inc.,* 17 F. App'x 433, 437 (7th Cir. 2001).

The Court is unpersuaded by Plaintiffs' argument, resting, as it does, on inapposite authorities. For example, Plaintiffs cite *Barber,* but the facts from that case are much different from those found here. In *Barber,* the Seventh Circuit found that it was not error for the district court to have excluded the expert testimony when the expert: (1) "relied on weather data, but [] rejected weather data that contradicted his opinion"; (2) "did not present any other data which supported his opinion"; and (3) "did not adequately explain why he ignored certain facts and data, while accepting others." *Barber,* 17 F. App'x at 437 (internal quotation marks omitted). In contrast to *Barber,* here Ready and Topel have spoken at length as to the "data or information" that they draw on in their reports.

Although both churned through reams of documents, they do not opine on antitrust matters and so do not consider any antitrust evidence. They explain that they are not antitrust experts, are not giving opinions on antitrust matters, and so do not rely (and should not have relied) on antitrust documents. In short, Ready and Huber (1) did not cherry-pick the antitrust records to favor their conclusions, selecting some and ignoring others; (2) did present many data sources supporting their opinions; and (3) adequately explained why they did not take account of certain documents.

Likewise, *LeClercq v. Lockformer Co.* does not support Plaintiffs' position. In *LeClercq,* this Court only faulted the expert for ignoring evidence that was "*clearly* material." *See, LeClercq v. Lockformer Co.,* 2005 U.S. Dist. LEXIS 7602, at *14-15 (N.D. Ill. Apr. 28, 2005) (emphasis in original). As the Court stated, the expert's "failure to discuss the import of, or even mention, these material facts in his reports amounts to 'cherry-picking the facts'". *Id*. On this basis, the Court barred the expert from testifying. It is clear that this case is much different from *LeClercq* and calls for a different outcome. Topel and Ready here are not giving antitrust opinions, so it can hardly be said that the antitrust evidence

is material to their testimonies.  The Court thus sees no reason to strike the proffered evidence.

Plaintiffs also raise a host of other arguments specific to Ready.  The Court swiftly dispatches of them.  Based on Ready's work history with the SEC, his research record, and his involvement in training analysts, the Court finds that he is qualified to give the opinion at hand.  *See, Smith,* 215 F.3d at 718 (stating that the trial court is to consider an expert's "full range" of experience when assessing his qualifications).  It further finds that Ready's testimony would be helpful to the jury to evaluate Plaintiffs' allegations regarding the impropriety of Defendants' communications.  Finally, the Court determines that Ready's method is reliable.  Plaintiffs complain that Ready (1) does not adequately explain how he comes to use the search terms that he does, (2) should have used different search terms, and (3) cannot guarantee that his sample from the search results is random.  These arguments, however, go to the weight that a factfinder should give to Ready's opinion rather than its reliability.  *See, Apple, Inc. v. Motorola Mobility, Inc.,* No. 11-cv-178-bbc, 2012 U.S. Dist. LEXIS 181854, at *71-72 (W.D. Wis. Oct. 29, 2012) (denying a party's *Daubert* motion when it argued that the expert "should have looked harder and used different search terms").

Given these findings, the Court denies the Motion to Strike Ready's testimony.

## I.  Lawrence Cunningham

Lawrence Cunningham's ("Cunningham") opinion serves to rebut Huber's and Ready's testimonies. Defendants, however, only object to the portion of Cunningham's report that calls Huber's opinion into question. Cunningham examines the documents that Plaintiffs argue that Huber (and Ready) should have considered. These include Defendants' internal antitrust policies, Section 5 of the FTC Act, FTC enforcement actions brought under that section, and various publications on "securities and antitrust harmony." *See,* ECF No. 1097, Ex. 1 (Cunningham's December 2016 Report) ¶¶ 37–58. After examining these documents, Cunningham concludes that Huber's opinion is fatally flawed as he did not account for the "vital limits" that such antitrust policies put on companies' public disclosures. Cunningham thus attacks Huber for failing "to consider the antitrust implications" of Defendants' disclosures, calling this an indefensible omission given the "central importance" that the "intersection of securities and antitrust laws [play] in disclosure practice." *Id.* ¶ 24.

Given that Cunningham opines on the intersection of securities and antitrust laws, one would expect that he has

expertise in both areas.  Yet, Cunningham admits that he is not an antitrust expert.  In particular, Cunningham testified to the following during his deposition:

> Q:   Do you consider yourself an expert on conspiracy
>      law?
> A:   No.
> Q:   The Sherman Act?
> A:   No.
> Q:   The FTC Act?
> A:   No.

