IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KLEEN PRODUCTS LLC, *et al.,*
Individually and on behalf
Of all those similarly
situated,

              Plaintiffs,

      v.

INTERNATIONAL PAPER, *et al.,*

              Defendants.

Case No. 10 C 5711

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motions for Summary Judgment filed by Defendants Georgia-Pacific [ECF No. 1086] and Westrock [ECF No. 1088]. For the reasons stated herein, the Court grants the Motions. It therefore denies as moot the parties' cross filings for partial summary judgment on the narrower issue of released and untimely claims [ECF Nos. 1114 and 1138]. Lastly, given that with this opinion the Court has disposed both of the parties' *Daubert* and summary judgment motions, it denies as moot the requests for hearings on those submissions [ECF Nos. 1272 and 1273].

## I.  BACKGROUND

This case is an antitrust class action in which Plaintiffs accuse Defendants of conspiring to fix prices in violation of

Section 1 of the Sherman Act.  Plaintiffs were direct purchasers of containerboard products from Defendant paper companies.  They allege that, between February 15, 2004 and November 8, 2010 ("the Class Period"), Defendants engaged in a series of agreed-upon actions to raise the price of containerboard products.  These include lockstep announcements of price increases and reductions in the supply of containerboard achieved by "cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory." *Kleen Prods. LLC v. Int'l Paper,* 306 F.R.D. 585, 589 (N.D. Ill. 2015) (internal quotation marks omitted).

All but two Defendants have settled.  The settling Defendants include Cascades Canada, Inc., Norampac Holdings U.S., Inc. (collectively "Norampac"), Packaging Corporation of America ("PAC"), International Paper Company, Temple-Inland, Inc., and Weyerhaeuser Company.  Defendants International Paper, Temple-Inland, and Weyerhaeuser settled only after filing for summary judgment.  Due to their settlement, their Motions have been denied as moot.  *See,* ECF No. 1365.

The two Defendants that remain in the case are Georgia-Pacific and Westrock (f/k/a/ Smurfit-Stone or RockTenn), and they have continued to press for summary judgment.  Defendants' case is simple.  They say that Plaintiffs have not carried their burden to show that there was an agreement to fix prices among

the alleged conspirators. All of their actions, Defendants claim, are consistent with actions taken in permissible competition. Moreover, Defendants argue that the range of permissible competition allowed them – large firms operating in a concentrated industry – is wide. In particular, they point out that they may lawfully raise prices not only because external market forces call for such price increases, but also because they believe that fellow competitors may find it in their best interest to raise prices as well. According to Defendants, once this range of lawful, consciously parallel behavior is accounted for, Plaintiffs' evidence cannot reasonably show that Defendants conspired.

Plaintiffs disagree. They contend that the evidence, when viewed in the light most favorable to them, permits a reasonable jury to find that Defendants were not competing but illegally colluding with one another. Plaintiffs offer the following evidence to contest summary judgment. First, they draw attention to the fact that during the six and a half years of the alleged conspiracy, Defendants – a group that includes both the Defendants that have settled and the two moving Defendants, Georgia-Pacific and Westrock, that have not – collectively announced 15 price increases. With one exception, all Defendants joined each price announcement and around the same time; twelve out of the 15 times, Defendants increased prices

for identical amounts; and all the increases carried nearly the same effective dates. Second, Plaintiffs show that the price increases came in close temporal proximity to trade association meetings, direct telephone calls, or other communications where Defendants had the opportunity to confer and enter into an agreement with one another. Third, Plaintiffs claim that Defendants reduced their containerboard production strategically, closing mills or otherwise slowing production around the time that they announced their price increases.

Table 1 summarizes some of this evidence. It shows the 15 price increases during the Class Period and one predating it. The first column lists the date on which a price increase was first announced and the second the amount of the price increase. The columns thereafter list for each Defendant how many days after the first price announcement it joined the price increase by making its own announcement. Where a Defendant announced a different price than what the first-to-announce firm committed to, its own price increase amount is noted. For example, the table shows that International Paper was the first to announce a price increase of $35.00 on March 31, 2003. Georgia-Pacific followed suit three days later, and a day after that (or four days from the initial announcement) Temple-Inland likewise announced that it was increasing its containerboard prices but by $40.00.

**Table 1: Price Increases during the Class Period**

| | Date of First Price Announcement | Amount of Price Increase | IP | Georgia-Pacific | Temple-Inland | Westrock | Weyer-haeuser | Norampac | PCA |
|---|---|---|---|---|---|---|---|---|---|
| 1 | March 31, 2003 | $35 | 1st to announce | +3 days | +4 days $40 | +4 days | +12 days | +7 days | Within +17 days |
| 2 | January 5, 2004 | $40 | +11 days | +11 days | +14 days | +14 days | 1st to announce | +17 days | +11 days |
| 3 | April 8, 2004 | $50 | Within +34 days | Within +14 days | +14 days | +18 days | 1st to announce | +34 days | +6 days |
| 4 | February 14, 2005* | $50 | 1st to announce | +9 days | +11 days | +8 days | +10 days | +56 days | +11 days |
| 5 | September 6, 2005 | $30 | +6 days | +7 days | +13 days | 1st to announce | +8 days | +7 days $40 | +2 days |
| 6 | November 28, 2005 | $40 | +4 days | +3 days | +2 days | +2 days | 1st to announce | +3 days | +0 day |
| 7 | February 10, 2006 | $50 | +7 days | 1st to announce | Within +10 days | +3 days | +10 days | +7 days | +11 days |
| 8 | October 26, 2006* | $40 | +6 days | +32 days $40 to $50 | +46 days | +35 days | 1st to announce | +39 days | +36 days |
| 9 | March 27, 2007* | $40 | 1st to announce | Customer-specific price increases | +34 days | Did not announce | Did not announce | Did not announce | +27 days |
| 10 | June 22, 2007 | $40 to $50 | +12 days $40 | +11 days | +13 days | +10 days $40 | 1st to announce | +9 days $40 | +11 days |
| 11 | February 1, 2008* | $50 | +3 days | +7 days | +6 days | 1st to announce | +10 days | +13 days | +10 days |
| 12 | May 28, 2008 | $55 | +1 day | 1st to announce | +5 days | +0 day | +2 days | +2 days | +2 days |
| 13 | August 28, 2008* | $60 | 1st to announce | +8 days | +7 days | +8 days | | 1st to announce | +12 days |
| 14 | November 23, 2009 | $50 to $70 | + 7 days | 1st among Ds to announce | +8 days | +8 days | | +14 days $50 | +14 days |
| 15 | February 22, 2010 | $60 | 1st to announce | +2 days | +4 days | +7 days | | +9 days | +11 days |
| 16 | June 29, 2010* | $60 | +0 day | 1st among Ds to announce | +1 day | +2 days | | +9 days | +11 days |

<u>Notes</u>:

- Except where noted, each Defendant's price increase was for the same amount as the first-to-announce firm's.
- The first price increase of March 31, 2003 predates the Class Period.
- Two of the price increases – those announced by Georgia-Pacific on November 23, 2009 and June 29, 2010 – were led by a non-Defendant. Georgia-Pacific was only the first among Defendants to announce these increases.
- Six of the price increases, marked with asterisks by the date of the first price announcement, failed.

- Weyerhaeuser did not announce any price increase after the May 28, 2008 announcement. This was presumably due to the fact that the company sold its containerboard business to International Paper on August 4, 2008.

In addition, Plaintiffs put forth a "conduit theory" to explain how Defendants facilitated their conspiracy. According to Plaintiffs, Defendants used their earnings calls, communications with industry analysts, and other public statements to leak confidential information to their co-conspirators. Plaintiffs assert that such leaks allowed Defendants to coordinate their actions and further their price-fixing scheme. In the same vein, Plaintiffs draw attention to the fact that Defendants traded often among themselves. Plaintiffs contend that such inter-firm trades allowed Defendants to treat each other as customers instead of competitors and so freely exchange information among them.

Plaintiffs also build a body of expert testimony. One of Plaintiffs' experts, Douglas Zona ("Zona"), opines that Defendants charged supracompetitive prices during the Class Period while depressing production to levels below that of a benchmark group not suspected of conspiracy. Another expert, Michael Harris ("Harris"), contends that Defendants' actions were inconsistent with those of firms in a competitive marketplace. A firm competing for business with its rivals, says Harris, would not cut production during a period of

increased demand or raise prices during an economic downturn, as Defendants did. Harris further focuses on Defendants' motive for colluding. He points to the fact that the containerboard industry was dominated by a few firms, had high barriers to entry, faced an inelastic demand for its product, and produced a homogeneous product. Harris opines that, under such circumstances, Defendants would tend to shy away from price competition and attempt to collude to reap profits from artificially inflated prices.

Defendants do not dispute many of the underlying facts. For example, they do not contest that they made announcements of price increases, closed certain mills, interacted with each other and analysts, engaged in inter-firm trading, and operated in a highly concentrated industry. Instead, they seek to undermine the inference of illicit agreement that Plaintiffs (and their experts) draw by introducing additional factual evidence and competing expert testimonies. For instance, Defendants adduce evidence to show that they independently considered raising prices. They further assert specific business reasons for having attended trade association meetings, made phone calls to each other, publicly disclosed information to analysts, and traded among themselves. Defendants also advance individual defenses. Georgia-Pacific emphasizes its

high production levels during the Class Period, while Westrock seeks to extricate itself on the basis that its decisions to announce a price increase and reduce supply were approved while it was in bankruptcy.

In addition, Defendants point to gaps in Plaintiffs' evidence. They focus on the fact that, after extensive discovery, Plaintiffs found no evidence to shed light on the substance of Defendants' supposedly improper communications during the various industry meetings and phone calls. This is despite Plaintiffs having combed through thousands of pages of Defendants' contemporaneously created records and deposed numerous employees involved in those meetings and calls as well as third parties. As such, Defendants argue that Plaintiffs rely only on speculation to advance the theory that Defendants conspired during these interactions.

Plaintiffs, in turn, admit the additional facts but argue that their case withstands Defendants' attempt at shading the record. They aim to excuse certain missing pieces of evidence by alluding to Defendants' prior brushes with antitrust lawsuits. Plaintiffs contend that as a result of such exposure, Defendants have learned to conceal their conduct, destroy business records, and generally make it difficult for Plaintiffs to find incriminating evidence.

Despite the vigorous back-and-forth between the parties and the voluminous record, the general lack of dispute on the underlying facts makes the case ripe for summary judgment.

## II. <u>SUMMARY JUDGMENT STANDARD AND SUBSTANTIVE ANTITRUST LAW</u>

To survive summary judgment on their Sherman Act conspiracy claim, Plaintiffs "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986); *accord Mkt. Force, Inc. v. Wauwatosa Realty Co.,* 906 F.2d 1167, 1171-72 (7th Cir. 1990).

Independent actions include, but are not limited to, the behavior of firms operating in perfectly competitive markets – that is, firms doing business in a market where there are many small firms, with each too small for its decisions to affect the market price. *See, In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 359 (3d Cir. 2004) (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 429, at 206 (2nd ed. 2000)). In such a market, each firm makes its decisions taking price and its competitors' actions as given. Perfectly competitive firms may "act in similar ways," but that is only because they are reacting to a "common stimulus," or external market forces unrelated to their own decisions. *See, In re Plasma-Derivative Protein Therapies Antitrust Litig.,* 764 F.Supp.2d 991, 997 (N.D.

