**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KLEEN PRODUCTS LLC, *et al*., individually and on behalf of all those similarly situated, | |
| Plaintiffs, | Case No. 1:10-cv-05711 |
| v. | Hon. Harry D. Leinenweber |
| INTERNATIONAL PAPER CO., *et al*., | |
| Defendants. | |

**CLASS COUNSEL'S PETITION**
**FOR INTERIM AWARD OF ATTORNEYS' FEES**

**Table of Contents**

I.      INTRODUCTION ................................................................................... 1

II.     CLASS COUNSEL'S WORK ................................................................ 3

   A.  Pre-Complaint Investigation and Motions to Dismiss ....................... 3

   B.  Discovery ............................................................................................ 4

   C.  Class Certification ............................................................................... 5

   D.  Settlements .......................................................................................... 6

   E.  Expert Witnesses and Daubert Motions ............................................ 7

   F.  Summary Judgment and Trial Preparation ........................................ 8

   G.  Total Time and Expense ..................................................................... 9

III.    ARGUMENT ......................................................................................... 9

   A.  The Requested Attorneys' Fees Are Fair and Reasonable................. 9

   1.  Legal Standard ................................................................................. 9

   2.  The Requested Fees Are Fair and Reasonable as a Percentage of the Fund.................... 11

   3.  A 30 Percent Contingent Fee Is Consistent with Class Counsel's Market
       Rate in Similar Cases ...................................................................... 13

   4.  A 30 Percent Contingent Fee Is Consistent with the Market Rate Approved
       by Courts in Similar Cases.............................................................. 14

   5.  A 30 Percent Contingent Fee Is Justified by the Risks of the Litigation......................... 17

   6.  A 30 Percent Fee Is Supported by the Amount and Quality of Class
       Counsel's Work and the Results Achieved for the Class ................ 19

   7.  Lodestar/Multiplier Analysis Supports the Requested Fee Award................................. 21

IV.    CONCLUSION..................................................................................... 24

## Table of Authorities

**Cases**

*Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*,
    743 F.3d 243 (7th Cir. 2014) .............................................................. 10, 11, 12, 19

*Blum v. Stenson*, 465 U.S. 886 (1984) ............................................................ 12

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)....................................................... 1, 9

*City of Greenville v. Syngenta Crop Prot., Inc.*,
    904 F. Supp. 2d 902 (S.D. Ill. 2012)................................................................ 14

*Florin v. Nationsbank of Ga., N.A.*, 60 F.3d 1245 (7th Cir. 1995) ............................................. 22

*Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560 (7th Cir. 1994) ................................... 12, 17, 21

*Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998)............................................... 12, 15, 23

*Goldsmith v. Tech. Solutions Co.*,
    92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995)....................................... 15

*Harman v. Lyphomed, Inc.*, 945 F.2d 969 (7th Cir. 1991).......................................... 22

*Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP-TAB,
    2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) ....................................................... 15

*In re Auto. Refinishing Paint Antitrust Litig.*,
    MDL No. 1426, 2008 WL 63269 (E.D Pa. Jan. 3, 2008) ...................................... 2, 10, 16, 18

*In re Brand Name Prescription Drugs*,
    No. 94 C 897, 2000 WL 204112....................................................... 18, 19, 20, 23

*In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) ............................................ 3, 9, 21

*In re Fasteners Antitrust Litig.*, CIV. A. 08-md-1912,
    2014 WL 296954 (E.D. Pa. Jan. 27, 2014) ....................................................... 16

*In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739 (E.D. Pa. 2013) ............................... 16, 22, 23

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ....................................................................... 19

*In re Linerboard Antitrust Litig.*,
  MDL No. 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ............................ 2, 16, 17, 18, 19, 23

*In re Lithotripsy Antitrust Litig.*, No. 98 C 8394,
  2000 WL 765086 (N.D. Ill. June 12, 2000) ...................................................................... 15

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  1:09-cv-07666 (N.D. Ill. Jan. 22/April 16, 2014) ........................................... 1, 10, 12, 14, 15

*In re Ready-Mixed Concrete Antitrust Litig.*, 1:05-CV-00979-SEB-TAB,
  2010 WL 3282591 (S.D. Ind. Aug. 17, 2010) ........................................................................ 15

*In re Relafen Antitrust Litig.*,
  No. 1:01-cv-12239-WGY (D. Mass. April 9, 2004) ............................................................... 16

*In re ShagrinGas Co. v. BP Products*,
  No. 1:06-cv-03621 (N.D. Ill. June 24, 2010) .................................................................. 12, 14

*In re Skelaxin (Metaxalone) Antitrust Litig.*, MDL No. 2343,
  2014 WL 2946459 (E.D. Tenn. Jun. 30, 2014) ....................................................... 13, 16, 22, 23

*In re Southeastern Milk Antitrust Litig.*, No. 2:08-MD-1000,
  2013 WL 2155387 (E.D. Tenn. May 17, 2013) ........................................ 10, 16, 18, 20, 22, 23

*In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003) ............................................................... 3

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ............................................ 2, 11, 17, 19, 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI,
  2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ........................................................................ 23

*In re Titanium Dioxide Antitrust Litig.*, 10–CV–00318(RDB),
  2013 WL 6577029 (D. Md. Dec. 13, 2013) .......................................................................... 16

*In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011) ................................... 10, 17

*In re Tricor Direct Purchaser Antitrust Litig.*,
  No. 05-340-SLR (D. Del. April 23, 2009) ...................................................................... 16, 23

*In re Urethane Antitrust Litig.*, MDL No. 1616 (D. Kan. 2011/2016) ........................ 2, 10, 14, 20

*In re Vitamins Antitrust Litig.*, No. Misc. 99-97 (TFH),
  2001 WL 34312839 (D.D.C. July 16, 2001) .......................................................................... 16

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)……………………………..2

*Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*,
  553 F.3d 487 (7th Cir. 2009) ................................................................. 21

*Kirchoff v. Flynn,* 786 F.2d 320 (7th Cir. 1986) ........................................ 12

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) ................................................................................ 19

*Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399 (7th Cir. 2000) ............ 14

*Pearson v. NBTY, Inc.*, No. 11 CV 7972,
  2014 WL 30676 (N.D. Ill. Jan. 3, 2014) ................................... 11, 15, 21