ECF No. 1097, Ex. 3 (Cunningham's Dep.) 84:6-12; *see also, id.* at 14:3-9 ("Q:  You've never authored an article or book solely on antitrust issues or antitrust law? A:  No.  Q:  You've never been qualified by a court as an expert on antitrust law?  A: No."); 28:7-10 ("Q:  In the five years you spent at BC Law School, how many times did you teach a full credit course on antitrust law? A:  None."); 28:15-17("Q:  In the five years you spent at GW, how many times have you taught a full credit course on antitrust law?  A:  None.").

Given such an admission, the Court entertains serious doubt about Cunningham's qualifications to offer the conclusion that antitrust law limits the disclosures that Defendants may make (and that Huber should have accounted for those limits).  The Court's reservations are only compounded when it delves into the details of Cunningham's purported expertise.  Cunningham has opined that "[t]he Huber Report . . . fails to consider vital

limits on the securities law framework that restrict anticompetitive disclosures." ECF No. 1097, Ex. 1 ¶ 12. Yet, when pressed on how he became an expert qualified to give such a view, Cunningham said, "I've become an expert as a result of *this case*, this research." ECF No. 1097, Ex. 3 at 88:18-24 (emphasis added). Cunningham's admission that he did not possess expertise on the issue before being retained for "this case" jibes with the following exchange:

> Q: Have you ever been qualified as an expert previously to offer an opinion on these vital limits?
> A: No.
> Q: Have you ever written article on the topic of these vital limits?
> A: No.
> Q: Have you ever lectured on the topic of these vital limits?
> A: No.
> Q: Have you ever discussed these vital limits in any law school class that you've given?
> A: No.

*Id.* at 88:25-89:14; *see also, id.* at 40:19-23 ("Q: Have you lectured on how antitrust law constrains the scope of disclosures that public companies may legally make? A: No.").

Faced with such damaging deposition testimony, Plaintiffs choose to sidestep the issue altogether. They offer no response in their briefs to address these statements, making no contention that Cunningham's statements were taken out of context, improperly portrayed, or should be treated as of

limited significance. Instead, Plaintiffs emphasize Cunningham's time in private practice, which involved dealing with securities law and corporate disclosures. The Court notes that Cunningham has six years of full-time practice experience in total, that he has let his law license lapse for about a decade now, and that he last practiced law 22 years ago. *See,* ECF No. 1097, Ex. 3 at 10:20-12:3, 14:11-14. All this said, the Court recognizes such experience is still more than "a single hedging decision made more than twenty years ago" that it previously found to be insufficient to allow the expert to comment on hedging strategies. *See, Vigortone Ag Prods. v. PM Ag Prods.,* No. 99 C 7049, 2004 U.S. Dist. LEXIS 456, at *10-11 (N.D. Ill. Jan. 14, 2004).

The problem is that Cunningham's experience, even if long, is not pertinent. *See, Sommerfield v. City of Chi.,* 254 F.R.D. 317, 319-20 (N.D. Ill. 2008) ("Just as proof of negligence in the air will not do, neither will proof of expertise in the abstract [not relevant to the task at hand].") (internal citation omitted). Not even Cunningham contends that he practiced antitrust law (except in a very indirect manner) while employed as a lawyer. *See,* ECF No. 1097, Ex. 3 at 22:10-25:20. Yet, his testimony is that antitrust concerns limit public disclosures, and for this he needs antitrust expertise. *Cf.,*

*supra,* Section III. E (noting both that Davis has antitrust experience and that "Plaintiffs have not pointed to any particular part of Davis' report that requires the application of principles and methods beyond the purview of Davis' extensive education, experience, and attendant skill or knowledge").

The Court also finds that the research Cunningham did in preparation for this case does not qualify him as an antitrust expert. Cunningham testified that he read antitrust materials, including the FTC opinions, after he was retained in the case. But given that Cunningham had no antitrust expertise prior to studying these materials, reading them does not endow him with the requisite qualifications. *See, Charter Nat'l Bank & Tr. v. Charter One Fin.,* No. 01 C 0905, 2001 U.S. Dist. LEXIS 13919, at *17-20 (N.D. Ill. Aug. 31, 2001). Indeed, Cunningham is remarkably like the law professor in *Charter Nat'l Bank* whom the court refused to qualify as an expert in trademark law. As the judge there explained: "Professor Lichtman is asking this Court to certify him as an expert because he has done what any motivated lawyer could do, namely, study precedent. There is no special or unique perspective, other than his intelligence, which Professor Lichtman can bring to the court." *Id.* at *19. That is not enough, and the court concluded that it "cannot find Professor Lichtman qualified as an expert." *Id.* Like Lichtman,

Cunningham is a "motivated" law professor with impressive academic credentials, but, like Lichtman, he is not qualified to give the specific opinion he proffers.