Ill. 2011) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554 (2007)). Independent actions, however, are not limited just to perfect competition.

The concept of independent actions takes on an additional dimension in this case because Defendants are oligopolies, or large firms operating in an industry dominated by few players. *See, In re Chocolate Confectionary Antitrust Litig.,* 801 F.3d 383, 397 n.10 (3d Cir. 2015) (defining an oligopoly as a market "in which a few relatively large sellers account for the bulk of the output") (quoting Areeda & Hovenkamp, ¶ 404a, at 10 (4th ed. 2014)) (internal quotation marks omitted). As a large firm operating among a select few, each Defendant recognizes that its pricing and output decisions affect its competitors, and depending on how they react, the market as a whole. *See, Flat Glass,* 385 F.3d at 359. Thus, any Defendant acting rationally and independently takes into account the anticipated reactions of the other firms. *See, id.; Plasma-Derivative,* 764 F.Supp.2d at 997. Independence in this context does not mean ignoring one's competitors.

Accordingly, a firm acting independently may choose to raise prices or lower output because it anticipates (or hopes) that its competitors, likewise acting independently and in their best interests, may follow the same course of action. *See, In*

*re Text Messaging Antitrust Litig.,* 782 F.3d 867, 876 (7th Cir. 2015) (noting that a firm may "raise its price, counting on its competitors to do likewise (but without any communication with them on the subject) and fearing the consequences if they do not"). Similarly, a firm may follow a competitor's lead in pricing and production. *See, id.* (stating that one can "expect competing firms to keep close track of each other's pricing and other market behavior" and that such firms "often find it in their self-interest to imitate that behavior rather than try to undermine it"). Such oligopolistic competition differs from perfect competition insofar as the interdependent, oligopolistic firms act in similar ways not only because they are reacting to common, external market conditions but also because they are responding to each other. However, it is like perfect competition in that such similar behavior does not evidence coordination.

The kind of interdependent conduct just described is variously known as conscious parallelism, tacit collusion, follow-the-leader strategy, or interdependent parallelism. However it is referred to, the crucial thing is that such conduct is lawful. *See, Twombly,* 550 U.S. at 553-54 (quoting Areeda & Hovenkamp, ¶ 1433a, p. 236, for the proposition that "[t]he courts are nearly unanimous in saying that mere

interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1") (internal quotation marks omitted); *Brooke Grp. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227 (1993); *Text Messaging,* 782 F.3d at 879 ("Tacit collusion . . . does not violate section 1 of the Sherman Act."); *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.,* 971 F.2d 37, 50 (7th Cir. 1992) ("[T]he Sherman Act prohibits *agreements* . . . [but] individual pricing decisions (even when each firm rests its own decision upon its belief that competitors will do the same) do *not* constitute an unlawful agreement under section 1 of the Sherman Act.") (quoting *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.,* 851 F.2d 478, 484 (1st Cir. 1988)) (emphasis in original).

Tacit collusion thus is lawful, and this is despite the fact that it may have the same anticompetitive effects as proscribed express collusion. *See, Reserve,* 971 F.2d at 50; *Plasma-Derivative,* 764 F.Supp.2d at 997 ("Section 1 of the Sherman Act . . . reaches only conduct which results from an agreement among firms and not independent action which happens to have an anti-competitive effect."); *In re Fla. Cement & Concrete Antitrust Litig.,* 746 F.Supp.2d 1291, 1310 n.15 (S.D. Fla. 2010) ("All things being equal, an antitrust policy [such as ours] which permits price following in an oligopoly will

result in higher prices and lower supply[.]"). By tacitly colluding, oligopolistic firms "in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level." *Brooke,* 509 U.S. at 227; *see also, Flat Glass,* 385 F.3d at 359-60 (explaining at some length how "firms in a concentrated market may maintain their prices at supracompetitive levels, or even raise them to those levels, without engaging in any overt concerted action"). As such, pricing supracompetitively, or above a level justified by competitive conditions, is as consistent with legal oligopolistic behavior as it is with illicit conspiracy.

The bottom line is that lawful independent actions subsume oligopolistic interdependent behavior. Thus, to prevail at summary judgment, Plaintiffs must offer evidence that tends to rule out both that Defendants acted independently as price-taking firms and that they acted interdependently as oligopolies. *See, In re Domestic Drywall Antitrust Litig.,* 163 F.Supp.3d 175, 189-90 (E.D. Pa. 2016) ("For Plaintiffs to create a fact issue about whether Defendants entered an agreement, Plaintiffs must present evidence tending to exclude the possibility of independent conduct, including interdependent conduct (*e.g.,* conscious parallelism)."). Defendants, on the other hand, may argue for both possibilities, pleading that some

of their actions are independent responses to external market conditions and others are interdependent follow-the-leader strategies.

In sum, the Court applies the following summary judgment standard in this antitrust case. It draws every reasonable inference in favor of non-movant Plaintiffs while keeping in mind that "[c]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita,* 475 U.S. at 587-88. Moreover, "[e]ven on summary judgment," the Court is "not required to draw every requested inference" but only "reasonable ones that are supported by the record." *Omnicare, Inc. v. Unitedhealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011). The Court does not weigh the evidence, since that is the domain of the jury, but it recognizes that for the case the reach the jury, Plaintiffs must show that there is a genuine dispute of material fact. *See,* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). This means that Plaintiffs must show that "the inference of conspiracy is reasonable in light of the competing inferences of independent action," where independent action should be understood to include oligopolistic interdependent conduct. *Matsushita,* 475 U.S. at 588.

# III.  **ANALYSIS**

The Court considers the evidence Plaintiffs bring to contest summary judgment individually and holistically.  The evidence is assessed individually against moving Defendants Georgia-Pacific and Westrock to determine whether Plaintiffs have carried their burden as to the specific Defendants.  *See, Alexander v. Phx. Bond & Indem. Co.,* 149 F.Supp.2d 989, 1000 (N.D. Ill. 2001) ("We will analyze each defendant individually because, even in a conspiracy case, liability remains individual and is not a matter of mass application.") (citing *Kotteakos v. United States,* 328 U.S. 750, 772 (1946)); *In re Brand Name Prescription Drugs Antitrust Litig.,* No. 94 C 897, MDL 997, 1996 U.S. Dist. LEXIS 4335, at *1 (N.D. Ill. Apr. 4, 1996) (denying the motions for summary judgment with respect to one class of defendants while granting them to another).  Since the settling Defendants are no longer requesting summary judgment, the evidence Plaintiffs offer against them will be considered only to the extent that it is relevant to the moving Defendants' arguments or a holistic view of Plaintiffs' case.

As against each moving Defendant, the Court examines the evidence as a whole to see if, viewed in the light most favorable to Plaintiffs, "it was more likely that the defendants had conspired to fix prices than that they had not conspired to

fix prices." *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 655-56 (7th Cir. 2002); *see also, Petruzzi's IGA Supermarkets v. Darling-Del. Co.,* 998 F.2d 1224, 1230 (3d Cir. 1993) ("[A] court should not tightly compartmentalize the evidence put forward by the nonmovant, but instead should analyze it as a whole to see if together it supports an inference of concerted action.") (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962)). The Court thus avoids looking at each piece of evidence Plaintiffs bring in isolation and concluding that "if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment." *High Fructose,* 295 F.3d at 655-56.

The Court begins by reviewing the procedural history of this case, which Plaintiffs argue constrains what the Court may do at this stage.

## A. Procedural History

This case arrives at summary judgment after this Court certified it as a class action and the Seventh Circuit affirmed the decision. Plaintiffs rely heavily on the Seventh Circuit's opinion in arguing why summary judgment is inappropriate here. In particular, they seize on the appellate court's language that "[t]here was a great deal of evidence designed to show that the

- 16 -

hypothesis that Defendants had organized a cartel was one that a jury could accept." *Kleen Prods. LLC v. Int'l Paper Co.,* 831 F.3d 919, 924 (7th Cir. 2016). Since they have now brought this "great deal of evidence," Plaintiffs press that the case should go to a jury.

Plaintiffs' argument proves too much. It suggests that in affirming class certification, the court of appeals decided the merits of Plaintiffs' case, concluding that the case was strong enough to be submitted to a jury and so should bypass not only summary judgment but also a directed verdict. This flies against the Supreme Court's teaching that "courts [have] no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 466 (2013). Since whether Plaintiffs' case is meritorious enough to go to a jury is not "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied," had the Seventh Circuit made such a finding, it would have ranged outside the bounds of its authority to review the issue on appeal. *Id.* ("Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."); *see also, Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 757-58 (7th

Cir. 2014) (holding that a class may be certified even if the court would then enter a judgment that exonerates the defendant and thus bifurcating the class certification and merits questions).   The Seventh Circuit did not make such an error.

This can be seen both in what the court said and what it did not say.   In its opinion, the court expressly noted that it was "not saying that any of these points [making up Plaintiffs' *prima facie* case] have been proven" but merely that Plaintiffs' "evidence is enough to support class treatment of the merits." *Kleen Prods.*, 831 F.3d at 928.   The court thus made clear that it was not deciding the merits of Plaintiffs' case, but only that Plaintiffs may attempt to prove the merits not just for themselves but for the class as a whole.

Furthermore, the Seventh Circuit did not rule that should Plaintiffs bring the type of proof they have now introduced, they may proceed directly to trial.   This comes through in what the court simply did not say.   The court said little about the substance of antitrust law, except as that body of law relates to class certification issues.   It mentioned the Sherman Act just once, at the beginning of the opinion; it did not distinguish between express and tacit collusion, despite the fact that only one of these two types of conduct violates antitrust law; it gave short shrift to what continues to be

Defendants' main defense, which is that their behavior was explained by "parallel but independent behavior undertaken by firms in a concentrated market"; and it credited facts that it had elsewhere said do not support an inference of conspiracy. *Compare, e.g., Kleen Prods.,* 831 F.3d at 924 ("Communication among the Defendants was easy, thanks to trade associations."), *with Omnicare,* 629 F.3d at 709 ("[C]ourts should not allow plaintiffs to pursue Sherman Act claims merely because conversations concerning business took place between competitors [during legitimate activities].") (quoting with approval the lower court's opinion). This would be a strange approach to take were the court assessing the strength of Plaintiffs' proffered evidence and measuring it against the substantive requirements of antitrust law. The more sensible conclusion is that the Seventh Circuit simply did not do what Plaintiffs wish it did: take the case outside of the realm where Defendants may succeed on summary judgment.

The Court thus declines Plaintiffs' invitation to dispose of the current motions based on the Seventh Circuit's class certification opinion alone. Instead, it considers the evidence the parties bring to summary judgment. Plaintiffs concede that they have uncovered no direct evidence of conspiracy. *See generally,* ECF No. 1230 (Pls.' Br.), at 4 (discussing the

various pieces of evidence to support their case and stating that "Plaintiffs present extensive and strong circumstantial evidence"). Therefore, circumstantial evidence decides this case, and such evidence comes in two forms, "economic evidence suggesting that the defendants were not in fact competing, and noneconomic evidence suggesting that they were not competing because they had agreed not to compete." *High Fructose,* 295 F.3d at 654-55. The Court examines these two types of evidence in the sections below.