*Pillsbury Co. v. Conboy*, 459 U.S. 248 (1983) ............................................ 19

*Retsky Family Ltd. Partnership v. Price Waterhouse LLP*,
  No. 97 C 7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ................. 15

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011) ............. 15

*Skelton v. Gen. Motors Corp.*, 860 F.2d 250 (7th Cir. 1988) ...................... 22

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) ......................................... 9

*Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005) ......................... 11, 14

*Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629 (7th Cir. 2011) ........... 10, 11

**Statutes**

Fed. R. Civ. P. 23(h) .................................................................................. 10

**Other Authorities**

Federal Judicial Center, Manual For Complex Litigation § 14.121 (4th ed. 2004) ...................... 12

Newberg on Class Actions §14.6 (4th ed. 2009) ..................................... 16, 22

## I.    __INTRODUCTION__

This petition for an interim award of attorneys' fees ("Petition") stems from lengthy, hard-fought, and extremely difficult litigation that led to an excellent result for the certified Class.  Class Counsel have represented the Class zealously and effectively in the nearly seven years since this case was filed in September 2010 and have done so without compensation. Having now negotiated an outstanding settlement of $354 million ("Settlement Funds") with Defendants International Paper Company ("IP"), Temple-Inland, Inc., now known as Temple-Inland LLC, and TIN Inc., now known as TIN LLC (collectively, "TIN"), and Weyerhaeuser Company ("WY") (the "IP/TIN/WY Settlement"), one of the largest settlements ever in a private antitrust class action in the Northern District of Illinois, Class Counsel are well-deserving of a reasonable fee award.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("this Court has recognized consistently that a [lawyer] who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  To that end, Class Counsel respectfully request that 30 percent of the IP/TIN/WY Settlement Funds be awarded as fair and reasonable compensation for their work—with a portion[1] of that amount to be held in escrow and subject to distribution at an indefinite future time, as set forth further below.[2]

---

[1] In their preliminary approval motion and the Court-approved notices to the Class, Class Counsel stated that they intended to request a distribution to Class members in an amount not to exceed $165 million and to seek fees not to exceed 30 percent of the IP/TIN/WY Settlement Funds, with 30 percent of that requested amount to be held in escrow.  Plaintiffs clarify that they are requesting a total award of 30 percent of the IP/TIN/WY Settlement Funds, with a portion of that award to be held in escrow until the terms of the Settlement Reduction Formula expire.  Once the Reduction Formula provision has lapsed, Plaintiffs will distribute the $118 million holdback amount.

[2] Having initiated and managed the litigation from the outset, Co-Lead Counsel are familiar with the contributions of the Class Counsel law firms and, consistent with standard practice in similar cases, propose to handle the allocation of any fee award among co-counsel. *See, e.g., In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 1:09-cv-07666, Dkt. Nos. 693, 701 (N.D. Ill. Jan. 22/April 16, 2014)

The 30 percent fee request is well within the range accepted by this Court, others in the Seventh Circuit, and courts around the country. Indeed, a 30 percent fee is particularly warranted here. Even by antitrust class action standards, this case was a massive undertaking. It did not follow a government investigation or prosecution, but was developed solely by Class Counsel and litigated aggressively at every stage against seven large and sophisticated Defendants[3] steeled in antitrust litigation and represented by dozens of skilled and well-compensated lawyers from top defense firms. Prosecuting the matter has required nearly $98 million dollars of attorney time (based on historical hourly rates), all of which was advanced by Class Counsel on a fully contingent basis with no guarantee of recovery. Had the case resulted in no recovery for the Class, Class Counsel would receive no compensation for their time or out-of-pocket expenses. Having incurred these substantial risks, and having secured a very large settlement fund for the benefit of the Class, Class Counsel earned the requested 30 percent fee award. Indeed, as discussed further below, on a "cross-check" basis, the request amounts to an extremely modest "multiplier" on the combined lodestar of Class Counsel.

The requested fee is also in accordance with the market rate guidelines established by the Seventh Circuit for fees in common fund class actions. *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*") ("On remand the district court must estimate the terms

---

(recent case in this district awarding one-third fee and authorizing co-lead counsel to allocate fee based on each law firm's respective contributions to the litigation) (copies attached as **Ex. A** hereto); *In re Urethane Antitrust Litig.*, MDL No. 1616, Dkt. No. 2210 (D. Kan. Dec. 13, 2011) (same) (copy attached as **Ex. B** hereto); *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2008 WL 63269, *7 (E.D. Pa. Jan. 3, 2008) ("Courts generally approve joint fee applications which request a single aggregate fee award with allocations to specific firms to be determined by Co-Lead Counsel, who are most familiar with the work done by each firm and each firm's overall contribution to the litigation."); *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *17 (E.D. Pa. June 2, 2004) (same); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 n.15 (3d Cir. 2004) (noting "the accepted practice of allowing counsel to apportion fees among themselves").

[3] Six of the seven named Defendants were on the Fortune 500 list of the largest U.S. companies at the beginning of the Class Period.

of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed)."); *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 975 (7th Cir. 2003) ("*Synthroid II*"); *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 568, 572 (7th Cir. 1992). Here, the record is clear that the market fee at the outset of the case was greater than 30 percent. *See* accompanying Declarations of Paul E. Slater ("Slater Decl.") and Marc M. Seltzer ("Seltzer Decl."). The extensive and diligent efforts of Class Counsel throughout this litigation are described below and are set forth in greater detail in the accompanying Joint Declaration of Michael J. Freed and Daniel J. Mogin ("Joint Decl."), Co-Lead Counsel in the case.[4]

## II.   CLASS COUNSEL'S WORK

### A.  Pre-Complaint Investigation and Motions to Dismiss

This action began in September 2010 with the filing of a detailed complaint alleging that Defendants, the nation's largest producers of Containerboard Products, conspired to fix the price of both intermediate containerboard and finished corrugated products over a period of more than six years, facilitated by various supply restrictions, on an industry-wide basis, causing injury to direct purchasers of Containerboard Products. The Mogin Law Firm P.C.[5] along with a small group of Class Counsel firms, including Freed Kanner London & Millen LLC ("Freed Kanner"), built the case from the ground up, interviewing witnesses and purchasers, studying industry documents, conferring with industry analysts, economists and investigators, and performing extensive legal research to evaluate potential claims—all of which informed the initial

---

[4] The Joint Declaration *includes*, *inter alia*, an overview of the case, a summary of Class Counsel's work, detail on time and expenses, and an assessment of the risks of continued litigation and the benefits of settlement.