In addition, the Court is not swayed by certain comments tending to suggest that Cunningham does not need to have expertise in antitrust. During his deposition, Cunningham stated that, "I'm not really making an opinion on antitrust law or policy." ECF No. 1097, Ex. 3 at 106:21-107:6. Similarly, he testified that "[m]y opinion is about the securities disclosure regime. I'm not giving opinions on what's appropriate to disclose under antitrust laws." *Id.* at 118:21-24. But this is unconvincing since the thrust of Cunningham's testimony is that antitrust law intersects with the "securities disclosure regime" and so "vitally limits" what companies may lawfully disclose. Given that Cunningham has an entire section in his report under the heading of "antitrust and disclosure," that he repeatedly refers to the FTC (an antitrust authority), its statute, views, and enforcement actions, and that he mentions no other limits on disclosures but antitrust (or what he calls anticompetitive) concerns, it is impossible to see how Cunningham is "not really making an opinion on antitrust law or policy."

The Court thus strikes Cunningham's testimony to the extent that testimony relies on antitrust expertise. Accordingly,

Cunningham may not offer any testimony resting on Section 5 of the FTC Act, FTC enforcement actions or consent decrees, Defendants' internal antitrust policies, or any other materials specific to antitrust law.

However, insofar as Cunningham's report survives this excision, he may opine on matters requiring expertise only in securities law. While Cunningham's background does not evidence antitrust expertise, it does indicate familiarity with securities issues. The Court finds, on the strength of Cunningham's teaching, research, and other professional activities, that he is qualified to give an opinion on securities law. It further finds that, insofar as Cunningham did not read Defendants' disclosures in their entirety before attacking Huber's analysis, such a deficiency may be explored during the adversarial process. *See, In re Urethane Antitrust Litig.,* No. 04-1616-JWL, 2012 U.S. Dist. LEXIS 181506, at *34 (D. Kan. Dec. 21, 2012) ("The extent to which Dr. Solow considered the entirety of the evidence in the case is a matter for cross-examination."). Likewise, if Cunningham lacks experience with specific securities regulations, *e.g.,* Reg. FD or Release 8350, then Defendants may use cross-examination to point out how his conclusions are undermined by these rules.

The Court thus grants in part and denies in part ECF No. 1096.

## J.  Donald Skupsky

Donald Skupsky ("Skupsky"), like Mark Ready, is Georgia-Pacific's expert.  Skupsky propounds on a topic so far untouched upon in this opinion:  Georgia-Pacific's record retention policy.  The issue arises because Plaintiffs have alleged that "as a result of Defendants' exposure to prior antitrust lawsuits . . . Defendants have taken steps to conceal their anticompetitive communications," including by adopting policies that allowed for "short retention periods for email resulting in destruction of any evidence of collusion." *See,* ECF No. 1111 at 2-3.  Skupsky aims to defuse this contention, opining that Georgia-Pacific's Records Management Program "complies with general practice." *See,* ECF No. 1111, Ex. 1 (Skupsky's June 2015 Report) ¶ 5.

Before delving into Skupsky's testimony, the Court reminds Plaintiffs that, in keeping with its previous instruction, they may not present evidence of prior antitrust lawsuits brought against Defendants. *See, supra* Section III. D.  The lawsuits that Plaintiffs speak of here are the class action *In re Linerboard Antitrust Litig.,* 305 F.3d 145 (3d Cir. 2002), which resulted in a settlement, and a consent decree entered into

between Westrock and the FTC.   The Court believes that the probative value of these lawsuits is substantially outweighed by the danger of undue prejudice to Defendants and so bars references to them.   *See,* FED. R. EVID. 403.   Plaintiffs may still argue that Defendants adopted new record management policies around 2005 to "minimize the risk of antitrust investigations and litigation," as there is evidence, independent of the particular lawsuits, that this was Defendants' motivation in taking up these policies.   *See,* ECF No. 1263 at 2 (internal quotation marks omitted).   But Plaintiffs may not present evidence of specific litigation which Defendants settled with private parties or regulatory agencies.

Plaintiffs fire a smorgasbord of objections at Skupsky's report.   The thrust of the criticism, however, is that while Skupsky studied Georgia-Pacific's records management program, he did not do the kind of investigation that would allow him to opine on whether Georgia-Pacific actually complied with the policies of that program.   In response, Georgia-Pacific freely admits that its expert "offers no testimony about . . . whether GP [Georgia-Pacific] employees complied with the company's retention policy."   ECF No. 1203 at 3.   However, it points out that this is immaterial as "Plaintiffs' argument is that GP's

document retention policy is *itself* evidence of unlawful behavior." *Id.* (emphasis in original).