## B. Economic Evidence of Conspiracy

The Court first tackles the economic evidence. Plaintiffs have amassed four categories of such evidence that they say support an inference that Defendants engaged in a conspiracy. These are: the market structure of the containerboard industry; the lockstep price increases; the accompanying supply reductions; and Defendants' actions purportedly taken against self-interest.

### 1. *Structure of the Containerboard Industry as Motive to Collude*

Plaintiffs' evidence on the structure of the containerboard industry, while not uncontested, can be treated as establishing that the "containerboard market was conducive to successful collusion." *Kleen Prods.,* 831 F.3d at 927-28. In particular,

Plaintiffs bring evidence to show that Defendants operated in a concentrated industry; that barriers to entry were high; that Defendants sold a standardized, homogeneous product; and that they faced an inelastic demand.

However, the value of this evidence to show that an actual conspiracy existed is limited. As the Court explained in its *Daubert* memorandum opinion,

> An industry structure is shared by Defendant and non-Defendant firms alike throughout the Class and non-Class Periods. As such, by itself, details of an industry structure cannot show that Defendants conspired during the Class Period any more than they can show that all containerboard firms conspired at all times.

*Kleen Prods. LLC v. Int'l Paper,* No. 10 C 5711, 2017 U.S. Dist. LEXIS 83321, at *51-52 (N.D. Ill. May 31, 2017). In treating the market structure of the containerboard industry as relevant but far from dispositive, the Court is following well-trodden ground. In particular, the Court adheres to the Seventh Circuit's teaching that, while the structure of an industry may be conducive to cartelization and so offers a motive to the defendants to conspire, such motive alone is "never enough to establish a traditional conspiracy." *Res. Supply,* 971 F.2d at 51 (quoting 6 Phillip E. Areeda, Antitrust Law P 1411 (1986)); *see, id.* ("It is well-established . . . that the mere existence of an oligopolistic market structure in which a small group of

manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws.") (collecting cases) (internal quotation marks omitted); *Chocolate,* 801 F.3d at 398 (stating that "evidence of motive without more does not create a reasonable inference of concerted action").

Moreover, the evidence that Plaintiffs bring does not offer unalloyed support to their case. For example, Plaintiffs stress that the demand for containerboard products was inelastic, meaning that Defendants' customers were not particularly sensitive to price. As such, when the price of containerboard increases, demand does not drop precipitously, and conversely, when the price of containerboard falls, demand does not increase significantly. Yet while pressing this fact, Plaintiffs also fault Defendants for not cutting prices in response to falling demand during a period of economic downturn dubbed the Great Recession. But the inelasticity of demand is exactly the reason that a price cut would not much help a Defendant's bottom line, and in fact, may hurt it. In an industry characterized by inelastic demand, cutting prices "will not increase the size of the total market." *See, Res. Supply,* 971 F.2d at 53 n.12 (quoting *United States v. FMC Corp.,* 306 F.Supp. 1106, 1139 (E.D. Pa. 1969)). To the extent that a firm may see increased

demand when it lowers prices, it mostly will be because the firm is taking customers away from its competitors. However, in a market with a homogeneous product, the competitors will be pressured to match the price cut, thus resulting in "static market shares [] and reduced profit margins" for all. *Id.* (explaining that in a market for homogeneous product "no producer can successfully sell at a higher price than its competitors; and if a seller attempts to sell at a lower price . . . its competitors will be given the opportunity to meet its lower price, thereby resulting in uniform prices again, but at a lower level; and without any increase in the original seller's net share of the market").

As such, inelastic demand and homogeneous products explain why Defendants do not compete on price, and this is so even in the absence of an unlawful agreement not to compete. *Cf. Text Messaging,* 782 F.3d at 876 (stating that "evidence of express collusion might be a *high* elasticity of demand . . . for this might indicate that the sellers had agreed not to cut prices even though it would be to the advantage of each individual seller to do so until the market price fell to a level at which the added quantity sold did not offset the price decrease") (emphasis added).

Similarly, Plaintiffs emphasize that the containerboard industry was dominated by a few players, protected by high barriers to entry, and became more concentrated still during the Class Period. *See, e.g.,* ECF No. 1230 at 25 ("Defendants' market shares also indicate their ability to conspire. During the Class Period alone, Defendants' collective market share has increased from 75% of total box production in 2005 to 81% in 2007."). It is true that "collusion is easier with fewer firms," *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Asso.,* 744 F.2d 588, 596 (7th Cir. 1984), but this statement applies to collusions of both the lawful and unlawful kind. In particular, with fewer firms, it is easier for Defendants to follow each other's pricing decisions – and do so without prior agreement. *See, Text Messaging,* 782 F.3d at 871 (explaining that "the fewer the firms, the easier it is for them to engage in 'follow the leader' pricing ('conscious parallelism,' as lawyers call it, 'tacit collusion' as economists prefer to call it) — which means coordinating their pricing without an actual agreement to do so"); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,* 906 F.2d 432, 443 (9th Cir. 1990) ("[A]s the number of firms in a market declines, the possibilities for interdependent pricing increase substantially."). Thus, to the extent that a concentrated market made it easy for Defendants to

"share monopoly power" and set supracompetitive prices by lawful means, Defendants might have had little (or less of a) motive to conspire. *Brooke,* 509 U.S. at 227.

In short, the structure of the containerboard industry is a double-edged sword. The industry features that Plaintiffs rely on to make out their case for an antitrust violation also provide Defendants with a ready-made defense that they did not break the law. With this fact in mind, the Court considers the rest of Plaintiffs' evidence in the context of the containerboard industry as Plaintiffs have described it.

### 2. *Lockstep Price Increases*

Plaintiffs' *prima facie* case for a price-fixing scheme is the fifteen price increases that Defendants announced during the six and half years of the Class Period. Although Plaintiffs describe these announcements as "lockstep," Table 1 gives a more precise look at these fifteen attempted price increases. In particular, the following is true about Plaintiffs' *prima facie* case.

First, the time that it took Defendants to follow a leader's price announcement varied widely. In one of the announcements, three of the six Defendants never did join the leader's price announcement. Of the three Defendants that joined the announcement, moving Defendant Georgia-Pacific made

customer-specific price increases rather than follow
International Paper's $40 blanket increase.  For the remaining
announcements which all Defendants joined, the time it took a
Defendant to make a follow-on price announcement ranged from
mere hours to no less than 56 days after the leader announced.
Within this range, announcements coming within days, closer to
one or two weeks, or in about a month's time are all common.

Overall, the pattern of price announcements in this case is
less suggestive of "lockstep," parallel behavior than that found
in other price-fixing cases.  Thus, at least on this dimension,
the case at bar is distinguishable from *Titanium Dioxide*.  *See,*
*In re Titanium Dioxide Antitrust Litig.,* 959 F.Supp.2d 799, 807-
08, 832 (D. Md. 2013) (denying summary judgment when all five
defendants participated in all 25 price increases during the
alleged conspiracy period, with the longest gap between the
initial price hike and the subsequent increase being, as far as
the Court can tell, 20 days).  At the same time, it appears even
more amenable to summary judgment than cases where courts have
granted it.  *See, e.g., Valspar Corp. v. E.I. du Pont de Nemours*
*& Co.,* 152 F.Supp.3d 234, 241 (D. Del. 2016) (granting summary
judgment even though the defendants "issued 31 parallel price
increase announcements nearly simultaneously," with near

simultaneity meaning no more than weeks apart) (internal quotation marks omitted).

Second, Defendants were not the only containerboard producers that timed their price increases to coincide with their competitors'.  In fact, two of the fifteen announcements were led by a non-Defendant.  Relatedly, the identity of the first firm to announce changed from announcement to announcement, meaning that no one Defendant led the majority of the announcements.  The rotating leadership suggests that Defendants "had the ability to decide independently to initiate a price raise, which the other [Defendant] manufacturers could decide if they would follow." *Res. Supply,* 971 F.2d at 54. This cuts against an inference of conspiracy. *Id.* (affirming grant of summary judgment in such a case).

Third, not every Defendant led a price announcement.  At least one court in this district has treated leaders and followers differently when examining an antitrust claim based on parallel conduct.  *See, Alexander,* 149 F.Supp.2d at 1005-008 (granting summary judgment to a defendant that represented "a clear example of a tax buyer following the leader" while denying it to another who "cannot argue that it was merely following the leader because it was a leader").  This ruling takes on particular significance for moving Defendant Westrock.

Although Westrock led two price increases over the entire Class Period, both of these instances preceded the company's discharge from bankruptcy. Judge Milton Shadur, who presided over the case before it was reassigned to this Court, ruled that Westrock "can be held liable only for its actions taken post-discharge." *Kleen Prods. LLC v. Int'l Paper,* 775 F.Supp.2d 1071, 1081-82 (N.D. Ill. 2011) (Shadur, J.). This Court concurred. *See, Kleen Prods.,* 306 F.R.D. at 608-09 (Leinenweber, J.) (stating that if Westrock's "post-discharge conduct does not give rise to an antitrust violation, [the company] will be absolved of all liability, despite its participation in the pre-discharge conspiracy"), *aff'd,* 831 F.3d 919, 930 (7th Cir. 2016) (iterating that Westrock's "liability would be predicated on post-discharge conduct").

Accordingly, in considering whether the case against Westrock should go to the jury, the Court may only look at the company's conduct after it exited bankruptcy on June 30, 2010 – or conduct within the last four months of the alleged conspiracy. During these last four months, Westrock did not lead a price increase. It joined one that failed.

This leads the Court to its next point: the frequent failures Defendants experienced in trying to hike prices. Six out of the fifteen times Defendants announced a price increase,

they failed to actually increase price. This is true even for those attempted price increases in which all Defendants participated. For instance, Westrock led the February 1, 2008 attempted price increase in which all Defendants followed in a space of less than two weeks. The increase nonetheless could not be implemented. Similarly, Georgia-Pacific was the first among Defendants to announce a higher price on June 29, 2010. International Paper followed that same day, and the slowest laggard (PCA), only 11 days later. Yet the attempt failed.

These unsuccessful attempts make the inference that Defendants engaged in coordinated action less reasonable. For if there were unlawful coordination, exposing Defendants to the risk of enormous penalties, one might expect that Defendants would have taken the plunge only for better odds than they evidently got. The unsuccessful price increases also distinguish Defendants' case from *Titanium Dioxide*. The court there rejected the defense of conscious parallelism because "that theory contemplates the possibility that a price leader would be forced to rescind its increase because competitors decided not follow it." *Titanium Dioxide,* 959 F.Supp.2d at 825 (internal citations omitted). In *Titanium Dioxide,* "no producer rescinded a price increase during the Class Period." *Id.* In contrast, Defendants in this case were "forced to rescind" their

attempted price increases six times during the Class Period, once because the attempt was not followed and five more times when the alleged conspirators did fall in line.