[5] The Mogin Law Firm P.C. is now MoginRubin LLP.

complaint. A consolidated complaint was filed in November 2010 (Dkt. No. 65) and two sets of amendments to that complaint were filed in April and October 2014 (Dkt. Nos. 622, 777).

In October 2010, Defendant Smurfit-Stone Container Corporation (now WestRock CP, LLC) filed an adversary proceeding in the United States Bankruptcy Court for the District of Delaware seeking to enjoin Plaintiffs from pursuing their claims here, which Plaintiffs opposed. The Bankruptcy Court held a telephonic conference in December 2010 and then declined to issue the requested relief, instead dismissing the adversary proceeding. Related arguments made in this District before the Honorable Milton I. Shadur were likewise rejected.

In January 2011, Freed Kanner and The Mogin Law Firm were appointed as interim co-lead counsel by then-presiding Judge Shadur. Also in January 2011, Defendants jointly and separately moved to dismiss the case and requested that discovery be stayed pending resolution of their motions. Following extensive briefing by all parties, Judge Shadur first declined to stay discovery on January 20, 2011 and ordered advanced initial disclosures (Dkt. No. 145), then denied the motions to dismiss on April 8, 2011 (Dkt. No. 193; 775 F. Supp. 2d 1071).

### B. Discovery

Discovery and document review in complex litigation invariably requires substantial time, effort, and expense. This case required even more than most. Class Counsel's discovery-related work included, *inter alia*:

- Drafting and negotiating proposed electronic discovery, expert discovery, and confidentiality orders (*see*, *e.g.*, Dkt. Nos. 227, 229, 245).
- Organizing and coordinating teams of co-counsel to manage discovery efforts as to each Defendant, experts, and third parties.
- Drafting and serving written discovery (requests for production, interrogatories, and requests for admission) on all Defendants collectively and, in some instances, on individual Defendants.

- Preparing for and taking nearly 80 depositions of Defendant fact witnesses, another 16 depositions of third party witnesses, and eight separate expert witnesses designated by Defendants, each of whom was deposed at least once.

- Working with the named Plaintiffs to answer interrogatories and other written discovery served by Defendants.

- Preparing for and defending depositions of the named Plaintiffs.

- Preparing for and defending class certification and merits depositions of Plaintiffs' expert witnesses, some of whom were deposed multiple times.

- Participating in evidentiary hearings and related proceedings before then-Magistrate Judge Nan R. Nolan over the span of almost one year regarding various discovery issues, including appropriate search protocols, document custodians, and the temporal scope of discovery. Hearings involved live and written testimony from experts in electronic discovery, computer forensics, linguistics, computational linguists, and data science/search procedures.

- Selecting outside vendors to process Defendant and third-party document productions, apply analytics, and host documents for analysis and coding on an online platform.

- Managing large teams of document examiners, including via regular conference calls.

- Filing motions and briefs on various discovery issues.

- Resolving many issues and disputes through meet and confers with Defendants, without the need for Court involvement.

- Analyzing and synthesizing over 25 million page equivalents of documents produced by Defendants.

- Collecting, reviewing, and producing requested document discovery from the named Plaintiffs.

- Working with expert economists and industry consultants to coordinate discovery and analysis of Defendants' transactional, financial, and operational data, including extensive and disparate sales data.

- Serving, negotiating, and reviewing discovery from various trade associations and other third parties, including multiple subpoenas to various telephone carriers.

A more complete description of Class Counsel's discovery-related efforts is set forth in the accompanying Joint Declaration.

## C. Class Certification

In this case, class certification required extensive legal, factual, and strategic development. Specifically, Co-Lead Counsel, with the assistance of other firms: (a) drafted

lengthy class certification briefs; (b) analyzed and coordinated supporting expert reports; (c) identified and organized thousands of pages of exhibits; (d) researched, prepared for and deposed Defendants' expert and fact witnesses; (e) prepared for and defended depositions of Plaintiffs' expert and fact witnesses; (f) opposed a motion to strike certain expert opinions; (g) retained and worked closely with appellate counsel; (h) prepared and filed oppositions to Defendants' Federal Rule of Civil Procedure 23(f) petition and class certification appeal brief before the Seventh Circuit; and (i) worked with appellate counsel to prepare for oral argument before the Seventh Circuit. *See* Joint Decl.

### D. Settlements

All of the discovery and class certification work summarized above and described further in the accompanying Joint Declaration was necessary to advance Plaintiffs' claims and lay the groundwork for the prior settlements with PCA and Cascades/Norampac and, ultimately, the IP/TIN/WY Settlement. In addition, each of those settlements involved protracted negotiations and drafting of monetary and other terms, as well as extensive work with claims administrators and banks on class notice, administration and escrow issues.

The IP/TIN/WY Settlement provides for a cash payment of $354 million with $118 million of that total potentially subject to a reduction clause that applies only if Plaintiffs settle with Defendant Georgia-Pacific for less than a certain amount. The minimum guaranteed amount of the IP/TIN/WY Settlement is therefore $236 million, which will go directly to the Class in cash now, after deducting Court-approved attorneys' fees, the cost of providing notice to the Class and taxes and related expenses. At this time, Class Counsel are not seeking

reimbursement of remaining substantial unreimbursed expenses advanced from their own pockets, nor any from the prior PCA and Cascades/Norampac settlements.[6]

### E. Expert Witnesses and *Daubert* Motions

Plaintiffs initially retained two economic experts to opine on liability and damages at the class certification stage, Drs. Michael Harris and Mark Dwyer. Plaintiffs later added Dr. J. Douglas Zona as both a rebuttal expert on class certification and a merits expert on issues of impact and damages. Plaintiffs also designated Professor Lawrence Cunningham as a rebuttal expert to respond to opinions offered by two of Defendants designated experts. All told, Plaintiffs' experts prepared and submitted five reports at the class certification stage and seven reports at the merits stage. Except for Prof. Cunningham, each of Plaintiffs' experts was deposed at least twice.