The Court agrees. Plaintiffs spend pages of their briefs detailing how the policies that Defendants adopted allowed them to "hide collusive conduct and thereby minimize their exposure to lawsuits." ECF No. 1263 at 1. For instance, they emphasize that Defendants' policies were based on a guideline promulgated by an industry group, which was written to "reduce the risk of antitrust litigation," "avoid [the] appearance of wrongdoing," and stop the "ammunition" given to "federal and state enforcement agencies and those plaintiffs' lawyers." *Id.* at 2 (internal quotation marks omitted). They deposed the industry group's general counsel, asked him specifically about the email retention policy (which they call a deletion policy), and quoted his answers in their briefs. In sum, Plaintiffs assert that they have "ampl[y]" demonstrated that the "document retention policies were used to aid Defendants in concealing collusion." *Id.* at 3.

Given this line of attack, Plaintiffs are unconvincing when they say that they take no issue with any Defendant's record retention policies, only their implementation. This is especially so since by "implementation" Plaintiffs seem to mean nothing more than Defendants adopted the policies that

Plaintiffs have been complaining about. Plaintiffs' argument is puzzling: if the policies are not suspect in some way, how can it be that their adoption is somehow suspicious? If the policies were innocuous, how could they "aid Defendants in concealing collusion"? Although Plaintiffs are entitled to make the separate argument that however suspect were Defendants' formal policies, their employees engaged in even more egregious behavior to "hide collusive conduct," this does not detract from the fact that Plaintiffs have introduced Defendants' record retention programs into dispute.

In sum, the Court rejects Plaintiffs' claim that Skupsky's opinion is unreliable or unhelpful to the trier of fact because it restricts itself to an evaluation of Georgia-Pacific's record keeping policy. Likewise, the Court finds no merit in the argument that Skupsky's opinions impermissibly encroach upon the Court's duty to instruct the jury as to the law in this case. Succinctly put, the opinions do not encompass inadmissible "legal conclusions that will determine the outcome of the case." *See, Good Shepherd,* 323 F.3d at 564; *supra,* Section III. G. Rather, they are properly limited to "describing sound professional standards and identifying [that there were no] departures from them." *West v. Waymire,* 114 F.3d 646, 652 (7th Cir. 1997) (internal quotation marks omitted).

Finally, the Court does not think that Skupsky's report conveys the impression that he is opining either on antitrust issues (an area for which he has no expertise) or how Georgia-Pacific's employees actually treated the record retention policy (an area that he did not examine). If the language of the report is not as clear as Plaintiffs would like – *e.g.,* that when Skupsky says that "GP's employees are required to identify and preserve Official Business Records," he means only that "under the formal record retention policy, GP's employees are required to identify and preserve Official Business Records" – then Plaintiffs are free to make clear the limit of his testimony, *e.g.,* by asking whether Skupsky can say that the employees actually did as they were required to do.

For these reasons, the Motion to Bar Skupsky from testifying is denied.

### K. Dennis Carlton

The Court has saved the shortest disposition for last. Plaintiffs' Motion to bar Dennis Carlton ("Carlton") from offering a specific opinion is unopposed and therefore granted. *See, Scottsdale Ins. Co. v. City of Waukegan,* 689 F.Supp.2d 1018, 1022 (N.D. Ill. 2010) ("A judge is not obliged to look into the questions posed by Rule 702 when neither side either requests or assists.") (quoting *United States v. Moore,* 521 F.3d

681, 685 (7th Cir. 2008)) (internal quotation marks omitted). Accordingly, the Court bars the proffered testimony that Plaintiffs' impact analysis needs to account for the possibility that class members' overcharge may have been reduced by lower prices paid in other transactions.

## IV. CONCLUSION

For the reasons stated herein, the Court rules as follows:

1. Denies the *Daubert* Motions found at ECF Nos. 1082, 1089, 1090, 1094, 1100, 1101, 1103, 1104, 1109, 1110, 1111, and 1125;

2. Grants in part and denies in part the Motion at ECF No. 1096; and

3. Grants the remaining Motion at ECF No. 1105.

While the Court has admitted most of the expert opinions at issue in the case, it cautions the parties that whether the evidence admitted is sufficient to carry the case to trial is another matter. The Court will take up that issue when it rules on the pending Motions for Summary Judgment.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 5/31/2017