Lastly, the Court could not detect in Defendants' fifteen price announcements any notable break with their prior practice. While Plaintiffs argue that Defendants were vigorously competing in the period before the alleged conspiracy began, they have not adduced much evidence on Defendants' pattern or practice regarding price announcements before the Class Period. The dearth of support on this point seriously weakens the inference of conspiracy. *See, Twombly,* 550 U.S. at 556 n.4 (crediting the position that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy*") (*internal quotation marks omitted); *Chocolate,* 801 F.3d at 410 ("For a change in conduct to create an inference of a conspiracy, the shift in behavior must be a 'radical' or 'abrupt' change from the industry's business practices.") (citing *Toys "R" Us v. FTC,* 221 F.3d 928, 935 (7th Cir. 2000)).

Indeed, what little evidence there is supports an inference that the parallel price increases were in line with historic behavior. Recall the one price announcement initiated by

International Paper on March 31, 2003, or about 11 months before the beginning of the Class Period. This pre-conspiracy announcement, far from establishing a baseline from which a "radical" or "abrupt" shift occurred, looks much like its later counterparts. In this episode, Defendants followed International Paper's lead with an alacrity that they often did not display during the alleged conspiracy. All Defendants participated in the attempted price increase; Georgia-Pacific followed International Paper's announcement after just 3 days, Westrock a day thereafter, and PCA, the latest to announce, within 17 days. All but one Defendant announced the same increase of $35.00, and the one outlier (Temple-Inland) actually attempted to increase its price by more than the rest of the group. Finally, and perhaps most importantly for companies that allegedly entered into an illegal agreement sometime thereafter, the price increase – without needing any agreement – succeeded.

As courts have been persuaded to grant or deny summary judgment based on the extent of continuity with past behavior, these facts favor Defendants. *Compare, Chocolate,* 801 F.3d at 410 (affirming a grant of summary judgment because "we fail to see why we should infer a conspiracy existed between 2002 and 2007 from behavior that is in fact consistent with how this industry has historically operated"); *Valspar,* 152 F.Supp.3d at

252 (granting summary judgment in a case where "public announcements of price increases and parallel pricing were not historically uncommon in the titanium dioxide industry"), *with Alexander,* 149 F.Supp.2d at 1007 (denying summary judgment because "the speed by which all the bidders changed from a highly competitive posture to a highly cooperative posture is difficult to reconcile with the idea of independent conduct"); *Domestic Drywall,* 163 F.Supp.3d at 255-56 ("Given the evidence that job quotes had been a feature in the drywall industry since the 1980s and that all Defendants eliminated this practice within weeks of each other in fall 2011, a jury might be justified in concluding that Defendants' shift in behavior was radical enough to contribute to the inference of conspiracy.").

In sum, the Court concludes that, even in the context of an industry structure conducive to collusion, the fifteen price increases do not raise an "inference of conspiracy [that] is reasonable in light of the competing inferences of independent action." *Matsushita,* 475 U.S. at 588.

### 3. *Supply Reductions as a Means to Support Price Collusion*

The Court next examines the contention that Defendants restricted their supply over the Class Period. The parties have recently spilled much ink over the importance of this issue,

with Plaintiffs insisting that supply reductions play only a supporting role in their case while Defendants protest that the reductions lie at the heart of Plaintiffs' conspiracy theory. *Compare, e.g.,* ECF No. 1230 (Pls.' Br.), at 2 ("Plaintiffs have always alleged a conspiracy to fix prices, aided by, among other things, numerous supply restrictions; not a conspiracy to reduce capacity."), *with* ECF No. 1098 (Defs.' Br.), at 1 ("Since the outset of this litigation, the crux of Plaintiffs' Complaint was Defendants' alleged across-the-board reductions in containerboard capacity.") (internal citation and quotation marks omitted). With all due respect, the Court thinks the parties are missing the forest for the trees.

An agreement to fix prices is not separate or separable from a mutual understanding to reduce output. This is for the simple reason that an effort to raise prices cannot succeed without a corresponding reduction in supply. As the Supreme Court has explained, "[t]he sales of even a monopolist are reduced when it sells goods at a monopoly price." *Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 470 (1992); *accord Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 226 (7th Cir. 1978) ("[A]ll serious attempts to establish a supracompetitive price must necessarily include an agreement to restrict output. Otherwise the monopoly price could never be

maintained.") (as quoted in *In re Sulfuric Acid Antitrust Litig.,* 743 F.Supp.2d 827, 869 (N.D. Ill. 2010)). This is because as "firms raise price, the market's demand for their product will fall, so the amount supplied will fall too." *Gen. Leaseways,* 744 F.2d at 594-95. The extent to which demand falls depends on the elasticity of demand, but as long as demand is not perfectly inelasticity, demand falls when price rises. People buy less when they have to pay more – the flip side of which is that when Defendants raised their prices, they sold less. Ergo, they produced less.

Of course, Defendants may have been "completely unrealistic" and agreed to attempt price increases without being willing to reduce production. *High Fructose,* 295 F.3d at 655 ("[P]rice-fixing agreements are illegal even if the parties were completely unrealistic in supposing they could influence the market price."). In that eventuality, Defendants' attempt to fix prices would have failed, and their inefficacious conspiracy would not have produced any damages. The possibility is thus of cold comfort to Plaintiffs, who have built a case in which Defendants successfully inflated prices and caused Plaintiffs some $3.8 billion in actual damages. In the alleged conspiracy *sub judice* then, increased prices and reduced output are two

sides of the same coin; Plaintiffs cannot argue that Defendants did one thing without committing that they did the other.

With this clarification in mind, the Court examines the evidence that Plaintiffs have adduced to show that Defendants cut production over the Class Period. The evidence is quite weak (thus explaining the parties' dispute over the focus of the case). First, the Court notes that Plaintiffs' various assertions about how much Defendants should have produced, but did not due to their conspiracy, often miss the mark. Plaintiffs appear to argue that if Defendants forwent some business, declined some customers' orders, or generally gave up volume, they were acting against their independent self-interest and so likely conspiring. But, even in the absence of an illicit agreement, Defendants may choose not to chase after every business opportunity.

The Seventh Circuit has made clear that such disdain for additional business is rational. In the words of the court, "a rational profit-maximizing seller does not care about the number of customers it has but about its total revenues relative to its total costs. If the seller loses a third of its customers because it has doubled its price, it's ahead of the game because twice two-thirds is greater than one (4/3 > 3/3)." *Text Messaging,* 782 F.3d at 877; *see also, Domestic Drywall,* 163

F.Supp.3d at 252 n.65 (stating that "evidence that a defendant refused to adjust its list price in order to secure a new customer would not be so probative" of uncompetitive behavior). In other words, Defendants can act in their independent self-interest even when they turn away business. The fact that they essentially did so by reducing supply does not, by itself, suggest conspiracy.

Second, even within this framework, Plaintiffs cannot dispute that Georgia-Pacific and Westrock did not restrict supply by closing any paper mill within the relevant time period (the Class Period for Georgia-Pacific and post-bankruptcy interval for Westrock). Plaintiffs argue, however, that the moving Defendants took "different forms of supply restrictions, including downtime and slowback," and that it is "irrelevant" how Defendants reduced their supply. ECF No. 1230 at 54. This is not true.

A mill closure is a permanent reduction in supply, costly to reverse and likely impossible to do so within a short period of time. In contrast, machine downtime and slowback are temporary, easy-to-undo measures. A machine turned off (downtime) can be switched back on; a machine run at slower speed (slowback) can be ramped up. Both can happen much more quickly than the reopening of a closed mill. As such, a

Defendant that shuttered its plants – a move Plaintiffs contend was sensible only in furtherance of a conspiracy and not justified by market forces – took much more risk than one that merely slowed production.

In other words, a Defendant that closed a mill engaged in "'perilous leading'." *Plasma-Derivative,* 764 F.Supp.2d at 1001-02 ("These business decisions [to reduce capacity] would be impossible to reverse quickly. As demand increased, the defendants would have been left without the ability to bring supply in line with orders. This sort of parallel behavior has been described as 'perilous leading' . . . .") (citing 6 Areeda & Hovenkamp ¶ 1425d). It took actions that, "absent an agreement," exposed it to "a significant risk that competitors won't follow." *Id.* Such risks make purely interdependent actions unlikely, as the inference is that a firm would not have perilously led without an agreement in place. *Id.* In contrast, when "supplies can be quickly adjusted," "firms face little risk in waiting to see how competitors price their products." *Id.* at 1001. In such a case, interdependent actions are not unlikely but plausible.

The form of supply restriction thus matters, and the particular form adopted here by the two moving Defendants – temporary measures such as downtime and slowback that could be

"quickly adjusted" – does little to make the inference of conspiracy more reasonable than lawful interdependence.

Third, the evidence that Plaintiffs have brought to show supply reductions (of any form) paints quite a mixed picture. For example, the evidence shows that Defendants added new capacity during the Class Period – they bought new mills as well as closed existing ones. Similarly, while Defendants reduced supply during the Great Recession, Plaintiffs admit that at least some of this reduction was justified by the decline in demand. Plaintiffs also do not dispute that Defendants cut capacity and production even before the conspiracy allegedly began and that, as a group, Defendants closed more mills before the Class Period than during it. Plaintiffs nonetheless seek to excuse this anomaly by positing that "capacity closures occurring *before* the Class Period set the stage for coordinated price increases *during the* Class Period." ECF No. 1230 at 58 (emphasis in original). The rationalization hardly strengthens Plaintiffs' case – if Defendants closed mills before the Class Period despite not having an agreement to do so, then their mill closures during the Class Period do not reasonably give rise to an inference that an agreement has taken place. Moreover, just about everything that Defendants did outside the Class Period can be characterized as "set[ting] the stage" for the

conspiracy. After all, everything helped Defendants to get to where they were when they purportedly entered into an agreement to fix prices.

The complicated picture regarding supply decisions forced Plaintiffs to make the argument that Defendants did not simply restrict supply, but that they restricted supply "relative to demand." *See, e.g.,* ECF No. 1230 at 45. But Plaintiffs make this argument without presenting data on containerboard demand. Instead they seem to argue that because some of the price increases succeeded, Defendants must have reduced supply over and above the amount justified by changes in demand. The argument thus is supported by little more than the fifteen price increases discussed previously.

Plaintiffs' only other piece of evidence regarding demand is the level of inventories in the industry. Plaintiffs introduce statements indicating that Defendants maintained low inventories, which may suggest that demand outstripped supply and so depleted inventories. However, Defendants point out that inventory – containerboard produced but not yet sold – was expensive to carry, and, as such, they rationally wanted to minimize the amount of inventories in the system. In any case, Defendants do not violate the Sherman Act merely by reducing supply in the hopes of creating scarcity so as to hike prices.

*See, In re Baby Food Antitrust Litig.,* 166 F.3d 112, 134-35 (3d Cir. 1999) ("Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act."); *Plasma-Derivative,* 764 F.Supp.2d at 997.

Moreover, Plaintiffs' theory that Defendants reduced production "strategically," or just around the time of the price announcements, is difficult to reconcile with economic reality. As explained *supra,* Defendants necessarily sell less containerboard when they sell them at dearer prices. Defendants therefore must restrict output *whenever* they sell at inflated prices. Plaintiffs seem to make an assumption to the contrary, indirectly positing that for the price increases to succeed Defendants needed to depress output only around the time of the price announcements. But Plaintiffs never explain why this assumption makes sense. If Defendants could have sold an unrestricted quantity of containerboard at higher prices, then why would they need to restrict production when they announced higher prices? If they could not sell such quantities, then why would they increase production in between price announcements (the non-strategic times)? In short, Plaintiffs' theory of the case leaves more questions unanswered than the Court would think is appropriate at this late stage in the proceeding.