For their part, Defendants designated two economic experts at the class certification stage, Drs. Januz Ordover and Dennis Carlton, and a total of eight experts (one a testifying employee expert) at the merits stage. Those experts submitted a total of 12 reports (covering both class certification and merits) with many thousands of pages of exhibits. Each of Defendants' experts was deposed, several of them more than once.

Both Plaintiffs and Defendants filed numerous *Daubert* motions to exclude expert reports and testimony. After complete and voluminous briefing on those motions, the Court issued an Order on May 31, 2017 denying nearly all the motions, granting only Plaintiffs' (unopposed) motion to exclude limited testimony by Dr. Carlton and a portion of Defendants' motion to exclude Lawrence Cunningham.

---

[6] Class Counsel previously petitioned the Court only for advancements to cover common case expenses from earlier settlements with Packaging Corporation of America ("PCA") and Cascades Canada, Inc./Norampac Holdings U.S., Inc.("Cascades/Norampac") pursuant to clauses contained in those settlement agreements.

A more complete description of Class Counsel's efforts concerning expert witnesses and *Daubert* motions is set forth in the accompanying Joint Declaration.

### F. Summary Judgment and Trial Preparation

On January 9, 2017, Defendants filed joint and individual motions for summary judgment on the merits along with a separate motion for partial summary judgment based on releases in settlements from the prior *In re Linerboard Antitrust Litigation* ("*Linerboard*") and the statute of limitations (for a total of seven motions). In addition to voluminous supporting briefs and exhibits, Defendants filed seven separate Local Rule 56.1 statements supported by additional exhibits. Plaintiffs cross-moved for partial summary judgment on the *Linerboard* releases and certain affirmative defenses asserted by Defendants.

On March 13, 2017, Plaintiffs filed their omnibus response to Defendants' motions for summary judgment on the merits, a separate Rule 56.1 statement of additional facts with exhibits, a response to Defendants' motion for partial summary judgement, and responses to each of the seven Local Rule 56.1 Statements. Defendants similarly filed their response to Plaintiffs' motion for partial summary judgment. All parties submitted reply papers on April 27, 2017 and Defendants unsuccessfully moved to strike Plaintiffs' Rule 56.1 statement of additional facts. The Court also requested, and the parties submitted, supplemental information concerning trade association meetings, production and capacity.

Prior to the Court's August 3, 2017 ruling on summary judgment, Class Counsel spent significant time organizing and preparing the case for trial. Indeed, Class Counsel approached the case from the outset with the expectation of proceeding to trial. In addition to practical tasks such as establishing the necessary evidentiary foundation for potential trial exhibits, designating deposition testimony, and preparing motions *in limine*, Class Counsel worked closely with a jury

consultant and held several full day in-person "all hands" meetings to discuss trial strategy and planning.

### G.  Total Time and Expense

In total, Class Counsel devoted more than 220,000 hours and nearly $98 million in time to prosecute the claims on behalf of the Class, all of which was advanced on a fully contingent basis with no guarantee of recovery.  *See* Joint Decl., ¶¶ 107-109.  The requested 30 percent fee award of $106.2 million thus represents less than a 1.1 multiplier over Class Counsel's total hourly fees (or "lodestar"), which is at the very bottom end of the range of fees awarded in similar common fund antitrust litigation, particularly in light of the success achieved on behalf of the Class under challenging circumstances.  A portion of the fee award, however, is subject to the $118 million Settlement Reduction holdback, thereby indefinitely delaying a full distribution of fees to Class Counsel.  Also, as previously noted, Class Counsel are not presently seeking reimbursement of remaining out-of-pocket expenses nor any fees from the prior settlements.

## III.  <u>ARGUMENT</u>

### A.  The Requested Attorneys' Fees Are Fair and Reasonable

#### 1.  Legal Standard

It is well-established that, having worked diligently to create a common class action settlement fund, Class Counsel are "entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. at 478; *see also Sutton v. Bernard*, 504 F.3d 688, 691 (7th Cir. 2007) ("this payment scheme is based on the equitable notion that those who have benefited from litigation should share in its costs") (internal quotation marks and citations omitted); *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992) ("Having employed their professional skills to create a cornucopia for the class, the lawyers for the class

were entitled under the principles of restitution to suitable compensation for their efforts."); Fed. R. Civ. P. 23(h) (authorizing reasonable fee awards to class counsel). It is equally well-established that attorneys' fees are properly awarded where, as here, common fund settlements are achieved with only certain named defendants. *See, e.g., In re Plasma-Derivative Protein Therapies Antitrust Litig.*, Dkt. No. 693 (**Ex. A** hereto) (awarding one-third interim fee from initial settlement in multi-defendant case); *In re Southeastern Milk Antitrust Litig.*, No. 2:08-MD-1000, 2013 WL 2155387, at *1 (E.D. Tenn. May 17, 2013) (noting initial one-third fee award from early settlements and approving additional fee from later settlements); *In re Urethane Antitrust Litig.*, Dkt. No. 2210 (awarding one-third fee from initial settlements with litigation continuing) (**Ex. B** hereto); *Auto. Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at *1 (E.D. Pa. Jan. 3, 2008) (noting prior 32 percent fee award from initial settlements and approving additional fee from later settlements).

Courts in the Seventh Circuit take a market-based approach in evaluating class action fee requests. *See, e.g., Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 246-47 (7th Cir. 2014) ("because we always seek to replicate the market value of an attorney's services—and because the market would assign value up front—a district court that leaves the matter of fees until the end of the litigation process must set a fee by approximating the terms that would have been agreed to *ex ante*, had negotiations occurred") (internal quotation marks and citations omitted); *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011) (same); *Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 635-36 (7th Cir. 2011) (same).

Relevant considerations include, *inter alia*, the ordinary market rate for class counsel's services, fee awards in similar matters, the nature of the particular case (including the risks of

non-recovery), and the amount and quality of class counsel's work. *See, e.g., Synthroid I*, 264 F.3d at 718 ("courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."); *id.* at 721 ("The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case."); *see also Taubenfeld v. Aon Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) (affirming fee award based on "awards made by courts in other class actions"; "the quality of legal services rendered"; and "the contingent nature of the case"); *Williams*, 658 F.3d at 636 (7th Cir. 2011) (affirming award based on "available market evidence"; "the amount of work involved, the risks of nonpayment, and the quality of representation"). Balancing these and any case-specific factors is a matter committed to the sound discretion of the trial court. *See, e.g., Americana Art*, 743 F.3d at 246 (court of appeals reviews attorney fee methodology *de novo* and reviews trial court's application of an accepted methodology for abuse of discretion). Here, the fee requested is at or below the market rate for similar litigation.