Lastly, even accepting all these shortfalls, Plaintiffs have not actually shown that the moving Defendants restricted supply. Plaintiffs' evidence of supply reduction comes from the expert report of Douglas Zona. Zona, however, conducted an analysis of all the Defendants' aggregate supply over the Class Period. Taken at face value, his analysis shows that Defendants, as a group, reduced their capacity during the Class Period over and above reductions predicted for a benchmark group not accused of conspiracy. But the analysis is mum as to any one Defendant within this group. In particular, it sheds no light on whether Georgia-Pacific and Westrock reduced their capacity during the relevant time period. Indeed, Georgia-Pacific has shown that its own capacity during the Class Period was higher than that of the benchmark group not suspected of conspiracy. Westrock, taking a different tack, argues that its one supply reduction made after its discharge from bankruptcy was planned months in advance, while it was still in bankruptcy, was approved by third parties overseeing its restructuring, and reflected routine, scheduled maintenance of its machines. Even if the Court discounts these explanations, then still the burden is on Plaintiffs to show that this reduction – the only one relevant for Westrock's liability in the case – deviated from the non-conspiracy benchmark. This, Plaintiffs have not done as

their expert's analysis focused on the entire Class Period (as well as all Defendants).

Plaintiffs seem to fall back on the position that even if they have not shown that the moving Defendants restricted supply, then still this is not fatal to their case. For this proposition, Plaintiffs cite *High Fructose,* where the court said: "Maintenance of excess capacity discourages new entry . . . and also shores up a cartel by increasing the risk that its collapse will lead to a devastating price war ending in the bankruptcy of some or all of the former cartelists." *High Fructose,* 295 F.3d at 657. However, Plaintiffs cite this language without having introduced any evidence indicating that entrants to the containerboard industry were deterred or that there was excess capacity in the industry during the Class Period. Again, the time for plausibility pleading has now passed. Plaintiffs have committed to a particular theory of the case, for which they must bring evidence raising a genuine dispute of material fact if they wish to go the jury. FED. R. CIV. P. 56(a); *Celotex,* 477 U.S. at 322-23.

For these reasons, the Court is of the view that Plaintiffs have not made a case allowing for a reasonable inference that Defendants restricted supply to facilitate their price-fixing scheme. This finding is near fatal to their conspiracy claim.

### *4. Acts against Self-Interest as Evidence of Collusion*

Nonetheless, the Court pushes ahead and considers the rest of Plaintiffs' evidence.  In this last category of economic evidence, Plaintiffs point to acts that suggest illegal collusion because they appear contrary to Defendants' independent self-interest.  Some of these actions have been alluded to previously, including the fact that Defendants raised prices during the Great Recession, and conversely, that they cut production in a period of high demand preceding the recession.  However, courts have found that neither of these actions unambiguously suggests behavior against self-interest.  *See, Plasma-Derivative,* 764 F.Supp.2d at 1001 ("It is also critical to repeat that an allegation that firms raise price or decrease supply at a time when demand is increasing would not necessarily suggest the firms are acting pursuant to an agreement.  Such behavior need not be, as plaintiffs argue, contrary to independent self-interest."); *Res. Supply,* 971 F.2d at 52-53 ("[W]e are unpersuaded by [the plaintiff's] argument that the economically rational action for Owens-Corning and CertainTeed during a time of reduced demand necessarily would have been to cut price in order to increase sales."); *see also, supra,* Section III.B.1.

Ultimately, the Court does not see why it would be more rational or reasonable for Defendants to have adopted this course of behavior as cartelists locked in an illegal agreement than as independent acting firms. For example, Plaintiffs assert that Georgia-Pacific had such low inventories during a period of high demand that its employees voiced concerns that "we may not have customers left to raise our prices to if we do not get some paper." ECF No. 1230 at 81; ECF No. 1280 ¶ 165; ECF No. 1227, Ex. 398. However, the low inventories and the lack of customers would present a problem whether or not Georgia-Pacific was part of a conspiracy. Georgia-Pacific needed paper to sell, and it needed customers to sell it to, whether or not it was conspiring. The fact that an employee was worried that the company had neither does not make it more likely that Georgia-Pacific was unlawfully colluding with fellow Defendants. Perhaps Georgia-Pacific had bad business planning, but this is not what this antitrust action is about. Likewise, a statement by a Westrock customer complaining about the company's 2010 price increase indicates nothing conspiratorial. The customer had written to Westrock: "You still suck. This increase will put your customers in bankruptcy, then what will you do?" ECF No. 1230 at 83; ECF No. 1280 ¶ 175; ECF No. 1277, Ex. 416. Certainly, the customer was unhappy, but incurring a

customer's wrath or risking his business seems a distinct possibility with any price increase regardless of whether Westrock was acting as a cartelist or opportunistically increasing its price when its competitors did so.

Parenthetically, the Court notes that, to the extent Plaintiffs are relying on the Great Recession to argue that the demand curve for containerboard shifted inward during this time, then a shift in demand hit Defendants whether they were colluding or acting as price takers. If it were irrational for Defendants to have raised prices during the Great Recession, then Defendants acted irrationally regardless of whether they were cartelists or competitive rivals.

Besides price and output, Plaintiffs also highlight another aspect of Defendants' businesses: the trades of containerboard among Defendants' firms. Defendants admit that they engaged in such inter-firm trading. That is, they admit that they sometimes bought containerboard from other paper companies, their alleged conspirators included. However, Defendants assert that they had legitimate reasons for making such purchases instead of producing their own. In particular, they claim that it was sometimes cheaper to buy from a competitor than to make the containerboard internally and ship it to a far-flung customer. Plaintiffs, in turn, concede that such decisions are

not in themselves suspect. *See, Univ. Life Ins. Co. v. Unimarc, Ltd.,* 699 F.2d 846, 852 (7th Cir. 1983) ("Firms constantly face 'make-or-buy' decisions – that is, decisions whether to purchase a good or service in the market or to produce it internally – and ordinarily the decision, whichever way it goes, raises no antitrust question.") (as quoted in *Sulfuric Acid,* 743 F.Supp.2d at 857-58)).

Nonetheless, seizing on language from *High Fructose,* Plaintiffs contend that the "possibility" exists that Defendants were using the trades to "shor[e] up" their cartel. *High Fructose,* 295 F.3d at 659. The Seventh Circuit, however, posited a very specific context in which such a possibility arises. As the court hypothesized:

> But if the firm *could* supply its customer (remember there was a lot of excess capacity in the HFCS industry during the period of the alleged conspiracy) *and* at a lower cost than its competitor would charge, why would it buy from the competitor rather than expanding its own production? The possibility that springs immediately to mind is that this is a way of shoring up a sellers' cartel by protecting the market share of each seller.

*Id.* (emphasis in original). The cartel possibility thus "springs immediately to mind" only when two conditions are satisfied: (1) the firm could supply its customer, as would be the case if there was a lot of excess capacity in the industry, and (2) the firm could do so at a lower cost than its

competitor. Plaintiffs have not shown that either of these conditions existed here. First, Plaintiffs' claim that Defendants shuttered capacity and maintained low inventories actually makes it plausible that Defendants sometimes could not supply their own customers and would prefer to buy from their competitors. *See, High Fructose,* 295 F.3d at 659 ("The firm would rather buy from a competitor to supply its customer than tell the customer to buy from the competitor, lest the customer never return."). Second, Plaintiffs have provided no information on Defendants' production costs so as to allow the Court to assess how much it would have cost Defendants to make the containerboard that they actually bought. As such, the Court cannot infer that, for the transactions where Defendants made inter-firm trades, it would have been cheaper for them to produce containerboard internally. Lastly, Plaintiffs have not told the Court whether the cartel possibility actually materialized in this case. Were the market shares of the alleged cartelists protected? At the least, were they stable *vis-à-vis* each other over the Class Period? Plaintiffs inexplicably gloss over the point.

The Court is thus not convinced that the trades were against Defendants' self-interest. This is regardless of whether it looks at the trades from the buyer's perspective, as

discussed in the preceding paragraphs, or from the seller's point of view. Plaintiffs introduced one piece of documentary evidence suggesting that Defendants priced below market when they sold to each other. If true, this would indicate that the seller was acting irrationally because one presumably would not sell for less what one could get more for. *But, see, Fla. Cement,* 746 F.Supp.2d at 1314 (explaining how low prices on inter-firm trades "have a legitimate business strategy explanation as well").

The evidence, however, falls short of establishing such below-market pricing. The evidence here consists of an email dated July 29, 2008 from an employee of Westrock to his counterpart at International Paper. *See,* ECF No. 1230 at 9, n. 34; ECF No. 1231 ¶ 163; ECF No. 1227, Ex. 396. The email thus does not implicate Georgia-Pacific, the other moving Defendant in this case. As to Westrock, the communication predates the company's discharge from bankruptcy and so does not shed light on whether Westrock joined or rejoined the conspiracy after that date. It is therefore of little value.

Nonetheless, the Court has perused the content of the document. It found this, too, wanting. In the email, the Westrock employee acknowledged that International Paper had asked Westrock to "price protect" one of its orders from a

recently announced price increase of $55.00. ECF No. 1227, Ex. 396. Westrock agreed. *Id.* As part of its concession, however, Westrock then requested that "IP in similar support, forgo the $40/ton increase proposed for the SBS business effective August 1st." *Id.* The email thus shows that Westrock and International Paper bargained with each other, as might any firms not suspected of conspiracy. Moreover, that International Paper appears to have bargained successfully and gotten itself a discount raises no red flags since, as Plaintiffs admit, discounts off list price were a common occurrence in the containerboard industry.

In sum, the Court finds that the economic evidence is not sufficient to permit a reasonable jury to conclude that Defendants worked together to fix prices. Even in the context of a containerboard industry as Plaintiffs have described it, Defendants' decisions to increase prices, reduce supply, and trade with each other remain as consistent with permissible competition as with conspiracy. The Court next asks whether adding the non-economic evidence to the mix changes the picture.

### C. Non-Economic Evidence of Agreement

The Court now considers the non-economic evidence of conspiracy. *See, Flat Glass,* 385 F.3d at 361 ("The most important evidence will generally be non-economic evidence that

there was an actual, manifest agreement not to compete.")
(internal quotation marks omitted) (as quoted in *Standard Iron
Works v. Arcelormittal,* 639 F.Supp.2d 877, 894-95 (N.D. Ill.
2009)).  Such evidence includes the opportunities to collude,
actions indicating that the opportunities were seized, and
Defendants' own incriminating statements.

### 1. Trade Association Meetings, Phone Calls, Inter-Firm Trades, and Public Messages as Opportunities to Collude

Plaintiffs press that Defendants had many opportunities to
collude as they interacted frequently with one another.  In
particular, Plaintiffs point to trade association meetings,
phone calls among Defendants, and inter-firm trades as channels
by which Defendants could communicate with each other and
thereby enter into an agreement to fix prices.  Relatedly,
Plaintiffs advance a theory in which Defendants used their own
public statements and industry analysts as "conduits" to signal
to each other and coordinate their price and supply decisions.