### 2. The Requested Fees Are Fair and Reasonable as a Percentage of the Fund

Two approaches commonly used in awarding class action attorneys' fees are: (i) the "percentage of recovery" method, under which the Court awards a percentage of the total common settlement fund; and (ii) the "lodestar" method, under which the fee award is a function of class counsel's lodestar (*i.e.*, reasonable hourly rates multiplied by the hours devoted to the case) times a "multiplier" adjustment to account for risk, quality, and outcome. *See generally Pearson v. NBTY, Inc.*, No. 11 CV 7972, 2014 WL 30676, *5-6 (N.D. Ill. Jan. 3, 2014). The Court has discretion to apply either method, *see Americana Art*, 743 F.3d at 247, but because the

11

requested fee here falls squarely within the customary range of outcomes in similar cases regardless of which method is employed, or whether one method is used as a cross-check for another, the Court should reach the same conclusion.

The percentage of recovery method is a framework accepted by the private market and often used by courts in antitrust class actions, particularly where, as here, class counsel secures an all-cash settlement fund for the benefit of the class. *See* Slater and Seltzer Decls.; *In re ShagrinGas Co. v. BP Products*, No. 1:06-cv-03621, Dkt. No. 209 (N.D. Ill. June 24, 2010) (Zagel, J.) (applying percentage methodology) (copy attached as **Ex. C** hereto); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, Dkt. No. 693 (awarding one-third percentage fee in antitrust class action) (**Ex. A** hereto); *see generally Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund[.]").

The percentage of recovery method has many advantages, including ease of administration, consistency with traditional "common fund" principles, and alignment of interests. *See, e.g., Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994) ("there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration"); *Blum v. Stenson*, 465 U.S. 886, 890 n.16 (1984) ("under the common fund doctrine . . . a reasonable fee is based on a percentage of the fund bestowed on the class"); *Kirchoff v. Flynn,* 786 F.2d 320, 326 (7th Cir. 1986) (contingent percentage fee "automatically aligns interests of lawyer and client, rewards exceptional success, and penalizes failure").[7]

---

[7] *See also* Federal Judicial Center, *Manual For Complex Litigation* § 14.121 (4th ed. 2004) ("the vast majority of courts of appeals now permit or direct district courts to use the percentage-fee method in common-fund cases" in part because "[i]n practice, the lodestar method is difficult to apply, time-

As explained in more detail below, Class Counsel's 30 percent fee request is consistent with the market rate to compensate them for the risks of the case, the amount and quality of their work, and the success achieved on behalf of the Class. For this reason, the request is in line with fees awarded in numerous, similar class actions

### 3. A 30 Percent Contingent Fee Is Consistent with Class Counsel's Market Rate in Similar Cases

As set forth in the accompanying Slater and Seltzer Declarations, a 30 percent contingent fee is lower than the *ex ante* market rate for Class Counsel's services in this litigation. Mr. Slater is a practicing attorney in Chicago who has handled many large antitrust and other complex cases on contingency as non-class action lawsuits. Mr. Seltzer is a senior partner and resident head of the Susman Godfrey's Los Angeles office. Susman Godfrey has served as lead or co-lead counsel in numerous class actions and other complex cases in courts throughout the country. The firm has also represented individuals and businesses in antitrust and other complex cases on contingency as non-class action lawsuits. The views of Messrs. Slater and Seltzer are consistent with the experience of Co-Lead Counsel in representing sophisticated clients in non-class action cases. In fact, where, as here, a proposed contingent case involves large claims against sophisticated parties, counsel will typically negotiate a fee of at least 33-1/3 percent from any settlement or judgment plus full reimbursement of all litigation expenses. *See* Slater Decl., ¶¶ 6-7, 9; Seltzer Decl., ¶ 4. Those percentages can increase significantly if counsel advance

---

consuming to administer, inconsistent in result, and capable of manipulation" and "creates inherent incentive to prolong the litigation"); *In re Skelaxin (Metaxalone) Antitrust Litig.*, MDL No. 2343, 2014 WL 2946459, *1 (E.D. Tenn. Jun. 30, 2014) ("The percentage-of-the-fund method is the proper method to compensate Class Counsel" in antitrust litigation because "the lodestar method is cumbersome; the percentage-of-the-fund approach more accurately reflects the result achieved; and the percentage-of-the-fund approach has the virtue of reducing the incentive for plaintiffs' attorneys to over-litigate or 'churn' cases.") (citations omitted).

expenses.  *See* Seltzer Decl., ¶ 4.  *See also Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000) (one "measure of what is reasonable is what an attorney would receive from a paying client in a similar case").

The requested 30 percent contingent fee is consistent with Co-Lead and Class Counsel's market rate in private antitrust cases. *See* Joint Decl., ¶ 109.  It is also consistent with the contingency market rate typically applied when a lead counsel structure is appointed to represent a class. In the *Urethane Antitrust Litigation* case, for example, the co-lead counsel firms handled complex claims for nearly a decade on behalf of direct purchasers. Unlike this case, *Urethane* followed an amnesty application and guilty pleas.  As here, the plaintiffs in *Urethane* settled with some (but not all) defendants before trial and, consistent with the common fund principles described above, the court awarded one-third of the settlement amounts as an interim fee award to compensate class counsel for years of hard-fought litigation.  *See In re Urethane Antitrust Litig.*, MDL No. 1616, Dkt No. 2210 (D. Kan. Dec. 13, 2011) (**Ex. B** hereto).