Before delving into each of the above, the Court notes that
"the mere opportunity to conspire, even in the context of
parallel business conduct, is not necessarily probative
evidence." *Weit v. Cont'l Ill. Nat'l Bank & Tr. Co.,* 641 F.2d
457, 462 (7th Cir. 1981); *see also, Brand Name,* 1999 U.S. Dist.
LEXIS 550, at *46 ("[E]vidence of the opportunity to conspire,

alone, is not sufficient to sustain a Section 1 Sherman Act claim."). In particular, when the opportunities to conspire coincide with regular means of conducting legitimate businesses, the Court is mindful not to deter the one in its effort to root out the other.

With this said, the Court examines the evidence with regards to the first communication venue: trade association meetings. As the Seventh Circuit has said, "[m]ere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws." *Moore v. Boating Indus. Assos.,* 819 F.2d 693, 712 (7th Cir. 1987) (internal quotation and alteration marks omitted); *see also, In re Chocolate Confectionary Antitrust Litig.,* 999 F.Supp.2d 777, 804 (M.D. Pa. 2014) ("The court rejects the suggestion that the contemporaneous presence of defendants' officers at a trade association meeting permits an inference of conspiracy."), *aff'd,* 801 F.3d 383 (3d Cir. 2015); *In re High Fructose Corn Syrup Antitrust Litig.,* 156 F.Supp.2d 1017, 1040 (C.D. Ill. 2001) ("Membership in a trade association and participation in its activities, without something more, does not tend to exclude the possibility of legitimate, legal activity . . . ."), *rev'd on other grounds,* 295 F.3d 651 (7th

Cir. 2002). Plaintiffs acknowledge that Defendants' participation in trade associations is legitimate activity. However, they contend that the proximity of the meetings to Defendants' price announcements suggests that Defendants came to an agreement during the meetings.

In the next section, the Court examines closely Plaintiffs' contention that the price announcements coincided with trade association meetings. For now, it is important to note two things.

One, a likely effect of inferring conspiracy from mere temporal proximity of a trade association meeting and a price announcement is to stop corporate officers from attending such meetings. Imagine an executive who contemplates going to a trade association meeting. The executive does not know (unless he really is conspiring with his competitors) whether any one of those competitors may be getting ready to announce a price change sometime during, shortly before, or shortly after the meeting. The executive, however, likely prizes his company's ability to follow that change should one materialize. If his doing so after having attended a meeting arouses suspicion of illegal collusion, then the executive may forego all meetings. The same goes for an executive who knows that he is planning a price change, since this executive cannot prevent his

competitors from following his lead.  The result is to turn what all parties agree is a legitimate activity – attendance in trade association meetings – to something that corporate officers may all avoid.

Two, the chilling effect on lawful conduct is mitigated to the extent that something more than temporal proximity is required to infer conspiracy.  The most natural "something more" seems to the Court to be evidence of the substance of the communications exchanged at these meetings.  But Plaintiffs have little to offer on that front.  Besides the price increases themselves, Plaintiffs bring nothing to suggest that Defendants discussed pricing during their various interactions.  Under such circumstances, to infer that an agreement to fix prices was born out of the trade association meetings appears imprudent. *Compare, In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,* 801 F.3d 758, 763 (7th Cir. 2015) (affirming a grant of summary judgment to the defendants when "Appellants have not pointed to a single communication that suggests a meeting of the minds to fix prices")*, with In re Publ'n Paper Antitrust Litig.,* 690 F.3d 51, 65 (2d Cir. 2012) (reversing a grant of summary judgment when "it is undisputed that in private phone calls and meetings — for which no social or personal purpose has been persuasively identified — Tynkkynen shared UPM's pricing

strategies with Korhonen and both men disclosed to each other their companies' intentions to increase prices before those decisions had been publicly announced").

The same rationale applies to the phone calls among the various employees at Defendants' companies. Again, the next section discusses in detail the frequency of these calls. But the mere fact that Defendants were in constant communication with one another does not, without more, suggest that Defendants agreed to fix prices. *See, Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 762 (1984) ("[T]he fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions."); *Mkt. Force,* 906 F.2d at 1173 ("If the exchange of information . . . is not unreasonable business behavior, then it is not an illegal agreement."). This is particularly so when the defendants have legitimate reasons to talk to one another – as Defendants in this case do being each other's customers and suppliers.

This customer-supplier relationship is what Plaintiffs attack next. Plaintiffs charge that Defendants are each other's "best customers, an arrangement they used to pass information along to each other." ECF No. 1230 at 34. First, there is nothing inherently suspicious about competitors also being each

other's customers, or even each other's largest customers. *See,*
*Dairy Farmers,* 801 F.3d at 760-61 (affirming a grant of summary
judgment in a case where "[a]lthough the two [defendant]
companies were competitors, DFA was also one of Schreiber's main
suppliers, and Schreiber was one of DFA's largest customers").
As for the accusation that Defendants "pass[ed] information
along to each other," Plaintiffs have not pointed out how the
information that was passed along supports an inference of
conspiracy.

In coming to this conclusion, the Court examined the
communications Plaintiffs have highlighted in their brief that
involved either Westrock or Georgia-Pacific. The one
communication to which Westrock was a party is an email from a
Westrock employee to a Temple-Inland employee. *See,* ECF
No. 1230 at 71; ECF No. 1231 ¶ 120; ECF No. 1227, Ex. 318. The
email informed Temple-Inland of Westrock's latest price
increase; it is dated July 1, 2010 – the same date as Westrock's
public announcement of its price increase – and contains the
same information as the public announcement. As such, the email
merely conveyed publicly available information, and the Court
cannot see how that is improper. *Cf. Publ'n Paper,* 690 F.3d at
65 (finding noteworthy the fact that the defendants "disclosed

to each other their companies' intentions to increase prices before those decisions had been publicly announced").

As for Georgia-Pacific, the communications between the company and the other Defendants consisted of information needed to trade, *e.g.,* price, quantity, and time frame for delivery. *See,* ECF No. 1230 at 24; ECF No. 1219 ¶ 48 & Ex. 74-75. The exchange of this information would be more worrisome if Plaintiffs had presented evidence that the trades should not have happened – but they have not done so. *See, supra,* Section III.B.4. Since the underlying exchanges are not suspect, the passing of information to permit such exchanges to occur likewise does not raise an inference of illicit coordination.

Plaintiffs also dwell on Georgia-Pacific's failed merger talks with International Paper, charging that "GP and IP were using merger discussions as a pretext to collude." ECF No. 1230 at 71. Plaintiffs are merely speculating that Defendants colluded during these interactions, as the evidence to support the inference that anything specific to containerboard prices or production was exchanged during these talks is thin to nil.

Finally, Plaintiffs raise a "conduit" theory, whereby Defendants used their own public statements and industry analysts to leak confidential information to their alleged

conspirators. According to Plaintiffs, the leaks served as signals to co-conspirators to raise prices or reduce supply, thereby coordinating the conspirators' activities and facilitating the conspiracy.

With respect to the analysts, the Court notes that Defendants should not be held accountable for what these third parties said unless Defendants were somehow responsible for the content of the analysts' communications. Yet, many of the analysts' statements Plaintiffs highlight involve neither moving Defendants, and none of the statements implicate Westrock in the period after its bankruptcy. *See,* ECF No. 1230 at 73-77.

Even were the statements to be aggregated and all Defendants lumped together, then still the bulk of the communications could not have reasonably facilitated anything. For example, Plaintiffs assert that, "Following Defendants' 2003 and early 2004 supply restrictions, Mr. Wilde announced that inventories were at 'an extremely lean level,' enabling Defendants to implement their June 2004 price increase." ECF No. 1230 at 74. There is no suggestion from this alone that Wilde, an analyst that Plaintiffs focus heavily on, learned about the level of inventories from one of the Defendants. Likewise, there is no indication that low inventories constitute confidential information that needed to be "leaked."

Furthermore, Defendants were presumably aware of the basic economic fact that output reductions allowed for prices increases. Each had already restricted supply; all that was left was to raise prices. The Court does not see how Wilde's statement "enabl[ed]" Defendants to do anything they were not already prepared to do.

Finally, the Court examines Defendants' own public statements. To the extent that Plaintiffs argue that such statements are improper because they disclose "granular details and public commitments to other Defendants," ECF No. 1230 at 77-78, the support for that argument is an expert report that has been excluded in large part by the Court's *Daubert* ruling. *See, Kleen Prods.,* 2017 U.S. Dist. LEXIS 83321, at *84-91. As the record now stands, Defendants have presented expert testimony that the information revealed in their public statements is consistent with their disclosure obligations, and Plaintiffs have little to rebut that testimony. Without such rebuttal, the fact that Defendants listened to their competitors' communications cannot raise an inference of illicit collusion. "Competitors in concentrated markets watch each other like hawks," even when they are not violating antitrust law. *Text Messaging,* 782 F.3d at 875.

## 2. Price Increases around Communications as Evidence of Opportunities Seized

Even though the price increases and the communications were not sufficient on their own to raise a reasonable inference of conspiracy, the two together may cross that threshold. Or so the *Text Messaging* court has said. *See, Text Messaging,* 782 F.3d at 878 (noting that opportunities for the defendants' executives to meet privately "would be more compelling if the immediate sequel to any of these meetings had been a simultaneous or near-simultaneous price increase by the defendants"). Plaintiffs thus try to shoehorn the facts of this case into the language of *Text Messaging,* arguing that Defendants' price increases often happened "simultaneous[ly]" or "near-simultaneous[ly]" with their having exchanged phone calls, attended trade association meetings, or received reports from industry analysts.

The Court examines these types of communications one by one to determine whether "the immediate sequel to any of [them]" had been a price increase. *Id.* The conclusion the Court comes to is that, given how frequently these communications took place, it would be more of a surprise if a price increase did *not* happen sometime around one of them.

To take the trade association meetings first: there were 505 such meetings during the 2,458-days long Class Period. *See,*

ECF No. 1350. This means that there was, on average, a trade meeting every five days during the Class Period. Plaintiffs object that some of these meetings should not be counted because they are not "relevant based on, *inter alia,* subject matter and/or . . . [Plaintiffs] lack evidence that two or more Defendant representatives attended or participated." *Id.* at 1 n.1. The Court wonders what subject matter is relevant to "illegal conspiracy" such that Plaintiffs can tell when a meeting's subject matter is not relevant. Nevertheless, going strictly by Plaintiffs' count, there were still 263 meetings during the Class Period, or about a meeting every 10 days. (The Court recognizes that the meetings are not uniformly distributed in between the start and end date of the Class Period, but the approximation is close enough. Moreover, because some meetings lasted more than one day, more days included a meeting than this calculation suggests.) With these many meetings, it would be an anomaly if some of the price increases did not happen close to a meeting date. As such, the fact that some of them did raises no inference of anything untoward having taken place at the meeting.