### 4.  A 30 Percent Contingent Fee Is Consistent with the Market Rate Approved by Courts in Similar Cases

"[A]ttorneys' fees from analogous class action settlements" can be used to evaluate the market rate for legal services, *Taubenfeld*, 415 F.3d at 600, and further demonstrate the reasonableness of Class Counsel's requested fee.  In fact, "[c]ourts throughout the Seventh Circuit routinely . . . conclude that a one-third contingency fee is standard" in class actions. *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 909 (S.D. Ill. 2012) (collecting cases and awarding one-third fee from $105 million settlement fund). *Accord In re ShagrinGas Co.*, No. 1:06-cv-03621, Dkt. No. 209 (N.D. Ill. June 24, 2010) (Zagel, J.) (crediting plaintiffs' evidence "that the market range for legal service in a contingency matter such as this . . . is 30-33%") (**Ex. C** hereto); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 1:09-cv-

14

07666, Dkt. No. 693 (N.D. Ill. 2014) (awarding one-third fee) (**Ex. A** hereto); *Gaskill*, 160 F.3d at 364 (7th Cir. 1998) (affirming 38 percent fee award); *cf. Pearson*, 2014 WL 30676, at \*6 (Zagel, J.) (noting that 25percent is the benchmark but special risks and circumstances can justify a higher award). *See also Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 (N.D. Ill. 2011) ("common-fund cases from within the Seventh Circuit show that an award of 33.3% of the settlement fund is within the reasonable range."); *Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at \*4 (N.D. Ill. Dec. 10, 2001) (in a complex class action, "[a] customary contingency fee would range from 33 1/3% to 40%"); *In re Lithotripsy Antitrust Litig.*, No. 98 C 8394, 2000 WL 765086, \*2 (N.D. Ill. June 12, 2000) ("33.3% of the fund plus expenses is well within the generally accepted range of attorneys['] fees in class-action antitrust lawsuits"); *Goldsmith v. Tech. Solutions Co.*, 92 C 4374, 1995 WL 17009594, at \*8 (N.D. Ill. Oct. 10, 1995) ("courts in this District commonly award attorneys' fees equal to approximately one-third or more of the recovery"); *Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP-TAB, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) (reviewing Seventh Circuit authority and awarding one-third fee from $90 million settlement fund); *In re Ready-Mixed Concrete Antitrust Litig.*, 1:05-CV-00979-SEB-TAB, 2010 WL 3282591, at \*3 (S.D. Ind. Aug. 17, 2010) (approving one-third fee).

     The recent *Plasma-Derivative Protein Therapies* case is illustrative. Like this case, *Plasma* involved complex antitrust claims, including alleged supply restrictions, and class counsel devoted tens of millions of dollars in time and expenses litigating the case on a purely contingent basis. The case settled favorably before class certification and the *Plasma* court awarded a one-third fee as a fair and reasonable percentage from the settlement fund. *See* **Ex. A**. Many recent complex antitrust cases are in accord, including many with comparable class

recoveries. *See, e.g. In re Southeastern Milk Antitrust Litig.*, No. 2:08–MD–1000, 2013 WL

2155387, *8 (E.D. Tenn. May 17, 2013) (one-third fee from settlements totaling $158.6 million);

*In re Titanium Dioxide Antitrust Litig.*, 10–CV–00318(RDB), 2013 WL 6577029, *1 (D. Md.

Dec. 13, 2013) (one-third fee from $163.5 million fund); *Skelaxin*, 2014 WL 2946459 at *1

("one third fee is fair and reasonable and fully justified" and "within the range of fees ordinarily

awarded" in case involving $73 million settlement fund) (collecting cases); *In re Flonase

Antitrust Litig.*, 951 F. Supp. 2d 739, 748-52 (E.D. Pa. 2013) (noting that in recent years "courts

in eight direct purchaser antitrust actions approved one-third fees" and awarding one-third fee

from $150 million fund); *In re Fasteners Antitrust Litig.*, CIV. A. 08-md-1912, 2014 WL

296954, *7 (E.D. Pa. Jan. 27, 2014) ("Co–Lead Counsel's request for one third of the settlement

fund is consistent with other direct purchaser antitrust actions."); *In re Tricor Direct Purchaser

Antitrust Litig.*, No. 05-340-SLR, Dkt. No. 543 (D. Del. April 23, 2009) (copy attached as **Ex. D**

hereto) (one-third fee from $250 million settlement fund).[8]

All of the authority cited above confirms that a 30 percent fee award is within the range

of reasonableness in comparable antitrust litigation, particularly given the case-specific risks

described below.

---

[8] *See also Auto. Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at *1 ($34.5 million
attorneys' fee from settlements totaling $105.75 million); *Linerboard Antitrust Litig.*, 2004 WL 1221350,
*19 (30 percent fee from $202.6 million settlement fund); *In re Relafen Antitrust Litig.*, No. 1:01-cv-
12239-WGY, Dkt. No. 297, at 8 (D. Mass. April 9, 2004) (copy attached as **Ex. E** hereto) (one-third fee
from $175 million settlement fund); *In re Vitamins Antitrust Litig.*, No. Misc. 99-97 (TFH), 2001 WL
34312839, at *10, 14 (D.D.C. July 16, 2001) (34 percent fee from $359 million settlement fund); William
B. Rubenstein, *Newberg on Class Actions* § 14:6 (4th ed.) ("Empirical studies show that . . . fee awards in
class actions average around one third of the recovery.").

**5. A 30 Percent Contingent Fee Is Justified by the Risks of the Litigation**

The Seventh Circuit has emphasized that fee awards must be evaluated "in light of the risk of nonpayment," *Synthroid I*, 264 F.3d at 718, and that "a higher risk of loss does argue for a higher fee." *In re Trans Union*, 629 F.3d at 746. *See also Florin*, 34 F.3d at 565 ("a court must assess the riskiness of the litigation by measuring the probability of success of this type of case *at the outset* of the litigation") (emphasis in original).

The risk here was significant. From an *ex ante* perspective, Class Counsel bore the risks of (i) motions to dismiss under the Supreme Court's then relatively new *Twombly* standard; (ii) potential discovery limitations and delays; (iii) dozens of defense arguments and potential *Daubert* challenges at class certification; (iv) if successful at the class certification stage, a possible Rule 23(f) review and attendant delay; and (v) all other risks of litigation on the merits, including summary judgment, new or renewed *Daubert* motions, other evidentiary challenges, trial risks on liability and damages, post-trial motions, appeals, and much more. *See* Joint Decl. (detailing case-specific risks); *Linerboard Antitrust Litig.,* 2004 WL 1221350, at *10 ("an antitrust class action is arguably the most complex action to prosecute" because the "legal and factual issues are always numerous and uncertain in outcome") (citations omitted).