This conclusion holds whether the Court adopts the reasoning of the court in *Valspar,* as Defendants urge, or *Titanium Dioxide,* as Plaintiffs wish. In *Valspar,* the plaintiff

made much of the fact that the "vast majority" of the defendants' price increases occurred "within 30 days before or after a General Committee meeting of the TDMA." *Valspar,* 152 F.Supp.3d at 246-47. The Delaware district court found that unpersuasive since "the meetings of the TDMA General Committee occurred quarterly," which means that "Valspar's logic would find suspect any announcement which occurred in eight out of twelve months." *Id.* at 247. "This proves too much," said the court. *Id.* In contrast, the Maryland court in *Titanium Dioxide* laid store by the fact that "88 percent of the price increase announcements . . . came within 30 days of a General Committee meeting of the TDMA." *Titanium Dioxide,* 959 F.Supp.2d at 809.

Here, the Court is not dealing with quarterly meetings. Instead, the evidence is that two or more of the Defendants had a meeting every 10 days or so. A meeting every 10 days means that 100% of the price increase announcements will, with certainty, happen within 10 days of a meeting. By either the standard of *Valspar* or *Titanium Dioxide* then, announcements coming within days of a meeting are nothing unusual or noteworthy.

Focusing on Georgia-Pacific and Westrock in particular, the Court can discern no pattern in the Defendants' trade association attendance and their pricing behavior to suggest

conspiracy. This is true even when the Court sets aside all the instances in which the moving Defendants attended a trade conference but took no pricing decision afterwards and focuses only on those times in which the companies did make a price announcement. Within this universe, out of the fifteen times in which Georgia-Pacific made a price announcement, seven were preceded by the company having attended a trade association meeting, and eight were without any such prior attendance. Thus, the company was as likely to announce a price increase after a period in which it did not attend a trade conference as when it did. Put differently, there is no connection between Georgia-Pacific's trade association participation and its price announcements.

As for Westrock, one of its officers attended a trade association meeting in the period after its bankruptcy discharge. Georgia-Pacific and International Paper had already made their price announcements before the meeting took place, and Temple-Inland announced on the same day as the meeting. Westrock followed the day after. Westrock brings documentary evidence to argue that it contemplated the price increase weeks before the meeting, and that the decision to announce was precipitated by Georgia-Pacific, International Paper, and Temple-Inland's announcements and not any illicit exchanges

during the meeting. Even if the Court disregards the explanation, it must recognize that to infer conspiracy from this evidence alone would chill Westrock's trade association participation. Moreover, the inference would be based on nothing more than temporal proximity between two things that the law allows Westrock to do: attend trade conferences and follow price increases. The chilling effect seems especially biting in this instance as the initial price announcements happened before the meeting.

The Court thus hesitates to infer conspiracy from the timing of events alone, especially when that timing does not appear out of the ordinary. Its hesitation is doubled with regard to the phone calls, since there were even more phone calls than trade association meetings. Plaintiffs have submitted evidence that over a thousand phone calls were exchanged among the seven Defendants over the six and a half years of the alleged conspiracy. *See,* ECF No. 1213, Ex. 2. Again, with these many calls, whenever Defendants announced a price increase, the announcement will be near a phone call.

Still, the Court has attempted to put on its most conspiratorial-minded hat in reviewing the specific calls that Plaintiffs highlight in their brief. But even so attired, the Court cannot make out an inference of conspiracy from what

Plaintiffs have cobbled together.  First, many instances of the calls highlighted were too remote from the time of the price announcement to count as being "simultaneous" or "near-simultaneous."  Second, the pattern as to who called whom and who actually ended up announcing a price increase shortly thereafter was a total mixed-bag.  And, finally, there were simply too many phone calls for any particular call to be out of the ordinary.

The Court concludes that the timing of the events is insufficient to reasonably raise an inference of conspiratorial agreement.  The Court's conclusion is bolstered by the fact that Plaintiffs have introduced no evidence as to the substance of these talks.  *See, Text Messaging,* 46 F.Supp.3d 788, 806 (N.D. Ill. 2014) ("Although plaintiffs reference the existence of communications involving defendants that are temporally near some of the pricing changes at issue here, they offer nothing other than speculation about the substance of these talks. . . . This is insufficient to give rise to a dispute of material fact on a price-fixing claim."), *aff'd,* 782 F.3d 867 (7th Cir. 2015); *supra,* Section III.C.1.  In fact, all persons deposed "uniformly denie[d] discussion of any agreement or understanding." *Weit,* 641 F.2d at 462-63.  The denials, of course, are self-serving, but that is not a reason to discount them altogether. *Id.*

(putting "significance [on] the sworn testimony compiled during eight years of depositions which uniformly denies discussion of any agreement or understanding as to the interest rate to be charged"). Not only is it axiomatic that "[a] plaintiff cannot make his case just by asking the jury to disbelieve the defendant's witnesses," *High Fructose,* 295 F.3d at 655, but also Plaintiffs have not shown why the witnesses should not be believed in this case. No documentary evidence, sworn statements of alleged co-conspirators, or naked inconsistencies in their own accounts impugn the deponents' testimonies.

The areas where Plaintiffs do have something "other than speculation about the substance" of the talks are the public announcements where Defendants allegedly signaled to their co-conspirators and used analysts as conduits for their messages. *Text Messaging,* 46 F.Supp.3d at 806. However, as discussed in the previous section, the substance of these communications is entirely consistent with independent actions. *See, supra,* Section III.C.1. Two permissible events – talks and price-following – put together does not transmogrify into conspiracy.

### 3. *Incriminating Words Suggesting Agreement*

Plaintiffs try again, this time pointing to Defendants' own words not as evidence of leaks or signals, but as more direct evidence of an agreement. Defendants' statements incriminate

them in this way if they show any of the following: (1) Defendants were aware of an agreement to fix prices; (2) Defendants were exhorting others to join an agreement; or (3) Defendants were manifesting assent to an agreement. *See, High Fructose,* 295 F.3d at 654, 662-63. In contrast, Defendants' statements do not run afoul of antitrust law if they merely express the speakers' awareness that they shared an economic interdependence with their fellow competitors. After all, since it is legal to act as a tacitly colluding oligopolist, it cannot be illegal – or evidence of illegal conduct – to say one is acting or ought to act as a tacitly colluding oligopolist. Put differently, since Defendants may take independent actions in recognition of "their shared economic interests and their interdependence with respect to price and output decisions," they may also say that they recognize their "shared economic interests and their interdependence with respect to price and output decisions." *Brooke,* 509 U.S. at 227.

Viewed in this light, the supposedly incriminating statements that Plaintiffs highlight appear "as consistent with permissible competition as with illegal conspiracy." *Matsushita,* 475 U.S. at 587-88. The most damning statement Plaintiffs have culled from the extensive record appears in a 2005 Westrock document. It says: "Pricing is between

competitors, the customer has little to do with the outcome." ECF No. 1225, Ex. 9. From this, Plaintiffs would have the Court infer that Westrock, as well as other Defendants, did price with their competitors.

The Court cannot do so for several reasons. First, the document has little probative value with regard to any Defendant other than Westrock since there is no evidence that any other Defendant was even aware of, much less adopted, the statement. Second, it is not certain that the document can implicate even Westrock. The document predates Westrock's bankruptcy and was not prepared by Westrock's employees, coming instead from presentation by a third-party consulting company. Third, it is not clear what the statement actually conveyed. Insofar as the quotation suggests that large players in a concentrated industry can affect the market price, that is neither untrue nor anything that has not publicly been said. If, instead, the statement constitutes advice to Westrock to price "between competitors," then its meaning is as consistent with a message to collude tacitly as it is to conspire. In particular, the Court sees nothing in the statement to suggest that it should be read as "enter into an agreement with your competitors to fix prices," as opposed to, "price as your competitors do."

Nor do Plaintiffs much advance the ball by pointing to Defendants' use of the words "discipline," "rationalization," or "good behavior." According to Plaintiffs, "discipline" and "rationalization" refer to supply restrictions, while "good behavior" indicates that Defendants are exercising "discipline." But for the same reason that independently restricting supply is not unlawful, it is not unlawful for Defendants' employees to talk about doing so either. Of course, if Defendants had crossed the line into encouraging their competitors to exercise discipline, then their talk would become actionable conduct (or at least indicate that a conspiracy was afoot). However, there is no evidence that this happened. In the voluminous record that Plaintiffs have introduced, Defendants discussed "discipline," "rationalization," *etc*. only in their own, internal documents. There is no evidence that Defendants shared these documents with their competitors or otherwise publicly pontificated on the desirability of industry-wide discipline. Defendants' words thus never strayed into territory suggesting agreement. *Cf. In re Domestic Airline Travel Antitrust Litig.*, 221 F.Supp.3d 46, 62-63 (D.D.C. 2016) ("Defendants made public statements about their own commitment to capacity discipline as well as the importance of maintaining the capacity discipline within the industry. Defendants' discussion of the need for

capacity discipline within the industry as a whole is notable because it involves more than a mere announcement of Defendant's own planned course of conduct.").

It is true that there is hearsay evidence that Georgia-Pacific's CEO gave a presentation in which he told the audience that the industry must "not make agreements where customers receive all of the benefits and the suppliers are not paid for any of it" and must "learn to say 'no' on deals when they are not profitable." ECF No. 1230 at 79. A newspaper reported on the presentation, and the newspaper clipping is Plaintiffs' proffered evidence that the CEO made the comment. Georgia-Pacific is correct that the newspaper clipping is hearsay. *See, Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997) (finding a newspaper article to be hearsay, or "an out-of-court statement offered to prove the truth of its contents – to prove, that is, that Centel or its investment bankers made the comments attributed to them"). Moreover, Plaintiffs have not offered a hearsay exception to allow the evidence to be considered. *Id.* (stating that, with some exceptions not applicable here, "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial"). The Court nonetheless puts all this aside and asks whether the comments,

assuming that Georgia-Pacific's CEO made them, allow for an inference of conspiracy.

The Court concludes that they do not. The CEO's comments do not rise to a level where they constitute an offer to enter an agreement to fix prices. *See, High Fructose,* 295 F.3d at 654. Instead, the comments reflect what firms in the industry likely all knew and what this Court, and others, have said: there is a trade-off between price and volume. If firms want to raise prices, they have to produce less, sell less, and thereby say "no" to customers. It should not be a mark of conspiracy to say what is true, already known by the audience, and articulated by countless third-party analysts, academicians, and jurists alike.

The Court is further persuaded by the fact that the CEO made this comment as part of a public speech given at a trade association made up primarily of customers. While it is the case that "Defendants cannot rely on the public or semi-public nature of trade meetings to immunize their statements from antitrust scrutiny," *Standard Iron,* 639 F.Supp.2d at 897 (citing Richard A. Posner, *Antitrust Law* (2d ed. 2001), at 170), the context of a statement aids in its interpretation. In determining whether certain words shade towards an inference of illegal conduct or innocuous behavior, the Court may consider

the forum in which they were uttered. In this case, the public nature of the speech and the likely audience make it unreasonable to think of the statement as an offer to conspire.