Given these potential pitfalls, the *ex ante* risk of the case justifies a substantial fee award to compensate Class Counsel for pursuing the claims in the first instance, litigating effectively for years without compensation, financing millions of dollars of case costs with no guarantee of reimbursement, and ultimately achieving outstanding results. *See, e.g., Syngenta*, 904 F. Supp. 2d at 909 ("Given the extreme difficulty presented by this matter and the attendant risk in investing years of attorney time carrying millions of dollars in litigation expenses with no guarantee of recovery, a substantial risk multiplier is warranted" and a "fee award of one-third of

17

the fund is thus appropriate[.]"); *Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at \*5 ("counsel undertook this case on a contingency-fee basis and accepted a substantial risk of nonpayment for legal work and reimbursement of out-of-pocket expenses advanced. The Court finds that the fee awarded should fully reflect the risk taken by these lawyers and is a very substantial factor in this case that weighs in favor of the requested [one-third] fee"); Slater Decl. (risks of the litigation support one-third fee award).

The risks here were heightened by the fact that Class Counsel investigated and developed this case on their own. There were no government investigations or indictments available to use as foundation for the claims. Counsel handled the case alone, with their own resources, and courts have long recognized that class counsel should be awarded a larger percentage fee in this situation to account for the greater risk of loss and the fact that, absent class counsel's independent work, class members would not have recovered anything at all.[9]

It is also important to reward Class Counsel in this situation to incentivize private enforcement of the antitrust laws. *See Southeastern Milk Antitrust Litig.*, 2013 WL 2155387 at \*5 ("failing to fully compensate class counsel for the excellent work done and the various substantial risks taken would undermine society's interest in the private litigation of antitrust cases. Society's interests are clearly furthered by the private prosecution of civil cases which

---

[9] *See, e.g., Auto. Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at \*5 ("The risk of nonpayment is even higher when a defendants' *prima facie* liability has not been established by the government in a criminal action" and thus "warrants approval" of class counsel's one-third fee request.); *Linerboard Antitrust Litig.*, 2004 WL 1221350, at \*11 (same); *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 2000 WL 204112, at \*1 (N.D. Ill. Feb. 10, 2000) ("This case was not marked by any governmental investigations or prosecutions, leaving the development of the facts in the hands of private litigants . . . Because of the uncertainty of the outcome of the case and the enormous amount of work necessary to the prosecution of the charges, counsel for the Class Plaintiffs had to invest a great deal of time and money even while faced with the risk of non-recovery.").

further important public policy goals, such as vigorous competition by marketplace competitors."); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) ("[w]ithout doubt, the private cause of action plays a central role in enforcing this [antitrust] regime."); *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws."); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664 (7th Cir. 2002) (same).

### 6. A 30 Percent Fee Is Supported by the Amount and Quality of Class Counsel's Work and the Results Achieved for the Class

The Court should further consider the amount and quality of Class Counsel's work in its fee analysis, *Synthroid I*, 264 F.3d at 721, as well as "the litigation's ultimate degree of success." *Americana Art*, 743 F.3d at 247 (court is permitted to consider success of the case as another factor supporting fee award). *Accord In re Brand Name Prescription Drugs*, 2000 WL 204112, at *2 ("There is no question that the results achieved by class counsel were extraordinary and that they are entitled to a substantial award."). Both factors fully support a 30 percent fee.

This case was a massive undertaking and the volume of work supporting the requested fee is substantial. Class Counsel have litigated this case for nearly seven years, spending more than 220,000 hours of attorney time collectively. *See Linerboard Antitrust Litig.*, 2004 WL 1221350, at *8 ("the quality and vigor of opposing counsel is relevant in evaluating the quality of plaintiffs' counsel."). Moreover, the very nature of the case—a nationwide antitrust class action against seven large Defendants represented by dozens of lawyers from the country's preeminent defense firms—presented significant challenges that underscore the scope of the

undertaking. The Court is well aware of the hundreds of docket entries that illustrate only the most public aspects of the litigation.[10]

The quality of Class Counsel's work and the outcome achieved also supports a 30 percent fee. On each and every issue raised by Defendants and their capable lawyers—from the motion to dismiss stage, to major discovery disputes, to the many contested class certification, *Daubert*, and summary judgment issues—Class Counsel have argued their case professionally and effectively. Class Counsel also attempted to minimize the number of disputes requiring Court involvement by meeting and conferring exhaustively (and often productively) with defense counsel. Class Counsel respectfully submit that their representation has been vigorous, efficient, and effective, and that the facts, arguments and credibility they developed throughout the litigation were key to achieving the recent IP/TIN/WY Settlement for the Class. As such, the quality of Class Counsel's representation supports the requested fee.

Finally, Class Counsel believe the results speak for themselves. *Id.* at *5 ("The result achieved is the clearest reflection of petitioners' skill and expertise."). A total class action cash settlement fund of $376.4 million with no reduction for opt outs is an outstanding outcome.[11] And because the proposed claims process is straightforward, Class members can receive their

---

[10] Class Counsel made every effort to work the case efficiently and, in Co-Lead Counsel's experience, the total reported lodestar is reasonable for a multi-defendant case of this nature. *See, e.g., Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *5, 7 (lodestar over $53 million after five years of litigation); *Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112, at *3 (lodestar of $84 million after approximately six years of litigation); *In re Urethane Antitrust Litig.*, MDL No. 1616, Dkt. Nos. 3276, 3251 (D. Kan. July 29/June 1, 2016) (lodestar of over $100 million based on 193,000 hours of time over more than ten years of litigation) (order awarding fees attached with excerpt of fee petition as **Ex. F** hereto).

[11] As the Court is aware, class action settlements sometimes raise challenging issues of valuation and claims administration, *e.g.*, in cases involving coupon settlements, reversion of unclaimed funds to defendants after the claims process, or reduction of the settlement to account for opt outs. Here, in contrast, the Class will benefit substantially from the large all-cash IP/TIN/WY Settlement fund with no opt out reductions and a simple claims process.