After six years of extensive discovery, more than a hundred depositions, and millions of documents produced in discovery, the statements that Plaintiffs were able to gather simply are not incriminating. This is all the more evident when the Court compares these statements to those found in cases where the courts have ruled that summary judgment was inappropriate. In *High Fructose,* for instance, the Seventh Circuit reversed the lower court's grant of summary judgment when the record showed that the defendants had said things like "[w]e have an understanding within the industry not to undercut each other's prices"; "our competitors are our friends"; and "every business I'm in is an organization," whereby "organization" appeared to mean "price-fixing conspiracy." *High Fructose,* 295 F.3d at 662-63 (internal quotation marks omitted). *See also, Flat Glass,* 385 F.3d at 363 (reversing a grant of summary judgment when, among other things, one of the defendants had previously made an "assertion that there was an 'across the board' agreement to increase prices"); *Sulfuric Acid,* 743 F.Supp.2d at 858-59 (discussing the various statements referencing an "agreement" between the defendants); *Titanium Dioxide,* 959 F.Supp.2d at 829

(noting, *inter alia,* a statement to the effect that "we have competition on board for the Oct 1 price increase announcement") (internal quotation marks omitted). Plaintiffs' evidence falls far from such powerful, incriminating statements.

To recap, the Court has now considered the evidence, economic and non-economic alike, that must "'tend[] to exclude the possibility' that the alleged conspirators acted independently." *Matsushita,* 475 U.S. at 588. Despite the abundance of evidence and the favorable light in which it is viewed, the inference of independent action remains as reasonable, if not more so, than that of conspiracy.

### D. The Evidence That Was Not There

Indeed, when the Court considers the evidence that is missing from the case, conspiracy becomes the less likely of the competing inferences. In an alleged conspiracy that spanned six and a half years, involved seven Defendants of varying sizes and strategic positions, included fifteen price increase attempts during both years of prosperity and recession, and subsumed wide variations in how quickly or willing Defendants were to follow a price increase or reduce their supply, there is no evidence of a single instance in which a Defendant was punished for deviating from the conspiracy.

In fact, there is no evidence of a punishment mechanism at all. This is troubling to Plaintiffs' case for cartelization, for "[g]ame theory teaches us that a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great." *Petruzzi's,* 998 F.2d at 1233 (citing Richard A. Posner, *Economic Analysis of Law,* 265-66 (3d ed. 1986); George J. Stigler, *A Theory of Oligopoly,* in *The Organization of Industry* 39, 42-44 (1968)); *see also, Matsushita,* 475 U.S. at 592 ("Maintaining supracompetitive prices in turns depends on the continued cooperation of the conspirators. . . ."); *Titanium Dioxide,* 959 F.Supp.2d at 817 (crediting the parties' position that "a credible punishment mechanism to penalize cheaters is an important component of a cartel") (internal quotation marks omitted).

A punishment mechanism is crucial for another reason as well: it helps to distinguish illicit express collusion from lawful tacit collusion. With express collusion, there is prior agreement to act a certain way; with tacit collusion, there is only expectation or hope that a competitor will act, and fear that it will not. *See, Text Messaging,* 782 F.3d at 876, 879. When there is agreement and a conspirator breaches the agreement, one would expect punishment to follow; when there is only flimsy hope and the always-present fear, punishment seems

less likely.  With no punishment, or even a mechanism to punish, the inference tends toward no agreement.

Plaintiffs attempt to excuse the lack of evidence, not just on this point but also more generally, by arguing that Defendants are experienced with antitrust litigation and so know to destroy evidence.  The Court cannot credit such a position, especially given that the evidence to support it is ambiguous at best and Plaintiffs have had extensive discovery to uncover even that which Defendants wish to hide.  More pragmatically, the Court does not know what to do with the contention that wholesale evidence has been destroyed.  What should the Court assume has been gotten rid of during the six and half years of conspiracy?  How devastating should the Court speculate the shredded evidence to have been?  This is not a case where a single document, or even several related documents, are alleged to have been destroyed, and the Court could make an adverse inference as to what the missing evidence would have shown.  *Cf. Text Messaging,* 782 F.3d at 873 (noting that, where the allegation is that several emails have been deleted, "the plaintiffs would be entitled to have the jury instructed that it could consider the deletion of the emails to be evidence (not conclusive of course) of the defendants' . . . guilt").  An

adverse inference would be meaningless where, as here, there is no anchor as to what the Court should be inferring.

In sum, when the Court considers both the evidence that has been presented and that which is missing, Plaintiffs' case falls even further from the mark necessary to survive summary judgment.

## E. The Evidence as a Whole

Before it shuts the door on this litigation, the Court takes a step back and looks at Plaintiffs' conspiracy claim and the evidence supporting it as a whole. *See, e.g., Omnicare,* 629 F.3d at 720 (examining the evidence *in toto*). In particular, the Court asks how the claim measures up to precedents from this circuit. *See, Chocolate,* 801 F.3d at 412 (adopting a similar approach). The most relevant Seventh Circuit authorities with which to compare this case are *High Fructose* and *Text Messaging*.

These two cases are factually and legally similar to Plaintiffs' own matter. Both cases involved a Section 1 antitrust claim at the summary judgment stage. The defendants in both matters, as here, operated in an industry whose structure was "conducive to successful collusion." *Kleen Prods.,* 831 F.3d at 927-28; *High Fructose,* 295 F.3d at 656-57 (taking note of the fact that the high fructose corn syrup (HFCS) market had "few sellers," that defendants accounted for

"90 percent of the sales of the product," and that the product was "highly standardized" and had "no close substitutes"); *Text Messaging,* 782 F.3d at 871-72 (similar).  In both cases, the defendants made parallel price increases (although the pattern was tighter in *High Fructose*) and took actions that were argued to be against their self-interest.  *See, High Fructose,* 295 F.3d at 659 ("There is evidence that defendants bought HFCS from one another even when the defendant doing the buying could have produced the amount bought at a lower cost than the purchase price."); *Text Messaging,* 782 F.3d at 871 (noting "the seeming anomaly of a price increase in the face of falling costs").

Yet *High Fructose* and *Text Messaging* resulted in divergent outcomes.  Judge Posner, who wrote both opinions, reversed the lower court's grant of summary judgment in favor of the defendants in *High Fructose*.  Thirteen years later, he affirmed a similar grant in *Text Messaging*.  Whatever are the differences that drive the different outcomes in the two cases, they are not the economic evidence.  As Judge Posner acknowledged in *High Fructose,* the decision to reverse the lower court's grant of summary judgment in that case was not based on the economic evidence since "all of this evidence is consistent with the hypothesis that [the defendants] had a merely tacit agreement, which at least for purposes of this appeal the plaintiffs

concede is not actionable under section 1 of the Sherman Act." *High Fructose,* 295 F.3d at 661.

Moreover, the non-economic evidence of conspiracy was at points stronger in *Text Messaging,* the case in which the Seventh Circuit affirmed summary judgment in favor of the defendants. For instance, the *Text Messaging* plaintiffs had brought evidence regarding opportunities to conspire that was absent from *High Fructose*. In particular, the *Text Messaging* complainants, like Plaintiffs in this case, pointed to "the trade association of which the defendants were members" and argued that they "were forums in which officers of the defendants met and conspired to raise [] prices." *Text Messaging,* 782 F.3d at 878. The Seventh Circuit credited this evidence, but ultimately found that it offered "insufficient support for the charge of express collusion." *Id.* at 878-79.

Nonetheless, the non-economic evidence in *High Fructose* won the case for the plaintiffs, and the crucial piece of evidence came from what the defendants had said. In Judge Posner's words, the evidence to show "that there was an explicit agreement to fix prices" consisted of things like:

> One of Staley's HFCS plant managers was heard to say: "We have an understanding within the industry not to undercut each other's prices."

> A Staley document states that Staley will "support efforts to limit HFCS pricing to a quarterly basis." Presumably the reference is to efforts by its competitors.
>
> The president of ADM stated that "our competitors are our friends. Our customers are the enemy."
>
> A director of Staley was reported to have said that "every business I'm in is an organization" . . . [where] it appears that "organization" meant price-fixing conspiracy.

*High Fructose,* 295 F.3d at 662-63 (emphasis and alteration marks removed). As such, the evidence that cost the *High Fructose* defendants so dearly was their loose lips. The defendants in *Text Messaging* did not make such incriminating statements, and the grant of summary judgment to them was appropriate. *See, generally,* 295 F.3d 867.

The Court concludes that this case lies closer to *Text Messaging* than *High Fructose.* Here, like in *Text Messaging* but unlike *High Fructose,* Defendants have said nothing that can be reasonably construed as acknowledgment of an agreement. *See, supra,* Section III.C.3. If, as appears to be the case, this is the dispositive difference between *Text Messaging* and *High Fructose,* then the Court should grant summary judgment for Defendants on this basis alone.

More still, besides what they have (not) said, what Defendants in this case have done is "as consistent with

permissible competition as with illegal conspiracy" and their
conduct cannot "support an inference of antitrust conspiracy."
*Matsushita,* 475 U.S. at 587-88.  In particular, Plaintiffs have
adduced no evidence that Defendants took actions that they would
have refrained from but for the fact that they were conspiring.
This is true whether the Court looks at the price increases, the
accompanying supply reductions, or the timing of those actions
as correlated to various communications.

"[Z]ero plus zero equals zero," and for something more to
be added to that equation, it must be some quantum of
probability more unlikely for Defendants to have done all of the
things they did, absent agreement, than for them to have done
any one of those things. *High Fructose,* 295 F.3d at 655.  But
in this case, the supply reductions add no implausibility to the
price increases, since one cannot sell for more without selling
less.  The timing of the actions also proves to be of little
value, as Defendants seem to have talked all the time, and
Plaintiffs either have no evidence of what was said or were
forced to resort to statements that constituted nothing more
than Defendants' articulation of the economic reality of their
industry.

Plaintiffs have amassed a wealth of evidence, but the
evidence is only such that it's "absence would tend to negate

both" express and tacit collusion but its "presence [did] not point unerringly to express collusion." *Text Messaging,* 782 F.3d at 87. Indeed, in light of the competing inference of lawful behavior, the evidence did not point *reasonably* to express collusion. Summary judgment must therefore be granted to Defendants. *See, Omnicare,* 629 F.3d at 720-21; *Weit,* 641 F.2d at 464 ("When a District Court has afforded the parties [] years of unlimited discovery, the parties have designated the evidence on which they will rely at trial, and the Court has had an opportunity to review the evidence and concludes that no reasonable jury could return a verdict for plaintiffs, judicial economy mandates that summary judgment be entered.").

This case highlights the difficulty of attempting "to prove illegal collusion without witnesses to an agreement." *Text Messaging,* 782 F.3d at 879. Most of all, it accentuates the limit of the Sherman Act, which "imposes no duty on firms to compete vigorously, or for that matter at all." *Id.* at 873. The Act allows Defendants to engage in anticompetitive behavior and requires only that they do so without prior agreement. *Id.* at 876 ("[I]t is not a violation of antitrust law for a firm to raise its price, counting on its competitors to do likewise (but without any communication with them on the subject) and fearing the consequences if they do not."). The law thus only requires

Defendants to gamble on the consequences of trusting their competitors. The gamble paid off in this case.

### III. <u>CONCLUSION</u>

For the reasons stated herein, Defendants' Motions for Summary Judgment [ECF Nos. 1086 and 1088] are granted. The Cross Motions for Partial Summary Judgment [ECF Nos. 1114 and 1138] are denied as moot, as are the Motions for *Daubert* and summary judgment hearings [ECF Nos. 1272 and 1273].

**IT IS SO ORDERED.**

_____
    Harry D. Leinenweber, Judge
    United States District Court

Dated: August 3, 2017