*pro rata* share of the IP/TIN/WY Settlement fund with minimum effort and delay after this Court rules on the motion for final settlement approval, plan of distribution, and request for attorneys' fees. Moreover, in addition to the presently recommended distribution to the Class, there is a great likelihood that a substantial additional distribution will be made at a future date from the $118 million Settlement reduction holdback. And like the Class itself, Class Counsel's fees will also be subject to the $118 holdback.

### 7. Lodestar/Multiplier Analysis Supports the Requested Fee Award

The Court may in its discretion "cross-check a percentage of recovery fee award with the lodestar method" to confirm its reasonableness. *Pearson*, 2014 WL 30676, at *6 (citing *Synthroid I*, 264 F.3d at 718). As noted above, the lodestar method multiplies the hours devoted to the case by the relevant professional's hourly rate, often applying a case-specific "multiplier" to compensate class counsel for risk, outcome, and quality of work. *Id.*[12] Here, each Class Counsel firm has represented that the hourly rates applied to this matter were the usual and customary rates their firms historically charged in similar matters as well as to their hourly and commercial clients. *See* Joint Decl., ¶ 109.

When using the lodestar method, a multiplier is generally "mandated" in successful contingent cases in which counsel bore the risk of loss. *See, e.g., Florin*, 34 F.3d at 565; *Continental*, 962 F.2d at 659 ("the need for such an adjustment is particularly acute in class action suits"); *Florin v. Nationsbank of Ga., N.A.* ("*Florin II*"), 60 F.3d 1245, 1247 (7th Cir.

---

[12] The hourly rates on which this calculation is based are the same rates charged to paying clients for similar work. *See Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*, 553 F.3d 487, 489-90 (7th Cir. 2009) (recognizing "presumption that an hourly rate is reasonable where the attorney demonstrates that the hourly rate she has requested is in line with what she charges other clients for similar work."); Joint Decl., ¶¶ 107-109 (lodestar submissions here are based on historic rates charged at the time work was performed).

1995) ("court[s] must also be careful to sustain the incentive for attorneys to continue to represent such clients on an 'inescapably contingent' basis"); *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988) ("the higher the risk . . . the greater the multiplier necessary to compensate plaintiff's attorney for bringing the action").

Typical multipliers range from 1-4 depending on the facts. *See, e.g., Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991) (multipliers from 1-4 have been approved); *Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at * 4 (awarding one-third fee and "multiplier of 1.9, clearly within, but in the bottom half of, the range of typical lodestar multipliers"); *Skelaxin Antitrust Litig.,* 2014 WL 2946459, at *2 (collecting cases and awarding "multiplier between 2.1 and 2.5," which is "reasonable in light of what has been routinely accepted as fair and reasonable in complex matters such as this one"); *Flonase Antitrust Litig.*, 951 F. Supp. 2d at 750-51 (noting that multipliers of 1-4 are common in antitrust cases and awarding one-third fee with 2.99 multiplier); *Newberg on Class Actions* §14.6 (4th ed. 2009) ("multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied").

Here, the lodestar method shows that the requested fee award falls squarely within the range of reasonableness. Based on historic hourly rates, the total lodestar from the inception of the case through July 31, 2017 is $97,900,000, which translates to a requested multiplier of less than 1.1, with distribution of a substantial portion delayed until the holdback provision expires.[13] Such a multiplier falls within the range of reasonableness, but at the very low end, and fairly

---

[13] Although use of current billing rates is permitted under Seventh Circuit authority, *see, e.g., Smith v. Vill. of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994), Class Counsel believe use of historic rates here presents a more conservative estimate of attorneys' fees accumulated. Applying an interest factor to account for this approach would likely bring the value of Class Counsel's time to more than the $106.2 million requested and result in a negative multiplier.

compensates Class Counsel for bearing the significant litigation risks described above and in the accompanying Joint Declaration. Success did not come easily in this matter.

After nearly seven years, millions of dollars in expenses advanced, tens of millions of dollars in professional time, material risk of loss at every step, and outstanding results for the Class, Class Counsel believe the requested fee is fair and reasonable. *See Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at*4-5 (one-third fee and 1.9 multiplier from settlements totaling $158.6 million); *Skelaxin Antitrust Litig.*, 2014 WL 2946459, at *2 (one-third fee and multiplier of 2.1-2.5 from $73 million settlement fund); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *8 (N.D. Cal. Apr. 3, 2013) (average multiplier of 2.4-2.6 from $1.08 billion settlement fund); *Flonase Antitrust Litig.*, 951 F. Supp. 2d at 750-51 (one-third fee and 2.99 multiplier from $150 million fund); *Tricor Antitrust Litig.* (**Ex. D** hereto) (one-third fee and 3.93 multiplier from $250 million fund); *Linerboard Antitrust Litig.*, 2004 WL 1221350, at *16 (2.66 multiplier to "reflect the risks of nonpayment facing counsel, to serve as an incentive for counsel to undertake socially beneficial litigation" and "as a reward to counsel for an extraordinary result"); *Brand Name Prescription Drugs Antitrust Litig.,* 2000 WL 204112, at *3 ($175 million fee and 2.06 multiplier from $696.7 million settlement fund); *see generally Gaskill*, 160 F.3d at 363 ("Because they shift part of the risk of loss from client to lawyer, contingent-fee contracts usually yield a larger fee in a successful case than an hourly fee would.").

IV.    **CONCLUSION**

For all the reasons set forth above and in both the accompanying declarations and

Plaintiffs' motion for final approval of the IP/TIN/WY Settlement, Class Counsel respectfully

request that their request for an award of attorneys' fees equal to 30 percent of the IP/TIN/WY

Settlement be granted.


Dated:  August 28, 2017                      Respectfully submitted,

*/s/ Michael J. Freed*                        */s/ Daniel J. Mogin*
Michael J. Freed                              Daniel J. Mogin
Robert J. Wozniak                             Jodie Williams
FREED KANNER LONDON                           MOGINRUBIN LLP
  & MILLEN LLC                                707 Broadway, Ste. 1000
2201 Waukegan Road, Ste. 130                  San Diego, CA 92101
Bannockburn, IL 60015                         (619) 687-6111
(224) 632-4500                                dmogin@moginrubin.com
mfreed@fklmlaw.com                            jwilliams@moginrubin.com
rwozniak@fklmlaw.com

                        *Co-Lead Class Counsel*
-